# 23-258(L)

## 23-263 (CON), 23-304 (CON), 23-346 (CON), 23-444 (CON)

### United States Court of Appeals
### *for the* Second Circuit

FIONA HAVLISH, RUSSA STEINER, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF WILLIAM STEINER, DECEASED, CLARA CHIRCHIRILLO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF PETER CHIRCHIRILLO, TARA BANE, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF MICHAEL A. BANE, GRACE M. PARKINSON-GODSHALK, IN HER OWN RIGHT AND ADMINISTRATIX OF THE ESTATE OF WILLIAM R. GODSHALK, ELLEN L. SARACINI, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF VICTOR J. SARACINI, DECEASED, THERESAANN LOSTRANGIO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF JOSEPH LOSTRANGIO, DECEASED, DEENA BURNETT, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF THOMAS E. BURNETT, JR., DECEASED, THOMAS E. BURNETT, SR., AS THE PARENT AND ON BEHALF OF THE FAMILY OF THOMAS E. BURNETT, JR., JUDITH REISS, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JOSHUA SCOTT REISS, DECEASED, WILLIAM COALE, IN HIS OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JEFFREY ALAN COALE, DECEASED, PATRICIA J. PERRY, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JOHN WILLIAM PERRY, DECEASED, BARBARA A. MINERVINO, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF LOUIS J. MINERVINO, DECEASED,

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF PLAINTIFFS-APPELLANTS FIONA HAVLISH, ET AL.; JOHN DOES 1 THROUGH 7; FEDERAL INSURANCE CO., ET AL.; AND RAYMOND ANTHONY SMITH, ET AL. (THE "JOINT CREDITORS")**

Ian Heath Gershengorn
Douglass A. Mitchell
JENNER & BLOCK LLP
1099 New York Ave. NW, Ste. 900
Washington, DC 20001
(202) 639-6000

Lee Wolosky
Benjamin D. Alter
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Andrianna D. Kastanek
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7285

*Counsel for Plaintiffs-Appellants Fiona Havlish, et al., Appellants in 23-258*

*Additional counsel listed inside*

MATTHEW T. SELLITTO, IN HIS OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF LOUIS J. MI-NERVINO, DECEASED, RALPH MAERZ, JR., AS PARENT AND ON BEHALF OF THE FAMILY OF NOELL MAERZ, DECEASED, LINDA PANIK, AS PARENT AND ON BEHALF OF THE FAMILY OF LT. JONAS MAR-TIN PANIK, DECEASED, MARTIN PANIK, AS PARENT OF AND ON BEHALF OF THE FAMILY OF LT. JONAS MARTIN PANIK, DECEASED, MARTINA LYNE-ANN PANIK, AS THE SISTER OF LT. JONAS MARTIN PANIK, STEPHEN L. CARTLEDGE, AS HUSBAND OF SANDRA WRIGHT CARTLEDGE, DECEASED, LOIS-ANNE DIEHL, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF MICHAEL DIEHL, DECEASED, TINA GRAZIOSO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF JOHN GRAZIOSO, DE-CEASED, JIN LIU, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF LIMING GU, DECEASED, ALL PLAINTIFFS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, MICHAEL ED-WARD PAIGE, SPECIAL ADMINISTRATOR OF THE ESTATE OF TIMOTHY RAYMOND WARD, DECEASED., BRIANNA L. GOMES, ADMINISTRATOR OF THE ESTATE OF DOYLE RAYMOND WARD, DECEASED, JOHN DOES 1 THROUGH 7, RAYMOND ANTHONY SMITH, AS ADMINISTRATOR OF THE ESTATE OF GEORGE ERIC SMITH, DECEASED, FEDERAL INSURANCE COMPANY, PACIFIC INDEMNITY COMPANY, CHUBB CUSTOM INSURANCE COMPANY, CHUBB INDEMNITY INSURANCE COMPANY, CHUBB INSUR-ANCE COMPANY OF CANADA, CHUBB INSURANCE COMPANY OF NEW JERSEY, GREAT NORTHERN INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, TIG INSURANCE COMPANY, KATHLEEN ASHTON, AS ADMINISTRATOR OF THE ESTATE OF THOMAS ASHTON, DECEASED AND ON BEHALF OF ALL SURVIVORS OF THOMAS ASHTON, JOSEPHINE ALGER, AS ADMINISTRATOR OF THE ESTATE OF FREDERICK ALGER, AS COEXECUTORS OF THE ESTATE OF DAVID D. ALGER, DECEASED AND ON BE-HALF OF THE SURVIVORS OF DAVID D. ALGER, ANGELICA ALLEN, AS ADMINISTRATOR OF THE ESTATE OF ERIC ALLEN, DECEASED AND ON BEHALF OF ALL SURVIVORS OF ERIC ALLEN, GEORGE ANDRUCKI, AS COADMINISTRATOR OF THE ESTATE OF JEAN ANDRUCKI ,DECEASED AND ON BEHALF OF ALL SURVIVORS OF JEAN ANDRUCKI, MARY ANDRUCKI, AS COADMINISTRATOR OF THE ESTATE OF JEAN ANDRUCKI, DECEASED AND ON BEHALF OF ALL SURVIVORS OF JEAN ANDRUCKI,

    Plaintiffs - Appellants,

KATHERINE SOULAS, IN HER OWN RIGHT, AS REPRESENTATIVE OF THE HEIRS, ON BEHALF OF HER MINOR CHILDREN, AND AS EXECUTRIX OF THE ESTATE OF TIMOTHY SOULAS, DECEASED, ON BEHALF OF THE SOLATIUM CLAIMANTS, INCLUDING KATHERINE SOULAS, FREDERICK SOULAS, II, TIMOTHY SOULAS, JR.,

    Plaintiff,

JANE DOE, IN HER OWN RIGHT, ON BEHALF OF HER MINOR CHILDREN, AND AS EXECUTRIX OF THE ESTATE OF TOM SAWYER, A FICTITIOUS NAME, DECEASED,

    Consolidated - Plaintiff,

v.

THE ISLAMIC EMIRATE OF AFGHANISTAN, THE TALIBAN, AL QAIDA/ISLAMIC ARMY, SHEIKH USA-MAH BIN-MUHAMMAD BIN-LADEN, AKA OSAMA BIN-LADEN, REPUBLIC OF IRAQ,

    Defendants - Appellees,

FEDERAL RESERVE BANK OF NEW YORK,

      Garnishee-Interested-Party-Appellee,

SHEIKH USAMA BIN-LADEN, MUHAMMAD OMAR, AL QAEDA/ISLAMIC ARMY, ISLAMIC REPUBLIC OF IRAN, AYATOLLAH ALI HOSEINI-KHAMENEI, SUPREME LEADER, IRANIAN MINISTRY OF INFORMATION AND SECURITY, THE ISLAMIC REVOLUTIONARY GUARD CORPS, HEZBOLLAH, AN UNINCORPORATED ASSOCIATION, IRANIAN MINISTRY OF PETROLEUM, IRANIAN MINISTRY OF ECONOMIC AFFAIRS AND FINANCE, IRANIAN MINISTRY OF COMMERCE, IRANIAN MINISTRY OF DEFENSE AND ARMED FORCES LOGISTICS, SADDAM HUSSEIN, PRESIDENT, IRAQI MINISTRY OF DEFENSE, IRAQI MINISTRY OF FINANCE, IRAQI MINISTRY OF OIL, IRAQI INTELLIGENCE SERVICE, QUSAY HUSSEIN, UNIDENTIFIED TERRORIST DEFENDANTS 1-500, ALI AKBAR HASHEMI RAFSANJANI, THE NATIONAL IRANIAN TANKER CORPORATION, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 2, THE NATIONAL IRANIAN OIL CORPORATION, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 3, THE NATIONAL IRANIAN GAS COMPANY, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 4, IRAN AIRLINES, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 5, THE NATIONAL IRANIAN PETROCHEMICAL COMPANY, THE CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, UNIDENTIFIED TERRORIST DEFENDANTS 8-500, AL-QAEDA, THE HAQQANI NETWORK, AL QAIDA, EGYPTIAN ISLAMIC JIHAD, OSAMA BIN LADEN, ESTATE OF MUHAMMAD ATEF, AYMAN AL ZAWAHARI, ABU ZUBAYDH,

      Defendants.[*]

---

[*] This caption reproduces the one currently on the Court's docket. However, the *Havlish* Plaintiffs-Appellants (the "*Havlish* Creditors") have moved the Court to correct this caption, as it is incorrect. *See* ECF 51 at 6; *see also* ECF 10. It omits a number of the *Havlish* Creditors and includes individuals who are not party to the *Havlish* case. This Court's April 5, 2023 order (Newman, J.) identified the correct list of *Havlish* Creditors in Exhibit A to that order. *See* ECF 56 at 4. The *Havlish* Creditors respectfully request that the caption be amended to correspond with the list identified in Exhibit A to the Court's April 5, 2023 order.

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, New York, NY 10001
(212) 446-2300
dbarrett@bsfllp.com

Stuart H. Singer
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
(954) 356-0011
ssinger@bsfllp.com

Timothy B. Fleming
WIGGINS CHILDS PANTAZIS FISHER
GOLDFARB, PLLC
2208 18th Street NW #110
Washington, D.C. 20009
(202) 467-4489
tfleming@wigginschilds.com

*Additional Counsel for Plaintiffs-Appellants
Fiona Havlish, et al., Appellants in 23-258*

John Thornton
Orlando do Campo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com
od@dandtlaw.com

*Counsel for Plaintiffs-Appellants John Does
1 through 7, Appellants in 23-263*

Sean P. Carter, Esq.
Stephen A. Cozen
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
(215) 665-2105
scarter1@cozen.com

Richard Klingler
ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
1155 F Street, N.W. Ste. 750
Washington, DC 20004
(202) 249-6900
rklingler@egcfirm.com

Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for Plaintiffs-Appellants Federal
Insurance Co., et al., Appellants in 23-346*

Dion G. Rassias
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000

*Counsel for Plaintiffs-Appellants Raymond
Anthony Smith, et al., Appellants in 23-304*

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, Appellants in *Federal Insurance Co., et al. v. Al Qaida, et al.,* 2d Cir. Docket No. 23-346, certify as follows:

Appellants Federal Insurance Company, Pacific Indemnity Company, Chubb Custom Insurance Company, Chubb Indemnity Insurance Company, Chubb Insurance Company of Canada, Chubb Insurance Company of New Jersey, Great Northern Insurance Company, and Vigilant Insurance Company are members of the Chubb Group of Insurance Companies. Chubb Limited is the ultimate parent of these subsidiaries and the only entity within the Chubb Group of Insurance Companies that is traded on any public exchange. Chubb Limited trades on the New York Stock Exchange under the symbol CB. No publicly held corporation owns 10% or more of the stock of Chubb Limited.

Appellant TIG Insurance Company is a member of the Fairfax Financial Group. Appellant's parent organization, Fairfax Financial Holdings Ltd., a publicly traded company, owns more than 10% of their stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT .........................................................4

ISSUES PRESENTED FOR REVIEW ....................................................5

STATEMENT OF THE CASE ..................................................................6

I.      Factual Background ..................................................................6

    A.      The Taliban's Support Of Al Qaeda Leads To The 9/11 Attacks And The Taliban's U.S. Assets Being Blocked ...................................6

    B.      Congress Enacts TRIA To Ensure Terror Victims Can Enforce Their Judgments Against Those Responsible For 9/11 .......................7

    C.      The Joint Creditors Obtain Judgments Against The Taliban...............9

    D.      The Taliban Retakes Control Of Afghanistan And DAB ..................10

    E.      The United States Acts To Ensure Terror Victims Can Enforce Their Judgments Against DAB's Assets............................................12

II.     Procedural History .......................................................................14

    A.      The Joint Creditors' Judgment Enforcement Proceedings..................14

    B.      The Magistrate Judge's Report ..........................................................16

    C.      The District Court's Order ..................................................................17

SUMMARY OF ARGUMENT .................................................................20

STANDARD OF REVIEW ......................................................................22

ARGUMENT ............................................................................................23

I.      The Joint Creditors Satisfy Every Element Of TRIA....................23

II. The District Court Had Subject-Matter Jurisdiction To Order Turnover Of DAB's Assets Held At The FRBNY To Satisfy The Joint Creditors' Judgments ........................................................ 27

    A. TRIA Overcomes All FSIA Immunity, Including Jurisdictional Immunity ......................................................... 29

        1. This Court Has Unambiguously Held That TRIA Provides An Independent Basis For Subject-Matter Jurisdiction Notwithstanding The FSIA, A Result Dictated By TRIA's Plain Text.................................. 29

        2. Congressional Intent Confirms That TRIA Overcomes Jurisdictional Obstacles To Enforcing A Judgment Against A Terrorist Party's Agency Or Instrumentality.......... 35

        3. The District Court's Limited Interpretation Of TRIA Was Erroneous .............................................. 37

    B. Even If TRIA Does Not Abrogate Jurisdictional Immunity, Section 1604 Is Inapplicable To This Enforcement Proceeding......... 45

III. The District Court's Constitutional And Equitable Concerns About Using The Assets Of The Taliban's Instrumentality To Satisfy The Taliban's Judgment Are Without Merit ...................................... 53

    A. TRIA Does Not Require Any Finding That The Taliban Exercises Control Over DAB As A Legitimate Government Or Owns DAB's Assets .............................................. 54

    B. A Finding That The Taliban Controls DAB Would Not Unconstitutionally Infringe On Executive Power ............................. 58

    C. The Political Branches Made A Considered Decision To Allow Turnover Of DAB's Assets To Satisfy The Taliban's Debts ............ 61

CONCLUSION ....................................................................... 64

CERTIFICATE OF COMPLIANCE.................................................. 67

CERTIFICATE OF SERVICE ...................................................... 68

# TABLE OF AUTHORITIES

## CASES

*American International Group, Inc. v. Bank of America Corp.*, 712 F.3d 775 (2d Cir. 2013) .............................................................22

*Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022) ...........................56

*Bank Markazi v. Peterson*, 578 U.S. 212 (2016) .......................................28

*Byrd v. Corporacion Forestal y Industrial de Olancho, S.A.*, 974 F. Supp. 2d 264 (S.D.N.Y. 2013), *aff'd sub nom. Byrd v. Republic of Honduras*, 613 F. App'x 31 (2d Cir. 2015) ..........................................50

*Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993 (2d Cir. 2014) ............................................................24

*Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993) ..............................32

*CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018) ............................................................14

*Disabled in Action of Metropolitan New York v. Hammons*, 202 F.3d 110 (2d Cir. 2000) ............................................................36

*Doe v. Ejercito De Liberacion Nacional*, 2017 WL 591193 (S.D.N.Y. Feb. 14, 2017), *aff'd sub nom. Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152 (2d Cir. 2018) ..............................................27

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007) ......................22, 24

*Epperson v. Entertainment Express, Inc.*, 242 F.3d 100 (2d Cir. 2001) ................27

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411 (S.D.N.Y. 2013) ..........................................15, 57

*FG Hemisphere Associates, LLC v. Republique du Congo*, 455 F.3d 575 (5th Cir. 2006) ............................................................49-50

*Frank's Landing Indian Community v. National Indian Gaming Commission*, 918 F.3d 610 (9th Cir. 2019) ..........................................33

iv

*Garland D. Cox & Associates, Inc. v. Koffman*, 400 N.E.2d 302 (N.Y. 1979) ................................................................................64

*Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428 (D.C. Cir. 2023).....28, 32, 37

*Hanson v. Denckla*, 357 U.S. 235 (1958) ..............................................48

*Harrison v. Republic of Sudan*, 309 F. Supp. 3d 46 (S.D.N.Y. 2018) ....................50

*Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17 (S.D.N.Y. 2015) ..............................................................................15

*Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207 (2d Cir. 2014) ................30

*Howard v. Senkowski*, 986 F.2d 24 (2d Cir. 1993)....................................44

*India Steamship Co. v. Kobil Petroleum Ltd.*, 620 F.3d 160 (2d Cir. 2010) ..............................................................................49

*Karaha Bodas Co. v. Pertamina*, 313 F.3d 70 (2d Cir. 2002)...............................24

*Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107 (2d Cir. 2016), *abrogated on other grounds, Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) .......................................*passim*

*Kirschenbaum v. Assa Corp.* (*Assa II*), 934 F.3d 191 (2d Cir. 2019) ..............25, 30

*Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44 (2d Cir. 1991)..........................56

*Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825 (N.Y. 2009) ...........................50

*Levinson v. Kuwait Finance House (Malaysia) Berhad*, 44 F.4th 91 (2d Cir. 2022) ..............................................................................64

*Mach Mining, LLC v. EEOC*, 575 U.S. 480 (2015)................................35

*Miccosukee Tribe of Indians of Florida v. United States Army Corps of Engineers*, 619 F.3d 1289 (11th Cir. 2010).........................................33

*In re MTBE Product Liabiality Litigation*, 522 F. Supp. 2d 557 (S.D.N.Y. 2007)..........................................................................39

*Mohammad Ladjevardian, Laina Corp v. Republic of Argentina*, 663 F. App'x 77 (2d Cir. 2016) .......................................................22

*North Dakota v. United States*, 460 U.S. 300 (1983) ...............................39

*Panjiva, Inc. v. United States Customs & Border Protection*, 975 F.3d 171 (2d Cir. 2020)...............................................39

*Peterson v. Islamic Republic of Iran*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 578 U.S. 212 (2016) ................................32

*Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017), *summarily vacated sub nom. Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020), *reinstated in relevant part*, 963 F.3d 192 (2d Cir. 2020) ...........................................48, 49

*RCA Corp. v. Tucker*, 696 F. Supp. 845 (E.D.N.Y. 1988) ................................ 50-51

*Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014).................. 51-52

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ................................32, 46

*Samantar v. Yousuf*, 560 U.S. 305 (2010) ................................... 32, 47-48

*Schwartz v. Aquatic Development Group, Inc.*, 352 F.3d 671 (2d Cir. 2003) ...............................................................31-32

*Shaffer v. Heitner*, 433 U.S. 186 (1977) ...............................................48

*Smith v. Federal Reserve Bank of New York* (*Smith I*), 280 F. Supp. 2d 314 (S.D.N.Y), *aff'd*, 75 F. App'x 860 (2d Cir. 2003), *aff'd*, 346 F.3d 264 (2d Cir. 2003) (*Smith II*).....................................40

*Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York*, 346 F.3d 264 (2d Cir. 2003) (*Smith II*)................................23, 40

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)............................................33

*Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940 (2023) ("*Halkbank*")..............................................3, 46, 52

*United States v. All Funds on Deposit with R.J. O'Brien & Associates*, 783 F.3d 607 (7th Cir. 2015) ...............................................34

*United States v. Assa Co.*, 934 F.3d 185 (2d Cir. 2019).........................3, 46, 47, 52

*United States v. Muhammad*, 463 F.3d 115 (2d Cir. 2006)...............................23, 25

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A. (Vera II)*, 946 F.3d 120
 (2d Cir. 2019)........................................................................................18, 43

*Vera v. Republic of Cuba (Vera I)*, 867 F.3d 310 (2d Cir. 2017)........................2, 30

*Villoldo v. Castro Ruz*, 113 F. Supp. 3d 435 (D. Mass. 2015), *aff'd*, 821
 F.3d 196 (1st Cir. 2016)....................................................................................31

*Walters v. Industrial & Commercial Bank of China, Ltd.*, 651 F.3d 280
 (2d Cir. 2011)..................................................................................4, 22, 49

*Weininger v. Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006)......27-28, 31, 37-38, 57

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010).................*passim*

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015)...........................58, 59, 60

S<span>TATUTES</span>

28 U.S.C. § 1291 ...........................................................................................4

28 U.S.C. § 1330(a) ...................................................................................46, 48

28 U.S.C. § 1331 ...........................................................................................4

28 U.S.C. § 1604 ...................................................................................*passim*

28 U.S.C. § 1605B(c)...................................................................................33

28 U.S.C. § 1609 ................................................................................... 17-18, 38

28 U.S.C. § 1611 .........................................................................................39

28 U.S.C. § 1611(b)(1)..................................................................................18

28 U.S.C. § 1659(b) ....................................................................................33

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201, 116
 Stat. 2322, 2337-40, as amended, Pub. L. No. 112-158, 126 Stat.
 1214, 1260 (codified at 28 U.S.C. § 1610 note).........................................*passim*

N.Y. C.P.L.R. § 5225(b) ...........................................................................14, 15, 57

## LEGISLATIVE MATERIALS

H.R. Doc. No. 106-268 (2000)................................................................6, 7, 25

H.R. Doc. No. 107-16 (2001) .............................................................6, 7, 45

H.R. Rep. No. 107-779 (2002) (Conf. Rep.) .......................................... 8-9

147 Cong. Rec. 23,377 (2001) ....................................................................36

148 Cong. Rec. 10,312–13 (2002) (statement of Sen. Gordon Smith)...................35

148 Cong. Rec. 16,397 (2002) (statement of Rep. Vito Fossella).......................9, 36

148 Cong. Rec. 16,400 (2002) (statement of Rep. Chris Shays)............................35

148 Cong. Rec. 23,121 (2002) (statement of Sen. Tom Harkin)........................8, 35

## COURT RULES

Fed. R. App. P. 4(a)(1)(A) ...........................................................................5

Fed. R. Civ. P. 69(a)(1) ..............................................................................14

## OTHER AUTHORITIES

31 C.F.R. § 594.201(a)..................................................................................7

31 C.F.R. § 594.310 .....................................................................................7

Actions Overview, Terrorism Risk Insurance Act of 2002, https://bit.ly/3NziUvD ...........................................................................8

*Background Press Call by Senior Administration Officials on U.S. Support for the People of Afghanistan*, White House (Feb. 11, 2022), https://bit.ly/3ra1U7x ...............................................................................13

Peter Baker, *U.S. Will Not Release $3.5 Billion in Frozen Afghan Funds for Now, Citing Terror Fears,* N.Y. Times (Aug. 15, 2022), https://nyti.ms/446OFmO ........................................................................13

Congressional Research Service, *Afghanistan Central Bank Reserves* (updated Mar. 13, 2023), https://bit.ly/3CTbgqU.....................................13

Executive Order No. 13,129, 64 Fed. Reg. 36,759 (July 4, 1999) ............6

Executive Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ........................7

Executive Order No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002) ...........................7

Executive Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022) ....................12, 24

Fact Sheet: *Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan*, White House (Feb. 11, 2022), https://bit.ly/44nscl3 ....................................................12, 13, 60, 62

Charlotte Greenfield, *Taliban Acting Finance Minister Becomes Central Bank Governor*, Reuters (Mar. 22, 2023), https://bit.ly/434Aux1 ......................................................................11

Press Release, U.S. Dep't of the Treasury, *Treasury Targets Taliban and Haqqani Network Leadership* (July 22, 2010), https://bit.ly/3NRXZFj.........................................................................11

*Restatement (Fourth) of Foreign Relations Law of the United States* § 464 (2018) ................................................................. 46-47

*Restatement (Second) of Foreign Relations Law of the United States* § 106 (1965) ....................................................................58, 59, 61

*Restatement (Second) of Judgments* § 8 (1982) .......................................27

*Restatement (Third) of Foreign Relations Law of the United States* § 203 (1987) .................................................................58

*Restatement (Third) of Foreign Relations Law of the United States* § 205 (1987) .................................................................57

Charlie Savage, *U.S. Establishes Trust With $3.5 Billion in Frozen Afghan Central Bank Funds*, N.Y. Times (Sept. 14, 2022), https://nyti.ms/43V0zQt.....................................................................13

Siegel, N.Y. Prac. § 510 (6th ed. 2022) ..................................................51

United Nations Security Council, *Twenty-ninth report of the Analytical Support and Sanctions Monitoring Team*, U.N. Doc. S/2022/83 (Feb. 3, 2022) ..............................................................................12

United States Department of State, *U.S. Relations With Afghanistan*
   (Aug. 15, 2022), https://bit.ly/3NuHopx ...........................................................11

**INTRODUCTION**

This is a turnover proceeding under the Terrorism Risk Insurance Act of 2002 ("TRIA") in which victims of terrorism with judgments against the Taliban—the designated terror group whose sponsorship of al Qaeda resulted in the 9/11 attacks— seek $3.5 billion in blocked assets held at the Federal Reserve Bank of New York ("FRBNY") belonging to the Taliban-controlled Da Afghanistan Bank ("DAB").

Section 201(a) of TRIA, enacted after 9/11 to ensure that the attacks' victims would obtain relief from frozen terrorist funds, provides that "in every case" in which "a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism," the "blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution" in satisfaction of the judgment, "[n]otwithstanding any other provision of law[.]" There can be no serious dispute that the Joint Creditors[1] satisfy each of TRIA's elements: They have judgments against a terrorist party, the Taliban, on claims based upon acts of terrorism. The blocked assets at the FRBNY belong to DAB. And DAB is an agency or instrumentality of the Taliban—a product of the Taliban seizing direct operational control of it in the summer of 2021.

---

[1] This brief is submitted on behalf of the *Havlish*, *Doe*, *Federal Insurance*, and *Smith* Creditors, judgment creditors of the Taliban whose turnover motions were denied by the district court's February 21, 2023 order under review. They are the appellants in Appeal Nos. 23-258, 23-263, 23-346, and 23-304, respectively, and are referred to herein as the "Joint Creditors."

The district court nonetheless denied turnover. It invoked two primary legal grounds—foreign sovereign immunity and the separation of powers—and also expressed a general concern that the Joint Creditors should not be "made whole … with the funds of the central bank of Afghanistan." S.A.30.[2] The court's legal conclusions were flawed and its broader concern was misplaced.

The district court first held that it lacked authority to order turnover of DAB's assets because DAB, as Afghanistan's central bank, is immune from the subject-matter jurisdiction of U.S. courts under § 1604 of the Foreign Sovereign Immunities Act ("FSIA"). S.A.10-22; *see* 28 U.S.C. § 1604. But TRIA unambiguously vests federal courts with jurisdiction over execution proceedings where terror victims seek recovery from the blocked assets of a terrorist party or any of its agencies or instrumentalities. It provides for such jurisdiction notwithstanding *any other provision of law*, including the FSIA's immunities. Accordingly, this Court has repeatedly stated that "TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property of a foreign state." *Vera v. Republic of Cuba (Vera I)*, 867 F.3d 310, 321 (2d Cir. 2017). Any

---

[2] Plaintiffs-Appellants' Appendix is cited as "App.," and the Special Appendix (appended to this brief) as "S.A." District court docket entries are, except where otherwise indicated, from the multidistrict litigation captioned *In re Terrorist Attacks on September 11, 2001*, No. 03-MD-1570 (S.D.N.Y.), and cited as "MDL Dkt." Docket entries on appeal are, except where otherwise indicated, from the lead case (Appeal No. 23-258) and cited as "ECF."

jurisdictional immunity that DAB might otherwise enjoy under § 1604—a contrary "provision of law"—is rendered inoperative by TRIA.

Even assuming a more limited role for TRIA (inconsistent with its text and this Court's precedent), the jurisdictional immunity conferred by § 1604 is still inapplicable here. The Supreme Court reemphasized this Term that § 1604 is limited in scope to civil actions against foreign states seeking *in personam* relief. *See Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940, 949 (2023) ("*Halkbank*"). This is not an *in personam* proceeding against a foreign state; it is a proceeding against a New York bank to enforce writs of execution against DAB's blocked assets. As this Court has made clear, an action against the *property* of a foreign state is not an action against the state itself and therefore does not implicate the state's jurisdictional immunity under § 1604. *See United States v. Assa Co.*, 934 F.3d 185, 189 (2d Cir. 2019). As a result, even if this Court were to accept the district court's flawed reading of TRIA as superseding only immunity from execution but not immunity from jurisdiction, the district court was *still* wrong to conclude that § 1604 withdrew its subject-matter jurisdiction.

The district court further erred by refusing to find that DAB is an agency or instrumentality of the Taliban because, it said, doing so would equate to formal diplomatic recognition of the Taliban as the lawful government of Afghanistan. S.A.22-29. DAB is an agency or instrumentality of the Taliban because it is

controlled by the Taliban. The district court did not need to determine whether such control was *lawful* or reflected acts of a *legitimate* government. And its ruling would not otherwise bestow formal U.S. recognition on the Taliban.

Both Congress and the President anticipated and intended that the assets of an instrumentality of a terrorist party—and specifically DAB—would be subject to execution. TRIA was introduced just weeks after 9/11, at a time when the Taliban controlled DAB. And the President made the considered political choice after the Taliban's 2021 takeover to again block DAB's assets at the FRBNY, making those assets subject to turnover in this action specifically.

TRIA mandates that DAB's blocked assets be turned over to the Joint Creditors in satisfaction of their judgments.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and § 201(a) of TRIA, a federal statute. As discussed below, such jurisdiction was not withdrawn by the immunity granted to foreign states under § 1604 of the FSIA.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to review the district court's February 21, 2023 Memorandum Decision and Order, which was a final order denying the Joint Creditors' motions for turnover. *See Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 283 (2d Cir. 2011). The Joint Creditors timely filed notices of appeal on February 27, 2023 (*Havlish*, App. 684), February

4

28, 2023 (*Doe*, App. 691), March 3, 2023 (*Smith*, App. 693), and March 10, 2023 (*Federal Insurance,* App. 694). *See* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED FOR REVIEW

1.     Whether TRIA § 201(a)—which permits terror victims with judgments against terrorist parties to execute on the blocked assets of any agency or instrumentality of those terrorist parties "[n]otwithstanding any other provision of law"—provides for subject-matter jurisdiction over such an execution proceeding irrespective of any jurisdictional immunity that might otherwise be afforded to the agency or instrumentality under § 1604 of the FSIA.

2.     Whether, even assuming TRIA's independent grant of subject-matter jurisdiction does not overcome § 1604 of the FSIA, the district court erred in assuming that provision applies to these proceedings in the first place, given that the proceedings do not involve *in personam* claims against a foreign state or its agency or instrumentality.

3.     Whether the district court erred in concluding that finding DAB to be an "agency or instrumentality" of the Taliban would infringe upon the President's exclusive constitutional power to recognize foreign governments.

## STATEMENT OF THE CASE

**I.  Factual Background**

**A.  The Taliban's Support Of Al Qaeda Leads To The 9/11 Attacks And The Taliban's U.S. Assets Being Blocked**

The Taliban is a religious fundamentalist terror group founded in southern Afghanistan. By 1996, it had taken control of the capital city of Kabul (including DAB, the central bank) and established a theocratic regime. The Taliban used its newfound dominance to offer safe harbor and support to other terrorists from around the world, including, significantly, Osama bin Laden and his al-Qaeda organization, which relied on the Taliban's protection in Afghanistan to set up training camps and recruit fighters. Over the next five years, al Qaeda used this safe haven to plan, finance, and carry out terrorist attacks against U.S. interests. App. 253.

In 1999, President Clinton declared the Taliban an "unusual and extraordinary threat to the national security and foreign policy of the United States." Exec. Order No. 13,129 § 1, 64 Fed. Reg. 36,759 (July 4, 1999). Exercising authority under the International Emergency Economic Powers Act ("IEEPA"), he blocked all Taliban property subject to U.S. jurisdiction, as well as the property of any entity "owned or controlled by" the Taliban. *Id*. Shortly thereafter, understanding DAB to be a "terrorist financing threat," App. 255, the Clinton Administration added DAB to the list of entities whose property was blocked under this order. H.R. Doc. No. 106-268, at 4 (2000); *see also* H.R. Doc. No. 107-16, at 4 (2001) (same). At least twice before

9/11, President Clinton warned Congress that DAB was "controlled by the Taliban." *Id*. Then, as now, the United States did not recognize the Taliban as a legitimate government yet acknowledged that the Taliban controlled the Afghan state and its institutions, including its central bank.

On September 11, 2001, the political branches' worst fears about the Taliban's use of Afghan institutions and territory to foment terrorism came true. Implementing a plan for which they had trained in Afghanistan under the Taliban's protection, al-Qaeda operatives deployed hijacked airliners to murder thousands of Americans.

Policymakers reacted swiftly. They initiated a military campaign to dislodge the Taliban from Afghanistan. Aiming to cripple the Taliban and al Qaeda financially, on September 23, 2001, President George W. Bush blocked all property in the United States in which certain identified terrorists had an interest. Exec. Order No. 13,224 § 1, 66 Fed. Reg. 49,079 (Sept. 23, 2001). Nine months later, when President Clinton's 1999 Taliban-specific blocking order expired, President Bush transitioned the Taliban to the list of persons blocked under Executive Order 13,224, thereby designating the Taliban a "Specially Designated Global Terrorist" ("SDGT"). Exec. Order No. 13,268 § 1, 67 Fed. Reg. 44,751 (July 2, 2002); 31 C.F.R. §§ 594.201(a), 594.310. The Taliban remains an SDGT to this day.

### B. Congress Enacts TRIA To Ensure Terror Victims Can Enforce Their Judgments Against Those Responsible For 9/11

It was in this context—just 51 days after 9/11, with smoke still rising from

Ground Zero and the Taliban still controlling DAB—that Congress introduced TRIA, with the specific purpose of facilitating financial recovery for terrorism victims.[3] The legislation's sponsors understood that, for too long, terrorism judgments were an empty letter, rendered unenforceable by Executive Branch resistance and foreign sovereign immunity. Congress crafted § 201(a) of TRIA to override legal roadblocks that historically had foreclosed recovery. It provides:

> *Notwithstanding any other provision of law,* and except as provided in subsection (b), *in every case* in which a person has obtained a *judgment against a terrorist party* on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7)], the blocked assets of that terrorist party (*including the blocked assets of any agency or instrumentality of that terrorist party*) *shall* be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), S.A.31 (emphases added).

Senator Tom Harkin, a TRIA sponsor, explained that § 201(a) would "deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties." 148 Cong. Rec. 23,122 (2002). The conference committee's report echoed this theme. H.R. Rep. No. 107-779, at 27 (2002) (Conf.

---

[3] Actions Overview, Terrorism Risk Insurance Act of 2002, https://bit.ly/3NziUvD (TRIA introduced on November 1, 2001).

Rep.) ("It is the intent of the Conferees that [§] 201 establish that such judgments [against terrorist parties] are to be enforced."). In addition, TRIA's supporters specifically cited pending 9/11 litigation—the *Havlish* and *Smith* suits had already been filed against the Taliban—and made clear they wanted the plaintiffs to be able to enforce their judgments. 148 Cong. Rec. 16,397 (2002) ("[T]housands of Americans … have joined the class action lawsuit[4] aimed at recovering and undermining the ability of these groups to perpetuate their acts of evil.") (statement of Rep. Vito Fossella).

### C. The Joint Creditors Obtain Judgments Against The Taliban

The Joint Creditors are the victims of terrorism facilitated by the Taliban. The *Havlish* and *Smith* Creditors are estates and family members of Americans killed on 9/11. The *Federal Insurance* Creditors are insurance companies that incurred billions of dollars in losses by paying claims arising from the 9/11 attacks. The *Doe* Creditors are civilian contractors injured in a 2016 suicide bomb attack in Afghanistan committed by the Taliban and others. Each group filed suit against the Taliban[5]—in some cases, decades ago—and holds a final judgment for

---

[4] The *Havlish* complaint was initially a class action. *See* Compl. ¶ 25, *Havlish v. Bin Laden*, No. 02-cv-305 (D.D.C. Feb. 19, 2002), Dkt. 1.

[5] Suits by 9/11 victims, including *Havlish* and *Federal Insurance*, were consolidated into *In re Terrorist Attacks on September 11, 2001*, No. 03-MD-1570 (S.D.N.Y.) ("MDL"). The *Doe* and *Smith* proceedings seeking turnover of DAB's assets were later transferred to the MDL. MDL Dkts. 7672, 8086.

compensatory damages in the following amounts, as of the date of its turnover motion:

| | |
|---|---|
| *Havlish* | $2,086,386,669 |
| *Doe* | $138,284,213 |
| *Federal Insurance* | $14,672,806,120 |
| *Smith* | $72,527,184 |

*See* App. 146-47; App. 352; App. 458; App. 529.

### D.    The Taliban Retakes Control Of Afghanistan And DAB

On August 15, 2021, as the United States was withdrawing from Afghanistan, the former government of Afghanistan collapsed, and its leaders fled. The Taliban quickly retook physical and operational control of Afghan institutions, including DAB. App. 260, 263-64. The Taliban continues to exercise complete control of DAB to this day. App. 264. Not only does the Taliban control DAB, but as the magistrate judge found, "the Taliban is using their control of DAB to advance their aims." App. 648.

As it did prior to 9/11, the Taliban permeates every level of DAB. App. 282. The Taliban's Deputy Prime Minister has chaired DAB meetings, and Taliban leaders set DAB policy. App. 283-85, 297, 301. One of the Taliban's first acts in Kabul was installing as DAB's Acting Governor a staunch Taliban loyalist, Mohammed Idris, whose only prior financial experience was leading a Taliban

commission tasked with managing narcotics proceeds. App. 265-67. The Taliban installed sanctioned terrorists as DAB's First and Second Deputy Governors and assigned them significant operational and management responsibilities. App. 267-81. In March 2023, the Taliban installed as DAB's Governor another of its own, the UN-designated terrorist Mullah Hidayatullah Badri, once a close aide to Taliban founder Mullah Omar.[6]

As of this filing, the Executive Branch "has not yet made a decision as to whether to recognize the Taliban or any other entity as the Government of Afghanistan,"[7] but acknowledges that the Taliban has seized power in Afghanistan. The Secretary of State has called the Taliban the "*de facto* government of Afghanistan." App. 676-78.

The situation in Afghanistan today is thus strikingly similar to what it was when Congress introduced TRIA in 2001. The Taliban, though not recognized as a legitimate government, controls Afghanistan and DAB. It once again supports al

---

[6] *See* Charlotte Greenfield, *Taliban Acting Finance Minister Becomes Central Bank Governor*, Reuters (Mar. 22, 2023), https://bit.ly/434Aux1; Press Release, U.S. Dep't of the Treasury, *Treasury Targets Taliban and Haqqani Network Leadership* (July 22, 2010), https://bit.ly/3NRXZFj.

[7] U.S. Dep't of State, *U.S. Relations With Afghanistan* (Aug. 15, 2022), https://bit.ly/3NuHopx.

Qaeda. App. 260-61.[8] DAB's assets are blocked. What is different, however, is that claims against the Taliban have, since TRIA's passage, resulted in money judgments[9]—which the Joint Creditors are entitled to enforce under that law.

### E. The United States Acts To Ensure Terror Victims Can Enforce Their Judgments Against DAB's Assets

As of August 15, 2021, the day the Taliban seized Kabul, DAB held substantial assets in accounts in foreign central banks, including approximately $7 billion at the FRBNY. App. 145-46, 178-246. Because DAB had fallen under the control of an SDGT, its assets were blocked, preventing the funds from being withdrawn or accessed by the Taliban. S.A.6.

Fully aware of TRIA and its purpose, President Biden signed an executive order on February 11, 2022 formally blocking all DAB property held at U.S. financial institutions, including the $7 billion at the FRBNY. Exec. Order No. 14,064 § 1(a), 87 Fed. Reg. 8391 (Feb. 11, 2022), App. 70-72. The Executive Order reflected the President's continued determination to "keep[] [the DAB assets] out of

---

[8] *See also* U.N. Security Council, *Twenty-ninth report of the Analytical Support and Sanctions Monitoring Team* at 5-6, 15, U.N. Doc. S/2022/83 (Feb. 3, 2022) (noting that "Al-Qaida ... received a significant boost following the Taliban takeover of Afghanistan in August 2021, as some of its closest sympathizers within the Taliban now occupy senior positions in the new *de facto* Afghan administration," and that "terrorist groups enjoy greater freedom [in Afghanistan] than at any time in recent history").

[9] The *Doe* Creditors' claims, which accrued later, also have resulted in judgments.

12

the hands of the Taliban and malicious actors."[10] President Biden ordered that half of the blocked assets—approximately $3.5 billion—be set aside for humanitarian purposes in Afghanistan under a Treasury Department license.[11] The President ordered that the other half remain at the FRBNY "subject to ongoing litigation by U.S. victims of terrorism."[12] The Biden Administration explained that this approach was responsive to "bipartisan calls from Congress" to mitigate the crisis in Afghanistan while "recognizing the importance of ongoing efforts by victims of terrorism and their families, including victims of the 9/11 attacks, to pursue [their] claims in court." Press Call, *supra* n.12. That same day, the United States filed a

---

[10] Fact Sheet: *Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan*, White House (Feb. 11, 2022), https://bit.ly/44nscl3 ("Feb. 11 Fact Sheet").

[11] In September 2022, the Biden Administration established the "Afghan Fund," intended to disburse the aforementioned $3.5 billion directly to the Afghan people. *See* Cong. Rsch. Serv., *Afghanistan Central Bank Reserves* (updated Mar. 13, 2023), https://bit.ly/3CTbgqU. The Fund is designed to support Afghanistan's economy while keeping DAB's assets from the Taliban. To that end, the Administration ruled out providing the funds directly to DAB, "unable to figure out a way to do so that would ensure that none of its funds reached the Taliban." Charlie Savage, *U.S. Establishes Trust With $3.5 Billion in Frozen Afghan Central Bank Funds*, N.Y. Times (Sept. 14, 2022), https://nyti.ms/43V0zQt. As of March 2023, the Fund had not made any disbursements. *See Afghan Central Bank Reserves*, *supra*. Previous efforts to release the $3.5 billion also were frustrated by the United States' inability to "secure[] persuasive guarantees that the money would not fall into terrorist hands." Peter Baker, *U.S. Will Not Release $3.5 Billion in Frozen Afghan Funds for Now, Citing Terror Fears*, N.Y. Times (Aug. 15, 2022), https://nyti.ms/446OFmO.

[12] *Background Press Call by Senior Administration Officials on U.S. Support for the People of Afghanistan*, White House (Feb. 11, 2022), https://bit.ly/3ra1U7x.

Statement of Interest in the district court, taking no position on the forthcoming turnover motions but identifying considerations it believed should inform the court's decision. App. 34-69.

## II. Procedural History

### A. The Joint Creditors' Judgment Enforcement Proceedings

Between March and May 2022, each of the Joint Creditors filed motions for turnover of the blocked DAB assets. Judgment-enforcement proceedings "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a)(1). Here, the relevant federal statute is TRIA, and the relevant state procedure is set forth in N.Y. C.P.L.R. § 5225. Section 5225(b) provides that, where property in which a judgment debtor has "an interest" is in a third party's possession, "the court shall require [the third party] to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor."

In keeping with these provisions, and with this Court's clarification that enforcement actions against third parties "may proceed by motion" in the underlying action that gave rise to the judgment, *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 469 (2d Cir. 2018), the Joint Creditors each filed motions against the FRBNY pursuant to § 5225(b) and TRIA, seeking orders compelling the FRBNY to turn over DAB's assets in its possession to satisfy their

14

compensatory damages awards against the Taliban.[13] App. 111-43, 319-49, 423-55, 484-504. The motions were served on the FRBNY, their legal target. Notice also was provided to the Taliban and DAB in accordance with § 5225(b), which requires "[n]otice of the proceeding [to] be served upon the judgment debtor in the same manner as a summons[.]" *See* App. 547 (order authorizing alternative service); App. 531-45, 565-93 (proofs of service). Neither the Taliban nor DAB appeared.

Shortly after the first turnover motions were filed, the Joint Creditors who are 9/11 victims and other 9/11 MDL plaintiff groups announced an agreed framework that would provide for broad distribution of DAB's assets should turnover be granted. *See* MDL Dkt. 7790. This "Framework Agreement," supported by the overwhelming majority of 9/11 plaintiff groups, would enable more than 10,000 9/11 claimants, including those without enforceable judgments against the Taliban, to share in any recovery. Only one MDL group, the *Ashton* Plaintiffs, which had not secured a money judgment against the Taliban, refused to participate; opposed the

---

[13] Judgment creditors in New York regularly use C.P.L.R. § 5225 as the procedural mechanism to effectuate the substantive entitlement to execution provided by TRIA. *See, e.g.*, *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 48 (S.D.N.Y. 2015); *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013).

turnover motions; and urged the district court to devise its own distribution scheme. *See* MDL Dkts. 7894, 7928.[14]

After the *Havlish* and *Doe* Creditors levied on DAB's assets, victims of the 1998 bombings of U.S. embassies in Africa sued the Taliban. *See Owens v. Taliban*, No. 22-CV-1949 (S.D.N.Y. filed Mar. 8, 2022). The *Owens* Plaintiffs obtained a prejudgment writ of attachment, *Owens* Dkt. 32, which later was vacated on foreign sovereign immunity grounds, *Owens* Dkt. 82. The *Owens* Plaintiffs have appealed.

## B. The Magistrate Judge's Report

On August 26, 2022, Magistrate Judge Netburn recommended denial of the Joint Creditors' turnover motions. App. 616-658 (the "R&R"). The magistrate judge found that the Taliban controls DAB and is using it to advance its aims, App. 648—a finding sufficient to make DAB an agency or instrumentality of the Taliban under this Court's precedent, *see Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830

---

[14] Additionally, a subset of the *Ashton* Plaintiffs—the *Wodenshek* Plaintiffs—collaterally attacked the turnover proceedings by filing a putative class action styled *In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank*, No. 22-CV-3228 (S.D.N.Y. filed Mar. 20, 2022). The district court *sua sponte* dismissed that action, finding it was "wholly inappropriate" claim-splitting. *See* MDL Dkt. 7966 at 3-4. The *Wodenshek* Plaintiffs appealed, *see In re Approximately $3.5 Billion*, Appeal No. 22-965 (2d Cir. filed Apr. 28, 2022), and that appeal is being held in abeyance pending resolution of this appeal. *See id.*, ECF 95. That appeal is separate from the *Ashton* Plaintiffs' appeal from the district court's denial of their motion for a writ of attachment, Appeal No. 23-444, which has been consolidated with this appeal. *See* ECF 81, 99.

F.3d 107, 135 (2d Cir. 2016), *abrogated on other grounds, Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018). The R&R nonetheless recommended that turnover be denied because DAB purportedly is immune from jurisdiction under § 1604 of the FSIA. App. 627-42. It additionally concluded that finding DAB to be an agency or instrumentality of the Taliban would recognize the Taliban as the government of Afghanistan, in violation of the constitutional separation of powers. App. 642-52.[15] The Joint Creditors timely objected. *See* MDL Dkts. 8733, 8735.

### C.     The District Court's Order

On February 21, 2023, the district court overruled the Joint Creditors' Objections and adopted the R&R's findings on subject-matter jurisdiction and the purported constitutional restraints on its authority. S.A.2.

The district court started with the assumption that, to prevail, the Joint Creditors would need to overcome both of "two types of foreign sovereign immunity" enjoyed by foreign states under the FSIA. S.A.12-13 (marks omitted). Section 1604 confers jurisdictional immunity and provides that, with certain exceptions, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. Section 1609 confers execution immunity: that, with certain exceptions, "the property in the United States

---

[15] The R&R also concluded that DAB is not an agency or instrumentality of the Taliban because it did not consensually enter its relationship with the Taliban. App. 652-656. The district court rejected this premise. S.A.2 n.5.

of a foreign state shall be immune from attachment[,] arrest[,] and execution." *Id*. § 1609. *See generally Walters*, 651 F.3d at 286 (distinguishing between the two).

The district court accepted that "the defining feature of TRIA [is] its abrogation of immunity enjoyed by foreign sovereigns under the FSIA," and agreed with the Joint Creditors that TRIA, if satisfied, "defeats" execution immunity under § 1609, as well as additional immunity ordinarily applicable to central bank assets under 28 U.S.C. § 1611(b)(1). S.A.17, S.A.21. But, the court held, TRIA does *nothing more* than that. Characterizing TRIA as a mere "execution" statute, it held that TRIA's "notwithstanding any other provision of law" clause abrogates only "provisions [of law] that conflict with TRIA's specific terms of execution." S.A.17-18. Finding that § 1604 does not conflict with TRIA's specific terms of execution, the district court held that TRIA cannot "provide the jurisdiction over DAB assets that the Judgment Creditors need." *Id*.

The district court acknowledged several cases in which this Court has said the opposite—*i.e.*, that TRIA does, in fact, "provide[] for federal court jurisdiction over execution and attachment proceedings involving the assets of a foreign sovereign." *Vera v. Banco Bilbao Vizcaya Argentaria, S.A. (Vera II)*, 946 F.3d 120, 133 (2d Cir. 2019). But the court construed those precedents and TRIA itself to apply only in the narrow situation where plaintiffs obtain a judgment against a state sponsor of terrorism and subsequently seek to execute on the assets of that state's agency or

18

instrumentality, such that the "sovereign's loss of jurisdictional immunity in the underlying judgment flows through to the instrumentality in the attachment proceeding." S.A.20. Because the Joint Creditors seek to enforce judgments against the Taliban, a nonstate terrorist party, the court concluded there is no underlying "waiver of jurisdictional immunity" of a sovereign to "flow[] through." *Id.*

The district court did not address the Joint Creditors' independent argument that any jurisdictional immunity DAB might enjoy under § 1604 is inapplicable in the first place. MDL Dkt. 8733 at 23-28; MDL Dkt. 8735; *see infra* Argument II.B.

Finally, the district court held that, even assuming jurisdiction, the Constitution would preclude it from finding that DAB is the Taliban's "agency or instrumentality" under TRIA. Reasoning that DAB is Afghanistan's central bank and central banks are generally controlled by governments, the district court concluded that a judicial finding regarding the Taliban's control of DAB would "necessarily and impermissibly impl[y] that the Taliban constitutes the *recognized* government of Afghanistan"—a determination entrusted to the President alone. S.A.25 (emphasis added). The district court noted the Taliban's "*de facto* dominance over Afghanistan" and that the State Department has called the Taliban Afghanistan's "*de facto* government." S.A.28. But it found itself constrained from acknowledging the legal consequences of such dominance, as doing so purportedly would amount to "recogniz[ing]" the Taliban regime. *Id.* (marks omitted).

19

The Joint Creditors timely appealed, and their appeals were consolidated. ECF 56.[16] This Court has not ruled on the Joint Creditors' pending motions for a stay pending appeal and to designate the FRBNY as appellee. ECF 25, 50.

## SUMMARY OF ARGUMENT

The Joint Creditors are entitled to turnover of DAB's assets held at the FRBNY. They indisputably meet each of TRIA's elements. Each group holds a final monetary "judgment against" the Taliban "on a claim based upon an act of terrorism." TRIA § 201(a). DAB is wholly controlled by the Taliban, so it qualifies as the Taliban's agency or instrumentality. Thus, the blocked assets of DAB—which include DAB's funds at the FRBNY—are subject to execution in satisfaction of the Joint Creditors' judgments.

Contrary to the district court's conclusion, the court had subject-matter jurisdiction over these proceedings, and § 1604 of the FSIA did not withdraw that jurisdiction, for two separate and independent reasons.

First, TRIA's very purpose was to remove sovereign immunity as an obstacle to the enforcement of terrorism judgments, and this Court has repeatedly held that it operates in this manner. This Court's holdings are consistent with the statute's plain text, which states that, where its elements are satisfied, it authorizes execution

---

[16] *Owens*, Appeal No. 23-354, was not consolidated but is being heard in tandem. ECF 57. *Ashton*, Appeal No. 23-444, was consolidated. ECF 81, 99.

"[n]otwithstanding *any other provision of law.*" As this Court has held, this phrase signals Congress's intent to remove *any* statutory impediment, including otherwise applicable limits on jurisdiction. The district court's narrow reading of TRIA as abrogating execution immunity, but not jurisdictional immunity, rewrites the statute to include a limitation it does not contain. Further, TRIA specifies that it applies "*in every case*" in which a judgment is obtained against a terrorist party—state or nonstate—and authorizes execution against the blocked assets of "*any* agency or instrumentality" of that terrorist party without limitation. In short, as this Court has long held, TRIA provides an independent basis for the exercise of jurisdiction in execution proceedings involving blocked foreign-state property.

Second, § 1604 does not even apply to this post-judgment enforcement action. Read in conjunction with 28 U.S.C. § 1330(a), as the Supreme Court mandates, § 1604 confers immunity only with respect to claims seeking *in personam* relief against a foreign state. These turnover proceedings seek no *in personam* relief against DAB or Afghanistan, so § 1604 does not apply.

On the merits, the district court misconstrued the nature of the finding required to authorize execution. A judicial finding that DAB is the Taliban's "agency or instrumentality" would not hold—or even imply—that the Taliban is the legitimate or "recognized" government of Afghanistan or that it owns DAB's assets. This Court's test for whether an entity is an agency or instrumentality of a terrorist party

21

under TRIA focuses on practical control, not formal ownership—as it should: Any other test would make it impossible to reach the assets of shadowy nonstate terrorists, who operate beyond the bounds of law and characteristically have no legitimate legal entitlements. Consistent with this test, courts regularly acknowledge an entity's unrecognized control over a state's institutions or territory without implying that this control signifies legitimate governmental authority and without infringing upon the separation of powers. The district court should have done the same.

## STANDARD OF REVIEW

This Court "review[s] a denial of a ... turnover order for abuse of discretion." *Mohammad Ladjevardian, Laina Corp. v. Republic of Argentina*, 663 F. App'x 77, 79 (2d Cir. 2016). It "will find an abuse of discretion whenever the district court commits an error of law, which [it] review[s] *de novo*." *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007) (marks omitted).

This Court reviews *de novo* the district court's conclusion that it lacked subject-matter jurisdiction under the FSIA. *See Walters*, 651 F.3d at 286. It also reviews *de novo* the district court's legal conclusion that finding DAB to be an agency or instrumentality of the Taliban would violate the constitutional separation of powers. *See Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 778 (2d Cir. 2013). The Court reviews for clear error the district court's factual findings,

including factual findings of the magistrate judge adopted by the district court. *See United States v. Muhammad*, 463 F.3d 115, 124 (2d Cir. 2006).

## ARGUMENT

### I. The Joint Creditors Satisfy Every Element Of TRIA

The Joint Creditors' motions unambiguously established their entitlement to turnover. TRIA authorizes holders of final monetary judgments against a terrorist party—and only such holders[17]—to satisfy those judgments using the blocked assets of the terrorist party, its agency, or its instrumentality. TRIA § 201(a). To enforce their judgments against DAB's assets "[n]otwithstanding any other provision of law," the Joint Creditors must establish that: (1) their judgments against the Taliban are final monetary "judgment[s] against a terrorist party based upon an act of terrorism"; (2) they seek the "blocked assets of" DAB; and (3) DAB is an "agency or instrumentality" of the Taliban. The Joint Creditors satisfy each element.

---

[17] TRIA "confers no entitlement" on terror victims without final judgments. *See Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003) (*Smith II*). At the time of the relevant proceedings below, the *Ashton* Plaintiffs had secured a judgment of liability against the Taliban but not a final monetary judgment because damages had not yet been determined, and they had neither obtained nor served writs of execution. The *Owens* Plaintiffs sought a prejudgment restraint on the blocked funds, without having even secured a liability determination against the Taliban. As such, neither group was entitled, as of the date of their motions for attachment, to overcome the prohibition under federal sanctions law against judicial encumbrances of assets blocked by the President, nor could either group benefit from TRIA's abrogation of any immunity the assets enjoy. *See* MDL Dkt. 8419.

First, as the district court found, the Joint Creditors "hold judgments against the Taliban, a 'terrorist party' as defined under TRIA § 201(d)(4)," and those "judgments are based on the Taliban's role" in acts of terrorism. S.A.24. Damages have been determined, and final monetary judgments entered.

Second, as the district court also found, the Joint Creditors seek the assets of DAB, blocked as of August 15, 2021, held in an account at the FRBNY in DAB's name. S.A.24 ("the turnover motions seek DAB funds that constitute 'blocked assets' under TRIA"); *see also* App. 49, 60, 145-46. Under New York law, which provides the framework for determining a judgment debtor's property interest in a TRIA action, *see Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 1001 (2d Cir. 2014), a party holding funds in a bank account is presumed to own those assets, *see Karaha Bodas Co. v. Pertamina*, 313 F.3d 70, 86 (2d Cir. 2002). In *EM Ltd.*, this Court applied this presumption to assets at the FRBNY held in the account of Argentina's central bank, which it determined were "owned by" the central bank, a separate juridical entity from the Republic of Argentina. 473 F.3d at 465-66, 473. Here, President Biden specifically found, in his February 11, 2022 Executive Order confirming the blocking of the funds, that DAB's funds at the FRBNY are the "property of Da Afghanistan Bank." App. 70.

Third, DAB is an "agency or instrumentality" of the Taliban. An entity is "an agency or instrumentality of a terrorist party for TRIA purposes" when one of three

independent conditions is satisfied: (1) it is "owned, controlled, or directed" by the terrorist party; (2) it provides "material services to, on behalf of, or in support of" the terrorist party; or (3) it is "a means through which a material function of the [terrorist party] is accomplished." *Kirschenbaum v. Assa Corp.* (*Assa II*), 934 F.3d 191, 199 (2d Cir. 2019) (marks omitted). DAB is and does all three.

As the magistrate judge found, the "facts on the ground" leave "little doubt" "the Taliban is using [its] control of DAB to advance [its] aims." App. 648-49.[18] The Joint Creditors presented substantial evidence, including detailed expert declarations, demonstrating that DAB is and was controlled and directed by the Taliban at all times relevant to this litigation. It was controlled and directed by the Taliban from 1996 to 2001, when the Taliban aided and abetted the 9/11 attacks. H.R. Doc. No. 106-268, at 4. And since the Taliban's most recent takeover, DAB has again been "operating under the Taliban's direct operational control." App. 299; *see also* App. 260-64; App. 265-81 (Taliban has installed DAB's leaders); App. 283-85 (Taliban issues edicts for DAB's implementation); App. 287-91 (U.S. officials recognize Taliban control of DAB).

Although the Taliban's control of DAB alone is sufficient to qualify it as an agency or instrumentality of the Taliban under *Kirschenbaum*, the Taliban also is

---

[18] This factual finding, in a portion of the R&R adopted in full by the district court, S.A.3 n.6, is reviewed for clear error. *See Muhammad*, 463 F.3d at 124.

using DAB to accomplish material functions of its role as a terrorist organization and to materially support that role, thereby satisfying the second and third *Kirschenbaum* tests. For example, the Taliban has used DAB since 2021 to generate "hundreds of millions of dollars in revenue," which it uses to carry out its agenda. App. 304. The U.S. Treasury Department's top representative in Afghanistan from 2018 through 2019 explained to the district court:

> The Taliban has … benefited directly from bringing DAB under its control by, among other things, gaining access to sensitive financial intelligence information, nonpublic supervisory information, and other economic data. The Taliban has been using this information and its control over [DAB] to advance its agenda, consolidate its control over Afghan territory, enhance revenue generation through its involvement in illicit narcotics production and trafficking operations, and allow the under-regulated hawala (money services business) sector to thrive, thereby facilitating the illicit financing of terrorism …

App. 251-52; *see also* App. 273, 286-87, 304, 307-13. In short, DAB is an agency or instrumentality of the Taliban, and, as such, its blocked assets "shall be subject to execution" to satisfy the Joint Creditors' judgments against the Taliban, "in every case" and "[n]otwithstanding any other provision of law." TRIA § 201(a).

\* \* \*

Despite recognizing that the Taliban controls DAB, the district court denied turnover, finding itself divested of jurisdiction by § 1604 and constitutionally precluded from determining that DAB is a Taliban instrumentality. Underlying each of these holdings was the district court's view that what it considered to be

26

*Afghanistan's* assets could not be used to satisfy a judgment against the *Taliban*. As explained below, the district court's legal theories lack merit, and its broader concerns are foreclosed by the political branches' policy choices.

## II.     The District Court Had Subject-Matter Jurisdiction To Order Turnover Of DAB's Assets Held At The FRBNY To Satisfy The Joint Creditors' Judgments

The district court possessed subject-matter jurisdiction over these proceedings pursuant to 28 U.S.C. § 1331 and TRIA. The proceedings involve the interpretation and application of a federal statute, TRIA, establishing jurisdiction under § 1331. *See Doe v. Ejercito De Liberacion Nacional*, 2017 WL 591193, at *1 (S.D.N.Y. Feb. 14, 2017), *aff'd sub nom. Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152 (2d Cir. 2018). And TRIA is not just any federal statute: As this Court has held, because TRIA applies notwithstanding any other provision of law, it overcomes other statutes that might stand in the way of the courts' exercise of subject-matter jurisdiction over proceedings to enforce terrorism judgments against blocked assets. *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010). The district court also had ancillary jurisdiction to enforce its own judgments entered against the Taliban. *See Restatement (Second) of Judgments* § 8 cmt. a (1982); *Epperson v. Ent. Express, Inc.*, 242 F.3d 100, 104 (2d Cir. 2001) ("[A]n action to collect a judgment … does not require an independent jurisdictional basis[.]"); *Weininger v. Castro*, 462 F.

Supp. 2d 457, 489-90 (S.D.N.Y. 2006) (exercising ancillary jurisdiction over TRIA action).

The district court's conclusion that its jurisdiction was withdrawn by § 1604 of the FSIA reflects a fundamental misunderstanding of the FSIA's immunities and the impact of TRIA on those immunities. The district court correctly acknowledged that TRIA overcomes the immunity from execution embodied in §§ 1609 and 1611 of the FSIA, which were enacted by Congress to protect foreign-state property. S.A.16-17; *see also Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023) (TRIA "supersedes" § 1609); *Bank Markazi v. Peterson*, 578 U.S. 212, 217 & n.2 (2016) (same as to § 1611(b)(1)). But the district court erred in concluding that a separate and narrower FSIA provision—§ 1604, which provides foreign states with immunity from *in personam* claims—stripped it of subject-matter jurisdiction. It does not, for two independent reasons. First, assuming § 1604 even applies in this proceeding, this Court has repeatedly confirmed that TRIA supersedes it, just as it does the execution immunity conferred by §§ 1609 and 1611(b)(1). *See infra* Argument II.A. Second, § 1604 in fact does not apply to this proceeding, which seeks no *in personam* relief against Afghanistan or DAB. *See infra* Argument II.B.

28

### A. TRIA Overcomes All FSIA Immunity, Including Jurisdictional Immunity

#### 1. This Court Has Unambiguously Held That TRIA Provides An Independent Basis For Subject-Matter Jurisdiction Notwithstanding The FSIA, A Result Dictated By TRIA's Plain Text

This Court has stated time and again that § 201(a) of TRIA overcomes the FSIA's jurisdictional immunities and creates an independent basis for the exercise of subject-matter jurisdiction over execution proceedings against the blocked assets of an agency or instrumentality of a terrorist party.

It first so held in *Weinstein*, 609 F.3d 43. There, terror victims with judgments against Iran sought to attach the property of Bank Melli, an instrumentality of Iran. Bank Melli argued that the court lacked jurisdiction because the bank was a juridical entity separate from Iran and was not named in the underlying judgment. *Id*. at 48-49. This Court emphatically disagreed, finding it "clear beyond cavil that [§] 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment." *Id*. at 50. As here, where terror victims seek to execute on the blocked assets of an agency or instrumentality of a terrorist party, the "unambiguous" and "plain language" of TRIA vests the court with jurisdiction, overcoming any immunity the agency or instrumentality otherwise would enjoy. *Id*.

at 49, 50. That is because "the force of" § 201(a)'s "notwithstanding" clause "plain[ly] ... extends everywhere," making it irrelevant that § 201(a) was not codified alongside other "exceptions to jurisdictional immunity." *Id*. at 49. If TRIA were interpreted to *not* provide "an independent grant of jurisdiction" over proceedings to attach the blocked assets of instrumentalities of terrorist parties, this Court explained, the statute's command that terror victims could collect those assets "would be a nullity." *Id*.

This Court has reaffirmed this principle repeatedly. In *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir. 2014) (*per curiam*), the Court characterized TRIA as a "terrorism-related exception[] to immunity under FSIA," trumping the rule "[i]n the ordinary case [that] a foreign state will be 'immune from the jurisdiction of the courts of the United States and of the States'" under § 1604. In *Kirschenbaum*, 830 F.3d at 132, the Court explained that § 201(a)'s "plain language" "confers an independent basis for subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an agency or instrumentality of the terrorist party." It said so again in *Vera I*, 867 F.3d at 321 ("TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property of a foreign state"), and yet again in *Assa II*, 934 F.3d at 198. The United States agrees: "[U]nder TRIA," it explained in its Statement of Interest, "the FSIA's immunities and

30

exemptions are inapplicable[.]" App. 65; *see also* App. 56 (quoting *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)) ("*Except where TRIA applies*, the FSIA provides 'the sole basis for obtaining jurisdiction over a foreign state in our courts.'" (emphasis added)).[19]

These statements comport with—indeed, as *Weinstein* held, are compelled by—TRIA's plain text. Section 201(a) specifies that judgments against terrorist parties shall be satisfied "in every case" by execution against the assets of those parties' agencies or instrumentalities. And it provides for this result "notwithstanding any other provision of law," including not only §§ 1609 and 1611's execution immunities but also § 1604's jurisdictional immunity. The text extends TRIA's reach to "*any* agency or instrumentality" of *any* "terrorist party," words broader than those used by Congress in the FSIA when referring only to foreign states. Each of these textual components, which have well-established meanings in statutory construction, are discussed in turn.

"***Notwithstanding Any Other Provision of Law***." TRIA begins with this "singularly broad phrase." *Schwartz v. Aquatic Dev. Grp., Inc.*, 352 F.3d 671, 680

---

[19] Indeed, until the decision below, every court to consider the issue had held that TRIA obviates jurisdictional immunity if such immunity would otherwise frustrate terrorism judgment holders' collection efforts. *See, e.g.*, *Weininger*, 462 F. Supp. 2d at 488 ("TRIA operates as an exception to immunity from both jurisdiction and execution."); *Villoldo v. Castro Ruz*, 113 F. Supp. 3d 435, 437 (D. Mass. 2015), *aff'd*, 821 F.3d 196 (1st Cir. 2016).

(2d Cir. 2003) (Straub, J., concurring). The Courts of Appeals "have regularly interpreted such 'notwithstanding' provisions 'to supersede all other laws[.]'" *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 190 n.2 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 578 U.S. 212 (2016) (quoting *Weinstein,* 609 F.3d at 53). Indeed, the Supreme Court has described a "notwithstanding" clause as the "cleare[st]" indication of Congress's intent to override contrary enactments. *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (marks omitted). And it has held up TRIA's "notwithstanding" clause as a specific example of such clarity. *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 825-26 (2018) (TRIA's language demonstrates that when Congress wants to make a statute's preemption of other provisions of law absolute, "it kn[ows] how to say so").[20]

For precisely this reason, this Court in *Weinstein* rejected the argument that TRIA overcomes only immunity from execution, not jurisdiction, and issued a blunt rejoinder: "[T]he operative language begins with the phrase '[n]otwithstanding any other provision of law,' thus making plain that the force of the section extends

---

[20] The D.C. Circuit recently interpreted § 201(a)'s "notwithstanding" clause to apply primarily to statutes, and concluded that the United States's common-law sovereign immunity was not plainly abrogated by TRIA. *Greenbaum*, 67 F.4th at 432. Its discussion of common-law immunities is inapplicable to a foreign state's sovereign immunity, which is governed exclusively by statute. *See Samantar v. Yousuf*, 560 U.S. 305, 313 (2010). And the D.C. Circuit confirmed that TRIA's notwithstanding clause "clearly requires courts to disregard other statutory provisions that conflict with [TRIA's] scope." *Greenbaum*, 67 F.4th at 432.

*everywhere*." *Weinstein*, 609 F.3d at 48-49 (emphasis added). In other words, this is not an instance in which Congress has enacted a limited provision designed to trump only certain specific, enumerated statutes (which it knows how to do).[21]

Other courts have interpreted notwithstanding clauses similarly. *E.g.*, *Frank's Landing Indian Cmty. v. Nat'l Indian Gaming Comm'n*, 918 F.3d 610, 619 (9th Cir. 2019) ("notwithstanding any other provision of law," rather than "nothing in this section," reflected Congress's "deliberate choice" to preempt other applicable laws); *Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Engineers*, 619 F.3d 1289, 1301 (11th Cir. 2010) ("notwithstanding" clause in appropriations provision was not limited to preempting appropriations laws).

It is also noteworthy that Congress expressly limited the scope of § 201(a)'s notwithstanding clause by specifying in a subclause that it applies to "any other provision of law, ... except as provided in subsection (b)." Under the canon of *expressio unius est exclusio alterius*, Congress's explicit exception must be given meaning. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (marks omitted)).

---

[21] *See, e.g.*, 28 U.S.C. § 1605B(c) ("Notwithstanding section 2337(2) of title 18... ."); *id*. § 1659(b) ("Notwithstanding section 337(n)(1) of the Tariff Act of 1930 ... .").

***"In Every Case."*** In drafting TRIA, Congress paired the "notwithstanding" clause with the similarly broad edict that TRIA must be applied "in every case" that meets its criteria. *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 621 (7th Cir. 2015) ("[W]ords of broad application bookend TRIA's 'notwithstanding' clause."). Contrary to the district court's incongruous reading of "every case" to mean instead only those cases in which another provision of law conflicts with its "specific terms of execution," S.A.17, this Court has cited TRIA's "every case" language to extend TRIA beyond the narrow context of execution immunity. For example, in *Weinstein*, this Court held that TRIA prevailed over international treaties that were invoked for reasons irrelevant to immunity from execution. 609 F.3d at 52-53 (TRIA would "abrogate" U.S.-Iran treaty designating Iranian bank juridically separate from Iranian state).

***"Any Agency or Instrumentality of That Terrorist Party."*** Section 201(a) mandates that when a judgment is obtained against a terrorist party, "the blocked assets of *any* agency or instrumentality of that terrorist party … shall be subject to execution," with "terrorist party" defined as a "terrorist," a "terrorist organization," or a "foreign state designated as a state sponsor of terrorism." TRIA § 201(a), (d)(4) (emphasis added). As discussed below, the district court's holding that judgments against the Taliban are insufficient to reach DAB's assets under TRIA, S.A.19-21, contravenes this statutory command. TRIA can be wielded against the blocked assets

of "*any* agency or instrumentality" of "*any* terrorist party," *Weinstein*, 609 F.3d at 49 (emphases added) (marks omitted), without regard to whether the agency or instrumentality is a foreign state ordinarily entitled to § 1604 immunity.

*"Shall Be Subject to Execution."* TRIA provides that, when its conditions are satisfied, covered assets "shall be subject to execution[.]" TRIA § 201(a). The word "shall" is "mandatory, not precatory." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015). Thus, regardless of extra-statutory concerns a court might otherwise consider, if TRIA's elements are satisfied, the court must authorize execution.

> ## 2. Congressional Intent Confirms That TRIA Overcomes Jurisdictional Obstacles To Enforcing A Judgment Against A Terrorist Party's Agency Or Instrumentality

The circumstances surrounding TRIA's passage confirm that when the 107th Congress enacted § 201, it had one essential goal: enabling victims of terrorism to collect on their judgments, including by removing sovereign immunity where necessary.

For years before § 201's passage, the Executive Branch and the courts expressed sympathy for terrorism victims while simultaneously invoking foreign policy concerns and principles of sovereign immunity to preclude recovery. *See, e.g.*, 148 Cong. Rec. 10,312–13 (statement of Sen. Gordon Smith); *id.* at 16,400 (Rep. Chris Shays); *id.* at 23,121 (Sen. Tom Harkin). After 9/11—with the Taliban specifically in mind—Congress wanted to ensure that terrorism victims would

recover on their judgments. As Rep. Vito Fossella, one of § 201's primary sponsors,

said on the House Floor just one day before the first anniversary of 9/11:

> The notion that[,] while brave men and women are fighting the war overseas[,] ... our government[] could prevent my neighbors and friends one day, if successful in a court of law in obtaining judgment, to be unable to recover assets of a terrorist organization or a state that sponsors terrorism to me is the most unjust thing in this Nation[.] ... [I]t is unbelievable that these families down the road, in the event that they will obtain a judgment, would have to come back to Congress or to their own government to petition against a terrorist organization or a state that sponsors terrorism to recover some of those assets.

> We should not be here next year or 10 years from now debating this. We should end the subject right now, put it to a close, and bring justice to those victims who suffer today and will be suffering for a long time.

148 Cong. Rec. 16,397, 16,399. Other contemporaneous materials also make clear

Congress's intent to remove *all* sovereign immunity, not just one part of sovereign

immunity, as a barrier to enforcement. 147 Cong. Rec. 23,377 (2001) (explaining

that a draft version of § 201 "removes foreign sovereign immunity and is designed

to ensure that victims of terrorism receive the compensation they are owed").[22]

---

[22] The district court "rejected" the premise that floor statements by § 201's primary sponsors serve "as evidence of *congressional* intent." S.A.18 n.9. But pre-enactment statements of legislative sponsors are among the "most authoritative and reliable materials of legislative history," *Disabled in Action of Metropolitan New York v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000), and here they confirm that TRIA was enacted specifically to overcome sovereign immunity.

### 3. The District Court's Limited Interpretation Of TRIA Was Erroneous

The district court nonetheless concluded that § 1604 withdrew its subject-matter jurisdiction. It reached this conclusion by way of three flawed premises: (1) TRIA's "notwithstanding any other provision of law" clause overcomes only execution immunity; (2) even if (as Second Circuit precedent makes clear) TRIA does overcome § 1604's immunities, it does so only where the judgment debtor is a foreign state whose immunity had been overcome in the underlying liability proceeding; and (3) judgments against nonstate terrorist parties cannot be used to execute against the assets of a foreign state unless the state is a designated state sponsor of terrorism. Each premise contravenes TRIA's text and this Court's decisions.

a. The district court determined that TRIA, as an "execution statute," can only "defeat[] provisions [of law] that conflict with [its] specific terms of execution," and therefore does not supersede the FSIA's jurisdictional immunities. S.A.17. That is wrong. As noted above, TRIA's "notwithstanding" clause "extends everywhere," *Weinstein*, 609 F.3d at 49, "requir[ing] courts to disregard other statutory provisions that conflict" with its scope. *Greenbaum*, 67 F.4th at 432. Section 1604 is one such provision. The fact that TRIA authorizes execution "notwithstanding any other provision of law" presupposes that jurisdictional immunity provisions will not be barriers to execution. It would make no sense "for Congress in the same breath to

37

expressly make the assets" of "any agency or instrumentality" of a terrorist party "subject to execution" while at the same time allowing jurisdictional immunity to bar that execution. *Weininger*, 462 F. Supp. 2d at 488.

To reach its conclusion, the district court compared TRIA's phrasing with certain terms used in the FSIA and concluded that, because TRIA uses the words "attachment and execution," as do §§ 1609-1611, TRIA was drafted to target execution immunity only, not jurisdictional immunity. S.A.16-17.

This analysis suffers from several fatal flaws. First, it disregards the breadth of the phrase "notwithstanding any other provision of law." According to the district court, the only situation in which that clause does any work is when a judgment creditor is "prevented from [executing on blocked assets] by an immunity to execution contained in [FSIA]… § 1610, § 1611, or some other statute." S.A.17. This approach impermissibly rewrites the phrase "notwithstanding any other provision of law" as "notwithstanding these two sections of this one law," which is inconsistent with how courts have interpreted such clauses. *See supra* Argument II.A.1.

Second, the district court's textual analysis is precluded by *Kirschenbaum*, which rejected the argument that TRIA should be interpreted by reference even to identical terms in the FSIA. 830 F.3d at 132-33 (the phrase "agency or instrumentality" has different meanings under TRIA and the FSIA because "TRIA

unambiguously reaches more broadly to permit the attachment of property in circumstances not covered by the FSIA or FSIA immunity"). Even if TRIA "resembles" the "execution immunity language in [§§ 1609 to 1611 of] the FSIA," S.A.16, it is a broader statute than the FSIA, targeting state and nonstate terrorists alike, and therefore should not be limited by similar words used in the FSIA.[23]

Nor does the "statutory context" provide support for the district court's interpretation. S.A.14. The district court found it significant that § 201 was codified as a note to § 1610 of the FSIA and is "part of an execution statute." S.A.15, S.A.17. But TRIA is a freestanding measure, not an amendment to § 1610 (or the FSIA more generally). And nothing can be inferred from its placement in the notes. As a choice made by the Office of Law Revision Counsel, not Congress, *see Panjiva, Inc. v. United States Customs & Border Prot.*, 975 F.3d 171, 174 (2d Cir. 2020); *In re MTBE Prod. Liab. Litig.*, 522 F. Supp. 2d 557, 567 (S.D.N.Y. 2007), its placement "should be given no weight," *North Dakota v. United States*, 460 U.S. 300, 310 n.13 (1983) (quoting *United States v. Welden*, 377 U.S. 95, 99 n.4 (1964)). Indeed, this Court in *Weinstein* rejected a similar argument based upon TRIA's codification as a

---

[23] The district court's focus on TRIA's relationship to 28 U.S.C. § 1610(f)—which authorizes the President to waive an immunity exception applicable to foreign states—is misplaced for the same reason. S.A.18. Preventing Presidential waivers may have been *one* reason for TRIA's enactment, but it cannot have been the *only* reason—otherwise there would have been no reason for TRIA to apply to both state and nonstate terrorist parties.

note to § 1610, concluding that "the plain language of [TRIA] cannot be overcome by its placement in the statutory scheme." *Weinstein*, 609 F.3d at 49.

None of this means, as the district court lamented, that the Joint Creditors' interpretation of TRIA's notwithstanding clause would "bulldoze[] … every possible legal obstacle" to turnover, including the need to comply with ordinary procedural rules. *See* S.A.17 (quoting App. 636). But the clause *does* target "other provisions of law" that directly conflict with terror victims' right to collect the blocked assets of "any agency or instrumentality" of a "terrorist party." Section 1604, assuming it applies (which it does not, *see infra* Argument II.B), would present such a direct conflict: It would operate to prohibit execution on the assets of certain terrorist instrumentalities. Procedural requirements such as service, by contrast, are merely conditions precedent to bringing an action under TRIA, and they can be satisfied without prohibiting execution.[24]

---

[24] The *Smith* cases cited by the district court to show that TRIA does not override every other statute, S.A.15-18, demonstrate the distinction. In *Smith*, the President confiscated Iraqi assets pursuant to IEEPA, which had the incidental effect of removing those assets from the reach of judgment creditors. *See Smith v. Fed. Rsrv. Bank of N.Y.* (*Smith I*), 280 F. Supp. 2d 314, 317-19 (S.D.N.Y), *aff'd*, 75 F. App'x 860 (2d Cir. 2003), *aff'd*, *Smith II*, 346 F.3d 264. The court held that TRIA does not extinguish the President's powers under IEEPA or otherwise "nullif[y] all previous statutes that pertain to blocked assets." *Smith I*, 280 F. Supp. 2d at 319-20. But *Smith* limited its holding to statutes that can coexist with TRIA "with no conflict," and distinguished between IEEPA (which affects availability of assets but not the right to turnover where TRIA's elements are met) and sovereign immunity. *Id.* ("[T]o the extent that a foreign country's sovereign immunity potentially conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict.").

40

b.     Faced with this Court's precedent plainly stating that TRIA provides an independent basis for subject-matter jurisdiction over execution proceedings involving foreign-state property, and with the expansive scope of TRIA's "notwithstanding" clause, the district court conceded that TRIA does have some jurisdictional effect. But it invented a limitation found nowhere in the statute's text: that TRIA provides jurisdiction only in the narrow circumstance when the underlying judgment that terror victims seek to enforce was entered against a foreign state. In such a case, the district court held, the abrogation of jurisdictional immunity in connection with the underlying judgment "flows through to the instrumentality in the attachment proceeding." S.A.20. Here, because the underlying judgments are against a nonstate terrorist party, the district court reasoned, TRIA does not vest it with jurisdiction over the Joint Creditors' turnover proceedings.

The district court's analysis was based on its misreading of *Weinstein* and the *Vera* cases. *Weinstein* itself rejected the district court's "flow through" theory. Bank Melli had argued that TRIA "simply provides an additional ground for abrogating immunity from attachment" for the party named in the judgment. The Court held that TRIA instead has broader effect: It constitutes "an *independent* grant of jurisdiction" where plaintiffs seek to satisfy a final monetary judgment against a terrorist party by executing against the blocked assets of "any" of its agencies or instrumentalities. 609 F.3d at 49 (emphasis added).

41

According to the district court, *Weinstein* reached its conclusion only because the case involved a judgment against a state sponsor of terrorism, Iran, whose immunity had been abrogated in the underlying litigation by the FSIA's terrorism exception (then codified at 28 U.S.C. § 1605(a)(7)). S.A.19-20. But this limitation finds no support in *Weinstein*'s analysis. *Weinstein* did not hold that jurisdiction over Iran in the underlying action pursuant to § 1605(a)(7) "flowed through" to provide jurisdiction over subsequent execution proceedings against the assets of Iran's separate instrumentalities. Instead, it held that *TRIA itself* "*provides courts with subject matter jurisdiction* over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment," 609 F.3d at 50 (emphasis added), such that any immunity Bank Melli might have enjoyed was rendered inoperative. This is because, according to this Court, (1) "the force of" § 201(a)'s "notwithstanding" clause "plain[ly] … extends *everywhere*"; (2) § 201(a) expressly subjects to execution the assets of "*any* agency or instrumentality" of "*any* terrorist party"; and (3) this "agency or instrumentality" provision "would be a nullity" if the statute did not "constitute an *independent* grant of jurisdiction over" execution proceedings targeting the blocked assets of the judgment debtor's agency or instrumentality. *Id*. at 49 (emphases added). This Court again confirmed in *Kirschenbaum* that TRIA "confers an *independent* basis for subject matter

jurisdiction," 830 F.3d at 132 (emphasis added), not one *dependent* on "the sovereign's loss of jurisdictional immunity in the underlying judgment," S.A.20, as the district court held.

The district court purported to find support for its limited reading of *Weinstein* in *Vera II*'s statement that TRIA provides jurisdiction for execution proceedings "involving the assets of a foreign sovereign ... *only* where 'a valid judgment has been entered' against the sovereign." S.A.19 (quoting *Vera II*, 946 F.3d at 133). But the *Vera* cases stand for the unremarkable proposition that one cannot use TRIA to enforce an *invalid* judgment.[25] The requirement of a valid judgment makes perfect sense, because TRIA is not triggered unless the creditor "has obtained a judgment" against a terrorist party. TRIA § 201(a). If the judgment is valid, *Vera II* itself stated that § 201(a) would "provide … a jurisdictional basis for enforcing [the] judgment[] … by attaching and executing on" blocked Cuban assets. 946 F.3d at 125 (emphasis added). Here, the Joint Creditors' judgments against the Taliban unquestionably are—as *Vera* required—valid.

That the Court in *Vera II* at one point phrased the relevant inquiry as whether the creditors had obtained a "valid judgment ... against the sovereign," 946 F.3d at 133 (marks omitted), simply reflects the fact that the purported judgment debtor in

---

[25] The underlying judgments in *Vera* were invalid because the Florida state court entering them did not have subject-matter jurisdiction. *Vera II*, 946 F.3d at 142-43.

*Vera was* a foreign sovereign. It does not somehow restrict TRIA's application to only those cases with underlying judgments against foreign states. *See Howard v. Senkowski*, 986 F.2d 24, 28 (2d Cir. 1993) ("[I]t is always hazardous to seize upon a single word or phrase in a judicial opinion and build upon it a rule that was not in issue in the case being decided.").

c.   The district court additionally held that § 201 "could not be wielded against Afghanistan or its instrumentalities independently because Afghanistan has not been designated as a state sponsor of terrorism." S.A.21. This holding distorts TRIA's text and contravenes Congressional intent.

The district court erroneously defined "terrorist party" under TRIA to mean "a foreign state designated as a state sponsor of terrorism…[.]" S.A.21-22 (quoting TRIA § 201(d)(4)). But that is not what § 201(d)(4) says. It defines "terrorist party" as either a "terrorist," a "terrorist organization," *or* a "foreign state designated as a state sponsor of terrorism." And § 201(a) extends TRIA's reach to "*any* agency or instrumentality" of those persons or entities (emphasis added). Here, the relevant terrorist party against whom the underlying judgments were entered is not Afghanistan, but the Taliban. The district court disregarded the straightforward reading that "*any* agency or instrumentality" of a nonstate "terrorist organization" such as the Taliban includes an entity that could also be an organ of a foreign state.

44

The possibility that a nonstate terrorist organization like the Taliban might seize and control a foreign-state entity to facilitate terrorism—thereby making the entity its agency or instrumentality under TRIA—is not some anomalous quirk of recent history or statutory application. It was a situation well-known to the statute's drafters: President Clinton had informed the very same Congress that, as of early 2001, the Taliban was in control of DAB. H.R. Doc. No. 107-16, at 4. Also well-known to Congress was the Taliban's role in the 9/11 attacks, leading to President Bush's designation of the Taliban as an SDGT. If Congress had wanted to limit the ability of terror victims to enforce their judgments against a nonstate terrorist party like the Taliban, using the assets of a terrorist-controlled state entity like DAB, it could have done so. But it chose not to, instead giving TRIA a broader sweep than the FSIA, *Kirschenbaum*, 830 F.3d at 133, and making the blocked assets of "*any*" agency or instrumentality of "*any*" terrorist party, *Weinstein*, 609 F.3d at 50, available to victims of that terrorist party "in every case." TRIA § 201(a). To read the district court's nonexistent limitations into the statute would effectively immunize the Taliban (or any other nonstate terrorist party that expropriates foreign state assets) from TRIA.

### B.   Even If TRIA Does Not Abrogate Jurisdictional Immunity, Section 1604 Is Inapplicable To This Enforcement Proceeding

Even if this Court were to agree with the district court that TRIA's grant of jurisdiction does not overcome any FSIA limitation on jurisdiction, the jurisdictional

immunity conferred by § 1604 still does not apply. Section 1604 applies only to claims against a foreign state for *in personam* relief, and the Joint Creditors have not brought any such claims.

Section 1604 provides that, subject to specific exceptions, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. Section 1604 provides immunity to foreign states—but only as to the "category of cases … contemplated in [28 U.S.C.] § 1330." *Halkbank*, 143 S. Ct. at 949; *Assa*, 934 F.3d at 188-89. Section 1330(a), in turn, provides that "district courts shall have original jurisdiction … of any nonjury civil action against a foreign state … as to any claim for relief *in personam* [subject to certain exceptions]." 28 U.S.C. § 1330(a).

These statutes work "in tandem": "Section 1330(a) spells out a universe of civil (and only civil) cases against foreign states over which district courts have jurisdiction, and § 1604 then clarifies how principles of immunity operate within that limited civil universe." *Halkbank*, 143 S. Ct. at 949. Thus, solely for claims that fall within the scope of § 1330(a), § 1604's "jurisdictional immunity" grants foreign states "immunity from suit in the United States," *i.e.*, immunity from being subject to "a claim" in a United States court. *Rubin*, 138 S. Ct. at 820, 822; *see also Restatement (Fourth) of Foreign Relations Law of the United States* § 464 cmt. a (2018) (describing foreign states' "jurisdictional immunity" as "immunity from

46

adjudicative jurisdiction"). As a result, § 1604 applies only to claims against a foreign state seeking relief *in personam*. These turnover actions do not involve any such claims.

To begin, the turnover proceedings are not against a foreign state. They were filed against the FRBNY (as garnishee) and directed against the DAB assets the FRBNY holds. The FRBNY is not a "foreign state," nor are the assets. Even though DAB is arguably an agency of Afghanistan, this Court has held that a suit against a foreign state's property is not a suit against the state itself.

In *Assa*, this Court instructed that "[t]he gateway into the FSIA's immunity regime is the phrase 'foreign state,'" and it expressly rejected the argument that "a suit against a foreign state's property is a suit against a foreign state." *Assa*, 934 F.3d at 188-89. Instead, this Court noted, the FSIA's "definition of foreign state" is limited to "actual foreign states, their 'political subdivision[s],' and their 'agenc[ies] or instrumentalit[ies].'" *Id.* at 189 (quoting 28 U.S.C. § 1603(a)). "Property belonging to a foreign state does not fit any of these categories," and a suit directed against such property "is therefore not a suit against a foreign state." *Id.* As a result, "the FSIA gateway is closed. No jurisdiction flows from § 1330(a), and no immunity flows from § 1604." *Id.*; *cf. Samantar*, 560 U.S. at 323 (because the FSIA's definition of foreign state does not include foreign officials, § 1604 immunity does

not "extend[] to suits against individual officials"). That rationale alone precludes the operation of § 1604 here.

Nor does the turnover proceeding involve—as it must to fall within § 1604's scope—any "claim for relief in personam" against Afghanistan or DAB. 28 U.S.C. 1330(a); *see also Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 88 (2d Cir. 2017) (§ 1604 imposes a "limit on *in personam* jurisdiction"), *summarily vacated sub nom. Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020), *reinstated in relevant part*, 963 F.3d 192, 196 (2d Cir. 2020). An "*in personam*" claim seeks to "impose a personal obligation on the defendant in favor of the plaintiff" and is based on the court's "authority over the defendant's person." *Shaffer v. Heitner*, 433 U.S. 186, 199 (1977); *see Hanson v. Denckla*, 357 U.S. 235, 246 n.12 (1958) ("A judgment *in personam* imposes a personal liability or obligation on one person in favor of another.").

The turnover proceeding presents no claim for relief *in personam* against DAB. It will not result in any judgment against DAB, and DAB would not incur any personal obligation as a result of the proceeding. Instead, as in any execution proceeding, the district court would impose an obligation on a third party (here, the FRBNY) to turn over blocked funds belonging to an instrumentality of the Taliban, and no jurisdiction would be exercised over DAB to impose or carry out that obligation. In these and other circumstances where enforcement actions are

48

undertaken against property, the jurisdictional immunities of § 1604 do not apply. *See Peterson*, 876 F.3d at 91 (§ 1604 is "no impediment to an order" directing a garnishee to turn over state assets to a judgment creditor). Instead, the FSIA separately provides immunity for the property of a foreign state through § 1609, which the district court agreed is superseded by TRIA.

The inapplicability of jurisdictional immunity is inherent in the nature of actions directed against property. As this Court has explained, a court's lack of *in personam* jurisdiction over a property owner does not impede an action against the property. *See India S.S. Co. v. Kobil Petroleum Ltd.*, 620 F.3d 160, 161 (2d Cir. 2010) (*per curiam*) ("Jurisdiction over a person is conceptually distinct from jurisdiction over the person's property[.] To attach property, a court will have jurisdiction over the property in question and the remedial authority to order attachment, regardless of the court's jurisdiction *in personam* over the property owner."). Courts have applied this principle to turnover proceedings against foreign-state property, finding that although sovereign property presumptively enjoys the protection of § 1609's execution immunity, which "inures in the property itself," *Walters*, 651 F.3d at 291, a judgment creditor need not overcome the state's own jurisdictional immunity under § 1604, *see id.* at 292 ("[I]n this turnover action only execution, not jurisdictional, immunity is at issue."); *see also FG Hemisphere Assocs., LLC v. Republique du Congo*, 455 F.3d 575, 595 (5th Cir. 2006) ("A finding

that an exception to executional immunity applies is a finding that the court has jurisdiction over the garnishment action."); *Byrd v. Corporacion Forestal y Indust. de Olancho, S.A.*, 974 F. Supp. 2d 264, 268 (S.D.N.Y. 2013), *aff'd sub nom. Byrd v. Republic of Honduras*, 613 F. App'x 31 (2d Cir. 2015). Because TRIA unquestionably overcomes the *property*'s immunity under § 1609, and because the *state*'s jurisdictional immunity under § 1604 is inapplicable, the FSIA does not bar turnover.

This understanding is also consistent with the turnover procedures specified by New York law, applicable here by operation of Rule 69(a). In New York, a court need not exercise jurisdiction over anyone but the garnishee to order the turnover of assets the garnishee holds. *See Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825, 830-31 (N.Y. 2009). TRIA extends that principle to assets held by the garnishee on behalf of an agency or instrumentality of a terrorist party judgment debtor. Under established New York law, neither the Taliban, as judgment debtor, nor DAB, as the agency or instrumentality of the judgment debtor, need be brought within the court's jurisdiction. *See Harrison v. Republic of Sudan*, 309 F. Supp. 3d 46, 48-50 (S.D.N.Y. 2018) (no jurisdiction over Sudan's central bank required to order turnover under TRIA of the central bank's assets deposited at a New York bank); *RCA Corp. v. Tucker*, 696 F. Supp. 845, 850 (E.D.N.Y. 1988) (judgment debtor is "not a necessary

party to the proceeding" for turnover); Siegel, N.Y. Prac. § 510 (6th ed. 2022) (turnover orders are judgments running directly against the garnishee).

These arguments were presented to the district court, MDL Dkt. 8733 at 23-28; MDL Dkt. 8735, yet its decision failed to address them. The district court only cursorily stated its basis for concluding that "the Judgment Creditors need exceptions to the FSIA both for DAB's jurisdictional and execution immunity," merely asserting that, to identify these exceptions, the Joint Creditors "look to TRIA." S.A.14. But the district court failed to consider whether § 1604 applies, much less justify its application to a turnover proceeding.

In assuming that both jurisdictional and execution immunity apply here, the district court invoked two broad principles related to the FSIA, neither of which is applicable. First, the district court noted that "[g]enerally, a foreign state and its agencies and instrumentalities, such as DAB, have 'two types of foreign sovereign immunity [under the FSIA]—immunity from jurisdiction and immunity from attachment and execution of the sovereign's property,'" S.A.12 (quoting *Vera II*, 946 F.3d at 133 (alteration in original)), and that "[t]hese 'provisions … operate independently,'" *id.* at 13 (quoting *Walters*, 651 F.3d at 288). But that does not mean that they both apply in every case. A foreign state's sovereign immunity only applies where provided for by the FSIA. *See Republic of Argentina v. NML Capital, Ltd*., 573 U.S. 134, 141-42 (2014) ("[A]ny sort of immunity defense … must stand on the

51

[FSIA's] text. Or it must fall." (marks omitted)). And, as explained above, the FSIA provides jurisdictional immunity only for claims against foreign states seeking *in personam* relief; it does not extend outside this "limited … universe." *Halkbank*, 143 S. Ct. at 949. The district court erroneously invoked the inapplicable § 1604 to provide an immunity that § 1609 would otherwise provide to property of a foreign state in a non-TRIA case.

Second, the district court noted that the FSIA is the "sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts." S.A.11 (quoting *Amerada Hess*, 488 U.S. at 434 (alteration in original)). Yet as this Court has explained, this statement from *Amerada Hess* does not apply to enforcement actions against property, where there is no need to obtain jurisdiction *in personam* over a foreign state. *See Assa*, 934 F.3d at 189 (noting that "'foreign state' in *Amerada Hess* … mean[s] the same thing it does in the FSIA," and does not include foreign-state property).

Likewise, the district court stated that "the court must make a FSIA immunity determination regardless of whether the foreign state is participating in the proceeding." S.A.11. While this is correct as far as it goes, given the truism that any court must determine whether it possesses jurisdiction, the principle says nothing about the scope or applicability of § 1604. DAB's participation or lack thereof

cannot transform an action against a New York bank to recover DAB's property into a claim seeking *in personam* relief against DAB itself.

## III. The District Court's Constitutional And Equitable Concerns About Using The Assets Of The Taliban's Instrumentality To Satisfy The Taliban's Judgment Are Without Merit

As discussed above, an entity is an agency or instrumentality of a terrorist party if the entity is "owned, controlled, or directed by the terrorist party." *Kirschenbaum*, 830 F.3d at 135. Substantial, undisputed evidence—what the R&R called the "facts on the ground"—shows that the Taliban controls DAB. Yet the district court declined to make an agency or instrumentality finding and order turnover.

The district court based its ruling on constitutional separation of powers concerns—that finding DAB to be an agency or instrumentality of the Taliban would "necessarily and impermissibly impl[y] that the Taliban constitutes the recognized government of Afghanistan," a determination reserved for the President, S.A.25. Inherent in the district court's reasoning was its broader discomfort with using what it considered to be Afghanistan's assets, associated with the legitimate pre-2021 Afghan government, to pay Taliban debts.

Both the district court's constitutional analysis and its concerns about the propriety of turnover were misplaced: To find that DAB is an agency or instrumentality of the Taliban under TRIA does not require the Court to find that the

Taliban's control and use of DAB is lawful, legitimate, or governmental in nature, or to bestow formal recognition on the Taliban. And the district court's more general view—that employing DAB's assets to satisfy Taliban judgments would intrude on the prerogatives of the political branches—overlooks that these proceedings are the *very result* of careful balancing of policy considerations by the political branches, including Congress's enactment of TRIA and the President's determination to block DAB's assets.

### A. TRIA Does Not Require Any Finding That The Taliban Exercises Control Over DAB As A Legitimate Government Or Owns DAB's Assets

The district court assumed that a judicial finding that the Taliban controls DAB would necessarily imply that the Taliban is Afghanistan's rightful government, in that it would amount to "[a]ccepting the Taliban's 'appointments' to DAB as *legitimate*" governmental acts and deeming "its pronouncements as *authoritative*." S.A.27-28 (emphases added). This conclusion cannot be reconciled with TRIA or this Court's decisions.

TRIA was designed to facilitate terror victims' recovery from both state and nonstate terrorist parties, as well as from their agencies or instrumentalities. Accordingly, under § 201(d)(4), a "terrorist party" can be (i) a state sponsor of terrorism, (ii) a nonstate terrorist organization, or (iii) an individual terrorist. Nonstate terrorist groups are, by definition, criminal organizations, and frequently

do not exercise control in a lawful or legitimate manner. They also typically do not hold assets lawfully and in their own names. Instead, they "operate in the shadows out of necessity," often "through layers of affiliated individuals and front companies." *Kirschenbaum*, 830 F.3d at 134 (quoting *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 732 (11th Cir. 2014)). Recognizing these characteristics, this Court has adopted a test for defining agency or instrumentality status under TRIA that turns on facts, not legal status: whether the entity is, in actuality, controlled by terrorists, rather than whether the terrorists have a legal right to control the entity. *See id.* at 135.

The district court ran afoul of these principles when it conflated a finding that the Taliban *de facto* controls DAB with a finding that the Taliban legally controls DAB *as Afghanistan's recognized government*. If the district court were correct that only an entity that was legitimately controlled by a terrorist party could be deemed that party's agency or instrumentality, the agencies or instrumentalities of many nonstate terrorist parties would be written out of TRIA.

The fact that the Taliban exercises control over DAB in a manner usually associated with the actions of a government—*e.g.*, installing leaders of a state organ and setting its policy—does not compel a different result. In other cases bearing on foreign affairs, courts have had no difficulty discerning when an entity exercises unrecognized control over a state's institutions or territory, and the legal

55

consequences that flow from such control, without implying that the entity exercises control as the rightful governmental authority. In *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 209 (D.C. Cir. 2022), for example, the D.C. Circuit held that plaintiffs stated a claim under the Anti-Terrorism Act against companies transacting with Iraq's Health Ministry on the basis that Jaysh al-Mahdi, a terrorist organization, "openly controlled [the government ministry] and used it as a vehicle for terrorist activity."[26] For another example, this Court in *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 48 (2d Cir. 1991), found that "the West Bank, the Gaza Strip, and East Jerusalem ... are all under the control of the State of Israel," such that the Palestine Liberation Organization was not an FSIA-eligible state. Just as the court in *Atchley* could determine that an Iraqi ministry was under terrorist control without implying that the terrorists were Iraq's government, and just as this Court in *Klinghoffer* could draw legal conclusions from Israel's control over disputed territory without needing to confront questions of *rightful* governance, the district court here could have authorized execution on the basis of the Taliban's undisputed

---

[26] In *Atchley*, the evidence of control was much like the evidence here: the terrorist group's flag flew at the Ministry's entrance, its soldiers policed the halls, and its loyalists "assum[ed] key positions throughout the Ministry and purg[ed] employees disloyal to them." 22 F.4th at 211-12; *see* App. 251-52, 265-85, 291 (discussing the installation of Taliban loyalists throughout DAB and the presence of the Taliban flag at DAB headquarters).

control of DAB without concluding that the Taliban is Afghanistan's legitimate government.

Nor would finding DAB to be the Taliban's agency or instrumentality—and employing DAB's assets to satisfy a judgment against the Taliban—impermissibly imply that the Taliban itself owns or is lawfully "entitled to" those assets. *See* S.A.29. To be sure, a state's unrecognized government may not be "entitled to" that state's property located in the United States. *See Restatement (Third) of Foreign Relations Law* § 205(2) (1987). But that principle is inapposite here. Congress designed TRIA to permit that the debts of terrorist parties be paid with blocked assets of their agencies or instrumentalities. *See Weinstein*, 609 F.3d at 50. Authorizing execution thus does not require any finding that *the Taliban* itself owns the blocked DAB assets or is "entitled to" them.[27] Indeed, such analysis would be misguided in the context of nonstate terrorist parties, and would render their inclusion in TRIA superfluous, given that they operate outside the law and are generally not "entitled to" property in a formal sense. *See Kirschenbaum*, 830 F.3d at 134. Instead, TRIA requires only that the assets are blocked "assets of" DAB and that DAB is the

---

[27] Nor is such a finding required by New York law. Section 5225(b) provides for turnover of property that the judgment debtor is "entitled to ... possess[]." In TRIA cases, however, § 5225(b) is satisfied if the property interest is held directly by the agency or instrumentality of the judgment debtor, rather than by the judgment debtor itself. *See, e.g.*, *Weininger*, 462 F. Supp. 2d at 499; *Heiser*, 919 F. Supp. 2d at 421-22.

Taliban's agency or instrumentality. The Joint Creditors have amply demonstrated that. *See supra* Argument I.

**B.     A Finding That The Taliban Controls DAB Would Not Unconstitutionally Infringe On Executive Power**

Nor would a judicial finding that the Taliban controls DAB "bestow[] recognition on the Taliban that [the district court could] not constitutionally confer" or intrude on the President's exclusive authority to recognize foreign governments. S.A.27; *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015). In reaching the contrary conclusion, the district court overlooked a crucial distinction between acknowledging the fact of the Taliban's control of Afghan territory and government institutions—which the Executive Branch has itself repeatedly acknowledged—and formally granting the Taliban legal status as a recognized government.

Under international law, "[r]ecognition of a government is *formal* acknowledgment that a particular regime is the effective government of a state," *Restatement (Third) of Foreign Relations Law* § 203 cmt. a (emphasis added). Most commonly, a state recognizes a foreign government via an express declaration by the executive branch of the recognizing state. *See* App. 663; *see also Restatement (Second) of Foreign Relations Law* § 106 cmt. a (1965). Recognition also can be bestowed implicitly, but only through acts that "clearly manifest" the recognizing state's intent to grant recognition. App. 665-67.

58

United States courts possess neither the constitutional authority nor the capacity to formally recognize a foreign regime. *Zivotofsky*, 576 U.S. at 13 ("[R]ecognition may be effected by different means, but each means is dependent upon Presidential power"). But a judicial finding to the effect that "unrecognized regimes have certain powers to act within the territory controlled by them ... do[es] not constitute recognition of such regimes," either expressly or implicitly. *Restatement (Second) of Foreign Relations Law* § 106 cmt. b.

This distinction is made clear by the facts of *Zivotofsky*, in which the Supreme Court held that the President alone possesses the power to recognize foreign governments, while making clear that this "exclusive power extends no further than his *formal* recognition determination." 576 U.S. at 30 (emphasis added). The *Zivotofsky* litigation involved a dispute over whether Congress could command the Executive Branch to print "Jerusalem, Israel" in the passports of Jerusalem-born U.S. citizens, notwithstanding the President's refusal to recognize Israel's claim over Jerusalem. The Supreme Court held that Congress could not so mandate because that would compel the President to issue a formal document (via his agent, the Secretary of State) amounting to an "official executive statement implicating recognition." *Id*. But the Court was careful to note that other branches *can* speak on issues related to the status of a foreign government without effecting, in the district court's words, an impermissible recognition "by implication." S.A.28 (quoting App. 649). Congress

can, for example, decline to pay for an embassy or refuse to confirm an ambassador to a foreign government it considers illegitimate, because that would not "alter the President's recognition decision." *Zivotofsky*, 576 U.S. at 30.

Here, a judicial finding that DAB is the Taliban's agency or instrumentality in TRIA's practical sense does not "alter the President's recognition decision." *Id*. Such a finding is not equivalent to formal recognition—it would neither be an express statement of recognition nor an implicit one "clearly manifest[ing]" the U.S. position, App. 665—and it does not compel any action or words from the President. To the contrary, a judicial finding that the Taliban *de facto* controls DAB would be fully aligned with the Executive Branch's position that the Taliban is Afghanistan's "*de facto* government," App. 676-78, and its blocking of DAB's assets to prevent the Taliban from accessing them while making them "subject to ongoing litigation by U.S. victims of terrorism."[28]

The district court acknowledged *Zivotofsky*'s distinction between formal acts of recognition and acts short of recognition, but held it to be relevant only to congressional acts. S.A.28. This is a mischaracterization. It is unsurprising that *Zivotofsky*, a case about the constitutionality of an act of Congress, focused on what

---

[28] *See* Feb. 11 Fact Sheet, *supra* n.10. If the President believed that execution on DAB's assets was precluded by separation-of-powers concerns, he would not have made clear his expectation that "Plaintiffs will have a full opportunity to have their claims heard in court." *Id*.

Congress can or cannot do. And nothing in *Zivotofsky* disturbed the settled principle that a court can acknowledge an unrecognized regime's *de facto* existence, and its control over government organs, without conferring recognition. *Restatement (Second) of Foreign Relations Law* § 106 cmt. b. The district court neither addressed this principle nor explained how its ruling would intrude on the President's constitutional authority to control "formal" acts of recognition.

### C. The Political Branches Made A Considered Decision To Allow Turnover Of DAB's Assets To Satisfy The Taliban's Debts

At the center of the district court's legal rationales was a broader concern: that it would be somehow unfair or inappropriate to use Afghanistan's money to satisfy the Taliban's debts. But this was the innovation of TRIA. Through TRIA, Congress specifically provided that *any* blocked assets of *any* instrumentality—state or non-state—of the terrorist party against whom a judgment has been entered could be used to satisfy a judgment against that terrorist party. There is no requirement that the terrorist judgment debtor itself own the assets. And there is no limitation on its application where the instrumentality is simultaneously a foreign-state entity.

In advancing their interpretation of TRIA, the Joint Creditors are not taking advantage of an unanticipated loophole in the statutory text. This is how § 201 is *supposed* to work and is the result of the political branches' considered choices.

When Congress authorized terror victims to collect the blocked assets of "any" agency or instrumentality of "any" terrorist party, it understood that nonstate

61

terrorist entities can and sometimes do unlawfully commandeer state institutions. That was the condition of the world when TRIA was introduced: As it does again now, the Taliban in 2001 controlled DAB and used it to advance its campaign against U.S. interests. *See supra* at 6. It was therefore wholly foreseeable to Congress that terror victims would use TRIA to satisfy judgments against nonstate terrorists with the assets of sovereign entities the terrorists had usurped. And by allowing terror victims to recover from the assets of entities that nonstate terrorists "control" but do not necessarily own, *Kirschenbaum*, 830 F.3d at 135, Congress wrote the statute in a way that would permit just that to occur.

The President, too, has deliberately made a policy judgment: that DAB's assets at the FRBNY should be available for turnover under TRIA. Congress gave the President the authority to block the assets of terrorists. President Clinton used that authority in 1999 to block DAB's assets, finding that the Taliban controlled DAB. After the Taliban's 2021 takeover, President Biden blocked DAB's assets at the FRBNY, finding that DAB was again controlled by the Taliban, that the FRBNY assets belonged to DAB, and that it was imperative to "keep[] them out of the hands of the Taliban and malicious actors." Feb. 11 Fact Sheet, *supra* n.10.

President Biden contemplated that terror victims in *this specific litigation* would satisfy their judgments against the Taliban by executing on the DAB assets, subject to the courts' determination that the assets qualified for TRIA execution. He

licensed the transfer of $3.5 billion of those assets for the benefit of the Afghan people, while determining that the other approximately $3.5 billion of DAB's blocked assets would remain "subject to ongoing litigation by U.S. victims of terrorism." *Id*. These policy choices resulted from deliberations "at the highest levels of [g]overnment." MDL Dkt. 7629 at 2. And the President made them knowing that, through TRIA, Congress had ensured that the blocked property of a terrorist party's agency or instrumentality would be available to the terrorists' victims—in every case and notwithstanding any other provision of law.

In short, the political branches have made deliberate choices to make available for turnover the blocked assets of an instrumentality of a terrorist party, which DAB is. A court may disagree with the wisdom of this approach, as the district court apparently did, but it was Congress's decision to authorize turnover under TRIA in these circumstances and the President's decision to block the assets, making them subject to TRIA and these proceedings.

\* \* \*

The Joint Creditors have demonstrated that they meet each of TRIA's elements, entitling them to turnover, *see supra* Argument I, and that the district court's two bases for denying turnover are without merit, *see supra* Arguments II-III.

No further proceedings are necessary on remand.[29] The district court should therefore be instructed to grant the turnover motions, allowing the Joint Creditors to implement a distribution agreement that will benefit more than 10,000 claimants in the 9/11 MDL.

## CONCLUSION

The judgment should be reversed and the cases remanded with instructions for the district court to enter turnover awards to the Joint Creditors.

---

[29] Although other groups of terror victims have disputed the validity of the Joint Creditors' underlying writs of execution in light of this Court's intervening decision in *Levinson v. Kuwait Finance House (Malaysia) Berhad*, 44 F.4th 91, 96 (2d Cir. 2022) (vacating writ of execution that had been issued prior to a finding that the property's owner was an agency or instrumentality of a terrorist party), that has no relevance here. To begin, the Joint Creditors' writs were not invalidated by *Levinson*. *See* MDL Dkt. 8399. In March 2022, nearly five months before *Levinson* was decided, the Joint Creditors' turnover motions had provided the district court with ample record evidence, in addition to the Executive Branch's decision to block the assets, clearly establishing that DAB is a Taliban instrumentality, as had the *Doe* Creditors' initial writ application. *See John Does 1 Through 7 v. The Taliban*, No. 20-mc-740 (S.D.N.Y. Aug. 26, 2021), Dkt. 15. Moreover, unlike in *Levinson*, the alleged instrumentality here has not challenged its status as such.

In any event, a writ of execution is *not* a prerequisite to a turnover order. *See Garland D. Cox & Assocs., Inc. v. Koffman*, 400 N.E.2d 302, 302 (N.Y. 1979). Because the Joint Creditors have demonstrated, on the basis of the existing factual record, their satisfaction of every element of TRIA, they are entitled to turnover. Moreover, *only* the Joint Creditors were entitled to turnover at the time their motions were denied. *See supra* n.17.

Dated: June 30, 2023                    Respectfully Submitted,

*/s/ Ian Heath Gershengorn*
Ian Heath Gershengorn                   David A. Barrett
Douglass A. Mitchell                    BOIES SCHILLER FLEXNER LLP
JENNER & BLOCK LLP                      55 Hudson Yards, New York, NY
1099 New York Avenue, NW,               10001
Ste. 900                                (212) 446-2300
Washington, DC 20001                    dbarrett@bsfllp.com
(202) 639-6000
igershengorn@jenner.com
dmitchell@jenner.com                    Stuart H. Singer
                                        BOIES SCHILLER FLEXNER LLP
Lee Wolosky                             401 East Las Olas Blvd., Ste. 1200
Benjamin D. Alter                       Fort Lauderdale, FL 33301
JENNER & BLOCK LLP                      (954) 356-0011
1155 Avenue of the Americas             ssinger@bsfllp.com
New York, NY 10036
(212) 891-1600
lwolosky@jenner.com                     Timothy B. Fleming
balter@jenner.com                       WIGGINS CHILDS PANTAZIS FISHER
                                        GOLDFARB, PLLC
Andrianna D. Kastanek                   2208 18th Street NW #110
JENNER & BLOCK LLP                      Washington, D.C. 20009
353 N. Clark Street                     (202) 467-4489
Chicago, IL 60654                       tfleming@wigginschilds.com
(312) 840-7285
akastanek@jenner.com                    *Counsel for Plaintiffs-Appellants*
                                        *Fiona Havlish, et al., Appellants in*
                                        *23-258*

*/s/ John Thornton*

John Thornton
Orlando do Campo
Do CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com
od@dandtlaw.com

*Counsel for Plaintiffs-Appellants John Does 1 through 7, Appellants in 23-263*

*/s/ Dion G. Rassias*

Dion G. Rassias
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000
dgr@beasleyfirm.com

*Counsel for Plaintiffs-Appellants Raymond Anthony Smith, et al., Appellants in 23-304*

*/s/ Sean P. Carter*

Sean P. Carter, Esq.
Stephen A. Cozen
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
(215) 665-2105
scarter1@cozen.com

Richard Klingler
ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
1155 F Street, N.W., Ste. 750
Washington, DC 20004
(202) 249-6900
rklingler@egcfirm.com

Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for Plaintiffs-Appellants Federal Insurance Co., et al., Appellants in 23-346*

## CERTIFICATE OF COMPLIANCE

On April 5, 2023, this Court issued an order increasing the word limit for this brief to 16,000 words. *See* ECF 57. This brief complies with the Court's order because it contains 15,806 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman 14-point.

Dated: June 30, 2023                    By:   Ian Heath Gershengorn

67

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2023, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 30, 2023                     By:   Ian Heath Gershengorn

**SPECIAL APPENDIX**

# INDEX

*In re Terrorist Attacks on September 11, 2001*, Memorandum Decision and Order, No. 03 MDL 1570 (S.D.N.Y. Feb. 21, 2023), Dkt. 8866 ........................S.A.1

Terrorism Risk Insurance Act of 2002, § 201 ...................................................S.A.31

28 U.S.C. § 1330 ...........................................................................................S.A.33

28 U.S.C. § 1331 ...........................................................................................S.A.33

28 U.S.C. § 1604 ...........................................................................................S.A.33

28 U.S.C. § 1609 ...........................................................................................S.A.34

28 U.S.C. § 1610 ...........................................................................................S.A.34

28 U.S.C. § 1611 ...........................................................................................S.A.37

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
IN RE:                                        :       MEMORANDUM DECISION
                                              :       AND ORDER
TERRORIST ATTACKS ON                          :
SEPTEMBER 11, 2001                            :       03 MDL 1570 (GBD) (SN)
                                              :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This document relates to:

      *Smith v. The Islamic Emirate of Afghanistan, et al.*, No. 01-cv-10132
      *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, No. 02-cv-6977
      *Havlish, et al. v. Bin Laden, et al.*, No. 03-cv-9848
      *Fed. Ins. Co. et al. v. Al Qaida, et al.*, No. 03-cv-6978
      *John Does 1 Through 7 v. The Taliban, et al.*, No. 20-mc-740

GEORGE B. DANIELS, United States District Judge:

      In this multidistrict litigation, four groups of judgment creditors ("Judgment Creditors")[1]

with judgments against the Taliban stemming from the terrorist attacks on September 11, 2001

(the "9/11 Attacks") moved for turnover to satisfy their judgments with assets in the name of

Afghanistan's central bank, Da Afghanistan Bank ("DAB"), held at the Federal Reserve Bank of

New York (the "FRBNY"). (ECF Nos. 7763, 7767, and 7936 in No. 03-md-1570; ECF No. 62 in

No. 01-cv-10132; ECF No. 597 in No. 03-cv-9848.)[2] Before this Court is Magistrate Judge Sarah

Netburn's August 26, 2022 Report and Recommendation (the "Report"), recommending that this

Court deny the Judgment Creditors' motions and not allow Judgment Creditors of the Taliban to

---

[1] The Judgment Creditors are the four sets of Plaintiffs in the following cases: *Smith v. The Islamic Emirate of Afghanistan, et al.*, No. 01-cv-10132 (the "*Smith* Creditors"), *Havlish, et al. v. Bin Laden, et al.*, No. 03-cv-9848 (the "*Havlish* Creditors"), *Fed. Ins. Co. et al. v. Al Qaida, et al.*, No. 03-cv-6978 (the "*Federal Insurance* Creditors"), and *John Does 1 Through 7 v. The Taliban, et. al.*, No. 20-mc-740 (the "*Doe* Creditors"). In their filings, Judgment Creditors refer to themselves collectively as the "Joint Creditors."

[2] Unless otherwise indicated, all references made herein to the docket sheet refer to the main docket sheet for this multidistrict litigation, No. 03-md-1570. Plaintiffs in *Ashton, et al. v. Al Qaeda Islamic Army, et al.*, No. 02-cv-6977 ("*Ashton* Plaintiffs") also filed an *ex parte* motion for attachment. (ECF No. 8412; ECF No. 1724 in No. 02-cv-6977.)

satisfy their judgments with DAB funds. (*See* Report, ECF No. 8463, at 2.) Magistrate Judge Netburn advised the parties that failure to file timely objections to the Report would constitute a waiver of those objections on appeal. (*Id.* at 42–43.) Judgment Creditors filed objections on November 10, 2022, (*see* Objections, ECF No. 8733),[3] and *amicus curiae* Mr. Naseer A. Faiq, the *Chargé de Affaires* of the Permanent Mission of the Islamic Republic of Afghanistan, responded to those objections on November 25, 2022, (*see* Faiq Nov. 25, 2022 Letter, ECF No. 8773).[4]

Because the parties filed timely objections, this Court undertakes a *de novo* review of the Report. After doing so, this Court ADOPTS Magistrate Judge Netburn's Report in finding that this Court lacks subject-matter jurisdiction over the turnover motions under the FSIA, (Report at 12–26), and that this Court is constitutionally restrained from determining the Taliban is the legitimate government of Afghanistan as required to attach DAB's assets, (Report at 27–37).[5] For the reasons stated herein, the Judgment Creditors' turnover motions are DENIED.

---

[3] *Ashton* Plaintiffs joined the Judgment Creditors' objections in part. (*See Ashton* Nov. 16, 2022 Letter, ECF No. 8756.)

[4] This Court accepts the *amicus* letter from Mr. Faiq as a response to the Judgment Creditors' objections because Magistrate Judge Netburn granted Mr. Faiq's motion, among others, for leave to file an *amicus* brief on April 27, 2022, prior to the issuance of her Report. (*See* Report at 10–11 (citing Order on *Amici*, ECF No. 7925; also citing Faiq Am. *Amicus* Br., ECF No. 7932-1); *see also* procedural history *infra* Section II.C.)

[5] This Court declines to adopt the Report's determination that the Taliban's nonconsensual control prevents DAB from being a Taliban agency or instrumentality. (*See* Report at 37–41.) It is not this Court's responsibility to assess whether the fact that "DAB has been violently occupied by the Taliban" via the Taliban takeover of Afghanistan consequently disqualifies DAB as an instrumentality of the Taliban. (*Contra id.* at 37.) One need only look at numerous examples throughout the world to understand the historic role of military force in the destruction and formation of recognized governments. This Court thus rejects the Report's finding that "the relationship between a terrorist [party] and its agency or instrumentality must be consensual." (*Id.* at 40); *see also, Kirschenbaum v. 650 Fifth Ave.*, 257 F. Supp. 3d 463, 523 (S.D.N.Y. 2017), *rev'd and remanded on other grounds sub nom. Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174 (2d Cir. 2019) ("*Kirschenbaum II*") ("As a matter of law . . . this Court does not believe knowledge of instrumentality status is a required element for a TRIA § 201(a) claim; . . . people or entities may become the unwitting instruments of another.").

2

S.A.2

# I. LEGAL STANDARD

A court "may accept, reject, or modify, in whole or in part, the findings or recommendations" set forth in a magistrate judge's report. 28 U.S.C. § 636(b)(1)(C). The court must review *de novo* the portions of a magistrate judge's report to which a party properly objects. *Id*. The court, however, need not conduct a *de novo* hearing on the matter. *See United States v. Raddatz*, 447 U.S. 667, 675–76 (1980). Rather, it is sufficient that the court "arrive at its own, independent conclusion" regarding those portions of the report to which objections are made. *Nelson v. Smith*, 618 F. Supp. 1186, 1189–90 (S.D.N.Y. 1985) (citation omitted).

Portions of a magistrate judge's report to which no or "merely perfunctory" objections are made are reviewed for clear error. *See Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006) (citations omitted). The clear error standard also applies if a party's "objections are improper—because they are 'conclusory,' 'general,' or 'simply rehash or reiterate the original briefs to the magistrate judge.'" *Stone v. Comm'r of Soc. Sec.*, No. 17-cv-569 (RJS)(KNF), 2018 WL 1581993, at *3 (S.D.N.Y. Mar. 27, 2018) (citation omitted). Clear error is present when "upon review of the entire record, [the court is] 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) (citation omitted).

# II. BACKGROUND

## A. Afghanistan and 9/11

The 9/11 Attacks resulted in the murder of nearly three thousand innocent people and injuries to thousands more.[6] In the ensuing days, U.S. President George W. Bush launched a global

---

[6] This Court assumes familiarity with the general background of this case and will only restate relevant factual background as necessary to address the pending motions. Because Sections I and II of the Report are adopted in full unless otherwise noted, this Court refers to facts detailed in the Report throughout this opinion.

3

military campaign to respond to the 9/11 Attacks and counter international terrorism. Since 1996, the Taliban had *de facto* control over the Islamic Emirate of Afghanistan, although the United States did not recognize the Taliban as Afghanistan's government.[7] President Bush demanded that the Taliban permanently close terrorist training camps within Afghanistan's borders and hand over those responsible for the 9/11 Attacks, principally al Qaeda leader Osama bin Laden. (*See Smith*, No. 01-cv-10132, ECF No. 63-3, Clayton Thomas, CONG. RSCH. SERV., *Taliban Government in Afghanistan: Background and Issues for Congress* 2 (2021) ("Taliban Background").) When the Taliban refused, the United States and coalition allies invaded Afghanistan on October 7, 2001 as part of Operation Enduring Freedom. *See id.* 2–3. Taliban forces fled Kabul, and the Islamic Emirate of Afghanistan collapsed within weeks. *Id.* The United Nations helped form an interim, and then transitional, government backed by U.S. and allied forces, culminating in the formation of the Islamic Republic of Afghanistan (the "Republic") in 2004. *See id.* at 3, 28.

Following a brutal war spanning two decades, the Taliban has returned to power in Afghanistan. During the administration of President Donald Trump, a February 2020 U.S.-Taliban agreement stipulated that the United States and its allies would fully withdraw all international forces from Afghanistan by May 2021. In April 2021, President Joseph Biden postponed this deadline to August of the same year. *Id.* at 6–7. The Taliban soon thereafter began a sweeping military offensive, capturing large swaths of Afghanistan before finally entering Kabul to overthrow the Republic on August 15, 2021. *See id.* at 7–8. Although U.S. forces managed to evacuate approximately 124,000 people up until the last American soldier left Afghanistan on August 30, 2021, the chaotic final days of U.S. presence coincided with a catastrophic suicide

---

[7] "The United States did not recognize the 1996-2001 Taliban government, maintaining that between 1996 and 2000, 'there was no functioning central government' in Afghanistan." (*Smith*, No. 01-cv-10132, ECF No. 63-3, Clayton Thomas, CONG. RSCH. SERV., *Taliban Government in Afghanistan: Background and Issues for Congress* 28 (2021) (citation omitted).)

4

**S.A.4**

bombing at Kabul's international airport and stranded hundreds of U.S. citizens and tens of thousands of Afghans who had worked with the United States. *See id.* at 22–23.

The people of Afghanistan then faced a relentless barrage of calamities. Up to 97 percent of Afghans may fall into poverty amid the collapse of the banking sector, and more than a million children are at risk of dying of starvation. (See Report at 4 (citing Faiq Am. *Amicus* Br., ECF No. 7932-1, at 2–3).) Some families have resorted to selling bodily organs or their own children to afford food. (*See id.* (citing Afghan Civ. Soc'y Orgs. *Amicus* Br., ECF No. 7896-1, at 5; also citing Faiq Am. *Amicus* Br. at 3).) The Taliban is ruthlessly hunting down journalists, civil society leaders, women activists, religious and ethnic minorities, former Republic officials, and former Afghan security forces who served with U.S.-allied forces. (*See id.* (citing Afghan Civ. Soc'y Orgs. *Amicus* Br. at 6).) After issuing edicts banning women from attending high school or college, the Taliban recently imposed a ban on women conducting humanitarian work, endangering approximately 28 million Afghans who desperately need assistance to survive a harsh winter, economic collapse, and the risk of famine. *See UN and Top Aid Officials Slam Afghan Rulers' NGO Ban for Women*, UN NEWS (Dec. 29, 2022), https://news.un.org/en/story/2022/12/1132082.

As before, the United States does not recognize the Taliban regime as the *de jure* government of Afghanistan. (*See* Report at 4 (citing U.S. Statement of Interest, ECF No. 7661, at 34.) Indeed, no country in the world does. *See, e.g.*, Belquis Ahmadi & Scott Worden, *The Taliban Continue to Tighten Their Grip on Afghan Women and Girls*, U.S. INSTIT. PEACE (Dec. 8, 2022), https://www.usip.org/publications/2022/12/taliban-continue-tighten-their-grip-afghan-women-and-girls.

5

**S.A.5**

**B. Da Afghanistan Bank**

DAB has been the central bank of Afghanistan since its founding in 1939. (Report at 4 (citing Decl. Alex Zerden, ECF No. 7766 ¶ 16).) When the Republic fell in August 2021, DAB held approximately $7 billion in assets at the FRBNY. (*Id.* (citing *Havlish* Mem. of Law on Mot. for Turnover, ECF No. 7764). Most of these funds came from international donors and the savings of Afghan citizens. (*Id.* (citing Faiq Am. *Amicus* Br. at 19 n.18).) The U.S. Treasury Department blocked the assets on August 15, 2021—the same day that the Taliban entered Kabul. (*Id.* (citing Taliban Background at 39).) While the action helped ensure that the funds would not fall into Taliban hands, it further exacerbated Afghanistan's humanitarian crisis because Afghan "banks were unable to lend money and citizens [were] unable to withdraw their own funds." (*Id.* (citing Afghan Civ. Soc'y Orgs. *Amicus* Br. at 5).)

In February 2022, President Biden issued an executive order titled "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan." Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022) ("E.O. 14,064"). The order addressed the frozen assets and stated that "the preservation of certain property of Da Afghanistan Bank (DAB) held in the United States by United States financial institutions is of the utmost importance to addressing this national emergency and the welfare of the people of Afghanistan." *Id.* Executive Order 14,064 determined that "the widespread humanitarian crisis in Afghanistan—including the urgent needs of the people of Afghanistan for food security, livelihoods support, water, sanitation, health, hygiene, shelter and settlement assistance, and COVID-19-related assistance, among other basic human needs" constituted an "unusual and extraordinary threat to the national security and foreign policy of the United States." (Report at 5 (quoting E.O. 14,064).) As a result, President Biden declared a national emergency and ordered that "[a]ll property and interests in property of DAB

6

**S.A.6**

that are held . . . in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked . . . ." (*Id.* (quoting E.O. 14,064 § 1(a)).)

The U.S. Treasury's Office of Foreign Assets Control ("OFAC") implemented Executive Order 14,064 through its issuance of License No. DABRESERVES-EO-2022-886895-1. (*Id.* (citing U.S. Statement of Interest, Ex. B, ECF No. 7661-2 (the "OFAC License").) The United States sought to use the license to transfer $3.5 billion—approximately half of DAB's assets— "for the benefit of the people of Afghanistan, including to an international financing mechanism (in which the United States is a member) holding and disbursing funds for the benefit of the people of Afghanistan, or to a United Nations fund, programme, specialized agency, or other entity or body for the benefit of the people of Afghanistan." (*Id.* (quoting OFAC License § 1(b)).) The United States reported that this OFAC License could not take effect without the Court modifying the writs of execution obtained by the Judgment Creditors or otherwise confirming that the writs did not restrain the $3.5 billion the license sought to transfer. (*Id.* at 5–6 (citing U.S. Statement of Interest at 2–3).) On February 25, 2022, Magistrate Judge Netburn issued an order with the parties' consent confirming that the writs did not restrain the $3.5 billion under the OFAC License. (*See* U.S. Dep't of Just. Feb. 24, 2022 Letter, ECF No. 7700; Order on OFAC License, ECF No. 7701.) The FRBNY retained the remaining DAB funds of $3.5 billion at issue here. (Report at 5–6.)

### C. Procedural History

The Judgment Creditors hold default judgments against the Taliban for their losses arising from the 9/11 Attacks and other acts of terrorism. (*See id.* at 6–9 (detailing judgments and timeline).) The *Havlish* Creditors and *Smith* Creditors brought suit and obtained default judgments against the Taliban for losses suffered on 9/11. (*Id.* at 6–8.) The *Federal Insurance* Creditors are insurance companies that made payments because of the 9/11 Attacks and obtained a default

7

**S.A.7**

judgment against the Taliban for their economic losses. (*Id.* at 7.) The *Doe* Creditors obtained a default judgment against the Taliban, among others, arising from a 2016 attack by the Taliban and other terrorist groups at a contractor compound in Afghanistan. (*Id.* at 8.) All of the Judgment Creditors hold judgments against the Taliban that remain substantially unsatisfied. (*See id.* at 6–9.)

The Judgment Creditors now seek to satisfy their judgments against the Taliban with DAB assets. The Republic was defending against claims consolidated in this multidistrict litigation until the Taliban takeover. (*See, e.g.*, *Faulkner v. Bin Laden, et al.*, No. 09-cv-07055, ECF No. 184.) After the Republic fell, the Judgment Creditors obtained writs of execution targeting DAB funds held at FRBNY and later filed respective motions for turnover of the funds pursuant to Federal Rule of Civil Procedure 69(a), New York Civil Practice Law and Rules ("CPLR") §§ 5225(b) and 5227, and the Terrorism Risk Insurance Act of 2002 ("TRIA") § 201, Pub. L. No. 107-297, 116 Stat. 2337, as amended, Pub. L. No. 112-158, 126 Stat. 1260 (codified at 28 U.S.C. § 1610 note). (*See* Report at 6–9 (detailing motions and timeline).) No Judgment Creditor holds a judgment against the state of Afghanistan or DAB. (*Id.* at 6.) Further, no representative for Afghanistan, DAB, or the Taliban is currently defending in this multidistrict litigation. (*Id.*)

The United States Government filed a Statement of Interest for these turnover proceedings. (*See* U.S. Statement of Interest.) Factually, the United States stated that DAB is the central bank of Afghanistan, (*id.* at 8), and provided that the United States has not recognized the Taliban or any other entity as the government of the state of Afghanistan, (*id.* at 26). While acknowledging "a compelling interest in permitting victims of terrorism to obtain compensation to the greatest degree permitted under the law," (*id.* at 19), the United States asserted "a strong interest in the President's constitutional authority to make decisions with respect to the recognition of foreign

8

**S.A.8**

governments and . . . in ensuring the proper construction of TRIA and the Foreign Sovereign Immunities Act," (*id.* at 3). The United States took "no position" on whether the Judgment Creditors had satisfied TRIA's requirements for turnover of DAB's assets. (Report at 9 (citing U.S. Statement of Interest at 19–20).) However, the United States noted that the courts should narrowly construe exceptions to the immunity of foreign sovereign property and measure such exceptions "against a benchmark that accounts for the risk of reciprocal challenges to American property abroad." (*Id.* at 10 (citing U.S. Statement of Interest at 27).) Further, the United States argued that the Judgment Creditors "must establish a theory of ownership by the Taliban that would not require this Court—either expressly or by implication—to make its own determination as to the identity of Afghanistan's government" because such a determination would infringe on the President's constitutional powers to recognize a foreign government. (*See* U.S. Statement of Interest at 26–27.)

Magistrate Judge Netburn accepted four *amicus curiae* briefs on these turnover motions. (Report at 10.) The briefs are from (1) the Women's Forum on Afghanistan (Women's F. Mar. 30, 2022 Letter, ECF No. 7823, at 3–4), (2) the Center for Constitutional Rights on behalf of four Afghan civil-society organizations (Afghan Civ. Soc'y Orgs. *Amicus* Br.),[8] (3) the non-governmental organization Unfreeze Afghanistan (Unfreeze Afghanistan *Amicus* Br., *Havlish*, No. 03-cv-9848, ECF No. 617), and (4) the Open Society Justice Initiative, submitted on behalf of Mr. Naseer A. Faiq, the *Chargé de Affaires* of the Permanent Mission of the Islamic Republic of Afghanistan (Faiq Am. *Amicus* Br.). Together, "[t]hese briefs describe the devastating effects that the Taliban's takeover has had on Afghan civil society and on the Afghan people. They also raise[]

---

[8] Those organizations are Global Advocates for Afghanistan, the Afghan Network for Advocacy and Resources, Afghans For A Better Tomorrow, and the Afghan-American Community Organization. (*See* Afghan Civ. Soc'y Orgs. *Amicus* Br. at vi–vii.)

9

several legal arguments against the Judgment Creditors' turnover motions." (Report at 11.) Magistrate Judge Netburn rejected two amicus briefs from groups that included members already represented in this litigation. (Apr. 27, 2022 Order on *Amici*, ECF No. 7925; May 2, 2022 Order on *Amici*, ECF No. 7941.) This Court also denied, based on being unhelpful and untimely, subsequent separate motions for leave to submit briefs as *amici curiae* from Osen LLC and Freshfields Bruckhaus Deringer US LLP on behalf of unnamed "former members of Congress and former government officials." (*See* Nov. 29, 2022 Order on *Amici*, ECF No. 8776, at 3.) Additionally, the FRBNY submitted a single non-substantive letter. (FRBNY May 20, 2022 Letter, ECF No. 8040.)

On August 26, 2022, Magistrate Judge Netburn issued her Report recommending that this Court deny the Judgment Creditors' motions and not allow the Judgment Creditors' to satisfy their judgments with DAB funds. (*See* Report at 2.) The Judgment Creditors filed timely objections on November 10, 2022, (*see* Objections), and Mr. Faiq responded to those objections on November 25, 2022, (*see* Faiq Nov. 25, 2022 Letter). The Judgment Creditors then replied to Mr. Faiq's filing. (Joint Creditors Dec. 14, 2022 Letter, ECF No. 8805.) Additionally, Mr. Faiq filed a notice of supplemental authority relating to the Report's interpretation of TRIA, (*see* Faiq Oct. 17, 2022 Letter, ECF No. 8645), and the Judgment Creditors responded, (*see* Joint Creditors Mem. of Law in Resp. to Suppl. Authority, ECF No. 8735).

## III.    MAGISTRATE JUDGE NETBURN CORRECTLY DETERMINED THAT THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER THE TURNOVER MOTIONS UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT

This Court lacks subject-matter jurisdiction over DAB and, by extension, over these turnover motions under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. DAB is the central bank of Afghanistan. As an instrumentality of a foreign state, DAB enjoys two

10

presumptive immunities under the FSIA: (1) immunity from jurisdiction and (2) immunity from execution on its property. Both immunities must be independently overcome for a party to reach the assets of an instrumentality of a foreign state. Here, "the Judgment Creditors propose to take their judgments against the non-sovereign Taliban, have DAB declared a Taliban instrumentality, and obtain a waiver of both DAB's immunities under TRIA § 201(a)." (Report at 20.) While TRIA can overcome jurisdictional immunity under certain circumstances, those circumstances are not present here. Therefore, DAB retains its jurisdictional immunity, and this Court lacks subject-matter jurisdiction over DAB and the turnover motions.

### A. DAB is a Central Bank Under the FSIA with Both Jurisdictional Immunity and Execution Immunity

"[T]he FSIA is the 'sole basis for obtaining jurisdiction over a foreign state in [U.S.] courts.'" *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 113 (2d Cir. 2017) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)). Foreign states are immune from court jurisdiction unless a specific exception to jurisdictional immunity applies. *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010) ("The FSIA provides that 'a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States' except as provided in the Act." (quoting 28 U.S.C. § 1604)). The FSIA "must be applied by the District Courts in every action against a foreign sovereign, since subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983) (citation omitted). Thus, in order for a court to determine whether it holds subject-matter jurisdiction over a case against a foreign sovereign or its instrumentalities, the court must make a FSIA immunity determination regardless of whether the foreign state is participating in the proceedings. *Id.* at 494

11

**S.A.11**

n.20 ("[E]ven if the foreign state does not enter an appearance to assert an immunity defense, a

District Court still must determine that immunity is unavailable under the [FSIA].").

For the purposes of the immunity determination under the FSIA, a foreign state "includes

a political subdivision of a foreign state or an agency or instrumentality of a foreign state."  28

U.S.C. § 1603(a).  The FSIA provides that an "agency or instrumentality of a foreign state" is any

entity

> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or
> a majority of whose shares or other ownership interest is owned by a
> foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in
> section 1332(c) and (e) of this title, nor created under the laws of any third
> country.

*Id.* § 1603(b)(1)–(3); (*see also* Report at 14 (quoting same)).  A central bank is "the paradigm of a

state agency or instrumentality."  *S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d

Cir. 1983).  Here, all parties and the United States agree that DAB is the central bank of

Afghanistan, although the United States has not yet recognized any regime as the *government* of

Afghanistan.  (*See* Report at 19.)  The United States reconciles this apparent contradiction by

noting that "there is a distinction between a foreign *government* and a foreign *state*, and '[a]

state can . . . recognize or treat an entity as a state while denying that a particular *regime* is its

*government*.'"  (Statement of Interest at 25 (quoting RESTATEMENT (THIRD) OF FOREIGN

RELATIONS LAW OF THE UNITED STATES § 203 cmt. a (1987)) (emphases added).)  Therefore, as

a central bank, DAB is the instrumentality of the foreign state of Afghanistan.

Generally, a foreign sovereign state and its agencies and instrumentalities, such as DAB,

have "two types of foreign sovereign immunity [under the FSIA]—immunity from jurisdiction

and immunity from attachment and execution of the sovereign's property."  *Vera v. Banco Bilbao*

*Vizcaya Argentaria, S.A.*, 946 F.3d 120, 133 (2d Cir. 2019) ("*Vera II*"). FSIA § 1604 grants foreign states and their instrumentalities immunity from *jurisdiction*, unless an exception under §§ 1605 to 1607 applies. In contrast, FSIA § 1609 renders the *property* of foreign states and their instrumentalities immune from *attachment* and *execution*, unless an exception under §§ 1610, 1611 applies. These "provisions governing jurisdictional immunity, on one hand, and execution immunity, on the other, operate independently." *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011). "[A] waiver of immunity from suit does not imply a waiver of immunity from attachment of property, and a waiver of immunity from attachment of property does not imply a waiver of immunity from suit." *Id.* (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 456(1)(b)). Thus, a party seeking to attach the central bank assets of a foreign sovereign must overcome both immunities. (*See also* Report at 15.)

Because DAB is Afghanistan's central bank, it is immune from the jurisdiction of U.S. courts under 28 U.S.C. § 1604 unless an exception to jurisdictional immunity applies. As to foreign state property, the FSIA neither grants nor forbids *in rem* civil-forfeiture actions. *See United States v. Assa Co.*, 934 F.3d 185, 190 (2d Cir. 2019) ("The FSIA does not create jurisdiction over, and does not immunize a foreign state's property from, *in rem* civil-forfeiture actions."). However, such actions face a steep climb because the FSIA was designed "to prevent the location of the [foreign state] property from conferring jurisdiction on the court—*i.e.*, to prevent *in rem* and *quasi-in-rem* actions from undermining the general principles codified in the FSIA." *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 253 (2d Cir. 1999). Through the FSIA, "Congress sought to clamp down on *quasi in rem* suits because they 'caused significant irritation to many foreign governments' and could potentially 'give rise to serious friction in United States' foreign relations.'" *Assa Co.*, 934 F.3d at 190 (citation omitted).

13

**S.A.13**

Furthermore, central bank assets used for central banking enjoy stronger protection from execution. FSIA § 1611(b)(1) stipulates that, notwithstanding the normal exceptions permitting execution on a foreign sovereign's assets, "the property . . . of a foreign central bank or monetary authority held for its own account" is immune from attachment or execution. (*See also* Report at 15.) In drafting the FSIA, Congress determined that "[i]f execution could be levied on such funds without an explicit waiver, deposit of foreign funds in the United States might be discouraged. Moreover, execution against the reserves of foreign states could cause significant foreign relations problems." *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 473 (2d Cir. 2007) (quotation marks and citation omitted). Courts must therefore be especially cautious about "weakening the immunity from suit or attachment traditionally enjoyed by the instrumentalities of foreign states" because such actions "could lead foreign central banks, in particular, to withdraw their reserves from the United States and place them in other countries." *EM Ltd. v. Banco Cent. De La Republica Argentina*, 800 F.3d 78, 98 (2d Cir. 2015) (quotation marks and citation omitted).

Here, the Judgment Creditors seek DAB assets maintained for central banking and held at the FRBNY. Therefore, to reach DAB's assets, the Judgment Creditors need exceptions to the FSIA both for DAB's jurisdictional immunity and execution immunity; they look to TRIA.

## B. TRIA Does Not Nullify DAB's Jurisdictional Immunity to Provide This Court with Subject-Matter Jurisdiction

The Judgment Creditors argue that TRIA's text nullifies any relevant constraint on DAB's jurisdictional immunity provided by the FSIA. (*See generally* Objections at 28–39.) A court begins its statutory analysis by looking to the ordinary meaning of the statutory text, rules of grammar, and statutory context. *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 299–301 (2017); *see also United States v. Sampson*, 898 F.3d 287, 302 (2d Cir. 2018) (looking to the "plain

14

language" of the statutory text). Codified as a note to 28 U.S.C. § 1610, TRIA § 201(a)'s terrorism-related exception reads

> Notwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605A or 28 U.S.C. § 1605(a)(7)(repealed)], the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a). As applicable to TRIA, "courts must be careful when interpreting the scope of the FSIA's exceptions" in order to ensure foreign sovereigns are held accountable "where Congress dictated," while avoiding "a flood of suits against foreign states, prompting those nations to reciprocate in foreign suits against the United States." *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 819 (2d Cir. 2021) (citations omitted).

In arguing that TRIA's exception abrogates the FSIA's provisions on jurisdictional immunity, the Judgment Creditors assert that TRIA § 201(a)'s clause of "[n]otwithstanding any other provision of law" overcomes any barrier to execution posed by DAB's jurisdictional immunities. (*See* Objections at 32–35; *see also* Report at 20–27.) For such a notwithstanding clause, courts must determine the statute's scope to understand what laws are overcome by the clause. *See Smith v. Fed. Rsrv. Bank of New York*, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003), *aff'd*, 75 F. App'x 860 (2d Cir. 2003), *and aff'd sub nom. Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York*, 346 F.3d 264 (2d Cir. 2003). In *Smith v. Federal Reserve Bank of New York*, the District Court determined that TRIA's notwithstanding clause, although broad, "necessarily has a scope and that scope depends on the substance of the provision to which it is attached." *Id.* TRIA's notwithstanding clause does not trump every statute but rather only those which conflict

15

**S.A.15**

with TRIA. *See id.* ("The phrase 'notwithstanding any other provision of law' simply means that Section 201(a) controls if there is another provision of law that conflicts with it.").

Thus, the question is whether the FSIA and TRIA conflict with respect to jurisdictional immunity. They do not. "TRIA . . . [is] an execution statute," *see Weininger v. Castro*, 462 F. Supp. 2d 457, 480 (S.D.N.Y. 2006). "Congress . . . created terrorism-related exceptions to immunity under FSIA," and "[o]ne such exception is TRIA's authorization of the *attachment of the property* of terrorist parties and that of their agencies or instrumentalities." *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir. 2014) (per curiam) (emphasis added); (*see also* Report at 15–16).

As detailed in the Report, the language in TRIA resembles the other execution immunity language in the FSIA, distinguishing it from the FSIA's language abrogating jurisdictional immunity. "[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning." *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 372–73 (2d Cir. 2022) (quotation marks and citation omitted). The sections of FSIA that 28 U.S.C. § 1604 expressly identifies as exceptions to immunity from *jurisdiction* are 28 U.S.C. §§ 1605 to 1607. 28 U.S.C. § 1604. Those exceptions stipulate when "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States . . . ." *See* 28 U.S.C. §§ 1605 to 1607; (*see also* Report at 23 (quoting provisions)). In contrast, the sections of FSIA that 28 U.S.C. § 1609 expressly identifies as exceptions to immunity from *attachment* and *execution* are 28 U.S.C. §§ 1610 (where TRIA § 201(a) exists as a note) and 1611. 28 U.S.C. § 1609. Those exceptions specify when the "property of a foreign state" or "property of an agency or instrumentality of such a state . . . shall not be immune from attachment in aid of execution . . . ." *See* 28 U.S.C. §§ 1610 to 1611; (*see also* Report at 23–24 (quoting provisions)). TRIA § 201(a) mirrors this attachment

16

**S.A.16**

and execution language, providing that "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) *shall be subject to execution or attachment in aid of execution . . . .*" (emphasis added). TRIA is thus rightfully categorized as an execution statute within the FSIA framework, "preserv[ing] a common law distinction between . . . jurisdictional immunity from actions brought in United States courts and immunity from attachment or execution of the foreign sovereign's property." *Weininger*, 462 F. Supp. 2d at 481.

As part of an execution statute, TRIA's notwithstanding clause defeats provisions that conflict with TRIA's specific terms of execution. The District Court in *Smith* addressed execution on Iraqi assets held at the FRBNY, which President Bush confiscated under the International Emergency Economic Powers Act ("IEEPA") and delivered to the U.S. Treasury. 280 F. Supp. 2d at 317–18. There, the plaintiffs argued that TRIA's notwithstanding clause trumped IEEPA and enabled them to reach the assets, but the *Smith* court rejected such an expansive scope of the notwithstanding clause. *Id.* at 319–20. The court held that "[a]lthough the 'notwithstanding' language Congress used in the TRIA was broad," "TRIA and the relevant provision of the IEEPA coexist with no conflict," so TRIA's notwithstanding clause did not permit the plaintiffs to execute on assets seized by the President under the IEEPA. *Id.* Applying these principles, TRIA would prevail in a statutory conflict if the Judgment Creditors sought to execute on assets but were prevented from doing so by an immunity to execution contained in 28 U.S.C. § 1610, § 1611, or some other statute. (*See also* Report at 25.) As Magistrate Judge Netburn rightly determined, TRIA's notwithstanding clause "is not a bulldozer that clears every possible legal obstacle between a litigant and their goal." (*Id.* at 21.) Because TRIA is an *execution* statute, it does not conflict with the provisions of FSIA that deal with *jurisdictional* immunity, and TRIA fails to provide the

17

jurisdiction over DAB assets that the Judgment Creditors need. *See Walters*, 651 F.3d at 288 (stating immunities from jurisdiction and execution operate independently).

Although secondary to the plain text, the circumstances around TRIA's passage also supports this interpretation of TRIA's notwithstanding clause. When faced with a plausibly ambiguous statute, a court may turn to legislative history to determine the statute's underlying purpose or confirm a reading suggested by other tools.[9] *See, e.g.*, *Milner v. Dep't of the Navy*, 562 U.S. 562, 572 (2011) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text."). As noted by Magistrate Judge Netburn, TRIA resulted from a battle between Congress and the President over the extent to which foreign sovereign property was subject to execution. (Report at 26.) Congress modified the FSIA exceptions in 1998 by adding 28 U.S.C. § 1610(f), which waives execution immunity for blocked assets of a foreign state where there is a judgment against the state for acts of terrorism. 28 U.S.C. § 1610(f)(1). However, this iteration of the FSIA enabled the President, in the interest of national security, to waive this immunity exception. 28 U.S.C. § 1610(f)(3); (*see also* Report at 26). The President consistently issued such waivers, preventing the terms of the § 1610(f) exception from ever taking effect. *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 n.6 (2018). Congress responded with TRIA, where it "placed the 'notwithstanding' clause in § 201(a) . . . to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the

---

[9] This Court rejects the Judgment Creditors' misplaced emphasis on statements of *individual* members of Congress as evidence of *congressional* intent. (*See* Objections at 39–41.) Such statements "reflect at best the understanding of individual Congressmen." *Zuber v. Allen*, 396 U.S. 168, 186 (1969); *see also, e.g., SW Gen., Inc.*, 580 U.S. at 306 ("What Congress ultimately agrees on is the text that it enacts, not the preferences expressed by certain legislators."); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."); (*see also* Nov. 29, 2022 Order on *Amici* at 4). This Court similarly declines to credit the floor statements of an individual senator cited in the Report as persuasive evidence of congressional intent. (*See* Report at 26–27 (quoting Sen. Tom Harkin).)

18

TRIA's enactment." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009). Thus, TRIA's notwithstanding clause and other broad language such as the statute's application "in every case," (*cf.* Objections at 35–36), do not abrogate the jurisdictional immunity that applies to DAB and its assets under the FSIA.

### C. Judgments Against the Taliban Are Insufficient to Reach DAB's Assets under TRIA

As an execution statute within the FSIA framework, TRIA § 201(a)'s waiver of immunity can provide a court with jurisdiction over the property of a foreign state or its instrumentality where there exists a valid underlying judgment *against the sovereign*. In *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010), plaintiffs obtained a default judgment against the Islamic Republic of Iran and then initiated execution proceedings against frozen assets held by separate entity Bank Melli, *id.* at 46–47. Plaintiffs held a valid judgment against Iran, for which Iran's jurisdictional immunity was waived under then 28 U.S.C. § 1605(a)(7), because the U.S. State Department had officially designated Iran as a "state sponsor of terrorism." *Id.* at 48. Bank Melli's status as an instrumentality of Iran was uncontested, but the bank argued that the district court lacked jurisdiction over the bank because it was not named in the original judgment. *Id.* at 48–49. The Court of Appeals for the Second Circuit rejected the argument and held that the plain language of TRIA § 201(a) covering "the blocked assets of any agency or instrumentality of that terrorist party" conferred subject-matter jurisdiction over an instrumentality not named in that original judgment if there was a valid judgment against the underlying sovereign. *Id.* at 50 (quoting TRIA § 201(a)).

Subsequent decisions reaffirmed that TRIA § 201 "provides for federal court jurisdiction over execution and attachment proceedings involving the assets of a foreign sovereign . . . *only* where 'a valid judgment has been entered' against the sovereign." *Vera II*, 946 F.3d at 133

19

(quoting *Vera v. Republic of Cuba*, 867 F.3d 310, 321 (2d Cir. 2017) ("*Vera I*")) (emphasis added); *see also Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 131 (2d Cir. 2016) ("*Kirschenbaum I*"), *abrogated on other grounds by Rubin*, 138 S. Ct. 816 ("TRIA provides jurisdiction for execution and attachment proceedings to satisfy a judgment for which there was original jurisdiction under the FSIA if certain statutory elements are satisfied."); (*see also* Report at 17–18 (quoting same)). Further, the waiver of immunity from execution for foreign sovereign property includes central bank assets otherwise protected under 28 U.S.C. § 1611, where a valid judgment has been entered against the sovereign. *Bank Markazi v. Peterson*, 578 U.S. 212, 217 n.2 (2016) ("FSIA's central-bank immunity provision" does not limit the availability of assets under TRIA).

While the sovereign's loss of jurisdictional immunity in the underlying judgment flows through to the instrumentality in the attachment proceeding, the Judgment Creditors here lack a judgment against a sovereign. There has been no waiver of jurisdictional immunity against DAB or Afghanistan in any of the Judgment Creditors' underlying judgments. (*See* Report at 18.) Without a waiver of jurisdictional immunity, TRIA § 201(a) does not offer a freestanding mechanism for waiving a foreign sovereign instrumentality's immunity to jurisdiction. (*Id.*; *supra* Section III.B.) The *Weinstein* court held that TRIA § 201(a) provided subject-matter jurisdiction over an instrumentality not named in that original judgment because there was a valid judgment against Iran—the underlying sovereign. 609 F.3d at 50. Here, the Judgment Creditors' judgments are inapposite because the Judgment Creditors hold valid default judgments against *the Taliban*, not the underlying sovereign. (*See* Report at 19–20 (listing Judgment Creditors' judgments against the Taliban as basis for turnover motions).) Without a waiver of jurisdictional immunity against

20

DAB or Afghanistan in any of the Judgment Creditors' underlying judgments, *Weinstein*'s application of TRIA is of no avail.

The Judgment Creditors misread the relevant case law in countering that any underlying judgment is sufficient to overcome the obstacle of jurisdictional immunity. In *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, the Second Circuit noted that "Congress . . . has created terrorism-related exceptions to immunity under FSIA," *id.* at 211; (*see also* Objections at 28 (quoting same)). The *Hausler* court continues, however, to explain that "[o]ne such exception is TRIA's authorization of *the attachment of the property* of terrorist parties and that of their agencies or instrumentalities to satisfy *certain judgments issued against them.*" *Hausler*, 770 F.3d at 211 (emphasis added). The *Hausler* court thus construed TRIA as an execution statute where judgments are issued against parties that would otherwise have foreign sovereign immunity. In fact, *Hausler* offers yet another example of TRIA abrogating execution immunity in a case where the underlying judgment was against a foreign state—namely, the Republic of Cuba. Therefore, *Hausler*, like *Vera II*, confirms the narrowness of *Weinstein*'s holding that pertains only to situations in which there is a valid underlying judgment against a foreign sovereign. Finding that TRIA permits execution to satisfy any valid underlying judgment, whether or not against a foreign sovereign, would require overlooking the defining feature of TRIA: its abrogation of immunity enjoyed by foreign sovereigns under the FSIA.

Moreover, TRIA § 201(a) could not be wielded against Afghanistan or its instrumentalities independently because Afghanistan has not been designated as a state sponsor of terrorism. TRIA defines a "terrorist party" whose assets may be targeted as "a foreign state designated as a state sponsor of terrorism under [former] section 6(j) of the Export Administration Act of 1979 . . . or section 620A of the Foreign Assistance Act of 1961." TRIA § 201(d)(4). A party may also use

TRIA to collect on judgments for acts for which a terrorist party lacks immunity under 28 U.S.C. § 1605A. *See* TRIA § 201(a). Like TRIA § 201(d)(4), section 1605A requires that a foreign state be designated as a state sponsor of terrorism. 28 U.S.C. § 1605A(a)(2)(A)(i)(I), (c). Yet, Afghanistan does not qualify as either a "terrorist party" under TRIA § 201(d)(4) or a nation liable for acts of terrorism under 28 U.S.C. § 1605A because Afghanistan is not and has never been designated as a state sponsor of terrorism. (*See* U.S. Statement of Interest at 9 n.2; *Havlish* Mem. of Law on Mot. for Turnover at 3 n.7.)

In sum, the Judgment Creditors' motions fail because DAB is a central bank under the FSIA, and TRIA § 201(a) does not overcome DAB's jurisdictional immunity under 28 U.S.C. § 1604. Furthermore, the Judgment Creditors cannot use TRIA to reach DAB's assets because their judgments are against the non-sovereign Taliban—not the sovereign nation of Afghanistan—and Afghanistan has never been designated as a state sponsor of terrorism.

## IV. THE U.S. CONSTITUTION RESTRAINS THIS COURT FROM THE FINDING REQUIRED UNDER TRIA TO ATTACH DAB'S ASSETS

Even if this Court had jurisdiction, the U.S. Constitution prevents this Court from rendering the findings that TRIA requires. For the Judgment Creditors to prevail, this Court must be able to find that DAB is a Taliban "agency or instrumentality." Finding that the Taliban controls DAB or can use DAB to advance its goals implies that the Taliban is Afghanistan's government. The Constitution vests this authority to recognize governments in the Executive Branch alone. (*See also* Report at 27–37.)

### A. The Judgment Creditors Fail to Satisfy All the Required Elements in the Legal Framework Governing Their Turnover Motions

Federal Rule of Civil Procedure 69(a), New York CPLR §§ 5225(b) and 5227, and TRIA § 201 govern these turnover motions. Under Rule 69(a), judgments are enforced through a writ of

execution, and the laws of the state where the court is located govern execution procedures unless a federal law applies. Fed. R. Civ. P. 69(a)(1). In New York, CPLR §§ 5225(b) and 5227 govern turnover proceedings. *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir. 2018) ("*CSX I*"). These statutes are "essentially interchangeable," *CSX Transportation, Inc. v. Emjay Env't Recycling, LTD.*, No. 12-cv-1865 (JS)(AKT), 2016 WL 755630, at \*3 (E.D.N.Y. Feb. 25, 2016) (quoting *LaBarbera v. Audax Constr. Corp.*, 971 F. Supp. 2d 273, 278 (E.D.N.Y. 2013)); (*see also* Objections at 5 n.5), and Magistrate Judge Netburn properly analyzed the turnover motions under CPLR § 5225(b) for simplicity,[10] (Report at 28). Under CPLR § 5225(b), the judgment creditor must show that (1) the judgment debtor has an interest in the property the creditor is targeting and (2) the judgment creditor is entitled to the property or has rights superior to the party possessing the property. *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019) (citation omitted).

A judgment creditor seeking turnover pursuant to TRIA will also have to satisfy the requirements of TRIA § 201(a): (1) the judgment creditor has obtained a judgment against a terrorist party, (2) on a claim based on an act of terrorism or an act for which a terrorist party is not immune under 28 U.S.C. § 1605A or 28 U.S.C. § 1605(a)(7),[11] which the creditor seeks to satisfy with the (3) blocked assets, (4) of that terrorist party or that terrorist party's agency or instrumentality, (5) to the extent of only the creditor's compensatory damages. TRIA § 201(a); (*see also* Report at 29 (same).)

---

[10] New York CPLR § 5225(b) permits judgment creditors to initiate "a special proceeding . . . against a person in possession or custody of money . . . in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property . . . ."

[11] As previously noted, Congress repealed FSIA § 1605(a)(7)'s terrorism exception to immunity and replaced it with § 1605A in 2008. Pub. L. No. 110–181, div. A, title X, § 1083(a)(1), 122 Stat. 338–44 (2008).

The Judgment Creditors satisfy all but one element under TRIA. First, the Judgment Creditors hold judgments against the Taliban, a "terrorist party" as defined under TRIA § 201(d)(4) by reference to 8 U.S.C. § 1182(a)(3)(B)(vi). *See* 8 U.S.C. § 1182(a)(3)(B)(iii)–(vi) (describing a terrorist organization as one committing or materially supporting activities such as hijacking, assassination, and the use of explosives to threaten individuals and property). Second, all of the judgments are based on the Taliban's role in the 9/11 Attacks or separate explosive attacks against Americans for which the Taliban is not immune. (*See* Report at 29 (listing judgments).) Third, the turnover motions seek DAB funds that constitute "blocked assets" under TRIA. *See* TRIA § 201(d)(2)(A) (defining blocked assets as "any asset seized or frozen by the United States . . . under sections 202 and 203 of the [IEEPA]. . . ."); E.O. 14,064 (blocking DAB funds pursuant to IEEPA). Finally, the Judgment Creditors seek only compensatory damages. (*See* Report at 30 (citing turnover motions).) Missing is the fourth prong required by TRIA: the blocked assets must be the assets of the terrorist party or the terrorist party's agency or instrumentality. TRIA § 201(a).

### B. This Court Lacks the Power to Recognize the Government of Afghanistan under the U.S. Constitution

The Judgment Creditors urge this Court to find that DAB is an "agency or instrumentality" of the Taliban. "TRIA, unfortunately, does not" define the meaning of a terrorist party's "agency or instrumentality." *Kirschenbaum I*, 830 F.3d at 132. Thus, the Second Circuit in *Kirschenbaum I* construed the terms "according to their ordinary meanings," holding that an entity is an agency or instrumentality of a terrorist group if it "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by the terrorist party." *Id.* at 135. Here, for the Judgment Creditors to prevail in their turnover motions, this Could would have to

24

**S.A.24**

make a judicial finding that DAB provided the Taliban with material functionality, material services, or was owned, controlled, or directed by the Taliban.

Under *Kirschenbaum I*, the government of Afghanistan necessarily exercises a degree of control or authority over its own central bank to make the central bank the Afghan government's agency or instrumentality. For instance, FSIA § 1611 stipulates that the property of a central bank is immune from attachment and execution "unless such bank or authority, or its *parent foreign government*, has explicitly waived its immunity from attachment in aid of execution, or from execution . . . ." *Id.* § 1611(b)(1) (emphasis added). Section 1611 thus conveys that a foreign government exercises control over the central bank, *e.g.*, through the foreign government's ability to waive the immunity of its central bank's property to attachment and execution.

DAB is Afghanistan's central bank and thus a government instrumentality subject to the government of Afghanistan. *See supra* Section III.A. The Judgment Creditors further argue that the Taliban is exercising control over DAB. (*See, e.g.*, Objections at 11 ("the Taliban retook control of DAB"); *id.* at 43–51.) The Judgment Creditors assert that the Taliban has appointed loyalists to key DAB leadership positions, women and dissidents have left DAB jobs, and non-Taliban personnel are merely figureheads. (*See* Report at 32 (citing *Havlish* and *Smith* expert reports for claims that the Taliban appointed DAB's Acting Governor, First Deputy Governor, and Second Deputy Governor).) The Judgment Creditors also argue that the Taliban is using DAB to set Afghanistan's monetary policy and manage the country's financial sector. (*Id.*) Additionally, in August 2021, "[t]he Taliban reportedly visited the central bank and asked to inspect its reserves, only to be told that most were located in New York." (Taliban Background at 39; *see also* Report at 33 (citing same).) The judicial finding the Judgment Creditors seek necessarily and impermissibly implies that the Taliban constitutes the recognized government of Afghanistan.

**S.A.25**

The Constitution vests in the Executive Branch the primary role of managing foreign affairs. *See Chicago & Southern Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 109 (1948) (characterizing the President "as the Nation's organ in foreign affairs"); *U.S. v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (deeming the President "the sole organ of the federal government in the field of international relations"). Critically, "[t]he text and structure of the Constitution grant the President the power to recognize foreign nations and governments." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015); *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964) ("Political recognition is exclusively a function of the Executive."). Courts have long encouraged judicial modesty in recognizing foreign governments, understanding that "recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing.'" *Baker v. Carr*, 369 U.S. 186, 212 (1962) (quoting *United States v. Klintock*, 18 U.S. 144, 149 (1820)). Similarly, courts have consistently held that unrecognized regimes lack standard privileges and immunities of foreign sovereigns, reasoning that permitting such regimes to invoke that status would encroach on the President's recognition power. *See, e.g., Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 444 (S.D.N.Y. 2004); *Fed. Rep. of Germany v. Elicon*, 358 F. Supp. 747, 756 (E.D.N.Y. 1970).

The President has the exclusive power to grant formal recognition to a foreign sovereign. *Zivotofsky*, 576 U.S. at 28 ("[T]he power to recognize foreign states and governments . . . is exclusive to the Presidency."). In *Zivotofsky ex rel. Zivotofsky v. Kerry*, the Supreme Court evaluated a conflict between the Foreign Relations Authorization Act, Fiscal Year 2003 (the "FRAA") and the U.S. State Department's Foreign Affairs Manual (the "FAM"). *See id.* at 5–8. In accordance with then-presidential policy to decline acknowledging any nation's sovereignty

26

**S.A.26**

over the city of Jerusalem, the FAM required that the State Department list place of birth as "Jerusalem" rather than "Israel" on the passports for those born in Jerusalem. *Id.* at 6–7. However, the FRAA allowed (though did not require) those born in Jerusalem to list their place of birth as "Israel" on their passports. *Id.* at 7. The Supreme Court held that this accommodation, although "not itself constitut[ing] a formal act of recognition," was unconstitutional because it was "a mandate that the Executive contradict his prior recognition determination in an official document issued by the Secretary of State." *Id.* at 30.

The Constitution forbids this Court from determining what the Judgment Creditors require under TRIA: a finding that the Taliban regime is in control of DAB—an instrumentality of the government of Afghanistan—and that the Taliban thus acts as the government of Afghanistan. Promoting financial stability and managing foreign reserves are the quintessential public and government functions performed by central banks. *See, e.g., Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004); *NML Cap., Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 195 (2d Cir. 2011). The Judgment Creditors "suggest that DAB is an agency or instrumentality of the Taliban because it has appointed leaders and those leaders are promulgating policies or taking acts like the elimination of money-laundering controls that materially advance the Taliban's goals." (Report at 35.) Accepting the Taliban's "appointments" to DAB as legitimate or its pronouncements as authoritative monetary policies bestows recognition on the Taliban that this Court may not constitutionally confer. *See, e.g.*, DAB, Da Afghanistan Bank Law art. 11 (2003), https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf (last visited Feb. 7, 2023) ("The Governor, the First Deputy Governor and the other members of the Supreme Council shall be appointed by a decree of the *President* of Afghanistan . . . .") (emphasis added). As Magistrate Judge Netburn rightly found, "[t]o credit those appointments as evidence of Taliban

27

**S.A.27**

control would be to suggest that the group is wielding power that was until recently vested in the Afghan state and the Republic." (Report at 36.)

This Court "can acknowledge the facts on the ground while recognizing that those facts do not permit it to recognize the Taliban as the government of Afghanistan directly or by implication." (Report at 34.) In September 2021, Secretary of State Antony Blinken did just that, acknowledging that the Taliban was the "*de facto* government" of Afghanistan. (*Id.* at 33 (citation omitted).) While Secretary Blinken and this Court can acknowledge the Taliban's *de facto* dominance over Afghanistan, accepting the Judgment Creditors' argument as to the Taliban's control over DAB makes the implied recognition of the Taliban as Afghanistan's government inescapable. (*See also* Report at 34.)

The Judgment Creditors' effort to distinguish between formal and informal recognition of a foreign government conflates Congress' powers with those of the Judiciary. The Judgment Creditors argue that only "formal" acts of recognition, such as an express declaration, concluding a treaty, or exchanging ambassadors, implicate the constitutional separation of powers. (Objections at 48–49.) While the *Zivotofsky* Court held that the "Executive's exclusive power extends no further than his formal recognition determination," 576 U.S. at 30, the non-exclusive, informal acts of recognition are shared with *Congress*, not the courts, *id.* at 22. "[T]he Court . . . mentioned both of the political branches in discussing international recognition, but it [did] so primarily in affirming that the Judiciary is not responsible for recognizing foreign nations." *Id.* (citing *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("Who is the sovereign, *de jure* or *de facto,* of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges.")

28

**S.A.28**

(quotation marks and citation omitted)).  The *Zivotofsky* Court thus denied any judicial role in the recognition of a foreign government.

"Recognition is a topic on which the Nation must 'speak . . . with one voice'" in order to determine "which governments are legitimate in the eyes of the United States and which are not." *Id.* at 14 (quoting *Am. Ins. Assn. v. Garamendi*, 539 U.S. 396, 424 (2003)).  This Court would intrude with a voice of its own were it to permit Afghanistan's treasury to pay the Taliban's judgment debts, even as the President declines to recognize the Taliban as the government of Afghanistan.

The fundamental conclusion—as required by TRIA and the Constitution—is that neither the Taliban nor the Judgment Creditors are entitled to raid the coffers of the state of Afghanistan to pay the Taliban's debts.  While the "funds of foreign central banks are managed through those banks' accounts in the United States, those funds are, in fact, the reserves of the foreign states themselves." *NML Cap., Ltd.*, 652 F.3d at 189 (cleaned up).  DAB funds are the property of the state of Afghanistan, and "a regime not recognized as the government of a state is not entitled to property belonging to that state located in the United States." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 205(2); *see also Repub. of Panama v. Rep. Nat. Bank of N.Y.*, 681 F. Supp. 1066, 1071 (S.D.N.Y. 1988) ("[I]t is not a proper function of a domestic court of the United States to attempt to judge which government best represents the interests of" a foreign nation.) (quotation marks and citation omitted).  Therefore, as the Restatement provides and TRIA and the Constitution dictate, this Court cannot find that the Taliban is entitled to Afghanistan's state funds held at the FRBNY or that the Judgment Creditors can obtain those funds through their default judgments against the Taliban.

29

## V. CONCLUSION

The Judgment Creditors are entitled to collect on their default judgments and be made whole for the worst terrorist attack in our nation's history, but they cannot do so with the funds of the central bank of Afghanistan. Pursuant to the FSIA, TRIA, and the U.S. Constitution, the Taliban—not the former Islamic Republic of Afghanistan or the Afghan people—must pay for the Taliban's liability in the 9/11 Attacks. Therefore, the Judgment Creditors' motions for turnover of DAB funds (ECF Nos. 7763, 7767, and 7936 in 03-md-1570; ECF No. 62 in 01-cv-10132; ECF No. 597 in 03-cv-9848) are DENIED.[12] The Judgment Creditors' motion for post-judgment attachment (ECF No. 8586 in 03-md-1570), *Ashton* Plaintiffs' motion for attachment (ECF No. 8412 in 03-md-1570; ECF No. 1724 in 02-cv-6977), *Ashton* Plaintiffs' motion for a protective order (ECF No. 7895 in 03-md-1570), *Owens* Proposed Intervenors' motion to intervene (ECF No. 8018 in 03-md-1570; ECF No. 1120 in 03-cv-6978), and *Federal Insurance* Creditors' motion to vacate (ECF No. 8055 in 03-md-1570) are DENIED as moot. The Clerk of Court is directed to close the motions accordingly.

Dated: February 21, 2023
      New York, New York

                                 SO ORDERED.

                                  *George B. Daniels*

                                  GEORGE B. DANIELS
                                  United States District Judge

---

[12] This decision in no way affects the Executive Branch's prerogative in determining the ultimate disposition of the blocked DAB assets that remain held at the FRBNY.

**Terrorism Risk Insurance Act of 2002, § 201**

Pub. L. No. 107-297, § 201, 116 Stat. 2322, 2337-2340, as amended, Pub. L. No. 112-158, 126 Stat. 1214, 1260 (codified at 28 U.S.C. § 1610 note)

\*\*\*\*

SEC. 201. SATISFACTION OF JUDGMENTS FROM BLOCKED ASSETS OF TERRORISTS, TERRORIST ORGANIZATIONS, AND STATE SPONSORS OF TERRORISM.

"(a) IN GENERAL.—

Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

"(b) PRESIDENTIAL WAIVER.—

"(1) IN GENERAL.—

Subject to paragraph (2), upon determining on an asset-by-asset basis that a waiver is necessary in the national security interest, the President may waive the requirements of subsection (a) in connection with (and prior to the enforcement of) any judicial order directing attachment in aid of execution or execution against any property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations.

"(2) EXCEPTION.—A waiver under this subsection shall not apply to—

"(A) property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations that has been used by the United States for any nondiplomatic purpose (including use as rental property), or the proceeds of such use; or

"(B) the proceeds of any sale or transfer for value to a third party of any asset subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations.

"(d) DEFINITIONS.—In this section, the following definitions shall apply:

"(1) ACT OF TERRORISM.—The term 'act of terrorism' means—

"(A) any act or event certified under section 102(1) [Pub. L. 107–297, set out in a note under section 6701 of Title 15, Commerce and Trade]; or

"(B) to the extent not covered by subparagraph (A), any terrorist activity (as defined in section 212(a)(3)(B)(iii) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(iii))).

"(2) **BLOCKED ASSET.**—The term 'blocked asset' means—

"(A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) [now 50 U.S.C. 4305(b)] or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and

"(B) does not include property that—

"(i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.); or

"(ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

"(3) **CERTAIN PROPERTY.**—

The term 'property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations' and the term 'asset subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations' mean any property or asset, respectively, the attachment in aid of execution or execution of which would result in a violation of an obligation of the United States under the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, as the case may be.

"(4) **TERRORIST PARTY.**—

The term 'terrorist party' means a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of

terrorism under [former] section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) [former 50 U.S.C. 4605(j)] or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)."

****

## 28 U.S.C. § 1330

§ 1330. Actions against foreign states

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605-1607 of this title.

## 28 U.S.C. § 1331

§ 1331. Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 28 U.S.C. § 1604

§ 1604. Immunity of a foreign state from jurisdiction

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

**28 U.S.C. § 1609**

§ 1609. Immunity from attachment and execution of property of a foreign state

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

**28 U.S.C. § 1610**

§ 1610. Exceptions to the immunity from attachment or execution

(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--

(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

(2) the property is or was used for the commercial activity upon which the claim is based, or

(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

(4) the execution relates to a judgment establishing rights in property--

(A) which is acquired by succession or gift, or

(B) which is immovable and situated in the United States: Provided, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

(6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or

execution, would not be inconsistent with any provision in the arbitral agreement, or

(7) the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based.

(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--

(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), or (5) or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based, or

(3) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605A of this chapter or section 1605(a)(7) of this chapter (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved in the act upon which the claim is based.

(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if--

(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

(e) The vessels of a foreign state shall not be immune from arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage as provided in section 1605(d).

(f)(1)(A) Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

(B) Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

(2)(A) At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A, the Secretary of the Treasury and the Secretary of State should make every effort to fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

(B) In providing such assistance, the Secretaries--

(i) may provide such information to the court under seal; and

(ii) should make every effort to provide the information in a manner sufficient to allow the court to direct the United States Marshall's office to promptly and effectively execute against that property.

(3) Waiver.--The President may waive any provision of paragraph (1) in the interest of national security.

(g) Property in certain actions.--

(1) In general.--Subject to paragraph (3), the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of--

(A) the level of economic control over the property by the government of the foreign state;

(B) whether the profits of the property go to that government;

(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

(D) whether that government is the sole beneficiary in interest of the property; or

(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

(2) United States sovereign immunity inapplicable.--Any property of a foreign state, or agency or instrumentality of a foreign state, to which paragraph (1) applies shall not be immune from attachment in aid of execution, or execution, upon a judgment entered under section 1605A because the property is regulated by the United States Government by reason of action taken against that foreign state under the Trading With the Enemy Act or the International Emergency Economic Powers Act.

(3) Third-party joint property holders.--Nothing in this subsection shall be construed to supersede the authority of a court to prevent appropriately the impairment of an interest held by a person who is not liable in the action giving rise to a judgment in property subject to attachment in aid of execution, or execution, upon such judgment.

## 28 U.S.C. § 1611

§ 1611. Certain types of property immune from execution

(a) Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process

impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if--

(1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

(2) the property is, or is intended to be, used in connection with a military activity and

(A) is of a military character, or

(B) is under the control of a military authority or defense agency.

(c) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution in an action brought under section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 to the extent that the property is a facility or installation used by an accredited diplomatic mission for official purposes.