# 23-258(L)

## 23-263 (CON), 23-304 (CON), 23-346 (CON), 23-444 (CON)

## United States Court of Appeals
### for the Second Circuit

FIONA HAVLISH, RUSSA STEINER, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF WILLIAM STEINER, DECEASED, CLARA CHIRCHIRILLO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF PETER CHIRCHIRILLO, TARA BANE, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF MICHAEL A. BANE, GRACE M. PARKINSON-GODSHALK, IN HER OWN RIGHT AND ADMINISTRATIX OF THE ESTATE OF WILLIAM R. GODSHALK, ELLEN L. SARACINI, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF VICTOR J. SARACINI, DECEASED, THERESAANN LOSTRANGIO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF JOSEPH LOSTRANGIO, DECEASED, DEENA BURNETT, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF THOMAS E. BURNETT, JR., DECEASED, THOMAS E. BURNETT, SR., AS THE PARENT AND ON BEHALF OF THE FAMILY OF THOMAS E. BURNETT, JR., JUDITH REISS, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JOSHUA SCOTT REISS, DECEASED, WILLIAM COALE, IN HIS OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JEFFREY ALAN COALE, DECEASED, PATRICIA J. PERRY, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JOHN WILLIAM PERRY, DECEASED, BARBARA A. MINERVINO, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF LOUIS J. MINERVINO, DECEASED,

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PLAINTIFFS-APPELLANTS' APPENDIX
### VOLUME I of III (Pages App.1 to App.246)

Ian Heath Gershengorn
Douglass A. Mitchell
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000

Lee Wolosky
Benjamin D. Alter
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Andrianna D. Kastanek
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7285

*Counsel for Plaintiffs-Appellants Fiona Havlish,
et al., Appellants in 23-258*

*Additional counsel listed inside*

MATTHEW T. SELLITTO, IN HIS OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF LOUIS J. MI-
NERVINO, DECEASED, RALPH MAERZ, JR., AS PARENT AND ON BEHALF OF THE FAMILY OF NOELL
MAERZ, DECEASED, LINDA PANIK, AS PARENT AND ON BEHALF OF THE FAMILY OF LT. JONAS MAR-
TIN PANIK, DECEASED, MARTIN PANIK, AS PARENT OF AND ON BEHALF OF THE FAMILY OF LT. JONAS
MARTIN PANIK, DECEASED, MARTINA LYNE-ANN PANIK, AS THE SISTER OF LT. JONAS MARTIN
PANIK, STEPHEN L. CARTLEDGE, AS HUSBAND OF SANDRA WRIGHT CARTLEDGE, DECEASED, LOIS-
ANNE DIEHL, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF MICHAEL DIEHL, DECEASED,
TINA GRAZIOSO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF JOHN GRAZIOSO, DE-
CEASED, JIN LIU, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF LIMING GU, DECEASED,
ALL PLAINTIFFS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, MICHAEL ED-
WARD PAIGE, SPECIAL ADMINISTRATOR OF THE ESTATE OF TIMOTHY RAYMOND WARD, DECEASED.,
BRIANNA L. GOMES, ADMINISTRATOR OF THE ESTATE OF DOYLE RAYMOND WARD, DECEASED,
JOHN DOES 1 THROUGH 7, RAYMOND ANTHONY SMITH, AS ADMINISTRATOR OF THE ESTATE OF
GEORGE ERIC SMITH, DECEASED, FEDERAL INSURANCE COMPANY, PACIFIC INDEMNITY COMPANY,
CHUBB CUSTOM INSURANCE COMPANY, CHUBB INDEMNITY INSURANCE COMPANY, CHUBB INSUR-
ANCE COMPANY OF CANADA, CHUBB INSURANCE COMPANY OF NEW JERSEY, GREAT NORTHERN
INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, TIG INSURANCE COMPANY, KATHLEEN
ASHTON, AS ADMINISTRATOR OF THE ESTATE OF THOMAS ASHTON, DECEASED AND ON BEHALF OF
ALL SURVIVORS OF THOMAS ASHTON, JOSEPHINE ALGER, AS ADMINISTRATOR OF THE ESTATE OF
FREDERICK ALGER, AS COEXECUTORS OF THE ESTATE OF DAVID D. ALGER, DECEASED AND ON BE-
HALF OF THE SURVIVORS OF DAVID D. ALGER, ANGELICA ALLEN, AS ADMINISTRATOR OF THE
ESTATE OF ERIC ALLEN, DECEASED AND ON BEHALF OF ALL SURVIVORS OF ERIC ALLEN, GEORGE
ANDRUCKI, AS COADMINISTRATOR OF THE ESTATE OF JEAN ANDRUCKI ,DECEASED AND ON BEHALF
OF ALL SURVIVORS OF JEAN ANDRUCKI, MARY ANDRUCKI, AS COADMINISTRATOR OF THE ESTATE
OF JEAN ANDRUCKI, DECEASED AND ON BEHALF OF ALL SURVIVORS OF JEAN ANDRUCKI,

     Plaintiffs - Appellants,

KATHERINE SOULAS, IN HER OWN RIGHT, AS REPRESENTATIVE OF THE HEIRS, ON BEHALF OF HER
MINOR CHILDREN, AND AS EXECUTRIX OF THE ESTATE OF TIMOTHY SOULAS, DECEASED, ON BEHALF
OF THE SOLATIUM CLAIMANTS, INCLUDING KATHERINE SOULAS, FREDERICK SOULAS, II, TIMOTHY
SOULAS, JR.,

     Plaintiff,

JANE DOE, IN HER OWN RIGHT, ON BEHALF OF HER MINOR CHILDREN, AND AS EXECUTRIX OF THE
ESTATE OF TOM SAWYER, A FICTITIOUS NAME, DECEASED,

     Consolidated - Plaintiff,

                             v.

THE ISLAMIC EMIRATE OF AFGHANISTAN, THE TALIBAN, AL QAIDA/ISLAMIC ARMY, SHEIKH USA-
MAH BIN-MUHAMMAD BIN-LADEN, AKA OSAMA BIN-LADEN, REPUBLIC OF IRAQ,

     Defendants - Appellees,

FEDERAL RESERVE BANK OF NEW YORK,

      Garnishee-Interested-Party-Appellee,

SHEIKH USAMA BIN-LADEN, MUHAMMAD OMAR, AL QAEDA/ISLAMIC ARMY, ISLAMIC REPUBLIC OF IRAN, AYATOLLAH ALI HOSEINI-KHAMENEI, SUPREME LEADER, IRANIAN MINISTRY OF INFORMATION AND SECURITY, THE ISLAMIC REVOLUTIONARY GUARD CORPS, HEZBOLLAH, AN UNINCORPORATED ASSOCIATION, IRANIAN MINISTRY OF PETROLEUM, IRANIAN MINISTRY OF ECONOMIC AFFAIRS AND FINANCE, IRANIAN MINISTRY OF COMMERCE, IRANIAN MINISTRY OF DEFENSE AND ARMED FORCES LOGISTICS, SADDAM HUSSEIN, PRESIDENT, IRAQI MINISTRY OF DEFENSE, IRAQI MINISTRY OF FINANCE, IRAQI MINISTRY OF OIL, IRAQI INTELLIGENCE SERVICE, QUSAY HUSSEIN, UNIDENTIFIED TERRORIST DEFENDANTS 1-500, ALI AKBAR HASHEMI RAFSANJANI, THE NATIONAL IRANIAN TANKER CORPORATION, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 2, THE NATIONAL IRANIAN OIL CORPORATION, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 3, THE NATIONAL IRANIAN GAS COMPANY, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 4, IRAN AIRLINES, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 5, THE NATIONAL IRANIAN PETROCHEMICAL COMPANY, THE CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, UNIDENTIFIED TERRORIST DEFENDANTS 8-500, AL-QAEDA, THE HAQQANI NETWORK, AL QAIDA, EGYPTIAN ISLAMIC JIHAD, OSAMA BIN LADEN, ESTATE OF MUHAMMAD ATEF, AYMAN AL ZAWAHARI, ABU ZUBAYDH,

      Defendants.[*]

---

[*] This caption reproduces the one currently on the Court's docket. However, the *Havlish* Plaintiffs-Appellants (the "*Havlish* Creditors") have moved the Court to correct this caption, as it is incorrect. *See* ECF 51 at 6; *see also* ECF 10. It omits a number of the *Havlish* Creditors and includes individuals who are not party to the *Havlish* case. This Court's April 5, 2023 order (Newman, J.) identified the correct list of *Havlish* Creditors in Exhibit A to that order. *See* ECF 56 at 4. The *Havlish* Creditors respectfully request that the caption be amended to correspond with the list identified in Exhibit A to the Court's April 5, 2023 order.

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, New York, NY 10001
(212) 446-2300
dbarrett@bsfllp.com

Stuart H. Singer
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011
ssinger@bsfllp.com

Timothy B. Fleming
WIGGINS CHILDS PANTAZIS FISHER
GOLDFARB, PLLC
2208 18th Street NW #110
Washington, D.C. 20009
(202) 467-4489
tfleming@wigginschilds.com

*Additional Counsel for Plaintiffs-Appellants
Fiona Havlish, et al., Appellants in 23-258*

John Thornton
Orlando do Campo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com
od@dandtlaw.com

*Counsel for Plaintiffs-Appellants John Does
1 through 7, Appellants in 23-263*

Andrew J. Maloney, III, Esq.
KREINDLER & KREINDLER LLP
485 Lexington Ave., 28th Floor
New York, NY 10017
(212) 687-8181
amaloney@kreindler.com

Sean P. Carter, Esq.
Stephen A. Cozen
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
(215) 665-2105
scarter1@cozen.com

Richard Klingler
ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
1155 F Street, N.W. Suite 750
Washington, DC 20004
(202) 249-6900
rklingler@egcfirm.com

Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for Plaintiffs-Appellants Federal
Insurance Co., et al., Appellants in 23-346*

Dion G. Rassias
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000

*Counsel for Plaintiffs-Appellants Raymond
Anthony Smith, et al., Appellants in 23-304*

Theresa Trzaskoma
Noam Biale
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 202-2600
ttrzaskoma@shertremonte.com
nbiale@shertremonte.com

*Counsel for Plaintiffs-Appellants Kathleen Ashton, et al., Appellants in 23-444*

# INDEX

## VOLUME I

Havlish Creditors' Judgment, No. 03-md-01570 (S.D.N.Y.) ("MDL Dkt."), Dkt. 2624 (Oct. 16, 2012) ..................................................... App.1

Doe Creditors' Judgment, No. 20-mc-740 (S.D.N.Y.) ("Doe Dkt."), Dkt. 5 (Jan. 20, 2021) ............................................................................ App.8

Federal Insurance Creditors' Judgment, MDL Dkt. 7888 (Apr. 20, 2022) ..................................................................................... App.12

Smith Creditors' Judgment, No. 01-cv-10132 (S.D.N.Y.) ("Smith Dkt."), Dkt. 28 (July 14, 2003) ......................................................... App.15

Amended Order of Judgment, MDL Dkt. 3226 (Mar. 8, 2016) ...................... App.17

Order of Further Partial Judgment, MDL Dkt. 3300 (June 16, 2016) ............. App.28

Memo Endorsement of Judge Failla, Doe Dkt. 26 (Sept. 23, 2021) ............... App.32

Statement of Interest of the United States, MDL Dkt. 7661, Doe Dkt. 49 (Feb. 11, 2022) ............................................................................. App.34

Executive Order 14,064, MDL Dkt. 7661-1, Doe Dkt. 49-1 (Feb. 11, 2022) ............................................................................................... App.70

Office of Foreign Assets Control License, MDL Dkt. 7661-2, Doe Dkt. 49-2 (Feb. 11, 2022) ........................................................................ App.73

Transcript of Proceedings, MDL Dkt. 7713 (Feb. 22, 2022) ......................... App.76

Havlish Creditors' Motion for Partial Turnover of Assets, MDL Dkt. 7764 (Mar. 20, 2022) .................................................................... App.111

Declaration of Douglass A. Mitchell in Support of the Havlish Creditors' Motion for Partial Turnover of Assets ("Mitchell Decl."), MDL Dkt. 7765 (Mar. 20, 2022) ................................................. App.144

Havlish Creditors' Writ of Execution, Ex. 1 to Mitchell Decl., MDL Dkt. 7765-1 (Mar. 20, 2022) ........................................................ App.149

i

U.S. Marshals' Letter to Federal Reserve Bank of New York, Ex. 2 to Mitchell Decl., MDL Dkt. 7765-2 (Mar. 20, 2022).......................................App.162

U.S. Marshals' Process Receipt and Return, Ex. 3 to Mitchell Decl., MDL Dkt. 7765-3 (Mar. 20, 2022).................................................................App.176

Consolidated Financial Statements of Da Afghanistan Bank, Ex. 4 to Mitchell Decl., MDL Dkt. 7765-4 (Mar. 20, 2022).......................................App.178

Currency Conversion Table, Ex. 5 to Mitchell Decl., MDL Dkt. 7765-5 (Mar. 20, 2022) ........................................................................................App.243

Twitter Screen Capture, Ex. 6 to Mitchell Decl., MDL Dkt. 7765-6 (Mar. 20, 2022) .................................................................................................App.245

## VOLUME II

Expert Declaration of Alex B. Zerden in Support of the Havlish Creditors' Motion for Partial Turnover of Assets, MDL Dkt. 7766 (Mar. 20, 2022) .................................................................................................App.247

Memorandum of Law in Support of the Doe Creditors' Motion for Turnover of Assets, MDL Dkt. 7769 (Mar. 20, 2022) ...................................App.319

Doe Creditors' Writ of Execution, Ex. A to Memorandum of Law in Support of the Doe Creditors' Motion for Turnover of Assets, MDL Dkt. 7769-1 (Mar. 20, 2022).........................................................................App.350

Declaration of John Thornton in Support of the Doe Creditors' Motion for Turnover of Assets, MDL Dkt. 7770 (Mar. 20, 2022)............................App.352

Complaint, No. 22-cv-3228 (S.D.N.Y.), Dkt. 1 (Apr. 20, 2022)...................App.354

Transcript of Proceedings, MDL Dkt. 7966 (Apr. 26, 2022) ........................App.383

Memorandum of Law in Support of the Federal Insurance Creditors' Motion for Partial Turnover of Assets, MDL Dkt. 7937 (Apr. 29, 2022) .............................................................................................................App.423

Declaration of Sean P. Carter in Support of the Federal Insurance Creditors' Motion for Partial Turnover of Assets ("Carter Decl."), MDL Dkt. 7938 (Apr. 29, 2022)....................................................................App.456

Federal Insurance Creditors' Writ of Execution, Ex. 1 to Carter Decl., MDL Dkt. 7938-1 (Apr. 29, 2022) .................................................. App.460

U.S. Marshal's Process Receipt and Return, Ex. 2 to Carter Decl., MDL Dkt. 7938-2 (Apr. 29, 2022) .......................................................... App.472

Declaration of J. Scott Tarbutton, Ex. 6 to Carter Decl., MDL Dkt. 7938-6 (Apr. 29, 2022) ................................................................. App.474

Memorandum of Law in Support of the Smith Creditors' Motion for Turnover of Assets, Smith Dkt. 63 (May 18, 2022) ..................................... App.484

Smith Creditors' Writ of Execution, Smith Dkt. 46-3 (Apr. 22, 2022) ......... App.505

## VOLUME III

Expert Declaration of Jonathan L. Cristol in Support of the Smith Creditors' Motion for Turnover of Assets, Smith Dkt. 64 (May 18, 2022) ............................................................. App.507

Declaration of James E. Beasley, Jr. in Support of the Smith Creditors' Motion for Turnover of Assets, Smith Dkt. 65 (May 18, 2022) .................... App.527

Havlish Creditors' Affidavit of Service, MDL Dkt. 7776 (Mar. 21, 2022) ............................................................. App.531

Doe Creditors' Affidavit of Service, MDL Dkt. 7777 (Mar. 21, 2022) ........ App.532

Doe Creditors' Certificate of Service, Doe Dkt. 90 (Mar. 30, 2022) ........... App.533

Doe Creditors' Certificate of Service, Doe Dkt. 91 (Mar. 30, 2022) ........... App.535

Doe Creditors' Certificate of Service, Doe Dkt. 93 (Mar. 31, 2022) ........... App.538

Doe Creditors' Certificate of Service, Doe Dkt. 94 (Mar. 31, 2022) ........... App.540

Doe Creditors' Certificate of Service, Doe Dkt. 95 (Apr. 1, 2022) ............... App.542

Doe Creditors' Notice of Acknowledgement of Service, Doe Dkt. 97 (Apr. 4, 2022) ................................................................. App.544

Opinion and Order of Magistrate Judge Netburn Authorizing Alternative Service, MDL Dkt. 7830 (Apr. 5, 2022) ..................................... App.546

Order of Judge Daniels Granting Federal Insurance Plaintiffs' Motion for Partial Final Judgment, MDL Dkt. 7833 (Apr. 6, 2022)..........................App.562

Havlish Creditors' Certificate of Service, MDL Dkt. 7904 (Apr. 25, 2022) ...............................................................................................App.565

Doe Creditors' Certificate of Service, MDL Dkt. 7910 (Apr. 25, 2022) ......App.569

Federal Insurance Creditors' Affidavit of Service, MDL Dkt. 7943 (May 3, 2022)...............................................................................................App.573

Havlish and Doe Creditors' Joint Certificate of Service by Publication, MDL Dkt. 8059 (May 31, 2022)....................................................................App.574

Smith Creditors' Certificate of Service by Publication, Smith Dkt. 68 (June 9, 2022)...............................................................................................App.579

Smith Creditors' Certificate of Service by Twitter and Electronic Mail, Smith Dkt. 69 (June 9, 2022) .........................................................................App.583

Federal Insurance Creditors' Certificate of Service, MDL Dkt. 8125 (June 17, 2022).............................................................................................App.586

Memorandum of Law in Support of Ashton Plaintiffs' Emergency Motion for Attachment, MDL Dkt. 8413 (Aug. 19, 2022)...........................App.594

Report & Recommendation of Magistrate Judge Netburn, MDL Dkt. 8463 (Aug. 26, 2022) ...................................................................................App.616

Declaration of William W. Burke-White, MDL Dkt. 8734 (Nov. 10, 2022) ...............................................................................................App.659

Memorandum Decision and Order of Judge Daniels Denying Motion for Stay Pending Appeal, MDL Dkt. 8876 (Feb. 24, 2023) ..........................App.679

Havlish Creditors' Notice of Appeal, MDL Dkt. 8881 (Feb. 27, 2023) .......App.684

Doe Creditors' Notice of Appeal, MDL Dkt. 8883 (Feb. 28, 2023) .............App.691

Smith Creditors' Notice of Appeal, Smith Dkt. 105 (Mar. 3, 2023).............App.693

Federal Insurance Creditors' Notice of Appeal, MDL Dkt. 8910 (Mar. 8, 2023) ...............................................................................................App.694

iv

Ashton Plaintiffs' Notice of Appeal, MDL Dkt. 8950 (Mar. 23, 2023)........App.696

Memorandum Decision and Order of Judge Daniels, MDL Dkt. 8973
(Mar. 30, 2023) ...............................................................................App.698

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 :

:

:          ORDER AND JUDGMENT

:          03 MDL 1570 (GBD)(FM)

:

------------------------------------------------------------------X

This Document Relates to
Havlish v. bin Laden,
03 Civ. 9848 (GBD) (FM)

In accordance with the Memorandum Decision and Order entered on October 3, 2012, it

is HEREBY:

ORDERED that Final Judgment is entered in favor of all Plaintiffs and against all

Sovereign Defendants and Non-Sovereign Defendants;

ORDERED that Plaintiffs are awarded: (1) economic damages of $394,277,884, as set

forth below; (2) damages for pain and suffering of $2,000,000 per Decedent for a total of

$94,000,000, as set forth below; (3) damages for solatium totaling $874,000,000, as set forth

below; (4) punitive damages of $4,686,235,921, as set forth below; and (5) prejudgment interest

on the amount of $968,000,000 in pain and suffering and solatium damges.

ORDERED that all Defendants are jointly and severally liable for the entire award;

AND IT IS FURTHER ORDERED that the economic damages are awarded to the

Decedents' Estates as follows:

App.1

| DECEDENT ESTATE | ECONOMIC LOSS TO EST. | PUNITIVE DAMAGES | TOTAL ECON. DAM. |
|---|---|---|---|
| Estate of Donald J. Havlish, Jr. | $6,711,879 | $23,088,864 | $29,800,743 |
| Estate of Michael A. Bane | $5,960,665 | $20,504,688 | $26,465,353 |
| Estate of Martin Boryczewski | $17,363,416 | $59,730,151 | $77,093,567 |
| Estate of Steven Cafiero | $1,754,202 | $6,034,455 | $7,788,657 |
| Estate of Richard M. Caproni | $3,551,011 | $12,215,478 | $15,766,489 |
| Estate of Peter Chirchirillo | $5,440,587 | $18,715,619 | $24,156,206 |
| Estate of Jeffrey Coale | $5,558,859 | $19,122,475 | $24,681,334 |
| Estate of Daniel M. Coffey | $5,059,077 | $17,403,225 | $22,462,302 |
| Estate of Jason Coffey | $4,006,486 | $13,782,312 | $17,788,798 |
| Estate of Jeffrey Collman | $4,318,172 | $14,854,512 | $19,172,684 |
| Estate of Michael Diehl | $5,584,103 | $19,209,314 | $24,793,417 |
| Estate of Stephen Dorf | $3,242,690 | $11,154,854 | $14,397,544 |
| Estate of Judy Fernandez | $2,852,544 | $9,812,751 | $12,665,295 |
| Estate of Ronald Gamboa | $2,890,981 | $9,944,975 | $12,835,956 |
| Estate of William R. Godshalk | $16,672,472 | $57,353,304 | $74,025,776 |
| Estate of John Grazioso | $7,376,753 | $25,376,030 | $32,752,783 |
| Estate of Liming Gu | $11,883,059 | $40,877,723 | $52,760,782 |
| Estate of James D. Halvorson | $9,464,745 | $32,558,723 | $42,023,468 |
| Estate of Denis Lavelle | $4,039,992 | $13,897,572 | $17,937,564 |
| Estate of Robert Levine | $4,520,876 | $15,551,813 | $20,072,689 |
| Estate of Joseph Lostrangio | $5,777,844 | $19,875,783 | $25,653,627 |
| Estate of Dorthy Mauro | $1,580,579 | $5,437,192 | $7,017,771 |
| Estate of Mary Melendez | $7,531,551 | $25,908,535 | $33,440,086 |
| Estate of Peter T. Milano | $22,153,588 | $76,208,343 | $98,361,931 |
| Estate of Yvette Nichole Moreno | $2,360,239 | $8,119,222 | $10,479,461 |
| Estate of Brian Nunez | $2,499,922 | $8,599,732 | $11,099,654 |
| Estate of Philip Paul Ognibene | $4,435,087 | $15,256,699 | $19,691,786 |
| Estate of Salvatore T. Papasso | $6,289,680 | $21,636,499 | $27,926,179 |
| Estate of John William Perry | $4,924,240 | $16,939,386 | $21,863,626 |
| Estate of Marsha Dianah Ratchford | $6,233,977 | $21,444,881 | $27,678,858 |
| Estate of Joshua Scott Reiss | $7,726,738 | $26,579,979 | $34,306,717 |
| Estate of John M. Rodak | $24,440,747 | $84,076,170 | $108,516,917 |
| Estate of Elvin Romero | $14,783,971 | $50,856,860 | $65,640,831 |
| Estate of Richard Rosenthal | $7,274,204 | $25,023,262 | $32,297,466 |
| Estate of Maria Theresa Santillian | $3,255,002 | $11,197,207 | $14,452,209 |
| Estate of Victor Saracini | $9,593,658 | $33,002,184 | $42,595,842 |
| Estate of Scott Schertzer | $2,792,107 | $9,604,848 | $12,396,955 |
| Estate of Paul K. Sloan | $5,967,696 | $20,528,874 | $26,496,570 |
| Estate of George Eric Smith | $2,609,215 | $8,975,700 | $11,584,915 |
| Estate of Timothy P. Soulas | $86,796,344 | $298,579,423 | $385,375,767 |
| Estate of William R. Steiner | $6,443,814 | $22,166,720 | $28,610,534 |

| | | | |
|---|---|---|---|
| Estate of Andrew Stergiopoulos | $5,716,259 | $19,663,931 | **$25,380,190** |
| Estate of Edward W. Straub | $16,552,703 | $56,941,298 | **$73,494,001** |
| Estate of Jennifer Tino | $2,625,577 | $9,031,985 | **$11,657,562** |
| Estate of Jeanmarie Wallendorf | $1,768,803 | $6,084,682 | **$7,853,485** |
| Estate of Meta Waller | $1,200,501 | $4,129,723 | **$5,330,224** |
| Estate of Timothy Raymond Ward | $2,691,269 | $9,257,965 | **$11,949,234** |
| | **$394,277,884** | **$1,356,315,921** | **$1,750,593,805** |

AND IT IS FURTHER ORDERED that damages for pain and suffering are awarded to

the Decedents' Estates as follows:

| DECEDENT ESTATE | PAIN & SUFFERING | PUNITIVE DAMAGES | TOTAL PAIN & SUF. |
|---|---|---|---|
| Estate of Donald J. Havlish, Jr. | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Michael A. Bane | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Martin Boryczewski | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Steven Cafiero | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Richard M. Caproni | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Peter Chirchirillo | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Jeffrey Coale | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Daniel M. Coffey | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Jason Coffey | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Jeffrey Collman | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Michael Diehl | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Stephen Dorf | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Judy Fernandez | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Ronald Gamboa | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of William R. Godshalk | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of John Grazioso | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Liming Gu | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of James D. Halvorson | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Denis Lavelle | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Robert Levine | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Joseph Lostrangio | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Dorthy Mauro | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Mary Melendez | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Peter T. Milano | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Yvette Nichole Moreno | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Brian Nunez | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Philip Paul Ognibene | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of Salvatore T. Papasso | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |
| Estate of John William Perry | $2,000,000.00 | $6,880,000.00 | **$8,880,000.00** |

| | | |
|---|---|---|
| Estate of Marsha Dianah Ratchford | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Joshua Scott Reiss | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of John M. Rodak | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Elvin Romero | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Richard Rosenthal | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Maria Theresa Santillian | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Victor Saracini | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Scott Schertzer | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Paul K. Sloan | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of George Eric Smith | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Timothy P. Soulas | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of William R. Steiner | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Andrew Stergiopoulos | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Edward W. Straub | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Jennifer Tino | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Jeanmarie Wallendorf | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Meta Waller | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| Estate of Timothy Raymond Ward | $2,000,000.00 | $6,880,000.00 | $8,880,000.00 |
| | $94,000,000.00 | $323,360,000.00 | $417,360,000.00 |

AND IT IS FURTHER ORDERED that damages for solatium are awarded as follows:

| PLAINTIFF | SOLATIUM | PUNITIVE | TOTAL |
|---|---|---|---|
| Fiona Havlish | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Donald Havlish, Sr. | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| William Havlish | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Susan Conklin | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Tara Bane | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Donald Bane | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Christina Bane-Hayes | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Krystyna Boryczewski | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Estate of Michael Boryczewski | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Julia Boryczewski | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Michele Boryczewski | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Richard A. Caproni | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Dolores Caproni | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Christopher Caproni | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Michael Caproni | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Lisa Caproni-Brown | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Clara Chirchirillo | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Livia Chirchirillo | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Catherine Deblieck | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| William Coale | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |

App.4

| | | |
|---|---|---|
| Frances M. Coffey | $21,000,000.00 | $72,240,000.00 | $93,240,000.00 |
| Daniel D. Coffey, M.D. | $12,750,000.00 | $43,860,000.00 | $56,610,000.00 |
| Kevin M. Coffey | $12,750,000.00 | $43,860,000.00 | $56,610,000.00 |
| Dwayne W. Collman | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Brian Collman | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Charles Collman | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Brenda Sorenson | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Loisanne Diehl | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Morris Dorf | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Anne Marie Dorf | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Joseph Dorf | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Michelle Dorf | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Robert Dorf | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Linda Sammut | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Corazon Fernandez | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Grace Parkinson-Godshalk | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Tina Grazioso | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Maureen Halvorson | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Jin Liu | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Alan Gu | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Grace Kneski | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Roni Levine | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Teresanne Lostrangio | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| JoAnne Lovett | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Regina Maria Merwin | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Margaret Mauro | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Ramon Melendez | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Patricia Milano | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Ivy Moreno | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Estate of Vincent A. Ognibene | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Marie Ann Paprocki | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |
| Patricia J. Perry | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Christine Papasso | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Rodney Ratchford | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Rodney M. Ratchford | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Marshee R. Ratchford | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Benefit of Maranda C. Ratchford | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Joyce Ann Rodak | $12,500,000.00 | $43,000,000.00 | $55,500,000.00 |
| Chelsea Nicole Rodak | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Benefit of Devon Marie Rodak | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| John Rodak | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Regina Rodak | $8,500,000.00 | $29,240,000.00 | $37,740,000.00 |
| Joanne Gori | $4,250,000.00 | $14,620,000.00 | $18,870,000.00 |

App.5

| | | | |
|---|---|---|---|
| Diane Romero | $12,500,000.00 | $43,000,000.00 | **$55,500,000.00** |
| Loren Rosenthal | $12,500,000.00 | $43,000,000.00 | **$55,500,000.00** |
| Judith Reiss | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Expedito Santillian | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Ester Santillian | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Ellen Saracini | $12,500,000.00 | $43,000,000.00 | **$55,500,000.00** |
| Guardian of Anne C. Saracini | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Joanne Renzi | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Paul Schertzer | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Ronald S. Sloan | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Raymond Doyle Smith | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Katherine Soulas | $12,500,000.00 | $43,000,000.00 | **$55,500,000.00** |
| Russa Steiner | $12,500,000.00 | $43,000,000.00 | **$55,500,000.00** |
| George Stergiopoulos, M.D. | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Angela Stergiopoulos | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Sandra Straub | $12,500,000.00 | $43,000,000.00 | **$55,500,000.00** |
| Joan E. Tino | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Pamela Schiele | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Christine Barton (now Pence) | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Doyle Raymond Ward | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Gerald Bingham | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Alice Carpeneto | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Stephen L. Cartledge | $12,500,000.00 | $43,000,000.00 | **$55,500,000.00** |
| Michelle Wright | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Maureen Halvorson | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Haomin Jian | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| FuMei Chien | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Huichun Jian | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Hui-Chuan Jian | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Hui-Chien Chen | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Hui-Zon Jian | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Michael LoGuidice | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Ralph S. Maerz | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Martin Panik | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Estate of Linda Ellen Panik | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Mary Lynn-Anna Panik Stanley | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Helen Rosenthal | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Alexander Rowe | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Ed Russin | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Gloria Russin | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Barry Russin | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| Leonard Zeplin | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |
| Leona Zeplin | $8,500,000.00 | $29,240,000.00 | **$37,740,000.00** |

App.6

| Joslin Zeplin | $4,250,000.00 | $14,620,000.00 | **$18,870,000.00** |
| | **$874,000,000.00** | **$3,006,560,000.00** | **$3,880,560,000.00** |

IT IS FURTHERMORE:

ORDERED that Plaintiffs shall forthwith, consistent with the requirements of 28 U.S.C. §

1608(e), send a copy of this Order and Judgment, together with the Memorandum Decision and

Order entered on October 3, 2012, and the Report and Recommendation to the Honorable

George B. Daniels issued on July 30, 2012, to Defendants.

This is a final, appealable order. See Fed.R.App.P.(4)(a).

**SO ORDERED.**

DATE _____

GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

**App.7**

AO 451 (TXND Rev. 10/13) Clerk's Certification of a Judgment to be Registered in Another District

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Texas

| | | |
|---|---|---|
| JOHN DOES 1-7 | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    4:20-CV-605 |
| THE TALIBAN, AL-QAEDA, ET AL | ) | |
| *Defendant* | ) | |

## CLERK'S CERTIFICATION OF A JUDGMENT TO BE REGISTERED IN ANOTHER DISTRICT

I certify that the attached judgment is a copy of a judgment entered by this court on *(date)*   November 5, 2020   .

I also certify that, as appears from this court's records, no motion listed in Fed. R. App. P. 4(a)(4)(A) is pending before this court, the time for filing an appeal has expired, and if an appeal was filed, it is no longer pending.

Date:    January 14, 2021

CLERK OF COURT

*Donna Rothunfeld*

_____
*Signature of Clerk or Deputy Clerk*

App.8

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CERTIFIED A TRUE COPY
KAREN MITCHELL, CLERK

By s/ DONNA ROHMFELD
DEPUTY CLERK
U.S. DISTRICT COURT, NORTHERN
DISTRICT OF TEXAS
December 14, 2020

JOHN DOES 1 THROUGH 7,

     *Plaintiffs,*

v.

THE TALIBAN, AL-QAEDA,
and THE HAQQANI NETWORK,

     *Defendants.*

Civil Action No. 4:20-CV-00605-P

## FINAL DEFAULT JUDGMENT

This matter having come before the Court on Plaintiffs' Motion for Default Judgment, and the Court, having considered the motion, Plaintiffs' Memorandum of Law on Damages, the supporting evidence, and otherwise being advised of the premises, it is hereby ORDERED and ADJUDGED that the following Judgment is entered in favor of Plaintiffs and against all Defendants named herein, jointly and severally, as follows, rounded to the nearest dollar:

1.    Judgment is hereby entered for Plaintiff John Doe 1 for compensatory damages in the amount of $23,179,645.00 (Twenty-Three Million One Hundred Seventy-Nine Thousand Six Hundred and Forty-Five Dollars).

App.9

2.      Judgment is hereby entered for Plaintiff John Doe 2 for compensatory damages in the amount of $23,296,980.00 (Twenty-Three Million Two Hundred Ninety-Six Thousand Nine Hundred and Eighty Dollars).

3.      Judgment is hereby entered for Plaintiff John Doe 3 for compensatory damages in the amount of $31,775,920.00 (Thirty-One Million Seven Hundred Seventy-Five Thousand Nine Hundred and Twenty Dollars).

4.      Judgment is hereby entered for Plaintiff John Doe 4 for compensatory damages in the amount of $24,231,823.00 (Twenty-Four Million Two Hundred Thirty-One Thousand Eight Hundred and Twenty-Three Dollars).

5.      Judgment is hereby entered for Plaintiff John Doe 5 for compensatory damages in the amount of $14,511,532.00 (Fourteen Million Five Hundred Eleven Thousand Five Hundred and Thirty-Two Dollars).

6.      Judgment is hereby entered for Plaintiff John Doe 6 for compensatory damages in the amount of $10,672,656.00 (Ten Million Six Hundred Seventy-Two Thousand Six Hundred and Fifty-Six Dollars).

7.      Judgment is hereby entered for Plaintiff John Doe 7 for compensatory damages in the amount of $10,750,185.00 (Ten Million Seven Hundred Fifty Thousand One Hundred and Eighty-Five Dollars).

8.      The above judgments are entered jointly and severally against the following named Defendants: the Taliban, Al-Qaeda, and the Haqqani Network.

**DONE AND ORDERED** at Fort Worth, Texas, on ___11-5-2020___

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

App.11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/20/2022

|  |  |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case<br><br>**RULE 54(b) JUDGMENT** |

*This document relates to:*           *Federal Insurance Co., et al v. al Qaida, et al.*
                                       03-CV-06978 (GBD) (SN)

Whereas, this matter having come before the Honorable George B. Daniels, United States

District Judge, on the application of certain Plaintiffs in *Federal Insurance Co., et al v. al Qaida,*

*et al.*, 03-CV-06978 (GBD) (SN) (the "*Federal Insurance* Plaintiffs"), requesting that the Court

extend its prior rulings on their Motion for Assessment of Damages against Al Qaeda, and later

Hezbollah, to defendant the Taliban, as to which a default judgment as to liability was entered on

April 7, 2006 (*Federal Insurance* Dkt. No. 626), and enter a final judgment in favor of the

*Federal Insurance* Plaintiffs and against the Taliban in accordance with those prior rulings

pursuant to Fed. R. Civ. P. 54(b), and the Court, on April 6, 2022, having rendered its Order,

attached as Exhibit A hereto, entering partial final judgment pursuant to Fed. R. Civ. P. 54(b)

against defendant the Taliban and in favor of the *Federal Insurance* Plaintiffs as set forth in

Exhibit A, and awarding prejudgment interest at the rate of 4.96 percent, compounded annually,

and lifting the stay imposed by Federal Rule of Civil Procedure 62(a) so that the *Federal*

*Insurance* Plaintiffs may execute on and enforce the judgment immediately (ECF No. 7833), and

further directing the Clerk of the Court to prepare and enter a final judgment, it is,

**ORDERED, ADJUDGED AND DECREED**: That judgment is hereby entered in favor

of the *Federal Insurance* Plaintiffs and against defendant the Taliban in accordance with the

Court's Order dated April 6, 2022 as follows:

| PLAINTIFF | COMPENSATORY DAMAGES | TREBELED AWARD |
|---|---|---|
| Vigilant Insurance Company | $42,305,933.24 | $126,917,799.72 |
| Chubb Custom Insurance Company | $612,585.00 | $1,837,755.00 |
| Chubb Indemnity Insurance Company | $4,083,878.20 | $12,251,634.60 |
| Federal Insurance Company | $1,513,667,597.39 | $4,541,002,792.17 |
| Chubb Insurance Company of New Jersey | $412,681.71 | $1,238,045.13 |
| Chubb Insurance Company of Canada | $50,452,395.71 | $151,357,187.13 |
| Pacific Indemnity Company | $9,936,536.66 | $29,809,609.98 |
| Great Northern Insurance Company | $595,997,113.79 | $1,787,991,341.37 |
| AXA Art Insurance Corp. | $14,287,543.00 | $42,862,629.00 |
| AXA Global Risks (UK) Ltd. | $10,986,623.57 | $32,959,870.71 |
| AXA CSA UK Branch | $64,779,883.00 | $194,339,649.00 |
| AXA Insurance Company | $131,696,044.96 | $395,088,134.88 |
| AXA Reinsurance Company | $82,714,778.00 | $248,144,334.00 |
| AXA RE | $105,790,023.00 | $317,370,069.00 |
| AXA RE Canadian Branch | $26,138,407.11 | $78,415,221.33 |
| AXA RE UK Plc | $18,162,701.70 | $54,488,105.10 |
| AXA Versicherung | $923,053.00 | $2,769,159.00 |
| SPS RE | $84,305,160.00 | $252,915,480.00 |
| American Alternative Insurance Company | $3,922,782.07 | $11,768,346.21 |

App.13

| | | |
|---|---|---|
| **Princeton Excess and Surplus Lines Insurance Company** | $3,796,292.50 | $11,388,877.50 |
| **Great Lakes UK Reinsurance Company** | $99,511,427.02 | $298,534,281.06 |
| **OneBeacon Insurance Company** | $176,514,985.40 | $529,544,956.20 |
| **TIG** | $76,084,229.30 | $228,252,687.90 |
| **Total** | $3,117,082,655.33 | $9,351,247,965.99 |

along with prejudgment interest at 4.96%, compounded annually, amounting to aggregate

prejudgment interest of $5,321,558,154.65.

It is further **ORDERED, ADJUDGED and DECREED** that, for the reasons stated in

the Court's Order dated April 6, 2022, the Court's entry of judgment against the Taliban is

certified as final pursuant to Fed. R. Civ. P. 54(b), and that the stay provided by Federal Rule of

Civil Procedure 62(a) is lifted so that the *Federal Insurance* Plaintiffs may execute on and

enforce the judgment immediately.

Dated: April 20, 2022
    New York, New York

Clerk of Court

BY:

Deputy Clerk

3

App.14

Query    Reports    Utilities    Help    Log Out

CLOSED,APPEAL,CASREF,LEAD,MDL,RELATED

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:01-cv-10132-GBD-SN

Smith v. The Islamic Emirate, et al             Date Filed: 11/14/2001
Assigned to: Judge George B. Daniels       Date Terminated: 05/07/2003
Referred to: Magistrate Judge Sarah Netburn      Jury Demand: Both
Demand: $9,999,000                       Nature of Suit: 890 Other Statutory
Lead case: 1:03-md-01570-GBD-SN       Actions
Member case: (View Member Case)        Jurisdiction: Federal Question
Related Case: 1:03-md-01570-GBD-SN
Cause: 28:1391 Personal Injury

| Date Filed | # | Docket Text |
|---|---|---|
| 07/14/2003 | 28 | JUDGMENT # 03,1446. Judgment is entered in favor of plaintiff, Raymond Anthony Smith, as Administrator of the Estate of George Eric Smith, Deceased, against defendants, the Islamic Emirate of Afghanistan; the Taliban; Al Qaeda/Islamic Army; Sheikh Usamah Bin-Muhammad Bin-laden, aka Osama Bin Laden, and the Republic of Iraq, jointly and severally for $2,114,860.00. Judgment is entered in favor of plaintiff, Raymond Anthony Smith, as Representative of the Heirs, and as Administrator of the Estate of George Eric Smith, Deceased, in accord with the 5/7/03 Opinion and Order of the Honorable Harold Baer, Jr. against defendant, the Republic of Iraq, as further set forth in this Judgment. Judgment is entered in favor of plaintiff, Raymond Anthony Smith, as Administrator of the Estate of George Eric Smith, Deceased, against defendants, the Islamic Emirate of Afghanistan; the Taliban; Al Qaeda/Islamic Army; and Sheikh Usamah Bin-Mumammad Bin-laden, aka Osama Bin Laden, jointly and severally, for $4,229,720.00. Judgment is entered in favor of Katherine Soulas, in her own right, on behalf of her minor children, and as Executrix of the Estate of Timothy Soulas, Deceased, against defendant, the Islamic Emirate of Afghanistan; the Taliban; Al Qaeda/Islamic Army; Sheikh Usamah Bin-Muhammad Bin-laden, a/k/a Osama Bin Laden, and the Republic of Iraq, jointly and severally, for $17,639,203.19. Judgment is entered in favor of Katherine Soulas, in her own right, as Representative of the Heirs, on behalf of her minor children, and as Executrix of the Estate of Timothy Soulas, Deceased, on behalf of the Solatium claimants in accord with the 5/7/03 Opinion and Order of the Honorable Harold Baer, Jr., against defendant, the Republic of Iraq, as further set forth in this Judgment. Judgment is entered in favor of Katherine Soulas, in her own right, on behalf of her minor children, and as Executrix of the Estate of Timothy Soulas, Deceased, against defendants, the Islamic Emirate of Afghanistan, the Taliban; Al Qaeda/Islamic Army, and Sheikh Usamah Bin-Muhammad Bin-laden, a/k/a Osama Bin Laden, jointly and |

**App.15**

severally, for $35,278,406.38. It is further Ordered that costs and post judgment interest in accordance with 28 U.S.C. 1961 shall be included in the judgment against the defendants (signed by Judge Harold Baer Jr. ); Mailed copies and notice of right to appeal. Entered On Docket: 7/15/03. (yv) (Entered: 07/15/2003)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 06/23/2023 10:38:43 | | | |
| **PACER Login:** | jb0014 | **Client Code:** | 99999-10319 |
| **Description:** | Docket Report | **Search Criteria:** | 1:01-cv-10132-GBD-SN Starting with document: 28 Ending with document: 28 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (FM)<br>ECF Case |

This document relates to:

*Ashton et al. v. al Qaeda Islamic Army, et al.*, 02-CV-6977 (GBD)(FM)

### AMENDED ORDER OF JUDGMENT

      Upon consideration of the evidence and arguments submitted by wrongful death Plaintiffs in the *Ashton* cases referenced above and the Judgment by Default Against the Islamic Republic of Iran entered on 08/26/2015, together with the entire record in this case, it is hereby;

      **ORDERED** that judgment is entered on behalf of all *Ashton* wrongful death Plaintiffs in *Ashton et al.* v. *Al Qaeda Islamic Army et al.*, 02-CV-6977 (GBD) (FM) for the estates of the decedents identified in the attached Exhibit A against the Islamic Republic of Iran; and it is

      **ORDERED** that the 844 *Ashton* wrongful death estates of the decedents identified in the attached Exhibit A are awarded: (1) compensatory damages for conscious pain and suffering in the amount of $2,000,000 each for a total of $1,688,000,000; (2) punitive damages for conscious pain and suffering in the amount of $6,880,000 each for a total of $5,806,720,000; and (3) prejudgment interest on the compensatory damages awards for conscious pain and suffering of each decedent to be calculated at the rate of 9% per annum from September 11, 2001 until today.

Dated:  New York, New York
              _____, 2016

                            SO ORDERED:

                            *George B. Daniels*
                            GEORGE B. DANIELS
                            UNITED STATES DISTRICT JUDGE

# Exhibit A – Decedents in *Ashton et al.*

| # | Decedent |
|-----|----------|
| 001 | Estate of Thomas Ashton |
| 002 | Estate of David Alger |
| 003 | Estate of Eric Allen |
| 004 | Estate of Jean Andrucki |
| 005 | Estate of Patrick Aranyos |
| 006 | Estate of David Arce |
| 007 | Estate of Barbara Argestgui |
| 008 | Estate of Adam P. Arias |
| 009 | Estate of Jack C. Aron |
| 010 | Estate of John Badagliacca |
| 011 | Estate of Michael Baksh |
| 012 | Estate of Gerald Barbara |
| 013 | Estate of Colleen Barkow |
| 014 | Estate of Durrell Pearsall |
| 015 | Estate of Evan Baron |
| 016 | Estate of Carlton Bartels |
| 017 | Estate of Alan Beaven |
| 018 | Estate of Carl Bedigian |
| 019 | Estate of Steven Berger |
| 020 | Estate of John Bergin |
| 021 | Estate of Shimmy D. Biegeleisen |
| 022 | Estate of Carl Bini |
| 023 | Estate of Craig Blass |
| 024 | Estate of Richard M. Blood |
| 025 | Estate of Nicholas Bogdan |
| 026 | Estate of Larry Boisseau |
| 027 | Estate of Richard Edward Bosco |
| 028 | Estate of Gary Box |
| 029 | Estate of Michael Boyle |
| 030 | Estate of Sandra J. Conaty-Brace |
| 031 | Estate of David B. Brady |
| 032 | Estate of Carol K. Demitz |
| 033 | Estate of Jonathan E. Briley |
| 034 | Estate of Herman C. Broghammer |
| 035 | Estate of Richard Bruehert |
| 036 | Estate of Rachel Tamares |
| 037 | Estate of Patrick Buhse |
| 038 | Estate of Donald Burns |
| 039 | Estate of Scott W. Cahill |
| 040 | Estate of Thomas J. Cahill |
| 041 | Estate of Edward Calderon |
| 042 | Estate of Dominick Calia |
| 043 | Estate of Brian Cannizzaro |

| # | Decedent |
|-----|----------|
| 044 | Estate of Peter J. Carroll |
| 045 | Estate of Thomas Casoria |
| 046 | Estate of Harry Taback |
| 047 | Estate of Richard G. Catarelli |
| 048 | Estate of Jason 'Jake' Cayne |
| 049 | Estate of Robert Chin |
| 050 | Estate of Christopher Ciafardini |
| 051 | Estate of Thomas Clark |
| 052 | Estate of Gregory A. Clark |
| 053 | Estate of Robert D. Colin |
| 054 | Estate of Thomas J. Collins |
| 055 | Estate of Joseph J. Jr. Coppo |
| 056 | Estate of John Coughlin |
| 057 | Estate of Angela Rosario |
| 058 | Estate of Grace Cua |
| 059 | Estate of Laurence 'Larry' Curia |
| 060 | Estate of Patricia Cushing |
| 061 | Estate of David Defeo |
| 062 | Estate of Andrea 'Ann' Della Bella |
| 063 | Estate of Colleen Ann Deloughery |
| 064 | Estate of Jerry Devito |
| 065 | Estate of Lourdes Janet Galletti |
| 066 | Estate of Rena Dinnoo |
| 067 | Estate of Joseph Dipilato |
| 068 | Estate of Brendan Dolan |
| 069 | Estate of Raymond M. Downey |
| 070 | Estate of Christopher J. Dunne |
| 071 | Estate of Paul Eckna |
| 072 | Estate of Michael Esposito |
| 073 | Estate of Michelle Eulau |
| 074 | Estate of Robert Evans |
| 075 | Estate of Douglas Farnum |
| 076 | Estate of John Farrell |
| 077 | Estate of Syed Abdul Fatha |
| 078 | Estate of Peter Feidelberg |
| 079 | Estate of Alan Feinberg |
| 080 | Estate of Michael Fiore |
| 081 | Estate of Christina Flannery |
| 082 | Estate of Andre Fletcher |
| 083 | Estate of CAROL FLYZIK |
| 084 | Estate of Jane Folger |
| 085 | Estate of Claudia Foster |
| 086 | Estate of Arthur Jones |
| 087 | Estate of Alan W. Friedlander |

| | |
|---|---|
| 088 | Estate of Andrew Friedman |
| 089 | Estate of Richard Gabriel |
| 090 | Estate of Richard Gabrielle |
| 091 | Estate of Michael Stewart |
| 092 | Estate of Peter J. Ganci |
| 093 | Estate of Andrew Garcia |
| 094 | Estate of Marlyn C. Garcia |
| 095 | Estate of Thomas Gardner |
| 096 | Estate of Gary Geidel |
| 097 | Estate of Peter V. Jr. Genco |
| 098 | Estate of Dennis Germain |
| 099 | Estate of Ronnie E. Gies |
| 100 | Estate of Paul J. Gill |
| 101 | Estate of Rodney Gillis |
| 102 | Estate of Steven A. Giorgetti |
| 103 | Estate of Salvatore Gitto |
| 104 | Estate of Thomas Glasser |
| 105 | Estate of Harry Glenn |
| 106 | Estate of John T. Gnazzo |
| 107 | Estate of Brian Goldberg |
| 108 | Estate of Lydia E. Bravo |
| 110 | Estate of Donald Greene |
| 111 | Estate of James Greenleaf |
| 112 | Estate of Peter Vega |
| 113 | Estate of Thomas Foley |
| 114 | Estate of Gary Haag |
| 115 | Estate of Andrea L. Haberman |
| 116 | Estate of Frederick K. Han |
| 117 | Estate of Thomas Hannafin |
| 118 | Estate of Harvey Harrell |
| 119 | Estate of John C. Hartz |
| 120 | Estate of Emeric J. Harvey |
| 121 | Estate of Scott O'Brien |
| 122 | Estate of Phillip T. Hayes |
| 123 | Estate of William Haynes |
| 124 | Estate of Michael Healey |
| 125 | Estate of Ronnie Lee Henderson |
| 126 | Estate of Neil Hinds |
| 127 | Estate of Tara Hobbs |
| 128 | Estate of Thomas W. Jr. Hohlweck |
| 129 | Estate of Joseph Holland |
| 130 | Estate of Darryl L. Mckinney |
| 131 | Estate of Thomas P. Holohan |
| 132 | Estate of Joseph L. Howard |
| 133 | Estate of Joseph G. Hunter |
| 134 | Estate of Robert R. Hussa |

| | |
|---|---|
| 135 | Estate of Jonathan Ielpi |
| 136 | Estate of Stephanie Irby |
| 137 | Estate of John Iskyan |
| 138 | Estate of Ariel Jacobs |
| 139 | Estate of Maria Jakubiak |
| 140 | Estate of Karl H. Joseph |
| 141 | Estate of Scott Mcgovern |
| 142 | Estate of Chandler Keller |
| 143 | Estate of Peter R. Kellerman |
| 144 | Estate of Joseph P. Kellett |
| 145 | Estate of Thomas R. Kelly |
| 146 | Estate of Rosemary A. Smith |
| 147 | Estate of Yvonne Kennedy |
| 148 | Estate of Robert King |
| 149 | Estate of Richard J. Klares |
| 150 | Estate of Julie Lynn Zipper |
| 151 | Estate of Michael P. Laforte |
| 152 | Estate of Alan Lafrance |
| 153 | Estate of Juan Lafuente |
| 154 | Estate of Amy Lamonsoff |
| 155 | Estate of Carlos Cortes |
| 156 | Estate of Robert Leblanc |
| 157 | Estate of David R. Leistman |
| 158 | Estate of Joseph A. Lenihan |
| 159 | Estate of Paul Battaglia |
| 160 | Estate of Robert M. Levine |
| 161 | Estate of Sherry Ann Bordeaux |
| 162 | Estate of Jacqueline Norton |
| 163 | Estate of Robert G. Norton |
| 164 | Estate of Gary W. Lozier |
| 165 | Estate of Marianne Macfarlane |
| 166 | Estate of James P. O'Brien |
| 167 | Estate of Jennieanne Maffeo |
| 168 | Estate of Joseph Maggitti |
| 169 | Estate of Jason M. Sekzer |
| 170 | Estate of Alfred Marchand |
| 171 | Estate of Brian E. Martineau |
| 172 | Estate of Joseph Mascali |
| 173 | Estate of Charles A. Mauro |
| 174 | Estate of Robert Mayo |
| 175 | Estate of Daniel Mcginley |
| 176 | Estate of Thomas Mcginnis |
| 177 | Estate of Michael Mcginty |
| 178 | Estate of Barry McKeon |
| 179 | Estate of John F. Jr. Mcdowell |
| 180 | Estate of Ann Mcgovern |

| | | | |
|---|---|---|---|
| 181 | Estate of Damien Meehan | 227 | Estate of Andrew Rosenblum |
| 182 | Estate of George L. Merino | 228 | Estate of Richard Ross |
| 183 | Estate of Lukasz Milewski | 229 | Estate of Bart Ruggiere |
| 184 | Estate of Karen Juday | 230 | Estate of Gilbert Ruiz |
| 185 | Estate of Henry Miller | 231 | Estate of Steven Russin |
| 186 | Estate of Robert Alan Miller | 232 | Estate of Edward Ryan |
| 187 | Estate of Louis J. Minervino | 233 | Estate of Matthew Ryan |
| 188 | Estate of Louis Modafferi | 234 | Estate of Thierry Saada |
| 189 | Estate of Manuel Mojica | 235 | Estate of Carmen Rodriguez |
| 190 | Estate of Krishna Moorthy | 236 | Estate of Nicholas Rossomando |
| 191 | Estate of Linda Oliva | 237 | Estate of Dennis Scauso |
| 192 | Estate of Marco Motroni | 238 | Estate of Jeffery Schreier |
| 193 | Estate of Matthew T. O'Mahony | 239 | Estate of Joseph P. Shea |
| 194 | Estate of Patrick Murphy | 240 | Estate of John A. Sherry |
| 195 | Estate of Mildred R. Naiman | 241 | Estate of Mark Shulman |
| 196 | Estate of Karen S. Navarro | 242 | Estate of David Silver |
| 197 | Estate of Theresa Nelson-Risco | 243 | Estate of Michael J. Simon |
| 198 | Estate of Michael Noeth | 244 | Estate of Khamladai Singh |
| 199 | Estate of Robert W. Noonan | 245 | Estate of Muriel F. Siskopoulos |
| 200 | Estate of Brian C. Novotny | 246 | Estate of James G. Smith |
| 201 | Estate of Diana O'Connor | 247 | Estate of Astrid Sohan |
| 202 | Estate of James A. O'Grady | 248 | Estate of Mary Trentini |
| 203 | Estate of Edward 'Eddie' Oliver | 249 | Estate of James A. Trentini |
| 204 | Estate of Betty Ann Ong | 250 | Estate of Donald F. Jr. Spampinato |
| 205 | Estate of Jeffery Palazzo | 251 | Estate of Laurence T. Stack |
| 206 | Estate of John Paolillo | 252 | Estate of Lisa Terry |
| 207 | Estate of Suzanne H. Passaro | 253 | Estate of Brian Sweeney |
| 208 | Estate of Anthony Perez | 254 | Estate of Sean Patrick Tallon |
| 209 | Estate of Christopher Pickford | 255 | Estate of Alan Tarasiewicz |
| 210 | Estate of Arturo Sereno | 256 | Estate of Jody Tepedino Nicholo |
| 211 | Estate of Shawn Powell | 257 | Estate of Goumatie Thackurdeen |
| 212 | Estate of Vincent Princiotta | 258 | Estate of Thomas F. Jr. Theurkauf |
| 213 | Estate of John F. Puckett | 259 | Estate of Nigel Thompson |
| 214 | Estate of Sonia M. Puopolo | 260 | Estate of Mary E. Tiesi |
| 215 | Estate of Patrick Quigley | 261 | Estate of Terrance Aiken |
| 216 | Estate of Eugene J. Raggio | 262 | Estate of Robert T. Twomey |
| 217 | Estate of Alfred Todd Rancke | 263 | Estate of Tyler Ugolyn |
| 218 | Estate of Adam D. Rand | 264 | Estate of Elsy C. Osorio |
| 219 | Estate of Amenia Rasool | 265 | Estate of Carlton F. II Valvo |
| 220 | Estate of Roger Rasweiler | 266 | Estate of Celeste Torres Victoria |
| 221 | Estate of Christopher Regenhard | 267 | Estate of Sharon Christina Milan |
| 222 | Estate of Leah Oliver | 268 | Estate of Chantal Vincelli |
| 223 | Estate of Clarin S. Schwartz | 269 | Estate of Lawrence J. Virgilio |
| 224 | Estate of Anthony Rodriguez | 270 | Estate of Honor Elizabeth Waino |
| 225 | Estate of Brooke D. Rosenbaum | 271 | Estate of Glen Wall |
| 226 | Estate of Lloyd Rosenberg | 272 | Estate of Christine Barbuto |

| 273 | Estate of Todd C. Weaver |
|-----|--------------------------|
| 274 | Estate of Timothy Welty |
| 275 | Estate of Karen E. Hagerty |
| 276 | Estate of David Wiswall |
| 277 | Estate of Christopher Wodenshek |
| 278 | Estate of Elkin Yuen |
| 279 | Estate of Michael H. Waye |
| 280 | Estate of Joseph J. Zuccala |
| 281 | Estate of Andrew Zucker |
| 282 | Estate of Alan J. Lederman |
| 283 | Estate of Angelo Amaranto |
| 284 | Estate of Michael Arczynski |
| 285 | Estate of Brian P. Dale |
| 286 | Estate of James W. Barbella |
| 287 | Estate of Joshua Birnbaum |
| 288 | Estate of Sean Booker |
| 289 | Estate of Kimberly S. Bowers |
| 290 | Estate of Alfred Braca |
| 291 | Estate of Michelle L. Robatham |
| 292 | Estate of Michael T. Carroll |
| 293 | Estate of Ruth Lapin |
| 294 | Estate of Robert Cruikshank |
| 295 | Estate of Mannie L. Clark |
| 296 | Estate of Christopher Dincuff |
| 297 | Estate of Irina Buslo |
| 298 | Estate of Valerie S. Ellis |
| 299 | Estate of William Erwin |
| 300 | Estate of George J. Ferguson |
| 301 | Estate of Kevin Frawley |
| 302 | Estate of Cynthia Giugliano |
| 303 | Estate of Joseph Grillo |
| 304 | Estate of Raul Hernandez |
| 305 | Estate of Bradely Hoorn |
| 306 | Estate of Milagros Hromada |
| 307 | Estate of Thomas Hughes |
| 308 | Estate of Daniel Ilkanayev |
| 309 | Estate of Harold Lizcano |
| 310 | Estate of James Mealary |
| 311 | Estate of Robert McCarthy |
| 312 | Estate of Timothy Mesweeney |
| 313 | Estate of Linda C. Mair Grayling |
| 314 | Estate of Gerald Thomas O'Leary |
| 315 | Estate of Michael Opperman |
| 316 | Estate of David Angell |
| 317 | Estate of Lynn Angell |
| 318 | Estate of Manish Patel |

| 319 | Estate of Gregory Reda |
|-----|------------------------|
| 320 | Estate of Isaias Rivera |
| 321 | Estate of David E. Rivers |
| 322 | Estate of Earl Shanahan |
| 323 | Estate of Sandra Taylor |
| 324 | Estate of David Tirado |
| 325 | Estate of Jon Vandevander |
| 326 | Estate of Simon V. Weiser |
| 327 | Estate of Louis C. III Williams |
| 328 | Estate of Pauline Tull-Franies |
| 329 | Estate of Edelmiro Abad |
| 330 | Estate of Terence Jr. Adderley |
| 331 | Estate of David Agnes |
| 332 | Estate of Joanne Ahladiotis |
| 333 | Estate of Jon L. Albert |
| 334 | Estate of Dominick J. Berardi |
| 335 | Estate of William R. Bethke |
| 336 | Estate of Harry A. Jr. Blanding |
| 337 | Estate of Edward Brennan |
| 338 | Estate of Mark Bruce |
| 339 | Estate of Thomas Daniel Burke |
| 340 | Estate of Thomas M. Butler |
| 341 | Estate of John Cahill |
| 342 | Estate of Philip Calcagno |
| 343 | Estate of Vincent A. Cangelosi |
| 344 | Estate of Louis Caporicci |
| 345 | Estate of Dennis Carey |
| 346 | Estate of Thomas E. III Sinton |
| 347 | Estate of Jeremy Carrington |
| 348 | Estate of Leonard M., Jr. Castrianno |
| 349 | Estate of Jason Cefalu |
| 350 | Estate of Delrose Cheatham |
| 351 | Estate of Michael Clarke |
| 352 | Estate of Eugene Clark |
| 353 | Estate of Susan M. Clyne |
| 354 | Estate of Steven Coakley |
| 355 | Estate of Joseph Corbett |
| 356 | Estate of Conrod Cottoy |
| 357 | Estate of Andrew Gilbert |
| 358 | Estate of Denise Crant |
| 359 | Estate of James L. Crawford |
| 360 | Estate of Lucy Crifasi |
| 361 | Estate of Dennis A. Cross |
| 362 | Estate of Eduvigis Jr. Reyes |
| 363 | Estate of Beverly Curry |
| 364 | Estate of Thomas P. Deangelis |

| 365 | Estate of James V. Deblase |
| 366 | Estate of Anthony Demas |
| 367 | Estate of Francis Deming |
| 368 | Estate of Christain Desimone |
| 369 | Estate of Robert Jr. Devitt |
| 370 | Estate of Michael Diagostino |
| 371 | Estate of Douglas Distefano |
| 372 | Estate of Lisa Egan |
| 373 | Estate of Samantha Egan |
| 374 | Estate of John B. Eagleson |
| 375 | Estate of Fanny Espinoza |
| 376 | Estate of William Fallon |
| 377 | Estate of Anthony Fallone |
| 378 | Estate of John Fanning |
| 379 | Estate of Clyde Jr. Frazier |
| 380 | Estate of Peter L. Freund |
| 381 | Estate of Arlene Fried |
| 382 | Estate of Peter Fry |
| 383 | Estate of John Gallagher |
| 384 | Estate of Edmund Glazer |
| 385 | Estate of Rocco N. Gargano |
| 386 | Estate of James Gartenberg |
| 387 | Estate of Peter Gelinas |
| 388 | Estate of Steven Geller |
| 389 | Estate of Joseph Giaccone |
| 390 | Estate of Calvin Gooding |
| 391 | Estate of Wade Brian Green |
| 392 | Estate of Douglas B. Gurian |
| 393 | Estate of Dana K. Hannon |
| 394 | Estate of James Haran |
| 395 | Estate of Stewart D. Harris |
| 396 | Estate of Monica E. Dejesus |
| 397 | Estate of Thomas Hobbs |
| 398 | Estate of Marcia Hoffman |
| 399 | Estate of Johnathan Hohmann |
| 400 | Estate of George Howard |
| 401 | Estate of Virginia Jablonski |
| 402 | Estate of Brook A. Jackman |
| 404 | Estate of Shari Kandell |
| 405 | Estate of John Katsimatides |
| 406 | Estate of Richard Keane |
| 407 | Estate of Timothy C. Kelly |
| 408 | Estate of Joseph A. Kelly |
| 409 | Estate of Brian Warner |
| 410 | Estate of Karen Klitzman |
| 411 | Estate of Hamiduo S. Larry |

| 412 | Estate of Neil Leavy |
| 413 | Estate of Richard Lee |
| 414 | Estate of Anthony Hawkins |
| 415 | Estate of Adrianna Legro |
| 416 | Estate of Jeffery E. Leveen |
| 417 | Estate of Marie Lukas |
| 418 | Estate of Michael Lunden |
| 419 | Estate of Laura A. Giglio |
| 420 | Estate of Keithroy Maynard |
| 421 | Estate of Justin McCarthy |
| 422 | Estate of Michael McCarthy |
| 423 | Estate of Matthew Mcdermott |
| 424 | Estate of John T. Meerlean |
| 425 | Estate of William J. Megovern |
| 426 | Estate of George III Mclaughlin |
| 427 | Estate of Martin Michelstein |
| 428 | Estate of George Merkouris |
| 429 | Estate of John Monahan |
| 430 | Estate of George Morell |
| 431 | Estate of Dennis Moroney |
| 432 | Estate of William Moskal |
| 433 | Estate of Charles A. Murphy |
| 434 | Estate of Brian Murphy |
| 435 | Estate of Richard Myhre |
| 436 | Estate of Kerene Gordon |
| 437 | Estate of Cano Gallo |
| 438 | Estate of Jeffery Nussbaum |
| 439 | Estate of Dennis Jr. O'Connor |
| 440 | Estate of Richard O'Connor |
| 441 | Estate of Lesley Thomas |
| 442 | Estate of Sean O'Neill |
| 443 | Estate of Ruben Ornedo |
| 444 | Estate of Alexander Steinman |
| 445 | Estate of James Ostrowski |
| 446 | Estate of Jason Oswald |
| 447 | Estate of Michael C. Ou |
| 448 | Estate of Peter Owens |
| 449 | Estate of Angel Pabon |
| 450 | Estate of Victor Hugo Gutierrez Paz |
| 451 | Estate of Stacey Peak |
| 452 | Estate of Mike Pelletier |
| 453 | Estate of Michael Berkeley |
| 454 | Estate of Joseph Perroncino |
| 455 | Estate of Edward Perrotta |
| 456 | Estate of Joanne Cregan |
| 457 | Estate of Gregory Richards |

| | |
|---|---|
| 458 | Estate of Richard Prunty |
| 459 | Estate of Joseph R. Riverso |
| 460 | Estate of Paul Rizza |
| 461 | Estate of Donald Robson |
| 462 | Estate of Peter Biefield |
| 463 | Estate of Scott W. Rohner |
| 464 | Estate of Luis E. Torres |
| 465 | Estate of Eric Sand |
| 466 | Estate of Susan Santo |
| 467 | Estate of Robert Scandole |
| 468 | Estate of Sean Schielke |
| 469 | Estate of Marisa Dinardo |
| 470 | Estate of Mark Schwartz |
| 471 | Estate of Adrianne Scibetta |
| 472 | Estate of Arthur Scullin |
| 473 | Estate of Khalid Shahid |
| 474 | Estate of Jayesh Shah |
| 475 | Estate of Gary Shamay |
| 476 | Estate of Leonard Snyder |
| 477 | Estate of Saranya Srinuan |
| 478 | Estate of Alexandru Stan |
| 479 | Estate of James J. Straine |
| 480 | Estate of John F. Swaine |
| 481 | Estate of Keiji Takahashi |
| 482 | Estate of Andrew Kates |
| 483 | Estate of Diane T. Lipari |
| 484 | Estate of Daniel Trant |
| 485 | Estate of William P. Tselepis |
| 486 | Estate of Jonathan Uman |
| 487 | Estate of Joseph Vilardo |
| 488 | Estate of Lisa Karen Orfi-Ehrlich |
| 489 | Estate of Frank Wisniewski |
| 490 | Estate of William J. Wik |
| 491 | Estate of Katherine Wolf |
| 492 | Estate of Martin Wortley |
| 493 | Estate of Michael Zinzi |
| 494 | Estate of Charles A. Zion |
| 495 | Estate of James M. Amato |
| 496 | Estate of John P. Burnside |
| 497 | Estate of Patricia Colodner |
| 498 | Estate of John Fischer |
| 499 | Estate of Thomas PALAZZO |
| 500 | Estate of William G. Minardi |
| 501 | Estate of James B. Reilly |
| 502 | Estate of Paul F. Sarle |
| 503 | Estate of Daniel J. Shea |

| | |
|---|---|
| 504 | Estate of Robert W. Jr. Spear |
| 505 | Estate of Anthony Starita |
| 506 | Estate of Keiichiro Takahashi |
| 507 | Estate of Japhet Aryee |
| 508 | Estate of Gregg A. Atlas |
| 509 | Estate of Inna Basin |
| 510 | Estate of Graham Berkeley |
| 511 | Estate of David S. Berry |
| 512 | Estate of Gennady Boyarsky |
| 513 | Estate of Sandra W. Bradshaw |
| 514 | Estate of Kevin Colbert |
| 515 | Estate of William Dean |
| 516 | Estate of Neil Wright |
| 517 | Estate of Eugene Kniazev |
| 518 | Estate of Arkady Zaltsman |
| 519 | Estate of David Brandhorst |
| 520 | Estate of Peter Goodrich |
| 521 | Estate of Tawanna Griffin |
| 522 | Estate of Shannon L. Adams |
| 523 | Estate of Abraham Ilowitz |
| 524 | Estate of Boris Khalif |
| 525 | Estate of Hyun Joon Lee |
| 526 | Estate of Andrew Kim |
| 527 | Estate of Irina Kolpakov |
| 528 | Estate of Pendyala Vamsikrishna |
| 529 | Estate of Prasanna Kalahasthi |
| 530 | Estate of Alexey Razuvaev |
| 531 | Estate of Joseph Maio |
| 532 | Estate of Bernard Mascarenhas |
| 533 | Estate of Joel Miller |
| 534 | Estate of Nancy Morgenstern |
| 535 | Estate of Marc A. Murolo |
| 536 | Estate of Kathleen Shearer |
| 537 | Estate of Kathleen A. Nicosia |
| 538 | Estate of Kaleen Pezzuti |
| 539 | Estate of Todd Reuben |
| 540 | Estate of Tatiana Ryjova |
| 541 | Estate of Carlos Lillo |
| 542 | Estate of Phillip Rosenzweig |
| 543 | Estate of Jonathan S. Ryan |
| 544 | Estate of David J. Statkevicus |
| 545 | Estate of Michael Tarrou |
| 546 | Estate of Lorisa Taylor |
| 547 | Estate of Frederick III Rimmelle |
| 548 | Estate of Anna Debarrera |
| 549 | Estate of Michele Reed |

| | |
|---|---|
| 550 | Estate of Soledi Colon |
| 551 | Estate of Robert Higley |
| 552 | Estate of Mark Ludvigsen |
| 553 | Estate of Andrew Knox |
| 554 | Estate of Nicholas Lassman |
| 555 | Estate of Yang Der Lee |
| 556 | Estate of Karen A. Martin |
| 557 | Estate of Steve Mercado |
| 558 | Estate of Michael J. Pascuma |
| 559 | Estate of Horan Passananti |
| 560 | Estate of Kevin Pfeifer |
| 561 | Estate of Laurence Polatsch |
| 562 | Estate of Donald Regan |
| 563 | Estate of John A. Reo |
| 564 | Estate of Christopher Santoro |
| 565 | Estate of Deepika Sattaluri |
| 566 | Estate of Lance Tumulty |
| 567 | Estate of Kui Fai Kwok |
| 568 | Estate of Ivelin Ziminski |
| 569 | Estate of Joseph J. Angelini |
| 570 | Estate of Faustino Apostol |
| 571 | Estate of Nina P. Bell |
| 572 | Estate of Larry Bowman |
| 573 | Estate of Mark Carney |
| 576 | Estate of Vincent Danz |
| 577 | Estate of Amy O'Doherty |
| 578 | Estate of Joseph Della Pietra |
| 579 | Estate of David T. Fontana |
| 580 | Estate of William Gardner |
| 581 | Estate of John Giordano |
| 582 | Estate of Florence M. Gregory |
| 583 | Estate of Leonard Hatton |
| 584 | Estate of Andrew LaCorte |
| 585 | Estate of Charles Jones |
| 586 | Estate of Robert Kennedy |
| 587 | Estate of James P. Ladley |
| 588 | Estate of Stephen Lamantia |
| 589 | Estate of Gary E. Lasko |
| 590 | Estate of Margaret Lewis |
| 591 | Estate of Michael Lynch |
| 592 | Estate of Thomas J. Mccann |
| 593 | Estate of Charles A. Mccrann |
| 594 | Estate of Mirna A. Daurte |
| 595 | Estate of Lorraine Lisi |
| 596 | Estate of Robert Shearer |
| 597 | Estate of Thomas G. O'Hagan |

| | |
|---|---|
| 598 | Estate of Maureen Olson |
| 599 | Estate of Alexander Ortiz |
| 600 | Estate of Deepa Pakkala |
| 601 | Estate of Bettina Browne-Radburn |
| 602 | Estate of Angel Perez |
| 603 | Estate of Benito Valentin |
| 604 | Estate of Norman Rossinow |
| 605 | Estate of Christina S. Ryook |
| 606 | Estate of Joseph Sacerdote |
| 607 | Estate of Eric Eisenberg |
| 608 | Estate of Kevin Smith |
| 609 | Estate of Norma Taddei |
| 610 | Estate of Jorge Velazquez |
| 611 | Estate of Joanne F. Weil |
| 612 | Estate of Debbie Williams |
| 613 | Estate of Brian P. Williams |
| 614 | Estate of Joseph Zaccoli |
| 615 | Estate of Mark Zangrilli |
| 616 | Estate of Prokopias Zois |
| 617 | Estate of Neil Levin |
| 618 | Estate of Carmen Fernandez |
| 619 | Estate of Vincent Laieta |
| 620 | Estate of Waleska Martinez |
| 621 | Estate of Luke Rambousek |
| 622 | Estate of Steven Weinberg |
| 623 | Estate of Martin Wohlforth |
| 624 | Estate of Paul Beyer |
| 625 | Estate of Ruben Correa |
| 626 | Estate of Suzanne Geraty |
| 627 | Estate of Brian Hickey |
| 628 | Estate of Thomas Mingione |
| 629 | Estate of Michael Mullan |
| 630 | Estate of Kevin Reilly |
| 631 | Estate of Frederick Ill |
| 632 | Estate of James Leahy |
| 633 | Estate of William Johnson |
| 634 | Estate of Gregory Saucedo |
| 635 | Estate of Stanley Smagala |
| 636 | Estate of Ramon Suarez |
| 637 | Estate of Michael Roberts |
| 638 | Estate of Gerald Atwood |
| 639 | Estate of Richard Aronow |
| 640 | Estate of Charles Burlingame |
| 641 | Estate of Maria Abad |
| 642 | Estate of David Barkway |
| 643 | Estate of Kenneth Basnicki |

| 644 | Estate of Kris Bishundat |
|-----|--------------------------|
| 645 | Estate of Michael Bocchino |
| 646 | Estate of Bruce Boehm |
| 647 | Estate of Francisco Bourdier |
| 648 | Estate of Ronald Breitweiser |
| 649 | Estate of Peter Brennan |
| 650 | Estate of Vincent Brunton |
| 651 | Estate of Anthony Coladonato |
| 652 | Estate of James Cove |
| 653 | Estate of Neil Cudmore |
| 654 | Estate of Scott Davidson |
| 655 | Estate of Donald Delapenha |
| 656 | Estate of Joseph Dickey |
| 657 | Estate of Eddie Dillard |
| 658 | Estate of William Dimmling |
| 659 | Estate of James Domanico |
| 660 | Estate of Mary Dowling |
| 661 | Estate of Charles Droz |
| 662 | Estate of Robert Eaton |
| 663 | Estate of Christopher Faughnan |
| 664 | Estate of Henry Fernandez |
| 665 | Estate of Bradley Fetchet |
| 666 | Estate of Michael Finnegan |
| 667 | Estate of Giann Gamboa |
| 668 | Estate of James Geyer |
| 669 | Estate of Andrew Golkin |
| 670 | Estate of Ian Gray |
| 671 | Estate of Barbara Habib |
| 672 | Estate of Michele Heidenberger |
| 673 | Estate of Kristin Ryan |
| 674 | Estate of Aram Iskenderian |
| 675 | Estate of Mark Jardim |
| 676 | Estate of Robert Jordan |
| 677 | Estate of Ann Judge |
| 678 | Estate of Frederick Kelley |
| 679 | Estate of James Kelly |
| 680 | Estate of Vanessa Kolpak |
| 681 | Estate of David Kovalcin |
| 682 | Estate of Brendan Lang |
| 683 | Estate of Roseann Lang |
| 684 | Estate of Scott Larsen |
| 685 | Estate of Joseph Leavey |
| 686 | Estate of Robert Lenoir |
| 687 | Estate of Vincent Litto |
| 688 | Estate of Daniel Lopez |
| 689 | Estate of Farrell Lynch |

| 690 | Estate of Brian Magee |
|-----|-----------------------|
| 691 | Estate of Edward Maloney |
| 692 | Estate of Terence Manning |
| 693 | Estate of Francis Meguinn |
| 694 | Estate of Thomas Mchale |
| 695 | Estate of Robert Mclaughlin |
| 696 | Estate of Laura Morabito |
| 697 | Estate of Kathleen Moran |
| 698 | Estate of Christopher M. Morrison |
| 699 | Estate of Michael Mullan |
| 701 | Estate of Christopher Newton |
| 702 | Estate of Christopher Newton-Carter |
| 703 | Estate of Timothy O'Brien |
| 705 | Estate of Jane Orth |
| 706 | Estate of Emilio Ortiz |
| 707 | Estate of Christopher Panatier |
| 708 | Estate of Bernard Patterson |
| 709 | Estate of James Quinn |
| 710 | Estate of Howard Reich |
| 711 | Estate of James Riches |
| 712 | Estate of Marjorie Salamone |
| 713 | Estate of John Salerno |
| 714 | Estate of Frank Salvaterra |
| 715 | Estate of Michael San Phillip |
| 716 | Estate of Michael Seaman |
| 717 | Estate of Craig Silverstein |
| 718 | Estate of Barry Simowitz |
| 719 | Estate of Christopher Slattery |
| 720 | Estate of Robert Sliwak |
| 721 | Estate of Heather Smith |
| 722 | Estate of Robert Spencer |
| 723 | Estate of William Steckman |
| 724 | Estate of Kevin Szocik |
| 725 | Estate of Nichola Thorpe |
| 726 | Estate of Richard Todisco |
| 727 | Estate of Vladimir Tomasevic |
| 728 | Estate of Stephen Tompsett |
| 729 | Estate of Michael Tucker |
| 730 | Estate of Ronald Vauk |
| 731 | Estate of Garo Voskerijian |
| 732 | Estate of John Wallice |
| 733 | Estate of Dinah Webster |
| 734 | Estate of David Weiss |
| 735 | Estate of Deborah Welsh |
| 736 | Estate of Jennifer Wong |
| 737 | Estate of John Works |

| | |
|---|---|
| 738 | Estate of Swede Chevalier |
| 739 | Estate of Carlos Dominguez |
| 740 | Estate of Laura Gilly |
| 741 | Estate of Won-Hyeong Song |
| 742 | Estate of Michael Taddonio |
| 743 | Estate of Gregory Buck |
| 744 | Estate of Pamela Chu |
| 745 | Estate of Mary D'Antonio |
| 746 | Estate of Thomas Dennis |
| 747 | Estate of Enrique Gomez |
| 748 | Estate of Jose Gomez |
| 749 | Estate of Elvira Granitto |
| 750 | Estate of H. Joseph Heller |
| 751 | Estate of Joseph Henry |
| 752 | Estate of Joon Kang |
| 753 | Estate of Brian Kinney |
| 754 | Estate of John Kren |
| 755 | Estate of John Levi |
| 756 | Estate of Richard Lynch |
| 757 | Estate of James Maounis |
| 758 | Estate of James Martello |
| 759 | Estate of Teddington Moy |
| 760 | Estate of Frank Naples |
| 761 | Estate of Peter Ortale |
| 762 | Estate of Sonia Ortiz |
| 763 | Estate of Todd Pelino |
| 764 | Estate of Steven Pollicino |
| 765 | Estate of Eric Ropiteau |
| 766 | Estate of Carlos Samaniego |
| 767 | Estate of Selina Sutter |
| 768 | Estate of Brian Terrenzi |
| 769 | Estate of Kenneth Waldie |
| 770 | Estate of Richard Fitzsimons |
| 771 | Estate of Dennis O'Berg |
| 772 | Estate of Frank Palombo |
| 773 | Estate of Eric Evans |
| 774 | Estate of Mary Booth |
| 775 | Estate of Mari-Rae Sopper |
| 776 | Estate of Sean Lynch |
| 777 | Estate of Edmund Mcnally |
| 778 | Estate of Patricia Mickley |
| 779 | Estate of Daphne Pouletsos |
| 780 | Estate of Rajesh Mirpuri |
| 781 | Estate of Jeffrey Mladenik |
| 782 | Estate of Jack Punches |
| 783 | Estate of Janice Scott |

| | |
|---|---|
| 784 | Estate of Mathew Gianna |
| 785 | Estate of Gerard Rauzi |
| 786 | Estate of William Wilson |
| 787 | Estate of William Wren |
| 788 | Estate of Charles Mathers |
| 789 | Estate of Francois Jean-Pierre |
| 790 | Estate of Rodney Wotton |
| 791 | Estate of W. David Bauer |
| 792 | Estate of Colin Bonnett |
| 793 | Estate of Thomas Bowden |
| 794 | Estate of Shawn Bowman |
| 795 | Estate of John Candela |
| 796 | Estate of Steven Schlag |
| 797 | Estate of Kevin Murphy |
| 798 | Estate of Salvatore Zisa |
| 799 | Estate of Donald Jones |
| 800 | Estate of Scott Vasel |
| 801 | Estate of David Meyer |
| 802 | Estate of Vincenzo Gallucci |
| 803 | Estate of Ronald Orsini |
| 804 | Estate of Kevin Hannaford |
| 805 | Estate of Steven Goldstein |
| 806 | Estate of Ronald Magnuson |
| 807 | Estate of Jack D'Ambrosi |
| 808 | Estate of Jay Magazine |
| 809 | Estate of Daniel Maher |
| 810 | Estate of Kristen Montanaro |
| 811 | Estate of Michael Tanner |
| 812 | Estate of Edward Carlino |
| 813 | Estate of Anil Bharvaney |
| 815 | Estate of Milton Bustillo |
| 816 | Estate of Carl Difranco |
| 817 | Estate of Catherine Macrae |
| 818 | Estate of Nancy Mauro |
| 819 | Estate of Stacey Sanders |
| 820 | Estate of Jean Peterson |
| 821 | Estate of Edward Felt |
| 822 | Estate of Joseph Keller |
| 823 | Estate of Jeremy Glick |
| 824 | Estate of Linda Gronlund |
| 825 | Estate of David Dimeglio |
| 826 | Estate of Bryan Jack |
| 827 | Estate of Donna Giordano |
| 828 | Estate of David Vargas |
| 829 | Estate of Thomas Swift |
| 830 | Estate of Todd Beamer |

| 831 | Estate of Thomas Brennan |
| 832 | Estate of Paul Beatini |
| 833 | Estate of Patrick Danahy |
| 834 | Estate of Alan Wisniewski |
| 835 | Estate of Michael Cunningham |
| 836 | Estate of Sean Rooney |
| 837 | Estate of John Ryan |
| 838 | Estate of Howard Kane |
| 839 | Estate of Joseph Sisolak |
| 840 | Estate of Scott Johnson |
| 841 | Estate of Adam Lewis |
| 842 | Estate of Noel Foster |
| 843 | Estate of Kevin York |
| 844 | Estate of Kenneth Tarantino |
| 845 | Estate of Daniel Smith |
| 846 | Estate of Ian Schneider |
| 847 | Estate of Stephen Dimino |
| 848 | Estate of Esmerlin Salcedo |
| 849 | Estate of Jonathan Connors |
| 850 | Estate of Gerard Baptiste |
| 851 | Estate of Daniel Crisman |

[1] Decedent's 109, 403, 574, 574, 700, 704, 814 have been omitted due to the circumstances outlined in our cover letter.

App.27

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                         :          ORDER OF FURTHER PARTIAL
                                               :                    JUDGMENT
     TERRORIST ATTACKS ON          :
     SEPTEMBER 11, 2001             :          03 MDL 1570 (GBD) (FM)
                                               :
                                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x



This document relates to:

*Ashton v. al Qaeda Islamic Army*, 02-cv-6977 (GBD) (FM)

     Upon consideration of the evidence and arguments submitted by the *Ashton* wrongful

death Plaintiffs in the above-captioned action and the Judgment by Default Against the Islamic

Republic of Iran entered on 08/26/2015, together with the entire record in this case, and in

addition to the default judgment award for compensatory and punitive damages for the pre-death

conscious pain and suffering of each decedent, (*see* ECF Nos. 3226, 3229), it is hereby;

     **ORDERED** that further partial judgment is entered on behalf of those Plaintiffs in *Ashton*

*et al. v. Al Qaeda Islamic Army et al.*, 02-CV-6977 (GBD) (FM) identified in the attached Exhibit

A against the Islamic Republic of Iran; and it is

     **ORDERED** that the *Ashton* wrongful death Plaintiffs identified in the attached Exhibit A

are awarded solatium damages as set forth in Exhibit A with prejudgment interest on those awards,

to the extent that Plaintiffs' claims arise out of injuries in New York State, to be calculated at the

statutory simple interest rate of nine percent per annum from September 11, 2001 until today; and

with prejudgment interest on awards arising out of injuries occurring elsewhere, to be calculated

at a rate of 4.96 percent per annum, compounded annually, over the same period;

App.28

**ORDERED** that the *Ashton* wrongful death Plaintiffs identified in the attached Exhibit A are awarded economic damages as set forth in Exhibit A and as supported by the expert reports and analyses submitted as Exhibits B and C; and

**ORDERED** that the *Ashton* wrongful death Plaintiffs not appearing on Exhibit A may submit in later stages applications for solatium and economic damages awards that will be approved on the same basis as currently approved for those Plaintiffs appearing on Exhibit A.

Dated: June 16, 2016
New York, New York

SO ORDERED:

GEORGE B. DANIELS
United States District Judge

**App.29**

# Exhibit A

**Exhibit A**

| Estate | Economic Loss to Estate | Economic Loss with Punitive Multiplier | Surviving Family Members | | Solatium Damages | | Solatium Damages with Punitive Multiplier |
|---|---|---|---|---|---|---|---|
| Estate of Patrick Quigley | $ 11,043,078.00 | $ 49,031,266.32 | | | | | |
| | | | Ruth Quigley | Sibling | $ 4,250,000.00 | $ | 18,870,000.00 |
| | | | Patrick James Quigley Jr. | Father | $ 8,500,000.00 | $ | 37,740,000.00 |
| | | | Rachel Quigley | Child | $ 8,500,000.00 | $ | 37,740,000.00 |
| | | | Patricia Quigley | Spouse | $ 12,500,000.00 | $ | 55,500,000.00 |
| | | | Leah Quigley | Child | $ 8,500,000.00 | $ | 37,740,000.00 |
| | | | John Vincent Quigley | Sibling | $ 4,250,000.00 | $ | 18,870,000.00 |
| | | | Mi Ja Kim Quigley | Mother | $ 8,500,000.00 | $ | 37,740,000.00 |
| Estate of Chandler Keller | $ 5,171,921.00 | $ 22,963,329.24 | | | | | |
| | | | Gavin D. Keller | Sibling | $ 4,250,000.00 | $ | 18,870,000.00 |
| | | | Elizabeth H. Keller-Baker | Spouse | $ 12,500,000.00 | $ | 55,500,000.00 |
| | | | Richard E. Keller | Father | $ 8,500,000.00 | $ | 37,740,000.00 |
| | | | Brandon S. Keller | Sibling | $ 4,250,000.00 | $ | 18,870,000.00 |
| | | | Kathryn R Keller | Mother | $ 8,500,000.00 | $ | 37,740,000.00 |
| Estate of Richard Gabrielle | $ 1,903,671.00 | $ 8,452,299.24 | | | | | |
| | | | Connie Gabrielle | Sibling | $ 4,250,000.00 | $ | 18,870,000.00 |
| | | | Nicole Gabrielle | Child | $ 8,500,000.00 | $ | 37,740,000.00 |
| | | | Monica Gabrielle | Spouse | $ 12,500,000.00 | $ | 55,500,000.00 |
| | | | George Gabrielle | Sibling | $ 4,250,000.00 | $ | 18,870,000.00 |
| Estate of Tyler Ugolyn | $ 5,249,237.00 | $ 23,306,612.28 | | | | | |
| | | | Diane Ugolyn | Mother | $ 8,500,000.00 | $ | 37,740,000.00 |
| | | | Trevor Ugolyn | Sibling | $ 4,250,000.00 | $ | 18,870,000.00 |
| | | | Victor Ugolyn | Father | $ 8,500,000.00 | $ | 37,740,000.00 |

App.31

## do Campo & Thornton, P.A.

ATTORNEYS AT LAW

CHASE BANK BUILDING
150 S.E. SECOND AVENUE • SUITE 602
MIAMI, FLORIDA 33131
PH 305 358 6600 • FAX 358 6601
DANDTLAW.COM

September 21, 2021

**VIA CM/ECF**
Hon. Katherine Polk Failla
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007



*Re: John Does 1 Through 7, v. The Taliban, Al-Qaeda, and The Haqqani Network*, No. 1:20-mc-00740-KPF

Dear Judge Polk Failla:

On September 16, 2021, in *Havlish et al. v. Bin Laden, et al.*, Case No. 03 Civ. 9848 in the United States District Court for the Southern District of New York, in which the plaintiffs likewise hold a judgment against the Taliban, the Government filed a request that the Honorable George B. Daniels and the Honorable Sarah Netburn defer judicial enforcement of a writ served in that matter so that it might consider filing a Statement of Interest. *See* letter motion dated September 16, 2021 attached here as Exhibit A.

The Government states in that letter motion that "**on September 13, 2021**, the plaintiffs … served a Writ of Execution on the Federal Reserve Bank of New York, seeking execution of a judgment for $7,045,632,402.79" against assets of Da Afghanistan Bank (emphasis added). The Government's request in that matter is being made *after* the writ had been served.

To remind the Court, on August 26, 2021, Plaintiffs in this matter filed the Emergency Motion for Writ of Execution (D.E. 15) directed to the same garnishee and the same assets. And, on September 7, 2021, Plaintiffs filed a motion to expedite the ruling, arguing that the government's potential Statement of Interest could and should be considered *after* the writ had attached, and that delay in issuing the writ would prejudice Plaintiffs by, *inter alia*, giving other judgment creditors the opportunity to serve a writ concerning these same assets first.

Sincerely,

Orlando do Campo
Counsel for Plaintiffs
Bar Code: OD1969

App.32

The Court is in receipt of Plaintiffs' correspondence of September 21, 2021, alerting the Court to the sequence of events in the analogous proceeding, *Havlish et al.* v. *Bin Laden et al.*, No. 03 Civ. 9848. (Dkt. #25).  Although not expressly labeled as such, the Court reads Plaintiff's correspondence as seeking reconsideration of the Court's denial of Plaintiff's request to expedite the issuance of their requested writ of execution. (Dkt. #21).

After review of Plaintiff's submissions and the comparable procedural posture of *Havlish*, the Court will permit service of Plaintiff's requested writ of execution, but DENIES Plaintiff's request that the Court endorse the proposed order appended to their moving papers directing the Clerk of Court to enter Plaintiff's writ of execution as previously filed.  (*See* Dkt. #15).

Per the Clerk of Court, the proper process for issuance of a writ of execution against property in this District is to send a physical copy of the writ of execution, complete with an original (*i.e.*, not electronic) signature directly to the Orders and Judgments Clerk either via hand delivery or a self-addressed, stamped return envelope. In order to seek their requested relief, Plaintiffs must submit the documents in accordance with these established procedures.

The Court emphasizes that it has no intention to thwart any argument that the Government intends to make in a potential Statement of Intent.  For avoidance of doubt, this endorsement does not alter the Court's October 14, 2021 deadline for the Government to file a letter of intent regarding a possible Statement of Interest in this matter. (Dkt. #19).  As such, the Court STAYS any judicial enforcement of Plaintiff's writ of execution upon its issuance.  This stay will remain in effect pending further order of the Court.

The Clerk of Court is directed to terminate the pending motions at docket entries 15 and 16.

Date:       September 23, 2021           SO ORDERED.
            New York, New York

HON. KATHERINE POLK FAILLA
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOHN DOES 1 THROUGH 7,    :
           :
     Plaintiffs,  :
           :
   - against -   :  No. 20 Misc. 740 (KPF)
           :
THE TALIBAN *et al.*,    :
           :
     Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
           :
IN RE: TERRORIST ATTACKS ON  :  No. 03 MD 1570 (GBD) (SN)
SEPTEMBER 11, 2001    :
           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
           :
FIONA HAVLISH *et al.*,    :
           :
     Plaintiffs,  :
           :
   - against -   :  No. 03 Civ. 9848 (GBD) (SN)
           :
SHEIKH USAMAH BIN-MUHAMMED :
BIN-LADEN, a.k.a. OSAMA BIN-LADEN *et al.,* :
           :
     Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**STATEMENT OF INTEREST**
**OF THE UNITED STATES OF AMERICA**

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

ANTHONY J. COPPOLINO
Deputy Branch Director

JOSEPH E. BORSON
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel.: (202) 514-1944
Email: Joseph.Borson@usdoj.gov

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

REBECCA S. TINIO
JEANNETTE A. VARGAS
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-0179
Fax: (212) 637-2686
Email: Rebecca.Tinio@usdoj.gov
      Jeannette.Vargas@usdoj.gov

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 5

    A.    Statutory Background ................................................................... 5

        1.    The President's Blocking and Licensing Powers ....................... 5

        2.    Section 25B Certification .......................................................... 8

        3.    The Foreign Sovereign Immunities Act .................................... 8

        4.    The Terrorism Risk Insurance Act of 2002 ("TRIA") ...................... 10

    B.    Factual and Procedural Background ............................................. 11

        1.    Writs of Execution Served on the DAB Accounts at FRBNY ................. 11

        2.    The E.O. and the OFAC License ................................................ 12

ANALYSIS .......................................................................................................... 14

    A.    TRIA Provides for the Attachment of Assets Only to Satisfy Judgments for Compensatory Damages ........................................... 14

    B.    The Portion of the DAB Assets Regulated by the OFAC License Is Not Subject to Attachment ................................................... 15

    C.    The Court Should Provide the Judgment Plaintiffs a Full Opportunity to Submit Their Arguments Regarding the Attachability of the Blocked Assets Under TRIA ........................................................... 19

i

**App.36**

# TABLE OF AUTHORITIES

**Cases:**                                                                                   Page(s):

*Argentina v. NML Capital, Ltd.*,
   573 U.S. 134 (2014) ............................................................................................. 26

*Argentine Repub. v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989)........................................................................................... 8, 15

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964)............................................................................................. 26

*Bank of China v. Wells Fargo Bank & Union Trust Co.*,
   104 F. Supp. 59 (N.D. Cal. 1952) ...................................................................... 26

*Bank of New York v. Rubin*,
   484 F.3d 149 (2d Cir. 2007)................................................................................ 17

*Bennett v. Islamic Repub. of Iran*,
   618 F.3d 19 (D.C. Cir. 2010) .............................................................................. 10

*Caballero v. Fuerzas Armadas Revolucionarias de Columbia*,
   No. 20-MC-0040 (W.D.N.Y. Dec. 18, 2020) .................................................... 23

*Calderon-Cardona v. Bank of New York Mellon*,
   770 F.3d 993 (2d Cir. 2014)........................................................................... 19, 20

*Calderon-Cardona v. JPMorgan Chase Bank, N.A.*,
   867 F. Supp. 2d 389 (S.D.N.Y. 2011)................................................................ 20

*Cont'l Transfert Technique, Ltd. v. Fed. Gov't of Nigeria*,
   No. 08-cv-2026 (PLF), 2019 WL 3562069 (D.D.C. Aug. 6, 2019) ................ 10, 24

*Corp. Comm'n v. Consol. Stage Co.*,
   62 Ariz. 257 (1945)............................................................................................. 25

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981).............................................................................................. 7

*D'Investissement, S.A. v. La Republica Del Ecuador*,
   823 F. Supp. 1106 (S.D.N.Y. 1993).................................................................... 23

*EM Ltd. v. Repub. of Argentina*,
   473 F.3d 463 (2d Cir. 2007)................................................................................ 24

ii

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*,
919 F. Supp. 2d 411 (S.D.N.Y. 2013) ................................................................ 6

*Estate of Heiser v. Islamic Repub. of Iran*,
807 F. Supp. 2d 9 (D.D.C. 2011) ...................................................................... 17

*Hausler v. JP Morgan Chase, NA*,
770 F.3d 207 (2d Cir. 2014) ........................................................................ 10, 19

*Hausler v. Repub. of Cuba v. Comcast IP Phone II*,
Case No. 09-20942-CIV-JORDAN, 2011 WL 13099669 (S.D. Fla. Apr. 26, 2011) ............... 18

*Heiser v. Islamic Repub. of Iran*,
735 F.3d 934 (D.C. Cir. 2013) ......................................................................... 19

*Karaha Bodas Co, LLC v. Perusahaan Pertambangan Minyak Dan Gas Gumi Negara*,
313 F.3d 80 (2d Cir. 2002) ............................................................................. 24

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
830 F.3d 107 (2d Cir. 2016) ........................................................................... 21

*Kirschenbaum v. Assa Corp.*,
934 F.3d 191 (2d Cir. 2019) ........................................................................... 22

*Martinez v. Repub. of Cuba*,
149 F. Supp. 3d 469 (S.D.N.Y. 2016) ............................................................... 14

*Movitz v. Todd*,
24 F. App'x 708 (9th Cir. 2001) ...................................................................... 25

*NML Capital, LTD v. Banco Central de la Republica Argentina*,
652 F.3d 172 (2d Cir. 2011) ....................................................................... 23, 24

*Oetjen v. Central Leather Co.*,
246 U.S. 297 (1918) ...................................................................................... 26

*Panama v. Rep. Nat. Bank of N.Y.*,
681 F. Supp. 1066 (S.D.N.Y. 1988) .................................................................. 26

*Rubin v. Islamic Repub. of Iran*,
830 F.3d 470 (7th Cir. 2016) ........................................................................... 26

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
__ F. Supp. 3d __, Civ. A. No. 21-1946 (BAH), 2021 WL 3566594 (D.D.C. Aug. 12, 2021) .. 7

**App.38**

*Smith ex rel. Estate of Smith v. Fed. Reserve Bank of N.Y.*,
  346 F.3d 264 (2d Cir. 2003)................................................................ 17

*Stansell v. Revolutionary Armed Forces of Colombia*,
  771 F.3d 713 (11th Cir. 2014) ........................................................... 22

*State Street Corp. v. Stati*,
  No. 19-mc-91107-LTS, 2020 WL 8839775 (D. Mass. Nov. 16, 2020) .................................. 10

*The Maret*,
  145 F.2d 431 (3d Cir. 1944)................................................................ 26

*United States v. All Funds on Deposit with R.J. O'Brien Assocs.*,
  783 F.3d 607 (7th Cir. 2015) ......................................................... 17, 18

*United States v. Holy Land Found. for Relief and Development*,
  722 F.3d 677 (5th Cir. 2013) ............................................................. 17

*Walters v. Indus. & Commercial Bank of China, Ltd.*,
  651 F.3d 280 (2d Cir. 2011)............................................................... 26

*Weininger v. Castro*,
  462 F. Supp. 2d 457 (S.D.N.Y. 2006)......................................... passim

*Weinstein v. Islamic Repub. of Iran*,
  299 F. Supp. 2d 63 (E.D.N.Y. 2004) ............................................. 16, 17

*Wyatt v. Syrian Arab Repub.*,
  83 F. Supp. 3d 192 (D.D.C. 2015)........................................................ 18

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
  750 F. Supp. 2d 150 (D.D.C. 2010) ....................................................... 7

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  135 S. Ct. 2076 (2015)..................................................................... 26


**Statutes:**

3 U.S.C. § 301 ................................................................................ 1

12 U.S.C. § 611................................................................................ 8

12 U.S.C. § 632................................................................................ 8

**App.39**

22 U.S.C. § 2371 ................................................................................................ 27

28 U.S.C. § 517 .................................................................................................... 1

28 U.S.C. § 1602 .................................................................................................. 3

28 U.S.C. § 1603(a) ............................................................................................ 21

28 U.S.C. § 1603(b) ...................................................................................... 15, 21

28 U.S.C. § 1604 .................................................................................................. 9

28 U.S.C. § 1605(a)(7) .................................................................................... 9, 10

28 U.S.C. § 1605A(c) ........................................................................................... 9

28 U.S.C. § 1609 .............................................................................................. 9, 15

28 U.S.C. § 1610 .............................................................................................. 9, 25

28 U.S.C. § 1610(c) ............................................................................................ 25

28 U.S.C. § 1611(b) ............................................................................................ 23

28 U.S.C. § 1611(b)(1) ..................................................................................... 9, 24

50 U.S.C. App. 5(b) ............................................................................................ 15

50 U.S.C. App. § 2405(j) .................................................................................... 27

50 U.S.C. § 1601 .................................................................................................. 1

50 U.S.C. § 1621 .................................................................................................. 5

50 U.S.C. § 1701 .................................................................................................. 1

50 U.S.C. § 1702(a)(1)(B) ............................................................................... 6, 16

National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181,
    122 Stat. 338-341 (2008) .............................................................................. 9

**Other Authorities:**

31 C.F.R. § 501.801 ............................................................................................. 6

v

**App.40**

1976 U.S.C.C.A.N. 6604 ........................................................................................ 24

Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Foreign
   Terrorist Organizations, and Specially Designated Narcotics Traffickers; Addition of Persons
   Blocked Pursuant to 21 Part 538, 31 Part 597, or Executive Order 13129, 65 Fed. Reg. 39,100
   (June 23, 2000) ................................................................................................. 22

Executive Order 12170, Blocking Iranian Government Property, 44 Fed. Reg. 65729 ............... 16

Executive Order 14040, Declassification Reviews of Certain Documents Concerning the
   Terrorist Attacks of September 11, 2001, Fed Reg. FR 50439.................................................... 3

Executive Order of February 11, 2022, Protecting Certain Property of Da Afghanistan Bank for
   the Benefit of the People of Afghanistan ........................................................... *passim*

Restatement (Third) of Foreign Relations Law of the United States § 203 (1987)...................... 25

Restatement (Third) of Foreign Relations Law of the United States § 205(1) (1987) ................ 26

## PRELIMINARY STATEMENT

The United States of America, by and through its undersigned counsel, respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517.[1]

On February 11, 2022, pursuant to his authority under the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* ("IEEPA"), the National Emergencies Act, 50 U.S.C. § 1601 *et seq.* (the "NEA"), and 3 U.S.C. § 301, the President issued an Executive Order entitled "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan" ("the E.O." or "the Executive Order"). *See* Exhibit A; *available at* https://www.whitehouse.gov/briefing-room/presidential-actions/2022/02/11/executive-order-on-protecting-certain-property-of-da-afghanistan-bank-for-the-benefit-of-the-people-of-afghanistan/. The E.O. addresses the property and interests in property of Afghanistan's central bank, Da Afghanistan Bank ("DAB"), that are held in the United States by any U.S. financial institution, including the Federal Reserve Bank of New York ("FRBNY"), as of February 11, 2022 (the "DAB Assets"). In recognition of the "unusual and extraordinary threat to the national security and foreign policy of the United States" posed by the "widespread humanitarian crisis in Afghanistan," the E.O. blocks the DAB Assets, providing that such assets "may not be transferred, paid, exported, withdrawn, or otherwise dealt in," except as specified by the Executive Order. *Id.* at 1-2.

That same date, consistent with the provisions of the Executive Order and with foreign policy guidance from the Department of State, the Department of the Treasury's Office of

---

[1] Pursuant to 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

Foreign Assets Control ("OFAC") issued License No. DABRESERVES-EO-2022-886895-1 (the "OFAC License").  *See* Exhibit B.  The OFAC License was issued to address significant humanitarian and economic concerns and to avoid further regional instability and other conditions contrary to the foreign policy interests of the United States.  The OFAC License authorizes and compels FRBNY: (1) to transfer $3.5 billion from an identified DAB account at FRBNY to "a separate blocked account at [FRBNY] in the name of [DAB]"; (2) to further transfer that amount—"[u]pon instructions from the individual(s) certified by the Secretary of State pursuant to Section 25B of the Federal Reserve Act as having authority to receive, control, or dispose of property from or for the account of [DAB]" (the "25B-Certified Individual(s)")— so that the assets can be used "for the benefit of the People of Afghanistan"; and (3) to "engage in any transactions ordinarily incident and necessary to [such transfers], including transactions related to the liquidation of [the DAB Assets]."  *Id.* § I(a)-(c).

In these proceedings, the plaintiffs in *Doe v. Taliban*, No. 20 Misc. 740 (KPF) (ECF Entry dated September 27, 2021), and *Havlish v. Bin-Laden*, No. 03 Civ. 9848 (GBD) (SN) (ECF Entry dated January 19, 2022) (collectively, the "Judgment Plaintiffs"), have served writs of execution on the DAB Assets.  The United States understands that the Judgment Plaintiffs will assert that the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 note ("TRIA"), entitles them to execute on the DAB Assets in satisfaction of federal court judgments based upon acts of terrorism that the Judgment Plaintiffs have obtained against the Taliban.  *See, e.g.*, *Doe* (ECF No. 15).

The United States has significant interests in the disposition of these proceedings.  Most urgently, the President, the Department of State, and the Department of the Treasury have taken actions to enable the transfer of a portion of the DAB Assets so that they can be used for the

App.43

benefit of the Afghan people, in view of the acute humanitarian and economic crisis facing

Afghanistan, while confirming that the rest of the DAB Assets are blocked and therefore will

remain at issue in this litigation even after any transfer occurs pursuant to the OFAC License.

The OFAC License's authorization and directive to make certain DAB Assets available for the

benefit of the Afghan people cannot be implemented until this Court confirms, for the reasons

discussed below, that the writs of execution served by the Judgment Plaintiffs are no obstacle.

The humanitarian situation in Afghanistan is further deteriorating due to economic collapse,

drought, the COVID-19 pandemic, and residual displacement and vulnerability stemming from

decades of conflict, among other factors. The United States has significant concerns that a

humanitarian and economic crisis in Afghanistan could further destabilize the region and

embolden various groups that present a dire national security threat to U.S. interests.

More broadly, the United States has a strong interest in the President's constitutional

authority to make decisions with respect to the recognition of foreign governments and his

blocking and licensing authority under IEEPA, and in ensuring the proper construction of TRIA

and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* ("FSIA"). Finally, the

United States recognizes that these proceedings arise in the context of efforts of numerous U.S.

victims of terrorist attacks who continue to seek accountability and compensation for those

horrific acts. President Biden has publicly acknowledged the enduring pain of the families and

loved ones of those who have been killed in terrorist attacks on American and foreign soil—

including families and loved ones who have brought claims in this case, as well as many

others—and the importance of their efforts to pursue accountability for such attacks. *See*, *e.g.*,

Executive Order 14040 on Declassification Review of Certain Documents Concerning the

Terrorist Attacks of September 11, 2001, 86 Fed. Reg. 50,439 (Sept. 3, 2021); Statement by

App.44

President Joe Biden on the Executive Order Directing Declassification Review of Documents Related to the September 11, 2001 Terrorist Attacks ("My heart continues to be with the 9/11 families who are suffering, and my Administration will continue to engage respectfully with members of this community."), https://www.whitehouse.gov/briefing-room/statements-releases/2021/09/03/statement-by-president-joe-biden-on-the-executive-order-directing-declassification-review-of-documents-related-to-the-september-11-2001-terrorist-attacks/.

In service of those objectives, the United States sets forth herein relevant background and considerations and makes three particular observations:

First, the scope of the attachments being sought by plaintiffs in this litigation must be calculated in a manner consistent with the text that Congress enacted. Irrespective of its other requirements, TRIA permits claimants to attach assets only to satisfy judgments for compensatory—rather than punitive—damages. The *Havlish* writ appears to seek attachment for punitive awards totaling more than $4.5 billion and should be revised to the extent of its overbreadth to conform to the clear text of the statute.

Second, the portion of the DAB Assets authorized by the OFAC License to be transferred for the benefit of the Afghan people, in view of the urgent humanitarian and economic crisis in Afghanistan, is not properly subject to attachment in this litigation. Under the precedent of this Circuit, assets that are regulated by an OFAC license are not blocked within the meaning of TRIA and are, therefore, not subject to attachment under TRIA. The Court should therefore confirm that the DAB Assets regulated by the OFAC License are not subject to writs of attachment and that the funds can be transferred, as authorized and directed by OFAC and instructed by the 25B-Certified Individual(s), to satisfy the urgent and acute needs in Afghanistan that catalyzed the issuance of the E.O. and the OFAC License. Given the ongoing

4

App.45

crisis, to the extent the Court cannot immediately resolve all issues associated with the writs, the United States respectfully urges the Court to first address any issues relating to the OFAC License and the transfers it authorizes.

Third, even after accounting for the portion of the DAB Assets subject to the OFAC License, billions of dollars of assets remain at issue in this litigation. The Court should afford the Judgment Plaintiffs a full opportunity—in keeping with the statutory framework Congress enacted in TRIA—to make submissions addressing the legal requirements of TRIA and setting forth their arguments regarding the attachability of the unlicensed DAB Assets. Once those submissions are received, the Court should evaluate the Judgment Plaintiffs' claims in light of settled legal principles, described herein, and against the backdrop of the President's prerogatives to conduct the Nation's foreign policy.

## BACKGROUND

### A. Statutory Background

#### 1. The President's Blocking and Licensing Powers

Under the NEA, the President may declare a national emergency and exercise certain special powers and authorities respecting that emergency, as delineated by the statute. 50 U.S.C. § 1621. The President must declare the emergency and "specif[y] the provisions of law under which he proposes that he, or other officers will act . . . either in the declaration of a national emergency, or by one or more contemporaneous or subsequent Executive orders." *Id.* § 1631.

IEEPA gives the President authority to take certain actions to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). To address declared

emergencies and threats, the President may, *inter alia*, "regulate, direct and compel, nullify, void, prevent, or prohibit" transactions involving "any property in which any foreign country or a national thereof has any interest," *id.* § 1702(a)(1)(B), which is typically effected via issuance of an Executive Order. *See, e.g.*, *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 417 (S.D.N.Y. 2013) (identifying several Executive Orders issued pursuant to IEEPA). The President (through his designee, typically the Department of the Treasury's Office of Foreign Assets Control (OFAC)) may also "regulate" assets by licensing transactions, including by the owners or authorized agents of the assets, that would otherwise be prohibited. *See* 31 C.F.R. § 501.801 (describing OFAC's licensing authority). For example, between September and December 2021, OFAC issued six licenses (not implicating the DAB Assets) specifically to facilitate the provision of humanitarian assistance (including the export of agricultural commodities, medicine, medical devices, and personal, non-commercial remittances) to the people of Afghanistan notwithstanding prohibitions on transactions involving the Taliban and the Haqqani Network. *See* https://home.treasury.gov/news/press-releases/jy0372 (General Licenses 14 and 15); https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20211210_33 (General License 16); https://home.treasury.gov/news/press-releases/jy0545 (General Licenses 17, 18, and 19). These licenses seek to provide clarity to organizations operating in Afghanistan that there are no comprehensive sanctions on Afghanistan by the United States, and that export or reexport of goods or services to Afghanistan, moving or sending money into and out of Afghanistan, or activities in Afghanistan are not prohibited, provided that such transactions or activities do not involve sanctioned individuals or entities such as the Taliban. *See* OFAC Frequently Asked Questions ("FAQs") No. 951 ("Is Afghanistan

App.47

subject to comprehensive sanctions?"), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/951.

Of particular importance here is the President's authority to "block" assets within the United States that belong to foreign parties.  When property is blocked, "[t]itle . . . remains with the target, but the exercise of powers and privileges normally associated with ownership is prohibited without authorization from OFAC."  *See* OFAC FAQs No. 9 ("What do you mean by 'blocking?'"), *available at* https://home.treasury.gov/policy-issues/financial-sanctions/faqs/9 ("Blocking immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property.").

The blocking and licensing powers stem from the President's long-recognized discretion and authority in the arena of foreign policy.  *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 678-80 (1981).  In view of the President's constitutional authority, courts have accorded significant deference to the Executive's conduct of foreign policy via blocking and licensing actions.  *See, e.g.*, *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) (quoting *Regan v. Wald*, 468 U.S. 222, 242 (1984) (opining that "courts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders" and citing cases); *Strait Shipbrokers Pte. Ltd. v. Blinken*, __ F. Supp. 3d __, No. 21-cv-1946 (BAH), 2021 WL 3566594, at *7 (D.D.C. Aug. 12, 2021) ("Deference for agency decision-making is heightened in the context of executive blocking decisions, which lie at the intersection of national security, foreign policy, and administrative law." (citation omitted)).

App.48

2. **Section 25B Certification**

The Edge Act, 12 U.S.C. § 611 *et seq.*, amended Section 25 of the Federal Reserve Act to authorize the Board of Governors of the Federal Reserve to charter corporations "for the purpose of engaging in international or foreign banking."  12 U.S.C. § 611.  Section 25(b) of the Edge Act provides:

> Whenever (1) any Federal Reserve bank has received any property from or for the account of a foreign state which is recognized by the Government of the United States, or from or for the account of a central bank of any such foreign state, and holds such property in the name of such foreign state or such central bank; (2) a representative of such foreign state who is recognized by the Secretary of State as being the accredited representative of such foreign state to the Government of the United States has certified to the Secretary of State the name of a person as having authority to receive, control, or dispose of such property; and (3) the authority of such person to act with respect to such property is accepted and recognized by the Secretary of State, and is certified by the Secretary of State to the Federal Reserve bank, the payment, transfer, delivery, or other disposal of such property by such Federal Reserve bank to or upon the order of such person shall be conclusively presumed to be lawful and shall constitute a complete discharge and release of any liability of the Federal Reserve bank for or with respect to such property.

12 U.S.C. § 632.

The DAB Assets at issue are housed in accounts held at FRBNY for DAB, which is the central bank of the foreign state of Afghanistan.  *See Doe* (ECF No. 36) (stating that the accounts at issue are held by FRBNY for DAB); https://www.dab.gov.af/departments (describing DAB's functions as the central bank of Afghanistan).  The Department of State is presently following the 25B process to designate the 25B-Certified Individual(s), who will not be representatives (or members) of the Taliban.

3. **The Foreign Sovereign Immunities Act**

The FSIA establishes a comprehensive and exclusive framework for obtaining and enforcing judgments against a foreign state in civil suits in U.S. courts.  *See, e.g.*, *Argentine Repub. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-35 (1989).  The FSIA provides that

App.49

a "foreign state" is "immune from the jurisdiction" of federal and state courts except as provided by the exceptions to immunity in 28 U.S.C. §§ 1605-1607. 28 U.S.C. § 1604. In 1996, Congress amended the FSIA to include the so-called "terrorism exception" to sovereign immunity, which was codified at 28 U.S.C. § 1605(a)(7). Under that exception, a foreign state would not have immunity for certain terrorism-related lawsuits if the Secretary of State had designated the foreign state as a state sponsor of terrorism.

In 2008, Congress repealed FSIA section 1605(a)(7)'s terrorism exception to immunity and replaced it with section 1605A. *See* National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub. L. No. 110-181, § 1083(a), (b)(1)(A)(iii) and (3)(D), 122 Stat. 338-341 (2008). The new section created a private right of action for U.S. citizens injured by state sponsors of terrorism. *See* 28 U.S.C. § 1605A(c). Moreover, like its predecessor, section 1605A abrogates foreign states' sovereign immunity from damages suits arising from certain terrorist acts, so long as the foreign state was designated a state sponsor of terrorism at a prescribed point in time. *See id.* § 1605A(a), (c).[2]

The FSIA also addresses the kinds of foreign sovereign property that are and are not immune from attachment by judgment creditors. The general rule is that "the property in the United States of a foreign state shall be immune from attachment." *See* 28 U.S.C. § 1609. Section 1610 sets out exceptions to the general immunity from attachment of foreign state property. But Section 1610's exceptions to attachment immunity are inapplicable when one of the conditions in Section 1611 is satisfied, including when the property sought to be attached "is that of a foreign central bank or monetary authority held for its own account." *Id.* § 1611(b)(1);

---

[2] Afghanistan is not (and has never been) designated by the United States as a state sponsor of terrorism. *See State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism.

App.50

*see also, e.g.*, *Cont'l Transfert Technique, Ltd. v. Fed. Gov't of Nigeria*, No. 08-cv-2026 (PLF), 2019 WL 3562069, at *13 (D.D.C. Aug. 6, 2019) *appeal dismissed*, 2020 WL 1268963 (D.C. Cir. Mar. 4, 2020); *State Street Corp. v. Stati*, No. 19-mc-91107-LTS, 2020 WL 8839775, at *8 (D. Mass. Nov. 16, 2020) *adopting report and recommendation*, 2021 WL 1010697 (D. Mass. Feb. 21, 2021).

### 4. The Terrorism Risk Insurance Act of 2002 ("TRIA")

In 2002, Congress passed TRIA, Pub. L. No. 107-297, 116 Stat. 2322 (2002), *reprinted in relevant part at* 28 U.S.C. § 1610 note, which permits attachment of certain blocked assets of a terrorist party to satisfy an award of compensatory damages notwithstanding the sovereign immunity protections afforded under sections 1609-1611 of the FSIA.  TRIA provides:

> Notwithstanding any other provision of law . . . , in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a).

TRIA defines "terrorist party" to include "a terrorist, a terrorist organization . . . or a foreign state designated as a state sponsor of terrorism." *Id.* § 201(d)(4).  As set forth above, a judgment holder seeking to attach assets under TRIA must establish that the assets are: (1) blocked, and (2) assets "of" that terrorist party (or "of" an agency or instrumentality of the terrorist party).  *See also, e.g.*, *Hausler v. JP Morgan Chase, NA*, 770 F.3d 207, 211 (2d Cir. 2014).  When its conditions are satisfied, TRIA section 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA.  *See, e.g.*, *Bennett v. Islamic*

**App.51**

*Repub. of Iran*, 618 F.3d 19, 21 (D.C. Cir. 2010); *Weininger v. Castro*, 462 F. Supp. 2d 457, 499

(S.D.N.Y. 2006) (TRIA "overrides the immunity conferred in [28 U.S.C.] § 1611").

### B. Factual and Procedural Background

#### 1. Writs of Execution Served on the DAB Accounts at FRBNY

At least two writs of execution have been served on the accounts at FRBNY held for

DAB. The *Doe* Plaintiffs served a writ in the amount of $138,418,741, *see Doe*, ECF No. 27,

which is the total amount of compensatory damages awarded in their underlying judgment

against the Taliban, Al-Qaeda, and the Haqqani Network. *See id.*, ECF No. 5 (final default

judgment issued in *John Does 1 Through 7 v. Taliban*, No. 4:20-CV-00605-P (N.D. Tex.)). The

*Havlish* Plaintiffs originally served a writ in the amount of $7,045,632,402.79, but appear to

have recently obtained issuance of a substitute writ in the revised amount of $6,839,548,468.75.

*See Havlish*, ECF No. 526-1; ECF Entry dated January 19, 2022. The *Havlish* Plaintiffs'

underlying Order and Judgment against numerous defendants in their case totals $6,048,513,805

(exclusive of prejudgment interest awarded by the Court on certain categories of damages, as

well as postjudgment interest). *Id.*, ECF No. 317 (the "*Havlish* Judgment"). While no publicly

filed document details the calculation of the amount claimed in the *Havlish* Plaintiffs' revised

writ of execution, it appears to include punitive damages. (The *Havlish* Judgment awards a total

of $1,362,277,884 in three categories of compensatory damages, and $4,686,235,921 in punitive

damages. *See id.*)

In addition to these writs from the *Doe* and *Havlish* plaintiffs (who in total number 164

individual plaintiffs), the United States is aware of thousands of other plaintiffs with default

judgments of liability against the Taliban arising from the terrorist attacks of September 11,

2001, who have pending motions for judgments of money damages against the Taliban and

related defendants. *See, e.g., Ashton et al. v. al Qaeda Islamic Army et al.*, No. 02 Civ. 6977 (GBD) (SN) (ECF Nos. 1576, 1584, 1586, 1588, 1597, 1600, 1601); *Bauer et al. v. al Qaeda Islamic Army et al.*, No. 02 Civ. 7236 (GBD) (SN) (ECF Nos. 132, 135); *Burlingame v. Bin Laden et al.*, No. 02 Civ. 7230 (GBD) (SN) (ECF Nos. 182, 187, 190); *Burnett et al. v. Al Baraka Inv. & Dev. Corp. et al.*, No. 03 Civ. 9849 (GBD) (SN) (ECF Nos. 941, 945); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD) (SN) (ECF No. 7496*); O'Neill v. Repub. of Iraq*, No. 04 Civ. 1076 (GBD) (SN) (ECF No. 604).[3]

### 2. The E.O. and the OFAC License

On February 11, 2022, the President issued an Executive Order entitled "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan." *See* Ex. A. Citing his authority under IEEPA and other statutes, *id.* at 1, the President finds in the E.O.:

> [T]hat the widespread humanitarian crisis in Afghanistan – including the urgent needs of the people of Afghanistan for food security, livelihoods support, water, sanitation, health, hygiene, shelter and settlement assistance, and COVID-19-related assistance, among other basic human needs – and the potential for a deepening economic collapse in Afghanistan constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. I hereby declare a national emergency to deal with that threat. In addition, I find that the preservation of certain property of [DAB] held in the United States by United States financial institutions is of the utmost importance to addressing this national emergency and the welfare of the people of Afghanistan.

*Id*.

As a means of addressing the declared national emergency, the E.O. blocks "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including [FRBNY]," meaning that any such assets "may not be transferred, paid, exported, withdrawn, or otherwise dealt in," except as

---

[3] The United States takes no position at this time on the question of priority as between those individuals who possess such judgments or who may obtain judgments at some future date.

App.53

specified in the E.O.  *Id.* § 1(a).  The E.O. directs that any assets described in Section 1(a) shall

be promptly transferred "into a consolidated account held at [FRBNY]," and specifies that

Section 1(a) does not prevent transactions involving the blocked assets pursuant to "statutes, or

in regulations, orders, directives, or licenses that may be issued pursuant to this order."  *Id.* §

1(b), (c).  Furthermore, the E.O. "and actions taken pursuant" thereto supersede any other

Executive Order that may arguably have applied with respect to the DAB Assets.  *See id.* § 2

("This order and actions taken pursuant to this order shall supersede any previously issued

Executive order to the extent such order blocks, regulates, or otherwise affects the property and

interests in property identified in section 1(a) of this order.").

Also on February 11, 2022, and expressly pursuant to the E.O., OFAC issued License No.

DABRESERVES-EO-2022-886895-1 to FRBNY.  *See* Ex. B.  The OFAC License authorizes

FRBNY "[t]o transfer [$3.5 billion] from the consolidated blocked account [FRBNY] holds for

[DAB] in accordance with Sections 1(a) and 1(b) of E.O. of February 11, 2022, to a separate

blocked account at [FRBNY] in the name of [DAB] (the 'Account')"; "[u]pon instructions from

the [25B-Certified Individual(s)], to transfer up to [$3.5 billion] from the Account, in one or

multiple transfers, for the benefit of the people of Afghanistan"; and "[t]o engage in any

transactions ordinarily incident and necessary to [the aforementioned transfers instructed by the

25B-Certified Individual(s)], including transactions related to the liquidation of assets held in the

Account, such as securities, bonds, or gold."  *Id.* § I.  Any other transactions involving any

property or account blocked pursuant to the E.O., except as specified in Section I of the OFAC

License, are prohibited.  *Id.* § III.  In sum, the OFAC License authorizes FRBNY to transfer $3.5

billion of the DAB Assets as instructed by the 25B-Certified Individual(s), in order to address the

national emergency declared in the E.O.

App.54

## ANALYSIS

In order to aid the Court's assessment of the issues relating to the disposition of the DAB Assets, this Statement sets forth analysis in three areas: (1) the scope of the existing writs that have been served on the DAB accounts at FRBNY; (2) the effect of the OFAC License on the licensed DAB Assets; and (3) relevant considerations in assessing the application of TRIA to this matter.

### A.  TRIA Provides for the Attachment of Assets Only to Satisfy Judgments for Compensatory Damages.

As an initial matter, the Court should require the Judgment Plaintiffs to substantiate the amounts of their writs.  By its text, TRIA permits the attachment of blocked assets of a terrorist party only "to the extent of any *compensatory* damages for which such terrorist party has been adjudged liable."  TRIA § 201(a) (emphasis added).  Punitive damages are therefore not subject to attachment under TRIA.  *See, e.g.*, *Martinez v. Repub. of Cuba*, 149 F. Supp. 3d 469, 471 n.2 (S.D.N.Y. 2016) (excluding punitive damages from the calculation of the total amount plaintiff sought to attach under TRIA, because "TRIA Section 201 permits attachment only to the extent of compensatory damages.").

As applied to the Judgment Plaintiffs, the *Doe* writ corresponds exactly to the underlying judgment for compensatory damages, but the *Havlish* writ appears to encompass both compensatory and punitive damages.  Even before the Court adjudicates the other TRIA requirements, the *Havlish* writ would need to be revised to limit its scope to compensatory damages.

Furthermore, any attempt to execute on the DAB Assets to satisfy a punitive damages award, even if a writ of execution has been served that on its face encompasses punitive damages, would be invalid, because punitive damages are not included within the exception to

14

the FSIA that TRIA provides.  Except where TRIA applies, the FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts."  *Amerada Hess*, 488 U.S. at 434 (1989); *see also* 28 U.S.C. § 1603(b).  DAB is the central bank of the State of Afghanistan.  Under the FSIA, the assets of a foreign central bank are "immune from attachment arrest and execution," except as provided in sections 1610 or 1611 of the FSIA.  28 U.S.C. § 1609.  The FSIA provides no exception to sovereign immunity that would permit attachment of the DAB assets to satisfy punitive damages awarded in these cases.  While TRIA supersedes the limitations on execution immunity set out in the FSIA, *see Weininger*, 462 F. Supp. 2d at 483, TRIA cannot provide a basis for attachment of the DAB Assets with respect to punitive damages, because TRIA authorizes attachment only to satisfy compensatory damages.

## B.  The Portion of the DAB Assets Regulated by the OFAC License Is Not Subject to Attachment.

Moreover, the amount of the DAB Assets that is licensed by OFAC cannot be attached by the Judgment Plaintiffs.  Pursuant to well-established precedent in this Circuit, when assets are "regulated" by an OFAC license, they are not "blocked" for purposes of TRIA and are therefore beyond the coverage of TRIA's attachment provision.  Accordingly, the $3.5 billion in DAB Assets that OFAC has licensed to be transferred for the benefit of the Afghan people cannot be attached by the Judgment Plaintiffs.

As noted above, TRIA authorizes a judgment creditor to attach only the "blocked assets" of a terrorist party, or of its agency or instrumentality, to satisfy a terrorism judgment.  TRIA § 201(a).  Assets are "blocked" under TRIA if they have been "*seized or frozen* by the United States under section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of [IEEPA]."  *Id.* § 201(d)(2)(A) (emphasis added).  IEEPA, in turn, authorizes the President to take a wide range of actions, spanning beyond seizure or freezing; it

15

authorizes the President to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" the acquisition, use, transfer, or other dealings of property subject to U.S. jurisdiction in which a foreign country or national has an interest. 50 U.S.C. § 1702(a)(1)(B).

In a line of cases beginning with *Weinstein v. Islamic Repub. of Iran*, 299 F. Supp. 2d 63 (E.D.N.Y. 2004), courts have concluded that IEEPA authorizes actions that do not "necessarily involve a seizing or freezing of property," and that "not every action regarding property under the authority of the IEEPA . . . results in the property being 'blocked' under the TRIA." *Id.* at 75. In *Weinstein*, the court assessed the status of certain Iranian assets. In 1979, President Carter exercised his authority under IEEPA to block all property and interests in property of the Government of Iran. Blocking Iranian Government Property, E.O. 12170, 44 Fed. Reg. 65,729 (Nov. 15, 1979). In 1981, to implement the Algiers Accords, OFAC took a variety of actions, including issuing a general license authorizing certain transactions with Iran. *See Weinstein*, 299 F. Supp. 2d at 67.

Against that backdrop, the *Weinstein* court determined that, even though E.O. 12170 remained in effect, the assets licensed by OFAC in 1981 were no longer "blocked" for purposes of TRIA insofar as the license "ha[d] the effect of removing a prohibition." *Id.* at 74; *see also id.* at 68 (the license identified certain transactions as "authorized," and "removed the prohibition" of the underlying sanctions); *id.* at 73 (the license "removed the effect of the blocking order"). The court rejected a reading of IEEPA that would have deemed "all assets 'regulated' or 'licensed' by OFAC under the IEEPA" to still be "blocked assets" under TRIA. *Id.* at 74-75. Rather, the court agreed that assets were "blocked" only if they were subject to a "'freezing' of assets that imposes an 'across-the-board prohibition against transfers or transactions of any kind

**App.57**

with regards to the property.'" *Id.* at 75 (quoting U.S. Treasury Dep't, *Foreign Assets Control Regulations for the Financial Community*, at 4 (Dec. 27, 2002)); *see also* OFAC FAQs No. 9, *available at* https://home.treasury.gov/policy-issues/financial-sanctions/faqs/9.  And assets were "[s]eized," in turn, only if there was a "transfer [of] *possessory* interest in the property." *Weinstein*, 299 F. Supp. 2d at 75 (quoting *Smith ex rel. Estate of Smith v. Fed. Rsrv. Bank of N.Y.*, 346 F.3d 264, 272 (2d Cir. 2003)).  Accordingly, "[g]iven that not every type of action authorized by the IEEPA necessarily involves a seizing or freezing of property, it follows that not every action regarding property under the authority of the IEEPA, including assets that may be 'regulated' or 'licensed,' results in the property being 'blocked' under the TRIA." *Id.*

The Second Circuit embraced the *Weinstein* approach in *Bank of New York v. Rubin*, 484 F.3d 149, 150 (2d Cir. 2007), adopting an opinion that had incorporated the "persuasive analysis" of *Weinstein*.  *See id.*  Other courts of appeals have similarly concluded that an OFAC license renders assets unblocked and therefore unattachable under TRIA.  In *United States v. Holy Land Foundation for Relief and Development*, 722 F.3d 677, 686-87 (5th Cir. 2013), the Fifth Circuit concluded that assets that were blocked pursuant to an Executive Order but also subject to an OFAC specific license were not subject to attachment under TRIA.  The Seventh Circuit reached a similar conclusion.  *See United States v. All Funds on Deposit with R.J. O'Brien Assocs.*, 783 F.3d 607, 622-24 (7th Cir. 2015) (funds formally blocked under IEEPA, but also subject to an OFAC specific license that authorized "final . . . transfer, or disposition" of those funds, were not subject to attachment under TRIA).  Numerous district courts have reached the same conclusion with respect to assets regulated by both general and specific licenses.  *See, e.g.*, *Estate of Heiser v. Islamic Repub. of Iran*, 807 F. Supp. 2d 9, 18 n.6 (D.D.C. 2011) (TRIA is inapplicable to assets that are "made under a general license" because such assets are

App.58

"regulated," rather than "seized or frozen") (quoting 31 C.F.R. § 560.508, TRIA § 201(d)(2)(A));

*Wyatt v. Syrian Arab Repub.*, 83 F. Supp. 3d 192, 197 (D.D.C. 2015) (funds that were

"authorized under a specific license" were immune from attachment, and "[b]ecause the funds

are subject to an OFAC license and may now be transferred without further OFAC intervention,

they are no longer 'frozen or seized' as required by [TRIA]"); *Hausler v. Repub. of Cuba v.*

*Comcast IP Phone II*, Case No. 09-20942-CIV-JORDAN, 2011 WL 13099669, at *4 (S.D. Fla.

Apr. 26, 2011) (funds were not "blocked assets" under TRIA because they were authorized

pursuant to an OFAC specific license); R&R on Mots. For Summ. J., *Martinez v. Rep. of Cuba*,

NO. 19-22095-CIV-MORENO/TORRES, ECF No. 61, at 15-16, *aff'd*, ECF No. 71 (assets

sought to be attached under TRIA were "authorized for transfer to Cuba" under OFAC licenses,

and thus were "not subject to an across-the-board prohibition on transfer" and not "blocked"

under TRIA).[4]

    As applied here, the OFAC License authorizes specific transfers of, and transactions

related to the liquidation of, $3.5 billion of the DAB Assets.  *See supra* Part B.2 (Background).

Those assets are not frozen or otherwise subject to an "across-the-board prohibition on transfer;"

---

[4] In *R.J. O'Brien*, Judge Manion wrote separately to propose a distinction between general and
specific licenses, opining that only the former would remove assets from TRIA attachability.  *See*
784 F.3d at 632-33 (Manion, J., concurring in part and dissenting in part).  Judge Manion
considered a "general license" to be "not so much a license as a regulation preventing assets
from being blocked in the first place," while a specific license is a "license issued under the
authority of the regulations that is necessary to unblock assets that the regulations have at first
blocked."  *Id.*  But the distinctions between general and specific licenses do not bear on the
operative legal standard; both types of licenses are authorizations from OFAC to engage in
specified activities or transactions involving certain blocked persons or property, and either can
be issued concurrently with or after a blocking action.  And as noted herein, courts—including
the *R.J. O'Brien* majority—have consistently held that assets regulated by specific licenses are
not attachable under TRIA.  *See id.* at 622-24; *see also, e.g.*, *Wyatt*, 83 F. Supp. 3d at 197; *see*
*generally* OFAC FAQs No. 74, *available at* https://home.treasury.gov/policy-issues/financial-
sanctions/faqs/74 ("What is a license?") (describing the characteristics of general and specific
licenses).

**App.59**

they therefore are not "blocked" for purposes of TRIA and are unavailable for attachment under TRIA.[5]

### C. The Court Should Provide the Judgment Plaintiffs a Full Opportunity to Submit Their Arguments Regarding the Attachability of the Blocked Assets Under TRIA.

Leaving aside the assets regulated by the OFAC License that are therefore not blocked (and not attachable) for TRIA purposes, there remain substantial DAB Assets that are certainly "blocked assets," subject to the prohibitions of the E.O. And the Judgment Plaintiffs have "obtained a judgment against a terrorist party on a claim based upon an act of terrorism." TRIA § 201. So with respect to those two requirements, the Judgment Plaintiffs have satisfied the applicable standards under TRIA.

The question remaining for the Court is therefore whether the unlicensed DAB Assets are "blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)." *Id.*; *see also Hausler*, 770 F.3d at 212 (citing *Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993, 1001 (2d Cir. 2014)); *Heiser v. Islamic Repub. of Iran*, 735 F.3d 934, 937-40 (D.C. Cir. 2013).

On that question, the United States respectfully urges that the Judgment Plaintiffs should be afforded a full opportunity—consistent with the purpose and standards of TRIA—to submit their arguments as to why they believe this legal requirement is satisfied. The United States has a compelling interest in permitting victims of terrorism to obtain compensation to the greatest degree permitted under the law. The United States does not, at this stage, take a position

---

[5] OFAC will not actually direct the execution of the authorized transfers while the Court reviews the pending writs of execution on the DAB Assets. Indeed, the OFAC License makes clear that it "does not excuse [FRBNY] from the need to comply with any applicable orders, rulings, writs, or other judicial process of the United States federal courts." *See* Ex. B. at 1 ¶ 5.

regarding whether the Judgment Plaintiffs have satisfied the remaining requirement for attachment under TRIA but identifies below considerations relevant to the Court's analysis of whether the requirement is satisfied.

*Ownership*.  In assessing whether the DAB Assets constitute the "blocked assets of [a] terrorist party" or the "blocked assets of any agency or instrumentality of that terrorist party," the word "of" plays an important role.  TRIA's standard requires an inquiry into whether a terrorist party (or an agency or instrumentality thereof) has an ownership interest in the DAB Assets. *See, e.g.*, *Heiser*, 735 F.3d at 937-40 (applying TRIA § 201 only against assets that the terrorist party owns).  As explained in greater detail below, determinations of ownership for purposes of TRIA implicate significant issues of foreign policy that sound in federal law, both as pertains to the governance of the international banking system and the prerogative of the President to recognize and to conduct diplomacy with foreign states.

*Terrorist Party*.  In assessing whether the DAB Assets, as Afghan central bank assets, constitute the "blocked assets of [a] terrorist party," itself, TRIA § 201(d)(4), "a foreign state is a 'terrorist party' for purposes of TRIA § 201(d) when it is 'designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 . . . or section 620A of the Foreign Assistance Act of 1961,'" *Calderon-Cardona*, 770 F.3d at 999 (quoting *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 867 F. Supp. 2d 389, 394 (S.D.N.Y. 2011)).  The State of Afghanistan has not been designated as a state sponsor of terrorism, nor have its agencies or instrumentalities been designated under other counterterrorism sanctions authorities.   A non-state entity is a "terrorist party" if it satisfies the definition specified in 8 U.S.C. § 1182(a)(3)(B)(vi).  TRIA § 201(d)(4).  The Taliban satisfies that definition.

**App.61**

***Agency or Instrumentality***.  In assessing whether the DAB Assets constitute the "blocked assets of any agency or instrumentality of that terrorist party," it will be necessary for the Court to consider the meaning of "agency or instrumentality" in this context.  Although TRIA does not define "agency or instrumentality," *see id.* § 201(d), the FSIA provides a starting point, defining "agency or instrumentality of a foreign state" as "any entity":

> (1) which is a separate legal person, corporate or otherwise, and
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
> (3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).  The DAB is an agency or instrumentality of the State of Afghanistan under the FSIA's definition and thus is to be treated as a "foreign state" for purposes of the FSIA.  28 U.S.C. § 1603(a) ("A 'foreign state', . . . includes . . . an agency or instrumentality of a foreign state as defined in subsection (b).").

Courts have held that the meaning of "agency or instrumentality" in TRIA cannot, however, be fully coextensive with the FSIA's definition because TRIA's definition of "terrorist party" encompasses non-state actors, whereas the FSIA applies only to foreign sovereigns.  For example, the Second Circuit has cautioned that TRIA's definition of an "agency or instrumentality" should not be read to "require[] a foreign state principal."  *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Repub. of Iran*, 138 S. Ct. 816 (2018) (citation omitted).  In a case concerning whether an entity holding blocked assets was the agency or instrumentality of a foreign state that had been designated as a state sponsor of terrorism, the *Kirschenbaum* court granted the terms "agency or instrumentality" their "ordinary meanings."  In evaluating whether the non-state entity acted as the "agency or instrumentality" of the designated state sponsor of terrorism, the

App.62

Second Circuit held that a plaintiff must establish that a defendant "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, *or* (3) was owned, controlled, or directed by the terrorist party." *Id.* at 135 (citing *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 723 (11th Cir. 2014)); *see also, e.g.*, *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 198-99 (2d Cir. 2019) (concluding that a corporation was an "agency or instrumentality" of a designated state sponsor of terrorism because it was undisputed that the corporation was an alter ego of the state and was "owned, controlled, and directed" by the state); *Levin v. Bank of New York Mellon*, No. 09 Civ. 5900 (JPO), 2019 WL564341, at *4 (S.D.N.Y. Feb. 12, 2019) (holding that a genuine issue of material fact existed as to whether a private individual was an agent or instrumentality of Iran).[6]

*Kirschenbaum* arose in a different posture than is presented here. The Second Circuit had no occasion in that case to consider whether, and under what circumstances (if any), an agency or instrumentality of a foreign state can simultaneously also be an agency or instrumentality of a non-state entity. As discussed below, the relevant legal considerations may differ when a court is asked to assess whether a foreign state, including its agency or instrumentality, can also act as an agency or instrumentality of a non-state entity.[7]

---

[6] In describing these judicial holdings, the United States does not adopt them as its own interpretations of the governing legal standards.

[7] In 2000, OFAC determined DAB "to be owned or controlled by, or to act for or on behalf of, the Taliban." *See* Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers; Addition of Persons Blocked Pursuant to 21 Part 538, 31 Part 597, or Executive Order 13129, 65 Fed. Reg. 39,100 (June 23, 2000). Notably, TRIA was enacted after this action was taken and after DAB was removed in 2002 from the Specially Designated Nationals and Blocked Persons List (*see* https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20020212).

**App.63**

A district court has applied *Kirschenbaum*'s agency or instrumentality standard to assess whether an agency of a foreign government is also an agency or instrumentality of a terrorist party. In *Caballero v. Fuerzas Armadas Revolucionarias de Columbia*, No. 20-MC-0040-LJV (W.D.N.Y. Dec. 18, 2020), the court issued a sealed order on a sealed, *ex parte* motion seeking to attach assets held by Venezuelan state-owned oil company PDVSA, on the theory that PDVSA was an agency or instrumentality of the terrorist group FARC. *See Caballero*, ECF No. 15. In light of the sealed posture of *Caballero*, the district court did not consider or pass upon the considerations identified in this Statement—particularly whether TRIA might limit the circumstances in which a court could determine that an agency or instrumentality of a foreign state not designated as a state sponsor of terrorism could nevertheless be deemed an agency or instrumentality of a terrorist party.

***Central Bank Considerations.*** In considering the position of the Judgment Plaintiffs, the Court should be mindful of the developed body of law as to ownership of assets in the context of foreign central banks. As a general rule, "[a]ny funds in an account in the name of a foreign central bank are . . . funds 'of' that central bank." *Weston Compagnie de Finance et D'Investissement, S.A. v. La Republica Del Ecuador* ("*Weston*"), 823 F. Supp. 1106, 1112 (S.D.N.Y. 1993); *see also NML Capital, LTD v. Banco Central de la Republica Argentina*, 652 F.3d 172, 195 (2d Cir. 2011). Some courts have refined this principle into a presumption, at least in the context of the FSIA's provision governing property of foreign central banks (28 U.S.C. § 1611(b)): "[A]n account that is registered in the name of a foreign central bank is *presumed* to be the 'property of' that foreign central bank under Section 1611 absent specific evidence

---

OFAC's 2000 determination, made solely in the sanctions context, rested on a different standard than the "agency or instrumentality" analysis under TRIA, which calls for a distinct analysis. OFAC has not made a similar, more recent determination with respect to DAB.

**App.64**

overcoming the presumption and establishing that the central bank does not own the account."

*Cont'l Transfert Technique*, 2019 WL 3562069, at \*7. "That presumption can be rebutted only

by providing evidence that the Account is not, in fact, the property of the foreign central bank," a

burden that is "substantial." *Id.* at \*10 (citation omitted). This mode of reasoning accords with

and, indeed, is based upon, New York state law. *See EM Ltd. v. Repub. of Argentina*, 473 F.3d

463, 473-74 (2d Cir. 2007) ("[Under New York law] [w]hen a party holds funds in a bank

account, possession is established, and the presumption of ownership follows") (quoting *Karaha

Bodas Co, LLC v. Perusahaan Pertambangan Minyak Dan Gas Gumi Negara*, 313 F.3d 80, 86

(2d Cir. 2002)).

There are federal-law implications, under the FSIA and TRIA, if the assets at issue are

deemed to be the property of a central bank. The FSIA provides that property of a central bank

held for its own account is immune from attachment and execution unless the parent foreign

government has "explicitly waived its immunity from attachment in aid of execution." *See* 28

U.S.C. § 1611(b)(1) ("the property of a foreign state shall be immune from attachment and from

execution, if . . . the property is of a foreign central bank or monetary authority held for its own

account"); *see also, e.g.*, *NML Capital*, 652 F.3d at 189 (this provision "reflects Congress's

understanding that while the 'funds of foreign central banks' are managed through those banks'

accounts in the United States, those funds are, in fact, the 'reserves of the foreign states'

themselves") (quoting H.R. Rep. No. 94-1487 at 31, *as reprinted in* 1976 U.S.C.C.A.N. 6604,

6630) (brackets omitted); *EM Ltd. v. Repub. of Argentina*, 473 F.3d 463, 473 (2d Cir. 2007)

(discussing protections provided to foreign central banks under FSIA).

Under TRIA, the FSIA's immunities and exemptions are inapplicable, but there would be

a series of potential implications to a determination that the DAB Assets are the property of a

App.65

central bank.  To the extent the assets of a foreign central bank represent the foreign state's reserves, such assets belong necessarily to the foreign state and thus would not be the assets of a private party.[8]

**Recognition and Sovereign Immunity Issues.**  If the Court determines that attachability turns on whether the Taliban is the Government of Afghanistan or that the DAB Assets constitute foreign state assets, a series of principles of hornbook law will prove instructive.

*First*, there is a distinction between a foreign government and a foreign state, and "[a] state can . . . recognize or treat an entity as a state while denying that a particular regime is its government."  RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 203 cmt. a.  Accordingly, there is a distinction between property owned by the state, and property owned by a regime that comprises the government of that state.  This principle accords with more general principles of corporate and agency law such as the idea that corporate property (by analogy, the property of the state) is not the property of the shareholders or directors of the corporation (the leaders of the state), but of the corporation itself.  *See*, *e.g.*, *Movitz v. Todd*, 24 Fed. App'x 708, 709 (9th Cir. 2001) ("By the very nature of the corporation the corporate property is vested in the corporation itself and not in its stockholders.") (quoting *Corp. Comm'n v. Consol. Stage Co.*, 62 Ariz. 257 (1945)).  And in this context, the assets of a central bank are considered those of the foreign state itself, not its government.  *See supra.*

---

[8] As noted above, while TRIA allows attachability of state assets in certain circumstances, it only does so with respect to designated state sponsors of terrorism.  *See* TRIA § 201(d)(4).

Moreover, to the extent that the DAB Assets are the property of the State of Afghanistan, the Court may consider whether the Judgment Plaintiffs have provided adequate notice to the State consistent with the provisions of FSIA.  *See* 28 U.S.C. §§ 1608, 1610(c).

*Second*, the authority to recognize a foreign government rests exclusively with the President and is not a matter for judicial inquiry. *See, e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2089 (2015) ("[T]he Court has long considered recognition to be the exclusive prerogative."); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964); *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918). Here, the United States has not yet made a decision as to whether to recognize the Taliban or any other entity as the Government of Afghanistan or as part of such a government.

*Third*, as a general rule, "a regime not recognized as the government of a state is not entitled to property belonging to that state located in the United States." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 205(1); *see also Repub. of Panama v. Rep. Nat. Bank of N.Y.*, 681 F. Supp. 1066, 1071 (S.D.N.Y. 1988); *Bank of China v. Wells Fargo Bank & Union Trust Co.*, 104 F. Supp. 59, 66 (N.D. Cal. 1952), *aff'd*, 209 F.2d 467 (9th Cir. 1953); *The Maret*, 145 F.2d 431, 442 (3d Cir. 1944). Thus, under the Restatement, certain questions of ownership can be answered by looking to which entity has been recognized by the United States.

*Fourth*, exceptions to execution immunity are, as a general matter, to be narrowly defined. This principle:

> is both well established and based on a critical diplomatic reality: Seizing a foreign state's property is a serious affront to its sovereignty . . . Correspondingly, judicial seizure of a foreign state's property carries potentially far-reaching implications for American property abroad.

*Rubin v. Islamic Repub. of Iran*, 830 F.3d 470, 480 (7th Cir. 2016); *see also Repub. of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 142 (2014) (discussing "narrower" exceptions to execution immunity under FSIA); *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 289 (2d Cir. 2011) (collecting cases noting that limits on execution immunity are intended to promote

26

App.67

foreign relations and comity). Accordingly, the Judgment Plaintiffs' theory of ownership must be measured against a benchmark that accounts for the risk of reciprocal challenges to American property abroad.

Synthesizing these principles, the Judgment Plaintiffs must establish a theory of ownership by the Taliban that would not require this Court—either expressly or by implication—to make its own determination as to the identity of Afghanistan's government or to make its own determination as to whether Afghanistan is a state sponsor of terrorism.[9]

The United States appreciates the opportunity to submit its views and to describe its interests in this matter.

---

[9] The text of TRIA reinforces the distinct role of the Executive Branch in making determinations as to foreign states. In defining which kinds of "terrorist party" assets could be attached under TRIA, Congress provided distinct categories for non-state actors ("terrorist" and "terrorist organization") and state actors ("a foreign state designated as a state sponsor of terrorism"). TRIA § 201(d)(4). Where a state is not designated as a state sponsor of terrorism, TRIA does not authorize the attachment of a foreign state's assets to satisfy a judgment against the foreign state. Permitting a foreign state's assets to be attached indirectly to satisfy the judgment against a non-state terrorist organization would supplant the discretion that Congress afforded to the Executive Branch in designating state sponsors of terrorism. *See* 50 U.S.C. App. § 2405(j); 22 U.S.C. § 2371. In applying *Kirschenbaum*, the *Caballero* court did not pass upon whether the asset-holder's status as a state-owned entity required a different analysis.

**App.68**

Dated: New York, New York
　　　February 11, 2022

　　　　　　　　　　　　　　　　　Respectfully submitted,

BRIAN M. BOYNTON　　　　　　　　DAMIAN WILLIAMS
Acting Assistant Attorney General　　　United States Attorney for the
　　　　　　　　　　　　　　　　　Southern District of New York

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

ANTHONY J. COPPOLINO
Deputy Branch Director

By: _/s/ Joseph E. Borson_　　　　By: _/s/ Rebecca S. Tinio_
　　JOSEPH E. BORSON　　　　　　　REBECCA S. TINIO
　　Trial Attorney　　　　　　　　　JEANNETTE A. VARGAS
　　U.S. Department of Justice　　　　Assistant United States Attorneys
　　Civil Division, Federal Programs Branch　86 Chambers Street, Third Floor
　　1100 L Street, NW　　　　　　　New York, New York 10007
　　Washington, DC 20005　　　　　　Tel.: (212) 637-0179
　　Tel.: (202) 514-1944　　　　　　Fax: (212) 637-2686
　　Email: Joseph.Borson@usdoj.gov　　Email: Rebecca.Tinio@usdoj.gov
　　　　　　　　　　　　　　　　　　　　Jeannette.Vargas@usdoj.gov

App.69

BRIEFING ROOM

# Executive Order on Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan

FEBRUARY 11, 2022 • PRESIDENTIAL ACTIONS

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), and section 301 of title 3, United States Code,

I, JOSEPH R. BIDEN JR., President of the United States of America, find that the widespread humanitarian crisis in Afghanistan — including the urgent needs of the people of Afghanistan for food security, livelihoods support, water, sanitation, health, hygiene, shelter and settlement assistance, and COVID-19-related assistance, among other basic human needs — and the potential for a deepening economic collapse in Afghanistan constitute an unusual and extraordinary threat to the national security and foreign policy of the United States.  I hereby declare a national emergency to deal with that threat.  In addition, I find that the preservation of certain property of Da Afghanistan Bank (DAB) held in the United States by United States financial institutions is of the utmost importance to addressing this national emergency and the welfare of the people of Afghanistan.  I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims.  This property is blocked under this order.

Accordingly, I hereby order:

Section 1.  (a)  All property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in, except as set forth in subsections (b) and (c) of this section.

   (b)  United States financial institutions shall promptly transfer the blocked property described in subsection (a) of this section into a consolidated account held at the Federal Reserve Bank of New York.

App.70

(c)  The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.

Sec. 2.  This order and actions taken pursuant to this order shall apply notwithstanding any previously issued Executive Order to the extent such order blocks, regulates, or otherwise affects the property and interests in property identified in section 1(a) of this order.  This order and actions taken pursuant to this order shall supersede any previously issued Executive Order to the extent such order blocks, regulates, or otherwise affects the property and interests in property identified in section 1(a) of this order.

Sec. 3.  (a)  Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b)  Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 4.  For the purposes of this order:

(a)  the term "Da Afghanistan Bank" or "DAB" means the Central Bank of Afghanistan;

(b)  the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization; and

(c)  the term "person" means an individual or entity.

Sec. 5.  For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds and other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual.  I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of the blocking of property and interests in property set forth in section 1(a) of this order.

Sec. 6.  The Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, is authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order.  The Secretary of the Treasury may, consistent with applicable law, redelegate any of these functions within the Department of the Treasury.  All executive departments and agencies of the United States shall take all appropriate measures within their authority to implement this order.

2/11/22, 2:24 PM    Executive Order on Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan | The White H…

Sec. 7.  Nothing in this order shall prohibit transactions for the conduct of the official business of the Federal Government by employees, grantees, and contractors thereof.

Sec. 8.  The Secretary of the Treasury, in consultation with the Secretary of State, is authorized to submit recurring and final reports to the Congress on the national emergency declared in this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of IEEPA (50 U.S.C. 1703(c)).

Sec. 9.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)   the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

JOSEPH R. BIDEN JR.

The White House,

February 11, 2022.



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

**LICENSE No. DABRESERVES-EO-2022-886895-1**

## EXECUTIVE ORDER OF FEBRUARY 11, 2022, "PROTECTING CERTAIN PROPERTY OF DA AFGHANISTAN BANK FOR THE BENEFIT OF THE PEOPLE OF AFGHANISTAN"

## LICENSE

(Granted under the authority of one or more of 50 U.S.C. §§ 1601-51, 1701-06, and Executive Order of February 11, 2022, "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan" ("E.O. of February 11, 2022"))

**To:** **Federal Reserve Bank of New York (the "Bank")**
**33 Liberty Street**
**New York, NY 10045**
**Attn:** **Michael Held, General Counsel**

**1.** In accordance with foreign policy guidance from the Department of State, the transactions described herein are hereby authorized.

**2.** This License is subject to the condition, among others, that the Bank comply with its terms and with all regulations, rulings, orders, and instructions issued under one or more of the authorities cited above.

**3.** This License is not transferable. The transactions described in this License are subject to the authorities cited above and any regulations and rulings issued pursuant thereto. This License may be revoked or modified at any time.

**4.** This License does not authorize transactions prohibited under any law or regulation (including reporting requirements) administered by the Office of Foreign Assets Control (OFAC) other than those listed above.

**5.** This License does not excuse the Bank from the need to comply with any applicable orders, rulings, writs, or other judicial process of the United States federal courts, or with any law or regulation (including reporting requirements) administered by any other agency or the need to obtain any required authorization(s) from any other agency.

Issued on behalf of the Secretary of the Treasury:

### OFFICE OF FOREIGN ASSETS CONTROL

**By** _____     February 11, 2022
         **Andrea M. Gacki**                        _____
         **Director**                                    **Date**

[Attention is directed to, inter alia, 18 U.S.C. § 1001, 50 U.S.C. § 1705, and E.O. of February 11, 2022 for provisions relating to penalties.]

SENSITIVE BUT UNCLASSIFIED

**SECTION I – AUTHORIZATION:** Subject to the conditions and limitations stated herein, the Bank is hereby authorized, instructed, directed, and compelled:

(a)        To transfer $3,500,000,000.00 from the consolidated blocked account the Bank holds for Da Afghanistan Bank in accordance with Sections 1(a) and 1(b) of E.O. of February 11, 2022 to a separate blocked account at the Bank in the name of Da Afghanistan Bank (the "Account");

(b)        Upon instructions from the individual(s) certified by the Secretary of State pursuant to Section 25B of the Federal Reserve Act as having authority to receive, control, or dispose of property from or for the account of Da Afghanistan Bank (the "25B-Certified Individual(s)"), to transfer up to $3,500,000,000.00 from the Account, in one or multiple transfers, for the benefit of the people of Afghanistan, including to an international financing mechanism (in which the United States is a member) holding and disbursing funds for the benefit of the people of Afghanistan, or to a United Nations fund, programme, specialized agency, or other entity or body for the benefit of the people of Afghanistan; and

(c)        To engage in any transactions ordinarily incident and necessary to transfer(s) pursuant to **SECTION I**, including transactions related to the liquidation of assets held in the Account, such as securities, bonds, or gold.

**SECTION II – CONDITIONS:** It is a condition of this License that the Bank provide a copy of this License to the 25B-Certified Individual(s) and to all entities that are U.S. persons involved in the transactions authorized in **SECTION I**.

**SECTION III – WARNINGS: (a)** Except as authorized in **SECTION I**, this License does not authorize the transfer of any blocked property, the debiting of any blocked account, the entry of any judgment or order that effects a transfer of blocked property, or the execution of any judgment against property blocked pursuant to any Executive order or Chapter V of Title 31 of the C.F.R.

**(b)** Except as authorized in **SECTION I**, this License does not authorize the transfer to or receipt of funds or other property, directly or indirectly, from any entity or individual whose property or interests in property are blocked pursuant to any Executive order or Chapter V of Title 31 of the C.F.R.

**(c)** Any transfer of funds through the U.S. financial system pursuant to the authorization set forth above should reference the number of this License to avoid the blocking or rejection of the transfer.

**SECTION IV – RECORDKEEPING & REPORTING REQUIREMENTS: (a)** The Bank is subject to the recordkeeping and reporting requirements of, *inter alia*, 31 C.F.R. §§ 501.601 and 501.602, including the requirement to maintain full and accurate records concerning the transactions undertaken pursuant to this License for a period of five years from the date of each transaction.

**(b)** No later than 14 days prior to each transfer instructed by the 25B-Certified Individual(s) pursuant to **SECTION I(b)** of the License, the Bank shall submit a detailed report to the Department of State and OFAC Licensing Division, including the amount of the transfer and the ultimate beneficiary of the transfer.

**(c)** No later than 10 days after the transfer authorized and directed in **SECTION I(a)** of the License, the Bank shall submit confirmation to the OFAC Licensing Division that the transfer is complete.

**(d)** No later than 10 days after each transfer authorized and directed in **SECTION I(b)** of the License, the Bank shall submit a detailed report to the OFAC Licensing Division, including the amount of the transfer and the ultimate beneficiary of the transfer.

SENSITIVE BUT UNCLASSIFIED

**LICENSE No. DABRESERVES-EO-2022-886895-1** Page 3 of 3

**(e)** Reports required under **SECTION IV** can be submitted via the OFAC Licensing Division's portal at https://licensing.ofac.treas.gov/Apply/Introduction.aspx and, with respect to the report(s) to the Department of

State required under **SECTION IV(b)**, via email to EB-A-TFS-TFC-DL@state.gov.  Please refer to **License No. DABRESERVES-EO-2022-886895-1** for all submissions**.**

**SECTION V – PRECEDENTIAL EFFECT:** The authorization contained in this License is limited to the facts and circumstances available to OFAC as of the date of this License's issuance.
*********************************************************************************

SENSITIVE BUT UNCLASSIFIED

M2m2TerC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   In re:  TERRORIST ATTACKS ON          03 MDL 1570 (GBD)
                SEPTEMBER 11, 2001
 4
     ------------------------------x
 5
     HAVLISH, et al.,                      03 Civ. 9848 (GBD)
 6
                    Plaintiffs,
 7
            v.
 8   BIN LADEN, et al.,

 9                  Defendants.

10   ------------------------------x

11   JOHN DOES 1 through 7,                20 Misc. 740 (GBD)

12                  Plaintiffs,

13          v.

14   THE TALIBAN, et al.,

15                  Defendants.

16   ------------------------------x      Remote Conference

17                                        New York, N.Y.

18                                        February 22, 2022

19                                        9:30 a.m.

20

21   Before:

22

23          HON. SARAH NETBURN,

24
                                          Magistrate Judge
25
```

M2m2TerC

```
 1                                   APPEARANCES

 2   DO CAMPO & THORNTON, P.A.
          Attorneys for John Does 1-7 Plaintiffs
 3   BY:  JOHN THORNTON
          ORLANDO DO CAMPO
 4        DANIELA JARAMILLO

 5

     JENNER & BLOCK, LLP
 6        Attorneys for Havlish Creditors
     BY:  LEE S. WOLOSKY
 7        DOUGLASS A. MITCHELL

 8        – and –

 9   WIGGINS CHILDS PANTAZIS FISHER GOLDFARB, PLLC
          Attorneys for Havlish Creditors
10   BY:  DENNIS G. PANTAZIS
          TIMOTHY B. FLEMING
11
          – and –
12
     RAMEY & HAILEY
13        Attorneys for Havlish Creditors
     BY:  RICHARD D. HAILEY
14

15   KREINDLER & KREINDLER
          Attorneys for Ashton Plaintiffs
16   BY:  MEGAN WOLFE BENETT
          JAMES P. KREINDLER
17        ANDREW J. MALONEY III

18        – and –

19   SPEISER KRAUSE, P.C.
          Attorneys for Ashton Plaintiffs
20   BY:  JEANNE M. O'GRADY

21        – and –

22   SHER TREMONTE, LLP
          Attorneys for Ashton Plaintiffs
23   BY:  MICHAEL TREMONTE

24        – and –

25
```

M2m2TerC

```
1                              APPEARANCES
                                (continued)
2


3   BAUMEISTER & SAMUELS, PC
         Attorneys for Ashton Plaintiffs
4   BY:  THEA CAPONE

5

    MOTLEY RICE LLC
6        Attorneys for Burnett Plaintiffs
    BY:  ROBERT T. HAEFELE
7        JODI WESTBROOK FLOWERS
         DONALD MIGLIORI
8

9   ANDERSON KILL P.C.
         Attorneys for O'Neill Plaintiffs
10  BY:  JERRY S. GOLDMAN
         BRUCE STRONG
11

12  COZEN O'CONNOR
         Attorneys for Federal Insurance Plaintiffs
13  BY:  SEAN P. CARTER
         J. SCOTT TARBUTTON
14

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    BY:  JEANNETTE A. VARGAS
17       Assistant United States Attorneys

18

    KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
19       Attorneys for Kingdom of Saudi Arabia
    BY:  GREGORY G. RAPAWY
20

21  WHITE & CASE, LLP
         Attorneys for Republic of the Sudan
22  BY:  CHRISTOPHER M. CURRAN
         NICOLE ERB
23       CLAIRE A. DeLELLE

24
    Also Present:
25  Joseph Borson, Department of Justice – Civil Division
```

M2m2TerC

```
1        (Case called)

2        THE COURT:  Good morning, everybody.  This is

3   Judge Netburn.  I think we are ready to begin.

4        This case is alternatively captioned In Re: Terrorists

5   Attacks on September 11, 03 MD 1570; in addition, today's

6   conference relates to Havlish v. bin Laden, 03 Civ. 9848; and

7   John Does 1 through 7 v. the Taliban, 20 Misc. 740.

8        I'm going to identify the parties that I believe are

9   here.  I know we have a number of lawyers on the line.  I'm

10  going to ask that only the lawyers who anticipate speaking

11  identify themselves when their case is called so we can have

12  those appearances made.  If somebody who does not initially

13  state an appearance wishes to be heard later, we can have you

14  state your appearance at that time.  But for these purposes, I

15  think I will just hear from the people who intend to speak.

16       So I will begin with a representative for the

17  plaintiffs for the John Does 1 through 7 parties.

18       MR THORNTON:  Good morning, your Honor.  John Thornton

19  on behalf of John Does 1 through 7, and my partner and

20  associate are on the call also.

21       THE COURT:  Thank you.

22       And on behalf of Havlish plaintiffs.

23       MR. WOLOSKY:  Good morning, your Honor.  This is Lee

24  Wolosky, from Jenner & Block, for the Havlish plaintiffs.  My

25  partner Doug Mitchell is on the line, as well.
```

M2m2TerC

1          THE COURT:  Thank you.

2          Let me hear, who do we have on behalf of the United

3     States?

4          MS. VARGAS:  Good morning, your Honor.  This is

5     Jeanette Vargas from the U.S. Attorney's office on behalf of

6     the United States.  Also on the line is Joseph Borson, from the

7     United States Department of Justice.

8          THE COURT:  Thank you.

9          And on behalf of the Federal Insurance plaintiffs?

10         MR. CARTER:  Good morning, your Honor.  Sean Carter

11    from Cozen O'Connor.

12         THE COURT:  Thank you.

13         And on behalf of Burnett plaintiffs?

14         MS. FLOWERS:  Good morning, your Honor.  It's Jodi

15    Flowers on behalf of the Burnett plaintiffs, and also with me

16    is my partner Don Migliori.

17         THE COURT:  Thank you.

18         On behalf of O'Neill plaintiffs?

19         MR. GOLDMAN:  Good morning, your Honor.  This is Jerry

20    Goldman on behalf of the O'Neill plaintiffs.  I have my partner

21    Bruce Strong on the line, and I have others listening.  Thank

22    you.

23         THE COURT:  Thank you.

24         And on behalf of Ashton plaintiffs?

25         MS. BENETT:  Good morning, your Honor.  This is Megan

App.80

M2m2TerC

1    Benett for the Ashton plaintiffs.  We have Michael Tremonte, of

2    Sher Tremonte, who will be putting in a notice of appearance

3    this morning.  He and I will be the two people who will be

4    speaking on behalf of Ashton.

5                THE COURT:  Thank you.

6                Any other plaintiff groups that I haven't identified

7    who intend to speak this morning?  All right.

8                And I think we may have some representatives of

9    defendants, though I don't know that they are going to be

10   participating.

11               Do we have a lawyer on the phone on behalf of the

12   Kingdom of Saudi Arabia?

13               MR. RAPAWY:  Yes, your Honor.  This is Gregory Rapawy

14   of Kellogg Hansen.  I do not anticipate speaking this morning,

15   but I am on the line.

16               THE COURT:  Okay.  Thank you.  And on behalf of the

17   Republic of the Sudan?

18               MS. ERB:  Good morning, your Honor.  This is Nicole

19   Erb.  I'm joined by Chris Curran and Claire DeLelle.  And

20   likewise, we do not intend to speak this morning.

21               THE COURT:  Thank you.  And any other defendant groups

22   who are on the line who would like to state their appearance?

23               Okay.  Hearing none, I will assume that is our set of

24   lawyers.

25               I understand we also have a line open for the public

M2m2TerC

1    and the press.  I will remind everybody who is listening in

2    that this is a court proceeding.  Any recording or

3    rebroadcasting of today's proceeding is strictly prohibited.

4              We have a court reporter on the line.  To facilitate

5    that person's job, we want to make sure that we are not

6    speaking over one another — everybody will have an opportunity

7    to be heard — that people are speaking slowly, and that you

8    state your name each and every time you speak so that the court

9    reporter knows to whom to attribute all statements.

10             Okay.  I believe we have two primary matters on our

11   agenda today.

12             First, we have the writs of execution against the

13   assets held at the Federal Reserve Bank of New York.  The

14   government has said that these writs need to be addressed to

15   facilitate the implementation of the President's foreign

16   policy, so we will begin by talking about whether there is an

17   efficient way to achieve that goal without having to resolve

18   all of the questions surrounding the entitlements to those

19   funds.

20             And second, there are currently stays on the writs of

21   execution targeting the Afghanistan bank funds, so we will

22   address that and, more broadly, how we want to move the

23   litigation on these funds forward.

24             So let me begin with the first item, and probably I

25   will address my comments in the first instance to Ms. Vargas.

M2m2TerC

1        So according to the government's statement of

2   interest, the Havlish and Doe writs are currently standing in

3   the way of implementing the division of the DAB funds that are

4   currently held at the Federal Reserve, and the government has

5   requested that these issues be dealt with in advance of all

6   other issues.  This will allow the executive branch to carry

7   out its foreign policy providence and, as it represents to us,

8   apparently the funds are needed to address a major Afghanistan

9   humanitarian crisis.

10       And so I would like to begin the crisis about thinking

11   about the best way that we can get out of the government's way

12   so that it can execute its foreign policy.

13       My understanding is that the Havlish and Doe writs may

14   be satisfied with far less than the $7 billion that are

15   currently being held in the Federal Reserve.  So given this, is

16   it the government's view that modifying the Havlish and Doe

17   writs to attach a smaller sum, which I understand would be

18   likely something less than the $3.5 billion, would permit the

19   transactions that are contemplated by President Biden's

20   February 11 executive order and the OFAC license that he also

21   issued on that same day?

22       Ms. Vargas, let me begin with you.

23       MS. VARGAS:  Yes, your Honor.  Thank you.

24       The government does believe that that would be

25   satisfactory.  What we are looking for is an order entered

M2m2TerC

1    expeditiously clarifying that the Doe and Havlish writs are

2    null and void and have no effect as to the 3.5 billion in

3    licensed assets but that those writs can remain in effect to

4    the extent permissible by law as to all other assets pending

5    further order of this Court.

6              As your Honor has observed, the Doe writ is for

7    approximately 138 million.  The Havlish writ is nominally in

8    the amount of approximately $6.8 billion; but, as set forth in

9    our statement of interest, TRIA permits attachment only to the

10   extent of compensatory damages.  The Havlish plaintiffs do not

11   disagree with this position; and, therefore, the unlicensed

12   funds that will remain in the account of the Federal Reserve

13   Bank of New York after the 3.5 billion in licensed funds are

14   removed will be more than sufficient to satisfy both the Doe

15   and Havlish writs combined when the Havlish writ is

16   appropriately modified to reflect compensatory damages only.

17             And alternatively, as set forth at length in the

18   government's statement of interest, the licensed funds are not

19   subject to attachment under TRIA as a matter of law as the

20   licensed funds are not blocked assets within the meaning of the

21   statute.

22             But for our purposes, what we need is an order simply

23   stating that the writs are null and void and have no effect as

24   to the 3.5 in licensed assets.  And we understand that the Doe

25   and Havlish plaintiffs do not object to this requested relief.

App.84

M2m2TerC

1         THE COURT:  Terrific.  That was going to be my next

2 question.

3         And so that would be, just so I am clear, the proposal

4 is simply an order that would effect those writs.  They don't

5 need to file new writs of execution, is that correct?

6         MS. VARGAS:  That's correct from the government's

7 perspective.  What we require, under paragraph 5 of our

8 license, the license states that the Federal Reserve Bank must

9 comply with any applicable orders, rulings, writs, or other

10 judicial process of the United States federal courts, which is

11 why this is at issue.  Therefore, we need an order that will

12 allow the Fed to have confidence that these writs do not

13 prevent any transfer of the licensed funds.

14         THE COURT:  Okay.  And if we issue that order

15 expeditiously, is that all that the government needs at this

16 time for it to carry out its foreign policy agenda?

17         MS. VARGAS:  At this present time, that's correct,

18 your Honor.

19         THE COURT:  Okay.  Thank you.

20         Let me turn now to John Thornton on behalf of the Doe

21 plaintiffs and then to Mr. Wolosky on behalf of the Havlish

22 plaintiffs to confirm that both parties are in agreement that

23 the best way to proceed, and on your consent, is to issue an

24 order indicating that the licensed funds are unavailable for

25 the attachment of the writ.

M2m2TerC

1           Let me turn to Mr. Thornton first.

2           MR THORNTON:  Thank you, your Honor.

3           From the way that was described, we would not object

4    to that approach, you know, obviously with the understanding

5    that our writ is not null and void; it's just that our writ

6    doesn't reach those $3 1/2 billion that are licensed.

7           THE COURT:  Thank you.

8           Mr. Wolosky?

9           MR. WOLOSKY:  Your Honor, we have no objection; but,

10   similarly, we believe that, as a matter of law, the Havlish

11   writ that was served in August or September currently does not

12   encompass the funds that the government wishes to move as a

13   result of the actions, both the blocking and the licensing

14   actions that the executive branch took on February 11.  So

15   certainly, to the extent that the Court wishes to enter an

16   order making that clear with respect to the 3.5, the Havlish

17   plaintiffs have no objection.

18          Your Honor has authority under New York CPLR Section

19   5240 to modify writs, if your Honor wishes to, to provide

20   assurance to the government by means of clarification with

21   respect to the funds that it wishes to move.

22          Again, we certainly don't think that an order -- we

23   would not agree that an order nullifying a writ would be

24   appropriate; but certainly modifying the writ, if the Court and

25   the government thinks it is necessary to make clear that the

M2m2TerC

1   writ -- the Havlish writ does not encumber the 3.5 billion that

2   the government wishes to move and which has now been licensed,

3   we have no objection to that.

4          THE COURT:  Okay.  Thank you.

5          Does any other party wish to be heard exclusively on

6   the question about how to act with respect to President Biden's

7   executive order and the OFAC license in connection with the

8   funds in the Federal Reserve?

9          Okay.  I don't know that this has ever happened, but

10  hearing nobody from any of the plaintiffs' executive

11  committees, I think we can move forward on that issue.

12         So I'm going to direct Ms. Vargas, if you can work

13  with the lawyers for the Doe and Havlish plaintiffs on

14  preparing an order for my signature, obviously the sooner you

15  get it to me, the sooner I will sign it and the funds will be

16  made available to the executive.  So I will just be on the

17  lookout for that draft order.  If you can get it to me as soon

18  as possible, I will sign it.

19         MS. VARGAS:  Thank you, your Honor.  We will work on

20  it and get it to you very shortly.

21         MS. BENETT:  Your Honor, this is Megan Benett on

22  behalf of the Ashton plaintiffs.

23         I just wanted to make sure I understood that, at least

24  on our behalf, there is no objection, of course, to rendering

25  the Havlish and Doe writs null and void with respect to the

M2m2TerC

1   licensed assets, and we would of course agree that that should

2   move expeditiously.

3           To the extent that an order would address anything

4   concerning those writs and the modification, for example, of

5   the Havlish writ, I think that that would be something we would

6   want to be heard on.  But, again, I don't think that's

7   necessary in the context of moving forward with rendering the

8   writs null and void with respect to the licensed assets.

9           THE COURT:  I'm not sure exactly what it is you are

10  referring to, Ms. Benett.  What precisely do you wish to be

11  heard on with respect to the Havlish writ?

12          MS. BENETT:  Well, to the --

13          THE COURT:  I know you want to be heard on the issue

14  of stay, but on issue of the writ itself.

15          MS. BENETT:  As we raised in the letter to the Court

16  that we submitted, we don't necessarily agree with

17  Mr. Wolosky's position that the Court has the authority to

18  modify the writ under Article 52 of the New York CPLR.  That's

19  one of the issues that we think would warrant some further

20  briefing and that we believe we have an interest in presenting

21  our position on that to the Court.

22          MR. TREMONTE:  Your Honor, this is Michael Tremonte,

23  on behalf also of the Ashton plaintiffs.

24          I just wonder if it is helpful to formulate this

25  precisely to see if in fact we are all in agreement.

1          It sounds as though the government and everyone else

2     shares the view that, with respect to the licensed funds, that

3     is to say, the portion of the DAB assets authorized by the OFAC

4     license to be transferred for the benefit of the Afghan people,

5     it sounds like we all agree that as a matter of law those

6     funds, the licensed funds, are not subject to attachment in

7     this litigation.  And I think if that alone is the basis for

8     the Court's order directing the release of those funds so that

9     the administration can fulfill its foreign policy objectives, I

10     don't think there is any controversy here at all as to this

11     piece.

12          THE COURT:  Okay.  I really hope there is no hold-up

13     here.  So I am going to direct that Ms. Vargas communicate with

14     the Havlish and Doe plaintiffs, as they are the only ones who

15     currently have writs attached to those funds as far as I am

16     aware, and to submit something on the -- a proposed order on

17     the MDL docket as soon as you can.  I will wait 24 hours to

18     sign that order.  If anybody wishes to be heard with respect to

19     that order, you can file it within that 24-hour window.  But I

20     will sign that order, assuming it is otherwise appropriate,

21     within 24 hours after the 24-hour window expires.  And

22     certainly to the extent you can let me know before 24 hours

23     that there is no objection, we will go ahead and get that up.

24          All right.  Thank you.  Let's move forward on the next

25     phase, which is in connection with these writs of execution.

M2m2TerC

1   They have been stayed.  Both the Havlish and the Doe plaintiffs

2   have requested that we lift those stays.  And so the next

3   question is how we should proceed with respect to those writs

4   and briefing on the issue with respect to entitlement to any of

5   the DAB funds.

6           So let me first hear from the Havlish plaintiffs on

7   how they think the most efficient way is for us to proceed at

8   this point.

9           MR. WOLOSKY:  Thank you, your Honor.  This is Lee

10  Wolosky for the Havlish plaintiffs.

11          The position of the Havlish creditors is that the

12  Court should lift the stay of enforcement in order to allow

13  these proceedings to move forward in accordance with normally

14  applicable procedures under New York law which assure that no

15  MDL party will be prejudiced.

16          This matter is certainly unique in many respects, but

17  what we are asking for is not.  We are asking the Court to move

18  forward with the next procedural step that parties holding

19  writs of execution must take in order to keep enforcement of

20  those writs.

21          The stay was put in place to permit the government to

22  file its statement of interest.  That has now happened.  The

23  government does not oppose the lifting of the stay consistent

24  with the views expressed in its statement of interest.  And

25  once the stay is lifted, all parties will have, as the

M2m2TerC

1    White House said in its February 11 statement when it blocked

2    the funds at issue, "a full opportunity to have their claims

3    heard in U.S. courts."

4         Other MDL parties oppose lifting the stay but, as my

5    partner Doug Mitchell will explain in a moment, lifting the

6    stay will afford them a full opportunity to have their claims

7    heard by the Court.  Significantly, the Havlish creditors have

8    no objection to their participation in the briefing following

9    the filing of the Havlish and Doe's motions for turnover.

10        I'm going to turn it over to my partner Doug Mitchell,

11   who will address with greater specificity the procedures that

12   we envision will govern in the event that the Court lifts the

13   stay.

14        THE COURT:  Thank you.

15        MR. MITCHELL:  Your Honor, this is Doug Mitchell, and

16   I will be brief.

17        But as Mr. Wolosky noted, under Federal Rule of Civil

18   Procedure 69(a), New York law applies to the resolution of and

19   the litigation of issues relating to judgment enforcement

20   proceedings subject to any application of TRIA in the context

21   of those judgment enforcement proceedings.

22        If we look at CPLR 5225 and/or 5227, both of those

23   enforcement procedures contemplate filing a special proceeding

24   to litigate claims relating to assets of a debtor that are held

25   in the hands of a garnishee such as the New York Federal

M2m2TerC

1    Reserve Bank.  Those provisions also specifically reference

2    another section, 5239, which allows claims by adverse parties

3    to raise their claims and to litigate their interest with

4    respect to those assets; and then it also provides the Court

5    with a framework for resolving those differing competing claims

6    and making final determinations about the disposition of the

7    assets that are subject to the writs filed by the Havlish

8    plaintiffs and the Doe plaintiffs.  And, consequently, your

9    Honor, we think that the New York law that has been in place

10   for quite some time governing the litigation of issues involved

11   with enforcing judgments against assets held by garnishees will

12   provide the Court and the parties with a full and fair

13   opportunity to be heard on any and all issues that will be

14   involved in this enforcement proceeding.  We also think that

15   the methodology to get that opportunity or to start that

16   process requires lifting the stay so that that process can be

17   implemented and the parties can move forward within that

18   framework.

19           THE COURT:  How quickly after we lift the stay would

20   you anticipate filing your application?

21           MR. WOLOSKY:  Your Honor, Lee Wolosky again.

22           We would propose filing our motion for turnover two

23   weeks from today, March 8.

24           THE COURT:  Okay.  And then just so I understand your

25   position, once you file your motion for turnover, interested

M2m2TerC

1    parties would be permitted to then participate either as an

2    interpleader or otherwise, is that correct?

3            MR. WOLOSKY:  Lee Wolosky again, your Honor.

4            That is correct.  We do not oppose any MDL parties

5    participating in the briefing.  And obviously other motion

6    practice that is underway with respect to the finalization of

7    money damage awards would proceed unobstructed and

8    concurrently.

9            THE COURT:  Thank you.

10           Mr. Thornton, on behalf of the John Doe plaintiffs,

11   anything that you want to add to that proposal or are you in

12   agreement with what the Havlish creditors are proposing?

13           MR THORNTON:  Your Honor, we are basically in

14   agreement with what they are proposing and the schedule.  We

15   just see this as a situation, a very straightforward situation,

16   where we have a writ that I believe we have had since September

17   and that the stay was initiated in order for the government to

18   give its statement of interest.  It's done that.  The

19   government doesn't oppose the matter moving forward, so we

20   think the matter should move forward.  We are fine with March

21   8.  We think we can file our turnover motion by March 8.

22           As far as the booty thing and who gets to say anything

23   about the briefing, our feeling is that there are only two

24   parties in this matter that have valid writs of execution

25   against the funds at issue and that those two parties — us and

M2m2TerC

1    the Havlish creditors and writ holders — have some common

2    questions of fact that we will both address in our motions, and

3    that, in the normal course, people that don't share those

4    commonalities don't have —— you know, aren't allowed to come in

5    and brief concerning them.

6           We are concerned about, and we filed a motion, as you

7    know, a letter motion, concerning the fact that we are in the

8    MDL with the rest of the September 11th plaintiffs who don't

9    have judgments, even, against the same parties, let alone writs

10   of execution, and we are concerned that the process not get

11   slowed down from what the normal process would be under the

12   prosecution of a writ under New York law.

13          THE COURT:  Thank you.  Understood.

14          All right.  Let me turn to the members of the

15   plaintiffs' executive committee.  I believe that there are

16   lawyers who wish to be heard.

17          Why don't I just begin, Mr. Carter, do you wish to be

18   heard?

19          MR. CARTER:  Yes, your Honor.  Thank you.

20          From my perspective, as one of the long-serving chairs

21   of the plaintiffs' executive committee, I think I come at this

22   with an eye towards the overarching case management issues that

23   some of the other counsel may not be as sensitized to, and also

24   mindful of the other issues that are going to require the

25   Court's attention in the very near term, including our motion

M2m2TerC

1    under Rule 54(b) based on the decisions in *Kaplan* and

2    *Honickman*.

3            It seems to us that one of the obvious challenges in

4    this moment is that recent developments have prompted numerous

5    plaintiffs' groups to file applications seeking, in effect, to

6    be placed on equal footing with the Havlish and Doe plaintiffs

7    in this context.  And part of the difficulty with that is that

8    the procedural status and degree of advancement of those

9    plaintiffs' claims against the Taliban varies quite

10   significantly.

11           On the one hand of the spectrum, we have the Havlish

12   and Doe plaintiffs who have secured monetary judgments again

13   the Taliban and served writs of execution.  You then have

14   certain plaintiffs in the federal action who secured liability

15   judgments against the Taliban in 2006 and filed proofs to

16   obtain a monetary award as to the Taliban in 2007, which the

17   Court has addressed in other contexts, but not as to the

18   Taliban.  You have other plaintiffs who likewise received

19   liability --

20           THE COURT:  Mr. Carter?  Sorry.

21           MR. CARTER:  Yes.

22           THE COURT:  Mr. Carter, can you speak a little more

23   slowly?

24           MR. CARTER:  Yes, sure.

25           You then have other plaintiffs who likewise received

M2m2TerC

1    liability default judgments in 2006 and have moved more

2    recently in the past few months for monetary awards as to the

3    Taliban.  There are then additional plaintiffs who were added

4    to complaints in which the Taliban was named as a defendant,

5    but not until after the 2006 liability defaults were entered,

6    who are now seeking both liability and monetary judgments.  And

7    beyond that, there are plaintiffs who are, in one way or

8    another, taking action now to validate claims against the

9    Taliban in the first instance.

10          And so as a practical matter, it seems to me that it

11   will be very difficult for the Court to harmonize the

12   procedural status of the claims of all of those different

13   groups.  And it also seems clear that plaintiffs who took

14   earlier action will have good reason to argue that they would

15   be prejudiced by having their rights deferred while less

16   advanced claims catch up.

17          And even beyond that, any attempt to achieve this sort

18   of equal footing result would require the Court to undertake

19   what appears to be a very expansive scope of work in a very

20   short period of time, and I think some of the comments you

21   heard from other counsel about the set of activities that will

22   be set in motion by the commencement of the turnover proceeding

23   underscore that.

24          So at least from my perspective, all of those

25   considerations call out for a concerted effort on the part of

M2m2TerC

1    the plaintiffs who have presented applications to the Court on

2    this front to sit down in earnest to try to work out a

3    framework that would obviate the need for the Court to address

4    competing priority and allocation arguments, and that would in

5    turn obviate the need for the Court to decide all of the

6    pending judgment applications under whatever approach the Court

7    might ultimately find most appropriate.

8              And again, an agreement on that front would then allow

9    the parties and the Court to focus the remaining briefing on

10   the scope and application of Section 201 of the Terrorism Risk

11   Insurance Act, and that can be quite focused if the plaintiffs

12   are all on the same page.  It does seem to me that those

13   conversations are likely to be more fruitful if they are

14   occurring before briefing begins in earnest on the turnover

15   proceedings.  That could happen very soon.  But it does strike

16   us that it would be beneficial for the Court to urge the

17   parties to sit down with one another and try and work out some

18   agreements on this framework.

19             THE COURT:  Thank you, Mr. Carter.  I agree with a lot

20   of what you said.  I also don't see how, even if the Court were

21   able to undertake the Herculean task of addressing all of the

22   pending or anticipated motions with respect to claims against

23   the Taliban, those claims would ever even be on equal footing

24   with the Doe and Havlish plaintiffs, given that they have

25   secured judgments and filed their writs.  It would seem to me,

M2m2TerC

1    under firm circuit law, that they would be a priority for any
2    claim.
3          And so that to me is yet another reason why having a
4    fire drill with respect to the outstanding and anticipated
5    motions seems to be time not well spent.  So I appreciate your
6    suggestion that coming up with a way to focus the Court's
7    attention on the issues that are most important and would
8    address the parties' realistic needs is the best way to
9    proceed.  So thank you for those comments.
10          MR. CARTER:  Certainly, your Honor.
11          THE COURT:  I know Ms. Benett said she wanted to be
12    heard, so I will turn to Ms. Benett or Mr. Tremonte.
13          MS. BENETT:  Thank you, your Honor.  I think I will
14    defer to Mr. Tremonte on this.
15          MR. TREMONTE:  Thank you, your Honor.  It is Michael
16    Tremonte.
17          I think we are largely in agreement with Mr. Carter's
18    suggestion, I think on the understanding that the stay would
19    remain in place while the parties are conferring towards the
20    goal that Mr. Carter articulated.  We do believe that the stay
21    should remain in place at this juncture.  The touchstone, of
22    course, is that we want all the 9/11 families to be treated
23    fairly and so, consistent with that important goal, any
24    proposal, you know, would need to be, at least in the short
25    term, against the backdrop of the stay remaining in place.

M2m2TerC

```
1              If the Court is inclined to instruct the parties to
2    meet and confer, as Mr. Carter suggested, I think we would
3    likely be in agreement with that.  Alternatively, another
4    procedure that would be consistent with ensuring fairness to
5    all of the 9/11 families would be to address the pending
6    motions for final damages judgments, to schedule briefing on
7    the threshold questions of attachability of the remaining
8    blocked assets under TRIA, and we think at the same time to
9    schedule briefing on the question of the appropriate proceeding
10   for enforcing the judgments.  And that, of course, is a
11   potentially very consequential set of issues as to enforcement
12   and, again, it is one with respect to which the interested
13   parties, the full range of interested parties should be heard,
14   and there is clear authority for that, in our view, under the
15   CPLR.
16              THE COURT:  Can I interrupt you for a second?
17              MR. TREMONTE:  Yes.
18              THE COURT:  What is the authority?  Your clients, as I
19   understand it, have no judgments against these entities for
20   which you could attach to the funds.  So what standing does
21   your client have, do you have to challenge the procedural
22   mechanism by which the Havlish and Doe plaintiffs seek to
23   proceed on their execution?  I understand that you might have a
24   right to, whether it is sort of interplead or otherwise join
25   the turnover proceeding, but why do you have a say on how they
```

M2m2TerC

1    proceed as a procedural matter?

2              MR. TREMONTE:  Yes, your Honor.

3              So in addition to the interpleader rights, which we

4    agree that we clearly have, we think that we are also

5    interested persons within the meaning of CPLR 5240, and that is

6    a provision that affords the Court very broad powers upon the

7    motion of an interested party or, frankly, on the Court's own

8    initiative within the clear language of the provision to

9    modify, limit, and condition the use of any enforcement

10   procedure.  And so we think at a minimum that provision affords

11   us standing to be heard and to brief the issues in connection

12   with the appropriate procedure, especially in connection with

13   such a unique set of circumstances as this one, where ensuring

14   fairness to the 9/11 families, to all of them, not just a very

15   small minority, is of paramount importance.  So that is the --

16             THE COURT:  Understood.  I don't think it needs to be

17   said, but obviously I also am interested in fairness.  I still

18   don't understand how you would be, under the law, an interested

19   party other than speculatively because your clients have no

20   judgment and some motions have been filed, some motions are

21   anticipated.  Who know when those will actually be addressed.

22   But the interest that you hold at this point is essentially

23   speculative until you have a judgment.  I understand that you

24   have an interest generally because your interest is in

25   providing fairness and equity to all of the 9/11 families, but

M2m2TerC

1    I'm not sure as a legal proposition that you have an interest

2    as the law understands it.

3              MR. TREMONTE:  Your Honor, so here is where I think it

4    is so important to keep the stay in place at least long enough

5    to brief this and related issues.  The potential prejudice to

6    the overwhelming majority of 9/11 families of having no

7    opportunity to be heard on precisely this issue would be

8    overwhelming, and so we think at a minimum the appropriate next

9    step for the Court to take is to, with the stay remaining in

10   place, to afford an opportunity to arguably interested parties

11   to brief that very issue.  It's a complicated issue.  There is

12   not a lot of precedent on it, although what precedent there is

13   clearly affords the Court very broad equitable powers.  And we

14   would argue that this situation is a very strong candidate for

15   the exercise of those equitable powers because of the interests

16   at stake and because of the fortuity of the situation we find

17   ourselves in as a result of a foreign policy decision that

18   nobody could have really accurately predicted in terms of its

19   temporal current.

20             So for those reasons, among others, we think really

21   what is appropriate here is keep the stay in place and let us

22   brief that very issue in addition to the threshold questions,

23   which are federal law questions, of the attachability of the

24   blocked assets.

25             THE COURT:  If we were to enter judgment tomorrow on

M2m2TerC

1  behalf of your clients as against the Taliban, hypothetically

2  speaking, so that you had the third judgment that you could

3  execute against the DAB funds, are you aware of any law that

4  would allow you to jump over the Doe and Havlish plaintiffs?

5  Doesn't their priority mean that, no matter what, they get to

6  go first?

7      MR. TREMONTE:  That is a critical threshold question

8  that is inextricable from the fairness question and, in our

9  view, from the equities questions.  Our position is that all

10  9/11 families should be on an equal footing.  And again --

11      THE COURT:  I understand that's your position, but are

12  you aware of any law?  I understand that that's your desire,

13  your goal, the objective here.  But are you aware of any law

14  that would allow a third-in-line judgment holder to jump

15  judgment holder one and two?

16      MR. TREMONTE:  Certain --

17      THE COURT:  My understanding of Second Circuit law,

18  and I am looking at *CSX Transportation v. Island Rail Terminal*,

19  I'm not aware of any law that would allow judgment holder

20  number three, which there is none at this point, but were there

21  to become one, I'm not aware of any law that would allow that

22  judgment holder to jump in line in order to get priority.  And

23  so I want to make sure -- I understand the goal and the

24  objective of fairness and equity, but I want to make sure that

25  we are acting in a way that is consistent with the law and it

M2m2TerC

1  seems to me unfair to the Doe and Havlish judgment holders to

2  hold up their execution if, under all circumstances of the law,

3  they are first in line.  What is the authority to prejudice

4  them in your client's interest when they are going to be third

5  in line or farther in line than Doe and Havlish?

6          MR. TREMONTE:  So, your Honor, I think there are

7  potentially multiple sources of legal authority here that could

8  potentially come into play, although I want to emphasize again,

9  in terms of the prejudice analysis, it would be, I think,

10 inarguably, much more prejudicial to the majority of 9/11

11 families that if they are in fact interested persons within the

12 meaning of 5240 and if, moreover, it is an appropriate exercise

13 of the Court's equitable powers under that provision of the

14 CPLR to adjust the enforcement mechanisms here, then it is

15 overwhelmingly prejudicial to them to not even afford them an

16 opportunity to brief whether or not they qualify under the

17 statute as such.

18          And then, in addition to that, there are also

19 potentially issues with, you know, defects or infirmities to

20 the writs that also would need to be briefed.  So I think there

21 are multiple potential sources of legal authority, beginning

22 with 5240; and, on top of that, there is the prejudice analysis

23 which argues very, very strongly in favor of a brief

24 continuance of the stay to afford the parties an opportunity to

25 brief the relevant procedures.

M2m2TerC

1          THE COURT:  Why would you be addressing any --

2          MR. TREMONTE:  And there are multiple cases --

3          THE COURT:  Why would you be addressing any --

4          MR. TREMONTE:  I'm sorry, your Honor.

5          THE COURT:  Why would you be addressing any defect of

6    the writ on this particular mechanism, meaning wouldn't that be

7    something that you would address once the stay is lifted?

8          MR. TREMONTE:  Right.  I think if we are briefing the

9    question of the Court's authority to modify enforcement

10   procedures to ensure fairness, it would make sense, in our

11   view, to simultaneously brief issues going to defects in the

12   infirmities in the writs of execution that would also impact

13   priority.

14          But, again, to be very, very clear, we are not looking

15   to jump ahead.  We are looking to be on equal footing.  And I

16   think there is legal authority for us to argue that it is

17   within the Court's power to put in place procedures to

18   effectuate that under these circumstances.

19          THE COURT:  Okay.  Any other counsel for one of the

20   plaintiffs' groups wish to be heard.

21          MS. FLOWERS:  Your Honor, this is Jodi Flowers.  I

22   just wanted to offer a citation for you for your question

23   previously.  That would be *Plymouth Ventures Partners II L.P.*

24   *v. GRT Source, LLC*.  It is Court of Appeals of New York,

25   December 16, 2021.  It doesn't have a number yet.  N.E.3d 2021

M2m2TerC

1   Westlaw number 59268932021.  It discusses Section 5240's -- the

2   Court's power under 5240, and I suggest that it might be a

3   place for the Court to look, quoting, "where the Court needs to

4   avoid expense, embarrassment, disadvantage, or other prejudice

5   to parties or courts," the Court can look at it, inseparable

6   powers, the precise question that we are talking about.

7           And I have to take issue with the statement by I

8   believe it was counsel for the Doe plaintiffs that there are

9   only two interests at issue here.  I think we have been clear

10  that we believe there are more.  For Burnett, for example, we

11  do have default judgments against the Taliban and have had them

12  since 2006 on behalf of 5,000 plaintiffs, over 5,000

13  plaintiffs, 5,182 plaintiffs.  And these are also people who

14  have their damages liquidated as against Iran.  So like with

15  other procedures before this Court, it is not a heavy stretch

16  to say that a joint tortfeasor can be held liable for those

17  same damages.

18          So I appreciate and sympathize with the amount of

19  papers that came in as a result of these developments, but a

20  lot of this work has already been done by this Court, a lot of

21  hard work on determining the damages; and I believe that if we

22  had the benefit of a little bit of time, we could address those

23  fully and come up with a procedure that's not onerous to this

24  Court and doesn't derail the proceedings.

25          You know, I'm not going to repeat the arguments in our

M2m2TerC

| | |
|---|---|
| 1 | papers, I would simply just say that we are very concerned that |
| 2 | lifting the stay could create a rush to judgments.  I would |
| 3 | like to believe Mr. Wolosky that no MDL party will be |
| 4 | prejudiced, but absent the ability to brief these threshold |
| 5 | issues before we are so off to the races I think will prejudice |
| 6 | at least my plaintiffs. |
| 7 | THE COURT:  Thank you. |
| 8 | Would Mr. Thornton or Mr. Wolosky or Mr. Mitchell wish |
| 9 | to be heard in response? |
| 10 | MR. WOLOSKY:  It is Lee Wolosky.  Just briefly, your |
| 11 | Honor. |
| 12 | Again, just to situate us, all we are here today |
| 13 | asking the Court to do is to lift the stay.  Obviously no money |
| 14 | is going anywhere.  All issues that have been raised on this |
| 15 | conference can and should be briefed. |
| 16 | And also, if it gives the Court assurance, you know, |
| 17 | we are happy to continue to meet and confer with the other |
| 18 | parties, as we have been, as we move forward. |
| 19 | Thank you, your Honor. |
| 20 | THE COURT:  Thank you.  All right.  Does anybody else |
| 21 | wish to be heard? |
| 22 | MR THORNTON:  Your Honor, John Thornton on behalf of |
| 23 | the Doe plaintiffs. |
| 24 | I didn't hear anything that had any foundation in law |
| 25 | for authority that would stop or that, you know, could be used |

M2m2TerC

1    to prevent just the normal prosecution of our writ.  And I also

2    didn't hear anything that I thought made any practical sense,

3    and so we would oppose it.  We think that it would prejudice

4    our plaintiffs, our clients' rights, and so we don't see any

5    reason not to simply allow us to move forward on the writs, as

6    the government thinks we should, and we don't see any reason to

7    tie our ability to do that to an unrelated, factually unrelated

8    group of plaintiffs.

9          Thank you.

10          THE COURT:  Thank you.  I think that's a good point.

11   The Doe judgments, I believe, are a little more than $100

12   million, and with $3.5 billion assets that are available, I

13   think there is a fair question whether or not they should be

14   treated, at a minimum, on a separate track.  And so I would

15   like everybody to be thinking about whether or not the Doe

16   plaintiffs, who are not part of the 9/11 case otherwise, only

17   by virtue of these funds, whether or not there is any objection

18   to lifting the stay for execution with respect to their

19   judgment.

20          So here is what I would like.  First and foremost, I

21   will turn back to Ms. Vargas, I would like you to get me a

22   proposed order so that the executive carry out its foreign

23   policy objectives as quickly as possible.  As I have indicated,

24   I will give the parties 24 hours from the filing of that

25   proposed order to file any objections or raise any issues, and

M2m2TerC

1   at the 24-hour expiration, assuming there is no reason not to,

2   I will go ahead and sign that proposed order.

3          So Ms. Vargas, you can also notify your point of

4   contact at the Department of State that that's going to be the

5   procedure so that they are starting to get themselves organized

6   with respect to those assets.

7          MS. VARGAS:  Thank you, your Honor.

8          THE COURT:  Thank you.

9          With respect to the lifting of the stay, I'm going to

10  hold off on lifting it today to give the parties an opportunity

11  to be heard.  I am hoping I'm not going to get full-blown

12  memoranda of law.  I think letter briefs should be adequate to

13  raise the issues, and I will direct that those are filed by

14  next Monday, which I believe is the 28th of February.

15         I assume the Havlish and Doe parties would like to be

16  heard in opposition to that.  I know that you are interested in

17  moving this as quickly as possible, so I will assume that you

18  will get your opposition submissions in soon thereafter, but I

19  will give you the -- I don't know how long these briefs are

20  going to be or how much time you will need to oppose them, so

21  we will defer to the Doe and Havlish plaintiffs.  If you can

22  just let me know when you anticipate filing your objections to

23  those briefs and then we will take all of that under

24  advisement.

25         Separately I would like, as Mr. Carter raised, to have

M2m2TerC

1    the parties speak about a proposal for the turnover proceedings

2    if and when the stay is lifted, and so I will ask for a

3    proposal from the parties on how that should be borne out as

4    well, and I will direct that that be filed next Wednesday,

5    which I believe is March 2.  I don't have my calendar in front

6    of me, but I think that's right.  Yes.  March 2.  If you can

7    file a letter application with the Court with a proposal,

8    having had a meet-and-confer with both the Doe and Havlish

9    judgment holders as well as the relevant members of the

10   plaintiffs' executive committee and any other interested

11   plaintiffs as to how we would proceed assuming the stay is

12   lifted, and we will take all of that under advisement.

13          I think that addresses all of the issues that I wanted

14   to cover today.  Anything further from the -- oh, and if I can

15   ask, as well, with respect to the letter that's filed on March

16   2, if the parties can specifically address this issue in

17   connection with the Doe plaintiffs, given that they are not

18   9/11 plaintiffs and their judgment is relatively small in

19   connection with the funds available.  So I would also like to

20   hear whether or not there is any objection to allowing that

21   application to proceed at a quicker pace or on a separate track

22   so that those plaintiffs who are really just being brought in

23   to the morass of the MDL can execute their judgment.

24          All right.  With that, let me turn to the Havlish and

25   the Doe judgment holders.  Anything further you would like to

M2m2TerC

1    discuss today?

2              MR. WOLOSKY:  Lee Wolosky.  No, your Honor, for

3    Havlish.

4              MR THORNTON:  John Thornton.  No, your Honor, for the

5    Doe plaintiffs.

6              THE COURT:  Great.  Thank you.

7              Ms. Vargas, anything further from the government?

8              MS. VARGAS:  Not at this time, your Honor.

9              THE COURT:  Okay.  And anything further from any of

10   the other plaintiffs' counsel who have spoken today?

11             A VOICE:  No, your Honor.

12             A VOICE:  No, your Honor.

13             A VOICE:  No, your Honor.

14             THE COURT:  All right.  Thank you very much.

15   Ms. Vargas, I will look out for your proposed order.  I hope

16   everybody remains healthy and safe.

17             We are adjourned.  Thank you.

18             COUNSEL:  Thank you.

19                          oOo

20

21

22

23

24

25

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |

| | |
|---|---|
| FIONA HAVLISH, individually and on behalf of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, *et al.*, | Case No. 03-cv-9848 (GBD)(SN) |
|     Creditors, | |
| v. | |
| THE TALIBAN, *et al.*, | |
|     Debtors, | |
| FEDERAL RESERVE BANK OF NEW YORK, | |
|     Garnishee. | |

## MEMORANDUM OF LAW IN SUPPORT OF THE HAVLISH CREDITORS' MOTION
## FOR PARTIAL TURNOVER OF ASSETS
## FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... ii

I.    Introduction .................................................................................................................1

II.   Background ..................................................................................................................4

      A.    Factual Background ...........................................................................................4

            1.    Background On Pre-Judgment Proceedings...........................................4

            2.    Changes In Afghanistan And Its Central Bank ......................................5

            3.    *Havlish* Writ Enforcement Procedural History .......................................9

      B.    Statutory And Regulatory Background .............................................................10

            1.    The Taliban And The Federal Sanctions Regime .................................10

            2.    TRIA......................................................................................................11

III.  Legal Standard ...........................................................................................................13

IV.   Argument ...................................................................................................................15

      A.    The Taliban Is A Terrorist Party Within The Meaning of TRIA .....................15

      B.    The Havlish Creditors Have A Judgment Against The Taliban Based On An Act
            Of Terrorism ....................................................................................................16

      C.    The DAB Assets Are "Blocked Assets" Within The Meaning Of TRIA.........16

      D.    The DAB Assets Are Blocked Assets Of DAB, Which Is An Agency Or
            Instrumentality Of The Taliban .......................................................................17

            1.    DAB Holds The DAB Assets................................................................17

            2.    DAB Is An Agency Or Instrumentality Of The Taliban Under TRIA....18

            3.    Treating DAB As An Agency Or Instrumentality Of The Taliban Is Consistent
                  With Binding Case Law, Statutory Text, And Congressional Purpose .................21

            4.    Alternatively, DAB Is The Taliban's Alter Ego ..................................24

      E.    The Havlish Creditors Are Entitled To The DAB Assets ...............................24

      F.    The Havlish Creditors' Writ Has Priority .......................................................25

V.    Conclusion .................................................................................................................25

**App.112**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bennett v. Islamic Republic of Iran*,
618 F.3d 19 (D.C. Cir. 2010) ........................................................................12–13

*Caballero v. FARC*,
No. 20-CV-1939, 2021 WL 6339256 (D. Conn. Jan. 14, 2021)...........................20, 23, 24–25

*Caballero v. FARC*,
No. 20-MC-0040, 2021 WL 307558 (W.D.N.Y. Jan. 29, 2021) ............................23

*Caballero v. FARC*,
No. 18-CV-25337, 2021 WL 3927826 (S.D. Fla. Aug. 24, 2021) .........................20

*Clark v. Martinez*,
543 U.S. 371 (2005)..............................................................................................23

*Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*,
423 F. Supp. 3d 45 (S.D.N.Y. 2019)....................................................................13

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*,
879 F.3d 462 (2d Cir. 2018)............................................................................13, 25

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*,
919 F. Supp. 2d 411 (S.D.N.Y. 2013)..............................................................14, 24

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,
304 F. Supp. 2d 232, 241 (D.R.I. 2004)..........................................................20–21

*Harrison v. Republic of Sudan*,
802 F.3d 399 (2d Cir. 2015), *rev'd on other grounds*, 139 S. Ct. 1048 (2019)................14, 24

*Hausler v. JP Morgan Chase Bank, N.A.*,
127 F. Supp. 3d 17 (S.D.N.Y. 2015)............................................................14, 17–18, 24

*Hill v. Republic of Iraq*,
No. 99-CV-3346, 2003 WL 21057173 (D.D.C. Mar. 11, 2003) ...........................25

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak*
*Dan Gas Bumi Negara ("Pertamina")*,
313 F.3d 70, 86 (2d Cir. 2002)............................................................................17

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
830 F.3d 107 (2d Cir. 2016), *abrogated on other grounds by*
*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ............................... *passim*

*Miller v. City of Ithaca,*
    No. 10-CV-597, 2019 WL 2502712 (N.D.N.Y. June 17, 2019)............................................18

*Phoenician Trading Partners LP v. Iseson,*
    No. 04-CV-2178, 2004 WL 3152394 (E.D.N.Y. Dec. 11, 2004) ............................................1

*Schneider v. National R.R. Passenger Corp.,*
    72 F.3d 17 (2d Cir. 1995)....................................................................................................9

*Smith v. Federal Rsrv. Bank of N.Y.,*
    280 F. Supp. 2d 314 (S.D.N.Y. 2003), *aff'd,* 346 F.3d 264 (2d Cir. 2003) ......................12, 21

*Stansell v. FARC,*
    771 F.3d 713 (11th Cir. 2014) ...........................................................................................18

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.,*
    982 F. Supp. 2d 830 (N.D. Ill. 2013),
    *vacated and remanded on other grounds,* 783 F.3d 607 (7th Cir. 2015) .............................16

*United States v. Santos,*
    553 U.S. 507 (2008) (plurality opinion) ..............................................................................23

*Weininger v. Castro,*
    462 F. Supp. 2d 457 (S.D.N.Y. 2006).................................................................12, 14, 15, 24

*Weinstein v. Islamic Republic of Iran,*
    609 F.3d 43 (2d Cir. 2010)..............................................................................12, 17, 25

**STATUTES AND RULES**

8 U.S.C. § 1182(a)(3)(B)(iii) ......................................................................................................16

Fed. R. Civ. P. 69(a) ..........................................................................................................1, 13

Foreign Sovereign Immunities Act of 1976,
    Pub L. No. 94–583, 90 Stat. 2891 (codified at 28 U.S.C. § 1602 *et seq.*) ....................3, 12, 13

International Emergency Economic Powers Act,
    Pub. L. No. 95–223, 91 Stat. 1625 (codified at 50 U.S.C. § 1701 *et seq.*) ........................10, 11

Terrorism Risk Insurance Act of 2002 § 201,
    Pub. L. No. 107–297, 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note) .................... *passim*

N.Y. C.P.L.R. § 5225............................................................................................1, 13, 14

N.Y. C.P.L.R. § 5227............................................................................................................1

N.Y. C.P.L.R. § 5232............................................................................................................9

N.Y. C.P.L.R. § 5234 ...................................................................................25

**LEGISLATIVE MATERIALS**

148 Cong. Rec. S11524 (daily ed. Nov. 19, 2002) ....................................12

H. DOC. NO. 106-268 (2000).................................................................3, 10, 11

H. DOC. NO. 107-16 (2001)...............................................................10, 11, 23

H. REP. NO. 107-779 (2002) (Conf. Rep.) ...............................................12

Hearing to Receive Testimony on Security in Afghanistan & in the Regions of
    South and Central Asia, S. Comm. on Armed Servs., 117th Cong., 1st Sess.
    (Oct. 26, 2021), https://www.armed-services.senate.gov/imo/media/doc/21-
    80_10-26-2021.pdf...........................................................................................4

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

31 C.F.R. § 594.201 ......................................................................................11

31 C.F.R. § 594.310 ...............................................................................11, 15

31 C.F.R. § 594.311 ......................................................................................15

Agreement for Bringing Peace to Afghanistan, Taliban-United States, Feb. 29,
    2020, https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-
    Bringing-Peace-to-Afghanistan-02.29.20.pdf...........................................6

Background Press Call by Senior Admin. Officials on U.S. Support for the People
    of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/
    briefing-room/statements-releases/2022/02/11/background-press-call-on-u-s-
    support-for-the-people-of-afghanistan ...........................................................1

Exec. Order No. 13,129, 64 Fed. Reg. 36,759 (July 7, 1999)................10, 11

Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) ...............11

Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002).............11, 15

Exec. Order No. 14,064, 87 Fed. Reg 8391 (Feb. 11, 2022) ............... *passim*

Remarks on United States Military Operations in Afghanistan,
    2021 DAILY COMP. PRES. DOC. 313 (April 14, 2021)...............................6

Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking
    Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-
    center/press-releases/Pages/po943.aspx..............................................11, 18

App.115

## OTHER AUTHORITIES

Brief of the United States in Response to Plaintiffs' Motion to Compel,
  *Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169
  (D.D.C. Feb. 2, 2005), 2005 WL 3518010, ECF No. 4 ........................................................15

Dan De Luce et al., *Taliban Keep Close Ties with Al Qaeda Despite Promise to U.S.*,
  NBC News (Feb. 17, 2021), https://www.nbcnews.com/politics/national-
  security/taliban-keep-close-ties-al-qaeda-despite-promise-u-s-n1258033 ..............................4

Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on
  the Taliban*, N.Y. Times (Aug. 18, 2021), https://www.nytimes.com/
  2021/08/18/business/afghan-central-bank.html ........................................................................5

Order, *Caballero v. FARC*, No. 20-MC-0040 (W.D.N.Y. Dec. 18, 2020),
  ECF No. 15 ...............................................................................................................................23

Reuters, *Taliban Name New Afghan Government, Interior Minister on U.S.
  Sanctions List* (Sept. 7, 2021), https://www.reuters.com/world/india/taliban-
  fire-air-scatter-kabul-protesters-no-reports-injuries-2021-09-07/ ............................................8

Charlie Savage, *Spurning Demand by the Taliban, Biden Moves to Split $7 Billion in
  Frozen Afghan Funds*, N.Y. Times (Feb. 11, 2022), https://www.nytimes.com/
  2022/02/11/us/politics/taliban-afghanistan-911-families-frozen-funds.html ...........................1

Siegel, *New York Practice*, § 497 (6th ed.)..............................................................................9

Jeff Stein, *Biden Administration Freezes Billions of Dollars in Afghan Reserves,
  Depriving Taliban of Cash*, Wash. Post (Aug. 17, 2021), https://www
  .washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/..............3, 8

Karin Strohecker et al., *Analysis: Afghan Central Bank's $10 Billion Stash Mostly
  Out Of Taliban's Reach*, Reuters (Aug. 18, 2021), https://www.reuters.com/
  world/asia-pacific/afghan-central-banks-10-billion-stash-not-all-within-reach-
  taliban-2021-08-17/.................................................................................................................2, 5

Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban
  Takeover in Afghanistan: Frequently Asked Questions* (2021),
  https://crsreports.congress.gov/product/pdf/R/R46879 ............................................................6

Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan:
  Background and Issues for Congress* (2021), https://crsreports.congress.gov/
  product/pdf/R/R46955 ...............................................................................................................8

Judgment Creditors Fiona Havlish *et al.* (the "Havlish Creditors"), by and through their undersigned counsel, respectfully submit this memorandum of law in support of their Motion for Partial Turnover of Assets from Garnishee the Federal Reserve Bank of New York ("FRBNY").

## I.    Introduction

On February 11, 2022, the President of the United States took a series of coordinated actions intended both to benefit the "welfare of the people of Afghanistan"[1] and to "clear a legal path" for the resolution of legal claims by U.S. victims of terrorism against the Taliban.[2] According to the White House, the steps were intended to permit U.S. claimants "a full opportunity to have their claims heard in U.S. courts."[3] Among other things, the steps taken that day blocked the property of Da Afghanistan Bank ("DAB") at the Federal Reserve Bank of New York, ensuring that the property is subject to execution under the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322.

As a result, the Havlish Creditors now move this Court, pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. §§ 5225(b) and 5227,[4] and Section 201 of TRIA for an order compelling the FRBNY to turn over to the Havlish Creditors those blocked assets of DAB in its possession (the "DAB Assets") sufficient to satisfy fully the compensatory damages for which the Taliban has been adjudged liable, plus interest, amounting to $2,086,386,669. Decl. of Douglass

---

[1] Exec. Order No. 14,064, 87 Fed. Reg 8391 (Feb. 11, 2022).

[2] Charlie Savage, *Spurning Demand by the Taliban, Biden Moves to Split $7 Billion in Frozen Afghan Funds*, N.Y. Times (Feb. 11, 2022), https://www.nytimes.com/2022/02/11/us/politics/taliban-afghanistan-911-families-frozen-funds.html.

[3] Background Press Call by Senior Admin. Officials on U.S. Support for the People of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/background-press-call-on-u-s-support-for-the-people-of-afghanistan/.

[4] Because Sections 5225 and 5227 are "essentially interchangeable," it is common practice to move for a turnover order under both provisions. *See Phoenician Trading Partners LP v. Iseson*, No. 04-CV-2178, 2004 WL 3152394, at *3 (E.D.N.Y. Dec. 11, 2004) (citation omitted).

A. Mitchell ISO Mot. for Partial Turnover ("Mitchell Decl.") ¶ 10.

The DAB Assets are subject to execution under TRIA. TRIA applies in cases where "a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism." TRIA § 201(a). The Havlish Creditors have obtained a judgment against a terrorist party, the Taliban, on a claim based on an act of terrorism, the September 11, 2001 attacks. Under Section 201 of TRIA, they may therefore execute against assets of the Taliban or its agencies or instrumentalities—like DAB.

It is undisputed that the Taliban has taken control of DAB, and it is binding law that an entity controlled by a terrorist party is an agency or instrumentality of that terrorist party under TRIA. It is also undisputed that DAB has a property interest in its account at the FRBNY, which now holds no less than $3.5 billion dollars in assets.[5] Because the Taliban now has an interest in these assets through its agency or instrumentality, DAB, they are subject to execution to the extent of the Havlish Creditors' compensatory damages under TRIA and state law. Notably, the United States does not say otherwise. *See Havlish* Dkt. 563 ("U.S. Statement") 19–20.

The United States raises several questions in its Statement of Interest related to the nearly unprecedented situation at issue. The circumstances giving rise to this motion are indeed highly unusual: A terrorist group seized control of a central bank and is now using that institution for its

---

[5] Mitchell Decl., Ex. 6; Karin Strohecker et al., *Analysis: Afghan Central Bank's $10 Billion Stash Mostly Out Of Taliban's Reach*, Reuters (Aug. 18, 2021), https://www.reuters.com/world/asia-pacific/afghan-central-banks-10-billion-stash-not-all-within-reach-taliban-2021-08-17/; *see also* Mitchell Decl. ¶¶ 4–8 & Ex. 4 (DAB held nearly $6 billion at the FRBNY at the end of 2020).

The United States ordered even more of DAB's property—all of its property in the United States—to be consolidated at the FRBNY. Exec. Order No. 14,064 § 1(b). On February 25, 2022, the Court issued an order permitting the transfer of $3.5 billion of DAB's assets out of the Fed, subject to the terms of OFAC License No. DABRESERVES-EO-2022-886895-1. *Havlish* Dkt. 585.

own purposes, potentially including the facilitation of further acts of terrorism.[6] The only similar

circumstances in memory occurred when the same terrorist group seized control of the same central

bank in the 1990s and used it for its own purposes—including the facilitation of acts of terrorism.

Then, the same facts led the United States to conclude that DAB was "controlled by the Taliban"

and to find that the Taliban "ha[d] an interest" in DAB. H. Doc. No. 106-268, at 4 (2000). But

despite this case's extraordinary facts, what the law requires is rather ordinary: the reasoned

application of settled law. As described further below, this Court can and should adjudicate this

motion under binding law. Notably, it can (and should) do so without any need to address any

novel or complex issues that implicate difficult constitutional questions or unsettled legal

standards.[7]

     For the last twenty years, the Havlish Creditors—the families and estates of Americans

murdered during the terrorist attacks of September 11, 2001—have sought justice for the injuries

they suffered that day and have continued to suffer in the days, months, and years thereafter. Some

have lost not only their loved ones, but also their homes, livelihoods, and aspirations as a result of

---

[6] Expert Decl. of Alex B. Zerden ("Zerden Decl.") ¶¶ 39–43, 144–145. Because of these circumstances, the United States cut off the Taliban's ability to withdraw DAB funds on account at the FRBNY last August. Jeff Stein, *Biden Administration Freezes Billions of Dollars in Afghan Reserves, Depriving Taliban of Cash*, Wash. Post (Aug. 17, 2021), https://www.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/.

[7] It is worth noting that the Havlish Creditors do not have a judgment against the State of Afghanistan (which is not a designated state sponsor of terrorism) and have never sought relief under the FSIA against the Taliban (which is not, and has never been, a recognized government of any state). Nor need they do so now (as the FSIA is expressly preempted by TRIA in all respects relevant to these proceedings). Under TRIA, the Court need not make any findings impacting the President's recognition authorities, the status of any State assets, or on any other issue outside of its Article III competencies in a manner impacting the Executive Branch's foreign policy prerogatives or as might be required if it were applying the FSIA. As the Government correctly notes: "When its conditions are satisfied, TRIA section 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA." U.S. Statement 10.

the ongoing, sustained trauma of the attacks and the financial hardships resulting therefrom.[8] They

have sought justice against Osama bin Laden and al Qaeda, who planned and executed the attack.

They have sought it against the state and instrumentalities of the Islamic Republic of Iran, who

were found liable for providing material support for the attack. And they have sought justice

against the Taliban, which once controlled, and now again controls, Afghanistan and DAB—for it

was the Taliban that provided bin Laden and al Qaeda with a base of operations and safe harbor in

Afghanistan in order to plot, train for, and commit the atrocities of 9/11 (and which has maintained

its close relationship with al Qaeda ever since).[9]

At long last, after twenty Christmases and twenty birthdays, twenty Fourth of Julys and

twenty Thanksgivings, an appropriate measure of justice can now be extracted from the terrorist

group that nurtured, protected, and supported al Qaeda. Twenty years is long enough to wait.

## II.     Background

### A.     Factual Background

#### 1.     Background On Pre-Judgment Proceedings

The factual and procedural background giving rise to the *Havlish* judgment is well known

to the Court and is provided here in only the most summary fashion. On September 11, 2001,

---

[8] While others have received compensation from the government-funded Victims of State Sponsored Terrorism program (VSST), the Havlish Creditors largely have not, pursuing instead justice from those who were actually responsible for killing their family members twenty years ago. The Havlish Creditors estimate they have received approximately one-half of one percent of the approximately $1.6 billion in total distributed by the government to 9/11 families through the VSST.

[9] *See, e.g.*, Dan De Luce et al., *Taliban Keep Close Ties with Al Qaeda Despite Promise to U.S.*, NBC News (Feb. 17, 2021), https://www.nbcnews.com/politics/national-security/taliban-keep-close-ties-al-qaeda-despite-promise-u-s-n1258033; *see also* Hearing to Receive Testimony on Security in Afghanistan & in the Regions of South and Central Asia, S. Comm. on Armed Servs., 117th Cong., 1st Sess. (Oct. 26, 2021), https://www.armed-services.senate.gov/imo/media/doc/21-80_10-26-2021 .pdf at 35 (statement of Dr. Colin Kahl, Under Secretary for Policy, U.S. Dep't of Defense) (al Qaeda could develop capability to attack U.S. from Afghanistan "within 1 to 2 years"); Zerden Decl. ¶¶ 20, 28, 40–42.

4

Osama bin Laden and al Qaeda committed the most heinous act of terrorism in the history of this nation. The terrorist organization known as the Taliban provided material support to al Qaeda before that day in territory under its control in Afghanistan, including through its control of DAB.[10] The Havlish Creditors consist of the estates and family members of Americans who were killed that day. On December 22, 2011, this Court ordered the entry of default judgment as to liability against, *inter alia*, the Taliban on the Havlish Creditors' claims. *Havlish* Dkt. 295. In subsequent proceedings, the Court determined that the Havlish Creditors were entitled to compensatory and punitive damages, in addition to prejudgment interest on their non-economic compensatory damages at a rate of 4.96 percent from September 11, 2001 through the date judgment was entered. *Havlish* Dkt. 314, 316. The Court entered final judgment on October 16, 2012 in favor of the Havlish Creditors and against all defendants, including the Taliban, *Havlish* Dkt. 317, and today the Havlish Creditors hold outstanding judgments for compensatory damages in the amount of $2,086,386,669, Mitchell Decl. ¶ 10.

### 2. Changes In Afghanistan And Its Central Bank

DAB holds substantial asset reserves in accounts in foreign central banks, including at the Federal Reserve Bank of New York. As of August 15, 2021, approximately $7 billion of DAB's asset reserves were held at the FRBNY.[11]

---

[10] Zerden Decl. ¶¶ 19–27, 40.

[11] *See* Mitchell Decl., Ex. 6; Strohecker, *supra* note 5; Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on the Taliban*, N.Y. Times (Aug. 18, 2021), https://www.nytimes.com/2021/08/18/business/afghan-central-bank.html; *see also* Mitchell Decl. ¶¶ 4–8 & Ex. 4 (DAB held nearly $6 billion at the FRBNY at the end of 2020).

On Sunday, August 15, 2021, as the United States was completing its withdrawal from Afghanistan,[12] the former government of Afghanistan collapsed and its leaders fled the country.[13] The Taliban arrived in the capital city of Kabul and quickly took physical and operational control of certain Afghan offices, agencies, and instrumentalities for its own benefit.[14] Most significantly for present purposes, the Taliban takeover of facilities in Kabul included taking control of DAB.[15]

The Taliban now completely controls DAB.[16] Control is exercised and evidenced in several ways, including through DAB's new leadership. One of the Taliban's first acts in Kabul was installing, as DAB's Acting Governor, a staunch Taliban loyalist whose only prior financial experience was serving as head of the Taliban's finance commission—a body the Taliban tasked with managing money from narcotics trafficking and collecting illegal taxes the Taliban collected from businesses and farmers in areas where the Taliban ran shadow governments.[17] The Taliban also installed as the First and Second Deputy Governors, the number two and three leadership positions at DAB, individuals who are individually sanctioned by the United States, the United

---

[12] On February 29, 2020, the United States and the Taliban signed the Doha Agreement to bring the decades-long war in Afghanistan to an end and facilitate the transition to a "new post-settlement Afghan Islamic government." Agreement for Bringing Peace to Afghanistan, Taliban-United States, Feb. 29, 2020, https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-Bringing-Peace-to-Afghanistan-02.29.20.pdf. That transition accelerated with extraordinary speed after April 14, 2021, when President Biden announced the United States would withdraw all U.S. forces from Afghanistan by September 11, 2021. Remarks on United States Military Operations in Afghanistan, 2021 DAILY COMP. PRES. DOC. 313 (April 14, 2021). The Taliban rapidly took control of most territory in Afghanistan during the summer of 2021.

[13] *See* Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban Takeover in Afghanistan: Frequently Asked Questions* 10, 12–13 (2021), https://crsreports.congress.gov /product/pdf/R/R46879.

[14] Zerden Decl. ¶¶ 39–40; Thomas, *supra* note 13, at 10, 13–14.

[15] Zerden Decl. ¶¶ 39, 49; *see* Thomas, *supra* note 13, at 40.

[16] Zerden Decl. ¶ 51.

[17] Zerden Decl. ¶¶ 54–58 (concerning Haji Mohammed Idris, DAB's Acting Governor).

Nations, and others for terrorist activities undertaken as members of the Taliban.[18] DAB's organizational structure assigns those sanctioned terrorists significant operational and management responsibilities.[19] By means of example, DAB's First Deputy Governor, sanctioned terrorist Noor Ahmad Agha, is now charged with supervising DAB's countering terrorist financing functions, among others.[20]

The Taliban permeates every level of DAB. The Taliban is driving essential technical experts who work for DAB out of the country[21] and replacing them with loyalists who do not have the requisite education, experience, and expertise to operate a central bank independently and competently.[22] Many DAB staff remain at the bank only because the Taliban compels them to work.[23] The private business sector reports encountering more and more frequently Taliban-affiliated staff at all levels of DAB.[24]

The Taliban Council of Ministers' open control over DAB removes any illusion that DAB is or can be independent of the Taliban.[25] The Council of Ministers consists of the heads of all Taliban government ministries, and, like DAB's leadership, includes individuals sanctioned for

---

[18] Noor Ahmad Agha is DAB's First Deputy Governor. He was sanctioned for his activities as the leader of the Taliban's military council and as a finance officer. Among other things, Agha had responsibilities for financing Taliban commanders and funding improvised explosive devices. Zerden Decl. ¶¶ 59–72. Abdul Qadeer Ahmad is DAB's Second Deputy Governor. He was sanctioned for, among other things, providing funds to Taliban commanders who carried out terrorist attacks in Afghanistan, collecting financial aid from the Taliban's domestic and foreign sponsors, distributing funds to Taliban shadow governors, and collecting Taliban revenues from narcotics trafficking. *Id.* at ¶¶ 73–82.

[19] Zerden Decl. ¶¶ 59, 73.

[20] Zerden Decl. ¶ 69.

[21] Zerden Decl. ¶ 101.

[22] Zerden Decl. ¶¶ 85–91; 136–137, 138(f).

[23] Zerden Decl. ¶¶ 85–91.

[24] Zerden Decl. ¶ 85.

[25] Zerden Decl. ¶¶ 92, 139.

Taliban terrorist activities.[26] The Council of Ministers has directed DAB policy.[27] The Taliban's Deputy Prime Minister has chaired meetings at DAB.[28]

On the same day the Taliban took control of Afghanistan's capital, including the facilities of DAB, the United States locked down DAB's assets at the FRBNY to prevent them from being withdrawn by a Taliban-controlled DAB or otherwise transferred to the Taliban.[29]

On February 11, 2022, President Biden signed an executive order designating "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, a[s] blocked[.]" Exec. Order No. 14,064 § 1(a). The Order further provides that all U.S. financial institutions must transfer all property and interests in property of DAB in the United States to the FRBNY. *Id.* § 1(b). Contemporaneously with the issuance of that Order, the Government issued a license through the Treasury Department's Office of Foreign Assets Control which authorizes, directs, and compels the FRBNY, upon further instructions, to transfer up to $3.5 billion of DAB's blocked assets "for the benefit of the people of Afghanistan, or to a United Nations fund, programme, specialized agency, or other entity or body for the benefit of the people of Afghanistan." *Havlish* Dkt. 563-2 at 2. The remainder of the blocked assets were left behind so that victims of terrorism, using TRIA, could "have their claims heard in U.S. courts."[30]

---

[26] Zerden Decl. ¶¶ 93, 130; *see also* Reuters, *Taliban Name New Afghan Government, Interior Minister on U.S. Sanctions List* (Sept. 7, 2021), https://www.reuters.com/world/india/taliban-fire-air-scatter-kabul-protesters-no-reports-injuries-2021-09-07/.

[27] Zerden Decl. ¶¶ 92, 139.

[28] Zerden Decl. ¶¶ 94–95, 139.

[29] *See* Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan: Background and Issues for Congress* 39 (2021), https://crsreports.congress.gov/product/pdf/R/R46955; Stein, *supra* note 6.

[30] White House, *supra* note 3.

### 3. *Havlish* Writ Enforcement Procedural History

The Havlish Creditors obtained a writ of execution from this court against the DAB assets at the FRBNY on August 27, 2021. *Havlish* Aug. 27, 2021 Minute Order; Mitchell Decl. Ex. 1. That writ was delivered that same day to the officer with jurisdiction to levy,[31] the U.S. Marshal for the Southern District of New York. Mitchell Decl. ¶ 2 & Ex. 2. The Marshal levied against DAB's assets at the FRBNY by service of the writ on the FRBNY on September 14, 2021.[32] Mitchell Decl. ¶¶ 3–4 & Ex. 3; *see also Havlish* Dkt. 526-1.

On September 16, 2021, the United States notified the Court that it was considering filing a Statement of Interest in the case and asked that the Court "defer judicial enforcement of the *Havlish* Writ" while it decided whether to do so. *Havlish* Dkt. 526 at 2. On October 14, 2021, the United States notified the Court that it would file a Statement of Interest, and the Court shortly thereafter stayed judicial enforcement of the writ. *Havlish* Dkt. 551. In light of the stay, the Havlish Creditors sought, and the Court granted, an extension of the *Havlish* Writ, which provides that the writ "will not expire until further order of the Court." *Havlish* Dkt. 551 at 2. The Government maintained that the DAB Assets were "subject to and restrained by" the *Havlish* Writ during this time. *Havlish* Dkts. 545 at 2, 558 at 2; *see also* U.S. Statement 3. The Government filed a Statement of Interest on February 11, 2022. *Havlish* Dkt. 563.

---

[31] *See Schneider v. National R.R. Passenger Corp.*, 72 F.3d 17, 18–19 (2d Cir. 1995).

[32] Levy was accomplished by service because the FRBNY has refused to turn DAB's assets over to the Marshal. N.Y. C.P.L.R. § 5232(a) (property not capable of delivery is levied upon service by marshal). This is precisely the sort of case where levy by service is appropriate. *See also* Siegel, *New York Practice*, § 497 (6th ed.) ("Any situation in which the sheriff cannot readily lay hands on the property interest involved, and by some means take immediate actual or at least constructive custody of it, should be deemed to involve property 'not capable of delivery' and therefore to permit levy by service under subdivision (a) of CPLR 5232[.]").

On February 25, 2022, the Court ordered that the $3.5 billion in DAB assets regulated by OFAC License No. DABRESERVES-EO-2022-886895-1 "are not judicially restrained[.]" *Havlish* Dkt. 585. It further ordered that, with respect to the DAB assets not regulated by the OFAC License, "the Havlish writ dated August 27, 2021, and the Doe writ dated September 27, 2021 . . . remain in effect pending further order of this Court." *Id.*

## B. Statutory And Regulatory Background

### 1. The Taliban And The Federal Sanctions Regime

Congress enacted the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95–223, 91 Stat. 1625, 50 U.S.C. § 1701 *et seq.*, at the end of 1977. The law provides that whenever the United States is faced with an "unusual and extraordinary threat . . . to [its] national security, foreign policy, or economy" which "has its source in whole or substantial part outside the United States," the President may "declare[] a national emergency with respect to such threat" and implement measures to regulate international economic transactions. 50 U.S.C. § 1701.

The Taliban is an Islamic fundamentalist terrorist group that has twice taken control of territory and institutions in Afghanistan, including DAB. The first time the Taliban did so, in the late 1990s, President Clinton declared a national emergency and exercised his power under IEEPA to block (1) "all property or interests in property of the Taliban," (2) all property or interests in property of anyone determined by the executive "to be owned or controlled by" or "to act for or on behalf of" the Taliban, and (3) all property or interests in property of anyone found "to provide financial, material, or technological support for, or services in support of" anyone owned, controlled by, or acting for or on behalf of the Taliban. Exec. Order No. 13,129 § 1, 64 Fed. Reg. 36,759 (July 7, 1999). Months later, the administration added DAB to the list of persons blocked under this order. H. DOC. NO. 106-268, at 4; *see also* H. DOC. NO. 107-16, at 4 (2001) (same). In his report to Congress, President Clinton stated that DAB "ha[s] been found to be controlled by

the Taliban, and to be [an] entit[y] in which the Taliban has an interest." *Id.* Notably, the United States did not recognize the Taliban as the government of Afghanistan but nevertheless recognized that the Taliban controlled DAB (even though DAB was Afghanistan's central bank).[33]

After the September 11 attacks, President George W. Bush took immediate action pursuant to IEEPA to block terrorists from accessing any property in the United States or within the control of any U.S. person. On September 23, 2001, he directed that "all property and interests in property" in the United States in which certain identified terrorists had any interest were henceforth blocked. Exec. Order No. 13,224 § 1, 66 Fed. Reg. 49,079. Nine months later, he added the Taliban to the list of persons blocked pursuant to that order, thereby deeming the Taliban a "Specially Designated Global Terrorist" or "SDGT." Exec. Order No. 13,268 § 1, 67 Fed. Reg. 44,751 (July 2, 2002); 31 C.F.R. §§ 594.201(a), 594.310. The Taliban remains a blocked person and an SDGT to this day.

## 2. TRIA

Shortly after the September 11 attacks, Congress became frustrated with the executive's longstanding sanctions rules that had the effect of preventing enforcement of money judgments issued to victims of terrorism against the assets of terrorist groups. Congress enacted a new law with the specific purpose of allowing victims of terrorism to obtain relief from blocked terrorist funds. Terrorism Risk Insurance Act of 2002 ("TRIA") § 201, Pub. L. No. 107–297, 116 Stat. 2322, 2337–2340 (codified at 28 U.S.C. § 1610 note). TRIA provides in operative part that:

> *Notwithstanding any other provision of law,* and except as provided in subsection (b), in every case in which a person has obtained a *judgment against a terrorist party* on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7)], the blocked assets of that terrorist party

---

[33] *See* Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-center/press-releases/Pages/po943.aspx. After the fall of the Taliban at the end of 2001, the Treasury Department issued a license authorizing the new Afghan government to access the DAB assets. *Id.*

11

> (*including the blocked assets of any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

*Id.* § 201(a) (emphasis added).

As Senator Tom Harkin, one of the primary sponsors of TRIA, explained: "The purpose of [Section 201] is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties. . . . [TRIA] establishes once and for all, that such judgments are to be enforced against any assets available in the U.S., and that *the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act.*" *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (quoting 148 Cong. Rec. S11524, S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin)) (emphasis added). The conference committee's report echoed this theme: "The purpose of Section 201 is to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties. It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced." H. REP. NO. 107-779, at 27 (2002) (Conf. Rep.).

It is settled law that TRIA preempts the Foreign Sovereign Immunities Act ("FSIA"). *Smith v. Federal Rsrv. Bank of N.Y.*, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003) ("[T]o the extent that a foreign country's sovereign immunity potentially conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict."), *aff'd*, 346 F.3d 264 (2d Cir. 2003); *Weininger v. Castro*, 462 F. Supp. 2d 457, 477, 488 (S.D.N.Y. 2006) (TRIA overrode FSIA immunity for Central Bank of Cuba); *accord Bennett v. Islamic Republic of Iran,* 618 F.3d 19, 21

(D.C. Cir. 2010); *see also* U.S. Statement 10 ("When its conditions are satisfied, TRIA [§] 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA.").

## III.    Legal Standard

The procedure for enforcement of writs of execution is governed by Federal Rule of Civil Procedure 69(a)(1), which provides that proceedings on execution "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." In the state of New York, C.P.L.R. Section 5225(b) provides the relevant procedure for enforcement of a judgment "against a third party who 'is in possession or custody of money or other personal property' in which the judgment debtor has an interest." *See CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir. 2018).[34]

In ordinary turnover proceedings, "N.Y. C.P.L.R. § 5225(b) requires a two-part showing before the Court can order [a] third party to turn over the money to the judgment creditor. The first prong requires that the judgment creditor show the judgment debtor has an interest in the property that the creditor is trying to reach. To satisfy the second prong, the Court must find either that the judgment debtor is entitled to the possession of such property, or that the judgment creditor's rights to the property are superior to those of the party who controls or possesses that property." *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019).

But in this case, the Court must also consider the effect of TRIA, which supersedes other laws by virtue of its preamble. Under that federal statute, assets in which a blocked terrorist party

---

[34] While the text of Section 5225(b) contemplates that enforcement actions under that statute will be brought as a "special proceeding," the Second Circuit has clarified that "a party seeking a money judgment against a non-party garnishee" in federal court "may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee." *CSX Transp.*, 879 F.3d at 469.

has an interest, "including the blocked assets of any agency or instrumentality of that terrorist party[] shall be subject to execution," "[n]otwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism . . . to the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a).[35]

Because TRIA provides the relevant framework for analyzing whether a terrorist party "has an interest in the property the judgment creditor is trying to reach" under C.P.L.R. § 5225(b), and because it mandates that such property "shall be subject to execution" if so, courts in this district routinely analyze whether assets are subject to TRIA in the first instance and then rely on the relevant TRIA holding to find that turnover is appropriate under the New York statute. *See, e.g.*, *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 48 (S.D.N.Y. 2015); *Weininger*, 462 F. Supp. 2d at 499; *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013).

The DAB Assets are blocked assets pursuant to Executive Order 14,064. TRIA Section 201(a) thus authorizes the Havlish Creditors to enforce their judgment against either (i) blocked assets of the Taliban or against (ii) blocked assets of an agency or instrumentality of the Taliban. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016) ("[T]he fact that Plaintiffs obtained their underlying judgments against [the Taliban] . . . does not prevent" them from executing against DAB's properties under TRIA if DAB is an "agenc[y] or instrumentalit[y] of [the Taliban] under the TRIA."), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

---

[35] An OFAC license is not required to execute against blocked assets under TRIA. *Harrison v. Republic of Sudan*, 802 F.3d 399, 408–09 (2d Cir. 2015), *rev'd on other grounds*, 139 S. Ct. 1048 (2019).

Therefore, the Havlish Creditors are entitled to enforce their judgments under TRIA and New York law against the blocked assets at the FRBNY so long as they establish these elements: (1) possession of a "judgment against a terrorist party"; (2) arising from an act of terrorism; (3) seeking to execute against "blocked assets" within the meaning of TRIA (*i.e.*, blocked assets of that terrorist party or an agency or instrumentality of that terrorist party); (4) to the extent of their "compensatory damages." *Weininger*, 462 F. Supp. 2d at 479.

## IV. Argument

The Havlish Creditors have satisfied all four TRIA elements. They have obtained a judgment against a terrorist party (the Taliban), on a claim based on an act of terrorism (the September 11, 2001 attacks) and seek to execute against the blocked assets of an agency or instrumentality of that terrorist party (DAB). The Havlish Creditors are thus entitled to execute against the DAB Assets to the extent of their compensatory damages.

### A. The Taliban Is A Terrorist Party Within The Meaning of TRIA

The Taliban is, without question, a terrorist party within the meaning of TRIA, as the United States agrees. *See* U.S. Statement 19. Section 201(d)(4) defines a "terrorist party" as, among other things, "a terrorist[.]" And the United States has classified the Taliban as a Specially Designated Global Terrorist since July 2, 2002. *See* Exec. Order No. 13,268 § 1; *see also* 31 C.F.R. §§ 594.310, 594.311. In conformity with that designation, the United States has represented to courts in other matters both that the Taliban is a "terrorist party" and that its assets are subject to attachment under TRIA. *See* Brief of the United States in Response to Plaintiffs' Motion to Compel at 3–4, *Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169 (D.D.C. Feb. 2, 2005), 2005 WL 3518010, ECF No. 4.

### B.      The Havlish Creditors Have A Judgment Against The Taliban Based On An Act Of Terrorism

There is also no question that the Havlish Creditors have a judgment against the Taliban "based on an act of terrorism[,]" as the United States agrees. *See* U.S. Statement 19. TRIA Section 201(d)(1)(A) defines an "act of terrorism" to include any "terrorist activity" as defined in 8 U.S.C. § 1182(a)(3)(B)(iii). The Havlish Creditors' judgment against the Taliban is based on the Taliban's participation in, and liability for, the September 11, 2001 terrorist attacks. *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 982 F. Supp. 2d 830, 843–44 (N.D. Ill. 2013) (undisputed that September 11 attacks were an act of terrorism), *vacated and remanded on other grounds,* 783 F.3d 607 (7th Cir. 2015); *see also* 8 U.S.C. § 1182(a)(3)(B)(iii) (cross-referenced in TRIA § 201(d)(1) and defining "terrorist activity" as "[t]he highjacking or sabotage of any conveyance[,]" "[a] violent attack upon an internationally protected person[,]" and/or "[t]he use of any . . . explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property").

### C.      The DAB Assets Are "Blocked Assets" Within The Meaning Of TRIA

TRIA defines "blocked asset[s]" as "any asset seized or frozen by the United States under . . . sections 202 and 203 of [IEEPA] (50 U.S.C. 1701; 1702)." TRIA § 201(d)(2)(A). On February 11, 2022, President Biden ordered, pursuant to IEEPA, that "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in[.]" Exec. Order No. 14,064 § 1(a). President Biden did so fully cognizant of the enforcement proceedings before this Court. 87 Fed. Reg at 8391 ("I also understand that various parties, including representatives of victims of

terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims. This property is blocked under this order."). The DAB Assets are therefore blocked property under TRIA, as the United States agrees. U.S. Statement 19.

### D. The DAB Assets Are Blocked Assets Of DAB, Which Is An Agency Or Instrumentality Of The Taliban

The Havlish Creditors can execute against the DAB Assets if the Court finds that (1) they are "held in the hands of" DAB, and (2) DAB is an agency or instrumentality of the Taliban. *Kirschenbaum*, 830 F.3d at 132 (quoting *Weinstein*, 609 F.3d at 49). The Havlish Creditors have met these conditions.

#### 1. DAB Holds The DAB Assets

Section 201 of TRIA authorizes execution against property belonging to "an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment." *Kirschenbaum*, 830 F.3d at 132 (citing *Weinstein*, 609 F.3d at 50). "[T]he fact that Plaintiffs obtained their underlying judgments against [the Taliban] . . . does not prevent" them from executing against DAB's properties under TRIA if DAB is an "agenc[y] or instrumentalit[y] of [the Taliban] under the TRIA." *Id.*

There is no question that the DAB Assets belong to DAB. They are in DAB's account at the Fed,[36] and a property interest may thus be presumed. *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 86 (2d Cir. 2002) ("When a party holds funds in a bank account, possession is established, and the presumption of ownership follows."); *see also Hausler*, 127 F. Supp. 3d at 49 ("[U]nder New York law, the account holder of accounts containing assets belonging to the account holder has a property interest

---

[36] *See* Mitchell Decl. ¶¶ 5, 7–8 & Exs. 4, 6; *see also* U.S. Statement 8 ("The DAB Assets at issue are housed in accounts held at FRBNY for DAB[.]").

17

App.133

in those assets[.]"); *Miller v. City of Ithaca*, No. 10-CV-597, 2019 WL 2502712, at *3 (N.D.N.Y. June 17, 2019) (where funds in bank's possession were the judgment debtor's, the judgment debtor "necessarily ha[d] an interest in those funds"). Indeed, President Biden recognized that DAB holds assets at the FRBNY on February 11—and ordered all of DAB's assets in the country transferred to a consolidated account there. Exec. Order No. 14,064 § 1(a)–(b).

### 2. DAB Is An Agency Or Instrumentality Of The Taliban Under TRIA

The Second Circuit has defined three independent ways in which DAB can qualify as an agency or instrumentality of a terrorist party under TRIA. First, DAB will be an agency or instrumentality if it is "a means through which a material function of the terrorist party is accomplished[.]" *Kirschenbaum*, 830 F.3d at 135. Second, DAB will be an agency or instrumentality of the Taliban if it provides "material services to, on behalf of, or in support of the terrorist party." *Id.* Or third, DAB will be an agency or instrumentality if it is "owned, controlled, or directed by the terrorist party." *Id.* The Eleventh Circuit has adopted a similar test. *See Stansell v. FARC*, 771 F.3d 713, 724 n.6, 732 (11th Cir. 2014) (cited with approval in *Kirschenbaum*, 830 F.3d at 135–36, 135 n.19). The Havlish Creditors need to satisfy only one of the three alternative tests. Here, the Havlish Creditors satisfy all three tests.

First, DAB is and was controlled and directed by the Taliban at all times relevant to this litigation. It was controlled and directed by the Taliban in 2001, when the Taliban aided and abetted al Qaeda's execution of the September 11 attacks. H. DOC. NO. 106-268, at 4; *see also* Press Release, U.S. Dep't of Treasury, *supra* note 33 (DAB assets were "associated with the Taliban regime"). And it is again controlled and directed by the Taliban today—and has been since August 2021, when the Havlish Creditors served their writ as Taliban-installed leadership took control of

DAB and began managing DAB's operations and activities for the Taliban's benefit.[37] As demonstrated above and as more fully detailed in the Zerden Declaration, DAB is completely controlled by the Taliban.[38] Taliban leaders have been installed as leaders of DAB.[39] The Taliban Council of Ministers issues edicts for DAB to implement.[40] Current and former U.S. government officials recognize the Taliban controls DAB.[41] DAB's own media relations show the Taliban controls DAB.[42] Public and private organizations that previously worked with or through DAB are now bypassing it because of the Taliban's control.[43] The reality is that "DAB is now operating under the Taliban's direct, operational control."[44]

Second, the Taliban is using DAB to accomplish material functions supporting its illicit activities. For example, the Taliban is using DAB to facilitate and enhance illegal narcotics trafficking that generates revenue for the Taliban.[45] The Taliban can now use DAB's archive of highly sensitive Suspicious Activity Reports and financial investigation records to identify, punish, and retaliate against opponents.[46] By using DAB's authority to supervise Afghanistan's entire banking system, the Taliban has the power to remove all anti-money laundering and counter-terrorism financing controls, monitoring systems, and enforcement mechanisms that previously

---

[37] Zerden Decl. ¶¶ 39, 49–51.

[38] Zerden Decl. ¶¶ 14, 49–143; *see also supra* Part II.A.2.

[39] Zerden Decl. ¶¶ 54–84.

[40] Zerden Decl. ¶¶ 92–95.

[41] Zerden Decl. ¶¶ 99–114.

[42] Zerden Decl. ¶¶ 115–35.

[43] Zerden Decl. ¶¶ 140–43.

[44] Zerden Decl. ¶ 137; *see also id.* ¶ 51.

[45] Zerden Decl. ¶¶ 146–55.

[46] Zerden Decl. ¶¶ 156–59.

interfered with its terror financing activities.[47] In fact, a Taliban official who has been sanctioned for terror financing is now responsible for DAB's AML/CFT functions.[48] The Taliban's opportunity to expand its terrorist activities is also greatly enhanced by its ability to remove any oversight or attempts to regulate Afghanistan's *hawala* system, a centuries-old informal money exchange system that has also been used to fund terrorism.[49]

Third, the same evidence shows that DAB is providing material services to the Taliban.

Indeed, the present circumstances are just a return to form for the Taliban's relationship with DAB—it is using DAB in the same way that it did during the period when it controlled Afghan territory and institutions between 1997 and 2001.[50] These same facts led the United States to conclude then that DAB was "controlled by the Taliban." H. DOC. NO. 106-268, at 4. The Taliban has simply reimposed its former control and picked up where it left off twenty years ago.

Courts have found that entities are agencies or instrumentalities of terrorist organizations for purposes of TRIA based on far less than the circumstances of this case. *See, e.g.*, *Caballero v. FARC*, No. 18-CV-25337, 2021 WL 3927826, at *3 (S.D. Fla. Aug. 24, 2021) (individual who operated currency exchange program on behalf of terrorist party was an "agency or instrumentality" of that party under TRIA); *Caballero v. FARC*, No. 20-CV-1939, 2021 WL 6339256, at *2 (D. Conn. Jan. 14, 2021) (unaffiliated corporation was "agenc[y] or instrumentality" of terrorist party which "use[d]" it "to launder money"); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 241 (D.R.I. 2004) (subjecting assets of Holy Land Foundation to execution as an agency or instrumentality of Hamas based on "strong

---

[47] Zerden Decl. ¶¶ 160–67.

[48] Zerden Decl. ¶ 69.

[49] Zerden Decl. ¶¶ 168–78.

[50] Zerden Decl. ¶ 27.

evidence" it "operate[d] as a fund-raiser for Hamas in the United States").

Because DAB is an agency or instrumentality of the Taliban under governing Second Circuit precedent, its assets—including at the FRBNY—are subject to execution under TRIA.

### 3. Treating DAB As An Agency Or Instrumentality Of The Taliban Is Consistent With Binding Case Law, Statutory Text, And Congressional Purpose

In its Statement of Interest, the United States takes no position on whether DAB is an agency or instrumentality of the Taliban under TRIA. U.S. Statement 19–20. Instead, it points out areas of sensitivity that the Court should be careful to avoid when adjudicating this motion. *Id.* There is a clear path that this Court should take to recognize the Havlish Creditors' entitlement to immediate relief without impinging upon Executive Branch prerogatives: a simple application of the binding standard in *Kirschenbaum*. To the extent that the Court must skirt legal territory related to the conduct of foreign relations as it walks down that path, that is so only because of Congress' choice in TRIA to prioritize the ability of victims of terrorism to recover judgments from terrorist parties (including from any agency or instrumentality of a terrorist party) over "any other provision of law," including the FSIA. *See* TRIA § 201(a); *Smith*, 280 F. Supp. 2d at 319. And the binding authority of *Kirschenbaum* does not compel—or even suggest—any different approach.

It is important to understand what the Havlish Creditors are not asking this Court to do. The Court does not need to recognize any government of Afghanistan or to preempt any Executive Branch determination on that matter. *See* U.S. Statement 26. The Court does not need to consider whether DAB is or is not an active central bank of any particular state—that is a determination relevant only for purposes of the FSIA, not TRIA. *See* U.S. Statement 25. The Court does not need to decide that the funds at the FRBNY are "assets of" the Taliban by virtue of its claim to be the government of Afghanistan. *See* U.S. Statement 25, 26. The Court does not need to deem either the Taliban or Afghanistan a state sponsor of terror. *See* U.S. Statement 20. The United States

asserts that these are sensitive areas of executive competency that the Court should take care to avoid, and we agree that those interests need not be disturbed.

The only thing this Court needs to do is apply the plain text of the "agency or instrumentality of any terrorist party" clause of TRIA pursuant to the Second Circuit's well-established, binding *Kirschenbaum* test and conclude that, under that test and on the present record, DAB is an agency or instrumentality of the Taliban (as the evidence overwhelmingly shows).[51]

Nor is there any basis to depart from the text simply because a non-state party is the defendant or because that non-state party has taken control of a state institution. As the Second Circuit has recognized, TRIA's definition of "agency or instrumentality" was intentionally drafted to extend much further than the definition of an "agency or instrumentality" under the FSIA. *Kirschenbaum*, 830 F.3d at 132–135. The Second Circuit did not hint that this test should be applied differently based on the identity of the terrorist party or instrumentality—in fact, it did quite the opposite. *See id.* at 134 ("The plain language of the TRIA refers only to 'the blocked assets of any agency or instrumentality of that terrorist party,' and does not differentiate among the variety of entities that might qualify as a 'terrorist party.'"). Notably, the *Kirschenbaum* Court applied its TRIA test to an alleged instrumentality of Iran (even though that is precisely the circumstance in which the FSIA's test would have traditionally applied).[52] *Id.* This Court must accordingly apply the same *Kirschenbaum* test for the same statutory phrase in this case. After all, "[t]he meaning of words in a statute cannot change with the statute's application. To hold otherwise

---

[51] Section 201(d)(4) of TRIA does not provide or suggest any limitation on what assets of a terrorist party can be attached; it merely contains the definition of a "terrorist party." *See* U.S. Statement 25 n.8.

[52] A finding that DAB is an instrumentality of the Taliban thus does not require the Court to make any prerequisite finding about whether the Taliban is the government of Afghanistan, as would be necessary under FSIA, because under *Kirschenbaum* the definitions of "agency or instrumentality" under TRIA and the FSIA are entirely separate.

'would render every statute a chameleon,' and 'would establish within our jurisprudence . . . the dangerous principle that judges can give the same statutory text different meanings in different cases[.]'" *United States v. Santos*, 553 U.S. 507, 522–23 (2008) (plurality opinion) (quoting *Clark v. Martinez,* 543 U.S. 371, 382, 386 (2005)) (citations omitted). And at least one court in this circuit has already applied the *Kirschenbaum* test to hold that agencies or instrumentalities of foreign governments can also constitute agencies and instrumentalities of an entirely separate terrorist party under TRIA. *See Caballero v. FARC*, No. 20-MC-0040, 2021 WL 307558 (W.D.N.Y. Jan. 29, 2021) (Venezuelan state oil company was agency or instrumentality of Colombian terrorist group pursuant to TRIA); Order, *Caballero*, No. 20-MC-0040 (W.D.N.Y. Dec. 18, 2020), ECF No. 15 (same); *see also Caballero*, 2021 WL 6339256, at *2 (PDVSA subsidiary was agency or instrumentality of FARC).

The idea that a non-state terrorist party might commandeer and control a state agency or instrumentality for its own purposes would not have been foreign to the 107th Congress when it enacted TRIA. Indeed, the very same Congress that passed TRIA had received a report from the President that, as of early 2001, the Taliban (in its role as a non-state actor) had taken control of DAB. H. Doc. No. 107-16, at 4. If that Congress had wanted to write a statute that limited the ability of terror victims to recover in these familiar circumstances—if it wanted terror victims to recover from only *private* agencies or instrumentalities of non-state terrorist actors, or wanted to limit them to recovery only under the principles established under the FSIA—it could have done so. But it plainly did not. To except the DAB's assets in this instance would effectively immunize the Taliban (or any other similarly situated terrorist party in the future) from TRIA and would frustrate the very purpose of that law: making assets of any agency or instrumentality of a terrorist

23

party, *i.e.*, any entity effectively controlled by or used for the benefit of that terrorist party, available for attachment by victims of that terrorist party.

And, as the United States agrees, in cases like this one, the statutory text of FSIA is wholly superseded by TRIA, which makes blocked assets of any terrorist party or any agency or instrumentality of any terrorist party available for execution "[n]otwithstanding any other provision of law." TRIA § 201(a); *see also Kirschenbaum*, 830 F.3d at 134–135 ("The FSIA definition of 'agency or instrumentality' . . . do[es] not pertain to those terms in the TRIA."). It thus makes little sense to attempt to graft principles of law gleaned from decades of interpreting the FSIA onto a provision that was intentionally written to supersede the limits of that statute.

### 4. Alternatively, DAB Is The Taliban's Alter Ego

The Court could also conclude that DAB is an alter ego of the Taliban, subjecting its assets to TRIA as a "terrorist party" itself, because DAB "is so extensively controlled by [the Taliban] that a relationship of principal and agent is created[.]" *Kirschenbaum*, 830 F.3d at 128 (citation omitted). As has been exhaustively shown, the Taliban exerts such extensive control over DAB that DAB qualifies as its alter ego. *See supra* Part IV.D.2.

### E. The Havlish Creditors Are Entitled To The DAB Assets

The second prong of the C.P.L.R. Section 5225(b) turnover analysis—that the judgment debtor is "entitled to possession of [the] property"—is satisfied because the property is indisputably DAB's and the only restraint on possession is the blocked nature of the assets. In such cases, TRIA makes blocked property available to qualified judgment creditors like the Havlish Creditors. *Weininger*, 462 F. Supp. 2d at 499; *see also Harrison*, 802 F.3d at 409 (funds subject to TRIA "may be distributed without a license from OFAC"). Courts thus routinely find that this prong is satisfied where the blocked assets at issue are subject to TRIA. *Hausler*, 127 F. Supp. 3d at 48; *Weininger*, 462 F. Supp. 2d at 499; *Heiser*, 919 F. Supp. 2d at 422; *accord Caballero*, 2021

WL 6339256, at *2 (Connecticut turnover statute satisfied based on TRIA agency/instrumentality analysis). Nothing else stands in the way of execution. *See also Hill v. Republic of Iraq,* No. 99-CV-3346, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) (the "notwithstanding provision" is "unambiguous and effectively supersedes all previous laws"); *cf. Weinstein*, 609 F.3d at 53 ("notwithstanding" clause superseded U.S. treaty obligations).

### F.     The Havlish Creditors' Writ Has Priority

The Havlish Creditors were the first to deliver their writ to the U.S. Marshal (and the first to levy upon the assets). *See* Mitchell Decl. ¶¶ 2 (*Havlish* Writ delivered to U.S. Marshal on Aug. 27, 2021), 3–4 & Ex. 3 (U.S. Marshal levied *Havlish* Writ against DAB Assets by service on Sept. 14, 2021); *supra* note 32 (levy can be accomplished by service). These facts are undisputed and establish the absolute priority of the *Havlish* Writ. *See also* N.Y. C.P.L.R. § 5234 (executions "shall be satisfied . . . in the order in which they were delivered"); *CSX Transp.*, 879 F.3d at 472.

## V.     Conclusion

For the foregoing reasons, the Court should grant the Havlish Creditors' turnover motion as to the blocked assets of DAB (as an agency or instrumentality of the Taliban) which are in the possession, custody, or control of the FRBNY in an amount sufficient to satisfy their award of compensatory damages in the amount of $2,086,386,669, pursuant to Section 201(a) of TRIA.

Dated: March 20, 2022

_/s/ Lee S. Wolosky_
Lee S. Wolosky
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1628
lwolosky@jenner.com

Douglass A. Mitchell _(pro hac vice)_
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6090
dmitchell@jenner.com

Timothy B. Fleming (DC Bar No 351114)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB PLLC
2202 18th Street, NW, #110
Washington, DC 20009-1813
(202) 467-4489

Dennis G. Pantazis
(AL Bar No. ASB-2216-A59D)
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB, LLC (Lead Counsel)
301 19th Street
North Birmingham, AL 35203
(205) 314-0500

Richard D. Hailey (IN Bar No. 7375-49)
RAMEY & HAILEY
9333 North Meridian Street, Suite 105
Indianapolis, IN 46260
(317) 582-0000

Robert M. Foote (IL Bar No. 03124325)
FOOTE, MIELKE,
CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
(630) 232-7450

26

**App.142**

Stuart H. Singer (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Phone 954 356 0011
Fax 954 356 0022

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
Phone 212 446 2300

*Counsel for the Havlish Creditors*

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |
| FIONA HAVLISH, individually and on behalf of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, *et al.*, <br><br> Creditors, <br><br> v. <br><br> THE TALIBAN, *et al.*, <br><br> Debtors, <br><br> FEDERAL RESERVE BANK OF NEW YORK, <br><br> Garnishee. | Case No. 03-cv-9848 (GBD)(SN) <br><br> **DECLARATION OF DOUGLASS A. MITCHELL IN SUPPORT OF THE HAVLISH CREDITORS' MOTION FOR PARTIAL TURNOVER OF ASSETS FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK** |

I, Douglass A. Mitchell, hereby declare:

1.      I am an attorney duly licensed to practice law in the state of Nevada and admitted to the bar of this Court *pro hac vice*. I am a partner with Jenner & Block LLP, counsel to Judgment Creditors Fiona Havlish, et al (the "Havlish Creditors") in the above-captioned action. I make this declaration in support of the Havlish Creditors' Motion for Partial Turnover of Assets from Garnishee Federal Reserve Bank of New York. Except for those matters on information and belief, which I believe to be true, I have firsthand knowledge of the contents of this declaration and I could testify thereto.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the Writ of Execution issued by this Court against the assets of the Taliban, including the assets of Da Afghanistan Bank, at the Federal Reserve Bank of New York, dated August 27, 2021 (the "Havlish Writ"). That same

App.144

day, the Havlish Writ was hand-delivered to the United States Marshal for the Southern District of New York.

3.     Attached hereto as **Exhibit 2** is a true and correct copy of the Havlish Writ as levied by the United States Marshal for the Southern District of New York against the assets of the Taliban, including the assets of Da Afghanistan Bank, at the Federal Reserve Bank of New York, including the Marshal's letter to the Federal Reserve Bank of New York notifying that institution of the levy dated September 13, 2021, which was previously filed in this action at *Havlish* Docket No. 526 as Exhibit A to the Government's September 16, 2021 letter to the Court requesting a stay of enforcement as to the Havlish Writ pending the Government's filing of a Statement of Interest pursuant to 28 U.S.C. § 517.

4.     Attached hereto as **Exhibit 3** is a true and correct copy of the United States Marshal Service's process receipt and return for the Havlish Writ, which the Marshal levied on September 14, 2021.

5.     Attached hereto as **Exhibit 4** is a true and correct copy of Da Afghanistan Bank's ("DAB") consolidated financial statements for the year ending December 20, 2020.

6.     Attached hereto as **Exhibit 5** is a true and correct copy of the Yahoo Finance historical currency conversion table between Afghan afghanis and U.S. dollars for the month of December 2020, available at https://finance.yahoo.com/quote/AFNUSD%3DX/history?period1=1606780800&period2=1609286400. According to this table, one Afghan afghani was equivalent to 0.013 U.S. dollars on December 20, 2020. This is in accord with the exchange rate applied in the DAB consolidated financial statement, at page 2, which indicates a ratio of 77.11 afghanis per dollar, or 0.0129 dollars per afghani.

**App.145**

7.       Page 23 of the DAB consolidated financial statement indicates that the Bank held U.S. treasury bonds and bills worth 336,963,212,000 afghanis at the Federal Reserve Bank of New York on December 20, 2020. Based on the conversion ratio in paragraph 6, these bonds and bills were worth approximately $4,380,521,756.

8.       Page 21 of the DAB consolidated financial statement indicates that the Bank held gold reserves worth 101,770,256,000 afghanis at the Federal Reserve Bank of New York on December 20, 2020. Based on the conversion ratio in paragraph 6, these gold reserves were worth approximately $1,323,013,328.

9.       Attached as **Exhibit 6** is a true and correct copy of a screen capture from the Internet Archive dated August 17, 2021, available at https://web.archive.org/web/20210818064018/ https://twitter.com/aahmady/status/1427883012348424192, of portions of an August 17, 2021 thread of tweets by Ajmal Ahmady, who served as the Governor of DAB prior to the Taliban takeover. According to Mr. Ahmady, DAB possessed $7.0 billion in reserves at the Federal Reserve Bank of New York as of the week prior to the Taliban takeover.

10.      The Havlish Creditors hold judgment from this Court for damages subject to execution under the Terrorism Risk Insurance Act of 2002 (*i.e.*, compensatory damages) in an amount totaling $2,086,386,669, including pre-judgment interest computed at an annually compounding rate of 4.96 percent and post-judgment interest (accrued through March 21, 2022) computed at an annually compounding rate of 0.18 percent. This amount was calculated by me as follows:

a.       First, I calculated the subtotal of damages for pain and suffering of the decedents and for solatium by the survivors. In its judgment entered October 16, 2012, *Havlish* Dkt. 317, the Court awarded the Havlish Creditors damages for pain and suffering

of $94,000,000 and for solatium of $874,000,000, for a subtotal of $968,000,000. This subtotal is the amount on which pre-judgment interest can be calculated and awarded.

b.     I then computed the pre-judgment interest amount on that $968,000,000 subtotal. Using an annually compounding rate of 4.96 percent, I calculated that pre-judgment interest had accrued in the amount of $689,014,013 between September 11, 2001 and the date of entry of final judgment on October 16, 2012. Thus, on the date of judgment, the total amount of damages awarded for pain and suffering and solatium, including pre-judgment interest on that amount, was $1,657,014,013.

c.     The Court also awarded economic damages to the *Havlish* decedents' estates in the amount of $394,277,884. While pre-judgment interest cannot be calculated and awarded on this amount, post-judgment interest can. As a result, the total amount eligible for post-judgment interest is the sum of $394,277,884 and $1,657,014,013, or $2,051,291,897.

d.     I then computed the post-judgment interest amount on that $2,051,291,897 total. Using an annually compounding rate of 0.18 percent, I calculated that post-judgment interest had accrued in the amount of $35,094,772 between October 16, 2012 and March 21, 2022.

e.     The sum of $2,051,291,897 and $35,094,772 is $2,086,386,669, which represents Plaintiffs' award of compensatory damages (including all applicable interest as calculated through March 21, 2022).

11.     Eight of the Havlish Plaintiffs elected to take distributions from the Victims of State Sponsored Terrorism fund, thereby reducing the amounts collectable on their judgments. The total amount of those distributions was $9,799,107.74.

I declare that the foregoing is true under penalty of perjury of the laws of the United States.

Executed this _17_ th day of March, 2022, in Las Vegas, Nevada.

By: _____

Douglass A. Mitchell

# EXHIBIT 1

# United States District Court

## SOUTHERN DISTRICT OF NEW YORK

JUDGMENT NO. 12, 1850

DOCKET NO. 03-cv-9848(GBD)(SN)
03-md-1570(GBD)(SN)

### THE PRESIDENT OF THE UNITED STATES OF AMERICA
To the Marshal of the Southern District of New York, GREETING:

YOU ARE COMMANDED, that of the goods and chattels of The Islamic Republic of Afghanistan, now know as the Islamic Emirate of Afghanistan, which the Taliban, Da Afghanistan Bank, the central to bank of Afghanistan, now a bank of the Islamic Emirate of Afghanistan, which is the Taliban, and any political subdivisions or agencies and instrumentalities of either the Islamic Republic of Afghanistan or the Islamic Emirate of Afghanistan, which is the Taliban.

in your district you cause to be made the sum of seven billion, forty-five million, six hundred thirty-two thousand, four hundred two

dollars and seventy-nine cents, ($ 7,045,632,402.79 )

which lately in the United States District Court of the United States for the Southern District of New York, in the Second Circuit, Fiona Havlish and the individuals and estates listed on Exhibit A attached hereto

recovered against the said The Taliban a/k/a the Islamic Emirate of Afghanistan and the other entities and individuals listed on Exhibit B attached hereto

in an action between Fiona Havlish and the individuals and estates listed on Exhibit A attached hereto

PLAINTIFF and The Taliban a/k/a the Islamic Emirate of Afghanistan and the other entities and individuals listed on Exhibit B attached hereto

DEFENDANT, in favor of said Fiona Havlish and the individuals and estates listed on Exhibit A attached hereto

as appears by the record filed in the Clerk's Office of said District Court on the 16 day of October , in the year of 2012

and if sufficient personal property of the said judgment debtor cannot be found in your District, that then you cause the same to be made out of the real property belonging to such judgment debtor on the above-mentioned day, or at any time thereafter, in whose hands soever the same may be, and return this execution within sixty days after its receipt by you, to the Clerk of said District Court.

WITNESS, the Honorable Laura T. Swain, Chief Judge of the United States District Court, for the Southern District of New York, at the City of New York, on the 27ᵀᴴ day of August in the year of our Lord 2021 , and of the Independence of the United States the two hundred forty fifth year.

CLERK

SDNY Web

05/2021

# United States District Court

## SOUTHERN DISTRICT OF NEW YORK

Fiona Havlish, et al

-against-

The Taliban a/ka Islamic Emirate of Afghanistan, which is now the government of Afghanistan; the government of Afghanistan, which is now the Islamic Emirate of Afghanistan, the central bank of Afghanistan, which is now a bank of the Islamic Emirate of Afghanistan; any political subdivision of the government of Afghanistan, which is now the Islamic Emirate of Afghanistan, and any agency or instrumentality of the government of Afghanistan, which are now agencies and instrumentatlifies of the Islamic Emirate of Afghanistan a/k/a the Taliban

EXECUTION AGAINST PROPERTY

Wiggins Childs Pantazis Fisher Goldfarb, PLLC
Attorney for
Fiona Havlish, et al

Borough of Manhattan
City of New York

To the Marshal:

You will levy and collect

$7,045,632,402.79

Dollars and 85

_____cents, with interest from the 16 day of

October, 2012, besides your fees, etc.

Attorney

# Exhibit A

EXHIBIT A
WRITE OF EXECUTION

**Estate of Donald J. Havlish, Jr.**          {Estates of 9/11 Decedents in bold}
Fiona Havlish
Estate of Donald Havlish, Sr.
William Havlish
Susan Conklin
**Estate of Michael A. Bane**
Tara Bane
Estate of Donald Bane
Christina Bane-Hayes
**Estate of Martin Boryczewski**
Krystyna Boryczewski
Estate of Michael Boryczewski
Julia Boryczewski
Michele Boryczewski
**Estate of Richard M. Caproni**
Richard A. Caproni
Dolores Caproni
Christopher Caproni
Michael Caproni
Lisa Caproni-Brown
**Estate of Peter Chirchirillo**
Clara Chirchirillo
Livia Chirchirillo
Catherine Deblieck
**Estate of Jeffrey Coale**
William Coale
**Estate of Daniel M. Coffey**
Frances M. Coffey
Daniel D. Coffey, M.D.
Kevin M. Coffey
**Estate of Jason Coffey**
Frances M. Coffey
Daniel D. Coffey, M.D.
Kevin M. Coffey
**Estate of Jeffrey Collman**
Dwayne W. Collman
Brian Collman
Charles Collman
Brenda Sorenson
**Estate of Michael Diehl**
Loisanne Diehl
**Estate of Stephen Dorf**
Estate of Morris Dorf

Estate of Anne Marie Dorf
Joseph Dorf
Michelle Dorf
Robert Dorf
Linda Sammut
**Estate of Judy Fernandez**
Corazon Fernandez
**Estate of William R. Godshalk**
Estate of Grace Parkinson-Godshalk
**Estate of John Grazioso**
Tina Grazioso
**Estate of James D. Halvorson**
Maureen Halvorson
**Estate of Liming Gu**
Jin Liu
Alan Gu
**Estate of Steven Cafiero**
Grace Kneski
**Estate of Robert Levine**
Roni Levine
**Estate of Joseph Lostrangio**
Teresanne Lostrangio
**Estate of Brian Nunez**
JoAnne Lovett
**Estate of Meta Waller**
**Estate of Ronald Gamboa**
Regina Maria Merwin
**Estate of Dorothy Mauro**
Margaret Mauro
**Estate of Mary Melendez**
Ramon Melendez
**Estate of Peter T. Milano**
Patricia Milano
**Estate of Yvette Nichole Moreno**
Ivy Moreno
**Estate of Philip Paul Ognibene**
Estate of Vincent A. Ognibene
**Estate of Denis Lavelle**
Marie Ann Paprocki
**Estate of John William Perry**
Patricia J. Perry
**Estate of Salvatore T. Papasso**
Christine Papasso

**Estate of Marsa Dianah Ratchford**
Rodney Ratchford
Rodney M. Ratchford
Marshee R. Ratchford
Benefit of Maranda C. Ratchford
**Estate of John M. Rodak**
Joyce Ann Rodak
Chelsea Nicole Rodak
Benefit of Devon Marie Rodak
John Rodak
Regina Rodak
Joanne Gori
**Estate of Elvin Romero**
Diane Romero
**Estate of Richard Rosenthal**
Loren Rosenthal
**Estate of Joshua Scott Reiss**
Judith Reiss
**Estate of Maria Theresa Santillian**
Expedito Santillian
Ester Santillian
**Estate of Victor Saracini**
Ellen Saracini
Estate of Anne C. Saracini
Joanne Renzi
**Estate of Scott Schertzer**
Paul Schertzer
**Estate of Paul K. Sloan**
Ronald S. Sloan
**Estate of George Eric Smith**
Raymond Alexander Smith
**Estate of Timothy P. Soulas**
Katherine Soulas
**Estate of William R. Steiner**
Russa Steiner
**Estate of Andrew Stergiopoulos**
George Stergiopoulos, M.D.
Angela Stergiopoulos
**Estate of Edward W. Straub**
Sandra Straub
**Estate of Jennifer Tino**
Joan E. Tino
Pamela Schiele

**Estate of Jeanmarie Wallendorf**
Christine Barton (now Pence)
**Estate of Timothy Raymond Ward**
Estate of Doyle Raymond Ward
Gerald Bingham
Alice Carpeneto
Stephen L. Cartledge
Michelle Wright
Maureen Halvorson
Haomin Jian
FuMei Chien
Huichun Jian
Hui-Chuan Jian
Hui-Chien Chen
Hui-Zon Jian
Michael LoGuidice
Ralph S. Maerz
Martin Panik
Estate of Linda Ellen Panik
Mary Lynn-Anna Panik Stanley
Helen Rosenthal
Alexander Rowe
Ed Russin
Gloria Russin
Barry Russin
Leonard Zeplin
Leona Zeplin
Joslin Zeplin

# Exhibit B

EXHIBIT B
WRIT OF EXECUTION

LIST OF DEFENDANTS AGAINST WHOM JUDGMENTS WERE ENTERED

The Taliban a/k/a the Islamic Emirate of Afghanistan
Islamic Republic of Iran
Ayatollah Ali Hoseini Khamenei, Supreme Leader of Iran
Ali Akbar Hashemi Rafsanjani, Chairman, Expediency Discernment Counsel
   and former President of Iran
Iranian's Ministry of Information and Security
Islamic Revolutionary Guard Corps
Iranian's Ministry of Petroleum
National Iranian Tanker Corporation
National Iranian Oil Company
National Iranian Gas Company
National Iranian Petrochemical Company
Iran Airlines
Iran's Ministry of Economic Affairs and Finance
Iran's Ministry of Commerce
Iran's Ministry of Defense and Armed Forces Logistics
Central Bank of the Islamic Republic of Iran a/k/a Bank Markazi
Hezbollah
al-Qaeda

# Exhibit C

EXHIBIT C

WRIT OF EXECUTION

The foregoing writ of execution is to be levied in conformity with United States and New York law against any property or property rights in any form (personal or real, tangible or intangible, materialized or dematerialized, direct or indirect, or fungible, including but not limited to any reserves, cash, gold, silver, securities, securities entitlements, securities accounts, equity interests, claims, contractual rights, statutory rights, special drawing rights from the International Monetary Fund, or any other interest of any kind in any asset of any kind) held or being maintained by, or in the possession, custody, or control of,

> Federal Reserve Bank of New York
> 33 Liberty Street
> New York, New York 10045

for the benefit of the government of Afghanistan (which the Taliban, also known as the Islamic Emirate of Afghanistan, now claims to be and to control), Da Afghanistan Bank, the central bank of Afghanistan (which is a bank, the assets of which, the Taliban, also known as the Islamic Emirate of Afghanistan, now claims to own and control), any political subdivision of the Islamic Republic of Afghanistan or the Islamic Emirate of Afghanistan (which the Taliban, also known as the Islamic Emirate of Afghanistan, now claims are its political subdivisions), and any agency or instrumentality of the Islamic Republic of Afghanistan or the Islamic Emirate of Afghanistan (which the Taliban, also known as the Islamic Emirate of Afghanistan, now claims are its agencies and instrumentalities).

Beginning on or about August 16, 2021, the previous government of Afghanistan was deposed by the Taliban, which also identifies itself as the Islamic Emirate of Afghanistan. On or about August 19, 2021, the Taliban declared itself the government of Afghanistan and changed the name of the country to the Islamic Emirate of Afghanistan, which is also the name of the Taliban. The Taliban as the Islamic Emirate of Afghanistan now asserts control over the country formerly known as Afghanistan, previously governed by the Islamic Republic of Afghanistan, and has assumed governance of the people within the jurisdictional borders of Afghanistan. The Taliban, as the Islamic Emirate of Afghanistan, also claims ownership of, and control over, all property, property interests, and all rights belonging to the former government of the Islamic Republic of Afghanistan, including all assets belonging to the central bank of Afghanistan, Da Afghanistan

Bank.  As a result, the judgment entered against the Taliban which is now the Islamic Emirate of Afghanistan can now be enforced against any and all assets belonging to the government of Afghanistan, including any assets held at the Federal Reserve Bank in the name, for the benefit, or on the account of Da Afghanistan Bank, the central bank of Afghanistan.

# EXHIBIT 2



**U.S. Department of Justice**

**United States Marshals Service**
*Southern District of New York*

*500 Pearl Street, Suite 400*
*New York, New York 10007*

*Telephone (212) 331-7200*
*Facsimile (212) 637-6130*

September 13, 2021

Federal Reserve of New York
ATTN: Legal Department
33 Liberty St
New York, NY 10045

      RE:    Fiona Havlish, et al v. The Taliban a/k/a the Islamic Emirate of Afghanistan, et al

Dear Sir/Madam:

      Pursuant to the attached Writ of Execution, I am herewith levying on all the right, title and interest that the judgment debtor, account of Wiggins Child Pantazis Fisher Goldfarb, PLLC and assets held in the Federal Reserve of New York including but not limited to all accounts to satisfy the judgment of $7,045,632,402.79 which includes fees for the United States Marshals Service in the amount of $66.12 plus interest from October 16, 2012.

      Please remit payment(s) promptly to:

            United States Marshal
            Southern District of New York
            500 Pearl Street, Suite 400
            New York, NY 10007

Thank you in advance for your cooperation in this matter.

            Very truly yours,

            Ralph Sozio
            United States Marshal,
            Southern District of New York

      By:

            Michael Gonzalez
            Deputy United States Marshal
            (212) 331-7119

# United States District Court

## SOUTHERN DISTRICT OF NEW YORK

JUDGMENT NO. 12, 1850            DOCKET NO. 03-cv-9848(GBD)(SN)

                                                          03-md-1570(GBD)(SN)

### THE PRESIDENT OF THE UNITED STATES OF AMERICA

To the Marshal of the Southern District of New York, GREETING:

YOU ARE COMMANDED, that of the goods and chattels of The Islamic Republic of Afghanistan, now know as the Islamic Emirate of Afghanistan, which the Taliban, Da Afghanistan Bank, the central to bank of Afghanistan, now a bank of the Islamic Emirate of Afghanistan, which is the Taliban, and any political subdivisions or agencies and instrumentalities of either the Islamic Republic of Afghanistan or the Islamic Emirate of Afghanistan, which is the Taliban.

in your district you cause to be made the sum of seven billion, forty-five million, six hundred thirty-two thousand, four hundred two

dollars and seventy-nine cents, ($ 7,045,632,402.79 )

which lately in the United States District Court of the United States for the Southern District of New York, in the Second Circuit, Fiona Havlish and the individuals and estates listed on Exhibit A attached hereto

recovered against the said The Taliban a/k/a the Islamic Emirate of Afghanistan and the other entities and individuals listed on Exhibit B attached hereto

in an action between Fiona Havlish and the individuals and estates listed on Exhibit A attached hereto

PLAINTIFF and The Taliban a/k/a the Islamic Emirate of Afghanistan and the other entities and individuals listed on Exhibit B attached hereto

DEFENDANT, in favor of said Fiona Havlish and the individuals and estates listed on Exhibit A attached hereto

as appears by the record filed in the Clerk's Office of said District Court on the 16 day of October , in the year of 2012

and if sufficient personal property of the said judgment debtor cannot be found in your District, that then you cause the same to be made out of the real property belonging to such judgment debtor on the above-mentioned day, or at any time thereafter, in whose hands soever the same may be, and return this execution within sixty days after its receipt by you, to the Clerk of said District Court.

WITNESS, the Honorable Laura T. Swain, Chief Judge of the United States District Court, for the Southern District of New York, at the City of New York, on the 27TH day of August in the year of our Lord 2021 , and of the Independence of the United States the two hundred forty fifth year.

CLERK

Case 1:03-cv-09848-GBD-SN   Document 526-12   Filed 09/10/22   Page 34 of 34

## United States District Court

SOUTHERN DISTRICT OF NEW YORK

Fiona Havlish, et al

-against-

The Taliban a/ka Islamic Emirate of Afghanistan, which is now the government of Afghanistan; the government of Afghanistan, which is now the Islamic Emirate of Afghanistan, the central bank of Afghanistan,

which is now a bank of the Islamic Emirate of Afghanistan; any political subdivision of the government of Afghanistan, which is now the Islamic Emirate of Afghanistan, and any agency or instrumentality of the

the government of Afghanistan, which are now agencies and instrumentalities of the Islamic Emirate of Afghanistan a/k/a the Taliban

EXECUTION AGAINST PROPERTY

Wiggins Childs Pantazis Fisher Goldfarb, PLLC
Attorney for
Fiona Havlish, et al

Borough of Manhattan
City of New York

To the Marshal:

You will levy and collect

$7,045,632,402.79

Dollars and 85 _

____cents, with interest from the  16  day of

October, 2012, besides your fees, etc

Attorney

App.165

# EXHIBIT A

EXHIBIT A
WRIT OF EXECUTION

**Estate of Donald J. Havlish, Jr.**                    {Estates of 9/11 Decedents in bold}
Fiona Havlish
Estate of Donald Havlish, Sr.
William Havlish
Susan Conklin
**Estate of Michael A. Bane**
Tara Bane
Estate of Donald Bane
Christina Bane-Hayes
**Estate of Martin Boryczewski**
Krystyna Boryczewski
Estate of Michael Boryczewski
Julia Boryczewski
Michele Boryczewski
**Estate of Richard M. Caproni**
Richard A. Caproni
Dolores Caproni
Christopher Caproni
Michael Caproni
Lisa Caproni-Brown
**Estate of Peter Chirchirillo**
Clara Chirchirillo
Livia Chirchirillo
Catherine Deblieck
**Estate of Jeffrey Coale**
William Coale
**Estate of Daniel M. Coffey**
Frances M. Coffey
Daniel D. Coffey, M.D.
Kevin M. Coffey
**Estate of Jason Coffey**
Frances M. Coffey
Daniel D. Coffey, M.D.
Kevin M. Coffey
**Estate of Jeffrey Collman**
Dwayne W. Collman
Brian Collman
Charles Collman
Brenda Sorenson
**Estate of Michael Diehl**
Loisanne Diehl
**Estate of Stephen Dorf**
Estate of Morris Dorf

Estate of Anne Marie Dorf
Joseph Dorf
Michelle Dorf
Robert Dorf
Linda Sammut
**Estate of Judy Fernandez**
Corazon Fernandez
**Estate of William R. Godshalk**
Estate of Grace Parkinson-Godshalk
**Estate of John Grazioso**
Tina Grazioso
**Estate of James D. Halvorson**
Maureen Halvorson
**Estate of Liming Gu**
Jin Liu
Alan Gu
**Estate of Steven Cafiero**
Grace Kneski
**Estate of Robert Levine**
Roni Levine
**Estate of Joseph Lostrangio**
Teresanne Lostrangio
**Estate of Brian Nunez**
JoAnne Lovett
**Estate of Meta Waller**
**Estate of Ronald Gamboa**
Regina Maria Merwin
**Estate of Dorothy Mauro**
Margaret Mauro
**Estate of Mary Melendez**
Ramon Melendez
**Estate of Peter T. Milano**
Patricia Milano
**Estate of Yvette Nichole Moreno**
Ivy Moreno
**Estate of Philip Paul Ognibene**
Estate of Vincent A. Ognibene
**Estate of Denis Lavelle**
Marie Ann Paprocki
**Estate of John William Perry**
Patricia J. Perry
**Estate of Salvatore T. Papasso**
Christine Papasso

**Estate of Marsa Dianah Ratchford**
Rodney Ratchford
Rodney M. Ratchford
Marshee R. Ratchford
Benefit of Maranda C. Ratchford
**Estate of John M. Rodak**
Joyce Ann Rodak
Chelsea Nicole Rodak
Benefit of Devon Marie Rodak
John Rodak
Regina Rodak
Joanne Gori
**Estate of Elvin Romero**
Diane Romero
**Estate of Richard Rosenthal**
Loren Rosenthal
**Estate of Joshua Scott Reiss**
Judith Reiss
**Estate of Maria Theresa Santillian**
Expedito Santillian
Ester Santillian
**Estate of Victor Saracini**
Ellen Saracini
Estate of Anne C. Saracini
Joanne Renzi
**Estate of Scott Schertzer**
Paul Schertzer
**Estate of Paul K. Sloan**
Ronald S. Sloan
**Estate of George Eric Smith**
Raymond Alexander Smith
**Estate of Timothy P. Soulas**
Katherine Soulas
**Estate of William R. Steiner**
Russa Steiner
**Estate of Andrew Stergiopoulos**
George Stergiopoulos, M.D.
Angela Stergiopoulos
**Estate of Edward W. Straub**
Sandra Straub
**Estate of Jennifer Tino**
Joan E. Tino
Pamela Schiele

**Estate of Jeanmarie Wallendorf**
Christine Barton (now Pence)
**Estate of Timothy Raymond Ward**
Estate of Doyle Raymond Ward
Gerald Bingham
Alice Carpeneto
Stephen L. Cartledge
Michelle Wright
Maureen Halvorson
Haomin Jian
FuMei Chien
Huichun Jian
Hui-Chuan Jian
Hui-Chien Chen
Hui-Zon Jian
Michael LoGuidice
Ralph S. Maerz
Martin Panik
Estate of Linda Ellen Panik
Mary Lynn-Anna Panik Stanley
Helen Rosenthal
Alexander Rowe
Ed Russin
Gloria Russin
Barry Russin
Leonard Zeplin
Leona Zeplin
Joslin Zeplin

# EXHIBIT B

EXHIBIT B
WRIT OF EXECUTION

LIST OF DEFENDANTS AGAINST WHOM JUDGMENTS WERE ENTERED

The Taliban a/k/a the Islamic Emirate of Afghanistan
Islamic Republic of Iran
Ayatollah Ali Hoseini Khamenei, Supreme Leader of Iran
Ali Akbar Hashemi Rafsanjani, Chairman, Expediency Discernment Counsel
    and former President of Iran
Iranian's Ministry of Information and Security
Islamic Revolutionary Guard Corps
Iranian's Ministry of Petroleum
National Iranian Tanker Corporation
National Iranian Oil Company
National Iranian Gas Company
National Iranian Petrochemical Company
Iran Airlines
Iran's Ministry of Economic Affairs and Finance
Iran's Ministry of Commerce
Iran's Ministry of Defense and Armed Forces Logistics
Central Bank of the Islamic Republic of Iran a/k/a Bank Markazi
Hezbollah
al-Qaeda

# EXHIBIT C

EXHIBIT C

WRIT OF EXECUTION

The foregoing writ of execution is to be levied in conformity with United States and New York law against any property or property rights in any form (personal or real, tangible or intangible, materialized or dematerialized, direct or indirect, or fungible, including but not limited to any reserves, cash, gold, silver, securities, securities entitlements, securities accounts, equity interests, claims, contractual rights, statutory rights, special drawing rights from the International Monetary Fund, or any other interest of any kind in any asset of any kind) held or being maintained by, or in the possession, custody, or control of,

> Federal Reserve Bank of New York
> 33 Liberty Street
> New York, New York 10045

for the benefit of the government of Afghanistan (which the Taliban, also known as the Islamic Emirate of Afghanistan, now claims to be and to control), Da Afghanistan Bank, the central bank of Afghanistan (which is a bank, the assets of which, the Taliban, also known as the Islamic Emirate of Afghanistan, now claims to own and control), any political subdivision of the Islamic Republic of Afghanistan or the Islamic Emirate of Afghanistan (which the Taliban, also known as the Islamic Emirate of Afghanistan, now claims are its political subdivisions), and any agency or instrumentality of the Islamic Republic of Afghanistan or the Islamic Emirate of Afghanistan (which the Taliban, also known as the Islamic Emirate of Afghanistan, now claims are its agencies and instrumentalities).

Beginning on or about August 16, 2021, the previous government of Afghanistan was deposed by the Taliban, which also identifies itself as the Islamic Emirate of Afghanistan. On or about August 19, 2021, the Taliban declared itself the government of Afghanistan and changed the name of the country to the Islamic Emirate of Afghanistan, which is also the name of the Taliban. The Taliban as the Islamic Emirate of Afghanistan now asserts control over the country formerly known as Afghanistan, previously governed by the Islamic Republic of Afghanistan, and has assumed governance of the people within the jurisdictional borders of Afghanistan. The Taliban, as the Islamic Emirate of Afghanistan, also claims ownership of, and control over, all property, property interests, and all rights belonging to the former government of the Islamic Republic of Afghanistan, including all assets belonging to the central bank of Afghanistan, Da Afghanistan

Bank.  As a result, the judgment entered against the Taliban which is now the Islamic Emirate of Afghanistan can now be enforced against any and all assets belonging to the government of Afghanistan, including any assets held at the Federal Reserve Bank in the name, for the benefit, or on the account of Da Afghanistan Bank, the central bank of Afghanistan.

# EXHIBIT 3

**U.S. Department of Justice**
United States Marshals Service

**PROCESS RECEIPT AND RETURN**
*See "Instructions for Service of Process by U.S. Marshal"*

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| Fiona Havlish, et al. | 03-cv-9848; 03-md-1570(GBD)(SN) |

| DEFENDANT | TYPE OF PROCESS |
|---|---|
| The Taliban a/k/a the Islamic Emirate of Afghanistan, et al. | Writ of Execution |

**SERVE AT**

NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN
Federal Reserve of New York

ADDRESS *(Street or RFD, Apartment No., City, State and ZIP Code)*
33 Liberty Street, New York, New York 10045

SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW

Timothy B. Fleming
Wiggins Childs Pantazis Fisher Goldfarb, PLLC
1211 Connecticut Avenue, Suite 420
Washington, DC 20036

| | |
|---|---|
| Number of process to be served with this Form 285 | 1 |
| Number of parties to be served in this case | 1 |
| Check for service on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service):*

NY Fed main telephone number: 212-720-5000

| Signature of Attorney other Originator requesting service on behalf of: ☒ PLAINTIFF ☐ DEFENDANT | TELEPHONE NUMBER 202-467-4489 | DATE 8/25/2021 |
|---|---|---|

**SPACE BELOW FOR USE OF U.S. MARSHAL ONLY - DO NOT WRITE BELOW THIS LINE**

| I acknowledge receipt for the total number of process indicated. *(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin No. 054 | District to Serve No. 054 | Signature of Authorized USMS Deputy or Clerk | Date 8/25/2 |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served, ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above on the on the individual, company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc., named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* HEAD OF SEC. FED RESERVE | Date 9/14/21 | Time 530 ☐ am ☒ pm |
|---|---|---|

Address *(complete only different than shown above)*

Signature of U.S. Marshal or Deputy

*Costs shown on attached USMS Cost Sheet >>*

REMARKS
SERVICE FEE = 1/HR = 65
MILES FEE = 2 MI = 1.12
TOTAL 66.12

Form USM-285
Rev. 03/21

# EXHIBIT 4

Chartered Accountants

# DA AFGHANISTAN BANK
## CONSOLIDATED FINANCIAL STATEMENTS
## FOR THE YEAR ENDED QAWS 30, 1399
## (DECEMBER 20, 2020)

UHY Shafiq Umar Daraz Co. Chartered Accountants - A member firm of UHY International (UK)
B- 32, 2nd Floor, Muslim Business Centre (AIB Building), Haji Yaqoob Square, Shahre Naw, Kabul Afghanistan

**Shafiq Umar Daraz & Co**
**Chartered Accountants**

Office No. 13, 2nd Floor,
AIB Building, Haji Yaqob Square
Shahr-e-Naw, Kabul
Afghanistan.
Tel: +(93) 789 168 000
Email: info@uhy-af.com
Web: www.uhy-af.com

## INDEPENDENT AUDITOR'S REPORT TO THE SUPREME COUNCIL OF DA AFGHANISTAN BANK

### Opinion

We have audited the consolidated financial statements of Da Afghanistan Bank (the Bank) and its Subsidiary ("the Group"), which comprise the consolidated statement of financial position as at 30 Qaws 1399 (20 December 2020), and the consolidated statement of profit and loss, consolidated statement of other comprehensive income, consolidated statement of cash flows and consolidated statement of changes in equity for the year then ended, and notes to the consolidated financial statements, including a summary of significant accounting policies and other explanatory information.

In our opinion, the accompanying consolidated financial statements present fairly, in all material aspects, the financial position of the Group as at 20 December 2020, and its consolidated financial performance and its consolidated cash flows for the year then ended in accordance with the accounting and reporting framework as stated in note 2 to the consolidated financial statements.

### Basis for Opinion

We conducted our audit in accordance with International Standards on Auditing (ISAs). Our responsibilities under those standards are further described in the *'Auditor's Responsibilities for the Audit of the Consolidated Financial Statements'* section of our report. We are independent of the Group in accordance with the International Ethics Standards Board for Accountants' Code of Ethics for Professional Accountants (IESBA Code), and we have fulfilled our other ethical responsibilities in accordance with the IESBA Code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

### Emphasis of Matter

We draw attention to note 19.3 to the consolidated financial statements, which states that the Bank is not in compliance with Article 74 of the DAB law which requires the Bank to limit its foreign currency liabilities up to 50% of its unimpaired capital and reserves, which works out to be Afs 94,828.557 million as at 30 Qaws 1399 (20 December 2020). Foreign currency liabilities of the Bank as at the said date stand at Afs 142,305.073 million, resulting in foreign currency liabilities exceeding the prescribed limit by Afs 47,476.515 million as at the year end. Our opinion is not qualified in respect to this matter.

### Key Audit Matters

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current period. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters.

| Key Audit Matter | How the matter was addressed in our audit |
|---|---|
| **Accuracy of the Liability for "Currency in Circulation"**<br><br>As disclosed in notes 16 and 16.1 to the accompanying consolidated financial statements, currency in circulation represent the liability of the Bank towards bank notes issued as a legal tender under the Chapter IV Part 1 "Currency" of The Afghanistan Bank | We obtained an understanding, evaluated the design, and tested the operating effectiveness of controls related to process for new notes, expansion and contraction of bank notes in circulation and cancellation of bank notes. |



Shafiq Umar Daraz & Co
**Chartered Accountants**

| Key Audit Matter | How the matter was addressed in our audit |
|---|---|
| Law" (the DAB Law) which comprise of 50% of the total liabilities of the Bank.<br><br>In view of the significance of liability in relation to the consolidated financial statements of the Group and complexities in the underlying processes relating to issuance of new notes, expansion and contraction of bank notes in circulation and cancellation of bank notes, we have considered the existence and completeness of liability as a key audit matter.<br><br>**Note: 16** | We analyzed the changes in the liability for bank notes in circulation during the year together with the underlying reports of banking and issue department.<br><br>We considered the completeness of the liability by inspecting the year-end statement of affairs of the Issue Circles. Further, we performed cut-off procedures on expansion and contraction of bank notes to assess the completeness of the year-end balances of the liability.<br><br>We considered the requirements of the DAB Law with regard to underlying assets backing the bank notes in circulation and tested its compliance with the relevant information provided by the Bank. |
| **Balances with International Monetary Fund (IMF)**<br><br>As per the arrangement between the Bank and IMF, as Trustee of the Poverty Reduction and Growth Trust, the MoF has been granted an extended credit facility loan (ECF loan) equivalent to SDR 80.95 million for a period of ten years which is non-interest bearing.<br><br>Liabilities with IMF represents around 0.62% of the total liabilities of the Bank. The valuation of liabilities with International Monetary Fund (IMF) was considered significant to our audit as that gives rise to foreign currency translation requirements and periodic interest accruals.<br><br>**Note: 20, 20.1, 20.2 & 20.3.** | Our audit procedures to address the risks of material misstatement relating to liability with International Monetary Fund, included sending direct confirmation to IMF, checking the SDR amount from IMF website, and subsequently testing the exchange rates used to translate this amount at the closing date. In addition, our procedures included examination of relevant documents of IMF on SDR allocation during the year and re-computation to confirm the amount of liabilities with IMF using the prevailing conversion rate as per IAS 21. |
| **Valuation of Gold Reserves**<br><br>The Bank maintains gold reserves equivalent to Afs. 101,770.256 million, which is one of the asset backing for Notes in Circulation. The valuation of the gold is carried out in line with the international market which is subject to market volatility and other external economic factors. Given the unique nature of the asset, the valuation methodology adopted and associated risks, it was considered significant to our audit.<br><br>**Note: 6.7, 7 & 7.1.** | Our audit procedures included reviewing the valuation methodology adopted and received conformation letter from Federal Reserve Bank, New York (FRB) as the Bank's international reserve of gold. Our procedures also included recalculation of gold value in line with prevailing market rate and management's assessment of asset backing for Currency in Circulation. |

UHY



**Shafiq Umar Daraz & Co**
**Chartered Accountants**

| Key Audit Matter | How the matter was addressed in our audit |
|---|---|
| **Foreign Investments**<br><br>The Bank's assets held in foreign investments amount to Afs 368,813.78 million (1398: 218,264.106 million), equivalent to 47 % (1398: 31%) of the Bank's total assets as summarized below as per note 9 to the Consolidated Financial Statements: | Our key procedures included the following:<br><br>For direct investments we obtained understanding of the processes, assessed the design and implementation and tested effectiveness of key controls throughout the year over recognition, de-recognition and valuation of investments and related revenue. |

| Type of security and mode of investment | Amount in million Afs |
|---|---|
| US treasury bonds and other securities – through International Bank for Reconstruction and Development (IBRD) | 187,121 |
| US treasury bonds – direct investment | 4,149 |
| US treasury bills | 145,693 |
| USD denominated Government Bonds, foreign currency swaps and other interest bearing securities – through Bank for International Settlements Investment Pool – A | 30,417 |
| Shares in ECOTDB | 1,434 |

The valuation and presentation of the foreign investments in the consolidated financial statements pose significant audit risk.

In view of the significance of these investments in relation to the total assets, the variation in type of investments and their management (involvement of Fund Managers, Custodian and in-house team) we have considered "foreign investments" as key audit matter.

**Note: 10.**

For all investments, we sent direct confirmations to counter-parties to confirm the balances of investment holdings and where relevant, performed physical verification of other investments.

For investment in US treasury Bonds, where valuation techniques with inputs based on observable market data were used, evaluating the appropriateness of the valuation methodologies and the reasonableness of the assumptions, and verifying the inputs to independent sources.

For investments through RAMP and BIS, where valuation techniques with inputs not based on observable market data were used, evaluating the appropriateness of the valuation methodologies and the reasonableness of the assumptions and inputs. We received and reviewed the valuations report for these securities.

For ECOTDB investments we verified the payments to the investee and reconciled the confirmations with the books of accounts.

Further, in respect of the all investment made through fund managers:

- We obtained Type 2 report from Custodian to assess that controls were suitably designed by custodian and operated effectively in respect of its activities.

- We obtained the monthly statement of changes in net assets provided by the Custodian used by management for recognizing income in respect of foreign currency securities and traced with the accounting records of the Bank to assess that they are accurately recorded.

UHY



**Shafiq Umar Daraz & Co**
**Chartered Accountants**

| Key Audit Matter | How the matter was addressed in our audit |
|---|---|
| | - We performed substantive audit procedures on year-end balance of portfolio including evaluation of Fund Managers' and Custodian's statements, and re-performance of valuations on the basis of observable data at the year end.<br><br>- We also evaluated the adequacy of the overall disclosures in the financial statements in respect of the investment portfolio in accordance with the requirements of applicable financial reporting framework. |
| **Interest Income**<br><br>Interest income has significantly decreased by Afs 4,230.021 million (44.41%) although investment has increased by Afs 150,549.674 (68.98%).<br><br>As disclosed in the consolidated note to the financial statement #26.1, for managing credit risk after Covid-19 pandemic, the Bank has liquidated some of its term deposits and placed these amounts in US treasury bills having lower credit risk resulting in lower interest income.<br><br>**Note: 26 & 10.** | We recalculated interest income on investments and term deposits to ensure that it is correctly calculated.<br><br>We checked the Monthly Holding Report provided by The World Bank to verify accrued interest income as at 20th December 2020. We also verified the interest / coupon rates and value of investment in RAMP from the same report.<br><br>We checked the swift documents of treasury bonds and bills issued by the US Treasury to verify interest / coupon rates, dates and purchase price of these investments.<br><br>We verified a sample of interest income on call accounts and overnight deposits from swift messages.<br><br>Further, we performed cut-off procedures on interest income to assess the completeness of the income. |

UHY



**Shafiq Umar Daraz & Co**
**Chartered Accountants**

| Key Audit Matter | How the matter was addressed in our audit |
|---|---|
| **Interest Expense**<br><br>Interest expense has significantly increased by Afs 487.283 million (278.20%). As disclosed in the consolidated note to the financial statement #27, during the year, interest expense on capital notes has significantly increased because carrying amount of capital notes increased from Afs 24,775.173 million to Afs 45,849.384 million and average interest rates on these notes has increased by more than double.<br><br>**Note: 27.** | We recalculated interest expense on capital notes to ensure that interest expense is correctly recorded.<br><br>We also verified interest rates and principle amount of capital notes from the supporting documents to confirm accuracy of the interest expense |
| **Net loss from dealings in foreign currency**<br><br>Net gain from dealing in foreign currencies has decreased by Afs 21,164.019 million (101%).<br><br>As disclosed in the consolidated note to the financial statement #28, During the year, Afghani appreciated against foreign currencies including US dollars. As a result, the Bank incurred loss on sale of those foreign currencies which were purchased at higher rates in previous years.<br><br>**Note: 28.** | We obtained complete listings of transactions of foreign currency dealings and re-calculated exchange gain or loss on selected transactions.<br><br>We checked supporting documents for sample of sale and purchase transactions of foreign currencies that resulted in exchange gain or loss. |
| **IT systems and controls over financial reporting**<br><br>We identified IT systems and IT general controls over financial reporting as a key audit matter because of the pervasive nature and complexity of the IT environment, the extensive volume of transactions processed daily and the reliance of the Group's financial accounting and reporting process on IT systems and controls | Our audit approach relies on automated controls and therefore procedures were designed to test access and control over IT systems and changes to such systems. Given the specialized nature of this area of audit, we involved our specialist IT team to assist with our audit procedures. We:<br><br>- Obtained an understanding of the IT governance over the Group's IT organization;<br><br>- Identified the key IT Systems and application controls which were integral to the Group's financial reporting;<br><br>- Evaluated the design, implementation and operating effectiveness of IT general controls covering change |

UHY

App.184



**Shafiq Umar Daraz & Co**
**Chartered Accountants**

| Key Audit Matter | How the matter was addressed in our audit |
|---|---|
|  | management, access management and IT operations over in-scope systems and significant accounts-related IT automated controls which were critical to financial reporting; and |
|  | - We tested the accuracy and completeness of key computer generated reports used in our audit. |

**Materiality**

The scope of our audit was influenced by our application of materiality. We set certain quantitative thresholds for materiality. These together with qualitative considerations, helped us to determine the scope of our audit and the nature, timing and extent of our audit procedures on the individual financial statements line items and disclosures and in evaluating the effect of misstatements, both individually and in aggregate on the financial statements as a whole.

Based on our professional judgement, we determined materiality for the financial statements as a whole as follows:

|  | Group financial statements | The Bank financial statements |
|---|---|---|
| Overall materiality How we determined it | …………………… For Statements of Financial Position 1% of total assets, For Statements of Profit or Loss 5% of average Net Profit of last 3 years. | …………………… For Statements of Financial Position 1% of total assets, For Statements of Profit or Loss 5% of average Net Profit of last 3 years. |
| Rational for benchmark applied | DAB is the Central Bank of Afghanistan, mainly relies on its assets to operate and all of its procedures and policies revolve around maintaining assets in order to have higher returns from them. So, total assets selected as benchmark for materiality of statement of financial position and average net profit for statement of profit or loss as the net profit has significantly declined during the year. | |

**Performance materiality** is the application of materiality at the individual account or balance level. It is set at an amount to reduce to an appropriate low level the probability that the aggregate of uncorrected and undetected misstatements exceeds materiality.

On the basis of our risk assessments together with our assessment of the Group's overall control environment, our judgement was that performance materiality was 75% of our planning materiality namely for group financial statements and for the separate financial statements of the Bank are;
- For statement of financial position Afs 5,854 million; and
- For statement of profit or loss Afs 786 million.

**Other Information**

In connection with our audit of the consolidated financial statements, we have been informed by the management that there is no other information that is attached by them along-with the consolidated financial statements and our auditor's report thereon. UHY



**Shafiq Umar Daraz & Co**
**Chartered Accountants**

**Responsibilities of Management and Those Charged with Governance for Consolidated Financial Statements**

Management is responsible for the preparation and fair presentation of consolidated financial statements in accordance with the accounting framework as stated in note 2 to the consolidated financial statements and for such internal control as management determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is responsible for assessing Group's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless management either intends to liquidate the Group or to cease operations, or has no realistic alternative but to do so.

Those charged with governance are responsible for overseeing the Group's financial reporting process.

**Auditor's Responsibilities for the Audit of the Consolidated Financial Statements**

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional skepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Group's internal control.

- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by the management.

- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Group's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditors' report to the related disclosures in the consolidated financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditors' report.

- Evaluate the overall presentation, structure and content of the consolidated financial statements, including the disclosures, and whether the consolidated financial statements represent the underlying transactions and events in a manner that achieves fair presentation. UHY



**Shafiq Umar Daraz & Co**
**Chartered Accountants**

- Obtain sufficient appropriate audit evidence regarding the financial information of the entity to express an opinion on the consolidated financial statements. We are responsible for the direction, supervision and performance of the audit. We remain solely responsible for our audit opinion.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence and to communicate with them all relationships and other matters that may reasonable be thought to bear on our independence and where applicable, related safeguards.

From the matters communicated with those charged with governance, we determine those matters that were of most significance in the audit of the consolidated financial statements of the current period and are therefore the key audit matters. We describe these matters in our auditors' report unless law or regulations precludes public disclosure about the matter or when, in extremely rare circumstances, we determine that a matter should not be communicated in our report because the adverse consequence of doing so would reasonable be expected to outweigh the public interest benefits of such communication.

The engagement partner on the audit resulting in this independent auditor's report is Umar Daraz.

*UHY Shafiq Umar Daraz & Co*

UHY Shafiq Umar Daraz & Co.
Chartered Accountants
Date: 18 March 2021
Kabul, Afghanistan

App.187

**DA AFGHANISTAN BANK**

**CONSOLIDATED STATEMENT OF FINANCIAL POSITION**

**AS AT 30 QAWS 1399 (20 DECEMBER 2020)**

| | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
| | | ------------ (Afs in '000') ------------ | |
| **ASSETS** | | | |
| Gold reserves | 7 | 101,770,256 | 81,400,561 |
| Foreign currency cash reserves | 8 | 34,167,341 | 19,583,336 |
| Due from banks and financial institutions | 9 | 254,677,074 | 355,570,353 |
| Investments | 10 | 368,813,780 | 218,264,106 |
| Assistance as lender of last resort | 11 | 170,154 | 166,793 |
| Advances and other receivables | 12 | 2,098,092 | 1,710,370 |
| Operating fixed assets | 13 | 5,299,483 | 5,376,792 |
| Intangible assets | 14 | 4,949 | 23,268 |
| Other assets | 15 | 13,535,171 | 13,491,650 |
| **Total assets** | | 780,536,301 | 695,587,229 |
| **LIABILITIES AND EQUITY** | | | |
| **LIABILITIES** | | | |
| Currency in circulation | 16 | 293,341,380 | 259,348,259 |
| Capital notes | 17 | 45,849,384 | 24,775,173 |
| Due to banks and financial institutions | 18 | 100,079,198 | 97,224,024 |
| Due to customers | 19 | 144,323,269 | 130,121,482 |
| IMF related liabilities | 20 | 3,692,126 | 3,003,600 |
| Defined contribution obligation | 21 | 1,909,843 | 1,769,903 |
| Deferred grants | 22 | 83,098 | 142,182 |
| Provisions and other liabilities | 23 | 1,600,887 | 14,479,909 |
| **Total liabilities** | | 590,879,185 | 530,864,532 |
| **EQUITY** | | | |
| Capital | 24 | 28,910,526 | 25,398,034 |
| Revaluation reserve | 24 | 103,427,178 | 82,273,898 |
| Other components of equity | 24 | 29,900,217 | 31,652,731 |
| General reserve | 24 | 27,419,195 | 25,398,034 |
| Accumulated profits | 24 | - | - |
| **Total equity** | | 189,657,116 | 164,722,697 |
| **Total liabilities and equity** | | 780,536,301 | 695,587,229 |
| **CONTINGENCIES AND COMMITMENTS** | 25 | | |

UHY

*The annexed notes 1 to 39 form an integral part of these financial statements.*

**Abdul Rahman Barhaq**
Acting Chief Financial Officer

**Ajmal Ahmady**
Acting Governor

1

App.188

**DA AFGHANISTAN BANK**

**CONSOLIDATED STATEMENT OF PROFIT OR LOSS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

| | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |
| Interest income | 26 | 5,295,334 | 9,525,355 |
| Interest expense | 27 | (662,438) | (175,155) |
| **Net interest income** | | 4,632,896 | 9,350,200 |
| | | | |
| Fee and commission income | | 196,075 | 235,884 |
| Fee and commission expense | | (167,243) | (141,207) |
| **Net fee and commission income** | | 28,832 | 94,677 |
| | | | |
| Net (loss) / gain from dealings in foreign currencies | 28 | (124,167) | 21,039,852 |
| Net gain / (loss) on financial assets measured at FVOCI | | 3,012,121 | 2,239,367 |
| Other income | 29 | 547,838 | 807,632 |
| | | 3,435,792 | 24,086,851 |
| **Operating income** | | 8,097,520 | 33,531,728 |
| | | | |
| **Operating expenses** | | | |
| Personnel expenses | 30 | (1,738,150) | (1,711,974) |
| Printing cost of bank notes | 12.3 | (262,294) | (280,924) |
| Other operating expenses | 31 | (475,771) | (515,426) |
| Depreciation and amortisation | 13.2 & 14 | (87,652) | (104,330) |
| **Net operating income** | | 5,533,653 | 30,919,074 |
| | | | |
| **Non-operating income and expenses:** | | | |
| Deferred grants recognised as income | 22 | 59,084 | 119,244 |
| Expenditure against grants | 32 | (59,084) | (119,244) |
| | | - | - |
| | | | |
| Net unrealised foreign exchange loss | 24.3 | (1,752,514) | (1,688,362) |
| **Profit for the year** | | 3,781,139 | 29,230,712 |

*UHY*

*The annexed notes 1 to 39 form an integral part of these financial statements.*

**Abdul Rahman Barhaq**
Acting Chief Financial Officer

**Ajmal Ahmady**
Acting Governor

2

**App.189**

**DA AFGHANISTAN BANK**

**CONSOLIDATED STATEMENT OF CASH FLOWS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

| | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |
| **Cash flows from operating activities** | | | |
| Profit for the year | | 3,781,139 | 29,230,712 |
| **Adjustments:** | | | |
| Depreciation and amortisation | 13.2 | 87,652 | 104,330 |
| Interest income | 26 | (5,295,334) | (9,525,355) |
| Interest expense | 27 | 662,438 | 175,155 |
| Deferred grants recognised as income | 22 | (59,084) | (119,244) |
| Expenditure against grants | 32 | 59,084 | 119,244 |
| Recovery of expected credit loss | 29 | (249,424) | (407,700) |
| Inter-branch balances (written back) / written off | | (190,931) | 26,117 |
| | | (1,204,460) | 19,603,259 |
| **Working capital adjustments:** | | | |
| Decrease / (increase) in due from banks and financial institutions | 9 | 25,223,897 | 140,790,268 |
| Decrease / (increase) in assistance as lender of last resort | 11 | (3,361) | 6,795,092 |
| Decrease / (increase) in advances and other receivables | 12 | (387,104) | 316,523 |
| Decrease / (increase) in other assets | 15 | 5,563 | 7,743 |
| Increase / (decrease) in currency in circulation | 16 | 33,993,121 | 31,292,681 |
| Increase / (decrease) in due to banks and financial institutions | 18 | 2,855,174 | 6,572,785 |
| Increase / (decrease) in due to customers | 19 | 14,201,787 | (6,394,797) |
| Increase / (decrease) in IMF related liabilities | 20 | 688,526 | 584,816 |
| Increase / (decrease) in defined contribution obligation | 21 | 139,940 | 123,870 |
| Increase / (decrease) in provisions and other liabilities | 23 | 71,062 | 634,225 |
| | | 76,788,605 | 180,723,206 |
| | | 75,584,145 | 200,326,465 |
| Interest received | | 5,256,214 | 9,485,532 |
| Interest paid | | (662,438) | (175,155) |
| Grant received | 22 | - | 12,365 |
| **Net cash flows from operating activities** | | 80,177,921 | 209,649,207 |
| **Cash flows from investing activities** | | | |
| Investments made during the year | | (149,766,379) | (9,060,143) |
| Net long-term assets of the subsidiary | | - | (4,362) |
| Purchase of property and equipment | 13.2 | (57,973) | (71,404) |
| Purchase of intangible assets | 14 | (490) | (2,157) |
| **Net cash flows used in investing activities** | | (149,824,842) | (9,138,066) |
| **Cash flows from financing activities** | | | |
| Receipts from / (Repayments against) capital notes | | 21,074,211 | (8,923,477) |
| Payments of profit to MoF | | (12,759,153) | (23,989,159) |
| **Net cash flows from / (used in) financing activities** | | 8,315,058 | (32,912,636) |
| Net (decrease) / increase in cash and cash equivalents | | (61,331,862) | 167,598,505 |
| Cash and cash equivalents at beginning of the year | | 295,985,397 | 128,386,892 |
| **Cash and cash equivalents at end of the year** | 33 | 234,653,535 | 295,985,397 |

*The annexed notes 1 to 39 form an integral part of these financial statements.*

UHY

**Abdul Rahman Barhaq**
Acting Chief Financial Officer

**Ajmal Ahmady**
Acting Governor

3

**DA AFGHANISTAN BANK**

**CONSOLIDATED STATEMENT OF OTHER COMPREHENSIVE INCOME**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

| | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |
| Profit for the year | | **3,781,139** | 29,230,712 |
| **Other comprehensive income** | | | |
| **Items that will be reclassified subsequently to the consolidated profit and loss account:** | | | |
| Revaluation gain on gold reserve | 7 | **20,369,695** | 15,221,968 |
| Net gains from changes in fair value of debt instruments at FVOCI | | **783,295** | 2,057,359 |
| Changes in allowances for expected credit loss of debt instruments at FVOCI | | **290** | (1,317) |
| **Other comprehensive income for the year** | | **21,153,280** | 17,278,010 |
| **Total comprehensive income for the year** | | **24,934,419** | 46,508,722 |

UHY

*The annexed notes 1 to 39 form an integral part of these financial statements.*

**Abdul Rahman Barhaq**
Acting Chief Financial Officer

**Ajmal Ahmady**
Acting Governor

4

Case 1:23-md-03590-GBD-SN Document 7785-45 Filed 07/20/23 Page 55 of 65

**DA AFGHANISTAN BANK**
**CONSOLIDATED STATEMENT OF CHANGES IN EQUITY**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

| | Capital | Revaluation reserve | | | | Other components of equity | | | General reserve | Accumulated profits | Grand total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Net unrealised gain / (loss) on financial assets measured at fair value | Freehold land | Gold | Total revaluation reserve | Exchange translation reserve | Residual undistributed net unrealised valuation gains | Total other components of equity | | | |
| | | | | | (Afs in '000) | | | | | | |
| Balance at 30 Qaws 1397 (21 December 2018) | 24,221,649 | 1,104,157 | 936,477 | 62,946,884 | 64,987,518 | 137 | 33,341,093 | 33,341,230 | 24,221,649 | - | 146,772,046 |
| Impact of adopting IFRS 9 | | 8,233 | | | 8,233 | | | | | (809,218) | (800,985) |
| Balance at 01 Jadi 1397 (22 December 2018) | 24,221,649 | 1,112,390 | 936,477 | 62,946,884 | 64,995,751 | 137 | 33,341,093 | 33,341,230 | 24,221,649 | (809,218) | 145,971,061 |
| Total comprehensive income for the year: | | | | | | | | | | | |
| Profit for the year | | | | | | | | | | 29,230,712 | 29,230,712 |
| Other comprehensive income: | | | | | | | | | | | |
| Net gains from changes in fair value of debt instruments at FVOCI | | 2,057,359 | - | - | 2,057,359 | - | - | - | - | - | 2,057,359 |
| Change in allowances for expected credit loss of debt instruments at FVOCI | | (1,317) | - | - | (1,317) | - | - | - | - | - | (1,317) |
| Revaluation gain on gold reserve | | - | - | 15,221,968 | 15,221,968 | - | - | - | - | - | 15,221,968 |
| Total other comprehensive income | | 2,056,042 | - | 15,221,968 | 17,278,010 | - | - | - | - | - | 17,278,010 |
| Total comprehensive income for the year | | 2,056,042 | - | 15,221,968 | 17,278,010 | - | - | - | - | 29,230,712 | 46,508,722 |
| Transactions recorded directly in equity: | | | | | | | | | | | |
| Transferred to capital | 1,176,385 | - | - | - | - | - | - | - | - | (1,176,385) | - |
| Transferred to general reserve | | - | - | - | - | - | - | - | 1,176,385 | (1,176,385) | - |
| Transferred to net unrealised gain on financial assets measured at FVOCI | | 137 | - | - | 137 | (137) | - | (137) | - | - | - |
| Transferred to Ministry of Finance | | - | - | - | - | - | - | - | - | (27,757,086) | (27,757,086) |
| Transferred to residual undistributed net unrealised valuation gains | | - | - | - | - | - | (1,688,362) | (1,688,362) | - | 1,688,362 | - |
| Balance at 30 Qaws 1398 (21 December 2019) | 25,398,034 | 3,168,569 | 936,477 | 78,168,852 | 82,273,898 | - | 31,652,731 | 31,652,731 | 25,398,034 | 1,688,362 | 164,722,697 |

# DA AFGHANISTAN BANK
## CONSOLIDATED STATEMENT OF CHANGES IN EQUITY
### FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)

(Afs in '000')

| | Capital | Net unrealised gain on financial assets measured at fair value through OCI | Freehold land | Gold | Total revaluation reserve | Exchange translation reserve | Residual undistributed net unrealised valuation gains | Total other components of equity | General reserve | Accumulated profits | Grand total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Revaluation reserve | | | | Other components of equity | | | | | |
| Balance at 01 Jadi 1398 (22 December 2019) | 25,398,034 | 3,168,569 | 936,477 | 78,168,852 | 82,273,898 | - | 31,652,731 | 31,652,731 | 25,398,034 | - | 164,722,697 |
| **Total comprehensive income for the year:** | | | | | | | | | | | |
| Profit for the year | - | - | - | - | - | - | - | - | - | 3,781,139 | 3,781,139 |
| Other comprehensive income: | | | | | | | | | | | |
| Net gains from changes in fair value of debt instruments at FVOCI | - | 783,295 | - | - | 783,295 | - | - | - | - | - | 783,295 |
| Change in allowances for expected credit loss of debt instruments at FVOCI | - | 290 | - | - | 290 | - | - | - | - | - | 290 |
| Revaluation gain on gold reserve | - | - | - | 20,369,695 | 20,369,695 | - | - | - | - | - | 20,369,695 |
| Total other comprehensive income | - | 783,585 | - | 20,369,695 | 21,153,280 | - | - | - | - | - | 21,153,280 |
| Total comprehensive income for the year | - | 783,585 | - | 20,369,695 | 21,153,280 | - | - | - | - | 3,781,139 | 24,934,419 |
| **Transactions recorded directly in equity:** | | | | | | | | | | | |
| Transferred to capital | 3,512,492 | - | - | - | - | - | - | - | - | (3,512,492) | - |
| Transferred to general reserve | - | - | - | - | - | - | - | - | 2,021,161 | (2,021,161) | - |
| Transferred to residual net unrealised valuation gains | - | - | - | - | - | - | (1,752,514) | (1,752,514) | - | 1,752,514 | - |
| Balance at 30 Qaws 1399 (20 December 2020) | 28,910,526 | 3,952,154 | 936,477 | 98,538,547 | 103,427,178 | - | 29,900,217 | 29,900,217 | 27,419,195 | 1,752,514 | 189,657,116 |

*The annexed notes 1 to 39 form an integral part of these financial statements.*

Abdul Rahman Barhaq
Acting Chief Financial Officer

Ajmal Ahmady
Acting Governor

App.193

6

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

1. **STATUS AND NATURE OF OPERATIONS**

1.1 The Group comprises of Da Afghanistan Bank ("the Bank") as the "Parent entity" and Afghanistan Payments Systems (APS) as "the Subsidiary".

1.2 Da Afghanistan Bank is the Central Bank of Afghanistan and was originally established in 1318 (1939) in accordance with Article 12 of the 1311 (1932) Constitution of Afghanistan. The Bank was operating under the supervision of the Ministry of Finance (MoF), Government of Islamic Republic of Afghanistan. Subsequently, during the transitional government on 27 Sunbula 1382 (18 September 2003), Da Afghanistan Bank Law ("the DAB Law") of the Islamic Republic of Afghanistan was enacted and the Bank was re-established as an independent legal entity. This law and the change in the Bank's status were ratified by an amendment to Article 12 of the Constitution of the Islamic Republic of Afghanistan in Jadi 1382 (January 2004).

1.3 As per the DAB Law, the Bank's main objective is to achieve and maintain domestic price stability with other objectives to foster the liquidity, solvency and effective functioning of a stable market based financial system. The Bank also controls monetary and exchange policy, manages reserves and acts as a bank, advisor and fiscal agent to the Government of Islamic Republic of Afghanistan and other state governed bodies.

1.4 Registered office (Head Office) of the Bank is situated in Kabul. As at 30 Qaws 1399 (20 December 2020), the Bank operates with 48 (1398: 48) branches.

1.5 Details and activities of the Subsidiary of the Bank are as follows:

The Subsidiary was incorporated as a limited liability company and got registered with Afghanistan Investment Support Agency, now "Ministry of Commerce and Industry (MOCI)" on January 31, 2011 under license number D-37351. The Company has its registered office located at House No.29, Street 8, Lane 1 District 10, Kabul Afghanistan.

The Bank purchased 100% shares of APS w.e.f. 01 January 2019 (11 Jadi 1397).

The Subsidiary operates under the umbrella of Da Afghanistan Bank (DAB) as the national e-payment switch of Afghanistan. The Subsidiary shall provide support to establish an electronic fund transfer platform for shared Automated Teller Machines (ATMs), creation of shared mobile banking infrastructure and the initiation of point of sale devices. The Subsidiary has launched domestic card scheme (AfPay) with the support of the Bank to enhance and promote financial inclusion.

2. **STATEMENT OF COMPLIANCE**

The consolidated financial statements have been prepared in accordance with International Financial Reporting Standards (IFRSs) as issued by the International Accounting Standards Board (IASB), the requirements of the DAB Law and accounting policies for gold and silver, bank notes and coins as stated in notes 6.7 and 6.13 respectively. Where the requirements of the DAB Law and accounting policies adopted by the Group differ with requirements of IFRSs, the requirements of DAB Law and accounting policies adopted by the Group take precedence.

These consolidated financial statements comprise consolidated statement of financial position, consolidated statement of profit or loss, consolidated statement of other comprehensive income, consolidated statement of cash flows, consolidated statement of changes in equity and the accompanying notes. UHY

7

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

Year end of the Subsidiary is 31 December 2020 (10 Jadi 1399). During 21 December 2020 to 31 December 2020, no significant change in the financial statements of the Subsidiary occurred.

The compliance status of IFRSs is as follows:

| | Compliance Status |
|---|---|
| IAS 1: Presentation of Financial Statements | Complied |
| IAS 2: Inventories | Complied |
| IAS 7: Statement of Cash Flows Complied | Complied |
| IAS 8: Accounting Policies, Changes in Accounting Estimates and Errors | Complied |
| IAS 10: Events after the Reporting Period | Complied |
| IAS 12: Income Taxes | Complied |
| IAS 16: Property, Plant and Equipment | Complied |
| IAS 19: Employee Benefits | Not Applicable |
| IAS 20: Accounting for Government Grants and Disclosure of Government Assistance | Complied |
| IAS 21: The Effects of Changes in Foreign Exchange Rates | Complied |
| IAS 23: Borrowing Costs | Complied |
| IAS 24: Related Party Disclosures | Complied |
| IAS 26: Accounting and Reporting by Retirement Benefit Plans | Not Applicable |
| IAS 27: Separate Financial Statements | Complied |
| IAS 28: Investment in Associates and Joint Ventures | Not Applicable |
| IAS 32: Financial Instruments: Presentation | Complied |
| IAS 33: Earnings Per Share | Not Applicable |
| IAS 34: Interim Financial Reporting | Not Applicable |
| IAS 36: Impairment of Assets | Complied |
| IAS 37: Provisions, Contingent Liabilities and Contingent Assets | Complied |
| IAS 38: Intangible Assets | Complied |
| IAS 40: Investment Property | Not Applicable |
| IAS 41: Agriculture | Not Applicable |
| IFRS 1: First time Adoption of International Financial Reporting Standards | Not Applicable |
| IFRS 2: Share based Payment | Not Applicable |
| IFRS 3: Business Combinations | Complied |
| IFRS 4: Insurance Contracts | Not Applicable |
| IFRS 5: Non-current Assets Held for Sale and Discontinued Operations | Not Applicable |
| IFRS 6: Exploration for and Evaluation of Mineral Resources | Not Applicable |
| IFRS 7: Financial Instruments: Disclosures | Complied |
| IFRS 8: Operating Segments | Not Applicable |
| IFRS 9: Financial Instruments | Complied |
| IFRS 10: Consolidated Financial Statements | Complied |
| IFRS 11: Joint Arrangements | Not Applicable |
| IFRS 12: Disclosure of Interests in Other Entities | Complied |
| IFRS 13: Fair Value Measurement | Complied |
| IFRS 14: Regulatory Deferral Accounts | Not Applicable |
| IFRS 15: Revenue from Contract with Customers | Complied |
| IFRS 16: Leases | Not Applicable |

IFRS 16 has not been applied as lease amount is not significant.

3. **FUNCTIONAL AND PRESENTATION CURRENCY**

These consolidated financial statements are presented in Afghani ('Afs'), which is the Group's functional and presentation currency.

477

8

**App.195**

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

4. **BASIS OF PREPARATION AND MEASUREMENT**

These consolidated financial statements have been prepared on the historical cost convention, except for gold reserves, foreign currency cash reserves, some investments and few items of operating fixed assets as referred to in their respective notes which have been reported at revalued amounts.

5. **New and amended standards and interpretations that are not yet effective**

A number of new standards and amendments to standards are effective for annual periods beginning after 21 December 2020 and earlier application is permitted; however, the Group has not early adopted the new and amended standards in preparing these consolidated financial statements.

The following new and amended standards are not expected to have a significant impact on the Group's consolidated financial statements:

— Onerous Contracts – Cost of Fulfilling a Contract (Amendments to IAS 37).
— COVID-19-Related Rent Concessions (Amendment to IFRS 16).
— Property, Plant and Equipment: Proceeds before Intended Use (Amendments to IAS 16).
— Reference to Conceptual Framework (Amendments to IFRS 3).
— Classification of Liabilities as Current or Non-current (Amendments to IAS 1).
— IFRS 17 Insurance Contracts and amendments to IFRS 17 Insurance Contracts.

6. **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The accounting policies adopted in preparation of these consolidated financial statements are consistent with those followed in the preparation of the annual financial statements of the Group for the year ended 30 Qaws 1399 (20 December 2020).

6.1 **Foreign currency**

Transactions in foreign currencies are translated into the functional currency of the Group at the spot exchange rate at the date of the transaction.

Monetary assets and liabilities denominated in foreign currencies at the reporting date are translated into the functional currency at the spot exchange rate at reporting date. Non-monetary assets and liabilities denominated in foreign currencies that are measured at fair value are retranslated into the functional currency at the spot exchange rate at the date that the fair value was determined. Non-monetary assets and liabilities that are measured in terms of historical cost in a foreign currency are translated using the exchange rate at the date of the transaction.

For the purpose of retranslation as at 20 December 2020, the Afghani exchange rates used for the major currencies were:

|  | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|
|  | ----------- Afs ----------- | |
| USD | 77.11 | 78.41 |
| EUR | 93.73 | 86.90 |
| GBP | 102.89 | 101.80 |
| PKR | 0.48 | 0.50 |
| SAR | 20.38 | 20.84 |
| AED | 20.92 | 21.36 |
| CAD | 43.35 | 43.35 |
| SDR | 111.34 | 108.02 |

UHY

9

App.196

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

Exchange differences arising on the settlement of monetary items or on translating monetary items at rates different from those at which they were translated on initial recognition during the period or in previous financial statements are recognised in statement of profit or loss in the period in which they arise.

When a gain or loss on a non-monetary item is recognised in consolidated statement of other comprehensive income, any exchange component of that gain or loss is also recognised in consolidated statement of other comprehensive income. Conversely, when a gain or loss on a non-monetary item is recognised in consolidated statement of profit or loss, any exchange component of that gain or loss is also recognised in consolidated statement of profit or loss.

**6.2  Interest income and expense**

Interest income and expense are recognised in consolidated statement of profit or loss using the effective interest method. The 'effective interest rate' is the rate that exactly discounts the estimated future cash payments and receipts through the expected life of the financial asset or liability (or, where appropriate a shorter period) to the carrying amount of the financial asset or liability. When calculating the effective interest rate, the Group estimates future cash flows considering all contractual terms of the financial instrument, but not future credit losses.

The calculation of the effective interest rate includes all fees paid or received that are an integral part of the effective interest rate. Transaction costs are incremental costs that are directly attributable to the acquisition, issue or disposal of a financial asset or liability.

**6.3  Fees and commission income and expense**

Fee and commission income and expenses that are integral to the financial asset or liability are included in the measurement of the effective interest rate.

Other fee and commission income, including account servicing fee, transfer commission, branch coordination commission are recognised as the related services are performed.

Other fee and commission expense relates mainly to transaction service fee and asset management services, which are expensed as the services are received.

**6.4  Taxation**

Under Article 118.2 of the DAB Law, the Bank is exempt from taxes on income or profits, personal property taxes on assets, taxes on transfer of funds and other financial transactions, stamp duties on issuance of securities and bank notes, customs duties, import duties, sales taxes, value added taxes on import of gold, bank notes and coins; and sales tax on domestic supply of gold, bank notes, and coins etc. Accordingly, no provision for income tax has been made in these consolidated financial statements.

**6.5  Financial assets and financial liabilities**

Financial instruments carried on the consolidated statement of financial statement include foreign currency cash reserves, due from banks and financial institutions, Investments, assistance as lender of last resort, advances and other receivables, other assets, currency in circulation, capital notes, due to banks and financial institutions, due to customers, IMF related liabilities, defined contribution obligation and accounts and provisions and other liabilities. The particular recognition and measurement methods adopted are disclosed in the individual policy statements associated with each consolidated financial instrument.

UHY

10

App.197

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

### 6.5.1 Financial instruments – initial recognition

All financial assets are initially recognised on the trade date, i.e. the date at which the Group becomes a party to the contractual provisions of the instruments. This includes purchases or sale of financial assets that require delivery of asset within the time frame generally established by regulations in market conventions.

All financial assets and financial liabilities are measured initially at their fair value plus transaction costs, except in the case of financial assets and financial liabilities recorded at fair value through profit or loss where transaction cost is taken directly to the profit and loss account. Any difference between the fair value of consideration given and the amount determined using the valuation techniques detailed in note 6.5.14 is recognised in the consolidated statement of profit or loss.

### 6.5.2 Classification and subsequent measurement of financial assets and liabilities

The Group classifies all of its financial assets based on two criteria:

i) The Group's business model for managing the assets; and
ii) whether the instruments' contractual cash flows represent 'solely payments of principal and interest' (the 'SPPI test') on the principal amount outstanding, measured at either:

- Amortised cost, as explained in Note 6.5.3
- FVOCI, as explained in Notes 6.5.4 and 6.5.5
- FVPL as explained in Note 6.5.6

#### i) Business model assessment

The Group determines its business model at the level that best reflects how it manages groups of financial assets to achieve its business objective.

The Group's business model is not assessed on an instrument-by-instrument basis, but at a higher level of aggregated portfolios and is based on observable factors such as:

- the stated policies and objectives for the portfolio and the operation of those policies in
- how the performance of the portfolio is evaluated and reported to management;
- the risks that affect the performance of the business model (and the financial assets held within that business model) and how those risks are managed;
- the frequency, volume and timing of sales in prior periods, the reasons for such sales and its expectations about future sales activity. However, managing the financial assets is achieved and how cash flows are realised; and
- financial assets that are held for trading or managed and whose performance is evaluated on a fair value basis are measured at FVPL because they are neither held to collect contractual cash flows nor held both to collect contractual cash flows and to sell financial assets.

The business model assessment is based on reasonably expected scenarios without taking 'worst case' or 'stress case' scenarios into account. If cash flows after initial recognition are realised in a way that is different from the Group's original expectations, The Group does not change the classification of the remaining financial assets held in that business model, but incorporates such information when assessing newly originated or newly purchased financial assets going forward.

UHY

11

App.198

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

*ii) The SPPI test*

As a second step of its classification process the Group assesses the contractual terms of financial to identify whether they meet the SPPI test.

'Principal' for the purpose of this test is defined as the fair value of the financial asset at initial recognition and may change over the life of the financial asset. The most significant elements of 'interest' within a lending arrangement are typically the consideration for the time value of money and credit risk. To make the SPPI assessment, the Group applies judgement and considers relevant factors such as the currency in which the financial asset is denominated, and the period for which the interest rate is set. In making the assessment, the Group considers:

- contingent events that would change the amount and timing of cash flows;
- leverage features;
- prepayment and extension terms;
- terms that limit the Group's claim to cash flows from specified assets (e.g. non-recourse asset arrangements); and
- features that modify consideration of the time value of money – e.g. periodical reset of interest rates.

The Group classifies and measures its derivative and trading portfolio at FVPL as explained in Notes 6.5.6 and 6.5.8. The Group may designate financial instruments at FVPL, if so doing eliminates or significantly reduces measurement or recognition inconsistencies, as explained in Note 6.5.6.

Financial liabilities, other than loan commitments and financial guarantees, are measured at amortised cost or at FVPL when they are held for trading and derivative instruments or the fair value designation is applied, as explained in Notes 6.5.6 and 6.5.8.

**6.5.3 Financial assets at amortised cost**

The Group classifies its financial assets at amortized cost only if both of the following conditions are met:

i) The asset is held within a business model whose objective is to hold assets to collect contractual cash flows; and

ii) The contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

After initial measurement, these financial instruments are subsequently measured at amortized cost using the Effective interest Rate (EIR), less impairment (if any).

**6.5.4 Debt instruments at FVOCI**

The Group classifies its financial assets as debt instruments measured at FVOCI when both of:

i) The asset is held within a business model whose objective is achieved by both collecting contractual cash flows and selling financial assets; and
ii) The contractual terms of the financial asset give rise on specified dates to cash flows that are solely payments of principal and interest on the principal amount outstanding.

These instruments largely comprise assets that had previously been classified as financial investments available-for-sale under IAS 39.

UHY

12

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

FVOCI debt instruments are subsequently measured at fair value with gains and losses arising due to changes in fair value recognised in OCI. Interest income and foreign exchange gains and losses are recognised in consolidated profit or loss statement in the same manner as for financial assets measured at amortised cost as explained in Note 6.5.3.

The ECLs for debt instruments measured at FVOCI do not reduce the carrying amount of these financial assets in the consolidated statement of financial position, which remains at fair value. Instead, an amount equal to the allowance that would arise if the assets were measured at amortised cost is recognised in OCI as an accumulated impairment amount, with a corresponding charge to the consolidated statement of profit or loss. The accumulated loss recognised in OCI is recycled to the profit and loss upon derecognition of the assets.

### 6.5.5 Equity instruments at FVOCI

Upon initial recognition, the Group elects to classify irrevocably some of its equity investments as equity instruments at FVOCI when they meet the definition of 'Equity' under IAS 32 Financial Instruments: Presentation and are not held for trading. Such classification is determined on an instrument-by-instrument basis.

Gains and losses on these equity instruments are never recycled to profit. Dividends are recognised in profit or loss as other operating income when the right of the payment has been established, except when the Group benefits from such proceeds as a recovery of part of the cost of the instrument, in which case, such gains are recorded in OCI. Equity instruments at FVOCI are not subject to an impairment assessment.

### 6.5.6 Financial assets and financial liabilities at fair value through profit or loss

Financial assets and financial liabilities in this category are those that are not held for trading and have been either designated by management upon initial recognition or are mandatorily required to be measured at fair value under IFRS 9. Management only designates an instrument at FVPL upon initial recognition when one of the following criteria are met. Such designation is determined on an instrument-by-instrument basis:

i) The designation eliminates, or significantly reduces, the inconsistent treatment that would otherwise arise from measuring the assets or liabilities or recognising gains or losses on them on a different basis, or

ii) The liabilities are part of a group of financial liabilities (or financial assets, or both under IAS 39), which are managed and their performance evaluated on a fair value basis, in accordance with a documented risk management or investment strategy, or

iii) The liabilities containing one or more embedded derivatives, unless they do not significantly modify the cash flows that would otherwise be required by the contract, or it is clear with little or no analysis when a similar instrument is first considered that separation of the embedded derivative(s) is prohibited.

Financial assets and financial liabilities at FVPL are recorded in the consolidated statement of financial position at fair value. Changes in fair value are recorded in profit and loss. Interest earned or incurred on instruments designated at FVPL is accrued in interest income or interest expense, respectively, using the EIR, taking into account any discount/ premium and qualifying transaction costs being an integral part of instrument. Interest earnt on assets mandatorily required to be measured at FVPL is recorded using contractual interest rate.

UHY

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

### 6.5.7 Financial liabilities at amortised cost

Financial liabilities with a fixed maturity are measured at amortised cost using the effective interest rate. These include currency in circulation, capital notes, due to banks and financial institutions, due to customers, IMF related liabilities, defined contribution obligation and provisions and other liabilities.

The ECLs for debt instruments measured at FVOCI do not reduce the carrying amount of these financial assets in the consolidated statement of financial position, which remains at fair value. Instead, an amount equal to the allowance that would arise if the assets were measured at amortised cost is recognised in OCI as an accumulated impairment amount, with a corresponding charge to the consolidated statement of profit or loss. The accumulated loss recognised in OCI is recycled to the profit or loss upon derecognition of the assets.

### 6.5.8 Derivative financial instruments

The Group uses derivative financial instruments which include forwards, futures and swaps. Derivatives are initially recorded at fair value and carried as assets when their fair value is positive and as liabilities when their fair value is negative. Derivatives are re-measured to fair value on subsequent reporting dates. The resultant gains or losses from derivatives are included in the consolidated statement of profit or loss.

### 6.5.9 Derecognition of financial assets and financial liabilities

i) *Financial assets*

The Group derecognizes a financial asset when the contractual rights to the cash flows from the asset expire, or when it transfers the rights to receive contractual cash flows in a transaction in which substantially all of the risks and rewards of ownership of the financial asset are transferred or in which the Group neither transfers nor retains substantially all of the risk and rewards of ownership and it does not retain control of the financial asset.

On derecognition of a financial asset, the difference between the carrying amount of the asset (or the carrying amount allocated to the portion of the asset derecognised) and consideration received (including any new asset obtained less any new liability assumed). Also all cumulative gain or loss that had been recognised in the other comprehensive income, is recognised in the consolidated statement of profit or loss. Any interest in the transferred financial assets that qualify for derecognition that is created or retained by the Group is recognised as a separate asset or liability.

ii) *Financial liabilities*

A financial liability is derecognised when the obligation under the liability is discharged or cancelled or expired. Where an existing financial liability is replaced by another from the same lender on substantially different terms, or the terms of an existing liability are substantially modified, such an exchange or modification is treated as a derecognition of the original liability and the recognition of new liability, and the difference in the respective carrying amount is recognised in the consolidated statement of profit or loss.

### 6.5.10 Impairment of financial assets

*Overview of the ECL principles*

The ECL allowance is based on the credit losses expected to arise over the life of the asset (the lifetime expected credit loss (LTECL), unless there has been no significant increase in credit risk since origin, in which case, the allowance is based on the 12 months' expected credit loss (12mECL). The Group's policies for determining if there has been a significant increase in credit risk are set out in Note 36.1.

UHY

14

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

The 12mECL is the portion of LTECLs that represent the ECLs that result from default events on a financial instrument that are possible within the 12 months after the reporting date.

The Group has established a policy to perform an assessment, at the end of each reporting period, of whether a financial instrument's credit risk has increased significantly since initial recognition, by considering the change in the risk of default occurring over the remaining life of the financial instrument.

Based on the above process, the financial assets are grouped into Stage 1, Stage 2 and Stage 3 as described below:

i)  Stage 1: When financial assets are first recognised, the Group recognises an allowance based on 12mECLs. Stage 1 assets also include facilities where the credit risk has improved and the loan has been reclassified from Stage 2.

ii) Stage 2: When a financial asset has shown a significant increase in credit risk since origination, the Group records an allowance for the LTECLs. Stage 2 assets also include facilities, where the credit risk has improved and the asset has been reclassified from Stage 3.

iii) Stage 3: Financial assets considered credit-impaired (as outlined in Note 36.1.1). The Group records an allowance for the LTECLs.

For financial assets for which the Group has no reasonable expectations of recovering either the entire outstanding amount, or a proportion thereof, the gross carrying amount of the financial asset is reduced. This is considered a (partial) derecognition of the financial assets.

*The calculation of ECLs*
The Group calculates ECLs based on a three probability-weighted scenarios to measure the expected cash shortfalls, discounted at an approximation to the EIR. A cash shortfall is the difference between the cash flows that are due to an entity in accordance with the contract and the cash flows that the entity expects to receive.

The mechanics of the ECL calculations are outlined below and the key elements are, as follows:

The Probability of Default (PD) is an estimate of the likelihood of default over a given time horizon. A default may only happen at a certain time over the assessed period, if the facility has not been previously derecognised and is still in the portfolio. The concept of PDs is further explained in Note 36.1.2.

The Exposure at Default (EAD) is an estimate of the exposure at a future default date, taking into account expected changes in the exposure after the reporting date, including repayments of principal and interest, whether scheduled by contract or otherwise, expected drawdowns on committed facilities, and accrued interest from missed payments. The EAD is further explained in Note 36.1.2.

The Loss Given Default (LGD) is an estimate of the loss arising in the case where a default occurs at a given time. It is based on the difference between the contractual cash flows due and those that the lender would expect to receive, including from the realisation of any collateral. It is usually expressed as a percentage of the EAD. The LGD is further explained in Note 36.1.2.

The maximum period for which the credit losses are determined is the contractual life of a financial instrument unless the Group has the legal right to call it earlier.

UH7

15

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

The mechanics of the ECL method are summarised below:

**Stage 1**
The 12mECL is calculated as the portion of LTECLs that represent the ECLs that result from default events on a financial instrument that are possible within the 12 months after the reporting date. The Group calculates the 12mECL allowance based on the expectation of a default occurring in the 12 months following the reporting date. These expected 12-month default probabilities are applied to a forecast EAD and multiplied by the expected LGD and discounted by an approximation to the original EIR. This calculation is made for each of the three scenarios, as explained above.

**Stage 2**
When a financial assets has shown a significant increase in credit risk since origination, the Group records an allowance for the LTECLs. The mechanics are similar to those explained above, including the use of multiple scenarios, but PDs and LGDs are estimated over the lifetime of the instrument. The expected cash shortfalls are discounted by an approximation to the original EIR.

**Stage 3**
For financial assets considered credit-impaired (as defined in Note 36.1.1), the Group recognises the lifetime expected credit losses for these loans. The method is similar to that for Stage 2 assets, with the PD set at 100%.

**Financial guarantee contracts**
The Group's liability under each guarantee is measured at the higher of the amount initially recognised less cumulative amortisation recognised in the income statement, and the ECL provision. For this purpose, the Group estimates ECLs based on the present value of the expected payments to reimburse the holder for a credit loss that it incurs The shortfalls are discounted by the risk-adjusted interest rate relevant to the exposure. The calculation is made using a probability-weighing of the three scenarios. The ECLs related to financial guarantee contracts are recognised within provisions.

**6.5.11 Forward looking information**

The Group formulates a base case view of the future direction of relevant economic variables and a representative range of other possible forecast scenarios and consideration of a variety of external actual and forecast information. This process involves developing three different economic scenarios, which represent a range of scenarios linked to GDP growth and CPI.

**6.5.12 Credit Enhancements: Collateral valuation and financial guarantees**

To mitigate its credit risks on financial assets, the Group seeks to use collateral. The collateral comes in various forms, such as cash, securities, letters of credit/guarantees and demand promissory notes. To the extent possible, the Group uses active market data for valuing financial assets held as collateral.

**6.5.13 Offsetting**

Financial assets and financial liabilities are offset and a net amount is presented in the consolidated statement of financial position when, and only when, the Group currently has a legally enforceable right to set off the amounts and intends either to settle on a net basis or to realize the asset and settle the liability simultaneously.

Income and expenses are presented on a net basis only when permitted under IFRS, or for gains and losses arising from a group of similar transactions.

UHY

16

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

### 6.5.14 Amortised cost measurement

The 'amortised cost' of a financial asset or financial liability is the amount at which the financial asset or financial liability is measured at initial recognition, minus principal repayments, plus or minus the cumulative amortization using the effective interest method of any difference between the initial amount recognised and the maturity amount, minus any reduction for impairment.

### 6.5.15 Fair value measurement

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date in the principal or, in its absence, the most advantageous market to which the Group has access at that date.

When available, the Group measures the fair value of an instrument using the quoted price in an active market for that instrument. A market is regarded as active if transactions for the asset or liability take place with sufficient frequency and volume to provide pricing information on an ongoing basis.

If there is no quoted price in an active market, then the Group uses valuation techniques that maximize the use of relevant observable inputs and minimize the use of unobservable inputs. The chosen valuation technique incorporates all of the factors that market participant would take into account in pricing a transaction.

The best evidence of the fair value of a financial instrument at initial recognition is normally the transaction price i.e. the fair value of the consideration given or received. If the Group determines that the fair value at initial recognition differs from the transaction price and the fair value is evidenced neither by a quoted price in an active market for an identical asset or liability nor based on a valuation technique that uses only data from observable markets, then the financial instrument is initially measured at fair value, adjusted to defer the difference between the fair value at initial recognition and the transaction price. Subsequently, that difference is recognised in consolidated statement of profit or loss on an appropriate basis over the life of the instrument but not later than when the valuation is wholly supported by observable market data or transaction is closed out.

If an asset or liability measured at fair value has a bid price and an ask price, then the Group measures assets and long positions at a bid price and liabilities and short positions at an ask price.

Portfolio of financial assets and financial liabilities that are exposed to market risk and credit risk that are managed by the Group on the basis that the net exposure to either market or credit risk are measured on the basis of a price that would be received to sell on a net long position (or paid to transfer a net short position) for a particular risk exposure. Those portfolio-level adjustments are allocated to the individual assets and liabilities on the basis of the relative risk adjustment of each of the individual instruments in the portfolio.

The fair value of deposits is not less than the amount payable, discounted from the first date on which the amount could be required to be paid.

The Group recognizes transfers between levels of fair value hierarchy as of the end of the reporting period during which the change has occurred.

UHY

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

### 6.6 Cash and cash equivalents

Cash and cash equivalents include foreign currency cash on hand and highly liquid financial assets with original maturities of less than three months, which are subject to insignificant risk of changes in their fair value, and are used by the Group in the management of its short-term commitments.

Cash and cash equivalents are carried at amortised cost in the consolidated statement of financial position.

### 6.7 Gold

#### 6.7.1 Gold held as reserve

Refined gold held as foreign reserve is recorded at fair value at the consolidated statement of financial position date. Fair price is determined by reference to the London Bullion Market Association (LBMA) fixings at a discount of USD 2.25 per troy ounce (1398: USD 2.25 per troy ounce). Fair value and foreign exchange changes in gold are taken to revaluation reserve account.

#### 6.7.2 Gold at Bank vault

Non-refined gold and silver held at the Group's vault are stated at cost less impairment (if any), and are included in other assets.

### 6.8 Property and equipment

Property and equipment, other than free-hold land (which is not depreciated), are stated at cost or revalued amount less accumulated depreciation and accumulated impairment losses, if any. Land is carried at revalued amount less impairment losses, if any.

Subsequent costs are included in an asset's carrying amount or recognised as a separate asset as appropriate, only when it is probable that future benefits associated with the item will flow to the Group and the cost of the item can be measured reliably. All other repairs and maintenance are charged to the statement of profit or loss as and when incurred.

Depreciation is calculated by the Group using the straight line method which writes down the cost of assets to their residual values over the estimated useful lives. Depreciation is charged from the date when the asset is available for use and no depreciation is charged from the date when the asset is disposed off. The estimated useful lives for the current and comparative periods are as follows:

|  | 1399 (2020) | 1398 (2019) |
| --- | --- | --- |
| Buildings | 40 years | 40 years |
| Furniture and fixtures | 5 to 10 years | 5 to 10 years |
| Motor vehicles | 5 years | 5 years |
| IT and office equipment | 3 to 10 years | 3 to 10 years |

The residual values, useful lives and depreciation method are reviewed and adjusted, if appropriate, at each reporting date.

UHY

18

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

Land and buildings are revalued by professionally qualified valuers with sufficient regularity to ensure that their net carrying value does not differ materially from their fair value. A surplus arising on revaluation is credited to the revaluation reserve account. Any deficit arising on subsequent revaluation of fixed assets is adjusted against the balance in the above-mentioned surplus account. The surplus on revaluation of fixed assets, to the extent of incremental depreciation, is transferred to retained earnings.

An item of property and equipment is derecognised upon disposal or when no future economic benefits are expected from its use or disposal. Any gain or loss arising on derecognition of the assets is recognised in the consolidated statement of profit or loss in the year when asset is derecognised.

### 6.9 Intangible assets

Banking software acquired by the Group is stated at cost less accumulated amortization and accumulated impairment losses, if any.

Subsequent expenditure on software is capitalised only when it is expected to increase the future economic benefits embodied in the specific asset to which it relates. All other expenditures are expensed as incurred.

Software is amortised on a straight-line basis in consolidated statement of profit or loss over its estimated useful life, from the date on which it is available for use. The estimated useful life of a software for the current period is three years while for comparative periods useful life was five years.

Amortization methods, useful lives and residual values are reviewed at each reporting date and adjusted, if appropriate.

### 6.10 Provisions

Provisions are recognised when the Group has a present obligation (legal or constructive) as a result of past events and it is probable that an outflow of resources will be required to settle the obligation and a reliable estimate of the amount can be made. Provisions are reviewed at each consolidated statement of financial position date and are adjusted to reflect the current best estimate.

### 6.11 Financial guarantees

'Financial guarantees' are contracts that require the Group to make specified payments to reimburse the holder for a loss it incurs because a specified debtor fails to make payment when due.

Liabilities arising from financial guarantee are initially measured at fair value and the initial fair value is amortised over the life of the guarantee. The liability is subsequently carried at the higher of this amortised amount and the present value of any expected payment to settle the liability when a payment under the contract has become probable.

### 6.12 Bank notes and coins

Bank notes and coins in circulation represent a demand liability of the Group when issued from the vaults and are recorded in the consolidated statement of financial position at their face value. Expenses on bank notes and coins in circulations include expenses on security, transportation, insurance and other expenses. Expenses on bank notes and coins in circulation are recognised as and when they are incurred. Any un-issued currency notes and coins lying at the presidential palace are not reflected in these financial statements.

UHY

19

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

### 6.13 Employee benefits

#### 6.13.1 Defined contribution obligation

In 2016, the Group has introduced an unfunded contribution scheme and operates it for all of its permanent employees. Monthly contributions are made both by the Group and the employees at 8% of employees' basic salary.

#### 6.13.2 Termination benefits

Termination benefits are expensed at the earlier of when the Group can no longer withdraw the offer of those benefits and when the Group recognizes the costs for a restructuring. If benefits are not expected to be settled wholly within 12 months of the reporting date, then these benefits are discounted.

#### 6.13.3 Short-term employee benefits

Short-term employee benefits are expensed as the related service is provided. A liability is recognised for the amount expected to be paid if the Group has a present legal or constructive obligation to pay this amount as a result of past service provided by the employee and the obligation can be estimated reliably.

### 6.14 Grants

Grants are recognised at their fair value where there is reasonable assurance that the grant will be received and the Group will comply with all the required conditions attached to it.

Grants for property and equipment are recorded as deferred grants in the consolidated statement of financial position and recognised income on a systematic basis over the useful life of assets acquired from the grant.

### 6.15 Deferred cost

The cost of printing of currency is recognised as a deferred expense in other assets. The cost is amortised in the consolidated statement of profit or loss when the printed currency is issued for circulation.

### 6.16 Allocation of net profit

According to Article 29 of the DAB Law, if the Bank has a net profit for any financial year, it shall be allocated in the following order of priority:

1) to increase the capital to a level equivalent to 5% of the aggregate amount of monetary liabilities at the end of the financial year.

2) to redeem the securities issued by the State to the Bank pursuant to Article 31.

3) to the General Reserve maintained by the Bank to a level equivalent to the amount of capital of the Bank.

4) to any other reserve for specific purposes established by the Bank subject to the approval of the MoF.

5) any residual net profit remaining after the preceding allocations shall be allocated in accordance with the following:

20

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

- the preceding allocations from net profit shall be calculated as if made from net operating revenues, except that, if no operating revenues are included in net profit or after the preceding allocations have exhausted net operating revenues included in net profit, such allocations shall be calculated as if made from net unrealized valuation gains;

- any residual net operating revenues shall be transferred to the State within four months after the end of the financial year; and

- residual net unrealized valuation gains if any shall be allocated to a Valuation Reserve Account maintained on the balance sheet of the Bank.

#### 6.17 Use of estimates and judgments

The preparation of consolidated financial statements in conformity with IFRSs requires management to make judgments, estimates and assumptions that affect the application of Group's accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates.

Estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to estimates are recognized prospectively. The areas involving a higher degree of judgment or complexity, or areas where assumptions and estimates are significant to the financial statements are given below:

| | | |
|---|---|---|
| - Useful lives and valuation of property and equipment; and | | Note 6.8 |
| - Provision for impairment. | | Note 6.10 |

| | Note | 30 Qaws 1399<br>(20 Dec 2020) | 30 Qaws 1398<br>(21 Dec 2019) |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |
| **7. GOLD RESERVES** | | | |
| Balance at beginning of the year | | 81,400,561 | 66,178,591 |
| Gain on revaluation | | 22,089,910 | 11,637,505 |
| Exchange (loss) / gain | | (1,720,215) | 3,584,465 |
| Balance at end of the year | 7.1 | 101,770,256 | 81,400,561 |

**7.1** This represents 703,004.944 fine troy ounces (1398:703,004.944 fine troy ounces) of gold in bar form held at Federal Reserve Bank (FRB), New York as the Bank's international reserve.

As per FRB, these bars meet the minimum LBMA (London Bullion Market Association) LGD (London Gold Delivery) standards for quality (995.0 parts per thousand) but do not comply with the requirements for dimension (top surface: 255 x 81 millimeters; bottom surface: 236 x 37 millimeters; thickness: 37 millimeters). In addition, some of these bars present imperfections such as surface roughness, cracks, fissures and holes which are considered unacceptable by the LBMA.

Accordingly, the Bank has obtained an advice for the estimate of discount to the LBMA rate of USD 1,879.75 per troy ounce (1398: USD 1,479.00 per troy ounce) from the Bank for International Settlements (BIS), Switzerland, which has suggested a discount of USD 2.25 per troy ounce (1398: USD 2.25 per troy ounce) to the LBMA rate. Accordingly, the Bank has valued the gold reserves at USD 1,877.5 per troy ounce (1398: USD 1,476.75 per troy ounce) using a discount of USD 2.25 per troy ounce (1398: USD 2.25 per troy ounce) to LBMA rate as at the reporting date.

21

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

|  |  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|---|
|  |  |  | ----------- (Afs in '000') ----------- | |
| **8.** | **FOREIGN CURRENCY CASH RESERVES** | | | |
| | Cash at head office | | 18,570,911 | 18,570,911 |
| | Cash at branches | | 15,596,430 | 1,012,425 |
| | | 8.1 | 34,167,341 | 19,583,336 |
| **8.1** | **Foreign currency profile** | | | |
| | USD | | 32,967,164 | 19,092,139 |
| | Euro | | 1,076,948 | 365,347 |
| | GBP | | 6,363 | 6,296 |
| | PKR | | 144 | 151 |
| | AED | | 2,092 | 2,136 |
| | SAR | | 114,630 | 117,267 |
| | | | 34,167,341 | 19,583,336 |

**8.2** This represents cash held by the Bank in foreign currency at the Presidential palace, the Head office and its branches.

|  |  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|---|
|  |  |  | ----------- (Afs in '000') ----------- | |
| **9.** | **DUE FROM BANKS AND FINANCIAL INSTITUTIONS** | | | |
| | **At amortised cost** | | | |
| | Term deposits with foreign banks | 9.1 | 168,905,679 | 301,434,893 |
| | Current accounts with foreign banks | | 29,408,353 | 45,776,760 |
| | Overnight deposits with foreign banks | 9.2 | 56,490,207 | 8,734,962 |
| | | | 254,804,239 | 355,946,615 |
| | Expected credit losses | 9.3 | (127,165) | (376,262) |
| | | | 254,677,074 | 355,570,353 |

**9.1** These carry interest rates ranging between -0.67% to 0.65% per annum (1398: -0.04% to 2.95% per annum) having maturity ranging from December 2020 to August 2021 (1398: December 2019 to October 2020).

**9.2** These represent overnight deposits carrying interest rate at the rate of 0.01% per annum (1398: 0.03% per annum).

**9.3** An analysis of changes in the ECL allowances in relation to foreign currency accounts of the Group measured at amortized cost is as follows:

|  | (Afs in '000') |
|---|---|
| **Level 2** | |
| Opening balance as at 21 December 2018 (30 Qaws 1397) | - |
| Impact of IFRS 9 | 800,647 |
| Expected credit losses as at 22 December 2018 (1 Jadi 1397) | 800,647 |
| Impact during the year | (424,386) |
| Balance as at 21 December 2019 (30 Qaws 1398) | 376,261 |
| | |
| Expected credit losses as at 22 December 2019 (1 Jadi 1398) | 376,261 |
| Impact during the year | (249,096) |
| Balance as at 20 December 2020 (30 Qaws 1399) | 127,165 |

UHY

22

App.209

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **10. INVESTMENTS** |  |  |  |
|  |  |  |  |
| **Investments measured at FVOCI** |  |  |  |
| US treasury bonds and other securities | 10.1 | 187,120,796 | 182,929,450 |
| US treasury bonds | 10.2 | 4,149,044 | 4,075,418 |
| US Treasury Bills | 10.3 | 145,693,372 | - |
| Bank for International Settlements Investment Pool - A | 10.4 | 30,416,640 | 29,825,310 |
|  |  | 367,379,852 | 216,830,178 |
|  |  |  |  |
| **Equity instruments at FVOCI** |  |  |  |
| Shares in ECOTDB | 10.5 | 1,433,928 | 1,433,928 |
|  |  |  |  |
|  |  | 368,813,780 | 218,264,106 |

**10.1** The Group has entered into an investment management and consulting agreement with the International Bank for Reconstruction and Development (IBRD), an organisation of the World Bank Group, for Reserves Advisory Management Program (RAMP). The IBRD has placed the funds in government securities, European federal agency securities and deposit accounts maintained with the Federal Reserve Bank of New York (FRB). This portfolio of investments carries return at rates ranging between 0.13% to 3.35% per annum (1398: 1.38% to 3.13% per annum).

**10.2** The Group has made investment in US treasury bonds held at the Federal Reserve Bank of New York (FRB). These carry interest rates ranging between 0.13% to 2.50% (1398: 1.375% to 2.750%) per annum. These securities have an aggregate face value of Afs.4,048 million (1398: Afs. 4,038 million).

**10.3** The Group has made investment in US treasury bills held at the Federal Reserve Bank of New York (FRB). These carry interest rates ranging between 0.06% to 0.12% per annum. These securities have an aggregate face value of Afs.1,890 million (1398: Afs: Nil). During the year, the Bank liquidated some of the term deposits to invest these amounts in US treasury bills to manage the credit risk due to COVID-19 impact.

**10.4** The Group holds units of Bank for International Settlements Investment Pool A" (BISIP-A) through an asset management agreement, which has investments in USD denominated Government Bonds, foreign currency swaps and other interest bearing securities. The total units held by the Group at the reporting date were 2,637,453 (1398: 2,637,453) having market value of USD 149.57 (1398: 144.22) per unit.

**10.5** The Group holds shares in the Economic Cooperation Organization Trade and Development Bank (ECOTDB), Istanbul, Turkey. As per the agreement, the Group is required to subscribe 500 shares, out of which 350 shares are callable. As of the year end, the Group has subscribed 150 (1398: 150) shares.

UHY

23

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**10.6** An analysis of changes in the ECL allowances in relation to investments of the Group is as follows:

| | Note | Investments measured at amortised cost | Investment in Debt instruments measured at FVOCI |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |
| **Level 1** | | | |
| Opening balance as at 21 December 2018 (30 Qaws 1397) | | - | - |
| Impact of IFRS 9 | | 338 | 8,233 |
| Expected credit losses as at 22 December 2018 (1 Jadi 1397) | | 338 | 8,233 |
| Expected credit losses | | (338) | (1,317) |
| Balance as at 21 December 2019 (30 Qaws 1398) | | - | 6,916 |
| | | | |
| Opening balance as at 22 December 2019 (30 Qaws 1398) | | - | 6,916 |
| Expected credit losses | | - | 290 |
| Balance as at 20 December 2020 (30 Qaws 1399) | | - | 7,206 |

| | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |

**11. ASSISTANCE AS LENDER OF LAST RESORT**

| | | | |
|---|---|---|---|
| Assistance as lender of last resort to Kabul Bank | 11.1 | **170,154** | 166,793 |

**11.1** This represents the amount paid to Kabul Bank as a lender of last resort ("LoLR") under Article 86 of the DAB Law.

On 21 Hamal 1390 (10 April 2011), the Bank signed a Promissory Note and Agreement ("PNA") with the Ministry of Finance ("MoF"), Government of Islamic Republic of Afghanistan, wherein MoF agreed to underwrite cost of LoLR facilities to Kabul Bank amounting to Afs.37,620 million (USD 825 million), which was subject to adjustments due to payments of claims against Kabul Bank in receivership. The repayment is subject to other conditions, as mentioned in the PNA, including assignment of claims of the Bank against Kabul Bank to MoF. As per the terms of repayment the entire amount was required to be paid to the Bank in 8 years in 32 quarterly increasing installments beginning from the end of first quarter of 1390.

This carries interest at the annual rate of 2% compounded quarterly on outstanding balance. The terms of repayment schedule under PNA were revised in 1399, wherein the end date of repayment period was extended from 1398 (21 December 2019) to the end of 1400 (20 Dec 2021). The movement in this balance during the year is as follows:

| | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |
| Opening balance | | **166,793** | 6,961,885 |
| Add: interest charged for the year | | **3,361** | 95,782 |
| Add: unwinding of discount on LoLR | 11.2 | - | 209,126 |
| Less: recoveries during the year from MoF | | - | (7,100,000) |
| Closing balance | | **170,154** | 166,793 |

UHY

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

11.2  In 1396, the Bank has used risk free interest rate of 6.67% to amortize the outstanding amount under PNA. During the year, based on the fact that the outstanding amount has reduced significantly and will be settled in 1400 under PNA, the management has not revised the interest rate to unwind the discount. The management of the Bank believes that it will not have material impact on the financial statements.

The balance amount of Afs 170.154 million (1398: Afs 166.793 million) will be received as soon as the national budget of Islamic Republic of Afghanistan will be approved by the Government for the year 1400.

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **12. ADVANCES AND OTHER RECEIVABLES** |  |  |  |
| Loans to staff | 12.1 | **1,215,346** | 603,394 |
| Afghanistan Deposit Protection Fund | 12.2 | **500,000** | 500,000 |
| Deferred cost on unissued currency | 12.3 | **230,762** | 493,056 |
| Other receivables from employees | 12.4 | **191,069** | 149,960 |
| Others |  | **129,369** | 133,032 |
|  |  | **2,266,546** | 1,879,442 |
| Expected credit losses | 12.5 | **(168,454)** | (169,072) |
|  |  | **2,098,092** | 1,710,370 |

12.1  This represent loans provided to employees of the Bank for housing, marriage and general purposes. These loans are interest free and are repayable on monthly basis over a period ranging from 1 to 15 years (1398: 1 to 15 years). These loans are secured against staff defined contribution obligation and personal guarantee of the employees of the Bank.

12.2  This represents contribution of the Bank for Afghanistan Deposit Protection Fund (ADPF).The Group contributed a sum of Afs. 500 million being its share in the initial capital of ADPF in the year 2009. Since then, the Group, on behalf of ADPF, has been collecting insurance premium from commercial banks at a certain rate based on their customer deposits (other than inter-bank deposits) and the same is deposited into ADPF's bank account held with the Bank. The salaries of staff and rent expense pertaining to ADPF are also currently being borne by the Group. ADPF has not been incorporated yet as a separate legal entity, as the relevant amendment in the DAB Law has not yet been approved by the Parliament.

12.3  This represents deferred cost incurred in respect of printing of currency. This cost is amortised as an expense in the consolidated statement of profit or loss when the printed currency is issued into circulation. The movement in this balance is as follows:

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| Balance as at beginning of the year |  | **493,056** | 773,980 |
| Less: amortisation of cost during the year |  | **(262,294)** | (280,924) |
| Balance as at end of the year |  | **230,762** | 493,056 |

12.4  This represents advances and receivables on account of misappropriation of cash by the Group's employees in prior years which are fully provided.

UHY

25

**App.212**

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**12.5  Expected credit losses**

An analysis of changes in the ECL allowances in relation to trade receivables of the Group measured at amortized cost is as follows:

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| Balance as at the beginning of the year |  | 169,072 | 150,731 |
| (Recovery of ECL) / impairment during the year |  | (618) | 18,341 |
| Balance as at the end of the year |  | 168,454 | 169,072 |

**13.  OPERATING FIXED ASSETS**

|  | Note | | |
|---|---|---|---|
| Capital work in progress | 13.1 | 24,072 | 6,664 |
| Property and equipment | 13.2 | 5,275,411 | 5,370,129 |
|  |  | 5,299,483 | 5,376,793 |

**13.1  Capital work in progress**

|  | Civil Works (Afs in '000') |
|---|---|
| **Balance as at 21 December 2018** | 9,925 |
| Capital expenditure incurred / advances made during the year | - |
| Transfer to operating fixed assets | (3,261) |
| **Balance as at 21 December 2019** | 6,664 |
| Capital expenditure incurred / advances made during the year | 17,408 |
| Transfer to operating fixed assets | - |
| **Balance as at 20 December 2020** | 24,072 |

UHY

App.213

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

### 13.2 Property and equipment

| | Note | Land | Buildings | Furniture and fixtures | Motor vehicles | IT and office equipment | Total |
|---|---|---|---|---|---|---|---|
| | | | | (Afs in '000') | | | |
| Balance as at 01 Jadi 1397 (22 December 2018) | | 4,303,486 | 893,251 | 132,792 | 195,444 | 901,873 | 6,426,846 |
| Additions | | - | 10,679 | 1,308 | - | 59,417 | 71,404 |
| Transfer from Capital Work In Progress | | - | 3,261 | - | - | - | 3,261 |
| Adjustments | | 1,699 | (3,845) | (61,232) | 41,481 | 14,783 | (7,114) |
| Disposal | | - | - | (842) | - | (20,465) | (21,307) |
| Balance as at 30 Qaws 1398 (21 December 2019) | | 4,305,185 | 903,346 | 72,026 | 236,925 | 955,608 | 6,473,090 |
| | | | | | | | |
| Balance as at 01 Jadi 1398 (22 December 2019) | | 4,305,185 | 903,346 | 72,027 | 236,927 | 955,608 | 6,473,090 |
| Additions | | - | 7,403 | 1,439 | 5,307 | 26,416 | 40,565 |
| Adjustments / write offs | | - | - | 417 | (46) | (9,115) | (8,744) |
| Disposals | | - | - | (427) | (1,065) | (5,202) | (6,694) |
| Balance as at 30 Qaws 1399 (20 December 2020) | | 4,305,185 | 910,749 | 73,456 | 241,123 | 967,707 | 6,498,217 |
| **Depreciation** | | | | | | | |
| Balance as at 01 Jadi 1397 (22 December 2018) | | - | 110,544 | 46,295 | 152,051 | 660,571 | 969,461 |
| Charge for the year | | - | 22,549 | 4,230 | 21,300 | 107,717 | 155,795 |
| Adjustments | | - | - | - | - | (3,138) | (3,138) |
| Disposals | | - | - | (764) | - | (18,393) | (19,157) |
| Balance as at 30 Qaws 1398 (21 December 2019) | | - | 133,093 | 49,761 | 173,351 | 746,757 | 1,102,962 |
| | | | | | | | |
| Balance as at 01 Jadi 1398 (22 December 2019) | | - | 133,093 | 49,761 | 173,351 | 746,757 | 1,102,962 |
| Charge for the year | | - | 22,769 | 3,175 | 9,956 | 92,027 | 127,927 |
| Adjustments / write offs | | - | - | (126) | - | (1,633) | (1,759) |
| Disposals | | - | - | (409) | (1,065) | (4,850) | (6,324) |
| Balance as at 30 Qaws 1399 (20 December 2020) | | - | 155,862 | 52,401 | 182,242 | 832,301 | 1,222,806 |
| | | | | | | | |
| NBV as at 30 Qaws 1398 (21 December 2019) | | 4,305,185 | 770,253 | 22,265 | 63,574 | 208,851 | 5,370,129 |
| NBV as at 30 Qaws 1399 (20 December 2020) | | 4,305,185 | 754,887 | 21,055 | 58,881 | 135,406 | 5,275,411 |

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

13.2.1 Land and buildings were revalued as at 30 Hoot 1389 by independent property dealer, M/S Pamir Property Dealer, a valuation expert having knowledge and experience in the location and category of property, on the basis of market values. The resulting impact from the revaluation exercise was recorded under revaluation reserve in the consolidated statement of changes in equity. The management is of the view that there are no significant changes in the value of land and building from last revaluation.

13.2.2 Land and buildings include properties having cost of Afs 106.557 million (1398: Afs 106.557 million) which have been transferred to the Group by different ministries, however, the title to these properties has not yet been transferred in the name of the Group. Further, properties having cost of Afs 51.864 million (1398: Afs 51.864 million) are disputed, mainly due to title / possession issues and are under review by the court of law.

13.2.3 Had no revaluation been carried out, the carrying amount of the land and buildings that would have been recognised in these financial statements is as under:

| | 30 Qaws 1399 (20 December 2020) ------- (Afs in '000') ------- | | 30 Qaws 1398 (21 December 2019) ------- (Afs in '000') ------- | |
|---|---|---|---|---|
| | Land | Buildings | Land | Buildings |
| Cost | 3,368,708 | 1,155,785 | 3,368,708 | 1,148,382 |
| Accumulated depreciation | - | (245,526) | - | (216,468) |
| Carrying amount | 3,368,708 | 910,259 | 3,368,708 | 931,914 |

**13.2.4 Allocation of depreciation**

| | 30 Qaws 1399 (20 Dec 2020) ------- (Afs in '000') ------- | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|
| Depreciation charged for the year | 127,927 | 155,796 |
| Less: Amount classified under grant expense | (44,347) | (99,318) |
| | 83,580 | 56,478 |

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **14.  INTANGIBLE ASSETS** | | | |
| **Cost** | | | |
| Balance as at beginning of the year | | 341,654 | 339,497 |
| Additions | | 490 | 2,157 |
| | | 342,144 | 341,654 |
| **Amortisation** | | | |
| Balance as at beginning of the year | | 318,386 | 250,608 |
| Charge for the year | | 18,810 | 67,778 |
| | | 337,196 | 318,386 |
| **NBV as at end of the year** | | 4,949 | 23,268 |
| **15.  OTHER ASSETS** | | | |
| Non-monetary gold bullion and bars | | 5,861,728 | 5,861,728 |
| Non-monetary silver | | 6,711,255 | 6,711,255 |
| | 15.1 | 12,572,983 | 12,572,983 |
| Accrued interest on investments measured at FVOCI | 10.2 | 940,734 | 901,617 |
| Cash and bank balances held by the Subsidiary | | 4,461 | 1,849 |
| Inter-branch accounts | | 1,661 | - |
| Others | | 15,332 | 15,201 |
| | | 13,535,171 | 13,491,650 |

**15.1** These represent the gold bullion and bars and silver coins held in the Bank's vault at the Presidential Palace. Under a Memorandum of Understanding ("MoU") agreed between the Bank and the Ministry of Finance (MoF) in the year 1383, the Bank has been granted clear title to all the gold bullion and bars, as well as certain gold and silver coins, asserted to be owned by the Bank and physically located in the Presidential Palace vault.

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **16.  CURRENCY IN CIRCULATION** | | | |
| Coins | | 617,400 | 548,400 |
| Bank notes | | 306,674,598 | 273,474,598 |
| | | 307,291,998 | 274,022,998 |
| Bank notes and coins held by the Bank | | (13,950,618) | (14,674,739) |
| | 16.1 | 293,341,380 | 259,348,259 |

**16.1** The liability for coins & bank notes issued by the Da Afghanistan Bank is recorded at its face value.

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **17.  CAPITAL NOTES** | | | |
| Face value | | 46,400,000 | 24,905,000 |
| Un-amortised discount | | (550,616) | (129,827) |
| | 17.1 & 17.2 | 45,849,384 | 24,775,173 |

UHY

29

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**17.1** These represent debt instruments issued by the Bank to the licensed commercial banks and licensed money changers. These instruments have maturity between 7 days to 364 days (1398: 7 to 364 days) and are freely transferable between licensed commercial banks, licensed money changers and the Bank.

**17.2** These notes carry interest rates ranging between 1.49% to 3.8% per annum (1398: 0.15% to 2.20% per annum).

| | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |
| **18. DUE TO BANKS AND FINANCIAL INSTITUTIONS** | | | |
| **Foreign currency:** | | | |
| Current accounts | | 36,856,040 | 29,817,126 |
| Required reserve balance | 18.1 | 17,350,088 | 17,200,085 |
| Frozen account | 18.2 | 385,525 | 392,042 |
| | | 54,591,653 | 47,409,253 |
| **Local currency:** | | | |
| Current accounts | | 28,245,193 | 29,510,518 |
| Required reserve balance | 18.1 | 7,314,977 | 5,734,431 |
| Overnight deposits | 18.3 | 9,927,375 | 14,569,822 |
| | | 45,487,545 | 49,814,771 |
| | | 100,079,198 | 97,224,024 |

**18.1** This represents interest free reserve balances maintained by the commercial banks with the Bank in accordance with the requirements of Article 64 of the DAB Law for local currency and circular no. 3967 dated 07 Sunbula 1396 (29 August 2017) issued by DAB for foreign currency.

**18.2** This represents balance due to a commercial bank which was withheld by the Bank on instructions of the Financial Supervision department.

**18.3** These are placed by local banks and carry interest at the rate of 0.1% per annum (1398: 0.1% per annum).

| | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |
| **19. DUE TO CUSTOMERS** | | | |
| **Foreign currency:** | | | |
| Current accounts | | 78,361,259 | 84,107,032 |
| Dormant accounts | 19.2 | 93,095 | 82,049 |
| Margin against letters of credit | 19.4 | 5,453,009 | 3,567,181 |
| | | 83,907,363 | 87,756,262 |
| **Local currency:** | | | |
| Current accounts | | 60,332,477 | 42,273,576 |
| Dormant accounts | 19.2 | 66,701 | 63,541 |
| Margin against letters of credit | 19.4 | 16,728 | 28,103 |
| | | 60,415,906 | 42,365,220 |
| | 19.1, 19.3 & 19.5 | 144,323,269 | 130,121,482 |

UHY

30

**App.217**

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

|  |  | **30 Qaws 1399** | **30 Qaws 1398** |
|---|---|---|---|
|  | **Note** | (20 Dec 2020) | (21 Dec 2019) |
|  |  | ----------- (Afs in '000') ----------- | |

**19.1** Due to customers consist of:

|  | | | |
|---|---|---|---|
| Government accounts | | 116,223,883 | 105,990,703 |
| Others | | 28,099,386 | 24,130,779 |
| | | 144,323,269 | 130,121,482 |

**19.2** These are prior year's non-operative accounts of the customers of the Bank and non-operative accounts transferred by other commercial banks. According to Article 75 of the DAB Law of Afghanistan, all commercial banks are required to dispatch a notice to each dormant account holder at their registered address and publish a notice in at least one local newspaper mentioning the name and particular of the dormant account holder. If the dormant account holder cannot be located within 90 days after the notice and publication of details, these non-operative accounts are classified as dormant for 10 years and transferred to the Bank which are held in a special account. Thereafter, if any dormant account holder satisfactorily proves his / her ownership, the Bank will repay the amount immediately. If the dormant account holder does not claim back their deposit within the required period, the Bank transfers it to the Ministry of Finance (MoF) for inclusion in the revenues of the Government of the Islamic Republic of Afghanistan.

**19.3** The Bank is not in compliance with Article 74 of the DAB law which requires the Bank to limit its foreign currency liabilities up to 50% of its unimpaired capital and reserves, which works out to be Afs.94,828.557 million as at 30 Qaws 1399 (20 December 2020). Foreign currency liabilities of the Bank as at the said date stand at Afs.142,305.073 million, resulting in foreign currency liabilities exceeding the prescribed limit by Afs. 47,476.515 million as at the year end.

**19.4** These represent the deposits received by the Bank against issuance of letters of credit (LCs). The Bank issues LCs only to the government and governmental organisations against receipt of 100% deposit.

**19.5** All these deposits are interest-free.

|  |  | **30 Qaws 1399** | **30 Qaws 1398** |
|---|---|---|---|
|  | **Note** | (20 Dec 2020) | (21 Dec 2019) |
|  |  | ----------- (Afs in '000') ----------- | |
| **20.** | **IMF RELATED LIABILITIES** | | |
| Account 1 | 20.1 | 86,983 | 86,983 |
| Account 2 | 20.1 | 35 | 36 |
| Extended Credit Facility Loan 2016-19 | 20.2 | 3,605,108 | 2,916,581 |
| | | 3,692,126 | 3,003,600 |

**20.1** The Islamic Republic of Afghanistan is a member of International Monetary Fund (IMF) since 1955. The member country can designate Ministry of Finance (MoF), central bank or any other agency as their Fiscal Agent. In addition, each member is statutorily required to designate its central bank as Depository. The Government of the Islamic Republic of Afghanistan has nominated Ministry of Finance as their Fiscal Agent and the Bank as Depository.

*uHy*

31

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

As the Depository for the Islamic Republic of Afghanistan, the Bank is required to maintain, in addition to other accounts, the following accounts:

Account 1 (Afghani)
Account 2 (Afghani)

IMF's holding of the member's currency is placed in IMF Account No 1 and Account No 2 in the Bank. The Bank is required to record balances in the IMF No.1 and No. 2 accounts as its liabilities. These balances, although maintained within the Bank, are owned by the IMF. The IMF Account No. 1 is used for the IMF's operational transactions whereas the IMF Account No. 2 is used for operational expenses incurred by the IMF in the member's currency.

**20.2** As per arrangement between the Bank, IMF and MoF in 2016, IMF approved Special Drawing Rights (SDRs) amounting to 32.38 million concessional financial assistance under Extended Credit Facility (ECF) program, in support of a three-year macroeconomic and structural adjustment program. The Bank has withdrawn equivalent to SDR 32.38 million (1398: SDR 27 million). The ECF loans have 10 years maturity and are repayable in 10 equal semiannual installments starting after the 5th year of disbursement.

| | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |
| **20.3 Off-balance sheet balances** | | | |
| | | | |
| Afghanistan's Quota in IMF | 20.3.1 | 36,051,083 | 34,977,362 |
| SDR Holdings | 20.3.1 | 4,142,392 | 4,249,449 |
| | | 40,193,475 | 39,226,810 |
| | | | |
| Liabilities | | | |
| Securities issued to IMF | 20.3.1 | 33,695,501 | 34,685,475 |
| SDR Allocations | 20.3.2 | 17,292,302 | 16,777,280 |
| Extended Credit Facility Loan 2006-10 | 20.3.2 | - | 61,032 |
| Extended Credit Facility Loan 2011-14 | 20.3.2 | 668,025 | 1,296,258 |
| Extended Credit Facility Loan 2020-24 | 20.3.2 | 9,012,771 | - |
| Rapid Credit Facility Loan 2020 | 20.3.3 | 18,025,541 | - |
| | | 78,694,140 | 52,820,045 |

**20.3.1** Government of Islamic Republic of Afghanistan has quota (SDR 323.8 million) in the IMF. This quota reflects the subscription in the IMF of respective members. The quota in the IMF is secured by the Ministry of Finance promissory note issued to the IMF and denominated in SDR. The Bank is the custodian of the promissory note. The differences are due to the evaluation of these positions at the SDR exchange rate.

The Ministry of Finance maintains an SDR-denominated current account with the IMF used for processing and settling all transactions with the IMF. This current account bears interest in the amount of the so-called IMF basic rate. In 1399, the basic rate ranged from 0.05% to 0.78% p.a. (1398: (1398: 0.76% to 1.15% p.a.). The SDR Holding balance amounted to SDR 37.206 million (1398: SDR 39.339 million).

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

20.3.2  Total liability of the Islamic Republic of Afghanistan for the SDR allocation amounts to SDR 155.31 million (1398: SDR 155.31 million). According to the IMF's Articles of Agreement, the liability for the SDR allocation falls due only in the case and in the amount of the cancelled SDR allocation, which requires a decision of the Council of IMF Governors, with 85% majority of votes, or in the case of canceling the participation in the IMF's SDR Department.

As per the new arrangement between the IMF and MoF during the year (the program), IMF approved SDR 259.04 million ECF to Government of Islamic Republic of Afghanistan under the program. The MoF has withdrawn equivalent to SDR 80.95 million in addition outstanding ECF 2011-14 equivalent to SDR 6 million (1398: SDR 12 million). The repayment of ECF loans to IMF has been made using SDR Holdings account with the IMF.

20.3.3  The IMF approved an emergency assistance to Government of Islamic Republic of Afghanistan-MoF equivalent to SDR 161.90 million under Rapid Credit Facility (RCF) during the year, to mitigate the impact of Covid-19 pandemic on Afghanistan's economy and to boost critical health spending and rolling out social assistance to households hit hard by the pandemic. The RCF has 10 years maturity and are repayable in 10 equal semiannual installments starting after 5th year of disbursement.

|  |  | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **21.** | **DEFINED CONTRIBUTION OBLIGATION** | | |
| | Defined contribution obligation | 21.1 | **1,909,843** | 1,769,903 |

21.1  In 1395, the Bank introduced an unfunded contribution scheme and operates it for all of its permanent employees. Monthly contributions are made both by the Bank and the employees at 8% of employees' basic salary.

**22.  DEFERRED GRANTS**

This represents grants received in kind from various donors in the form of information technology and power equipments for the purpose of supporting the government owned entities.

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| Balance at the beginning of the year | | **142,182** | 249,061 |
| Grants received during the year | | **-** | 12,365 |
| | | **142,182** | 261,426 |
| Less: Deferred grants recognised as income | | **(59,084)** | (119,244) |
| Balance at the end of the year | | **83,098** | 142,182 |

UHY

33

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

|  |  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|---|
|  |  |  | ----------- (Afs in '000') ----------- | |
| 23. | **PROVISIONS AND OTHER LIABILITIES** |  |  |  |
|  | Provision against MOU adjustments | 23.1 | **29,467** | 29,467 |
|  | Payable to Ministry of Finance | 23.2 | **-** | 12,759,153 |
|  | Payable in respect of defined contribution obligation | 23.3 | **195,904** | 198,600 |
|  | Security deposits | 23.4 | **497,640** | 455,743 |
|  | Sundry payables |  | **785,979** | 781,246 |
|  | Auditor's remuneration | 23.5 | **3,753** | 3,763 |
|  | Inter-branch accounts |  | **-** | 185,332 |
|  | Others |  | **88,144** | 66,605 |
|  |  |  | **1,600,887** | 14,479,909 |

**23.1** The Bank has recognised this provision pending the conclusion of reconciliation process relating to the balances due from / to various ministries of the Government.

**23.2** This represents payable to Ministry of Finance on account of profit of the Bank transferable under article 29 of the DAB Law.

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| Opening balance as at beginning of the year |  | **12,759,153** | 8,991,226 |
| Transfer against profit for the year |  | **-** | 27,757,086 |
| Less: Payment on account of profit during the year |  | **(12,759,153)** | (23,989,159) |
| Balance as at end of the year |  | **-** | 12,759,153 |

**23.3** The Bank has discontinued its defined pension scheme with effect from Hamal 1395. The balance of defined benefit obligation is retained in the books of the Bank as a full reconciliation has not yet been finalized and is in process. Hence, the obligation will be transferred to defined contribution obligation on completion of reconciliation process.

**23.4** This includes security deposits received from foreign exchange dealers and money service providers.

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **23.5** Movement of Auditor's Remuneration |  |  |  |
| Opening balance as at beginning of the year |  | **3,763** | 6,160 |
| Plus: Provision for current year |  | **3,753** | 3,759 |
| Less: Payment during the year |  | **(3,763)** | (6,156) |
| Balance as at end of the year |  | **3,753** | 3,763 |

UHY

34

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**24. CAPITAL AND RESERVES**

**24.1 Capital**

According to Article 27 of the DAB Law, the authorised capital of the Bank is Afs 8,000 million or such higher amount as shall result form allocations from net profit pursuant to Article 29 of the DAB Law. Capital of the Bank is solely held by the Government of Islamic Republic of Afghanistan, and shall not subject to lien or encumbrances.

According to Article 29 of the DAB Law, if the Bank has a net profit for any financial year, it shall be allocated in the following order of priority:

a) To capital account of Da Afghanistan Bank (DAB) in such amount as shall be required to increase the authorized capital of the Bank to a level equivalent to five percent of the aggregate amount of monetary liabilities shown on the consolidated statement of financial position of the Bank for the end of that financial year;

b) To redeem the securities issued by the State to the Bank pursuant to Article 31 and held by the Bank;

c) To the General Reserve maintained by the Bank in such amount as shall be required to increase the amount of the General Reserve to a level equivalent to the amount of the authorized capital of the Bank; and

d) To any other reserve for specific purposes established by the Bank subject to the approval of Minister of Finance.

**24.2 Revaluation reserve**

The Bank's revaluation reserve represents the cumulative unrealised gains on revaluation of gold reserves at market prices, revaluation of freehold land at fair values and net unrealised valuation gains from available-for-sale financial assets at reporting date.

**24.3 Residual undistributed net unrealised valuation gains**

The Bank's residual undistributed net unrealised revaluation reserve is created under article 29 of the DAB Law. This represents the cumulative unrealised gains on the valuation of financial assets and liabilities at the closing exchange rate at the reporting date.

**25. CONTINGENCIES AND COMMITMENTS**

**25.1 Contingencies**

There are no outstanding financial guarantees and performance guarantees to third parties including the government.

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **25.2 Commitments** |  |  |  |
| Outstanding letter of credits |  | **5,469,737** | 3,595,284 |
| **26. INTEREST INCOME** |  |  |  |
| Interest income on: |  |  |  |
| Due from banks and financial institutions |  | **1,730,375** | 5,609,306 |
| Investments measured at FVOCI |  | **3,561,598** | 3,820,267 |
| Interest on LoLR | 11.1 | **3,361** | 95,782 |
|  |  | **5,295,334** | 9,525,355 |

UHY

35

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

26.1 During the year, interest income has decreased significantly due to decrease in interest rates caused by COVID-19 pandemic. Further, for managing credit risk after COVID-19 pandemic, the Bank has liquidated some of its term deposits and placed these amounts in US treasury bills having lower credit risk resulting in lower interest income.

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **27. INTEREST EXPENSE** |  |  |  |
| Interest expense on: |  |  |  |
| Capital notes | 17.2 | **655,167** | 166,846 |
| Overnight deposits | 18.3 | **7,271** | 8,309 |
|  |  | **662,438** | 175,155 |

27.1 During the year, interest expense on capital notes has significantly increased because carrying amount of capital notes has increased from Afs 24,780 million to Afs 45,840 million and average interest rates on these notes has increased by more than 100% .

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **28. NET (LOSS) / GAIN FROM DEALINGS IN FOREIGN CURRENCIES** |  |  |  |
|  |  | **(124,167)** | 21,039,852 |

28.1 During the year, Afghani appreciated against foreign currencies including US dollars. As a result, the Bank incurred loss on sale of those foreign currencies which were purchased at higher rates in previous years.

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| **29. OTHER INCOME** |  |  |  |
| Regulatory income |  | **91,001** | 181,081 |
| Unwinding of discount on LoLR | 11.2 | **-** | 209,126 |
| Recovery of expected credit loss | 36.1.2 | **249,424** | 407,700 |
| Write-back of inter-branch accounts | 29.1 | **190,931** | - |
| Others |  | **16,482** | 9,725 |
|  |  | **547,838** | 807,632 |

29.1 This represents the balances written back during the year as a result of the ongoing reconciliation process relating to the inter-branch accounts. These mainly include differences in opening balances of branches since 1383 which now have been charged to profit & loss.

UHY

36

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

|  |  | Note | 30 Qaws 1399<br>(20 Dec 2020) | 30 Qaws 1398<br>(21 Dec 2019) |
|---|---|---|---|---|
|  |  |  | ----------- (Afs in '000') ----------- |  |
| **30.** | **PERSONNEL EXPENSES** |  |  |  |
|  | Salaries |  | 1,627,052 | 1,600,662 |
|  | Charge against defined contribution obligation |  | 111,098 | 111,312 |
|  |  |  | 1,738,150 | 1,711,974 |
| **31.** | **OTHER OPERATING EXPENSES** |  |  |  |
|  | Repairs and maintenance |  | 42,490 | 46,260 |
|  | Rent |  | 7,796 | 10,101 |
|  | Auditor's remuneration |  | 3,753 | 3,759 |
|  | Consultancy fee |  | 60,264 | 28,909 |
|  | Staff training |  | 5,720 | 14,962 |
|  | Printing and stationery |  | 42,278 | 31,439 |
|  | Office supplies and maintenance |  | 16,146 | 11,224 |
|  | Transportation | 31.1 | 131,269 | 149,568 |
|  | Fee and subscription |  | 8,822 | 5,116 |
|  | Communication |  | 29,579 | 37,101 |
|  | Security services |  | 25,157 | 9,814 |
|  | Travelling |  | 12,815 | 37,154 |
|  | Write-off of inter-branch accounts |  | - | 26,117 |
|  | Financial assistance to AIBF | 31.2 | 23,000 | - |
|  | Utilities |  | 36,208 | 37,862 |
|  | Publications for public awareness |  | 4,215 | 25,924 |
|  | Others |  | 26,259 | 40,116 |
|  |  |  | 475,771 | 515,426 |

**31.1** This includes foreign currency transportation cost amounting to Afs 110.072 million (1398: Afs 129.192 million) incurred during the year.

**31.2** This represents financial assistance given to Afghanistan Institute of Banking and Finance (AIBF) by the Bank to meet its operational cost for financial year 2020.

|  |  | Note | 30 Qaws 1399<br>(20 Dec 2020) | 30 Qaws 1398<br>(21 Dec 2019) |
|---|---|---|---|---|
|  |  |  | ----------- (Afs in '000') ----------- |  |
| **32.** | **EXPENDITURE AGAINST GRANTS** |  |  |  |
|  | Depreciation | 13.2.4 | 44,347 | 99,318 |
|  | Amortisation |  | 14,737 | 19,926 |
|  |  |  | 59,084 | 119,244 |
| **33.** | **CASH AND CASH EQUIVALENTS** |  |  |  |
|  | Foreign currency cash reserves | 8.1 | 34,167,341 | 19,583,336 |
|  | Deposits (having maturity of less than three months) |  | 114,583,173 | 221,888,490 |
|  | Current accounts with foreign banks | 9 | 29,408,353 | 45,776,760 |
|  | Overnight balances with foreign banks | 9 | 56,490,207 | 8,734,962 |
|  | Cash and bank balances held by the Subsidiary | 15 | 4,461 | 1,849 |
|  |  |  | 234,653,535 | 295,985,397 |

UHY

37

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

### 34. RELATED PARTIES

**Transactions with related parties**

The Bank is a Government entity and the Government of Islamic Republic of Afghanistan is ultimate owner of the Bank. Related parties to the Bank include the Government of Islamic Republic of Afghanistan, various departments of the government and government controlled entities and enterprises. The Bank enters into transactions with related parties in its normal course of business and it is impracticable to disclose all transactions with related parties. Generally the Bank enters into the following transactions with the government and its related organizations.

(a) The Bank acts as a depository of the government or its agent, providing banking services to government, governmental organizations and enterprises;

(b) Issues letters of credit on behalf of government, governmental organisation and enterprises;

(c) The Bank does not ordinarily collect any commission, fees or other charges for the services which it renders to the government; and

(d) As an agent of the government, the bank manages foreign reserves.

**Members of the Supreme Council**

H.E Mr. Ajmal Ahmady, Acting Governor & Chairman of the Supreme Council

H.E Dr. Shah Mohammad Mehrabi, member of the Supreme Council and Chairman of the Audit Committee

H.E Dr. Muhammad Naim Azimi, member of the Supreme Council

H.E Dr. Abdul Wakil Muntazer, member of the Supreme Council

H.E Ms. Katrin Faqiri, member of the Supreme Council

**Members of the Executive Board**

H.E Mr. Ajmal Ahmady, Acting  Governor &  Chairman of Supreme Council

| | 30 Qaws 1399 | 30 Qaws 1398 |
|---|---|---|
| | (20 Dec 2020) | (21 Dec 2019) |
| **Transactions with key management personnel** | ----------- (Afs in '000') ----------- | |
| | | |
| **Key management personnel compensation** | | |
| Salary and other employee benefits | **10,885** | 21,337 |

Compensation of the Bank's key management personnel includes salaries and benefits.

The transactions and outstanding balances related to key management personnel were as follows:

| | Note | 30 Qaws 1399 | 30 Qaws 1398 |
|---|---|---|---|
| | | (20 Dec 2020) | (21 Dec 2019) |
| | | ----------- (Afs in '000') ----------- | |
| **Loans to key management personnel** | | | |
| Loans outstanding as at beginning of the year | | **16,792** | 19,095 |
| Loans advanced during the year | | **1,000** | - |
| Loan repayments during the year | | **(2,188)** | (2,303) |
| Loans outstanding as at end of the year | | **15,604** | 16,792 |
| | | | |
| *Other related party transactions* | | | |
| **Assistance as lender of last resort** | | | |
| Repayments received during the year | 11.1 | **-** | 7,100,000 |
| Balance outstanding as at the year end | 11.1 | **170,154** | 166,793 |
| | | | |
| **Advance for Afghanistan Deposit Insurance Corporation** | | | |
| Balance outstanding as at the year end | 12.2 | **500,000** | 500,000 |
| | | | |
| **Government accounts** | | | |
| Opening outstanding balance | | **105,990,703** | 111,133,304 |
| Deposits during the year | | **1,088,055,772** | 982,086,583 |
| Payments during the year | | **(1,077,822,592)** | (987,229,184) |
| Closing outstanding balance | | **116,223,883** | 105,990,703 |

UHY

38

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

35. FINANCIAL ASSETS AND LIABILITIES

Classification of financial instrument and fair values

The table below sets out the Group's classification of each class of financial assets and liabilities.

| 30 Qaws 1399 (20 December 2020) | Note | Assets at fair value through profit or loss | Assets at Fair Value through OCI | Amortised cost | Total |
|---|---|---|---|---|---|
| | | ------------------------------ (Afs in '000') ------------------------------ | | | |
| **Financial Assets** | | | | | |
| Foreign currency cash reserves | 8 | - | - | 34,167,341 | 34,167,341 |
| Due from banks and financial institutions | 9 | - | - | 254,804,239 | 254,804,239 |
| Investments | 10 | - | 368,813,780 | - | 368,813,780 |
| Assistance as lender of last resort | 11 | - | - | 170,154 | 170,154 |
| Advances and other receivables | 12 | - | - | 1,715,346 | 1,715,346 |
| Other assets | 15 | - | - | 4,461 | 4,461 |
| | | - | 368,813,780 | 290,861,541 | 659,675,321 |
| **Financial Liabilities** | | | | | |
| Currency in circulation | 16 | - | - | 293,341,380 | 293,341,380 |
| Capital notes | 17 | - | - | 45,849,384 | 45,849,384 |
| Due from banks and financial institutions | 18 | - | - | 100,079,198 | 100,079,198 |
| Due to customers | 19 | - | - | 144,323,269 | 144,323,269 |
| IMF related liabilities | 20 | - | - | 3,692,126 | 3,692,126 |
| Defined contribution obligation | 21 | - | - | 1,909,843 | 1,909,843 |
| Provisions and other liabilities | 23 | - | - | 1,567,667 | 1,567,667 |
| | | - | - | 590,762,867 | 590,762,867 |
| **30 Qaws 1398 (21 December 2019)** | | | | | |
| **Financial Assets** | | | | | |
| Foreign currency cash reserves | 8 | - | - | 19,583,336 | 19,583,336 |
| Due from banks and financial institutions | 9 | - | - | 355,946,615 | 355,946,615 |
| Investments | 10 | - | 218,264,106 | - | 218,264,106 |
| Assistance as lender of last resort | 11 | - | - | 166,793 | 166,793 |
| Advances and other receivables | 12 | - | - | 1,103,394 | 1,103,394 |
| Other assets | 15 | - | - | 1,849 | 1,849 |
| | | - | 218,264,106 | 376,801,987 | 595,066,093 |
| **Financial Liabilities** | | | | | |
| Currency in circulation | 16 | - | - | 259,348,259 | 259,348,259 |
| Capital notes | 17 | - | - | 24,775,173 | 24,775,173 |
| Due from banks and financial institutions | 18 | - | - | 97,224,024 | 97,224,024 |
| Due to customers | 19 | - | - | 130,121,482 | 130,121,482 |
| IMF related liabilities | 20 | - | - | 3,003,600 | 3,003,600 |
| Defined contribution obligation | 21 | - | - | 1,769,903 | 1,769,903 |
| Provisions and other liabilities | 23 | - | - | 14,261,347 | 14,261,347 |
| | | - | - | 530,503,788 | 530,503,788 |

Fair value is the price that would be received from sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

Financial assets which are tradable in an open market are revalued at the market prices prevailing on the consolidated statement of financial position date. The estimated fair value of all other financial assets and liabilities is considered not significantly different from book value.

The table below sets out fair values of the Bank's financial assets and liabilities.

UHY

39

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

| | Note | 20 December 2020 30 Qaws 1399 | | 21 December 2019 30 Qaws 1398 | |
| --- | --- | --- | --- | --- | --- |
| | | Carrying amount | Fair value | Carrying amount | Fair value |
| | | ------------------------------ (Afs in '000') ------------------------------ | | | |
| **30 Qaws 1399 (20 December 2020)** | | | | | |
| **Financial Assets** | | | | | |
| Foreign currency cash reserves | 8 | 34,167,341 | 34,167,341 | 19,583,336 | 19,583,336 |
| Due from banks and financial institutions | 9 | 254,804,239 | 254,804,239 | 355,946,615 | 355,946,615 |
| Investments | 10 | 368,813,780 | 368,813,780 | 218,264,106 | 218,264,106 |
| Assistance as lender of last resort | 11 | 170,154 | 170,154 | 166,793 | 166,793 |
| Advances and other receivables | 12 | 1,715,346 | 1,715,346 | 1,103,394 | 1,103,394 |
| Other assets | 15 | 4,461 | 4,461 | 1,849 | 1,849 |
| | | 659,675,321 | 659,675,321 | 595,066,093 | 595,066,093 |
| | | | | | |
| **Financial Liabilities** | | | | | |
| Currency in circulation | 16 | 293,341,380 | 293,341,380 | 259,348,259 | 259,348,259 |
| Capital notes | 17 | 45,849,384 | 45,849,384 | 24,775,173 | 24,775,173 |
| Due from banks and financial institutions | 18 | 100,079,198 | 100,079,198 | 97,224,024 | 97,224,024 |
| Due to customers | 19 | 144,323,269 | 144,323,269 | 130,121,482 | 130,121,482 |
| IMF related liabilities | 20 | 3,692,126 | 3,692,126 | 3,003,600 | 3,003,600 |
| Defined contribution obligation | 21 | 1,909,843 | 1,909,843 | 1,769,903 | 1,769,903 |
| Provisions and other liabilities | 23 | 1,567,667 | 1,567,667 | 14,261,347 | 14,261,347 |
| | | 590,762,867 | 590,762,867 | 530,503,788 | 530,503,788 |

The following table shows financial instruments recognised at fair value, analysed between those whose fair value is based on:

**Level 1:** Fair value measurements using quoted prices (unadjusted) in active markets for identical assets or liabilities.

**Level 2:** Fair value measurements using inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly (i.e. as prices) or indirectly (i.e. derived from prices).

**Level 3:** Fair value measurements using inputs for the asset or liability that are not based on observable market data (i.e. unobservable inputs).

The table below analyses financial instruments measured at the end of the reporting period by the level in the fair value hierarchy into which the fair value measurement is categorised:

| | Level 1 | Level 2 | Level 3 | Total |
| --- | --- | --- | --- | --- |
| | ------------------------------ (Afs in '000') ------------------------------ | | | |
| **30 Qaws 1399 (20 December 2020)** | | | | |
| Due from banks and financial institutions | - | 254,677,074 | - | 254,677,074 |
| US treasury bonds and other securities | 187,120,796 | - | - | 187,120,796 |
| US treasury bonds | 4,149,044 | - | - | 4,149,044 |
| US Treasury Bills | 145,693,372 | - | - | 145,693,372 |
| Bank for International Settlements Investment Pool - A | 30,416,640 | - | - | 30,416,640 |
| Shares in ECOTDB | - | - | 1,433,928 | 1,433,928 |
| Assistance as lender of last resort | - | - | 170,154 | 170,154 |
| Advances and other receivables | - | - | 1,715,346 | 1,715,346 |
| Other assets | - | - | 4,461 | 4,461 |
| | 367,379,852 | 254,677,074 | 3,323,889 | 625,380,815 |
| | | | | |
| **30 Qaws 1398 (21 December 2019)** | | | | |
| Due from banks and financial institutions | - | 355,570,353 | - | 355,570,353 |
| US treasury bonds and other securities | 182,929,450 | - | - | 182,929,450 |
| US treasury bonds | 4,075,418 | - | - | 4,075,418 |
| Bank for International Settlements Investment Pool - A | 29,825,310 | - | - | 29,825,310 |
| Shares in ECOTDB | - | - | 1,433,928 | 1,433,928 |
| Assistance as lender of last resort | - | - | 166,793 | 166,793 |
| Advances and other receivables | - | - | 1,103,394 | 1,103,394 |
| Other assets | - | - | 1,849 | 1,849 |
| | 216,830,178 | 355,570,353 | 2,705,964 | 575,106,495 |

4HY

40

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**36. RISK MANAGEMENT POLICIES**

The Supreme Council of the Group, chaired by the Governor, has the overall responsibility and oversight of the Group's risk management framework. The Group is primarily subject to credit, liquidity, market (interest and currency) risks and operational risk. The policies and procedures for managing these risks are outlined in notes 36.1 to 36.5. The Group has designed and implemented a framework of controls to identify, monitor and manage these risks. The senior management is responsible for advising the Governor on the monitoring and managing of these risks. In addition, International Monetary Fund (IMF) representatives visit the Bank periodically to advise senior management and the Governor on the management of these risks.

The Market Operations Department within the Bank is responsible for monitoring the Foreign Currency Reserves as per the Bank's Reserves Management Policy and Guidelines.

**36.1 Credit risk management**

Credit risk is the risk that the counterparty to a financial instrument will fail to discharge an obligation or commitment that it has entered into with the Group, resulting in a financial loss to the Group. The Group's primary exposure to credit risk arises through investment in government securities, deposits with banks and financial institutions and investments in FVOCI financial assets. Credit risk arising from deposit with banks and financial institutions is managed by monitoring, reviewing and analyzing these deposits frequently. Investments are made in government securities, securities issued by government entities and other highly reputable organizations; periodic monitoring and review is carried out by the management. The Group manages credit risk arising from issuance of letters of credit by obtaining 100% margin against letters of credit.

**Concentration of credit risk**

The Group's concentration of credit risk exposure is as follows:

|  | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
|  |  | ----------- (Afs in '000') ----------- | |
| Due from banks and financial institutions | 9 | 254,804,239 | 355,946,615 |
| Investments | 10 | 368,813,780 | 218,264,106 |
| Assistance as lender of last resort | 11 | 170,154 | 170,154 |
| Advances and other receivables | 12 | 1,715,346 | 1,103,394 |
| Other assets | 15 | 4,461 | 1,849 |
|  |  | 625,507,980 | 575,486,118 |

The Group neither enters into nor is a party to financial instruments and contractual obligations that, under certain conditions, could give rise to or involve elements of, market or credit risk in excess of that shown in the consolidated statement of financial position, such as interest rate swaps, forward foreign exchange contracts, financial guarantees, and commitments to extend credit.

The analysis below summarises the credit quality of the Group's liquid portfolio as on 20 December 2020:

UHY

41

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**Due from banks and term deposits rating by Rating Category**

| Short Term | Note | 30 Qaws 1399 (20 Dec 2020) | 30 Qaws 1398 (21 Dec 2019) |
|---|---|---|---|
| | | ----------- (Afs in '000') ----------- | |
| A-1+ | | 29.28% | 14.85% |
| A-1 | | 36.53% | 8.91% |
| A-2 | | 17.02% | 44.57% |
| A-3 | | 16.83% | 25.65% |
| B | | 0.00% | 0.25% |
| Unrated | | 0.34% | 5.77% |
| | | 100.00% | 100.00% |

The Group monitors concentrations of credit risk by sector and geographic location.

The following table breaks down the Group's main credit exposure by geographical region. For this table, the Group has allocated exposures to the regions based on the country of domicile of counterparties.

| | Due from banks and financial institutions | Investments | Advances and other receivables | Assistance as a LoLR | Total |
|---|---|---|---|---|---|
| | -------------------------------------- (Afs in '000') -------------------------------------- | | | | |
| **30 Qaws 1399 (20 December 2020)** | | | | | |
| Afghanistan | - | - | 1,715,346 | 170,154 | 1,885,500 |
| Asia | 41,298,402 | - | - | - | 41,298,402 |
| Europe | 156,955,235 | 31,850,568 | - | - | 188,805,803 |
| America | 56,550,602 | 336,963,212 | - | - | 393,513,814 |
| | 254,804,239 | 368,813,780 | 1,715,346 | 170,154 | 625,503,519 |
| **30 Qaws 1398 (21 December 2019)** | | | | | |
| Afghanistan | - | - | 1,103,394 | 166,793 | 1,270,187 |
| Asia | 98,259,614 | - | - | - | 98,259,614 |
| Europe | 161,122,031 | 31,259,238 | - | - | 192,381,269 |
| America | 96,564,970 | 187,004,867 | - | - | 283,569,837 |
| | 355,946,615 | 218,264,105 | 1,103,394 | 166,793 | 575,480,907 |

UHY

42

App.229

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

### 36.1.1 Credit risk measurement

The estimation of credit exposure for risk management purposes is complex and requires the use of models, as the exposure varies with changes in market conditions, expected cash flows and the passage of time. The assessment of credit risk of a portfolio of assets entails further estimations as to the likelihood of defaults occurring, of the associated loss ratios and of default correlations between counterparties. For risk management reporting purposes, the Group considers and consolidates loan size as an element of credit risk exposure. The Group measures credit risk using Probability of Default (PD), Exposure at Default (EAD) and Loss Given Default (LGD).

**Expected credit loss measurement**

IFRS 9 outlines a 'three-stage' model for impairment based on changes in credit quality since initial recognition as summarized below:

- A financial assets that is not credit-impaired on initial recognition is classified in 'Stage 1' and has its credit risk continuously monitored by the Group.
- If a significant increase in credit risk (SICR) since initial recognition is identified, the financial assets is moved to 'Stage 2' but is not yet deemed to be credit-impaired.
- If the financial assets is credit-impaired, the financial instrument is then moved to 'Stage 3'.
- Financial assets in Stage 1 have their ECL measured at an amount equal to the portion of lifetime expected credit losses that result from default events possible within the next 12 months. Assets in Stages 2 or 3 have their ECL measured based on expected credit losses on a lifetime basis.
- A pervasive concept in measuring ECL in accordance with IFRS 9 is that it should consider forward-looking information.
- Purchased or originated credit-impaired financial assets are those financial assets that are credit-impaired on initial recognition. Their ECL is always measured on a lifetime basis (Stage 3).

**Significant increase in credit risk**

When determining whether the risk of default on a financial instrument has increased significantly since initial recognition, the Group considers reasonable and supportable information that is relevant and available without undue cost or effort. This includes both quantitative and qualitative information and analysis, based on the Group's historical experience and expert credit assessment and including forward-looking information. The objective of the assessment is to identify whether a significant increase in credit risk has occurred for an exposure by comparing:

- The remaining lifetime PD as at the reporting date; with
- The remaining lifetime PD for this point in time that was estimated at the time of initial recognition of the exposure (adjusted where relevant for changes in prepayment expectations).

The Group uses following criteria for determining whether there has been significant increase in credit risk:
- Quantitative test based on movement in PD; and
- Forbearance status.

UHY

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

"Forbearance" occurs upon restructuring, i.e. prolongation in payment terms of payment of interest or principal arising from a deterioration of a borrower's financial condition such that it is not the same as it was at the time of loan origination and a borrower has applied for a change in the payment scheme of the loan. Restructuring only occurs when the appropriate division of the Group is reasonably confident that a borrower is able to service the renewed payment schedule.

Multiple economic scenarios form the basis of determining the PD at initial recognition and at subsequent reporting dates. Different economic scenarios will lead to a different PD. It is the weighting of these different scenarios that forms the basis of a weighted average PD that is used to determine whether credit risk has significantly increased. Forward-looking information includes the future prospects of Afghanistan economy obtained from economic expert reports, financial analysts, governmental bodies, relevant think-tanks and other similar organizations, as well as consideration of various internal and external sources of actual and forecast economic information.

**Definition of default**

Critical to the determination of ECL is the definition of default. The definition of default is used in measuring the amount of ECL and in the determination of whether the loss allowance is based on 12-month or lifetime ECL, as default is a component of the probability of default (PD) which affects both the measurement of ECLs and the identification of a significant increase in credit risk.

The Group considers the following as constituting an event of default:

The contract is past due more than 30 days; or
The credit obligations reflected in the contract is unlikely to be paid to the Group in full.

The definition of default is appropriately tailored to reflect different characteristics of different types of assets. When assessing if the borrower is unlikely to pay its credit obligation, the Group takes into account both qualitative and quantitative indicators. Quantitative indicators, such as overdue status and non-payment on another obligation of the same counterparty are key inputs in this analysis. The Group uses a variety of sources of information to assess default which are either developed internally or obtained from external sources.

The following diagram summarizes the impairment requirements under IFRS 9 (other than purchased or originated credit-impaired financial assets):

| Stage 1 | Stage 2 | Stage 3 |
|---|---|---|
| (Initial recognition) | (Significant increase in credit risk since initial recognition) | (Credit-impaired assets) |
| 12-month expected credit losses | Lifetime expected credit losses | Lifetime expected credit losses |

UHY

44

App.231

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**36.1.2 Movement in Expected Credit Losses**

The following table reconciles the expected credit losses allowance for the year ended 20 December 2020 by classes of financial instruments:

| | Due from Banks and Financial Institutions | Investments | Advances and other receivables | Total |
|---|---|---|---|---|
| | Note 9.3 | Note 10.6 | Note 12.5 | |
| | ----------- (Afs in '000') ----------- | | | |
| Opening balance as at 21 December 2018 | - | - | 150,731 | 150,731 |
| Impact on initial recognition of IFRS 9 | 800,647 | 8,571 | - | 809,218 |
| **Balance as at 22 December 2018** | **800,647** | **8,571** | **150,731** | **959,949** |
| Expected credit loss / (recovery) | (424,386) | (1,655) | 18,341 | (407,700) |
| **Balance as at 21 December 2019** | **376,261** | **6,916** | **169,072** | **552,249** |
| Expected credit loss / (recovery) | (249,096) | 290 | (618) | (249,424) |
| **Balance as at 20 December 2020** | **127,165** | **7,206** | **168,454** | **302,825** |

**36.1.2 Measurement of ECL**

The key inputs into the measurement of ECL are the term structure of the following variables:

- Probability of default (PD);
- Loss given default (LGD);
- Exposure at default (EAD).

These parameters are generally derived from internally developed statistical models and other historical data.

Probability of default (PD)

The Group defines a financial instrument as in default when the financial asset is credit - impaired and meets one or more of the following criteria:

*Quantitative criteria*

The borrower is more than 90 days past due on its contractual payments are considered default by the Group.

*Qualitative criteria*

- a breach of contract, such as default or past due event;
- the lenders of the counterparty have granted a concession to the counterparty for economic or contractual reasons;
- relating to the counterparty's financial difficulty that the lender would not otherwise consider;
- the likelihood or probability that the counterparty will enter bankruptcy or other financial reorganization; or
- the dissolution of an active market for that financial asset due to financial difficulties.

*UH7*

45

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

*Credit rating and PD estimation process*

The Group's PD estimation process is based on the

| Internal rating description | 12 month PD | External Rating |
|---|---|---|
| **Performing** | | |
| High grade | - | Sovereign |
| High grade | | AAA |
| High grade | | AA+ to AA- |
| High grade | | A+ to A- |
| Standard Grade | | BBB+ to BBB- |
| Standard Grade | | BB+ to BB- |
| Standard Grade | | B+ to B- |
| Being below standard | | CCC+ to CCC- |
| Being below standard | | CC |
| Non performing | 100% | |

Exposure at default (EAD)

Exposure at default represents the gross carrying amount of the financial instruments subject to the impairment calculation, addressing both the client's ability to increase its exposure while approaching default and potential early repayments too. To calculate the EAD for a Stage 1 loan, the Group assesses the possible default events within 12 months for the calculation of the 12mECL. For Stage 2 and Stage 3 the exposure at default is considered for events over the lifetime of the instruments. The Group determines EADs by modelling the range of possible exposure outcomes at various points in time, corresponding the multiple scenarios. The IFRS 9 PDs are then assigned to each economic scenario based on the outcome of Group's models.

Loss given default (LGD)

Loss given default represents the Group's expectation of the extent of loss on a defaulted exposure. LGD varies by type of counterparty, type and seniority of claim and availability of collateral or other credit support.

*Significant increase in credit risk*

The Group considers a financial asset to have experienced a significant increase in credit risk when:

- credit rating falls below investment grade in case of investments made in financial assets, or
- the contractual payments are 30 days past due.

*Collateral and other credit enhancements*

To mitigate its credit risks on financial assets, the Group seeks to use collateral, where possible. The collateral comes in various forms, such as cash, securities, letters of credit/guarantees and demand promissory notes. The collaterals held against financials assets of the Group have been disclosed in their respective notes, where applicable.

UHY

46

App.233

Case 1:23-mc-00150-LGS-SN Document 77-85-45 Filed 07/20/2213 Page 57 of 65

# DA AFGHANISTAN BANK

## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)

### 36.2 Liquidity risk

Liquidity risk is the risk that the Group will encounter difficulty in meeting the obligations associated with its financial liabilities that are settled by delivering cash or another financial asset. In order to reduce the level of liquidity risk arising out of the local currency activities, the Bank manages the daily liquidity position of the banking system including advancing and withdrawal of funds from the system for smoothening out daily peaks and troughs.

The table below analyse the Group's financial liabilities into relevant maturity groupings based on the remaining period at the consolidated statement of financial position date to the contractual maturity date. The amounts in the table are the contractual undiscounted cash flows.

The maturity profile of the Bank's liabilities based on contractual maturities is given below:

**30 Qaws 1399 (20 December 2020)**

*(Afs in '000')*

| | Note | Gross nominal inflow / (outflow) | Up to 1 month | 1 to 3 months | 3 to 12 months | 1 to 5 years | Over 5 years | Carrying amount |
|---|---|---|---|---|---|---|---|---|
| **Financial assets** | | | | | | | | |
| Foreign currency cash reserves | 8 | 34,167,341 | 34,167,341 | - | - | - | - | 34,167,341 |
| Due from banks and financial institutions | 9 | 254,804,239 | 196,098,074 | 4,467,803 | 54,238,362 | - | - | 254,677,074 |
| Investments | 10 | 368,781,440 | 8,581,398 | 81,337,927 | 75,498,559 | 203,363,556 | - | 368,813,780 |
| Assistance as lender of last resort | 11 | 170,154 | - | - | 170,154 | - | - | 170,154 |
| Advances and other receivables | 12 | 1,715,346 | 21,018 | 42,036 | 174,029 | 638,137 | 840,126 | 1,715,346 |
| Other assets | 15 | 4,461 | 4,461 | - | - | - | - | 4,461 |
| | | 659,642,981 | 238,872,292 | 85,847,766 | 130,081,104 | 204,001,693 | 840,126 | 659,548,156 |
| **Liabilities** | | | | | | | | |
| Currency in circulation | 16 | 293,341,380 | - | - | - | - | 293,341,380 | 293,341,380 |
| Capital notes | 17 | 45,849,384 | 13,554,173 | 5,793,346 | 26,501,865 | - | - | 45,849,384 |
| Due to banks and financial institutions | 18 | 100,079,198 | 75,028,608 | - | 24,665,065 | 385,525 | - | 100,079,198 |
| Due to customers | 19 | 144,323,269 | 138,853,532 | 5,469,737 | - | - | - | 144,323,269 |
| IMF related liabilities | 20 | 3,692,126 | 3,692,126 | - | - | - | - | 3,692,126 |
| Defined contribution obligation | 21 | 1,909,843 | 1,909,843 | - | - | - | - | 1,909,843 |
| Provisions and other liabilities | 23 | 1,567,667 | 1,567,667 | - | - | - | - | 1,567,667 |
| | | 590,762,867 | 234,605,949 | 11,263,083 | 51,166,930 | 385,525 | 293,341,380 | 590,762,867 |
| **Net liquidity gap** | | 68,880,114 | 4,266,343 | 74,584,683 | 78,914,174 | 203,616,168 | (292,501,254) | 68,785,289 |

Case 1:3-md-03150-GBD-SN Document 7765-45 Filed 03/20/24 Page 58 of 65

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**30 Qaws 1398 (21 December 2019)**

(Afs in '000')

| | Note | Gross nominal inflow / (outflow) | Up to 1 month | 1 to 3 months | 3 to 12 months | 1 to 5 years | Over 5 years | Carrying amount |
|---|---|---|---|---|---|---|---|---|
| **Financial assets** | | | | | | | | |
| Foreign currency cash reserves | 8 | 19,583,336 | 19,583,336 | - | - | - | - | 19,583,336 |
| Due from banks and financial institutions | 9 | 355,946,615 | 144,892,961 | 132,167,199 | 78,886,455 | - | - | 355,570,353 |
| Investments | 10 | 218,264,106 | - | - | 380,138 | 217,883,968 | - | 218,264,106 |
| Assistance as lender of last resort | 11 | 166,793 | - | - | 166,793 | - | - | 166,793 |
| Advances and other receivables | 12 | 1,103,394 | 11,219 | 22,438 | 83,127 | 240,776 | 745,834 | 1,103,394 |
| Other assets | 15 | 1,849 | 1,849 | - | - | - | - | 1,849 |
| | | 595,066,093 | 164,489,365 | 132,189,637 | 79,516,513 | 218,124,744 | 745,834 | 594,689,831 |
| **Liabilities** | | | | | | | | |
| Currency in circulation | 16 | 259,348,259 | - | - | - | - | 259,348,259 | 259,348,259 |
| Capital notes | 17 | 24,775,173 | 6,533,217 | 8,282,550 | 9,959,406 | - | - | 24,775,173 |
| Due to banks and financial institutions | 18 | 97,224,024 | 73,897,466 | - | 22,934,516 | 392,042 | - | 97,224,024 |
| Due to customers | 19 | 130,121,482 | 126,526,198 | 3,595,284 | - | - | - | 130,121,482 |
| IMF related liabilities | 20 | 3,003,600 | 3,003,600 | - | - | - | - | 3,003,600 |
| Defined contribution obligation | 21 | 1,769,903 | 1,769,903 | - | - | - | - | 1,769,903 |
| Provisions and other liabilities | 23 | 14,265,110 | 14,265,110 | - | - | - | - | 14,265,110 |
| | | 530,507,551 | 225,995,494 | 11,877,834 | 32,893,922 | 392,042 | 259,348,259 | 530,507,551 |
| **Net liquidity gap** | | 64,558,542 | (61,506,129) | 120,311,803 | 46,622,591 | 217,732,702 | (258,602,425) | 64,182,280 |

48

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

### 36.3 Market risk

Market risk is the risk that the fair value of future cash flows of a financial instrument will fluctuate because of changes in market prices. Market risk comprises three types of risk: interest rate risk, currency risk and other price risk, such as equity price risk and commodity risk. The Group is exposed to market risk, as a consequence of its operations to deliver its policy objectives as well as in the course of managing the Group's consolidated statement of financial position, principally through changes in the relative interest rates received on its assets and paid on its liabilities. Exposure may also be incurred to changes in exchange rates and to shifts in general market conditions, such as the liquidity of asset markets.

All market risk is managed within the Bank's Market Operations Department through Reserves Management Policy and Guidelines. The Group is exposed to interest rate risk principally via its investments in available for sale financial assets and short term deposits with other banks and financial institutions bought and held to maturity in normal circumstances with the intention of maintaining the value of the Group's capital and generating income to pay for the Group's policy functions.

### 36.4 Interest rate risk exposure

Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Group's investments and short term deposits with other banks and financial institutions are primarily linked to prevailing market conditions. All other liabilities of the Group are non interest bearing except the capital notes and overnight deposits included in due to banks and financial institutions.

The Group does not have any material positions in off-balance-sheet instruments, whose value can be affected by interest rate changes, such as swaps, futures, and forwards; option contracts, such as caps, floors, and options on futures; and firm forward commitments to buy or sell loans, securities, or other financial instruments.

The table below summarises the Group's exposure to interest rate risks. Included in the table are the Group's financial assets and liabilities at carrying or revalued amounts, categorised by earlier of contractual repricing of maturity dates. Non interest bearing financial instruments are shown for reconciliation purposes.

| | Note | Interest rates (p.a) | Up to 1 month | 1 to 3 months | 3 to 12 months | 1 to 5 years | Total | Non-Interest bearing | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Interest bearing | | | | |
| | | | | | (Afs in '000') | | | | |
| **30 Qaws 1399 (20 December 2020)** | | | | | | | | | |
| **Financial assets** | | | | | | | | | |
| Foreign currency cash reserves | 8 | - | | | | | | 34,167,341 | 34,167,341 |
| Due from banks and financial institutions | 9 | -0.67 - 0.65% | 166,689,721 | 4,467,803 | 54,238,362 | - | 225,395,886 | 29,408,353 | 254,804,239 |
| Investments | 10 | 0.06 - 3.35% | 8,581,398 | 81,337,927 | 75,498,559 | 171,512,988 | 336,930,872 | 31,850,568 | 368,781,440 |
| Assistance as lender of last resort | 11 | - | - | - | - | - | - | 170,154 | 170,154 |
| Advances and other receivables | 12 | - | - | - | - | - | - | 1,715,346 | 1,715,346 |
| Other assets | 15 | - | - | - | - | - | - | 4,461 | 4,461 |
| | | | 175,271,119 | 85,805,730 | 129,736,921 | 171,512,988 | 562,326,758 | 97,316,223 | 659,642,981 |

49

Case 1:03-md-01570-GBD-SN Document 7785-45 Filed 03/20/2246 Page 60 of 65

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

| 30 Qaws 1399 (20 December 2020) | Note | Interest rates (p.a) | Up to 1 month | 1 to 3 months | 3 to 12 months | 1 to 5 years | Total | Non-interest bearing | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | Interest bearing | | | | | | |
| | | | (Afs in '000) | | | | | | |
| **Financial liabilities** | | | | | | | | | |
| Currency in circulation | 16 | - | - | - | - | - | - | 293,341,380 | 293,341,380 |
| Capital notes | 17 | 0.79 - 3.80% | 13,554,173 | 5,793,346 | 26,501,865 | - | 45,849,384 | - | 45,849,384 |
| Due to banks and financial institutions | 18 | 0.1% | 9,927,375 | - | - | - | 9,927,375 | 90,151,823 | 100,079,198 |
| Due to customers | 19 | - | - | - | - | - | - | 144,323,269 | 144,323,269 |
| IMF related liabilities | 20 | - | - | - | - | - | - | 3,692,126 | 3,692,126 |
| Defined contribution obligation | 21 | - | - | - | - | - | - | 1,909,843 | 1,909,843 |
| Provisions and other liabilities | 23 | - | - | - | - | - | - | 1,567,667 | 1,567,667 |
| | | | 23,481,548 | 5,793,346 | 26,501,865 | - | 55,776,759 | 534,986,108 | 590,762,867 |
| On balance sheet interest sensitivity gap | | | 151,789,571 | 80,012,384 | 103,235,056 | 171,512,988 | 506,549,999 | (437,669,885) | 68,880,114 |

| 30 Qaws 1398 (21 December 2019) | Note | Interest rates (p.a) | Up to 1 month | 1 to 3 months | 3 to 12 months | 1 to 5 years | Total | Non-interest bearing | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | Interest bearing | | | | | | |
| | | | (Afs in '000) | | | | | | |
| **Financial assets** | | | | | | | | | |
| Foreign currency cash reserves | 8 | -0.04 - 2.95% | - | - | - | - | - | 19,583,336 | 19,583,336 |
| Due from banks & financial institutions | 9 | 1.38 - 3.13% | 99,116,201 | 132,167,199 | 78,886,455 | - | 310,169,855 | 45,776,760 | 355,946,615 |
| Investments | 10 | 2% | - | - | 380,138 | 186,624,730 | 187,004,868 | 31,259,238 | 218,264,106 |
| Assistance as lender of last resort | 11 | - | - | - | 166,793 | - | 166,793 | - | 166,793 |
| Advances and other receivables | 12 | - | - | - | - | - | - | 1,103,394 | 1,103,394 |
| Other assets | 15 | - | - | - | - | - | - | 1,849 | 1,849 |
| | | | 99,116,201 | 132,167,199 | 79,433,386 | 186,624,730 | 497,341,516 | 97,724,577 | 595,066,093 |
| **Financial liabilities** | | | | | | | | | |
| Currency in circulation | 16 | - | - | - | - | - | - | 259,348,259 | 259,348,259 |
| Capital notes | 17 | 0.15 - 2.20% | 6,553,217 | 8,282,550 | 9,959,406 | - | 24,775,173 | - | 24,775,173 |
| Due to banks and financial institutions | 18 | 0.1% | 14,569,822 | - | - | - | 14,569,822 | 82,654,202 | 97,224,024 |
| Due to customers | 19 | - | - | - | - | - | - | 130,121,482 | 130,121,482 |
| IMF related liabilities | 20 | - | - | - | - | - | - | 3,003,600 | 3,003,600 |
| Defined contribution obligation | 21 | - | - | - | - | - | - | 1,769,903 | 1,769,903 |
| Provisions and other liabilities | 23 | - | - | - | - | - | - | 14,265,110 | 14,265,110 |
| | | | 21,103,039 | 8,282,550 | 9,959,406 | - | 39,344,995 | 491,162,556 | 530,507,551 |
| On balance sheet interest sensitivity gap | | | 78,013,162 | 123,884,649 | 69,473,980 | 186,624,730 | 457,996,521 | (393,437,979) | 64,558,542 |

If the interest rate increase / decrease by 100 bps, the effect on profit for the year would have been Afs.5,065.499 million (1398: Afs.4,579.965 million) higher / lower respectively.

Case 1:03-md-01570-GBD-SN   Document 7785-45   Filed 03/20/22   Page 61 of 65

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**36.5   Currency risk**

Currency risk is the risk that the fair value or future cash flows of an exposure will fluctuate because of changes in foreign exchange rates. Foreign currency activities result mainly from the Bank's holding of foreign currency assets under its foreign reserve management function. The overall level of these assets is determined based on the prevailing extent of credit and liquidity risks. In order to avoid losses arising from adverse changes in the rates of exchange, the Bank's compliance with the limits established for foreign currency positions is required to be monitored by the management. The Bank has not entered in to any foreign currency hedging transaction as at year end.

The Bank's exposure to foreign currency risk is as follow:

| 30 Qaws 1399 (20 December 2020) | Note | USD | Euro | GBP | PKR | AED | Others | Afs | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Afs in '000') | | | | |
| **Financial assets** | | | | | | | | | |
| Foreign currency cash reserves | 8 | 32,967,164 | 1,076,948 | 6,363 | 144 | 2,092 | 114,630 | - | 34,167,341 |
| Due from banks and financial institutions | 9 | 145,125,469 | 52,385,389 | 54,712,055 | 853,509 | 1,727,817 | - | - | 254,804,239 |
| Investments | 10 | 367,379,852 | - | - | - | - | 1,433,928 | - | 368,813,780 |
| Assistance as lender of last resort | 11 | - | - | - | - | - | - | 170,154 | 170,154 |
| Advances and other receivables | 12 | - | - | - | - | - | - | 1,715,346 | 1,715,346 |
| Other assets | 15 | - | - | - | - | - | - | 4,461 | 4,461 |
| | | 545,472,485 | 53,462,337 | 54,718,418 | 853,653 | 1,729,909 | 1,548,558 | 1,889,961 | 659,675,321 |
| **Financial liabilities** | | | | | | | | | |
| Currency in circulation | 16 | - | - | - | - | - | - | 293,341,380 | 293,341,380 |
| Capital notes | 17 | - | - | - | - | - | - | 45,849,384 | 45,849,384 |
| Due to banks and financial institutions | 18 | 45,917,309 | 8,496,545 | 177,046 | 753 | - | - | 45,487,545 | 100,079,198 |
| Due to customers | 19 | 79,810,670 | 1,499,406 | 1,125 | 10,762 | - | 2,585,400 | 60,415,906 | 144,323,269 |
| IMF related liabilities | 20 | - | - | - | - | - | 3,605,108 | 87,018 | 3,692,126 |
| Defined contribution obligation | 21 | - | - | - | - | - | - | 1,909,843 | 1,909,843 |
| Provisions and other liabilities | 23 | 117,480 | - | - | - | - | - | 1,450,187 | 1,567,667 |
| | | 125,845,459 | 9,995,951 | 178,171 | 11,515 | - | 6,190,508 | 448,541,263 | 590,762,867 |
| **Net foreign currency exposure** | | 419,627,026 | 43,466,386 | 54,540,247 | 842,138 | 1,729,909 | (4,641,950) | (446,651,302) | 68,912,454 |

Case 1:23-md-03050-GBD-SN   Document 7783-45   Filed 07/02/24   Page 62 of 65

**DA AFGHANISTAN BANK**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

## 30 Qaws 1398 (21 December 2019)

(Afs in '000)

| | Note | USD | Euro | GBP | PKR | AED | Others | Afs | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Financial assets** | | | | | | | | | |
| Foreign currency cash reserves | 8 | 19,092,139 | 365,347 | 6,296 | 151 | 2,136 | 117,267 | - | 19,583,336 |
| Due from banks and financial institutions | 9 | 250,218,549 | 49,455,971 | 53,938,565 | 880,667 | 1,452,863 | - | - | 355,946,615 |
| Investments | 10 | 216,830,178 | - | - | - | - | 1,433,928 | - | 218,264,106 |
| Assistance as lender of last resort | 11 | - | - | - | - | - | - | 166,793 | 166,793 |
| Advances and other receivables | 12 | - | - | - | - | - | - | 1,103,394 | 1,103,394 |
| Other assets | 15 | - | - | - | - | - | - | 1,849 | 1,849 |
| | | 486,140,866 | 49,821,318 | 53,944,861 | 880,818 | 1,454,999 | 1,551,195 | 1,272,036 | 595,066,093 |
| **Financial liabilities** | | | | | | | | | |
| Currency in circulation | 16 | - | - | - | - | - | - | 259,348,259 | 259,348,259 |
| Capital notes | 17 | - | - | - | - | - | - | 24,775,173 | 24,775,173 |
| Due to banks and financial institutions | 18 | 38,273,368 | 8,959,923 | 175,174 | 788 | - | - | 49,814,771 | 97,224,024 |
| Due to customers | 19 | 84,536,721 | 3,198,626 | 4,556 | 10,977 | - | 5,382 | 42,365,220 | 130,121,482 |
| IMF related liabilities | 20 | - | - | - | - | - | 2,916,581 | 87,019 | 3,003,600 |
| Defined contribution obligation | 21 | - | - | - | - | - | - | 1,769,903 | 1,769,903 |
| Provisions and other liabilities | 23 | 105,517 | - | - | - | - | - | 14,159,593 | 14,265,110 |
| | | 122,915,606 | 12,158,549 | 179,730 | 11,765 | - | 2,921,963 | 392,319,938 | 530,507,551 |
| **Net foreign currency exposure** | | 363,225,260 | 37,662,769 | 53,765,131 | 869,053 | 1,454,999 | (1,370,768) | (391,047,902) | 64,558,542 |

52

App.239

Case 1:23-mc-00150-LAK-SN Document 72-45 Filed 07/20/24 Page 53 of 65

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**36.5.1 Sensitivity analysis on foreign currency financial assets and liabilities**

A 1% increase in the exchange rates of USD, Euro, GBP, PKR and AED at 20 December 2020 would have increased / (decreased) equity and profit by the amounts shown below. This analysis is based on foreign currency exchange rate variances that the Bank considered to be reasonably possible at the end of the reporting period. The analysis assumes that all other variables, in particular interest rates, remain constant.

| | USD | Euro | GBP | PKR | AED | Others | Afs | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (Afs in '000') | | | | |
| **30 Qaws 1399 (20 December 2020)** | | | | | | | | |
| **Effect of 1% increase in exchange rate** | | | | | | | | |
| **Financial assets** | | | | | | | | |
| Foreign currency cash reserves | 329,672 | 10,769 | 64 | 1 | 21 | 1,146 | - | 341,673 |
| Due from banks and financial institutions | 1,451,255 | 523,854 | 547,121 | 8,535 | 17,278 | - | - | 2,548,043 |
| Investments | 3,673,799 | - | - | - | - | 14,339 | - | 3,688,138 |
| Assistance as lender of last resort | - | - | - | - | - | - | - | - |
| Advances and other receivables | - | - | - | - | - | - | - | - |
| Other assets | - | - | - | - | - | - | - | - |
| | 5,454,726 | 534,623 | 547,185 | 8,536 | 17,299 | 15,485 | - | 6,577,854 |
| **Financial liabilities** | | | | | | | | |
| Due to banks and financial institutions | (459,173) | (84,965) | (1,770) | (8) | - | - | - | (545,916) |
| Due to customers | (798,107) | (14,994) | (11) | (108) | - | (25,854) | - | (839,074) |
| IMF related liabilities | - | - | - | - | - | (36,051) | - | (36,051) |
| Defined contribution obligation | - | - | - | - | - | - | - | - |
| Provisions and other liabilities | (1,175) | - | - | - | - | - | - | (1,175) |
| | (1,258,455) | (99,959) | (1,781) | (116) | - | (61,905) | - | (1,422,216) |
| **Effect on Equity / Profit** | 4,196,271 | 434,664 | 545,404 | 8,420 | 17,299 | (46,420) | - | 5,155,638 |

App.240

Case 1:23-md-03090-GBD-SN Document 77-35 Filed 07/29/25 Page 64 of 65

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

**30 Qaws 1398 (21 December 2019)**

**Effect of 1% increase in exchange rate**

| | USD | Euro | GBP | PKR | AED | Others | Afs | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (Afs in '000') | | | | |
| **Financial assets** | | | | | | | | |
| Foreign currency cash reserves | 190,921 | 3,653 | 63 | 2 | 21 | 1,173 | - | 195,833 |
| Due from banks and financial institutions | 2,502,185 | 494,560 | 539,386 | 8,807 | - | - | - | 3,544,938 |
| Investments | 2,168,302 | - | - | - | - | 14,339 | - | 2,182,641 |
| Assistance as lender of last resort | - | - | - | - | - | - | - | - |
| Advances and other receivables | - | - | - | - | - | - | - | - |
| Other assets | - | - | - | - | - | - | - | - |
| | 4,861,408 | 498,213 | 539,449 | 8,809 | 21 | 15,512 | - | 5,923,412 |
| **Financial liabilities** | | | | | | | | |
| Due to banks and financial institutions | (382,734) | (89,599) | (1,752) | (8) | - | - | - | (474,093) |
| Due to customers | (845,367) | (31,986) | (46) | (110) | - | (54) | - | (877,563) |
| IMF related liabilities | - | - | - | - | - | (29,166) | - | (29,166) |
| Defined contribution obligation | - | - | - | - | - | - | - | - |
| Provisions and other liabilities | (1,055) | - | - | - | - | - | - | (1,055) |
| | (1,229,156) | (121,585) | (1,798) | (118) | - | (29,220) | - | (1,381,877) |
| **Effect on Equity / Profit** | 3,632,252 | 376,628 | 537,651 | 8,691 | 21 | (13,708) | - | 4,541,535 |

36.5.2 Effect of 1% decrease in exchange rates will have same effect on net unrealised gains / (losses) for both years but in opposite direction.

App.241

**DA AFGHANISTAN BANK**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 30 QAWS 1399 (20 DECEMBER 2020)**

37. **DATE OF AUTHORISATION FOR ISSUE**

   These financial statements were authorised for issue by the Supreme Council of the Group on 14 March 2021.

38. **EVENTS AFTER THE REPORTING DATE**

   Subsequent to the statement of financial position date, no events have occurred which require adjustments to/or disclose in the financial statements.

39. **GENERAL**

   Figures have been rounded off to the nearest thousand, except as otherwise mentioned.

**Abdul Rahman Barhaq**
Acting Chief Financial Officer

**Ajmal Ahmady**
Acting Governor

# EXHIBIT 5

## AFN/USD (AFNUSD=X)  ⭐ Add to watchlist

CCY - CCY Delayed Price. Currency in USD

Quote Lookup

### 0.0108  +0.0002 (+1.4830%)

As of 04:55PM GMT. Market open.

Summary    Chart    Conversations    **Historical Data**

Time Period: Nov 30, 2020 - Dec 29, 2020 ⌄    Show: Historical Prices ⌄

Frequency: Daily ⌄    Apply

Currency in USD    ⬇ Download

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Dec 30, 2020 | 0.0130 | 0.0130 | 0.0129 | 0.0130 | 0.0130 | - |
| Dec 29, 2020 | 0.0129 | 0.0130 | 0.0129 | 0.0130 | 0.0130 | - |
| Dec 28, 2020 | 0.0131 | 0.0131 | 0.0129 | 0.0131 | 0.0131 | - |
| Dec 25, 2020 | 0.0131 | 0.0131 | 0.0131 | 0.0130 | 0.0130 | - |
| Dec 24, 2020 | 0.0131 | 0.0131 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 23, 2020 | 0.0130 | 0.0131 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 22, 2020 | 0.0130 | 0.0131 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 21, 2020 | 0.0131 | 0.0131 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 18, 2020 | 0.0131 | 0.0131 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 17, 2020 | 0.0129 | 0.0131 | 0.0129 | 0.0130 | 0.0130 | - |
| Dec 16, 2020 | 0.0129 | 0.0130 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 15, 2020 | 0.0131 | 0.0131 | 0.0129 | 0.0130 | 0.0130 | - |
| Dec 14, 2020 | 0.0131 | 0.0131 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 11, 2020 | 0.0132 | 0.0132 | 0.0131 | 0.0130 | 0.0130 | - |
| Dec 10, 2020 | 0.0131 | 0.0131 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 09, 2020 | 0.0132 | 0.0132 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 08, 2020 | 0.0131 | 0.0132 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 07, 2020 | 0.0131 | 0.0131 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 04, 2020 | 0.0131 | 0.0131 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 03, 2020 | 0.0132 | 0.0132 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 02, 2020 | 0.0132 | 0.0132 | 0.0130 | 0.0130 | 0.0130 | - |
| Dec 01, 2020 | 0.0131 | 0.0131 | 0.0130 | 0.0130 | 0.0130 | - |

*Close price adjusted for splits.    **Adjusted close price adjusted for splits and dividend and/or capital gain distributions.



**yahoo!** finance
**Pro tools and expert insights**
To raise your trading game
Try 14 days free*

### People Also Watch

| Symbol | Last Price | Change | % Change |
|--------|-----------|--------|----------|
| AFN=X USD/AFN | 91.9600 | -1.3600 | -1.4574% |
| AOAUS... AOA/USD | 0.0019 | +0.0000 | +0.03% |
| BGNUS... BGN/USD | 0.5849 | +0.0002 | +0.04% |
| AFNBR... AFN/BRX | 0.0565 | +0.0001 | +0.2660% |
| AWGUS... AWG/USD | 0.5555 | 0.0000 | 0.0000% |

Data Disclaimer    Help    Suggestions

Privacy Dashboard ▷

Privacy (Updated)    About Our Ads    Terms (Updated)    Sitemap

🐦 f in

© 2022 Yahoo. All rights reserved.

App. 244

# EXHIBIT 6

INTERNET ARCHIVE WaybackMachine https://twitter.com/aahmady/status/1427883012348424192 Go
17 captures
18 Aug 2021 - 10 Oct 2021
JUL AUG OCT
18
2020 2021 2022
About this capture

Ajmal Ahmady @aahmady · 6s
First, total DAB reserves were approximately $9.0 billion as of last week.

But this does not mean that DAB held $9.0 billion physically in our vault.

As per international standards, most assets are held in safe, liquid assets such as Treasuries and gold

> zerohedge @zerohedge
> AFGHANISTAN CENTRAL BANK HAS $10 BILLION IN ASSETS, BUT A MAJORITY OF THE FUNDS ARE HELD BY THE FEDERAL RESERVE IN NEW YORK -RTRS

1

Ajmal Ahmady
@aahmady
Follow

The major investment categories include the following assets (all figures in billions)

(1) Federal Reserve = $7.0
- U.S. bills/bonds: $3.1
- WB RAMP assets: $2.4
- Gold: $1.2
- Cash accounts: $0.3

(2) International accounts = 1.3

(3) BIS = $0.7

11:40 PM - 17 Aug 2021

1

Ajmal Ahmady @aahmady · 6s
Interesting note was that the IMF had approved a SDR650 billion allocation recently.

DAB was set to receive approximately $340 million on August 23rd.

