# 23-258(L)

## 23-263 (CON), 23-304 (CON), 23-346 (CON), 23-444 (CON)

### United States Court of Appeals
### *for the* Second Circuit

FIONA HAVLISH, RUSSA STEINER, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF WIL-LIAM STEINER, DECEASED, CLARA CHIRCHIRILLO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF PETER CHIRCHIRILLO, TARA BANE, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ES-TATE OF MICHAEL A. BANE, GRACE M. PARKINSON-GODSHALK, IN HER OWN RIGHT AND ADMINISTRATIX OF THE ESTATE OF WILLIAM R. GODSHALK, ELLEN L. SARACINI, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF VICTOR J. SARACINI, DECEASED, THERESAANN LOSTRANGIO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF JOSEPH LOSTRANGIO, DE-CEASED, DEENA BURNETT, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF THOMAS E. BURNETT, JR., DECEASED, THOMAS E. BURNETT, SR., AS THE PARENT AND ON BEHALF OF THE FAMILY OF THOMAS E. BURNETT, JR., JUDITH REISS, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JOSHUA SCOTT REISS, DECEASED, WILLIAM COALE, IN HIS OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JEFFREY ALAN COALE, DECEASED, PATRICIA J. PERRY, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JOHN WILLIAM PERRY, DECEASED, BAR-BARA A. MINERVINO, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF LOUIS J. MINERVINO, DECEASED,

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### PLAINTIFFS-APPELLANTS' APPENDIX
### VOLUME II of III (Pages App.247 to App.506)

Ian Heath Gershengorn
Douglass A. Mitchell
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000

Lee Wolosky
Benjamin D. Alter
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Andrianna D. Kastanek
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7285

*Counsel for Plaintiffs-Appellants Fiona Havlish, et al., Appellants in 23-258*

*Additional counsel listed inside*

MATTHEW T. SELLITTO, IN HIS OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF LOUIS J. MI-
NERVINO, DECEASED, RALPH MAERZ, JR., AS PARENT AND ON BEHALF OF THE FAMILY OF NOELL
MAERZ, DECEASED, LINDA PANIK, AS PARENT AND ON BEHALF OF THE FAMILY OF LT. JONAS MAR-
TIN PANIK, DECEASED, MARTIN PANIK, AS PARENT OF AND ON BEHALF OF THE FAMILY OF LT. JONAS
MARTIN PANIK, DECEASED, MARTINA LYNE-ANN PANIK, AS THE SISTER OF LT. JONAS MARTIN
PANIK, STEPHEN L. CARTLEDGE, AS HUSBAND OF SANDRA WRIGHT CARTLEDGE, DECEASED, LOIS-
ANNE DIEHL, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF MICHAEL DIEHL, DECEASED,
TINA GRAZIOSO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF JOHN GRAZIOSO, DE-
CEASED, JIN LIU, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF LIMING GU, DECEASED,
ALL PLAINTIFFS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, MICHAEL ED-
WARD PAIGE, SPECIAL ADMINISTRATOR OF THE ESTATE OF TIMOTHY RAYMOND WARD, DECEASED.,
BRIANNA L. GOMES, ADMINISTRATOR OF THE ESTATE OF DOYLE RAYMOND WARD, DECEASED,
JOHN DOES 1 THROUGH 7, RAYMOND ANTHONY SMITH, AS ADMINISTRATOR OF THE ESTATE OF
GEORGE ERIC SMITH, DECEASED, FEDERAL INSURANCE COMPANY, PACIFIC INDEMNITY COMPANY,
CHUBB CUSTOM INSURANCE COMPANY, CHUBB INDEMNITY INSURANCE COMPANY, CHUBB INSUR-
ANCE COMPANY OF CANADA, CHUBB INSURANCE COMPANY OF NEW JERSEY, GREAT NORTHERN
INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, TIG INSURANCE COMPANY, KATHLEEN
ASHTON, AS ADMINISTRATOR OF THE ESTATE OF THOMAS ASHTON, DECEASED AND ON BEHALF OF
ALL SURVIVORS OF THOMAS ASHTON, JOSEPHINE ALGER, AS ADMINISTRATOR OF THE ESTATE OF
FREDERICK ALGER, AS COEXECUTORS OF THE ESTATE OF DAVID D. ALGER, DECEASED AND ON BE-
HALF OF THE SURVIVORS OF DAVID D. ALGER, ANGELICA ALLEN, AS ADMINISTRATOR OF THE
ESTATE OF ERIC ALLEN, DECEASED AND ON BEHALF OF ALL SURVIVORS OF ERIC ALLEN, GEORGE
ANDRUCKI, AS COADMINISTRATOR OF THE ESTATE OF JEAN ANDRUCKI ,DECEASED AND ON BEHALF
OF ALL SURVIVORS OF JEAN ANDRUCKI, MARY ANDRUCKI, AS COADMINISTRATOR OF THE ESTATE
OF JEAN ANDRUCKI, DECEASED AND ON BEHALF OF ALL SURVIVORS OF JEAN ANDRUCKI,

     *Plaintiffs - Appellants,*

KATHERINE SOULAS, IN HER OWN RIGHT, AS REPRESENTATIVE OF THE HEIRS, ON BEHALF OF HER
MINOR CHILDREN, AND AS EXECUTRIX OF THE ESTATE OF TIMOTHY SOULAS, DECEASED, ON BEHALF
OF THE SOLATIUM CLAIMANTS, INCLUDING KATHERINE SOULAS, FREDERICK SOULAS, II, TIMOTHY
SOULAS, JR.,

     *Plaintiff,*

JANE DOE, IN HER OWN RIGHT, ON BEHALF OF HER MINOR CHILDREN, AND AS EXECUTRIX OF THE
ESTATE OF TOM SAWYER, A FICTITIOUS NAME, DECEASED,

     *Consolidated - Plaintiff,*

<div align="center">v.</div>

THE ISLAMIC EMIRATE OF AFGHANISTAN, THE TALIBAN, AL QAIDA/ISLAMIC ARMY, SHEIKH USA-
MAH BIN-MUHAMMAD BIN-LADEN, AKA OSAMA BIN-LADEN, REPUBLIC OF IRAQ,

     *Defendants - Appellees,*

FEDERAL RESERVE BANK OF NEW YORK,

     Garnishee-Interested-Party-Appellee,

SHEIKH USAMA BIN-LADEN, MUHAMMAD OMAR, AL QAEDA/ISLAMIC ARMY, ISLAMIC REPUBLIC OF IRAN, AYATOLLAH ALI HOSEINI-KHAMENEI, SUPREME LEADER, IRANIAN MINISTRY OF INFORMATION AND SECURITY, THE ISLAMIC REVOLUTIONARY GUARD CORPS, HEZBOLLAH, an unincorporated association, IRANIAN MINISTRY OF PETROLEUM, IRANIAN MINISTRY OF ECONOMIC AFFAIRS AND FINANCE, IRANIAN MINISTRY OF COMMERCE, IRANIAN MINISTRY OF DEFENSE AND ARMED FORCES LOGISTICS, SADDAM HUSSEIN, PRESIDENT, IRAQI MINISTRY OF DEFENSE, IRAQI MINISTRY OF FINANCE, IRAQI MINISTRY OF OIL, IRAQI INTELLIGENCE SERVICE, QUSAY HUSSEIN, UNIDENTIFIED TERRORIST DEFENDANTS 1-500, ALI AKBAR HASHEMI RAFSANJANI, THE NATIONAL IRANIAN TANKER CORPORATION, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 2, THE NATIONAL IRANIAN OIL CORPORATION, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 3, THE NATIONAL IRANIAN GAS COMPANY, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 4, IRAN AIRLINES, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 5, THE NATIONAL IRANIAN PETROCHEMICAL COMPANY, THE CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, UNIDENTIFIED TERRORIST DEFENDANTS 8-500, AL-QAEDA, THE HAQQANI NETWORK, AL QAIDA, EGYPTIAN ISLAMIC JIHAD, OSAMA BIN LADEN, ESTATE OF MUHAMMAD ATEF, AYMAN AL ZAWAHARI, ABU ZUBAYDH,

     Defendants.[*]

---

[*] This caption reproduces the one currently on the Court's docket. However, the *Havlish* Plaintiffs-Appellants (the "*Havlish* Creditors") have moved the Court to correct this caption, as it is incorrect. *See* ECF 51 at 6; *see also* ECF 10. It omits a number of the *Havlish* Creditors and includes individuals who are not party to the *Havlish* case. This Court's April 5, 2023 order (Newman, J.) identified the correct list of *Havlish* Creditors in Exhibit A to that order. *See* ECF 56 at 4. The *Havlish* Creditors respectfully request that the caption be amended to correspond with the list identified in Exhibit A to the Court's April 5, 2023 order.

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, New York, NY 10001
(212) 446-2300
dbarrett@bsfllp.com

Stuart H. Singer
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011
ssinger@bsfllp.com

Timothy B. Fleming
WIGGINS CHILDS PANTAZIS FISHER
GOLDFARB, PLLC
2208 18th Street NW #110
Washington, D.C. 20009
(202) 467-4489
tfleming@wigginschilds.com

*Additional Counsel for Plaintiffs-Appellants
Fiona Havlish, et al., Appellants in 23-258*

John Thornton
Orlando do Campo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com
od@dandtlaw.com

*Counsel for Plaintiffs-Appellants John Does
1 through 7, Appellants in 23-263*

Andrew J. Maloney, III, Esq.
KREINDLER & KREINDLER LLP
485 Lexington Ave., 28th Floor
New York, NY 10017
(212) 687-8181
amaloney@kreindler.com

Sean P. Carter, Esq.
Stephen A. Cozen
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
(215) 665-2105
scarter1@cozen.com

Richard Klingler
ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
1155 F Street, N.W. Suite 750
Washington, DC 20004
(202) 249-6900
rklingler@egcfirm.com

Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for Plaintiffs-Appellants Federal
Insurance Co., et al., Appellants in 23-346*

Dion G. Rassias
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000

*Counsel for Plaintiffs-Appellants Raymond
Anthony Smith, et al., Appellants in 23-304*

Theresa Trzaskoma
Noam Biale
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 202-2600
ttrzaskoma@shertremonte.com
nbiale@shertremonte.com

*Counsel for Plaintiffs-Appellants Kathleen Ashton, et al., Appellants in 23-444*

# INDEX

# VOLUME I

Havlish Creditors' Judgment, No. 03-md-01570 (S.D.N.Y.) ("MDL Dkt."), Dkt. 2624 (Oct. 16, 2012) ....................................................App.1

Doe Creditors' Judgment, No. 20-mc-740 (S.D.N.Y.) ("Doe Dkt."), Dkt. 5 (Jan. 20, 2021)............................................................................App.8

Federal Insurance Creditors' Judgment, MDL Dkt. 7888 (Apr. 20, 2022)......................................................................................App.12

Smith Creditors' Judgment, No. 01-cv-10132 (S.D.N.Y.) ("Smith Dkt."), Dkt. 28 (July 14, 2003) ..........................................................App.15

Amended Order of Judgment, MDL Dkt. 3226 (Mar. 8, 2016) ......................App.17

Order of Further Partial Judgment, MDL Dkt. 3300 (June 16, 2016)............App.28

Memo Endorsement of Judge Failla, Doe Dkt. 26 (Sept. 23, 2021) ..............App.32

Statement of Interest of the United States, MDL Dkt. 7661, Doe Dkt. 49 (Feb. 11, 2022) ...............................................................................App.34

Executive Order 14,064, MDL Dkt. 7661-1, Doe Dkt. 49-1 (Feb. 11, 2022) ............................................................................................App.70

Office of Foreign Assets Control License, MDL Dkt. 7661-2, Doe Dkt. 49-2 (Feb. 11, 2022)....................................................................App.73

Transcript of Proceedings, MDL Dkt. 7713 (Feb. 22, 2022) ..........................App.76

Havlish Creditors' Motion for Partial Turnover of Assets, MDL Dkt. 7764 (Mar. 20, 2022) ....................................................................App.111

Declaration of Douglass A. Mitchell in Support of the Havlish Creditors' Motion for Partial Turnover of Assets ("Mitchell Decl."), MDL Dkt. 7765 (Mar. 20, 2022) ...................................................App.144

Havlish Creditors' Writ of Execution, Ex. 1 to Mitchell Decl., MDL Dkt. 7765-1 (Mar. 20, 2022) ..........................................................App.149

i

U.S. Marshals' Letter to Federal Reserve Bank of New York, Ex. 2 to Mitchell Decl., MDL Dkt. 7765-2 (Mar. 20, 2022).......................................App.162

U.S. Marshals' Process Receipt and Return, Ex. 3 to Mitchell Decl., MDL Dkt. 7765-3 (Mar. 20, 2022) .................................................................App.176

Consolidated Financial Statements of Da Afghanistan Bank, Ex. 4 to Mitchell Decl., MDL Dkt. 7765-4 (Mar. 20, 2022)......................................App.178

Currency Conversion Table, Ex. 5 to Mitchell Decl., MDL Dkt. 7765-5 (Mar. 20, 2022) ......................................................................................App.243

Twitter Screen Capture, Ex. 6 to Mitchell Decl., MDL Dkt. 7765-6 (Mar. 20, 2022) .................................................................................................App.245

## VOLUME II

Expert Declaration of Alex B. Zerden in Support of the Havlish Creditors' Motion for Partial Turnover of Assets, MDL Dkt. 7766 (Mar. 20, 2022) .................................................................................................App.247

Memorandum of Law in Support of the Doe Creditors' Motion for Turnover of Assets, MDL Dkt. 7769 (Mar. 20, 2022) ...................................App.319

Doe Creditors' Writ of Execution, Ex. A to Memorandum of Law in Support of the Doe Creditors' Motion for Turnover of Assets, MDL Dkt. 7769-1 (Mar. 20, 2022).........................................................................App.350

Declaration of John Thornton in Support of the Doe Creditors' Motion for Turnover of Assets, MDL Dkt. 7770 (Mar. 20, 2022)...........................App.352

Complaint, No. 22-cv-3228 (S.D.N.Y.), Dkt. 1 (Apr. 20, 2022)...................App.354

Transcript of Proceedings, MDL Dkt. 7966 (Apr. 26, 2022) .......................App.383

Memorandum of Law in Support of the Federal Insurance Creditors' Motion for Partial Turnover of Assets, MDL Dkt. 7937 (Apr. 29, 2022) ...........................................................................................................App.423

Declaration of Sean P. Carter in Support of the Federal Insurance Creditors' Motion for Partial Turnover of Assets ("Carter Decl."), MDL Dkt. 7938 (Apr. 29, 2022).................................................................App.456

Federal Insurance Creditors' Writ of Execution, Ex. 1 to Carter Decl., MDL Dkt. 7938-1 (Apr. 29, 2022) .................................................App.460

U.S. Marshal's Process Receipt and Return, Ex. 2 to Carter Decl., MDL Dkt. 7938-2 (Apr. 29, 2022) ..........................................................App.472

Declaration of J. Scott Tarbutton, Ex. 6 to Carter Decl., MDL Dkt. 7938-6 (Apr. 29, 2022) ...................................................................App.474

Memorandum of Law in Support of the Smith Creditors' Motion for Turnover of Assets, Smith Dkt. 63 (May 18, 2022) .....................................App.484

Smith Creditors' Writ of Execution, Smith Dkt. 46-3 (Apr. 22, 2022).........App.505

## VOLUME III

Expert Declaration of Jonathan L. Cristol in Support of the Smith Creditors' Motion for Turnover of Assets, Smith Dkt. 64 (May 18, 2022) ..............................................................................................App.507

Declaration of James E. Beasley, Jr. in Support of the Smith Creditors' Motion for Turnover of Assets, Smith Dkt. 65 (May 18, 2022)....................App.527

Havlish Creditors' Affidavit of Service, MDL Dkt. 7776 (Mar. 21, 2022) ..............................................................................................App.531

Doe Creditors' Affidavit of Service, MDL Dkt. 7777 (Mar. 21, 2022) ........App.532

Doe Creditors' Certificate of Service, Doe Dkt. 90 (Mar. 30, 2022) ............App.533

Doe Creditors' Certificate of Service, Doe Dkt. 91 (Mar. 30, 2022) ............App.535

Doe Creditors' Certificate of Service, Doe Dkt. 93 (Mar. 31, 2022) ............App.538

Doe Creditors' Certificate of Service, Doe Dkt. 94 (Mar. 31, 2022) ............App.540

Doe Creditors' Certificate of Service, Doe Dkt. 95 (Apr. 1, 2022)...............App.542

Doe Creditors' Notice of Acknowledgement of Service, Doe Dkt. 97 (Apr. 4, 2022)................................................................................App.544

Opinion and Order of Magistrate Judge Netburn Authorizing Alternative Service, MDL Dkt. 7830 (Apr. 5, 2022).....................................App.546

Order of Judge Daniels Granting Federal Insurance Plaintiffs' Motion for Partial Final Judgment, MDL Dkt. 7833 (Apr. 6, 2022) ..........................App.562

Havlish Creditors' Certificate of Service, MDL Dkt. 7904 (Apr. 25, 2022) ...........................................................................................................App.565

Doe Creditors' Certificate of Service, MDL Dkt. 7910 (Apr. 25, 2022) ......App.569

Federal Insurance Creditors' Affidavit of Service, MDL Dkt. 7943 (May 3, 2022)..........................................................................................App.573

Havlish and Doe Creditors' Joint Certificate of Service by Publication, MDL Dkt. 8059 (May 31, 2022)....................................................................App.574

Smith Creditors' Certificate of Service by Publication, Smith Dkt. 68 (June 9, 2022)............................................................................................App.579

Smith Creditors' Certificate of Service by Twitter and Electronic Mail, Smith Dkt. 69 (June 9, 2022) ..........................................................................App.583

Federal Insurance Creditors' Certificate of Service, MDL Dkt. 8125 (June 17, 2022)..........................................................................................App.586

Memorandum of Law in Support of Ashton Plaintiffs' Emergency Motion for Attachment, MDL Dkt. 8413 (Aug. 19, 2022)............................App.594

Report & Recommendation of Magistrate Judge Netburn, MDL Dkt. 8463 (Aug. 26, 2022) ....................................................................................App.616

Declaration of William W. Burke-White, MDL Dkt. 8734 (Nov. 10, 2022) ...........................................................................................................App.659

Memorandum Decision and Order of Judge Daniels Denying Motion for Stay Pending Appeal, MDL Dkt. 8876 (Feb. 24, 2023) ..........................App.679

Havlish Creditors' Notice of Appeal, MDL Dkt. 8881 (Feb. 27, 2023) .......App.684

Doe Creditors' Notice of Appeal, MDL Dkt. 8883 (Feb. 28, 2023) .............App.691

Smith Creditors' Notice of Appeal, Smith Dkt. 105 (Mar. 3, 2023).............App.693

Federal Insurance Creditors' Notice of Appeal, MDL Dkt. 8910 (Mar. 8, 2023) ...........................................................................................App.694

iv

Ashton Plaintiffs' Notice of Appeal, MDL Dkt. 8950 (Mar. 23, 2023)........App.696

Memorandum Decision and Order of Judge Daniels, MDL Dkt. 8973
(Mar. 30, 2023) ...............................................................................App.698

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |
| FIONA HAVLISH, individually and on behalf of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, *et al.*, <br><br> Creditors, <br><br> v. <br><br> THE TALIBAN, *et al.*, <br><br> Debtors, <br><br> FEDERAL RESERVE BANK OF NEW YORK, <br><br> Garnishee. | Case No. 03-cv-9848 (GBD)(SN) |

## EXPERT DECLARATION OF ALEX B. ZERDEN

### I. Introduction and Qualifications

1.　　My name is Alex B. Zerden. I am submitting this declaration in my capacity as an expert consultant to the Plaintiffs in *Havlish v. the Taliban*, Case No. 03-cv-09848 (S.D.N.Y.). I also understand this declaration is being filed, and relied upon, by the plaintiffs in *John Does 1 Through 7, v. The Taliban, Al-Qaeda, and The Haqqani Network*, Case No. 20-mc-00740 (S.D.N.Y.). The facts and opinions stated in this report are based on my research, expertise, and personal experiences and observations, including my tenure as the U.S. Treasury Department's top representative stationed in Afghanistan from 2018–2019. If called as an expert witness in this proceeding, I could testify competently to all that follows.

2.　　I am an attorney, former policymaker, and former diplomat with over fifteen years of experience in the executive branch, Congress, and the private sector. I am currently the

founder and principal of Capitol Peak Strategies LLC, which advises organizations on regulatory, legal, public policy, and strategy issues. I am also a senior advisor to WestExec Advisors, a strategic advisory firm, an adjunct senior fellow at the bipartisan Center for a New American Security (CNAS), and a term member of the Council on Foreign Relations (CFR).

3.　　I regularly provide expert analysis on Afghanistan, economic sanctions, and anti-money laundering and countering the financing of terrorism (AML/CFT) matters. My research, writings, and policy recommendations on Afghanistan have been published through the Atlantic Council, the Brookings Institution Lawfare Institute, CNAS, the Center for Strategic and International Studies (CSIS), and the New York University School of Law's Reiss Center on Law and Security through the Just Security platform. I participate in various public and nonpublic fora to provide expert analysis on Afghanistan to the executive branch, Congress, non-governmental organizations, and international organizations.

4.　　From July 2018 to November 2019, I served as the U.S. Treasury Department's Financial Attaché in Kabul, Afghanistan.  In that capacity I supervised all the Treasury Department's in-country operations.  Stationed at the U.S. embassy in Kabul, I advised senior officials across the U.S. Government, including the U.S. Ambassador to Afghanistan, military generals, Members of Congress, and Treasury Department leadership on Afghan economic and illicit finance matters such as AML/CFT and economic sanctions. In this capacity, I served as the Treasury Department representative on the embassy Country Team.[1] My mandate also included supporting the former government of Afghanistan to promote economic stability and combat illicit finance, including terrorism financing involving designated entities such as the Taliban, the

---

[1] The Country Team is "[a]n interagency group made up of the heads of each State Department section in the embassy and the heads of the other U.S. Government agencies represented at post." U.S. Dep't of State, Nat'l Museum Am. Diplomacy: *Country team*, (June 2019), https://diplomacy.state.gov/glossary/country-team-2/.

Haqqani Network, Al Qaeda, the Islamic State Khorasan Province (ISIS-K), and the Iranian

Islamic Revolutionary Guards Corps-Quds Force (IRGC-QF). While in Afghanistan, I

participated in providing evidentiary support for the October 23, 2018 U.S. Treasury Department

counter-terrorism sanctions designation of several Taliban-associated individuals.[2]

5.      As the U.S. Treasury Department Financial Attaché to Afghanistan, I regularly

interfaced directly with senior officials of the former government of Afghanistan, including

leadership, senior officials, and staff of Da Afghanistan Bank ("DAB"), which is the central bank

of Afghanistan, and with DAB's Financial Intelligence Unit, the Financial Transactions and

Reports Analysis Center of Afghanistan (FinTRACA).[3]  I also regularly interfaced with other

banking and financial sector leaders in Afghanistan. I briefed former President Ashraf Ghani and

former National Security Advisor Hamdullah Mohib at the Afghan Presidential Palace on illicit

finance matters.

6.      I met with DAB officials on numerous occasions in both Afghanistan and abroad.

I communicated with DAB officials on a nearly daily basis while working during my tour in

Afghanistan. My work with DAB included, among other things, collaborating with FinTRACA

to combat terrorism financing threats, especially those presented by the Taliban.  I trained dozens

of DAB and FinTRACA employees, along with dozens of other Afghan government and private

sector officials, on sanctions and illicit finance matters.

7.      In addition, I visited DAB facilities on at least seven occasions between 2018 and

2019.

---

[2] *See* U.S. Treas. Dep't Press Release, *Treasury and the Terrorist Financing Targeting Center Partners Sanction Taliban Facilitators and their Iranian Supporters* (Oct. 23, 2018), https://home.treasury.gov/news/press-releases/sm532.

[3] As explained more fully below, FinTRACA was the Afghan counterpart to the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) and was responsible for investigating crimes involving the Afghan financial system, including money laundering and terror financing.

8.     As a result of my work with DAB, I am personally familiar with DAB's history, operations, and structure.

9.     In recognition of my work with DAB, I received a letter of commendation dated October 28, 2020, from the then-DAB Acting Governor and First Deputy Governor for "cooperating with Da Afghanistan Bank in areas concerning AML/CFT, interagency cooperation, capacity building, and the supervisory framework of the central bank."  Based on information communicated to me by DAB, I understand that I was the first non-Afghan official to receive such a commendation from DAB.

10.     In recognition of my service in Afghanistan, I received a letter from the then-U.S. Ambassador to Afghanistan, dated October 13, 2019, which stated, in part, "[Alex Zerden] is a committed public servant who, through his service in harm's way, has strengthened our ability to safeguard the nation and our fellow Americans."

11.     In addition to my position as Financial Attaché in Kabul between 2018 and 2019, my public service has included working as Legal Counsel to Majority Whip James Clyburn on the House of Representatives Select Subcommittee on the Coronavirus Crisis (2020-2021); a Policy Advisor in the Treasury Department's Office of Terrorism and Financial Intelligence (2019-2020); a Senior Enforcement Officer in the Treasury Department's Financial Crimes Enforcement Network (2016-2018);[4] and a Treasury Department official detailed to the White House National Economic Council (2016-2017).

12.     I received a JD, *summa cum laude*, from the American University Washington College of Law, in Washington, DC, and a BA in Middle Eastern Studies and Political Science,

---

[4] The Treasury Department's Financial Crimes Enforcement Network (FinCEN) is the U.S. government's Financial Intelligence Unit and was a counterpart to FinTRACA while I served as the Financial Attaché in Afghanistan.

*cum laude*, from Tufts University in Medford, MA. I am admitted to practice law in the State of New York.

13.     I have been asked to provide an expert opinion regarding facts relevant to the determination as to whether Da Afghanistan Bank (DAB) is an "agency or instrumentality" of the Taliban within the meaning of Section 201(a) of the Terrorism Risk Insurance Act of 2002 (TRIA). I understand that in 2016, the United States Court of Appeals for the Second Circuit established criteria for determining whether an entity is an agency or instrumentality of a terrorist party. *See Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018). According to the Second Circuit's *Kirschenbaum* test, DAB will qualify as an agency or instrumentality of the Taliban if any of the following three conditions are satisfied: DAB "(1) was a means through which a material function of the [Taliban] is accomplished, [DAB] (2) provided material services to, on behalf of, or in support of the [Taliban], *or* [DAB] (3) was owned, controlled, or directed by the [Taliban]." *Id*. At 135.

14.     Based on my experience and in my expert opinion, the facts readily satisfy each prong of the *Kirschenbaum* test. The Taliban has installed new leaders at DAB (including terrorists designated by the United States, United Nations, United Kingdom, and European Union) whose only qualifications are their loyalty and substantial material support to the terrorist organization, assumed control over the bank's existing employees, and begun to shape the bank in accordance with its goals and practices—including by issuing directives from the Taliban's Council of Ministers that DAB must follow and having the Taliban Deputy Prime Minister, Mawlawi Abdul Salam Hanafi, chair meetings at DAB headquarters to provide instructions about economic policy.  The Taliban has also benefited directly from bringing DAB under its control

by, among other things, gaining access to sensitive financial intelligence information, nonpublic

supervisory information, and other economic data.  The Taliban has been using this information

and its control over Afghanistan's central bank to advance its agenda, consolidate its control over

Afghan territory, enhance revenue generation through its involvement in illicit narcotics

production and trafficking operations, and allow the under-regulated *hawala* (money services

business) sector to thrive, thereby facilitating the illicit financing of terrorism, money laundering,

and the narcotics trade.

15.    I begin by providing background information regarding the Taliban and how it

came to reassert control over Afghanistan in the summer of 2021. I will then describe the effect

that the Taliban's takeover has had on the leadership and operations of DAB. These changes

involving DAB all support my ultimate conclusion that, among other things, the Taliban directs

and controls DAB and that DAB is a now an agency or instrumentality of the Taliban.

## II.    Background on Da Afghanistan Bank and the Taliban

### A.    DAB is the Central Bank of Afghanistan

16.    DAB is the central bank of Afghanistan and has been since its formation in 1939.[5]

### B.    The Taliban is a Terrorist Party

17.    The Taliban has been an officially designated terrorist entity, sanctioned by the

United States and other jurisdictions, since at least 1999.[6]  In July 2002, the Taliban was

designated a Specially Designated Global Terrorist (SDGT) because of its role in the 9/11

terrorist attacks, its long history of supporting terrorism against the United States, and its

continuing threat to the United States and its citizens.[7]  The Taliban remains an SDGT today.

---

[5] Da Afghanistan Bank, *About Us: History*, https://dab.gov.af/about-us (last accessed Mar. 19, 2022).

[6] Exec. Order No. 13129, 64 Fed. Reg. 36759 (July 7, 1999), https://www.govinfo.gov/content/pkg/FR-1999-07-07/pdf/99-17444.pdf.

[7] Exec. Order 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001),

### 1. The Taliban Was Designated a Terrorist Party in 1999

18.     The Taliban's roots trace back to the Afghan resistance to the Soviet Union's occupation of Afghanistan, where almost all its initial leadership fought against Soviet soldiers. Established as an identifiable group in approximately 1994, Taliban forces fought in the civil war that arose after Soviet forces withdrew from Afghanistan. The Taliban eventually conquered large portions of Afghanistan, including Kabul, Afghanistan's capital. By 1996, the Taliban had taken control of not only large parts of Afghanistan but also many Afghan government agencies and instrumentalities. Consequently, much as it does today, the Taliban claimed to be the government of Afghanistan. And, as it is doing today, the United States did not then recognize the Taliban (or any other group) as the government of Afghanistan.

19.     During this first period of Taliban control over Afghanistan, the Taliban controlled key institutions of the state of Afghanistan, including, significantly, DAB.

20.     The Taliban used its control over Afghanistan to provide a base of operations, training bases, and safe haven for Osama bin Laden and Al Qaeda. Bin Laden and Al Qaeda used the territory provided by the Taliban to plan, train, finance, and direct the September 11, 2001 terrorist attacks in the United States. The Taliban and Al Qaeda were closely affiliated and, to this day, the Taliban has not condemned or disassociated itself from Al Qaeda.

21.     For years prior to the 9/11 terrorist attacks, the Taliban had been providing a base of operations, material support, and a safe haven to Al Qaeda for terrorist attacks carried out against United States interests. For example, the Taliban was providing material support to Al

---

https://www.govinfo.gov/content/pkg/CFR-2002-title3-vol1/pdf/CFR-2002-title3-vol1-eo13224.pdf ; Exec. Order No. 13268, 67 Fed. Reg. 44751 (July 3, 2002), https://www.govinfo.gov/content/pkg/WCPD-2002-07-08/pdf/WCPD-2002-07-08-Pg1129.pdf.

Qaeda when it planned, carried out, or facilitated terrorist attacks against, among other targets, the 1993 World Trade Center Bombing in New York; the 1995 car bombing in Riyadh, Saudi Arabia that targeted and killed U.S. military personnel; and the 2000 bombing of the USS Cole while at port in Aden, Yemen.

22.    The Taliban's participation in, and provision of material support for, Al Qaeda's terrorist activities led President Clinton to sign Executive Order 13,129 on July 4, 1999, entitled "Blocking Property and Prohibiting Transactions with the Taliban."  In Executive Order 13,129, President Clinton found that "the actions and policies of the Taliban in Afghanistan, in allowing territory under its control to be used as a safe haven and base of operations for Usama bin Ladin and the Al Qaeda organization" constituted "an unusual and extraordinary threat to the national security and foreign policy of the United States."  In particular, President Clinton referenced Al Qaeda's "acts of violence," and its threats "to continue to commit acts of violence, against the United States and its nationals."[8]

23.    As a result, Executive Order 13,129 blocked "all property subject to U.S. jurisdiction in which there is any interest of the Taliban." The Order also blocked the property and interests in property subject to U.S. jurisdiction of persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, "(1) to be owned or controlled by or to act for or on behalf of, the Taliban, or (2) to provide financial, material, or technological support for, or services in support of, any of the foregoing."[9]

24.    On October 15, 1999, the United Nations Security Council adopted Resolution 1267, which "[s]trongly condemn[ed] the continuing use of Afghan territory, especially areas

---

[8] Exec. Order No. 13129, *supra* note 6.
[9] *Id.*

controlled by the Taliban, for the sheltering and training of terrorists and planning of terrorist acts"; demanded "that the Taliban turn over Usama bin Laden without further delay to appropriate authorities in a country where he has been indicted," and directed all UN member states to impose financial sanctions and travel restrictions on the Taliban.[10]

### 2. The Taliban Controlled DAB the Last Time It Controlled Afghanistan

25.     On October 22, 1999, the United States added Da Afghanistan Bank to the list of sanctioned Afghan entities whose assets were blocked pursuant Executive Order 13,129.  The United States sanctioned DAB even though it was the central bank of Afghanistan, even though the Taliban claimed to be the government of Afghanistan, and even though the Taliban, in its claimed capacity as the government of Afghanistan, asserted the right to control DAB and its assets.

26.     On July 18, 2000,  President Clinton reported to Congress that the Treasury Department's Office of Foreign Assets Control (OFAC), in consultation with the Departments of State and Justice, had added DAB to the list of sanctioned Taliban affiliates because the United States had determined DAB was "controlled by the Taliban," and that "the Taliban ha[d] an interest" in it.[11] The fact that the Taliban controlled DAB was sufficient to recognize it as a terrorist financing threat and to impose blocking sanctions against it, notwithstanding its role as the central bank of Afghanistan. President Clinton sent a similar report making similar findings to Congress on January 17, 2001.[12]

---

[10] S.C. Res. 1267 (Oct. 15, 1999), available at http://unscr.com/en/resolutions/doc/1267.

[11] July 18, 2000, Message from the President of the United States Transmitting His Periodic Report on the National Emergency with Respect to the Taliban in Afghanistan, https://www.govinfo.gov/content/pkg/CDOC-106hdoc268/pdf/CDOC-106hdoc268.pdf.

[12] https://www.govinfo.gov/content/pkg/CDOC-107hdoc16/html/CDOC-107hdoc16.htm.

27.   Today, as then, the Taliban is a terrorist party that controls Afghanistan and its government agencies and is not recognized as the legitimate government of Afghanistan. Today, years of progress have been sadly wiped away, as the Taliban reverts to controlling DAB now in the same manner as when it controlled Afghanistan and its government institutions between 1996 and 2001.

### 3.   The Taliban Remained a Designated Terrorist Party After 9/11

28.   On September 11, 2001, Al Qaeda terrorists hijacked passenger aircraft and flew them into the twin towers of the World Trade Center in New York, NY; the Pentagon in Washington, D.C.; and an open field in Somerset County, Pennsylvania, killing several thousand people and injuring many others.  These attacks were made possible by the base of operations, training bases, and safe haven the Taliban provided to Al Qaeda and Osama bin Laden during the years preceding September 11, 2001.  The Taliban continued to provide material support to Osama bin Laden and Al Qaeda after the 9/11 terrorist attacks.

29.   On September 23, 2001, in response to the attacks, President Bush signed Executive Order 13,224,[13] which "provides a means by which to disrupt the financial support network for terrorists and terrorist organizations by authorizing the U.S. Government to designate and block the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism."[14]  That order directs that "all property and interests in property" belonging to certain identified persons "that are in the United States or that hereafter come within the United States . . . are blocked," and provided for a process by which the Secretary of State or the Secretary of the Treasury could designate additional entities that

---

[13] Exec. Order 13224, *supra* note 7.

[14] U.S. Dep't of State, Bureau of Counterterrorism, Exec. Order 13224,  https://www.state.gov/executive-order-13224/ (last visited Mar. 19, 2022).

pose a threat of terrorism. Individuals or entities designated pursuant to E.O. 13,224 are identified as "Specially Designated Global Terrorists" ("SDGT").[15]  The Executive Order was issued pursuant to the authorities granted the president by the International Emergency Economic Powers Act (50 U.S.C. § 1701 *et seq.*) ("IEEPA"), among others.  Because the Taliban and DAB were still sanctioned under Executive Order 13,129, President Bush did not initially designate them as SDGTs in Executive Order 13,224.

30.    In late 2001, a U.S.-led coalition ousted the Taliban from positions of power in the government of Afghanistan, and took control of Afghanistan's capital, Kabul.

31.    In July 2002, President Bush, acting pursuant to his authority under IEEPA, issued Executive Order 13,268.  In Executive Order 13,268, President Bush found that Executive Order 13,129 was no longer applicable because the Taliban no longer controlled Afghanistan and could no longer provide Al Qaeda with "a safe haven and base of operations in Afghanistan." Instead, President Bush found the Taliban continued to be involved in "grave acts of terrorism" and "threats of terrorism," including "the continuing and immediate threat of further attacks on United States Nationals or the United States."  As a result, President Bush designated the Taliban, and its then-leader Mohammed Omar, as Specially Designated Global Terrorists (SDGTs) pursuant to Executive Order 13,224.[16]

32.    Since being ousted from power in Afghanistan, the Taliban continued to plan, finance, and carry out terrorist attacks against "United States Nationals or the United States" in Afghanistan.  In fact, the Taliban continued to carry out violent terrorist attacks against U.S. forces in Afghanistan and against the internationally-backed government of Afghanistan.  Their

---

[15] *Id.*
[16] Exec. Order 13268, *supra* note 7.

terrorist attacks were "characterized by brutal indiscriminate violence, mainly inflicted by suicide bombings and IEDs."[17] For instance, in January 2016, a suicide bomber in a truck packed with explosives detonated outside of Darya Village, a protected hotel compound in Kabul, Afghanistan, ripping a deep crater in the ground, leaving a tangle of wreckage, and injuring United States Nationals. The Taliban took responsibility for the attack, claiming it was a "place of vulgarity and profanity" and that "foreign invaders must leave Afghanistan."[18]

33.    According to the Congressional Research Service, the United States "suffered over 22,000 military casualties (including about 2,400 fatalities) in Afghanistan, mostly at the hands of the robust and growing Taliban insurgency…"[19] According to an unclassified assessment by the Office of the Director of National Intelligence's (ODNI) National Counterterrorism Center (NCTC), "[t]he Afghan Taliban [were] responsible for most insurgent attacks in Afghanistan, which follow an established pattern of regular low-level ambush and hit-and-run attacks, coupled with periodic high-profile attacks."[20]

34.    In 2011, the United Nations Security Council made substantive changes to its sanctions program against the Taliban and Al Qaeda under United Nations Security Council Resolution 1267 (1999), effectively bifurcating the sanctions into two distinct sanctions

---

[17] Atal Ahmadzal, *Why the Taliban Still Love Suicide Bombing*, Foreign Policy (Dec. 17, 2021), https://foreignpolicy.com/2021/12/07/taliban-suicide-bombing-parade-violence-afghanistan/.

[18] Sayed Hassib, *Taliban claim Kabul bomb attack on compound used by foreigners*, Reuters (July 31, 2016), https://www.reuters.com/article/us-afghanistan-blast/taliban-claim-kabul-bomb-attack-on-compound-used-by-foreigners-idUSKCN10B0WA.

[19] Congressional Research Service, *Afghanistan: Background and U.S. Policy: In Brief* at 2 (updated Feb. 17, 2022), https://crsreports.congress.gov/product/pdf/R/R45122.

[20] U.S. Office of the Director of National Intelligence, National Counterterrorism Center, *Terrorist Groups*, https://www.dni.gov/nctc/groups/afghan_taliban.html (last visited Mar. 19, 222).

programs through United Nations Security Council Resolution 1988 (2011) for the Taliban and

United Nations Security Council Resolution 1989 (2011) for Al Qaeda.[21]

35.    The Taliban remains a Specially Designated Global Terrorist to this day.

Executive Order 13,224, as amended, including by Executive Order 13,268, remains in place and

continues to apply to the Taliban. *See* Exec. Order. 13,268 § 1; *see also* 31 C.F.R. §§ 594.310,

594.311. Accordingly, the United States continues to view the Taliban as a terrorist group

constituting a "continuing and immediate threat of further attacks on United States Nationals or

the United States." Executive Order 13,224, as amended, blocks all Taliban property and

interests in property that are subject to the jurisdiction of the United States. Many senior Taliban

leaders (including, as discussed below, some now with senior leadership positions at DAB) also

remain listed by the U.S. Government as Specially Designated Global Terrorists.

### 4.    The Taliban, a Designated Terrorist Party, Took Control of Afghanistan in August 2021

36.    On February 29, 2020, the United States and the Taliban entered into the

"Agreement for Bringing Peace to Afghanistan" ("Taliban Doha Agreement").[22]  On the same

date, the United States and the former government of Afghanistan issued a "Joint Declaration

between the Islamic Republic of Afghanistan and the United States of America for Bringing

Peace to Afghanistan" ("Afghanistan Joint Declaration").[23]

---

[21] S.C. Sanctions: *Security Council Committee Established Resolution 1988* (2011),
https://www.un.org/securitycouncil/sanctions/1988; S.C. Res. 1988 (June 17, 2011),
https://www.undocs.org/Home/Mobile?FinalSymbol=S%2FRES%2F1988(2011)&Language=E&DeviceType=Desk
top&LangRequested=False.

[22] Agreement for Bringing Peace to Afghanistan between the Islamic Emirate of Afghanistan which is not
recognized by the United States as a State and is known as the Taliban and the United States of America, Feb. 29,
2020, https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-Bringing-Peace-to-Afghanistan-
02.29.20.pdf.

[23] Joint Declaration between the Islamic Republic of Afghanistan and the United States of America for Bringing
Peace to Afghanistan (Feb. 2020), https://www.state.gov/wp-content/uploads/2020/02/02.29.20-US-Afghanistan-
Joint-Declaration.pdf.

37.    Through the Taliban Doha Agreement and the Afghanistan Joint Declaration, the Taliban was offered the opportunity to participate in a peaceful intra-Afghan political settlement of the war in Afghanistan, to achieve a permanent ceasefire, and to participate in a post-settlement Afghan government.  The Taliban further promised not to intervene in the internal affairs of the Afghan government.

38.    The Taliban breached the Taliban Doha Agreement.

39.    In the summer of 2021, as most U.S. military forces withdrew from Afghanistan, the Taliban launched a major offensive and rapidly consolidated control over the country through violence and intimidation instead of participating in the peaceful intra-Afghan process described in the Taliban Doha Agreement and the Afghanistan Joint Declaration. By August, the Taliban had taken over DAB facilities in several provinces around Afghanistan. By mid-August, the Taliban had captured Kabul and taken control of DAB entirely.

**5.    The Taliban's Return to Control Presents a Terrorism Threat**

40.    The Taliban's return to control of Afghanistan repeats history. In the late 1990s, as discussed above, the Taliban used its control of Afghan territory and Afghan government institutions, including specifically DAB, to materially support Al Qaeda terrorism, which paved the way for the September 11 attacks.  Today, the Taliban has consolidated control over that same territory, has once again taken control of Afghan government institutions, including specifically DAB, and remains a terrorist organization with close ties to, and involvement with, international terrorist organizations including Al Qaeda.

41.    According to the U.S. Government, "Al-Qaeda maintains close contacts" and a "strong relationship" with the Taliban, "providing advice, guidance, and financial support." In January 2021, the U.S. Treasury Department publicly assessed that as recently as 2020, "Al

Qaeda [was] gaining strength in Afghanistan while continuing to operate with the Taliban under

the Taliban's protection." The Treasury Department further assessed that "Al Qaeda capitalizes

on its relationship with the Taliban through its network of mentors and advisers who are

embedded with the Taliban, providing advice, guidance, and financial support." As of May 2020,

the Taliban and Al Qaeda "continued to meet regularly."[24]

42.    According to the U.S. Government, as of March 2022, "the Taliban takeover

threatens U.S. interests, including the possibility of terrorist safe havens re-emerging."[25]

According to the Director of National Intelligence, Al Qaeda maintains a presence in Afghanistan

and "will try to maintain its presence in Afghanistan and capitalize on permissive operating

environments."[26] The Director of National Intelligence has further noted that "Al-Qa'ida

probably will gauge its ability to operate in Afghanistan under Taliban restrictions and will focus

on maintaining its safe haven before seeking to conduct or support external operations from

Afghanistan."[27]

43.    According to State Department Deputy Assistant Secretary and Special

Representative for Afghanistan Thomas West, "the Taliban has no interest in co-operating with

the United States when it comes to fulfilment of their commitments to the Doha agreement,"

which required the group to cut ties with Al Qaeda.[28]

---

[24] U.S. Treas. Dep't Mem. *Operation Inherent Resolve* (Jan. 4, 2021), https://oig.treasury.gov/sites/oig/files/2021-01/OIG-CA-21-012.pdf.

[25] Dir. of Nat'l Intelligence, *Annual Threat Assessment of the U. S. Intelligence Community* at 5 (Feb. 2022), https://www.odni.gov/files/ODNI/documents/assessments/ATA-2022-Unclassified-Report.pdf.

[26] *Id*. at 26.

[27] *Id*.

[28] Bryant Harris, *Biden's Afghanistan envoy details 'honest and productive' dialogue with Taliban*, The National News (Feb. 15, 2022), https://www.thenationalnews.com/world/us-news/2022/02/15/bidens-afghanistan-envoy-details-honest-and-productive-dialogue-with-taliban/.

6.      The Taliban's Return to Control Significantly Increases AML/CFT
        Risks

44.     In March 2022, the Department of State found that "The Taliban have not
announced the adoption of any purported anti-money laundering/combating the financing of
terrorism (AML/CFT) laws and regulations" and that FinTRACA, the Afghan Financial
Intelligence Unit at DAB, is "non-operational."[29]

45.     On October 5, 2021, former U.S. Treasury Department and National Security
Council official Adam Smith testified before the Senate Committee on Banking, Housing, and
Urban Affairs, stating that, "From the perspective of sanctions, the Taliban's move from rebel
group at the periphery to central government leadership is unprecedented. There has never been a
case of which I am aware in which a designated terrorist group has assumed the control of an
entire jurisdiction."[30]

46.     Brian O'Toole, a former U.S. Treasury Department official, wrote that "Many of
those with expertise and experience fled the country, and the Taliban does not have the capability
or the proclivity to run a modern administrative state."[31]

47.     The Financial Action Task Force (FATF), the leading intergovernmental
organization through which governments cooperate on AML/CFT issues, released a statement on
October 21, 2021 regarding the heightened risk of money laundering and terrorist financing in
light of the Taliban's takeover. The statement declared that, "In light of recent events in
Afghanistan, the FATF, as the global standard setting body for anti-money laundering and

---

[29] U.S. State Dep't, *International Narcotics Control Strategy Report: Money Laundering* at 32-33 (Mar. 2022),
https://www.state.gov/wp-content/uploads/2022/03/22-00768-INCSR-2022-Vol-2.pdf.

[30] *Afghanistan's Future: Assessing the National Security, Humanitarian, and Economic Implications of the Taliban
Takeover*: Hearing before the Senate Comm. on Banking, Housing, Urban Affairs (Oct. 2021),
https://www.banking.senate.gov/imo/media/doc/Smith%20Testimony%2010-5-21.pdf.

[31] Brian O'Toole, *On Afghanistan's $7B Question, Biden Gets it Right*, Atlantic Council (Feb. 15, 2022),
https://www.atlanticcouncil.org/blogs/new-atlanticist/on-afghanistans-7b-question-biden-gets-it-right/.

counter-terrorist financing, expresses its concern about the current and evolving money laundering and terrorist financing risk environment in the country."[32]

48.     Thus, from almost every perspective, the Taliban's takeover of Afghanistan has significantly elevated the threat of international terrorism, and its control over the Afghan banking, financial, and monetary systems creates significant AML/CFT risks.[33]

## III.     Da Afghanistan Bank is Currently Controlled and Directed by the Taliban

49.     As explained in detail herein, the Taliban has taken control over DAB. In doing so, it also took control over assets DAB held in Afghanistan and multiple financial institutions in countries around the world.  In response, the United States in August 2021 froze access to $7 billion of DAB's holdings in financial institutions in the United States, including financial assets at the Federal Reserve Bank of New York.  Pursuant to President Biden's February 11, 2022 "Executive Order on Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan," all property and interests in property of DAB held in the United States have been transferred, or are in the process of being transferred, to the Federal Reserve Bank of New York, and were blocked.[34]

50.     Pursuant to OFAC License No. DABRESERVES-EO-2022-886895-1 and this Court's February 25, 2022 Order, I understand that approximately $3.5 billion of the estimated $7 billion at the Federal Reserve Bank of New York has been released from any judicial restraint

---

[32] FATF, *Outcomes FATF Plenary* (Oct. 21, 2021),  https://www.fatf-gafi.org/publications/fatfgeneral/documents/outcomes-fatf-plenary-october-2021.html and FATF, *Public Statement on the Situation in Afghanistan*, https://www.fatf-gafi.org/publications/fatfgeneral/documents/afghanistan-2021.html (last visited Mar. 19, 2022).

[33] *See* Alex Zerden, *Reassessing Counter Terrorism Financing in a Taliban-Controlled Afghanistan*, N.Y. Univ. Law (Sept. 17, 2021), https://www.justsecurity.org/78221/reassessing-counter-terrorism-financing-in-a-taliban-controlled-afghanistan/.

[34] Exec. Order  14064, Fed. Reg. 8391 (Feb. 11, 2022),  https://www.whitehouse.gov/briefing-room/presidential-actions/2022/02/11/executive-order-on-protecting-certain-property-of-da-afghanistan-bank-for-the-benefit-of-the-people-of-afghanistan/.

App.263

created by the Havlish Creditor's August 27, 2021 writ of execution ("Havlish Writ") and the

Doe Creditors' September 27, 2021 writ of execution ("Doe Writ"). I understand the funds at the

Federal Reserve Bank of New York that are not regulated by the OFAC License are still

restrained by the Havlish and Doe Writs. *See* MDL Dkt. 7701.

51.     In my opinion, the Taliban now controls all aspects of DAB's operations. Based

on my research, my interpretation of media reports, DAB public statements, and communications

with former and current DAB staff and other knowledgeable individuals, I understand that since

mid-August 2021, the Taliban has taken control of DAB. They have done so by, among other

things, appointing DAB's leadership (at least two of whom are individually Specially Designated

Global Terrorist (SDGTs)) and directing DAB's day-to-day activities.

**A.  DAB's Previous Leadership Fled to Evade the Taliban**

52.     As the Taliban took control of Kabul, the previous senior leadership of DAB

either fled Afghanistan or went into hiding. Ajmal Ahmady, who had been the Acting Governor

of DAB since June 2020, fled Afghanistan on the day Kabul fell to the Taliban aboard a military

C-17 transport aircraft.[35] In a November 2021 interview, Ahmady stated that he would not go

back to Afghanistan, because has no "intention of returning to work for the Taliban" and would

not "feel safe."[36]

53.     Based on information reported to me personally, I understand that several other

senior DAB officials either fled Afghanistan or went into hiding, including the Director General

of Supervision, the Director General of Monetary Policy, the Director General of Market

---

[35] David Beckworth, *Ajmal Ahmady on the Afghan Economy and the Challenges Facing the Nation's Future* (Nov. 15, 2021), https://www.mercatus.org/bridge/podcasts/11152021/ajmal-ahmady-afghan-economy-and-challenges-facing-nation's-future.
[36] *Id*.

Operations, and the Director General of FinTRACA. Like Ahmady, they fled because they did not want to work for the Taliban.

**B.     The Taliban Has Replaced Fleeing DAB Leadership With U.S.- Designated Terrorists and Other Taliban Loyalists**

54.     The Taliban has replaced DAB's fleeing, non-Taliban leadership with its own loyalists, including individuals sanctioned as terrorists by the United States, the United Nations, the United Kingdom and the European Union.

55.     On August 23, 2021, the Taliban appointed Haji Mohammed Idris, a/k/a Abdul Qahir, a/k/a Haji Idrees as Acting Governor of DAB.[37]  A Taliban spokesman, Zabiullah Mujahid, announced Idris's appointment as head of DAB via a statement.[38] On September 11, 2021, DAB posted its first press release following the Taliban takeover and identified Idris as the Acting Governor.[39] According to media reports at the time, Idris was "an obscure official" and a "Taliban loyalist" with little formal education and no formal training in macro- or microeconomic policy.[40]  I understand this to signify that Idris's appointment was a result of his longstanding ties to the Taliban. His only experience with financial matters stemmed from his role as head of the Taliban's finance commission, a commission whose activities included collecting money from narcotics trafficking and illegal taxes from businesses and farmers to fund

---

[37] Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank Chief with Crisis Looking*, Blomberg (Aug. 23, 2021), https://www.bloomberg.com/news/articles/2021-08-23/taliban-name-obscure-official-central-bank-chief-as-crisis-looms.

[38] Tamila Varshalomidze et al., *Taliban Warns of "Consequences" if US Delays Withdrawal*, Aljazeera (Aug. 23, 2021), https://www.aljazeera.com/news/2021/8/23/afghan-guard-killed-in-armed-clash-at-kabul-airport-live-news.

[39] Da Afghanistan Bank, *DAB Leadership Holds Meeting with the High Ranking Officials of Commercial Banks* (Sept. 11, 2021), https://dab.gov.af/dab-leadership-holds-meeting-with-high-ranking-officials-commercial-banks.

[40] Tom Arnold et al., *Taliban Launch Charm Offensive with Afghan Banks Amid Funding Fears*, Reuters (Sept. 1, 2021), https://www.reuters.com/world/asia-pacific/exclusive-taliban-launch-charm-offensive-with-afghan-banks-amid-funding-fears-2021-09-01.

the Taliban's insurgency.[41]  As I have noted in September 2021, "the Taliban prioritizes loyalty to the organization over technical competency."[42]  Based on my experience with DAB, if DAB were operating independently of the Taliban, someone with Idris's minimal qualifications would not have been installed as Acting Governor of the bank.

56.    In a November 15, 2021 interview, Ahmady, the former Acting Governor of DAB, echoed the reports regarding Idris, stating that he is "a loyalist to the Taliban" without "a background in banking or finance or technical matters."

57.    Ahmady also described other changes in the staffing of DAB following the Taliban takeover, including that women were "told to stay home" and that there has been "a loss or degradation of institutional capability within the central bank."[43]  In a January 14, 2022 interview, Ahmady stated that Idris has "kept some members of the staff that were there when I was governor and some others have been fired or relieved from working at the central bank."[44]

58.    Idris appears to still be DAB's Acting Governor.  A January 2022 DAB press release refers to him as the Acting Governor using both the name "Mr. Abdul Qahir" and the name "Haji Idrees."[45]  A March 10, 2022 DAB press release indicated that Idris addressed a training workshop for Afghan media in his capacity as DAB's Acting Governor.[46] Idris has also

---

[41] *See e.g.*, Press Release U.S. Treas. Dep't,  *Treasury Sanctions Taliban and Haqqani Network Financiers and Facilitators* (Jan. 25, 2018), https://home.treasury.gov/news/press-releases/sm0265  (2018 OFAC designation of Taliban officials, including Abdul Qadeer Basir Abdul Baseer who "As of early 2014, collected all the money from narcotics trafficking…").

[42] Zerden, *supra* note 33.

[43] Beckworth, *supra* note 35.

[44] Tracy Alloway & Joe Weisenthal, *Transcript: Afghanistan's Former Central Bank Chief on the Dire State of the Country's Economy*, Bloomberg Law (Jan. 14, 2022) [On File].

[45] Da Afghanistan Bank, *Meeting with the Afghanistan Commercial Companies and Investors' Association Representatives* (Jan. 2022), https://dab.gov.af/meeting-afghanistan-commercial-companies-and-investors'-association-representatives. The English-language press release is dated both Jan 23 and Jan 27, 2022.

[46] DAB, *DAB Held a Workshop for Mass Media Representatives* (Mar. 2022), https://dab.gov.af/dab-held-workshop-mass-media-representatives.

appeared on the DAB Twitter account, @AFGCentralbank, as recently as March 20, 2022, and is referred to as DAB's Acting Governor.[47]

### C. The Taliban Installed an Internationally Designated Terrorist as the First Deputy Governor

59.     In 2021, the Taliban also installed Ahmad Zia Agha (Agha), also known as Noor Ahmad Agha, as the DAB First Deputy Governor. Based on my personal knowledge of DAB's system of administration and leadership, the First Deputy Governor is a highly consequential position at DAB, especially when the governor is only operating in an "acting" capacity.  The Afghanistan Banking Law appears silent on the status of a Governor operating in an "acting" capacity.   Thus, while Idris is the Acting Governor of DAB, Agha operates practically as an administrative and operational leader of DAB in coordination with the Second Deputy Governor (identified below as a likely Specially Designated Global Terrorist). Idris, Agha, and the Second Deputy Governor are currently the three most senior officials at DAB.

60.     The Wall Street Journal recently reported that Agha is a "senior Taliban military and financial leader sanctioned for allegedly managing funds intended for bombs and for distributing money to Taliban commanders and associates abroad."[48]  On June 21, 2011, OFAC designated Agha as an SDGT under Executive Order 13,224,[49] in consultation with the U.S. Departments of State, Homeland Security, Justice, and other relevant agencies.[50]  According to the Federal Register,[51] Agha's designation included the following identifiers, which are common

---

[47] DAB, Twitter (Mar. 20, 2022), https://twitter.com/AFGCentralbank/status/1505444516446314496.

[48] Ian Talley et al., *Sanctioned Taliban Financier Holds Leadership Post at Afghan Central Bank*, Wall St. J. (Mar. 11, 2022), https://www.wsj.com/articles/sanctioned-taliban-financier-tapped-to-help-lead-afghan-central-bank-11647003720.

[49] *Designation of Four Individuals Pursuant to Exec. Order 13224* , 64 Fed. Reg. 37891 (June 28, 2011), https://www.federalregister.gov/documents/2011/06/28/2011-16185/designation-of-four-individuals-pursuant-to-executive-order-13224.

[50] *Id.*

[51] *Id.*

ways to improve identification and reduce false positive identifications, especially by financial institution compliance departments and automated software screening services:

> The designees are as follows:
>
> 1. AGHA, Ahmad Zia (a.k.a. AGHA SAYEED, Sia; a.k.a. AGHA, Zia; a.k.a. AHMAD, Noor; a.k.a. AHMED, Noor); DOB 1974; POB Maiwand District, Qandahar Province, Afghanistan; Haji (individual) [SDGT]

61.    Below is a screenshot taken on March 12, 2022, from a search result of "Ahmad Zia Agha" using OFAC's Sanctions List Search application, a publicly available tool which "is designed to facilitate the use of the Specially Designated Nationals and Blocked Persons list ("SDN List") and other sanctions lists administered by OFAC."[52]



---

[52] Office of Foreign Assets Control, *Sanctions List Search* (last updated Mar. 18, 2022), https://sanctionssearch.ofac.treas.gov/Details.aspx?id=12795.

62. On January 6, 2012, the United Nations Security Council 1988 Sanctions Committee, a group created by the United Nations to implement United Nations Security Council Resolution 1988, added Agha to the Committee's 1988 Sanctions List, which contains "individuals and entities subject to the assets freeze, travel ban, and arms embargo set out in paragraph 1 of Security Council resolution 1988 (2011)."[53] The United Nations Security Council found that Agha is a "Senior Taliban official with military and financial responsibilities as of 2011," who "[led] the Taliban's Military Council" and in 2008-09, "served as a Taliban finance officer and distributed money to Taliban commanders in [the] Afghanistan/Pakistan border area."[54] A screenshot of Agha's information is provided below:

**A.**     **Individuals associated with the Taliban**

**TI.A.156.12. Name:** 1: AHMAD 2: ZIA 3: AGHA 4: na
**Name (original script):** احمد ضیا آغا
**Title:** Haji  **Designation:** na  **DOB:** 1974  **POB:** Maiwand District, Kandahar Province, Afghanistan  **Good quality a.k.a.: a)** Zia Agha **b)** Noor Ahmad **c)** Noor Ahmed  **Low quality a.k.a.:** Sia Agha Sayeed  **Nationality:** na **Passport no.:** na  **National identification no.:** na  **Address:** na  **Listed on:** 6 Jan. 2012  **Other information:** Senior Taliban official with military and financial responsibilities as at 2011. Leader of the Taliban's Military Council as of 2010. In 2008 and 2009, served as a Taliban finance officer and distributed money to Taliban commanders in Afghanistan/Pakistan border area.

63. The United Nations Security Council maintains a webpage providing derogatory information about Agha through a narrative summary of the reasons for his sanctions designation.[55] A screenshot of that information is provided below:

---

[53] Press Release S. C., *Security Council 1988 Sanctions Committee Adds Four Individuals to its Sanctions List* (Jan. 6, 2012), https://www.un.org/press/en/2012/sc10512.doc.htm.
[54] *Id.*
[55] S. C.: *Ahmad Zia Agha*, https://www.un.org/securitycouncil/sanctions/1988/materials/summaries/individual/ahmad-zia-agha.



UNITED NATIONS SECURITY COUNCIL

Search the UN

About the Council | Sanctions | Members | Meetings | Documents | News

Home » AHMAD ZIA AGHA

AHMAD ZIA AGHA

In accordance with paragraph 20 of resolution 2160 (2014), the 1988 Sanctions Committee makes accessible a narrative summary of reasons for the listing for individuals, groups, undertakings and entities included in the 1988 Sanctions List.

TAi.156
AHMAD ZIA AGHA
**Date on which the narrative summary became available on the Committee's website:** 6 January 2012
**Reason for listing:**
Ahmad Zia Agha was listed on **6 January 2012** pursuant to paragraph 3 of resolution 1988 (2011) as being associated with the Taliban for "participating in the financing, planning, facilitating, preparing or perpetrating of acts or activities by, in conjunction with, under the name of, on behalf of, or in support of" and "otherwise supporting acts or activities of those designated and other individuals, groups, undertakings and entities associated with the Taliban" in constituting a threat to the peace, stability and security of Afghanistan.

**Additional information:**
Ahmad Zia Agha is a senior Taliban leader with military and financial responsibilities. In 2010, Ahmad Zia Agha was the leader of the Taliban's military shura (council), which directed Taliban military operations in western Afghanistan. In 2009, Ahmad Zia Agha served as a Taliban finance officer and distributed money to Taliban commanders. As part of his financial responsibilities, Ahmad Zia Agha transferred tens of thousands of dollars to Taliban shadow provincial governors; the Taliban's shura treasurer also entrusted Ahmad Zia Agha with hundreds of thousands of dollars to fund improvised explosive device (IED) operations. In 2008, Ahmad Zia Agha was involved in distributing funds to Taliban commanders in Afghanistan and transferred money to individuals associated with the Taliban outside the country. He has also facilitated communications

**Related listed individuals and entities:**

64. During my work as the senior U.S. Treasury Department official in Kabul in 2018 and 2019, I never had a reason to believe that a senior DAB official had been a "senior Taliban leader with military and financial responsibilities" or was "entrusted…with hundreds of thousands of dollars to fund improvised explosive device (IED) operations." To the contrary, I worked with DAB leadership to shut down financing for the Taliban, its officials, and its military operations. While I served in Afghanistan, IEDs killed and wounded numerous U.S. military personnel.

65. The United Kingdom has also designated Agha as a target of financial sanctions. The United Kingdom first designated Agha on January 6, 2012. The United Kingdom's HM Treasury oversees financial sanctions through its Office of Financial Sanctions Implementation (OFSI). A screenshot of OFSI's designation of Agha is provided below from its "Consolidated

List of Financial Targets in the UK, Status: Asset Freeze Targets," last updated on February 25, 2022:[56]

<table>
<tr><td>19. <b>Name 6:</b> AGHA <b>1:</b> AHMAD <b>2:</b> ZIA <b>3:</b> n/a <b>4:</b> n/a <b>5:</b> n/a.<br>
<b>Name (non-Latin script):</b> احمد ضیا آغا<br>
<b>Title:</b> Haji <b>DOB:</b> --/--/1974. <b>POB:</b> Maiwand District, Kandahar Province, Afghanistan <b>Good quality a.k.a.:</b> (1) AGHA, Zia (2) AHMAD, Noor (3) AHMED, Noor <b>Low quality a.k.a.:</b> SAYEED, Agha, Sia <b>Other Information:</b> (UK Sanctions List Ref):AFG0122 (UN Ref):TAi.156 Senior Taliban official with military and financial responsibilities as at 2011. Leader of the Taliban's Military Council as of 2010. In 2008 and 2009, served as a Taliban finance officer and distributed money to Taliban commanders in Afghanistan/ Pakistan border area. INTERPOL-UN Security Council Special Notice web link: https://www.interpol.int/en/How-wework/Notices/View-UN-Notices-Individuals click here <b>Listed on:</b> 29/03/2012 <b>UK Sanctions List Date Designated:</b> 06/01/2012 <b>Last Updated:</b> 01/02/2021 <b>Group ID:</b> 12454.</td></tr>
</table>

66. The European Union has also designated Agha as of at least March 24, 2012.[57] A screenshot of the European Union's designation is provided below:

<table>
<tr><td>24.3.2012</td><td>EN</td><td>Official Journal of the European Union</td><td>L 87/25</td></tr>
<tr><td colspan="4">

**Additional information from the narrative summary of reasons for listing provided by the Sanctions Committee:**

Abdul Aziz Abbasin is a key commander in the Haqqani Network, a Taliban-affiliated group of militants that operates from Eastern Afghanistan and North Waziristan Agency in the Federally Administered Tribal Areas of Pakistan. As of early 2010, Abbasin received orders from Sirajuddin Haqqani and was appointed by him to serve as the Taliban shadow governor of Orgun District, Paktika Province, Afghanistan. Abbasin commands a group of Taliban fighters and has assisted in running a training camp for foreign fighters based in Paktika Province. Abbasin has also been involved in ambushing vehicles supplying Afghan government forces and in the transport of weapons to Afghanistan.

(127) **Ahmad Zia Agha** (*alias* (**a**) Zia Agha (**b**) Noor Ahmad (**c**) Noor Ahmed (**d**) Sia Agha Sayeed)

**Title:** Haji. **Date of birth:** 1974. **Place of birth:** Maiwand District, Kandahar Province, Afghanistan. **Other information:** (**a**) Senior Taliban official with military and financial responsibilities as at 2011, (**b**) Leader of the Taliban's Military Council as of 2010, (**c**) In 2008 and 2009, served as a Taliban finance officer and distributed money to Taliban commanders in Afghanistan/Pakistan border area. **Date of UN designation:** 6.1.2012.</td></tr>
</table>

---

[56] Office of Fin. Sanctions Implementation HM Treasury, *Consolidated List of Financial Sanctions Targets in the UK,* (last updated Feb. 25, 2022), https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1057454/Afghanistan.pdf.

[57] Official Journal of the European Union, Council Implementing Decision (CFSP) 2017/476, https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:32017D0416&rid=2.

67.  Interpol, the International Criminal Police Organization, an intergovernmental body with 195 member countries,[58] lists Agha, along with identifying information,[59] in a section on its public website to "alert[] global police to individuals and entities that are subject to sanctions imposed by the United Nations Security Council."[60]  A screenshot of the beginning of Agha's profile on the Interpol website is provided below:



68.  I do not know Agha and did not transact with him during my time as the U.S. Treasury Department's Financial Attaché at the U.S. Embassy in Kabul, Afghanistan, in 2018

---

[58] Interpol: *What is Interpol*, https://www.interpol.int/en/Who-we-are/What-is-INTERPOL.

[59] Interpol, *Agha, Ahmad Zia*, https://www.interpol.int/en/How-we-work/Notices/View-UN-Notices-Individuals#2012-308182.

[60] Interpol, *View UN Notices-Individuals*, https://www.interpol.int/en/How-we-work/Notices/View-UN-Notices-Individuals#.

and 2019. If I were to have transacted with him, I would have needed to obtain a license from OFAC because Agha is an SDGT.

69. Former Canadian intelligence analyst and international terrorism financing expert Jessica Marin Davis has confirmed that Agha is "in charge of the AML/CFT implementation" at DAB.[61]

70. According to Adam Smith, a former U.S. Treasury Department and National Security Council official, Agha's role leading DAB "increases the risk profile more than it was before. It adds a wrinkle and a challenge to an already challenging environment."[62]

71. According to Adam Weinstein, a Research Fellow at the Quincy Institute for Responsible Statecraft with expertise on Afghanistan,[63] "For the Taliban to turn around and appoint a designated person to lead the central bank, that shows an absolute disconnect from the reality they are facing . . . It's a slap in the face to the international community."[64]

72. Notwithstanding Agha's multiple terrorism designations, DAB prominently promotes Agha on its social media, a primary mechanism for the Taliban to broadcast DAB-related messages. For instance, on February 13, 2022, the Taliban used DAB's official Twitter account, @AFGCentralbank,[65] to identify Noor Ahmad Agha as the "First Vice President" of DAB (translated by Google Translate). I believe "First Vice President" to mean "First Deputy Governor" given the context and organizational structure of DAB. Pictures accompanying the tweet show the Taliban flag, the DAB flag, and the Afghan national flag at DAB headquarters.[66]

---

[61] Twitter, *JMDavis*, (Mar. 11, 2022),
https://twitter.com/JessMarinDavis/status/1502282682859806726?s=20&t=ccs0VCTnhw4j6WC1hRGX3A.
[62] Talley, *supra* note 48.
[63] Quincy Inst. for Responsible Statecraft, *Bio Adam Weinstein*, https://quincyinst.org/author/aweinstein/.
[64] Talley, *supra* note 48.
[65] This Twitter account had over 36,400 followers as of March 17, 2022.
[66] DAB Twitter (Feb 13, 2022), https://twitter.com/AFGCentralbank/status/1492824469425070085.



**D.** **The Taliban Likely Installed an OFAC Designated Terrorist as the Second Deputy Governor**

73.     Abdul Qadeer Ahmad currently serves as the Second Deputy Governor of DAB. While Idris is the Acting Governor of DAB, Ahmad operates as an administrative and operational leader of DAB in coordination with Agha, the First Deputy Governor (and a Specially Designated Global Terrorist).

74.     In my expert opinion, Abdul Qadeer Ahmad is most likely an alias for Abdul Qadeer Basir Abdul Baseer a/k/a Abdul Qadir Ahmat (Baseer). This assessment is based on several factors, including the Taliban's control of DAB through its leadership by Idris and Agha, the similarity of a name variant provided by the U.S. Government and other authorities (Abdul Qadir Ahmat), Baseer's senior financial and military leadership role in the Taliban as publicly

identified by the U.S. Government and the United Nations, and the Taliban's pattern of purging technocratic leadership from key institutions and substituting established Taliban members.

75.    The Treasury Department designated Baseer on January 25, 2018 pursuant to Executive Order 13,224 for acting on behalf of the Taliban.[67] Baseer was a member of the Taliban Finance Commission and "led the Finance Commission of the Taliban Peshawar Shura, which was responsible for the Taliban's military and political activities in northern and eastern Afghanistan." Baseer also "collected all the money from narcotics trafficking, precious stone sales, tithing, and almsgiving." Baseer served as the Taliban treasurer, advised the Taliban's Peshawar Military Council on financial matters, led the Taliban's Peshawar Financial Commission, and personally delivered money from the Taliban's leadership committee, or Shura to Taliban groups throughout Pakistan. A screenshot from the Treasury Department OFAC designation is provided below to describe additional derogatory information provided publicly by the U.S. Government:

---

[67] *Treasury Sanctions Taliban and Haqqani Network Financiers and Facilitators*, *supra* note 41.

# ABDUL QADEER BASIR ABDUL BASEER

Abdul Qadeer Basir Abdul Baseer (Baseer) was designated for acting for or on behalf of the Taliban.

In the fall of 2017, Baseer provided Taliban commanders with tens of thousands of dollars for previous attacks conducted in Kunar Province, Afghanistan. In early 2016, Baseer hosted meetings with leaders of the Taliban to convince them to support the then-Supreme Leader of the Taliban, Mullah Akhtar Mohammad Mansur. In the spring of 2015, Baseer, a member of the Taliban Finance Commission, hosted a meeting of the Taliban Senior Shura to plan for the spring 2015 fighting season. As of early 2015, Baseer led the Finance Commission of the Taliban Peshawar Shura, which was responsible for the Taliban's military and political activities in northern and eastern Afghanistan. Baseer was responsible for collecting financial aid from domestic and foreign sponsors. As of early 2014, Baseer disbursed funds directly to Taliban shadow governors and was responsible for approving large expenses. As of early 2014, Baseer collected all the money from narcotics trafficking, precious stone sales, tithing, and almsgiving.

As of 2009, he served as the treasurer for the Taliban in Peshawar, Pakistan. He was the financial advisor to the Taliban's Peshawar Military Council and head of the Taliban's Peshawar Financial Commission as of early 2010. He personally delivers money from the Taliban's leadership Shura to Taliban groups throughout Pakistan.

During the Taliban regime, Baseer was the General Consul of the Taliban in Islamabad, Pakistan, and according to the United Nations, he also served as the Taliban regime's Military Attaché at the Taliban Embassy in Islamabad, Pakistan.

76.    It is my expert opinion that this derogatory information is antithetical to the qualifications to serve as the third-highest ranking official in a normal central bank.

77.    OFAC provides the following aliases and identifiers for Baseer, which are common ways to improve identification and reduce false positive identifications, especially by financial institution compliance departments and automated software screening services:[68]

---

[68] U.S. Treas. Dep't, *Counter Terrorism Designations* (Jan. 25, 2018), https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20180125.



U.S. DEPARTMENT OF THE TREASURY

ABOUT TREASURY POLICY ISSUES DATA SERVICES NEWS

We can do this. Find COVID-19 vaccines near you. Visit Vaccines.gov.

RECENT ACTIONS

Enforcement Actions
General Licenses
Misc./Other
Regulations and Guidance
Sanctions List Updates

Counter Terrorism Designations

01/25/2018

SPECIALLY DESIGNATED NATIONALS LIST UPDATE

**The following individuals have been added to OFAC's SDN List:**

ABDUL BASEER, Abdul Qadeer Basir (a.k.a. AHMAT, Abdul Qadir; a.k.a. BASIR, Abdul Qadir; a.k.a. HAQQANI, Abdul Qadir; a.k.a. QADIR, Abdul; a.k.a. "Nasibullah"), Peshawar, Pakistan; DOB 1964; POB Nangarhar Province, Afghanistan; nationality Afghanistan; Gender Male; Passport D000974 (Afghanistan) (individual) [SDGT] (Linked To: TALIBAN).

78. Baseer has appeared on DAB's official Twitter account, including on March 9, 2022, where his name is translated as "Abdul Qadir Ahmad" and his title is "Second Deputy Governor of Da Afghanistan Bank."[69] The reference to "Child Protection Agency" in the tweet is likely a mistranslation of the non-governmental organization Save the Children. A screenshot is provided below for reference:

[69] DAB Twitter (Mar. 9, 2022), https://twitter.com/AFGCentralbank/status/1501519102027911172.



79.    Baseer was also sanctioned by the United Nations for being the military attaché for the Taliban and being the financial advisor to the Taliban Peshawar Military Council as well as the head of the Taliban Peshawar Financial Commission.[70] A screenshot of the derogatory information provided by the United Nations is below:

**TAi.128  Name:** 1: ABDUL QADEER 2: BASIR 3: ABDUL BASEER 4: na
**Name (original script):** عبدالقدير بصير عبد البصير

**Title: a)** General **b)** Maulavi **Designation:** Military Attache, Taliban Embassy, Islamabad, Pakistan **DOB:** 1964 **POB: a)** Surkh Rod District, Nangarhar Province, Afghanistan **b)** Hisarak District, Nangarhar Province, Afghanistan **Good quality a.k.a.: a)** Abdul Qadir **b)** Ahmad Haji **c)** Abdul Qadir Haqqani **d)** Abdul Qadir Basir **Low quality a.k.a.:** na **Nationality:** Afghan **Passport no.:** Afghanistan number D 000974 **National identification no.:** na **Address:** na **Listed on:** 25 Jan. 2001 (amended on 3 Sep. 2003, 25 Jul. 2006, 23 Apr. 2007, 18 Jul. 2007, 21 Sep. 2007, 29 Nov. 2011, 13 Aug. 2012 ) **Other information:** Financial advisor to Taliban Peshawar Military Council and Head of Taliban Peshawar Financial Commission. Believed to be in Afghanistan/Pakistan border area. Review pursuant to Security Council resolution 1822 (2008) was concluded on 21 Jul. 2010.

---

[70] United Nations, *Consolidated United Nations Security Council Sanctions List* (Oct. 2, 2015), https://www.un.org/french/sc/committees/consolidated.htm.

80.    Interpol lists Baseer on its website to assist global police forces in complying with international sanctions.[71]  According to Interpol, Baseer has held positions such as head of Taliban's Peshawar Financial Commission and Financial Advisor to the Taliban Peshawar Military Council. A screenshot of the beginning of Baseer's derogatory information page on Interpol's website is provided below:



81.    The United Kingdom also designated Baseer as a target of financial sanctions and identified him as the Head of the Taliban Peshawar Financial Commission and the Financial Advisor to the Taliban Peshawar Military Council. The United Kingdom first designated Baseer

---

[71] Interpol: *Abdul Qadeer, Basir Abdul Baseer*, https://www.interpol.int/en/How-we-work/Notices/View-UN-Notices-Individuals#2007-22901 (last visited Mar. 19, 2022).

in 2001. A screenshot of OFSI's designation of Baseer is provided below from its "Consolidated List of Financial Targets in the UK, Status: Asset Freeze Targets," last updated on February 25, 2022:[72]

4. **Name 6:** ABDUL BASEER **1:** ABDUL QADEER **2:** BASIR **3:** n/a **4:** n/a **5:** n/a.
**Name (non-Latin script):** عبدالقدير بصير عبد البصير
**Title:** (1) General (2) Maulavi **DOB:** --/--/1964. **POB:** (1) Hisarak District, Nangarhar Province. (2) Surkh Rod District, Nangarhar Province, (1) Afghanistan (2) Afghanistan **Good quality a.k.a:** (1) BASIR, Abdul Qadir (2) HAJI, Ahmad (3) HAQQANI, Abdul Qadir (4) QADIR, Abdul **Nationality:** Afghanistan **Passport Number:** D 000974 **Passport Details:** Afghanistan number **Position:** (1) Head of Taliban Peshawar Financial Commission. (2) Military Attache, Taliban Embassy, Islamabad, Pakistan **Other Information:** (UK Sanctions List Ref):AFG0098 (UN Ref):TAi.128 Financial advisor to Taliban Peshawar Military Council and Head of Taliban Peshawar Financial Commission. Believed to be in Afghanistan/Pakistan border area. Review pursuant to Security Council resolution 1822 (2008) was concluded on 21 Jul. 2010. INTERPOL-UN Security Council Special Notice web link: https://www.interpol.int/en/How-we-work/Notices/View-UN-Notices-Individuals click here **Listed on:** 23/02/2001 **UK Sanctions List Date Designated:** 25/01/2001 **Last Updated:** 01/02/2021 **Group ID:** 6911.

82.    Baseer was also designated by the European Union. A screenshot of Baseer's designation information is provided below from the European Union's consolidated financial sanctions list, updated on March 15, 2022:[73]

---

[72] *Consolidated List of Financial Sanctions Targets in the UK*, *supra* note 56.

[73] European Commission, *European Union Consolidated Financial Sanctions List* (updated Mar. 18, 2022), https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwiOg-ftu832AhXIpXIEHeN_BSkQFnoECAkQAQ&url=https%3A%2F%2Fwebgate.ec.europa.eu%2Ffsd%2Ffsf%2Fpublic%2Ffiles%2FpdfFullSanctionsList%2Fcontent%3Ftoken%3DdG9rZW4tMjAxNw&usg=AOvVaw0ARqJS5nkNxPS8oyWH3C65.

**EU reference number:** EU.701.13
**Legal basis:** 2017/404 (OJ L63)
**Programme:** AFG - Afghanistan
**Identity information:**
• **Name/Alias:** Abdul Qadeer Basir Abdul Baseer  **Title:** (a) General, (b) Maulavi  **Function:** Military Attaché, Taliban Embassy, Islamabad, Pakistan
• **Name/Alias:** Abdul Qadir
• **Name/Alias:** Ahmad Haji
• **Name/Alias:** Abdul Qadir Haqqani
• **Name/Alias:** Abdul Qadir Basir

**Birth information:**
• **Birth date:** 1964  **Birth place:** Afghanistan, Surkh Rod District, Nangarhar Province
• **Birth date:** 1964  **Birth place:** Afghanistan, Hisarak District, Nangarhar Province

**Citizenship information:**
• **Citizenship:** Afghanistan

**Identification document information:**
• **Source:** Afghanistan  **Document:** National passport D 000974

**Remark:** Believed to be in Afghanistan/Pakistan border area. Review pursuant to Security Council Resolution 1822 (2008) was concluded on 21 Jul. 2010. INTERPOL-UN Security Council Special Notice web link: https://www.interpol.int/en/notice/search/un/1474039

83.    The presence of Taliban members at DAB is a new development. As noted earlier, I personally visited DAB facilities at least seven times between August 2018 and November 2019 to meet with DAB senior officials and communicated with many others almost daily. During these two years, I never met, spoke, or transacted with a DAB employee who was a known member of the Taliban or a sanctioned terrorist during any of my visits. Indeed, my understanding is that I would have needed to receive a general or specific license from OFAC before doing so. Furthermore, if I became aware that a DAB employee, especially a senior DAB official such as an Acting Governor, First Deputy Governor, or Second Deputy Governor, was a known member of the Taliban or a sanctioned terrorist, then there would likely have been severe practical, economic and diplomatic consequences for DAB and the former Afghan government.

84.    In my dealings with DAB during my time in Kabul, my direct counterparts were DAB's permanent Governor, Mr. Khalil Sediq, and its First Deputy Governor, Mr. Wahidullah Nosher, who later served as Acting Governor. Based on my experiences with them, neither Mr. Sediq nor Mr. Nosher were members of the Taliban and, in fact, they actively opposed the Taliban.

E.  **Taliban Loyalists Have Been Installed to Carry Out DAB's Operations Throughout the Bank's Organization**

85.  Personnel changes at DAB involving non-Taliban employees have not been limited to senior officials. Based on my conversations with Afghans in the private business sector, I understand that Afghan businesspeople are encountering Taliban at all levels of DAB with greater frequency.  From what is being communicated to me, Afghan businesspeople can readily distinguish between non-Taliban and Taliban employees of DAB.

86.  Media reports, including an October 19, 2021 report in the Associated Press (AP), further confirm that the Taliban has asserted control over technocrats at the central bank, "command[ing]" and "order[ing]" them to return to work.[74]  The AP reports that "[f]our employees from financial institutions" described "how the Taliban commanded bureaucrats from the previous government's Finance Ministry, central bank and other state-owned banks to return to work."[75] These accounts "were confirmed by three Taliban officials."[76]

87.  In the article, Mawlawi Abdul Jabbar, described as a Taliban adviser, is reported to have said that the returning experts are "with the government."[77]

88.  The AP report suggests that DAB technocrats do not want to work for the Taliban. Instead, "[m]any hope to leave Afghanistan. Given the chance, the technocrats running the country's finances would also leave." The AP interviewed one DAB official who said he was

---

[74] Samya Kullab, *The Economy on the Brink, Taliban Rely on Former Technocrats*, AP News (Oct. 19, 2021), https://apnews.com/article/afghanistan-business-united-nations-economy-kabul-08db064b2e1d8986b3f731ae7f6589f4.
[75] *Id.*
[76] *Id.*
[77] *Id.*

waiting on his asylum papers to go to a Western country. "If it comes," he told the AP, "I will definitely leave. I would never work with the Taliban again."[78]

89.    In the context of my communications with people in Afghanistan, Afghan private sector officials, and former DAB officials and staff, I interpret the AP report to mean that DAB technocrats are doing what the Taliban is compelling them to do and that they would not work at DAB without being directed to work by the Taliban.  I am furthermore concerned that both private and public communications from DAB officials under the Taliban's control are likely coerced.

90.    Disturbingly, the Taliban instructed female civil servants to stay at home when the Taliban took over in August 2021.[79] I understand that such an edict applies to female staff at DAB. The Taliban forced female bank employees at gunpoint to leave their jobs and go home without any determination of when they could return to work.[80]

91.    In my opinion, the Taliban's ability to hire, fire, remove, replace and compel employees of DAB demonstrates the Taliban's control over DAB.

**F.    The Taliban Council of Ministers Is Directing DAB's Actions and Policies**

92.    The Taliban's Council of Ministers is directing DAB activities through its Economic Commission, which undermines any pretense that DAB operates independently of Taliban control. A December 14, 2021 Reuters article, for example, describes economic decision making by the Taliban flowing from the Taliban's Council of Ministers to the Economic

---

[78] *Id.*

[79] *See e.g.*, E. Najafizada, *A Taliban Ban on Women in the Workforce Can Cost Economy $1bn*, Bloomberg (Dec. 1, 2021), https://www.aljazeera.com/economy/2021/12/1/talibans-ban-on-women-in-the-workforce-can-cost-economy-1bn and Adela Suliman et al., *Taliban tells Kabul's Female City Government Employees Not to Come to Work,* Wash. Post (Mar. 21, 2021), https://www.washingtonpost.com/world/2021/10/21/taliban-women-work-afghanistan/.

[80] Rupam Jain, *Afghan Women Forced from Banking Jobs As Taliban Take Control*, Reuters (Aug. 15, 2021), https://www.reuters.com/world/asia-pacific/afghan-women-bankers-forced-roles-taliban-takes-control-2021-08-13/.

App.283

Commission to the Taliban-controlled DAB.[81]  Due to currency volatility, the Council of

Ministers "instructed" the Economic Commission to "take steps to ensure the stability of the

afghani."[82] In response, DAB engaged in outreach with the financial sector and issued a

statement attempting to halt the local currency's depreciation.[83]

93.    The Taliban's Economic Commission is led by the U.N.-sanctioned Mullah Abdul

Ghani Baradar,[84] currently the Taliban's Acting First Deputy Prime Minister, who is also a

Taliban co-founder and a former deputy to Mullah Mohammed Omar, the former leader of the

Taliban.[85]

94.    Disturbingly, a senior Taliban official led a financial coordination meeting at

DAB. This is highly unusual; a Taliban leader never led a financial coordination meeting at DAB

when I was the Treasury Department Financial Attaché in Kabul from 2018-2019 and such an

occurrence likely would have resulted in severe practical, economic and diplomatic

consequences for DAB and the former Afghan government. Specifically, on September 25, 2021

the Taliban Deputy Prime Minister, Mawlawi Abdul Salam Hanafi, chaired a meeting with

Taliban DAB Acting Governor Idris at DAB, according to a DAB press release.[86] This Taliban-

led meeting demonstrates that DAB is not independent but is rather controlled and directed by

the Taliban.

---

[81] James MacKenzie et al., *Afghan Central Bank Moves to Halt Currency Slid As Crisis Deepens*, Yahoo!Finance (Dec. 14, 2021),  https://finance.yahoo.com/news/afghanistan-central-bank-says-acting-094556696.html.

[82] *Id*.

[83] *Id*.

[84]Najibullah Lalzoy, *Mullah Baradar Assures Investors of Security in Afghanistan*, Khaama Press (Mar. 3, 2022), https://www.khaama.com/mullah-baradar-assures-investors-of-security-in-afghanistan-5678756/.

[85] U.N. Security Council, *Abdul Ghani Baradar Abdul Ahmad Turk*, https://www.un.org/securitycouncil/sanctions/1988/materials/summaries/individual/abdul-ghani-baradar-abdul-ahmad-turk (last visited Mar. 19, 2022).

[86] DAB, *Efforts for Improving and Strengthening the Banking Sector of the Country*, https://dab.gov.af/efforts-improving-and-strengthening-banking-sector-country (last visited Mar. 19, 2022).

95.     According to the DAB press release, "A meeting aimed at coordinating the improvement and stability of the banking system of the country was held at the Headquarters of Da Afghanistan Bank. The meeting was chaired by Mr. Mawlawi Abdul Salam Hanafi, the Deputy Prime Minister of the Islamic Emirate of Afghanistan. Mr. Abdul Qahir (Mohammad Idrees) the Acting Governor of DAB, representatives of the commercial banks, and Chairman of the Afghanistan Banks Association also participated in the meeting." A screenshot appears below from the DAB website showing Taliban Deputy Prime Minister Hanafi in the center, Taliban DAB Acting Governor Idris on the left, and a Taliban flag on the right.



September 25, 2021 – A meeting aimed at coordinating the improvement and stability of the banking system of the country was held at the Headquarters of Da Afghanistan Bank. The meeting was chaired by Mr. Mawlawi Abdul Salam Hanafi, the Deputy Prime Minister of the Islamic Emirate of Afghanistan. Mr. Abdul Qahir (Mohammad Idrees) the acting Governor of DAB, representatives of the commercial banks, and Chairman of the Afghanistan Banks Association also participated in the meeting.

### G. Once Prohibited From Conducting Any Financial Transactions at DAB, the Taliban Now Controls All Financial Transactions Conducted by DAB

96.     When DAB was controlled by the former Islamic Republic of Afghanistan, the Taliban was identified by DAB as a "Terrorist Group" and measures were taken against the Taliban, including placing it on a public list of entities prohibited from depositing or withdrawing U.S. dollar banknotes.[87]  I have direct personal knowledge that publicly listing the Taliban as a "Terrorist Group" required substantial political will by DAB because of physical security threats made by the Taliban against DAB personnel.

97.     An archived copy of FinTRACA's website from August 13, 2021 contains a link to the United Nations Security Council Resolution 1988 Sanctions Committee List (described as UN Sanctions List 1988), which lists the Taliban's current DAB First Deputy Governor Ahmad Zia Agha and Second Deputy Governor Abdul Qadeer Ahmad, also known as Abdul Qadeer Basir Abdul Baseer (Baseer).[88]

98.     Now, the Taliban controls every material decision DAB makes and every material financial transaction DAB conducts, and supervises the entire Afghan monetary and financial system, including Afghanistan's private commercial banks. The Taliban also has the ability and authority to oversee Afghanistan's *hawala* system—an alternative trust-based remittance and money-transfer system often used by terrorist organizations to transfer money without being recorded, traced, or monitored. Taken together, the Taliban's consolidation of control over the Afghan financial and monetary systems presents a major terror financing risk. As explained

---

[87] DAB, *List of Entities Prohibited from Depositing or Withdrawing USD Banknotes*, https://web.archive.org/web/20210815225011/http://www.fintraca.gov.af/ListOfProhibitedEntities.html. The FinTRACA website is no longer available. This is a link for an archived version of the site from August 13, 2021.
[88] DAB, *UN Sanctions List*, https://web.archive.org/web/20210815225012/http://www.fintraca.gov.af/UNList1988.html (archived Aug. 13, 2021) and UN Security Council, *Sanctions*, https://scsanctions.un.org/hhzvqen-taliban.html (last visited Mar. 19, 2022).

further below, the Taliban can exploit its control over the Afghan banking and financial system

through its control of DAB for malign purposes.

### H. Current U.S. Officials Recognize that the Taliban Controls DAB

99.    A number of current senior U.S. Government officials, in their official capacities,

have made clear that the Taliban now controls DAB.

100.   During sworn public testimony on October 19, 2021, before the U.S. Senate

Committee on Banking, Housing, and Urban Affairs, U.S. Treasury Department Deputy

Secretary Wally Adeyemo testified that the Taliban would not be allowed access to DAB foreign

exchange reserves.[89]  Adeyemo stated, "we believe that it's essential that we maintain our

sanctions against the Taliban but at the same time find ways for legitimate humanitarian

assistance to get to the Afghan people. That's exactly what we're doing."[90]

101.   A January 18, 2022 statement by U.S. Treasury Department Deputy Secretary

Wally Adeyemo noted that the Taliban "continues to . . . drive essential technical experts and

government officials—including those who work for Afghanistan's central bank and financial

institutions—out of the country."[91]

102.   At a public event hosted by the U.S. Institute for Peace (USIP) on February 15,

2022, U.S. State Department Deputy Assistant Secretary and Special Representative for

Afghanistan Thomas West made several important statements about the current character of

DAB. West confirmed that "a range of senior technocrats left Da Afghanistan Bank after the

events of August and we saw certain functions atrophy or all together disappear. … [W]e have

---

[89] Daphne Psaledakis et al., *Taliban Won't be Allowed Access to Afghan Central Bank Reserves-Adeyemo* (Oct. 19, 2021), https://www.reuters.com/world/asia-pacific/taliban-wont-be-allowed-access-afghan-central-bank-reserves-adeyemo-2021-10-19/.
[90] *Id.*
[91] U.S. Treas. Dep't, Readout: *Deputy Secretary of the Treasury Wally Adeyemo's Meeting with CEOs of NGOs Operating in Afghanistan* (Jan. 18, 2022), https://home.treasury.gov/news/press-releases/jy0560.

engaged in dialogue with these technocrats and Taliban leadership over steps that they can take to enhance functionality to bring in both third-party contractors to both audit as well as deliver capacity building assistance and also to enhance the central bank's independence."[92]

103.  I believe that this distinction between technocrats and Taliban leadership by the United States Government further demonstrates that the Taliban controls DAB. I also believe that the reference to central bank independence by Special Representative for Afghanistan West means that the central bank is not currently independent due to the Taliban's control of it.

104.   Regarding the approximately $3.5 billion dollars in DAB assets that is now subject to an OFAC license, *see supra* para. 50, West described the potential creation of a "temporary finance mechanism" and said that the $3.5 billion "represents the potential recapitalization of a *central bank that is recognized…*" (emphasis added).[93] West continued, "there will be professional Afghans involved in this process as we move ahead…and when I say Afghans, I do not mean the Taliban, to be very clear. I mean professional Afghans with deep experience in this space."

105.  These statements by Special Representative for Afghanistan West, the senior State Department official with responsibility for Afghanistan, make clear that the U.S. Government recognizes the Taliban's control of DAB.  West's statements concerning capitalizing a new, independent central bank also make clear that the U.S. Government recognizes that the Taliban so deeply and completely controls DAB that the way forward may require a completely new central bank.

---

[92] U.S. Inst. of Peace, *U.S. Engagement With Afghanistan After Six Months of Taliban Rule*, https://www.usip.org/events/us-engagement-afghanistan-after-six-months-taliban-rule (last visited Mar. 19, 2022).
[93] *Id.*

106.  On February 25, 2022, OFAC issued a new general license, General License No. 20 Authorizing Transactions Involving Afghanistan or Governing Institutions in Afghanistan (General License 20), that authorizes certain transactions with DAB despite existing sanctions against the Taliban and individual members of the Taliban.[94]

107.  Concurrent with General License 20, OFAC issued Frequently Asked Question 995, which begins, "Does Afghanistan-related General License (GL) 20 authorize financial transfers to governing institutions in Afghanistan, including the Central Bank of Afghanistan (Da Afghanistan Bank, or DAB), or state-owned or -controlled companies and enterprises in Afghanistan?"[95]

108.  Frequently Asked Question 995 notes that General License 20 "authorizes financial transfers to or involving all governing institutions in Afghanistan—including but not limited to the DAB … provided there are no financial transfers to the Taliban … or any blocked individual who is in a leadership role of a governing institution in Afghanistan other than for the purpose of effecting the payment of taxes, fees, or import duties, or the purchase or receipt of permits, licenses, or public utility services…"[96]

109.  As a general matter, OFAC licenses are special measures taken by the Treasury Department to authorize transactions that otherwise would be prohibited under sanctions laws and regulations.[97]

---

[94] Press Release, U.S. Treas. Dep't, *U.S. Treasury Issues General License to Facilitate Economic Activity in Afghanistan* (Feb. 25, 2022), https://home.treasury.gov/news/press-releases/jy0609; U.S. Treas. Dep't, OFAC, General License 20, *Authorizing Transactions Involving Afghanistan or Governing Institutions in Afghanistan*, https://home.treasury.gov/system/files/126/ct_gl20.pdf.

[95] U.S. Treas. Dep't FAQs, *Afghanistan-Related Sanctions*, https://home.treasury.gov/policy-issues/financial-sanctions/faqs/995 (last visited Mar. 19, 2022).

[96] *Id.*

[97] *See* U.S. Treas. Dep't FAQs, *OFAC Licenses*, https://home.treasury.gov/policy-issues/financial-sanctions/faqs/74 (last visited Mar. 19, 2022).

110.  Based on my knowledge of the Treasury Department and OFAC, this General License 20 and accompanying Frequently Asked Question 995 provide further acknowledgment by the U.S. Government that the Taliban controls DAB, including through the placement of designated terrorists in leadership roles at DAB.  Several factors inform my opinion, including the internal steps required by the Treasury Department to take such special measures, the specificity of the conditions for General License 20 as described in more detail by Frequently Asked Question 995, and the Treasury Department's specific identification of DAB.

## I.    Former U.S. Officials Recognize that the Taliban Controls DAB

111.  A number of former U.S. Government officials have expressed the view that the Taliban now controls DAB.

112.  Former senior Treasury Department officials have confirmed the Taliban's control over DAB. For example, on August 17, 2021, according to the Washington Post, Daniel Glaser, a former Assistant Secretary at the Treasury Department (and a senior official in the Treasury Department's Office of Terrorism and Financial Intelligence), advocated cutting Afghanistan off from the DAB funds located in the United States, because the Taliban could not be trusted to be "responsible custodians of Afghanistan's reserves."[98]

113.  On October 5, 2021, former Treasury Department and National Security Council official Adam Smith testified before the U.S. Senate Committee on Banking, Housing, and Urban Affairs that DAB "is now under the control of the Taliban."[99]

---

[98] Jeff Stein, *Biden Administration Freezes Billions of Dollars in Afghan Reserves, Depriving Taliban of Cash*, Wash. Post (Aug. 17, 2021), https://www.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/.
[99] *Afghanistan's Future: Assessing the National Security, Humanitarian, and Economic Implications of the Taliban Takeover*, *supra* note 30.

114.  Former U.S. Treasury Department official Brian O'Toole stated, "Many of those with expertise and experience fled the country, and the Taliban does not have the capability or the proclivity to run a modern administrative state."[100]

### J.  DAB's Social Media Posts Show That the Taliban Controls DAB

115.  DAB's social media accounts provide further evidence that the Taliban now controls DAB.

116.  Images posted to DAB's Twitter account (@AFGCentralBank) on February 19, 2022 display the white Taliban flag behind officials at DAB meetings.  In addition to the Taliban flag, one of the images shows OFAC Specially Designated Global Terrorist and DAB First Deputy Governor Ahmad Zia Agha (also known as Noor Ahmad Agha) in attendance at the meeting.[101]



---

[100] Brian O'Toole, *supra* note 31.

[101] DAB Twitter (Feb. 19, 2022), https://twitter.com/AFGCentralbank/status/1494958204987617281.

117.  For reference, the U.S. Office of the Director of National Intelligence's (ODNI) National Counterterrorism Center (NCTC) includes a graphic depiction of the Taliban flag with the text "TALIBAN FLAG" below it on an unclassified public webpage that includes background information on the Taliban.[102]  A screenshot from the NCTC website is provided below.



118.  As shown below, as recently as March 10, 2022, the Taliban flag appeared in a tweet posted by DAB's official Twitter account.[103]

---

[102] NCTC, *Terrorist Groups*, *supra* note 20.

[103] DAB Twitter (Mar. 10, 2022), https://twitter.com/AFGCentralbank/status/1501878055534481410.



119.  While I served as the U.S. Treasury Department Financial Attaché at the U.S. Embassy in Kabul, Afghanistan between 2018 and 2019, I never saw a Taliban flag during any of my seven visits to DAB facilities.

120.  On August 23, 2021, DAB's first Twitter post after the Taliban's takeover shows what appears to be attendees making gestures for prayer.  Given the Taliban's religious fundamentalism, this photograph suggests the bank has come under Taliban control. During my time as the U.S. Treasury Department Financial Attaché at the U.S. Embassy in Kabul, Afghanistan, I do not recall DAB leadership beginning any meeting with a required prayer.



121.  DAB social media posts from prior to the Taliban takeover do not include the Taliban flag or religious gestures. For example, the following photograph was posted to DAB's Facebook page in October 2018 and shows a meeting between DAB officials and U.S. State and Treasury Department officials (including me).



122. On DAB's Twitter feed, the Taliban has posted images depicting DAB leadership and their delegation meeting with banking officials in other regions of Afghanistan outside of Kabul.

123. For instance, on March 12, 2022, DAB's official Twitter account posted pictures of a delegation headed by Idris and announcing that a DAB delegation led by Idris will visit all of the zones in the country where DAB has offices.[104]

---

[104] DAB Twitter (Mar. 12, 2022), https://twitter.com/AFGCentralbank/status/1502614526323314690.

124.  On March 14, 2022, DAB's official Twitter account posted images of Idris and his delegation traveling to the northern region of Afghanistan to "supervise[] the affairs of this zone."[105]

125.  I interpret this information from DAB's official Twitter account to mean that the Taliban directs and controls all of DAB operations, not just in Kabul, but throughout all of Afghanistan.

**K.  DAB's Webpage Demonstrates the Taliban's Day-to-Day Control of DAB**

126.  Under the news section of the official DAB webpage (https://dab.gov.af/all-news), the Taliban DAB leadership post articles to provide updates on the bank's activities. These articles highlight the involvement of senior Taliban officials in DAB's day-to-day work.

127.  For instance, on August 29, 2021, a mere two weeks after the Taliban takeover of Afghanistan, the Taliban's DAB leadership held a meeting with high-ranking commercial bank officials, in which Acting Governor Idris chaired the meeting and spoke on behalf of DAB.[106]

128.  On September 15, 2021, Idris issued a statement addressing the people of Afghanistan, assuring the population that all commercial banks operating in the country are "completely secure" and further stating that "the banking sector is in a good condition." He further communicated that all "banks, [foreign exchange dealers], and companies, including national merchants" within Afghanistan can "soon adjust their operations in a normal and regular manner" and "conduct their business affairs with complete surety."[107]

---

[105]  DAB Twitter (Mar. 14, 2022), https://twitter.com/AFGCentralbank/status/1503334035489230852.

[106]  DAB, *DAB Leadership Holds Meeting with High Ranking Officials of Commercial Banks*, https://www.dab.gov.af/dab-leadership-holds-meeting-high-ranking-officials-commercial-banks (last visited Mar. 19, 2022).

[107]  DAB, *Message of Mr. Alhaj Abdul Qahir [Idris], the Acting Governor of Da Afghanistan Bank* (Sept. 15, 2021), https://www.dab.gov.af/message-mr-alhaj-abdul-qahir-acting-governor-da-afghanistan-bank.

129.  On September 25, 2021, the Taliban Deputy Prime Minister, Mr. Mawlawi Abdul Salam Hanafi, Idris, representatives of commercial banks, the chairman of the Afghanistan Banks Association, the Minister of Commerce and Industry, the Deputy Minister of Finance, and the advisor to the Minister of Finance met at the DAB headquarters to coordinate the improvement and stability of the banking system in Afghanistan. The U.N.-sanctioned Mawlawi Abdul Salam Hanafi is a senior Taliban leader.[108]

130.  On September 29, 2021, the SDGT Taliban Deputy Governors of DAB, the SDGT Minister of Finance,[109] the Minister of Commerce and Industry, and directors of relevant branches of DAB met at DAB headquarters to discuss and approve a comprehensive plan prepared by DAB's leadership.[110]

131.  On December 12, 2021, DAB's Taliban-appointed leadership issued a statement to acknowledge a third shipment of cash shipments to the private Afghanistan International Bank (AIB).[111]

132.  On February 12, 2022, DAB's Taliban leadership released a press release criticizing President Biden's Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan and alleging that the Biden Administration allocated assets for "irrelevant purposes," thereby creating an injustice. The press release stated that the Taliban-

---

[108] *Efforts for Improving and Strengthening the Banking Sector of the Country*, *supra* note 86.

[109] *See, e.g.* Saeed Shah, *Taliban Looks to Private Sector to Save Afghanistan's Economy From Collapse*, Wall St.J. (Feb. 20, 2022), available at https://www.wsj.com/articles/taliban-looks-to-private-sector-to-save-afghanistans-economy-from-collapse-11645353000 ("The finance minister, who handled the group's money when fighting the insurgency, is under international terrorism sanctions, as are many other top officials such as the interior minister."); and Greg Jaffe, *Afghanistan's last finance minister turned Uber driver ponders his country's collapse and his life*, Wash. Post (March 18, 2022), available at https://www.washingtonpost.com/nation/2022/03/18/afghanistans-last-finance-minister-now-dc-uber-driver-ponders-what-went-wrong/ ("Seven months later, [the former Finance Minister's] position of finance minister was held by a childhood friend of Taliban founder Mohammad Omar, who had made a name for himself during the war by raising money for suicide bombers in Kandahar.").

[110] DAB, *Third Meeting on TTs* (Sept. 29, 2021), https://www.dab.gov.af/third-meeting-tts.

[111] DAB, *Third USD Shipment Reached Afghanistan and Delivered to the AIB* (Dec. 12, 2021), https://www.dab.gov.af/third-usd-shipment-reached-afghanistan-and-delivered-aib.

controlled DAB will never accept the reserves' disbursement under the name of "humanitarian assistance," and demanded the reversal of the decision, ostensibly requesting that the Biden Administration release the reserves to the Taliban-controlled DAB.[112]

133. On February 23, 2022, Acting Governor Idris met with the UN Special Representative for Afghanistan to discuss financial and banking issues.[113]

134. On February 26, 2022, DAB's Taliban leadership "extended its gratitude and appreciation to the U.S. Department of Treasury for issuing [OFAC General License 20]."[114]

135. On March 8, 2022, DAB held a workshop for mass media representatives, in which information pertaining to the goals, duties and overall monetary policies of the bank was delivered by, among others, Acting Governor Idris.[115] Based on my review of video footage of the meeting uploaded to YouTube and posted on DAB's website, I believe that sanctioned Taliban DAB officials Ahmad Zia Agha and Abdul Qadeer Ahmad (Baseer) were in attendance as well.

### L. DAB Does Not Operate Independently From the Taliban

136. Ideally, central banks operate independently from a country's political leadership. This concept of central bank independence is designed to insulate central bank decision making from political interference, given the politically unpopular decisions that central banks may have

---

[112] Press Release, DAB, *On the Decision of United States of America Regarding the Foreign Exchange Reserves of Afghanistan* (Feb. 2022), https://www.dab.gov.af/press-release-da-afghanistan-bank-decision-united-states-america-regarding-foreign-exchange.

[113] DAB, *DAB Governor Meets with the UN Special Representative for Afghanistan* (Feb. 2022), https://www.dab.gov.af/dab-governor-meets-un-special-representative-afghanistan.

[114] DAB, *The U.S. Department of Treasury Issued General License 20 to Facilitate Economic Activity in Afghanistan* (Feb. 26, 2022), https://www.dab.gov.af/us-department-treasury-issued-general-license-20-facilitate-economic-activity-afghanistan.

[115] DAB, *DAB Held a Workshop for Mass Media Representatives* (Mar. 2022), https://www.dab.gov.af/dab-held-workshop-mass-media-representatives. A link to a video describing the event is available at www.dab.gov.af/index.php/media-gallery, and the video itself is available at www.youtube.com/watch?v=EtSc4sVoSGs.

to make to fulfill their monetary policy and other mandates. Concepts of central bank independence are dynamic. While I worked with DAB leadership, DAB operated with sufficient independence from the former Islamic Republic of Afghanistan's control as to not create concerns from the U.S. Treasury Department.

137. Based on information communicated to me by people inside and outside of Afghanistan, I understand that DAB is now operating under the Taliban's direct operational control. Recognizing this reality, many, myself included, have written about the need for the United States and the international community to "appoint[] independent, internationally recognized technocrats to lead and operate DAB and FinTRACA, as opposed to Taliban loyalists who lack requisite education or experience."[116]

138. Other experts have also confirmed that DAB is not currently independent of the Taliban. For example,

    a. In sworn testimony before the U.S. Senate Foreign Relations Committee's Subcommittee on Near East, South Asia, and Counterterrorism, Graeme Smith of the International Crisis Group testified on February 9, 2022 that "Afghanistan needs an entity to serve the functions of a central bank, holding U.S. dollar currency auctions, printing local currency, and regulating the banking sector." Smith called for "reviving Da Afghanistan Bank" through foreign technical assistance and "ring-fencing" the bank "*to keep it independent from the Taliban-controlled government*."[117]

---

[116] Zerden, *supra* note 33.

[117] Graeme Smith, *Afghanistan: The Humanitarian Crisis and U.S. Response*, Int'l Crisis Grp. (Feb. 10, 2022), https://www.crisisgroup.org/asia/south-asia/afghanistan/afghanistan-humanitarian-crisis-and-us-response (emphasis added).

b. Dr. William Byrd of the U.S. Institute of Peace wrote on January 4, 2022 that "[t]he Taliban need to restore capacity and a degree of independence in the Ministry of Finance and DAB and appoint competent, experienced technocrats to key positions."[118]

c. U.S. legislative leaders have also recognized the need to remove the Taliban's control over DAB. On February 11, 2022, a group of 27 Members of Congress called for the United States to "support an independent and technocratic Afghan central bank free from Taliban interference."[119]

d. On December 21, 2021, a bipartisan group of Members of Congress noted that "Afghanistan will need an entity to serve as a central bank. . . . The Biden administration should signal openness to designating a private Afghan or third-country bank to facilitate dollar auctions not only to stop a meltdown but to enable ordinary Afghans to get back on their feet without having to depend on the Taliban."[120]

e. On February 15, 2022, the U.S. State Department Special Representative for Afghanistan Thomas West called for DAB's "professionalization" and "independence."[121]

f. On January 18, 2022, Nazir Kabiri, an Afghan academic, describing the situation in Afghanistan generally, noted that the remaining non-Taliban officials in government

---

[118] William Byrd, *How to Mitigate Afghanistan's Economic and Humanitarian Crises*, U.S. Inst. of Peace (Jan. 4, 2022), https://www.usip.org/publications/2022/01/how-mitigate-afghanistans-economic-and-humanitarian-crises.

[119] Press Release, *Merkley, Connolly Lead Bicameral Push to Help Afghans at Risk of Starvation* (Feb. 11, 2022), https://www.merkley.senate.gov/news/press-releases/merkley-connolly-lead-bicameral-push-to-help-afghans-at-risk-of-starvation.

[120] Press Release, *Crow, Malinowski, Meijer Make Bipartisan Push for Humanitarian Aid for Afghanistan* (Dec. 21, 2021), https://crow.house.gov/media/press-releases/crow-malinowski-meijer-make-bipartisan-push-humanitarian-aid-afghanistan.

[121] Twitter, Graeme Smith (Feb. 2022), https://twitter.com/smithkabul/status/1493970324764995586?s=20&t=RdiTmXPqQfE1O6mSXuxLHQ.

App.300

institutions "all have Taliban ministers over them, so they have no authority to make decisions."[122]

139.  Furthermore, DAB currently operates at the direction of the Taliban's Council of Ministers and the Taliban's Economic Commission.[123] The Taliban Economic Commission is led by the U.N.-sanctioned Mullah Baradar, the Taliban's Acting First Deputy Prime Minister, a Taliban co-founder, and a former deputy to Mullah Mohammed Omar.[124] On September 25, 2021 the Taliban Deputy Prime Minister, Mawlawi Abdul Salam Hanafi, individually sanctioned by the U.N. for narcotics trafficking, chaired a meeting with Taliban DAB Acting Governor Idris at DAB, according to a DAB press release.[125] This Taliban-led meeting at DAB demonstrates the absence of DAB independence and its control and direction by the Taliban.

## M.  Public and Private Organizations Are Bypassing DAB Because It Is Controlled By The Taliban

140.  The private sector and many international non-governmental organizations are attempting to bypass DAB because it is controlled by the Taliban.  Most prominently, the United Nations has been shipping hundreds of millions of U.S. dollars as banknotes into Afghanistan since late 2021, but is transferring these funds to a private bank, Afghanistan International Bank, rather than DAB. Such an arrangement is highly unusual because DAB previously received U.S. dollar banknote shipments directly before August 2021, a program which ceased in order to prevent the Taliban from accessing the funds.[126] The tweet below from DAB's account confirms

---

[122] Pamela Constable, *Afghanistan Desperately Needs Aid*, Wash. Post (Jan. 18, 2022), https://www.washingtonpost.com/world/2022/01/18/afghanistan-aid-finance/.

[123] MacKenzie, *supra* note 81.

[124] Lalzoy, *supra* note 84.

[125] *Efforts for Improving and Strengthening the Banking Sector of the Country*, *supra* note 86.

[126] Kate Davidson et al., *U.S. Halted Dollar Shipments to Afghanistan to Keep Cash Out of Taliban's Hands*, Wall. St. J. (Aug. 17, 2021), https://www.wsj.com/articles/u-s-halted-dollar-shipments-to-afghanistan-to-keep-cash-out-of-talibans-hands-11629233621.

these more recent transfers. (Note: The automated Google Translate mistranslates Afghanistan International Bank (AIB) as "World Bank".)



141. Below are additional examples of international and nongovernmental organizations attempting to avoid engaging with the Taliban-controlled DAB as they carry out financial activity that would typically occur through a central bank.

a. The United Nations Office for Project Services is working to facilitate humanitarian relief into Afghanistan. It has been working on a currency swap facility that would involve the support of the World Bank, the United Nations Office for the Coordination of

Humanitarian Affairs (OCHA), and others to bypass "DAB and the Afghan Government, but connect[] to a number of companies to give access to [Afghan currency]."[127]

     b.     Some NGOs employ a strategy involving an individual or company releasing funds in Afghanistan in return for reimbursement in the United Kingdom, Iraq, or elsewhere in the world.[128]

     c.     Some NGOs use strategies that avoid involving Afghan individuals or companies directly in the transaction, but still provide payment in Afghanistan using *hawala* or other funding mechanisms available within Afghanistan.[129]

     d.     Some NGOs and private sector actors are running their own "humanitarian swap facilities" for humanitarian actors to avoid exposure to DAB or the wider Afghan Government.[130]

     142.  Financial institutions around the world are avoiding interacting with DAB. While these actions are in part motivated by sanctions compliance concerns, financial institutions also have independent risk considerations that factor into broader money laundering, terrorism financing, and narcotrafficking controls.[131]

     143.  Based on the totality of information currently available, it is my expert opinion that DAB is controlled completely by the Taliban. As the U.S. Government and observers

---

[127] Norwegian Refugee Council, *Life and Death: NGO Access to Financial Services in Afghanistan* at 33 (Jan. 2022), https://reliefweb.int/sites/reliefweb.int/files/resources/life-and-death_0.pdf.

[128] *Id*.

[129] *Id*.

[130] *Id*.

[131] *Afghanistan's Future: Assessing the National Security, Humanitarian, and Economic Implications of the Taliban Takeover* at 4, *supra* note 30; Jacob Kurtzer, *Assessing Economic Crisis Response Options for Afghanistan*, Center for Strategic and International Studies (Feb. 9, 2022), https://www.csis.org/analysis/assessing-economic-crisis-response-options-afghanistan.

around the world have noted, DAB is not currently serving the function of an independent central bank. It is, instead, being actively directed by the Taliban.

**IV.** **DAB is a Means Through Which the Taliban Accomplishes Material Functions and DAB Provides Material Support to the Taliban**

144. In addition to controlling it, the Taliban also uses DAB as a means by which to accomplish several functions that are material to its role as a terrorist organization. The same evidence shows that DAB is providing material support to the Taliban. In fact, one cannot overstate the potential consequences and international harm that may arise from a designated, committed terrorist organization controlling the central bank of a state.

145. In my expert opinion, the Taliban is using its control over DAB for its material benefit in at least several key ways: 1) support for the Taliban's efforts to generate hundreds of millions of dollars in revenue from the illicit narcotics trade, revenue that it can in turn use to carry out its agenda; 2) exploitation of access to sensitive financial intelligence information such as Suspicious Activity Reports ("SARs") and dossiers compiled by FinTRACA, DAB's Financial Intelligence Unit; 3) exploitation of access to sensitive, nonpublic financial supervisory information and supervisory capabilities; and 4) enhanced, unregulated use of the high-risk *hawala* sector for terrorism financing, narcotrafficking, money laundering, and other illicit purposes.

**A.** **Control of DAB Materially Supports the Taliban's Revenues from Illicit Narcotics**

146. The Taliban is using its control over DAB to support its efforts to generate hundreds of millions of dollars in revenue from the illicit narcotics trade.

147. As identified by the United Nations, the drug trade is the "largest single source of income" for the Taliban as of June 2021.[132] The United Nations found that "[t]he primary sources of Taliban financing remain criminal activities, including drug trafficking and opium poppy production, extortion, kidnapping for ransom, mineral exploitation and revenues from tax collection in areas under Taliban control or influence."[133]

148. Afghanistan is the largest producer of opium in the world, accounting for at least 85 percent of global production as of November 2021, according to the United Nations.[134]

149. For years, the Taliban has benefitted from taxation of narcotics production and trafficking.

150. According to the U.S. Government, "Following the Taliban takeover, there is at present no indication of an existing mechanism for investigating, prosecuting, and adjudicating narcotics trafficking."[135]

151. According to the U.S. Government, "The Taliban have not announced the adoption of any purported anti-money laundering/combating the financing of terrorism (AML/CFT) laws and regulations."[136]

152. I am not aware of any other terrorist group whose "single largest source of income" is the illicit drug trade and who has access to central bank functionality to support its revenue generation from the illicit drug trade.

---

[132] U.N. S.C., S/2021/486, *Twelfth Report of the Analytical Support and Sanctions Monitoring Team* https://www.un.org/securitycouncil/sanctions/1988/monitoring-team/reports.

[133] *Id*. at 14, 22.

[134] UNODC, *Afghan Opiates Supply 8 Out of 10 Opiate Users Worldwide, UNODC finds, as Experts meet in Vienna to Combat Illicit Trafficking* (Nov. 16, 2021), https://www.unodc.org/unodc/en/frontpage/2021/November/afghan-opiates-supply-8-out-of-10-opiate-users-worldwide--unodc-finds--as-experts-meet-in-vienna-to-combat-illicit-trafficking.html.

[135] *International Narcotics Control Strategy Report: Money Laundering* at 33, *supra* note 29.

[136] *Id*. at 32.

**App.305**

153. Based on my experience in Afghanistan between 2018 and 2019, DAB under the former Islamic Republic of Afghanistan had sufficient political will and technical capabilities to address AML/CFT risks, including those risks associated with the Taliban and its revenue generation through the illegal narcotics trade. According to the U.S. Government, this included "a comprehensive AML law with significant provisions on the criminalization of money laundering, customer due diligence (CDD) and suspicious activity reporting (SAR) provisions, and asset seizure and forfeiture authority. In 2016, DAB issued a regulation pursuant to Article 69 of the *Anti-Money Laundering and Proceeds of Crime Law* requiring all financial institutions to develop effective frameworks, preventive measures, systems, controls, and practices to manage their potential money laundering/terrorist financing risks" and established FinTRACA in 2014.[137]

154. These efforts taken by DAB under the former Islamic Republic of Afghanistan helped to address money laundering and terrorism financing risks in Afghanistan, including the Taliban's terrorism financing efforts involving revenue from illegal narcotics.

155. It is my expert opinion that unfettered control of a central bank allows the Taliban to use central bank capabilities (including the decommissioning of those capabilities) to further its financing of terrorism through illicit narcotics trafficking operations by supercharging the Taliban's ability to engage in money laundering to obfuscate the sources of illicit proceeds. The fact that the Taliban has wrested control of DAB from its prior leadership—leadership that was dedicated to upholding international AML/CFT standards—means that prior checks on the Taliban's illicit activities are no longer in place.

---

[137] *Id*. at 33.

**B.      Control of DAB Provides Access to Sensitive Financial Intelligence Information**

156.   Through its control over DAB, the Taliban has gained access to sensitive financial intelligence information maintained at the bank and control over the entire Afghan banking system.  Given how quickly the Afghan government collapsed, it is highly unlikely that DAB employees would have been able to take steps to prevent the Taliban from accessing the records. Among other things, the Taliban may now have access to the following kinds of sensitive financial information it can weaponize against those it seeks to harm in Afghanistan and abroad:

a.      **Suspicious Activity Reports ("SARs").** Through the Afghan Financial Intelligence Unit, FinTRACA, DAB received, investigated, and maintained suspicious activity reports.  Suspicious activity reports ("SARs") are reports that many governments obligate financial institutions to file whenever they identify transactions or other activities that are suspicious for money-laundering, terrorism financing, or other illicit activities. [138]  While SARs are not formal accusations, they do contain information that is so sensitive and confidential that banks submitting them are generally prohibited from confirming their existence.  Therefore, the risks associated with misuse is extraordinarily high.

1)      The Taliban could, for instance, use SARs about former Afghan officials suspected of financial improprieties like embezzlement to justify charging, imprisoning, torturing, or executing them. [139]

2)      Since many filed SARs likely involve Taliban activity for terrorism financing and money laundering, the Taliban could also use SAR

---

[138] Afghan authorities and certain publications refer to SARs as "Suspicious Transaction Reports," or STRs, but the term SARs is used in the United States.

[139] Valentina Pasquali, *FinTRACA, Afghanistan's Financial Intelligence Unit, Faces Bleak Future*, ACAMS (Sept. 13, 2021), https://www.moneylaundering.com/news/fintraca-afghanistans-financial-intelligence-unit-faces-bleak-future/.

data to retaliate against (1) financial industry compliance officials who compiled these reports in the ordinary course of their work and (2) confidential sources who provided derogatory information about the Taliban, Al Qaeda, the Haqqani Network, or others to financial industry compliance officials.

3) More troubling, the Taliban-controlled DAB, through FinTRACA, is still the repository for SARs; financial institutions in Afghanistan are still obligated to file SARs, including against suspected Taliban terrorism financing activities, to the Taliban-controlled DAB. This reality severely undermines the intent and purpose of the SAR filing regime to confidentially identify suspicious financial activity for action by competent and credible regulatory authorities.

4) Here, the Taliban materially benefits from DAB's access to SAR information. In fact, almost every other jurisdiction in the world goes to great lengths to protect the content of confidential SAR information and the integrity of the SAR process from terrorist groups like the Taliban.

b. **FinTRACA Reports**. FinTRACA is the Financial Transactions and Reports Analysis Center of Afghanistan and was created in 2014 as the Financial Intelligence Unit for Afghanistan. It is the unit of DAB responsible for identifying and investigating financial improprieties like those giving rise to SARs. Many different parts of the former Afghan government, the banking system, and foreign partners provided sensitive information to

FinTRACA.  FinTRACA also had access to the Afghan government's information and databases and worked closely with law enforcement to investigate and prosecute illegal activity. FinTRACA was established to deny the use of Afghanistan's financial system to those who were trying to use the system to obtain, use, or transfer funds from illegal activities or for terrorist purposes, including the Taliban and Al Qaeda.  FinTRACA also interfaced with Afghanistan's commercial banks and *hawala* (money services business) sector (discussed in greater detail, below) to enhance Afghanistan's national anti-money laundering and countering the financing of terrorism (AML/CFT) capabilities.

1)      The information possessed by FinTRACA was extremely sensitive and included information about the sources who provided the information.  Ironically, the Taliban, a Specially Designated Global Terrorist, now controls the financial investigative system that was created to prevent it and other malign actors from using Afghanistan's financial system to finance, and provide material support for, terrorist activities.  Furthermore, the purposes of certain FinTRACA reports were to provide lead generation and evidentiary packets of financial information as part of referrals to competent law enforcement agencies in Afghanistan to action through criminal prosecutorial authorities; now, these law enforcement agencies are either disbanded or also controlled by the Taliban.

2)      Therefore, the financial regulatory support nexus to law enforcement is existentially compromised and cannot fulfill its

intended function, especially to address terrorism financing and other criminal activity associated with the Taliban. The Taliban is now able to use these DAB assets created to fight the Taliban to advance its own terrorist and criminal activities instead.

3)     This view appears consistent with the position taken by the Egmont Group of Financial Intelligence Units. The Egmont Group suspended DAB's FinTRACA from the Egmont Secure Web, a secure communications platform among Financial Intelligence Units around the world. The Egmont Group released a statement that, "Taking into consideration the situation in Afghanistan, the Egmont Group disconnected the Financial Transactions and Reports Analysis Center of Afghanistan (FinTRACA) from the Egmont Secure Web (ESW) on Sunday, August 15th, 2021. The Egmont Group stands in solidarity with our colleagues at FinTRACA and hopes that they and their families are safe." The Egmont Group of Financial Intelligence Units is an intergovernmental organization that "was created to provide [Financial Intelligence Units] around the world a forum to exchange information confidentially to combat Money-Laundering, the Financing of Terrorism, and other predicate offenses."

157. According to the U.S. Government, because of the Taliban's control over DAB, "FinTRACA currently is non-operational."[140]

158. According to the U.S. Government in the same March 2022 report, "DAB and FinTRACA may experience major changes as Taliban representatives now oversee these organizations that previously investigated Taliban finances and coordinated responses through law enforcement and other channels."[141]

159. In sum, the Taliban's access to sensitive financial information through DAB is enabling it to carry out key material functions, including gaining advantages over its adversaries, supporting terrorism and crime, and further extending its control over Afghanistan.

**C. Control of DAB Provides Access to Sensitive, Nonpublic Financial Supervisory Information and Enables the Abuse of Supervisory Capabilities**

160. Through its control over DAB, the Taliban now controls the entire Afghan banking and financial services ecosystem. Among other things, DAB developed and maintained sensitive, nonpublic information about Afghanistan's commercial banks and *hawala* (money services business) sector as part of its supervisory role over them. Such information likely would include likely work product related to examinations of the commercial banks and *hawalas* for macroprudential purposes such as institutional safety and soundness. It would also include critically important information concerning anti-money laundering and countering the financing of terrorism (AML/CFT) matters, like evaluations of AML/CFT policies and procedures, capabilities, and deficiencies at regulated financial institutions throughout Afghanistan. I have personal knowledge that DAB's Supervision Department before August 2021 dedicated an office and staff to AML/CFT supervision. I have personal knowledge that the head of that office is no

---

[140] *International Narcotics Control Strategy Report: Money Laundering* at 33, *supra* note 29.
[141] *Id.*

longer in the jurisdiction of Afghanistan. And, Agha, a person sanctioned by multiple jurisdictions for, among other things, his terrorist financing activity on behalf of the Taliban, is now in charge of AML/CFT functions at DAB.[142]

161.  With control over DAB and supervisory responsibility over all Afghan banks and the *hawala* sector, the Taliban can use DAB, the commercial banks, and the *hawala* sector to further its terrorist purposes, including facilitating the financing of terrorism and revenue generation through the illicit narcotics trade, by identifying and then exploiting weaknesses in AML/CFT procedures at banks and *hawalas* both inside and outside Afghanistan, as well as to abuse DAB itself as a central bank in charge of AML/CFT and other supervisory obligations.

162.  A Taliban-controlled DAB, for instance, can easily conceal the true nature and purpose of Al Qaeda transactions intended to finance terrorist attacks around the world and then provide cover when foreign banks or other international parties conduct their due diligence investigations into suspicious transactions. A Taliban-controlled DAB can perform the same function of concealment for itself as a terrorist group, for its foreign sponsors such as Pakistan and wealthy individual donors, and for transnational criminal organizations that the Taliban may partner with to profit from drug trafficking.

163.  A Taliban-controlled DAB can also engage in diversion of international assistance, even when that aid goes through commercial banks.[143]

164.  The U.S. Government assessed in March 2022 that "DAB and FinTRACA may experience major changes as Taliban representatives now oversee these organizations that

---

[142] *See* Talley, *supra* note 48.

[143] Kurtzer, *supra* note 131.

previously investigated Taliban finances and coordinated responses through law enforcement and other channels."[144]

165. The Financial Action Task Force (FATF), the leading intergovernmental organization through which governments cooperate on AML/CFT issues, identified the heightened risk of money laundering and terrorist financing in light of the Taliban's takeover.[145]

166. According to the U.S. Government, "The Taliban have not announced the adoption of any purported anti-money laundering/combating the financing of terrorism (AML/CFT) laws and regulations."[146]

167. It is my expert opinion that a Taliban-controlled DAB, led by Specially Designated Global Terrorists in the senior most leadership positions, hollowed out by the departure of non-Taliban leadership and technical staff, without an operational Financial Intelligence Unit, and lacking any AML/CFT laws and regulations cannot credibly supervise AML/CFT in Afghanistan. Rather, a Taliban-controlled DAB will serve the Taliban's own purposes in facilitating narcotrafficking and the financing of terrorist groups such as the Taliban itself and Al Qaeda. An Afghanistan stripped of proper financial supervision materially benefits the Taliban and allows the Taliban to openly implement its own aims, particularly in the realm of terrorist financing.

**D. Control of DAB Results in a Lack of Meaningful Oversight for the High-Risk *Hawala* Sector, Which the Taliban Exploits**

168. The Taliban-controlled DAB now has full control over the historically under-regulated and perennially high-risk *hawala* sector, which the Taliban uses to fund itself. By

---

[144] *International Narcotics Control Strategy Report: Money Laundering* at 33, *supra* note 29.

[145] *Outcomes FATF Plenary*, *supra* note 32; and *Public Statement on the Situation in Afghanistan*, *supra* note 30.

[146] *International Narcotics Control Strategy Report: Money Laundering* at 32, *supra* note 29.

ensuring that the *hawala* sector goes largely unregulated, the Taliban can preserve an environment favorable to the narcotrafficking and illicit finance on which it relies.

169.  *Hawala* is a "centuries-old informal money exchange system that provides for both domestic and international transfers."[147]  According to *The Economist*, "regulators around the world hate the system, because of its opacity and its role in helping to fund terrorism."[148]

170.  According to the U.S. Government, "during the Taliban rule (1996-2001), Afghanistan's financial system relied heavily on hawala. The Taliban [is] unlikely to enforce international sanctions and regulate the hawala money transfer system."[149]  The U.S. Government further stated, "With a quarter of Afghanistan's commercial banks state-owned, it is unclear the extent to which the Taliban will enforce AML/CFT rules, including administration of the hawala sector."[150] The report continued, "With many Afghans conducting financial transactions outside of the formal banking system, irregular cash transactions and transfers through hawaladars [hawalas] form the nexus of Afghanistan's money laundering problems."[151]

171.  The U.S. Treasury Department published a report entitled "The Hawala Alternative Remittance System and Its Role in Money Laundering" and found that hawala features and capabilities include cost effectiveness, efficiency, reliability, lack of bureaucracy, lack of a paper trail, and [facilitating] tax evasion.[152]

---

[147] Zerden, *supra* note 33.

[148] The Economist, *Hawala Traders are Being Squeezed by Regulators and Covid-19* (Nov. 28, 2020 ed.), https://www.economist.com/finance-and-economics/2020/11/26/hawala-traders-are-being-squeezed-by-regulators-and-covid-19.

[149] *International Narcotics Control Strategy Report: Money Laundering* at 32, *supra* note 29.

[150] *Id*. at 33.

[151] *Id*. at 32.

[152] Patrick M. Jost et al., *The Hawala Alternative Remittance System and its Role in Money Laundering*, FinCen, https://www.treasury.gov/resource-center/terrorist-illicit-finance/documents/fincen-hawala-rpt.pdf.

172. The intergovernmental standard setting body for money laundering and terrorism financing, the Financial Action Task Force (FATF), studied hawalas and found that, "As with other sectors, the less regulated and supervised the hawala and other similar service providers market is, the greater the money laundering and terrorist financing vulnerability. Completely unregulated operators are particularly vulnerable to Money Laundering/Terrorist Financing risks because they permit funds to be sent with little or no [Customer Due Diligence] requirements, allowing a money launderer or terrorist financier to freely send funds with limited risk of being identified."[153] It is my expert opinion that a hawala sector supervised by the Taliban-controlled DAB cannot address AML/CFT vulnerabilities in Afghanistan and in fact furthers the Taliban's own purposes by facilitating narcotrafficking and other forms of illicit finance through the *hawala* system.

173. Under the former Islamic Republic of Afghanistan, the *hawala* industry was lightly regulated. The U.S. Government found in March 2021 that hawala networks in Afghanistan were "often used to circumvent government oversight."[154] Afghan bankers frequently complained to me that the hawala system benefited from less regulation and supervisory scrutiny from DAB and FinTRACA. I worked with U.S. Government, Afghan government, and other partners to address supervisory gaps in the *hawala* system, particularly to improve AML/CFT controls. Yet substantial work remained. An April 2020 DAB report "identifie[d] a multitude of significant deficiencies and conclude[d] that, overall [hawala] compliance with applicable laws and regulations is weak."[155] However, it is my expert opinion

---

[153] FATF, *The Role of Hawala and Other Similar Service Providers in Money Laundering and Terrorist Financing* at 26 (Oct. 2013), https://www.fatf-gafi.org/media/fatf/documents/reports/Role-of-hawala-and-similar-in-ml-tf.pdf.

[154] U.S. State Dep't, *International Narcotics Control Strategy Report: Money Laundering* at 32-33 (Mar. 2021), https://www.state.gov/wp-content/uploads/2021/02/21-00620-INLSR-Vol2_Report-FINAL.pdf.

[155] *Id.* at 36.

that DAB under the former Islamic Republic of Afghanistan attempted in good faith to improve supervision of the hawala sector, including with respect to AML/CFT.

174.  Based in part on my experience in Afghanistan working with DAB to develop systems for regulating and monitoring the *hawala* system, it is my expert opinion that the Taliban uses the *hawala* system as its "primary financial lifeline."[156] Public reports describe the use of *hawala* to move money for Taliban-linked militants. The U.S. Government, the United Nations, and the former Afghan government took actions to disrupt financial activity through the *hawala* system that benefitted the Taliban.[157]

175.  Driven by the loss of technical personnel at DAB and FinTRACA due to the Taliban's control of DAB, as well as the Taliban's reliance on the *hawala* system for illicit financial activities such as narcotrafficking and terrorism financing, it is my expert opinion that the Taliban-controlled DAB will not, and cannot, effectively enforce adequate AML/CFT oversight over the *hawala* system.  Instead, it will use the *hawala* system, or knowingly allow the *hawala* system to be used, to materially support narcotrafficking, terrorist financing, and other Taliban objectives, much like it did in the years before the 9/11 terror attacks.

176.  It is my expert opinion that the Taliban benefits materially from an unregulated *hawala* system that lacks effective AML/CFT oversight. Effective AML/CFT oversight would seek to deny the Taliban access to the *hawala* system.  The Taliban's control of DAB allows it to exploit a *hawala* system which poses heightened terrorism financing risks to the Afghan and international financial systems. As the U.S. Government assessed in March 2022, "The Taliban

---

[156] Zerden, *supra* note 33.
[157] *Id.*

are unlikely to enforce international sanctions and regulate the hawala money transfer system."[158]

177.  According to the U.S. Government, "The Taliban have not announced the adoption of any purported anti-money laundering/combating the financing of terrorism (AML/CFT) laws and regulations."[159]

178.  It is my expert opinion that the Taliban's control of DAB enables an unsupervised or under-supervised *hawala* sector which "creates substantial vulnerabilities that could facilitate billions of dollars in terrorism financing, narcotrafficking, and tax evasion, and turn Afghanistan into an even larger money laundering hub with disastrous consequences for both crime and terrorism."[160]

## V.  Conclusion

179.  Based on my research, expertise, and personal experiences and observations, it is my expert opinion that Da Afghanistan Bank (DAB) is now fully directed and controlled by the Taliban and is an agency or instrumentality of the Taliban.  It is also my expert opinion that DAB is a means through which material functions of the Taliban are accomplished, and that DAB is providing material services to, on behalf of, and in support of the Taliban.

---

[158] *International Narcotics Control Strategy Report: Money Laundering* at 32, *supra* note 29.
[159] *Id.*
[160] Zerden, *supra* note 33.

I declare that the foregoing is true under penalty of perjury of the laws of the United States.

Executed this 20th day of March, 2022 in Washington, D.C.

By: _____
        Alex B. Zerden

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN DOES 1 THROUGH 7, | |
| *Judgment Creditors,* | |
| v. | |
| THE TALIBAN, AL-QAEDA, and THE HAQQANI NETWORK, | Misc Action No. 1:20-mc-00740-GBD |
| *Judgment Debtors,* | |
| and | |
| THE FEDERAL RESERVE BANK OF NEW YORK, | |
| *Garnishee.* | |

**MEMORANDUM OF LAW IN SUPPORT OF THE DOE CREDITORS' MOTION
FOR TURNOVER OF ASSETS
FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK**

# <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................................ iii

I.  Introduction ...................................................................................................................... 1

II. Background ........................................................................................................................ 4

    A.   Factual Background ................................................................................................... 4

        1.   The Judgment ................................................................................................. 4

        2.   Changes In Afghanistan And Its Central Bank ............................................. 5

        3.   Doe Writ Enforcement Procedural History ................................................... 8

    B.   Statutory and Regulatory Background ..................................................................... 9

        1.   The Taliban And The Federal Sanctions Regime ......................................... 9

        2.   TRIA .............................................................................................................. 11

III. Legal Standard ................................................................................................................. 12

IV. Argument .......................................................................................................................... 14

    A.   The Taliban Is A Terrorist Party Within The Meaning of TRIA .................................... 15

    B.   The Doe Creditors Have A Judgment Against The Taliban Based On An Act Of Terrorism ............................................................................................................... 15

    C.   The DAB Assets Are "Blocked Assets" Within The Meaning Of TRIA ...................... 16

    D.   The DAB Assets Are Blocked Assets Of DAB, Which Is An Agency Or Instrumentality Of The Taliban, And Is The Taliban's Alter Ego ................................. 16

        1.   DAB Holds The DAB Assets ........................................................................ 16

        2.   DAB Is An Agency Or Instrumentality Of The Taliban Under TRIA ................ 17

        3.   Treating DAB As An Agency Or Instrumentality Of The Taliban Is Consistent With Binding Case Law, Statutory Text, And Congressional Purpose ........................................................................................................ 20

        4.   Alternatively, DAB Is The Taliban's Alter Ego ............................................ 23

    E.   The Doe Creditors Are Entitled To Possess The DAB Assets ..................................... 24

    F.   There Is No Question Of Priority ................................................................................ 24

V.   Conclusion ..................................................................................................................25

# **TABLE OF AUTHORITIES**

**Cases**

*Banco Nacional de Cuba v. Chem. Bank N.Y. Tr. Co.,* 658 F.2d 903 (2d Cir. 1981).................. 23

*Bennett v. Islamic Repub. of Iran,* 618 F.3d 19 (D.C. Cir. 2010) .................................................. 12

*Caballero v. FARC*, No. 18-CV-25337, 2021 WL 3927826 (S.D. Fla. Aug. 24, 2021) ............. 19

*Caballero v. FARC*, No. 20-CV-1939, 2021 WL 6339256 (D. Conn. Jan. 14, 2021)...... 19, 22, 24

*Caballero v. FARC*, No. 20-MC-0040, 2021 WL 307558 (W.D.N.Y. Jan. 29, 2021) ................ 22

*Clark v. Martinez,* 543 U.S. 371 (2005) ....................................................................................... 22

*Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45
(S.D.N.Y. 2019). .......................................................................................................................... 13

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018)........................... 13

*Doe v. ELN,* No. 10-CV-21517, 2013 U.S. Dist. LEXIS 186742 543(S.D. Fla. Sep. 12, 2013).. 22

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*, 919 F. Supp. 2d 411
(S.D.N.Y. 2013) .................................................................................................................... 14, 24

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232 (D.R.I. 2004)..... 19

*Harrison v. Republic of Sudan*, 802 F.3d 399 (2d Cir. 2015)............................................... 13, 24

*Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17 (S.D.N.Y. 2015) ....... 14, 17, 23, 24

*Hill v. Republic of Iraq,* No. 99-CV-3346, 2003 WL 21057173, (D.D.C. Mar. 11, 2003) .......... 24

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara
("Pertamina")*, 313 F.3d 70 (2d Cir. 2002).............................................................................. 17

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016)......... *passim*

*Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 200 (2d Cir. 2019)................................................. 23

*Knox v. PLO*, 306 F. Supp. 2d 424 (S.D.N.Y. 2004)..................................................................... 4

*Miller v. City of Ithaca*, No. 10-cv-597, 2019 WL 2502712 (N.D.N.Y. June 17, 2019)............. 17

*Phoenician Trading Partners LP v. Iseson*, No. 04-CV-2178, 2004 WL 3152394 (E.D.N.Y. Dec.
11, 2004) ...................................................................................................................................... 1

iii

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018)............................................................ 14

*Smith v. Fed. Rsrv. Bank of N.Y.*, 280 F. Supp. 2d 314 (S.D.N.Y. 2003)............................... 12, 20

*Smith v. FRB*, 346 F.3d 264 (2d Cir. 2003) ............................................................................... 12

*Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169, 2005 WL 3518010 (D.D.C. Feb. 2, 2005) ........................................................................................................................................ 15

*Stansell v. FARC*, 771 F.3d 713 (11th Cir. 2014) ..................................................................... 18

*United States v. Santos*, 553 U.S. 507 (2008)............................................................................ 22

*Weininger v. Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006) ........................................... 12, 14, 24

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) ................................ 11, 16, 24

**Statutes**

8 U.S.C. § 1182 ......................................................................................................................... 15

28 U.S.C. § 1610 note............................................................................................................ *passim*

28 U.S.C. § 1602 .......................................................................................... 12, 20, 21, 22, 23

50 U.S.C. § 1701 ...................................................................................................... 9, 10, 16

50 U.S.C. § 1702 ....................................................................................................................... 16

N.Y. C.P.L.R. § 5225...................................................................................................... *passim*

N.Y. C.P.L.R. § 5227....................................................................................................... 1

N.Y. C.P.L.R. § 5332 .................................................................................................................. 9

**Rules and Regulations**

31 C.F.R. § 594.201 ............................................................................................................ 11, 15

31 C.F.R. § 594.310 ............................................................................................................ 11, 15

31 C.F.R. § 594.311 ................................................................................................................... 15

64 FR 36759.............................................................................................................................. 10

66 FR 49079 ............................................................................................................................. 11

67 FR 44751.............................................................................................................................. 11

**App.323**

87 FR 8391 ................................................................................................................ 16

Fed. R. Civ. P. 69(a) ............................................................................................. 1,12

**Other Authorities**

148 Cong. Rec. S11524 ......................................................................................... 12

148 Cong. Rec. S11528 ......................................................................................... 12

2021 Daily Comp. Pres. Doc. 313 (April 14, 2021) ............................................... 5

Exec. Order No. 13129 ......................................................................................... 10

Exec. Order No. 13268 ..................................................................................... 11, 15

Exec. Order No. 14064 ........................................................................... 1, 7, 14, 16, 17

Exec. Order No. 13224 ......................................................................................... 11

H. Doc. No. 106-268 (2000) ..................................................................... 3, 10, 18, 19

H. Doc. No. 107-16 (2001) ............................................................................... 10, 22

H. Rep. No. 107-779 (2002) . ............................................................................... 12

OFAC License No. DABRESERVES-EO-2022-886895-1 ...................................... 2, 9

App.324

Judgment Creditors John Does 1-7 (the "Doe Creditors"), by and through their undersigned counsel, respectfully submit this memorandum of law in support of their Motion for Turnover of Assets from Garnishee the Federal Reserve Bank of New York ("FRBNY").

## I. Introduction

On February 11, 2022, the President of the United States took a series of coordinated actions intended both to benefit the "welfare of the people of Afghanistan"[1] and to "clear a legal path" for the resolution of legal claims by U.S. victims of terrorism against the Taliban.[2] According to the White House, the steps were intended to permit U.S. claimants "a full opportunity to have their claims heard in U.S. courts."[3] Among other things, the steps taken that day blocked the property of Da Afghanistan Bank ("DAB") at FRBNY, ensuring that the property is subject to execution under the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322.

As a result, the Doe Creditors now move this Court, pursuant to N.Y. C.P.L.R. §§ 5225(b) and 5227,[4] Federal Rule of Civil Procedure 69(a), and Section 201 of TRIA for an order compelling the FRBNY to turn over to the Doe Creditors those blocked assets of DAB in its possession (the "DAB Assets") sufficient to satisfy the outstanding amount of their judgment for compensatory damages against the Taliban, amounting to $138,056,445.37, plus further post-judgment interest that may accrue. Decl. of John Thornton ("Thornton Decl.") ¶ 4.

---

[1] Exec. Order No. 14,064, 87 Fed. Reg 8391 (Feb. 11, 2022).

[2] Charlie Savage, *Spurning Demand by the Taliban, Biden Moves to Split $7 Billion in Frozen Afghan Funds*, N.Y. TIMES (Feb. 11, 2022), https://www.nytimes.com/2022/02/11/us/politics/taliban-afghanistan-911-families-frozen-funds.html.

[3] Background Press Call by Senior Admin. Officials on U.S. Support for the People of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/background-press-call-on-u-s-support-for-the-people-of-afghanistan/.

[4] Because Sections 5225 and 5227 are "essentially interchangeable," it is common practice to move for a turnover order under both provisions. *See Phoenician Trading Partners LP v. Iseson*, No. 04-CV-2178, 2004 WL 3152394, at *3 (E.D.N.Y. Dec. 11, 2004) (citation omitted).

The DAB Assets are subject to execution under TRIA. TRIA applies in cases where "a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism." TRIA § 201(a). The Doe Creditors were civilian contractors in Afghanistan and were victims of an act of terrorism, a suicide bomb attack on January 4, 2016. They have obtained a judgment against a terrorist party, the Taliban, on a claim based on that act of terrorism. Under Section 201 of TRIA, they may therefore execute against assets of the Taliban or its agencies or instrumentalities, such as DAB.

It is undisputed that the Taliban has taken control of DAB, and it is binding law that an entity controlled by a terrorist party is an agency or instrumentality of that terrorist party under TRIA. It is also undisputed that DAB owns the funds in its account at the FRBNY, which is estimated to hold $3.5 billion dollars in assets.[5] Because the Taliban now has an interest in these assets through its agency or instrumentality (or alter ego), DAB, they are subject to execution to the extent of the Doe Creditors' compensatory damages under TRIA and state law. Notably, the United States does not say otherwise. *See Doe* Dkt. 49 ("U.S. Statement") 19-20.

The United States raises several interesting questions in its Statement of Interest related to the nearly unprecedented situation at issue. The circumstances giving rise to this motion are indeed highly unusual: A terrorist group seized control of a central bank and is now using that institution for its own purposes, potentially including the facilitation of further acts of terrorism.[6] The only

---

[5] *See* https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/ ("Even if funds are transferred for the benefit of the Afghan people, more than $3.5 billion in DAB assets would remain in the United States and are subject to ongoing litigation by U.S. victims of terrorism.") The United States ordered even more of DAB's property—all of its property in the United States—to be consolidated at the FRBNY. Exec. Order No. 14,064. On February 25, 2022, the Court issued an order permitting the transfer of $3.5 billion of DAB's assets out of FRBNY, subject to the terms of OFAC License No. DABRESERVES-EO-2022-886895-1. *Doe* Dkt. 65.

[6] Expert Decl. of Alex B. Zerden ("Zerden Decl.") ¶ 14, 40–42, 48. Because of these circumstances, the United States cut off the Taliban's ability to withdraw DAB funds on account at the FRBNY last August. Jeff Stein, *Biden administration freezes billions of dollars in Afghan reserves, depriving Taliban of cash*, Wash. Post (Aug. 17, 2021), https://www.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/.

similar circumstances in memory occurred when the same terrorist group seized control of the same bank in the 1990s and used it for its own purposes—including the facilitation of acts of terrorism. Then, the same facts led the United States to conclude that DAB was "controlled by the Taliban" and to find that the Taliban "ha[d] an interest" in DAB. H. Doc. No. 106-268, at 4 (2000). But despite this case's extraordinary facts, what the law requires is rather ordinary: the reasoned application of settled law. As described further below, this Court can and should adjudicate this motion under binding law. Notably, it can (and should) do so without any need to address any novel or complex issues that implicate difficult constitutional questions or unsettled legal standards.[7]

There was never any mystery about who attacked the Doe Creditors. The Taliban took responsibility for the attack, claiming its target was a "place of vulgarity and profanity".[8] The Doe Creditors timely sought justice against the Taliban and its co-conspirators in the Courts. Now, the Doe Creditors have seen the very entity, the Taliban, and even the very individuals involved in planning and financing the bomb attack, again come to control Afghanistan and DAB. The Taliban

---

[7] It is worth noting that the Doe Creditors do not have a judgment against the State of Afghanistan (which is not a designated state sponsor of terrorism) and have never sought relief under the FSIA against the Taliban (which is not a recognized government of any state). Nor need they do so now (as the FSIA is expressly preempted by TRIA in all respects relevant to these proceedings). Under TRIA, the Court need not make any findings impacting the President's recognition authorities, the status of any state assets, or on any other issue outside of its Article III competencies in a manner impacting the Executive Branch's foreign policy prerogatives or as might be required under the FSIA. As the Government correctly notes: "When its conditions are satisfied, TRIA section 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA." U.S. Statement 10.

[8] See Hassib, Sayed, *Taliban claim Kabul bomb attack on compound used by foreigners*, Reuters (July 31, 2016), https://www.reuters.com/article/us-afghanistan-blast/taliban-claim-kabul-bomb-attack-on-compound-used-by-foreigners-idUSKCN10B0WA.

are up to their old ways.[9] But now, the Taliban's victims have a way to fight back—by using the legal tools Congress granted them to achieve a measure of justice.[10]

## II.    Background

### A.    Factual Background

#### 1.    The Judgment

On November 5, 2020, Doe Creditors obtained a Judgment in the United States District Court for the Northern District of Texas against the Taliban, Al-Qaeda, and the Haqqani Network for an amount totaling One Hundred Thirty-Eight Million Four Hundred Eighteen Thousand Seven Hundred Forty-One Dollars and zero cents ($138,418,741) in compensatory damages, jointly and severally, for an act of terrorism committed by the Judgment Debtors. On January 20, 2021, Doe Creditors registered the Judgment in this district. *Doe* Dkt. 5. On February 23, 2021, the Clerk of this Court issued a Writ of Execution in favor of Doe Creditors against the Taliban, Al-Qaeda and the Haqqani Network for the amount of the judgment. On November 2, 2021, Doe Creditors collected $362,430.13 from blocked assets of an agency/instrumentality of Al Qaeda. As of March 21, 2022, the Doe Creditors hold outstanding judgments for compensatory damages in the amount of $138,284,213.26, on which post-judgment interest continues to run. Thornton Decl. ¶ 4.

---

[9] *See, e.g.*, Dan De Luce et al., *Taliban Keep Close Ties with Al Qaeda Despite Promise to U.S.*, NBC News (Feb. 17, 2021), https://www.nbcnews.com/politics/national-security/taliban-keep-close-ties-al-qaeda-despite-promise-u-s-n1258033; *see also* Hearing to Receive Testimony on Security in Afghanistan and in the Regions of South and Central Asia, S. Comm. on Armed Servs., 117th Cong., 1st Sess. (Oct. 26, 2021), https://www.armed-services.senate.gov/imo/media/doc/21-80_10-26-2021.pdf at 35 (statement of Dr. Colin Kahl, Under Secretary for Policy, U.S. Dep't of Defense) (al Qaeda could develop capability to attack U.S. from Afghanistan "within 1 to 2 years"). *See also*, Zerden Decl. ¶ 41-42.

[10] As the Southern District of New York described the purpose of TRIA:

> In fact, at its core, the statute embodies a precept that goes to the heart of its design, a principle of survival. It manifests that for American victims of international terrorism, finality comes to rest not in violence, but in justice, and that, when all is said and done, the larger and more enduring end lies in the judicial remedy the law uniquely prescribes to survive and redress the terrorist's assault.

*Knox v. PLO*, 306 F. Supp. 2d 424, 448 (S.D.N.Y. 2004)

## 2.    Changes In Afghanistan And Its Central Bank

DAB holds substantial asset reserves in accounts in foreign central banks, including FRBNY. As of August 15, 2021, approximately $7 billion of DAB's asset reserves were held at the FRBNY.[11]

On Sunday, August 15, 2021, as the United States was completing its withdrawal from Afghanistan,[12] the former government of Afghanistan collapsed and its leaders fled the country.[13] The Taliban arrived in the capital city of Kabul and quickly took physical and operational control of certain Afghan government offices, agencies, and instrumentalities for the Taliban's own benefit.[14] Most significantly for present purposes, the Taliban's takeover of these facilities included control of DAB.[15]

The Taliban now completely controls DAB.[16] One of the Taliban's first acts in Kabul was installing, as DAB's Acting Governor, a staunch Taliban loyalist whose only prior financial experience was serving as head of the Taliban's finance commission—a body the Taliban tasked with managing money from narcotics trafficking and collecting illegal taxes the Taliban imposed on businesses and farmers in areas where the Taliban ran shadow governments.[17] The Taliban also installed as the First and Second Deputy Governors, the number two and three leadership positions

---

[11] *See* Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on the Taliban*, N.Y. Times (Aug. 18, 2021), https://www.nytimes.com/2021/08/18/business/afghan-central-bank.html

[12] On February 29, 2020, the United States and the Taliban signed the Doha Agreement to bring the decades-long war in Afghanistan to an end and facilitate the transition to a "new post-settlement Afghan Islamic government." Agreement for Bringing Peace to Afghanistan, Taliban-United States, Feb. 29, 2020, https://www.state.gov/wp-content/uploads/2020/02/Agreement-For-Bringing-Peace-to-Afghanistan-02.29.20.pdf. That transition accelerated with extraordinary speed after April 14, 2021, when President Biden announced the United States would withdraw all U.S. forces from Afghanistan by September 11, 2021. Remarks on United States Military Operations in Afghanistan, 2021 DAILY COMP. PRES. DOC. 313 (April 14, 2021). The Taliban rapidly took control of most territory in Afghanistan during the summer of 2021.

[13] *See* Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban Takeover in Afghanistan: Frequently Asked Questions* 10, 12–13 (2021), https://crsreports.congress.gov/product/pdf/R/R46879.

[14] Zerden Decl. ¶ 39; Thomas, *supra* note [13], at 10, 13–14.

[15] Zerden Decl. ¶ 39; *see* Thomas, *supra* note [13], at 40.

[16] Zerden Decl. ¶ 14, 39, 49, 51, 54-55, 74, 86, 91, 98, 103, 110, 115-25, 126-35, 137-139, 143

[17] Zerden Decl. ¶ 55 (concerning Haji Mohammed Idris, DAB's Acting Governor).

at DAB, individuals who are personally sanctioned by the United States, the United Nations, and other jurisdictions for terrorist activities undertaken as members of the Taliban.[18] DAB's organizational structure assigns those sanctioned terrorists significant operations and management responsibilities.[19] In fact, DAB's First Deputy Governor, Noor Ahmad Agha, is charged with supervising DAB's anti-money laundering and countering the funding of terrorism functions.[20]

The Taliban permeates every level of DAB. The Taliban is driving essential technical experts who work for DAB out of the country[21] and replacing them with loyalists who do not have the requisite education, experience, and expertise to operate a central bank independently and competently.[22] Many DAB staff remain at the bank only because the Taliban compels them to work.[23] The private business sector reports encountering more and more frequently Taliban-affiliated staff at all levels of DAB.[24]

The Taliban Council of Ministers' open control over DAB removes any illusion that DAB is independent of the Taliban.[25] The Council of Ministers consists of the heads of all Taliban government ministries, and, like DAB's leadership, includes individuals sanctioned for Taliban terrorist activities.[26] The Council of Ministers has directed DAB policy.[27] The Taliban's Deputy

---

[18] Noor Ahmad Agha is DAB's First Deputy Governor. He was sanctioned for his activities as the leader of the Taliban's military council and as a finance officer. Among other things, Agha had responsibilities for financing Taliban commanders and funding improvised explosive devices. Zerden Decl. ¶ 59-67. Abdul Qadeer Ahmad is DAB's Second Deputy Governor. He was sanctioned for, among other things, providing funds to Taliban commanders who carried out terrorist attacks in Afghanistan, collecting financial aid from the Taliban's domestic and foreign sponsors, distributing funds to Taliban shadow governors, and collecting Taliban revenues from narcotics trafficking. Id. at ¶ 73-82.

[19] Zerden Decl. ¶ 55, 59-67, 73-82.

[20] Zerden Decl. ¶ 69.

[21] Zerden Decl. ¶ 88.

[22] Zerden Decl. ¶ 55, 59-67, 73-82, 85.

[23] Zerden Decl. ¶ 86, 88-89.

[24] Zerden Decl. ¶ 85.

[25] Zerden Decl. ¶ 92-95.

[26] Zerden Decl. ¶ 93; *see also* Reuters, Taliban Name New Afghan Government, Interior Minister on U.S. Sanctions List (Sept. 7, 2021), https://www.reuters.com/world/india/taliban-fire-air-scatter-kabul-protesters-no-reports-injuries-2021-09-07/.

[27] Zerden Decl. ¶ 92.

6

**App.330**

Prime Minister has chaired meetings at DAB.[28] And Taliban officials have begun discussing proposals to subordinate DAB under the Taliban-controlled Ministry of Finance.[29] In fact, DAB is now so completely fused with the Taliban that U.S. officials have begun discussing the need to stand up a brand new central bank that is wholly separate from the Taliban.[30]

On the same day the Taliban took control of Afghanistan's capital, including the facilities of DAB, the United States locked down DAB's assets at the FRBNY to prevent them from being withdrawn by a Taliban-controlled DAB or otherwise transferred to the Taliban.[31]

On February 11, 2022, President Biden signed an executive order designating "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, a[s] blocked[.]" Exec. Order No. 14,064 § 1(a). The order further provides that all U.S. financial institutions must transfer all property and interests in property of DAB in the United States to the FRBNY. *Id.* § 1(b). Contemporaneously with the issuance of that order, the Government issued a license through the Treasury Department's Office of Foreign Assets Control which authorizes, directs, and compels the FRBNY, upon further instructions, to transfer up to $3.5 billion of DAB's blocked assets "for the benefit of the people of Afghanistan, or to a United Nations fund, programme, specialized agency, or other entity or body for the benefit of the people of Afghanistan." *Doe* Dkt. 49-2 at 2. The remainder of the blocked assets were left behind so that victims of terrorism, using TRIA, could "have their claims heard in U.S. courts."

---

[28] Zerden Decl. ¶ 94.
[29] Zerden Decl. ¶ 138.
[30] Zerden Decl. ¶ 105.
[31] *See* Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan: Background and Issues for Congress* 39 (2021), https://crsreports.congress.gov/product/pdf/R/R46955; Stein, *supra* note 6.

**App.331**

### 3.     Doe Writ Enforcement Procedural History

On August 26, 2021, less than two weeks after the Taliban takeover of DAB, Doe Creditors filed an Emergency Motion for a Writ of Execution specifically directed to "The Taliban, including the blocked assets of Da Afghanistan Bank held by the Federal Reserve Bank or any other financial institution." *Doe* Dkt. 15.[32] On August 30, the United States notified the Honorable Katherine Polk Failla, before whom this matter was then pending, that it was considering filing a Statement of Interest and requested that the Court defer any ruling on the motion. *Doe* Dkt. 18. The same day, the Court granted the Government's request. *Doe* Dkt. 19. On September 7, 2021, Doe Creditors filed a letter motion requesting that the Court expedite consideration of their motion, citing the prejudice they were suffering by the Court's delay associated with the issuance of their writ. *Doe* Dkt. 20. On September 8, 2021, the Court denied the motion to expedite. *Doe* Dkt. 21. On September 21, 2021, Doe Creditors filed a letter informing the Court that on September 16, 2021, the Government had filed a letter motion in *Havlish et al. v. Bin Laden, et al.*, Case No. 03 Civ. 9848, stating that the Havlish creditors had served a Writ of Execution on FRBNY. *Doe* Dkt. 25. On September 23, 2021, the Court stated that it "reads Plaintiff's correspondence as seeking reconsideration of the Court's denial of Plaintiff's request to expedite the issuance of their requested writ of execution." *Doe* Dkt. 26. The Court instructed Doe Creditors to submit documents to the clerk for the issuance of a writ, but stayed any judicial enforcement of the writ upon its issuance. *Id*. On September 27, 2021, the clerk issued the requested writ, and it was duly served on FRBNY, first by process server, then by the U.S. Marshal. *See* Exhibit A, Writ of

---

[32] Doe Creditors had prior, on February 23, 2021, obtained a Writ of Execution directed to its three judgment debtors: the Taliban, Al-Qaeda and the Haqqani Network only. After Doe Creditors encountered difficulty in obtaining a writ directed more specifically to the blocked assets of Da Afghanistan Bank, they served this earlier writ on FRBNY on September 20, 2021. Given that Doe Creditors subsequently obtained and served their requested writ in time to establish a sufficient priority position to secure recovery, Doe Creditors will not relate these efforts further.

Execution; *see also Doe* Dkt. 27, Affidavit of Service, *Doe* Dkt. 67, Process Receipt and Return

from the United States Marshals Service.[33] On October 14, 2021, the Government informed the

Court that it intended to file a Statement of Interest. *Doe* Dkt. 29. Also on October 14, 2021, Doe

Creditors filed a Motion for *Nunc Pro Tunc* Issuance and Service of Writ. *Doe* Dkt. 30.

In light of the stay, the Doe Creditors sought and the Court granted an extension of the *Doe*

Writ, which provides that the writ "is hereby extended and shall not expire until further order of

the Court." *Doe* Dkt. 40, 41 at 2. The Government maintained that the DAB Assets were "subject

to and restrained by" the *Doe* writ during this time. *Doe* Dkts. 42 at 2, 47 at 2; *see also* U.S.

Statement 3. The Government filed a Statement of Interest on February 11, 2022. *Doe* Dkt. 49.

On February 25, 2022, the Court ordered that the $3.5 billion in DAB assets regulated by

OFAC License No. DABRESERVES-EO-2022-886895-1 "are not judicially restrained[.]" *Doe*

*Dkt.* 65. It further ordered that, with respect to the DAB assets not regulated by the OFAC License,

"the Havlish writ dated August 27, 2021, and the Doe writ dated September 27, 2021 … remain

in effect pending further order of this Court." *Id.*

### B.     Statutory and Regulatory Background

#### 1.     The Taliban And The Federal Sanctions Regime

Congress enacted the International Emergency Economic Powers Act ("IEEPA"), Pub. L.

No. 95–223, 91 Stat. 1625, 50 U.S.C. § 1701 *et seq.*, at the end of 1977. The law provides that

whenever the United States is faced with an "unusual and extraordinary threat … to [its] national

security, foreign policy, or economy" which "has its source in whole or substantial part outside

---

[33] Levy was accomplished by service because the FRBNY has refused to turn the DAB's assets over to the Marshal. N.Y. C.P.L.R. § 5232(a) (property not capable of delivery is levied upon service by marshal). This is precisely the sort of case where levy by service is appropriate. *See also* Siegel, *New York Practice*, § 497 (6th ed.) ("Any situation in which the sheriff cannot readily lay hands on the property interest involved, and by some means take immediate actual or at least constructive custody of it, should be deemed to involve property 'not capable of delivery' and therefore to permit levy by service under subdivision (a) of CPLR 5232[.]").

the United States," the President may "declare[] a national emergency with respect to such threat" and implement measures to regulate international economic transactions. 50 U.S.C. § 1701.

The Taliban is an Islamic fundamentalist terrorist group that has twice taken control of territory and institutions in Afghanistan, including DAB. The first time the Taliban did so, in the late 1990s, President Clinton declared a national emergency and exercised his power under IEEPA to block (1) "all property or interests in property of the Taliban," (2) all property or interests in property of anyone determined by the executive "to be owned or controlled by" or "to act for or on behalf of" the Taliban, and (3) all property or interests in property of anyone found "to provide financial, material, or technological support for, or services in support of" anyone owned, controlled by, or acting for or on behalf of the Taliban. Exec. Order No. 13,129 § 1, 64 Fed. Reg. 36,759 (July 7, 1999). Months later, the administration added DAB to the list of persons blocked under this order. H. DOC. NO. 106-268, at 4; *see also* H. DOC. NO. 107-16, at 4 (2001) (same). In his report to Congress, President Clinton stated that DAB "ha[s] been found to be controlled by the Taliban, and to be [an] entit[y] in which the Taliban has an interest." *Id.* Notably, the United States did not recognize the Taliban as the government of Afghanistan at the time that the United States nevertheless recognized that the Taliban controlled DAB (even though DAB was Afghanistan's central bank).[34]

After the September 11 attacks, President George W. Bush took immediate action pursuant to IEEPA to block terrorists from accessing any property in the United States or within the control of any U.S. person. On September 23, 2001, he directed that "all property and interests in property" in the United States in which certain identified terrorists had any interest were henceforth blocked.

---

[34] *See* Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-center/press-releases/Pages/po943.aspx. After the fall of the Taliban at the end of 2001, the Treasury Department issued a license authorizing the new Afghan government to access the DAB assets. *Id.*

Executive Order 13,224 § 1, 66 Fed. Reg. 49,079. Nine months later, he added the Taliban to the

list of persons blocked pursuant to that order, thereby deeming the Taliban a "Specially Designated

Global Terrorist" or "SDGT." Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002); 31

C.F.R. §§ 594.201(a), 594.310. The Taliban remains a blocked person and an SDGT to this day.

**2.      TRIA**

Shortly after the September 11 attacks, Congress became frustrated with the executive's

longstanding sanctions rules that had the effect of preventing enforcement of money judgments

issued to victims of terrorism against the assets of terrorist groups. Congress enacted a new law

with the specific purpose of allowing victims of terrorism to obtain relief from blocked terrorist

funds. Terrorism Risk Insurance Act of 2002 ("TRIA") § 201, Pub. L. No. 107–297, 116 Stat.

2322, 2337–2340 (codified at 28 U.S.C. § 1610 note). TRIA provides in operative part that:

> *Notwithstanding any other provision of law,* and except as provided in subsection
> (b), in every case in which a person has obtained a *judgment against a terrorist
> party* on a claim based upon an act of terrorism, or for which a terrorist party is not
> immune under [28 U.S.C. § 1605(a)(7)], the blocked assets of that terrorist party
> (*including the blocked assets of any agency or instrumentality of that terrorist
> party*) shall be subject to execution or attachment in aid of execution in order to
> satisfy such judgment to the extent of any compensatory damages for which such
> terrorist party has been adjudged liable.

*Id.* § 201(a) (emphasis added).

As Senator Tom Harkin, one of the primary sponsors of TRIA, explained: "[t]he purpose

of [Section 201] is to deal comprehensively with the problem of enforcement of judgments issued

to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the

frozen assets of terrorist parties … [TRIA] establishes once and for all, that such judgments are to

be enforced against any assets available in the U.S., and that *the executive branch has no statutory

authority to defeat such enforcement under standard judicial processes, except as expressly

provided in this act*." *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (quoting

11

**App.335**

148 Cong. Rec. S11524, S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin)) (emphasis added). The conference committee's report echoed this theme: "The purpose of Section 201 is to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties. It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced." H. REP. NO. 107-779, at 27 (2002) (Conf. Rep.).

It is settled law that TRIA preempts the Foreign Sovereign Immunities Act ("FSIA"). *See Smith v. Fed. Rsrv. Bank of N.Y.*, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003) ("[T]o the extent that a foreign country's sovereign immunity potentially conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict."), *aff'd*, 346 F.3d 264 (2d Cir. 2003); *Weininger v. Castro*, 462 F. Supp. 2d 457, 477, 488 (S.D.N.Y. 2006) (TRIA overrode FSIA immunity for Central Bank of Cuba); *accord Bennett v. Islamic Repub. of Iran,* 618 F.3d 19, 21 (D.C. Cir. 2010); *see also* U.S. Statement 10 ("When its conditions are satisfied, TRIA [§] 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA.").

## III.    Legal Standard

The procedure for enforcement of writs of execution is governed by Federal Rule of Civil Procedure 69(a)(1), which provides that proceedings on execution "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." In the state of New York, C.P.L.R. Section 5225(b) provides the relevant procedure for enforcement of a judgment "against a third party who 'is in possession or custody of money or other personal

App.336

property' in which the judgment debtor has an interest." *See CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir. 2018).[35]

In ordinary turnover proceedings, "N.Y. C.P.L.R. § 5225(b) requires a two-part showing before the Court can order [a] third party to turn over the money to the judgment creditor. The first prong requires that the judgment creditor show the judgment debtor has an interest in the property that the creditor is trying to reach. To satisfy the second prong, the Court must find either that the judgment debtor is entitled to the possession of such property, or that the judgment creditor's rights to the property are superior to those of the party who controls or possesses that property." *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019).

But in this case, the Court must also consider the effect of TRIA, which supersedes other laws by virtue of its preamble. Under that federal statute, assets in which a blocked terrorist party has an interest, "including the blocked assets of any agency or instrumentality of that terrorist party[] shall be subject to execution," "[n]otwithstanding any other provision of law … in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism … to the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a).[36]

Because TRIA provides the relevant framework for analyzing whether a terrorist party "has an interest in the property the judgment creditor is trying to reach" under C.P.L.R. § 5225(b), and because it mandates that such property "shall be subject to execution" if so, courts in this district

---

[35] While the text of Section 5225(b) contemplates that enforcement actions under that statute will be brought as a "special proceeding," the Second Circuit has clarified that "a party seeking a money judgment against a non-party garnishee" in federal court "may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee." *CSX Transp.*, 879 F.3d at 469.

[36] An OFAC license is not required to execute against blocked assets under TRIA. *See Harrison v. Republic of Sudan*, 802 F.3d 399, 408–09 (2d Cir. 2015), *rev'd on other grounds*, 139 S. Ct. 1048 (2019).

routinely analyze whether assets are subject to TRIA in the first instance and then rely on the relevant TRIA holding to find that turnover is appropriate under the New York statute. *See, e.g.*, *Hausler v. JP Morgan Chase Bank, N.A.* (*Hausler III*), 127 F. Supp. 3d 17, 48 (S.D.N.Y. 2015); *Weininger*, 462 F. Supp. 2d at 499; *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013).

The DAB Assets are blocked assets pursuant to Executive Order 14,064. TRIA Section 201(a) thus authorizes the Doe Creditors to enforce their judgment against either (i) blocked assets of the Taliban or against (ii) blocked assets of an agency or instrumentality of the Taliban. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016) ("[T]he fact that Plaintiffs obtained their underlying judgments against [the Taliban] … does not prevent" them from executing against DAB's properties under TRIA if DAB is an "agenc[y] or instrumentalit[y] of [the Taliban] under the TRIA."), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

Therefore, the Doe Creditors are entitled to enforce their judgments under TRIA and New York law against the blocked assets at the FRBNY so long as they establish these elements: (1) possession of a "judgment against a terrorist party"; (2) arising from an act of terrorism; (3) seeking to execute against "blocked assets" within the meaning of TRIA (*i.e.*, blocked assets of that terrorist party or an agency or instrumentality of that terrorist party); (4) to the extent of their "compensatory damages." *Weininger*, 462 F. Supp. 2d at 479.

## IV. Argument

The Doe Creditors have satisfied all four TRIA elements. They have obtained a judgment against a terrorist party (the Taliban), on a claim based on an act of terrorism (a suicide bomb attack in 2016) and seek to execute against the blocked assets of an agency or instrumentality of

that terrorist party (DAB). The Doe Creditors are thus entitled to execute against the DAB Assets to collect on their judgment for compensatory damages.

### A. The Taliban Is A Terrorist Party Within The Meaning of TRIA

The Taliban is, without question, a terrorist party within the meaning of TRIA, as the United States agrees. *See* U.S. Statement 19. Section 201(d)(4) defines a "terrorist party" as, among other things, "a terrorist[.]" The United States has classified the Taliban as a Specially Designated Global Terrorist since July 2, 2002. *See* Exec. Order No. 13,268 § 1; *see also* 31 C.F.R. §§ 594.310, 594.311. In conformity with that designation, the United States has represented to courts in other matters both that the Taliban is a "terrorist party" and that its assets are subject to attachment under TRIA. *See* Brief of the United States in Response to Plaintiffs' Motion to Compel at 3–4, *Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169 (D.D.C. Feb. 2, 2005), 2005 WL 3518010, ECF No. 4.

### B. The Doe Creditors Have A Judgment Against The Taliban Based On An Act Of Terrorism

There is also no question that the Doe Creditors have a judgment against the Taliban "based on an act of terrorism[,]" as the United States agrees. *See* U.S. Statement 19. TRIA Section 201(d)(1) defines an "act of terrorism" to include "(A) any act or event certified under section 102(1)"; or "(B) to the extent not covered by subparagraph (A), any terrorist activity" as defined in 8 U.S.C. § 1182(a)(3)(B)(iii). The attack on which the Doe Creditor's judgment is based was indeed certified as a terrorist attack under Section 102(1) of TRIA on April 13, 2016.[37] Had it not already been certified, this attack would qualify under subsection (B).

---

[37] *See International Terrorism Victim Expense Reimbursement Program–Terrorist Incident Designation List available at* https://ovc.ojp.gov/program/international-terrorism-victim-expense-reimbursement-program-itverp/terrorist-incident-designation-list.

### C. The DAB Assets Are "Blocked Assets" Within The Meaning Of TRIA

TRIA defines "blocked asset[s]" as "any asset seized or frozen by the United States under … sections 202 and 203 of [IEEPA] (50 U.S.C. 1701; 1702)." TRIA § 201(d)(2)(A). On February 11, 2022, President Biden ordered, pursuant to IEEPA, that "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in[.]" Exec. Order No. 14,064 § 1(a). President Biden did so fully cognizant of the enforcement proceedings before this Court. 87 Fed. Reg at 8391 ("I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims. This property is blocked under this order."). The DAB Assets are therefore blocked property under TRIA, as the United States agrees. U.S. Statement 19.

### D. The DAB Assets Are Blocked Assets Of DAB, Which Is An Agency Or Instrumentality Of The Taliban, And Is The Taliban's Alter Ego

The Doe Creditors can execute against the DAB Assets if the Court finds that (1) they are "held in the hands of" DAB, and (2) DAB is an agency or instrumentality of the Taliban. *Kirschenbaum*, 830 F.3d at 132 (quoting *Weinstein*, 609 F.3d at 49). The Doe Creditors have met these conditions.

#### 1. DAB Holds The DAB Assets

Section 201 of TRIA authorizes execution against "property held in the hands of an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment." *Kirschenbaum*, 830 F.3d at 132 (citing *Weinstein*, 609 F.3d at 50). "[T]he fact that Plaintiffs obtained their underlying judgments against [the Taliban] … does not prevent" them

from executing against DAB's properties under TRIA if DAB is an "agenc[y] or instrumentalit[y] of [the Taliban] under the TRIA." *Id.*

There is no question that the DAB Assets are "held in the hands" of DAB. They are in DAB's account at FRBNY,[38] and a property interest may thus be presumed. *See Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 86 (2d Cir. 2002) ("When a party holds funds in a bank account, possession is established, and the presumption of ownership follows."); *see also Hausler III*, 127 F. Supp. 3d at 49 ("There is no question that under New York law, the account holder of accounts containing assets belonging to the account holder has a property interest in those assets[.]"); *Miller v. City of Ithaca*, No. 10-cv-597, 2019 WL 2502712, at *3 (N.D.N.Y. June 17, 2019) (where funds in bank's possession were the judgment debtor's, the judgment debtor "necessarily ha[d] an interest in those funds"). Indeed, President Biden expressly recognized that DAB holds assets at FRBNY on February 11—and ordered all of DAB's assets in the United States transferred to a single consolidated account at the FRBNY. Exec. Order No. 14,064 § 1(a)–(b).

### 2. DAB Is An Agency Or Instrumentality Of The Taliban Under TRIA

The Second Circuit has defined three independent ways in which DAB can qualify as an agency or instrumentality of a terrorist party under TRIA. First, DAB will be an agency or instrumentality if it is "a means through which a material function of the terrorist party is accomplished[.]" *Kirschenbaum*, 830 F.3d at 135. Second, DAB will be an agency or instrumentality of the Taliban if it provides "material services to, on behalf of, or in support of the terrorist party." *Id.* Or third, DAB will be an agency or instrumentality if it is "owned, controlled, or directed by the terrorist party." *Id.* The Eleventh Circuit has adopted a similar test. *See Stansell*

---

[38] *See* U.S. Statement 8 ("The DAB Assets at issue are housed in accounts held at FRBNY for DAB[.]").

*v. FARC*, 771 F.3d 713, 724 n.6, 732 (11th Cir. 2014) (cited with approval in *Kirschenbaum*, 830 F.3d at 135–36, 135 n.19). The Doe Creditors need to satisfy only one of the three alternative tests. Here, the Doe Creditors satisfy all three tests.

First, DAB is controlled and directed by the Taliban. It was controlled and directed by the Taliban in 2001.[39] It is again controlled and directed by the Taliban today—and has been since August 2021, when the Doe Creditors moved for their writ as Taliban-installed leadership took control of DAB and began managing DAB's operations and activities for the Taliban's benefit.[40] As demonstrated above and as more fully detailed in the Zerden Declaration, DAB is completely controlled by the Taliban.[41] Current and former U.S. government officials recognize the Taliban controls DAB.[42] DAB's own media relations show the Taliban controls DAB.[43] Public and private organizations that previously worked with or through DAB are now bypassing it because of the Taliban's control.[44] The reality is that "DAB is now operating under the Taliban's direct, operational control."[45]

Second, the Taliban is using DAB to accomplish material functions supporting its illicit activities. For example, the Taliban is using DAB to facilitate and enhance its illegal narcotics trafficking.[46] The Taliban can now use DAB's archive of highly sensitive Suspicious Activity Reports and financial investigation records to identify, punish, and retaliate against opponents.[47]

---

[39] H. Doc. No. 106-268, at 4; *see also* Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-center/press-releases/Pages/po943.aspx (DAB assets were "associated with the Taliban regime").
[40] Zerden Decl. ¶ 27.
[41] Zerden Decl. ¶ 14, 39, 49, 51, 54-55, 74, 86, 91, 98, 103, 110, 115-25, 126-35, 137-139, 143; *see also supra* Part II.A.2.
[42] Zerden Decl. ¶ 99-114.
[43] Zerden Decl. ¶ 115-35.
[44] Zerden Decl. ¶ 140-43.
[45] Zerden Decl. ¶ 14, 39, 49, 51, 54-55, 74, 86, 91, 98, 103, 110, 115-25, 126-35, 137-139, 143
[46] Zerden Decl. ¶ 146-55.
[47] Zerden Decl. ¶ 156-159.

**App.342**

By using DAB's authority to supervise Afghanistan's entire banking system, the Taliban has the power to remove all AML/CFT controls, monitoring systems, and enforcement mechanisms that previously interfered with its terror financing activities.[48] In fact, someone sanctioned for terror financing is now responsible for DAB's AML/CFT functions.[49] The Taliban's opportunity to expand its terrorist activities is also greatly enhanced by its ability to remove any oversight or attempts to regulate Afghanistan's hawala system, a centuries-old informal money exchange system used to fund terrorism throughout the world.[50]

Third, the same evidence shows that DAB is providing material services to the Taliban.

Indeed, the present circumstances are just a return to form for the Taliban's relationship with DAB—it is using DAB in the same way that it did during the period when it controlled Afghan territory and institutions between 1997 and 2001.[51] These same facts led the United States to conclude then that DAB was "controlled by the Taliban." H. Doc. No. 106-268, at 4. The Taliban has simply reimposed its former control and picked up where it left off twenty years ago.

Courts have found that entities are agencies or instrumentalities of terrorist organizations for purposes of TRIA based on far less than the circumstances of this case. *See, e.g.*, *Caballero v. FARC*, No. 18-CV-25337, 2021 WL 3927826, at *3 (S.D. Fla. Aug. 24, 2021) (individual who operated currency exchange program on behalf of terrorist party was an "agency or instrumentality" of that party under TRIA); *Caballero v. FARC*, No. 20-CV-1939, 2021 WL 6339256, at *2 (D. Conn. Jan. 14, 2021) (unaffiliated corporation was "agenc[y] or instrumentality" of terrorist party which "use[d]" it "to launder money"); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 241 (D.R.I. 2004) (subjecting assets of Holy

---

[48] Zerden Decl. ¶ 160-61, 166-67.
[49] Zerden Decl. ¶ 69.
[50] Zerden Decl. ¶ 161, 168-78.
[51] Zerden Decl. ¶ 25-27.

Land Foundation to execution as an agency or instrumentality of Hamas based on "strong evidence" it "operate[d] as a fund-raiser for Hamas in the United States").

Because DAB is an agency or instrumentality of the Taliban under governing Second Circuit precedent, its assets—including at the FRBNY—are subject to execution under TRIA.

### 3. Treating DAB As An Agency Or Instrumentality Of The Taliban Is Consistent With Binding Case Law, Statutory Text, And Congressional Purpose

In its Statement of Interest, the United States takes no position on whether DAB is an agency or instrumentality of the Taliban under TRIA. U.S. Statement 19–20. Instead, it points out areas of sensitivity that the Court should be careful to avoid when adjudicating this motion. *Id.* There is a clear path that this Court should take to recognize the Doe Creditors' entitlement to immediate relief without impinging upon Executive Branch prerogatives: a simple application of the binding standard in *Kirschenbaum*. To the extent that the Court must skirt legal territory related to the conduct of foreign relations as it walks down that path, that is so only because of Congress' choice in TRIA to prioritize the ability of victims of terrorism to recover judgments from terrorist parties (including from any agency or instrumentality of a terrorist party) over "any other provision of law," including the FSIA. *See* TRIA § 201(a); *Smith*, 280 F. Supp. 2d at 319. And the binding authority of *Kirschenbaum* does not compel—or even suggest—any different approach.

It is important to understand what the Doe Creditors are not asking this Court to do. The Court does not need to recognize any government of Afghanistan or to preempt any Executive Branch determination on that matter. *See* U.S. Statement 26. The Court does not need to consider whether DAB is or is not an active central bank of any particular state—that is a determination relevant only for purposes of the FSIA, not TRIA. *See* U.S. Statement 25. The Court does not need to decide that the funds at the FRBNY are "assets of" the Taliban by virtue of its claim to be the government of Afghanistan. *See* U.S. Statement 25, 26. The Court does not need to deem either

**App.344**

the Taliban or Afghanistan a state sponsor of terror. *See* U.S. Statement 20. The United States asserts that these are sensitive areas of executive competency that the Court should take care to avoid, and we agree that those interests need not be disturbed.

The only thing this Court needs to do is apply the plain text of the "agency or instrumentality of any terrorist party" clause of TRIA pursuant to the Second Circuit's well-established, binding *Kirschenbaum* test and conclude that, under that test and on the present record, DAB is an agency or instrumentality of the Taliban (as the evidence overwhelmingly shows).[52]

Nor is there any basis to depart from the text simply because a non-state party is the defendant or because that non-state party has taken control of a state institution. As the Second Circuit has recognized, TRIA's definition of "agency or instrumentality" was intentionally drafted to extend much further than the definition of an "agency or instrumentality" under the FSIA. *Kirschenbaum*, 830 F.3d at 132–135. The Second Circuit did not hint that this test should be applied differently based on the identity of the terrorist party or instrumentality—in fact, it did quite the opposite. *See id.* at 134 ("The plain language of the TRIA refers only to 'the blocked assets of any agency or instrumentality of that terrorist party,' and does not differentiate among the variety of entities that might qualify as a 'terrorist party.'"). Notably, the *Kirschenbaum* Court applied its TRIA test to an alleged instrumentality of Iran (even though that is precisely the circumstance in which the FSIA's test would have traditionally applied).[53] *Id.* This Court must apply the same *Kirschenbaum* test for the same statutory phrase in this case. After all, "[t]he meaning of words in a statute cannot change with the statute's application. To hold otherwise

---

[52] Section 201(d)(4) of TRIA does not provide or suggest any limitation on what assets of a terrorist party can be attached; it merely contains the definition of a "terrorist party." *See* U.S. Statement 25 n.8.

[53] A finding that DAB is an instrumentality of the Taliban thus does not require the Court to make any prerequisite finding about whether the Taliban is the government of Afghanistan, as would be necessary under FSIA, because under *Kirschenbaum* the definitions of "agency or instrumentality" under TRIA and the FSIA are entirely separate.

App.345

'would render every statute a chameleon,' and 'would establish within our jurisprudence … the dangerous principle that judges can give the same statutory text different meanings in different cases[.]'" *United States v. Santos*, 553 U.S. 507, 522–23 (2008) (plurality opinion) (quoting *Clark v. Martinez,* 543 U.S. 371, 382, 386 (2005)) (citations omitted). And at least one court in this circuit has already applied the *Kirschenbaum* test to hold that agencies or instrumentalities of foreign governments can also constitute agencies and instrumentalities of an entirely separate terrorist party under TRIA. *See Caballero v. FARC*, No. 20-MC-0040, 2021 WL 307558 (W.D.N.Y. Jan. 29, 2021) (Venezuelan state oil company was agency or instrumentality of Colombian terrorist group pursuant to TRIA); Order, *Caballero*, No. 20-MC-0040 (W.D.N.Y. Dec. 18, 2020), ECF No. 15 (same); *see also Caballero*, 2021 WL 6339256, at *2 (PDVSA subsidiary was agency or instrumentality of FARC).[54]

The idea that a non-state terrorist party might commandeer and control a state agency or instrumentality for its own purposes would not have been foreign to the 107th Congress when it enacted TRIA. Indeed, the very same Congress that passed TRIA had received a report from the President that, as of early 2001, the Taliban (in its role as a non-state actor) had taken control of DAB. H. Doc. No. 107-16, at 4. If that Congress had wanted to write a statute that limited the ability of terror victims to recover in these familiar circumstances—if it wanted terror victims to recover from only *private* agencies or instrumentalities of non-state terrorist actors or wanted to limit them to recovery only under the principles established under the FSIA—it could have done

---

[54] Likewise, in another district, the judgment creditor of a non-state terrorist judgment debtor successfully employed TRIA to satisfy his judgment from Venezuelan state-owned assets. The Government's Statement of Interest filed in that matter did not raise any objection to the fact that the execution to satisfy a judgment against a non-state terrorist group was against assets that were owned by a state that had not been designated as a state sponsor of terrorism. *See* Dkt. 272, Sealed Statement of Interest of the United States (now unsealed), dated Nov. 25, 2019, in *Doe v. ELN*, *et al.*, Case No. 10-cv-21517 in the United States District Court for the Southern District of Florida, attached hereto as Exhibit B. Clearly, assets of state entities that serve as agencies of terrorist organizations are subject to TRIA execution.

so. But it plainly did not. To exempt the DAB's assets in this instance would effectively immunize the Taliban (or any other similarly situated terrorist party in the future) from TRIA and would frustrate the very purpose of the law: making assets of any agency or instrumentality of a terrorist party, *i.e.*, any entity effectively controlled by or used for the benefit of that terrorist party, available for attachment by victims of that terrorist party.

And, as the United States agrees, in cases like this one the statutory text of FSIA is wholly superseded by TRIA, which makes blocked assets of any terrorist party or any agency or instrumentality of any terrorist party available for execution "[n]otwithstanding any other provision of law." TRIA § 201(a); *see also Kirschenbaum*, 830 F.3d at 134-135 ("The FSIA definition of 'agency or instrumentality' … do[es] not pertain to those terms in the TRIA."). It thus makes little sense to attempt to graft principles of law gleaned from decades of interpreting the FSIA onto a provision that was intentionally written to supersede the limits of that statute.

Finally, the fact that the assets were confiscated by a rogue regime is no bar to the application of TRIA. Indeed, it has long been the rule in this Circuit that blocked assets of a confiscated entity should be used to compensate victims. *See Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 56 (S.D.N.Y. 2015) (following *Banco Nacional de Cuba v. Chem. Bank N.Y. Tr. Co.,* 658 F.2d 903 (2d Cir. 1981) and authorizing TRIA collection against blocked assets of entity wrongfully confiscated by Cuba).

### 4.    Alternatively, DAB Is The Taliban's Alter Ego

The Court should also conclude that DAB is an alter ego of the Taliban, subjecting its assets to TRIA as a "terrorist party" itself, because DAB "is so extensively controlled by [the Taliban] that a relationship of principal and agent is created[.]" *Kirschenbaum*, 830 F.3d at 128 (citation omitted); *see also Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 200 (2d Cir. 2019) (affirming TRIA collection where entity was "*both* an alter ego and an agency or instrumentality

23

**App.347**

of a terrorist party under TRIA …".) (emphasis added). As has been exhaustively shown, the Taliban exerts such extensive control over DAB that DAB qualifies as its alter ego. *See supra* Part IV.D.2.

### E. The Doe Creditors Are Entitled To Possess The DAB Assets

The second prong of the C.P.L.R. Section 5225(b) turnover analysis—that the judgment debtor is "entitled to possession of [the] property"—is satisfied because the property is indisputably DAB's and the only restraint on DAB's possession is the blocked nature of the assets. In such cases, TRIA makes blocked property available to qualified judgment creditors like the Doe Creditors. *Weininger*, 462 F. Supp. 2d at 499; *see also Harrison*, 802 F.3d at 409 (funds subject to TRIA "may be distributed without a license from OFAC"). Courts thus routinely find that this prong is satisfied where the blocked assets at issue are subject to TRIA. *See Hausler III*, 127 F. Supp. 3d at 48; *Weininger*, 462 F. Supp. 2d at 499; *Heiser*, 919 F. Supp. 2d at 422; *accord Caballero*, 2021 WL 6339256, at *2 (Connecticut turnover statute satisfied based on TRIA agency/instrumentality analysis). Nothing else stands in the way of execution. *See Hill v. Republic of Iraq,* No. 99-CV-3346, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) (the "notwithstanding provision" is "unambiguous and effectively supersedes all previous laws"); *cf. Weinstein*, 609 F.3d at 53 ("notwithstanding" clause superseded U.S. treaty obligations).

### F. There Is No Question Of Priority

No other creditors have priority over these Doe Creditors that would impact this collection. Regardless of whether the Doe Creditors' pending motion, "Plaintiffs' Motion for *Nunc Pro Tunc* Issuance and Service of Writ", DE 30, is granted, there are sufficient funds to satisfy the compensatory portions of both the Havlish Creditors' writ and the Doe Creditors' writs.

## V.    Conclusion

For the foregoing reasons, the Court should grant the Doe Creditors' turnover motion as to the blocked assets of the DAB (as an agency or instrumentality, or alter ego, of the Taliban) which are in the possession, custody, or control of the Federal Reserve Bank of New York in an amount sufficient to satisfy the award of compensatory damages in the amount of $138,284,213.26, plus post-judgment interest since March 21, 2022, pursuant to Section 201(a) of TRIA.

Dated: March 20, 2022

Respectfully submitted,

**do Campo & Thornton, P.A.**
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
(305) 358-6600

s/ *Orlando do Campo*
Orlando do Campo
Bar Code: OD1969
od@dandtlaw.com

s/*John Thornton*
John Thornton *(pro hac vice)*
jt@dandtlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 20, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ *Orlando do Campo*
Orlando do Campo

# United States District Court
## SOUTHERN DISTRICT OF NEW YORK

JUDGMENT NO._____          DOCKET NO. 1:20-mc-00740-KPF

THE PRESIDENT OF THE UNITED STATES OF AMERICA
To the Marshal of the Southern District of New York, GREETING:

YOU ARE COMMANDED, that of the goods and chattels of The Taliban, including the blocked assets of

Da Afghanistan Bank held by the Federal Reserve Bank of New York or any other financial institution

in your district you cause to be made the sum of One hundred thirty-eight million four hundred eighteen thousand

and seven hundred forty-one _____ dollars and zero _____ cents, ($138,418,741.00 )

which lately in the United States District Court of the United States for the Southern District of New York, in the Second

Circuit, John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7

recovered against the said The Taliban

in an action between John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7

PLAINTIFF and The Taliban, Al-Qaeda, and The Haqqani Network

DEFENDANT, in favor of said Plaintiffs - John Does 1 through 7

as appears by the record filed in the Clerk's Office of said District Court on the 20th _____ day

of January _____, in the year of 2021

and if sufficient personal property of the said judgment debtor cannot be found in your District, that then you cause the same to be made out of the real property belonging to such judgment debtor on the above-mentioned day, or at any time thereafter, in whose hands soever the same may be, and return this execution within sixty days after its receipt by you, to the Clerk of said District Court.

WITNESS, the Honorable Laura T. Swain, Chief Judge of the United States District Court, for the Southern District of New York, at the City of New York, on the 27th day of SEPTEMBER in the year of our Lord 2021 , and of the Independence of the United States the two hundred Forthy Sixth year.

_____
CLERK

# United States District Court

SOUTHERN DISTRICT OF NEW YORK

## John Does 1 through 7

-against-

## The Taliban, Al-Qaeda, The Haqqani Network and agencies and instrumentalities thereof

EXECUTION AGAINST PROPERTY

Attorney for

## Plaintiffs, John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7

Borough of Manhattan
City of New York

### Orlando do Campo, Esq.

To the Marshal:
You will levy and collect

one hundred thirty-eight million four hundred

eighteen thousand seven hundred forty-one Dollars

and        zero                                    cents,

with interest from the    5th

day of    November                          .    2020

besides your fees,

Attorney

App.351

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN DOES 1 THROUGH 7,

*Judgment Creditors,*

v.                                                      Misc Action No. 1:20-mc-00740-GBD

THE TALIBAN, AL-QAEDA,
and THE HAQQANI NETWORK,

*Judgment Debtors.*

---

**DECLARATION OF JOHN THORNTON**
**IN SUPPORT OF THE DOE CREDITORS' MOTION FOR TURNOVER OF ASSETS**
**FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK**

I John Thornton, depose and say:

1.      I represent Judgment Creditors in the above-referenced matter.

2.      On November 5, 2020, Doe Creditors obtained a Judgment in the United States District Court for the Northern District of Texas against the Taliban, Al-Qaeda, and the Haqqani Network for an amount totaling One Hundred Thirty-Eight Million Four Hundred Eighteen Thousand Seven Hundred Forty-One Dollars and zero cents ($138,418,741) in compensatory damages, jointly and severally, for an act of terrorism committed by the Judgment Debtors. Post-judgment interest on this Judgment runs at .12%

3.      On November 2, 2021, Doe Creditors collected $ 362,430.13 from blocked assets of an agency/instrumentality of Al Qaeda.

4.      As of March 21, 2022, the Doe Creditors will hold outstanding judgments for compensatory damages in the amount of $138,284,213.26, on which post-judgment interest continues to run.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Miami, Florida on March 17, 2022.

John Thornton

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank | ECF Case<br><br>Case No. 22-cv-03228 |

### CLASS ACTION COMPLAINT

Plaintiffs The Estate of Christopher Wodenshek, Anne Wodenshek, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek, by their attorneys Kreindler & Kreindler LLP, Sher Tremonte LLP, and Samuel Issacharoff, Esq., individually and on behalf of others similarly situated, and pursuant to Federal Rule of Civil Procedure 23, allege as follows:

### INTRODUCTION

1.      Individual plaintiffs The Estate of Christopher Wodenshek, Anne Wodenshek, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek (together, the "Wodensheks" or "Plaintiffs"), litigants against the Taliban whose claims arise directly out of the September 11, 2001 terrorist attacks (the "9/11 Attacks"), bring this action on behalf of themselves and a class of similarly situated claimants seeking the equitable distribution of approximately $3.5 billion of Taliban assets currently on deposit at the Federal Reserve Bank of New York ("FRBNY") in the name of Da Afghanistan Bank ("DAB").

2.      For the past two decades, Plaintiffs and thousands of other victims of the 9/11 Attacks have sought to hold the Taliban accountable for its role in sponsoring and facilitating the deadliest terrorist attack on U.S. soil. Plaintiffs and numerous others obtained liability judgments against the Taliban in 2006; other 9/11 victims obtained judgments against the Taliban years later. However, because the Taliban and its leadership are and have been subject to strict

economic sanctions by the United States and others (including the United Nations Security Council), Plaintiffs and other victims of Taliban-enabled terrorism had little to no hope of identifying any assets that could be used to satisfy their judgments against the Taliban.

3.      That changed on February 11, 2022, when President Joseph R. Biden signed Executive Order 14064 (the "Executive Order") concerning approximately $7 billion of assets held in the name of Afghanistan's central bank, DAB. The Executive Order followed a series of unprecedented and unforeseen historic events that resulted in the Taliban's takeover of Afghanistan and all of DAB's assets in August 2021.

4.      In recognition of the Taliban's control over DAB and its assets, the Executive Order and its accompanying "Fact Sheet" directed that all DAB assets in the United States be consolidated in a blocked account at the FRBNY.[1] They further directed that half of those assets (approximately $3.5 billion) be preserved for the benefit of U.S. victims of terrorism (the "DAB Assets"), and, through an Office of Foreign Asset Control license, the Administration has facilitated access to the other half (approximately $3.5 billion)[2] to provide humanitarian relief to the people of Afghanistan.

5.      The Executive Order sparked an uncoordinated race among those victims to collect from the limited DAB Assets. Claimants rushed to establish (or in any event, to not lose) "priority" under New York State's default judgment enforcement rules. This, in turn, led other

---

[1] Executive Order 14,064, 87 Fed. Reg. 8391 (2022); White House Fact Sheet, Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan, (Feb. 11, 2022) (hereinafter, the "Fact Sheet") (emphasis added), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/.

[2] Unless otherwise noted, the "DAB Assets" are defined as the approximately $3.5 billion in DAB funds that *were not* earmarked for Afghan humanitarian relief and *were* earmarked for U.S. victims of terrorism in the Executive Order.

**App.355**

victims of terrorism to join the race to claim "priority" to the DAB Assets. Consequently, the DAB Assets are now the subject of two writs of execution in the combined amount of approximately $2.2 billion, with briefing on turnover proceedings already under way, and a prejudgment order of attachment in excess of $4.7 billion. Meanwhile, Plaintiffs and hundreds of other victims of the 9/11 Attacks have pending motions to confirm damages awards of billions of dollars against the Taliban.

6.     The $3.5 billion in DAB Assets, which constitute the sum total of assets available to satisfy judgments against the Taliban, are insufficient to satisfy the writs of execution and attachment orders to which those assets are currently subject, let alone to satisfy other damages awards against the Taliban that have been or will soon be granted. Adjudication of any individual claim or groups of claims will be dispositive of—and will substantially impair the rights of—Plaintiffs and thousands of other terrorism victims. Indeed, if individual adjudications proceed under the "first in time is first in right" approach, a small number of claimants will likely take the entire $3.5 billion in DAB Assets for themselves, while Plaintiffs and thousands of other victims will likely recover nothing—a profoundly inequitable outcome.

7.     The DAB Assets thus constitute a classic limited fund for purposes of Rule 23(b)(1)(B), one in which:

> an adjudication as to one or more members of the class will necessarily be or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims. A class action by or against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund meets the problem.[3]

---

[3] Fed. R. Civ. P. 23(b)(1)(B) Advisory Committee's Notes (1966).

App.356

8.      Plaintiffs seek to ensure that the DAB Assets are distributed equitably, and to avoid a grossly unjust scenario in which a small handful of claimants obtain tens of millions of dollars each in compensation at the expense of thousands of other victims of Taliban-sponsored or Taliban-supported terrorist attacks who stand to receive nothing. Accordingly, Plaintiffs seek:

a)  an immediate order in aid of the Court's jurisdiction enjoining any judgment enforcement proceeding in any court affecting the DAB Assets pending adjudication of Plaintiffs' Class Action Complaint;

b)   certification of a mandatory class composed of all persons and/or estates with a compensatory damages claim against the Taliban on file in a U.S. court of record as of April 20, 2022, where such claim arises directly out of an act of terrorism, where the injuries suffered were proximately caused by that act of terrorism, and where the Taliban has been or likely will be adjudged liable for those injuries (the "Class");

c)  a declaration that the DAB Assets are available to satisfy the Class members' judgments against the Taliban under Section 201 of the Terrorism Risk Insurance Act, Pub. L. No. 107-297, 116 Stat. 2322–2341 (2002) ("TRIA");

d)  the imposition of a constructive trust over the DAB Assets; and

e)  distribution of the DAB Assets on an equitable basis to all Class members.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the relief Plaintiffs seek includes a declaration of Class members' rights under TRIA, and the rights of the Class members to recover the compensatory damages at issue are defined by the Anti-Terrorism Act, 18 U.S.C. § 2333(a). The Court also has jurisdiction under the Air Transportation Safety and System Stabilization Act of 2001 (the "Air Stabilization Act"), 49

4

U.S.C. § 40101, Title IV, § 408(b)(3), which grants the Southern District of New York ("S.D.N.Y.") "original and exclusive jurisdiction over all actions brought for any claim . . . resulting from or relating to the terrorist-related aircraft crashes of" the 9/11 Attacks. This Court further has jurisdiction under 12 U.S.C. § 632, which grants federal courts original jurisdiction of all civil suits involving any Federal Reserve Bank.

10.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(f)(1) because the property that is the subject of this action is situated in this district, and pursuant to the Air Stabilization Act, which designates the S.D.N.Y. as the exclusive venue for all civil litigation arising out of or related to the 9/11 Attacks.

## **PARTIES**

11.    Plaintiff The Estate of Christopher Wodenshek is the successor of Christopher Wodenshek, a U.S. citizen killed in the 9/11 Attacks. One month before the 9/11 Attacks, the Wodenshek family moved from Connecticut to New Jersey so that Christopher, a broker at Cantor Fitzgerald, could shorten his commute and spend more time with his wife and five young children. The morning of September 11, 2001, two days after his eleventh wedding anniversary, Christopher went to work, arriving on the 105th floor of the World Trade Center's North Tower between 7:00 and 7:30 a.m. An hour later, at 8:46 a.m., the hijacked American Airlines Flight 11 slammed into the building between the ninety-third and ninety-ninth floors. Christopher was, along with many others, trapped and killed.

12.    Plaintiff Anne Wodenshek is the personal representative of The Estate of Christopher Wodenshek, and his surviving wife. A motion to confirm their compensatory damages awards of $14,738,118 and $12,500,000, respectively, against the Taliban is currently pending in *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (S.D.N.Y.) (the "9/11 MDL"). To date, Christopher Wodenshek's estate and Anne Wodenshek have received

App.358

approximately $55,000 and approximately $48,000, respectively, from the government-funded U.S. Victims of State Sponsored Terrorism program (the "USVSST"), which has so far disbursed approximately $1.6 billion to 10,590 victims of the 9/11 Attacks.

13.     Plaintiffs Sarah, Haley, Mollie, William, and Zachary Wodenshek are Christopher Wodenshek's surviving children, who were ages nine, seven, six, four, and two on the day of the 9/11 Attacks. The motion to confirm their compensatory damages awards of $8,500,000 each against the Taliban is currently pending in the 9/11 MDL. To date, they have received approximately $32,000 each from the USVSST.

## FACTUAL ALLEGATIONS

**THE TALIBAN**

14.     The Taliban was established by cleric Mullah Mohammad Omar ("Mullah Omar") in 1994, following the Soviet Union's withdrawal from Afghanistan and during the subsequent Afghan civil war.  Its original membership largely consisted of mujahedeen fighters, insurgent forces that fought against the Soviet occupation of Afghanistan from 1969–1989.  Among these mujahedeen was the Saudi-born Osama Bin Laden, who founded the international terrorist group known as al Qaeda in Afghanistan.

15.     By 1996, the Taliban had seized control of much of Afghanistan and established the Islamic Emirate of Afghanistan, with Mullah Omar serving as head of state.  The Taliban imposed strict Sharia law in the areas it controlled. That same year, the Taliban welcomed the return of Bin Laden from Sudan, after which he established al Qaeda's base of operations in Afghanistan. Because of its involvement in terrorist activity, discussed in more detail below, the Taliban has been subject to a wide-range of strict sanctions, blocking the organization and its leadership from transacting any business in the United States.

16.     At the time the Taliban ruled the Islamic Emirate of Afghanistan, it controlled and directed Afghanistan's central bank, DAB.[4] It continued to do so until late September 2001, when a U.S.-led coalition invaded Afghanistan following the 9/11 Attacks and removed the Taliban from power.

17.     After the Taliban's fall, a transitional government was formed under Hamid Karzai and it governed Afghanistan until 2003, when the people of Afghanistan ratified a new constitution and elected a civilian government recognized by the United States and the international community at large—the Islamic Republic of Afghanistan. However, the Taliban maintained a constant insurgency for the two decades following its 2001 deposition.

18.     In 2020, the United States entered an agreement to withdraw its troops from Afghanistan. Following that withdrawal in the summer of 2021, concluding the U.S. military's two-decade long military presence, the Taliban commenced a major offensive. On August 15, 2021, the Taliban captured the capital of Kabul and Afghanistan's then-leadership abdicated, disbanded and/or fled Afghanistan. Within a brief time, the Taliban gained control of the entire country.

---

[4] *See* H. DOC. NO. 106-268, at 4 (describing the Departments of State and Justice adding DAB to list of blocked entities under Executive Order 13129 in 1999); Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://home.treasury.gov/news/press-releases/po943 (describing unblocked DAB assets as having been "associated with the Taliban regime").

7

19. In August 2021, as part of its complete takeover of Afghanistan and all of its state organs, the Taliban took control of DAB, installed senior Taliban leaders as DAB leadership,[5] and caused DAB to implement Taliban edicts.[6]

20. Prior to the Taliban's 2021 takeover of Afghanistan, it had no tangible assets in the United States against which Plaintiffs or any other claimants could have enforced judgments.

**THE 1998 U.S. EMBASSY BOMBINGS IN KENYA AND TANZANIA**

21. The following allegations are largely drawn from the March 8, 2022 complaint in *Owens v. Taliban*, 22-cv-1949 (S.D.N.Y.) (hereinafter cited as "*Owens* Compl."),[7] and are re-alleged below for purposes of contextualizing a known act of terrorism out of which claims against the Taliban arise.

---

[5] *See, e.g.*, Ian Talley, et al., *Sactioned Taliban Finance Leader Holds Leadership Post at Afghan Central Bank*, WALL ST. J. (Mar. 11, 2022), https://www.wsj.com/articles/sanctioned-taliban-financier-tapped-to-help-lead-afghan-central-bank-11647003720?mod=newsviewer_click (appointing Noor Ahmad Agha as DAB first deputy governor); Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank Chief with Crisis Looking*, BLOOMBERG (Aug. 23, 2021), https://www.bloomberg.com/news/articles/2021-08-23/taliban-name-obscure-official-central-bank-chief-ascrisis-looms (appointing Haji Mohammed Idris DAB Acting Governor); Da Afghanistan Bank, *DAB Leadership Holds Meeting with the High Ranking Officials of Commercial Banks* (Sept. 11, 2021), https://www.dab.gov.af/dab-leadership-holds-meeting-high-ranking-officials-commercial-banks (announcing Taliban takeover of Da Afghanistan Bank).

[6] *See* James Mackenzie, Mohammad Yunus Yawar, *Afghan Central Bank Moves to Halt Currency Slide As Crisis Deepens*, REUTERS (Dec. 14, 2021), https://finance.yahoo.com/news/afghanistan-central-bank-says-acting-094556696.html (describing Taliban efforts to utilize DAB, among other entities, to stabilize Afghanistan's currency).

[7] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 9, 2022), ECF 1 (deficiently filed complaint), 7 (re-filed complaint).

22.     On August 7, 1998, the eighth anniversary of the United States' deployment of troops to Saudi Arabia, al Qaeda nearly simultaneously detonated bombs at the U.S. Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania.[8]

23.     The Nairobi bombing was executed by Jihad Muhammed Ali ("Ali") and Mohammed Rashed Daoud al-Owhali ("al-Owhali").[9]

24.     Prior to the bombing, al-Owhali spent time at al Qaeda's camps in Afghanistan, where he was trained in explosives, hijacking, and kidnapping. He personally requested a jihad mission from Bin Laden. Al-Owhali was then sent to fight alongside the Taliban against an American-backed military group. After he distinguished himself in battle with the Taliban, in or about late 1997 or early 1998, he was approached by an al Qaeda leader and offered a mission—the bombing of the U.S. Embassy in Nairobi—for which he received additional training in Afghanistan.[10]

25.     Ali detonated a truck bomb in front of the U.S. Embassy in Nairobi using a gas-enhanced explosive device at 10:30 a.m., killing himself and 213 people, including twelve Americans, and injuring more than 4,000 others.[11]

26.     Concurrently, in Dar es Salaam, two al Qaeda members detonated a truck bomb outside the U.S. Embassy. One was killed in the blast. The other, Khalfan Khamis Mohamed, had

---

[8] *Owens* Compl. ¶ 110.

[9] *Id.* ¶ 111.

[10] *Id.* ¶ 112.

[11] *Id.* ¶ 113.

**App.362**

previously received explosives training in an al Qaeda training camp in Afghanistan.  Eleven people were killed, and eighty-five were injured.[12]

27.     The U.S. government immediately linked the U.S. Embassy bombings to al Qaeda and the Taliban.[13]

a) On August 20, 1998, President William J. Clinton signed Executive Order 13099, which froze all assets of al Qaeda and Bin Laden in the United States, banned the import of Afghan goods, and prohibited the sale of goods and services to the Taliban.

b) President Clinton ordered airstrikes on terrorist training camps throughout Taliban-controlled territory in Afghanistan.  The strikes began on August 20, 1998, and were intended to persuade the Taliban to hand over Bin Laden.  The initial strikes killed twenty to thirty people but missed Bin Laden by a few hours.

c) The United States issued a formal warning to the Taliban, vowing to hold it responsible for any attacks on Americans carried out by al Qaeda.

d) U.S. diplomats unsuccessfully attempted to convince the Taliban to surrender Bin Laden. Mullah Omar refused to do so and vowed to protect Bin Laden "at any cost."[14]

---

[12] *Id.* ¶ 114.

[13] *Id.* ¶ 115.

[14] *Taliban Vows to Protect Suspect in U.S. Embassy Blasts 'At Any Cost'*, HOUSTON CHRONICLE, Nov. 6, 1998.

    e) On October 8, 1999, the U.S. Secretary of State designated al Qaeda as a Foreign Terrorist Organization in accordance with section 219 of the Immigration and Nationality Act, as amended.

**THE 9/11 ATTACKS**

28.    On September 11, 2001, five al Qaeda members hijacked American Airlines Flight 11 carrying ninety-two persons, bound from Boston to Los Angeles, and at approximately 8:46 a.m., crashed the plane into the North Tower of the World Trade Center in New York.

29.    On September 11, 2001, five other al Qaeda members hijacked United Airlines Flight 175 carrying sixty-five persons, bound from Boston to Los Angeles, and at approximately 9:02 a.m., crashed the plane into the South Tower of the World Trade Center in New York.

30.    On September 11, 2001, five other al Qaeda members hijacked American Airlines Flight 77 carrying sixty-four persons, bound from Virginia to Los Angeles, and at approximately 9:37 a.m., crashed the plane into the Pentagon.

31.    On September 11, 2001, four other al Qaeda members hijacked United Airlines Flight 93 carrying forty-five persons, bound from Newark to San Francisco with the intention of crashing the plane into a target in Washington, D.C., such as the White House or the Capitol. At approximately 10:10 a.m., because of the heroic intervention of Flight 93's passengers, the aircraft crashed into a field in Shanksville, Pennsylvania.

32.    At approximately 9:50 a.m. and 10:29 a.m., the South and North Towers of the World Trade Center, respectively, collapsed.

33.    The hijackings and resulting suicide attacks—the 9/11 Attacks—were the culmination of a conspiracy among a number of parties, including, among others, al Qaeda, the Kingdom of Saudi Arabia, and the Taliban, to attack the United States and murder U.S. citizens.

**LITIGATION AGAINST THE TALIBAN**

34.     In September 2002, the Wodensheks and certain other victims of the 9/11 Attacks

and their families filed a complaint against numerous defendants responsible for the 9/11 Attacks,

including the Taliban.[15] The Wodensheks' right to relief is based upon the Taliban's support of

al Qaeda and its leader, Bin Laden, perpetrators of the 9/11 Attacks, and the 9/11 Attacks' support

network.[16] That complaint was subsequently consolidated and amended several times.[17]

35.     This was one of multiple actions commenced in the S.D.N.Y. and in the District

of Columbia beginning in 2002, which were eventually consolidated by the Judicial Panel for

Multi-District Litigation into the 9/11 MDL.[18]

36.     On June 16, 2004, the 9/11 MDL court designated Jim Kreindler of Kreindler &

Kreindler LLP, counsel for the Wodensheks, and Ronald Motley, counsel for plaintiffs in *Burnett*

*et al v. Al Baraka Investment and Development Co.*, 03-cv-9849 (S.D.N.Y.) (the "*Burnett*

Plaintiffs"), as co-chairs of the Plaintiffs' Executive Committee for Personal Injury and Death

---

[15] The Wodensheks asserted federal jurisdiction over the Taliban pursuant to, among other things, the Alien Tort Statute (28 U.S.C. § 1350), the Foreign Sovereign Immunities Act (28 U.S.C. § 1605(a)(7) and the Torture Victim Protection Act (28 U.S.C. § 1350 note), and made claims for damages under those provisions as well as under the Anti-Terrorism Act (18 U.S.C. § 2333) and state law for the deaths, injuries, and losses suffered in the 9/11 Attacks.

[16] *See Ashton v. Al Qaeda Islamic Army et al.*, 02-cv-6977 (S.D.N.Y. Sept. 10, 2002), ECF 2 (asserting federal jurisdiction over the Taliban pursuant to, among other things, the Alien Tort Statute (28 U.S.C. § 1350), the Foreign Sovereign Immunities Act (28 U.S.C. § 1605(a)(7)) and the Torture Victim Protection Act (28 U.S.C. § 1350 note), and claiming damages under those provisions as well as under the Anti-Terrorism Act (18 U.S.C. § 2333) and state law for the deaths, injuries, and losses suffered in the 9/11 Attacks).

[17] *See*, *e.g.*, 02-cv-6977 (S.D.N.Y. Mar. 6, 2003), ECF 11; *id.* (Aug. 1, 2003), ECF 32; *id.* (Aug. 13, 2003), ECF 38; *id.* (Sept. 5, 2003), ECF 111; *id.* (Sept. 30, 2005), ECF 465.

[18] *See*, *e.g.*, *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2004), ECF 247 at 12 (consolidating *Ashton v. Al Qaeda*, among other actions, into the 9/11 MDL).

Claims (the "Wrongful Death PEC"), and Elliot Feldman and Sean Carter of Cozen O'Connor P.C. as co-chairs of the Plaintiffs' Executive Committee for Commercial Claims (the "Commercial Claims PEC").[19] The Wrongful Death and Commercial Claims PECs were instructed to work together whenever possible to promote the orderly and efficient administration of the litigation and promote judicial economy.[20]

37.     Among counsel named to the Wrongful Death PEC were Dennis Pantazis of Wiggins Childs Pantazis Fisher Goldfarb PLLC and Richard Hailey of Ramey & Hailey,[21] counsel for estates and survivors of forty-seven individuals killed in the 9/11 Attacks in *Havlish v. bin Laden*, 03-cv-9848 (S.D.N.Y.) (the "*Havlish* Plaintiffs"), actions consolidated within the 9/11 MDL.

38.     On September 15, 2004, the 9/11 MDL court authorized plaintiffs in *Ashton*, 02-cv-6977 (S.D.N.Y), *Burnett*, 03-cv-9849 (S.D.N.Y.) and *Federal Insurance Co. v. al Qaida*, 03-cv-6978 (S.D.N.Y.) to serve certain foreign defendants, including the Taliban, via appropriately designated media publications.[22] Plaintiffs in *O'Neill v. Al Baraka Investment and Development Co.*, 04-cv-1923 (S.D.N.Y.) were subsequently added to this publication service group on October 31, 2004.[23] The Taliban did not respond, and in 2006, the 9/11 MDL court

---

[19] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2004), ECF 248-2 ¶¶ 4–7.

[20] *See, e.g.*, *id.* (June 16, 2004) ¶ 3.

[21] *Id.* (June 16, 2004) ¶ 6

[22] *In re Terrorist Attacks*, 03-cv-1570 (S.D.N.Y. Sept. 16, 2004), ECF 445.

[23] *In re Terrorist Attacks*, 03-cv-1570 (S.D.N.Y. Oct. 31, 2014), ECF 2908.

granted motions for default liability in favor of the *Ashton, Burnett, O'Neill* and *Federal Insurance* Plaintiffs.[24]

39.     Between 2008 and 2011, the *Havlish* Plaintiffs' counsel separately sought default judgments against foreign sovereign defendant Islamic Republic of Iran ("Iran") and other defendants, including a number of non-sovereign defendants such as the Taliban. The *Havlish* Plaintiffs presented no facts or arguments concerning the role of non-sovereign defendant the Taliban in the 9/11 Attacks, as was required in the default judgment effort against sovereign defendant Iran, instead relying entirely on the fact of the Taliban's default. As it had done six years prior for the *Ashton* Plaintiffs and others, the 9/11 MDL court granted default judgments in favor of the *Havlish* Plaintiffs and granted motions for final damages judgments as against certain foreign sovereign Iranian entities and numerous other non-sovereign defendants, including the Taliban.[25]

40.     In 2015, the *Ashton*, *Burnett*, *O'Neil* and *Federal* Plaintiffs obtained default judgments against Iran, and the 9/11 MDL court began issuing final damages judgments on a rolling basis, beginning on March 8, 2016.[26] The 9/11 MDL court issued individual damage awards for economic losses in each of those cases, and $2,000,000 for conscious pain and suffering of each of the *Ashton* Plaintiffs' decedents killed in the 9/11 Attacks.[27] The 9/11 MDL

---

[24] *See, e.g.*, *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 27, 2006), ECF 1782, *et seq.*; *id.* (May 12, 2006) ECF 1797 (referring to the individual defendants listed in Exhibit B to the *Ashton* Plaintiffs' motion, including the Taliban). The *Ashton* Plaintiffs' default liability judgment was issued on May 12, 2006, and applies to all claims, plaintiffs and defendants included up to and through the Sixth Amended Complaint. *Id.*

[25] *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Oct. 3, 2012), ECF 2623.

[26] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 8, 2016), ECF 3226.

[27] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 8, 2016), ECF 3226.

court next awarded solatium damages under the Anti-Terrorism Act, 18 U.S.C. § 2333, to immediate surviving family members, to include surviving spouses, children, parents, siblings and/or their functional equivalents.[28] The 9/11 MDL court determined those damages values to be $12,500,000 for a spouse; $8,500,000 for a child or parent; and $4,250,000 for a sibling.[29] Despite those substantial judgments, no claimant has recovered close to the full amounts, with nearly all of the families victimized in the 9/11 Attacks receiving no more than 5% of their judgments, and spouses and dependents of decedents generally receiving less than 0.76% of their judgments.[30]

**EFFORTS TO COLLECT ON CLAIMS AGAINST THE TALIBAN**

41.     Nearly contemporaneously with the Taliban's takeover of Afghanistan and the DAB in the summer of 2021, two plaintiff groups obtained and served writs of execution on the FRBNY as to Taliban assets.[31] On September 13, 2021, the *Havlish* Plaintiffs served their writ on the FRBNY in the amount of $7,045,632,402.79.[32] The *Havlish* Plaintiffs did not publicly docket their writ of execution against the Taliban in the 9/11 MDL or otherwise notify other parties to the 9/11 MDL about their plan, despite the fact that two of their attorneys sit on the

---

[28] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2016), ECF 3300.

[29] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. June 16, 2016), ECF 3300 at 4 (Ex. A).

[30] *See* USVSST Special Master Reports to Congress published August 2017, February 2019 and June 2020, available at http://www.usvsst.com/news.php (last accessed Apr. 18, 2022).

[31] The *Havlish* Plaintiffs are currently represented by, among others, an attorney who, until January 2022, served as special counsel to the National Security Council advising the Biden Administration in connection with legal efforts to resettle Afghan evacuees.

[32] *Havlish*, 03-cv-9848 (S.D.N.Y.), ECF 527 at 1.

Wrongful Death PEC.[33] On September 27, 2021, a group of seven anonymous non-9/11 MDL plaintiffs known as the "*Doe* Plaintiffs" served their writ in the amount of $138,418,741.[34]

42.     The U.S. government, through the Department of Justice ("DOJ"), promptly intervened and the *Havlish* and *Doe* courts granted stays of any judicial enforcement of the respective writs of execution.[35] During the pendency of those stays, beginning in December 2021, the *Ashton* Plaintiffs moved for final judgments for damages against Iran's co-tortfeasor, the Taliban, seeking to extend to the Taliban the same damages awards ordered against Iran.[36] The cumulative final damages awards sought in the *Ashton* Plaintiffs' motions cited herein—which remain pending as of this filing—are nearly $30 billion. Other 9/11 MDL plaintiffs also have pending motions for damages awards.[37]

---

[33] The non-*Havlish* Plaintiffs learned of the writ only because DOJ attached the writ as an exhibit to a letter it filed with the 9/11 MDL court after the writ had already been served. *Havlish*, 03-cv-9848 (S.D.N.Y. Sep. 16, 2021), ECF 526, 526-1; *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Sep. 20, 2021), ECF 7120.

[34] *Does v. The Taliban*, 20-mc-740 (S.D.N.Y. Aug. 26, 2021), ECF 15; *id.* (Aug. 30, 2021), ECF 19; *id.* (Sep. 23, 2021), ECF 26; *id.* (Oct. 14, 2021), ECF 30. The *Doe* Plaintiffs are seven anonymous U.S. contractors injured in a 2016 suicide bombing in Afghanistan who obtained a final default judgment against the Taliban in November 2020. *See Doe 1 v. Al-Qaeda*, 4:20-cv-605 (N.D. Tex. Mar. 20, 2020), ECF 1 (complaint); *id.* (Nov. 5, 2020), ECF 22 (final default judgment).

[35] *See Havlish*, 03-cv-09848 (S.D.N.Y. Sep. 20, 2021), ECF 527 at 3; *Does*, 20-cv-740 (S.D.N.Y. Sep. 23, 2021), ECF 26 at 2.

[36] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Dec. 20, 2021), ECF 7489–91; *id.* (Dec. 31, 2021), ECF 7516–18; *id.* (Jan. 13, 2022), ECF 7594; *id.* (Jan. 28, 2022), ECF 7634.

[37] *See, e.g.*, *Burnett v. Al Baraka Investment & Development Corp, et al*, 03-cv-9849 (S.D.N.Y. Apr. 7–8, 2022), ECF 962–65.

43. The stays of the *Havlish* and *Doe* Plaintiffs' writs were extended pending the filing of a Statement of Interest by the United States, which was ultimately filed on February 11, 2022, the same day President Biden signed the Executive Order.[38]

44. As described in the U.S. Statement of Interest, the Executive Order

> addresses the property and interests in property of Afghanistan's central bank, Da Afghanistan Bank ("DAB"), that are held in the United States by any U.S. financial institution, including the Federal Reserve Bank of New York ("FRBNY"), as of February 11, 2022 . . . . In recognition of the "unusual and extraordinary threat to the national security and foreign policy of the United States" posed by the "widespread humanitarian crisis in Afghanistan," the E.O. blocks the DAB [funds], providing that such assets "may not be transferred, paid, exported, withdrawn, or otherwise dealt in," except as specified by the Executive Order.[39]

In effect, the Executive Order obligated U.S. financial institutions holding DAB funds, including the FRBNY, to transfer those funds to the FRBNY for consolidation in a blocked account.[40] The Executive Order explicitly states that the President signed it in part to benefit all victims of terrorism with claims against the Taliban: "I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims. This property is blocked under this order."[41]

---

[38] *Havlish*, 03-cv-9848 (S.D.N.Y. Feb. 11, 2022), ECF 563; *Does*, 20-cv-740 (S.D.N.Y. Feb. 11, 2022), ECF 49.

[39] *Havlish*, 03-cv-9848 (S.D.N.Y. Feb. 11, 2022), ECF 563 at 1.

[40] Executive Order.

[41] *Id.*

45.     In furtherance of this explanation, the Administration issued that same day a "Fact Sheet" concerning the Executive Order, making clear that the DAB Assets are earmarked for "U.S. victims of terrorism":[42]

> Many U.S. victims of terrorism, including relatives of victims who died in the September 11, 2001 terrorist attacks, have brought claims against the Taliban and are pursuing DAB [funds] in federal court. Because some of these plaintiffs currently have writs of execution against the DAB [funds], the court will need to issue a further decision regarding the scope of those writs. Even if funds are transferred for the benefit of the Afghan people, <u>more than $3.5 billion in DAB [funds] would remain in the United States and are subject to ongoing litigation by U.S. victims of terrorism. Plaintiffs will have a full opportunity to have their claims heard in court.</u>[43]

46.     Upon the filing of the Statement of Interest, the *Havlish* and *Doe* Plaintiffs requested the stays be lifted. On February 22, 2022, the 9/11 MDL court held a hearing at which counsel for the United States and the *Havlish*, *Doe*, *Ashton, O'Neill*, and *Federal Insurance* Plaintiffs, among others, apprised the court of their respective positions on lifting the stays.[44] Counsel for the *Ashton* Plaintiffs urged the court to exercise its equitable powers to ensure fair treatment of all plaintiffs in the 9/11 MDL.[45]

---

[42] The availability of the DAB Assets under Section 201 of TRIA remains unresolved, although it is the subject of briefing in the *Havlish* and *Doe* Plaintiffs' turnover motions. *See Havlish*, 03-cv-9848 (S.D.N.Y. Mar. 20, 2022), ECF 598; *Does*, 20-mc-740 (S.D.N.Y. Mar. 20, 2022), ECF 80. Certain female Afghan leaders have written to the 9/11 MDL court to contend that the DAB Assets "are owned by the State of Afghanistan" rather than the Taliban. *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 31, 2022), ECF 7823 at 4. Any determination as to the DAB Assets' ownership and availability under Section 201 of TRIA necessarily bear on all Class members as claimants who have or will have compensatory damages judgments against the Taliban.

[43] Fact Sheet (emphasis added).

[44] *Ashton v. Al Qaeda Islamic Army et al.*, 02-cv-6977 (S.D.N.Y. Feb. 22, 2022), ECF 1614.

[45] *See id.* at 27:9–10.

18

47.     Ultimately, the stays were lifted on March 2, 2022,[46] triggering a flurry of activity as disparate plaintiff groups competed for priority over the DAB Assets.

48.     On March 20, 2022, the *Havlish* and *Doe* Plaintiffs filed motions for partial turnover as to the DAB Assets in amounts sufficient to satisfy their respective compensatory damages awards of $2,086,386,669 and $138,284,213.26.[47] Oppositions to those turnover motions are due to be filed on April 20, 2022.

49.     In addition, yet another group of plaintiffs—this time unrelated to the 9/11 Attacks and the 9/11 MDL—emerged to claim the remaining DAB Assets. Specifically, on March 8, 2022, more than twenty-three years after al Qaeda's August 7, 1998 bombings of the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, individuals allegedly injured or killed in those bombings (or their estates) and their family members (together, the "*Owens* Plaintiffs") filed a complaint, solely against the Taliban, seeking compensatory and punitive damages.[48] As they filed their complaint, the *Owens* Plaintiffs also moved on an emergency basis (citing the *Havlish* and *Doe* Plaintiffs' September 2021 service of writs of execution against the DAB Assets) for a prejudgment order of attachment against the DAB Assets for an amount in excess of $4,669,011,012.21.[49] A stated purpose of this emergency application for attachment was to obtain priority over other plaintiffs with claims against the Taliban.

---

[46] *See, e.g.*, *Does*, 20-mc-740 (S.D.N.Y. Mar. 2, 2022), ECF 68.

[47] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 20, 2022), ECF 7763–71. As to at least the *Havlish* motion, the actual judgment underlying the writ includes punitive damages, which cannot be recovered under the TRIA, which is the basis for obtaining the DAB Assets, and the interest calculation may be incorrect.

[48] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 8, 2022), ECF 1 (deficiently filed complaint); *id.* (Mar. 9, 2022), ECF 7 (re-filed complaint).

[49] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 8, 2022), ECF 4–6.

50.     On March 21, 2022, the *Owens* court granted a prejudgment attachment as to $1,373,761,042.95 of the DAB Assets (reflecting the compensatory damages portion of the $4,669,011,012.21 the *Owens* Plaintiffs claim in damages).[50] In a subsequent Opinion and Order, the *Owens* court explicitly recognized that the limited DAB Assets are insufficient to satisfy all deserving victims of terrorism with claims against the Taliban and that New York State's default judgment enforcement rules have incentivized this inequitable "run" on the DAB Assets.

> The unfortunate reality that the numerous victims of acts of terror perpetrated by the Taliban may not collect on judgments is not lost on the Court, and the Court does not seek to engage in gamesmanship over which victims are more deserving to collect on the underline limited funds underline available. New York law contemplates that pre-judgment attachment provides priority among creditors.[51]

51.     Also on March 22, 2022, counsel for the *Federal Insurance* Plaintiffs in the 9/11 MDL and co-chair of its Commercial Claims PEC, submitted a letter (the "Priority Settlement Letter") apprising the 9/11 MDL court that the *Federal Insurance* Plaintiffs and certain other groups of plaintiffs, including the *Havlish* and *Doe* Plaintiffs (together, the "Settling MDL Plaintiffs"), had "reached agreement in principle" effectively allocating priority among themselves over the DAB Assets subject to attachment by the *Owens* Plaintiffs (the "Priority Settlement").[52]

52.     On March 22 and 23, 2022, the *Bauer* Plaintiffs and *Schneider* Plaintiffs voiced objections to the Priority Settlement on the basis that the Priority Settlement is inequitable and

---

[50] *Owens*, 22-cv-1949 (S.D.N.Y. Mar. 21, 2022), ECF 33.

[51] *Owens*, 22-cv-1949 (S.D.N.Y. Apr. 11, 2022), ECF 38 (emphasis added).

[52] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 22, 2022), ECF 7790 at 1.

conflicts with the explicit motivation of the Executive Order—to compensate victims of terrorism with claims against the Taliban equitably.[53]

53.     Plaintiffs (and many others) declined to participate in the Priority Settlement because, if allowed, it will still result in a highly inequitable distribution of the DAB Assets, such that a relatively small number of claimants will receive an outsized portion of the funds, and most other claimants will receive, if anything, only a tiny fraction of that recovery.[54]

54.     On April 6, 2022, the 9/11 MDL court granted the *Federal Insurance* Plaintiffs' motion for a partial final default judgment against the Taliban, for a total award, excluding prejudgment interest, of $9,351,247,965.99 (approximately $3.1 billion of which is for compensatory damages).[55] In granting the motion, the 9/11 MDL court noted that there are more than a dozen motions for default judgment against the Taliban pending on the MDL, including the *Ashton* Plaintiffs' motions which (encompassing the Wodensheks' claims) seek damages in excess of nearly $30 billion.[56] The 9/11 MDL court directed "all plaintiffs to continue to meet and propose strategies for an efficient and fair process to adjudicate pending default judgment

---

[53] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 22, 2022), ECF 7792 at 3 ("It was not, and could never be, the position of the Biden Administration, that some 9/11 family members would receive compensation for their losses for these blocked assets than others do measured merely by the date they received their final judgments."); *id.* (Mar. 23, 2022), ECF 7793 (joining in the Baumeister letter and requesting the appointment of a Special Master to oversee distribution of the DAB Assets).

[54] *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Mar. 30, 2022), ECF 7810 at 2.

[55] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833.

[56] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Dec. 20, 2021), ECF 7489–91; *id.* (Dec. 31, 2021), ECF 7516–18; *id.* (Jan. 13, 2022), ECF 7594; *id.* (Jan. 28, 2022), ECF 7634.

motions."[57] It also noted that the *Federal Insurance* Plaintiffs "may execute on and enforce the[ir] judgment immediately."[58]

55.     Accordingly, the DAB Assets are currently subject to two writs of execution and a prejudgment attachment order. And the *Federal Insurance* Plaintiffs may execute on their damages judgment any day.[59] The dollar amounts contemplated by the writs and attachment order alone exceed the $3.5 billion in DAB Assets, and they concern only a tiny fraction of claimants against the Taliban, to say nothing of the *Federal Insurance*, *Ashton*, and other plaintiffs who have received or expected to soon receive damages awards. Thus, absent the relief sought in this Class Action Complaint, thousands of terror victims with claims against the Taliban who are not members of the *Havlish*, *Doe*, and *Owens* Plaintiffs (or the Settling MDL Plaintiffs, should the *Owens* Plaintiffs be unable to execute) are all but guaranteed to recover either very little or nothing from the DAB Assets.

---

[57] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833.

[58] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833.

[59] On April 20, 2022, the 9/11 MDL court affirmed the *Federal Insurance* Plaintiffs' prejudgment interest calculation, enabling their Final Judgment to issue. *See In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 20, 2022), ECF 7888.

**Compensatory Damages Exhausting the $3.5 Billion DAB Assets**

| Arguable Priority | Plaintiffs | Compensatory Damages |
|---|---|---|
| 1 | *Havlish* | $2,086,386,669 |
| 2 | *Doe* | $138,285,213.26 |
| 3 | *Owens* | $1,373,761,042.95 |
| TBD | *Federal Insurance* | $3,117,082,655.33 |
| TBD | *Ashton* (including Plaintiffs) | [nearly $30 billion][60] |

## CLASS ACTION ALLEGATIONS

56.     The series of separate lawsuits against the Taliban brought (1) in the 9/11 MDL on behalf of victims of the 9/11 Attacks and their surviving family members, (2) by the *Doe* Plaintiffs , and (3) by the *Owens* Plaintiffs has led to a race among Class members to win priority regarding the DAB Assets. In the absence of this class action, under the default New York state priority rules, family members of forty-seven of the 2,977 individuals killed in the 9/11 Attacks (the *Havlish* Plaintiffs) would be poised to deplete nearly two thirds of the limited DAB Assets. And a small number of other victims (the *Doe* and either the *Owens* Plaintiffs or the Settling MDL Plaintiffs) stand to absorb the remainder. This profoundly inequitable result would leave thousands of victims of the 9/11 Attacks and other terrorism victims with claims on file against the Taliban—including those like the Wodensheks who have a liability judgment in hand and a pending motion seeking to confirm almost $70 million in compensatory damages—to receive very little or even nothing.

57.     To ensure a just and fair distribution of the DAB Assets among all Class members, Plaintiffs bring this action individually and on behalf of all others similarly situated, seeking to

---

[60] Confirmation of the *Ashton* Plaintiffs' cumulative compensatory damages award is pending.

certify and maintain as a class action pursuant to Rule 23(a) and 23(b)(1)(B) on behalf of the following:

> all persons and/or estates with a compensatory damages claim against the Taliban on file in a U.S. court of record as of April 20, 2022, where such claim arises directly out of an act of terrorism and the injuries suffered were proximately caused by that act of terrorism and the Taliban has been or likely will be adjudged liable for those injuries.

The members of the Class, thousands of victims of the Taliban's terrorism, are so numerous and geographically dispersed that joinder of each is impracticable. As such, Rule 23(a)(1) is satisfied.

58.     This case presents questions of law and fact common to the claims of all members of the Class that will require common answers, including whether the DAB Assets are available to satisfy judgments against the Taliban under Section 201 of TRIA, whether Class members' claims exceed the value of the collectable DAB Assets, whether the Court should impose a constructive trust on the DAB Assets, and whether and how the DAB Assets as a limited fund should be equitably distributed among Class members. As such, Rule 23(a)(2) is satisfied.

59.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other members of the Class, the Wodensheks are the estate and surviving immediate family members of a victim of terrorism with compensatory damages claims on file against the Taliban arising directly out of the Taliban's facilitation of an act of terrorism. They are among the "U.S. victims of terrorism" who "have brought claims against the Taliban" that are intended as beneficiaries of the Executive Order.[61] Further, they currently hold liability judgments and have pending motions for damages judgments, which the 9/11 MDL court is in the process of adjudicating. And,

---

[61] Fact Sheet.

accordingly, like all other members of the Class, they have an interest in the DAB Assets. As such, Rule 23(a)(3) is satisfied.

60.    Plaintiffs will fairly and adequately protect the interests of the Class as a whole rather than the narrow interests of any single member or group of members of the Class. Indeed, Plaintiffs' desire for fairness and to protect the interests of other similarly situated terrorism victims with respect to the DAB Assets is what motivates this action. Plaintiffs' counsel are experienced in aggregate and mass tort litigation, class actions, and other complex litigation. Counsel from Kreindler & Kreindler LLP have extensive experience representing victims in aviation disaster litigation and they have represented Plaintiffs (and numerous other plaintiffs among the *Ashton* Plaintiffs) in connection with the 9/11 MDL for nearly twenty years. Plaintiffs' counsel also have significant experience in matters involving equitable distributions in federal courts, such as bankruptcy proceedings and SEC receiverships. Indeed, Plaintiffs' counsel includes Samuel Issacharoff, a leading authority in class and other complex litigation who has served, among other roles, as a Reporter for the American Law Institute's *Principles of the Law of Aggregate Litigation*. As such, Rule 23(a)(4) is satisfied.

61.    The DAB Assets valued at approximately $3.5 billion have been earmarked for U.S. victims of terrorism pursuant to the Executive Order. The value of compensatory damages awards held (and expected to soon be held) by members of the Class far exceeds this $3.5 billion. The *Havlish* and *Doe* Plaintiffs seek turnover of a combined $2,224,671,882.26, the *Owens* Plaintiffs have obtained an order of attachment as to $1,373,761,042.95, and the *Federal Insurance* Plaintiffs' "may execute on and enforce [their $9,351,247,965.99] judgment immediately."[62] Further, the *Ashton* Plaintiffs' pending motions for final judgment on damages

---

[62] *In re Terrorist Attacks*, 03-md-1570 (S.D.N.Y. Apr. 6, 2022), ECF 7833 at 3.

**App.378**

alone seek compensatory damages awards of nearly $30 billion, without calculation of prejudgment interest. Even without consideration of other similarly situated Class members, those judgments alone would dissipate the DAB Assets in their entirety. Consequently, the DAB Assets constitute a limited fund to satisfy the claims of all members of the Class.

62.     Adjudications concerning this limited fund with respect to individual Class members would, as a practical matter, be dispositive of the interests of the other Class members and would substantially impair or impede their ability to protect their interests. In circumstances such as this, equity requires that a mandatory class be certified to determine the rights of all Class members and the Class falls within the ambit of a Rule 23(b)(1)(B) "limited fund" class. Unless the Class is certified, some members of the Class will be able to collect a disproportionate share of the limited fund relative to their compensatory damages judgments while others with identical rights and interests will receive very little or even nothing.  Accordingly, the requirements of Rule 23(b)(1)(B) are satisfied.

## COUNT I
### INJUNCTIVE AND DECLARATORY RELIEF
### PURSUANT TO 28 U.S.C. §§ 2201 AND 2202

63.     Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as if fully set forth herein.

64.     28 U.S.C. § 2201 provides in relevant part that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree. "

65.     28 U.S.C. § 2202 permits "[f]urther necessary or proper relief" to be awarded "based on a declaratory judgment or decree . . . against any adverse party whose rights have been determined by such judgment."

26

66. The DAB is an instrumentality of the Taliban and the DAB Assets, which have been consolidated in a blocked account at the FRBNY pursuant to the Executive Order, are available to satisfy judgments against the Taliban under Section 201 of TRIA.

67. The DAB Assets are the only known collectible Taliban assets in the United States (or elsewhere). The value of existing judgments against the Taliban, including claims by plaintiffs in the 9/11 MDL and in *Owens*, already far exceeds the value of the DAB Assets. As a result, the DAB Assets are a limited fund pursuant to Rule 23(b)(1)(B).

68. In circumstances in which a limited fund exists, equity requires that absent parties be represented, joinder being impractical, where individual claims to be satisfied from the one asset would, as a practical matter, prejudice the rights of absent claimants against a fund inadequate to pay them all.

69. All persons and/or estates with a compensatory damages claim against the Taliban on file in a U.S. court of record as of April 20, 2022, where such claim arises directly out of an act of terrorism and the injuries suffered were proximately caused by that act of terrorism and the Taliban has been or likely will be adjudged liable for those injuries have sought or will seek to enforce judgments on said claims. Members of the Class who have not yet obtained judgments against the Taliban, will almost certainly obtain those judgments and seek to enforce them. As a result, all members of the Class have an equitable interest in the DAB Assets.

70. Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the Court issue an immediate order in aid of the Court's jurisdiction enjoining any judgment enforcement proceeding in any court affecting the DAB Assets pending adjudication of Plaintiffs' Class Action Complaint. Plaintiffs further request that the Court certify the mandatory Class, declare that the DAB Assets are available under TRIA to satisfy Class

App.380

members' judgments against the Taliban, establish a constructive trust over the DAB Assets for the benefit of all Class members, and distribute the DAB Assets on an equitable basis to all Class members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for the following relief:

A.      Because this is a national mandatory class action pursuant to Rule 23(b)(1)(B), superseding all litigation concerning the enforcement of judgments against the DAB Assets in state and federal forums, an immediate order in aid of the Court's jurisdiction enjoining any judgment enforcement proceeding in any court affecting the DAB Assets pending adjudication of Plaintiffs' Class Action Complaint;

B.      An order certifying the mandatory Class and declaring that the value of the existing and likely future judgments against the Taliban for claims arising directly out of acts of terrorism far exceeds the value of the DAB Assets, and, as a result, the DAB Assets comprise a limited fund pursuant to Rule 23(b)(1)(B);

C.      A declaration that the DAB Assets are available under Section 201 of TRIA to satisfy Class members' judgments against the Taliban;

D.      A declaration that all members of the Class have an interest in the DAB Assets and such assets constitute, and shall be held as, a constructive trust for the benefit of all Class members;

E.      The equitable distribution of the DAB Assets to all members of the Class at a time and in a manner to be determined by the Court; and

F.      All other available and appropriate relief.

Dated:  April 20, 2022
          New York, New York

**KREINDLER & KREINDLER LLP**

Megan Wolfe Benett
Noah H. Kushlefsky
485 Lexington Avenue, 28th Floor
New York, New York 10007
Telephone: (212) 687-8181
Facsimile: (212) 972-9432
mbenett@kreindler.com
nkushlefsky@kreindler.com

**SHER TREMONTE LLP**

By:   _/s/ Theresa Trzaskoma_____
         Theresa Trzaskoma
         Michael Tremonte
         Max Tanner (*application for admission forthcoming*)
         Kathryn E. Ghotbi
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
mtremonte@shertremonte.com
mtanner@shertremonte.com
kghotbi@shertremonte.com

-and-

Samuel Issacharoff, Esq. (*pro hac vice application forthcoming*)
40 Washington Square South
New York, New York 10012
Telephone: (212) 988-6580
si13@nyu.edu

*Counsel for Plaintiffs The Estate of Christopher Wodenshek, Sarah Wodenshek, Haley Wodenshek, Mollie Wodenshek, William Wodenshek, and Zachary Wodenshek*

**App.382**

M4qWashC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In re Approximately $3.5 Billion
    of Assets on Deposit at the Federal      22 Civ. 3228 (GBD)(SN)
4   Reserve Bank of New York in the
    Name of Da Afghanistan Bank

5
                                             Conference
6   ------------------------------x
                                             New York, N.Y.
7                                            April 26, 2022
                                             11:00 a.m.
8
    Before:
9
                        HON. GEORGE B. DANIELS,
10
                                             District Judge
11                          –and–

12                    HON. SARAH NETBURN,

13                                           U.S. Magistrate Judge

14

15

16                          APPEARANCES

17

18  KREINDLER & KREINDLER LLP
            Attorneys for Ashton and Wodenshek Plaintiffs
19  BY:   JAMES P. KREINDLER
          MEGAN WOLFE BENETT
20        ANDREW J. MALONEY III
          STEVEN R. POUNIAN
21        JAMES G. SIMPSON
          –and–
22  SHER TREMONTE LLP
    BY: THERESA TRZASKOMA
23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

M4qWashC

1                          APPEARANCES (cont'd)

2    BAUMEISTER & SAMUELS P.C.
          Attorneys for Bauer Plaintiffs
3    BY:  MICHEL F. BAUMEISTER
          DOROTHEA M. CAPONE
4
     MOTLEY RICE, LLP
5         Attorneys for Burnett Plaintiffs
     BY:  ROBERT T. HAEFELE
6         WILLIAM H. NARWOLD

7    JOHN F. SCHUTTY
          Attorney for Dickey Plaintiffs
8
     COZEN O'CONNOR
9         Attorneys for Federal Insurance Plaintiffs
     BY:  SEAN P. CARTER
10
     JENNER & BLOCK LLP
11        Attorneys for Havlish Plaintiff
     BY:  LEE WOLOSKY
12        DOUGLASS A. MITCHELL
          -and-
13   WIGGINS, CHILDS, PANTAZIS FISHER & GOLDFARB LLC
     BY:  DENNIS G. PANTAZIS
14        -and-
     FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
15   BY:  ROBERT M. FOOTE
          -and-
16   RAMEY & HAILEY
     BY:  RICHARD D. HAILEY
17
     MELLON & WEBSTER, P.C.
18        Attorneys for Hoglan Plaintiffs
     BY:  JAMES McCOY
19
     ANDERSON KILL P.C.
20        Attorneys for O'Neill Plaintiffs
     BY:  JERRY S. GOLDMAN
21        BRUCE E. STRONG

22   DO CAMPO & THORNTON, P.A.
          Attorneys for Judgment Creditors
23        John Does 1 through 7
     BY:  JOHN THORNTON
24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                              **App.384**

M4qWashC

1          (Case called)

2          JUDGE DANIELS:  All right.

3          Ladies and gentlemen, first, the purpose of this

4   proceeding is so that everyone can get a clear understanding,

5   from your perspective and from our perspective, of how we're

6   proceeding with regard to these funds.  My intent is to resolve

7   whatever issues need to be resolved in the current turnover

8   proceedings.  Anyone who believes they have any interest, who

9   are a part of the MDL or not part of the MDL, in these funds,

10  if they're not already here in this proceeding, should seek to

11  intervene, because this is where we're going to decide this

12  issue.

13         I've spoken with Judge Caproni.  We are in agreement

14  that we will be moving forward, and it is not likely that any

15  other proceeding will interfere or address the issues that we

16  intend to address in the turnover proceedings prior to our

17  moving forward.

18         We have a schedule.  The most recent letters asked

19  about adjusting the schedule.  I'll let Judge Netburn address

20  those issues, but I want to make something really clear.  There

21  is no other proceeding that anyone in this room can initiate

22  that will be appropriate to address the issues that we're going

23  to address in the turnover proceeding.

24         I'll be more direct about this.  The filing that was

25  made before Judge Caproni of a separate complaint by plaintiffs

App.385

M4qWashC

1   who are already plaintiffs within another case in which they're

2   seeking to obtain funds in support of judgments here is wholly

3   inappropriate.  We can address that further, but I do not

4   intend to spend any more of the Court's time or the lawyers'

5   time addressing those issues.  As far as I'm concerned, that

6   case will not interfere.

7           I will give the lawyers in that case an opportunity to

8   consider immediately whether they wish to, within the next 24

9   hours, move to dismiss that case without prejudice.  If that is

10  not done, if that's not a decision that is made by the lawyers

11  in that case, then I will act independently on that case and

12  dismiss that case on its merits.  I'll give you 24 hours to

13  decide what to do.  It is inappropriate to file a duplicative

14  case that seeks to enforce the same rights based on the same

15  set of facts and to enforce a judgment in a litigation in which

16  the parties have been engaged for years.  It is clearly not

17  appropriate for a class action, a putative class action.

18          The fact is that's one of the reasons why we're all

19  here in an MDL, because presumptively, this is not appropriate

20  for a class action.  These are individual claims, and I do not

21  intend to prejudice any party.  In the turnover proceeding, we

22  intend to resolve certain specific issues.  And I can tell

23  you -- I have my notes here -- one, we're going to first

24  resolve whether or not these subject funds are available to

25  satisfy judgments against the Taliban.  That's the first

M4qWashC

1    question to be resolved.

2            Second, which plaintiffs may recover and obtain money

3    from those funds if those funds are, in fact, legally available

4    to satisfy judgments?

5            And then discuss and determine what is an equitable

6    distribution of those funds given the number of plaintiffs that

7    are outstanding.

8            I can tell you right now my inclination is not that an

9    equitable distribution is first come first served.  My

10   understanding is it will be resolved one of three ways.  If the

11   plaintiffs cannot agree, this Court will independently

12   determine whether these funds are available and what is the

13   appropriate distribution of those funds.

14           If there is a suggestion by the parties, that the

15   parties agree upon -- and my understanding is that pretty much

16   everyone has agreed to some form of distribution, other than

17   the Ashton plaintiffs -- and again, my reaction to the filing

18   of a separate case before another judge to try to obtain those

19   funds is inappropriate not only because there's a case already

20   pending here -- and that's filed to be related to a case that

21   isn't even part of the MDL and isn't even a 9/11 case -- but

22   also, as a class, the relief that the parties sought in that

23   case advantages no one but themselves.  So to say that there is

24   somehow a reasonable representative plaintiff for all the other

25   plaintiffs, quite frankly, from what I've read, I don't know

M4qWashC

1    any other plaintiff in this room who agrees with it.

2                    This was what I consider to be a totally inappropriate

3    attempt to simply advantage one set of plaintiffs.  There's no

4    legal basis to do so.  There's no legal basis to file a

5    separate complaint, given there's already litigation here, and

6    there's no legal basis to attempt to make that into a class

7    action to represent a class of plaintiffs.  We have

8    approximately 10,000 plaintiffs here, and I see no advantage to

9    any of the particularly 9,000 of these plaintiffs who already

10   have judgments or are in the process of obtaining judgments.

11                   Now, I've spoken with Judge Caproni.  We all know what

12   the status is of the case that's before her.

13                   One, it is not a 9/11 case.

14                   Two, the plaintiffs don't have a judgment.

15                   Three, the plaintiffs haven't even served in that

16   case.

17                   So that case is not likely to advance in any way that

18   would interfere with the schedule that we anticipate in

19   efficiently and effectively moving forward with to resolve the

20   turnover proceeding.

21                   Judge Caproni and I have been in contact, and we're

22   going to keep in contact with an understanding that if some

23   action needs to be taken in that case that might influence

24   what's going on here, we will discuss it before it happens.

25   But it is not likely that even in a general scenario -- there's

App.388

M4qWashC

1    no need for any further orders to prevent that from happening.

2    That case not only is not ripe for this determination of the

3    issues that the second case was attempting to join, there are

4    even questions about whether or not that in and of itself is a

5    viable case.

6         So everybody should understand that we will be

7    proceeding as we intended to proceed.  We will decide those

8    issues in this litigation.  I do not anticipate that it will be

9    decided anywhere else, and I am going to indicate right now

10   that no further filings of new complaints in any other court

11   that address the claims raised in this case and before this

12   Court are to be filed without leave of this Court.  All right?

13        I want to make that clear to everybody.  Most of the

14   concerns that the parties have raised in their letters and in

15   their actions are concerns that both Magistrate Judge Netburn

16   and I have already discussed, have already factored in, have

17   already considered, and we intend to move forward in order to

18   make a determination as to if and how these funds are to be

19   distributed.

20        As I say, my intent is to concentrate, to the extent

21   possible, on what would be an equitable distribution of those

22   funds if those funds are available.  It is not, as I say, first

23   come first served.  If the parties have a suggestion, which is

24   unanimous or which is the majority of the parties, the vast

25   majority, we are willing to consider that.

1    I don't want to go too far ahead of myself, but I'm

2    even willing to consider, if it's appropriate, appointing a

3    special master to help the parties agree on a proposal that we

4    can consider and determine whether or not it's a reasonable

5    distribution of those funds if those funds are legally

6    appropriate to disburse to the plaintiffs in this case.

7    So I want to make it real clear there should be no

8    more strategic filings in order to advantage any particular

9    plaintiff.  Quite frankly, if I have to make an equitable

10   determination about who gets what, one of the things I may end

11   up factoring in is which parties have been obstructionist with

12   regard to the process and whether or not they should be treated

13   on the same footing with the other plaintiffs.

14   Let me be blunt about it.  The lawyers here are not

15   crabs in a barrel.  All right?  You're all plaintiffs with the

16   same type of claim and similar interests, but the determination

17   of who is to recover, how much is to be recovered, and where

18   that recovery should come from are individual decisions, for

19   the most part, that have to be made.  And we are in the

20   process.  We would be probably a good 25 hours ahead of where

21   we are today if we didn't have to deal with this kind of issue

22   in this case and we could continue to concentrate on moving

23   along with the determination of damage awards and final

24   judgments for the parties.

25   That's my initial statement.

M4qWashC

1          If someone wants to be heard, if you have any

2     questions about that, let me hear it now, because this isn't

3     rocket science that we're dealing with.  We're moving forward

4     efficiently, and to the extent that you have a concern that

5     your interests are not being adequately considered, you can let

6     me know.

7          Yes, Ms. Benett.

8          MS. BENETT:  Megan Benett on behalf of the Ashton

9     plaintiffs and the Wodenshek plaintiffs.

10          First, I'd like to thank the Court for having us

11     appear in person for this conference and for stating your

12     concerns as to equitable treatment and not sort of having this

13     as a first-come-first-served process.

14          I do want to be clear we are the people who filed the

15     class complaint.  I understand the Court's frustration.  I hear

16     what the Court is saying about that.  I want to clarify a

17     couple of points.

18          First of all, the Ashton plaintiffs are not a small

19     minority.  We represent 800-some families, 25 percent of the

20     victims killed in the 9/11 attacks.  The reason that you see

21     that we haven't joined into what has been described as the

22     framework agreement is that because it is our understanding

23     that that framework agreement would put the families of the

24     Havlish plaintiffs in a position of receiving somewhere north

25     of 80 percent of their judgments, the value of their judgments;

M4qWashC

1    the insurance companies receiving less than 20 percent of the

2    value of their judgments; and the rest of the 2,900-some

3    families receiving something on the order of 1 or maybe 2

4    percent of the value of their judgments.

5          JUDGE DANIELS:  Well, since it has not been laid out

6    for me or Judge Netburn exactly what that agreement entails, I

7    have not factored any of that in a determination at this point

8    as to whether these funds are available for recovery and how

9    these funds should be distributed.

10         MS. BENETT:  I understand, and that obviously, both in

11   this case and the Owens case, is the major threshold question.

12   And when we had the initial conference in February, I think we

13   had expected that the order, the decision-making would take

14   those dispositive threshold questions first and then the

15   thornier distribution questions as sort of a second-order

16   problem.  It appeared to us, based on the schedule in the

17   turnover proceedings, that there was going to be a

18   determination regarding distribution perhaps simultaneous with

19   the question of whether those assets would be available at all.

20         To be clear, the 23(b)(1)(B) complaint would not

21   advantage the Ashton plaintiffs over anybody else.  In fact,

22   the class definition was defined specifically in a way to

23   include everybody who has a claim against those assets and

24   would allow for transparent -- because to the Court's comment

25   about the terms of this framework agreement, we haven't been

M4qWashC

1    presented with a formal term sheet at all either.  So my

2    description to the Court is driven, in part, by the fact that

3    this is somewhat opaque and that the 23(b)(1)(B) class

4    complaint seemed to us the most transparent, equitable and

5    judicially overseen vehicle to consider the distribution,

6    should the Court get to the distribution stage.

7         It also, and I understand that the Court -- I

8    understand the hostility to the vehicle, but it did, to our

9    mind, also provide the Court with a way to take jurisdiction

10   over the entirety of those $3.5 billion in assets.  And I hear

11   the Court's representation regarding the Owens case.  The fact

12   is that the April 11 decision from Judge Caproni granted an

13   order of attachment and stated that the Owens plaintiffs would

14   have priority.

15        It may well be that that is not ultimately the case,

16   but given that posture, I think we were not unreasonable to be

17   concerned that there was an ongoing race to the bank.  The

18   23(b)(1)(B) complaint is not unusual as a sort of settlement

19   vehicle.  It is specifically designed when there is a limited

20   fund.  It is not a question about determination of liability on

21   an individual basis, but it's basically an equitable vehicle

22   that is similar to a bankruptcy proceeding or reverse

23   interpleader.  And so the point about filing was simply to

24   provide a vehicle that would treat all of the victims of

25   Taliban-sponsored terrorism in the fairest, most equitable and

M4qWashC

1    most transparent basis.

2            It was not meant to advantage one family.  It was not

3    meant to advantage one law firm.  To the contrary; we have

4    consistently, throughout this process, been voicing our

5    concerns about any distribution proceeding that would treat one

6    family who suffered similar, if not identical, losses

7    differently from another family who suffered those same losses.

8            I believe that everybody, all of the 9/11 families

9    feel that way.  I know that in statements to the press, that

10   the lawyers for the Havlish group and Ms. Havlish herself

11   stated that they care about fair treatment here.  The

12   23(b)(1)(B) limited class fund, to our mind, given the

13   competing claims in the Owens case -- and to be clear, the

14   Owens plaintiffs would also be able to participate in a limited

15   class fund.  This was not meant to exclude the non-9/11

16   community.  It was meant to be as welcoming as possible to

17   everybody who can establish that they have liability claims

18   against the Taliban and that they've suffered injuries

19   proximately caused by the Taliban's support of mass terrorist

20   attacks.

21           I don't know if the Court wants to hear anything more

22   about that.

23           JUDGE DANIELS:  No, I don't, because I understand your

24   position and I understand what you attempted to do, but I think

25   it's totally inappropriate in this case.

1          I'll just give you one example. There's absolutely no

2    reason why that complaint should have been filed before Judge

3    Caproni rather than filed here, and I don't know that there's

4    any party here who is going to say that your filing that,

5    particularly as a class action, somehow advantaged them. It

6    was an attempt to advantage you and disadvantage everyone else.

7    As I say, unless the parties want to spend some more time

8    briefing it and litigating it, I have determined that it is

9    inappropriate and it is appropriate for dismissal. It does not

10   add anything to this litigation, and it does not address any

11   issues that are not being addressed in this litigation. That

12   should settle the issue.

13          I will give you 24 hours to decide whether or not you

14   want to move to dismiss this case, without prejudice, and if

15   you make such an application within the next 24 hours, I will

16   grant that application. If you do not make such an

17   application, I will move forward to dismiss the case on its

18   merits, because it has no utility. It has absolutely no

19   utility.

20          Now, if it was motivated out of fear, I understand

21   that; that's what you're basically saying to me. But I can

22   assure you that the process we have in place, the

23   communications that are almost daily at this point that

24   Magistrate Judge Netburn and I have on this issue and the

25   communications that I am now having directly with Judge

Caproni, having the same conversations we're having here about

what's going on over there and what's going on over here and

whether or not cases belong over here and whether or not

anybody can pick and choose and judge shop where they want to

file their next claim, that clearly is to be resolved in this

MDL litigation.

So the fact is you should let me know whether you want

to step aside and focus on the turnover proceeding.  If the

Owens plaintiffs want to come in and they think they've got an

interest and they want to participate in the turnover

proceeding, they can.  But we intend to move forward and

resolve this issues expeditiously, step by step, giving

everyone an opportunity to be heard.  There's no reason to

believe that there's any concern that these issues are going to

be resolved somewhere else before they're resolved here.

You made your calculation that this was the way that

you wanted to proceed, by filing a separate lawsuit related to

Owens.  But I want to make clear to you and to everybody else

who might want to consider doing the same thing, it's not going

to happen.  What you will do is not put yourself at the front

of the line; you will end up putting yourself at the back of

the line by taking those kind of actions.

You know we have a forum to resolve these issues.

That is the only forum that exists to resolve these issues

currently.  If that changes, then we can address it.  But I

M4qWashC

1  don't anticipate it's going to change, and I don't anticipate

2  that Judge Caproni is going to take any action in that infant

3  case to interfere with a determination that all of you are

4  going to have an opportunity to participate in and will be

5  resolved here and resolved with the availability and the

6  distribution of those funds, if those funds are available to

7  distribute to the parties.

8          I don't want to spend a whole lot more time on this,

9  unless you want to spend a lot more of your time on this.

10         MS. BENETT:  No.  I just want to correct a couple of

11  things.

12         First of all, to be clear, the class complaint -- and

13  I hear the Court on that, but I want to make clear it would not

14  have advantaged the Ashton plaintiffs.  We would not have been

15  driving the process the way the Havlish attorneys suggested in

16  their filing yesterday.  It would have been a judicially

17  overseen process.

18         JUDGE DANIELS:  Well, who would it have advantaged

19  then?

20         MS. BENETT:  All of the families who are victims.

21         JUDGE DANIELS:  Why?  They're perfectly satisfied to

22  have this issue resolved in a turnover proceeding.

23         MS. BENETT:  No, no.  That's not true.  It's not all

24  of the 9/11 families who are perfectly happy to have it

25  satisfied in the turnover proceeding, and it's and it's not all

M4qWashC

1     of the victims of Taliban-sponsored terrorism.

2             JUDGE DANIELS:  Who else are you referring to other

3     than yourself?

4             MS. BENETT:  All of the embassy bombing victims, and

5     to be clear --

6             JUDGE DANIELS:  Who else are you referring to, other

7     than your client?

8             MS. BENETT:  The 25 percent of the 9/11 families that

9     we represent.

10            JUDGE DANIELS:  I'm sorry.  I have not received any

11    communication from any other lawyers saying that they are in

12    agreement with what you did.

13            MS. BENETT:  They aren't.  They made a different,

14    tactical decision.  They wanted to enter into an agreement to

15    hedge their bets and guarantee some modest economic recovery

16    for their clients at a grossly disproportionate value vis-à-vis

17    the insurance companies and the families of a smaller number of

18    victims.  That was a different decision.

19            We made a decision to file this because we thought it

20    wasn't right to disadvantage 2,900 --

21            JUDGE DANIELS:  It should have been filed here.

22    That's my first point.  It should have been filed here.  You

23    don't get to file it in Wyoming.

24            MS. BENETT:  I hear you.

25            JUDGE DANIELS:  We're in the middle of an MDL that's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

App.398

M4qWashC

1   been going on for years and involves thousands, as you say, of

2   plaintiffs who have a similar interest in these funds.  That is

3   not the appropriate way to proceed.  It's not even the

4   efficient way to proceed.  It's the inefficient way to proceed,

5   given the fact we are engaged in turnover proceedings.

6           MS. BENETT:  I hear you on that point, and I know the

7   Court recognizes this, but I do want to just state on the

8   record we filed with -- in connection with marking it related

9   to Owens for one reason, which is that that was the only case

10  that had a judicial restraint on the funds.  It's an *in rem*

11  proceeding against $3.5 billion.  We sent a copy.  As the Court

12  knows, we sent a copy of our filings.  We filed them the same

13  time in the MDL, and I recognize that this was not how the

14  Court would have --

15          JUDGE DANIELS:  Well, look --

16          MS. BENETT:  But we did not try to hide it.  We

17  provided and we trusted --

18          JUDGE DANIELS:  If you don't want to participate here

19  and you want to go sit over there, maybe I'll consider that.

20  But you know that's not what you want to do.

21          MS. BENETT:  We want all of the claims to the $3.5

22  billion to be consolidated in front of a single court.

23          JUDGE DANIELS:  And that's this Court.

24          MS. BENETT:  And that's fine.

25          JUDGE DANIELS:  There's no reason to believe that

M4qWashC

1  that's supposed to be Judge Caproni.

2         MS. BENETT:  But we only believed that because Judge

3  Caproni had issued the April 11 order restraining the assets

4  and because in connection with the previous effort to have the

5  Owens case brought into the MDL, both courts rejected that.  So

6  we gave both courts the complaint.  Certainly, in retrospect, I

7  wish that we had marked it as related to both.  I'm not sure if

8  that's even an option on the form, now that I'm thinking about

9  it.

10        JUDGE DANIELS:  No, it's not.  It would have been an

11 inappropriate option.

12        MS. BENETT:  We gave both courts, we intended to give

13 both courts notice and trust the courts to decide which venue

14 was proper.  But the point was always that the 3.5 billion

15 should be adjudicated by a single court, including all those

16 threshold questions that are going to be dispositive of whether

17 this money is available to satisfy any judgments in the first

18 place.

19        So the filing of the class complaint was meant to, A,

20 have all the adjudications regarding those assets from a single

21 court; and two, as I said, and I -- you know, I hear the

22 Court's response to this.  But it was truly because we were

23 concerned about a process that was going to so grossly

24 disproportionately treat 9/11 family members in a way that

25 our -- and I speak to our clients all the time.  I know the

App.400

M4qWashC

1     same is true even for clients represented by firms that reached

2     a different decision, that the distribution as proposed in the,

3     initially in the turnover proceedings was so deeply troubling

4     to our family members that we did not believe that we could

5     participate in the framework agreement that would have put, you

6     know, treated one person's life as worth 2 percent of the

7     others'.

8              JUDGE DANIELS:  As I usually say, that was a hallway

9     debate that you had with the others.  That was not an issue

10    that this Court raised.  That is not an issue that this Court

11    adopted.  This Court isn't even aware of what the agreement is.

12    The appropriate place to resolve those issues and understand

13    how we were ultimately going to proceed is in this forum, in

14    this courtroom.

15             MS. BENETT:  And I think that that's -- and to the

16    extent that we can do so with judicial oversight and in a

17    transparent manner, that will provide real comfort to the

18    family members.  Before the Court's order on Thursday, we had

19    intended to file something noting that we were -- you know,

20    given that the framework agreement had been discussed in papers

21    but without terms, we did intend, before our attention turned

22    to the hearing this morning, to ask the Court to perhaps

23    explore what the terms of that framework agreement looked like,

24    because like I said, our position has been all along that every

25    single family member, all 2,977 families, should be treated

M4qWashC

1   fairly and equitably; that the agreement, as we understood it,

2   would not only fail to do so but would fail to do so in a very

3   dramatic fashion; that the 23(b)(1)(B) class complaint was a

4   vehicle that could take into consideration certain concerns

5   that parties have raised previously of those who have not

6   participated in the USVSST fund, which has made, to be clear,

7   very modest payments to some of the 9/11 family members, that

8   their decision not to participate in that fund could be taken

9   into consideration when fashioning any distribution should the

10  assets be available through the class complaint -- through the

11  limited class fund, rather.

12         JUDGE DANIELS:  And you all have the opportunity to

13  raise those issues before this Court.

14         JUDGE NETBURN:  Right.  I think the thing that's most

15  frustrating here is you could say a lot about this MDL, but you

16  could not say that we haven't given everybody an opportunity to

17  be heard.  We allow everybody to speak up.  We want every

18  family to participate, and filing this class action before

19  Judge Caproni feels like an end run around that process.  And

20  that feels inappropriate.  I understand that you represent a

21  quarter of the families, but the vehicle that you chose to do

22  this feels completely like you're trying to slot out everybody

23  else when you have never been denied an opportunity to be

24  heard.

25         I think there's lots of questions about your class

1   complaint, as evidenced by this conference, as to whether or

2   not you would be adequate counsel, given the opposition so many

3   people have; whether or not your claims are typical; whether or

4   not you can prove that class is a superior method over the MDL.

5   All of those things are very serious questions in my mind and

6   point to a not-well-thought-out choice. And as a result, we

7   have all spent, as Judge Daniels said, dozens and dozens of

8   hours focusing on this charade instead of focusing on the real

9   issue.

10          So if you want to be heard on what you think is an

11  appropriate distribution, should the Court determine that those

12  funds are available, you will have that opportunity to be

13  heard. But going about it this way leaves a very off taste in

14  our mouths, and it doesn't feel like it's being done in the

15  interest of the class. It feels like it's being done in the

16  interest of your clients because your clients feel like they're

17  not going to get what you think is appropriate. And I'd like

18  to hear about this, but not through this vehicle.

19          MS. BENETT: Understood.

20          Just to be clear, Judge, at the February 22

21  conference, there was the *sua sponte* questions about how

22  anybody without a liquidated damages judgment would have

23  standing to participate in a turnover proceeding as a sort of

24  the threshold matter, and it was at that point that we became

25  concerned. And I hear what the Court is saying about the time

M4qWashC

1     and effort spent thinking about an equitable process here.  And

2     again, it's obviously very reassuring to the family members;

3     I'm sure all of them, not just those we represent.  But we did

4     have concerns that there would be -- we didn't know how it was

5     going to unfold.

6          The class complaint was -- and I, again, hear the

7     Court.  I can say it was not meant to be an end run at all.  To

8     the contrary, and it's not meant to be outside of the MDL.  It

9     is a limited class fund that could be available for purposes of

10    resolving claims to the DAB assets within the MDL.  It's not --

11    there are no sort of -- there are no liability questions.  I

12    mean depending on how -- and again, the way the class was

13    crafted was meant to be as fair and reasonable as possible

14    given the nature of the claims already asserted by various

15    parties against the Taliban and against the DAB assets.

16          I don't know that it's worth answering the Court's

17    questions or addressing the Courts' complaints.  I will say

18    it's certainly not meant to be a charade.  It was meant to be a

19    vehicle that would -- you know, we thought that the Court might

20    welcome as a method for this distribution, given also what the

21    Court said at the February 22 conference about being sort of

22    bound by New York State priority rules and the same -- Judge

23    Caproni echoing the same at the March conference of the Owens

24    hearing.

25          And the fact is that the Rule 23(b)(1)(B) limited

**App.404**

M4qWashC

1   class fund would actually take jurisdiction over all of the

2   assets and would provide a way for the Court to not have to

3   worry about the built-in inequity of the priority rules in a

4   case like this, where you have a mass terror attack or several

5   terrorist attacks with sort of predetermined damages, judgments

6   issued against the co-joint tortfeasor, would allow the Court a

7   means by which to address this equitably without having to be

8   concerned with the New York State priority rules, which I think

9   it's fair to say certainly didn't contemplate this particular

10   situation but also don't seem to have fair application in an

11   MDL, where the use of those priority rules would sort of force

12   the Court into the position of choosing, you know, one person,

13   one identically situated person over another.

14           I don't know if it's --

15           JUDGE DANIELS:  Those are tough choices, but this

16   Court is prepared to make those choices.  OK?  And it's not up

17   to you to make those choices, to reframe it to your advantage.

18   Those issues will have to be addressed.  We will address every

19   one of those issues after giving everyone a full opportunity to

20   give their input.  Neither you nor any individual lawyer in

21   this room has the ability or the right to define that for this

22   Court or for the rest of these plaintiffs.

23           All of these plaintiffs have the same interest that

24   you have in making sure that their clients get as much

25   satisfaction of their outstanding damages as you do.  That's to

M4qWashC

1    be decided in the same room at the same time for all of the

2    plaintiffs, not to be decided in a separate courtroom, in a

3    separate litigation, while we're trying to figure out what

4    you're doing across the hall.

5         MS. BENETT:  I hear you, and I know I've said this

6    already.  I just want to be clear.  The proposal that we put

7    forward -- first of all, this Court could oversee a limited

8    fund.

9         JUDGE DANIELS:  You didn't bring it to this Court.

10   You didn't give us any indication --

11        MS. BENETT:  I understand.

12        JUDGE DANIELS:  -- that that was the case.  You gave

13   us the opposite indication.

14        MS. BENETT:  My point is that this Court, of course,

15   could take jurisdiction over that if it chose to, but I just

16   want to clarify that it would not advantage the family members

17   we represent over somebody else.  To the contrary, it is

18   currently the only, the only vehicle, procedural vehicle we see

19   that would not do that.

20        JUDGE DANIELS:  Thank you.

21        MS. BENETT:  I'm sorry.  I just wanted to clarify that

22   the proposed limited class fund would not, in fact,

23   advantage -- well, that's not -- it would advantage -- it would

24   be more advantageous to the 2,930 non-Havlish family members

25   than strict application of New York priority rules, but it

M4qWashC

1    would not be more advantageous to the family members we

2    represent vis-à-vis all of the other family members of those

3    killed and injured in Taliban-sponsored terrorist attacks.

4         I understand, and I've heard both of the judges

5    express your displeasure and believe that this was

6    gamesmanship.  I want to be clear.  We filed this in order to

7    treat every family that was a victim of a Taliban-sponsored

8    terrorist attack on an equal and fair basis, not to advantage

9    our clients, not to advantage certain family members over

10   others and not to advantage us.  In fact, a limited class fund

11   would be overseen by the Court.  It would not be overseen by

12   the lawyers.

13        This was not a question about class counsel fees.

14   This was about making sure there was a vehicle, given what we

15   had heard at the two prior hearings, in the Owens case and this

16   case, about the Court's feeling bound by New York State

17   priority rules and given what the contours of this framework

18   agreement, which I understand neither I nor the Court know the

19   specifics of, but I am fairly confident would not have treated

20   family members on a fair and equitable basis.

21        JUDGE NETBURN:  I think Judge Daniels and I both don't

22   want to get too far along on the merits of this class

23   complaint, but to the extent what I'm hearing is that you think

24   filing a class action would obviate the need or the obligation

25   of the Court to consider New York priority rules, why do you

1    think that?  Wouldn't there still be an application of priority

2    at least within the class complaint, or you think that just

3    disappears then and there wouldn't be subclasses, for instance?

4            MS. BENETT:  Do you mind if I -- my cocounsel, Ms.

5    Trzaskoma, who has more familiarity with this process, can tell

6    you why.  But there could be an equitable way to treat people

7    based on, for example, what category you fall into.  But I do

8    not believe that New York State priority rules would have any

9    application in the -- that basically the $3.5 billion goes into

10   a judicially supervised equitable trust, and then it is for the

11   Court to decide without application.

12           The only reason New York State priority rules are at

13   issue here is because of Federal Rule of Civil Procedure 69,

14   which says that in the execution of judgments, the Court should

15   look to the law of the state where it's situated.  Under a Rule

16   23(b)(1)(B) limited class complaint posture, however, you're

17   not looking at the execution of judgments.  You're looking at

18   the people who have claims.  However the Court would define the

19   class, you're looking at people who fall into that class who

20   have claims against that fund.  That's why it's an *in rem*

21   proceeding.

22           I think in the letter last night, one of the parties

23   had said they don't even know who the defendants are, but

24   that's because it's an *in rem* proceeding against these assets

25   themselves, and so New York State priority rules don't come

M4qWashC

1  into play because you're not looking at execution of judgments.

2          JUDGE DANIELS:  All right.  Did you want to be heard

3  further on that?

4          I don't want to spend a lot of time debating

5  backwards.  I understand your position.  After we have this

6  discussion, as far as I'm concerned, as I always say, we start

7  this litigation anew.  I'm not holding this against the parties

8  at this point, but I expect you to conform your conduct in the

9  future consistent with the way this MDL is established and the

10  issues that are supposed to be decided in this MDL.  That

11  filing before Judge Caproni is inconsistent with that for a

12  number of reasons that we just discussed.

13          So as long as you understand and everyone else

14  understands -- this is not just for you; it's for anyone else's

15  benefit who thinks, OK, this is a way that I'm supposed to

16  change the issues that are before the Court and have them

17  decided in the way you want them decided.  That is not the way

18  we're going to proceed.  Due warning to everyone is that you

19  will do nothing but disadvantage your clients by this kind of

20  conduct in the future rather than advancing the possibility of

21  an equitable distribution of these funds if these funds are, in

22  fact, available.

23          Yes.

24          MS. TRZASKOMA:  Yes, your Honor.

25          JUDGE NETBURN:  Could you just state your appearance

M4qWashC

```
 1     for the court reporter.

 2               MS. TRZASKOMA:  Yes.  Apologies.

 3               Theresa Trzaskoma from Sher Tremonte on behalf of the

 4     Ashton plaintiffs and the class plaintiffs.

 5               I don't want to tread on ground that Ms. Benett

 6     already covered, but I do want to explain what the relief was,

 7     is, that we are seeking in the 23(b)(1)(B) class.

 8               This is with the reverse interpleader.  It doesn't

 9     advantage anyone to be the class plaintiffs.  It is seeking an

10     equitable distribution of all the assets, including those that

11     are subject to the attachment order that Judge Caproni issued

12     in Owens.

13               Prior to our filing of that class action, it

14     appeared -- perhaps we were reading tea leaves, but there were

15     comments on the record in both this MDL and by Judge Caproni

16     that strict priority rules were going to apply, and that is not

17     appropriate in these circumstances.

18               A Rule 23(b)(1)(B) class action cuts through all of

19     that.  It allows the Court to do equity, which is what I hear

20     the Court wants to do.  It allows a single court, currently

21     this MDL Court, to take control and jurisdiction over the $3.5

22     billion and then to determine what is an equitable distribution

23     based on whatever factors all of the individual plaintiffs'

24     lawyers want to make arguments to the Court.  It is not

25     controlled by class plaintiffs.  It is solely in the Court's
```

M4qWashC

1  discretion.

2         And that's the vehicle we brought to -- I realize we

3  brought it to Judge Caproni, which you've made clear was the

4  wrong court.  But it was not intended to circumvent anything.

5  It was intended to provide a mechanism for, a procedural

6  mechanism for dealing with New York priority rules, which were

7  never intended to meet this extraordinary circumstance.

8         Rule 23 makes the New York priority rules irrelevant.

9  It takes us into an equitable process, where New York priority

10  rules don't even have to be considered.  It preempts New York

11  priority rules.

12         So it can argue the right mechanism for this very

13  extraordinary situation.

14         JUDGE DANIELS:  All right.

15         Before I turn to Magistrate Judge Netburn with regard

16  to -- I know there were some questions and requests about the

17  process and the dates of what things are due -- did anyone else

18  want to be heard before we moved into that?

19         MR. KREINDLER:  Good morning, your Honor.

20         Very quickly -- jim Kreindler -- and I'm not saying

21  anything about the class action or the specifics, but I did

22  want to just make one comment, your Honor, because we have been

23  together wrestling with this case for 15 years.  And even

24  before that, it's a long history, starting with the 1996

25  effective death penalty and Antiterrorism Act that was

M4qWashC

1   spearheaded by then Senator Biden and Senator Kennedy.  And

2   from that time on, when it comes to the states who are sponsors

3   or involved with terror, whether it's Libya or Saudi Arabia or

4   Iran, speaking personally, I have one principle in mind.  And

5   that is everyone -- every victim -- should be treated equally.

6   And as your Honors both know, while it took 20 years,

7   ultimately, we got $10 million per death for 270 people from

8   Libya in the Pan Am 103 bombing.  And that's been my approach,

9   and from the day or two after 9/11, it's something I've

10  expressed to the clients.

11          And your Honor is quite right when you identified the

12  fear we have that this approach, equal treatment for everyone,

13  which has been something important to me for these 25, 30

14  years, might be jeopardized by this, you know, race to file

15  first or obtain writs or judgments first.  And while I know

16  it's taken a lot of time, speaking personally, I'm glad we're

17  together, because at least personally, I feel that this

18  commitment that I think we all share is a common theme, and we

19  can achieve it not just with this fund but when we reach the

20  promised land at the end of the case.

21          So I just wanted to thank your Honors for your time

22  and, at least speaking personally, I am reassured that whatever

23  misconceptions were there we've taken care of, and we're on

24  track to do something good and right.

25          So thank you.

M4qWashC

1        JUDGE DANIELS:  Thank you, Mr. Kreindler.

2        Does anyone else want to be heard?

3        MR. CARTER:  Your Honor, very briefly.  Sean Carter

4   from Cozen O'Connor, your Honor.

5        There's been a fair amount of discussion today about

6   the framework agreement, and I just want to provide a brief

7   perspective on that for the Court.

8        There are many of us who recognized that there was a

9   pool of funds here that was unprotected and subject to

10   potential attack from parties outside of the MDL.  And at the

11   same time, we recognized the complexity of the issues facing

12   this Court in trying to deal with the turnover issues,

13   including because the procedural posture of claims on behalf of

14   the various plaintiffs, differed wildly, from people who had

15   actual judgments, who had moved for monetary judgments years,

16   ago to people who had only recently filed claims the.

17        Within all of those issues, many of us sought to reach

18   a range of compromises in that achieving a good result --

19   perhaps not a perfect result, but a good result -- would also

20   have streamlined this entire process for the Court.  So when

21   there's conversations here about what equity demands, what is

22   equitable and what's fair, I think part of the consideration

23   for the rest of us was achieving a good result that simplified

24   issues for the MDL Court and allowing the entire case to go

25   forward.

M4qWashC

1            That's all, your Honor.

2            JUDGE DANIELS:  Yes.

3            MR. BAUMEISTER:  Good morning.  I'll be brief also.

4            JUDGE DANIELS:  Put your appearance on the record.

5            MR. BAUMEISTER:  Mich Baumeister, representing the

6    Bauer plaintiffs.

7            I certainly am responding to Mr. Carter, and while he

8    talks about this was an efficient way, I can tell the Court

9    that my clients -- some of them are listening on the phone

10   today -- were told by other clients that the Havlish plaintiffs

11   would get 1.7 billion, his client would get 500 million.  They

12   were the deal people that would take it, and if you didn't

13   agree to sign on, even though you didn't know what you would

14   get as a client, even though you didn't know if there would be

15   money, especially even Owens, if you didn't do it, at the end

16   of the day you would get zero.

17           Some of my clients have been threatened.  I received a

18   letter threatening me, Do the deal.  It wasn't about

19   efficiency.  It was about lining their pockets and

20   disadvantaging the families.

21           So that's all I wanted to say.

22           JUDGE DANIELS:  Well, the question of what is an

23   equitable distribution, if that question is to be answered,

24   will be answered by this Court.  If all of the plaintiffs have

25   a suggestion or some of the plaintiffs have a suggestion or

M4qWashC

| | |
|---|---|
| 1 | some third party has a suggestion for the plaintiffs, the |
| 2 | ultimate decision lies with the Court.  So I urge you to agree, |
| 3 | to the extent that you can agree, on what is, if you can, a |
| 4 | joint position.  If you cannot, those issues, the disputes |
| 5 | between the parties with regard to what is an appropriate |
| 6 | recovery for each plaintiff is an individual decision that has |
| 7 | to be made by this Court.  All right? |
| 8 | Anyone else? |
| 9 | Yes, sir. |
| 10 | MR. SCHUTTY:  Thank you, your Honor.  John Schutty.  I |
| 11 | represent a subset of the Ashton plaintiffs. |
| 12 | Your Honor, I want to thank you for your reassuring |
| 13 | words.  I can advise you that my clients have lived in fear |
| 14 | since February 22 when the New York State priority rules were |
| 15 | emphasized at that conference, and it was a growing fear among |
| 16 | the 9/11 families that the Havlish plaintiffs at that time |
| 17 | would take the lion's share of the $3-1/2 billion.  So I want |
| 18 | to thank your Honor for clarifying that the Court's intent is |
| 19 | to make an equitable distribution. |
| 20 | As you may know, I filed a letter, a motion requesting |
| 21 | permission to contest the judgment that was entered in favor of |
| 22 | the Havlish plaintiffs because that judgment was entered in |
| 23 | 2012 based on common law, and under the common law of the state |
| 24 | of New York, for example, many of those plaintiffs would not |
| 25 | recover money.  Many of them would not get solatium damages. |

M4qWashC

1    So I'd like the opportunity to address that issue with the

2    Court.

3              And in addition, I just want to tell your Honor that I

4    think the suggestion that a special master here would help to

5    get together with the plaintiffs' attorneys to ensure an

6    equitable distribution is something that should be thoroughly

7    considered.  Both judges sitting on the bench today worked so

8    hard for us, and this issue seems to be a subset of what's

9    going on overall in the litigation.  So I just would like you

10   to consider fairness and equity and remove some of the fear of

11   some of the family members.

12             Thank you.

13             JUDGE NETBURN:  I'll just note that I've received your

14   letter application.  I haven't acted on it.  We will shortly.

15             Anyone else want to be heard?

16             JUDGE DANIELS:  Ms. Benett.

17             MS. BENETT:  Just briefly.

18             JUDGE NETBURN:  Sure.

19             MS. BENETT:  Sorry.  One final suggestion from us.

20             I heard Judge Daniels on the 24 hours with respect to

21   our pending class complaint.  I'd ask if the Court might let us

22   provide a short letter explanation of how that particular

23   vehicle could work in a proceeding like this, specifically

24   thinking of this now in light of Mr. Schutty's concerns raised

25   in his letter and in his statements, that there is --

M4qWashC

1      JUDGE DANIELS:  I have no interest in pursuing that

2      option.

3      MS. BENETT:  OK.  I was going to offer the opportunity

4      to explain a little bit of the procedural aspects of it.

5      JUDGE DANIELS:  There's nothing that you can say that

6      would convince me that rather than proceed in this MDL under

7      this turnover order, that the alternative would be that we

8      adopt the complaint that you have filed.

9      MS. BENETT:  I hear you, Judge.  Thank you.

10     JUDGE NETBURN:  All right.  I'm going to turn down the

11     heat a little bit and talk about briefing schedules.

12     I understand that there's an issue related to the

13     various amici that have filed briefs.  I'm going to set a

14     deadline of this Friday, which is April 29, for any other amici

15     who wishes to be heard to file their leave application.  I

16     think at this point we have about five, and we will be generous

17     in allowing appropriate amici to be heard if they wish.

18     So April 29 will be the deadline for any potential

19     other amici, who might be listening in or here in the

20     courtroom, to file any leave application.  And I know that the

21     Havlish creditors had proposed a more extensive briefing

22     schedule.  The Court really wants to move on this, as I imagine

23     everybody else does.  So my proposal is that any opposition

24     that the Havlish and Doe creditors wish to file or a response

25     be set at May 13.

M4qWashC

1              Any objection to that schedule?

2              All right.  Hearing none, the deadline -- we'll issue

3      an order today.  Just to put it out on the record, the deadline

4      for any amici who wish to file an amicus brief will be April

5      29, and anyone who wishes to respond to those amicis, the

6      merits of their briefs, will be due May 13.

7              All right.  Anything further from anyone?

8              JUDGE DANIELS:  All right.  We're working hard.  We

9      encourage your assistance and your input.  It makes a big

10     difference, particularly -- and it's interesting that by the

11     time we read the letters that you've sent us, we've already

12     discussed half the issues that are in your letters, so it gives

13     me some comfort that we're approaching this in the appropriate

14     way and we'll be able to expeditiously make some decisions

15     about this.

16             Obviously, the Court is not in a position to give any

17     plaintiff a guarantee that they will recover these funds or any

18     funds and the extent to which they will recover.  But I

19     guarantee you that our main goal is to make sure that all

20     plaintiffs can recover as much of the available funds as

21     possible in an equitable way.

22             Now, whether or not we face other legal hurdles with

23     regard to priority or with regard to other issues that might

24     affect that, we will confront them and we will address them.

25     But it is our intent, to the extent, consistent with the law as

M4qWashC

1    we can apply it, to make sure that all plaintiffs get some

2    degree of satisfaction.  Obviously, no plaintiff in any case

3    can be made whole.  Nobody can bring back a deceased relative.

4    Nobody can undo the damage that has been done, but we are

5    focused on figuring out, and we continue to focus on figuring

6    out, what actual funds might be available, what actual funds

7    could be distributed, and what is a reasonable and equitable

8    way to distribute those funds.

9            We still seek your guidance on that.  We'll give

10   further consideration as we go through the turnover proceedings

11   as to whether or not we should initiate at this point a

12   process, if the parties agree they would like a special master

13   to look at those issues, but I can guarantee you that we will

14   give you a full opportunity to be heard, as we have given you a

15   full opportunity to be heard, on these issues -- the issues of

16   the availability of funds and the issue of who is entitled to

17   some of those funds and what would be the appropriate way to

18   distribute available funds, not just the funds at issue here

19   but any funds.

20           We know we're setting a framework for any other funds

21   that might be available in the future and the parties will seek

22   a distribution of those funds.  So be assured that any concerns

23   that you have about certain issues, the appropriate way to

24   address them is to bring them to the attention of this Court

25   and to have the other side -- anyone who disagrees with your

M4qWashC

1    position -- be able to weigh in in this proceeding, in this MDL

2    proceeding.  And we will fairly and, hopefully, efficiently

3    move forward and give you some assurance that although we give

4    no one any guarantees that you will be satisfied with the

5    ultimate result, we can give you assurance that you will all be

6    heard.  Your positions will be considered, and we will make the

7    best decision that we can.

8            My position is always this -- that the best decisions

9    aren't made by smart people.  They're made by informed people.

10   Give us the information that you think is compelling, and we

11   will factor it in.  When we make mistakes, we usually say, Oh,

12   if I'd only known X.  Right?

13           So keep us informed.  To the extent that you genuinely

14   want to assist us, we encourage you to do so.  To the extent

15   that you just want to simply advantage your own client, we are

16   deciding these cases on their merits, not on any other basis.

17   So keep that in mind.

18           I think it was important for us to meet here.  If

19   there are other issues that this raises or that come up, bring

20   them to our attention right away.  As I say, despite everything

21   else that we're doing, literally we're in contact almost on a

22   daily basis at this point with regard to these issues so we can

23   move forward efficiently and give you a result that maybe not

24   everyone will be total satisfied with, but hopefully a result

25   that you can understand, that is a reasoned judgment,

M4qWashC

1    consistent with the law, as to how you should participate in

2    distribution of funds and what the relationship is between the

3    plaintiffs.

4         My final reminder is you are all plaintiffs.  Your

5    clients are all victims.  OK?  That's what should be driving

6    everyone here.  That's what drives us as we're addressing these

7    issues.  Right now, everyone before this Court is on an equal

8    footing, and everyone should consider when you make your

9    arguments whether those arguments support everyone's position

10   or whether those arguments simply support your position or

11   whether those arguments disadvantage some at the expense of

12   others, because that's the first evaluation that I'll have with

13   regard to your conduct, your applications, and your filings.

14        Remember, this is the forum that we're going to

15   resolve these issues.  That's the bottom line of this

16   proceeding.  We're going to resolve it here, not before Judge

17   Caproni, not before some other judge in this court, not in some

18   other duplicative proceeding that is to address the same issues

19   that we are already addressing here.  Regardless of what any

20   party believes, it is a more efficient, effective and

21   advantageous way for us to proceed.

22        We've laid out the process and we're going to stick

23   with that process, and as far as I'm concerned, that process is

24   working.  It will hopefully, and I'm confident it will, give us

25   the best result that we could possibly reach on behalf of the

M4qWashC

1    plaintiffs and victims that have the true interest in this
2    litigation.
3            Thank you very much.
4            Let's move forward, and we will proceed efficiently.
5    If there are any other issues that need to be addressed with
6    regard to any of these claims -- of liability or damages --
7    obviously, my position is they should be raised with this Court
8    on notice to all the other parties, either jointly or having an
9    opportunity to disagree.
10           Thank you all very much.  And we will continue.
11           (Adjourned)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re Terrorist Attacks on September 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |
| Federal Insurance Company, et al., | Case No. 03-cv-6978 (GBD)(SN) |
|      Creditors, | |
| v. | |
| The Taliban, et al., | |
|      Debtors, | |
| Federal Reserve Bank of New York, | |
|      Garnishee. | |

## MEMORANDUM OF LAW IN SUPPORT OF THE
## *FEDERAL INSURANCE* CREDITORS' MOTION FOR PARTIAL TURNOVER OF
## ASSETS FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK

APRIL 29, 2022

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

I. Introduction ..................................................................................................... 2

II. Background ....................................................................................................... 4

    A. Factual Background ................................................................................. 4

        1. Background On Pre-Judgment Proceedings.............................. 4

        2. Changes In Afghanistan And Its Central Bank ......................... 5

        3. Turnover Proceeding And *Federal Insurance* Writ Enforcement Procedural History .......................................................................................... 9

    B. Statutory And Regulatory Background .................................................... 9

        1. The Taliban And The Federal Sanctions Regime ..................... 9

        2. TRIA ...................................................................................... 11

III. Legal Standard ................................................................................................ 12

IV. Argument ........................................................................................................ 14

    A. The Taliban Is A Terrorist Party Within The Meaning Of TRIA ................. 15

    B. The *Federal Insurance* Creditors Have A Judgment Against The Taliban Based On An Act Of Terrorism ....................................................................... 15

    C. The DAB Assets Are "Blocked Assets" Within The Meaning Of TRIA........ 16

    D. The DAB Assets Are Blocked Assets Of DAB, Which Is An Agency Or Instrumentality Of The Taliban .......................................................... 16

        1. DAB Holds The DAB Assets.................................................. 17

        2. DAB Is An Agency Or Instrumentality Of The Taliban Under TRIA .................... 17

        3. Treating DAB As An Agency Or Instrumentality Of The Taliban Is Consistent With Binding Case Law, Statutory Text, And Congressional Purpose .................. 20

        4. Alternatively, DAB Is The Taliban's Alter Ego ...................... 24

    E. The *Federal Insurance* Creditors Are Entitled To The DAB Assets ............ 24

    F. The *Federal Insurance* Creditors' Writ Is At Worst Third In Line For Purposes Of Priority..................................................................................... 24

V. Conclusion ...................................................................................................... 25

# TABLE OF AUTHORITIES

<div align="right">**Page(s)**</div>

**CASES**

*Bennett v. Islamic Republic of Iran*,
 618 F.3d 19 (D.C. Cir. 2010) ................................................12

*Caballero v. FARC*,
 No. 20-CV-1939, 2021 WL 6339256 (D. Conn. Jan. 14, 2021) ................................20, 23, 24

*Caballero v. FARC*,
 No. 20-MC-0040, 2021 WL 307558 (W.D.N.Y. Jan. 29, 2021) ......................................22-23

*Caballero v. FARC*,
 No. 18-CV-25337, 2021 WL 3927826 (S.D. Fla. Aug. 24, 2021) ........................20

*Clark v. Martinez*,
 543 U.S. 371 (2005)................................................22

*Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*,
 423 F. Supp. 3d 45 (S.D.N.Y. 2019)................................13

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*,
 879 F.3d 462 (2d Cir. 2018)................................................13, 25

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*,
 919 F. Supp. 2d 411 (S.D.N.Y. 2013)................................14, 24

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,
 304 F. Supp. 2d 232, 241 (D.R.I. 2004)................................20

*Harrison v. Republic of Sudan*,
 802 F.3d 399 (2d Cir. 2015), *rev'd on other grounds*, 139 S. Ct. 1048 (2019)................13, 24

*Hausler v. JP Morgan Chase Bank, N.A.*,
 127 F. Supp. 3d 17 (S.D.N.Y. 2015)................................14, 17, 24

*Hill v. Republic of Iraq*,
 No. 99-CV-3346, 2003 WL 21057173 (D.D.C. Mar. 11, 2003) ............................24

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak
 Dan Gas Bumi Negara ("Pertamina")*,
 313 F.3d 70, 86 (2d Cir. 2002)................................17

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
 830 F.3d 107 (2d Cir. 2016), *abrogated on other grounds by
 Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ................................ *passim*

*Miller v. City of Ithaca*,
    No. 10-CV-597, 2019 WL 2502712 (N.D.N.Y. June 17, 2019).............................17

*Phoenician Trading Partners LP v. Iseson*,
    No. 04-CV-2178, 2004 WL 3152394 (E.D.N.Y. Dec. 11, 2004) ...............................2

*Schneider v. National R.R. Passenger Corp.*,
    72 F.3d 17 (2d Cir. 1995).......................................................................................9

*Smith v. Federal Rsrv. Bank of N.Y.*,
    280 F. Supp. 2d 314 (S.D.N.Y. 2003), *aff'd*, 346 F.3d 264 (2d Cir. 2003) ................12, 21, 25

*Stansell v. FARC*,
    771 F.3d 713 (11th Cir. 2014) .............................................................................18

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*,
    982 F. Supp. 2d 830 (N.D. Ill. 2013),
    *vacated and remanded on other grounds,* 783 F.3d 607 (7th Cir. 2015) ...............15

*United States v. Santos*,
    553 U.S. 507 (2008) (plurality opinion) ...............................................................22

*Weininger v. Castro*,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006).......................................................12, 14, 24

*Weinstein v. Islamic Republic of Iran*,
    609 F.3d 43 (2d Cir. 2010)...............................................................12, 16, 17, 24

**STATUTES AND RULES**

8 U.S.C. § 1182(a)(3)(B)(iii) ...................................................................... 15-16

Fed. R. Civ. P. 69(a) ..................................................................................2, 12

Foreign Sovereign Immunities Act of 1976,
    Pub L. No. 94–583, 90 Stat. 2891 (codified at 28 U.S.C. § 1602 *et seq.*)............12, 21, 22, 23

International Emergency Economic Powers Act,
    Pub. L. No. 95–223, 91 Stat. 1625 (codified at 50 U.S.C. § 1701 *et seq.*)..............9, 10, 16, 25

Terrorism Risk Insurance Act of 2002 § 201,
    Pub. L. No. 107–297, 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note) .................... *passim*

N.Y. C.P.L.R. § 5225 ..........................................................................2, 12, 13, 24

N.Y. C.P.L.R. § 5227 ....................................................................................2

N.Y. C.P.L.R. § 5232 ....................................................................................9

**App.426**

N.Y. C.P.L.R. § 5234 ..................................................................................................25

**LEGISLATIVE MATERIALS**

148 Cong. Rec. S11524 (daily ed. Nov. 19, 2002) ......................................................12

H. DOC. NO. 106-268 (2000)....................................................................4, 10, 18, 20

H. DOC. NO. 107-16 (2001)....................................................................................10, 23

H. REP. NO. 107-779 (2002) (Conf. Rep.) ..................................................................12

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

31 C.F.R. § 594.201 ....................................................................................................11

31 C.F.R. § 594.310 ..............................................................................................11, 15

31 C.F.R. § 594.311 ....................................................................................................15

31 C.F.R. § 594.312 ....................................................................................................25

Background Press Call by Senior Admin. Officials on U.S. Support for the People
of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/
briefing-room/statements-releases/2022/02/11/background-press-call-on-u-s-
support-for-the-people-of-afghanistan ..................................................................2, 8

Exec. Order No. 13,129, 64 Fed. Reg. 36,759 (July 7, 1999).....................................10

Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) .................................10

Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002)...............................11, 15

Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022) ............................. *passim*

Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking
Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-
center/press-releases/Pages/po943.aspx............................................................10, 18

**OTHER AUTHORITIES**

Brief of the United States in Response to Plaintiffs' Motion to Compel,
*Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169
(D.D.C. Feb. 2, 2005), 2005 WL 3518010, ECF No. 4 ........................................15

Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on
the Taliban*, N.Y. Times (Aug. 18, 2021), https://www.nytimes.com/
2021/08/18/business/afghan-central-bank.html ......................................................6

App.427

Order, *Caballero v. FARC*, No. 20-MC-0040 (W.D.N.Y. Dec. 18, 2020),
ECF No. 15 ...................................................................................................................23

Reuters, *Taliban Name New Afghan Government, Interior Minister on U.S.
Sanctions List* (Sept. 7, 2021), https://www.reuters.com/world/india/taliban-
fire-air-scatter-kabul-protesters-no-reports-injuries-2021-09-07/ ...........................................8

Charlie Savage, *Spurning Demand by the Taliban, Biden Moves to Split $7 Billion in
Frozen Afghan Funds*, N.Y. Times (Feb. 11, 2022), https://www.nytimes.com/
2022/02/11/us/politics/taliban-afghanistan-911-families-frozen-funds.html ...........................2

Siegel, *New York Practice*, § 497 (6th ed.)....................................................................................9

Jeff Stein, *Biden Administration Freezes Billions of Dollars in Afghan Reserves,
Depriving Taliban of Cash*, Wash. Post (Aug. 17, 2021), https://www
.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/ ..............3, 8

Karin Strohecker et al., *Analysis: Afghan Central Bank's $10 Billion Stash Mostly
Out Of Taliban's Reach*, Reuters (Aug. 18, 2021), https://www.reuters.com/
world/asia-pacific/afghan-central-banks-10-billion-stash-not-all-within-reach-
taliban-2021-08-17/.....................................................................................................................3, 6

Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban
Takeover in Afghanistan: Frequently Asked Question*s (2021),
https://crsreports.congress.gov/product/pdf/R/R46879 .............................................................6

Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan:
Background and Issues for Congress* (2021), https://crsreports.congress.gov/
product/pdf/R/R46955 ................................................................................................................8

Judgment Creditors *Federal Insurance Co., et al.* (the "*Federal Insurance* Creditors"), by and through their undersigned counsel, respectfully submit this memorandum of law in support of their Motion for Partial Turnover of Assets from Garnishee the Federal Reserve Bank of New York ("FRBNY"). This motion does not seek turnover of assets solely for the benefit of the *Federal Insurance* Creditors, but rather for the benefit of all members of the 9/11 Community participating in the Framework Agreement described in the letter filed at ECF No. 7790. Every group of MDL plaintiffs pursuing Taliban judgments was provided the opportunity to participate in the Framework Agreement, and the vast majority of plaintiffs (over 9,400, by the estimation of the Framework Agreement Plaintiffs) have agreed to do so. Only the *Ashton* Plaintiffs have refused.

Funds turned over pursuant to this motion and that of the *Havlish* Creditors will be distributed in accordance with the Framework Agreement, resulting in a single event distribution in excess of $1 billion to 9/11 Community members who do not yet have final judgments against the Taliban. This would represent the largest single distribution to the 9/11 Community, exceeding the amounts distributed to the 9/11 Community in any of the Victims of State Sponsored Terrorism Fund tranches. By using the *Federal Insurance* Creditors' judgment and writ to secure turnover for the benefit of the broader 9/11 Community, the Framework Agreement cuts through a range of complexities posed by the disparate procedural status of the Taliban claims, enabling broad participation by plaintiffs who do not yet have final judgments (some of whom are several steps away from being able to secure them). Turnover of the assets at issue in this motion will enable this manifestly fair and equitable result, achieved through the thoughtful engagement of counsel for all of the Framework Agreement participants.

## I.     Introduction

On February 11, 2022, the President of the United States took a series of coordinated actions intended both to benefit the "welfare of the people of Afghanistan"[1] and to "clear a legal path" for the resolution of legal claims by U.S. victims of terrorism against the Taliban.[2] According to the White House, the steps were intended to permit U.S. claimants "a full opportunity to have their claims heard in U.S. courts."[3] Among other things, the steps taken that day blocked the property of Da Afghanistan Bank ("DAB") at the Federal Reserve Bank of New York ("FRBNY"), ensuring that the property is subject to execution under the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322.

As a result, the *Federal Insurance* Creditors now move this Court, pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. §§ 5225(b) and 5227,[4] and Section 201 of TRIA for an order compelling the FRBNY to turn over to the *Federal Insurance* Creditors those blocked assets of DAB in its possession (the "DAB Assets"), which are not found to be subject to turnover to other creditors with priority, to partially satisfy the compensatory damages for which the Taliban has been adjudged liable. The *Federal Insurance* Creditors' compensatory damages amount to $14,672,806,120.64. Decl. of Sean P. Carter ISO Mot. for Partial Turnover ("Carter Decl.") ¶ 9.

The DAB Assets are subject to execution under TRIA. TRIA applies in cases where "a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism."

---

[1] Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022).

[2] Charlie Savage, *Spurning Demand by the Taliban, Biden Moves to Split $7 Billion in Frozen Afghan Funds*, N.Y. Times (Feb. 11, 2022), https://www.nytimes.com/2022/02/11/us/politics/taliban-afghanistan-911-families-frozen-funds.html.

[3] Background Press Call by Senior Admin. Officials on U.S. Support for the People of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/background-press-call-on-u-s-support-for-the-people-of-afghanistan/.

[4] Because Sections 5225 and 5227 are "essentially interchangeable," it is common practice to move for a turnover order under both provisions. *See Phoenician Trading Partners LP v. Iseson*, No. 04-CV-2178, 2004 WL 3152394, at *3 (E.D.N.Y. Dec. 11, 2004) (citation omitted).

TRIA § 201(a). The *Federal Insurance* Creditors have obtained a judgment against a terrorist party, the Taliban, on a claim based on an act of terrorism, the September 11, 2001 attacks. Under Section 201 of TRIA, they may therefore execute against assets of the Taliban or its agencies or instrumentalities—like DAB.

It is undisputed that the Taliban has taken control of DAB, and it is binding law that an entity controlled by a terrorist party is an agency or instrumentality of that terrorist party under TRIA. It is also undisputed that DAB has a property interest in its account at the FRBNY, which now holds no less than $3.5 billion dollars in assets.[5] Because the Taliban now has an interest in these assets through its agency or instrumentality, DAB, they are subject to execution to the extent of the *Federal Insurance* Creditors' compensatory damages under TRIA and state law. Notably, the United States does not say otherwise. *See Havlish* Dkt. 563 ("U.S. Statement") 19-20.

The United States raises several questions in its Statement of Interest related to the nearly unprecedented situation at issue. The circumstances giving rise to this motion are indeed highly unusual: A terrorist group seized control of a central bank and is now using that institution for its own purposes, potentially including the facilitation of further acts of terrorism.[6] The only similar circumstances in memory occurred when the same terrorist group seized control of the same central bank in the 1990s and used it for its own purposes—including the facilitation of acts of terrorism.

---

[5] Carter Decl., Ex. 5; Karin Strohecker et al., *Analysis: Afghan Central Bank's $10 Billion Stash Mostly Out Of Taliban's Reach*, Reuters (Aug. 18, 2021), https://www.reuters.com/world/asia-pacific/afghan-central-banks-10-billion-stash-not-all-within-reach-taliban-2021-08-17/; *see also* Carter Decl. ¶¶ 3-7 & Ex. 3 (DAB held nearly $6 billion at the FRBNY at the end of 2020).

The United States ordered even more of DAB's property—all of its property in the United States—to be consolidated at the FRBNY. Exec. Order No. 14,064 § 1(b). On February 25, 2022, the Court issued an order permitting the transfer of $3.5 billion of DAB's assets out of the Fed, subject to the terms of OFAC License No. DABRESERVES-EO-2022-886895-1. *Havlish* Dkt. 585.

[6] Carter Decl., Ex. 7, Decl. of Alex B. Zerden ("Zerden Decl.") ¶¶ 39–43, 144–145. Because of these circumstances, the United States cut off the Taliban's ability to withdraw DAB funds on account at the FRBNY last August. Jeff Stein, *Biden Administration Freezes Billions of Dollars in Afghan Reserves, Depriving Taliban of Cash*, Wash. Post (Aug. 17, 2021), https://www.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/.

Then, the same facts led the United States to conclude that DAB was "controlled by the Taliban" and to find that the Taliban "ha[d] an interest" in DAB. H. Doc. No. 106-268, at 4 (2000). But despite this case's extraordinary facts, what the law requires is rather ordinary: the reasoned application of settled law. As described further below, this Court can and should adjudicate this motion under binding law. Notably, it can (and should) do so without any need to address any novel or complex issues that implicate difficult constitutional questions or unsettled legal standards.

For the last twenty years, the *Federal Insurance* Creditors, working alongside the families of those murdered in the terrorist attacks of September 11, 2001 and survivors of those attacks, have sought through this litigation to hold parties who aided and abetted al Qaeda and provided material support and resources to that terrorist organization accountable. Among others, the *Federal Insurance* Creditors have sought to hold the Taliban accountable, for its role in providing bin Laden and al Qaeda with a base of operations and safe harbor in Afghanistan in order to plot, train for, and commit the atrocities of 9/11. The Taliban has maintained its close relationship with al Qaeda ever since, and is now once again in control of Afghanistan and DAB.

## II.    Background

### A.    Factual Background

#### 1.    Background On Pre-Judgment Proceedings

The factual and procedural background giving rise to the *Federal Insurance* judgment is well known to the Court and is provided here in only the most summary fashion. *See, e.g.*, ECF No. 7498 (detailing history of *Federal Insurance* judgment efforts). On September 11, 2001, Osama bin Laden and al Qaeda committed the most heinous act of terrorism in the history of this nation. The terrorist organization known as the Taliban provided material support to al Qaeda

App.432

before that day in territory under its control in Afghanistan, including through its control of DAB.[7]
The *Federal Insurance* Creditors incurred billions in losses as a result of the attacks, pursuant to
payments to their insureds in compensation for injuries and losses resulting from the attacks. On
April 7, 2006, this Court ordered the entry of default judgment as to liability against, *inter alia*,
the Taliban on the *Federal Insurance* Creditors' claims. *Fed. Ins.* Dkt. No. 626. In subsequent
proceedings, the Court conducted a thorough assessment of damages and determined that the
*Federal Insurance* Creditors were entitled to compensatory and trebled damages. *See, e.g.*, ECF
Nos. 2479, 2502, 2538, 2582, 2583. By letter dated March 22, 2022, the *Federal Insurance*
Creditors, along with the *Havlish* Creditors and the *Burnett*, *O'Neill*, *Hoglan*, *Grazioso*, *Ray*, and
*Ryan* Plaintiffs, advised the Court that they had reached a Framework Agreement for distribution
of DAB assets deemed subject to turnover, which would provide broad compensation to 9/11
plaintiffs pursuing claims against the Taliban, and obviate the need for the Court to parse through
thousands of procedurally disparate claims. ECF Nos. 7790, 7817 n.1. On April 20, 2022, the
Court entered final judgment in favor of the *Federal Insurance* Creditors and against the Taliban,
along with prejudgment interest at a rate of 4.96%, compounded annually, from September 11,
2001 through the date the order of judgment was entered. ECF No. 7888. Today, the *Federal
Insurance* Creditors hold outstanding judgments for compensatory damages in the amount of
$14,672,806,120.64, Carter Decl. ¶ 9.

### 2. Changes In Afghanistan And Its Central Bank

DAB holds substantial asset reserves in accounts in foreign central banks, including at the
FRBNY. As of August 15, 2021, approximately $7 billion of DAB's asset reserves were held at

---

[7] Zerden Decl. ¶¶ 19–27, 40.

the FRBNY.[8]  On Sunday, August 15, 2021, as the United States was completing its withdrawal from Afghanistan, the former government of Afghanistan collapsed and its leaders fled the country.[9] The Taliban arrived in the capital city of Kabul and quickly took physical and operational control of certain Afghan offices, agencies, and instrumentalities for its own benefit.[10] Most significantly for present purposes, the Taliban takeover of facilities in Kabul included taking control of DAB.[11]

The Taliban now completely controls DAB.[12] Control is exercised and evidenced in several ways, including through DAB's new leadership. One of the Taliban's first acts in Kabul was installing, as DAB's Acting Governor, a staunch Taliban loyalist whose only prior financial experience was serving as head of the Taliban's finance commission—a body the Taliban tasked with managing money from narcotics trafficking and collecting illegal taxes the Taliban collected from businesses and farmers in areas where the Taliban ran shadow governments.[13] The Taliban also installed as the First and Second Deputy Governors, the number two and three leadership positions at DAB, individuals who are individually sanctioned by the United States, the United Nations, and others for terrorist activities undertaken as members of the Taliban.[14] DAB's

---

[8] *See* Carter Decl., Ex. 5; Strohecker, *supra* note 5; Eshe Nelson & Alan Rappeport, *U.S. and I.M.F. Apply a Financial Squeeze on the Taliban*, N.Y. Times (Aug. 18, 2021), https://www.nytimes.com/2021/08/18/business/afghan-central-bank.html; *see also* Carter Decl. ¶¶ 3–7 & Ex. 3 (DAB held nearly $6 billion at the FRBNY at the end of 2020).

[9] *See* Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban Takeover in Afghanistan: Frequently Asked Questions* 10, 12–13 (2021), https://crsreports.congress.gov/product/pdf/R/R46879.

[10] Zerden Decl. ¶¶ 39–40; Thomas, *supra* note 9, at 10, 13–14.

[11] Zerden Decl. ¶¶ 39, 49; *see* Thomas, *supra* note 9, at 40.

[12] Zerden Decl. ¶ 51.

[13] Zerden Decl. ¶¶ 54–58 (concerning Haji Mohammed Idris, DAB's Acting Governor).

[14] Noor Ahmad Agha is DAB's First Deputy Governor. He was sanctioned for his activities as the leader of the Taliban's military council and as a finance officer. Among other things, Agha had responsibilities for financing Taliban commanders and funding improvised explosive devices. Zerden Decl. ¶¶ 59–72. Abdul Qadeer Ahmad is DAB's Second Deputy Governor. He was sanctioned for, among other things, providing funds to Taliban commanders who carried out terrorist attacks in Afghanistan, collecting financial aid from the Taliban's domestic and foreign

organizational structure assigns those sanctioned terrorists significant operational and management responsibilities.[15] By means of example, DAB's First Deputy Governor, sanctioned terrorist Noor Ahmad Agha, is now charged with supervising DAB's countering terrorist financing functions, among others.[16]

The Taliban permeates every level of DAB. The Taliban is driving essential technical experts who work for DAB out of the country[17] and replacing them with loyalists who do not have the requisite education, experience, and expertise to operate a central bank independently and competently.[18] Many DAB staff remain at the bank only because the Taliban compels them to work.[19] The private business sector reports encountering more and more frequently Taliban-affiliated staff at all levels of DAB.[20]

The Taliban Council of Ministers' open control over DAB removes any illusion that DAB is or can be independent of the Taliban.[21] The Council of Ministers consists of the heads of all Taliban government ministries, and, like DAB's leadership, includes individuals sanctioned for

---

sponsors, distributing funds to Taliban shadow governors, and collecting Taliban revenues from narcotics trafficking. *Id.* at ¶¶ 73–82.

[15] Zerden Decl. ¶¶ 59, 73.

[16] Zerden Decl. ¶ 69.

[17] Zerden Decl. ¶ 101.

[18] Zerden Decl. ¶¶ 85–91; 136–137, 138(f).

[19] Zerden Decl. ¶¶ 85–91.

[20] Zerden Decl. ¶ 85.

[21] Zerden Decl. ¶¶ 92, 139.

Taliban terrorist activities.[22] The Council of Ministers has directed DAB policy.[23] The Taliban's

Deputy Prime Minister has chaired meetings at DAB.[24]

On the same day the Taliban took control of Afghanistan's capital, including the facilities

of DAB, the United States locked down DAB's assets at the FRBNY to prevent them from being

withdrawn by a Taliban-controlled DAB or otherwise transferred to the Taliban.[25]

On February 11, 2022, President Biden signed an executive order designating "[a]ll

property and interests in property of DAB that are held, as of the date of this order, in the United

States by any United States financial institution, including the Federal Reserve Bank of New York,

a[s] blocked[.]" Exec. Order No. 14,064 § 1(a). The Order further provides that all U.S. financial

institutions must transfer all property and interests in property of DAB in the United States to the

FRBNY. *Id.* § 1(b). Contemporaneously with the issuance of that Order, the Government issued a

license through the Treasury Department's Office of Foreign Assets Control which authorizes,

directs, and compels the FRBNY, upon further instructions, to transfer up to $3.5 billion of DAB's

blocked assets "for the benefit of the people of Afghanistan, or to a United Nations fund,

programme, specialized agency, or other entity or body for the benefit of the people of

Afghanistan." *Havlish* Dkt. 563-2 at 2. The remainder of the blocked assets were left behind so

that victims of terrorism, using TRIA, could "have their claims heard in U.S. courts."[26]

---

[22] Zerden Decl. ¶¶ 93, 130; *see also* Reuters, *Taliban Name New Afghan Government, Interior Minister on U.S. Sanctions List* (Sept. 7, 2021), https://www.reuters.com/world/india/taliban-fire-air-scatter-kabul-protesters-no-reports-injuries-2021-09-07/.

[23] Zerden Decl. ¶¶ 92, 139.

[24] Zerden Decl. ¶¶ 94–95, 139.

[25] *See* Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan: Background and Issues for Congress* 39 (2021), https://crsreports.congress.gov/product/pdf/R/R46955; Stein, *supra* note 6.

[26] White House, *supra* note 3.

### 3. Turnover Proceeding and *Federal Insurance* Writ Enforcement Procedural History

In late summer 2021, plaintiffs in *Havlish, et al. v. The Taliban, et al.,* Case No. 1:03-cv-09848 (GBD) (SN) the "*Havlish* Creditors"), and *John Does 1 Through 7 v. The Taliban, et al.*, Misc. Action No. 1:20-mc-00740 (GBD) (SN) (the "*Doe* Creditors"), levied writs of execution against the DAB Assets pursuant to judgments against the Taliban. The *Havlish* and *Doe* Creditors moved for partial turnover of the DAB assets on March 20, 2022. The turnover proceedings are pending before this Court.

The *Federal Insurance* Creditors obtained a writ of execution from this court against the DAB assets at the FRBNY on April 20, 2022. *Federal Insurance* April 20, 2022 Minute Order; Carter Decl. Ex. 1. That writ was delivered that same day to the officer with jurisdiction to levy,[27] the U.S. Marshal for the Southern District of New York. Carter Decl. ¶ 2 & Ex. 2. The Marshal levied against DAB's assets at the FRBNY by service of the writ on the FRBNY on April 21, 2022.[28] Carter Decl. ¶ 3 & Ex. 2.

### B. Statutory And Regulatory Background

### 1. The Taliban And The Federal Sanctions Regime

Congress enacted the International Emergency Economic Powers Act ("IEEPA"), Pub. L. No. 95–223, 91 Stat. 1625, 50 U.S.C. § 1701 *et seq.*, at the end of 1977. The law provides that whenever the United States is faced with an "unusual and extraordinary threat . . . to [its] national security, foreign policy, or economy" which "has its source in whole or substantial part outside

---

[27] *See Schneider v. National R.R. Passenger Corp.*, 72 F.3d 17, 18–19 (2d Cir. 1995).

[28] Levy was accomplished by service because the FRBNY has refused to turn DAB's assets over to the Marshal. N.Y. C.P.L.R. § 5232(a) (property not capable of delivery is levied upon service by marshal). This is precisely the sort of case where levy by service is appropriate. *See also* Siegel, *New York Practice*, § 497 (6th ed.) ("Any situation in which the sheriff cannot readily lay hands on the property interest involved, and by some means take immediate actual or at least constructive custody of it, should be deemed to involve property 'not capable of delivery' and therefore to permit levy by service under subdivision (a) of CPLR 5232[.]").

9

the United States," the President may "declare[] a national emergency with respect to such threat" and implement measures to regulate international economic transactions. 50 U.S.C. § 1701.

The Taliban is an Islamic fundamentalist terrorist group that has twice taken control of territory and institutions in Afghanistan, including DAB. The first time the Taliban did so, in the late 1990s, President Clinton declared a national emergency and exercised his power under IEEPA to block (1) "all property or interests in property of the Taliban," (2) all property or interests in property of anyone determined by the executive "to be owned or controlled by" or "to act for or on behalf of" the Taliban, and (3) all property or interests in property of anyone found "to provide financial, material, or technological support for, or services in support of" anyone owned, controlled by, or acting for or on behalf of the Taliban. Exec. Order No. 13,129 § 1, 64 Fed. Reg. 36,759 (July 7, 1999). Months later, the administration added DAB to the list of persons blocked under this order. H. DOC. NO. 106-268, at 4; *see also* H. DOC. NO. 107-16, at 4 (2001) (same). In his report to Congress, President Clinton stated that DAB "ha[s] been found to be controlled by the Taliban, and to be [an] entit[y] in which the Taliban has an interest." *Id.* Notably, the United States did not recognize the Taliban as the government of Afghanistan but nevertheless recognized that the Taliban controlled DAB (even though DAB was Afghanistan's central bank).[29]

After the September 11 attacks, President George W. Bush took immediate action pursuant to IEEPA to block terrorists from accessing any property in the United States or within the control of any U.S. person. On September 23, 2001, he directed that "all property and interests in property" in the United States in which certain identified terrorists had any interest were henceforth blocked. Exec. Order No. 13,224 § 1, 66 Fed. Reg. 49,079. Nine months later, he added the Taliban to the

---

[29] *See* Press Release, U.S. Dep't of Treasury, Treasury Signs License Unblocking Frozen Afghan Assets (Jan. 24, 2002), https://www.treasury.gov/press-center/press-releases/Pages/po943.aspx. After the fall of the Taliban at the end of 2001, the Treasury Department issued a license authorizing the new Afghan government to access the DAB assets. *Id.*

list of persons blocked pursuant to that order, thereby deeming the Taliban a "Specially Designated Global Terrorist" or "SDGT." Exec. Order No. 13,268 § 1, 67 Fed. Reg. 44,751 (July 2, 2002); 31 C.F.R. §§ 594.201(a), 594.310. The Taliban remains a blocked person and an SDGT to this day.

## 2. TRIA

Shortly after the September 11 attacks, Congress became frustrated with the executive's longstanding sanctions rules that had the effect of preventing enforcement of money judgments issued to victims of terrorism against the assets of terrorist groups. Congress enacted a new law with the specific purpose of allowing victims of terrorism with final judgments against terrorist parties to obtain relief from blocked terrorist funds. Terrorism Risk Insurance Act of 2002 ("TRIA") § 201, Pub. L. No. 107–297, 116 Stat. 2322, 2337–2340 (codified at 28 U.S.C. § 1610 note). TRIA provides in operative part that:

> *Notwithstanding any other provision of law,* and except as provided in subsection (b), in every case in which a person has obtained a *judgment against a terrorist party* on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7)], the blocked assets of that terrorist party (*including the blocked assets of any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

*Id.* § 201(a) (emphasis added).

As Senator Tom Harkin, one of the primary sponsors of TRIA, explained: "The purpose of [Section 201] is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties. . . . [TRIA] establishes once and for all, that such judgments are to be enforced against any assets available in the U.S., and that *the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly*

11

*provided in this act.*" *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (quoting 148 Cong. Rec. S11524, S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin)) (emphasis added). The conference committee's report echoed this theme: "The purpose of Section 201 is to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties. It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced." H. REP. No. 107-779, at 27 (2002) (Conf. Rep.).

It is settled law that TRIA preempts the Foreign Sovereign Immunities Act ("FSIA"). *Smith v. Federal Rsrv. Bank of N.Y.*, 280 F. Supp. 2d 314, 319 (S.D.N.Y. 2003) ("[T]o the extent that a foreign country's sovereign immunity potentially conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict."), *aff'd*, 346 F.3d 264 (2d Cir. 2003); *Weininger v. Castro*, 462 F. Supp. 2d 457, 477, 488 (S.D.N.Y. 2006) (TRIA overrode FSIA immunity for Central Bank of Cuba); *accord Bennett v. Islamic Republic of Iran,* 618 F.3d 19, 21 (D.C. Cir. 2010); *see also* U.S. Statement 10 ("When its conditions are satisfied, TRIA [§] 201(a) permits attachment of property even if attachment might otherwise be precluded by the FSIA.").

## III.   Legal Standard

The procedure for enforcement of writs of execution is governed by Federal Rule of Civil Procedure 69(a)(1), which provides that proceedings on execution "must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." In the state of New York, C.P.L.R. Section 5225(b) provides the relevant procedure for enforcement of a judgment "against a third party who 'is in possession or custody of money or other personal

App.440

property' in which the judgment debtor has an interest." *See CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 468 (2d Cir. 2018).[30]

In ordinary turnover proceedings, "N.Y. C.P.L.R. § 5225(b) requires a two-part showing before the Court can order [a] third party to turn over the money to the judgment creditor. The first prong requires that the judgment creditor show the judgment debtor has an interest in the property that the creditor is trying to reach. To satisfy the second prong, the Court must find either that the judgment debtor is entitled to the possession of such property, or that the judgment creditor's rights to the property are superior to those of the party who controls or possesses that property." *Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019).

But in this case, the Court must also consider the effect of TRIA, which supersedes other laws by virtue of its preamble. Under that federal statute, assets in which a blocked terrorist party has an interest, "including the blocked assets of any agency or instrumentality of that terrorist party[] shall be subject to execution," "[n]otwithstanding any other provision of law . . . in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism . . . to the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a).[31]

Because TRIA provides the relevant framework for analyzing whether a terrorist party "has an interest in the property the judgment creditor is trying to reach" under C.P.L.R. § 5225(b), and because it mandates that such property "shall be subject to execution" if so, courts must analyze

---

[30] While the text of Section 5225(b) contemplates that enforcement actions under that statute will be brought as a "special proceeding," the Second Circuit has clarified that "a party seeking a money judgment against a non-party garnishee" in federal court "may proceed by motion and need not commence a special proceeding, as long as the court has personal jurisdiction over the garnishee." *CSX Transp.*, 879 F.3d at 469.

[31] An OFAC license is not required to execute against blocked assets under TRIA. *Harrison v. Republic of Sudan*, 802 F.3d 399, 408–09 (2d Cir. 2015), *rev'd on other grounds*, 139 S. Ct. 1048 (2019).

whether assets are subject to TRIA in the first instance and then rely on the relevant TRIA holding to find that turnover is appropriate under the New York statute. *See, e.g.*, *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 48 (S.D.N.Y. 2015); *Weininger*, 462 F. Supp. 2d at 499; *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, N.Y. Branch*, 919 F. Supp. 2d 411, 422 (S.D.N.Y. 2013).

The DAB Assets are blocked assets pursuant to Executive Order 14,064. TRIA Section 201(a) thus authorizes the *Federal Insurance* Creditors to enforce their judgment against either (i) blocked assets of the Taliban or against (ii) blocked assets of an agency or instrumentality of the Taliban. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 133 (2d Cir. 2016) ("[T]he fact that Plaintiffs obtained their underlying judgments against [the Taliban] . . . does not prevent" them from executing against DAB's properties under TRIA if DAB is an "agenc[y] or instrumentalit[y] of [the Taliban] under the TRIA."), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

Therefore, the *Federal Insurance* Creditors are entitled to enforce their judgments under TRIA and New York law against the blocked assets at the FRBNY so long as they establish these elements: (1) possession of a "judgment against a terrorist party"; (2) arising from an act of terrorism; (3) seeking to execute against "blocked assets" within the meaning of TRIA (*i.e.*, blocked assets of that terrorist party or an agency or instrumentality of that terrorist party); (4) to the extent of their "compensatory damages." *Weininger*, 462 F. Supp. 2d at 479.

## IV. Argument

The *Federal Insurance* Creditors have satisfied all four TRIA elements. They have obtained a judgment against a terrorist party (the Taliban), on a claim based on an act of terrorism (the September 11, 2001 attacks), and seek to execute against the blocked assets of an agency or

instrumentality of that terrorist party (DAB). The *Federal Insurance* Creditors are thus entitled to execute against the DAB Assets to the extent of their compensatory damages.

### A.    The Taliban Is A Terrorist Party Within The Meaning Of TRIA

The Taliban is, without question, a terrorist party within the meaning of TRIA, as the United States agrees. *See* U.S. Statement 19. Section 201(d)(4) defines a "terrorist party" as, among other things, "a terrorist[.]" And the United States has classified the Taliban as a Specially Designated Global Terrorist since July 2, 2002. *See* Exec. Order No. 13,268 § 1; *see also* 31 C.F.R. §§ 594.310, 594.311. In conformity with that designation, the United States has represented to courts in other matters both that the Taliban is a "terrorist party" and that its assets are subject to attachment under TRIA. *See* Brief of the United States in Response to Plaintiffs' Motion to Compel at 3–4, *Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169 (D.D.C. Feb. 2, 2005), 2005 WL 3518010, ECF No. 4.

### B.    The *Federal Insurance* Creditors Have A Judgment Against The Taliban Based On An Act Of Terrorism

There is also no question that the *Federal Insurance* Creditors have a judgment against the Taliban "based on an act of terrorism[,]" as the United States acknowledged in relation to the *Havlish* Creditors' judgment. *See* U.S. Statement 19. TRIA Section 201(d)(1)(A) defines an "act of terrorism" to include any "terrorist activity" as defined in 8 U.S.C. § 1182(a)(3)(B)(iii). The *Federal Insurance* Creditors' judgment against the Taliban is based on the Taliban's participation in, and liability for, the September 11, 2001 terrorist attacks. *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 982 F. Supp. 2d 830, 843–44 (N.D. Ill. 2013) (undisputed that September 11 attacks were an act of terrorism), *vacated and remanded on other grounds,* 783 F.3d 607 (7th Cir. 2015); *see also* 8 U.S.C. § 1182(a)(3)(B)(iii) (cross-referenced in TRIA § 201(d)(1) and defining "terrorist activity" as "[t]he highjacking or sabotage of any

conveyance[,]" "[a] violent attack upon an internationally protected person[,]" and/or "[t]he use of any . . . explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property").

### C.    The DAB Assets Are "Blocked Assets" Within The Meaning Of TRIA

TRIA defines "blocked asset[s]" as "any asset seized or frozen by the United States under . . . sections 202 and 203 of [IEEPA] (50 U.S.C. 1701; 1702)." TRIA § 201(d)(2)(A). On February 11, 2022, President Biden ordered, pursuant to IEEPA, that "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in[.]" Exec. Order No. 14,064 § 1(a). President Biden did so fully cognizant of the enforcement proceedings before this Court. 87 Fed. Reg. at 8391 ("I also understand that various parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB or indicated in public court filings an intent to make such claims. This property is blocked under this order."). The DAB Assets are therefore blocked property under TRIA, as the United States agrees. U.S. Statement 19.

### D.    The DAB Assets Are Blocked Assets Of DAB, Which Is An Agency Or Instrumentality Of The Taliban

The *Federal Insurance* Creditors can execute against the DAB Assets if the Court finds that (1) they are "held in the hands of" DAB, and (2) DAB is an agency or instrumentality of the Taliban. *Kirschenbaum*, 830 F.3d at 132 (quoting *Weinstein*, 609 F.3d at 49). The *Federal Insurance* Creditors have met these conditions.

### 1. DAB Holds The DAB Assets

Section 201 of TRIA authorizes execution against property belonging to "an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment." *Kirschenbaum*, 830 F.3d at 132 (citing *Weinstein*, 609 F.3d at 50). "[T]he fact that Plaintiffs obtained their underlying judgments against [the Taliban] . . . does not prevent" them from executing against DAB's properties under TRIA if DAB is an "agenc[y] or instrumentalit[y] of [the Taliban] under the TRIA." *Id.*

There is no question that the DAB Assets belong to DAB. They are in DAB's account at the Fed,[32] and a property interest may thus be presumed. *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 86 (2d Cir. 2002) ("When a party holds funds in a bank account, possession is established, and the presumption of ownership follows."); *see also Hausler*, 127 F. Supp. 3d at 49 ("[U]nder New York law, the account holder of accounts containing assets belonging to the account holder has a property interest in those assets[.]"); *Miller v. City of Ithaca*, No. 10-CV-597, 2019 WL 2502712, at *3 (N.D.N.Y. June 17, 2019) (where funds in bank's possession were the judgment debtor's, the judgment debtor "necessarily ha[d] an interest in those funds"). Indeed, President Biden recognized that DAB holds assets at the FRBNY on February 11—and ordered all of DAB's assets in the country transferred to a consolidated account there. Exec. Order No. 14,064 § 1(a)–(b).

### 2. DAB Is An Agency Or Instrumentality Of The Taliban Under TRIA

The Second Circuit has defined three independent ways in which DAB can qualify as an agency or instrumentality of a terrorist party under TRIA. First, DAB will be an agency or instrumentality if it is "a means through which a material function of the terrorist party is

---

[32] *See* Carter Decl. ¶¶ 4, 6-7 & Exs. 3, 5; *see also* U.S. Statement 8 ("The DAB Assets at issue are housed in accounts held at FRBNY for DAB[.]").

accomplished[.]" *Kirschenbaum*, 830 F.3d at 135. Second, DAB will be an agency or instrumentality of the Taliban if it provides "material services to, on behalf of, or in support of the terrorist party." *Id.* Or third, DAB will be an agency or instrumentality if it is "owned, controlled, or directed by the terrorist party." *Id.* The Eleventh Circuit has adopted a similar test. *See Stansell v. FARC*, 771 F.3d 713, 724 n.6, 732 (11th Cir. 2014) (cited with approval in *Kirschenbaum*, 830 F.3d at 135–36, 135 n.19). The *Federal Insurance* Creditors need to satisfy only one of the three alternative tests. Here, the *Federal Insurance* Creditors satisfy all three tests.

First, DAB is and was controlled and directed by the Taliban at all times relevant to this litigation. It was controlled and directed by the Taliban in 2001, when the Taliban aided and abetted al Qaeda's execution of the September 11 attacks. H. DOC. NO. 106-268, at 4; *see also* Press Release, U.S. Dep't of Treasury, *supra* note 29 (DAB assets were "associated with the Taliban regime"). And it is again controlled and directed by the Taliban today—and has been since August 2021, when Taliban-installed leadership took control of DAB and began managing DAB's operations and activities for the Taliban's benefit.[33] As demonstrated above and as more fully detailed in the Zerden Declaration, DAB is completely controlled by the Taliban.[34] Taliban leaders have been installed as leaders of DAB.[35] The Taliban Council of Ministers issues edicts for DAB to implement.[36] Current and former U.S. government officials recognize the Taliban controls DAB.[37] DAB's own media relations show the Taliban controls DAB.[38] Public and private

---

[33] Zerden Decl. ¶¶ 39, 49–51.

[34] Zerden Decl. ¶¶ 14, 49–143; *see also supra* Part II.A.2.

[35] Zerden Decl. ¶¶ 54–84.

[36] Zerden Decl. ¶¶ 92–95.

[37] Zerden Decl. ¶¶ 99–114.

[38] Zerden Decl. ¶¶ 115–35.

organizations that previously worked with or through DAB are now bypassing it because of the Taliban's control.[39] The reality is that "DAB is now operating under the Taliban's direct, operational control."[40]

Second, the Taliban is using DAB to accomplish material functions supporting its illicit activities. For example, the Taliban is using DAB to facilitate and enhance illegal narcotics trafficking that generates revenue for the Taliban.[41] The Taliban can now use DAB's archive of highly sensitive Suspicious Activity Reports and financial investigation records to identify, punish, and retaliate against opponents.[42] By using DAB's authority to supervise Afghanistan's entire banking system, the Taliban has the power to remove all anti-money laundering and counter-terrorism financing controls, monitoring systems, and enforcement mechanisms that previously interfered with its terror financing activities.[43] In fact, a Taliban official who has been sanctioned for terror financing is now responsible for DAB's AML/CFT functions.[44] The Taliban's opportunity to expand its terrorist activities is also greatly enhanced by its ability to remove any oversight or attempts to regulate Afghanistan's *hawala* system, a centuries-old informal money exchange system that has also been used to fund terrorism.[45]

Third, the same evidence shows that DAB is providing material services to the Taliban.

Indeed, the present circumstances are just a return to form for the Taliban's relationship with DAB—it is using DAB in the same way that it did during the period when it controlled Afghan

---

[39] Zerden Decl. ¶¶ 140–43.

[40] Zerden Decl. ¶ 137; *see also id.* ¶ 51.

[41] Zerden Decl. ¶¶ 146–55.

[42] Zerden Decl. ¶¶ 156–59.

[43] Zerden Decl. ¶¶ 160–67.

[44] Zerden Decl. ¶ 69.

[45] Zerden Decl. ¶¶ 168–78.

territory and institutions between 1997 and 2001.[46] These same facts led the United States to conclude then that DAB was "controlled by the Taliban." H. DOC. NO. 106-268, at 4. The Taliban has simply re-imposed its former control and picked up where it left off twenty years ago.

Courts have found that entities are agencies or instrumentalities of terrorist organizations for purposes of TRIA based on far less than the circumstances of this case. *See, e.g.*, *Caballero v. FARC*, No. 18-CV-25337, 2021 WL 3927826, at *3 (S.D. Fla. Aug. 24, 2021) (individual who operated currency exchange program on behalf of terrorist party was an "agency or instrumentality" of that party under TRIA); *Caballero v. FARC*, No. 20-CV-1939, 2021 WL 6339256, at *2 (D. Conn. Jan. 14, 2021) (unaffiliated corporation was "agenc[y] or instrumentality" of terrorist party which "use[d]" it "to launder money"); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 241 (D.R.I. 2004) (subjecting assets of Holy Land Foundation to execution as an agency or instrumentality of Hamas based on "strong evidence" it "operate[d] as a fund-raiser for Hamas in the United States").

Because DAB is an agency or instrumentality of the Taliban under governing Second Circuit precedent, its assets—including at the FRBNY—are subject to execution under TRIA.

### 3. Treating DAB As An Agency Or Instrumentality Of The Taliban Is Consistent With Binding Case Law, Statutory Text, And Congressional Purpose

In its Statement of Interest, the United States takes no position on whether DAB is an agency or instrumentality of the Taliban under TRIA. U.S. Statement 19–20. Instead, it points out areas of sensitivity that the Court should be careful to avoid when adjudicating this motion. *Id.* There is a clear path that this Court should take to recognize the *Federal Insurance* Creditors' entitlement to immediate relief without impinging upon Executive Branch prerogatives: a simple

---

[46] Zerden Decl. ¶ 27.

application of the binding standard in *Kirschenbaum*. To the extent that the Court must skirt legal territory related to the conduct of foreign relations as it walks down that path, that is so only because of Congress' choice in TRIA to prioritize the ability of victims of terrorism to recover judgments from terrorist parties (including from any agency or instrumentality of a terrorist party) over "any other provision of law," including the FSIA. *See* TRIA § 201(a); *Smith*, 280 F. Supp. 2d at 319. And the binding authority of *Kirschenbaum* does not compel—or even suggest—any different approach.

It is important to understand what the *Federal Insurance* Creditors are not asking this Court to do. The Court does not need to recognize any government of Afghanistan or to preempt any Executive Branch determination on that matter. *See* U.S. Statement 26. The Court does not need to consider whether DAB is or is not an active central bank of any particular state—that is a determination relevant only for purposes of the FSIA, not TRIA. *See* U.S. Statement 25. The Court does not need to decide that the funds at the FRBNY are "assets of" the Taliban by virtue of its claim to be the government of Afghanistan. *See* U.S. Statement 25, 26. The Court does not need to deem either the Taliban or Afghanistan a state sponsor of terror. *See* U.S. Statement 20. The United States asserts that these are sensitive areas of executive competency that the Court should take care to avoid, and we agree that those interests need not be disturbed.

The only thing this Court needs to do is apply the plain text of the "agency or instrumentality of any terrorist party" clause of TRIA pursuant to the Second Circuit's well-established, binding *Kirschenbaum* test and conclude that, under that test and on the present record, DAB is an agency or instrumentality of the Taliban (as the evidence overwhelmingly shows).[47]

---

[47] Section 201(d)(4) of TRIA does not provide or suggest any limitation on what assets of a terrorist party can be attached; it merely contains the definition of a "terrorist party." *See* U.S. Statement 25 n.8.

Nor is there any basis to depart from the text simply because a non-state party is the defendant or because that non-state party has taken control of a state institution. As the Second Circuit has recognized, TRIA's definition of "agency or instrumentality" was intentionally drafted to extend much further than the definition of an "agency or instrumentality" under the FSIA. *Kirschenbaum*, 830 F.3d at 132–135. The Second Circuit did not hint that this test should be applied differently based on the identity of the terrorist party or instrumentality—in fact, it did quite the opposite. *See id.* at 134 ("The plain language of the TRIA refers only to 'the blocked assets of any agency or instrumentality of that terrorist party,' and does not differentiate among the variety of entities that might qualify as a 'terrorist party.'"). Notably, the *Kirschenbaum* Court applied its TRIA test to an alleged instrumentality of Iran (even though that is precisely the circumstance in which the FSIA's test would have traditionally applied).[48] *Id.* This Court must accordingly apply the same *Kirschenbaum* test for the same statutory phrase in this case. After all, "[t]he meaning of words in a statute cannot change with the statute's application. To hold otherwise 'would render every statute a chameleon,' and 'would establish within our jurisprudence . . . the dangerous principle that judges can give the same statutory text different meanings in different cases[.]'" *United States v. Santos*, 553 U.S. 507, 522–23 (2008) (plurality opinion) (quoting *Clark v. Martinez,* 543 U.S. 371, 382, 386 (2005)) (citations omitted). And at least one court in this circuit has already applied the *Kirschenbaum* test to hold that agencies or instrumentalities of foreign governments can also constitute agencies and instrumentalities of an entirely separate terrorist party under TRIA. *See Caballero v. FARC*, No. 20-MC-0040, 2021 WL 307558 (W.D.N.Y. Jan. 29, 2021) (Venezuelan state oil company was agency or instrumentality of

---

[48] A finding that DAB is an instrumentality of the Taliban thus does not require the Court to make any prerequisite finding about whether the Taliban is the government of Afghanistan, as would be necessary under FSIA, because under *Kirschenbaum* the definitions of "agency or instrumentality" under TRIA and the FSIA are entirely separate.

**App.450**

Colombian terrorist group pursuant to TRIA); Order, *Caballero*, No. 20-MC-0040 (W.D.N.Y. Dec. 18, 2020), ECF No. 15 (same); *see also Caballero*, 2021 WL 6339256, at *2 (PDVSA subsidiary was agency or instrumentality of FARC).

The idea that a non-state terrorist party might commandeer and control a state agency or instrumentality for its own purposes would not have been foreign to the 107th Congress when it enacted TRIA. Indeed, the very same Congress that passed TRIA had received a report from the President that, as of early 2001, the Taliban (in its role as a non-state actor) had taken control of DAB. H. Doc. No. 107-16, at 4. If that Congress had wanted to write a statute that limited the ability of terror victims to recover in these familiar circumstances—if it wanted terror victims to recover from only *private* agencies or instrumentalities of non-state terrorist actors, or wanted to limit them to recovery only under the principles established under the FSIA—it could have done so. But it plainly did not. To except the DAB's assets in this instance would effectively immunize the Taliban (or any other similarly situated terrorist party in the future) from TRIA and would frustrate the very purpose of that law: making assets of any agency or instrumentality of a terrorist party, *i.e.*, any entity effectively controlled by or used for the benefit of that terrorist party, available for attachment by victims of that terrorist party.

And, as the United States agrees, in cases like this one, the statutory text of FSIA is wholly superseded by TRIA, which makes blocked assets of any terrorist party or any agency or instrumentality of any terrorist party available for execution "[n]otwithstanding any other provision of law." TRIA § 201(a); *see also Kirschenbaum*, 830 F.3d at 134–135 ("The FSIA definition of 'agency or instrumentality' . . . do[es] not pertain to those terms in the TRIA."). It thus makes little sense to attempt to graft principles of law gleaned from decades of interpreting the FSIA onto a provision that was intentionally written to supersede the limits of that statute.

#### 4.     Alternatively, DAB Is The Taliban's Alter Ego

The Court could also conclude that DAB is an alter ego of the Taliban, subjecting its assets to TRIA as a "terrorist party" itself, because DAB "is so extensively controlled by [the Taliban] that a relationship of principal and agent is created[.]" *Kirschenbaum*, 830 F.3d at 128 (citation omitted). As has been exhaustively shown, the Taliban exerts such extensive control over DAB that DAB qualifies as its alter ego. *See supra* Part IV.D.2.

#### E.     The *Federal Insurance* Creditors Are Entitled To The DAB Assets

The second prong of the C.P.L.R. Section 5225(b) turnover analysis—that the judgment debtor is "entitled to possession of [the] property"—is satisfied because the property is indisputably DAB's and the only restraint on possession is the blocked nature of the assets. In such cases, TRIA makes blocked property available to qualified judgment creditors like the *Federal Insurance* Creditors. *Weininger*, 462 F. Supp. 2d at 499; *see also Harrison*, 802 F.3d at 409 (funds subject to TRIA "may be distributed without a license from OFAC"). Courts thus routinely find that this prong is satisfied where the blocked assets at issue are subject to TRIA. *Hausler*, 127 F. Supp. 3d at 48; *Weininger*, 462 F. Supp. 2d at 499; *Heiser*, 919 F. Supp. 2d at 422; *accord Caballero*, 2021 WL 6339256, at *2 (Connecticut turnover statute satisfied based on TRIA agency/instrumentality analysis). Nothing else stands in the way of execution. *See also Hill v. Republic of Iraq,* No. 99-CV-3346, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) (the "notwithstanding provision" is "unambiguous and effectively supersedes all previous laws"); *cf. Weinstein*, 609 F.3d at 53 ("notwithstanding" clause superseded U.S. treaty obligations).

#### F.     The *Federal Insurance* Creditors' Writ Is At Worst Third In Line For Purposes Of Priority

As indicated above, the *Havlish* and *Doe* Creditors levied writs of execution against the DAB assets in late summer 2021, pursuant to their judgments against the Taliban. They seek

turnover to the extent of their compensatory damages,[49] totaling $2,224,670,879.26 in aggregate. The blocked DAB assets exceed that aggregate amount.

The *Federal Insurance* Creditors have priority with respect to any DAB assets not deemed subject to turnover to the *Havlish* and *Doe* Creditors. The *Federal Insurance* Creditors delivered their writ to the U.S. Marshal on April 20, 2022. *See* Carter Decl. at ¶ 2, Ex. 1. The Marshal levied the *Federal Insurance* writ the following day. *Id.* at ¶ 3; Ex. 2. The *Federal Insurance* writ issued pursuant to a valid final judgment against the Taliban, and is thus proper and authorized under TRIA and federal sanctions law.[50] The *Federal Insurance* Creditors are thus entitled to turnover of all DAB assets not deemed subject to turnover to the *Havlish* and *Doe* Creditors pursuant to their writs. *See also* N.Y. C.P.L.R. § 5234 (executions "shall be satisfied . . . in the order in which they were delivered"); *CSX Transp.*, 879 F.3d at 472.

## V.    Conclusion

For the foregoing reasons, the Court should grant the *Federal Insurance* Creditors' turnover motion as to the blocked assets of DAB (as an agency or instrumentality of the Taliban) which are in the possession, custody, or control of the FRBNY, to partially satisfy their award of compensatory damages in the amount of $14,672,806,120.64, pursuant to Section 201(a) of TRIA. The turnover of these assets will be distributed pursuant to the Framework Agreement, in order to provide broad relief to the 9/11 Community, a manifestly fair and equitable result.

---

[49] *Under the Framework Agreement, the Havlish Creditors and Federal Insurance Creditors have agreed to pass on a substantial portion of any recovery to the broader 9/11 community.*

[50] Plaintiffs in *Owens v. Taliban,* 22-cv-1949 (S.D.N.Y. Mar. 21, 2022), obtained a provisional *ex parte* emergency prejudgment order of attachment before Judge Caproni, which they have not yet sought to confirm. We expect that further proceedings will make clear that the *Owens'* plaintiffs prejudgment attachment efforts are prohibited by federal sanctions law and binding Second Circuit precedent. That is because: (1) it attaches assets which have been blocked by the President pursuant to his authority under IEEPA, Exec. Order No. 14,064 § 1(a); (2) blocked assets are not subject to attachment orders, *see, e.g.*, 31 C.F.R. § 594.312; and (3) TRIA's exception for writs of execution against blocked assets is not available to those (like the *Owens* litigants) without enforceable final judgments. *Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York*, 346 F.3d 264, 271 (2d Cir. 2003).

Dated:  April 29, 2022

Respectfully submitted,

COZEN O'CONNOR

By:  _/s/  Sean P. Carter_____
    Sean P. Carter, Esq.
    Stephen A. Cozen, Esq.
    J. Scott Tarbutton, Esq.
    1650 Market Street
    Philadelphia, PA 19103
    Tel: (215) 665-2105
    scarter1@cozen.com

Attorneys for *Federal Insurance* Creditors

26

App.454

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the Memorandum of Law in Support of the *Federal Insurance* Creditors' Motion for Partial Turnover of Assets From Garnishee Federal Reserve Bank of New York, was electronically filed this 29th day of April 2022. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

_____
J. Scott Tarbutton, Esq.

LEGAL\57723985\1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re Terrorist Attacks on September 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |

| | |
|---|---|
| Federal Insurance Company, et al., | Case No. 03-cv-6978 (GBD)(SN) |
|      Creditors, | |
| v. | |
| The Taliban, et al., | |
|      Debtors, | |
| Federal Reserve Bank of New York, | |
|      Garnishee. | |

## DECLARATION OF SEAN P. CARTER IN SUPPORT OF THE *FEDERAL INSURANCE* CREDITORS' MOTION FOR PARTIAL TURNOVER OF ASSETS FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK

I, Sean P. Carter, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge and belief:

1.     I am an attorney admitted to practice *pro hac vice* in the above-captioned matter, and the Co-Chair of the Plaintiffs' Executive Committees established by this Court in 2004.  I am a Member with Cozen O'Connor, and counsel to Judgment Creditors *Federal Insurance Company, et al.* (the "*Federal Insurance* Creditors") in the above-captioned action.  I make this Declaration in support of the *Federal Insurance* Creditors' Motion for Partial Turnover of Assets from Garnishee Federal Reserve Bank of New York.  I have firsthand knowledge of the contents of this Declaration and I can testify to the matters set forth herein, except as to those matters presented on information and belief, which I believe to be true.

**App.456**

2.      Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the Writ of Execution issued by this Court against the assets of the Taliban, including the assets of Da Afghanistan Bank ("DAB") at the Federal Reserve Bank of New York, dated April 20, 2022 (the "*Federal Insurance* Writ").  That same day, the *Federal Insurance* Writ was hand-delivered to the United States Marshal for the Southern District of New York.

3.      Attached hereto as <u>Exhibit 2</u> is a true and correct copy of the United States Marshal Service's process receipt and return for the *Federal Insurance* Writ, which the United States Marshal levied on April 21, 2022.

4.      Attached hereto as <u>Exhibit 3</u> is a true and correct copy of DAB's consolidated financial statements for the year ending December 20, 2020.

5.      Attached hereto as <u>Exhibit 4</u> is a true and correct copy of the Yahoo Finance historical currency conversion table between Afghan afghanis and U.S. dollars for the month of December 2020, available at https://finance.yahoo.com/quote/AFNUSD%3DX/history?period1=1606780800&period2=1609286400.  According to this table, one Afghan afghani was equivalent to 0.013 U.S. dollars on December 20, 2022.  This is in accord with the exchange rate applied in the DAB consolidated financial statement, at page 9, which indicates a ratio of 77.11 afghanis per dollar, or 0.0129 dollars per afghani.

6.      Page 23 of the DAB consolidated financial statement indicates that the Bank held U.S. treasury bonds and bills with 336,963,212,000 afghanis at the Federal Reserve Bank of New York on December 20, 2020.  Based on the conversion ratio in ¶ 6, these bonds and bills were worth approximately $4,380,521,756.

7.      Page 21 of the DAB consolidated financial statement indicates that the Bank held gold reserves worth 101,770,256,000 afghanis at the Federal Reserve Bank of New York on December 20, 2020.  Based on the conversion ratio in ¶ 6, these gold reserves were worth approximately $1,323,013,328.

8.      Attached hereto as Exhibit 5 is a true and correct copy of a screen capture from the Internet Archive dated August 17, 2021, available at https://web.archive.org/web/202108180 64018/https://twitter.com/aahmady/status/1427883012348424192, of portions of an August 17, 2021 thread of tweets by Ajmal Ahmady, who served as the Governor of DAB prior to the Taliban takeover.  According to Mr. Ahmady, DAB possessed $7.0 billion in reserves at the Federal Reserve Bank of New York as of the week prior to the Taliban takeover.

9.      The *Federal Insurance* Creditors hold judgment from this Court for damages subject to execution under the Terrorism Risk Insurance Act of 2002 ("TRIA") totaling $3,117,082,655.33 in actual damages, $9,351,247,965.99 in trebled compensatory damages, and prejudgment interest computed at an annually compounding rate of 4.96%, totaling $5,321,558,154.65, as calculated in the April 7, 2022 Declaration of J. Scott Tarbutton at ECF No. 7836-1, a true and correct copy of which is attached hereto as Exhibit 6. In aggregate, the *Federal Insurance* Creditors' compensatory damages amount to $14,672,806,120.64.

10.     Attached hereto as Exhibit 7 is a true and correct copy of the March 20, 2022 Expert Declaration of Alex B. Zerden (ECF No. 7766), filed with the consent of the *Havlish* Creditors.

App.458

Executed in Philadelphia, PA on April 29, 2022.

_____

Sean P. Carter, Esq.

LEGAL\57618746\1

# Exhibit 1

# United States District Court
## SOUTHERN DISTRICT OF NEW YORK

JUDGMENT NO. <u>MDL ECF No. 7888</u>

DOCKET NO. <u>03-cv-6978</u>
<u>03-md-1570</u>

### THE PRESIDENT OF THE UNITED STATES OF AMERICA
To the Marshal of the Southern District of New York, GREETING:

YOU ARE COMMANDED, that of the goods and chattels of <u>The Taliban, also known as the Islamic Emirate of Afghanistan (previously the Islamic Republic of Afghanistan); Da Afghanistan Bank, the central bank of the Islamic Emirate of Afghanistan, which is the Taliban; and any political subdivisions or agencies and instrumentalities of the Islamic Emirate of Afghanistan, which is the Taliban.</u>

in your district you cause to be made the sum of <u>fourteen billion, six hundred seventy-two million, eight hundred six thousand,</u>

<u>one hundred twenty</u> dollars and <u>sixty-four</u> cents, ($ <u>14,672,806,120.64</u> )

which lately in the United States District Court of the United States for the Southern District of New York, in the Second

Circuit, <u>the Federal Insurance Company and other Plaintiffs listed in Exhibit A attached hereto</u>

recovered against the said <u>The Taliban (a/k/a The Islamic Emirate of Afghanistan)</u>

in an action between <u>the Federal Insurance Company and other Plaintiffs listed in Exhibit A attached hereto</u>

PLAINTIFF and <u>The Taliban (a/k/a The Islamic Emirate of Afghanistan)</u>

DEFENDANT, in favor of said <u>Federal Insurance Company and other Plaintiffs listed in Exhibit A attached hereto</u>

as appears by the record filed in the Clerk's Office of said District Court on the <u>twentieth</u> day

of <u>April</u>, in the year of <u>2022</u>

and if sufficient personal property of the said judgment debtor cannot be found in your District, that then you cause the same to be made out of the real property belonging to such judgment debtor on the above-mentioned day, or at any time thereafter, in whose hands soever the same may be, and return this execution within sixty days after its receipt by you, to the Clerk of said District Court.

WITNESS, the Honorable Laura T. Swain, Chief Judge of the United States District Court, for the Southern District of New York, at the City of New York, on the <u>20th</u> day of <u>April</u> in the year of our Lord <u>2022</u>, and of the Independence of the United States the two hundred <u>forty</u> <u>sixth</u> year.

_____
CLERK

## United States District Court
### SOUTHERN DISTRICT OF NEW YORK

Federal Insurance Company, et al.

-against-

The Taliban (a/k/a the Islamic Emirate of Afghanistan) (previously the Islamic Republic of Afghanistan); Da Afghanistan Bank, the central bank of the Islamic Emirate of Afghanistan, which is the Taliban; and any political subdivisions or agencies and instrumentalities of the Islamic Emirate of Afghanistan, which is the Taliban.

EXECUTION AGAINST PROPERTY
J. Scott Tarbutton, Esq., Cozen O'Connor

Attorney for

Federal Insurance Company, et al.

Borough of Manhattan
City of New York

To the Marshal:
You will levy and collect

$9,351,247,965.99 in compensatory damages +

prejudgment interest of $5,321,558,154.65 _ Dollars

and ___ ___ ___ ___ ___ ___ ___ ___ ___ cents,

with interest from the 11th

day of September , 2001 ,

besides your fees, etc.

_____
Attorney

# Exhibit A

## WRIT OF EXECUTION – EXHIBIT A

**Plaintiffs in *Federal Ins. Co., et al. v. Al Qaida*, et al., Case No. 1:03-cv-06978 (GBD) (SN)**

Federal Insurance Company

Vigilant Insurance Company

Chubb Custom Insurance Company

Chubb Indemnity Insurance Company

Chubb Insurance Company of New Jersey

Chubb Insurance Company of Canada

Pacific Indemnity Company

Great Northern Insurance Company

AXA Art Insurance Corp.

AXA Global Risks (UK) Ltd.

AXA CSA UK Branch

AXA Insurance Company

AXA Reinsurance Company

AXA RE

AXA RE Canadian Branch

AXA RE UK Plc

AXA Versicherung

SPS RE

American Alternative Insurance Company

Princeton Excess and Surplus Lines Insurance Company

Great Lakes UK Reinsurance Company

OneBeacon Insurance Company

TIG

# Exhibit B

# WRIT OF EXECUTION – EXHIBIT B

The foregoing writ of execution is to be levied in conformity with United States and New York law against any property or property rights in any form (personal or real, tangible or intangible, materialized or dematerialized, direct or indirect, or fungible, including but not limited to any reserves, cash, gold, silver, securities, securities entitlements, securities accounts, equity interests, claims, contractual rights, statutory rights, special drawing rights from the International Monetary Fund, or any other interest of any kind in any asset of any kind) held or maintained by, or in possession, custody, or control of,

Federal Reserve Bank of New York
33 Liberty Street
New York, New York 10045

for the benefit of the government of Afghanistan (which the Taliban, also known as the Islamic Emirate of Afghanistan, claims to be and to control), Da Afghanistan Bank ("DAB"), the central bank of Afghanistan (which is a bank, the assets of which, the Taliban, also known as the Islamic Emirate of Afghanistan, claims to own and control), any political subdivision of the Islamic Republic of Afghanistan or the Islamic Emirate of Afghanistan (which the Taliban, also known as the Islamic Emirate of Afghanistan, claims are its political subdivisions), and/or any agency or instrumentality of the Islamic Republic of Afghanistan or the Islamic Emirate of Afghanistan (which the Taliban, also known as the Islamic Emirate of Afghanistan, claims are its agencies and instrumentalities).

Beginning on or about August 16, 2021, the previous government of Afghanistan was deposed by the Taliban, which identifies itself as the Islamic Emirate of Afghanistan. On or about August 19, 2021, the Taliban declared itself the government of Afghanistan and changed the name of the country to the Islamic Emirate of Afghanistan, which is also the name of the Taliban. The Taliban, as the Islamic Emirate of Afghanistan, asserts control over the country formerly known as Afghanistan, previously governed by the Islamic Republic of Afghanistan, and has assumed governance of the people within the jurisdictional borders of Afghanistan. The Taliban, as the Islamic Emirate of Afghanistan, claims ownership of, and control over, all property, property interests, and all rights belonging to the former government of the Islamic Republic of Afghanistan, including all assets belonging to DAB, the central bank of Afghanistan.

On the same day the Taliban took control of Afghanistan's capital, including the facilities of DAB, the United States froze approximately $7 billion of DAB's asset reserves held at the Federal Reserve Bank of New York ("FRBNY") to prevent them from being withdrawn by a Taliban-controlled DAB or otherwise transferred to the Taliban.

On February 11, 2022, President Biden issued Executive Order 14064 entitled "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan," designating "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, a[s] blocked[.]" Exec. Order 14064 § 1(a). The Executive Order further provides that all U.S. financial institutions must transfer all property and interests in property of DAB in the United States to the FRBNY. *Id.* § 1(b). Contemporaneously with the

issuance of Executive Order 14064, the United States issued a license through the Treasury Department's Office of Foreign Assets Control which authorizes, directs, and compels the FRBNY to transfer up to $3.5 billion of DAB's blocked assets "for the benefit of the People of Afghanistan." The remainder of the blocked DAB assets, approximately $3.5 billion, "remain in the United States and are subject to ongoing litigation by U.S. victims of terrorism." *See* February 11, 2022 Fact Sheet: Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan.

The April 20, 2022 Rule 54(b) final judgment entered in favor of certain Plaintiffs in *Federal Ins. Co., et al. v. Al Qaida*, et al., Case No. 1:03-cv-06978 (GBD) (SN), against the Taliban (also known as the Islamic Emirate of Afghanistan), and awarding Plaintiffs $3,117,082,655.33 in actual damages, $9,351,247,965.99 in trebled compensatory damages, and prejudgment interest of $5,321,558,154.65, *see* MDL 1570 ECF No. 7888, attached hereto as Exhibit C, can be enforced against any and all assets belonging to the government of Afghanistan, including any assets held at the FRBNY in the name of, for the benefit of, or on the account of DAB, the central bank of Afghanistan.

Exhibit C

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/20/2022

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case<br><br>**RULE 54(b) JUDGMENT** |

*This document relates to:*     *Federal Insurance Co., et al v. al Qaida, et al.*
03-CV-06978 (GBD) (SN)

Whereas, this matter having come before the Honorable George B. Daniels, United States

District Judge, on the application of certain Plaintiffs in *Federal Insurance Co., et al v. al Qaida,*

*et al.*, 03-CV-06978 (GBD) (SN) (the "*Federal Insurance* Plaintiffs"), requesting that the Court

extend its prior rulings on their Motion for Assessment of Damages against Al Qaeda, and later

Hezbollah, to defendant the Taliban, as to which a default judgment as to liability was entered on

April 7, 2006 (*Federal Insurance* Dkt. No. 626), and enter a final judgment in favor of the

*Federal Insurance* Plaintiffs and against the Taliban in accordance with those prior rulings

pursuant to Fed. R. Civ. P. 54(b), and the Court, on April 6, 2022, having rendered its Order,

attached as Exhibit A hereto, entering partial final judgment pursuant to Fed. R. Civ. P. 54(b)

against defendant the Taliban and in favor of the *Federal Insurance* Plaintiffs as set forth in

Exhibit A, and awarding prejudgment interest at the rate of 4.96 percent, compounded annually,

and lifting the stay imposed by Federal Rule of Civil Procedure 62(a) so that the *Federal*

*Insurance* Plaintiffs may execute on and enforce the judgment immediately (ECF No. 7833), and

further directing the Clerk of the Court to prepare and enter a final judgment, it is,

**ORDERED, ADJUDGED AND DECREED**: That judgment is hereby entered in favor

of the *Federal Insurance* Plaintiffs and against defendant the Taliban in accordance with the

Court's Order dated April 6, 2022 as follows:

| PLAINTIFF | COMPENSATORY DAMAGES | TREBELED AWARD |
|---|---|---|
| Vigilant Insurance Company | $42,305,933.24 | $126,917,799.72 |
| Chubb Custom Insurance Company | $612,585.00 | $1,837,755.00 |
| Chubb Indemnity Insurance Company | $4,083,878.20 | $12,251,634.60 |
| Federal Insurance Company | $1,513,667,597.39 | $4,541,002,792.17 |
| Chubb Insurance Company of New Jersey | $412,681.71 | $1,238,045.13 |
| Chubb Insurance Company of Canada | $50,452,395.71 | $151,357,187.13 |
| Pacific Indemnity Company | $9,936,536.66 | $29,809,609.98 |
| Great Northern Insurance Company | $595,997,113.79 | $1,787,991,341.37 |
| AXA Art Insurance Corp. | $14,287,543.00 | $42,862,629.00 |
| AXA Global Risks (UK) Ltd. | $10,986,623.57 | $32,959,870.71 |
| AXA CSA UK Branch | $64,779,883.00 | $194,339,649.00 |
| AXA Insurance Company | $131,696,044.96 | $395,088,134.88 |
| AXA Reinsurance Company | $82,714,778.00 | $248,144,334.00 |
| AXA RE | $105,790,023.00 | $317,370,069.00 |
| AXA RE Canadian Branch | $26,138,407.11 | $78,415,221.33 |
| AXA RE UK Plc | $18,162,701.70 | $54,488,105.10 |
| AXA Versicherung | $923,053.00 | $2,769,159.00 |
| SPS RE | $84,305,160.00 | $252,915,480.00 |
| American Alternative Insurance Company | $3,922,782.07 | $11,768,346.21 |

2

| | | |
|---|---|---|
| **Princeton Excess and Surplus Lines Insurance Company** | $3,796,292.50 | $11,388,877.50 |
| **Great Lakes UK Reinsurance Company** | $99,511,427.02 | $298,534,281.06 |
| **OneBeacon Insurance Company** | $176,514,985.40 | $529,544,956.20 |
| **TIG** | $76,084,229.30 | $228,252,687.90 |
| **Total** | $3,117,082,655.33 | $9,351,247,965.99 |

along with prejudgment interest at 4.96%, compounded annually, amounting to aggregate

prejudgment interest of $5,321,558,154.65.

It is further **ORDERED, ADJUDGED and DECREED** that, for the reasons stated in

the Court's Order dated April 6, 2022, the Court's entry of judgment against the Taliban is

certified as final pursuant to Fed. R. Civ. P. 54(b), and that the stay provided by Federal Rule of

Civil Procedure 62(a) is lifted so that the *Federal Insurance* Plaintiffs may execute on and

enforce the judgment immediately.

Dated: April 20, 2022
      New York, New York

_____
Clerk of Court

BY:   _____
      Deputy Clerk

3

App.471

# Exhibit 2

**U.S. Department of Justice**
United States Marshals Service

# PROCESS RECEIPT AND RETURN
*See "Instructions for Service of Process by U.S. Marshal"*

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| Federal Insurance Company, et al. | 1:03-cv-06978; 1:03-md-01570 |
| DEFENDANT | TYPE OF PROCESS |
| The Taliban (a/k/a The Islamic Emirate of Afghanistan) | Writ of Execution |

**SERVE AT**

| NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN |
|---|
| Federal Reserve Bank of New York |
| ADDRESS (Street or RFD, Apartment No., City, State and ZIP Code) |
| 33 Liberty Street, New York, NY 10045 |

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | | |
|---|---|---|
| J. Scott Tarbutton, Esq.<br>Cozen O'Connor<br>One Liberty Place, 1650 Market Street, Suite 2800, Philadelphia, PA 19103<br>(215) 665-7255<br>starbutton@cozen.com | Number of process to be served with this Form 285 | 1 |
| | Number of parties to be served in this case | 1 |
| | Check for service on U.S.A. | |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service)*:
(212) 720-5000 (main telephone number for the Federal Reserve Bank of New York)

| Signature of Attorney other Originator requesting service on behalf of: | ☒ PLAINTIFF<br>☐ DEFENDANT | TELEPHONE NUMBER | DATE |
|---|---|---|---|
| *[signature]* | | 215-665-7255 | 4/20/2022 |

## SPACE BELOW FOR USE OF U.S. MARSHAL ONLY - DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated. *(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process | District of Origin No. 054 | District to Serve No. 054 | Signature of Authorized USMS Deputy or Clerk *[signature]* | Date 4/20/22 |
|---|---|---|---|---|---|

I hereby certify and return that I ☐ have personally served , ☐ have legal evidence of service, ☒ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above on the on the individual, company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above (See remarks below)

| Name and title of individual served (if not shown above) | Date | Time | |
|---|---|---|---|
| DAVID GROSS - SENIOR VP OF LAW ENFORCEMENT | 4/21/22 | 7:00 | ☐ am ☒ pm |
| Address (complete only different than shown above) | Signature of U.S. Marshal or Deputy *[signature]* | | |

Costs shown on *attached USMS Cost Sheet* >>

REMARKS

SERVICE FEE $65 = 1 HR
MIL FEE 2MI = 1.17
TOTAL . 66.17

(212) 720-2356
(646) 720-2356
FAX (212) 720-8700
david.gross@ny.frb.org

**DAVID GROSS**
SENIOR VICE PRESIDENT
DIRECTOR, LAW ENFORCEMENT UNIT
CHIEF INVESTIGATOR, INTERNAL INVESTIGATIONS

FEDERAL RESERVE BANK
OF NEW YORK

33 LIBERTY STREET
NEW YORK, NY
100450001

Form USM-285
Rev. 03/21

# Exhibit 6

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Terrorist Attacks on September 11, 2001* | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

*This document relates to:  Federal Insurance Co., et al v. al Qaida, et al.,*
03-CV-06978 (GBD) (SN)

**DECLARATION OF J. SCOTT TARBUTTON PURSUANT TO THE
COURT'S APRIL 6, 2022 ORDER AND INSTRUCTIONS TO THE
*FEDERAL INSURANCE* PLAINTIFFS (ECF NO. 7833)**

I, J. Scott Tarbutton, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of

perjury, that the following is true and correct to the best of my knowledge and belief:

1.       I am an attorney admitted to practice *pro hac vice* in the above-captioned matter,

and a member of the law firm Cozen O'Connor.  I submit this Declaration pursuant to the

Court's April 6, 2022 Order entering partial final judgment pursuant to Fed. R. Civ. P. 54(b)

against defendant the Taliban and in favor of the *Federal Insurance* Plaintiffs, awarding

prejudgment interest at the rate of 4.96 percent, compounded annually, lifting the stay imposed

by Federal Rule of Civil Procedure 62(a) so that the *Federal Insurance* Plaintiffs may execute on

and enforce the judgment immediately, and directing the Clerk of the Court to enter final

judgment (ECF No. 7833).

2.       Attached hereto as <u>Exhibit 1</u> is a true and correct copy of the April 6, 2022 Order

at ECF No. 7833.

3.       Contemporaneous with the Court's award of prejudgment interest at the rate of

4.96 percent, compounded annually, the Court's Order instructs the *Federal Insurance* Plaintiffs

to file a document calculating the prejudgment interest to aid the Clerk of the Court in preparing

the final judgment.  ECF No. 7833 at p. 3.

4.      For purposes of calculating the prejudgment interest relative to the $3,117,082,655.33 compensatory damages award, I used a compound interest calculator, a true and correct copy of which is attached hereto as <u>Exhibit 2</u>.

5.      Using the annual compounding rate of 4.96%, I calculated prejudgment interest accrued in the amount of $5,321,558,154.65 between September 11, 2001 and April 6, 2022, the date of the Court's Order entering partial final judgment against defendant the Taliban and in favor of the *Federal Insurance* Plaintiffs.  *See* Exhibit 2.

6.      Thus, as of the date of the Court's April 6, 2022 Order at ECF No. 7833, the total amount of the *Federal Insurance* Plaintiffs' compensatory damages, including prejudgment interest on that amount, is $8,438,640,809.98.

Executed in Philadelphia, PA on April 7, 2022.

_____
J. Scott Tarbutton, Esq.

LEGAL\57428922\1

2
**App.477**

Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
IN RE:                                            :
                                                  :
TERRORIST ATTACKS ON                              :
SEPTEMBER 11, 2001                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

ORDER

03 MDL 1570 (GBD) (SN)

GEORGE B. DANIELS, United States District Judge:

This document relates to:

<u>Fed. Ins. Co. v. al Qaida</u>, Case No. 03-cv-06978

Certain plaintiffs in *Fed. Ins. Co. v. al Qaida*, No. 03-cv-06978 (the "*Federal Insurance*

Plaintiffs") move for a partial final default judgment against the Taliban under Federal Rule of

Civil Procedure 54(b). (Case No. 03-md-1570, ECF No. 7496.) This Motion is GRANTED.

A default judgment against the Taliban and others, including Al Qaeda and Hezbollah, was

entered in favor of the *Federal Insurance* Plaintiffs on April 7, 2006. (Case No. 03-md-1570, ECF

No. 1755.) The *Federal Insurance* Plaintiffs' total damages against Al Qaeda were assessed at

$9,351,247,965.99. (Case No. 03-md-1570, ECF Nos. 2479, 2502.) This assessment was later

extended against Hezbollah. (Case No. 03-md-1570, ECF No. 2582.)

Several Plaintiffs in the multi-district litigation have used judgments against the Taliban in

an attempt to attach assets of Da Afghanistan Bank held in the Federal Reserve Bank of New York.

(*See* Writ of Execution, *Havlish, et al. v. Iran, et al.*, Case No. 03-cv-9848, ECF No. 526-1.) Parties

in other cases have sought prejudgment attachments of these assets as well. (*See e.g.*, *Owens v.*

*Taliban, et al.*, Case No. 22-cv-1949, ECF Nos. 32, 33.)

There are more that a dozen motions for default judgment against the Taliban pending in

the multi-district litigation. The *Federal Insurance* Plaintiffs' motion is the most procedurally

advanced. Liability and damages have already been determined as to Al Qaeda and Hezbollah. It is appropriate to extend these prior liability and damages determinations to the Taliban.

The Court will continue to adjudicate pending default judgment motions as efficiently as possible. The Court encourages all plaintiffs to continue to meet and propose strategies for an efficient and fair process to adjudicate pending default judgment motions.

Accordingly, for the reasons set forth in the Court's Order at Case No. 03-md-1570, ECF No. 2502, adopting the Report and Recommendation at Case No. 03-md-1570, ECF No. 2479, partial final default judgment under Federal Rule of Civil Procedure 54(b) is entered against the Taliban and in favor of the *Federal Insurance* Plaintiffs in the following amounts:

| Plaintiff | Compensatory Damages | Trebled Award |
|---|---|---|
| Vigilant Insurance Company | $42,305,933.24 | $126,917,799.72 |
| Chubb Custom Insurance Company | $612,585.00 | $1,837,755.00 |
| Chubb Indemnity Insurance Company | $4,083,878.20 | $12,251,634.60 |
| Federal Insurance Company | $1,513,667,597.39 | $4,541,002,792.17 |
| Chubb Insurance Company of New Jersey | $412,681.71 | $1,238,045.13 |
| Chubb Insurance Company of Canada | $50,452,395.71 | $151,357,187.13 |
| Pacific Indemnity Company | $9,936,536.66 | $29,809,609.98 |
| Great Northern Insurance Company | $595,997,113.79 | $1,787,991,341.37 |
| AXA Art Insurance Group | $14,287,543.00 | $42,862,629.00 |
| AXA Global Risk (UK) Ltd. | $10,986,623.57 | $32,959,870.71 |
| AXA CSA UK Branch | $64,779,883.00 | $194,339,649.00 |
| AXA Insurance Company | $131,696,044.96 | $395,088,134.88 |
| AXA Reinsurance Company | $82,714,778.00 | $248,144,334.00 |
| AXA RE | $105,790,023.00 | $317,370,069.00 |
| AXA RE Canadian Branch | $26,138,407.11 | $78,415,221.33 |
| AXA RE UK Plc | $18,162,701.70 | $54,488,105.10 |
| AXA Vericherung | $923,053.00 | $2,769,159.00 |
| SPS RE | $84,305,160.00 | $252,915,480.00 |
| American Alternative Insurance Co. | $3,922,782.07 | $11,768,346.21 |
| Princeton Excess and Supply Lines Insurance Company | $3,796,292.50 | $11,388,877.50 |
| Great Lakes UK Reinsuranec Company | $99,511,427.02 | $298,534,281.06 |
| OneBeacon | $176,514,985.40 | $529,544,956.20 |

2

| TIG | $76,084,229.30 | $228,252,687.90 |
| Total Award | $3,117,082,655.33 | $9,351,247,965.99 |

The *Federal Insurance* Plaintiffs are also awarded prejudgment interest at the rate of 4.96 percent, compounded annually. Pursuant to Federal Rule of Civil Procedure 62(a), the stay normally imposed under that Rule is lifted. The *Federal Insurance* Plaintiffs may execute on and enforce the judgment immediately. The Clerk of the Court is respectfully directed to prepare and enter a final judgment. To aid this preparation, the *Federal Insurance* Plaintiffs shall file a document calculating the prejudgment interest at their earliest convenience.

Dated: April 6, 2022
     New York, New York

SO ORDERED.

_George B. Daniels_
GEORGE B. DANIELS
United States District Judge

3

App.481

Exhibit 2

| | |
|---|---|
| Starting Amount (PV)?: | $3,117,082,655.33 |
| Annual Interest Rate?: | 4.9600% |
| Days (-9,999 < # < 47,482)?: | 7,512 |
| Start Date (year > 1969)?: | 09/11/2001 |
| End Date (year < 2100)?: | 04/06/2022 |
| Compounding?: | Annually |
| Days In Year?: | 365 |
| | |
| Interest Earned: | $5,321,558,154.65 |
| Future Value (FV): | $8,438,640,809.98 |
| Annual Percentage Yield (APY): | 4.9581% |
| Daily Interest Rate: | 0.0136% |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RAYMOND ANTHONY SMITH, as
Administrator of the Estate of George Eric
Smith, deceased

              Plaintiff,

      v.

THE ISLAMIC EMIRATE OF
AFGHANISTAN, et al.

              Defendants.

CASE NO. 01-cv-10132-LAK

## MEMORANDUM OF LAW IN SUPPORT OF THE SMITH/SOULAS CREDITORS' MOTION FOR TURNOVER OF ASSETS FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK

1

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. THE TALIBAN, ET. AL.**
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS FROM GARNISHEE
FEDERAL RESERVE BANK OF NEW YORK

App.484

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................ ii

I. Introduction ....................................................................................................................... 1

II. Background........................................................................................................................ 4

III. Facts ................................................................................................................................. 4

A. The Smith/Soulas Creditors Obtain the First 9/11 Judgment Against The Taliban and Others ..................................................................................................................................... 4

B.      Afghanistan's Central Bank, Da Afghanistan Bank, is under the control of the Taliban; that is the precise reason that the Biden Administration froze these assets ....... 4

IV. The Law ............................................................................................................................ 6

A.      The TRIA Provides Primary Guidance For Plaintiffs To Execute On DAB Assets Held at the FRBNY ................................................................................................................ 6

B.      The Taliban, Per the TRIA, and the Executive Orders, is a Terrorist Entity .......... 9

C.      The Smith/Soulas Decedents were Killed in the World Trade Center Terrorist Attacks of 11 September 2001; their Judgments against the Taliban are a Result of these Terrorist Attacks.................................................................................................................. 10

D.      The DAB Assets Identified by E.O. 14,064 Meet the TRIA's Definition of "Blocked Assets." .................................................................................................................. 10

E.      As an Agency or Instrumentality of The Taliban, the DAB assets held by the FRBNY are those of The Taliban via its Alter Ego, the DAB ........................................... 11

1.      The DAB Holds The Taliban assets held in the DAB............................................. 11

2.      Per the TRIA, DAB is an Agency or Instrumentality of The Taliban ....................12

3.      The Smith/Soulas Creditors Have Established Entitlement to Satisfy Their Judgment, and Interest, From the DAB Assets ................................................................. 15

4.      The Priority Nature of the Smith/Soulas Creditors' Writ ...................................... 16

IV.      Conclusion..................................................................................................................16

i

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

App.485

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Caballero v. FARC*, No. 20-CV-1939, 2021 WL 6339256 (D. Conn. Jan. 14, 2021) .........14

*Caballero v. FARC*, No. 18-CV-25337, 2021 WL 3927826 (S.D. Fla. Aug. 24, 2021) ........14

*CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018) .................16

*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,
304 F. Supp. 2d 232, 241 (D.R.I. 2004) ...................................................................15

*Harrison v. Republic of Sudan*,
802 F.3d 399 (2d Cir. 2015), *rev'd. on other grounds*, 139 S. Ct. 1048 (2019) .................15

*Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17 (S.D.N.Y. 2015) ........... 12, 16

*Hill v. Republic of Iraq,* No. 99-CV-3346, 2003 WL 21057173 (D.D.C. Mar. 11, 2003) ..16

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi
Negara ("Pertamina")*, 313 F.3d 70, 86 (2d Cir. 2002) ...........................................12

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016) 7-9, 11-12

*Miller v. City of Ithaca*, No. 10-CV-597, 2019 WL 2502712 (N.D.N.Y. June 17, 2019) ...12

*Weininger v. Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006) ........................... 8, 9, 12, 15, 16

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) ...............................11, 12

## STATUTES AND RULES

8 U.S.C. § 1182(a)(3)(B)(iii) .......................................................................................8, 10

Fed. R. Civ. P. 69(a) ................................................................................................... 2, 6

Foreign Sovereign Immunities Act of 1976,
Pub L. No. 94–583, 90 Stat. 2891 (codified at 28 U.S.C. § 1602 *et seq.*) ............................7

Terrorism Risk Insurance Act of 2002 § 201,
Pub. L. No. 107–297, 116 Stat. 2322 (codified at 28 U.S.C. § 1610 note) .................. *passim*

N.Y. C.P.L.R. § 5225 .................................................................................................2, 6, 15

ii

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. THE TALIBAN, ET AL.**
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE
FEDERAL RESERVE BANK OF NEW YORK

App.486

N.Y. C.P.L.R. § 5227.............................................................................................2

N.Y. C.P.L.R. § 5234 ..........................................................................................16

**LEGISLATIVE MATERIALS**

H. DOC. NO. 106-268 (2000) ...............................................................................14

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

31 C.F.R. § 594.310..............................................................................................9

31 C.F.R. § 594.311 ..............................................................................................9

Background Press Call by Senior Admin. Officials on U.S. Support for the People
of Afghanistan, White House (Feb. 11, 2022), https://www.whitehouse.gov/
briefing-room/statements-releases/2022/02/11/background-press-call-on-u-ssupport-
for-the-people-of-afghanistan ...............................................................................2

Exec. Order No. 13,129, 44. Fed. Reg. 36,759 (July 7, 1999) ............................9

Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002) .............................9

Exec. Order No. 14,064, 87 Fed. Reg 8391 (Feb. 11, 2022) ..........................*passim*

**OTHER AUTHORITIES**
Brief of the United States in Response to Plaintiffs' Motion to Compel,
*Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169
(D.D.C. Feb. 2, 2005), 2005 WL 3518010, ECF No. 4............................................15

Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban
Takeover in Afghanistan: Frequently Asked Questions* (2021),
https://crsreports.congress.gov/product/pdf/R/R46879.......................................3

Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan:
Background and Issues for Congress* (2021), https://crsreports.congress.gov/
product/pdf/R/R46955.........................................................................................3

Clayton Thomas, Cong. Rsch. Serv., IF10604, Terrorist Groups in Afghanistan (April 19,
2022), https://sgp.fas.org/crs/row/IF10604.pdf.............................................8-9

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. THE TALIBAN, ET AL.**
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE
FEDERAL RESERVE BANK OF NEW YORK

App.487

## I.    INTRODUCTION

This Motion for Asset Turnover of funds held by the Federal Reserve Bank of New York (FRBNY or Garnishee), as it relates to a Judgment obtained against debtors whose assets are held by the Garnishee, is brought by Plaintiffs and Judgment Creditors Raymond Anthony Smith, Administrator of the Estate of George Smith, and Katherine Soulas, individually, on behalf of her children, and as Executrix of the Estate of Timothy Soulas (Judgment Creditors). The Judgment Creditors' counsel respectfully submits this Memorandum of Law in support of their Motion for Asset Turnover held by the FRBNY/Garnishee.

## II.    BACKGROUND

This is the first lawsuit, filed 14 November 2001, involving the 11 September 2001 Terrorist Attacks which has obtained a judgment against, *inter alia*, the Taliban and the Islamic Emirate of Afghanistan (The Taliban). This Judgment followed an Inquest before the Honorable (dec.) Harold Baer in February and March, 2003, resulting in an Opinion and Order dated 7 May 2003 finding in favor of the Plaintiffs and against all defendants, including the Taliban (ECF 25). This Opinion and Order was reduced to a final judgment on 14 July 2003 (ECF 28), and a Writ of Execution was filed and served on Garnishee FRBNY on 14 March 2022 (ECF 41). This Writ has been indefinitely extended (ECF 48).

Judge Baer's 7 May 2003 Opinion and Order provides a most detailed analysis of the Court's calculation of damages sought via the 22 February 2022 Writ of Execution; it fully complies with the requirements of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322 in terms of describing the methods of compensatory damages calculations as to the Taliban defendants. Accordingly, and

1

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA. 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. THE TALIBAN, ET AL.**
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE
FEDERAL RESERVE BANK OF NEW YORK

App.488

pursuant to Judge Baer's findings, a Writ of Execution as to assets owned and controlled by the Taliban held by the FRBNY/Garnishee was filed 22 February 2022 and served on the Garnishee on 14 March 2022, specifically Da Afghanistan Bank (DAB). These assets were identified, pursuant to President Biden's 11 February 2022 Executive Order (Exec. Order No. 14,064, 87 Fed. Reg 8391) to be, in part, available to those who have obtained judgments against the terrorist entities that perpetrated the 11 September 2001 terrorist attacks. The Executive Order, associated Fact Sheet, and Background Press Call by Senior Administration Officials on U.S. Support for the People of Afghanistan, attached collectively as Exhibit "A." A relevant portion follows:

> Many U.S. victims of terrorism, including relatives of victims who died in the September 11, 2001 terrorist attacks, have brought claims against the Taliban and are pursuing DAB assets in federal court. Because some of these plaintiffs currently have writs of execution against the DAB assets, the court will need to issue a further decision regarding the scope of those writs. Even if funds are transferred for the benefit of the Afghan people, *more than $3.5 billion in DAB assets would remain in the United States and are subject to ongoing litigation by U.S. victims of terrorism. Plaintiffs will have a full opportunity to have their claims heard in court.* (emphasis added).

As this Smith/Soulas judgment against the Taliban stems from the Taliban's terrorist activities on 11 September 2001, and the Plaintiffs' decedents were killed by these terrorist attacks, attachment of these Taliban DAB assets held by the Garnishee/FRBNY per the Writ of Execution is appropriate, necessary, and proper under the TRIA, Fed. R. Civ. P. 69(a), and N.Y. C.P.L.R. §§ 5225(b)/5227. The TRIA § 201(a) subjects the DAB assets to Execution when "a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism." The Smith/Soulas plaintiffs/creditors are precisely the persons for whom the TRIA acts to provide satisfaction of a judgment against an entity such as the Taliban.

2

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. THE TALIBAN, ET AL.**
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE
FEDERAL RESERVE BANK OF NEW YORK

App.489

This Motion seeks access to the Taliban's DAB assets held by the FRBNY, also earmarked to satisfy judgments such as that obtained by the Smith/Soulas plaintiffs.

The United States Congress, via its Congressional Research Service (https://crsreports.congress.gov), has extensive analysis on the Taliban Government in Afghanistan as it exists after the August, 2021 collapse of the recognized government. These CRS reports describe the Taliban's control in all aspects of the Afghan Government, and the numerous Taliban personnel appointed to all aspects of the Afghan Government. *See* Exhibit B, Clayton Thomas, Cong. Rsch. Serv., R46879, *U.S. Military Withdrawal and Taliban Takeover in Afghanistan: Frequently Asked Questions* 10, 12–13 (September 17, 2021), https://crsreports.congress.gov/product/pdf/R/R46879 and Exhibit C, Clayton Thomas, Cong. Rsch. Serv., R46955, *Taliban Government in Afghanistan: Background and Issues for Congress,* (November 2, 2021), https://crsreports.congress.gov/product/pdf/R/R46955.

These, and other documents in this Motion, make plain that the Taliban's absolute control of the Afghanistan government has rendered, for purposes of this Turnover Motion, the DAB as an agency and instrumentality of the Taliban. This makes the frozen funds available, per TRIA, and the Executive Order, to satisfy the Plaintiffs' Judgment. *See also* declaration of Jonathan Cristol, Ph.D. (Exhibit "D").

The Smith/Soulas judgment creditors seek an order compelling the FRBNY to turn over those blocked assets of DAB in its possession (the "DAB Assets") sufficient to satisfy the outstanding amount of their judgment for compensatory damages against the Taliban, amounting to $59,262,189.57, plus further post-judgment interest that has been accruing pursuant to 28 U.S.C. § 1961. Decl. of James E. Beasley, Jr., Exhibit "E." ("Beasley Decl.").

3

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA. 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. THE TALIBAN, ET AL.**
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE
FEDERAL RESERVE BANK OF NEW YORK

App.490

The Biden Administration's freezing of these DAB assets and earmarking them for plaintiffs such as the Smith/Soulas families is because the Taliban, a terrorist entity, is in control of the DAB. Therefore, the DAB is an "agency or instrumentality" of the Taliban, as the Taliban controls the DAB and its assets, including those held by the FRBNY. Per the TRIA, these DAB assets held by the Garnishee/FRBNY and earmarked for 9/11 plaintiffs by the Biden Administration are subject to execution.

### III. FACTS

#### A. The Smith/Soulas Creditors Obtain the First 9/11 Judgment Against The Taliban and Others

On 14 July 2003, this Honorable Court entered judgment on Judge Baer's 7 May 2003 Opinion and Order finding that, *inter alia*, the Taliban and the Islamic Emirate of Afghanistan (The Taliban) were liable to the Smith and Soulas plaintiffs for the deaths of their loved ones during the September 11, 2001 terrorist attacks. On 22 February 2022, the Clerk issued a Writ of Execution that totals $59,262,189.57[1] as to compensatory damage claims against The Taliban. This Writ, served on the FRBNY via the US Marshall on 14 March 2003, has been indefinitely extended. ECF 41; ECF 48; Beasley Decl.

#### B. Afghanistan's Central Bank, Da Afghanistan Bank, is under the control of the Taliban; that is the precise reason that the Biden Administration froze these assets.

As more fully described in the Expert Declaration of Dr. Cristol (Exhibit "D") and its referenced attachments, the Taliban has assumed effective control of the entirety of the Afghan Government since the establishment of the recognized government. *See, e.g.*, Cristol Decl., §II A, B; §III A-C. On 7 September 2021, the Taliban appointed 53 cabinet

---

[1] Interest continues to accrue.

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA. 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

officials, and announced the establishment of a "caretaker government." Less than one month later, the Taliban appointed an additional 38 high-ranking officials; all the appointments are either Taliban members, or those sympathetic to the Taliban. This includes the Taliban having appointed high-level Taliban members/sympathizers to control the DAB, including Taliban First Deputy Prime Minister Mullah Ghani Baradar Akhund to oversee the DAB. *See generally* Cristol Decl., Section III B. *The Taliban control DAB*. DAB control is particularly important for the Taliban's control of Afghanistan, as controlling the Central Bank is a significant statement to the world of the Taliban's control of the Afghan Government. *See, e.g.*, CRS Reports (Exhibits "B" and "C") and Cristol Decl. (Ex. "D.") at § III, A-C, which describe, *inter alia*, the Taliban's use of the DAB as an agency and instrumentality of the Taliban, and the United States government's recognition that the Taliban control DAB.

As documented in this Motion and attachments, the Taliban and DAB themselves provide evidence to support this claim. The Taliban and DAB provide multiple statements, images, and claims via its Twitter account, including images of Taliban members in the DAB with Taliban flags prominently displayed. Since the Taliban's takeover of the Afghan Government in 2021, it has appointed multiple different governors of the DAB; first, it was Mohammed Idris as the DAB's Acting Governor until 8 October 2021, who was the Taliban's finance minister and chief money launderer. He was replaced by another Taliban appointee, Shakir Jalali was appointed Governor of DAB; Idris' title changed to "Acting General Manager" and he continues to chair meetings and represent the DAB in official settings. (Cristol decl. ¶¶ 40, 41). Similarly loyal Taliban members are involved in the operation and management of every aspect of the DAB; many

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

SMITH V. THE TALIBAN, ET AL.
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE
FEDERAL RESERVE BANK OF NEW YORK
App.492

have been specifically targeted by the United States for their illegal financial activities. For example, the DAB's First Deputy Governor, Noor Ahmad Agha, has a known history within the Taliban for ensuring funding for Taliban weapons and explosives (*Id*.). Dr. Cristol outlines other individuals who have been placed into authority positions at DAB, including Lutful Haq Noor Pasarli, a senior economic advisor to the Taliban. (*Id*., 43). In other words, the Taliban, between 1996 and December, 2001, and since the September, 2021 announcement of the new government, has had DAB as its financial agency and instrumentality to further its goals.

This is important for purposes of this Turnover Motion, as the reason that the Biden Administration froze the DAB assets held in the FRBNY was to ensure they would not be used for the Taliban's terroristic purposes, instead to be used and distributed per the terms of the 11 February 2022 Executive Order. Indeed, the same day that the Taliban overtook the Afghanistan Government, the FRBNY was directed to prohibit DAB asset withdrawal or transfer by or to the Taliban.

## IV.    THE LAW

### A.    The TRIA Provides Primary Guidance For Plaintiffs To Execute On The DAB Assets Held at the FRBNY.

As this matter seeks satisfaction of the plaintiffs' judgment from blocked Taliban assets as a function of their involvement in the 11 September 2001 World Trade Center terrorist attacks, then one must first look[2] to Title II, *Treatment of Terrorist Assets*, of

---

[2] The "[N]otwithstanding any other provision of law" language in TRIA requires one to only evaluate it in this Motion for the plaintiffs to perfect their Writ of Execution. However, application of Fed. R. Civ. P. 69(a)(1) would provide the same remedy: New York Civil Practice Law and Rules Section 5225(b) provides the relevant procedure for enforcement of a judgment against a third party in possession or custody of money or other personal property in which the judgment debtor has an interest. Its requirements are similarly met based upon the content of this Motion.

6

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA  19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

the TRIA.  §201(a) reads as follows:

SEC. 201.  SATISFACTION OF JUDGMENTS FROM BLOCKED ASSETS OF TERRORISTS, TERRORIST ORGANIZATIONS, AND STATE SPONSORS OF TERRORISM.

> (a) In General.--Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

The Taliban assets of DAB in the FRBNY via the 11 February 2022 Executive Order 14,064 and its Fact Sheet are identified as available to those with judgments arising from terrorist activities of the Taliban:

> Many U.S. victims of terrorism, including relatives of victims who died in the September 11, 2001 terrorist attacks, have brought claims against the Taliban and are pursuing DAB assets in federal court. Because some of these plaintiffs currently have writs of execution against the DAB assets, the court will need to issue a further decision regarding the scope of those writs.  Even if funds are transferred for the benefit of the Afghan people, more than $3.5 billion in DAB assets would remain in the United States and are subject to ongoing litigation by U.S. victims of terrorism.

It is apparent that this section of the TRIA authorizes the instant Motion for Asset Turnover.  As these defendants are not foreign sovereigns (*See generally* Cristol Decl.) the Foreign Sovereign Immunity Act, 28 USC §1602 et seq. (FSIA) is inapplicable; TRIA controls the process for executing on judgments to reach assets of a terrorist entity held by a third party.  The Second Circuit, via *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016), has described the process by which the TRIA is used to execute on these assets: "[T]hus, to attach Defendants' properties under the TRIA,

7

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA  19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

<u>SMITH V. THE TALIBAN, ET AL.</u>
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK

App.494

Plaintiffs must show (1) that the Defendants are a "terrorist party" or an "agency or instrumentality of that terrorist party," and (2) that the Defendants' properties are "blocked assets." *Kirschenbaum*, 830 F.3d at 132. *See also Weininger v. Castro*, 462 F. Supp. 2d. 457, 479 (SDNY, 2006):

> Thus, TRIA allows for execution on the blocked assets of a terrorist party, or its agency or instrumentality, to satisfy a judgment against the terrorist party, provided that the following requirements are met:
> (1) a person has obtained a judgment against a terrorist party;
> (2) the judgment is either
> (a) for a claim based on an act of terrorism, or
> (b) for a claim for which a terrorist party is not immune under § 1605(a)(7);
> (3) the assets are "blocked assets" within the meaning of TRIA; and
> (4) execution is sought only to the extent of any compensatory damages.
>
> In addition, as indicated, and important to this case, by its terms § 201 provides that the blocked assets that may be executed upon are those of either the "terrorist party" or "any agency or instrumentality of that terrorist party," even though the judgment itself need be only against the terrorist party.

The *Kirschenbaum* and *Weininger* courts provide clear guidance that the Smith/Soulas plaintiffs may, via the TRIA[3], enforce their judgments as to the blocked assets held pursuant to the Executive Order at the FRBNY. Their judgments do not include punitive damages, the judgment is against a terrorist entity (the Taliban) for its involvement in the World Trade Center attacks on 11 September 2001, and the DAB is an " ... agency or instrumentality" of the Taliban.

The TRIA also defines "Terrorist party" at section 201(d)(4):

(4) Terrorist party.--The term ``terrorist party'' means a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

---

[3] Federal and state law requirements, secondary to the TRIA, are discussed below.

8

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. THE TALIBAN, ET AL.**
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK

App.495

As demonstrated below, there is irrefutable evidence that the Taliban fall within the definition of "terrorist party" per TRIA §201(d)(4). Those proofs, and the connection between the Taliban and the DAB assets for each of the TRIA requirements identified in *Kirschenbaum* and *Weininger* now follows.

### B. The Taliban, Per the United States Government, the TRIA, and the Executive Orders, is a Terrorist Entity.

This lawsuit's past briefings, such as the United States' filings in it, identify the Taliban as a recognized terrorist entity. When these plaintiffs served a subpoena on the Office of Foreign Asset Control (OFAC) in 2005, the United States filed a brief related to that OFAC subpoena. In that filing, the United States identified the Taliban as a Specially Designated Global Terrorist. *See Smith v. Islamic Emirate of Afghanistan*, No. 03-MC-2169, 2005 WL 3518010 (D.D.C. Feb. 2, 2005), at fn 9:

> 9 The assets of the Taliban previously had been blocked pursuant to Executive Order 13,129, 64 Fed. Reg. 36,739 (July 4, 1999). In July 2002, as a result of the success of the military campaign in Afghanistan, the President revoked Executive Order 13,129 and terminated the national emergency declared in that order with respect to the Taliban. See Executive Order, No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002). At the same time, the President designated the Taliban as one of the entities subject to the President's 2001 blocking order. *See id*. **Accordingly, the Taliban – like Al Qaida/Islamic Army and Usama bin Laden – remain Specially Designated Global Terrorists**. *See supra* note 4 (explaining that the Islamic Emirate of Afghanistan is the former Taliban government of Afghanistan). (emphasis added).

This designation of the Taliban as a terrorist entity is still applicable. December, 2001 was when Hamid Karzai was selected as head of an interim national government, "...marking the beginning of post-Taliban governance." Exhibit "B" at 3. This was the event that created the new government, replacing the Taliban government. The Taliban were subject to sanctions at the time they participated in the 11 September 2001 attacks

9

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA. 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

*SMITH V. THE TALIBAN, ET AL.*
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK

App.496

on the United States. The Taliban, since 7 July 1999, have been the subject of E.O. 13,129, which declared a national emergency as to the Taliban and its support of terror, and the Taliban have been designated as a Specially Designated Global Terrorist. *See* E.O. No. 13,268[4] § 1; *see also* 31 C.F.R. §§ 594.310, 594.311. As written above, the recent 11 February 2022 Executive Order 14,064 continues to define the Taliban as a terrorist entity. Additional governmental support for that claim comes from a recent CRS document, Clayton Thomas, Cong. Rsch. Serv., IF10604, Terrorist Groups in Afghanistan (April 19, 2022), https://sgp.fas.org/crs/row/IF10604.pdf. This recent document, prepared for Congress, further and specifically defines the Taliban as not only a terrorist entity, but one that works with other terrorist entities:

> This product outlines major terrorist groups present in Afghanistan that are affiliated and allied with Al Qaeda (AQ) and the Islamic State (IS, also known as ISIS, ISIL, or by the Arabic acronym Da'esh), and relations between these groups and other actors, most notably the Taliban. These dynamics may inform assessments of U.S. policy in Afghanistan in light of the Taliban's renewed control of the country.

> *Id.* at 1.

Dr. Cristol provides further evidence, support, and expert opinions for this designation. *See generally* Cristol Decl., Section II D; Section III C.

**C.  The Smith/Soulas Decedents were Killed in the World Trade Center Terrorist Attacks of 11 September 2001; their Judgments against the Taliban are a Result of these Terrorist Attacks.**

Although obvious, the 11 September 2001 attacks on the World Trade Center (and other locations) were due to an "act of terrorism." As discussed above, section 201(d)(1) of the TRIA defines an "act of terrorism" to include "(A) any act or event certified under

---

[4]E.O. 13,268 ended the national emergency as to the Taliban created by President Clinton in E.O. 13,129.

10

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA. 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

SMITH V. THE TALIBAN, ET AL.
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK

App.497

section 102(1)"; or "(B) to the extent not covered by subparagraph (A), any terrorist

activity" as defined in 8 U.S.C. § 1182(a)(3)(B)(iii).  The 9/11 attacks meet these criteria,

and the United States has confirmed that.   Id.

### D.  The DAB Assets Identified in E.O. 14,064 Meet the TRIA's Definition of "Blocked Assets."

As referenced herein, President Biden's E.O. 14,064, § 1(a), ordered:

> [a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in[.]

President Biden authorized this E.O. knowing that lawsuits such as this had been

outstanding for many years.   *See* 87 Fed. Reg. at 8391 ("I also understand that various

parties, including representatives of victims of terrorism, have asserted legal claims

against certain property of DAB or indicated in public court filings an intent to make such

claims. This property is blocked under this order."). The DAB Assets are therefore blocked

property under TRIA, and available to the Smith/Soulas Creditors to satisfy their

Judgment and associated Writ of Execution.

### E.  As an Agency Or Instrumentality Of The Taliban, the DAB assets held by the FRBNY are those of The Taliban via its Alter Ego, the DAB.

The Smith/Soulas Creditors can execute against the DAB Assets if the Court finds

that (1) they are "held in the hands of" DAB, and (2) DAB is an agency or instrumentality

of the Taliban. *Kirschenbaum*, 830 F.3d at 132 (quoting *Weinstein*, 609 F.3d at 49). This

Motion confirms that all of these criteria have been met.

#### 1.  The DAB Holds The Taliban assets held in the FRBNY

As already reviewed, President Biden's Executive Order 14,064 blocked DAB assets

11

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA  19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

in the FRBNY because the Taliban claimed those funds to be theirs, to use as they intend. These funds held in the DAB accounts, as described below, therefore are presumed to be those of the Taliban, and therefore, pursuant to the plain language of the E.O., the TRIA, Federal and State law, they are available to the Smith/Soulas Creditors.

All evidence supports the fact that the DAB Assets are "held in the hands" of DAB. It undisputed that these funds are in DAB's account at the FRBNY, resulting in a presumption of a property interest. Holding funds in ones' bank account establishes a property interest, possession, and a presumption of ownership. *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 86 (2d Cir. 2002); *Hausler v. JP Morgan*, 127 F. Supp. 3d 17 (S.D.N.Y. 2015) and *Miller v. City of Ithaca*, No. 10-cv- 597, 2019 WL 2502712 (N.D.N.Y. June 17, 2019).

The TRIA and interpreting caselaw (namely *Kirschenbaum* and *Weininger*, *supra*) provide further authority for this Honorable Court to authorize release of these funds pursuant to the Writ of Execution. *Kirschenbaum* is particularly appropriate in an analogous situation wherein Creditors were seeking funds of an agency/instrumentality of a terrorist defendant:

> *Section 201(a) of the TRIA confers an independent basis for subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment. Weinstein, 609 F.3d at 50.* As this Court has previously explained, this basis for subject matter jurisdiction derives from the plain language of TRIA *§ 201(a)*, which "clearly differentiates between the party that is the subject of the underlying judgment itself, which can be any terrorist party (here, Iran), and parties whose blocked assets are subject to execution or attachment, which can include not only the terrorist party but also 'any agency or instrumentality of that terrorist party.'" *Id. at 49.* Thus, the fact that Plaintiffs obtained their underlying judgments against *Iran*, not specifically against *Alavi* or *650 Fifth Ave. Co.*, does not prevent

12

**SMITH V. THE TALIBAN, ET AL.**
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE
FEDERAL RESERVE BANK OF NEW YORK

App.499

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

Plaintiffs from attaching Defendants' properties under the TRIA.

*Kirschenbaum* at 132 (emphasis added).

### 2. Per the TRIA, DAB is an Agency or Instrumentality of The Taliban

There are multiple, independent ways that the DAB can be defined as an "agency or instrumentality" of a terrorist party. Again, the Second Circuit's *Kirschenbaum* opinion, at 135, provides useful instruction. So long as the Smith/Soulas Creditors can show one of the three, then their burden as to the DAB assets held via E.O. 14,064 are met.

1) Was DAB "a means through which a material function of the Taliban is accomplished[.]"?
*or*

2) Did DAB provide "material services to, on behalf of, or in support of the Taliban?"
*or*

3) Is DAB "owned, controlled, or directed by the terrorist party"?

Although providing evidence supporting only one of these tests is required, as described below, it is respectfully submitted that facts identified in this Motion, and the attachments including Dr. Cristol's declaration, prove that the Smith/Soulas Creditors meet each test. For example, and in sum:

1) At every occasion when the Taliban has been in control of Afghanistan, such as during the 9/11 terrorist attacks, when this suit was filed, and after the August, 2021 collapse of the recognized Afghanistan Government, the Taliban has owned, controlled, and operated the DAB. As demonstrated above and as more fully detailed in Dr. Cristol's analysis and associated documents, the Taliban's assuming control of the Afghan Government also resulted in its assuming control of DAB by installing its own personnel

13

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA. 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

to operate it, providing management and operations to benefit the Taliban. The E.O. 14,064 acknowledges as much. The Taliban's and DAB's marketing and social medial reveal countless images, statements, and claims that all reveal active and full control of the DAB. Indeed, the DAB and the Taliban have acknowledged litigation such as this, calling for the release of DAB assets held via the E.O. 14,064. *See generally* Cristol decl.

2) The Taliban's control of DAB causes it to provide support to the Taliban. Now that the Taliban have its personnel in all levels of DAB control, the Taliban can supervise Afghanistan's entire banking system, and use it as it sees fit to further its goals. The Taliban's official spokesperson, Suhail Shaheen, on 24 September 2021 has specifically written about the blocked Central Bank (DAB) assets and demanded their release. Cristol decl. ¶ 47.

That the Taliban's official spokesperson, speaking on behalf of the Afghan Central Bank (DAB), demanding release of the funds, is another example of Taliban control and interest in DAB. In sum, all of the evidence in this Motion and attachments reveal that the Taliban exert control over DAB just as it did when it previously controlled Afghanistan:

> 2. The Department of the Treasury's Office of Foreign Assets Control ("OFAC"), in consultation with the Departments of State and Justice, has added three entities to the list of those whose assets are blocked pursuant to Executive Order 13129. On August 18, 1999, OFAC added Ariana Afghan Airlines (f.k.a. Bakhtar Afghan Airlines). On October 22, 1999, OFAC added Banke Millie Afghan (a.k.a. Afghan National Bank; a.k.a. Bank E. Millie Afghan), and *Da Afghanistan Bank (a.k.a. Bank of Afghanistan; a.k.a. Central Bank of Afghanistan; a.k.a. The Afghan State Bank)*. These entities have been found to be controlled by the Taliban, and to be entities in which the Taliban has an interest.

H. DOC. NO. 106-268, at 4 (emphasis added).

The TRIA and its interpretive caselaw reveal that entities have been defined as

14

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. THE TALIBAN, ET AL.**
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE
FEDERAL RESERVE BANK OF NEW YORK

App.501

agencies or instrumentalities of terrorist organizations with fewer connections than are demonstrated in this Motion. *See, e.g.*, *Caballero v. FARC*, No. 18-CV-25337, 2021 WL 3927826, at *3 (S.D. Fla. Aug. 24, 2021) (individual who operated currency exchange program on behalf of terrorist party was an "agency or instrumentality" of that party under TRIA); *Caballero v. FARC*, No. 20-CV-1939, 2021 WL 6339256, at *2 (D. Conn. Jan. 14, 2021) (unaffiliated corporation was "agenc[y] or instrumentality" of terrorist party which "use[d]" it "to launder money"); *Estates of Ungar Ex Rel. Strachman v. Palestinian,* 153 F. Supp. 2d 76 (D.R.I. 2001).

### 3. The Smith/Soulas Creditors Have Established Entitlement to Satisfy Their Judgment, and Interest, From DAB Assets

NY C.P.L.R. § 5225, *Payment or delivery of property of judgment debtor*, subpart (b), reads as follows:

> (b) Property not in the possession of judgment debtor. Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor and, if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff. Costs of the proceeding shall not be awarded against a person who did not dispute the judgment debtor's interest or right to possession. Notice of the proceeding shall also be served upon the judgment debtor in the same manner as a summons or by registered or certified mail, return receipt requested. The court may permit the judgment debtor to intervene in the proceeding. The court may permit any adverse claimant to intervene in the proceeding and may determine his rights in accordance with section 5239.

Given the facts and law as presented in this Motion, §5225(b) affirms that the

15

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA. 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. THE TALIBAN, ET AL.**
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE
FEDERAL RESERVE BANK OF NEW YORK

App.502

Smith/Soulas Creditors are entitled to "... possession of [the] property" held by the FRBNY. The property (blocked assets) is that of DAB. It is held via E.O. 14,014. The TRIA allows blocked property such as this to be provided to the Smith/Soulas Judgment Creditors. *Weininger*, 462 F. Supp. 2d at 499; *see also Harrison*, 802 F.3d at 409 (funds subject to TRIA "may be distributed without a license from OFAC"). When blocked assets are subject to the TRIA, they are available to access by Judgment Creditors such as Smith/Soulas. *Hausler*, 127 F. Supp. 3d at 48; *Weininger*, 462 F. Supp. 2d at 499. Therefore, once the TRIA's requirements are met, as they are here, there are no limitations to access of these funds. *Hill v. Republic of Iraq*, No. 99-CV-3346, 2003 WL 21057173, at *2 (D.D.C. Mar. 11, 2003) (the "notwithstanding provision" is "unambiguous and effectively supersedes all previous laws").

### 4. The Priority Nature of the Smith/Soulas Creditors' Writ

The Smith/Soulas Creditors were the first obtain a judgment against the Taliban, hold the only valid judgment as to these plaintiffs, and filed their Writ of Execution on 22 February 2022, after two other Creditors filed their Writs of Execution. Beasley Decl. ¶ 5. When the Smith/Soulas Judgment Creditors filed and served their Writ of Execution, there was a significant excess of funds available to judgment creditors who follow their Writ. *See* Beasley Decl. ¶ 8. This history supports the claim that this Writ of Execution is timely and filed well before other Judgment creditors who would otherwise exhaust the available DAB assets held at the FRBNY. *See* N.Y. C.P.L.R. § 5234 (executions "shall be satisfied . . . in the order in which they were delivered"). *See also CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 472 (2d Cir. 2018).

16

<div align="center">

**The Beasley Firm, LLC**
1125 Walnut Street
Philadelphia, PA. 19107
215.592.1000
215.592.8360 (fax)
www.beasleyfirm.com

**SMITH V. THE TALIBAN, ET AL.**
Memorandum Of Law In Support Of Plaintiffs' Motion For Turnover Of Assets To From Garnishee
Federal Reserve Bank Of New York

# App.503

</div>

## V.    CONCLUSION

The facts, law, US government materials, briefings, and expert opinion in this Motion make it plain that the Smith/Soulas plaintiffs/judgment creditors have satisfied their requirements to access the DAB funds held in the FRBNY. As first judgment holders and the third Writ of Execution holders behind two other Creditors' Writs that seek less than the total amount of DAB funds held at the FRBNY, and as the only case with valid judgments and Writs of Executions for and by these Smith/Soulas plaintiffs specifically, the priority of the Smith/Soulas judgment creditors is established and available funds are available to satisfy the 14 July 2003 Judgment, plus interest.  It is respectfully submitted that it is appropriate and necessary for this Honorable Court to grant the relief sought in this Motion for Asset Turnover.  A proposed Order is attached.

Respectfully submitted,

*12 May 2022*

**THE BEASLEY FIRM, LLC**

By:    _____

**JAMES E. BEASLEY, JR. (pro hac vice)
DION G. RASSIAS**
The Beasley Building
1125 Walnut Street
Philadelphia, PA  19107
215.592.1000
215.592.1523 (telefax)
Attorneys for Plaintiffs

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

17

SMITH V. THE TALIBAN, ET AL.
MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TURNOVER OF ASSETS TO FROM GARNISHEE FEDERAL RESERVE BANK OF NEW YORK

App.504

# United States District Court

## SOUTHERN DISTRICT OF NEW YORK

JUDGMENT NO. 03,1446        DOCKET NO. 1:01-cv-10132 HB

THE PRESIDENT OF THE UNITED STATES OF AMERICA
To the Marshal of the Southern District of New York, GREETING:

YOU ARE COMMANDED, that of the goods and chattels of the Islamic Emirate of Afghanistan (Afghanistan), a/k/a

## The Taliban; The Taliban, al Qaeda

in your district you cause to be made the sum of fifty-nine million, two-hundred and sixty-two thousand, one-hundred

and eighty-nine _____ dollars and fifty-seven _____ cents, ($ 59,262,189.57 )

which lately in the United States District Court of the United States for the Southern District of New York, in the Second

Circuit, Raymond Anthony Smith, Administrator of George Smith Estate, and Katherine Soulas, Executrix of the Timothy Soulas Estate

recovered against the said Islamic Emirate of Afghanistan (Afghanistan) a/k/a/ The Taliban; al Qaeda; The Taliban

in an action between Raymond Anthony Smith (Administrator of the Estate of George Eric Smith);

Katherine Soulas (Executrix of the Estate of Timothy Soulas, and in her own right, on behalf of her minor children)

PLAINTIFF and the Islamic Emirate of Afghanistan (Afghanistan) a/k/a/ The Taliban, The Taliban, al Qaeda

DEFENDANT, in favor of said Plaintiff, Raymond Anthony Smith; Plaintiff, Katherine Soulas, individually and on behalf of their respective Estates

as appears by the record filed in the Clerk's Office of said District Court on the fourteenth _____ day

of July _____, in the year of 2003 _____

and if sufficient personal property of the said judgment debtor cannot be found in your District, that then you cause the same to be made out of the real property belonging to such judgment debtor on the above-mentioned day, or at any time thereafter, in whose hands soever the same may be, and return this execution within sixty days after its receipt by you, to the Clerk of said District Court.

WITNESS, the Honorable Laura T. Swain, Chief Judge of the United States District Court, for the Southern District of New York, at the City of New York, on the 22nd day of February in the year of our Lord 2022 , and of the Independence of the United States the two hundred Fourty Six year.

_____
CLERK

App.505

United States District Court

SOUTHERN DISTRICT OF NEW YORK

Raymond Anthony Smith; Katherine Soulas

-against-

the Islamic Emirate of Afghanistan; the Taliban, al Qaeda

EXECUTION AGAINST PROPERTY

James E. Beasley, Jr., Esquire.

Attorney for

Plaintiffs, Smith and Soulas

Borough of Manhattan
City of New York

To the Marshal:
You will levy and collect

59,262,189 _____

_____ Dollars

and _____ 57 cents,

with interest from the fourteenth _____

day of _____ July _____, 2003

besides your fees, etc.

*in accordance with 28 U.S.C. § 1961*

_____
Attorney

App.506