# 23-258(L)

## 23-263 (CON), 23-304 (CON), 23-346 (CON), 23-444 (CON)

### United States Court of Appeals
### *for the* Second Circuit

FIONA HAVLISH, RUSSA STEINER, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF WILLIAM STEINER, DECEASED, CLARA CHIRCHIRILLO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF PETER CHIRCHIRILLO, TARA BANE, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF MICHAEL A. BANE, GRACE M. PARKINSON-GODSHALK, IN HER OWN RIGHT AND ADMINISTRATIX OF THE ESTATE OF WILLIAM R. GODSHALK, ELLEN L. SARACINI, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF VICTOR J. SARACINI, DECEASED, THERESAANN LOSTRANGIO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF JOSEPH LOSTRANGIO, DECEASED, DEENA BURNETT, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF THOMAS E. BURNETT, JR., DECEASED, THOMAS E. BURNETT, SR., AS THE PARENT AND ON BEHALF OF THE FAMILY OF THOMAS E. BURNETT, JR., JUDITH REISS, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JOSHUA SCOTT REISS, DECEASED, WILLIAM COALE, IN HIS OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JEFFREY ALAN COALE, DECEASED, PATRICIA J. PERRY, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JOHN WILLIAM PERRY, DECEASED, BARBARA A. MINERVINO, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF LOUIS J. MINERVINO, DECEASED,

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### PLAINTIFFS-APPELLANTS' APPENDIX
### VOLUME III of III (Pages App.507 to App.708)

Ian Heath Gershengorn
Douglass A. Mitchell
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000

Lee Wolosky
Benjamin D. Alter
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Andrianna D. Kastanek
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7285

*Counsel for Plaintiffs-Appellants Fiona Havlish, et al., Appellants in 23-258*

*Additional counsel listed inside*

MATTHEW T. SELLITTO, IN HIS OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF LOUIS J. MI-
NERVINO, DECEASED, RALPH MAERZ, JR., AS PARENT AND ON BEHALF OF THE FAMILY OF NOELL
MAERZ, DECEASED, LINDA PANIK, AS PARENT AND ON BEHALF OF THE FAMILY OF LT. JONAS MAR-
TIN PANIK, DECEASED, MARTIN PANIK, AS PARENT OF AND ON BEHALF OF THE FAMILY OF LT. JONAS
MARTIN PANIK, DECEASED, MARTINA LYNE-ANN PANIK, AS THE SISTER OF LT. JONAS MARTIN
PANIK, STEPHEN L. CARTLEDGE, AS HUSBAND OF SANDRA WRIGHT CARTLEDGE, DECEASED, LOIS-
ANNE DIEHL, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF MICHAEL DIEHL, DECEASED,
TINA GRAZIOSO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF JOHN GRAZIOSO, DE-
CEASED, JIN LIU, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF LIMING GU, DECEASED,
ALL PLAINTIFFS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, MICHAEL ED-
WARD PAIGE, SPECIAL ADMINISTRATOR OF THE ESTATE OF TIMOTHY RAYMOND WARD, DECEASED.,
BRIANNA L. GOMES, ADMINISTRATOR OF THE ESTATE OF DOYLE RAYMOND WARD, DECEASED,
JOHN DOES 1 THROUGH 7, RAYMOND ANTHONY SMITH, AS ADMINISTRATOR OF THE ESTATE OF
GEORGE ERIC SMITH, DECEASED, FEDERAL INSURANCE COMPANY, PACIFIC INDEMNITY COMPANY,
CHUBB CUSTOM INSURANCE COMPANY, CHUBB INDEMNITY INSURANCE COMPANY, CHUBB INSUR-
ANCE COMPANY OF CANADA, CHUBB INSURANCE COMPANY OF NEW JERSEY, GREAT NORTHERN
INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, TIG INSURANCE COMPANY, KATHLEEN
ASHTON, AS ADMINISTRATOR OF THE ESTATE OF THOMAS ASHTON, DECEASED AND ON BEHALF OF
ALL SURVIVORS OF THOMAS ASHTON, JOSEPHINE ALGER, AS ADMINISTRATOR OF THE ESTATE OF
FREDERICK ALGER, AS COEXECUTORS OF THE ESTATE OF DAVID D. ALGER, DECEASED AND ON BE-
HALF OF THE SURVIVORS OF DAVID D. ALGER, ANGELICA ALLEN, AS ADMINISTRATOR OF THE
ESTATE OF ERIC ALLEN, DECEASED AND ON BEHALF OF ALL SURVIVORS OF ERIC ALLEN, GEORGE
ANDRUCKI, AS COADMINISTRATOR OF THE ESTATE OF JEAN ANDRUCKI ,DECEASED AND ON BEHALF
OF ALL SURVIVORS OF JEAN ANDRUCKI, MARY ANDRUCKI, AS COADMINISTRATOR OF THE ESTATE
OF JEAN ANDRUCKI, DECEASED AND ON BEHALF OF ALL SURVIVORS OF JEAN ANDRUCKI,

     Plaintiffs - Appellants,

KATHERINE SOULAS, IN HER OWN RIGHT, AS REPRESENTATIVE OF THE HEIRS, ON BEHALF OF HER
MINOR CHILDREN, AND AS EXECUTRIX OF THE ESTATE OF TIMOTHY SOULAS, DECEASED, ON BEHALF
OF THE SOLATIUM CLAIMANTS, INCLUDING KATHERINE SOULAS, FREDERICK SOULAS, II, TIMOTHY
SOULAS, JR.,

     Plaintiff,

JANE DOE, IN HER OWN RIGHT, ON BEHALF OF HER MINOR CHILDREN, AND AS EXECUTRIX OF THE
ESTATE OF TOM SAWYER, A FICTITIOUS NAME, DECEASED,

     Consolidated - Plaintiff,

                          v.

THE ISLAMIC EMIRATE OF AFGHANISTAN, THE TALIBAN, AL QAIDA/ISLAMIC ARMY, SHEIKH USA-
MAH BIN-MUHAMMAD BIN-LADEN, AKA OSAMA BIN-LADEN, REPUBLIC OF IRAQ,

     Defendants - Appellees,

FEDERAL RESERVE BANK OF NEW YORK,

      Garnishee-Interested-Party-Appellee,

SHEIKH USAMA BIN-LADEN, MUHAMMAD OMAR, AL QAEDA/ISLAMIC ARMY, ISLAMIC REPUBLIC OF IRAN, AYATOLLAH ALI HOSEINI-KHAMENEI, SUPREME LEADER, IRANIAN MINISTRY OF INFORMATION AND SECURITY, THE ISLAMIC REVOLUTIONARY GUARD CORPS, HEZBOLLAH, AN UNINCORPORATED ASSOCIATION, IRANIAN MINISTRY OF PETROLEUM, IRANIAN MINISTRY OF ECONOMIC AFFAIRS AND FINANCE, IRANIAN MINISTRY OF COMMERCE, IRANIAN MINISTRY OF DEFENSE AND ARMED FORCES LOGISTICS, SADDAM HUSSEIN, PRESIDENT, IRAQI MINISTRY OF DEFENSE, IRAQI MINISTRY OF FINANCE, IRAQI MINISTRY OF OIL, IRAQI INTELLIGENCE SERVICE, QUSAY HUSSEIN, UNIDENTIFIED TERRORIST DEFENDANTS 1-500, ALI AKBAR HASHEMI RAFSANJANI, THE NATIONAL IRANIAN TANKER CORPORATION, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 2, THE NATIONAL IRANIAN OIL CORPORATION, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 3, THE NATIONAL IRANIAN GAS COMPANY, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 4, IRAN AIRLINES, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 5, THE NATIONAL IRANIAN PETROCHEMICAL COMPANY, THE CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, UNIDENTIFIED TERRORIST DEFENDANTS 8-500, AL-QAEDA, THE HAQQANI NETWORK, AL QAIDA, EGYPTIAN ISLAMIC JIHAD, OSAMA BIN LADEN, ESTATE OF MUHAMMAD ATEF, AYMAN AL ZAWAHARI, ABU ZUBAYDH,

      Defendants.*

---

\* This caption reproduces the one currently on the Court's docket. However, the *Havlish* Plaintiffs-Appellants (the "*Havlish* Creditors") have moved the Court to correct this caption, as it is incorrect. *See* ECF 51 at 6; *see also* ECF 10. It omits a number of the *Havlish* Creditors and includes individuals who are not party to the *Havlish* case. This Court's April 5, 2023 order (Newman, J.) identified the correct list of *Havlish* Creditors in Exhibit A to that order. *See* ECF 56 at 4. The *Havlish* Creditors respectfully request that the caption be amended to correspond with the list identified in Exhibit A to the Court's April 5, 2023 order.

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, New York, NY 10001
(212) 446-2300
dbarrett@bsfllp.com

Stuart H. Singer
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
(954) 356-0011
ssinger@bsfllp.com

Timothy B. Fleming
WIGGINS CHILDS PANTAZIS FISHER
GOLDFARB, PLLC
2208 18th Street NW #110
Washington, D.C. 20009
(202) 467-4489
tfleming@wigginschilds.com

*Additional Counsel for Plaintiffs-Appellants
Fiona Havlish, et al., Appellants in 23-258*

John Thornton
Orlando do Campo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com
od@dandtlaw.com

*Counsel for Plaintiffs-Appellants John Does
1 through 7, Appellants in 23-263*

Andrew J. Maloney, III, Esq.
KREINDLER & KREINDLER LLP
485 Lexington Ave., 28th Floor
New York, NY 10017
(212) 687-8181
amaloney@kreindler.com

Sean P. Carter, Esq.
Stephen A. Cozen
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
(215) 665-2105
scarter1@cozen.com

Richard Klingler
ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
1155 F Street, N.W. Suite 750
Washington, DC 20004
(202) 249-6900
rklingler@egcfirm.com

Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for Plaintiffs-Appellants Federal
Insurance Co., et al., Appellants in 23-346*

Dion G. Rassias
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000

*Counsel for Plaintiffs-Appellants Raymond
Anthony Smith, et al., Appellants in 23-304*

Theresa Trzaskoma
Noam Biale
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 202-2600
ttrzaskoma@shertremonte.com
nbiale@shertremonte.com

*Counsel for Plaintiffs-Appellants Kathleen Ashton, et al., Appellants in 23-444*

# INDEX

## VOLUME I

Havlish Creditors' Judgment, No. 03-md-01570 (S.D.N.Y.) ("MDL Dkt."), Dkt. 2624 (Oct. 16, 2012) ....................................................App.1

Doe Creditors' Judgment, No. 20-mc-740 (S.D.N.Y.) ("Doe Dkt."), Dkt. 5 (Jan. 20, 2021)............................................................................App.8

Federal Insurance Creditors' Judgment, MDL Dkt. 7888 (Apr. 20, 2022).......................................................................................App.12

Smith Creditors' Judgment, No. 01-cv-10132 (S.D.N.Y.) ("Smith Dkt."), Dkt. 28 (July 14, 2003) ........................................................App.15

Amended Order of Judgment, MDL Dkt. 3226 (Mar. 8, 2016) ......................App.17

Order of Further Partial Judgment, MDL Dkt. 3300 (June 16, 2016)............App.28

Memo Endorsement of Judge Failla, Doe Dkt. 26 (Sept. 23, 2021) ..............App.32

Statement of Interest of the United States, MDL Dkt. 7661, Doe Dkt. 49 (Feb. 11, 2022) ...............................................................................App.34

Executive Order 14,064, MDL Dkt. 7661-1, Doe Dkt. 49-1 (Feb. 11, 2022) ...............................................................................................App.70

Office of Foreign Assets Control License, MDL Dkt. 7661-2, Doe Dkt. 49-2 (Feb. 11, 2022).........................................................................App.73

Transcript of Proceedings, MDL Dkt. 7713 (Feb. 22, 2022) .........................App.76

Havlish Creditors' Motion for Partial Turnover of Assets, MDL Dkt. 7764 (Mar. 20, 2022) ....................................................................App.111

Declaration of Douglass A. Mitchell in Support of the Havlish Creditors' Motion for Partial Turnover of Assets ("Mitchell Decl."), MDL Dkt. 7765 (Mar. 20, 2022) ..................................................App.144

Havlish Creditors' Writ of Execution, Ex. 1 to Mitchell Decl., MDL Dkt. 7765-1 (Mar. 20, 2022).........................................................App.149

U.S. Marshals' Letter to Federal Reserve Bank of New York, Ex. 2 to Mitchell Decl., MDL Dkt. 7765-2 (Mar. 20, 2022)......................................App.162

U.S. Marshals' Process Receipt and Return, Ex. 3 to Mitchell Decl., MDL Dkt. 7765-3 (Mar. 20, 2022) ...............................................................App.176

Consolidated Financial Statements of Da Afghanistan Bank, Ex. 4 to Mitchell Decl., MDL Dkt. 7765-4 (Mar. 20, 2022)......................................App.178

Currency Conversion Table, Ex. 5 to Mitchell Decl., MDL Dkt. 7765-5 (Mar. 20, 2022) ....................................................................................App.243

Twitter Screen Capture, Ex. 6 to Mitchell Decl., MDL Dkt. 7765-6 (Mar. 20, 2022) ................................................................................................App.245

## VOLUME II

Expert Declaration of Alex B. Zerden in Support of the Havlish Creditors' Motion for Partial Turnover of Assets, MDL Dkt. 7766 (Mar. 20, 2022) ................................................................................................App.247

Memorandum of Law in Support of the Doe Creditors' Motion for Turnover of Assets, MDL Dkt. 7769 (Mar. 20, 2022) ...................................App.319

Doe Creditors' Writ of Execution, Ex. A to Memorandum of Law in Support of the Doe Creditors' Motion for Turnover of Assets, MDL Dkt. 7769-1 (Mar. 20, 2022).........................................................................App.350

Declaration of John Thornton in Support of the Doe Creditors' Motion for Turnover of Assets, MDL Dkt. 7770 (Mar. 20, 2022)............................App.352

Complaint, No. 22-cv-3228 (S.D.N.Y.), Dkt. 1 (Apr. 20, 2022)...................App.354

Transcript of Proceedings, MDL Dkt. 7966 (Apr. 26, 2022) ........................App.383

Memorandum of Law in Support of the Federal Insurance Creditors' Motion for Partial Turnover of Assets, MDL Dkt. 7937 (Apr. 29, 2022) ................................................................................................................App.423

Declaration of Sean P. Carter in Support of the Federal Insurance Creditors' Motion for Partial Turnover of Assets ("Carter Decl."), MDL Dkt. 7938 (Apr. 29, 2022)....................................................................App.456

Federal Insurance Creditors' Writ of Execution, Ex. 1 to Carter Decl., MDL Dkt. 7938-1 (Apr. 29, 2022) ................................................................App.460

U.S. Marshal's Process Receipt and Return, Ex. 2 to Carter Decl., MDL Dkt. 7938-2 (Apr. 29, 2022) ..........................................................................App.472

Declaration of J. Scott Tarbutton, Ex. 6 to Carter Decl., MDL Dkt. 7938-6 (Apr. 29, 2022) ................................................................................App.474

Memorandum of Law in Support of the Smith Creditors' Motion for Turnover of Assets, Smith Dkt. 63 (May 18, 2022) ......................................App.484

Smith Creditors' Writ of Execution, Smith Dkt. 46-3 (Apr. 22, 2022).........App.505

## VOLUME III

Expert Declaration of Jonathan L. Cristol in Support of the Smith Creditors' Motion for Turnover of Assets, Smith Dkt. 64 (May 18, 2022) ...........................................................................................................App.507

Declaration of James E. Beasley, Jr. in Support of the Smith Creditors' Motion for Turnover of Assets, Smith Dkt. 65 (May 18, 2022)....................App.527

Havlish Creditors' Affidavit of Service, MDL Dkt. 7776 (Mar. 21, 2022) ...........................................................................................................App.531

Doe Creditors' Affidavit of Service, MDL Dkt. 7777 (Mar. 21, 2022) ........App.532

Doe Creditors' Certificate of Service, Doe Dkt. 90 (Mar. 30, 2022) ............App.533

Doe Creditors' Certificate of Service, Doe Dkt. 91 (Mar. 30, 2022) ............App.535

Doe Creditors' Certificate of Service, Doe Dkt. 93 (Mar. 31, 2022) ............App.538

Doe Creditors' Certificate of Service, Doe Dkt. 94 (Mar. 31, 2022) ............App.540

Doe Creditors' Certificate of Service, Doe Dkt. 95 (Apr. 1, 2022)...............App.542

Doe Creditors' Notice of Acknowledgement of Service, Doe Dkt. 97 (Apr. 4, 2022).................................................................................................App.544

Opinion and Order of Magistrate Judge Netburn Authorizing Alternative Service, MDL Dkt. 7830 (Apr. 5, 2022)......................................App.546

Order of Judge Daniels Granting Federal Insurance Plaintiffs' Motion for Partial Final Judgment, MDL Dkt. 7833 (Apr. 6, 2022)..........................App.562

Havlish Creditors' Certificate of Service, MDL Dkt. 7904 (Apr. 25, 2022) ................................................................................................App.565

Doe Creditors' Certificate of Service, MDL Dkt. 7910 (Apr. 25, 2022) ......App.569

Federal Insurance Creditors' Affidavit of Service, MDL Dkt. 7943 (May 3, 2022)........................................................................................App.573

Havlish and Doe Creditors' Joint Certificate of Service by Publication, MDL Dkt. 8059 (May 31, 2022)....................................................................App.574

Smith Creditors' Certificate of Service by Publication, Smith Dkt. 68 (June 9, 2022)........................................................................................App.579

Smith Creditors' Certificate of Service by Twitter and Electronic Mail, Smith Dkt. 69 (June 9, 2022) ........................................................................App.583

Federal Insurance Creditors' Certificate of Service, MDL Dkt. 8125 (June 17, 2022)......................................................................................App.586

Memorandum of Law in Support of Ashton Plaintiffs' Emergency Motion for Attachment, MDL Dkt. 8413 (Aug. 19, 2022)..........................App.594

Report & Recommendation of Magistrate Judge Netburn, MDL Dkt. 8463 (Aug. 26, 2022) .................................................................................App.616

Declaration of William W. Burke-White, MDL Dkt. 8734 (Nov. 10, 2022) ................................................................................................App.659

Memorandum Decision and Order of Judge Daniels Denying Motion for Stay Pending Appeal, MDL Dkt. 8876 (Feb. 24, 2023) ..........................App.679

Havlish Creditors' Notice of Appeal, MDL Dkt. 8881 (Feb. 27, 2023) .......App.684

Doe Creditors' Notice of Appeal, MDL Dkt. 8883 (Feb. 28, 2023) .............App.691

Smith Creditors' Notice of Appeal, Smith Dkt. 105 (Mar. 3, 2023).............App.693

Federal Insurance Creditors' Notice of Appeal, MDL Dkt. 8910 (Mar. 8, 2023) ................................................................................................App.694

Ashton Plaintiffs' Notice of Appeal, MDL Dkt. 8950 (Mar. 23, 2023)........App.696

Memorandum Decision and Order of Judge Daniels, MDL Dkt. 8973
(Mar. 30, 2023) ...............................................................................App.698

**EXPERT DECLARATION OF JONATHAN L. CRISTOL**

**I.      Introduction and Qualifications**

1.      My name is Jonathan L. Cristol, Ph.D. I am submitting this declaration in my capacity as an expert consultant to the Plaintiffs in Smith/Soulas v. The Taliban (aka. The Islamic Emirate of Afghanistan). The facts and opinions stated in this report are based on my research, expertise, observations, and professional experience.

2.      I am the Interim Director of International Studies at Adelphi University in Garden City, NY. I am an adjunct assistant professor of political science at Yeshiva University in New York, NY. At both institutions I teach courses including: "American Foreign Policy"; "International Security"; "Middle East Politics"; and "Terrorism and Asymmetric Conflict," among others. I am also a senior fellow at Bard College's Center for Civic Engagement in Annandale-on-Hudson, New York.

3.      I have studied the Taliban and the concepts of "effective control," "sovereignty," and "diplomatic recognition" for more than twenty years. I am the author of the 2019 book *The United States and the Taliban before and after 9/11* (Palgrave), and more than fifty articles on a range of topics pertaining to international security. I frequently offer expert commentary in global media and regularly act as a regional subject-matter expert on topics related to this motion in the US intelligence community. In addition, I have attended closed meetings related to the Taliban both in the United States and in Qatar.[1]

---

[1] Note: This document does not contain classified information. I am not required to submit my work for prepublication review.

4.      I received a B.A. in Political Studies from Bard College, in Annandale-on-Hudson, NY, and an M.A. in International Relations from Yale University, in New Haven, CT. I earned my Ph.D. in Politics and International Relations from the University of Bristol, in Bristol, United Kingdom.

5.      My doctoral dissertation focused on the diplomatic practice of the USG when new states are created and/or new regimes take power through irregular means— The non-recognition of the Taliban government was a primary focus of my doctoral research.

6.      I have been asked to provide an expert opinion regarding facts relevant to the determination as to whether Da Afghanistan Bank (DAB) is under the "effective control" of the Taliban. As a result of my professional experience, I am able to offer expert opinion on both the Taliban and Taliban governance and on the nature of "effective control."

**II.      The Taliban**

      **A.      The Taliban have "effective control" of Afghanistan.**

7.      "Effective control" is a prerequisite for sovereignty under both customary international law and the standard diplomatic practice of the United States. A political entity cannot rightly be said to be a sovereign power if it does not establish and maintain effective control over its territory.

8.      The prevailing standard for what constitutes "effective control" is that a political entity must: 1) be "in actual control of the administrative machinery of the state"; 2) perform "normal

governmental functions"; and 3) not be met "with open resistance to its authority."[2] The Taliban clearly meet the prevailing standard for "effective control" over the internationally recognized territory of Afghanistan.

9.    The Taliban control the administrative machinery of the state. On 7 September 2021, the Taliban appointed 53 cabinet officials and announced the establishment of a "caretaker government."[3] The Taliban appointed an additional 38 high-ranking government officials on 4 October 2021.[4] These appointments are not only in areas of defense, foreign, and economic policy; but include an Acting Head of the National Olympic Committee and an Acting Director of Central National Statistics. The overwhelming majority of appointments to managerial positions have been of Taliban members; those that are not themselves Taliban are sympathetic to the Taliban. These appointments and the continued functioning of government agencies show that the Taliban have asserted control over the administrative machine of the state— and I have absolutely no doubt that the Taliban do control the administrative machinery of the state.

10.    The Taliban are performing normal governmental functions. Since retaking control of Afghanistan the Taliban have reopened cabinet agencies and government offices. The Taliban have: exerted authority over the education system;[5] enacted and enforced local laws;[6] and defended

---

[2] Fenwick, C.G. 1944. The Recognition of New Governments Instituted by Force. *The American Journal of International Law.* 38 (3): 448–452.

[3] Bahiss, I. 2021. Afghanistan's Taliban Expand Their Interim Government. *International Crisis Group.*. 28 September 2021. (https://www.crisisgroup.org/asia/south-asia/afghanistan/afghanistans-taliban-expand-their-interim-government) Accessed: 1 May 2022.

[4] N.A. 2021. Taliban appointments add to all-male Afghan government team. *Associated Press.* 4 October 2021. (https://apnews.com/article/business-taliban-zabihullah-mujahid-afghanistan-government-kabul-f087fcd995431f3ae430ded3b0b7a937) Accessed: 3 May 2022.

[5] Qazizai, F. 2022. Taliban reverses decision, barring Afghan girls from attending school beyond 6th grade. *All Things Considered.* National Public Radio. (https://www.npr.org/2022/03/23/1088202759/taliban-afghanistan-girls-school) Accessed: 2 May 2022.

[6] Padshah, S. and Gibbons-Neff, T. 2022. Taliban Outlaw Opium Poppy Cultivation in Afghanistan. *New York Times.* 3 April 2022.

Afghanistan's borders;[7] to name just a few of countless examples. The nature of the Taliban's actions in this regard is not relevant; and I have absolutely no doubt that the Taliban are performing normal governmental functions— though their specific actions in this regard range from the ill-advised to morally repugnant.

11. The Taliban are not meeting open resistance to its authority. Street protests against Taliban policies, even violent protests, do not constitute "open resistance" for the purpose of establishing "effective control." The relevant fact is that there is no other entity that both possesses and asserts political authority in Afghanistan. A recent Congressional Research Service (CRS) report on the Taliban government discusses the *possibility* of armed, organized resistance to the Taliban in purely hypothetical terms.[8]

12. The Taliban's primary domestic opposition is "Islamic State Khorasan" (IS-K); but IS-K cannot be considered a political rival for effective control of "Afghanistan" as it hopes to eliminate Afghanistan as a distinct political entity: "IS-K disregards international borders and envisions its territory transcending nation-states like Afghanistan and Pakistan."[9] It is my expert

---

[7] The Taliban and Iranian forces have exchanged fire across the internationally recognized Afghanistan/Iran border on multiple occasions since 7 September 2021. See: Motamedi, M. 2021. Iran and Taliban forces clash in border area. *Al Jazeera.* 1 December 2021. (https://www.aljazeera.com/news/2021/12/1/iran-and-taliban-forces-clash-in-border-areas); N.A. 2022. Taliban, Iranian Border Guards Exchange Fire. *Radio Free Europe/Radio Liberty.* 8 March 2022. (https://gandhara.rferl.org/a/taliban-iranian-border-guards/31742788.html); and Anadolu Agency. 2022. Iran closes Afghan border crossing after skirmishes with Taliban. *Daily Sabah.* 23 April 2022. (https://www.dailysabah.com/world/mid-east/iran-closes-afghan-border-crossing-after-skirmishes-with-taliban); all accessed 2 May 2022.

[8] "[The] existence of resistance factions, in Panjshir or elsewhere, could serve as a rallying point or galvanize Taliban opponents nationwide, who might then make additional appeals for U.S. or other international assistance. It is not clear how likely this prospect is." Thomas, C. 2021. Taliban Government in Afghanistan: Background and Issues for Congress. Congressional Research Service. 2 November 2021. pp. 14.

[9] Sharb. C. 2018. Islamic State Khorasan (IS-K). Center for Strategic and International Studies. (https://www.csis.org/programs/transnational-threats-project/past-projects/terrorism-backgrounders/islamic-state-khorasan) Accessed: 2 May 2022.

opinion that the Taliban face no serious "open resistance" to its authority and are highly unlikely to face any such resistance for the foreseeable future.

13.     It is my expert opinion that the Taliban have established effective control of the internationally recognized territory of Afghanistan. Moreover, the USG acknowledges the Taliban's effective control of the internationally recognized territory of Afghanistan: "the Taliban appear to effectively control the entire country."[10]

**B.      The Taliban are the *de facto* sovereign power in Afghanistan.**

14.     The Taliban became the *de facto* sovereign power in Afghanistan when it announced the formation of a new government on 7 September 2021.[11] The Taliban both possess and assert all three attributes of sovereignty necessary to be considered the *de facto* sovereign in Afghanistan: 1) control over international borders; 2) a monopoly on the use of force; and 3) the ability to conduct an independent foreign policy.[12]

---

[10] Thomas, C. 2021. Taliban Government in Afghanistan: Background and Issues for Congress. Congressional Research Service. 2 November 2021. pp. 13.

[11] The Taliban's announcement of a "caretaker government" on 7 September 2021 is a necessary assertion of sovereignty and marks that date as the formal start of Taliban rule in Afghanistan. However, it should be noted that the Taliban achieved effective control at some point between 15 August 2021 when it entered Kabul and 31 August 2021 when the USG completed its withdrawal from Afghanistan.

[12] These are the attributes applicable to an unrecognized government and to *de facto* sovereignty. See: Cristol, J. 2012. American Diplomatic Recognition and Classical Realist International Relations Theory. University of Bristol, UK. Ph.D. Diss. Chapter One.

15.     The Taliban control Afghanistan's borders and act to defend those borders.[13] CRS reports that in July 2021, "the Taliban began seizing border crossings with Tajikistan, Iran, and Pakistan."[14] The Taliban took control of the border with Uzbekistan in early August 2021.[15] A Council on Foreign Relations map (Appendix A) shows that by 15 August 2021 the Taliban were in almost complete control of Afghanistan's borders.

16.     The Taliban have a monopoly on the use of force in Afghanistan and there are no domestic rivals to Taliban rule.[16]

17.     The Taliban have the ability to conduct and do conduct an independent foreign policy. The Taliban regularly negotiate with recognized governments and international institutions, including the United States and the European Union. The Taliban maintain an official office in Doha, Qatar and Taliban representatives regularly travel internationally to conduct official business. The Taliban do not take direction from any other state or non-state actor.

18.     It is my expert opinion that the Taliban are the *de facto* sovereign power inside the internationally recognized territory of Afghanistan.

### C.     The Taliban are not the recognized government of Afghanistan.

19.     The Taliban are not the recognized government of Afghanistan. The United States does not recognize the Taliban (or any other actor) as the government of Afghanistan. The Taliban are

---

[13] See Footnote 7.
[14] Thomas. 2021.
[15] N.A. 2021. Taliban seizes Afghan borders with Tajikistan, Uzbekistan: Russia. *Al Jazeera.* 11 August 2021.
[16] See Para. 12-13.

not recognized as the legitimate government of Afghanistan by any United Nations (UN) member state, nor does the Taliban government represent Afghanistan in any international institution.

20.     The establishment of "effective control" is necessary, but not sufficient, for recognition. It is possible to have *de facto* sovereignty without recognition— as has been the case vis-a-vis the United States and Taiwan since 1979.

21.     Recognition may only be granted after certain conditions are met; but the standard practice of the United States is to treat recognition as a political decision and not an acknowledgement that a state has met objective criteria.[17]

22.     The POTUS has sole constitutional authority to recognize new states and new governments. Unless and until the POTUS recognizes the Taliban as the legitimate government of Afghanistan, the Taliban, its representatives and its agencies (including DAB), are not entitled to any legal protections, guarantees, or immunities afforded exclusively to recognized governments. Moreover, unless and until the POTUS recognizes the Taliban as the legitimate government of Afghanistan, it remains a terrorist entity, and *all* federal government agencies (including DAB) in Afghanistan can rightly be considered an agency or instrumentality of the Taliban.

**D.     The Taliban are a terrorist entity.**

**i. Status of the Taliban under US law.**

---

[17] See: Coggins, B. 2006. Secession, Recognition and the Politics of Statehood. Ph. D. Diss. Ohio State University; and Geldenhuys, D. 2009. *Contested States in World Politics.* New York: Palgrave Macmillan.

23.     The USG has acknowledged the existence of the Taliban as a distinct political entity for at least 27 years.[18] The Taliban is currently designated as a Specially Designated Global Terrorist entity (SDGT) as defined by Executive Order 13224. There are more than 70 Afghan-based individuals and organizations currently subject to sanctions as Specially Designated Global Terrorists — and there are many other Taliban-linked individuals and organizations designated as SDGTs that are based outside of Afghanistan. The Office of the Director of National Intelligence's National Counterterrorism Center includes the Taliban in its list of "terrorist groups."[19]

24.     The Taliban is not designated as a Foreign Terrorist Organization by the Department of State because such a designation would preclude direct talks between the USG and the Taliban. Afghanistan is not designated as and cannot be designated as a "State Sponsor of Terrorism," because the USG does not recognize the Taliban government as the *de jure* sovereign power in Afghanistan.

### ii. The Taliban/Al Qaeda Relationship.[20]

---

[18] Smyth, W.H. 1994. New Fighting and New Forces in Kandahar [from US Consulate Peshawar to Secretary of State Christopher]. 3 November 1994. US Department of State, document accessed at the National Security Archive, Washington, DC.

[19] N.A. Undated. "Afghan Taliban." *Counter Terrorism Guide*. National Counterterrorism Center. Office of the Director of National Intelligence. (https://www.dni.gov/nctc/groups/afghan_taliban.html) Accessed: 4 May 2022.

[20] This section draws heavily on: Cristol, J. 2019. *The United States and the Taliban before and after 9/11*. New York: Palgrave

25.     The Taliban were formed by Mullah Mohammad Omar and Ehsanullah Ehsan in Afghanistan in 1994.[21] One 1995 USG diplomatic cable described the Taliban as, "Well-armed, militarily proficient, and eager to expand their influence" and to take control of "as much of the rest of Afghanistan as possible."[22] The Taliban took Kabul on 27 September 1996 and toppled the internationally recognized government of Afghanistan.

26.     Osama bin Laden (OBL) moved to Afghanistan on 19 May 1996 and gave the Taliban an initial $3 million donation.[23] In January 1997 the Taliban acknowledged to John Holzman, a US diplomat serving in Pakistan, that OBL was their "guest." Taliban officials told Holzman that Al Qaeda terrorist training camps in Afghanistan could remain open. Holzman concluded that, "The Taliban appears to have concluded that it is in their interest to give [bin Laden] refuge."[24]

27.     Between 1997 and 2001 USG and Taliban representatives held dozens of meetings in Afghanistan, Pakistan, and the United States.[25] To the best of my knowledge, I have read every declassified document about these meetings. The Taliban/Al Qaeda relationship was raised in *all* of these meetings. The CIA concluded that Mullah Omar "is formally committed to bin Laden's

---

[21] "Mullah" is an amorphous term that indicates the person is a learned religious person or cleric. In this report I use it only in reference to Mullah Mohammad Omar, as the standard practice is to refer to him as "Mullah Omar." I do not use "Mullah" or any other honorific in reference to anyone else in this report.

[22] Holzman, J. 1995. The Taliban: What We've Heard [from US Embassy Islamabad to Secretary of State Christopher]. 26 January 1995. US Department of State, document accessed at the National Security Archive, Washington, DC.

[23] LeVine, S. and Bonner, R. 1998. Doubts Grow That Taliban Would Give up Terrorist Mastermind to the U.S. *New York Times.* 25 August 1998. p. A6.

[24] Hanson, B. 1997. Afghanistan: Taliban Agree to Visits of Militant Training Camps, Admit Bin Ladin Is Their Guest [from US Consulate Peshawar to Secretary of State Albright]. 9 January 1997. US Department of State, document accessed at the National Security Archive, Washington, DC.

[25] In conducting research for Cristol 2012 and Cristol 2019, I attempted to count all known US/Talibanmeetings; but I stopped counting when the number reached into the thirties.

continued stay in Afghanistan" and that if half his country "had to be destroyed to protect bin Laden, then so be it."[26]

28.     The USG clearly acknowledged that the Taliban and al Qaeda had a close relationship. The historical record clearly indicates: that the USG believed that the Taliban had the capacity to shut down Al Qaeda operations in Afghanistan but refused to do so; and that the Taliban had the capacity to detain OBL and transfer him to USG custody but refused to do so.

### iii. The Taliban and terrorism today.

29.     The Taliban today are not the same as the Taliban who had effective control of Afghanistan from 1996-2001— They are worse. "Many of the moderate members of the Taliban, who opposed the tacit alliance with Al Qaeda, either left the country or changed sides at the time of the initial invasion. The Taliban today is more unreasonable, intransigent, ideological, and extremist [than they were in 2001]."[27] I wrote those words before the US withdrawal from Afghanistan and, unfortunately, subsequent events bare that out.

30.     The Taliban are now one of the most deadly terrorist groups in the world. The Global Terrorism Index (GTI)— generally considered to be highly accurate— records 9,473 fatalities from Taliban terrorist attacks between 2007 and 2021. In the past two years, the Taliban conducted 474 terrorist attacks, including 11 suicide bombings. The 2022 GTI notes that: in 2021, the Taliban "was the most active terrorist group in Afghanistan"; "the Taliban recorded IED attacks with mobiles and uploaded them on Twitter to recruit, raise funds and build morale"; and

---

[26] Filkins, D. 2001. The Legacy of the Taliban Is a Sad and Broken Land. *New York Times.* 31 December 2001. pp. A1, B4.
[27] Cristol, J. 2019. *The United States and the Taliban before and after 9/11.* New York: Palgrave. pp. 102.

indicates that, "global jihadi terrorist groups may once again find a safe haven [in Afghanistan]." These brief quotes indicate that: 1) the Taliban continue to carry out terrorist attacks; 2) the Taliban glorify terrorist attacks; and 3) the Taliban may allow Afghanistan to be used as a base for other terrorist groups.[28] I agree with this assessment.

31.     The Taliban work closely with other terrorist organizations. The Haqqani Network (HN), a designated FTO, is "allied with, and increasingly embedded in, the Taliban leadership structure."[29]  HN's leader Sirajuddin Haqqani is the Interior Minister of the Taliban government. The Taliban government's Minister for Refugees (Khalil-Ur-Rehman Haqqani) has "acted on behalf of Al-Qaeda… and has been linked to its military operations" and "provides support to the Taliban and the Haqqani Network."[30] CRS reports that the Taliban government gives safe harbor to Tehrik-e-Taliban Pakistan and is "allied" with the Islamic Movement of Uzbekistan, both of which are designated FTOs.[31]

32.     The Taliban are the *de facto* government of Afghanistan and an SDGT entity. The USG acknowledges that a *de facto* government can also be a terrorist entity. The USG acknowledges that a *de facto* government can even be an FTO— as is the case with Hamas and the Gaza Strip.

## III.     Da Afghanistan Bank (DAB)

---

[28] The information in this paragraph comes from: N.A. 2022. Global Terrorism Index 2022. Institute for Economics & Peace. (https://reliefweb.int/sites/reliefweb.int/files/resources/GTI-2022-web.pdf) Accessed: 4 May 2022.

[29] Smith, J. 2021. The Haqqani Network: The New Kingmakers in Kabul. *War on the Rocks*. 12 November 2021. (https://warontherocks.com/2021/11/the-haqqani-network-afghanistans-new-power-players/) Accessed: 4 May 2022.

[30] N.A. 2011. Khalil Ahmed Haqqani. 1988 Sanctions Committee. United Nations Security Council. 9 February 2011. (https://www.un.org/securitycouncil/sanctions/1988/materials/summaries/individual/khalil-ahmed-haqqani) Accessed: 4 May 2022.

[31] Thomas, C. 2022. Terrorist Groups in Afghanistan. *CRS in Focus*. Congressional Research Service. 19 April 2022. (https://sgp.fas.org/crs/row/IF10604.pdf) Accessed: 4 May 2022.

## A.    DAB is the central bank of Afghanistan.

33.    DAB is the central bank of Afghanistan. DAB was established in 1939 and its main tasks, as described on DAB's website, are those commonly associated with a central bank.[32]

34.    DAB is recognized by the USG and the international financial institutions as the central bank of Afghanistan. President Biden's Executive Order 14064 states that the "term 'Da Afghanistan Bank' or 'DAB' means the Central Bank of Afghanistan."[33] The International Monetary Fund (IMF) refers to DAB as the central bank of Afghanistan and treats it as same.[34] The World Bank refers to DAB as the central bank of Afghanistan and treats it as same.[35]

## B.    The Taliban control DAB.

35.    The Taliban control DAB. Taliban officials visited DAB soon after the Taliban assumed control of the administrative machinery of the state. The Taliban "immediately claimed a right to the money"[36] and appointed new leadership of DAB even before announcing the establishment of its "caretaker government." The Sweden-based *Independent Persian* reports that DAB "is controlled by the Taliban and all management positions are held by Taliban members."[37] That

---

[32] N. A. About Us. Da Afghanistan Bank. (https://www.dab.gov.af/about-us) Accessed: 30 April 2022.
[33] Biden, J.R. 2022. Executive Order on Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan. 11 February 2022.
[34] N.A. Islamic Republic of Afghanistan. IMF Country Report No. 19/382. December 2019. (https://www.imf.org/-/media/Files/Publications/CR/2019/1AFGEA2019003.ashx) Accessed: 30 April 2022.
[35] N.A. 2021. *The World Bank Group in Afghanistan :Country Update (English).* Washington, D.C. : World Bank Group.(http://documents.worldbank.org/curated/en/451181617171930719/The-World-Bank-Group-in-Afghanistan-Country-Update) Accessed: 30 April 2022.
[36] Savage, C. 2022. Spurning Demand by the Taliban, Biden Moves to Split $7 Billion in Frozen Afghan Funds. *New York Times*. 11 February 2022.
[37] Vafaee, M. 2022. Taliban Lobbies: Give Afghanistan's foreign exchange reserves to a Taliban-controlled bank. *Independent Persian.*14 March 2022.

statement is accurate— but the situation is perhaps not as straightforward as reported in the popular press.

36.     DAB governance is amorphous and opaque, but it can be understood. The Taliban do control DAB and it is clear that they intend to use DAB as an instrument to pursue their own goals. One of those goals is to show that they are capable of governing Afghanistan; another is to ensure Taliban control of current and future funds held by DAB— a Taliban goal since the 1990s.[38] It is important to the Taliban that DAB does not collapse or they will fail to achieve either goal. The Taliban thus need to balance loyalty and commitment to the organization with minimal competence and experience. It is my expert opinion that they have set up a system in which relatively competent non-Taliban advisors provide their expertise to Taliban decision-makers. Both groups act as frontmen depending on the intended audience— competent non-Taliban advisors and well-known Taliban figures handle outward-facing meetings and appearances, while lesser known or more extreme Taliban handle inward-facing meetings and appearances. It is my expert opinion that this type of governance is in keeping with past Taliban practice and indicates that the Taliban intend to operate DAB in accordance with their own interests and aims, and to do so indefinitely.

37.     The particular job titles and formal roles within DAB shift frequently and without notice, but it is possible to show that Taliban managers, including SDGTs, control DAB. The following paragraphs provide brief profiles of senior DAB decision-makers and advisors. I have chosen to use a single job title for each person, but in every case the reader should assume that the titles are ever-changing, even if the nature of the position is constant.

---

[38] See Cristol 2019, pp. 6, 99.

38.     Taliban First Deputy Prime Minister Mullah Ghani Baradar Akhund (aka Abdul Ghani Baradar Abdul Ahmad Turk) has oversight authority of DAB. Baradar is the former head of the Taliban's political office in Doha and was the lead negotiator in talks with the USG. He helped Mullah Omar to found the Taliban and later married Mullah Omar's sister.[39] Baradar does not run DAB's day-to-day operations, but weighs in on matters of policy and even on seemingly mundane decisions.[40]

39.     Gul Agha Ishakzai (aka Hedayatullah Badari) is the Taliban finance minister and is also in an oversight/supervisory role vis-a-vis DAB. Ishakzai is a member of the Taliban's Leadership Council[41] and  "is renowned for organizing terror funding for suicide missions and was one of [Taliban founder] Mullah Omar's closest confidants."[42]

40.     Mohammad Idris (aka Mohammad Idrees aka Alhaj Abdul Qahir) was appointed governor of DAB pm 7 September 2021 and Idris served in that position until 8 October 2021.[43] Idris was the Taliban finance minister and his primary financial experience is as the Taliban's chief

---

[39] N.A. 2021. Profile: Mullah Baradar, new deputy leader in Afghan gov't. *Al Jazeera*. 7 September 2021. (https://www.aljazeera.com/news/2021/9/7/profile-mullah-baradar-afghanistans-new-leader) Accessed: 3 May 2022.

[40] Da Afghanistan Bank-Afghanistan. [@AFGCentral Bank]. 21 April 2022. The Economic Commission, headed by Mullah Abdul Ghani Baradar Akhund, the first deputy prime minister, said the scheme developed by Da Afghanistan Bank for money changers was feasible. The scheme is aimed at regulating money changers, obtaining work permits and preventing money laundering outside Afghanistan. [Tweet]. Retrieved from: https://twitter.com/AFGCentralbank/status/1517047893676498945.  [Translated from Pashto by Google Translate]

[41] N.A. 2021. Profiles Of Afghan Taliban Ministers – Interior Minister Is On FBI's Most Wanted List, 14 Ministers Including Prime Minister Are On UN Security Council's Terror Blacklist. Middle East Media Research Institute. Special Dispatch No. 9566. (https://www.memri.org/reports/profiles-afghan-taliban-ministers-%E2%80%93-interior-minister-fbis-most-wanted-list-14-ministers). Accessed: 2 May 2022.

[42] Misra, A. 2021. Afghanistan: who's who in the Taliban's 'inclusive 'new administration. *The Conversation*. 26 August 2021. (https://theconversation.com/afghanistan-whos-who-in-the-talibans-inclusive-new-administration-166767) Accessed: 2 May 2022.

[43] Despite official announcements that Shakir Jalali was the new DAB governor, Idris is still sometimes referred to as DAV governor and his formal title is unclear. However, it is clear that he still maintains managerial authority DAB.

money launderer. After Shakir Jalali was appointed governor of DAB, Idris became the "Acting General Manager." Idris continues to chair meetings and to represent DAB in official settings—and indeed Taliban communication channels occasionally refer to him as the acting governor. After the 9/11 attacks, the CIA contacted Idris directly and asked for his assistance in detaining and extraditing Osama bin Laden— Idris declined.[44]

41.     Noor Ahmad Agha (aka Ahmad Zia Agha) is the DAB First Deputy Governor. *The Wall Street Journal* reports that Agha, "is a senior Taliban military and financial leader sanctioned for allegedly managing funds intended for bombs and for distributing money to Taliban commanders and associates abroad."[45] Agha was a Taliban finance officer whose responsibilities included both the distribution of funds to Taliban commanders and funding, "improvised explosive device (IED) operations." He then became "the leader of the Taliban's military shura (council), which directed Taliban military operations in western Afghanistan" and was considered by the international community to be "a threat to the peace, stability and security of Afghanistan."[46]

42.     The current DAB Governor is Shakir Jalali, who was appointed to the position by the Taliban on 8 October 2022.[47] Jalali appears to have been chosen for his credentials; but after a thorough search of official DAB and Taliban spokesmen statements and Tweets, it is my opinion that Jalali acts in an advisory position without decision-making authority.

---

[44] See Cristol 2019, pp. 96.

[45] Talley, I., Sun, M., and Stancati, M. 2022. Sanctioned Taliban Financier Holds Leadership Post at Afghan Central Bank. *The Wall Street Journal.* 11 March 2022.

[46] N.A. 2012. Ahmad Zia Agha. 1988 Sanctions Committee. United Nations Security Council. Permanent Reference Number TAi. 156. (https://www.un.org/securitycouncil/sanctions/1988/materials/summaries/individual/ahmad-zia-agha) Accessed: 3 May 2022.

[47] TOLOnews. [@TOLOnews]. 8 October 2021. Shakir Jalali was appointed by the Islamic Emirate as the head of the National Bank of Afghanistan. Zabihullah Mujahid, deputy minister of information and culture, says Jalali has completed his studies in Islamic banking. [Tweet]. Retrieved from: https://twitter.com/TOLOnews/status/1446404039172841510.

43.     Lutful Haq Noor Pasarli (aka Lutful Haq Noor Paserly aka Lutfulhaq Noor Paserly) is a senior economic advisor. Pasarli held similar positions under the previous government. He is not "career Taliban," but is useful to the Taliban due to his international contacts—  He recently represented the Taliban government in meetings with the European Union. Pasarli appears to have been chosen for his credentials; but after a thorough search of official DAB and Taliban spokesmen statements and Tweets, it is my opinion that Pasarli acts in an advisory position without decision-making authority.

44.     It is my expert opinion that the Taliban control DAB and that the Taliban intend to use DAB as an instrument to carry out the Taliban's agenda; and I believe that the current nature and structure of DAB governance is designed to present DAB as a "normal" central bank to outside observers, while simultaneously maintaining Taliban control over DAB strategy and funds.

### C.     The USG acknowledges that the Taliban control DAB.

45.     The USG recognizes the Taliban as in control of DAB. Executive Order 14064 issued on 11 February 2022 blocks, "All property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York." This argument might seem tautological; but a White House statement says that the EO was designed to keep DAB assets "out of the hands of the Taliban and malicious actors." The "malicious actors" likely refers to HN as the statement goes on to say that "the United States has sanctions in place against the Taliban and the Haqqani network."[48] It is

---

[48] N.A. 2022. FACT SHEET: Executive Order to Preserve Certain Afghanistan Central Bank Assets for the People of Afghanistan. The White House. 11 February 2022.

logical to infer that the USG believes that the Taliban control DAB and intend to use it for purposes outside the normal roles of a central bank.

## IV.    Conclusion

46.    The Taliban are the *de facto* sovereign power in Afghanistan and have effective (and total) control of all Afghan government institutions, including DAB. The Taliban intend to operate, and are already operating, the totality of the Afghan government, including DAB, as an instrument to achieve organizational objectives. The Taliban have organized DAB in such a way as to obscure their true intentions, and have done so in a manner consistent with past practice.

47.    The Taliban is both a Specially Designated Global Terrorist entity *and* the *de facto* government of Afghanistan. DAB is a government agency controlled by an SDGT and thus DAB serves as an arm and an instrument of an SDGT.  The Taliban consistently sought access to and control of DAB assets in the 1996-2001 period.  The Taliban again see access to and control of DAB assets as a priority goal— important enough to allow and encourage street protests to demonstrate that priority to an international audience. (Shaheen, S. [@suhailshaheen1]. September 2021).  People in the capital city of Kabul took to the street, demanding immediate release of Afghanistan's central bank reserves. They were chanting, our people are facing hard economic situation, there is urgent need for unfreezing our asset to overcome the harsh poverty situation. [Tweet]. Retrieved from: https://twitter.com/suhailshaheen1/status/1441388614810837000.



24 September 2021. [Tweet]. Retrieved: 5 May 2022).  In my expert opinion, the Taliban government today pursues virtually identical goals, using virtually identical methods, using virtually identical language as it did in its first iteration.

48.      The USG's non-recognition of the Taliban government has no bearing on the Taliban's effective control of Afghanistan or of DAB. The USG's non-recognition of the Taliban government has no bearing on the Taliban's status as the *de facto* sovereign power in Afghanistan. Recognition is a political decision. Effective control and *de facto* sovereignty are objective facts.

49.      The USG's non-recognition of the Taliban government is important. It means that Taliban government agencies do not enjoy the immunities or other rights and privileges granted to recognized governments. The US Constitution grants the POTUS sole authority to recognize new states and new regimes; and while it is possible for an act of Congress to essentially reproduce that authority, no such act has been passed.

50. I declare that, to the best of my knowledge, this statement is true under penalty of perjury of

the laws of the United States and provide within a reasonable degree of professional certainty.

_Jonathan L. Cristol_        May 5, 2022

Jonathan L. Cristol, Ph.D.        5 May 2022



**APPENDIX A.**

Maizland, L. 2021. The Taliban in Afghanistan. *CFR Backgrounder*. Council on Foreign Relations. 15 September 2021.(https://www.cfr.org/backgrounder/taliban-afghanistan) (Accessed: 2 May 2022).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RAYMOND ANTHONY SMITH, as
Administrator of the Estate of George Eric
Smith, deceased

                Plaintiff,

      v.

THE ISLAMIC EMIRATE OF
AFGHANISTAN, et al.

                Defendants.

CASE NO.  01-cv-10132-LAK

DECLARATION OF JAMES E.
BEASLEY, JR.

I, James E. Beasley, Jr., hereby declare:

1. I hold a license to practice law in the Commonwealth of Pennsylvania, and am admitted *pro hac vice* to the bar of this Court. I am a partner and managing member of The Beasley Firm, LLC, attorneys for the Smith/Soulas Judgment creditors. This declaration is presented in support of the Smith/Soulas Motion for Asset Turnover from Garnishee Federal Reserve Bank of New York.  I offer this Declaration based upon information known to me or facts and circumstances which I believe to be accurate.  If needed, I can testify to the information contained within this Declaration.

2. On 14 November 2001, this suit was started; beginning 28 February 2003 and extending in the following week, the Smith/Soulas plaintiffs presented evidence to the Honorable (dec.) Harold Baer for their claims against, inter alia, the Taliban and the Islamic Emirate of Afghanistan (Taliban).

3. On 7 May 2003, Judge Baer issued his Opinion and Order (ECF 25) finding in favor of the Smith/Soulas plaintiffs; pursuant to the Terrorism Risk Insurance Act of 2002 (TRIA) and supporting laws, Judge Baer awarded a total of $59,262,189.57 (not including statutory interest) as against the Taliban defendants.

4. On 14 July 2003, Judgment was entered in favor of the Smith/Soulas plaintiffs and against, *inter alia*, the Taliban and Islamic Emirate of Afghanistan.  ECF 28.

5. ECF 41 is the 22 February 2022 Writ of Execution issued by the Clerk of this Court against the Taliban assets held at the Federal Reserve Bank of New York (FRBNY)

via the assets of the Da Afghanistan Bank (DAB). This Writ was served on the garnishee FRBNY via the US Marshal Service on 14 March 2022.

6. ECF 48 is this Honorable Court's Order extending, indefinitely, the Writ of Execution.

7. Attached as Exhibit one (1) is a schedule of interest to be applied to the judgment as identified in the Writ of Execution. These calculations are pursuant to 28 U.S.C. § 1961. The interest continues to accumulate; this is as of 4 May 2022.

8. This Smith/Soulas claim is the first, valid Judgment against the Taliban and the third Writ of Execution as to the Taliban/DAB assets sought and held at the FRBNY; *Havlish v. bin Laden, et al.*, 03-MD-01570 (GBD)(SN) and *Doe v. The Taliban, et al.*, 1:20 mc 00740-GBD are, respectively, the first and second filed and served Writs of Execution. These three Writs of Execution seek less than the total funds held and available for the respective Writs of Execution.

This declaration is made under penalty of perjury and is executed in Philadelphia, Pennsylvania, USA on _12_ May, 2022.

_____
James E. Beasley, Jr.

2

**App.528**

**The Beasley Firm, LLC**
**Interest Calculation on Judgement**
**Last Updated: 05.04.2022**

| | Principal | Annual Rate | # Years Compounded | # Times Compounded | Compounded Amount | Days | Daily Rate | Additional Interest | Total Outstanding | Principal Balance | Accrued Interest | Total @ 5.4.22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **George Eric Smith** | | | | | | | | | | | | |
| *Economic Damages* | | | | | | | | | | | | |
| Funeral Services | $ 1,580.00 | 1.08% | 18 | 1 | $ 1,917.04 | 293 | 0.00295890041% | $ 16.62 | $ 1,933.66 | $ 1,580.00 | $ 353.66 | $ 1,933.66 |
| Lost Earnings | $ 1,113,280.00 | 1.08% | 18 | 1 | $ 1,350,761.29 | 293 | 0.00295890041% | $ 11,710.55 | $ 1,362,471.84 | $ 1,113,280.00 | $ 249,191.84 | $ 1,362,471.84 |
| Sub-Total | $ 1,114,860.00 | | | | $ 1,352,678.33 | 293 | | $ 11,727.17 | $ 1,364,405.50 | $ 1,114,860.00 | $ 249,545.50 | $ 1,364,405.50 |
| Treble Damages | $ 2,229,720.00 | 1.08% | 18 | 1 | $ 2,705,356.66 | 293 | 0.00295890041% | $ 23,454.33 | $ 2,728,810.99 | $ 2,229,720.00 | $ 499,090.99 | $ 2,728,810.99 |
| *Total Economic Damages* | $ 3,344,580.00 | | | | $ 4,058,034.99 | | | $ 35,181.50 | $ 4,093,216.49 | $ 3,344,580.00 | $ 748,636.49 | $ 4,093,216.49 |
| *Pain & Suffering* | | | | | | | | | | | | |
| Pain & Suffering | $ 1,000,000.00 | 1.08% | 18 | 1 | $ 1,213,316.76 | 293 | 0.00295890041% | $ 10,518.96 | $ 1,223,835.72 | $ 1,000,000.00 | $ 223,835.72 | $ 1,223,835.72 |
| Treble Damages | $ 2,000,000.00 | 1.08% | 18 | 1 | $ 2,426,633.53 | 293 | 0.00295890041% | $ 21,037.92 | $ 2,447,671.45 | $ 2,000,000.00 | $ 447,671.45 | $ 2,447,671.45 |
| *Total Pain & Suffering* | $ 3,000,000.00 | | | | $ 3,639,950.29 | | | $ 31,556.88 | $ 3,671,507.17 | $ 3,000,000.00 | $ 671,507.17 | $ 3,671,507.17 |
| **Total - George Eric Smith** | $ 6,344,580.00 | | | | $ 7,697,985.28 | | | $ 66,738.38 | $ 7,764,723.66 | $ 6,344,580.00 | $ 1,420,143.66 | $ 7,764,723.66 |
| **Timothy Soulas** | | | | | | | | | | | | |
| *Economic Damages* | | | | | | | | | | | | |
| Funeral Services | $ 18,603.19 | 1.08% | 18 | 1 | $ 22,571.56 | 293 | 0.00295890041% | $ 195.69 | $ 22,767.25 | $ 18,603.19 | $ 4,164.06 | $ 22,767.25 |
| Lost Earnings | $ 15,120,600.00 | 1.08% | 18 | 1 | $ 18,346,077.48 | 293 | 0.00295890041% | $ 159,052.95 | $ 18,505,130.43 | $ 15,120,600.00 | $ 3,384,530.43 | $ 18,505,130.43 |
| Sub-Total | $ 15,139,203.19 | | | | $ 18,368,649.04 | 293 | | $ 159,248.64 | $ 18,527,897.68 | $ 15,139,203.19 | $ 3,388,694.49 | $ 18,527,897.68 |
| Treble Damages | $ 30,278,406.38 | 1.08% | 18 | 1 | $ 36,737,298.07 | 293 | 0.00295890041% | $ 318,497.28 | $ 37,055,795.35 | $ 30,278,406.38 | $ 6,777,388.97 | $ 37,055,795.35 |
| *Total Economic Damages* | $ 45,417,609.57 | | | | $ 55,105,947.11 | | | $ 477,745.92 | $ 55,583,693.03 | $ 45,417,609.57 | $ 10,166,083.46 | $ 55,583,693.03 |
| *Pain & Suffering* | | | | | | | | | | | | |
| Pain & Suffering | $ 2,500,000.00 | 1.08% | 18 | 1 | $ 3,033,291.91 | 293 | 0.00295890041% | $ 26,297.39 | $ 3,059,589.30 | $ 2,500,000.00 | $ 559,589.30 | $ 3,059,589.30 |
| Treble Damages | $ 5,000,000.00 | 1.08% | 18 | 1 | $ 6,066,583.82 | 293 | 0.00295890041% | $ 52,594.79 | $ 6,119,178.61 | $ 5,000,000.00 | $ 1,119,178.61 | $ 6,119,178.61 |
| *Total Pain & Suffering* | $ 7,500,000.00 | | | | $ 9,099,875.74 | 293 | | $ 78,892.18 | $ 9,178,767.92 | $ 7,500,000.00 | $ 1,678,767.92 | $ 9,178,767.92 |
| **Total - Timothy Soulas** | $ 52,917,609.57 | | | | $ 64,205,822.85 | | | $ 556,638.10 | $ 64,762,460.95 | $ 52,917,609.57 | $ 11,844,851.38 | $ 64,762,460.95 |

**8 U.S. Code Section 1961 - Interest**

(A)

Interest shall be calculated from the date of the entry of the judgement (7/15/2003) at a rate equal to the weekly
average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve
System, for the calendar week preceding the date of the judgement (week ending 7/11/2003, Rate: 1.08%)

(B)

Interest shall be computed daily to the date of payment except as provided in Section 2516(b) [Interest on a judgement
against the United States affirmed by the Supreme Court after review on petition of the United States] and
section 1304(b) of title 31 [relating to interest on a judgement of a district court, only when the judgements becomes
final after review on appeal or petition by the United States Government] and shall be computed annually.

A = P ( 1 + R/N)^NT
A = Amount
P = Principal
R = Interest Rate
N = # of times interest compounded per T
T = Time
Interest Rate = 1.08%
There have been 18 full years of compounding through 7/15/2021
There have been 293 days of computed interest through 5/4/2022

https://web.archive.org/web/20030714220959/http;/federalreserve.gov/releases/h15/Current/
https://www.thecalculatorsite.com/articles/finance/compound-interest-formula.php

App.530

## AFFIDAVIT OF PROCESS SERVER

### United States District Court for the Southern District of New York

**Fiona Havlish, individually and on behalf of the Estate of Donald G. Havlish, Jr., Deceased, et al**

      Creditor,

VS.

**The Taliban, et al (DEBTORS)**

    .

Attorney: Lee S. Wolosky

Jenner & Block LLP (DC)
1099 New York Ave., NW
Washington DC 20001

*276313*

**Case Number: No. 1:03-cv-9848 (S.D.N.Y.); No. 1:03-md-1570 (S.D.N.Y.)**

Legal documents received by Same Day Process Service, Inc. on **03/20/2022** at **5:45 PM** to be served upon **Da Afghanistan Bank at 1920 North Dinwiddie St., Arlington, VA 22207**

I, **Jared Mills**, swear and affirm that on **March 20, 2022** at **8:33 PM**, I did the following:

Served **Da Afghanistan Bank** by delivering a conformed copy of the **Letter dated March 20, 2022; Notice of Motion for Partial Turnover of Assets From Garnishee Federal Reserve Bank of New York; Memorandum of Law in Support of the Havlish Creditors' Motion for Partial Turnover of Assets From Garnishee Federal Reserve Bank of New York; Declaration of Douglass A. Mitchell in Support of the Havlish Creditors' Motion for Partial Turnover of Assets From Garnishee Federal Reserve Bank of New York; Exhibits; Expert Declaration of Alex B. Zerden; [Proposed] Order Granting Havlish Creditors' Motion for Partial Turnover of Assets From Garnishee Federal Reserve Bank of New York; USB Thumb Drive (Containing Digital Copies of the Above Documents)** to **Dr. Shah Mohammad Mehrabi** as **Supreme Council Member & Authorized Agent** of Da Afghanistan Bank at **1920 North Dinwiddie St. , Arlington, VA 22207**.

**Description of Person Accepting Service:**
Sex: Male Age: 68 Height: 5ft4in-5ft8in Weight: 131-160 lbs Skin Color: Middle Eastern Hair Color: Bald & Gray

**Supplemental Data Appropriate to this Service:**

I declare under penalty of perjury that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

**Jared Mills**
Process Server
**Same Day Process Service, Inc.**
**1413 K St., NW, 7th Floor**
**Washington DC 20005**
**(202)-398-4200**
**info@samedayprocess.com**

Internal Job
ID:276313



# AFFIDAVIT OF PROCESS SERVER

## United States District Court for the Southern District of New York

**John Does 1 Through 7**

      Judgment Creditor,

vs.

**The Taliban, et al**

      Judgment Debtors.

Attorney: Orlando do Campo

do Campo & Thornton, P.A.
150 SE 2nd Ave., #602
Miami FL 33131



*276314*

**Case Number: No. 20-mc-740 (S.D.N.Y.), No. 03-md-1570 (S.D.N.Y.)**

Legal documents received by Same Day Process Service, Inc. on **03/20/2022** at **5:45 PM** to be served upon **Da Afghanistan Bank at 1920 North Dinwiddie St., Arlington, VA 22207**

I, **Jared Mills**, swear and affirm that on **March 20, 2022** at **8:33 PM**, I did the following:

Served **Da Afghanistan Bank** by delivering a conformed copy of the **Letter dated March 20, 2022; Notice of Doe Creditors' Motion for Turnover of Assets From Garnishee Federal Reserve Bank of New York; Memorandum of Law in Support of the Doe Creditors' Motion for Turnover of Assets From Garnishee Federal Reserve Bank of New York; Exhibits; [Proposed] Order Granting Doe Creditors' Motion for Turnover of Assets From Garnishee Federal Reserve Bank of New York; Declaration of John Thornton in Support of the Doe Creditors' Motion for Turnover of Assets From Garnishee Federal Reserve Bank of New York; Doe Creditors' Notice of Filing Expert Declaration of Alex B. Zerden in Support of Doe Creditors' Motion for Turnover of Assets From Garnishee Federal Reserve Bank of New York; Expert Declaration of Alex B. Zerden; USB Thumb Drive (Containing Digital Copies of the Above Documents) to Dr. Shah Mohammad Mehrabi as Supreme Council Member & Authorized Agent of Da Afghanistan Bank at 1920 North Dinwiddie St. , Arlington, VA 22207.**

**Description of Person Accepting Service:**
Sex: Male Age: 68 Height: 5ft4in-5ft8in Weight: 131-160 lbs Skin Color: Middle Eastern Hair Color: Bald & Gray

**Supplemental Data Appropriate to this Service:**

I declare under penalty of perjury that the foregoing information contained in this affidavit is true and correct and that I am a professional process server over the age of 18 and have no interest in the above legal matter.

**Jared Mills**
Process Server
**Same Day Process Service, Inc.
1413 K St., NW, 7th Floor
Washington DC 20005
(202)-398-4200
info@samedayprocess.com**

Internal Job
ID:276314



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

*IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001

---

JOHN DOES 1 THROUGH 7,

     *Judgment Creditors,*

v.

THE TALIBAN, AL-QAEDA,
 and THE HAQQANI NETWORK,

     *Judgment Debtors,*

and

THE FEDERAL RESERVE BANK OF
 NEW YORK,

     *Garnishee.*

Case No. 1:03-md-01570-GBD-SN

Misc Action No. 1:20-mc-00740-GBD

## <u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that a true and correct copy of the Notice of the Doe Creditors' Motion for Turnover of Assets from Garnishee Federal Reserve Bank of New York, DE 79, was provided to Da Afghanistan Bank via Twitter, in both Pashto and English, at the following Twitter account: @AFGCentralBank on March 30, 2022. *See* Exhibit A. @AFGCentralBank is the official twitter account for Da Afghanistan Bank. *See* Exhibit B.

     Respectfully submitted,

     **do Campo & Thornton, P.A.**
     150 S.E. 2nd Avenue, Ste. 602
     Miami, Florida 33131
     (305) 358-6600

     s/ *Orlando do Campo*
     Orlando do Campo

1

Bar Code: OD1969
od@dandtlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 30, 2022, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

<u>s/ *Orlando do Campo*    </u>
Orlando do Campo

2

**App.534**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

*IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001

---

JOHN DOES 1 THROUGH 7,

     *Judgment Creditors,*

v.

THE TALIBAN, AL-QAEDA,
 and THE HAQQANI NETWORK,

     *Judgment Debtors,*

and

THE FEDERAL RESERVE BANK OF
 NEW YORK,

     *Garnishee.*

Case No. 1:03-md-01570-GBD-SN

Misc Action No. 1:20-mc-00740-GBD

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that a true and correct copy of the Notice of the Doe Creditors' Motion for Turnover of Assets from Garnishee Federal Reserve Bank of New York, DE 79, was provided to the Taliban via Twitter, in both Pashto and English, at the following Twitter accounts: @Zabehulah_M33, @leaoffice, @QyAhmadi21, and @suhailshaheen1 on March 30, 2022. *See* Exhibit A.

    According to Twitter, @Zabehulah_M33 is the official Twitter account of the spokesman of the Islamic Emirate of Afghanistan, Zabiullah Mujahid. *See* Exhibit B. Zabiullah Mujahid is a senior Taliban official who previously served as the spokesman for the Taliban. Mujahid reported on Taliban activity in central, eastern, and northern Afghanistan. Following the Taliban's takeover of Afghanistan in August 2021, on September 7, it was announced that

Mujahid will serve as the deputy minister of information and broadcasting of the Taliban's "government" in Afghanistan.[1]

The account @leaoffice is the official Twitter account for the spokesman of the political office of the Islamic Emirate of Afghanistan, Dr. Mohammad Naeem Wardak. *See* Exhibit C. Dr. Mohammad Naeem Wardak is the current Taliban "government's" spokesperson in the Qatar office. He has served the Taliban in Qatar since 2013, when the Taliban's first political office opened there and has been in charge of strategic and foreign relations.[2]

The account @QyAhmadi21 is the official Twitter account of the spokesman of the Islamic Emirate of Afghanistan, Qari Yousaf Ahmadi. *See* Exhibit D. Qari Yousaf Ahmadi is one of two Taliban "government" spokesmen, the other being Zabiullah Mujahid. Qari Yousaf Ahmadi has been a spokesperson for the Taliban since 2006, when he reached out to different news outlets to offer Taliban messages about Afghanistan.[3]

The account @suhailshaheen1 is the official twitter account of the Islamic Emirate of Afghanistan's permanent representative designated to the United Nations, Suhail Shaheen. *See* Exhibit E. Suhail Shaheen is currently the Taliban "government's" permanent representative-designee to the United Nations. Prior to this post, Shaheen was the Taliban's second Secretary and Deputy Ambassador of the Afghanistan embassy in Pakistan. He was also the Taliban's Doha/Qatar official political spokesperson.[4]

Respectfully submitted,

**do Campo & Thornton, P.A.**
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
(305) 358-6600

s/ *Orlando do Campo*
Orlando do Campo
Bar Code: OD1969
od@dandtlaw.com

---

[1] *See* https://www.counterextremism.com/extremists/zabiullah-mujahid

[2] *See* http://www.afghan-bios.info/index.php?option=com_afghanbios&id=2874&task=view&total=581&start=557&Itemid=2

[3] *See* https://www.france24.com/en/video/20210902-cyril-payen-interviews-taliban-spokesman-qari-yusuf-ahmadi; *see also*, https://www.nbcnews.com/id/wbna12909608, http://news.bbc.co.uk/2/hi/south_asia/5349330.stm.

[4] *See* http://www.afghan-bios.info/index.php?option=com_afghanbios&id=2464&task=view&total=22&start=14&Itemid=2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 30, 2022, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

s/ *Orlando do Campo*
Orlando do Campo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | |
| | |
| JOHN DOES 1 THROUGH 7, | |
| *Judgment Creditors,* | |
| v. | |
| THE TALIBAN, AL-QAEDA, and THE HAQQANI NETWORK, | Case No. 1:03-md-01570-GBD-SN |
| *Judgment Debtors,* | Misc Action No. 1:20-mc-00740-GBD |
| and | |
| THE FEDERAL RESERVE BANK OF NEW YORK, | |
| *Garnishee.* | |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the Notice of the Doe Creditors'
Motion for Turnover of Assets from Garnishee Federal Reserve Bank of New York, DE 79, was
provided to Da Afghanistan Bank via Twitter, in both Pashto and English, at the following
Twitter account: @AFGCentralBank on March 31, 2022. *See* Exhibit A. Additionally, the
following link containing the Memorandum of Law in Support of Doe Creditors' Motion for
Turnover and accompanying exhibits, DE 80; the Declaration of John Thornton in Support of the
Memorandum of Law, DE 81; and the Notice of Filing Expert Declaration with the
accompanying Declaration, DE 82, was provided to Da Afghanistan Bank in the same
communication:

https://drive.google.com/drive/folders/1H6cwM9UA8WNfOMiD1UY9Iscnk8QJAU5l?usp=shar
ing. The account @AFGCentralBank is the official twitter account for Da Afghanistan Bank.

Respectfully submitted,

**do Campo & Thornton, P.A.**
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
(305) 358-6600

s/ *Orlando do Campo*
Orlando do Campo
Bar Code: OD1969
od@dandtlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 31, 2022, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

s/ *Orlando do Campo*
Orlando do Campo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | |
| JOHN DOES 1 THROUGH 7, | |
|      *Judgment Creditors,* | |
| v. | |
| THE TALIBAN, AL-QAEDA,<br> and THE HAQQANI NETWORK, | Case No. 1:03-md-01570-GBD-SN |
|      *Judgment Debtors,* | Misc Action No. 1:20-mc-00740-GBD |
| and | |
| THE FEDERAL RESERVE BANK OF<br> NEW YORK, | |
|      *Garnishee.* | |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the Notice of the Doe Creditors'
Motion for Turnover of Assets from Garnishee Federal Reserve Bank of New York, DE 79, was
provided to the Taliban via Twitter, in both Pashto and English, at the following Twitter
accounts: @Zabehulah_M33, @leaoffice, @QyAhmadi21, and @suhailshaheen1 on March 31,
2022. *See* Exhibit A. Additionally, the following link containing the Memorandum of Law in
Support of Doe Creditors' Motion for Turnover and accompanying exhibits, DE 80; the
Declaration of John Thornton in Support of the Memorandum of Law, DE 81; and the Notice of
Filing Expert Declaration with the accompanying Declaration, DE 82, was provided to the
Taliban in the same communication:

https://drive.google.com/drive/folders/1H6cwM9UA8WNfOMiD1UY9Iscnk8QJAU5l?usp=shar
ing.

**App.540**

Respectfully submitted,

**do Campo & Thornton, P.A.**
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
(305) 358-6600

s/ *Orlando do Campo*
Orlando do Campo
Bar Code: OD1969
od@dandtlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 31, 2022, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

s/ *Orlando do Campo*
Orlando do Campo

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

*IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001

---

JOHN DOES 1 THROUGH 7,

          *Judgment Creditors,*

v.

THE TALIBAN, AL-QAEDA,
 and THE HAQQANI NETWORK,

          *Judgment Debtors,*

and

THE FEDERAL RESERVE BANK OF
 NEW YORK,

          *Garnishee.*

Case No. 1:03-md-01570-GBD-SN

Misc Action No. 1:20-mc-00740-GBD

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 1, 2022, that I provided notice of the pending turnover proceedings (DE 79-82) to Da Afghanistan Bank *via* two e-mails, one in Pashto and one in English, at the following email account: info@dab.gov.af., which is provided as the contact for Da Afghanistan Bank on the front page of its website: dab.gov.af.

The re: line of the e-mails was: Notice of turnover proceedings against the assets of Da Afghanistan Bank in the United States District Court for the Southern District of New York, John Does 1-7 v. the Taliban et al; and the Federal Reserve Bank of New York, Garnishee. Case number 1:20-mc-00740. The Pashto version of the e-mail had this text in Pashto, pursuant to a certified translation.

**App.542**

Each e-mail contained a pdf of DEs 79-82 with all exhibits.

The Pashto e-mail contained a certified Pashto translation of the Notice of the Doe Creditors' Motion for Turnover of Assets from Garnishee Federal Reserve Bank of New York, DE 79, both as an image pasted into the body of the text, and as the text itself. I bcc'd myself to show what the Da Afghanistan Bank received. *See* Exhibit A.

The English e-mail contained the Doe Creditors' Motion for Turnover of Assets from Garnishee Federal Reserve Bank of New York, DE 79, both as an image pasted into the body of the text, and as the text itself. I bcc'd myself to show what the Da Afghanistan Bank received. *See* Exhibit B.

Respectfully submitted,

**do Campo & Thornton, P.A.**
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
(305) 358-6600

s/ *John Thornton*
John Thornton
(*admitted pro hac vice*)

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 1, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ *John Thornton*
John Thornton

**App.543**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001

JOHN DOES 1 THROUGH 7,

        *Judgment Creditors,*

v.

THE TALIBAN, AL-QAEDA,
 and THE HAQQANI NETWORK,

        *Judgment Debtors,*

and

THE FEDERAL RESERVE BANK OF
 NEW YORK,

        *Garnishee.*

Case No. 1:03-md-01570-GBD-SN

Misc Action No. 1:20-mc-00740-GBD

### <u>NOTICE OF ACKNOWLEDGEMENT OF SERVICE</u>

    I HEREBY CERTIFY that on April 3, 2022, at 3:28 a.m. EDT, Da Afghanistan Bank responded to an e-mail and acknowledged receipt of notice of the turnover proceedings in this matter.[1] The e-mail reply acknowledging receipt was sent from kazem.sarwary@dab.gov.af.

---

[1] On April 1, 2022, this law firm had provided notice of the pending turnover proceedings (DE 79-82) to Da Afghanistan Bank *via* two e-mails, one in Pashto and *via* in English, at the following email account: info@dab.gov.af., which is provided as the contact for Da Afghanistan Bank on the homepage of its website: dab.gov.af. A certificate of service reflecting the notice given was filed in this matter. DE 95.

1

Based on information and belief, Kazem Sarwary is the Communications Manager for Da

Afghanistan. The full text of the email is:

> Dear Sir/Madam
>
> We would like to assure you of receiving your email and for further action
>
> and decision making sent it to relevant Department.
>
> With Best Regards,
>
> Governor's Office Directorate
>
> Da Afghanistan Bank, Ibni-Sina Watt. Kabul, Afghanistan
>
> Email: info@dab.gov.af
>
> Tell : 0202104146

A pdf of the email acknowledgment, which includes the text of the e-mail (in English)

that it was responding to, is attached as Exhibit A.

Respectfully submitted,

**do Campo & Thornton, P.A.**
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
(305) 358-6600

s/ *Orlando do Campo*
Orlando do Campo
Bar Code: OD1969
od@dandtlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 4, 2022, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.

s/ *Orlando do Campo*
Orlando do Campo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

In re:

     TERRORIST ATTACKS ON
     SEPTEMBER 11, 2001

----------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____           │
│ DATE FILED: ___4/5/2022___       │
└─────────────────────────────────┘
```

03-MD-01570 (GBD)(SN)

<u>OPINION & ORDER</u>

**SARAH NETBURN, United States Magistrate Judge:**

This document relates to:

> <u>Havlish, et al. v. Bin Laden, et al.</u>, No. 03-cv-9848
> <u>John Does 1 through 7 v. The Taliban et al.</u>, No. 20-mc-740

     Plaintiffs in <u>Havlish, et al. v. Bin Laden, et al.</u>, No. 03-cv-9848 ("<u>Havlish</u>"), and <u>John Does 1 through 7 v. The Taliban et al.</u>, No. 20-mc-740 ("<u>Doe</u>"), move this Court to authorize alternative service on the Taliban. ECF Nos. 7779, 7815 (<u>Doe</u>), 7783 (<u>Havlish</u>).[1] The <u>Havlish</u> Plaintiffs also move for supplemental service on Da Afghanistan Bank ("DAB"). These motions are granted in part. Alternative and supplemental service on the Taliban and DAB shall be carried out in accordance with this Opinion and Order.

**BACKGROUND**

     The Court assumes familiarity with the history of this multidistrict litigation. It discusses only those elements germane to the parties' motion for alternative service. The <u>Havlish</u> Plaintiffs secured a final judgment against the Taliban on October 16, 2012. ECF No. 2624. A large portion of that judgment remains unsatisfied. The <u>Doe</u> Plaintiffs obtained a 2020 judgment against the Taliban in the Northern District of Texas and registered it in this District. <u>Doe</u>, No.

---

[1] Unless otherwise noted, all "ECF No." citations are to the docket of <u>In Re Terrorist Attacks on September 11, 2001</u>, 03-md-1570.

20-mc-740, ECF No. 1. That judgment remains unsatisfied as well. Both parties allege that DAB

is an agent or instrumentality of the Taliban. Based on this, they have filed turnover motions

targeting DAB assets currently held in the Federal Reserve Bank of New York. ECF Nos. 7763,

7764 (Havlish), 7767, 7769 (Doe). In support of those turnover motions, the Havlish Plaintiffs

move for leave to serve the Taliban by substitute service as provided for by court order. They

also seek leave to conduct additional supplemental service as provided for by court order on

DAB. The Doe Plaintiffs initially sought leave for supplemental service as well. ECF No. 7779.

Then, however, they filed a supplemental letter indicating that they attempted to serve the

Taliban using Twitter. They request that the Court authorize this method of service *nunc pro*

*tunc*. ECF No. 7815.

## DISCUSSION

Because both the Havlish and Doe Plaintiffs' motions are governed by the same

framework, the Court considers them together, addressing divergences in their positions as

appropriate.

## I.    Alternative Service on the Taliban by Publication and Social Media is Proper

The Havlish and Doe Plaintiffs may serve the Taliban by publication and social media

under Federal Rule of Civil Procedure 4(f)(3). The procedure for executing judgments is

governed by Federal Rule of Civil Procedure 69. This provides that execution "must accord with

the procedure of the state where the court is located, but a federal statute governs to the extent it

applies." Fed. R. Civ. P. 69(a)(1).

Under New York's procedures "[n]otice of the [execution] proceeding shall . . . be served

upon the judgment debtor in the same manner as a summons or by registered or certified mail,

return receipt requested." CPLR § 5225(b); see also Off-White, LLC v. Alins, No. 19-cv-9593

2

(AT), 2021 WL 4710785, at \*6 (S.D.N.Y. Oct. 8, 2021) (internal citation omitted). ("[A]ny post-judgment relief available to Plaintiff is ruled by state law. . . In New York, the applicable procedure is found in N.Y. C.P.L.R. §§ 5222 and 5225.") The notice procedure for a summons is set out by Federal Rule of Civil Procedure 4. See, e.g., Hausler v. JP Morgan Chase Bank, N.A., 141 F. Supp. 3d 248, 252 (S.D.N.Y. 2015) (using Federal Rule of Civil Procedure 4 as the framework for evaluating the adequacy of notice to an impleaded third party).

The Doe Plaintiffs suggest that because this is a *quasi in rem* proceeding, Federal Rule of Civil Procedure 4 is inapposite. ECF No. 7815 at 2. Rule 4(n), however, provides procedures for *quasi in rem* actions. Where jurisdiction over property in an action is authorized by federal statue, Rule 4(n)(1) requires that "[n]otice to claimants of the property . . . be given as provided in the statute or by serving a summons under this rule." Alternatively, Rule 4(n)(2) provides that jurisdiction over property may sometimes be acquired under state law using state law procedures. New York's procedures require notice in the same manner as a summons, which is governed by Rule 4.

Federal Rule of Civil Procedure 4(h) sets out the summons procedure for corporate entities. Under this Rule, when such an entity cannot be served in a judicial district of the United States, they may be served in the manner provided for in Rule 4(f). Fed. R. Civ. P. 4(h)(2). Rule 4(f) offers three options for service:

(1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;

(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:

(A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;

(B) as the foreign authority directs in response to a letter rogatory or letter of request; or

(C) unless prohibited by the foreign country's law, by:

…

(ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or

(3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).[2]

Only the last option is viable. Afghanistan is not part of any relevant international convention on the service of documents. See ECF No. 7784 at 7. As the U.S. Government has noted in other filings in this case, Afghanistan currently has no government recognized by the United States that could aid in the methods of service provided for by Rule 4(f)(2). ECF No. 7661 at 34. Certified mail services are not operating there. See ECF Nos. 7781 at ¶ 3 (Doe declaration indicating that mail service to Afghanistan was broadly unavailable), 7785 at ¶ 3 (Havlish declaration indicating the same). As the other methods of service are not viable, Rule 4(f)(3) provides the proper framework. See, e.g., Smith v. Islamic Emirate of Afghanistan, No. 01-cv-10132 (HB), 2001 WL 1658211, at *2 (S.D.N.Y. Dec. 26, 2001) (authorizing alternative services where "the other methods set forth in FRCP(f)(2), would be futile . . . .")

"Service under Rule 4(f)(3) is proper as long as it (1) is not prohibited by international agreement; and (2) comports with constitutional notions of due process." Washington State Inv. Bd. v. Odebrecht S.A., No. 17-cv-8118 (PGG), 2018 WL 6253877, at *4 (S.D.N.Y. Sept. 21, 2018) (quoting Stream SICAV v. Wang, 989 F. Supp. 2d 264, 278 (S.D.N.Y. 2013)) (internal quotations omitted). "Service by substitute . . . comports with due process by being 'reasonably

---

[2] For foreign corporations, Federal Rule of Civil Procedure 4(h)(2) prohibits the use of personal service.

calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Bozza v. Love, No. 15-cv-3271 (LGS), 2015 WL 4039849, at *2 (S.D.N.Y. July 1, 2015) (quoting S.E.C. v. Tome, 833 F.2d 1086, 1093 (2d Cir.1987)).[3]

So long as substitute service achieves these goals, "[a] court is 'afforded wide discretion in ordering service of process under Rule 4(f)(3).'" S.E.C. v. Anticevic, No. 05-cv-6991 (KMW), 2009 WL 361739, at *3 (S.D.N.Y. Feb. 13, 2009) (quoting BP Prods. N. Am., Inc. v. Dagra, 236 F.R.D. 270, 271 (E.D.Va.2006)). Thus, for example, service by publishing notice in a prominent international financial journal for four successive weeks was deemed sufficient where the defendant already had actual knowledge of the suit against him. Tome, 833 F.2d at 1093 (2d Cir. 1987). Similarly, in Anticevic, service by publication in three newspapers likely to be read by the defendant, combined with the defendant's actual knowledge of the suit was deemed sufficient. 2009 WL 361739, at *4. Service on the Taliban was permitted in this case by publication in the International Herald Tribune, USA Today, and an Arabic language newspaper circulated in the Middle East, supplemented by a posting on a website. In re Terrorist Attacks on Sept. 11, 2001, No. 03-md-1570 (GBD)(SN) (Dec. 10, 2003), ECF No. 445.

Courts have also permitted the use of social media and email as an alternative means of service. See, e.g., F.T.C. v. PCCare247 Inc., No. 12-cv-7189 (PAE), 2013 WL 841037, at *6

---

[3] In normal circumstances, "courts in the Southern District of New York 'generally impose two additional threshold requirements before authorizing service under Rule 4(f)(3): (1) a showing that the plaintiff has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary.'" Hardin v. Tron Found., No. 20-cv-2804 (VSB), 2020 WL 5236941, at *2 (S.D.N.Y. Sept. 1, 2020) (quoting Devi v. Rajapaska, No. 11-cv-6634, 2012 WL 309605, at *1 (S.D.N.Y. Jan. 31, 2012)). These are sound prudential considerations, but, as S.E.C. v. Anticevic, makes clear, they are discretionary. No. 05-cv-6991 (KMW), 2009 WL 361739, at *4 (S.D.N.Y. Feb. 13, 2009). Because attempting service under Rules 4(f)(1) and (2) would be futile, the Court declines to invoke these discretionary factors.

(S.D.N.Y. Mar. 7, 2013) (authorizing service by Facebook and email); <u>Hardin v. Tron Found.</u>, No. 20-cv-2804 (VSB), 2020 WL 5236941, at *2 (S.D.N.Y. Sept. 1, 2020) (authorizing service by email and LinkedIn). This manner of service is reasonable where the defendants already have actual knowledge of the suit. <u>See, e.g.</u>, <u>PCCare247 Inc.</u>, 2013 WL 841037, at *5 (determining that service by social media and email was particularly appropriate where the defendants have actual knowledge of the lawsuit).

Service by social media and email, without additional means, however, is generally authorized only after a showing of some additional factor. In the case of email, for example, a party may be expected to show that the target for service is likely to receive the communication. Thus, in <u>Philip Morris USA Inc. v. Veles Ltd.</u>, email and fax service was authorized after the plaintiffs showed that "defendants conduct business extensively, if not exclusively, through their Internet websites and correspond regularly with customers via email." No. 06-cv-2988 (GBD), 2007 WL 725412, at *3 (S.D.N.Y. Mar. 12, 2007). Alternatively, a party may show that they are resorting to email and social media service after other methods have been attempted and proven unsuccessful. <u>See, e.g.</u>, <u>Sirius XM Radio Inc. v. Aura Multimedia Corp.</u>, 339 F.R.D. 592, 593 (S.D.N.Y. 2021) (email service authorized after "numerous attempts" at service failed), <u>In re Bystolic Antitrust Litig.</u>, No. 20-cv-5735 (LJL), 2021 WL 4296647, at *1 (S.D.N.Y. Sept. 20, 2021) (authorizing service by email after service under the Hague Convention failed); <u>Day v. Slothower</u>, No. 21-cv-1188 (PAE), 2021 WL 6427556, at *1 (S.D.N.Y. Apr. 27, 2021) (authorizing service by email after service by mail failed). For social media in particular, courts in this District have treated such service as a "backstop" for other methods, not a standalone option. <u>Kesten v. Broad. Music, Inc.</u>, No. 20-cv-8909 (LJL), 2021 WL 1740806, at *2 (S.D.N.Y. Mar. 3, 2021) (collecting cases).

**App.551**

While the Doe and Havlish Plaintiffs agree that alternative service is proper, they disagree on the means. The Havlish Plaintiffs propose substitute service by two means. First, in accordance with New York's procedure for service by publication under CPLR § 316, they propose to publish notice of this action for four consecutive weeks in three publications: *Al Quds Al-Arabi,* the *Financial Times*, and *The New York Times*. ECF No. 7786 at 1. The content and timing of this notice will follow the requirements of CPLR § 316 and include publication of the relevant motion papers in that advertisement. ECF No. 7784 at 10. Second, they propose to serve the Taliban by Twitter through communications to accounts associated with Taliban First Deputy Prime Minister Abudllah Azzam, purportedly tweeting as @Abdullah_azzam7, Taliban politician spokesman Mohammad Naeem, purportedly tweeting as @IeaOffice, and any other Twitter accounts associated with the Taliban. ECF No. 7786 at 2.

The Doe Plaintiffs ask the Court to determine *nunc pro tunc* that they have achieved service on the Taliban through tweets directed to five Twitter accounts purportedly run by senior Taliban officials. ECF No. 7815. They assert that service under CPLR § 316 would be unnecessarily expensive and time-consuming. ECF No. 7780 at 6.

In determining the proper service method, the Court accounts for the fact that the Taliban has actual notice of this case. Its representatives have repeatedly issued press statements demonstrating that they are aware that the DAB Funds in this case are currently being held and targeted in this litigation. ECF Nos. 7785-6, 7785-7, 7785-8 (copies of *The New York Times*, *The Washington Post*, and *Associated Press* articles in which high-ranking Taliban representatives discuss this case and the freezing of funds held by DAB).

Given the Taliban's actual notice, service by publication is appropriate. The Court is not aware of any international agreement that would foreclose this option and indeed, has permitted

**App.552**

service by publication on the Taliban in this case previously. See In re Terrorist Attacks on Sept. 11, 2001, No. 03-md-1570, ECF No. 445.

The Doe Plaintiffs' proposal for retroactive service is denied for two reasons. First, courts in this District have generally found that Rule 4 does not permit *nunc pro tunc* service. See, e.g., In re Coudert Bros. LLP, No. 16-cv-8237 (KMK), 2017 WL 1944162, at *13 (S.D.N.Y. May 10, 2017) ("[A]lternative service under Rule 4(f)(3) is available only where ordered by the court . . . the Court cannot, after the fact, provide such authorization."); see also Integr8 Fuels, Inc. v. OW Bunker Panama SA, No. 16-cv-4073 (VSB), 2017 WL 11455309, at *3 (S.D.N.Y. Feb. 2, 2017) (collecting cases). Two circuit courts have also ruled that *nunc pro tunc* alternative service under Rule 4(f)(3) is not permissible. See Brockmeyer v. May, 383 F.3d 798, 806 (9th Cir. 2004), De Gazelle Grp., Inc. v. Tamaz Trading Establishment, 817 F.3d 747, 750 (11th Cir. 2016). The Court finds those opinions compelling.

Second, even assuming that *nunc pro tunc* service was allowed, notice by Twitter alone, in the absence of any prior efforts at service, and without sufficient factual support does not comport with the requirements of due process. The Doe Plaintiffs have not provided evidence that the Taliban engages with people using Twitter, as opposed to just posting announcements or otherwise using it solely to send, but not receive messages. There is no evidence that Twitter has been used to communicate with the Taliban or serve process on them successfully before. Finally, service by Twitter would be the Doe Plaintiffs' first, and if the Court granted their request, only means of serving notice. They have proffered no case in which a court has authorized the use of a social media service as the exclusive means of attempting service. Thus, the Court does not find that service by Twitter alone is "reasonably calculated" to afford the Taliban notice of this action. Bozza, 2015 WL 4039849, at *2.

The Court, though, is sensitive to the Doe Plaintiffs' concerns about the cost and expense associated with running a substantial ad in multiple papers for four weeks. As both the Doe and Havlish Plaintiffs are involved in the same multidistrict litigation, requiring both parties to post separate announcements of their suits in the papers and by Twitter will be expensive, duplicative, and unnecessary.

Accordingly, the Doe and Havlish Plaintiffs shall serve the Taliban by publication in the following manner. They shall publish notice in *Al Quds Al-Arabi*[4] and *The New York Times*.[5] These notices shall run once a week for at least four weeks. That notice shall conform to the requirements of CPLR § 316. As an alternative to publishing the full motion papers, however, the parties may, at their choosing, include an electronic address such as a URL or a QR code that directs the reader to easily accessible online versions of those papers. The notice must still, per CPLR § 316, include "a brief statement of the nature of the action and the relief sought." Finally, the Doe and Havlish Plaintiffs may, at their option, run a single notice together, so long as the statement covers the nature of both of their actions and provides either both of their papers or the electronic means to see their papers as described above.

In addition, as a supplement to these publications, the parties shall serve the Taliban by communications to the Twitter accounts of Taliban First Deputy Prime Minister Abudllah Azzam (@Abdullah_azzam7) and Taliban political spokesman Mohammad Naeem (@IeaOffice), or to any other Twitter accounts reported to belong to Taliban spokespersons.

---

[4] Al Quds Al-Arabi has been used to achieve service on the Taliban and other groups in prior terrorism cases. See, e.g., Smith v. Islamic Emirate of Afghanistan, No. 01-cv-10132 (HB), 2001 WL 1658211, at *3 (S.D.N.Y. Dec. 26, 2001); Mwani v. bin Laden, 417 F.3d 1, 5 (D.C. Cir. 2005).

[5] This is one less newspaper than the Havlish Plaintiffs requested. If, out of an abundance of caution, they wish to publish in additional papers, they may, but that is not required to satisfy the notice authorized by the Court.

App.554

While the <u>Doe</u> Plaintiffs have already made certain Twitter communications to Taliban accounts, ECF No. 7815 at 1, they shall make further communications in accordance with the terms of this Order.

## II. Supplemental Service on Da Afghanistan Bank By Publication, Email, Social Media and Personal Service Is Authorized

The <u>Havlish</u> and <u>Doe</u> Plaintiffs report that they completed service on DAB through personal service on Dr. Shah Mehrabi. They assert that this satisfies the requirements for service imposed by Rule 4, CPLR §§ 2552 and 2557, and Section 1608(b)(2) of the Foreign Sovereign Immunities Act (FSIA), in the event that the FSIA applies to DAB as an agent or instrumentality of a foreign state. ECF No. 7784 at 10–11, 13–15. Without conceding any argument as to the proper status of DAB, the <u>Havlish</u> Plaintiffs ask for authorization to supplement this service by publication, email, social media, and personal service on DAB in Afghanistan. The <u>Doe</u> Plaintiffs do not seek any further service on DAB and believe the Court need not authorize further service. ECF No. 7780 at 7.

The question of DAB's status is being briefed as part of the <u>Havlish</u> and <u>Doe</u> Plaintiffs' turnover motions. <u>See, e.g.</u>, ECF No. 7764 at 23–30. This Opinion and Order does not address DAB's status and there is no need to do so because the procedures for supplemental service are, for practical purposes, identical regardless of whether service on DAB must be authorized under the Rule 4 procedures for a foreign entity or the 28 U.S.C. § 1608(b) procedures for service on the instrumentality of a foreign sovereign.

As discussed, the procedure for service on foreign entities is contained at Federal Rule of Civil Procedure 4(h), which is applicable even in a *quasi in rem* proceeding. Where the entity is an agency or instrumentality of a foreign state, however, Rule 4(j) provides that service must be

carried out under the FSIA's procedures at 28 U.S.C. § 1608 ("§ 1608"). Section 1608(b) provides that service may be made on an agency or instrumentality of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

Thus, unlike the procedures of Rule 4, where "[s]ervice of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief," KPN B.V. v. Corcyra D.O.O., No. 08-cv-1549 (JGK), 2009 WL 690119, at *1 (S.D.N.Y. Mar. 16, 2009) (internal citation and quotations omitted), the § 1608(b) options are in descending order of preference. Service must be unavailable under § 1608(b)(1) to attempt service under § 1608(b)(2), and both must be unavailable to attempt service under § 1608(b)(3).

Despite this, court-ordered service on DAB remains the only viable mechanism, whether under the auspices of Rule 4(f) or § 1608(b)(3)(C). Starting with Rule 4(f), Afghanistan is not, as discussed, part of any relevant convention. It has no certified mail services or recognized government. That makes service on DAB under Rules 4(f)(1) and Rule 4(f)(2) futile and leaves only court-ordered means under Rule 4(f)(3). Turning to § 1608(b), there is no special agreement

11

**App.556**

between the <u>Havlish</u> Plaintiffs and DAB for service, ECF No. 7784 at 16, and Afghanistan lacks either certified mail or a recognized government that could aid in the execution of letters rogatory. That makes service under § 1608(b)(1), § 1608(b)(3)(A), and § 1608(b)(3)(B) futile. As noted, the <u>Havlish</u> Plaintiffs have already attempted service on Dr. Mehrabi pursuant to § 1608(b)(2). If, and the Court issues no opinion on the question, that service was not effective, that would leave § 1608(b)(3)(C), authorizing service as directed by court order. In short, regardless of whether service on DAB is properly executed under Rule 4(f) or § 1608(b)(3)(C), service as directed by court order is the only viable option.

Service by court order under § 1608(b)(3)(C) is not the norm, likely owing to the relative ease by which one may satisfy § 1608(b)(3) using § 1608(b)(3)(B)'s method of service by registered mail as directed by the clerk of the court. <u>See, e.g.</u>, <u>Est. of Hartwick v. Islamic Republic of Iran</u>, No. 18-cv-1612 (CKK), 2021 WL 6805391, at *8 (D.D.C. Oct. 1, 2021) (service on Iranian instrumentalities by certified mail was proper); <u>Hawkeye Gold, L.L.C. v. China Nat'l Materials Indus. Imp. & Exp. Corp.</u>, No. 16-cv-00355 (JAJ)(SBJ), 2020 WL 11028006, at *3 (S.D. Iowa Oct. 22, 2020) (permitting service on Chinese instrumentalities using the same method).

Indeed, service on instrumentalities under § 1608(b)(3)(C) appears to occur only when notice must be achieved despite a near-total breakdown in a country's services. In <u>Janvey v. Libyan Inv. Auth.</u>, for example, the Court authorized service on Libyan government instrumentalities where "[t]he ongoing strife in Libya apparently has rendered communicating with the Libyan Defendants and other Libyan authorities via mail or courier impossible." No. 11-cv-1177-N, 2011 WL 13299660, at *6 (N.D. Tex. June 16, 2011). Similarly, in <u>Harris Corp. v. Nat'l Iranian Radio & Television</u>, the Court of Appeals for the Eleventh Circuit accepted, albeit

12

**App.557**

with reservation, service on Iranian instrumentalities using a combination of Telex, registered mail, and delivery of papers to the instrumentalities' law firm. 691 F.2d 1344, 1352 n.15 (11th Cir. 1982).

Afghanistan is facing such a breakdown. The Court is thus left to order a suitable means "reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state . . . ." § 1608(b)(3). Because both this statute and the standard for Rule 4(f)(3) require that service be "reasonably calculated" to provide notice, Bozza, 2015 WL 4039849, at *2, comparable methods of service would be viable under each. Furthermore, Janvey, 2011 WL 13299660, at *6, and Harris Corp., 691 F.2d 1352 n.15, countenanced an array of service methods (*e.g.*, email, fax, Telex) comparable to the email and social media methods permitted by Rule 4(f)(3). This further confirms that comparable methods are permissible under § 1608(b)(3) and Rule 4. Thus, notwithstanding the Doe Plaintiffs' dissent, if the Havlish Plaintiffs wish, out of an abundance of caution, to alert DAB to this action through additional forms of notice, there is no reason not to permit them to do so.

Additionally, in setting the method of service, the Court notes that DAB has actual notice of this suit. It has publicly commented on the fact that its assets are frozen by an Executive Order. ECF No. 7785-11 at 3 (DAB press release opposing the blocking of DAB assets). That Executive Order acknowledges that DAB assets are being targeted in litigation. ECF No. 7661-1.

Taking this into account, the Court authorizes supplemental service on DAB by the following methods:

13

**App.558**

1. **Publication**: notice shall be published in *Al Quds Al-Arabi* and *The New York Times*.[6]
   These notices shall run once a week for four weeks and shall conform to the requirements
   of CPLR § 316.

2. **Email**: notice and supporting papers shall be emailed to info@dab.gov.af, a general-
   purpose email address listed on DAB's website, https://dab.gov.af/.

3. **Twitter**: notice shall be provided by Twitter communication to @AFGCentralbank, the
   Twitter account to which DAB's website is linked.

4. **Personal Service**: per the Havlish Plaintiffs' request, the Court authorizes personal
   service on DAB at its offices in Ibni-Sina Watt, Kabul, Afghanistan. Given the precarious
   security situation in Afghanistan, personal service on DAB appears neither viable nor
   advisable. See ECF No. 7781-5 at 1 (U.S. State Department Travel Advisory warning
   that "the risk of kidnapping or violence against U.S. citizens in Afghanistan is high . . .
   .") If it can be safely carried out, however, the Court will not deny the Havlish Plaintiffs
   the opportunity to supplement their service by this method. Any failure to achieve
   personal service on DAB will not negatively affect the validity of service on DAB.

Per § 1608(b)(3), notice shall be accompanied by a translation of the relevant documents
"into the official language of the foreign state. . . ." § 1608(b)(3). This requirement may be
impractical because Afghanistan may not have an official language. Recognizing that
"substantial compliance" is the touchstone for effective service under § 1608(b), the Court
authorizes the Havlish Plaintiffs to satisfy this requirement by providing a translation in any
language spoken by a substantial percentage of Afghanistan's population. Trans Commodities,

---

[6] In conformity with service on the Taliban, the Court orders one less newspaper than the Havlish
Plaintiffs requested. If, out of an abundance of caution, they wish to publish in additional papers, they
may, but that is not required to satisfy the notice authorized by the Court.

14

**App.559**

Inc. v. Kazakstan Trading House, No. 96-cv-9782 (BSJ), 1997 WL 811474, at *4 n.7 (S.D.N.Y. May 28, 1997) ("In considering service under section 1608(b), courts apply a substantial compliance test, not the strict compliance test applicable under section 1608(a).")

Finally, in the absence of a recognized Afghan government to promulgate laws, it does not appear that this method of service will offend any law that could be applied to these circumstances. Should the Doe Plaintiffs wish to supplement their service on DAB, they may do so by the same mechanisms without further application to the Court. As discussed, however, the Court will not authorize other methods of service *nunc pro tunc*.[7]

## CONCLUSION

The Court grants in part the Doe and Havlish Plaintiffs' motion for alternative service on the Taliban and the Havlish Plaintiffs' motion for supplemental service on Da Afghanistan Bank. The Doe Plaintiffs' motion for *nunc pro tunc* approval of their service is denied. The Doe and Havlish Plaintiffs shall serve the Taliban according to the procedures set out in Section I of this Opinion and Order. The Havlish Plaintiffs shall conduct supplemental service on Da Afghanistan Bank according to the procedures set out in Section II of this Opinion and Order. Should the Doe Plaintiffs wish to supplement their service on DAB, they may do so by the same mechanisms without further application to the Court.

---

[7] While the Doe Plaintiffs did not move for supplemental service on DAB, and do not seek further supplemental service on DAB presently, they note that they may seek such supplemental service in the future. ECF No. 7780 at 7.

The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 7779

and 7783, as well as ECF No. 85 in <u>Doe</u>, No. 20-mc-740, and ECF No. 605 in <u>Havlish</u>, No. 03-

cv-9848.

**SO ORDERED.**

Dated: April 5, 2022                _____
       New York, New York             SARAH NETBURN
                                            United States Magistrate Judge

16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

IN RE:                           :

                        :        <u>ORDER</u>

TERRORIST ATTACKS ON       :

SEPTEMBER 11, 2001        :    03 MDL 1570 (GBD) (SN)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

This document relates to:

> <u>Fed. Ins. Co. v. al Qaida</u>, Case No. 03-cv-06978

Certain plaintiffs in *Fed. Ins. Co. v. al Qaida*, No. 03-cv-06978 (the "*Federal Insurance*

Plaintiffs") move for a partial final default judgment against the Taliban under Federal Rule of

Civil Procedure 54(b). (Case No. 03-md-1570, ECF No. 7496.) This Motion is GRANTED.

A default judgment against the Taliban and others, including Al Qaeda and Hezbollah, was

entered in favor of the *Federal Insurance* Plaintiffs on April 7, 2006. (Case No. 03-md-1570, ECF

No. 1755.) The *Federal Insurance* Plaintiffs' total damages against Al Qaeda were assessed at

$9,351,247,965.99. (Case No. 03-md-1570, ECF Nos. 2479, 2502.) This assessment was later

extended against Hezbollah. (Case No. 03-md-1570, ECF No. 2582.)

Several Plaintiffs in the multi-district litigation have used judgments against the Taliban in

an attempt to attach assets of Da Afghanistan Bank held in the Federal Reserve Bank of New York.

(*See* Writ of Execution, *Havlish, et al. v. Iran, et al.*, Case No. 03-cv-9848, ECF No. 526-1.) Parties

in other cases have sought prejudgment attachments of these assets as well. (*See e.g.*, *Owens v.*

*Taliban, et al.*, Case No. 22-cv-1949, ECF Nos. 32, 33.)

There are more that a dozen motions for default judgment against the Taliban pending in

the multi-district litigation. The *Federal Insurance* Plaintiffs' motion is the most procedurally

advanced. Liability and damages have already been determined as to Al Qaeda and Hezbollah. It is appropriate to extend these prior liability and damages determinations to the Taliban.

The Court will continue to adjudicate pending default judgment motions as efficiently as possible. The Court encourages all plaintiffs to continue to meet and propose strategies for an efficient and fair process to adjudicate pending default judgment motions.

Accordingly, for the reasons set forth in the Court's Order at Case No. 03-md-1570, ECF No. 2502, adopting the Report and Recommendation at Case No. 03-md-1570, ECF No. 2479, partial final default judgment under Federal Rule of Civil Procedure 54(b) is entered against the Taliban and in favor of the *Federal Insurance* Plaintiffs in the following amounts:

| Plaintiff | Compensatory Damages | Trebled Award |
|---|---|---|
| Vigilant Insurance Company | $42,305,933.24 | $126,917,799.72 |
| Chubb Custom Insurance Company | $612,585.00 | $1,837,755.00 |
| Chubb Indemnity Insurance Company | $4,083,878.20 | $12,251,634.60 |
| Federal Insurance Company | $1,513,667,597.39 | $4,541,002,792.17 |
| Chubb Insurance Company of New Jersey | $412,681.71 | $1,238,045.13 |
| Chubb Insurance Company of Canada | $50,452,395.71 | $151,357,187.13 |
| Pacific Indemnity Company | $9,936,536.66 | $29,809,609.98 |
| Great Northern Insurance Company | $595,997,113.79 | $1,787,991,341.37 |
| AXA Art Insurance Group | $14,287,543.00 | $42,862,629.00 |
| AXA Global Risk (UK) Ltd. | $10,986,623.57 | $32,959,870.71 |
| AXA CSA UK Branch | $64,779,883.00 | $194,339,649.00 |
| AXA Insurance Company | $131,696,044.96 | $395,088,134.88 |
| AXA Reinsurance Company | $82,714,778.00 | $248,144,334.00 |
| AXA RE | $105,790,023.00 | $317,370,069.00 |
| AXA RE Canadian Branch | $26,138,407.11 | $78,415,221.33 |
| AXA RE UK Plc | $18,162,701.70 | $54,488,105.10 |
| AXA Vericherung | $923,053.00 | $2,769,159.00 |
| SPS RE | $84,305,160.00 | $252,915,480.00 |
| American Alternative Insurance Co. | $3,922,782.07 | $11,768,346.21 |
| Princeton Excess and Supply Lines Insurance Company | $3,796,292.50 | $11,388,877.50 |
| Great Lakes UK Reinsuranec Company | $99,511,427.02 | $298,534,281.06 |
| OneBeacon | $176,514,985.40 | $529,544,956.20 |

| TIG | $76,084,229.30 | $228,252,687.90 |
| Total Award | $3,117,082,655.33 | $9,351,247,965.99 |

The *Federal Insurance* Plaintiffs are also awarded prejudgment interest at the rate of 4.96 percent, compounded annually. Pursuant to Federal Rule of Civil Procedure 62(a), the stay normally imposed under that Rule is lifted. The *Federal Insurance* Plaintiffs may execute on and enforce the judgment immediately. The Clerk of the Court is respectfully directed to prepare and enter a final judgment. To aid this preparation, the *Federal Insurance* Plaintiffs shall file a document calculating the prejudgment interest at their earliest convenience.

Dated: April 6, 2022
New York, New York

SO ORDERED.

GEORGE B. DANIELS
United States District Judge

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re Terrorist Attacks on September 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |
| Fiona Havlish, individually and on behalf of the Estate of Donald G. Havlish, Jr., Deceased, *et al.*,<br><br>   Creditors,<br><br>v.<br><br>The Taliban, *et al.*,<br><br>   Debtors,<br><br>Federal Reserve Bank of New York,<br><br>   Garnishee. | Case No. 03-cv-9848 (GBD)(SN) |

## CERTIFICATE OF SERVICE

I, Benjamin D. Alter, hereby certify as follows:

1. I am an attorney duly licensed to practice law in the state of New York and admitted to the bar of this Court. I am an associate with Jenner & Block LLP, which represents Movant-Creditors Fiona Havlish et al. (the "Havlish Creditors") in the above-captioned action. This certificate of service and the attached exhibits document steps taken to serve the Havlish Creditors' turnover motion papers (MDL Dkts. 7763, 7764, 7765, 7766, and 7768) on the Taliban and Da Afghanistan Bank. I am personally familiar with the instances of service described below.

2. On April 5, 2022, Magistrate Judge Sarah Netburn issued an Opinion and Order (the "Order") authorizing and directing alternative and supplemental service of the Havlish Creditors' turnover motion papers on the Taliban and Da Afghanistan Bank. *See* MDL Dkt. 7830.

3. The Order authorized service on the Taliban via publication in the *New York Times* and *Al-Quds Al-Arabi* pursuant to N.Y.C.P.L.R. § 316, as well as service by Twitter to the accounts @abdullah_azzam7, @IeaOffice, "or to any other Twitter accounts reported to belong to Taliban spokespersons." *Id.* at 9. The Order authorized service on Da Afghanistan Bank via (1) publication in the same newspapers; (2) email to info@dab.gov.af; and (3) Twitter communication to @AFGCentralbank. *Id.* at 14.

4. To facilitate service by publication and other means, the Order authorized the Havlish and Doe Creditors, "[a]s an alternative to publishing the full motion papers," to include in their published notice "an electronic address such as a URL or a QR code that directs the reader to easily accessible online versions of those papers." *Id.* at 9. To that end, I helped facilitate the creation of a public website—www.DABturnover.com—which contains links to PDFs of the Havlish Creditors' and Doe Creditors' turnover motion papers in both English and Pashto, as well as an English and Pashto notice describing the relief sought in the motions.

5. Attached hereto as **Exhibit A** is a true and correct copy of a screen capture of www.DABturnover.com. The English text of the notice reads as follows (and is also translated into Pashto):

> **PUBLIC NOTICE**
> **To the Taliban and Da Afghanistan Bank**
>
> **In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN, 03-CV-9848-GBD-SN, and 20-MC-740-GBD-SN, Judgment Creditors Fiona Havlish et al. ("the Havlish Creditors") and John Does 1 through 7 ("the Doe Creditors") have each filed a motion seeking a turnover of assets of Da Afghanistan Bank (DAB) held in the Federal Reserve Bank of New York (FRBNY). The Havlish Creditors seek these assets to satisfy the final judgment entered by the Court on October 16, 2012 against the Taliban, among others, in connection with the terrorist attacks of September 11, 2001. The Doe Creditors seek these assets to satisfy a final judgment entered in the Northern District of Texas on November 5, 2020 against the Taliban, among others, in connection with a terrorist attack in Kabul, Afghanistan on January 4, 2016. Pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. Sections 5225(b) and 5227, and Section 201(a) of the Terrorism Risk Insurance Act of 2002, the Havlish Creditors' and the Doe Creditors' motions seek to compel FRBNY to turn over the blocked assets of DAB in amount sufficient to satisfy the outstanding amounts of their awards of compensatory damages as of the date the motions were filed, namely $2,086,386,669 and $138,418,741, respectively.**
>
> **This is a notice that the motions have been filed. The motion papers are available below in both English and Pashto.**

6. Beginning at 11:30 p.m. EDT on Saturday, April 23, 2022, I personally effected email and Twitter service on Da Afghanistan Bank and the Taliban in accordance with the Order. I understand that 11:30 p.m. on Saturday, April 23, 2022 corresponds to 8:00 a.m. on Sunday, April 24, 2022 in Kabul, and I further understand on information and belief that Sunday is a business work day in Afghanistan. I also understand that business hours at Da Afghanistan Bank are Saturday through Thursday, from 8:00 a.m. Kabul time until 1:00 pm Kabul time. *See* Da Afghanistan Bank, Zones and Branches, https://www.dab.gov.af/zones-and-branches.

2

7. All of the emails and tweets described below were transmitted between 11:30 p.m. EDT on Saturday, April 23, 2022 and 12:30 a.m. EDT on Sunday, April 24, 2022 (or between 8:00 a.m. and 9:00 a.m. in Kabul on Sunday, April 24, 2022), and the images of those emails and tweets were captured at that time.

8. Attached hereto as **Exhibit B** is a true and correct copy of a screen capture of an April 23, 2022 email sent from the Havlish Creditors to info@dab.gov.af, which the Order described as "a general-purpose email address listed on DAB's website." MDL Dkt. 7830 at 14. The email included English and Pashto descriptions of the Havlish Creditors' turnover motion, and included as attachments copies of the Havlish Creditors' turnover motion papers, in both English and Pashto. The email also included a link to www.DABturnover.com.

9. Attached hereto as **Exhibit C** are true and correct copies of tweets, in English and Pashto, sent from @HavlishTurnover to @AFGCentralBank. I understand @AFGCentralBank to be Da Afghanistan Bank's primary Twitter account, and the Order described it as "the Twitter account to which DAB's website is linked." MDL Dkt. 7830 at 14. The tweets contained English and Pashto descriptions of the Havlish Creditors' turnover motion papers and included a link to www.DABturnover.com.

10. Attached hereto as **Exhibit D** is a true and correct copy of a screen capture of the Twitter profile for @AFGCentralBank.

11. Attached hereto as **Exhibit E** are true and correct copies of tweets, in English and Pashto, sent from @HavlishTurnover to @IeaOffice. I understand @IeaOffice to be a Twitter account associated with, as the Order stated, "Taliban political spokesman Mohammed Naeem." MDL Dkt. 7830 at 9. The tweets contained English and Pashto descriptions of the Havlish Creditors' turnover motion papers and included a link to www.DABturnover.com.

12. Attached hereto as **Exhibit F** is a true and correct copy of a screen capture of the Twitter profile for @IeaOffice, which states that it is the account of the "Spokesman of the Political Office of the Islamic Emirate of Afghanistan."

13. Attached hereto as **Exhibit G** are true and correct copies of tweets, in English and Pashto, sent from @HavlishTurnover to @abdullah_azzam7. I understand @abdullah_azzam7 to be a Twitter account associated with Abdullah Azzam, the "secretary to Taliban acting first deputy prime minister Abdul Ghani Baradar." *See* MDL Dkt. 7784 at 7. The tweets contained English and Pashto descriptions of the Havlish Creditors' turnover motion papers and included a link to www.DABturnover.com.

14. Attached hereto as **Exhibit H** is a true and correct copy of a screen capture of the Twitter profile for @abdullah_azzam7, which states that it is the account of the "Personal Secretary 2 D 1st Deputy PM of D IEA, Mullah Abdul Ghani Baradar."

15. Attached hereto as **Exhibit I** are true and correct copies of tweets, in English and Pashto, sent from @HavlishTurnover to @QaharBalkhi. I understand @QaharBalkhi to be a Twitter account associated with Abdul Qahar Balkhi, a spokesperson for the Taliban's Ministry of

Foreign Affairs. The tweets contained English and Pashto descriptions of the Havlish Creditors' turnover motion papers and included a link to www.DABturnover.com.

16. Attached hereto as **Exhibit J** is a true and correct copy of a screen capture of the Twitter profile for @QaharBalkhi, which states that it is the account of the "MoFA Spokesperson, Islamic Emirate of Afghanistan."

17. Attached hereto as **Exhibit K** are true and correct copies of tweets, in English and Pashto, sent from @HavlishTurnover to @Zabehulah_M33. I understand @Zabehulah_M33 to be a Twitter account associated with Zabiullah Mujahid, a Taliban spokesman. The tweets contained English and Pashto descriptions of the Havlish Creditors' turnover motion papers and included a link to www.DABturnover.com.

18. Attached hereto as **Exhibit L** is a true and correct copy of a screen capture of the Twitter profile for @Zabehulah_M33, which states that it is the "Official Twitter Account of the Spokesman of Islamic Emirate of Afghanistan, Zabihullah Mujahid."

19. Service of the Havlish Creditors' motion papers by publication in the *New York Times* and *Al-Quds Al-Arabi* is currently being arranged, and the Havlish Creditors will file additional proofs of service when such service by publication has been completed in compliance with the Order.

Dated: April 25, 2022
New York, NY

/s/ Benjamin D. Alter
Benjamin D. Alter
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 407-1755

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

*IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001

---

JOHN DOES 1 THROUGH 7,

      *Judgment Creditors,*

v.

THE TALIBAN, AL-QAEDA,
 and THE HAQQANI NETWORK,

      *Judgment Debtors,*

and

THE FEDERAL RESERVE BANK OF
 NEW YORK,

      *Garnishee.*

Case No. 1:03-md-01570-GBD-SN

Misc Action No. 1:20-mc-00740-GBD

## <u>CERTIFICATE OF SERVICE</u>

     I, Orlando do Campo, hereby certify as follows:

1.    This certificate of service and the attached exhibits document steps taken to serve the Doe Creditors' turnover motion papers (DEs 79, 80, 81, and 82) on the Taliban and Da Afghanistan Bank.

2.    On April 5, 2022, Magistrate Judge Sarah Netburn issued an Opinion and Order (hereinafter "the Order") authorizing and directing alternative and supplemental service of the Doe Creditors' turnover motion papers on the Taliban and Da Afghanistan Bank. DE 99.

3.    The Order authorized service on the Taliban via publication in the New York Times and Al-Quds Al-Arabi pursuant to N.Y.C.P.L.R. § 316, as well as service via Twitter to the accounts reported to belong to Taliban spokespersons. *Id*. at 9.

1

4.    The Order authorized service on Da Afghanistan Bank via publication in the same newspapers, email to info@dab.gov.af; and Twitter communication to @AFGCentralbank. *Id.* at 14.

5.    To facilitate service by publication and other means, the Order authorized the Havlish and Doe Creditors, "[a]s an alternative to publishing the full motion papers," to include in their published notice "an electronic address such as a URL or a QR code that directs the reader to easily accessible online versions of those papers." *Id.* at 9. To that end, the Havlish and Doe Creditors' launched of a public website—www.DABturnover.com—containing links to PDFs of the Havlish Creditors' and Doe Creditors' turnover motion papers in both English and Pashto, as well as an English and Pashto notice describing the relief sought in the motions. *See* Exhibit A.

6.    On April 20, 2021, the Doe Creditors effected e-mail and Twitter service on Da Afghanistan Bank in accordance with the Order. *See* Exhibit B.

7.    On April 20, 2021, the Doe Creditors effected Twitter service at the following Twitter accounts in accordance with the Order: @Zabehulah_M33, @leaoffice, @QyAhmadi21, and @suhailshaheen1 on March 31, 2022. *See* Exhibit C.

8.    According to Twitter, @Zabehulah_M33 is the official Twitter account of the spokesman of the Islamic Emirate of Afghanistan, Zabiullah Mujahid. *See* Exhibit B. Zabiullah Mujahid is a senior Taliban official who previously served as the spokesman for the Taliban. Mujahid reported on Taliban activity in central, eastern, and northern Afghanistan. Following the Taliban's takeover of Afghanistan in August 2021, on September 7, it was announced that Mujahid will serve as the deputy minister of information and broadcasting of the Taliban's "government" in Afghanistan.[1]

9.    The account @leaoffice is the official Twitter account for the spokesman of the political office of the Islamic Emirate of Afghanistan, Dr. Mohammad Naeem Wardak. *See* Exhibit C. Dr. Mohammad Naeem Wardak is the current Taliban "government's" spokesperson in the Qatar office. He has served the Taliban in Qatar since 2013, when the Taliban's first political office opened there and has been in charge of strategic and foreign relations.[2]

---

[1] *See* https://www.counterextremism.com/extremists/zabiullah-mujahid
[2] *See* http://www.afghan-bios.info/index.php?option=com_afghanbios&id=2874&task=view&total=581&start=557&Itemid=2

10. The account @QyAhmadi21 is the official Twitter account of the spokesman of the Islamic Emirate of Afghanistan, Qari Yousaf Ahmadi. *See* Exhibit D. Qari Yousaf Ahmadi is one of two Taliban "government" spokesmen, the other being Zabiullah Mujahid. Qari Yousaf Ahmadi has been a spokesperson for the Taliban since 2006, when he reached out to different news outlets to offer Taliban messages about Afghanistan. [3]

11. The account @suhailshaheen1 is the official twitter account of the Islamic Emirate of Afghanistan's permanent representative designated to the United Nations, Suhail Shaheen. *See* Exhibit E. Suhail Shaheen is currently the Taliban "government's" permanent representative-designee to the United Nations. Prior to this post, Shaheen was the Taliban's second Secretary and Deputy Ambassador of the Afghanistan embassy in Pakistan. He was also the Taliban's Doha/Qatar official political spokesperson. [4]

12. Service of the Doe Creditors' motion papers by publication in the New York Times and Al-Quds Al-Arabi is currently being arranged, and the Doe Creditors will file additional proofs of service when such service by publication has been completed in compliance with the Order.

Dated: April 25, 2022

Respectfully submitted,

**do Campo & Thornton, P.A.**
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
(305) 358-6600

s/ *Orlando do Campo*
Orlando do Campo
Bar Code: OD1969
od@dandtlaw.com

---

[3] *See* https://www.france24.com/en/video/20210902-cyril-payen-interviews-taliban-spokesman-qari-yousuf-ahmadi; *see also*, https://www.nbcnews.com/id/wbna12909608, http://news.bbc.co.uk/2/hi/south_asia/5349330.stm.
[4] *See* http://www.afghan-bios.info/index.php?option=com_afghanbios&id=2464&task=view&total=22&start=14&Itemid=2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 25, 2022, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.

s/ *Orlando do Campo*
Orlando do Campo

App.572

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

In Re Terrorist Attacks on September 11, 2001

**Federal Insurance Company, et al.,   Creditors,**

|  |  |
|---|---|
| | Case No.: 03-md-1570 (GBD)(SN) |
| *vs.* | Case No.: 03-cv-6978 (GBD)(SN) |

**The Taliban, et al.,   Debtors,**

**Federal Reserve Bank of New York,   Garnishee.**

---

## AFFIDAVIT OF SERVICE

That I, David S. Felter, a Private Process Server, being duly sworn, depose and say:

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

Legal documents received by Capitol Process Services, Inc. on May 2, 2022 to be served on Da Afghanistan Bank at 1920 North Dinwiddie Street, Arlington, Virginia 22207.

I, David S. Felter, swear and affirm that on May 2, 2022 at 3:58 PM, I did the following:

Served Da Afghanistan Bank by delivering a copy of the Letter dated May 2, 2022; Notice of Motion to Join the Turnover Proceedings and for Partial Turnover of Assets from Garnishee Federal Reserve Bank of New York (MDL ECF No. 7936); Memorandum of Law In Support of the Federal Insurance Creditors' Motion for a Partial Turnover of Assets from Garnishee Federal Reserve Bank of New York (MDL ECF No. 7937); Declaration of Sean P. Carter In Support of the Federal Insurance Creditors' Motion for a Partial Turnover of Assets from Garnishee Federal Reserve Bank of New York (MDL ECF No. 7938); Exhibits 1-7 to the Declaration of Sean P. Carter (MDL ECF No. 7938-1 through 7938-7), including the Expert Declaration of Alex B. Zerden (MDL ECF No. 7938-7); and a USB Thumb Drive (containing digital copies of the above referenced documents) to Dr. Shah Mohammad Mehrabi as Supreme Council Member and Authorized Agent of Da Afghanistan Bank at 1920 North Dinwiddie Street, Arlington, Virginia 22207.

I declare under penalty of perjury that this information is true.

May 3, 2022
_____
Executed On

David S. Felter
_____
David S. Felter

Client Ref Number:00117430
Job #: 1602296

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *IN RE* TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |

| | |
|---|---|
| FIONA HAVLISH, individually and on behalf of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, *et al.*, | Case No. 03-cv-9848 (GBD)(SN) |
|       Creditors, | |
| v. | |
| THE TALIBAN, *et al.*, | |
|       Debtors, | |
| FEDERAL RESERVE BANK OF NEW YORK, | |
|       Garnishee. | |

| | |
|---|---|
| JOHN DOES 1 THROUGH 7, | Case No. 20-mc-0740 (GBD)(SN) |
|       Creditors, | |
| v. | |
| THE TALIBAN, *et al.*, | |
|       Debtors, | |
| FEDERAL RESERVE BANK OF NEW YORK, | |
|       Garnishee. | |

## JOINT CERTIFICATE OF SERVICE BY PUBLICATION

The undersigned, Benjamin D. Alter and Orlando do Campo, hereby certify as follows:

1. We are attorneys duly licensed to practice law in the state of New York and admitted to the bar of this Court. Mr. Alter is an associate with Jenner & Block LLP, which represents Movant-Creditors Fiona Havlish et al. (the "Havlish Creditors") in the above-captioned action (No. 03-cv-9848). Mr. do Campo is a partner with do Campo & Thornton, P.A., which represents Movant-Creditors John Does 1 through 7 (the "Doe Creditors") in the above-captioned action (No. 20-mc-740).

1

2. This joint certificate of service and the attached exhibits document steps taken to serve the Havlish and Doe Creditors' turnover motion papers (MDL Dkts. 7763–7771) on the Taliban and Da Afghanistan Bank ("DAB") by publication in the *New York Times* and *Al-Quds Al-Arabi*, in conformity with the Court's April 5, 2022 Order authorizing alternative service. *See* MDL Dkt. 7830. We are personally familiar with the instances of service by publication described below.

3. This certificate of service by publication supplements previous proofs of service submitted in connection with the Havlish and Doe Creditors' turnover proceedings. *See* MDL Dkts. 7904, 7910 (documenting the Havlish and Doe Creditors' service on the Taliban by Twitter and on DAB by Twitter and email); MDL Dkts. 7776, 7777 (documenting the Havlish and Doe Creditors' service of DAB via its officer or agent Dr. Shah Mehrabi); *see also* MDL Dkt. 7784 at 11 (explaining why DAB was properly served via Dr. Mehrabi).

4. On April 5, 2022, Magistrate Judge Sarah Netburn issued an Opinion and Order (the "Order") authorizing and directing alternative and supplemental service of the Havlish and Doe Creditors' turnover motion papers on the Taliban and DAB. *See* MDL Dkt. 7830.

5. The Order authorized service on the Taliban and DAB, *inter alia*, via publication in the *New York Times* and *Al-Quds Al-Arabi* pursuant to N.Y.C.P.L.R. § 316. Order at 9, 14. The Order authorized the Havlish and Doe Creditors to publicize "a single notice together, so long as the statement covers the nature of both of their actions." *Id*. at 9. The Order further authorized the Havlish and Doe Creditors, "[a]s an alternative to publishing the full motion papers," to include in their published notice "an electronic address such as a URL or a QR code that directs the reader to easily accessible online versions of those papers." *Id*. at 9.

6. To that end, we helped facilitate the creation of a public website— www.DABturnover.com—which contains links to PDFs of the Havlish Creditors' and Doe Creditors' turnover motion papers in both English and Pashto, as well as an English and Pashto notice describing the relief sought in the motions. We understand Pashto to be a "language spoken by a substantial percentage of Afghanistan's population." Order at 14.

7. Attached hereto as **Exhibit A** is a true and correct copy of a screen capture of www.DABturnover.com, captured on April 24, 2022. The English text of the notice reads as follows (the notice is also translated into Pashto on the website):

**PUBLIC NOTICE**
**To the Taliban and Da Afghanistan Bank**

**In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN, 03-CV-9848-GBD-SN, and 20-MC-740-GBD-SN, Judgment Creditors Fiona Havlish et al. ("the Havlish Creditors") and John Does 1 through 7 ("the Doe Creditors") have each filed a motion seeking a turnover of assets of Da Afghanistan Bank (DAB) held in the Federal Reserve Bank of New York (FRBNY). The Havlish Creditors seek these assets to satisfy the final judgment entered by the**

2

Court on October 16, 2012 against the Taliban, among others, in connection with the terrorist attacks of September 11, 2001. The Doe Creditors seek these assets to satisfy a final judgment entered in the Northern District of Texas on November 5, 2020 against the Taliban, among others, in connection with a terrorist attack in Kabul, Afghanistan on January 4, 2016. Pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. Sections 5225(b) and 5227, and Section 201(a) of the Terrorism Risk Insurance Act of 2002, the Havlish Creditors' and the Doe Creditors' motions seek to compel FRBNY to turn over the blocked assets of DAB in amount sufficient to satisfy the outstanding amounts of their awards of compensatory damages as of the date the motions were filed, namely $2,086,386,669 and $138,418,741, respectively.

This is a notice that the motions have been filed. The motion papers are available below in both English and Pashto.

8. Following the creation of the website, the Havlish and Doe Creditors submitted a notice for publication in the *New York Times* and *Al-Quds Al-Arabi*. The notice included "a brief statement of the nature of the action[s] and the relief sought," *see* Order at 9; CPLR § 316, and the notice made reference to www.DABTurnover.com, which includes links to English and Pashto versions of the Havlish and Doe Creditors' turnover motion papers.

9. A copy of the English language version of the notice that was submitted for publication in the *New York Times* is attached hereto as **Exhibit B**. The notice was translated into Arabic for publication in *Al-Quds Al-Arabi*, and a copy of the Arabic translation of the notice is attached hereto as **Exhibit C**.

10. In conformity with the Order and CPLR § 316, the notices were published in the *New York Times* (both the U.S. and international editions) and *Al-Quds Al-Arabi* once per week for four consecutive weeks.

11. As further documented below and in the attached exhibits, English-language notices were published in the U.S. edition of the *New York Times* on April 26, 2022; May 3, 2022; May 10, 2022; and May 17, 2022. Arabic-language notices were published in *Al-Quds Al-Arabi* on April 28, 2022; May 4, 2022; May 11, 2022; and May 18, 2022. English-language notices were published in the international edition of the *New York Times* on April 28, 2022; May 5, 2022; May 12, 2022; and May 19, 2022.

12. Attached hereto as **Exhibit D** is a true and correct copy of an affidavit from the *New York Times* concerning the April 26, 2022 publication of the Havlish and Doe Creditors' notice in the U.S. edition of the *New York Times*. Attached hereto as **Exhibit E** is a true and correct copy of a tearsheet showing the placement of the notice in the newspaper.

13. Attached hereto as **Exhibit F** is a true and correct copy of an affidavit from the *New York Times* concerning the April 28, 2022 publication of the Havlish and Doe Creditors' notice in the international edition of the *New York Times*. Attached hereto as **Exhibit G** is a true and correct copy of a tearsheet showing the placement of the notice in the newspaper.

3

14. Attached hereto as **Exhibit H** is a true and correct copy of an affidavit from the *New York Times* concerning the May 3, 2022 publication of the Havlish and Doe Creditors' notice in the U.S. edition of the *New York Times*. Attached hereto as **Exhibit I** is a true and correct copy of a tearsheet showing the placement of the notice in the newspaper.

15. Attached hereto as **Exhibit J** is a true and correct copy of an affidavit from the *New York Times* concerning the May 5, 2022 publication of the Havlish and Doe Creditors' notice in the international edition of the *New York Times*. Attached hereto as **Exhibit K** is a true and correct copy of a tearsheet showing the placement of the notice in the newspaper.

16. Attached hereto as **Exhibit L** is a true and correct copy of an affidavit from the *New York Times* concerning the May 10, 2022 publication of the Havlish and Doe Creditors' notice in the U.S. edition of the *New York Times*. Attached hereto as **Exhibit M** is a true and correct copy of a tearsheet showing the placement of the notice in the newspaper.

17. Attached hereto as **Exhibit N** is a true and correct copy of an affidavit from the *New York Times* concerning the May 12, 2022 publication of the Havlish and Doe Creditors' notice in the international edition of the *New York Times*. Attached hereto as **Exhibit O** is a true and correct copy of a tearsheet showing the placement of the notice in the newspaper.

18. Attached hereto as **Exhibit P** is a true and correct copy of an affidavit from the *New York Times* concerning the May 17, 2022 publication of the Havlish and Doe Creditors' notice in the U.S. edition of the *New York Times*. Attached hereto as **Exhibit Q** is a true and correct copy of a tearsheet showing the placement of the notice in the newspaper.

19. Attached hereto as **Exhibit R** is a true and correct copy of an affidavit from the *New York Times* concerning the May 19, 2022 publication of the Havlish and Doe Creditors' notice in the international edition of the *New York Times*. Attached hereto as **Exhibit S** is a true and correct copy of a tearsheet showing the placement of the notice in the newspaper.

20. Attached hereto as **Exhibit T** is a true and correct copy of a declaration from Pat Sundram, the business manager of *Al-Quds Al-Arabi*, certifying that the Havlish and Doe Creditors' notice was published in that newspaper on April 28, 2022; May 4, 2022; May 11, 2022; and May 18, 2022. The declaration also includes true and correct copies of pages from *Al-Quds Al-Arabi* on those dates, each of which contains the published notice.

4

Dated: May 31, 2022
New York, NY

/s/ *Benjamin D. Alter*
Benjamin D. Alter
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 407-1755

/s/ *Orlando do Campo*
Orlando do Campo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600

5

App.578

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAYMOND ANTHONY SMITH, as Administrator of the Estate of George Eric Smith, deceased<br><br>                  Plaintiff,<br><br>    v.<br><br>THE ISLAMIC EMIRATE OF AFGHANISTAN, et al.<br><br>                  Defendants. | CASE NO. 01-cv-10132-GBD-SN |

## CERTIFICATE OF SERVICE BY PUBLICATION

I, the undersigned, James E. Beasley, Jr., Esquire, hereby certify as follows:

1.    I am an attorney duly licensed to practice law in the Commonwealth of Pennsylvania and have been admitted *pro hac vice* to the bar of this Court.

2.    This certificate of service and the attached exhibits document steps taken to serve the Smith/Soulas Creditors' Turnover Motion papers [ECF 50; 61-65] on the Taliban and Da Afghanistan Bank ("DAB") by publication in the *New York Times* and *Al-Quds Al-Arabi*, in conformity with the Honorable Lewis A. Kaplan's Order [ECF 45] authorizing alternative service. I am personally familiar with the instances of service by publication described below.

3.    On 14 April 2022, the Honorable Lewis A. Kaplan issued an Order [ECF 45] authorizing and directing alternative service of the Smith/Soulas Creditors' turnover motion papers on the Taliban and DAB.

4.    The Order authorized service on the Taliban and DAB*, inter alia*, via publication in the *New York Times* and *Al-Quds Al-Arabi* pursuant to N.Y. C.P.L.R. § 316.

5.    The Beasley Firm, LLC created a public website, www.talibanassetturnover.com which contains links to PDFs of the Smith/Soulas Creditors' turnover motion papers in both English and Dari. I understand Dari to be a language spoken by a substantial percentage of Afghanistan's population.

1

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

SMITH V. ISLAMIC EMIRATE OF AFGHANISTAN, ET AL.
CERTIFICATE OF SERVICE BY PUBLICATION
App.579

6.    Attached hereto as Exhibit A is a true and correct copy of a screen capture of www.talibanassetturnover.com captured on 08 June 2022.  The English text of the notice reads as follows (the notice is also translated into Dari and Arabic on the website):

### LEGAL NOTICE

| To: The Taliban<br>    The Islamic Emirate of Afghanistan<br>    Da Afghanistan Bank | NOTICE SERVED BY:<br>James E. Beasley, Jr., Esquire<br>Dion G. Rassias, Esquire<br>THE BEASLEY FIRM, LLC<br>1125 Walnut Street<br>Philadelphia, PA 19107 |
|---|---|

Notice is hereby served on Defendants The Taliban and The Islamic Emirate of Afghanistan, and the Da Afghanistan Bank (DAB), that the Plaintiffs in Smith, et al. v. The Taliban, et al., No. 01-CV-10132 (LAK) in the United States District Court for the Southern District of New York, 500 Pearl Street, New York, NY 10007 have filed a Motion for Asset Turnover directed to the garnishee Federal Reserve Bank of New York (FRBNY).  This Motion seeks turnover of defendants' DAB assets held by the FRBNY to satisfy the 14 July 2003 Judgment, $59,262,189.57, plus daily interest, entered against these defendants in this lawsuit in connection with the World Trade Center attacks of 11 September 2001.

If you wish to respond to the Motion for Asset Turnover as set forth in the attached links, you must take action by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections in the required time period.  You are warned that if you fail to do so you may lose your rights, money and/or property without further notice.

The Motion for Asset Turnover is in the following links in English and Dari:

www.talibanassetturnover.com

7.    The Smith/Soulas Creditors submitted a notice for publication in the *New York Times* and *Al-Quds Al-Arabi*. The notice includes "a brief statement of the nature of the action[s] and the relief sought" pursuant to N.Y. C.P.L.R. § 316, and also references www.talibanassetturnover.com, the website which includes links to English and Dari versions of the Smith/Soulas Creditors' turnover motion papers.

8.    The English language version of the notice that was submitted for publication in the *New York Times* is attached hereto as Exhibit B. The notice was also

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA  19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

translated into Arabic for publication in *Al-Quds Al-Arabi*. A copy of the Arabic translation of the notice is attached hereto as Exhibit C.

9.     In compliance with Judge Kaplan's Order and N.Y. C.P.L.R. § 316, the notices were published in the *New York Times* and *Al-Quds Al-Arabi* once per week for four consecutive weeks.

10.    As further documented below and in the attached Exhibits, an English-language notice was published in the *New York Times* on 12 May, 2022; 19 May 2022; 26 May 2022 and 2 June 2022. An Arabic-language notice was published in *Al-Quds Al-Arabi* on 12 May 2022; 19 May 2022; 26 May 2022 and 2 June 2022.

11.    Attached hereto as Exhibit D is a true and correct copy of an affidavit from *the New York Times* for the 12 May 2022 publication of the notice. Attached hereto as Exhibit E is a true and correct copy of the "tearsheet" showing the placement of the notice in the newspaper.

12.    Attached hereto as Exhibit F is a true and correct copy of an affidavit from the *New York Times* for the 19 May 2022 publication of the notice. Attached hereto as Exhibit G is a true and correct copy of the "tearsheet" showing the placement of the notice in the newspaper.

13.    Attached hereto as Exhibit H is a true and correct copy of an affidavit from the *New York Times* for the 26 May 2022 publication of the notice. Attached hereto as Exhibit I is a true and correct copy of the "tearsheet" showing the placement of the notice in the newspaper.

14.    Attached hereto as Exhibit J is a true and correct copy of an affidavit from the *New York Times* for the 2 June 2022 publication of the notice. Attached hereto as Exhibit K is a true and correct copy of the "tearsheet" showing the placement of the notice in the newspaper.

15.    Attached hereto as Exhibit L is a true and correct copy of a Declaration of Publication from Pat Sundram, business manager of *Al-Quds Al-Arabi*, certifying that the Smith/Soulas Creditors' notice was published in that newspaper on 12 May 2022; 19 May 2022; 26 May 2022; and 2 June 2022. The declaration also includes true and correct copies of pages from *Al-Quds Al-Arabi* on those dates, each of which contains the published notice.

**REMAINDER OF THIS PAGE INTENTIONALLY BLANK**

3

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

<u>**SMITH V. ISLAMIC EMIRATE OF AFGHANISTAN, ET AL.**</u>
CERTIFICATE OF SERVICE BY PUBLICATION
App.581

Respectfully submitted,

**THE BEASLEY FIRM, LLC**

By: _____

Date: **6/9/22**

**JAMES E. BEASLEY, JR. (*pro hac vice*)**
**DION G. RASSIAS**
The Beasley Building
1125 Walnut Street
Philadelphia, PA 19107
215.592.1000
215.592.1523 (telefax)
Attorneys for Plaintiffs

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. ISLAMIC EMIRATE OF AFGHANISTAN, ET AL.**
CERTIFICATE OF SERVICE BY PUBLICATION

App.582

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RAYMOND ANTHONY SMITH, as
Administrator of the Estate of George Eric
Smith, deceased

               Plaintiff,

    v.

THE ISLAMIC EMIRATE OF
AFGHANISTAN, et al.

               Defendants.

CASE NO.  01-cv-10132-GBD-SN

## CERTIFICATE OF SERVICE BY TWITTER AND ELECTRONIC MAIL

I, the undersigned, James E. Beasley, Jr., Esquire, hereby certify as follows:

1.    I am an attorney duly licensed to practice law in the Commonwealth of Pennsylvania and have been admitted *pro hac vice* to the bar of this Court.

2.    This certificate of service and the attached exhibits document steps taken to serve the Smith/Soulas Creditors' Turnover Motion papers [ECF 50; 61-65] on the Taliban and Da Afghanistan Bank ("DAB") via Twitter and e-mail in conformity with the Honorable Lewis A. Kaplan's Order [ECF 45] authorizing alternative service.  I am personally familiar with the instances of service described below.

3.    On 14 April 2022, the Honorable Lewis A. Kaplan issued an Order [ECF 45] authorizing and directing alternative service of the Smith/Soulas Creditors' turnover motion papers on the Taliban and DAB.

4.    The Order authorized service on the Taliban and DAB, *inter alia*, via Twitter, through communication to Twitter accounts held by Taliban spokespersons, and by Twitter and e-mail communications to the official accounts of DAB.

5.    The Beasley Firm, LLC created a public website, www.talibanassetturnover.com which contains links to PDFs of the Smith/Soulas Creditors' turnover motion papers in both English and Dari. I understand Dari to be a language spoken by a substantial percentage of Afghanistan's population.

6.    Attached hereto as Exhibit A is a true and correct copy of a screen capture of www.talibanassetturnover.com captured on 08 June 2022.  The English text of the notice reads as follows (the notice is also translated into Dari and Arabic on the website):

1

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA  19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**SMITH V. ISLAMIC EMIRATE OF AFGHANISTAN, ET AL.**
CERTIFICATE OF SERVICE BY TWITTER AND ELECTRONIC MAIL

App.583

LEGAL NOTICE

| To: The Taliban<br>    The Islamic Emirate of Afghanistan<br>    Da Afghanistan Bank | NOTICE SERVED BY:<br>James E. Beasley, Jr., Esquire<br>Dion G. Rassias, Esquire<br>THE BEASLEY FIRM, LLC<br>1125 Walnut Street<br>Philadelphia, PA 19107 |
|---|---|

Notice is hereby served on Defendants The Taliban and The Islamic Emirate of Afghanistan, and the Da Afghanistan Bank (DAB), that the Plaintiffs in Smith, et al. v. The Taliban, et al., No. 01-CV-10132 (LAK) in the United States District Court for the Southern District of New York, 500 Pearl Street, New York, NY 10007 have filed a Motion for Asset Turnover directed to the garnishee Federal Reserve Bank of New York (FRBNY). This Motion seeks turnover of defendants' DAB assets held by the FRBNY to satisfy the 14 July 2003 Judgment, $59,262,189.57, plus daily interest, entered against these defendants in this lawsuit in connection with the World Trade Center attacks of 11 September 2001.

If you wish to respond to the Motion for Asset Turnover as set forth in the attached links, you must take action by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections in the required time period. You are warned that if you fail to do so you may lose your rights, money and/or property without further notice.

The Motion for Asset Turnover is in the following links in English and Dari:

www.talibanassetturnover.com

7.      On or about 12 May 2022, the Beasley Firm sent the notice via Tweets and e-mail to Taliban spokespersons and Da Afghanistan Bank, as authorized by Judge Kaplan's Order directing alternative service. Attached hereto as Exhibit B is the screenshot of the Beasley Firm's Twitter page. Attached hereto as Exhibit C is the Beasley Firm's 12 May 2022 e-mail communication to DAB (with delivery and read receipts).

**REMAINDER OF THIS PAGE INTENTIONALLY BLANK**

2

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

SMITH V. ISLAMIC EMIRATE OF AFGHANISTAN, ET AL.
CERTIFICATE OF SERVICE BY TWITTER AND ELECTRONIC MAIL
App.584

Respectfully submitted,

**THE BEASLEY FIRM, LLC**

Date: 6/9/22        By: _____

**JAMES E. BEASLEY, JR. (pro hac vice)**
**DION G. RASSIAS**
The Beasley Building
1125 Walnut Street
Philadelphia, PA  19107
215.592.1000
215.592.1523 (telefax)
Attorneys for Plaintiffs

**THE BEASLEY FIRM, LLC**
1125 WALNUT STREET
PHILADELPHIA, PA  19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

<u>SMITH V. ISLAMIC EMIRATE OF AFGHANISTAN, ET AL.</u>
CERTIFICATE OF SERVICE BY TWITTER AND ELECTRONIC MAIL

App.585

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re Terrorist Attacks on September 11, 2001 | Case No. 03-md-1570 (GBD) (SN) |
| Federal Insurance Company, et al., | Case No. 03-cv-6978 (GBD) (SN) |
|     Creditors, | |
| v. | |
| The Taliban, et al., | |
|     Debtors, | |
| Federal Reserve Bank of New York, | |
|     Garnishee. | |

### *FEDERAL INSURANCE* CREDITORS' CERTIFICATE OF SERVICE

I, J. Scott Tarbutton, hereby certifies as follows:

1.      I am an attorney admitted to practice *pro hac vice* in the above-captioned matter, and a member of the law firm Cozen O'Connor, which represents Judgment Creditors *Federal Insurance Co., et al.* (the "*Federal Insurance* Creditors") in the above-captioned action. This certificate of service and the attached exhibits document the steps taken by the *Federal Insurance* Creditors' to serve their turnover papers (MDL ECF Nos. 7936-7938) on the Taliban and Da Afghanistan Bank ("DAB") via email, Twitter, and publication, as authorized by the Court at MDL ECF Nos. 7830, 7946. I am personally familiar with the instances of service described herein.

2.      This certificate of service supplements previous proofs of service submitted in connection with the *Federal Insurance* Creditors' turnover proceedings. *See* MDL ECF No.

7943 (documenting the *Federal Insurance* Creditors' service of DAB via its agent or officer Dr. Shah Mohammad Mehrabi); *see also* MDL ECF No. 7784 at 11-13 (discussing why DAB was properly served via Dr. Mehrabi).

3.      On April 5, 2022, Magistrate Judge Sarah Netburn issued an Opinion and Order (the "Order") authorizing and directing alternative and supplemental service of the *Havlish* Creditors' and *Doe* Creditors' turnover motion papers on the Taliban and DAB.  *See* MDL ECF No. 7830.

4.      That Order authorized service on the Taliban (1) via publication in the *New York Times* and *Al-Quds Al-Arabi* pursuant to N.Y. C.P.L.R. § 316, and (2) by Twitter communications to the accounts of Taliban First Deputy Prime Minister Abdullah Azzam (@Abdullah_azzam7), Taliban political spokesman Mohammad Naeem (@IeaOffice), "or to any other Twitter accounts reported to belong to Taliban spokespersons."  *Id.* at 9.

5.      The Order further authorized service on DAB (1) via publication in the *New York Times* and *Al-Quds Al-Arabi* pursuant to N.Y. C.P.L.R. § 316, (2) email to info@dab.gov.af, and (3) Twitter communication to DAB (@AFGCentralbank).  *Id.* at 14.

6.      On May 4, 2022, Magistrate Judge Sarah Netburn issued an Order permitting the *Federal Insurance* Creditors to "achieve supplemental and alternative service on the Taliban and Da Afghanistan Bank using the methods authorized by the Court at ECF No. 7830."  *See* MDL ECF No. 7946.

7.      To facilitate service on the Taliban and DAB, the April 5, 2022 Order authorized the *Havlish* and *Doe* Creditors, "[a]s an alternative to publishing the full motion papers," to include in their published notice "an electronic address such as a URL or a QR code that directs the reader to easily accessible online versions of those papers."  Order at 9.  Thereafter, the

**App.587**

*Havlish* Creditors created a public website – www.DABturnover.com – which contains links to PDFs of the *Havlish* Creditors' and *Doe* Creditors' turnover motion papers in both English and Pashto, as well as an English and Pashto notice describing the relief sought in the motions. *See* MDL ECF No. 7904 at ¶¶ 4-5. The parties understand Pashto to be a "language spoken by a substantial percentage of Afghanistan's population." Order at 14.

8.  On May 18, 2022, the Public Notice to the Taliban and DAB at www.DABturnover.com was edited to include specific information identifying the *Federal Insurance* Creditors' turnover motion and relief sought in both English and Pashto, as well as links to PDFs of the *Federal Insurance* Creditors' motion papers in English and Pashto. *See* Exhibit 1.

9.  The revised English text of the Public Notice to the Taliban and DAB at www.DABturnover.com reads as follows (and is also translated into Pashto):

> In the United States District Court for the Southern District of New York, Case Nos. 03-MD-1570-GBD-SN, 03-CV-9848-GBD-SN, 20-MC-740-GBD-SN, and 03-CV-6978-GBD-SN, Judgment Creditors Fiona Havlish et al. ("the Havlish Creditors"), John Does 1 through 7 ("the Doe Creditors"), and Judgment Creditors Federal Insurance Co., et al. (the "Federal Insurance Creditors"), have each filed a motion seeking a turnover of assets of Da Afghanistan Bank (DAB) held in the Federal Reserve Bank of New York (FRBNY). The Havlish Creditors seek these assets to satisfy the final judgment entered by the Court on October 16, 2012 against the Taliban, among others, in connection with the terrorist attacks of September 11, 2001. The Doe Creditors seek these assets to satisfy a final judgment entered in the Northern District of Texas on November 5, 2020 against the Taliban, among others, in connection with a terrorist attack in Kabul, Afghanistan on January 4, 2016. The Federal Insurance Creditors seek these assets to satisfy the final judgment entered by the Court on April 20, 2022 against the Taliban in connection with the terrorist attacks of September 11, 2001. Pursuant to Federal Rule of Civil Procedure 69(a), N.Y. C.P.L.R. Sections 5225(b) and 5227, and Section 201(a) of the Terrorism Risk Insurance Act of 2002, the Havlish Creditors', the Doe Creditors', and the Federal Insurance Creditors' motions seek to compel FRBNY to turn over the blocked assets of DAB in an amount sufficient to satisfy the outstanding amounts of their awards of compensatory damages as of the date the motions were filed, namely $2,086,386,669, $138,418,741, and $14,672,806,120.64, respectively.

**App.588**

This is a notice that the motions have been filed. The motion papers are available below in both English and Pashto.

*See id.*

A.    Service on DAB and the Taliban via Email

10.    In accordance with the Court's Order authorizing service "to info@dab.gov.af, a general purpose email address listed on DAB's website, https://dab.gov.af," Order at 14, I personally effected email service on DAB and the Taliban starting at 11:30 p.m. EST on Friday, May 20, 2022. I understand that 11:30 p.m. on Friday, May 20, 2022 corresponds to 8:00 a.m. on Saturday, May 21, 2022 in Kabul, Afghanistan, and I further understand on information and belief that Saturday is a business work day in Afghanistan. It is also my understanding that business hours at DAB are Saturday through Thursday, from 8:00 a.m. Kabul time until 4 p.m. Kabul time. *See* https://dab.gov.af.

11.    Attached hereto as Exhibit 2 is a true and correct copy of the May 20, 2022 email sent from counsel for the *Federal Insurance* Creditors to info@dab.gov.af. The email included English and Pashto descriptions of the *Federal Insurance* Creditors' turnover motion, and also included as attachments copies of the *Federal Insurance* Creditors' turnover motion papers, in both English and Pashto. The email also included a link to www.DABturnover.com.

12.    Immediately following service via email on May 20, 2022, copies of the *Federal Insurance* Creditors' turnover motion papers, in both English and Pashto, were additionally sent via secure file transfer to DAB at info@dab.gov.af. *See* Exhibit 3.

B.    Service on DAB and the Taliban via Twitter

13.    In accordance with the Court's Order authorizing service on DAB and the Taliban via Twitter, *supra* ¶¶ 4-5, the *Federal Insurance* Creditors effected Twitter service on DAB and the Taliban on May 24, 2022.

4

**App.589**

14.     Attached hereto as <u>Exhibit 4</u> are true and correct copies of tweets, in English and Pashto, sent from @FederalTurnover to @AFGCentralbank.  I understand @AFGCentralbank to be DAB's primary Twitter account, and the Order described it as "the Twitter account to which DAB's website is linked."  Order at 14.  The tweets contained English and Pashto descriptions of the *Federal Insurance* Creditors' turnover motion papers and included a link to www.DABturnover.com.

15.     Attached hereto as <u>Exhibit 5</u> is a true and correct copy of a screen capture of the Twitter profile for @AFGCentralbank.

16.     Attached hereto as <u>Exhibit 6</u> are true and correct copies of tweets, in English and Pashto, sent from @FederalTurnover to @IeaOffice.  I understand @IeaOffice to be a Twitter account associated with "Taliban political spokesman Mohammed Naeem."  Order at 9.  The tweets contained English and Pashto descriptions of the *Federal Insurance* Creditors' turnover motion papers and included a link to www.DABturnover.com.

17.     Attached hereto as <u>Exhibit 7</u> is a true and correct copy of a screen capture of the Twitter profile for @IeaOffice, which states that it is the account of the "Spokesman of the Political Office of the Islamic Emirate of Afghanistan."

18.     Attached hereto as <u>Exhibit 8</u> are true and correct copies of tweets, in English and Pashto, sent from @FederalTurnover to @Abdullah_azzam7.  I understand @Abdullah_azzam7 to be a Twitter account associated with Abdullah Azzam, the "secretary to Taliban acting first deputy prime minister Abdul Ghani Baradar."  MDL ECF No. 7784 at 7.  The tweets contained English and Pashto descriptions of the *Federal Insurance* Creditors' turnover motion papers and included a link to www.DABturnover.com.

**App.590**

19.     Attached hereto as <u>Exhibit 9</u> is a true and correct copy of a screen capture of the Twitter profile for @Abdullah_azzam7, which states that it is the account of the "Personal Secretary 2 D 1st Deputy PM of D IEA, Mullah Abdul Ghani Baradar."

20.     Attached hereto as <u>Exhibit 10</u> are true and correct copies of tweets, in English and Pashto, sent from @FederalTurnover to @QaharBalkhi.  I understand @QaharBalkhi to be a Twitter account associated with Abdul Qahar Balkhi, a spokesperson for the Taliban's Ministry of Foreign Affairs.  The tweets contained English and Pashto descriptions of the *Federal Insurance* Creditors' turnover motion papers and included a link to www.DABturnover.com.

21.     Attached hereto as <u>Exhibit 11</u> is a true and correct copy of a screen capture of the Twitter profile for @QaharBalkhi, which states that it is the account of the "MoFA Spokesperson, Islamic Emirate of Afghanistan."

22.     Attached hereto as <u>Exhibit 12</u> are true and correct copies of tweets, in English and Pashto, sent from @FederalTurnover to @Zabehulah_M33.  I understand @Zabehulah_M33 to be a Twitter account associated with Zabihullah Mujahid, a Taliban spokesperson.  The tweets contained English and Pashto descriptions of the *Federal Insurance* Creditors' turnover motion papers and included a link to www.DABturnover.com.

23.     Attached hereto as <u>Exhibit 13</u> is a true and correct copy of a screen capture of the Twitter profile for @Zabehulah_M33, which states that it is the "Official Twitter Account of the Spokesman of Islamic Emirate of Afghanistan, Zabihullah Mujahid."

      C.      <u>Service on DAB and the Taliban via Publication</u>

24.     In accordance with the Court's Order authorizing service on DAB and the Taliban via publication, *supra* ¶¶ 4-5, the *Federal Insurance* Creditors submitted a Public Notice for publication in the *New York Times* and *Al-Quds Al-Arabi*.  The Public Notice included "a brief

**App.591**

statement of the nature of the action and the relief sought," *see* Order at 9, CPLR § 316, and the notice made reference to www.DABturnover.com, which includes links to PDFs of the *Federal Insurance* Creditors' motion papers in English and Pashto.

25.     A copy of the English language version of the Public Notice that was submitted for publication in the *New York Times* is attached hereto as <u>Exhibit 14</u>.  The Public Notice was also translated into Arabic for publication in the *Al-Quds Al-Arabi*, and a copy of the Arabic translation of the notice is attached hereto as <u>Exhibit 15</u>.

26.     In conformity with the Order and CPLR § 316, the Public Notices were published in the *New York Times* and *Al-Quds Al-Arabi* once per week for four consecutive weeks.

27.     As further documented below and in the attached exhibits, English-language notices were published in the *New York Times* on May 23, 2022, May 30, 2022, June 6, 2022, and June 13, 2022.  Arabic-language notices were published in the *Al-Quds Al-Arabi* on May 25, 2022, June 1, 2022, June 8, 2022, and June 15, 2022.

28.     Attached hereto as <u>Exhibit 16</u> is a true and correct copy of an affidavit from the *New York Times* concerning the May 23, 2022 publication of the *Federal Insurance* Creditors' Public Notice, including a true and correct copy of a tear sheet showing the placement of the Public Notice in the newspaper.

29.     Attached hereto as <u>Exhibit 17</u> is a true and correct copy of an affidavit from the *New York Times* concerning the May 30, 2022 publication of the *Federal Insurance* Creditors' Public Notice, including a true and correct copy of a tear sheet showing the placement of the Public Notice in the newspaper.

30.     Attached hereto as <u>Exhibit 18</u> is a true and correct copy of an affidavit from the *New York Times* concerning the June 6, 2022 publication of the *Federal Insurance* Creditors'

Public Notice, including a true and correct copy of a tear sheet showing the placement of the Public Notice in the newspaper.

31.     Attached hereto as <u>Exhibit 19</u> is a true and correct copy of an affidavit from the *New York Times* concerning the June 13, 2022 publication of the *Federal Insurance* Creditors' Public Notice, including a true and correct copy of a tear sheet showing the placement of the Public Notice in the newspaper.

32.     Attached hereto as <u>Exhibit 20</u> is a true and correct copy of a June 17, 2022 Declaration of Publication from Pat Sundram, *Al-Quds Al-Arabi* Business Manager, certifying that the *Federal Insurance* Creditors' Public Notice was published in the *Al-Quds Al-Arabi* on May 25, 2022, June 1, 2022, June 8, 2022, and June 15, 2022.  The Declaration also includes true and correct copies of pages from *Al-Quds Al-Arabi* on those publication dates, each of which contain the published Public Notice.

Respectfully submitted,

COZEN O'CONNOR

By:   */s/ J. Scott Tarbutton*
J. SCOTT TARBUTTON
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel.: (215) 665-2000
Email: starbutton@cozen.com

*Counsel for the Federal Insurance Creditors*

LEGAL\58294195\1

8

**App.593**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

*In re Terrorist Attacks on September 11, 2001* | 03 MDL 1570 (GBD) (SN)
ECF Case

This document relates to:

*Ashton et al. v. al Qaeda Islamic Army, et al.*, 02-cv-6977 (GBD) (SN)
*Bauer et al. v. al Qaeda Islamic Army, et al.*, 02-cv-7236 (GBD) (SN)
*Burlingame v. Bin Laden, et al.*, 02-cv-7230 (GBD) (SN)
*Schneider et al. v. Islamic Republic of Iran*, 02-cv-7209 (GBD) (SN)

**MEMORANDUM OF LAW IN SUPPORT OF MOVANTS'**
***EX PARTE* EMERGENCY MOTION FOR ORDER OF ATTACHMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 2

BACKGROUND ............................................................................................................ 4

ARGUMENT .................................................................................................................. 8

I.    MOVANTS ARE ENTITLED TO AN ATTACHMENT ORDER AGAINST TALIBAN ASSETS .................................................................................................................. 9

II.   THE DAB ASSETS ARE SUBJECT TO ATTACHMENT UNDER TRIA ................... 12

III.  THIS COURT SHOULD GRANT MOVANTS' EMERGENCY MOTION *EX PARTE* 16

CONCLUSION ............................................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banco Internacional, S.A. v. Vilaseca*,
    631 N.Y.S.2d 468 (N.Y. Sup. Ct. 1994) ........................................................ 17

*Calderon-Cardona v. Bank of N. Y. Mellon*,
    770 F.3d 993 (2d Cir. 2014)........................................................................... 12

*Cap. Ventures Int'l v. Republic of Argentina*,
    443 F.3d 214 (2d Cir. 2006)......................................................................... 8, 9

*Concord Asset Mgmt., Inc. v. Intercredit Corp.*,
    No. 92 CIV. 7756 (JFK), 1992 WL 373477 (S.D.N.Y. Dec. 3, 1992) ........................... 16

*Correspondent Servs. Corp. v. J.V.W. Investments Ltd.*,
    No. 99 CIV. 8934 (RWS), 2000 WL 1718785 (S.D.N.Y. Nov. 14, 2000)...................... 12

*Cty. of Oswego Indus. Dev. Agency v. Fulton Cogeneration Assocs.*,
    05-cv-926, 2006 WL 752772 (N.D.N.Y. Mar. 22, 2006) ................................. 11

*Elton Leather Corp. v. First Gen. Res. Co.*,
    138 A.D.2d 132 (1st Dep't 1988) ................................................................ 11

*Herzi v. Ateliers De La Haute-Garonne*,
    15-cv-7702, 2015 WL 8479676 (S.D.N.Y. Oct. 13, 2015)............................... 16

*ITC Entm't v. Nelson Film Partners*,
    714 F.2d 217 (2d Cir. 1983)........................................................................ 10

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*,
    306 F. Supp. 2d 482 (S.D.N.Y. 2004) ............................................................ 8

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
    830 F.3d 107 (2d Cir. 2016).................................................................. 14, 15

*Levin v. Bank of N.Y.*,
    No. 09-CV-5900, 2011 WL 812032 (S.D.N.Y. Mar. 4, 2011) ........................ 13

*Levinson v. Kuwait Finance House (Malaysia) Berhad*,
    No. 21-2043, 2022 WL 3269083, (2d Cir. July 21, 2022)........................... 8, 13

*Owens v. Taliban*,
    22-cv-1949,2022 WL 1090618 (S.D.N.Y. Apr. 11, 2022) ........................ passim

*Smith v. Islamic Emirate of Afghanistan*,
No. 03-mc-2169, 2005 WL 3518010 (D.D.C. Feb. 2, 2005) .......................................... 13

*TAGC Mgmt., LLC v. Lehman*,
842 F. Supp. 2d 575 (S.D.N.Y. 2012) .............................................................................. 10

*Thornapple Assocs., Inc. v. Sahagen*,
06-cv-6412 (JFK), 2007 WL 747861 (S.D.N.Y. Mar. 12, 2007) .................................... 11

*Unitrans Int'l, Inc. v. Gulf & Orient S.S. Lines, Inc.*, 97-cv-801 (WK),
2002 WL 1205744 (S.D.N.Y. Mar. 6, 2002) .................................................................... 16

## Statutes

18 U.S.C. § 2331 .......................................................................................................................... 13

22 U.S.C. § 2556f ......................................................................................................................... 14

## Rules

CPLR § 6201(1) ............................................................................................................................ 10

CPLR § 6211(b) ............................................................................................................................ 17

CPLR § 6212(a) .............................................................................................................................. 8

## Regulations

31 C.F.R. §§ 594.310, 594.311 ..................................................................................................... 13

Blocked Persons,Specially Designated Nationals, Specially Designated Terrorists,
ForeignTerrorist Organizations, and Specially Designated Narcotics Traffickers; Addition
of Persons Blocked Pursuant to 31CFR Part 538, 31 CFR Part 597, or Exec. Order 13129,
....................................................................................................................................... 14

## Executive Orders

Exec. Order No. 13268 § 1 ........................................................................................................... 13

Exec. Order 13129, 64 Fed. Reg. 36,759 (July 4, 1999) ............................................................. 14

## Other Authorities

Justice for American Victims of Terrorism Act of 2022, H.R. 8219, 177th Cong. (2022) .......... 12

Ned Price (Department of State Spokesperson), Department Press Briefing-February 14, 2022,
U.S. Department of State Press Briefing (February 14, 2022),
https://www.state.gov/briefings/department-press-briefing-february-14-2022/ ................ 6

**App.597**

Plaintiffs in *Ashton v. al Qaeda Islamic Army*, 02-cv-6977 (GBD) (SN) ("Movants"),[1] respectfully submit this Memorandum of Law in support of their *Ex Parte* Emergency Motion to Attach funds of Da Afghanistan Bank ("DAB" and the "DAB Assets") currently held at the Federal Reserve Bank of New York ("FRBNY").

Movants continue to support the equitable distribution of the DAB Assets and the filing of *In re Approximately $3.5 Billion of Assets on Deposit at the Federal Reserve Bank of New York in the Name of Da Afghanistan Bank*, 22-cv-3228 (GBD) (SN). In the alternative, as articulated in the *Ashton* Plaintiffs' Memorandum of Law in Opposition to the *Havlish* and *Doe* Creditors' Motion for Partial Turnover, (Apr. 20, 2022), ECF No. 7894, Movants believe that the Court can and should fashion an equitable remedy for the division of the DAB Assets that would not unreasonably privilege a small group of terrorism victims over hundreds of other identically situated victims.[2] Movants seek this Attachment Order to protect their rights and ensure that they are not foreclosed by other creditors from obtaining recovery. Movants are not seeking an advantage but rather continue to support an equitable distribution of the DAB Assets to all victims of Taliban-sponsored terrorism. To this end, if other claimants seek similar relief, Movants

---

[1] This motion is made on behalf of all *Ashton* Plaintiffs to which this Court's May 12, 2006 default liability judgment against the Taliban applied. This includes all defendants included up to and through the Sixth Amended Consolidated Master Complaint. ECF No. 1797. All of the *Ashton* Plaintiffs now seeking an order of attachment—Movants—were included in the suit as of the filing of the Sixth Amended Consolidated Master Complaint. *Ashton*, 02-cv-6799 (GBD) (SN) (S.D.N.Y.), ECF No. 465.

[2] Movants note, again, that while a "Framework Agreement" has been discussed on the record, *see, e.g.,* ECF No. 7893, none of the parties to this putative agreement have ever affirmatively disclosed its terms, or denied Movants' understanding of that agreement's terms—that the families of 47 out of 2,977 of the victims murdered in the terrorist attacks on September 11, 2001, would receive $1.8 billion of the DAB assets; insurance companies would receive $600 million of the DAB assets; and the remaining 2,930 9/11 Families would have to divide up the remainder, with each family receiving about one percent of what the "first in priority" 47 families would obtain. ECF No. 7962, at 3.

respectfully request that the Court grant attachment or writs of execution simultaneously so as to preclude any potential claims to priority.

**PRELIMINARY STATEMENT**

Movants are individuals harmed as a consequence of the 9/11 terror attacks, including individuals harmed themselves, and the estates and surviving family members of over 800 victims of the attacks. They consist of plaintiffs in the *Ashton* action, which was consolidated with the *Bauer*, 02-cv-7236, *Burlingame*, 02-cv-7230, and *Schneider*, 02-cv-7209, actions, and the plaintiffs in each of those actions join in this motion under the *Ashton* caption. Movants brought their lawsuits to hold the Taliban accountable for its conspiracy, aiding and abetting, and provision of material support to al Qaeda and the 9/11 hijackers and the harm caused on September 11, 2001, including the murder of Movants' family members.

Since 2003, Movants have litigated their claims as part of this multi-district litigation action, *In re Terrorist Attacks on September 11, 2001*, 03-md-1570 (GBD) (SN), in which many 9/11-related actions have been consolidated (the "9/11 MDL"). After obtaining liability judgments against the Taliban and Omar in May 2006, and final damages judgments against the Taliban's co-tortfeasor, Iran, Movants began moving in December 2021 for final damages judgments against the Taliban—seeking to extend to the Taliban those damages judgments the Court has already awarded them against Iran. Those motions for final damages judgments were dismissed in July 2022, without prejudice and with leave to refile in accordance with the dismissal order. And on July 27, 2022, Movants began refiling their motions for final damages judgments. *See, e.g.*, ECF Nos. 8274-75; 8278. The *Ashton* Plaintiffs' motion for final damages judgments, which is pending, alone seeks final compensatory damages awards against the Taliban in the amount of $10,491,535,243. *Id.* Movants now seek, in the interim, an order of attachment against the approximately $3.5 billion in DAB Assets blocked by Executive Order 14064 (the "Executive

Order").[3] Exec. Order 14064, 87 Fed. Reg. 8391 (2022). Movants easily meet the requirements for attachment under Article 62 of New York's CPLR.

*First*, Movants are likely to succeed on the merits of their claims. Indeed, they have more than mere causes of action—they have liability judgments against the Taliban. All that remains for the Court to determine is the precise quantum of damages to which each Movant is entitled. But even that should be a straightforward exercise, as Movants merely seek to obtain damages judgments in the same amounts already granted against Iran extended to the Taliban, Iran's joint tortfeasor. Movants also satisfy CPLR § 6201(1) because the Taliban is a nondomiciliary of New York. *See Owens v. Taliban*, 22-cv-1949, 2022 WL 1090618, *5 (S.D.N.Y. Apr. 11, 2022). Further, Movants have good reason to believe that the DAB Assets may be distributed imminently to other creditors and/or moved or unblocked by the United States, constituting another basis for the DAB Assets' prompt attachment.

*Second*, under § 201 of the Terrorism Risk Insurance Act ("TRIA"), the DAB Assets are subject to attachment in connection with Movants' claims against the Taliban. Movants possess liability judgments against the Taliban, which is a terrorist party, and the claims underlying those judgments arise from the terrorist attacks on September 11, 2001. Further, the DAB Assets in particular are available for attachment in satisfaction of Movants' judgments because DAB is an

---

[3] Movants seek attachment of the entirety of the approximately $3.5 billion in blocked DAB Assets. The *Ashton* Plaintiffs alone have moved for approximately $10 billion in compensatory damages. However, as discussed above, the *Ashton-Bauer*, *Ashton-Burlingame*, and *Ashton-Schneider* Plaintiffs join in this motion (as Movants) as liability judgment holders. They have refiled and/or are refiling their motions for final damages judgments in which they seek compensatory damages totaling approximately $5.7 billion. *See* ECF Nos. 8298-8300-4; 8376; 8379-8380-2; 8382 (*Ashton-Bauer* Plaintiffs' refiled motions); ECF Nos. 8335; 8337-1; 8337-2; 8341; 8363; 8364-1; 8364-2; 8366 (*Ashton-Burlingame* refiled motions); ECF Nos. 7805; 7806; 7815 (*Ashton-Schneider* original motions).

App.600

agency or instrumentality of the Taliban under TRIA, and the Assets are blocked pursuant to the Executive Order.

*Lastly*, Movants are entitled to an order of attachment *ex parte* under CPLR § 6211(a). Service upon the Taliban is impractical, as this Court has previously determined in connection with the *Havlish* and *Doe* Plaintiffs' turnover motions. Further, District Judge Valerie E. Caproni granted the *Owens* Plaintiffs an *ex parte* temporary order of attachment as to the DAB Assets, *Owens*, 2022 WL 1090618, at *3-5, and her Opinion and Order granting the *Owens* Plaintiffs' *ex parte* application for a pre-judgment order of attachment is highly persuasive authority supportive of Movants' factually and legally similar application here.

For these reasons, which are set forth more fully below, Movants satisfy the statutory criteria for an Attachment Order and the attached funds should be subject to levy until this action is fully adjudicated.

## **BACKGROUND**

On September 4, 2002, the *Ashton* Plaintiffs filed their first complaint against the alleged sponsors of the September 11, 2001 terrorist attacks, which included claims against defendants al Qaeda Islamic Army, the Taliban, and Muhammad Omar, among others. *See* 02-cv-6977 (S.D.N.Y.), ECF No. 1. That complaint was consolidated and amended several times. *See, e.g.*, 02-cv-6977 (S.D.N.Y.), ECF Nos. 2; 11; 32; 38; 111; 465. As reflected in the accompanying Declaration of Andrew J. Maloney, III ("Maloney Decl."), Movants are composed of a consolidated group of complainants represented by separate counsel, some of whom are also on the 9/11 MDL's Plaintiffs' Executive Committee. *See* Maloney Decl. ¶¶1-3.

Pursuant to this Court's order, Movants served the Taliban and Omar by publication. ECF No. 445, at 1, 8, 11. Verification of service was provided on March 16, 2005, and March 31, 2005,

for publication in both English and Arabic. ECF Nos. 709; 735.[4] The Taliban and Omar never answered, and Movants thereafter moved for a Certificate of Default and a default judgment, which this Court granted on May 12, 2006. ECF Nos. 1782-97 (referring to the defendants listed in Exhibit B to the *Ashton* Plaintiffs' motion, including the Taliban and Omar).[5] In other words, since May 12, 2006, Movants have possessed a liability default judgment against the Taliban and Omar, among others.

In 2015, Movants, among others, obtained default judgments against Iran, and the Court began issuing final damages judgments on a rolling basis, beginning on March 8, 2016. *See, e.g.*, ECF No. 3226. Beginning in December 2021, Movants then filed motions for final damages judgments against the Taliban, seeking to extend to the Taliban damages awarded against the Taliban's co-tortfeasor, Iran. *See, e.g.*, ECF Nos. 7489-91 (*Ashton* Plaintiffs). While Movants' motions for final damages judgments were pending, on February 11, 2022, President Joseph R. Biden issued the Executive Order, which blocked approximately $3.5 billion of DAB's assets at the FRBNY and directed that it be preserved to benefit "victims of terrorism". The express intention of the Biden Administration's directive was to provide all human "[v]ictims of terrorism,

---

[4] The publication notices directed the named defendants to the 9/11 MDL docket and advised them in both English and Arabic that they were required to answer the complaints on that docket, which sought, among other things, compensatory, treble, and punitive damages within 60 days. ECF Nos. 709, at 2; 735, at 2.

[5] This Court's default liability judgment was issued on May 12, 2006, and stated that it applied to all claims, plaintiffs, and defendants included up to and through the Sixth Amended Consolidated Master Complaint. ECF No. 1797. All of the Plaintiffs comprising Movants and now seeking an Order of attachment were included in the suit as of the filing of the Sixth Amended Consolidated Master Complaint.

including of the September 11, 2001 terrorist attacks," with "a full opportunity to set forth their arguments in court[.]"[6]

On July 11, 2022, this Court denied Movants' initial motions for final damages judgments (and related, later-filed motions seeking similar relief) without prejudice and with leave to refile, pursuant to the terms and procedures set forth in that dismissal order. ECF No. 8198. On July 27, 2022, Movants began refiling their motions for final damages judgments in a manner designed to comply with those procedures, along with a proposed order. *See*, e.g.*,* ECF Nos. 8274-76; 8278 (*Ashton* Plaintiffs' refiled motion for final damages judgments).[7] The total compensatory damages for which Movants have moved (or will soon move) significantly exceeds the value of the blocked DAB Assets. For example, the *Ashton* Plaintiffs' motion for final damages judgments, which is pending, alone seeks final compensatory damages awards against the Taliban in the amount of $10,491,535,243. ECF Nos. 8274-75; 8278.[8]

This Court has already reviewed the *Ashton* Plaintiffs' (i) documentary evidence (such as copies of birth certificates, passports, and/or verified applications to the September 11, 2001 Victim Compensation Fund ("VCF")), or summaries of counsel; (ii) personal interviews and/or

---

[6] Ned Price (Department of State Spokesperson), *Department Press Briefing-February 14, 2022*, U.S. Department of State Press Briefing (February 14, 2022), https://www.state.gov/briefings/department-press-briefing-february-14-2022/.

[7] Counsel for the *Ashton-Schneider* Plaintiffs has not yet filed a motion for final judgment on damages following this Court's July 11, 2022 Order denying motions without prejudice to renew. ECF No. 8198. They will be refiling and again, as with the other *Ashton* Plaintiffs, seeking to extend to the Taliban damages judgements already granted against Iran.

[8] As previously referenced, the *Ashton-Bauer*, *Ashton-Burlingame*, and *Ashton-Schneider* Plaintiffs have refiled and/or are refiling their motions for final damages judgments in which they seek compensatory damages totaling approximately $5.7 billion. *See* ECF Nos. Nos. 8298-8300-4; 8376; 8379-8380-2; 8382 (*Ashton-Bauer* Plaintiffs' refiled motions); ECF Nos. 8335; 8337-1; 8337-2; 8341; 8363; 8364-1; 8364-2; 8366 (*Ashton-Burlingame* refiled motions); ECF Nos. 7805; 7806; 7815 (*Ashton-Schneider* original motions).

written communications; and (iii) expert economist reports in connection with the damages awards against co-defendant Iran. Movants' expert economist relied on documentary evidence, including economic expert reports, VCF applications, VCF work-papers and distribution plans, VCF determinations, underlying economic documents, VCF valuation files, tax submissions, and other earnings information, and applied generally accepted methodologies and assumptions to calculate the present value of economic losses to a reasonable degree of accounting and actuarial certainty. *See* Maloney Decl. ¶ 13. This Court also previously awarded damages to the estates of those *Ashton* Plaintiffs killed in the 9/11 terror attacks for conscious pain and suffering of each decedent in connection with claims asserted against defendant Iran at a value of $2,000,000. *Id.*

In addition, those *Ashton* Plaintiffs named in the Sixth Amended Complaint have asserted claims for solatium damages against the Taliban in the same amounts this Court granted them against Iran. This Court previously established the following schedule for solatium damages in this MDL:

| Relationship to Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

Counsel has confirmed the relationship between each decedent and the immediate family for whom solatium damages are sought and those *Ashton* Plaintiffs have liability judgments and pending damages judgments against the Taliban in the same amounts previously awarded against Iran. The continuing pendency of the *Ashton* Plaintiffs' refiled motion for final judgments, the efforts by insurance companies and a group representing only two percent of 9/11 Families to seize

all of the DAB assets (as part of their proposal for a highly inequitable distribution) and the Second Circuit's recent decision in *Levinson v. Kuwait Finance House (Malaysia) Berhad*, No. 21-2043, 2022 WL 3269083, (2d Cir. July 21, 2022), stating that a district court can issue a pre-judgment attachment order (as opposed to a writ of execution) prior to reaching decisions on other threshold legal issues compels Movants to act to protect their interests in the DAB Assets—and the interests of all of the 9/11 Families who could be severely and unduly prejudiced by the pending turnover proceedings.

## ARGUMENT

Under Federal Rule of Civil Procedure 64, which incorporates the New York state procedures set forth in Article 62 of the CPLR, Movants are entitled to attachment of the Taliban's assets because: (1) "there is a cause of action"; (2) "it is probable that the plaintiff will succeed on the merits"; (3) "one or more grounds for attachment provided in section 6201 exist"; and (4) "the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." CPLR § 6212(a); *see JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, 306 F. Supp. 2d 482, 484–85 (S.D.N.Y. 2004). Movants easily satisfy each element. And "[a]lthough the remedy [of attachment] is discretionary, the Second Circuit has made clear that where all the statutory requirements have been satisfied, a district court has no option but to grant pre-judgment attachment." *Owens*, 2022 WL 1090618, at *2 (citing *Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 222 (2d Cir. 2006)).

The DAB Assets are the proper subject of attachment because those funds may be available under TRIA § 201 to satisfy Movants' judgments against the Taliban. TRIA § 201 provides, "Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, . . . the blocked assets of that terrorist party (including the blocked assets of any

8

**App.605**

agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." *Id*. Movants here have a liability judgment against the Taliban, the Taliban is a terrorist party, Movants' claims are based on an act of terrorism, DAB is an agency or instrumentality of the Taliban, and the DAB Assets have been blocked by the Executive Order.

Finally, pursuant to Local Civil Rule 6.1(d) and CPLR § 6211(a), Movants are entitled to obtain the requested order of attachment *ex parte*. The Taliban is a designated terrorist entity without a known address, and, as this Court and Judge Caproni have already recognized, it is especially difficult to serve. Further, the Taliban has acknowledged the various proceedings against the DAB Assets and declined to participate. Movants therefore have good and sufficient reasons for proceeding against the Taliban *ex parte*.

## I. MOVANTS ARE ENTITLED TO AN ATTACHMENT ORDER AGAINST TALIBAN ASSETS

Movants' likelihood of success on the merits of their damages claims against the Taliban is high. Movants already possess liability judgments against the Taliban. *See* ECF Nos. 1782-97. The merits of Movants' claims against the Taliban, therefore, have already been adjudicated and resolved. Nor is there any reason to doubt that Movants will prevail on their damages claims. They have refiled, or will soon refile, their motions for final damages judgments. *See, e.g.* ECF Nos. 7489-91 (*Ashton* Plaintiffs' refiled motion). This Court already awarded damages to Movants against the Taliban's joint tortfeasor—Iran—and the pending (and/or soon-to-be refiled) motions merely request that the same damages be applied to the Taliban. Moreover, this Court has granted substantially similar motions for final judgments filed by the *Havlish* and *Federal Insurance* Plaintiffs and should do the same for Movants here.

**App.606**

Movants also have a basis for attachment under CPLR § 6201. "An order of attachment may be granted . . . where the plaintiff has demanded and would be entitled, in whole or in part, . . . to a money judgment" against a "nondomiciliary residing without the state." CPLR § 6201(1). "[A]ttachment under New York law solely for security purposes is appropriate only when it appears likely that a plaintiff will have difficulty enforcing a judgment." *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586–87 (S.D.N.Y. 2012) (citation omitted). Accordingly, in invoking CPLR § 6201(1), Movants must show that the foreign "defendant has assets within the State that could satisfy a judgment" and that their "fear that the judgment will not be satisfied" absent attachment of those assets "is reasonable." *Id.* at 586 (citation omitted). Those requirements are fully met here.

The Taliban plainly is a non-domiciliary of New York. *See Owens*, 2022 WL 1090618, at *5 (agreeing that the "non-domiciliary residing without the state . . . description aptly fits the Taliban") (internal quotation marks omitted). Additionally, "New York courts have long recognized" that the rationale for § 6201(1) is, in relevant part, "based on the assumption that there is much more propriety in requiring a debtor, whose domicile is without the state, *to give security for the debt*, than on one whose domicile is within." *ITC Entm't v. Nelson Film Partners*, 714 F.2d 217, 220 (2d Cir. 1983) (internal quotation marks omitted).

Movants' need to obtain security for the Taliban's debts cannot be overstated. For the past two decades, Movants and thousands of other victims have sought to hold the Taliban accountable for its role in sponsoring and facilitating the 9/11 attacks. Because the Taliban and its leadership are and have been subject to strict economic sanctions by the United States and others (including the United Nations Security Council), however, Movants and other victims of Taliban-enabled terrorism previously had little to no hope of identifying any assets that could be used to satisfy

their judgments against the Taliban. It was only as an extraordinary consequence of the Taliban's recapture of Afghanistan and the Executive Order that the DAB Assets were blocked and made subject to attachment under TRIA.

While the Executive Order has made the DAB Assets available, Movants will have difficulty enforcing their judgments against the Taliban as a consequence of the many judgments the Taliban owes to other creditors. And a defendant's deleterious financial position "may justify a plaintiff's fear that a potential judgment will not be satisfied and thus provide a ground for an attachment." *Thornapple Assocs., Inc. v. Sahagen*, 06-cv-6412 (JFK), 2007 WL 747861, at *8 (S.D.N.Y. Mar. 12, 2007). Indeed, courts routinely order attachment where a defendant owes "significant sums to other creditors" and lacks sufficient assets to satisfy a potential judgment. *Cty. of Oswego Indus. Dev. Agency v. Fulton Cogeneration Assocs.*, 05-cv-926, 2006 WL 752772, at *1–2 (N.D.N.Y. Mar. 22, 2006); *see also Elton Leather Corp. v. First Gen. Res. Co.*, 138 A.D.2d 132, 134 (1st Dep't 1988) (upholding attachment where defendants had failed to make payments to two secured creditors). As recognized by Judge Caproni, that is certainly the case here, where, across the 9/11 MDL and the *Owens* action, five different groupings of plaintiffs with claims against the Taliban have been vying in turnover proceedings to recover the DAB Assets in satisfactions of judgments against the Taliban that exceed the approximately $3.5 billion in DAB Assets. *See Owens*, 2022 WL 1090618, at *5 ("The unfortunate reality that the numerous victims of acts of terror perpetrated by the Taliban may not collect on judgments is not lost on the Court[.]"). Movants are entitled under these circumstances to protect their rights with respect to the DAB Assets via attachment, just as others have done.

Additionally, although approximately $3.5 billion in DAB Assets has been blocked and made available to satisfy claims by U.S. victims of terrorism, it is entirely possible that these funds

could be dissipated absent judicial attachment. The U.S. House of Representatives is currently considering legislation which would transfer "[a]ll funds of Da Afghanistan Bank that have been transferred or have been directed to be transferred into the consolidated account held at the Federal Reserve Bank of New York" pursuant to the Executive Order into the U.S. Victims of State Sponsored Terrorism Fund (the "USVSST"). *See* Justice for American Victims of Terrorism Act of 2022, H.R. 8219, 177th Cong. (2022). This uncertainty confirms the need for immediate attachment. *See Correspondent Servs. Corp. v. J.V.W. Investments Ltd.,* No. 99 CIV. 8934 (RWS), 2000 WL 1718785, at *4 (S.D.N.Y. Nov. 14, 2000) (continuing levy is appropriate where it is needed "to avert the chance that the funds will be transferred out of the jurisdiction"). Thus, the difficulty of enforcing their judgments against the Taliban, and Movants' justifiable concerns that the DAB Assets could be dissipated in the absence of their judicial attachment, necessitate Movants' application for their Attachment Order.

## II.      THE DAB ASSETS ARE SUBJECT TO ATTACHMENT UNDER TRIA

Under TRIA § 201, the DAB Assets are subject to attachment to satisfy Movants' claims against the Taliban. Specifically, § 201 provides, "Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, . . . the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." *See also Calderon-Cardona v. Bank of N. Y. Mellon*, 770 F.3d 993, 998-99 (2d Cir. 2014). Under TRIA, attachment requires a likelihood of success in showing (i) a judgment, (ii) against a terrorist

**App.609**

party, (iii) related to an act of terrorism, (iv) against blocked assets that belong to an agency or instrumentality of that terrorist party. Movants meet each of TRIA's requirements.[9]

*First*, as discussed above, since 2006, Movants have held judgments against the Taliban for compensatory damages. *See* ECF No. 1797. Movants await the Court's determination as to the precise quantum of compensatory damages to which they are entitled, but there is no prohibition against—nor justification for denying—attachment under CPLR § 6201 where a movant has a judgment and only the quantum is yet to be determined.

*Second*, the Taliban is unquestionably a "terrorist party" within the meaning of TRIA. The United States has classified the Taliban as a Specially Designated Global Terrorist since July 2, 2002. *See* Exec. Order No. 13268 § 1; 31 C.F.R. §§ 594.310, 594.311. Consistent with that designation, the United States has represented to courts in other matters both that the Taliban is a "terrorist party" and that its assets are subject to attachment under TRIA. *See* Br. of the United States in Resp. to Pls' Mot. to Compel at 3–4, *Smith v. Islamic Emirate of Afghanistan*, No. 03-mc-2169, 2005 WL 3518010 (D.D.C. Feb. 2, 2005), ECF No. 4.

*Third*, Movants' claims against the Taliban arise out of the 9/11 terrorist attacks, unquestionably an act of terrorism. *See, e.g.*, *Ashton*, 02-cv-6799 (GBD) (SN) (S.D.N.Y.), ECF No. 465 (Sixth Amended Consolidated Master Complaint); 18 U.S.C. § 2331 (defining

---

[9] As articulated by the Second Circuit in *Levinson*, "[B]efore ordering assets to be seized under TRIA, a district court must make findings as to whether TRIA indeed permits those assets to be seized." No. 21-2043, 2022 WL 3269083, at *4 (citing *Levin v. Bank of N.Y.*, No. 09-CV-5900, 2011 WL 812032, at *13 (S.D.N.Y. Mar. 4, 2011)). However, such requirement does not extend to "pre-execution attachment procedures" pursuant to which Movants here move. *Id.* at *5 ("The Levinsons were therefore, consistent with state law, entitled to pursue pre-execution attachment proceedings here, *see* Fed. R. Civ. P. 64, 'an order of attachment may be granted in any action . . . when . . . the cause of action is based on a judgment, decree or order of a court of the United States.'") (quoting CPLR § 6201(5)).

"terrorism"); 22 U.S.C. § 2556f (same). Indeed, the Secretary of the Treasury has certified the 9/11 terrorist attacks as an act of terrorism for purposes of TRIA.

*Finally*, the DAB Assets are blocked pursuant to the Executive Order and are the property of DAB. The DAB Assets are held at FRBNY in an account under DAB's name and are identified as such in the Executive Order, which directed that "[a]ll property and interest in property of DAB that are held as of the date of this order" be consolidated in the blocked FRBNY account. Executive Order § 1(a)–(b). Accordingly, the DAB Assets may be attached even though DAB is not named in the complaint or judgment. *See Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 132 (2d Cir. 2016) (permitting attachment of assets belonging to "an agency or instrumentality of the terrorist party, even if the agency or instrumentality is not itself named in the judgment.").

DAB is an agency or instrumentality of the Taliban. When the Taliban controlled Afghanistan as the Islamic Emirate of Afghanistan, the United States recognized that DAB was "owned or controlled by" or "act[s] for or on behalf of, the Taliban." *See* Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers; Addition of Persons Blocked Pursuant to 31 CFR Part 538, 31 CFR Part 597, or Exec. Order 13129, 65 Fed. Reg. 39,100 (June 23, 2000). After President Clinton blocked "all property and interests in property of the Taliban" under the International Emergency Economic Powers Act ("IEEPA") in the aftermath of the 1998 embassy bombings in Dar es Salaam and Nairobi, Exec. Order 13129, 64 Fed. Reg. 36,759 (July 4, 1999), the Department of the Treasury's Office of Foreign Assets Control issued orders determining that DAB's funds were also properly blocked as, in effect, property of the Taliban. *E.g.*, 65 Fed. Reg. at 39,100.

As President Biden's Executive Order illustrates, the same is true now that the Taliban has once again seized control of Afghanistan. The United States has not recognized the Taliban as the rightful government of Afghanistan, but in blocking the funds, it has acknowledged that the Taliban effectively controls DAB. This is further evidenced by the fact that the Taliban has installed senior Taliban leaders as DAB leadership,[10] and caused DAB to implement Taliban edicts.[11] *See Kirschenbaum*, 830 F.3d. at 135 (deeming an entity an agency or instrumentality if it is "a means through which a material function of the terrorist party is accomplished," if it provides "material services to, on behalf of, or in support of the terrorist party," or if it is "owned, controlled, or directed by the terrorist party"). Other creditors of the Taliban have argued persuasively before this Court that DAB is an agency and instrumentality of the Taliban. *See e.g.*, ECF No. 7764, at 18-21 ("Because DAB is an agency or instrumentality of the Taliban under governing Second Circuit precedent, its assets—including at the FRBNY—are subject to execution under TRIA.").

Accordingly, the DAB Assets are subject to attachment under TRIA.

---

[10] *See, e.g.*, Ian Talley, et al., *Sanctioned Taliban Finance Leader Holds Leadership Post at Afghan Central Bank*, WALL ST. J. (Mar. 11, 2022), https://www.wsj.com/articles/sanctioned-taliban-financier-tapped-to-help-lead-afghan-central-bank-11647003720?mod=newsviewer_click (appointing Noor Ahmad Agha as DAB first deputy governor); Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank Chief with Crisis Looking*, BLOOMBERG (Aug. 23, 2021), https://www.bnnbloomberg.ca/taliban-name-obscure-official-central-bank-chief-as-crisis-looms-1.1643238 (appointing Haji Mohammed Idris DAB Acting Governor); Da Afghanistan Bank, *DAB Leadership Holds Meeting with the High Ranking Officials of Commercial Banks* (Sept. 11, 2021), https://www.dab.gov.af/dab-leadership-holds-meeting-high-ranking-officials-commercial-banks (announcing Taliban takeover of Da Afghanistan Bank).

[11] *See* James Mackenzie and Mohammad Yunus Yawar, *Afghan Central Bank Moves to Halt Currency Slide as Crisis Deepens*, REUTERS (Dec. 14, 2021), https://www.reuters.com/markets/currencies/afghanistan-central-bank-says-it-is-acting-halt-currency-slide-2021-12-14/ (describing Taliban efforts to utilize the DAB, among other entities, to stabilize Afghanistan's currency).

App.612

## III.    THIS COURT SHOULD GRANT MOVANTS' EMERGENCY MOTION *EX PARTE*

Pursuant to Local Civil Rule 6.1(d), this Court may grant an "ex parte order . . . upon a clear and specific showing by affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary, and stating whether a previous application for similar relief has been made." This is Movants' first request for such relief. Maloney Decl. ¶ 7.

CPLR § 6211(a) likewise provides for an order of immediate attachment "without notice." The substantive "standard [in CPLR § 6212] applies regardless of whether a plaintiff is seeking an order of attachment pursuant to an ex parte—that is, without notice—application or a motion on notice." *Herzi v. Ateliers De La Haute-Garonne*, 15-cv-7702, 2015 WL 8479676, at *1 (S.D.N.Y. Oct. 13, 2015). Because an *ex parte* order of attachment under CPLR § 6211 provides urgent, temporary relief, courts have characterized it as the "practical equivalent" of a temporary restraining order. *Concord Asset Mgmt., Inc. v. Intercredit Corp.*, No. 92 CIV. 7756 (JFK), 1992 WL 373477, at *2 (S.D.N.Y. Dec. 3, 1992).

Here, *ex parte* disposition of Movants' application is necessary because of the severe challenges posed by serving process on the Taliban, which has already declined to participate in these proceedings despite having acknowledged its awareness of them. *See* ECF No. 7830, at 7 (noting that the Taliban's "representatives have repeatedly issued press statements demonstrating that they are aware that the DAB [Assets] in this case are currently being held and targeted in this litigation"). The Taliban is a designated terrorist entity without a known address, and the difficulty of identifying an official representative of the Taliban on whom process could be served provides "good and sufficient reasons," Local Civil Rule 6.1(d), to permit Movants to proceed *ex parte*. *Cf. Unitrans Int'l, Inc. v. Gulf & Orient S.S. Lines, Inc.*, 97-cv-801 (WK), 2002 WL 1205744, at *1 (S.D.N.Y. Mar. 6, 2002) (permitting plaintiff to seek release of security *ex parte* because defendant

16

had gone out of business and "there [was] no new address or phone number available"). As this Court has recognized in connection with the *Havlish* and *Doe* Plaintiffs' turnover motions, normal methods of service are not practicable here. *See* ECF No. 7830 (permitting alternative service on the Taliban).

Once attachment is granted, the requesting party has "ten days after levy" to move "for an order confirming the order of attachment." CPLR § 6211(b). "Upon the motion to confirm," the burden-of-proof provisions in CPLR § 6223(b) "shall apply." *Id.* Thus, Movants will ultimately bear "the burden of establishing the grounds for the attachment, the need for continuing the levy and the probability that [they] will succeed on the merits." CPLR § 6223(b). To obtain an *ex parte* order of attachment, however, Movants must merely demonstrate a "prima facie case." *Banco Internacional, S.A. v. Vilaseca*, 631 N.Y.S.2d 468, 469–70 (N.Y. Sup. Ct. 1994). Movants have done so here.[12]

## CONCLUSION

For the foregoing reasons, the requirements of CPLR §§ 6201, 6211-12 and TRIA § 201 have been met. Accordingly, the Court should grant Movants' *ex parte* emergency motion for an order of attachment for compensatory damage against DAB in the full amount of the approximately $3.5 billion in blocked assets. This amount does not include any award for punitive damages.

---

[12] CPLR § 6212(b) requires a plaintiff moving for an order of attachment to post an undertaking in an "amount fixed by the court" of "not less than five hundred dollars" to provide surety for any damages a defendant might suffer as a result of the attachment. Here, Movants, who are individual victims of terrorism, request this requirement be waived or in the alternative, an undertaking of not more than $10,000 in total. The DAB funds they seek to levy are already blocked by Executive Order, so attachment will not cause any additional harm to the Taliban.

Date: August 19, 2022
New York, New York

Respectfully submitted,

**KREINDLER & KREINDLER LLP**

BY: ___/s/ Andrew J. Maloney, III ___
Andrew J. Maloney, III, Esq.
485 Lexington Ave., 28th Floor
New York, New York 10017
Tel: (212) 687-8181

*Counsel for Movants*

– and –

**SHER TREMONTE LLP**

Theresa Trzaskoma
Noam Biale
Kathryn E. Ghotbi
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
nbiale@shertremonte.com
kghotbi@shertremonte.com

*Counsel for Movants*

App.615

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**

-----------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: ___8/26/2022___

**03-MD-01570 (GBD)(SN)**

<u>**REPORT &**
**RECOMMENDATION**</u>

**SARAH NETBURN, United States Magistrate Judge:**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

> <u>Smith v. The Islamic Emirate of Afghanistan, et al.</u>, No. 01-cv-10132
> <u>Havlish, et al. v. Bin Laden, et al.</u>, No. 03-cv-9848
> <u>Fed. Ins. Co. et. al. v. Al Qaida, et al.</u>, No. 03-cv-6978
> <u>John Does 1 Through 7 v. The Taliban et al.</u>, No. 20-mc-740

In November 2001, an Afghan-American coalition drove the Taliban from the Afghan

capital of Kabul. Almost two decades later, the Taliban returned, retook Kabul, and destroyed the

Islamic Republic of Afghanistan (the "Republic") that this coalition had established. Afghanistan

now lies in disarray. It has no internationally recognized government, its people face a

humanitarian crisis of catastrophic proportions, and while the Taliban is not the recognized

government, it has *de facto* control over the country.

      This has made Afghanistan's assets a target for the Taliban's victims. While the Republic

is gone, Afghanistan's central bank, Da Afghanistan Bank ("DAB"), remains. It holds several

billion dollars (the "DAB Funds") in assets in the Federal Reserve Bank of New York (the

"FRBNY").

      Four groups of judgment creditors (the "Judgment Creditors") seek to satisfy their

judgments against the Taliban with these funds: <u>Smith v. The Islamic Emirate of Afghanistan, et</u>

al., No. 01-cv-10132 (the "Smith Creditors"), Havlish, et al. v. Bin Laden, et al., No. 03-cv-9848 (the "Havlish Creditors"), Fed. Ins. Co. et. al. v. Al Qaida, et al., No. 03-cv-6978 (the "Federal Insurance Creditors"), and John Does 1 Through 7 v. The Taliban et al., No. 20-mc-740 (the "Doe" and the "Doe Creditors"). These creditors hold judgments against the Taliban for its role in the September 11 Terrorist Attacks or other terrorist acts. They move under § 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA") for a turnover of the DAB Funds to satisfy these judgments.

The Court recommends denying these motions for three reasons. First, DAB is immune to this Court's jurisdiction. It is the central bank of a foreign state. This means it is entitled to immunity from jurisdiction and its property is entitled to immunity from execution. TRIA may overcome DAB's execution immunity, but not its jurisdictional immunity. Second, even if there was jurisdiction, the Court is constitutionally restrained from making the finding that TRIA requires to authorize the turnover. Only the President may recognize the government of a foreign sovereign nation. Courts may not do so directly or by implication. Authorizing the parties to satisfy the Taliban's judgments with Afghanistan's central bank funds unavoidably acknowledges the Taliban as the Afghan government. Third, even if that were not the case, TRIA § 201(a) requires an agency relationship in order to execute on an entity's assets. This relationship requires a manifestation of consent that is not present where the Taliban has seized DAB by force.

## BACKGROUND

The Court assumes familiarity with the broader procedural and factual background of this litigation. It discusses only those elements relevant to the Judgment Creditors' turnover motions.

**App.617**

I. **Factual Background**

   A. **The Fall of the Republic**

These motions have their origins in the fall of the Republic. A full accounting of this tragedy is beyond the scope of this Report and Recommendation. The Court recounts only the broad outlines.

After the devastation of the September 11 Terrorist Attacks, the United States invaded Afghanistan to force the Taliban from power. The United States never recognized the Taliban as the *de jure* government of Afghanistan but it had ruled the country since capturing Kabul in September 1996. In October 2001, a coalition of U.S. and Afghan forces attacked the Taliban, evicting it from Kabul in November 2001. Clayton Thomas, Cong. Rsch. Serv., <u>Taliban Government in Afghanistan: Background and Issues for Congress</u> 7–8 (2021) (the "<u>Taliban Report</u>").[1] The Republic was then established.

By 2020, the Taliban was ascendant again. In February 2020, the United States and the Taliban agreed that the U.S. would withdraw all its troops by April 2021. As American forces withdrew, the Republic's position deteriorated. The crisis reached a head in August 2021. Taliban forces made a series of rapid advances throughout Afghanistan ending in the second capture of Kabul on August 15, 2021. While Afghan leaders attempted to establish a resistance in the Panjshir province, that area fell by September 2021. <u>Taliban Report</u> at 11–15. The fall of Panjshir left the Taliban in even more complete control of Afghanistan than it was in 1990s. <u>Id.</u>

---

[1] This document was appended as an exhibit in <u>Smith</u>, No. 01-cv-10132, ECF No. 63-3. It has also been cited by the other Judgment Creditors, ECF Nos. 7764 at 14 n.29 (<u>Havlish</u> Creditors); 7769 at 13 n.31 (<u>Doe</u> Creditors); 7937 at 14 n.25 (<u>Federal Insurance</u> Creditors).

**App.618**

at 18. As before, the United States has not recognized the Taliban as the *de jure* government of Afghanistan. ECF No. 7661 at 34.[2]

The fall of the Republic has been an unmitigated disaster for the Afghan people. Food, water, and shelter are all in critically short supply. ECF No. 7896 at 17. By the end of 2022, as many as 97 percent of Afghans could be living in poverty. More than a million children are at risk of dying of starvation. ECF No. 7932 at 10–11. The society-wide deprivation is so severe that some families are selling their children or organs to escape starvation. ECF Nos. 7896 at 17, 7932 at 11. The Taliban has also begun a brutal crackdown on women, religious and ethnic minorities, former Republic officials, and many civil society organizations. ECF No. 7896 at 18. More Afghans may eventually die from these society-wide convulsions than perished in the last two decades of war. ECF Nos. 7896 at 17, 7932 at 11.

**B. Da Afghanistan Bank**

The Republic's collapse made DAB's assets a target. DAB has been the central bank of Afghanistan since its founding in 1939. ECF No. 7766 at ¶ 16. When the Republic fell, DAB held approximately $7 billion in assets at the FRBNY. ECF No. 7764 at 11. Most of this appears to have come from international donors or the savings of Afghan citizens. ECF No. 7932 at 27 n.18. The U.S. Treasury Department blocked these assets the same day that the Taliban entered Kabul. Taliban Report at 45. Amici report that the decision to freeze Afghan assets has further exacerbated the country's humanitarian crisis because "banks were unable to lend money and citizens unable to withdraw their own funds." ECF No. 7896 at 17.

Six months later President Biden addressed the use of these assets with Executive Order 14064. Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 15, 2022) ("E.O. 14,064"). This order

---

[2] Unless otherwise noted, all ECF citation are to In re Terrorist Attacks, 03-md-1570.

determined that "the widespread humanitarian crisis in Afghanistan — including the urgent needs of the people of Afghanistan for food security, livelihoods support, water, sanitation, health, hygiene, shelter and settlement assistance, and COVID-19-related assistance, among other basic human needs" was an "unusual and extraordinary threat to the national security and foreign policy of the United States." Id. It further stated that "the preservation of certain property of Da Afghanistan Bank (DAB) held in the United States by United States financial institutions is of the utmost importance to addressing this national emergency and the welfare of the people of Afghanistan." Id.

Accordingly, E.O. 14,064 provided that "[a]ll property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked . . . ." Id. at § 1(a). This order was implemented when the U.S. Treasury's Office of Foreign Assets Control ("OFAC") issued License No. DABRESERVES-EO-2022-886895-1. See ECF No. 7661-2 (the "OFAC License"). With this license, the United States sought to transfer $3.5 billion, or approximately half of DAB's assets, "for the benefit of the people of Afghanistan, including to an international financing mechanism (in which the United States is a member) holding and disbursing funds for the benefit of the people of Afghanistan, or to a United Nations fund, programme, specialized agency, or other entity or body for the benefit of the people of Afghanistan." Id. at § 1(b). The remaining $3.5 billion was retained in the FRBNY.

The United States reported that this license could not take effect without the Court modifying the writs of execution obtained by the Judgment Creditors or otherwise confirming that the writs did not restrain the $3.5 billion the license sought to transfer. ECF No. 7661 at 10–

**App.620**

11. The Court granted this request with the parties' consent on February 25, 2022. ECF Nos. 7700, 7701. The FRBNY hold the remaining DAB Funds.

## II. Procedural Background

After the fall of the Republic, the Judgment Creditors filed their turnover motions. Four amici and the United States also filed briefs. No Judgment Creditor has a judgment against the nation of Afghanistan or DAB. No representative for Afghanistan, DAB, or the Taliban has appeared in this case. The FRBNY has submitted only a single non-substantive letter. ECF No. 8040.

### A. The Havlish Motion

The Havlish Creditors are family members and estates of Americans killed in the September 11 Attacks. They secured a default liability judgment against the Taliban for its role in this attack on December 22, 2011. ECF No. 2516. They were awarded compensatory damages, punitive damages, and prejudgment interest on their non-economic compensatory damages. ECF No. 2618, adopted at ECF No. 2623. Their total outstanding compensatory damages are $2,086,386,669. ECF No. 7765 at 3–4.

On August 27, 2021, shortly after the fall of the Republic, the Havlish Creditors obtained a writ of execution (the "Havlish Writ") targeting the DAB Funds held at FRBNY. In re Terrorist Attacks, No. 03-md-1570, Minute Entry, August 27, 2021. Marshals attached the DAB Funds by serving the writ on the FRBNY on September 14, 2021. ECF No. 7765-3 (service of process receipt).

The enforcement of this writ was stayed on September 16, 2021, at the request of the United States, which was deciding whether to file a Statement of Interest. Havlish, No. 03-cv-9848, ECF No. 526. The Court granted that request and three extensions. ECF Nos. 7120, 7269,

**App.621**

7402, 7631. It also extended the duration of the <u>Havlish</u> Writ beyond the 90-day period normally afforded for execution to accommodate these extensions. ECF No. 7447. The United States filed its Statement of Interest in <u>Havlish</u> and other related cases on February 11, 2022. ECF No. 7661.

The stay of enforcement was then lifted. ECF No. 7717. The <u>Havlish</u> Creditors promptly filed their motion for the turnover of the DAB assets pursuant to Rule 69(a), N.Y. CPLR §§ 5225(b) and 5227, and TRIA § 201. ECF No. 7763.

### B. The <u>Federal Insurance</u> Motion

The <u>Federal Insurance</u> Creditors are insurance companies who made payments because of the September 11 Attacks. They obtained a default judgment of liability against the Taliban, Al Qaeda, and Hezbollah in April 2006. ECF No. 1755. The Court awarded them $9,351,247,965.99 as to Al Qaeda. ECF No. 2502. Just less than a decade later, the <u>Federal Insurance</u> Creditors requested that this award be extended against the Taliban. ECF No. 7790. The Court granted this partial default judgment and extended this award against the Taliban. ECF No. 7833. It also waived the automatic 60-day stay of execution provided for by Rule 62(a). <u>Id.</u> at 3.

The <u>Federal Insurance</u> Creditors obtained their writ of execution on April 20, 2022. <u>Fed. Ins. Co. et al.</u>, No. 03-cv-6978, Minute Entry, April 20, 2022. The DAB Funds at the FRBNY were attached a day later. ECF No. 7938-2 at 1. The <u>Federal Insurance</u> Creditors promptly moved for a turnover order.

**App.622**

## C. The <u>Smith</u> Motion[3]

The <u>Smith</u> Creditors also brought suit against the Taliban for losses suffered on September 11. <u>Smith</u>, No. 01-cv-10132, ECF No. 63 at 5. Judge Harold Baer found in their favor on May 7, 2003, awarding economic damages, solatium damages, and compensation for their decedents' pain and suffering. <u>Id.</u> at ECF No. 25.[4] A final judgment was entered two months later. <u>Id.</u> at ECF No. 28. Almost nineteen years later, the <u>Smith</u> Creditors served their writ of execution on the FRBNY, also seeking to satisfy their judgments with the DAB Funds. <u>Id.</u> at ECF No. 41. They moved for a turnover order on May 18, 2022. <u>Id.</u> at ECF Nos. 62, 63 at 6–7.

## D. The <u>Doe</u> Motion

The <u>Doe</u> Creditors' injuries arose from a 2016 attack by the Taliban and other terror groups. Their operatives crashed a truck laden with explosives into the gates of a contractor compound located in Afghanistan.[5] The <u>Doe</u> Creditors obtained a default judgment against the Taliban, Al Qaeda, and the Haqqani Network in the Northern District of Texas on November 5, 2020. <u>Doe</u>, 20-mc-740, ECF No. 1 at 2–4. They were awarded compensatory damages and post-judgment interest. ECF No. 7770 at ¶ 2. The <u>Doe</u> Creditors collected some of this award from an Al Qaeda instrumentality. ECF No. 7769 at 10. As of March 21, 2022, however, most of their judgment remains unsatisfied. ECF No. 7770 at ¶ 4. They registered that judgment in this District about a month after obtaining the award. <u>Doe</u>, 20-mc-740, ECF No. 1.

---

[3] <u>Smith</u> was not initially a part of this case but was accepted as a related case on June 6, 2022. <u>Smith</u>, No. 01-cv-10132, Minute Entry, June 6, 2022.

[4] A copy of this opinion is not on ECF but is available under the following citation: <u>Smith ex rel. Smith v. Islamic Emirate of Afghanistan</u>, 262 F. Supp. 2d 217 (S.D.N.Y. 2003), <u>amended sub nom.</u> <u>Smith ex rel. Est. of Smith v. Islamic Emirate of Afghanistan</u>, No. 01-cv-10132 (HB), 2003 WL 23324214 (S.D.N.Y. May 19, 2003).

[5] A copy of this complaint is available at <u>Doe</u>, 20-mc-740, ECF No. 8-2.

The Doe Creditors sought an emergency writ of execution on August 26, 2021. Id. at ECF No. 15. As in Havlish, the United States requested that a ruling on this motion be delayed as it decided whether to file a Statement of Interest. Id. at ECF No. 18. While this decision was pending, the Doe Creditors secured a writ of execution targeting the DAB Funds. The Court stayed enforcement of this writ pending the United States' Statement of Interest decision. Id. at ECF No. 26. The writ was served on FRBNY in the meanwhile. Id. at ECF No. 67. As with the Havlish Writ, the Court directed that this writ not expire absent further action. Id. at ECF No. 41. Doe was then transferred to this multidistrict litigation given the common issues presented by the DAB Funds. Id. at ECF No. 54.

The stays of the Doe and Havlish writs were lifted at the same time. ECF No. 7717. The Doe Creditors moved for turnover of the assets on the same day as the Havlish Creditors. ECF No. 7767.

### E. United States' Statement of Interest

The Statement of Interest asserted that "[t]he United States has significant interests in the disposition of these [turnover] proceedings." ECF No. 7661 at 10. Some of these interests related to the speedy resolution of the issues associated with the OFAC License. Beyond this, the United States asserted "a strong interest in the President's constitutional authority to make decisions with respect to the recognition of foreign governments and . . . in ensuring the proper construction of TRIA and the Foreign Sovereign Immunities Act." Id. at 11. At the same time, the United States recognized "a compelling interest in permitting victims of terrorism to obtain compensation to the greatest degree permitted under the law." Id. at 27.

While it acknowledged these interests, the United States took no position on whether the Judgement Creditors had satisfied TRIA's requirements. Id. at 27–28. Instead, it raised a series

**App.624**

of considerations for the Court's attention. It noted that "determinations of ownership for purposes of TRIA implicate significant issues of foreign policy that sound in federal law, both as pertains to the governance of the international banking system and the prerogative of the President to recognize and to conduct diplomacy with foreign states . . . ." Id. at 28. In particular, it noted that exceptions to immunity that a foreign sovereign's property enjoys must be construed narrowly and "be measured against a benchmark that accounts for the risk of reciprocal challenges to American property abroad." Id. at 35. It also stated that, to prevail, the Judgement Creditors "must establish a theory of ownership by the Taliban that would not require this Court—either expressly or by implication—to make its own determination as to the identity of Afghanistan's government" because such a determination would infringe on the President's constitutional prerogatives to conduct foreign relations. Id.

The Statement of Interest also put forward several factual positions. The United States stated that it had not recognized the Taliban or any other entity as the government of the state of Afghanistan. Id. at 34. It also confirmed that DAB is the central bank of Afghanistan. Id. at 16.

**F. Amicus Briefs**

The Court accepted four amicus briefs on these turnover motions. The first is a letter submitted by the Women's Forum on Afghanistan signed by several women who held prominent civil positions in the Republic before its fall. ECF No. 7823. The second is from the Center for Constitutional Rights on behalf of four Afghan civil organizations: Global Advocates for Afghanistan, The Afghan Network for Advocacy and Resources, Afghans for A Better Tomorrow, and the Afghan-American Community Organization. ECF No. 7896-1. The third brief is submitted by Unfreeze Afghanistan, a woman-led non-governmental organization advocating for the release of the DAB Funds. Havlish, No. 03-cv-9848, ECF No. 617. The final

**App.625**

brief is from the Open Society Justice Initiative, submitted on behalf of Naseer A. Faiq, the *Chargé de Affaires* of the Permanent Mission of the Islamic Republic of Afghanistan. ECF No. 7932-1. These briefs describe the devastating effects that the Taliban's takeover has had on Afghan civil society and on the Afghan people. They also raised several legal arguments against the Judgment Creditors' turnover motions.

The Court accepted each of these briefs after finding that they provided unique information that would not create or enlarge the issues presented by the turnover motions. ECF Nos. 7823 at 1–2, 7925 at 2–3. It rejected two amicus briefs from groups that included members already represented in this case. ECF Nos. 7925, 7941.

## DISCUSSION

The Judgment Creditors' motions must be denied for three reasons. First, the Court lacks subject matter jurisdiction over DAB under the Foreign Sovereign Immunities Act ("FSIA"). Second, even if the Court has jurisdiction, it may not constitutionally render the findings required by TRIA. For the Judgment Creditors to prevail, the Court must be able to find that DAB is a Taliban agency or instrumentality. Finding that the Taliban controls DAB or can use it to advance its goals implies that the Taliban is Afghanistan's government. The Constitution vests the authority to recognize governments in the President alone. Third, TRIA requires an agency relationship based on consent to find that an entity is the agency or instrumentality of a terrorist group. That relationship is plainly not present where the Taliban has seized DAB by force.

This determination is not affected by Levinson v. Kuwait Fin. House (Malaysia) Berhad, which was decided while this turnover motion was pending. No. 21-2043, 2022 WL 3269083 (2d Cir. July 21, 2022). Under Levinson, "[t]o be entitled to attachment or execution under TRIA, a plaintiff must first establish defendant's status as an agency or instrumentality." Id. at *4. No

**App.626**

determination was made as to DAB's agency or instrumentality status before these writs of execution were issued.

A creditor, however, need not obtain a writ of execution before seeking a turnover under N.Y. CPLR §§ 5225(b) and 5227. Garland D. Cox & Assocs., Inc. v. Koffman, 400 N.E.2d 302 (N.Y. 1979) ("There is no requirement that a judgment creditor obtain priority by way of execution before he resorts to one of the other enforcement devices provided by CPLR article 52 . . . "); see also CSX Transportation, Inc. v. Island Rail Terminal, Inc., 879 F.3d 462, 472–73 (2d Cir. 2018) ("CSX I") ("[A] judgment creditor must take additional steps—such as securing a turnover order or an execution levy—to prevent intervening parties from attaining higher priority.") Thus, regardless of the validity of the parties' writs of execution, they are entitled to make the motions for turnover under N.Y. CPLR §§ 5225(b) and 5227 that are the predicate for this Report and Recommendation.[6]

## I. The Court Lacks Subject Matter Jurisdiction Over the Turnover Motions Under the FSIA

The Court lacks subject matter jurisdiction over DAB and by extension over these turnover motions. This analysis begins with the critical and uncontroverted fact that DAB is the central bank of Afghanistan. As an instrumentality of a foreign state, it enjoys immunity from jurisdiction under the FSIA. The Judgment Creditors propose to overcome this immunity through TRIA § 201. This statute defeats the immunity from execution that the property of sovereign

---

[6] Rule 69(a) provides that "[a] money judgment is enforced by a writ of execution . . . ." Thus, if the Judgment Creditors were to prevail, there is a question of whether given the effect of Levinson on their writs, they would be required to seek new writs of execution to permit the enforcement of their judgments. As the Court recommends that they do not prevail on these turnover motions, it need not reach this question. Here, the only question is if the absence of a writ of execution bars the Court from hearing the Judgment Creditors' turnover motions. The answer is no. Rule 69(a) provides that procedures in aid of judgment or execution must accord with state law. New York state law does not require a writ of execution as a prerequisite to a turnover motion.

states and their instrumentalities normally enjoy. Sovereign states and instrumentalities, however, possess immunity from both jurisdiction and execution on their property. Both immunities must be independently overcome. In limited circumstances, TRIA can overcome jurisdictional immunity. Those circumstances are not present here. DAB therefore retains its jurisdictional immunity.

## A. The FSIA and the Sovereign's Two Immunities

Under the FSIA, a foreign sovereign state and its agencies and instrumentalities possess two immunities: immunity from jurisdiction and immunity from the execution on property. Recognizing the "Supreme Court's emphatic and oft-repeated declaration in <u>Amerada Hess</u> . . . the FSIA is the 'sole basis for obtaining jurisdiction over a foreign state in our courts . . . .'" <u>Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela</u>, 863 F.3d 96, 113 (2d Cir. 2017) (quoting <u>Argentine Republic v. Amerada Hess Shipping Corp.</u>, 488 U.S. 428, 434 (1989)).[7] Thus, the FSIA "must be applied by the District Courts in every action against a foreign sovereign, since subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity . . . ." <u>Verlinden B.V. v. Cent. Bank of Nigeria</u>, 461 U.S. 480, 493 (1983). Because the FSIA implicates the Court's subject matter

---

[7] A narrow exception to this rule exists for *in rem* actions. "The FSIA does not create jurisdiction over, and does not immunize a foreign state's property from, in rem civil-forfeiture actions." <u>United States v. Assa Co.</u>, 934 F.3d 185, 190 (2d Cir. 2019). In drafting the FSIA, however, "Congress sought to clamp down on *quasi in rem* suits because they 'caused significant irritation to many foreign governments' and could potentially 'give rise to serious friction in United States' foreign relations.'" <u>Assa Co.</u>, 934 F.3d at 190 (quoting H.R. Rep. No. 94–1487, at 27 (1976), as reprinted in 1976 U.S.C.C.A.N. 6604, 6626). Absent this *in rem* exception, the Court heeds the general requirement that all actions against foreign sovereigns and their instrumentalities must satisfy the FSIA's requirements.

jurisdiction, a court must consider its applicability even *sua sponte* if necessary. See, e.g., Walters v. Indus. & Com. Bank of China, Ltd., 651 F.3d 280, 287 (2d Cir. 2011).[8]

The FSIA does not define a "foreign state" but provides that it "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). "An 'agency or instrumentality of a foreign state' means any entity --

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b)(1)–(3).

Foreign states and instrumentalities that meet these criteria have "two types of foreign sovereign immunity [under the FSIA] —immunity from jurisdiction and immunity from attachment and execution of the sovereign's property." Vera v. Banco Bilbao Vizcaya Argentaria, S.A., 946 F.3d 120, 133 (2d Cir. 2019) ("Vera II"). Section § 1604 of the FSIA renders foreign sovereigns and their instrumentalities immune from jurisdiction unless an exception under 28 U.S.C. §§ 1605 to 1607 applies. Section § 1609 of the FSIA renders the property of foreign sovereigns immune from attachment or execution unless there is an exception under 28 U.S.C. §§ 1610 or 1611.

---

[8] Where a sovereign defendant appears and invokes sovereign immunity, that defense is analyzed under a burden-shifting framework. Rukoro v. Fed. Republic of Germany, 976 F.3d 218, 224 (2d Cir. 2020) (describing this framework). This accords with "the FSIA's legislative history suggest[ing] that jurisdictional immunity is 'an affirmative defense which must be specially pleaded' by the foreign sovereign." Walters, 651 F.3d at 287. Nonetheless, as immunity from jurisdiction goes to a court's subject matter jurisdiction, "even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the [FSIA]." Verlinden B.V., 461 U.S. at 494 n.20.

14

**App.629**

Central banks enjoy heightened protection from execution. Section 1611(b)(1) of the FSIA provides that, notwithstanding the normal exceptions permitting execution on a foreign sovereign's assets, "the property . . . of a foreign central bank or monetary authority held for its own account" is immune to attachment or execution. Sound reasons exist for extending additional protections to assets held by foreign central banks used exclusively for central banking. Congress recognized that "[i]f execution could be levied on such funds without an explicit waiver, deposit of foreign funds in the United States might be discouraged. Moreover, execution against the reserves of foreign states could cause significant foreign relations problems." EM Ltd. v. Republic of Argentina, 473 F.3d 463, 473 (2d Cir. 2007) (quoting H.R.Rep. No. 94–1487 at 31, as reprinted in 1976 U.S.C.C.A.N. 6604, 6630) (internal quotations omitted).

These two immunities, jurisdictional and execution-based, generally "operate independently." Walters, 651 F.3d at 288. "[A] waiver of immunity from suit does not imply a waiver of immunity from attachment of property, and a waiver of immunity from attachment of property does not imply a waiver of immunity from suit." Id. (quoting Restatement (Third) of Foreign Relations Law of the United States, § 456(1)(b) (1987)). Thus, a party seeking to attach the central bank assets of a foreign sovereign must overcome both immunities.

## B. TRIA

TRIA § 201 is an exception provided under the FSIA to a sovereign's immunity to attachment and execution.[9] Hausler v. JP Morgan Chase Bank, N.A., 770 F.3d 207, 211 (2d Cir.

---

[9] The relevant section of TRIA was first passed as part of Pub. L. 107–297, Title II, § 201(a), (b), (d), Nov. 26, 2002, 116 Stat. 2337. It was then amended by Pub. L. 112–158, Title V, § 502(e)(2), Aug. 10, 2012, 126 Stat. 1260. For simplicity, the Court refers to the relevant section of Pub. L. 107–297 as amended by Pub. L. 112–158 as "TRIA" with additional clarification on which section of TRIA the Court references as needed.

2014) ("Congress . . . has created terrorism-related exceptions to immunity under FSIA . . . One such exception is TRIA's authorization of the attachment of the property of terrorist parties and that of their agencies or instrumentalities.") In certain limited circumstances, it also provides subject matter jurisdiction over instrumentalities where there was a valid underlying judgment against the sovereign. TRIA § 201(a) is codified as a note to 28 U.S.C. § 1610, which sets out other exceptions to sovereign property immunity:

> Notwithstanding any other provision of law . . . every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605A or 28 U.S.C. § 1605(a)(7)(repealed)] the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a). This provides a broad waiver of the immunity from execution that foreign sovereigns' property enjoys. This includes even the immunity of central bank assets provided by 28 U.S.C. § 1611. Bank Markazi v. Peterson, 578 U.S. 212, 217 n.2 (2016) (the "FSIA's central-bank immunity provision" does not limit the availability of assets under TRIA).

In certain circumstances, TRIA § 201(a) also provides "subject matter jurisdiction over post-judgment execution and attachment proceedings involving blocked assets." Vera II, 946 F.3d at 133. This was established in Weinstein v. Islamic Republic of Iran, 609 F.3d 43 (2d Cir. 2010). There, plaintiffs obtained a default judgment against the Islamic Republic of Iran. They then initiated execution proceedings against frozen assets held by a separate entity, Bank Melli. It was uncontested that there was a valid underlying judgment against Iran for which its jurisdictional immunity was waived under the FSIA. It was also uncontested that Bank Melli was

16

**App.631**

an instrumentality of Iran. Id. at 48. Nonetheless, Bank Melli claimed that the district court lacked jurisdiction over it because it was not named in the original judgment.

The Court of Appeals rejected this argument. It found that TRIA § 201(a) provided subject matter jurisdiction over an instrumentality not named in that original judgment if there was a valid judgment against the underlying sovereign. Id. at 50. The analysis turned on the need to avoid surplusage in the line: "the blocked assets of that terrorist party *(including the blocked assets of any agency or instrumentality of that terrorist party)* . . . ." TRIA § 201(a) (emphasis added). Weinstein noted that, if a party was required to obtain jurisdiction independently via a judgment against both the foreign sovereign and its agency or instrumentality, the agency and instrumentality language would be rendered superfluous "since the agency or instrumentality would itself have been a "terrorist party" against which the underlying judgment had been obtained." Weinstein, 609 F.3d at 49.

Thus, Weinstein addressed a specific scenario: one in which a court may maintain jurisdiction over an execution against a foreign sovereign instrumentality where the foreign sovereign's jurisdictional immunity was already overcome as part of an underlying judgment. The court specifically noted that original jurisdiction under the FSIA was not an issue in the case before it. Id. at 52 ("The TRIA provides jurisdiction for execution and attachment proceedings to satisfy a judgment for which there was original jurisdiction under the FSIA (which is not challenged here) if certain statutory elements are satisfied.")

Subsequent decisions reaffirmed that TRIA § 201 "provides for federal court jurisdiction over execution and attachment proceedings involving the assets of a foreign sovereign . . . *only* where 'a valid judgment has been entered' against the sovereign." Vera II, 946 F.3d at 133 (citing Vera v. Republic of Cuba, 867 F.3d 310, 321 (2d Cir. 2017) ("Vera I")) (emphasis

**App.632**

added); see also Kirschenbaum v. 650 Fifth Ave. & Related Properties, 830 F.3d 107, 131 (2d

Cir. 2016) ("Kirschenbaum I"), abrogated on other grounds by Rubin v. Islamic Republic of Iran,

138 S. Ct. 816 (2018) ("The TRIA provides jurisdiction for execution and attachment

proceedings to satisfy a judgment for which there was original jurisdiction under the FSIA if

certain statutory elements are satisfied."); Weininger v. Castro, 462 F. Supp. 2d 457, 487

(S.D.N.Y. 2006) ("[I]n the plain language of TRIA and its legislative history there is such a clear

expression to make the instrumentalities substantively liable for the debts of their related foreign

governments . . . .")[10]

In effect, the sovereign's loss of jurisdictional immunity in the underlying judgment

flows through to the instrumentality in the attachment proceeding. Weinstein did not address the

treatment of jurisdictional immunity where the underlying judgment is not against a foreign

sovereign and so original jurisdiction against a sovereign entity under the FSIA was never

obtained.

### C. Judgment Creditors Lack an Original Judgment That May Overcome DAB's Immunity and Grant This Court Subject Matter Jurisdiction

There has been no waiver of jurisdictional immunity against DAB or Afghanistan in any

of the Judgment Creditors' underlying judgments. Without this original waiver of jurisdictional

immunity, TRIA § 201(a) does not provide a freestanding mechanism for waiving a foreign

---

[10] One court in this Circuit initially granted post-judgment execution under TRIA § 201(a) against a state instrumentality on the basis that it was also the instrumentality of a non-state terrorist organization. See Caballero v. Fuerzas Armadas Revolucionarias De Coloumbia, et al., 20-mc-0040 (W.D.N.Y. Sept. 10, 2020), ECF No. 15. That execution, however, was obtained ex parte. This instrumentality has since appeared and filed a motion to vacate. Id. at ECF No. 85. The United States has since also appeared and stated that it intends to file a statement of interest. See id. at ECF No. 118. As the Caballero court did not have the benefit of full adversarial briefing in rendering its initial decision, the Court declines to reference that decision in the resolution of these motions.

**App.633**

sovereign instrumentality's immunity to jurisdiction. Accordingly, the Court lacks jurisdiction over DAB and its assets.

### 1. DAB is a Central Bank Under the FSIA

DAB is the instrumentality of a foreign state, and specifically, a central bank. An entity must have three attributes to be a foreign instrumentality: separate legal personhood, not being a U.S. citizen or third-party legal entity, and being an "organ" of a foreign state. 28 U.S.C. § 1603(b)(1)-(3) While these factors are sometimes sharply disputed, that is not the case here.

Central banks are "the paradigm of a state agency or instrumentality." S & S Mach. Co. v. Masinexportimport, 706 F.2d 411, 414 (2d Cir. 1983), and all parties agree that DAB is the central bank of Afghanistan. While the United States has not yet recognized any entity as the government of Afghanistan, it agrees that DAB is Afghanistan's central bank. ECF No. 7661 at 9, 16, 23. The Havlish Creditor's expert states that "DAB is the central bank of Afghanistan and has been since its formation in 1939." ECF No. 7766 at ¶ 16. The Doe and Federal Insurance Creditors both rely on this expert's declaration in support of their own motions. ECF Nos. 7771-1 (Doe Creditors), 7938 at ¶ 10 (Federal Insurance Creditors). The Smith Creditors have their own expert who also states that "DAB is the central bank of Afghanistan . . . and its main tasks, as described on DAB's website, are those commonly associated with a central bank." Smith, No. 01-cv-10132, ECF No. 64 at ¶ 33.

Because DAB is Afghanistan's central bank, it is immune from the jurisdiction of this Court under 28 U.S.C. § 1604 unless an exception to jurisdictional immunity applies. The Judgment Creditors do not identify one. The Court has not either. They acknowledge that they do not have a judgment against either the state of Afghanistan or DAB for which immunity under the FSIA was waived. All of their turnover motions are based on judgments against the Taliban. See ECF No. 7764 at 9 n.7 (Havlish Creditors), ECF No. 7769 at 9 n.7 (Doe Creditors), ECF No.

19

**App.634**

7937 at 9 (<u>Federal Insurance</u> Creditors), <u>Smith</u>, No. 01-cv-10132, ECF No. 63 at 5 (<u>Smith</u> Creditors).

In fact, TRIA § 201(a) could not be wielded against Afghanistan or its instrumentalities independently. The statute defines a "terrorist party" whose assets may be targeted as "a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 . . . or section 620A of the Foreign Assistance Act of 1961 . . . ." TRIA § 201(d)(4). Alternatively, it may be employed to collect on judgments for acts for which a terrorist party lacks immunity under 28 U.S.C. § 1605A. Section 1605A similarly requires that a state be designated a state sponsor of terrorism. 28 U.S.C. § 1605A(a)(2)(A)(i)(I), (c). Afghanistan is not and has never been designated a state sponsor of terrorism, ECF Nos. 7661 at 17 n.2, 7764 at 9 n.7, so it could not be a "terrorist party" or a nation liable for acts of terrorism under 28 U.S.C. § 1605A.

## 2. DAB's Assets May Not Be Attached Under TRIA Based on a Judgment Against the Taliban

To overcome DAB's immunities, the Judgment Creditors proffer TRIA's "agency and instrumentality" language as a backdoor exception to jurisdictional immunity that could not be obtained otherwise. Lacking a judgment against either Afghanistan or DAB, the Judgment Creditors propose to take their judgments against the non-sovereign Taliban, have DAB declared a Taliban instrumentality, and obtain a waiver of both DAB's immunities under TRIA § 201(a). The text and history of the FSIA and TRIA foreclose this.

The lynchpin of the Judgment Debtor's case is TRIA's broad language. It applies "[n]otwithstanding any other provision of law . . . ." TRIA § 201(a). The Judgment Creditors argue that this is sufficient to overcome any barrier to execution posed by DAB's immunities to jurisdiction and execution.

**App.635**

A "notwithstanding clause," however, is not a bulldozer that clears every possible legal obstacle between a litigant and their goal. A court may not handwave away requirements of jurisdiction, service, liability, judgment, or execution simply because some law the suit touches includes a "notwithstanding" clause. Rather, when confronted with a "notwithstanding" clause, a court must determine its scope. Laws that fall within that scope yield to the statute with the "notwithstanding" clause.

Kucana v. Holder is instructive. 558 U.S. 233 (2010). There, the Court assessed the operation of 8 U.S.C. § 1252(a)(2)(B), which stripped courts of jurisdiction over certain immigration issues. It provides that "[n]otwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to review" an enumerated array of actions. 8 U.S.C. § 1252(a)(2)(B). As Kucana noted, that "introductory clause . . . does not define the scope of [the enumerated action's] jurisdictional bar. It simply informs that once the scope of the bar is determined, jurisdiction is precluded regardless of what any other provision or source of law might say." 558 U.S. at 238 n.1. Accordingly, to understand what laws are overcome by a statute with a "notwithstanding" clause, a court must first determine that statute's scope.

Courts in this District have already applied this principle to TRIA § 201(a). Smith v. Fed. Rsrv. Bank of New York addressed execution on Iraqi assets held in the FRBNY. 280 F. Supp. 2d 314 (S.D.N.Y.), aff'd, 75 F. App'x 860 (2d Cir. 2003), and aff'd sub nom. Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York, 346 F.3d 264 (2d Cir. 2003). Those assets, however, were confiscated by President Bush under the International Emergency Economic Powers Act ("IEEPA") and delivered to the U.S. Treasury. The defendants argued that this put the funds beyond the reach of TRIA. The plaintiffs retorted that TRIA's "notwithstanding" clause trumped the IEEPA. Id. at 317–18.

**App.636**

Smith rejected such an expansive scope of TRIA's "notwithstanding" clause. The court noted that "[a]lthough the 'notwithstanding' language Congress used in the TRIA was broad, it necessarily has a scope and that scope depends on the substance of the provision to which it is attached." Id. at 319. Where TRIA's terms conflict with the terms of another law, that law yields to TRIA. The IEEPA, however, merely authorized the President to do something that negatively affected the Plaintiffs. It did not conflict with TRIA's execution provisions. Because "TRIA and the relevant provision of the IEEPA coexist with no conflict," TRIA's notwithstanding clause did not permit the Plaintiffs to execute on assets seized by the President under the IEEPA. Id. at 319–20.

The first step then is to identify TRIA's scope. "[C]ourts must be careful when interpreting the scope of the FSIA's exceptions . . . Too restrictive a reading, and foreign sovereigns could avoid accountability even where Congress dictated otherwise. Too expansive, and the exceptions could result in a flood of suits against foreign states, prompting those nations to reciprocate in foreign suits against the United States." Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse, 999 F.3d 808, 819 (2d Cir. 2021) (internal citations omitted); see also Rubin v. Islamic Republic of Iran, 830 F.3d 470, 480 (7th Cir. 2016), aff'd, 138 S. Ct. 816 (2018) ("Seizing a foreign state's property is a serious affront to its sovereignty . . . Correspondingly, judicial seizure of a foreign state's property carries potentially far-reaching implications for American property abroad.")

Courts must be even more cautious about "weakening the immunity from suit or attachment traditionally enjoyed by the instrumentalities of foreign states" because this "could lead foreign central banks, in particular, to withdraw their reserves from the United States and place them in other countries. Any significant withdrawal of these reserves could have an

**App.637**

immediate and adverse impact on the U.S. economy and the global financial system." EM Ltd. v. Banco Cent. De La Republica Argentina, 800 F.3d 78, 98 (2d Cir. 2015) (internal citations and quotations omitted).

"TRIA . . . [is] an execution statute." Weininger, 462 F. Supp. 2d at 480. It is silent on jurisdiction. This is readily apparent when it is compared to 28 U.S.C. §§ 1605 to 1607, the sections that 28 U.S.C. § 1604 expressly identifies as providing exceptions to jurisdictional immunity. ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.") Three of these sections, 28 U.S.C. § 1605, § 1605A, and § 1605B, begin their jurisdictional immunity waiving provisions with virtually the same words. See 28 U.S.C. § 1605(a) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . ."); 28 U.S.C. § 1605(b) ("A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case . . . ."); 28 U.S.C. § 1605(d) ("A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action . . . ."); 28 U.S.C. § 1605A(a)(1) ("A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . ."); 28 U.S.C. § 1605B(b) ("A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case . . . .") The last section, § 1607, which deals exclusively with counterclaims, provides that a "foreign state shall not be accorded immunity with respect to any counterclaim . . . ."

Similarly, each exception to attachment and immunity identified in 28 U.S.C. § 1609 and set out at 28 U.S.C. §§ 1610 and 1611, including TRIA § 201(a), references the waiver or scope of immunity specifically with respect to attachment or execution. See, e.g., 28 U.S.C. § 1610(a) ("The property in the United States of a foreign state . . . used for a commercial activity in the

**App.638**

United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment . . . ."); 28 U.S.C. § 1610(b) ("[A]ny property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State"); 28 U.S.C. § 1610(d) ("The property of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment . . . ."), 28 U.S.C. § 1610(g)(1) ("the property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity . . . is subject to attachment in aid of execution, and execution . . . ."); 28 U.S.C. § 1611(b) ("Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if . . . ."). TRIA § 201(a) similarly says that "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) *shall be subject to execution or attachment in aid of execution* . . . ." (emphasis added).

The consistent use of language in the jurisdictional exceptions on the one hand and the execution exceptions on the other reflects that "the FSIA preserves a common law distinction between . . . jurisdictional immunity from actions brought in United States courts and immunity from attachment or execution of the foreign sovereign's property." Weininger, 462 F. Supp. 2d at 481. Where Congress sought to target jurisdictional immunity, the statute references jurisdiction, and in all but one instance, does so with virtually identical language. Where Congress sought to target execution, it does so by explicitly stating what property is "subject to attachment in aid of

24

**App.639**

execution" or what property "shall not be immune from attachment in aid of execution, or from execution."

Comparing these statutes shows that Congress knows how to draft a statute to waive immunity from either jurisdiction or execution and what language accomplishes each goal. TRIA § 201(a) uses the language of execution waivers, not jurisdictional waivers, a topic on which it says nothing. "The familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of statutory interpretation has full force here. The silence of Congress is strident." Comm'r of Internal Revenue v. Beck's Est., 129 F.2d 243, 245 (2d Cir. 1942); see also, e.g., Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1617 (2018) ("Telling, too, is the fact that when Congress wants to mandate particular dispute resolution procedures it knows exactly how to do so . . . .")

Because TRIA is an execution statute, there is generally no conflict between it and those parts of the FSIA that deal with jurisdictional immunity. Immunities from jurisdiction and execution operate independently. Walters, 651 F.3d at 288. A conflict would arise if the Judgment Creditors sought to execute on TRIA's assets and were prevented from doing so by an immunity to execution contained in 28 U.S.C. § 1610, 28 U.S.C. §1611, or some other statute. Only in that case would TRIA prevail.

Additionally, when, like in Weinstein, jurisdictional immunity has already been overcome against the sovereign, TRIA pulls that jurisdictional waiver through to the sovereign's instrumentalities, since an alternative reading would render parts of TRIA superfluous. 609 F.3d at 49. But this is a limited rule that "provides for federal court jurisdiction over execution and attachment proceedings involving the assets of a foreign sovereign . . . *only* where 'a valid judgment has been entered' against the sovereign." Vera II, 946 F.3d at 133.

**App.640**

TRIA's legislative history further confirms that its scope is execution, not jurisdiction. Its passage was the culmination of an extended battle between Congress and the President over the extent to which foreign sovereigns' property could be subject to execution by plaintiffs. In 1998, Congress modified the FSIA's exceptions to execution immunity in 28 U.S.C. § 1610, by adding a new section, § 1610(f). This waived execution immunity for blocked assets of foreign states that had judgments against them for acts of terrorism. Pub. L. No. 105–277 § 117, October 21, 1998, 112 Stat 2681. This subsection could be waived by the President in the interest of national security. President Clinton waived this section the same day he signed the law. 1998 U.S.C.C.A.N. 576, 581, 1998 WL 971395.

Two years later, Congress modified the section, but again authorized the President to waive this section in the interest of national security. Pub. L. No. 106–386 § 2002, October 28, 2000, 114 Stat 1464. Again, President Clinton waived § 1610(f) the same day he signed the bill into law. Statement by the President on HR 3244 10/28/00 (Oct. 28, 2000), 2000 WL 1617225, at *5. No President has rescinded these waivers, and 28 U.S.C. § 1610(f) has never taken effect. Rubin v. Islamic Republic of Iran, 138 S. Ct. 816, 826 n.6 (2018).

Congress responded with TRIA, where it "placed the 'notwithstanding' clause in § 201(a) . . . to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment." Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi, 556 U.S. 366, 386 (2009). The floor statements of Senator Harkin confirm this:

> Let there be no doubt on this point. Title II operates to strip a terrorist state of its immunity from execution or attachment in aid of execution by making the blocked assets of that terrorist state, including the blocked assets of any of its agencies or instrumentalities, *available for attachment and/or execution of a judgment issued against that terrorist state*. Thus, *for purposes of*

26

**App.641**

> *enforcing a judgment against a terrorist state*, title II does not recognize any juridical distinction between a terrorist state and its agencies or instrumentalities.

148 Cong. Rec. S11524-01 at S11528, 2002 WL 31600115 (Nov. 19, 2002) (statement of Sen. Harkin) (emphases added)).

Senator Harkin's references to execution and attachment, rather than jurisdiction confirms that TRIA is an execution statute intended to aid in the enforcement of judgments already issued against terrorist states. It does not waive jurisdictional immunity for a sovereign state or instrumentality that would not otherwise be viable. Senator Harkin's statements cannot be given controlling effect, but because they are consistent with TRIA's text, they provide further evidence of Congress' intent that TRIA not provide a basis to obtain jurisdiction over a sovereign without an underlying judgment for which immunity under the FSIA was already defeated. See, e.g., Brock v. Pierce Cnty., 476 U.S. 253, 263 (1986) ("[S]tatements by individual legislators should not be given controlling effect, but when they are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent.")

TRIA § 201(a) does not overcome DAB's jurisdictional immunity under 28 U.S.C. § 1604. The Court, therefore recommends finding that there is no jurisdiction over DAB or, by extension, these turnover motions.

## II.    The Court is Constitutionally Restrained from Making the Finding TRIA Requires to Attach DAB's Assets

Even if the Court had jurisdiction, it is constitutionally restrained from making the findings that are required by TRIA § 201 to authorize execution. The Constitution vests the President with the sole power to recognize foreign governments. Courts may not extend such recognition either directly or by implication. Yet such recognition would be inescapably implied if this Court found that the DAB is being controlled and used by the Taliban such that the

27

**App.642**

Taliban may use DAB's assets (ultimately the assets of the sovereign state of Afghanistan) to pay its legal bills. The Constitution thus restrains the Court from making the finding necessary to attach DAB's assets.

## A. Framework for the Turnover Motions

These turnover motions are governed by Rule 69, CPLR §§ 5225(b) and 5227, and TRIA § 201. Rule 69 provides the procedure for enforcing money judgments. Under Rule 69(a), judgments are enforced through a writ of execution. Execution procedures are governed by the laws of the state where the court is located unless a federal law applies. In New York, CPLR §§ 5225(b) and 5227 govern turnover proceedings. CSX I, 879 F.3d at 468. These statutes are "essentially interchangeable," CSX Transportation, Inc. v. Emjay Env't Recycling, LTD., No. 12-cv-1865 (JS)(AKT), 2016 WL 755630, at *3 (E.D.N.Y. Feb. 25, 2016) (quoting LaBarbera v. Audax Constr. Corp., 971 F. Supp. 2d 273, 278 (E.D.N.Y. 2013)), so the Court analyzes the turnover motions under CPLR §§ 5225(b) for simplicity.

Section 5225(b) permits judgment creditors to initiate:

> a special proceeding . . . against a person in possession or custody of money . . . in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property . . . .

The Federal Rules have no equivalent to a "special proceeding" so parties may seek a turnover under these provisions by motion. CSX I, 879 F.3d at 470.

CPLR § 5225(b) "requires a two-part showing before the Court can order the third party to turn over the money to the judgment creditor." Hyegate, LLC v. Boghossian, No. 21-cv-1450 (JGK), 2022 WL 1488171, at *2 (S.D.N.Y. May 11, 2022) (Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A., 423 F. Supp. 3d 45, 51 (S.D.N.Y. 2019)). The judgment creditor must show that the judgment debtor has an interest in the property the creditor is

28

**App.643**

targeting, and that the judgment creditor is entitled to that property or has rights superior to the party possessing the property. Id.

A judgment creditor must also satisfy the requirements of TRIA § 201(a) if they seek a turnover on those grounds. A party seeking to execute against assets using TRIA § 201(a) must show that: (1) they have obtained a judgment against a terrorist party, (2) on a claim based on an act of terrorism or an act for which a terrorist party is not immune under 28 U.S.C. § 1605A or 28 U.S.C. § 1605(a)(7), which they seek to satisfy with the (3) blocked assets, (4) of that terrorist, terrorist party, or their agency or instrumentality, (5) to the extent of only their compensatory damages.

The Judgment Creditors easily show all but one element. They all possess judgments against the Taliban, a terrorist group, for the September 11 Terrorist Attacks or other acts of terrorist violence. TRIA § 201(d)(4) defines a terrorist party by reference to 8 U.S.C. § 1182(a)(3)(B)(vi). This describes a terrorist group as one involved in activities such as hijacking, assassination, and the use of explosives to threaten individuals and property. 8 U.S.C. § 1182(a)(3)(B)(iii), (vi). All of the judgments the parties possess against the Taliban are based on its role in the September 11 Attacks, ECF Nos. 1755 (Federal Insurance Creditors), 2516 (Havlish Creditors), Smith, No. 01-cv-10132, ECF No. 25 (Smith Creditors), or separate acts in which explosives were used to attack Americans, Doe, No. 20-mc-740, ECF Nos. 1, 8-2 (Doe Creditors).

The DAB Funds are "blocked assets." TRIA § 201(d)(2)(A) defines blocked assets as "any asset seized or frozen by the United States . . . under sections 202 and 203 of the [IEEPA] (50 U.S.C. 1701; 1702) . . . ." E.O. 14,064 blocks the DAB Funds pursuant to the IEEPA.

29

**App.644**

All the parties seek compensatory damages only. See ECF Nos. 7765 at ¶¶ 10–11 (Havlish Creditors); 7770 at ¶ 4 (Doe Creditors); 7938 at ¶ 9 (Federal Insurance Creditors); Smith, No. 01-cv-10132, ECF Nos. 25, 63 at 7 (Smith Creditors). The only question is whether the blocked DAB Funds are the assets of an agency or instrumentality of the Taliban.

**B. The Constitution Prevents the Court From Declaring DAB a Taliban Agency or Instrumentality**

Declaring DAB an agency or instrumentality of the Taliban inescapably implies that the Taliban is the government of Afghanistan. Only the President may make such a determination. The Court is thus constitutionally restrained from finding that DAB is a Taliban agency or instrumentality as TRIA § 201(a) requires.

"TRIA, unfortunately, does not" define what it means to be an "agency or instrumentality" of a terrorist party. Kirschenbaum I, 830 F.3d at 132. "Because the terms 'agency or instrumentality' are undefined under the TRIA," the Court of Appeals "construe[d] these words according to their ordinary meanings." Id. at 135.

Drawing on several dictionary definitions, the Court of Appeals determined that an entity is an agency or instrumentality of a terrorist group if it "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by the terrorist party." Id.

The Court cannot find that that DAB was owned, controlled, or directed by the Taliban or that it provided the Taliban with materials services and functionality without recognizing the Taliban as the government of Afghanistan. The Constitution forbids this. "[T]he power to recognize foreign states and governments . . . is exclusive to the Presidency." Zivotofsky ex rel.

Zivotofsky v. Kerry, 576 U.S. 1, 28 (2015). This is true whether recognition is direct or by implication.

Zivotofsky, for example, dealt with a conflict between the Foreign Relations Authorization Act, Fiscal Year 2003 (the "FRAA"), and the U.S. State Department's Foreign Affairs Manual (the "FAM"). At the time of Zivotofsky, presidential policy was to refuse to acknowledge any nation's sovereignty over the city of Jerusalem. The FAM thus required that when the State Department issued passports to people born in Jerusalem, the passport list their place of birth as "Jerusalem" rather than "Israel." The FRAA permitted (though did not require) people born in Jerusalem to list their place of birth as "Israel" on their passports. Id. at 5–8. Even though this amounted to little more than a requirement that the President accommodate private citizens' requests on their passports, the Supreme Court held that this accommodation was unconstitutional because it was "a mandate that the Executive contradict his prior recognition determination in an official document issued by the Secretary of State." Id. at 30.

Applying this to DAB, the government of a foreign sovereign state exercises some manner of control or authority over the central bank. This is apparent from 28 U.S.C. § 1611 of the FSIA which specifically addresses central banks and their assets. This makes the property of a central bank immune from attachment and execution "unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution . . . ." 28 U.S.C. § 1611(b)(1). The use of "parent" implies a degree of supervision by the foreign government over the central bank. See, e.g., Parent Corporation, Black's Law Dictionary (11th ed. 2019) ("A corporation that has a controlling interest in another corporation."). Further confirming that a government exercises some control over the central

**App.646**

bank, 28 U.S.C. § 1611(b)(1) permits a foreign government to waive the immunity of their central bank's property to attachment and execution.

The Judgment Creditors allege the Taliban is exercising control over DAB. The Havlish Creditors' expert reports that the Taliban has appointed loyalists to key leadership positions. ECF No. 7766 at ¶ 54. This includes DAB's Acting Governor, id. at ¶ 55, First Deputy Governor, id. at ¶ 59, Second Deputy Governor, id. at ¶ 73, and personnel throughout the organization. Id. at ¶¶ 85–91. Numerous former DAB leaders and employees have fled the institution because they will not work for the Taliban. Id. at ¶¶ 52–53. Senior personnel and experts have joined the exodus or are trying to leave. Id. at ¶¶ 88, 102. Women have been forced to leave DAB jobs, id. at ¶ 90, and those DAB personnel that remain appear to be doing so only because of Taliban coercion. Id. at ¶ 89. The Smith Creditor's expert similarly notes that numerous Taliban loyalists have been appointed to senior leadership positions in DAB. Smith, No. 01-cv-10132, ECF No. 64 at ¶¶ 40–41. Non-Taliban personnel in leadership positions are reportedly little more than figureheads subject to Taliban control. Id. at ¶¶ 42–43.

The Taliban is using its control of DAB through these senior positions to set monetary policy. It has tried to use DAB "to halt the local currency's depreciation." ECF No. 7766 at ¶ 92. Through DAB, it is supervising the entire Afghan financial sector, id. at ¶ 98, and its appointees make statements about the country's banking policies. Id. at ¶ 128.

Finally, the Judgment Creditors suggest that the Taliban can use its control of DAB to advance its cause in numerous ways. It can cripple the central bank's anti-money laundering controls, id. at ¶¶ 155, 160, 165, generate revenue from the narcotics trade, id. at ¶¶ 155, 161, weaponize sensitive financial information against its enemies, id. at ¶ 159, and weaken oversight

**App.647**

of high-risk financial sectors (*e.g.*, *hawala*, an informal money exchange system) that are likely to fund terrorists, id. at ¶¶ 168–78.

The Smith Creditor's expert expands on this. He notes that beyond advancing its aims through monetary policy, one of the Taliban's goals in controlling DAB is "to show that they are capable of governing Afghanistan . . . ." Smith, No. 01-cv-10132, ECF No. 64 at ¶ 36. It appointed DAB leadership even before it announced the establishment of its caretaker "government." Id. at ¶ 35. To advance this effort and create the impression of a competent Taliban-run DAB, the Taliban has employed tactics like presenting credentialed non-Taliban technical experts as DAB personnel in external meetings while Taliban loyalists handle internal affairs. Id. at ¶ 36. Thus, for example, the Smith Creditor's expert reports that the current DAB Governor, Shakir Jalali, was "chosen for his credentials" but, despite being DAB's governor, he "acts in an advisory position without decision-making authority." Id. at ¶ 42. This governance structure "is designed to present DAB as a 'normal' central bank to outside observers, while simultaneously maintaining Taliban control over DAB strategy and funds." Id. at ¶ 44.

The Smith Creditor's expert also notes that part of the allure of controlling DAB is gaining control over its reserves. The Taliban claimed a right to that money "immediately," id. at ¶ 35, and reportedly sought to inspect the reserves just after gaining physical control of DAB's premises, Taliban Report at 45.

The Court has little doubt that much or all of this is factually true, and that the Taliban is using their control of DAB to advance their aims. In September 2021, Secretary of State Antony Blinken acknowledged that the Taliban was the "*de facto* government" of Afghanistan.[11] There

---

[11] Amanda Macias, *Secretary of State Blinken calls Taliban 'the de facto government of Afghanistan'*, CNBC (last updated Mon. Sept. 13, 2021), https://www.cnbc.com/2021/09/13/secretary-of-state-blinken-calls-taliban-the-de-facto-government-of-afghanistan.html.

**App.648**

is no reason to think DAB has escaped this dominion. But, just as Secretary Blinken could acknowledge the Taliban's *de facto* dominance of Afghanistan even as the United States declines to formally recognize it as Afghanistan's government, the Court can acknowledge the facts on the ground while recognizing that those facts do not permit it to recognize the Taliban as the government of Afghanistan directly or by implication.

If the Court accepts the Judgment Creditors' argument, the implied recognition of the Taliban as Afghanistan's government is inescapable. The Judgment Creditors report that the Taliban has appointed leaders to the institution. It is advancing its goals through those leaders and by setting monetary policies like preventing currency depreciation. Promoting financial stability and managing foreign reserves are classic public and government functions performed by central banks. See, e.g., Filler v. Hanvit Bank, 378 F.3d 213, 217 (2d Cir. 2004); NML Cap., Ltd. v. Banco Cent. de la Republica Argentina, 652 F.3d 172, 195 (2d Cir. 2011). The Taliban directing DAB's governmental functions implies that the Taliban acts as a government.

Recognition would be further implied if the Court was prepared to give effect to the acts of those DAB "leaders" installed by the Taliban. A hypothetical involving waiver provisions of 28 U.S.C. § 1611(b)(1) illustrates the point. This section allows either the central bank or its parent government to waive immunity to execution on central bank resources. If the Taliban, through their appointed DAB leaders, proffered such a waiver to advance some objective, two outcomes are possible. A court could give effect to the waiver. In that case, Taliban-appointed leaders, on orders from the Taliban, would be issuing an order that controlled the disposition of Afghanistan's central bank reserves. If permitting a private citizen born in Jerusalem to choose "Israel" as his place of birth on his passport impermissibly encroaches on the President's prerogative to recognize governments, then handing over Afghanistan's reserves on the Taliban's

34

**App.649**

say-so must as well. Or, a court could refuse to credit the waiver because acknowledging that the Taliban can control DAB assets or policies in this way confers governmental recognition on the organization that is the sole constitutional prerogative of the President.

The Judgment Creditors' argument is only a less extreme version of this scenario. They suggest that DAB is an agency or instrumentality of the Taliban because it has appointed leaders and those leaders are promulgating policies or taking acts like the elimination of money-laundering controls that materially advance the Taliban's goals. But accepting that these leaders have actually been appointed to lead DAB or that, based on these appointments they may legitimately promulgate the policies and pronouncements that materially advance the Taliban's goals bestows governmental recognition on the Taliban that this Court may not constitutionally confer.

Other factors further confirm that permitting the turnover of the DAB Funds on the basis proffered by the Judgment Creditors implies recognition of the Taliban. The Judgment Creditors' expert declarations reference DAB's website as a credible source of information about the institution. See, e.g., ECF No. 7766 at ¶ 16 n.5, ¶ 55 n.39, ¶ 58 n.45, ¶ 58 n.46, ¶ 94 n.86, ¶ 126–35; Smith, No. 01-cv-10132, ECF No. 64 at ¶ 33 n.32. That website includes a section with the "Da Afghanistan Bank Law," which sets out the governance of the institution. See DAB, *Laws* (last visited August 26, 2022), available at https://dab.gov.af/laws. Article 11 of the Da Afghanistan Bank Law provides that "[t]he Governor, the First Deputy Governor and the other members of the Supreme Council shall be appointed by a decree of the President of Afghanistan." See DAB, *Da Afghanistan Bank Law* (last visited August 26, 2022), available at https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf.[12]

---

[12] The Unfreeze Afghanistan amicus brief similarly references this Afghanistan Bank Law. See Havlish, No. 03-cv-9848, ECF No. 617 at 5.

The laws of Afghanistan are doubtless in flux given the Republic's collapse but the legal authorities DAB proffers on its website still state that the President of Afghanistan is responsible for appointing DAB officials. The Judgment Creditors, meanwhile, point to the Taliban's appointment of these officials as evidence of its control over DAB. To credit those appointments as evidence of Taliban control would be to suggest that the group is wielding power that was until recently vested in the Afghan state and the Republic.

Accepting this argument is particularly ill-advised given the Smith Creditor's expert opinion that the Taliban sees its control over DAB as a means to demonstrate that it can competently govern Afghanistan. To find that DAB is an agency or instrumentality of the Taliban based on its control of it and use to advance its ends would thus effectively adopt the group's theory for why it is Afghanistan's legitimate government.

Finally, permitting the Taliban to pay its judgments with DAB's money implies an ownership that is only properly held by Afghanistan and its government. While "the funds of foreign central banks are managed through those banks' accounts in the United States, those funds are, in fact, the reserves of the foreign states themselves." NML Cap., Ltd., 652 F.3d at 189 (internal citations omitted) (cleaned up). The reserves are thus foreign state property and "a regime not recognized as the government of a state is not entitled to property belonging to that state located in the United States . . . ." Restatement (Third) of Foreign Relations Law § 205(2) (1987). If the Court nonetheless permitted the Taliban to pay its judgments with Afghan state money held in the United States, the reasonable interpretation given § 205(2) is that the Taliban is entitled to Afghanistan's property.

Zivotofsky recognized that the "[t]he Nation must 'speak . . . with one voice' regarding which governments are legitimate in the eyes of the United States and which are not . . . ." 576

**App.651**

U.S. at 2 (quoting American Insurance Assn. v. Garamendi, 539 U.S. 396, 424 (2003)). That would be impossible if, even as the President declines to accept the Taliban as the Afghan government, the Court permits these terrorists' judgments to be paid with Afghanistan's treasury. The Court thus recommends finding that it is constitutionally restrained from rendering the finding TRIA requires for the Judgment Creditor's turnover motions.

## III. The Taliban's Nonconsensual Control Prevents DAB From Being an Agency or Instrumentality

Finally, even if the Court was not constitutionally restrained from finding that DAB is an agency or instrumentality of the Taliban, the Judgment Creditors cannot establish an agency relationship. "To be entitled to attachment or execution under TRIA, a plaintiff must first establish defendant's status as an agency or instrumentality." Levinson, 2022 WL 3269083, at *4. Consent is essential to an agency relationship. DAB has been violently occupied by the Taliban. It cannot not demonstrate the consent necessary to an agency relationship.

Because TRIA does not define an "agency or instrumentality," Kirschenbaum I defined these terms "according to their ordinary meanings," settling on the three possible tests noted above. 830 F.3d at 135. But Kirschenbaum I and its progeny acknowledged that this test was only a starting point that would necessarily be refined as new circumstances presented themselves. Kirschenbaum I specifically acknowledged that the decision did not address:

> whether, to satisfy the TRIA's definition of agency or instrumentality, Plaintiffs must here show that Defendants knew, or reasonably should have known, that they were functioning for, providing material services on behalf of, or being owned, controlled, or directed by the terrorist party (here, Iran). Nor have they addressed whether an innocent-owner-type defense would be available to a terrorist's agency or instrumentality.

830 F.3d at 136. Similarly, Kirschenbaum v. Assa Corp. acknowledged that "it is possible that, if broadly construed, Kirschenbaum I's reading of TRIA could invite lawsuits against a third-party

37

**App.652**

institution, such as a bank, that had only incidental and perhaps unintentional involvement with a terrorist party. How TRIA balances these concerns is not an issue before us at this time . . . ." 934 F.3d 191, 199 (2d Cir. 2019) ("Kirschenbaum II"). Together, Kirschenbaum I and Kirschenbaum II acknowledge that the Kirschenbaum I test left unanswered the question of what level of knowledge and consent is required to be an agency or instrumentality.

That question is now squarely before the Court. As the Judgment Creditors acknowledge, the Taliban has seized DAB by force. The Havlish Creditors acknowledge that the Taliban has "forcibly seized Afghan territory and institutions, including DAB." ECF No. 8019 at 24. Thus, the Court must determine whether a bank robber can transform an unwilling bank into his agency or instrumentality.

The answer must be no. To determine this, the Court returns to Kirschenbaum I's guidance that "agency or instrumentality" must be defined based on the ordinary meaning of those words. 830 F.3d at 135. It also considers that "Congress is understood to legislate against a background of common-law adjudicatory principles." Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991). "Thus, where a common-law principle is well established . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." Id. (internal citations and quotations omitted)."

With that background, the Court returns to TRIA § 201(a)'s text. The ordinary meanings of "agency or instrumentality" identified in Kirschenbaum I reflect the need for its definition to account for the traditional elements of an agency relationship. That an agency relationship is implied in the use of the term "agency" is apparent, but the definition of "instrumentality" put

**App.653**

forward in Kirschenbaum I similarly returns to the concept of agency as an essential element of being an instrumentality:

> "Instrumentality" is a means through which a function of another entity is accomplished, analogous to a branch of a governing body. See Black's Law Dictionary (10th ed. 2014) (defining "instrumentality" as "a means or *[a]gency* through which a function of another entity is accomplished, such as a branch of a governing body"); Webster's Third New International Dictionary 1172 (1993) (defining instrumentality as "something that serves as an intermediary or *agent* through which one or more functions of a controlling force are carried out: a part, organ, or subsidiary branch esp. of a governing body"); OED Online, Oxford University Press, June 2016 (defining instrumentality as "[t]hat which serves or is employed for some purpose or end; a means, an *agency*"); Merriam–Webster Collegiate Dictionary 22 (10th ed. 1993) (defining instrumentality as a "means" or an "*agency*").

830 F.3d at 135 (emphases added).

"Agency" is a well-defined common law concept. See generally Restatement (Third) of Agency (2006). The Court of Appeals has already resorted to agency principles in Kirschenbaum II, noting that "courts need not 'adhere blindly to the corporate form' [in TRIA actions] where doing so would ignore a foreign state's *principal-agent relationship* or lead to fraud or injustice. Kirschenbaum II, at 934 F.3d at 199 (quoting First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 632 (1983)). Thus, if Congress had intended to displace agency principles in a statute discussing agency, one would have expected explicit language like in 28 U.S.C. § 1603(b) where it provided a specific definition of "agency or instrumentality of a foreign state . . . ." Instead, it left the term undefined, and courts have filled the gap through the normal interpretive tools of ordinary usage and common law meaning. The need for an agency relationship between the terrorist party and its "agency or instrumentality" is thus apparent from TRIA § 201(a)'s text.

**App.654**

This also aligns with the Circuit and the District's existing TRIA jurisprudence. There has been no case invoking the <u>Kirschenbaum I</u> test where the entity alleged to be an agency or instrumentality was credibly alleged to be an unwilling or even unknowing pawn of the terrorists controlling them. <u>See, e.g.</u>, <u>Kirschenbaum II</u>, 934 F.3d at 199 (2d Cir. 2019) (targeted entity was the "alter ego" of Iran), <u>Levin v. Bank of New York Mellon</u>, No. 09-cv-5900 (JPO), 2019 WL 564341, at *4 (S.D.N.Y. Feb. 12, 2019) (noting that a person was an instrumentality of Hezbollah where he contributed money to them and ran their front companies). Returning to agency principles thus comports with this Circuit's existing jurisprudence.

An agency requirement also aligns with Congress' purpose in passing TRIA. The Taliban may have defeated the Republic and occupied Afghanistan, but without presidential recognition, it has no legitimate authority to represent the Afghan state or the Afghan people. "To the extent innocent parties pay some part of a terrorist state's judgment debt, the terrorist state's liability is ultimately reduced. Congress could not have intended such a result." <u>Heiser v. Islamic Republic of Iran</u>, 735 F.3d 934, 940 (D.C. Cir. 2013). The same is true if a non-state terrorist group like the Taliban can drain an Afghan treasury built on international donations and Afghans' savings to reduce its own liability. An agency requirement ensures that only those who have agreed to aid terrorists are responsible for those terrorists' liabilities.

Because an agency relationship is required, that means the relationship between a terrorist and its agency or instrumentality must be consensual, or at least not adversarial. "New York common law provides that an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'" <u>New York Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)</u>, 266 F.3d 112, 122 (2d Cir. 2001) (quoting <u>Meese v. Miller</u>, 79 A.D.2d 237, 242 (4th Dep't 1981)); <u>see</u>

40

**App.655**

also Restatement (Third) of Agency § 1.01 cmt. d (2006) ("Under the common-law definition, agency is a consensual relationship. The definition requires that an agent-to-be and a principal-to-be consent to their association with each other.") [13]

DAB and the Taliban do not have a consensual relationship. The Taliban destroyed the Republic in battle and occupies its central bank by force. When DAB promulgates policies or aids in the Taliban's efforts, it does so with leadership that was illegitimately installed. The Court cannot credit these leaders' acts for the constitutional recognition reasons already identified. But, even if the Court had jurisdiction, and even if it was not constitutionally restrained from making the finding TRIA requires, it recommends finding that the Judgment Creditors cannot show that DAB has proffered the consent necessary to find DAB to be a Taliban agency or instrumentality.

---

[13] While this motion was pending, the Court of Appeals for the Eleventh Circuit decided Stansell v. FARC, No. 20-11736 (11th Cir. August 23, 2022). While not binding on this Court, Stansell addresses the requirements for an entity to be deemed an agency or instrumentality so a brief discussion here is appropriate. Stansell defined "agency or instrumentality" according to the legal definitions of those terms, rather than the common understanding, which it recognized was "largely synonymous." Id. at 20, 22. Thus, while "agency" required an agency relationship and the normal requirements associated with that relationship (i.e., consent), id. at 23–24, an "instrumentality" may be an unwitting "person or thing through which or by which some end or purpose is achieved." Id. at 24–25. The Court finds this unpersuasive for two reasons. First, the use of specifically legal definitions conflicts with Kirschenbaum I, which defined instrumentality by reference to common usage and general-purpose dictionaries. 830 F.3d at 135. As discussed, this common usage in this case requires an agency relationship where instrumentality is concerned. Alternatively, one could imagine a interpretation in which an "instrumentality" is an inanimate object such as a boat used by terrorists, and so seized by judgment creditors, where an agency relationship is then inapplicable. This would also eliminate concerns about construing "instrumentality" in a way that renders it surplusage since it would cover a category (inanimate objects and things that are not legal persons) not covered by "agency." The Court need not address this because that would be inapplicable to DAB. Second, Stansell's "instrumentality" definition would swallow its "agency" definition. Any agent is also a means of achieving some end so the Stansell "instrumentality" definition is basically the same as that of an "agency" but without additional consent requirements, rendering it surplusage.

**CONCLUSION**

The Taliban's victims have fought for years for justice, accountability, and compensation. They are entitled to no less. But the law limits what compensation the Court may authorize and those limits put the DAB's assets beyond its authority. Accordingly, the Court recommends dismissing these turnover motions. The Court lacks subject matter jurisdiction over the turnover motions because the Judgment Creditors have not overcome DAB's immunity from jurisdiction. And even if they had, the Court cannot find that DAB is an agency or instrumentality of the Taliban under TRIA § 201 without infringing on the President's constitutional recognition prerogative. Finally, if all that were not the case, the Judgment Creditors have not made the showing required by TRIA because they have not established that the relationship between the Taliban and DAB is the kind of consensual relationship required for an entity to be an "agency or instrumentality." Upon resolution of these motions, the Clerk of the Court may terminate the motions at ECF Nos. 7763, 7936, Havlish, No. 03-cv-09848, ECF No. 597, and Smith, No. 01-cv-10132, ECF No. 62.

Dated:  August 26, 2022
        New York, New York

SARAH NETBURN
United States Magistrate Judge

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Rule 72(b)(2). These objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the

42

**App.657**

United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Rule 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Rule 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

43

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Case No. 03-md-1570 (GBD)(SN) |
| FIONA HAVLISH, individually and on behalf of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, *et al.*,<br><br>    Creditors,<br><br>v.<br><br>THE TALIBAN, *et al.*,<br><br>    Debtors,<br><br>FEDERAL RESERVE BANK OF NEW YORK,<br><br>    Garnishee. | Case No. 03-cv-9848 (GBD)(SN) |
| JOHN DOES 1 THROUGH 7,<br><br>    Creditors,<br><br>v.<br><br>THE TALIBAN, *et al.*,<br><br>    Debtors,<br><br>FEDERAL RESERVE BANK OF NEW YORK,<br><br>    Garnishee. | Case No. 20-mc-0740 (GBD)(SN) |

| | |
|---|---|
| FEDERAL INSURANCE CO., *et al.*,<br><br>      Creditors,<br><br>v.<br><br>THE TALIBAN, *et al.*,<br><br>      Debtors,<br><br>FEDERAL RESERVE BANK OF NEW YORK,<br><br>      Garnishee. | Case No. 03-cv-6978 (GBD)(SN) |
| ESTATE OF GEORGE E. SMITH, *et al.*,<br><br>      CreditorCreditors,<br><br>v.<br><br>THE TALIBAN, *et al.*,<br><br>      Debtors,<br><br>FEDERAL RESERVE BANK OF NEW YORK,<br><br>      Garnishee. | Case No. 01-cv-10132 (GBD)(SN) |

## EXPERT DECLARATION OF WILLIAM W. BURKE-WHITE

### I.    Introduction and Qualifications

1.    My name is William Burke-White. I am submitting this declaration in my capacity as an expert consultant to the judgment creditors in the above-captioned actions.

2.    I am Professor of Law at the University of Pennsylvania Carey School of Law, where I have taught since 2005. From 2009-2011, I served on Secretary of State Hillary Clinton's Policy Planning Staff at the United States Department of State. In that capacity, I provided direct guidance to the Secretary of State on issues including international law, international institutions, and US foreign relations. From 2019-2021, I was Visiting Fellow at the Brookings Institution in

Washington, D.C. where I worked on issues of international law and US foreign relations law. From 2014-2019 I served as the Richard Perry Professor and Inaugural Director of Perry World House, the University of Pennsylvania's foreign policy and global affairs research institute. Earlier in my career, I taught at Princeton University's School of Public and International Affairs from 2003-2005. I have also been a Visiting Professor at institutions including Harvard Law School, The Hebrew University of Jerusalem, the Max Plank Institute of International Law in Heidelberg, Germany, and the Moscow State Institute of International Relations. I have written and published widely in both academic and policy journals on topics including US foreign policy, international investment law, international human rights law, and US national security law.

3.   I hold a Ph.D. and an M.Phil. from the University of Cambridge, where I was a J. William Fulbright Scholar, a *Juris Doctorate* from Harvard Law School (*magna cum laude*), and an A.B. from Harvard College (*magna cum laude*).

4.   I have been asked to opine on the mechanisms by which a state extends diplomatic recognition to a foreign government and U.S. practice in that regard. In my expert opinion, a judicial opinion that acknowledges the Taliban's *de facto* control over Afghanistan and Afghan state institutions, including Da Afghanistan Bank, would not and could not interfere with the President's exclusive recognition authority or imbue the Taliban, implicitly or otherwise, with status as Afghanistan's recognized or legitimate government. As I explain in further detail below, recognition of a foreign government is a formal act that is circumscribed by form, and can generally be accomplished only by express, unambiguous statements or a narrow subset of diplomatic actions. It is thus entirely appropriate, and consistent with both U.S. and international

law, for a court to acknowledge that an unrecognized, *de facto* government exercises control over state institutions and territory.

## II. To Ensure Clarity in the Functioning of the International System, the Mechanisms of Diplomatic Recognition are Circumscribed by Form and Technicality

5.      International law establishes a strict set of requirements for statehood based on whether the entity in question has a "permanent population," a "defined territory," a "government," and the "capacity to enter into relations with other states."[1] While the satisfaction of these criteria qualify an entity as a state under international law, every government has complete discretion as to whether to undertake the formal act of recognizing a new state or government. In modern practice, countries often condition recognition on a range of factors, including the means through which a government came to power and its commitment to the protection of international human rights.[2] This discretion allows a state to avoid formal recognition of malign actors that may control a state and to encourage such entities to improve their behavior.[3]

6.      Once a state has made the decision as to whether or not to formally recognize a foreign government, the effective functioning of the international legal and diplomatic system demands that such government have clarity as to its status in the eyes of other states. Clear indications of whether a government has been formally recognized by another state allow it, for

---

[1] Montevideo Convention on the Rights and Duties of States art. 1, Dec. 26, 1933, 165 L.N.T.S. 19.

[2] *Declaration on the `Guidelines on the Recognition of New States in Eastern Europe and in the Soviet Union'*, Dipublico (Oct. 15, 2010), https://www.dipublico.org/100636/declaration-on-the-guidelines-on-the-recognition-of-new-states-in-eastern-europe-and-in-the-soviet-union-16-december-1991/ (last visited Nov. 9, 2022).

[3] James Crawford, Brownlie's Principles of Public International Law 142 (9th ed. 2019).

example, to know in advance whether its ambassadors will be accorded diplomatic immunity.[4]

To ensure that needed clarity, the recognition of foreign states and governments is undertaken

through highly specific diplomatic and legal forms and processes. International law requires that

for recognition to be effective, a state must manifest an *intent* to recognize the foreign state or

government. Article 7 of the Montevideo Convention on the Rights and Duties of States—the

critical international legal instrument on point—provides that recognition turns on "the intention

of recognizing the new state."[5] In diplomatic practice, only a narrow set of acts manifest such

intent in a way that is clear to the rest of the international community.

     7.    Typically, recognition involves an express, unambiguous statement by the

recognizing government. As Moore's influential *Digest of International Law* (1906) makes clear:

recognition generally takes the form of an express "written or oral declaration."[6] So too, Ian

Brownlie, the former Chichele Professor of International Law at Cambridge, explains that the

"most common form of recognition … involves the sending of a letter or telegram of felicitations

by a Head of State to the Head of State or other appropriate organ of the new state."[7] The formal

and specific nature of recognition of foreign states and governments is confirmed by the

Restatement (Third) of the Foreign Relations Law of the United States: "Recognition of a

government is formal acknowledgment that a particular regime is the effective government of a

state and implies a commitment to treat that regime as the government of that state."[8]

---

[4] *Zivotofsky ex rel. Zivotofsky v.* Kerry, 576 U.S. 1, 11 (2015) (citing 1 J. Moore, Digest of International Law §27 72 (1906))..

[5] *Id.* at 7.

[6] *Id.* at 11 (quoting 1 J. Moore, Digest of International Law §27 73 (1906)).

[7] Ian Brownlie, *Recognition in Theory and Practice*, 53 British Y.B. Int'l L. 197 (1982) [hereinafter Brownlie 1982]..

[8] Restatement (Third) of Foreign Relations Law § 203 cmt. a (Am. L. Inst. 1987).

8.    Throughout modern US diplomatic history, recognition of both states and governments has taken the form of express statements by the US executive. For example, when the US government officially recognized the State of Israel on January 31, 1949, the White House issued a note stating that the United States was "pleased to extend *de jure* recognition to the Government of Israel."[9] When President Carter recognized the Communist government in China, he announced, "The United States of America recognizes the Government of the People's Republic of China as the sole legal Government of China."[10] More recently, when the US recognized Kosovo on February 18, 2008, Secretary of State Condoleezza Rice issued the following statement: "The United States has today formally recognized Kosovo as a sovereign and independent state."[11] On July 9, 2011, President Obama issued a statement recognizing South Sudan: "I am proud to declare that the United States formally recognizes the Republic of South Sudan as a sovereign and independent state upon this day, July 9, 2011."[12]  On January 23, 2019, President Trump declared that he was "officially recognizing the President of the Venezuelan National Assembly, Juan Guaido, as the Interim President of Venezuela" and noted his view that the National Assembly was "the only legitimate branch of government duly elected by the Venezuelan people."[13]

---

[9] Israel, 1963 Digest of International Law, ch. 3, §25, at 169; *see also*, Charles L. Cochran, *De facto and de jure recognition: Is there a difference?* 62 Am. J. Int'l L. 457, 458 (1968).

[10] Terence Smith, *Link to Taiwan Ends*, N.Y. Times, Dec. 16, 1978, at 1, https://www.nytimes.com/1978/12/16/archives/link-to-taiwan-ends-carter-in-tv-speech-says-we-recognize-reality.html.

[11] Press Release, Condoleezza Rice, U.S. Secretary of State, U.S. Recognizes Kosovo as Independent State (Feb. 18, 2008).

[12] Press Release, Office of the Press Secretary, White House, Statement of President Barack Obama Recognition of the Republic of South Sudan (July 9, 2011).

[13] Press Release, Office of the Press Secretary, U.S. Embassy & Consulate in Ecuador, Statement from President Donald J. Trump Recognizing Venezuelan National Assembly President Juan Guaido as the Interim President of Venezuela (Jan. 23, 2019).

9.    Such clear and unequivocal statements of recognition are critical for both international law and the effective conduct of US foreign affairs. Unambiguous statements of recognition put foreign governments on notice that a state has been recognized and therefore has had its international legal personality accepted "with all the rights and duties determined by international law."[14] As the Supreme Court observed in *Zivotofsky v. Kerry*, "Foreign countries need to know, before entering into diplomatic relations or commerce with the United States, whether their ambassadors will be received; whether their officials will be immune from suit in federal court; and whether they may initiate law suits here to vindicate their rights. These assurances can not be equivocal."[15] So too, clarity of recognition allows the recognizing government to act consistently and coherently toward a foreign state, "speak[ing] … with a single voice."[16] Hence, the US executive has consistently relied on clear, formal, and unambiguous statements to recognize foreign states and governments.

10.    Beyond written or oral declarations of recognition, a narrow category of diplomatic acts can themselves be deemed a form of tacit recognition.  Again, such acts must clearly manifest the *intent* of the recognizing state to grant recognition through the act in question. The Montevideo Convention provides that tacit recognition only arises where there is a clear "intention of recognizing the new state."[17] Similarly, Brownlie explains that the "correct approach" to determine if an act constitutes recognition is to look to the "intention of the government concerned on the basis of the documents and other evidence."[18]

---

[14] Montevideo Convention on the Rights and Duties of States, *supra* note 1, 165 L.N.T.S. at 25.
[15] *Zivotofsky*, 576 U.S. at 11.
[16] *American Insurance Ass'n* v. *Garamendi*, 539 U.S. 396, 424 (2003).
[17] Montevideo Convention on the Rights and Duties of States, *supra* note 1, 165 L.N.T.S. at 25.
[18] Brownlie 1982, *supra* note 7, at 199.

11.   In diplomatic practice, only a select few acts carry the necessary intent of recognition. The two most notable are "concluding a bilateral treaty or by sending or receiving diplomatic agents."[19] Limiting tacit recognition to these two categories of acts is well founded in international law and diplomacy. In his seminal 1947 volume on the topic, Hersh Lauterpacht QC, a judge on the International Court of Justice, explains: "only the conclusion of a bilateral treaty, the formal initiation of diplomatic relations, and, probably, the issue of consular exequaturs, justify the implication" of recognition.[20] It is only acts such as these, according to Story's *Commentary on the Constitution of the United States* that constitute an "acknowledgment of the sovereign authority … of such new nation, or party."[21] Critically, the act of receiving a foreign ambassador, like the act of entering into a treaty, is broadly understood by all states as constitutive of recognition. Acts short thereof are not. As the Swiss Jurist Emirch de Vattel wrote in the *Law of Nations* in 1758, "Every sovereign state then has a right to send and to receive public ministers; for they are necessary instruments in the management of those affairs which sovereigns have to transact with each other."[22] The act of entering into a bilateral treaty with a foreign sovereign necessarily implies a recognition of that state and its government because only sovereign states and their rightful governments have the international legal personality necessary to enter into a treaty.[23]

---

[19] Ian Brownlie, Brownlie's Principles of Public International Law 93 (7th ed. 2008) (hereinafter Brownlie 2008).

[20] Hersch Lauterpacht, Recognition in International Law 406 (1947, reprt. 2013).

[21] 3 J. Story, Commentaries on the Constitution of the United States §1560, 416 (1833).

[22] Emer de Vattel, The Law of Nations; or, Principles of the Law of Nature Applied to the Conduct and Affairs of Nations and Sovereigns 80 (1805).

[23] Vienna Convention on the Law of Treaties art. 6, May 23, 1969, 1155 U.N.T.S. 331.

12.   Other acts that may involve engagement with an unrecognized state should not and do not imply recognition.  To suggest otherwise undermines the clarity of the recognition doctrines in international law and the effective functioning of the diplomatic system. Construing other ambiguous acts as indicators of formal recognition would prevent governments from undertaking the necessary maintenance of foreign affairs with entities that they have decided – for whatever reason in their discretion – not to recognize. Again, Lauterpacht explains: "No recognition is implied from negotiations, unofficial representation, the conclusion of a multilateral treaty to which the unrecognized entity is also a party, admission to an international organization … or participation with the entity concerned at an international conference."[24] Avoiding any presumption of recognition allows countries to carry on necessary diplomacy and foreign affairs without unintentionally engaging in recognition.

13.   US law and diplomacy likewise affirm the narrow category of acts that can constitute recognition. The reporters' notes to Section 204 of the Restatement (Third) of Foreign Relations Law provide: "the President may exercise his power of recognition either expressly or by implication. Recognition of a state has been affected by express official declaration, by the conclusion of a bilateral agreement with the state, by the presentation of credentials by a United States representative to the authorities of the new state, and by receiving the credentials of a diplomatic representative of that state."[25] Other acts should not be construed as implying recognition. The Restatement makes clear, for example, that the mere "fact that the United States is a member of an international organization of which a state it does not recognize is also a member does not imply recognition of that state by the United States…"[26]

---

[24] Lauterpacht, *supra* note 20, at 406.
[25] Restatement (Third) of Foreign Relations Law § 204 reporters' note 2 (Am. L. Inst. 1987).
[26] *Id.*

9
**App.667**

14.    While these forms of tacit recognition were more common in the early years of US history, in contemporary practice they have been almost exclusively supplanted by formal written or oral statements of recognition. While the *Zivotofsky* opinion references that "President Washington recognized the French Revolutionary Government by receiving its ambassador,"[27] the modern US executive almost exclusively grants recognition through formal written statements.[28]

### III.    International Law Permits Broad Engagement With Non-recognized Governments, and Gives Legal Effect to Their Actions

15.    The pursuit of foreign policy interests and the maintenance of international peace and security require governments to engage with a wide range of foreign actors, including potentially malign actors that a government may not wish to formally recognize. International law gives effect to the acts of a government where it has become the *de facto* authority in a territory, even where it is not formally recognized by other countries. In so doing, a legal fiction is established through which the acts of the *de facto* government are treated as authoritative, *even vis-a-vis* a country that refuses to formally recognize it. The Restatement (Third) of Foreign Relations explains: "Formal recognition of a government, like formal recognition of a state, is not mandatory, but there is a duty to treat as the government a regime that is the government in fact … Treating a regime as a government includes accepting its acts as creating international rights and obligations."[29]

16.    Given the discretion states enjoy in deciding whether to formally recognize another state and the imperative of conducting foreign affairs with the full range of governments,

---

[27] *Zivotofsky*, 576 U.S. at 12.

[28] L. Thomas Galloway, Recognizing Foreign Governments: The Practice of the United States (1978).

[29] Restatement (Third) of Foreign Relations Law § 203 cmt. b (Am. L. Inst. 1987)

the international legal and diplomatic systems expressly facilitate broad engagement with non-recognized states and governments. Engagement with governments that exercise *de facto* control over a territory, even if they are not formally recognized, is ubiquitous in international diplomacy. Such engagement often includes bilateral meetings, mutual participation in international conferences, and cooperation around common threats and objectives. So too, international law and domestic practice give effect to the official acts of non-recognized entities to ensure the orderly functioning of the international system. It is critical to note that such engagement does not constitute an act of recognition, particularly given the narrow, formal processes described above through which official recognition is undertaken.

17.     International law's facilitation of engagement with *de facto* but non-recognized governments is grounded in long historical tradition, through which the acts of *de facto* governments are given effect under international law. The 1923 Tinoco Claims Arbitration (Great Britain v. Costa Rica) is illustrative of how international law respects the official acts of *de facto* regimes while preserving a state's discretion not to recognize the regime behind the acts. In the Tinoco Arbitration, Costa Rica sought to invalidate a concession granted to a British national by its own prior government (the Tinoco government) on the grounds that Great Britain had not recognized that government. Britain sought to enforce the concession granted by the Tinoco government, notwithstanding its non-recognition thereof. The sole arbitrator, former US President William H. Taft, observed: "When recognition *vel non* is by such nations determined by inquiry not into its *de facto* sovereignty and complete governmental control, but into its illegitimacy or irregularity of origin, their non-recognition loses something of evidential weight on the issue with which those applying the rules of international law are concerned…. Such non-recognition for any reason, however, can not outweigh the evidence before me as to the *de facto*

character of Tinoco's government according to the standards of international law."[30] Ultimately Taft upheld the concession agreement on the grounds that the Tinoco government was the *de facto* government of Costa Rica, even though it was not recognized by Great Britain. Notably Taft did not find that Great Britain's attempt to enforce the concession agreement entered into with a non-recognized government itself constituted a form of tacit recognition.

18.    The Tinoco example is just one in a long list of historical precedents of engagement with *de facto* governments. As Crawford explains, "Unrecognized states are quite commonly the object of international claims by the very states refusing recognition. An example is Israel, long held accountable under international humanitarian and human rights law by certain Arab states that still deny its recognition."[31] Similarly, in the years preceding World War II, many European governments "accepted certain legal consequences of German control of Austria" even while they did not "accept the lawfulness of German control."[32]

19.    International law gives effect to a broad range of actions undertaken by *de facto,* but unrecognized, governments. The 1937 decision of Britain's High Court of Justice in *Bank of Ethiopia vs National Bank of Egypt and Liguori* is illustrative. The case involved a decree by Italian authorities that were the *de facto,* but not recognized, government of Ethiopia after their capture of Addis Ababa in 1936. The decree dissolved the Bank of Ethiopia which, in turn, sought to claim certain accounts being held by the National Bank of Egypt. The case turned on whether the Italian dissolution decree was valid in that it would prevent the Bank of Ethiopia from making claims against the National Bank of Egypt. The judge found that because the

---

[30] Aguilar-Amory and Royal Bank of Canada Claims (Great Britain v. Costa Rica), 1 R.I.A.A. 369 (1923).

[31] Brownlie 2008, *supra* note 19, at 136.

[32] *Id.*

British government had "recognized the Italian government as being in fact (*de facto*) the government of the area then under Italian control"—even though Britain had not formally recognized the Italian government in Ethiopia—he was "bound to treat the acts of the government as acts that can not be impugned on the ground that they were not the acts of a rightful but usurping government."[33] Notably, the judge found that the validity of the Italian rule "applies not only to acts done after the date when His Majesty's Government recognized the Italian government as the *de facto* government but also to any acts of that government done at any time at which … they were in fact the government."[34] Similar cases, including notably *AM Luther v James Sagor & Co*,[35] have held that even where the recognition of a foreign government was "on a de facto basis alone," it "did not diminish the legal rights available to the state."[36]

20.    US courts are often called upon and commonly do give consideration to acts undertaken by *de facto,* but non-recognized governments, and address those questions without resulting in recognition.  In *Oetjen v. Central Leather Co.* the Supreme Court took notice "of the fact that since the transactions thus detailed and since the trial of this case in the lower courts, the government of the United States recognized the government of Carranza as the *de facto* government of the Republic of Mexico, on October 19, 1915."[37] Notably, in that case, formal

---

[33] *Bank of Ethiopia v. National Bank of Egypt and Liguori*, 31 Am. J. Int'l L. 742, 747 (Oct. 1937)..

[34] *Id.*

[35] AM Luther v. Sagor [1921] 3 K.B. 532.

[36] Brownlie 2008, *supra* note 19, at 149. In the words of the court "The Government of this country [the UK] having, to use the language just quoted, recognized the Soviet Government as the Government really in possession of the powers of sovereignty in Russia, the acts of that Government must be treated by the Courts of this country with all the respect due to the acts of a duly recognized foreign sovereign state." AM Luther v. Sagor [1921] 3 K.B. 532. The court concluded that "there is no difference for the present purpose between a government recognized as such de jure and one recognized de facto." *Id.*

[37] *Oetjen v. Central Leather Co.*, 246 U.S. 297, 301  (1918).

recognition of the Republic of Mexico did not occur until August 31, 1917. Similarly, in *Upright v. Mercury Business Machines,* a New York appellate court observed that "[a] foreign government, although not recognized by the political arm of the United States Government, may nevertheless have *de facto* existence which is juridically cognizable."[38]

21.    The Restatement (Third) of Foreign Relations similarly affirms that "a regime representing a non-state or an unrecognized regime is not an absolute nullity."[39] Rather, "acts of unrecognized governments" dealing with "domestic matters" will "be given effect" in the courts of foreign states.[40]    The approach is clearly illustrated in the rationale expressed in *Salimoff v Standard Oil Co. of New York*, in which the Court found that "to refuse to recognize Soviet Russia as a government regulating the internal affairs of the country, is to give to fictions an air of reality which they do not deserve."[41]

## IV.    The US Has an Established Practice of Engagement with *De Facto* Governments that it Has Not Formally Recognized.

22.    The US President's power to recognize foreign governments does not always involve a binary choice of recognition or non-recognition. In fact, throughout its history, the United States has frequently engaged with foreign governments in *de facto* control of a territory, despite not formally recognizing that government. Such engagement is a standard part of US foreign policy and allows the US to advance its national interests without undermining the President's freedom to decide whether or not to engage in formal recognition. When the President decides to treat a government as the *de facto* authority on a territory, but not to

---

[38] *Upright v. Mercury Business Machines*, 213 N.Y.S.2d 417, 419 (1961).

[39] Restatement (Third) of Foreign Relations Law § 205(3) (Am. L. Inst. 1987)

[40] Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena, 293 F.Supp. 892, 900 (S.D.N.Y.1968), *modified*, 433 F.2d 686 (2d Cir.1970), *certiorari denied*, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971)

[41] *M. Salimoff & Co. v. Standard Oil Co. of New York*, 262 N.Y. 220, 227 (1933); Brownlie 2008, *supra* note 19, at 152.

formally recognize the government, the President is exercising his constitutional "control over recognition decisions."[42] In such cases, the President has decided to engage with the foreign government as the *de facto* authority over the territory, but to refrain from formal recognition through one of the processes described above. Such a decision is an express foreign policy choice, usually intended to allow effective functioning of the nation's foreign policy, without the conferral of legitimacy that may flow from formal recognition.

23.     Among numerous historical examples of the US executive deciding to engage with a foreign government without formally recognizing it, two are particularly illustrative: US policy toward the Soviet Union between 1917 and 1933, and toward Taiwan since 1972. Both cases illustrate the policy choice of the US executive to engage with a foreign government without formal recognition and the broad range of activities the US conducts with such governments without implying recognition.

24.     On December 6, 1917 the US Government terminated its diplomatic relations with the Russian Empire. After a brief recognition of a Provisional Government, President Wilson decided, consistent with his discretionary power over formal recognition, not to recognize the new Bolshevik regime because it refused to honor debts incurred by the prior government.[43] In the nearly two decades the followed, the US had robust political, diplomatic, and commercial engagement with the Soviet government, which it continued not to recognize. For example, in 1921, the US government's American Relief Administration negotiated and signed an implementation agreement with Soviet officials so as to provide famine relief

---

[42] *Zivotofsky v. Kerry*, 576 U.S. 13 (2015).

[43] Office of the Historian, *Recognition of the Soviet Union, 1933*, U.S. Department of State, https://history.state.gov/milestones/1921-1936/ussr (last visited Nov. 9, 2022).

assistance.[44] In 1921, the US formally lifted a ban on trade with Russia and annual bilateral trade

reached more than $140 million in 1930.[45] In 1928, the US and the Soviet Union both signed the

Kellogg-Briand Pact, forbidding recourse to war under international law.[46] So too, a range of US

companies engaged with Soviet Russia in the 1920s. It was not, however, until November 15,

1933 that President Roosevelt formally recognized the Soviet Union through the Roosevelt-

Litvinov Agreement and dispatched the first US Ambassador to the Soviet Union.[47]

25.    US relations with Taiwan offer a second useful example. Prior to 1979, the US

Government recognized the government seated in Taipei as the government of China. However,

that year the US switched its recognition, withdrawing formal recognition of the Taipei

government and officially recognizing the government in Beijing as the legitimate government of

China.[48] Also in 1979, the US Congress passed the Taiwan Relations Act, affirming that,

notwithstanding the lack of formal recognition, the US would maintain significant relations with

Taiwan, including the sale of arms,[49] a range of programs, transactions, and other relations with

the people on Taiwan,[50] allowing Taiwan to sue and be sued in US courts,[51] continuing the

commitments contained in "all treaties and international agreements which were in force

between the US and Taiwan," and the establishment of bilateral relations through the American

---

[44] Benjamin M. Weissman, *Herbert Hoover and the Famine in Soviet Russia, 1921-23*, *in* Herbert Hoover Reassessed 390-96 (Mark Hatfield ed., 1981).

[45] Harold Kellock, *American and British Relations with Russia*, CQ Press (Apr. 1, 1963), https://library.cqpress.com/cqresearcher/document.php?id=cqresrre1943040100.

[46] Office of the Historian, *The Kellogg-Briand Pact, 1928*, U.S. Department of State, https://history.state.gov/milestones/1921-1936/kellogg (last visited Nov. 9, 2022).

[47] *Recognition of the Soviet Union*, *supra* note 43.

[48] Bureau of East Asia and Pacific Affairs, *U.S. Relations with Taiwan*, U.S. Department of State (May 28, 2022), https://www.state.gov/u-s-relations-with-taiwan/.

[49] Taiwan Relations Act, 22 U.S.C. § 3301(b)(5).

[50] Taiwan Relations Act § 3303(b)(2).

[51] Taiwan Relations Act § 3303(b)(7),

Institute in Taiwan.[52] The US has maintained extremely close working relations with Taiwan over the succeeding decades. In 1982, President Reagan offered Taiwan formal assurances as to its security and sovereignty.[53] The US has continued arms sales to Taiwan and has sent high level government officials to Taiwan including in 2022 Speaker of the House Nancy Pelosi. The US and Taiwan are both part of numerous international organizations, including the World Trade Organization, the Asia-Pacific Economic Cooperation Forum, and the Asian Development Bank.[54]

26.     Consistent with the Taiwan Relations Act, US courts treat Taiwan as a sovereign in many respects, without in any way formally recognizing it. Specifically, the Foreign Sovereign Immunities Act applies to Taiwan, notwithstanding the fact that such applicability is usually the result of formal recognition. 22 U.S.C. § 3303(b)(1) provides that "[w]henever the laws of the United States refer to or relate to foreign countries, nations, states, governments, or similar entities, such terms shall include and such laws shall apply with respect to Taiwan." Recent decisions continue to affirm this approach. For example, in *Kuo v. Government of Taiwan,* the court found that Taiwan and its Ministry of Defense are properly treated as "foreign state" defendants and dismissed the case against them.[55]

**V.     Acknowledgement the Taliban's of Control of DAB is Fully Consistent With the Policy of the US Executive to Treat the Taliban as the *De Facto* Government of Afghanistan, Even Without Formal Recognition.**

---

[52] Taiwan Relations Act §§ 3305, 3310.

[53] Cong. Rsch. Serv., IF11665, President Reagan's Six Assurances to Taiwan, (Oct. 8, 2020). f

[54] *U.S. Relations with Taiwan, supra* note 48. /

[55] *Kuo v. Gov't of Taiwan*, No. 17-CV-10156 (JPO), 2019 WL 120725, at *2 (S.D.N.Y. Jan. 7, 2019), *aff'd sub nom. Sheafen Kuo v. Gov't of Taiwan*, 802 F. App'x 594 (2d Cir. 2020); *see also Lu v. Cent. Bank of Republic of China Taiwan*, No. LACV1200317JAKRZX, 2013 WL 12128821 (C.D. Cal. June 18, 2013), *aff'd sub nom. Lu v. Cent. Bank of Republic of China (Taiwan)*, 610 F. App'x 674 (9th Cir. 2015).

27. The Soviet and Taiwan situations clearly demonstrate that the US government is legally entitled and politically capable of deep engagement with *de facto* governments that the US has expressly chosen not to formally recognize. Such engagement, including giving effect to the legal decisions and decrees of the relevant *de facto* authorities, do not trigger formal recognition.

28. This is exactly the policy choice to date of the US executive with respect to the Taliban in Afghanistan. As early as August 2021, just days after the US military withdrawal from Afghanistan and the Taliban's seizure of Kabul, Secretary of State Blinken acknowledged: "the Taliban, whether we like it or not, is in control—largely in control of the country, certainly in control of the city of Kabul."[56] Responding to questions from Congress in September 2021, Secretary Blinken expressly stated that the Taliban is "the de facto government of Afghanistan. Those are just the facts."[57] The US has also recognized that the Taliban is in fact running key governmental institutions in Afghanistan, including its central bank. In a joint statement of September 14, 2022, the US Departments of State and Treasury noted that the economic situation in Afghanistan is continuing to deteriorate "due to the Taliban's poor economic management and failure to restore critical capabilities to DAB."[58]

29. The United States has also maintained regular contacts with the Taliban since its seizure of power in the summer of 2021 on issues from humanitarian aid to terrorism to prisoner

---

[56] Press Release, Antony J. Blinken, U.S. Secretary of State, Secretary Antony J. Blinken on Afghanistan (Aug. 25, 2021).

[57] Amanda Macias, *Secretary of State Blinken calls Taliban 'the de facto government of Afghanistan'*, CNBC, Sept. 13, 2021, https://www.cnbc.com/2021/09/13/secretary-of-state-blinken-calls-taliban-the-de-facto-government-of-afghanistan.html.

[58] Press Release, U.S. Department of Treasury, Joint Statement by U.S. Treasury and State Department: The United States and Partners Announce Establishment of Fund for the People of Afghanistan (Sept. 14, 2022).

exchanges.[59] At least two high profile U.S.-Taliban meetings have occurred in recent months. In July 2022, a "senior interagency delegation from the Department of State and the Department of the Treasury" met with "senior Taliban representatives" in Uzbekistan to discuss the humanitarian situation in Afghanistan and "ongoing efforts to enable the $3.5 billion in licensed Afghan central bank reserves to be used for the benefit of the Afghan people."[60] In October 2022, the Deputy Director of the CIA and the State Department's special representative for Afghanistan met with a Taliban delegation in Doha, Qatar.[61]

30.   The US executive has termed this policy choice one of "pragmatic engagement." Under this policy, the US will continue to engage diplomatically with the Taliban and provide humanitarian aid to the Afghan people, while conditioning the prospect of future recognition on improvements in the Taliban's governance and policies.[62] As Secretary Blinken explained: "[t]he Taliban can earn that legitimacy [of formal recognition] gradually, over time, through a sustained pattern of action that demonstrates a genuine commitment to core expectations that are enshrined in the Security Council resolution adopted on August 30th."[63] The goal of US policy is not to deny the reality that the Taliban is the *de facto* government running Afghanistan nor that it

---

[59] Karen DeYoung, *U.S. holds first direct talks with Taliban since withdrawal*, Washington Post, Oct. 9, 2021, https://www.washingtonpost.com/national-security/us-taliban-talks/2021/10/09/0e4326ee-2914-11ec-8831-a31e7b3de188_story.html; *see also* Press Briefing, White House, Background Press Call by Senior Administration Officials on the Release of Mark Frerichs (Sept. 19, 2022) (stating that "We undertook months of tough negotiations with the Taliban for Mark's release.").

[60] Media Note, Office of the Spokesperson, U.S. Department of State, U.S. Delegation Meeting with Taliban Representatives on Afghan Central Bank Reserves (July 28, 2022).

[61] Alex Marquardt, *First on CNN: Top US officials hold first in-person meeting with the Taliban since the US killed al Qaeda's leader in July*, CNN, Oct. 8, 2022, https://www.cnn.com/2022/10/08/politics/us-taliban-talks-wasiq-qatar.

[62] *See generally* Joint Declaration between the Islamic Republic of Afghanistan and the United States of America for Bringing Peace to Afghanistan, Taliban-U.S., Feb. 29, 2020.

[63] Antony Blinken, U.S. Sec'y of State, Remarks at Ramstein Air Base: Secretary Antony J. Blinken Opening Remarks at Ministerial on Afghanistan (Sept. 8, 2021).

controls the agencies and instrumentalities of the state. Rather, the goal is to advance US policy objectives *while* maintaining the leverage that comes with the prospect of future recognition.

31. US courts may give effect to this express policy choice made by the President under his recognition powers. The Court may permissibly acknowledge, as the US executive has, that the Taliban is in *de facto* control of Afghanistan, including DAB. In fact, the acknowledgement of the Taliban's *de facto* control is fully consistent with the US executive's decision to block Afghanistan's assets precisely because the Taliban was in control of Afghanistan. I understand the Joint Creditors to be arguing that, for purposes of resolving their turnover motions, the Court does not need to decide whether or not the Taliban is acting as a *de facto* government. But if the Court were to treat the Taliban as the *de facto* government of Afghanistan, even that would not usurp the President's recognition powers. Rather, it would be fully consistent with both longstanding precedent and the manner in which the President has chosen to engage the Taliban. Under well-settled applicable law and U.S. practice, it would in no way constitute an act of tacit recognition with legal consequence beyond what the executive has already done.

\*\*\*

I declare that the foregoing is true under penalty of perjury of the laws of the United States.

Executed this 10th day of November, 2022 in Philadelphia, Pennsylvania.

By: _____
William W. Burke-White

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:                        :       <u>MEMORANDUM DECISION</u>
                             :          <u>AND ORDER</u>

TERRORIST ATTACKS ON      :
SEPTEMBER 11, 2001           :      03 MDL 1570 (GBD) (SN)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This document relates to:

> *Smith v. The Islamic Emirate of Afghanistan, et al.*, No. 01-cv-10132
> *Havlish, et al. v. Bin Laden, et al.*, No. 03-cv-9848
> *Fed. Ins. Co. et al. v. Al Qaida, et al.*, No. 03-cv-6978
> *John Does 1 Through 7 v. The Taliban, et al.*, No. 20-mc-740

GEORGE B. DANIELS, United States District Judge:

Four groups of judgment creditors (the "Judgment Creditors")[1] with judgments

against the Taliban stemming from the terrorist attacks on September 11, 2001 (the "9/11

Attacks") and other terrorist attacks moved for turnover of funds to satisfy their judgments

with assets in the name of Afghanistan's central bank, Da Afghanistan Bank ("DAB"),

presently being held at the Federal Reserve Bank of New York ("FRBNY"). (ECF Nos.

7763, 7767, and 7936 in No. 03-md-1570; ECF No. 62 in No. 01-cv-10132; ECF No. 597 in

No. 03-cv-9848.) On February 21, 2023, this Court adopted Magistrate Judge Sarah

Netburn's August 26, 2022 Report and Recommendation, (the "Report," ECF No. 8463), in

its decision denying the turnover motions, (the "Decision," ECF No. 8866). This Court

ruled that DAB funds are not the property of the Taliban available to satisfy the Taliban's

judgment debts. Specifically, this Court found that it lacks subject-matter jurisdiction over

---

[1] The Judgment Creditors are the four sets of Plaintiffs in: *Smith v. The Islamic Emirate of Afghanistan, et al.*, No. 01-cv-10132 (the "*Smith* Creditors"), *Havlish, et al. v. Bin Laden, et al.*, No. 03-cv-9848 (the "*Havlish* Creditors"), *Fed. Ins. Co. et al. v. Al Qaida, et al.*, No. 03-cv-6978 (the "*Federal Insurance* Creditors"), and *John Does 1 Through 7 v. The Taliban, et al.*, No. 20-mc-740 (the "*Doe* Creditors"). The Judgment Creditors refer to themselves as the "Joint Creditors."

the turnover motions under the Foreign Sovereign Immunities Act ("FSIA"), (Decision at 10–22), and that it is constitutionally restrained from determining that the Taliban is the legitimate government of Afghanistan as required to attach DAB's assets, (Decision at 22–29). The Judgment Creditors now move to stay that Decision pending appeal. (Letter Mot. to Stay, ECF No. 8869.) For the reasons stated herein, the Judgment Creditors' motion to stay is DENIED.

Courts consider four factors when determining whether to grant a stay: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether [it] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted); *accord SEC v. Daspin*, 557 F. App'x 46, 47–48 (2d Cir. 2014). The first two factors are "the most critical." *Nken*, 556 U.S. at 434. Likelihood of success on the merits can be satisfied when "there are 'serious questions' going to the merits of the dispute and the applicant is able to establish that the balance of hardships tips *decidedly* in its favor." *In re A2P SMS Antitrust Litig.*, No. 12-CV-2656, 2014 WL 4247744, at *2 (S.D.N.Y. Aug. 27, 2014) (quoting *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)). "The degree to which a factor must be present varies with the strength of the others." *Daspin*, 557 F. App'x at 48. Moreover, the "probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (quotation marks and citation omitted).

2

The Judgment Creditors have failed to show that they are likely to succeed on the merits of their turnover motions. In their letter request, the Judgment Creditors reference their Objections to the Report, (*see* ECF No. 8733), "the complexity of these proceedings," and "the substantial arguments offered by the [Judgment] Creditors in support of turnover." (Letter Mot. to Stay at 1.) This Court considered the Judgment Creditors' Objections and arguments in its review of the Report, and concurred instead with Magistrate Judge Netburn's interpretation of the Terrorism Risk Insurance Act of 2002 ("TRIA")[2] and the Executive Branch's constitutional authority to recognize foreign governments. For the reasons provided in this Court's Decision, this Court finds these rationales compelling. The Judgment Creditors have not shown that they are likely to succeed on the merits of both their TRIA interpretation and constitutional arguments, so as to ultimately prevail in the turnover of DAB funds.

The Judgment Creditors have also failed to demonstrate the irreparable injury they will suffer from the denial of their turnover requests. They state that a stay is appropriate due to the "irreparable harm that more than 10,000 members of the 9/11 community would face should restraints on Da Afghanistan Bank's assets be dissolved." (Letter Mot. to Stay at 1.) However, the Judgment Creditors did not have access to the DAB funds prior to this Court's Decision, and they do not have access to the DAB funds after this Court's Decision; that status quo is undisturbed. The Judgment Creditors cite two other cases in this District in which parties are pursuing DAB assets in arguing that "[a] stay will preserve the 9/11 community's ability to recover should the Second Circuit order turnover." (*Id.* at 1 n.1

---

[2] TRIA § 201, Pub. L. No. 107-297, 116 Stat. 2337, as amended, Pub. L. No. 112-158, 126 Stat. 1260 (codified at 28 U.S.C. § 1610 note).

(citing *Owens v. the Taliban*, No. 22-cv-1949-VEC (S.D.N.Y.); also citing *Bushnell v. Islamic Emirate of Afghanistan*, No. 22-cv-8901-JSR (S.D.N.Y.)).)[3]  This Court's Decision, however, does not address the priority of creditors' attachments or the 9/11 Judgment Creditors' relationship to the potential creditors in the other proceedings.

Moreover, there is currently no immediate threat of dissipation of the funds being held at the FRBNY that might prejudice the rights of Plaintiffs in this multidistrict litigation. On February 3, 2023, the President issued a one-year extension of the national emergency on the humanitarian crisis in Afghanistan. *See* Continuation of the National Emergency with Respect to the Widespread Humanitarian Crisis in Afghanistan and the Potential for a Deepening Economic Collapse in Afghanistan, 88 Fed. Reg. 7837 (Feb. 3, 2023).  That notice of extension continues to block DAB funds under Executive Order 14,064,[4] recognizing that "[v]arious parties, including representatives of victims of terrorism, have asserted legal claims against certain property of DAB." *Id.*  Thus, the Decision would not prejudice any of the Judgment Creditors' asserted priority or alter the current status quo, were they ultimately to prevail on appeal of the denial of their motions.  No irreparable harm exists.

Staying this Court's Decision risks injuring the other interested parties in leaving the turnover issues ambiguously resolved.  This Court declines to temper its ruling. *Contra Northern Mariana Islands v. Millard*, 287 F.R.D. 204, 215 (S.D.N.Y. 2012).  More

---

[3] The *Owens* and *Bushnell* cases are in their infancy and without judgments with which any plaintiffs' claims might be satisfied with the restrained DAB funds.

[4] *See* Exec. Order No. 14,064 § 1(a), 87 Fed. Reg. 8391 (Feb. 11, 2022) ("All property and interests in property of DAB that are held, as of the date of this order, in the United States by any United States financial institution, including the Federal Reserve Bank of New York, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in . . . .").

4

concretely, a stay is not within the public interest. As this Court has recently held, the public interest in this long-standing multidistrict litigation on the 9/11 Attacks lies in dispensing the most expeditious justice against all those responsible for the worst terrorist attack in our nation's history. (*See* Jan. 12, 2023 Order, ECF No. 8828, at 6.) This Court concurs with the Judgment Creditors that an important public interest lies in "the enforcement of terrorism judgments." (Letter Mot. to Stay at 1.) But that enforcement must be in accordance with the U.S. Constitution, federal statutes, and state law. The public interest, both in the United States and abroad, compels this Court's adjudication and resolution on whether the Judgment Creditors have the right to take Afghanistan's money deposited by Afghan civilians and international donors to satisfy the debts of the Taliban. The Judgment Creditors have been heard and have established no such right.

The Judgment Creditors have failed to meet the standard for a stay. Therefore, the Judgment Creditors' letter motion to stay this Court's Decision dated February 21, 2023 (ECF No. 8869 in 03-md-1570; ECF No. 102 in 01-cv-10132; ECF No. 1186 in 03-cv-06978; ECF No. 682 in 03-cv-09848; ECF No. 144 in 20-mc-00740) is DENIED.

The Clerk of Court is directed to close the open letter motions accordingly.

Dated: February 24, 2023
New York, New York

SO ORDERED.

_Jeorge B. Daniels_
GEORGE B. DANIELS
United States District Judge

5

**App.683**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | Multidistrict Litigation No. 03-md-1570 (GBD)(SN) |
| FIONA HAVLISH, individually and on behalf of the ESTATE OF DONALD G. HAVLISH, JR., Deceased, *et al.*,<br><br>    Plaintiffs-Judgment Creditors,<br><br>v.<br><br>FEDERAL RESERVE BANK OF NEW YORK,<br><br>    Garnishee. | Member Case No. 03-cv-9848 (GBD)(SN) |

## NOTICE OF APPEAL

Notice is given this 27th day of February, 2023, that Plaintiffs-Judgment Creditors Fiona Havlish, *et al*. ("Havlish Judgment Creditors"), all of the plaintiffs-judgment creditors in the above-captioned case, hereby appeal to the United States Court of Appeals for the Second Circuit from the final order entered by the Honorable George B. Daniels on February 21, 2023 (ECF No. 8866 in 03-md-1570; ECF No. 681 in 03-cv-9848), and all other orders that are merged into that final order or that are otherwise appealable. The full list of the Havlish Judgment Creditors is attached as Exhibit A.

Dated: February 27, 2023

*/s/ Lee Wolosky*
Lee Wolosky
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1628
lwolosky@jenner.com

Douglass A. Mitchell
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6090
dmitchell@jenner.com

*Counsel for the Havlish Judgment Creditors*

# EXHIBIT A

## LIST OF HAVLISH JUDGMENT CREDITORS

Alan Gu
Diane Romero
Alexander Rowe
Alice Carpeneto
Angela Stergiopoulos
Anne Marie Dorf
Barry Russin
Benefit of Devon Marie Rodak
Benefit of Maranda C. Ratchford
Brenda Sorenson
Brian Collman
Catherine Deblieck
Charles Collman
Chelsea Nicole Rodak
Christina Bane-Hayes
Christine Barton (now Pence)
Christine Papasso
Christopher Caproni
Clara Chirchirillo
Corazon Fernandez
Daniel D. Coffey, M.D.
Diane Romero
Dolores Caproni
Donald Bane
Donald Havlish, Sr.
Doyle Raymond Ward
Dwayne W. Collman
Ed Russin
Ellen Saracini
Estate of Andrew Stergiopoulos
Estate of Brian Nunez
Estate of Daniel M. Coffey
Estate of Denis Lavelle
Estate of Donald J. Havlish, Jr.
Estate of Dorthy Mauro
Estate of Edward W. Straub
Estate of Elvin Romero
Estate of George Eric Smith
Estate of James D. Halvorson
Estate of Jason Coffey
Estate of Jeanmarie Wallendorf
Estate of Jeffrey Coale
Estate of Jeffrey Collman
Estate of Jennifer Tino
Estate of John Grazioso

Estate of John M. Rodak
Estate of John William Perry
Estate of Joseph Lostrangio
Estate of Joshua Scott Reiss
Estate of Judy Fernandez
Estate of Liming Gu
Estate of Linda Ellen Panik
Estate of Maria Theresa Santillian
Estate of Marsha Dianah Ratchford
Estate of Martin Boryczewski
Estate of Mary Melendez
Estate of Meta Waller
Estate of Michael A. Bane
Estate of Michael Boryczewski
Estate of Michael Diehl
Estate of Paul K. Sloan
Estate of Peter Chirchirillo
Estate of Peter T. Milano
Estate of Philip Paul Ognibene
Estate of Richard M. Caproni
Estate of Richard Rosenthal
Estate of Robert Levine
Estate of Ronald Gamboa
Estate of Salvatore T. Papasso
Estate of Scott Schertzer
Estate of Stephen Dorf
Estate of Steven Cafiero
Estate of Timothy P. Soulas
Estate of Timothy Raymond Ward
Estate of Victor Saracini
Estate of Vincent A. Ognibene
Estate of William R. Godshalk
Estate of William R. Steiner
Estate of Yvette Nichole Moreno
Ester Santillian
Expedito Santillian
Fiona Havlish
Frances M. Coffey
FuMei Chien
George Stergiopoulos, M.D.
Gerald Bingham
Gloria Russin
Grace Kneski
Grace M. Parkinson-Godshalk
Guardian of Anne C. Saracini

Haomin Jian
Helen Rosenthal
Hui-Chien Chen
Hui-Chuan Jian
Hui-Zon Jian
Huichun Jian
Ivy Moreno
Jin Liu
Joan E. Tino
Joanne Gori
Joanne Lovett
Joanne Renzi
John Rodak
Joseph Dorf
Joslin Zeplin
Joyce Ann Rodak
Judith Reiss
Julia Boryczewski
Katherine Soulas
Kevin M. Coffey
Krystyna Boryczewski
Leona Zeplin
Leonard Zeplin
Linda Sammut
Lisa Caproni-Brown
Livia Chirchirillo
Loisanne Diehl
Loren Rosenthal
Margaret Mauro
Marie Ann Paprocki
Marshee R. Ratchford
Martin Panik
Mary Lynn-Anna Panik Stanley
Maureen Halvorson
Maureen R. Halvorson
Michael Caproni
Michael Loguidice
Michele Boryczewski
Michelle Wright
Morris Dorf
Pamela Schiele
Patricia J. Perry
Patricia Milano
Paul Schertzer
Ralph S. Maerz
Ramon Melendez

Raymond Doyle Smith
Regina Maria Merwin
Regina Rodak
Richard A. Caproni
Robert Dorf
Rodney M. Ratchford
Rodney Ratchford
Ronald S. Sloan
Roni Levine
Russa Steiner
Sandra Straub
Stephen L. Cartledge
Susan Conklin
Tara Bane
Teresanne Lostrangio
Tina Grazioso
William Coale
William Havlish

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN DOES 1 THROUGH 7,

        *Judgment Creditors,*

v.

THE TALIBAN, AL-QAEDA,
 and THE HAQQANI NETWORK,

        *Judgment Debtors,*

and

THE FEDERAL RESERVE BANK OF
NEW YORK,

        *Garnishee.*

Misc Action No. 1:20-mc-00740-GBD

**NOTICE OF APPEAL**

Notice is hereby given that Plaintiffs John Does 1 through 7 appeal to the United States Court of Appeals for the Second Circuit from the Memorandum Decision and Order of the Honorable George B. Daniels entered on February 21, 2023 (ECF 143).

The Plaintiffs/Judgment Creditors appeal from each and every part of the final judgment entered in this matter.

Dated:  February 28, 2023.

Respectfully submitted,

**do Campo & Thornton, P.A.**
Chase Bank Building
150 S.E. 2nd Avenue, Ste. 602
Miami, Florida 33131
Telephone: (305) 358-6600
Facsimile: (305) 358-6601

By:     s/ *Orlando do Campo*

App.691

Orlando do Campo
Bar Code: OD1969
od@dandtlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on February 28, 2023, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

<u>s/ *Orlando do Campo*      </u>
Orlando do Campo

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAYMOND ANTHONY SMITH, as Administrator of the Estate of George Eric Smith, deceased <br><br> Plaintiffs, <br><br> v. <br><br> THE ISLAMIC EMIRATE OF AFGHANISTAN, et al. <br><br> Defendants. | CASE NO. 01-cv-10132 (GBD) (SN) <br> 03 MDL 1570 (GBD) (SN) |

**NOTICE OF APPEAL**

Notice is given this 3rd day of March, 2023, that Plaintiffs-Judgment Creditors Raymond Anthony Smith, Administrator of the Estate of George Smith, and Katherine Soulas, Executrix of the Estate of Timothy P. Soulas (Smith/Soulas Creditors) hereby appeal to the United States Court of Appeals for the Second Circuit from the judgment entered by the Honorable George B. Daniels on 21 February 2023 (ECF No. 8866 in 03-md-1570; ECF No. 101 in 01-cv-10132), and all other orders that are merged into that final order or that are otherwise appealable.

Respectfully submitted,

**THE BEASLEY FIRM, LLC**

By:  */s/ Dion G. Rassias*
Dated: 03 March 2023        DION G. RASSIAS
JAMES E. BEASLEY, JR. (*pro hac vice*)
The Beasley Building
1125 Walnut Street
Philadelphia, PA 19107
215.592.1000
215.592.1523 (telefax)
Attorneys for Plaintiffs

THE BEASLEY FIRM, LLC
1125 WALNUT STREET
PHILADELPHIA, PA 19107
215.592.1000
215.592.8360 (FAX)
WWW.BEASLEYFIRM.COM

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In Re Terrorist Attacks on September 11, 2001 | Case No. 03-md-01570 (GBD)(SN) |
| Federal Insurance Company, et al., | Case No. 03-cv-06978 (GBD)(SN) |
|     *Plaintiffs-Judgment Creditors*, | |
| v. | |
| The Taliban, et al., | |
|     *Judgment Debtors*, | |
| and | |
| Federal Reserve Bank of New York, | |
|     *Garnishee*. | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiffs-Judgment Creditors Federal Insurance Company, Pacific Indemnity Company, Chubb Custom Insurance Company, Chubb Indemnity Insurance Company, Chubb Insurance Company of Canada, Chubb Insurance Company of New Jersey, Great Northern Insurance Company, Vigilant Insurance Company, Hiscox Dedicated Corporate Member Ltd., TIG Insurance Company, and Woburn Insurance Ltd. (the "*Federal Insurance Judgment Creditors*"), in the above named case, hereby appeal to the United States Court of Appeals for the Second Circuit from each and every part of the Memorandum Decision and Order entered by the Honorable George B. Daniels on February 21, 2023 (ECF No. 8866 in 03-md-01570; ECF No. 1185 in 03-cv-06978), a copy of which is attached as Exhibit A, and from each and every part of all other opinions and orders that are merged into that final order or are otherwise appealable.

Dated:  March 8, 2023

Respectfully submitted,

COZEN O'CONNOR

By:  __/s/  Sean P. Carter__
     Sean P. Carter, Esq.
     COZEN O'CONNOR
     One Liberty Place
     1650 Market Street, Suite 2800
     Philadelphia, PA 19103
     Tel: (215) 665-2105
     scarter1@cozen.com

     Attorney for the *Federal Insurance* Judgment
     Creditors

LEGAL\61757226\1

**App.695**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| *In re Terrorist Attacks on September 11, 2001* | 03-md-1570 (GBD) (SN)<br>ECF Case |

This document relates to:

*Ashton et al. v. al Qaeda Islamic Army, et al.*, 02-cv-6977 (GBD) (SN)
*Bauer et al. v. al Qaeda Islamic Army, et al.*, 02-cv-7236 (GBD) (SN)
*Burlingame v. Bin Laden, et al.*, 02-cv-7230 (GBD) (SN)
*Schneider et al. v. Islamic Republic of Iran*, 02-cv-7209 (GBD) (SN)

## NOTICE OF APPEAL

Notice is given this 23rd day of March, 2023, that Plaintiffs Kathleen Ashton *et al*., Virginia Bauer *et al.*, Sheri Burlingame *et al.*, and Cheryl Schneider *et al.* in the above-captioned cases, hereby appeal to the United States Court of Appeals for the Second Circuit from the final order entered by the Honorable George B. Daniels on February 21, 2023 (ECF No. 8866 in 03-md-1570; ECF No. 1917 in 02-cv-06977; ECF No. 226 in 02-cv-7236; ECF No. 280 in 02-cv-7230; and ECF No. 109 in 02-cv-7209), a copy of which is attached as Exhibit A, and all other orders that are merged into that final order or that are otherwise appealable. The full list of the Ashton, Bauer, Burlingame, and Schneider Plaintiffs is attached as Exhibit B.

Date: March 23, 2023
    New York, New York

Respectfully submitted,

**KREINDLER & KREINDLER LLP**

BY:    /s/ Andrew J. Maloney, III  
Andrew J. Maloney, III, Esq.
485 Lexington Ave., 28th Floor
New York, New York 10017
Tel: (212) 687-8181
amaloney@kreindler.com

*Counsel for Ashton Plaintiffs*

– and –

**SHER TREMONTE LLP**

Theresa Trzaskoma
Noam Biale
90 Broad Street, 23rd Floor
New York, New York 10004
Telephone: (212) 202-2600
Facsimile: (212) 202-4156
ttrzaskoma@shertremonte.com
nbiale@shertremonte.com

*Counsel for Ashton Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE:                                                    :          MEMORANDUM DECISION
                                                          :              AND ORDER
TERRORIST ATTACKS ON                                      :
SEPTEMBER 11, 2001                                        :          03 MDL 1570 (GBD) (SN)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This document relates to:

> *Ashton, et al. v. Al Qaeda Islamic, et al.*, No. 02-cv-06977
> *Burlingame, et al. v. Bin Laden, et al.*, No. 02-cv-07230
> *Bauer, et al. v. Al Qaeda Islamic Army, et al.*, No. 02-cv-07236
> *Leftt, et al. v. Kingdom of Saudi Arabia, et al.*, No. 18-cv-03353

GEORGE B. DANIELS, United States District Judge:

In July and August 2022, six groups of Plaintiffs moved this Court to issue partial final

default judgments against the Taliban and its former leader Mullah Muhammad Omar based on

injuries sustained in the September 11, 2001 terrorist attacks ("9/11 Attacks"). (*See* ECF Nos.

8274, 8298, 8335, 8363, and 8386;[1] ECF No. 75 in No. 18-cv-03353.[2]) Before this Court is

Magistrate Judge Sarah Netburn's March 15, 2023 Report and Recommendation (the "Report"),[3]

recommending that this Court grant the motions for default judgment and award damages for

certain claims against the Taliban and deny all other motions with leave to refile. (Report, ECF

No. 8929, at 1.) Magistrate Judge Netburn advised the parties that failure to file timely objections

---

[1] Unless otherwise indicated, all docket numbers refer to the main docket sheet for this multidistrict litigation. *See In re Terrorist Attacks on September 11, 2001,* No. 03-md-1570.

[2] Counsel appears to have transposed case names and misfiled its motion against the Taliban and Muhammad Omar in *Leftt, et al. v. Kingdom of Saudi Arabia, et al.*, No. 18-cv-03353, rather than in *Ashton, et al. v. Al Qaeda Islamic, et al.*, No. 02-cv-06977. (*See* Mot. Default J., ECF No. 75, at 1 (citing case as "*Ashton, et al. v. Al Qaeda Islamic, et al.*, No. 18-cv-03353").) Neither the Taliban nor Muhammad Omar is a named Defendant in *Leftt, et al. v. Kingdom of Saudi Arabia, et al.*, No. 18-cv-03353. (*See also Ashton* Pls.' Mar. 21, 2023 Letter, ECF No. 8942.)

[3] Magistrate Judge Netburn amended her original March 14, 2023 Report and Recommendation on the motions (ECF No. 8925) with updated exhibit numbers and a revised appendix. (Report at 1 n.2.)

1

to the Report would constitute a waiver on appeal. (*Id.* at 15.) *Dickey* Plaintiffs filed objections on March 28, 2023, (*see* Objections, ECF No. 8959).[4] Because *Dickey* Plaintiffs filed timely objections to the Report regarding default judgments both for parents and siblings of 9/11 victims and for claims filed after the statute of limitations, this Court undertakes a *de novo* review of those portions of the Report. After doing so, this Court ADOPTS the Report.

## I.   BACKGROUND[5]

Plaintiffs filed a complaint seeking to hold the Taliban and Mullah Muhammad Omar liable for injuries caused by the 9/11 Attacks. Pursuant to Court order (ECF No. 445), Plaintiffs served the Taliban and Omar by publication. (*See* 2005 Service Verifications, ECF Nos. 709 and 735.) On September 30, 2005, Plaintiffs filed their Sixth Amended Consolidated Master Complaint (ECF No. 1463), the operative complaint for these motions. (*See* Report at 2.) This complaint continued to name the Taliban and Omar as Defendants, with most Plaintiffs also named in the complaint and others added later. (*Id.* (citing Sixth Am. Consolidated Master Compl.; also citing Notice Am., ECF No. 7856).) After Defendants neither responded nor appeared, Plaintiffs moved for entry of default, which this Court granted on May 12, 2006. (*See* Order, ECF No. 1797.)

The present motions seek partial final default judgment against the Taliban and Omar on behalf of different groups of Plaintiffs: U.S. citizens and noncitizens, estate and personal injury Plaintiffs, and immediate family members and their functional equivalents. (*See* Report at 2 (listing motions).) These Plaintiffs have all been awarded relief against Iran and now seek similar damages against the Taliban and Omar. (*Id.*)

---

[4] Given Defendant's default in all related cases, no responses from Defendant are expected.

[5] This Court assumes familiarity with the general background of this multidistrict litigation and will only restate factual background as necessary to address the pending motions. Because the Report is adopted in full unless otherwise noted, this Court refers to facts detailed in the Report throughout this decision.

## II.   LEGAL STANDARDS

### A. Reports and Recommendations

A court "may accept, reject, or modify, in whole or in part, the findings or recommendations" set forth in a magistrate judge's report. 28 U.S.C. § 636(b)(1)(C). The court must review *de novo* the portions of a magistrate judge's report to which a party properly objects. *Id.* The court, however, need not conduct a *de novo* hearing on the matter. *See United States v. Raddatz*, 447 U.S. 667, 675–76 (1980). Rather, it is sufficient that the court "arrive at its own, independent conclusion" regarding those portions of the report to which objections are made. *Nelson v. Smith*, 618 F. Supp. 1186, 1189–90 (S.D.N.Y. 1985) (citation omitted).

Portions of a magistrate judge's report to which no or "merely perfunctory" objections are made are reviewed for clear error. *See Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006) (citations omitted). The clear error standard also applies if a party's "objections are improper—because they are 'conclusory,' 'general,' or 'simply rehash or reiterate the original briefs to the magistrate judge.'" *Stone v. Comm'r of Soc. Sec.*, No. 17-CV-569 (RJS) (KNF), 2018 WL 1581993, at *3 (S.D.N.Y. Mar. 27, 2018) (citation omitted). Clear error is present when "upon review of the entire record, [the court is] 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006) (citation omitted).

### B. Default Judgments

Rule 55(b)(2) of the Federal Rules of Civil Procedure authorizes the Court to enter default judgments against defendants who fail to appear in or defend cases against them. This process includes two steps: (1) determining that the defendant defaulted, and then (2) entering a default judgment. *Nationsbank of Fla. v. Banco Exterior de España*, 867 F. Supp. 167, 174 n. 9 (S.D.N.Y. 1994); *see also* Fed. R. Civ. P. 55(a)–(b). In defaulting, a defendant admits "all of the factual allegations of the complaint, except those relating to damages." *Au Bon Pain Corp. v. Artect, Inc.*,

3

653 F.2d 61, 65 (2d Cir. 1981). A court must evaluate those admissions to determine whether there is "a sufficient basis in the pleadings" to establish defendants' liability. *Di Marco Constructors, LLC v. Sinacola, Inc.*, 407 F. Supp. 2d 442, 445 (W.D.N.Y. 2006) (cleaned up); *accord Wagstaff-El v. Carlton Press Co.*, 913 F.2d 56, 57 (2d Cir. 1990). If there is a sufficient basis, the court then assesses damages, relying on plaintiffs' "affidavits or documentary evidence in lieu of an evidentiary hearing." *DIRECTV, Inc. v. Hamilton,* 215 F.R.D. 460, 462 (S.D.N.Y. 2003); *see also Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1992).

## III.   MAGISTRATE JUDGE NETBURN DID NOT ERR IN RECOMMENDING THAT ONLY CLAIMS BROUGHT BY U.S. CITIZENS AGAINST THE TALIBAN SHOULD BE GRANTED

Magistrate Judge Netburn properly assessed three groups of claims: (1) against Muhammad Omar; (2) by noncitizens against the Taliban; and (3) by U.S. citizens against the Taliban. (Report at 4–14.) This Court denies all claims against Omar. This Court denies without prejudice to refile all claims against the Taliban brought by noncitizens. This Court grants judgment against the Taliban on claims brought by U.S. citizens for damages consistent with prior awards against Iran.

### A. Defendant Muhammad Omar Is Dismissed, and All Motions for Default Judgments against Omar Are Denied as Moot

Plaintiffs' claims against former Taliban leader Muhammad Omar are not viable because he is dead and the Plaintiffs' Executive Committees ("PECs") do not intend to substitute any party for him. (Report at 4 (citing PECs' Sept. 16, 2022 Letter, ECF No. 8535; also citing Sept. 19, 2022 Report and Recommendation, ECF No. 8540).) Magistrate Judge Netburn previously recommended that all claims against Omar be dismissed, to which no party objected. (*See* Sept. 19, 2022 Report and Recommendation.) Finding "no clear error on the face of the record," *see Adee Motor Cars, LLC v. Amato*, 388 F. Supp. 2d 250, 253 (S.D.N.Y. 2005) (citation omitted), this Court adopts Magistrate Judge Netburn's September 19, 2022 Report and Recommendation

4

as to Muhammad Omar. Muhammad Omar is therefore dismissed from all actions in this multidistrict litigation pursuant to Federal Rule of Civil Procedure 25(a)(1). In accordance with the Report at issue for the present motions, this Court denies all motions for default judgments against Omar, (*see* Report at 4), leaving the pending motions for default against the Taliban.

### B. All Noncitizens' Motions for Default Judgment Are Denied without Prejudice

Motions by noncitizen estates and noncitizen solatium Plaintiffs ("noncitizen Plaintiffs") against the Taliban cite a number of causes of action under federal and state law. (*See id.*) The complaint, however, includes only three of these grounds: the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333 (Count Four); the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note (Count Five); and state law (Counts One, Two, and Three). (Report at 4–5 (citing Sixth Am. Consolidated Master Compl. ¶¶ 463–83).)

Magistrate Judge Netburn properly found that the ATA permits claims only by an injured "national of the United States . . . or his or her estate, survivors, or heirs," 18 U.S.C. § 2333(a), while TVPA claims may only be against individuals. (Report at 5.) Neither statute permits noncitizen Plaintiffs' claims against the unincorporated association of the Taliban.[6] As for state law, noncitizen Plaintiffs assert three claims: "Wrongful Death Based on Intentional Murder," "Survival Damages Based on Intentional Murder," and "Assault and Battery." (Report at 5 (citing Sixth Am. Consolidated Master Compl. ¶¶ 463–75.) Noncitizen Plaintiffs, however, fail to identify the specific "causes of action for which the plaintiffs seek damages," rendering this Court unable to determine with certainty the appropriate damages for each noncitizen Plaintiff. (*Id.* (quoting Jul. 11, 2022 Order, ECF No. 8198 (listing requirements for default judgment motions)).)

---

[6] Because noncitizen solatium Plaintiffs here do not clearly identify the nationalities of the decedents and bring their claims pursuant to ATA § 2333, this Court declines to rule on whether § 2333 permits noncitizens to bring solatium claims where decedent family members were U.S. citizens. (*See* Report at 5 n.3.)

This Court therefore denies without prejudice the motions brought by noncitizen Plaintiffs and directs that they may refile. In accordance with this Court's prior orders and Magistrate Judge Netburn's Report, any renewed motions are to address the bases for jurisdiction, address the relevant state or federal law authorizing the cause of action, identify the allegations in the complaint establishing liability for each cause of action, provide exhibits that designate the cause of action relevant to each request for damages, and assess the scope of damages available under the relevant law. (*See id.* at 5–6 (citing Jul. 11, 2022 Order).)

## C. U.S. Citizens' Motions for Default Judgment under the ATA against the Taliban Are Granted

In evaluating U.S. citizen Plaintiffs' motions, Magistrate Judge Netburn properly determined (1) who may sue under the ATA, (2) that the Taliban forfeited its statute of limitations defense, and (3) that citizen Plaintiffs are entitled to default judgment awards against the Taliban.

### 1. The Report Correctly Determined Who May Sue under the ATA

The ATA permits "any national of the United States" or "his or her estate, survivors, or heirs" to sue for "injur[ies]" caused by acts of terrorism. 18 U.S.C. § 2333(a). *Dickey* Plaintiffs argue that the ATA is "silent" as to which individuals may bring an ATA wrongful death claim and who qualifies as "survivors" or "heirs." (*See* Objections at 2–17.) *Dickey* Plaintiffs thus urge this Court to rely on state common law as a "gap filler" for determining who has a cause of action under the ATA, thereby ruling that only legal heirs have such a right. (*Id.* at 9–13.)

Magistrate Judge Netburn correctly found that immediate family members of people killed in terrorist attacks, not just their legal heirs, may sue under the ATA. (*See* Report 7–8.) First, a wrongful death caused by an act of international terrorism constitutes an "injury" under the ATA. *See, e.g.*, *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 490 (2d Cir. 2021) ("Plaintiffs-Appellants and their family members . . . were injured or *killed* in attacks carried out by Hamas" and sued

6

App.703

under the ATA, 18 U.S.C. § 2333) (emphasis added). Second, by its plain text, section 2333 distinguishes between "survivors" and "heirs." *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (courts should "give effect . . . to every word Congress used."). The ATA's statutory language is therefore clear both as to who may bring an ATA wrongful death claim and that individuals beyond "heirs" may sue, notwithstanding the *Dickey* Plaintiffs' reliance on unclear legislative history concerning the ATA. (*See* Objections at 4–6); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("We will not . . . allow[] ambiguous legislative history to muddy clear statutory language.")

Moreover, the ability of parents and siblings to seek relief for the 9/11 Attacks has longstanding support in both the law of this multidistrict litigation, *see, e.g.*, *Smith ex rel. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, 234–37 (S.D.N.Y. 2003) (awarding default judgments to parents and siblings); (Oct. 3, 2012 Order, ECF No. 2623 (same under the Foreign Sovereign Immunities Act with current framework)), and in other ATA cases, *see e.g.*, *Estates of Ungar ex rel. Strachman v. Palestinian Authority*, 304 F. Supp. 2d 232, 263 (D.R.I. 2004) (finding that use of the term "survivors" in § 2333(a) demonstrates Congress sought to extend liability to "family members who are not legal heirs"); *Knox v. Palestine Liberation Organization*, 442 F. Supp. 2d 62, 75 (S.D.N.Y. 2006) (holding parents and siblings are "survivors" under the ATA). This interpretation of the ATA does not depend on the choice of law analysis at issue in *Ungar* and *Knox*. *See Knox*, 442 F. Supp. 2d at 75 ("The *Ungar* court concluded that, based on the legislative history of the ATA and the underlying purpose of the ATA . . . , the term 'survivors' as used in § 2333(a) includes parents and grown siblings of United States nationals killed by an act of international terrorism."); (*Contra* Objections at 13–15).

7

Furthermore, the Court "has *discretion* [but is not required] to borrow from state law when there are deficiencies in the federal statutory scheme." *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) (emphasis added). This Court need not restrict to state law the interpretation of the term "survivors" in the ATA, particularly in light of the "distinct need for nationwide legal standards" in the ATA context. *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 98 (1991) (explaining when federal courts should "fill the interstices of federal remedial schemes with uniform federal rules"). Magistrate Judge Netburn thus correctly held that Americans directly injured, estates and heirs of Americans killed, and immediate family members (and functional equivalents of immediate family members) of Americans killed in the 9/11 Attacks can all bring claims under § 2333. (Report at 8.)

### 2. *The Report Properly Declined to Invoke the Statute of Limitations* Sua Sponte

"District court[s] ordinarily should not raise [the statute of limitations] *sua sponte*," *Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir. 1987), even in favor of a defendant who has never appeared in the case, *Sec. & Exch. Comm'n v. Amerindo Inv. Advisors*, 639 F. App'x 752, 754 (2d Cir. 2016); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114–15 (D.C. Cir. 2019) (holding that district court "lacked authority or discretion to *sua sponte* raise the terrorism exception's statute of limitations"). On January 2, 2013, Congress extended the statute of limitations for ATA cases related to the 9/11 Attacks to January 2, 2019. *See* Nat'l Def. Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 1251(c), 126 Stat. 1632, 2017 (2013). *Dickey* Plaintiffs urge this Court to deny other Plaintiffs' motions for default judgment filed after that date.[7] (*See* Objections 17–33.) Because the statute of limitations is "an affirmative defense that is waived [or

---

[7] *Dickey* Plaintiffs lack standing to assert the Taliban's statute of limitations defense against other Plaintiffs; it is thus incumbent on this Court to evaluate raising the defense *sua sponte*. (*See* Report at 9 n.5.)

8

forfeited] if not raised," *Kropelnicki v. Siegel*, 290 F.3d 118, 130 n.7 (2d Cir. 2002), and a district court raising the defense *sua sponte* is disfavored, this Court declines to dismiss *sua sponte* claims by other Plaintiffs against the Taliban as time-barred.

### 3. *U.S. Citizen Plaintiffs Are Entitled to Default Judgment Awards*

This Court has jurisdiction over the U.S. citizens' default judgment motions under the ATA, (*see* Report at 9–11), and Plaintiffs' allegations establish the Taliban's primary and aiding-and-abetting liability in the 9/11 Attacks,[8] (*see id.* at 11–13). This Court therefore enters default judgment against the Taliban in favor of U.S. citizen Plaintiffs and must assess Plaintiffs' damages.[9] The ATA supports "threefold" damages for pain and suffering, economic loss, and loss of solatium. 18 U.S.C. § 2333; (*see also* Report at 13 (citing cases)). This Court has previously awarded Plaintiffs such damages against Iran. (Report at 13 (citing orders).) Magistrate Judge Netburn correctly adopted and applied to the Taliban this Court's prior damages determinations of pain and suffering and economic damages for the estates of people killed, pain and suffering damages for people injured, and solatium damages for immediate family members (and their functional equivalents) of people killed in the 9/11 Attacks. (*Id.* (citing Plaintiffs' exhibits; also citing Appendix A (calculating damages for *Dickey* Plaintiffs)).) Having reviewed the exhibits filed by Plaintiffs against Iran and the new economic damages sought by the *Burlingame II* Plaintiffs (ECF No. 8364-1), this Court adopts the Report's recommendations and awards treble damages, as provided under § 2333, against the Taliban. (*See* Report at 13–14.)

---

[8] As alleged by Plaintiffs, the Taliban is a non-sovereign "unincorporated association." (*See* Report at 10; *see also* Feb. 21, 2023 Decision, ECF No. 8866, at 22–29 (holding that the United States has not recognized the Taliban as the government of Afghanistan and the Judiciary cannot do so).)

[9] Five citizen Plaintiffs (Diane Genco, Janlyn Scauso, Laurie Spampinato, Kimberly Trudel, and Cella Woo-Yuen) are excluded at counsel's request. (Report at 13 n.7 (citing Oct. 20, 2022 Letter, ECF No. 8660).)

Awards are subject to all caveats and corrections noted below and in Report Appendix A. Because U.S. citizens Plaintiffs named in the motion in Case No. 18-cv-03353 (ECF No. 75) have failed to demonstrate that they appear in the Sixth Amended Consolidated Master Complaint at ECF No. 1463, (*see* Report App. A), or file sufficient evidence as to economic damages and solatium damages, that motion is denied without prejudice and with leave to refile.[10]

## IV.   CONCLUSION

This Court GRANTS partial final default judgment as to U.S. citizen Plaintiffs listed in ECF Nos. 8275-1, 8275-3 (other than the five Plaintiffs' claims that will be adjudicated with the motion at ECF No. 8568, *see supra* note 9), 8364-1, 8380-1, 8380-2, 8490-1, 8755-1, 8755-3,[11] and Report Appendix A, subject to the corrections and caveats described therein.[12] It is

**ORDERED** that U.S. citizen Plaintiffs are awarded damages as provided in ECF Nos. 8275-1,[13] 8275-3,[14] 8364-1, 8380-1, 8380-2, 8490-1, 8755-1, 8755-3, and Report Appendix A;[15] and it is

---

[10] *See also supra* note 2 (noting motion also filed in case in which the Taliban is not a Defendant).

[11] Decedent columns should read "Michael Bocchino" and Plaintiff columns should read "Mary Ann Falzone, as Personal Representative of the Estate of Thomas Bocchino." (*See* ECF No. 8755-3, ¶ 3.)

[12] In accordance with the Report's recommendations and this Court's February 21, 2023 Decision denying Plaintiffs' motion to satisfy their judgments with DAB funds, the PECs' separate letter request to include "stay" language, staying the effect of default judgments issued to these new default judgment Plaintiffs, is DENIED. (*Contra* PECs' Mar. 24, 2023 Letter, ECF No. 8951.)

[13] Trebled damages of $18,893,874 are awarded to the Estate of Christine Barbuto (pain and suffering of $2,000,000 and economic loss of $4,297,958 for total compensatory of $6,297,958). (*Compare* ECF No. 8275-1, ¶ 27 (listing economic damages as $2,368,810), *with* ECF No. 3370-1, at 1 (listing economic damages as $4,297,958).)

[14] Trebled solatium damages of $25,500,000 are awarded to Frederick Irby (compensatory of $8,500,000). (*Compare* ECF No. 8275-3, ¶ 250 (relationship as parent but the amount of $4,250,000 for siblings), *with* ECF No. 4880, ¶ 441 (relationship as parent and the amount of $8,500,000 for parents).)

[15] Trebled solatium damages of $25,500,000 are also awarded to Anne Lynch, the child of decedent Farrell Lynch. (*Compare* Report at 17, *with* Decl. John F. Schutty, ECF No. 8387-8, at 4.)

10

**ORDERED** that prejudgment interest is awarded at a rate of 4.96 percent per annum, all interest compounded annually for the period from September 11, 2001 until the date of the judgment for damages; and it is

**ORDERED** that these Plaintiffs may apply for punitive, economic, and/or other damages at a later date, to the extent such damages were not sought in these motions.

Default judgment motion at ECF No. 75 in Case No. 18-cv-03353 and all noncitizen Plaintiffs' motions are DENIED without prejudice and with leave to refile. Muhammad Omar is dismissed from all actions in this multidistrict litigation. The Clerk of Court is directed to close the open motions (ECF Nos. 8274, 8298, 8335, 8363, 8386, and 8959 in 03-md-01570; ECF Nos. 1691, 1701, 1708, 1713, 1720, and 1934 in 02-cv-06977; ECF Nos. 230 and 234 in 02-cv-07230; ECF No. 167 in 02-cv-07236; ECF No. 75 in 18-cv-03353).

Dated: March 30, 2023
      New York, New York

SO ORDERED.

_____
GEORGE B. DANIELS
United States District Judge

11

App.708

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2023, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 30, 2023                    By:   Ian Heath Gershengorn