# 23-258(L)

**23-263(CON), 23-304(CON), 23-346(CON), 23-444(CON)**

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

FIONA HAVLISH, ET AL.,

*Plaintiffs-Appellants,*

KATHERINE SOULAS,

*Plaintiff,*

JANE DOE,

*Consolidated-Plaintiff,*

*v.*

THE TALIBAN, ET AL.,

*Defendants-Appellees,*

SHEIKH USAMA BID-LADEN, ET AL.,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF SUPPORTING AFFIRMANCE OF *AMICUS CURIAE*
NASEER A. FAIQ, *CHARGÉ D'AFFAIRES* OF THE PERMANENT
MISSION OF THE ISLAMIC REPUBLIC OF AFGHANISTAN
TO THE UNITED NATIONS**

Natasha Arnpriester
James A. Goldston
A. Azure Wheeler
OPEN SOCIETY JUSTICE INITIATIVE
224 West 57th Street
New York, NY 10019

Justin B. Cox
LAW OFFICE OF JUSTIN B. COX
PO Box 1106
Hood River, OR 97031

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................i

INTEREST OF *AMICUS CURIAE*.....................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................4

BACKGROUND ...................................................................................8

    I.   Foreign Sovereign Immunity ...........................................8

       A.  General Framework .................................................8

       B.  Terrorism-related Immunity Exceptions ...................11

    II.  Procedural History ..........................................................14

       A.  The Fall of Kabul and *Havlish* & *Doe* Execution Liens..............14

       B.  February 11, 2022: Executive Order, OFAC License, and Statement of Interest ....................................18

       C.  Turnover Motions, R&R, and District Court Decision ..............20

    III. Arguments on Appeal.......................................................22

ARGUMENT.........................................................................................22

    I.   THE DISTRICT COURT CORRECTLY HELD THAT IT LACKED JURISDICTION TO AUTHORIZE CONFISCATING AFGHANISTAN'S CENTRAL RESERVES TO SATISFY JUDGMENTS AGAINST THE TALIBAN..............22

CONCLUSION ....................................................................................36

CERTIFICATE OF COMPLIANCE ...................................................38

# TABLE OF AUTHORITIES

## CASES

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ...................................................................... 31, 32

*Bank Markazi v. Peterson*, 578 U.S. 212 (2016) ................................ 11, 28

*Bolivarian Republic of Venezuela v. Helmerich & Payne Intern'l Drilling Co.*, 581 U.S. 170 (2017) ................................ 8, 29, 31

*Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999) ........................................................................ 6

*Epperson v. Entertainment Express, Inc.*, 242 F.3d 100 (2d. Cir. 2001) ........................................................................... 31

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005) ........................................................................... 5, 7

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*") ................................ 13, 14, 25

*Geveke & Co., Int'l v. Kompania Di Awa I Elektrisidat Di Korsou N.V.*, 482 F. Supp. 660 (S.D.N.Y. 1979) ................................ 9

*Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428 (D.C. Cir. 2023) ........................................................................... 28

*Hibbs v. Winn*, 542 U.S. 88 (2004) ............................................... 25

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107 (2d Cir. 2016) ................................................................ 24

*Kucana v. Holder*, 558 U.S. 233 (2010) ......................................... 28

*Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009) ............. 13, 27

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96 (2d Cir. 2017) ...................................................... 34

*Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 448 F. Supp. 622 (S.D.N.Y. 1978) ................................................................ 34

*Peacock v. Thomas*, 516 U.S. 349 (1996) ..................................... 31

*Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134 (2014) ................................................................................. 10

*Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008) ............ 8, 33, 34

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ...................... 30

*Samantar v. Yousuf*, 560 U.S. 305 (2010) ................................. 25, 32, 35

*Smith ex rel. Estate of Smith v. FRBNY*, 346 F.3d 264 (2d Cir. 2003) ................................................................................. 27, 28

*Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023) ("*Halkbank*") ................................................... *passim*

*United States v. Assa Co. Ltd.*, 934 F.3d 185 (2d Cir. 2019)... 9, 31, 34, 35

*United States v. Prado*, 933 F.3d 121 (2d Cir. 2019) ............................ 26

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120 (2d Cir. 2019) .................................................................... 24

*Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480 (1983) .............. 10

*Walters v. Indus. & Commercial Bank of China*, 651 F.3d 280 (2d Cir. 2011) ............................................................... 9, 10, 24

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) ............................................................... 14, 24, 25, 30

**STATUTES AND STATUTORY PROVISIONS**

22 U.S.C. § 4308(f) ................................................................... 12

22 U.S.C. § 8772(a)(1) .............................................................. 28

28 U.S.C. § 1330 ................................................................. *passim*

28 U.S.C. § 1331 ............................................................. 7, 31, 32

28 U.S.C. § 1603 ...................................................................... 4

28 U.S.C. § 1604 ................................................................. *passim*

28 U.S.C. § 1605(a)(7) ......................................................... *passim*

28 U.S.C. § 1605A ............................................................... *passim*

28 U.S.C. § 1608 ..................................................................... 10

28 U.S.C. § 1609 .............................................................. 10, 23

28 U.S.C. § 1610.............................................................*passim*

28 U.S.C. § 1611.....................................................................10

Pub. L. No. 105-277 § 117 ....................................................12

Pub. L. No. 106-386 § 2002(f)...............................................12

Terrorism Risk Insurance Act (TRIA), Pub. L. No. 107-297
(*codified as amended at* 28 U.S.C. § 1610 note) .......................*passim*

## OTHER AUTHORITIES

Charlie Savage, *Taliban and 9/11 Families Fight for Billions
in Frozen Afghan Funds*, N.Y. Times, Nov. 29, 2021,
https://nyti.ms/3DtTJFZ .............................................................17, 18

H.R. Conf. Rep. 107-779 (2002), *available at* 2002 WL
31529126..................................................................................13

Form: Writ of Execution Against Property (S.D.N.Y.)
www.nysd.uscourts.gov/forms/writ-execution-against-
property ......................................................................................15

Joint Stmt. by U.S. Treasury and State Dep't: The United
States and Partners Announce Establishment of Fund for
the People of Afghanistan (Sept. 14, 2022),
https://home.treasury.gov/news/press-releases/jy0947 ....................19

Pres. Determination No. 2001-03, 65 Fed. Reg. 66483..........................12

Pres. Determination No. 99-1, 63 Fed. Reg. 59201.................................12

## INTEREST OF *AMICUS CURIAE*[1]

Naseer A. Faiq is the highest ranking Afghan diplomat in the United States. He has served as the *chargé d'affaires* of the Permanent Mission of the Islamic Republic of Afghanistan (Afghanistan) to the United Nations in New York since December 2021. Mr. Faiq has served Afghanistan as a diplomat for nearly two decades in various senior-level capacities, including as the Mission's Minister Counselor, Political Coordinator, and Economic Counsellor; and as Afghanistan's Deputy Director General of the Ministry of Foreign Affairs.

The Taliban, whose hostile occupation terrorizes Afghanistan, opposes Mr. Faiq's service in his current position, noting that he does not represent the Taliban regime—a regime that is not recognized as the government of Afghanistan by the international community or any individual country, including the United States. As Mr. Faiq stated in a speech to the UN Security Council, he does "not represent[] the former

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than counsel for *amicus curiae*—contributed money that was intended to fund preparing or submitting this brief.

government of Afghanistan … nor … the interest of any political group." Mr. Faiq strives to represent the interests of the Afghan people, who have endured "a relentless barrage of calamities" since the Taliban returned to power in August 2021, S.A.5, culminating in a devastating and ongoing humanitarian crisis exacerbated by the unavailability of their reserves held by the Federal Reserve Bank of New York ("FRBNY") for Da Afghanistan Bank ("DAB"), Afghanistan's central bank, S.A.6.

Mr. Faiq and the Afghan people have a paramount interest in the continued safeguarding of the State of Afghanistan's reserves. For more than forty years, the Afghan people have suffered from war, violence, conflict, and terrorism. Millions have lost their lives, been severely injured, or been forced to flee the nation altogether. After decades of hardship, many Afghans have hoped to reach a new age of durable and inclusive peace and prosperity. But following the reemergence of the Taliban, all fundamental rights are under attack, and Afghanistan is grappling with a humanitarian crisis of famine and extreme poverty. *See* App.618-19.

Mr. Faiq fully supports compensation for the Taliban's victims, including those who have obtained judgments in American courts. But

that compensation cannot come from the Afghan people, who are neither morally nor legally responsible for the tragic events of September 11, 2001, or other acts of terrorism committed by the Taliban. To the contrary, countless Afghans worked alongside Americans as allies to push and keep the Taliban from power, in furtherance of the United States' global fight against terrorism. To this day, in the face of reprisal, including death, brave Afghans continue to resist the Taliban regime, motivated by the hope that they, too, can someday enjoy the liberty, freedom, and democracy found elsewhere.

Given the absence of adversarial briefing and the importance of Afghanistan's reserves to the future of the Afghan people, Mr. Faiq submits this brief to explain how jurisdictional defects in the turnover proceedings demonstrate that that the district court was right to conclude that the Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107-297 (*codified as amended at* 28 U.S.C. § 1610 note), does not authorize the Taliban's creditors to satisfy their judgments with Afghanistan's reserves. Mr. Faiq also agrees with and adopts the arguments of *amici* Afghan and Afghan-American Civil Society Organizations (filing contemporaneously) about how, even if there were

jurisdiction, the TRIA does not authorize creditors satisfying their judgments with assets in which the debtor has no property interest.

Should the Court decide to hold oral argument on these appeals, counsel for Mr. Faiq is available to participate.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court correctly denied Joint Creditors' turnover motions, which sought to satisfy default judgments against the Taliban with $3.5 billion of Afghanistan's reserves held in the name of DAB, which must be treated as the foreign state itself under the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1603(a); S.A.12. The TRIA, on which the Taliban's creditors rely, does not authorize taking the property of a foreign sovereign to satisfy judgments against third parties, particularly where, as here, there is no subject matter (adjudicative) or personal jurisdiction over the sovereign, no ability to obtain either, and the sovereign is not a party to the proceedings. As the district court held, at most the TRIA abrogates execution immunity, and not jurisdictional. S.A.11-19.

The Joint Creditors contest the district court's jurisdictional holding on two alternate grounds. First, they contend that the TRIA's

"notwithstanding" clause abrogates DAB's jurisdictional immunity under 28 U.S.C. § 1604 of the FSIA; and second, that § 1604 does not apply at all because (they argue) it only precludes *in personam* claims, which the Taliban's creditors do not have. J. Creditors' Br., ECF 118 ("J.C.__") at 27-53.

In view of the overall statutory structure and design, basic requirements of civil litigation, and the "bedrock principle" that district courts are "courts of limited jurisdiction," *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552-53 (2005), it is plain that these jurisdictional arguments are wrong, and that the TRIA does not authorize turnover of DAB's assets here. Indeed, even if the Court accepts either of the Joint Creditors' arguments about jurisdictional *immunity*, the district court still lacked jurisdiction to order turnover. This Court should affirm.

1. The district court correctly held that the TRIA at most abrogates execution immunity, and not jurisdictional. This conclusion is plain from the TRIA's text, context, history, purpose, and controlling precedent. *Every* case the Joint Creditors cite to support their position that the TRIA authorizes executing on sovereign assets involved creditors who already

had FSIA judgments against that sovereign. This means that jurisdictional immunity had necessarily been overcome before the TRIA ever came into play at the post-judgment stage. The TRIA is an execution statute, and so its "notwithstanding" clause has no bearing on jurisdictional immunity under § 1604 of the FSIA.

2. The Joint Creditors' alternative argument, that § 1604 does not apply in the first place because they have no *in personam* claims against Afghanistan, is directly contrary to the text of § 1604—which provides that "a foreign state shall be immune from the jurisdiction of the courts" without regard to the nature of the claim—and a central purpose of the FSIA: to *prevent* the location of a sovereign's assets from giving a court jurisdiction. *See, e.g.*, *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 253 (2d Cir. 1999). The creditors premise their attempt to cabin § 1604 on the FSIA's affirmative grant of jurisdiction, 28 U.S.C. § 1330, which is limited to *in personam* claims. But Congress's decision to limit jurisdiction over foreign sovereigns to *in personam* proceedings (in § 1330) does not mean that its decision to grant immunity (in § 1604) is somehow also limited to *in personam* claims; this makes no sense. The only authority the Joint Creditors cite in support of their implausible

interpretation is the Supreme Court's recent decision in *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023) ("*Halkbank*"), which the Joint Creditors misrepresent to claim it supports their position when it does the opposite, by reiterating yet again that the FSIA is the *only* avenue for U.S. courts to obtain jurisdiction over a foreign sovereign in civil litigation. In addition, if the FSIA is wholly inapplicable as Joint Creditors argue, then Afghanistan's reserves would be absolutely immune under common law. *See id.* at 280-81.

3. Regardless, even if Afghanistan's jurisdictional immunity is entirely abrogated or inapplicable, the Joint Creditors still lack a *source* of statutory jurisdiction. *See Allapattah Servs.*, 545 U.S. at 552 ("[D]istrict courts may not exercise jurisdiction absent a statutory basis."). They claim in passing that the district court had jurisdiction under the federal question statute, 28 U.S.C. § 1331, or ancillary jurisdiction, J.C.27, but neither confers adjudicative jurisdiction over a foreign sovereign (nor personal jurisdiction over anyone). As has long been clear, and as *Halkbank* reinforced, the FSIA is the sole avenue through which a court can exercise jurisdiction over a foreign sovereign in civil litigation. 598 U.S. at 272-73.

4.   Finally, even if the district court theoretically *could* have exercised jurisdiction over Afghanistan, it did not do so here. None of the Taliban's creditors sought to join Afghanistan or DAB as a party to their turnover proceedings, and thus they were absent. The Supreme Court has held expressly that district courts cannot adjudicate claims regarding assets that *might* belong to a foreign sovereign in that sovereign's absence. *Republic of Philippines v. Pimentel*, 553 U.S. 851, 864 (2008). If immunity precludes the sovereign from being joined (as it does here), "the action must be dismissed." *Id.* at 872.

## BACKGROUND

### I.  Foreign Sovereign Immunity

#### A.      General Framework

The FSIA, 28 U.S.C. §§ 1330; 1602-11, is a "comprehensive" framework for making immunity determinations in civil cases involving foreign sovereigns and is the "sole basis for obtaining jurisdiction over a foreign state in federal court." *Halkbank,* 598 U.S. at 272-73, 278 (citation omitted). The FSIA "starts from a premise of immunity and then creates exceptions to the general principle." *Bolivarian Republic of Venezuela v. Helmerich & Payne Intern'l Drilling Co.*, 581 U.S. 170, 180 (2017) (citation omitted). There are two kinds of immunity under the FSIA:

"jurisdictional" and "execution" immunity, and they "operate independently"; the abrogation of one "does not imply" abrogation of the other. App.630 (quoting *Walters v. Indus. & Commercial Bank of China*, 651 F.3d 280, 288 (2d Cir. 2011)).

Section 1604 makes foreign states (defined to include DAB) "immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607." Even where jurisdictional immunity is abrogated, the scope of the FSIA's affirmative conferral of jurisdiction in § 1330(a) is limited to "claim[s] for relief *in personam*." Congress chose this design to eliminate the previously "common method of obtaining jurisdiction over foreign states," which was simply "to attach their property in the United States" and then proceed *quasi in rem. Geveke & Co., Int'l v. Kompania Di Awa I Elektrisidat Di Korsou N.V.*, 482 F. Supp. 660, 664 (S.D.N.Y. 1979). "Congress sought to clamp down on *quasi in rem* suits because they 'caused significant irritation to many foreign governments' and could potentially 'give rise to serious friction in United States' foreign relations.'" *United States v. Assa Co. Ltd.*, 934 F.3d 185, 190 (2d Cir. 2019) (citation omitted). Personal jurisdiction over a foreign state

requires both an exception from jurisdictional immunity and service in accordance with § 1608. *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983).

The property of a foreign state, meanwhile, is presumptively immune from restraint, attachment, or execution under § 1609. Notably, exceptions to execution immunity are "narrower" than those for jurisdictional immunity, *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 142 (2014), reflecting that, "at the time the FSIA was passed, the international community viewed execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action." *Walters*, 651 F.3d at 289 (citation omitted); *see also* App.67-68.

The FSIA generally abrogates attachment immunity only of property "used for a commercial activity in the United States." *See* 28 U.S.C. § 1610(a)(1)-(7); (b)(1)-(3). Certain special types of property remain immune "[n]otwithstanding" § 1610's immunity abrogating provisions. 28 U.S.C. § 1611. These include the property "of a foreign central bank or monetary authority held for its own account," *id.* § 1611(b)(1), including DAB's assets held by FRBNY, App.634 ("all

parties agree that DAB is the central bank of Afghanistan"), S.A.14.

## B. Terrorism-related Immunity Exceptions

Since 1996, the FSIA has had a terrorism-related exception to jurisdictional immunity. Thereunder, a U.S. court can adjudicate certain claims seeking damages arising from certain terroristic acts of a foreign state if—and *only* if—that foreign state was designated "as a state sponsor of terrorism" by the Secretary of State "at the time the act occurred" or later "as a result of such act." 28 U.S.C. § 1605A(a)(2)(A)(i)(I); 28 U.S.C. § 1605(a)(7) (2007).[2] Afghanistan has never been so designated. S.A.21-22.

Plaintiffs have secured large judgments (often by default) against state sponsors of terror under §§ 1605(a)(7) and 1605A, but they have faced challenges identifying attachable assets to satisfy these judgments. *Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016). State sponsors of terror tend not to have much property in the United States, and what is here tends to be blocked under Executive Branch sanctions programs—and thus generally unattachable absent an Office of Foreign

---

[2] In 2008, Congress replaced former § 1605(a)(7) with § 1605A; for present purposes, their differences are immaterial.

Assets Control (OFAC) license. Considering these difficulties, Congress sought to make their blocked assets available.

In 1998, Congress first tried to make blocked assets available to satisfy terrorism judgments against terrorist states by adding § 1610(f). This section permits executing on blocked property "[n]otwithstanding any other provision of law, including but not limited to [22 U.S.C. § 4308(f)]," to satisfy a judgment "for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section 1605(a)(7)." Pub. L. No. 105-277 § 117. Simultaneously, Congress authorized the President to waive this exception to attachment immunity "in the interest of national security." *Id.* § 117(d). The same day he signed the legislation, President Clinton waived the exception in its entirety. *See* Pres. Determination No. 99-1, 63 Fed. Reg. 59201.

Two years later, Congress slightly amended § 1610(f) and re-codified the President's waiver authority. Pub. L. No. 106-386 § 2002(f). Once more, President Clinton signed the legislation and, the same day, waived § 1610(f) entirely. *See* Pres. Determination No. 2001-03, 65 Fed. Reg. 66483 (2000). Section 1610(f) has never gone into effect. S.A.18.

In 2002, Congress tried again, by enacting the TRIA. As in 1998 and 2000, and in largely the same language, Congress again abrogated the attachment immunity of blocked assets belonging to designated state sponsors of terror to enable satisfaction of judgments rendered under §1605(a)(7) (and later, § 1605A). TRIA § 201; *see also* H.R. Conf. Rep. 107-779, 2002 WL 31529126, at *27 (2002) ("Section 201 builds upon and extends the principles in section 1610(f)(1) of the [FSIA]."). To avoid the fate of § 1610(f), the TRIA gives only limited waiver authority, and Congress made the abrogation of attachment immunity "[n]otwithstanding any other provision of law" to "eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment." *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009). Also, unlike § 1610(f), the TRIA authorizes attaching the property of individual "terrorist[s]" and "terrorist organization[s]" to satisfy judgments against them that are based on "an act of terrorism."

Like § 1610(f), the TRIA includes the parenthetical "(including the blocked assets of any agency or instrumentality of that terrorist party)," which relates to *First National City Bank v. Banco Para El*

*Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"). *Bancec* held that since the FSIA "was not intended to affect … the attribution of liability among instrumentalities of a foreign state," foreign government instrumentalities "established as juridical entities distinct and independent from their sovereign should normally be treated as such"— and thus the assets of a foreign state's instrumentality generally cannot be used to satisfy a judgment against the foreign state itself. *Id.* at 620, 626-27. "What the TRIA did … was to override" this part of *Bancec*, making a judgment against a state sponsor of terror "more readily enforceable" against its assets held by juridically separate instrumentalities. *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 51 (2d Cir. 2010).

## II. Procedural History

### A. The Fall of Kabul and *Havlish* & *Doe* Execution Liens

On August 15, 2021—the day the Taliban overtook Kabul by force— the Treasury Department blocked Afghanistan's U.S.-based assets, including some $7 billion in central reserves held by FRBNY, to prevent Taliban access. S.A.6. The funds were used for central banking services, and they originated principally from international donors and the

savings of ordinary Afghans accrued during the time the U.S. military was in Afghanistan. S.A.6.

Almost immediately, the Taliban's many creditors sought to attach Afghanistan's blocked reserves. On August 25, *Havlish* creditors served FRBNY with a "Restraining Notice." *Havlish*, No. 1:03cv9848 (S.D.N.Y.), ECF 550 at 2. Two days later they obtained a writ of execution for $7,045,632,402.79, App.150—the amount of their 2012 default judgment against the Taliban and others, jointly and severally liable, for both compensatory and punitive damages, plus pre- and post-judgment interest. App.1, 146.

"No determination was made as to DAB's agency or instrumentality status before th[is and later] writs of execution were issued." App.626-27. *Havlish* creditors did not even file a motion to obtain their writ; instead, their counsel completed a two-page form on the district court's website[3] and submitted it and exhibits to the Clerk's Office. App.150-61. None of their papers mentioned the TRIA. Rather, the proffered writ sought to execute on the State of Afghanistan's central reserves to satisfy the

_____

[3] https://www.nysd.uscourts.gov/forms/writ-execution-against-property.

*Havlish* judgment against the Taliban because now "Afghanistan … is the Taliban." App.150. It listed "the government of Afghanistan," "any political subdivision," and "any agency or instrumentality of the government of Afghanistan" as defendants to the judgment, App.151, and asserted that "the judgment entered against the Taliban … can now be enforced against any and all assets belonging to the government of Afghanistan" "[a]s a result of" the Taliban's "claims [of] ownership," App.160-61. Based on these representations, the Clerk of Court signed the requested writ. App.150. Upon service on September 14, the writ encumbered virtually all of Afghanistan's reserves at FRBNY. App.163.

Although it was the initial domino pushed over, the existence of the August 27, 2021 *Havlish* execution lien was not publicly known— apparently not even by the presiding judges—until it was brought to the district court's attention by the Department of Justice on September 16, 2021. *Havlish* Dkt. 526.[4] Enforcement proceedings were stayed for the

---

[4] "The *Havlish* Plaintiffs did not publicly docket their writ of execution … or otherwise notify other parties in the District Court about their plan," *Ashton* Br., ECF 116 at 6, and the paperless docket entry intended to memorialize the writ's issuance erroneously identifies it (still) as relating to Iran—the only sovereign defendant subject to the *Havlish* judgment, App.158—without any mention of Afghanistan, DAB, or the Taliban.

next five months while the United States considered submitting a statement of interest, but public knowledge of the *Havlish* lien set off a race for priority among Taliban creditors. On September 23, 2021, *Doe* Plaintiffs persuaded Judge Polk Failla to reconsider her earlier denial of their motion to permit service of a similar writ on FRBNY by informing her of the *Havlish* writ and the importance of priority.[5] App.33 (granting reconsideration given "comparable procedural posture" of *Havlish*). Other creditors rushed to finalize judgments against the Taliban and then to execute on DAB's assets or, where doing that was infeasible, to seek a slice of Afghanistan's assets through other vehicles. *See, e.g.*, App.354 (class action complaint); App.594 (motion for prejudgment attachment).

Meanwhile, during the stay of enforcement proceedings, counsel for *Havlish* and other Taliban creditors "opened negotiations with the Justice Department" regarding their liens and claims and what position the United States would take in this litigation. Charlie Savage, *Taliban*

---

[5] *Doe* was later transferred to the MDL. App.624.

*and 9/11 Families Fight for Billions in Frozen Afghan Funds*, N.Y. Times, Nov. 29, 2021, https://nyti.ms/3DtTJFZ.

### B. February 11, 2022: Executive Order, OFAC License, and Statement of Interest

Thereafter, the federal government took three relevant actions, all on February 11, 2022. First, President Biden issued "Executive Order on Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan." App.70. President Biden determined that the humanitarian crisis in Afghanistan "constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States," to which preserving DAB's assets for the benefit of the Afghan people "is of the utmost importance." *Id.* The order maintained the block on Afghanistan's reserves, mandated the transfer of all DAB assets held by U.S. institutions to FRBNY, and authorized OFAC to license otherwise prohibited transactions involving DAB assets.

Contemporaneously therewith, OFAC issued such a license, directing FRBNY to segregate $3.5 billion of DAB's assets into a distinct account and to transfer those assets "for the benefit of the people of

Afghanistan" upon instructions from whomever the Secretary of State certifies as having the requisite authority to control the reserves.[6] App.73

Lastly, the United States filed a statement of interest with the district court. App.34-69. "Most urgently," it requested an order confirming that the $3.5 billion licensed by OFAC is not subject to attachment, notwithstanding the *Havlish* and *Doe* encumbrances.[7] App.43-46; 60n.5; *see also* App.83-85. Beyond that, the Statement encouraged the district court to give the Taliban's creditors a "full opportunity" to make "their arguments regarding the attachability of the unlicensed DAB assets," and then to evaluate their claims in light of several "settled legal principles," App.46, which the Statement discusses at some length, App.60-68. The United States formally took no position on the ultimate question of the Taliban creditors' ability to execute on

---

[6] The Secretary later certified two such individuals. *See* Joint Stmt. by U.S. Treasury and State Dep't: The United States and Partners Announce Establishment of Fund for the People of Afghanistan (Sept. 14, 2022), https://home.treasury.gov/news/press-releases/jy0947.

[7] The requested order was issued two weeks later. S.A.7.

Afghanistan's reserves, but the principles it set out, when taken to their logical conclusion, preclude such execution.[8]

## C. Turnover Motions, R&R, and District Court Decision

Joint Creditors' motions seeking turnover were briefed over the ensuing months. None of the creditors sought to join DAB or Afghanistan as a party to the turnover proceedings.

Following briefing, Magistrate Judge Netburn issued a thorough report and recommendation ("R&R") that the turnover motions be denied for three independent reasons. First, she recommended holding that the TRIA does not authorize executing on foreign sovereign assets absent jurisdiction over the sovereign itself, which the district court did not have. App.627-42. Judge Netburn recommended rejecting the argument, which is repeated on appeal, that the TRIA's "notwithstanding" clause abrogates both execution and jurisdictional immunity, explaining that "[a] court may not handwave away requirements of jurisdiction, service,

---

[8] In another case presenting similar questions, the United States submitted a statement setting out the same principles but also articulating the conclusion they dictate: the TRIA does not authorize taking sovereign assets to satisfy judgments against non-state third parties. Mr. Faiq submitted this other statement as supplemental authority, to which creditors responded. *See* S.A.10.

liability, judgment, or execution simply because some law the suit touches includes a 'notwithstanding' clause." App.636. Second, even assuming jurisdiction was present, Judge Netburn also recommended denying the motions on the additional grounds that granting turnover of Afghanistan's assets to satisfy judgments against the Taliban would require recognizing the latter as the government of the former, which the Court is constitutionally constrained from doing, App.642-52; and third, that the nonconsensual nature of the Taliban's control over DAB precludes a finding of a true agency relationship, App.652-56.

Upon objections to the R&R, District Judge Daniels undertook a *de novo* review and adopted its first two recommendations, regarding jurisdiction and recognition, as independently sufficient grounds to deny the turnover motions. S.A.3n.6. Judge Daniels agreed with the R&R that both jurisdictional and execution immunity "must be independently overcome for a party to reach the assets of an instrumentality of a foreign state," S.A.11, and that the TRIA's text, context, and history make clear that, as "an *execution* statute," it does not affect jurisdictional immunity under the FSIA. S.A.17-18. Judge Daniels emphasized that although the Taliban's creditors "are entitled to collect on their default judgments …

they cannot do so with the funds of the central bank of Afghanistan" because, "[p]ursuant to the FSIA, TRIA, and the U.S. Constitution, the Taliban—not the former Islamic Republic of Afghanistan or the Afghan people—must pay for the Taliban's liability." S.A.30. Judge Daniels later denied Joint Creditors' request for equitable relief to maintain their priority pending appeal, App.679, as did this Court, on July 6, 2023.

## III.   Arguments on Appeal

On appeal, Joint Creditors argue that the district court erred in rejecting their argument that the TRIA's "notwithstanding" clause "remove[s] *any* statutory impediment" to collecting on their default judgments against the Taliban, including the jurisdictional immunity conferred by § 1604 of the FSIA. J.C.20-21. Alternatively, they argue that § 1604 is wholly inapplicable because (they say) it only confers immunity for *in personam* claims, which they do not have. J.C.45-53.

## ARGUMENT

### I.   THE DISTRICT COURT CORRECTLY HELD THAT IT LACKED JURISDICTION TO AUTHORIZE CONFISCATING AFGHANISTAN'S CENTRAL RESERVES TO SATISFY JUDGMENTS AGAINST THE TALIBAN.

Congress has made DAB presumptively immune from the jurisdiction of U.S. courts and has made its assets presumptively immune

from execution. 28 U.S.C. §§ 1604, 1609. As the district court correctly held, executing on DAB's assets requires an exception to both immunities. S.A.11-13. The Taliban's creditors have neither.

Section 201(a) of the TRIA expressly contemplates executing on sovereign property in only one circumstance: to satisfy judgments rendered against a state sponsor of terror under § 1605A or former § 1605(a)(7). *See* App.66n.8. Afghanistan has never been designated a state sponsor of terror, and so there are no such judgments. The TRIA is thus wholly inapplicable to Afghanistan's reserves.

Moreover, even where it does apply, the TRIA—"an execution statute"—only abrogates *execution* immunity, and not jurisdictional immunity. S.A.17. By defining its scope with reference to "judgments," the TRIA presupposes that the creditors seeking to invoke it would have already overcome jurisdictional hurdles, including immunity—otherwise they would not have a judgment at all. *See id.* The Taliban's creditors cannot cite a single case in which a court has held that the TRIA abrogates jurisdictional immunity where the foreign sovereign's jurisdictional immunity had not *already* been overcome; the precedent on

which they rely themselves note this fact.[9] *See, e.g.*, *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 131 (2d Cir. 2016); *Walters*, 651 F.3d at 292; *Weinstein*, 609 F.3d at 52.

Were there any doubt, *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120, 133 (2d Cir. 2019), explicitly held that district courts only have jurisdiction to execute on foreign sovereign assets under the TRIA if the creditors "h[o]ld judgments that were based on an exception to immunity from jurisdiction established by the FSIA." Where (like here) there is no basis for "subject matter jurisdiction" under the FSIA, district courts "lack[] jurisdiction" over enforcement proceedings under the TRIA. *Id.* at 142. Binding precedent is thus clear that applying the TRIA to foreign state property requires a source of original subject matter jurisdiction within the FSIA.

Interpreting the TRIA to abrogate jurisdictional immunity is also not a reasonable way to read its text. For example, if the TRIA can be used to take state assets for *any* judgment based on an act of terrorism,

_____

[9] Those opinions (and the FSIA generally) also all presuppose that creditors seeking to execute on sovereign assets hold judgments "*against the sovereign.*" S.A.19.

that would render superfluous the TRIA's references to §§ 1605A and 1605(a)(7) judgments, violating the "rule against superfluities." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). It would also undermine Congress's decision to tether the TRIA's abrogation of foreign sovereign immunity to the statutory scheme through which (only) the Executive decides which foreign states to designate as sponsors of terror. Indeed, the TRIA's express mentions of §§ 1605A and 1605(a)(7) judgments in § 201(a) and of state sponsors of terror in § 201(d)(4) strongly suggest congressional intent that the TRIA only be used to take blocked sovereign assets to satisfy those specific types of judgments.[10] *See Samantar v. Yousuf*, 560 U.S. 305, 317 (2010) (rejecting the argument that the FSIA's definition of "foreign state" includes government officials; although that interpretation "is literally possible," "elsewhere in the FSIA Congress expressly mentioned officials when it wished to count their acts as

_____

[10] Joint Creditors also ignore that the TRIA's "including any agency or instrumentality" parenthetical responds to *Bancec*, *see supra* at 13-14, which decided only when it is permissible to disregard corporate formalities when there is a common owner. *See* 462 U.S. at 629; *Weinstein*, 609 F.3d at 50. Creditors' interpretation ascribes a congressional intent to go *far* past the context of juridically separate entities with a common owner.

equivalent to those of the foreign state, which suggests that officials are not included within the unadorned term 'foreign state'").

The TRIA also looks nothing like the statutory provisions in which Congress *did* say that jurisdictional immunity can be abrogated, which are explicit on this point.[11] *See, e.g.*, 28 U.S.C. § 1605(a) ("a foreign state shall not be immune from the jurisdiction of the courts of the United States"), (b) (same), (d) (same), 1605A(a)(1) (same). Instead, the TRIA identifies "assets" that "shall be subject to execution or attachment"— just like the FSIA's execution immunity-abrogating provisions, in § 1610, and specifically the wholly-waived subsection (f), on which the TRIA was based. S.A.16-19; App.641-42. Given the balance of the statutory scheme, the district court rightly refused to interpret the TRIA as abrogating jurisdictional immunity. *See Halkbank*, 598 U.S. at 274-76 (rejecting the argument that the FSIA grants immunity in criminal proceedings; "In complete isolation, § 1604 might be amenable to that reading. But this

_____

[11] Nor does the TRIA bear any resemblance to the FSIA's jurisdiction-conferring provision, § 1330(a), or other jurisdiction-conferring statutes, *see United States v. Prado*, 933 F.3d 121, 141 n.11 (2d Cir. 2019) (collecting such statutes).

Court has a 'duty to construe statutes, not isolated provisions,'" and other parts of the FSIA establish its "exclusively civil focus").

The TRIA's "notwithstanding" clause, upon which the Taliban's creditors balance their entire argument, does not abrogate jurisdictional immunity. That clause "applies only when some 'other provision of law' conflicts with TRIA," *Smith ex rel. Estate of Smith v. FRBNY*, 346 F.3d 264, 271 (2d Cir. 2003), and there is no conflict here. As the district court explained, exceptions to jurisdictional and execution immunity have always been separate (and deliberately asymmetric) under the FSIA, which itself simply codified the extant distinction at common law; the distinct types of foreign sovereign immunities is a feature of the statutory scheme, not a conflict. S.A.15-18; App.641-42.

What is more, the TRIA itself references—in the same *sentence* as the "notwithstanding" clause—the terrorism exceptions to jurisdictional immunity in §§ 1605A and 1605(a)(7). That reference makes clear that Congress was building on the existing statutory scheme and its separate provisions regarding exceptions to jurisdictional immunity—not supplanting that scheme wholesale by dispensing with the need for an exception to jurisdictional immunity. *See, e.g.*, *Elahi*, 556 U.S. at 386

("Congress could not have intended" the "notwithstanding" clause in the TRIA to override another provision "that it inserted in the same statute"); *Smith*, 346 F.3d at 271 (rejecting another argument regarding the application of the TRIA's "notwithstanding" clause for similar reasons).

More generally, as the district court explained, a "notwithstanding" clause does not define the scope of a statute into which its inserted. S.A.15. It merely says what to do "once the scope of [the statute] is determined," *Kucana v. Holder*, 558 U.S. 233, 238 n.1 (2010), and "that scope depends on the substance of the provision to which it is attached," S.A.15. This interpretive rule makes particular sense given that there are apparently "2,170 identical notwithstanding clauses scattered across the U.S. Code," *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 434 (D.C. Cir. 2023)—yet Joint Creditors cannot cite a single precedent holding that a "notwithstanding" clause is the type of "bulldozer that clears every possible legal obstacle" that they need to take Afghanistan's assets.[12] S.A.17.

―――――――――――

[12] Congress knows how to write a notwithstanding clause affecting sovereign immunity. *See, e.g.*, 22 U.S.C. § 8772(a)(1) ("notwithstanding any other provision of law, including any provision of law relating to sovereign immunity"); *Peterson*, 578 U.S. at 218n.4.

Reading the TRIA to abrogate jurisdictional immunity would also be a radical departure from the current understanding of the FSIA and central bank immunity. For the first time ever, the reserves of foreign states *other* than those the Executive designates as state sponsors of terror—which is to say, every other country in the world—would be vulnerable to execution under the TRIA. They would be vulnerable to satisfy judgments, moreover, that are against third parties, rendered in proceedings in which the sovereign was not and could not have been made a party. Even the terms under which these foreign state assets could be attached would be highly uncertain: all that would be needed is for a judge, often in a non-adversarial setting, to decide that, as a factual matter, a terrorist individual or organization exert(s/ed)[13] a statutorily undefined level of control over a foreign state entity. *Contra Bolivarian Republic of Venezuela*, 581 U.S. at 183 (rejecting FSIA interpretation that "would create increased complexity in respect to a jurisdictional matter where clarity is particularly important. And clarity is doubly important here where foreign nations and foreign lawyers must understand our

_____

[13] The relevant time period to measure this control is likewise uncertain. *See* MDL Dkt. 7932-1 at 17-18.

law."). And it apparently would be irrelevant if that terrorist individual or organization exercised such control unlawfully; the terrorists' victimization of the foreign state would itself be the grounds upon which the foreign state's property could be taken.

As the district court recognized, such an interpretation could have significant consequences, including to the United States and New York, who have realized tremendous benefits from being considered a safe place to deposit foreign central reserves.[14] S.A.14; App.637-38. There is no evidence that Congress intended the TRIA to effect such a destabilizing change to the "the delicate balance that [it] struck in enacting the FSIA." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 825 (2018) ("declin[ing]," out of respect for that balance, "to read into [§ 1610(g)] a blanket abrogation of attachment and execution immunity for § 1605A judgment holders absent a clearer indication of Congress' intent");

---

[14] Such an interpretation would also raise constitutional issues. *Weinstein* rejected a Takings Clause argument by Bank Melli—which conceded it was an instrumentality of Iran, against whom the creditors had obtained a FSIA judgment—on the ground that it was the bank's own voluntary conduct that "opened it to liability for judgments already entered against Iran." 609 F.3d at 54. There was nothing "voluntary" about the State of Afghanistan being taken over by the Taliban.

*Bolivarian Republic of Venezuela*, 581 U.S. at 181 (rejecting FSIA interpretation that would be a "radical departure" from the statutory scheme's "basic principles," given lack of a clear statement).

Yet another way to see that the Taliban creditors' expansive interpretation of the TRIA is wrong is that, even if one accepts their argument that the TRIA abrogates § 1604 jurisdictional immunity, they still cannot point to a *source* of statutory jurisdiction over DAB. *See Assa*, 934 F.3d at 188. Abrogating § 1604 can only result in jurisdiction (personal and adjudicative) *if* 28 U.S.C. § 1330 applies, *see id.* at 189— and the Joint Creditors cannot claim it does. Instead, they assert in passing that the district court had jurisdiction under 28 U.S.C. § 1331 or could exercise ancillary jurisdiction, J.C.27, but neither can carry that weight. Ancillary jurisdiction cannot be used to take the property of a nonparty not already liable,[15] and "*Amerada Hess* made clear that the

_____

[15] *Peacock v. Thomas*, 516 U.S. 349, 357 (1996) ("We have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment."); *Epperson v. Entertainment Express, Inc.*, 242 F.3d 100, 104-06 (2d. Cir. 2001) ("[A]n action to establish liability on the part of a third party … must have its own source of federal jurisdiction").

FSIA displaces general 'grants of subject-matter jurisdiction in Title 28,'" expressly including § 1331. *Halkbank*, 598 U.S. at 278 (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 437 (1989)). And even if one or both apply, they cannot provide a basis for *personal* jurisdiction.

In short, the notion that the TRIA can be read to abrogate jurisdictional immunity under § 1604 cannot be reconciled with statutory text, structure, history, or with basic requirements of civil litigation.

The Joint Creditors' argument in the alternative, that § 1604 is wholly inapplicable, suffers similar fatal flaws—even if accepted, they still lack a source of statutory subject matter or personal jurisdiction—in addition to several more. For one, "if [this] suit is not governed" by the FSIA, as the Joint Creditors argue, then courts must consider whether it is "barred by foreign sovereign immunity under the common law." *Halkbank*, 598 U.S. at 280-81; *accord Samantar*, 560 U.S. at 324-25. The Taliban's creditors have no argument for why Afghanistan's central reserves—which lie at the heartland of foreign sovereign immunity— would not be absolutely immune under the common law. *See* J.C.32n.20 (disclaiming any argument regarding common law immunities).

For another, the argument that § 1604 is inapplicable is wrong on the merits. Joint Creditors mispresent *Halkbank*, claiming it held that § 1604 only confers immunity for *in personam* claims. J.C.3, 46-47. *Halkbank* said nothing of the sort; nor would it, given that § 1604 grants immunity without regard to the nature of the claim. To the contrary, in holding that the FSIA does not apply to criminal proceedings involving foreign sovereigns, *Halkbank* canvassed the "exclusively civil scope" of the litigation contemplated by the FSIA's text, and then *reiterated* that civil litigants seeking to take sovereign assets must go through the FSIA. 598 U.S. at 272-73.

Nor are the Taliban's creditors helped by the fact that "the turnover proceedings are not against [Afghanistan or DAB]," J.C.47, who have not been (and could not be) made parties to the turnover proceedings. Civil litigants cannot take the property of a foreign sovereign in the sovereign's absence. The Supreme Court said so explicitly in *Pimentel*, holding that where there is a "not frivolous" possibility that the property to be attached belongs to a foreign sovereign, that sovereign is a required party under Rule 19—and that "dismissal of the action must be ordered" if the foreign sovereign cannot be joined because of jurisdictional immunity.

553 U.S. at 864, 867. Any other outcome would "fail[] to give full effect to sovereign immunity." *Id.* at 865. So too here.

Moreover, as the district court noted, S.A.13, a principal purpose of the FSIA was to prevent the location of a foreign sovereign's property being used as a basis for jurisdiction. For that additional reason, Joint Creditors' arguments that the district court only needs jurisdiction over FRBNY, which holds DAB's property, J.C.47-50, are unavailing. The FSIA intentionally eliminated the option of using the geographic location of property to justify an exercise of jurisdiction, by requiring civil litigants to proceed against foreign sovereigns *in personam*, while also providing, "for the first time in U.S. law, … a statutory procedure" for obtaining that jurisdiction. *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 124 (2d Cir. 2017) (citation omitted); *Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 448 F. Supp. 622, 638 (S.D.N.Y. 1978) ("The liberal standards for acquiring *in personam* jurisdiction find their quid pro quo in the elimination of jurisdictional attachments.").

This Court's 2019 *Assa* decision fully supports this conclusion, even assuming it remains good law after *Halkbank*. *Assa* considered the nature of that proceeding—an *in rem* civil forfeiture proceeding under 18

U.S.C. § 981(a)(1), which only the United States can bring pursuant to jurisdictional statutes inapplicable here—and held, based on the structure and history of the FSIA, that it was not the kind of suit that "Congress meant for the FSIA to address." 934 F.3d at 189. In so holding, *Assa* explicitly acknowledged that *quasi in rem* actions—like this one—remain forbidden by the FSIA. *See id.* at 190 ("Although *in rem* and *quasi in rem* proceedings both involve a *rem* (a 'thing'), the relevant similarity ends there."); *see also* App.548 (acknowledging turnover proceedings were *quasi in rem*).

Finally, the Joint Creditors' arguments are not helped by their repeated suggestions that the Executive wants them to have DAB's assets. For one, that issue is controlled by law, not politics, *see Samantar*, 560 U.S. at 323 (FSIA enacted to ensure immunity determinations "are made on purely legal grounds" (citation omitted)); and for another, the Executive's explicit position is merely that the Taliban's creditors should have a full opportunity to prove their entitlement to DAB's assets. App.46. Joint Creditors have gotten exactly that; if anything, they have received far more process than they should have, given how they leveraged the *Havlish* execution lien—issued by the Clerk based on

representations that have never been defended or repeated to a judge—into months of time to research and draft without any risk of Afghanistan's reserves being used for any purpose, like addressing the humanitarian crisis enveloping millions of Afghans.

The district court correctly held that "neither the Taliban nor the Judgment Creditors are entitled to raid the coffers of the state of Afghanistan to pay the Taliban's debts." S.A.29.

## CONCLUSION

Mr. Faiq reiterates his deepest sympathy for the Taliban's American victims and his appreciation for the United States' commitment to the rule of law.

Dated: October 6, 2023          Respectfully submitted,


*/s/ Justin B. Cox*
Justin B. Cox
Law Office of Justin B. Cox
P.O. Box 1106
Hood River, OR 97031

*/s/ Natasha Arnpriester*
Natasha Arnpriester
James A. Goldston*
A. Azure Wheeler*
Open Society Justice Initiative
224 West 57th St.
New York, NY 10019

* admission pending

*Counsel for* Amicus Curiae *Naseer Faiq*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Second Circuit Local Rule 29.1(c). Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(f), the brief contains 6973 words, according to the word count feature of the word processing system. This brief also complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6), as it has it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook type style.

/s/ Justin B. Cox
Justin B. Cox