UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 23-258(L)

Caption [use short title]

Motion for: Leave to File Brief as Amicus Curiae

Set forth below precise, complete statement of relief sought:

Movants Afghan and Afghan-American civil society organizations

seek leave to file an amicus curiae brief in support of affirmance.

Fiona Havlish et al., v. The Taliban, et al.,

Katherine Soulas v. The Taliban, et al.,

Jane Doe v. The Taliban, et al.,

| MOVING PARTY: Amicus Curiae | OPPOSING PARTY: Fiona Havlish et. al, Katherine Soulas, Jane Doe |
|---|---|
| ☐ Plaintiff    ☐ Defendant | |
| ☐ Appellant/Petitioner    ☐ Appellee/Respondent | |

MOVING ATTORNEY: Katherine Gallagher

OPPOSING ATTORNEY: Douglass A. Mitchell (contact for Joint-Creditors)

[name of attorney, with firm, address, phone number and e-mail]

| Center for Constitutional Rights | Jenner & Block LLP |
|---|---|
| 666 Broadway, 7th Floor, New York, NY 10012 | 1155 Avenue of the Americas, New York, NY 10036 |
| 212-614-6464 / kgallagher@ccrjustice.org | 202-639-6000 / dmitchell@jenner.com |

Court- Judge/ Agency appealed from: Hon. George B. Daniels / United States District Court for the Southern District of New York

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes    ☐ No (explain):_____

Opposing counsel's position on motion:
☑ Unopposed  ☐ Opposed  ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes  ☐ No  ☑ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has this request for relief been made below?    ☐ Yes  ☐ No
Has this relief been previously sought in this court?    ☐ Yes  ☐ No
Requested return date and explanation of emergency:_____

Is oral argument on motion requested?    ☐ Yes  ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes  ☑ No  If yes, enter date:_____

Signature of Moving Attorney:

/s /Katherine Gallagher    Date: Oct. 6, 2023    Service by: ☑ CM/ECF  ☐ Other [Attach proof of service]

# 23-258(L)

## 23-263(CON), 23-304(CON), 23-346(CON), 23-444(CON)

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

FIONA HAVLISH, ET AL.,
*Plaintiffs-Appellants*,

KATHERINE SOULAS,
*Plaintiff*,

JANE DOE,
*Consolidated-Plaintiff*,

*v.*

THE TALIBAN, ET AL.,
*Defendants-Appellees*,

FEDERAL RESERVE BANK OF NEW YORK,
*Garnishee-Interested Party,*

SHEIKH USAMA BIN-LADEN, ET AL.,
*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**MOTION OF *AMICI CURIAE* AFGHAN AND AFGHAN-AMERICAN CIVIL SOCIETY ORGANIZATIONS: RAWADARI, TRANSITIONAL JUSTICE COORDINATION GROUP, WOMEN'S FORUM ON AFGHANISTAN, GLOBAL ADVOCATES FOR AFGHANISTAN, PROJECT ANAR, AFGHANS FOR A BETTER TOMORROW, AND AFGHAN-AMERICAN COMMUNITY ORGANIZATION FOR LEAVE TO FILE BRIEF SUPPORTING AFFIRMANCE**

Katherine Gallagher
Sadaf Doost
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Fl.
New York, NY 10012
Phone: (212) 614-6464

Pursuant to Federal Rule of Appellate Procedure 29(a)(3) and Local Rule 29.1, *Amici Curiae* Afghan and Afghan-American Civil Society Organizations, Rawadari, the Transitional Justice Coordination Group, the Women's Forum on Afghanistan, Global Advocates for Afghanistan, Project ANAR (Afghan Network for Advocacy and Resources), Afghans for a Better Tomorrow, and the Afghan-American Community Organization, respectfully move this Court for leave to file a brief as *Amici Curiae* in support of affirmance in the above captioned case. A copy of the proposed Brief accompanies this Motion.[1]

*Amici Curiae* are Afghan and Afghan-American civil society and grassroots organizations undertaking human rights, legal, advocacy, and humanitarian aid efforts in and for Afghanistan and its people, including in response to the Taliban takeover of Afghanistan in August 2021 and while in exile. In a case that raises significant economic, geopolitical, and jurisprudential matters, proposed *Amici Curiae* bring a critical perspective otherwise not directly before the court: the interests of Afghan people. *Amici Curiae*, and especially the Afghan civil society organizations, have committed many years to documenting abuses against and advancing the rights of Afghans – including women and girls, ethnic and religious

---

[1] No party or party's counsel authored this brief in whole or in part and no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief. The Joint Creditors take no position on the filing of this amicus brief at this time. Both the *Ashton* Plaintiffs-Appellants and the *Owens* Plaintiffs-Appellants (23-354) consent to the filing of this brief.

minorities, human rights defenders, journalists and educators – before the United Nations, human rights treaty bodies, and the Afghan government and judiciary, among other fora. *See Sec. & Exch. Comm'n v. Ripple Labs, Inc.,* No. 20-cv-10832 (AT), 2021 WL 4555352, at *5 (S.D.N.Y. Oct. 4, 2021) (citations omitted) (participation as *Amicus Curiae* is appropriate when "the amicus has unique information or perspective that can help the court").

The accompanying Brief does not seek to create or enlarge issues, but rather to highlight for the Court certain omitted analysis, responses or nuances in the arguments already before it, with regard to the distinction in public international law between a State and its government; the origins and importance of foreign sovereign immunity, including for central banks, under international and U.S. law; and with regard to property interest and ownership as related to the application of the Terrorism Risk Insurance Act of 2002 ("TRIA") Pub. L. No. 107–297, 116 Stat. 2322, in explaining why this Court should affirm the District Court's February 21, 2023 Memorandum Decision and Order denying Joint Creditors their Motion for Turnover. The District Court decision correctly found that the State of Afghanistan's assets cannot be attached to enforce a judgment rendered against the Taliban (the State of Afghanistan was not named as a defendant) and that the Da Afghanistan Bank assets, as sovereign property, enjoy immunity for enforcement. The brief also addresses the relationship of the Foreign Sovereign Immunities Act, 28 U.S.C. §§

1330, 1602-1611, and the TRIA, which the Joint-Creditors have briefed extensively, particularly in the context of foreign states that have not been designated as state-sponsors of terrorism in light of international law and U.S. foreign relations law on foreign sovereign immunity. The brief explains why central bank funds have received heightened protections from enforcement actions in foreign courts, and why those funds are so necessary for the people of Afghanistan in the current humanitarian and human rights crisis they face.

As Afghan and Afghan-American civil society organizations, *Amici Curiae* have a direct and deep interest in the outcome of the Turnover Motions: ensuring that Afghanistan's central bank, Da Afghanistan Bank ("DAB") assets held in the U.S. as sovereign funds are to be used for the people of Afghanistan to prevent further deterioration of the economic, humanitarian, and human rights circumstances of Afghan civilians. *Amici* are concerned that the Afghanistan State's assets may be disposed of, removing any chances that the people of Afghanistan, who are currently living through a profound attack on their human rights and on the brink of famine, might one day have access to these funds to aid in their own development in the wake of the humanitarian crisis Afghan civilians are experiencing. *Amici* respectfully submit that relieving the Taliban – a non-state entity – of its financial responsibility for its crimes by punishing the sovereign Afghan people suffering under its rule, would result in a tragic injustice.

*Amici Curiae* would like to make clear that they do not challenge the judgments rendered in favor of the Joint-Creditors, nor do they question the Joint-Creditors' right to compensation. *Amici* fully support the Joint-Creditors in their efforts to collect on the duly-obtained judgments against the Taliban and other named defendants. *Amici* cannot, however, support the manner in which Joint-Creditors move this Court to do so, namely by taking sovereign assets from Afghanistan's central bank; these assets belong to the State of Afghanistan, and ultimately, to and are for the people of Afghanistan, not the Taliban. The Taliban bears responsibility for payment of the judgments, but satisfaction of a judgment for its crimes cannot – and should not – come from the people of Afghanistan.

In addition, nothing in this Motion or in the accompanying Brief should be read as a position affirming the legitimacy of the *de facto* authority, the Taliban.

Accordingly, *Amici* respectfully request that the Court grant this Motion for Leave and accept the accompanying Brief, which will aid it in resolving the present matter, while offering a distinct perspective of the interests of the Afghan people, including information as to the human rights and humanitarian catastrophe impacting millions in the country. *See, e.g.*, *Soos v. Cuomo*, 470 F. Supp. 3d 268, 284 (N.D.N.Y. 2020) (citation omitted) ("The usual rationale for amicus curiae submissions is that they are of aid to the court and offer insights not available from the parties.").

Dated: October 6, 2023

Respectfully submitted,

*/s/ Katherine Gallagher*

Katherine Gallagher (KG-2222)
Sadaf Doost
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) and Local Civil Rule 27.1(a)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 975 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and Local Civil Rule 27.1(a)(1) and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(6) and Local Civil Rule 27.1(a)(1) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: October 6, 2023            By:    */s/Katherine Gallagher*
                                         Katherine Gallagher

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 6, 2023, I electronically filed the foregoing Motion of *Amici Curiae* Afghan and Afghan-American Civil Society Organizations: Rawadari, Transitional Justice Coordination Group, Women's Forum on Afghanistan, et al. for Leave to File Brief Supporting Affirmance with the Clerk of the Court of the United States Court of Appeals for the Second Circuit using the Court's CM/ECF system and served on all counsel of record via CM/ECF.

Dated: October 6, 2023   By: */s/Katherine Gallagher*
              Katherine Gallagher

# 23-258(L)

### 23-263(CON), 23-304(CON), 23-346(CON), 23-444(CON)

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

FIONA HAVLISH, ET AL.,
*Plaintiffs-Appellants*,

KATHERINE SOULAS,
*Plaintiff*,

JANE DOE,
*Consolidated-Plaintiff*,
*v.*

THE TALIBAN, ET AL.,
*Defendants-Appellees*,

FEDERAL RESERVE BANK OF NEW YORK,
*Garnishee-Interested Party,*

SHEIKH USAMA BIN-LADEN, ET AL.,
*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* AFGHAN AND AFGHAN-AMERICAN CIVIL
SOCIETY ORGANIZATIONS: RAWADARI, TRANSITIONAL JUSTICE
COORDINATION GROUP, WOMEN'S FORUM ON AFGHANISTAN,
GLOBAL ADVOCATES FOR AFGHANISTAN, PROJECT ANAR,
AFGHANS FOR A BETTER TOMORROW, AND AFGHAN-AMERICAN
COMMUNITY ORGANIZATION SUPPORTING AFFIRMANCE**

Katherine Gallagher
Sadaf Doost
CENTER FOR CONSTITUTIONAL RIGHTS
666 BROADWAY, 7TH FL.
NEW YORK, NY 10012
Phone: (212) 614-6464

## <u>**TABLE OF CONTENTS**</u>

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF *AMICI CURIAE* ............................................................. viii

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

BACKGROUND .........................................................................................5

      A.    THE TALIBAN TAKEOVER, CONTINUED PERPETUATION OF THE HUMAN RIGHTS AND HUMANITARIAN CRISIS, AND IMPACT OF U.S. ACTIONS TOWARDS DAB ASSETS. ...................................5

      B.    THE IDENTIFICATION OF THE JUDGMENT DEBTOR. ..............................................................11

      C.    STATEMENT OF INTEREST OF THE UNITED STATES. .........................................................12

ARGUMENT ...........................................................................................14

    I.    UNDER FUNDAMENTAL PRINCIPLES OF U.S. FOREIGN RELATIONS AND INTERNATIONAL LAW, ASSETS OF DAB ARE PROTECTED SOVEREIGN ASSETS FOR THE STATE AND ITS PEOPLE, NOT THE TALIBAN. .........................14

      A.    THE STATE OF AFGHANISTAN, AND ITS AGENCY DAB, NOT THE TALIBAN, IS THE SOVEREIGN ENTITY OF AFGHANISTAN. ...............................................15

      B.    PRINCIPLES OF FOREIGN SOVEREIGN IMMUNITY PROTECT THE SOVEREIGN PROPERTY OF AFGHANISTAN, INCLUDING DAB, FROM TURNOVER IN U.S. COURTS...............................................17

          1.   DAB is an Agency/Instrumentality of the Sovereign State and Immune from Judicial Process in U.S. Courts..............20

i

2.   Title Over DAB's Assets was Unaffected by the Taliban Takeover and They Remain Assets of the Sovereign – Not the Taliban. ........................................................................23

C.   TRIA'S OWNERSHIP REQUIREMENTS CANNOT BE BYPASSED IN AN ATTEMPT TO ENFORCE A JUDGMENT AGAINST FUNDS PROTECTED BY SOVEREIGN IMMUNITY. .......................................................24

1.   TRIA Does Not Allow the Joint-Creditors to Bypass Ownership. ........................................................................24

2.   Joint-Creditors Misapprehend the Relationship Between the FSIA and TRIA. ...................................................27

CONCLUSION ........................................................................................29

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS .......................................................................30

CERTIFICATE OF SERVICE ...............................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989)..................................................................27

*Baker v. Carr*,
    369 U.S. 186 (1962) ................................................................17

*Bank of N.Y. v. Nickel*,
    789 N.Y.S. 2d 95 (N.Y. App. Div. 2004)................................25

*Bank Markazi v. Peterson*,
    578 U.S. 212 (2016)..................................................................22

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
    945 F.3d 1270 (10th Cir. 2019) ..............................................21

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
    No. 20-MC-0030, 2021 WL 307558 (W.D.N.Y. Jan 29, 2021)........................27

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
    No. 20-MC-00040-LJV, 2022 WL 633572 (W.D.N.Y. Mar. 4, 2022) ..................................27

*EM Ltd. v. Republic of Argentina*,
    473 F.3d 463 (2d Cir. 2007) ....................................................22

*Gates v. Syrian Arab Republic*,
    No. 11 C 8715, 2013 WL 1337223 (Mar. 29, 2013) ...............20

*Guar. Tr. Co. v. United States*,
    304 U.S. 126 (1938)............................................................16, 17

*Hausler v. JP Morgan Chase Bank, N.A.*,
    770 F.3d 207 (2d. Cir. 2014) ...................................................25

*Heiser v. Islamic Republic of Iran*,
    735 F.3d 934 (D.C. Cir. 2013)..................................................25

*Kirschenbaum v. 650 Fifth Ave.*,
   830 F.3d 107 (2016)...........................................................26

*Murray v. The Schooner Charming Betsy*,
   2 Cranch 64 (1804) ..........................................................24

*Nat'l City Bank v. Republic of China*,
   348 U.S. 356 (1955)..........................................................17

*NML Capital, LTD v. Banco Central de la Republica Argentina*,
   652 F.3d 172 (2d Cir. 2011) ..............................................21

*The Paquete Habana*,
   175 U.S. 677 (1900)..........................................................14

*Permanent Mission of India to United Nations v. City of New York*,
   551 U.S. 193 (2007)..........................................................20

*S & S Machinery Co. v Masinexportimport*,
   706 F.2d 411 (2d. Cir. 1983) .......................................20, 22

*Samantar v. Yousuf*,
   560 U.S. 305 (2010)................................................18, 19, 20

*The Schooner Exchange v. McFaddon*,
   11 U.S. 116 (1812)............................................................18

*Turkiye Halk Bankasi A.S. v. United States*,
   598 U.S. 264 (2023) ....................................................18, 21

*Weininger v. Castro*,
   462 F. Supp. 2d 457 (S.D.N.Y. 2006) ...............................20

*Weinstein v. Islamic Republic of Iran*,
   609 F.3d 43 (2d Cir. 2010) ..............................................20

*Zivotofsky v. Kerry*,
   576 U.S. 1 (2015)..............................................................17

iv

**Statutes**

Foreign Sovereign Immunities Act,
28 U.S.C. § 1330, 1602-11 ......................................................................*passim*

Terrorism Risk Insurance Act of 2002,
Pub. L. No. 107–297, 116 Stat. 2322.........................................................*passim*

**Other Authorities**

*About Us: Departments*, DA AFGHANISTAN BANK ................................................22

*Afghanistan: Economic Roots of the Humanitarian Crisis*, HUMAN
RIGHTS WATCH (Mar. 1, 2022) ......................................................................7, 11

*Afghanistan: The Humanitarian Crisis and U.S. Response: Hearing
Before the Subcomm. on Near East, South Asia, Central Asia, and
Counterterrorism of the S. Comm. on Foreign Rels.*, 117th Cong.
13 (2022) ........................................................................................................10

*Afghanistan*, OCHA ................................................................................................9

*Afghanistan: Repression Worsens 2 Years into Taliban Rule*, HUM.
RTS. WATCH (Aug. 10, 2023) ............................................................................11

*Afghanistan Refugee Crisis Explained,* USA for UNHCR, THE UN
REFUGEE AGENCY (July 18, 2023), (July 18, 2023) ..............................................6

*Afghanistan: WFP forced to cut food aid for 2 million more*, UNITED
NATIONS (Sept. 5, 2023) ..................................................................................10

*Amnesty International Report 2021/22: The state of the world's
human rights*, AMNESTY INT'L (March 29, 2022)..................................................8

*Arbitrary and Illegal Detentions in Taliban-Ruled Afghanistan*,
RAWADARI (Jan. 23, 2023) ..................................................................................6

Clayton Thomas, CONG. RSCH. SERV., R46955, TALIBAN GOV'T IN
AFG.: BACKGROUND & ISSUES FOR CONGRESS (Nov. 2, 2021) ............................5

Clayton Thomas, CONG. RSCH. SERV., R46879, U.S. MILITARY
WITHDRAWAL & TALIBAN TAKEOVER IN AFG.: FREQUENTLY ASKED
QUESTIONS (Sept. 17, 2021)..............................................................................5

Convention on Jurisdictional Immunities of States and their Property, *adopted* Dec. 2, 2004, G.A. Res. 59/38 ............................................................18

Exec. Order No. 14064, 87 Fed. Reg. 8391 (2022) ...................................8

Fereshta Abbasi, *Afghans Dying from Lack of Medicine*, HUM. RTS. WATCH (May 9, 2022) ........................................................................9

HAZEL FOX & PHILIPPA WEBB, THE LAW OF STATE IMMUNITY (Oxford University Press, 3d ed. 2015)................................................19, 20, 22

Hizbullah Khan, *The families losing their loved ones to hunger suicide in Afghanistan*, PROSPECT (March 9, 2023) ........................................10

H.R. Rep. No. 94-1487 (1976)..............................................................21

*Human Rights Situation in Afghanistan: Mid-year Report*, RAWADARI (Aug. 12, 2023) ..................................................................................6

Lindsay Maizland, *The Taliban in Afghanistan,* COUNCIL ON FOREIGN RELATIONS (Jan. 19, 2023)...................................................................5

Patricia Gossman, *Hard Choices in Afghanistan's Humanitarian Crisis,* HUM. RTS. WATCH (May 15, 2023) ........................................9

Press Release, *The Women's Forum on Afghanistan Deplores the Exclusion of Afghan Women from Key Talks on Afghanistan*, WOMEN'S FORUM ON AFGHANISTAN (Apr. 28, 2023) ........................................11

R. JENNINGS & A. WATTS, OPPENHEIM'S INTERNATIONAL LAW, PEACE (9th ed., 1992) ................................................................................16

R. Bennett (Special Rapporteur on the Situation of Human Rights in Afghanistan), *Situation of human rights in Afghanistan*, U.N. Doc. A/HRC/52/84 (Feb. 9, 2023) ..................................................8, 9, 10

*Repression, Regression & Reversal: One Year of Taliban Rule in Afghanistan*, RAWADARI (Dec. 10, 2022) ........................................6

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES (1987)....................................................................15, 16

vi

Stefani Glinski, *'The Taliban know they need us': the Afghan hospitals run by women*, THE GUARDIAN (May 9, 2022) ....................................9

*Second Statement of Interest of the United States, Rubin v. Islamic Republic of Iran,* No. 03-cv-9370 (N.D. Ill. Mar. 3, 2006), ECF No. 145..........................................................................................19

Situation in the Islamic Republic of Afghanistan, ICC-02/17, Order (Feb. 24, 2022)..........................................................................16

*Stopping State Failure in Afghanistan*, INT'L CRISIS GRP.: COMMENTARY (Jan. 27, 2022) ...............................................8

UN Secretary-General, *The situation and its implications for international peace and security*, U.N. Doc. A/77/772-S/2023/151 (Feb. 27, 2023)..........................................................................11

Yogita Limaye, Afghanistan: *'I drug my hungry children to help them sleep'*, BBC (Nov. 24, 2022) .........................................................10

ZAFIRIS TZANNATOS, UNDP, AFGHANISTAN SOCIO-ECONOMIC OUTLOOK 2021–2022: AVERTING A BASIC NEEDS CRISIS 2 (2021).....................7

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are Afghan and Afghan-American civil society and grassroots organizations undertaking human rights, legal, advocacy, and humanitarian efforts in and for Afghanistan and its people, including in response to the Taliban takeover of Afghanistan in August 2021 and while in exile. In a case that raises significant human rights, economic, geopolitical and jurisprudential matters, *Amici Curiae* bring a critical perspective otherwise not directly before the court: the interests of the Afghan people. *Amici Curiae*, and especially the Afghan civil society organizations, have committed many years to documenting abuses against and advancing the rights of Afghans – including women and girls, ethnic and religious minorities, human rights defenders, journalists and educators – before the United Nations, human rights treaty bodies, and the Afghan government and judiciary, among other fora.

*Amici Curiae* have a direct and deep interest in the outcome of the Turnover Motions: to ensure that the remaining $3.5 billion of the assets of Afghanistan's central bank, Da Afghanistan Bank ("DAB"), currently held in the United States as sovereign funds, are to be used for the people of Afghanistan to prevent further

---

[1]    No party or party's counsel authored this brief in whole or in part and no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief. The Joint Creditors take no position on the filing of this amicus brief at this time. Both the *Ashton* Plaintiffs-Appellants and the *Owens* Plaintiffs-Appellants (23-354) consent to the filing of this brief.

deterioration of the economic, humanitarian, and human rights circumstances of Afghan civilians.  Indeed, relieving the Taliban – a non-state entity – of its financial responsibility for its heinous crimes by punishing the sovereign Afghan people suffering under Taliban rule would produce a tragic injustice.

**Rawadari** is an Afghan human rights organization that aims to deepen and grow the human rights culture of Afghanistan, ultimately reducing the suffering of all Afghans, especially women and girls.  Rawadari helps build an Afghan human rights movement, monitors human rights violations, and pursues justice and accountability for violations.  Rawadari works with individuals and collectives inside and outside Afghanistan.

The **Transitional Justice Coordination Group** ("TJCG") is a coalition of 26 organizations and individuals active in the field of transitional justice inside and out of Afghanistan with focus on Afghanistan.  The TJCG was formed in 2008 with the aim of strengthening advocacy and strategic coordination between organizations involved in transitional justice in Afghanistan.  Since its inception, the group has been active and outspoken on transitional justice issues, and has dedicated itself to raising the voices of Afghanistan's victims of war and oppression, including assisting victims to participate in the International Criminal Court's proceedings.

The **Women's Forum on Afghanistan** is an initiative created and led by Afghan women, with the support of global women leaders, to work for the well-

being and human rights of the Afghan people. It advocates inclusive solutions to the social, economic, and political challenges the country is currently facing. The Women's Forum believes that women's rights in Afghanistan – access to education, employment, political participation, resources and freedom of movement – are critical to international peace and security in the country, the region, and the world.

**Global Advocates for Afghanistan** ("GAA") is an independent, Afghan-led movement which began as an emergency response to the deteriorating human rights and humanitarian crises unfolding in Afghanistan in the wake of the Taliban takeover in August 2021. GAA has led UN advocacy efforts and international and domestic campaigns in the U.S., Canada, and Europe, as well as worked with civil society groups to organize legal intake clinics in the U.S. for hundreds of recently arrived Afghan refugees.

**Project ANAR (Afghan Network for Advocacy and Resources)** is a national Afghan grassroots community immigration justice organization based primarily in San Francisco, California and in Virginia, that has coordinated urgent pro bono legal assistance efforts for Afghans. We offer services to community members seeking refuge and family reunification, and fighting deportation and detention. Project ANAR offers legal services, community outreach and education, and advocacy related to immigrants' rights. Project ANAR is fiscally sponsored by Pangea Legal Services, a 501(c)(3) immigrant defense organization based in San

Francisco, California. Project ANAR works in partnership with local Afghan community organizations and Afghan organizations across the country, and has offered direct legal services to more than 2,000 Afghans since August 2021. Project ANAR is founded and led by Afghan, Afghan American and other Asian American and Muslim women lawyers and organizers.

**Afghans For A Better Tomorrow** ("AFBT") is a grassroots, Afghan-led, advocacy and community organization whose mission aims to organize the Afghan-American community to bring about systemic change in the U.S. and beyond to ensure all Afghans have lives of safety, dignity, and freedom. AFBT provides critical aid and support to Afghans seeking asylum, builds capacity with Afghan-American youth and works to tell the stories of Afghan Americans to shift narratives.

The **Afghan-American Community Organization** ("AACO") is a 501(c)(3) nonprofit dedicated to advancing the Afghan-American community through education and outreach, and promoting civic and social engagement. Since 2015, AACO has brought the Afghan diaspora together to connect, uplift, and address the biggest issues facing the community through the largest annual conference for Afghan-Americans, the only scholarship program for Afghan-American students, fundraising efforts for humanitarian causes in Afghanistan, and civic advocacy on behalf of the diaspora.

*Amici Curiae* urge this Court to affirm the District Court's ruling that it lacks subject matter jurisdiction over the DAB and the Turnover Motions due to the principles of foreign sovereign immunity, and that it would violate the separation of powers to allow DAB's assets to be deemed assets of the Taliban because to do so would implicitly, if not explicitly, recognize the Taliban as the government of Afghanistan, which President Biden has refused to do (and which no country has done).  Accordingly, *Amici Curiae* ask the Court to preserve the Afghan assets held in Afghanistan's Central Bank, Da Afghanistan Bank, for the Afghan people.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

The matter arises out of a deeply painful event in United States history, the September 11th attacks, which killed nearly 3,000 people, including loved ones of judgment creditors who come to this Court seeking some measure of justice for their losses arising out of acts of terror (collectively, "Joint-Creditors").[2] *Amici Curiae* support Joint-Creditors' efforts to collect on duly-obtained judgments against the Taliban and other, *actual* defendants whose crimes caused grievous suffering; still, *Amici* must oppose the method by which they seek to do so, namely by taking $3.5 billion in assets of Afghanistan's central bank, Da Afghanistan Bank ("DAB"), held at the Federal Reserve Bank of New York ("FRBNY"). The assets at issue are sovereign assets of the state of Afghanistan ("Afghan Assets"), and as such, are the assets of and for the Afghan people – not the Taliban. The Taliban bears responsibility for payment of the judgments; satisfaction of a judgment for its crimes should not – and cannot – come from the people of Afghanistan.

The Afghan Assets should be kept as sovereign reserves to *inter alia* maintain the value of the Afghan currency if not directly support the population, and not effectively be given to the Taliban, who are suppressing the rights of women and

---

[2]    Joint-Creditors include estates and family members of those killed in the September 11th attacks (*Havlish* and *Smith*); private contractors injured in a 2016 bombing in Afghanistan (*Doe*); and insurance companies that paid claims arising out of the September 11th attacks (*Federal Insurance*). *See* J. Creditors' Br. ("J.C.") 9.

girls, human rights defenders, and ethnic and religious minorities, among others, and in doing so, exacerbate an already catastrophic humanitarian crisis. It would be profoundly unjust to transfer assets intended for the Afghan people to pay the Taliban's debts. Fundamental principles of foreign relations and separation-of-powers make it clear that it is also unlawful: a court cannot authorize the seizure of sovereign assets of Afghanistan, which are protected by principles of foreign sovereign immunity under both international and U.S. statutory law.

*Amici* submit that the relief Joint-Creditors are seeking is not only misdirected, but wrong as a matter of law. As the District Court correctly determined in denying their Turnover Motions, *first*, DAB is the central bank of Afghanistan, and as such, is an instrumentality of a foreign sovereign, Afghanistan (S.A. 10, 12), which has never been designated a "state-sponsor of terrorism" (S.A. 22), and accordingly enjoys the full immunity protections from adjudicative and enforcement jurisdiction of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, thus depriving the Court of subject matter jurisdiction over DAB and, consequently, the Turnover Motions (*see* S.A. 10-18); and *second*, because the Taliban has not been recognized by the Executive (or any country in the world) as the government of Afghanistan (S.A. 5), the Court is prohibited under the United States Constitution from recognizing (implicitly or explicitly) the Taliban as the legitimate government of Afghanistan, which is required for it to turnover central

bank assets to Joint-Creditors based on a finding that DAB is an agency or instrumentality of the Taliban.

Joint-Creditors minimize or simply avoid these foundational facts and the well-established legal principles that follow in relation to state recognition, foreign sovereign immunity, and the status of and specific protections afforded to central banks. Joint-Creditors provide no answer to the District Court's sound conclusion that without a basis for adjudicative jurisdiction over Afghanistan (including its central bank, DAB), they cannot enforce a judgment against its immunity-protected sovereign assets held in the central bank. Instead, they jump forward directly to attachment of what they reduce to run-of-the-mill "property" – in reality, sovereign Afghan Assets – and focus their argument on the Taliban's alleged *control* over that "property" – Afghanistan's central bank, DAB; but under the law of the FSIA, DAB *is* the foreign state, immune from such U.S. legal process. *See* 28 U.S.C. § 1603(a). The Joint-Creditors do not, and indeed cannot, establish the Taliban's *ownership* over DAB's sovereign assets, as required.

A key question is who has title to the assets in the DAB account. As DAB is an instrumentality of Afghanistan, that answer can only be Afghanistan. *See* Statement of Interest of the United States ("US SOI"), App. 62 (confirming DAB is an agency or instrumentality *of* Afghanistan, not the Taliban). Consequently, Joint-Creditors, with judgments against the Taliban and not Afghanistan (which enjoys

immunity from suit), have no title to execute their judgment against the Afghan Assets.

Indeed, the Court cannot reach the application of the execution statute, Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322, that Joint-Creditors propose without first addressing key foreign relations questions. As the District Court rightly held, it would be contrary to the law of recognition, against U.S. foreign policy, and violative of the separation of powers for this Court to consider that sovereign assets can be stripped of their protection and seized to enforce a terrorism judgment against a non-state entity. S.A. 26-28. TRIA's "notwithstanding" clause does not and cannot override the immunities for foreign sovereigns (and their agencies/instrumentalities) under the FSIA, and the comity and foreign relations considerations that undergird them, as Joint-Creditors suggest.

Attaching the Afghan Assets is not "extract[ing justice]" from the Taliban (Havlish Creditors' Motion for Partial Turnover, March 20, 2022, App. 120); to the contrary, it would permit the Taliban to be relieved of a significant debt without bearing the punitive effects of payment of the judgments. Moreover, recognizing the Taliban as the owner of the sovereign assets of Afghanistan held in the state's central bank would necessarily – even if implicitly – grant the Taliban a level of sovereign recognition that contravenes U.S. foreign policy and harms *Amici* and all

Afghans who object to the Taliban's violent takeover of their country, including those on the ground who continue to challenge the Taliban's illegitimate and catastrophic rule despite the grave risk it poses of detention, disappearance, or even death. It would also deprive the people of Afghanistan the funds they and their country need and that they hope to reclaim.

## BACKGROUND

### A. THE TALIBAN TAKEOVER, CONTINUED PERPETUATION OF THE HUMAN RIGHTS AND HUMANITARIAN CRISIS, AND IMPACT OF U.S. ACTIONS TOWARDS DAB ASSETS.

The Taliban was formed in the early 1990s by Islamic guerilla fighters involved in resistance efforts against the Soviet Union's occupation of Afghanistan.[3] In 1996, after Taliban forces seized Afghanistan's capital, Kabul, the extremist group ruled the country until the 2001 U.S.-led invasion following the September 11th attacks.[4] Despite losing power, the Taliban waged a two-decade insurgency in Afghanistan. As early as October 2018, up to 40% of Afghanistan was either under Taliban rule or disputed territory.[5] By early August 2021, the Taliban had seized

---

[3] Lindsay Maizland, *The Taliban in Afghanistan,* COUNCIL ON FOREIGN RELS., (Jan. 19, 2023).

[4] *Id.* The United States did not recognize the Taliban, maintaining that between 1996 and 2000, there was no functioning central government in Afghanistan. Clayton Thomas, CONG. RSCH. SERV., R46955, TALIBAN GOV'T IN AFG.: BACKGROUND & ISSUES FOR CONGRESS 28 (Nov. 2, 2021).

[5] Clayton Thomas, CONG. RSCH. SERV., R46879, U.S. MILITARY WITHDRAWAL & TALIBAN TAKEOVER IN AFG.: FREQUENTLY ASKED QUESTIONS 9 (Sept. 17, 2021).

several border crossings and taken over half of Afghanistan's provincial capitals. On August 15, 2021, the Taliban undertook its final push, seizing Kabul.

The effect of the Taliban takeover on the Afghan people was immediate. Over 1.6 million Afghans fled the country in search of safety.[6] Rights groups have documented grave human rights violations by the Taliban: in the first year of its rule, 1,174 people were killed,[7] and over 420 people including activists, journalists, professors and religious scholars were illegally detained in the fifteen months after the takeover.[8] The violence has continued, with 516 individuals killed and injured in the first half of 2023, 342 of which were killed in targeted, mysterious, or extrajudicial killings.[9] The Taliban is committing systemic human rights violations across Afghanistan, most notably in effort to erase women's rights and curtail the participation of women and girls in public life and daily depriving them "of their

---

[6] *Afghanistan Refugee Crisis Explained,* USA FOR UNHCR, THE UN REFUGEE AGENCY (July 18, 2023), https://www.unrefugees.org/news/afghanistan-refugee-crisis-explained/.

[7] *Repression, Regression & Reversal: One Year of Taliban Rule in Afghanistan*, RAWADARI 6 (Dec. 10, 2022), https://rawadari.org/wp-content/uploads/2022/12/One-Year-of-Taliban-Rule-in-Afghanistan.pdf.

[8] *Arbitrary and Illegal Detentions in Taliban-Ruled Afghanistan*, RAWADARI 6 (Jan. 23, 2023), https://rawadari.org/230120231263.htm/.

[9] *Human Rights Situation in Afghanistan: Mid-year Report*, RAWADARI 7, 10 (Aug. 12, 2023), https://rawadari.org/wp-content/uploads/2023/08/RW_AFGHumanRights2023_English.pdf.

fundamental human rights and freedoms, including the right to education, the right to work and participate in public affairs, and the right to freedom of movement."[10]

Directly after the Taliban's violent takeover, the U.S. government effectively froze $7.1 billion of Afghan state reserves located at the FRBNY in an attempt to prevent the Taliban from accessing funds that would otherwise contribute to the sovereign wealth of the country.[11] DAB Central Bank was prevented from "accessing foreign currency reserves even as collateral to provide short-term liquidity to settle dollar transactions, make essential payments, purchase banknotes to hold auctions of dollars for private banks, or pay dues to the World Bank."[12]

Because of the central role played by DAB in the Afghan economy and the lives of Afghans, the U.S. government's decision to freeze the Afghan Assets has had serious and widespread effects, which the Taliban rule has only worsened, including shortages of currency in U.S. dollars and Afghan afghanis so that banks are unable to lend money and citizens unable to withdraw their own funds.[13] Indeed, the entire Afghan population has been forced to bear the consequences of Taliban-specific sanctions and the cost of freezing the Afghan Assets. In recognition of *inter*

---

[10]     *Id.* at 24.

[11]     *Afghanistan: Economic Roots of the Humanitarian Crisis*, HUM. RTS. WATCH (Mar. 1, 2022).

[12]     *Id.*

[13]     *Id.*; Zafiris Tzannatos, UNDP, AFGHANISTAN SOCIO-ECONOMIC OUTLOOK 2021–2022: AVERTING A BASIC NEEDS CRISIS 2 (2021).

*alia* the "significant humanitarian and economic concerns," the Executive made "certain property ***of***" DAB available when it issued Executive Order 14064 by blocking DAB assets at the FRBNY, in recognition of the importance of the "preservation" of DAB's property to "addressing the welfare of the people of Afghanistan," and the OFAC license to enable $3.5 billion of the Afghan Assets to be used "for the benefit of the People of Afghanistan." Exec. Order No. 14064, 87 Fed. Reg. 8391-93 (2022); US SOI, App. 43.

Despite the continuing crisis, there is no indication that the Taliban views itself as concerned with the needs or respecting the interests of the people of Afghanistan, but rather, "ruling Afghanistan through fear and repressive policies aimed at suppressing communities, and women in particular."[14] It has restricted access to the courts, removed specialized courts for women, and ultimately eradicated a functioning legal system,[15] while engaging in the systematic persecution of religious and ethnic minorities and women and girls, and attacks on human rights defenders, journalists, and former government officials, among others.[16] Human

---

[14] R. Bennett (Special Rapporteur on Situation of Human Rights in Afghanistan), *Situation of human rights in Afghanistan*, ¶ 7, U.N. Doc. A/HRC/52/84 (Feb. 9, 2023) ("UN Special Rapporteur February 2023 Report").

[15] *Id.* at ¶¶ 50, 52-53, 55; *Stopping State Failure in Afghanistan*, INT'L CRISIS GRP.: COMMENTARY (Jan. 27, 2022).

[16] *Amnesty International Report 2021/22: The state of the world's human rights*, AMNESTY INT'L 66 (March 29, 2022) https://www.amnesty.org/en/documents/pol10/4870/2022/en/.

rights defenders have been forced to change locations regularly due to fear and threats from the Taliban, including raids of civil society organizations' premises and demands for "names and contact details of the staff and associated individuals."[17]

In the two years since the Taliban's takeover, Afghanistan continues to endure "one of the world's worst humanitarian disasters"[18] and unprecedented levels of "systemic collapse and human catastrophe."[19] The Taliban's crackdown on human rights undoubtedly exacerbates the humanitarian crisis, harming if not destroying many sectors of the country with little regard for providing for the basic needs of the people of Afghanistan: (1) the country's healthcare infrastructure is devastated, with shortages in essential medicine and medical equipment, doctors and healthcare workers are forced to forego pay, and Taliban authorities ban female medical staff from medical practice or kill or detain doctors or hospital officials;[20] (2) the economic and banking sector collapsed in functionality, with public confidence fractured; and (3) the education system – the largest employer in Afghanistan – can

---

[17]    UN Special Rapporteur February 2023 Report ¶ 64.

[18]    Patricia Gossman, *Hard Choices in Afghanistan's Humanitarian Crisis,* HUM. RTS. WATCH (May 15, 2023), https://www.hrw.org/news/2023/05/15/hard-choices-afghanistans-humanitarian-crisis.

[19]    *Afghanistan*, OCHA, https://www.unocha.org/afghanistan.

[20]    Fereshta Abbasi, *Afghans Dying from Lack of Medicine*, HUM. RTS. WATCH (May 9, 2022), https://www.hrw.org/news/2022/05/09/afghans-dying-lack-medicine; Stefani Glinski, *'The Taliban know they need us': the Afghan hospitals run by women*, THE GUARDIAN (May 9, 2022), https://www.theguardian.com/global-development/2022/may/09/taliban-afghanistan-hospitals-run-by-women-doctors.

no longer provide payments to educators and staff.[21] Approximately 700,000 are unemployed since the Taliban takeover – many of them women.[22]

Food insecurity is rampant; the United Nations World Food Program said it is forced to "choose between the hungry and the starving."[23] Families have resorted to "drugging hungry children to [make them] fall asleep."[24] Others have committed suicide.[25] "Over 1 million children under age 5 are suffering from prolonged acute malnutrition, with long-term consequences."[26]

Expert predictions surfaced in 2021 of an unprecedented human rights and humanitarian catastrophe have regretfully proven to be true: in the lead-up to the two year anniversary of the Taliban takeover, the United Nations reported that the number needing humanitarian assistance increased from 18.4 million to an estimated

---

[21]    *Afghanistan: The Humanitarian Crisis and U.S. Response: Hearing Before the Subcomm. on Near East, South Asia, Central Asia, and Counterterrorism of the S. Comm. on Foreign Rels.*, 117th Cong. 13 (2022) (statement of Graeme Smith, Senior Consultant, Int'l Crisis Grp.).

[22]    UN Special Rapporteur February 2023 Report ¶ 28.

[23]    *Afghanistan: WFP forced to cut food aid for 2 million more*, UNITED NATIONS (Sept. 5, 2023), https://news.un.org/en/story/2023/09/1140372.

[24]    Yogita Limaye, *Afghanistan: 'I drug my hungry children to help them sleep'*, BBC (Nov. 24, 2022), https://www.bbc.com/news/world-asia-63733683.

[25]    Hizbullah Khan, *The families losing their loved ones to hunger suicide in Afghanistan*, PROSPECT (March 9, 2023) (Samia, a 35-year-old widow, said: "My husband saw the cries of hungry children for months and tried several times to earn money and feed children, but failed and committed suicide as he lost hope.").

[26]    UN Special Rapporteur February 2023 Report ¶ 86.

28.3 million Afghans, or two-thirds of the country.[27] The total is nearly 100% for households headed by women[28] – a profound example of how, especially in the case of women and girls, the human rights crisis in Afghanistan worsens the humanitarian catastrophe.[29] One of the main causes of food insecurity is the Taliban's "harsh restrictions on women and girls' rights," leading to their dismissal from or loss of jobs, including due to the near-total ban on women working with local and international nongovernmental organizations and the United Nations.[30]

## B. THE IDENTIFICATION OF THE JUDGMENT DEBTOR.

There is no dispute that Joint-Creditors' judgments were rendered against the Taliban.[31] Afghanistan was not a party to the proceedings resulting in the judgments for which Joint-Creditors seek enforcement and collection, nor could it have been. Sovereign immunity from jurisdiction only allows for very limited exceptions.

---

[27] UN Secretary-General, *The situation and its implications for international peace and security*, ¶ 55, U.N. Doc. A/77/772-S/2023/151 (Feb. 27, 2023).

[28] *Afghanistan: Economic Roots of the Humanitarian Crisis.*

[29] Press Release, *The Women's Forum on Afghanistan Deplores the Exclusion of Afghan Women from Key Talks on Afghanistan*, WOMEN'S FORUM ON AFGHANISTAN (Apr. 28, 2023), https://www.womens-forum-afghanistan.org/wp-content/uploads/2023/05/WFA-April-28-Press-Release.pdf.

[30] *Afghanistan: Repression Worsens 2 Years into Taliban Rule*, HUM. RTS. WATCH (Aug. 10, 2023), https://www.hrw.org/news/2023/08/10/afghanistan-repression-worsens-2-years-taliban-rule.

[31] In *Havlish*, for example, against both state and non-state entities, the Taliban were listed as "non-sovereign defendant." *Havlish*, Judgment on Liability, Dec. 22, 2011, MDL #294.

While the FSIA provides such an exception for "state sponsors of terrorism," Afghanistan has never been designated as such.

Because the judgments were rendered against the Taliban, a non-state "terrorist party," none of the Joint-Creditors hold title to enforce their judgment against Afghanistan – or its assets. To the extent that a Writ of Execution designated the Taliban as, or equated the Taliban with, the sovereign of Afghanistan,[32] that is both legal and factual error; the Writ cannot convert the sovereign assets of Afghanistan into assets of the Taliban, a non-state "terrorist party."

### C. STATEMENT OF INTEREST OF THE UNITED STATES.

Joint-Creditors submit that the "political branches made a considered decision to allow turnover of DAB's assets to satisfy the Taliban's debts" and specifically, that President Biden contemplated that they "would" satisfy their judgments against the Taliban by executing on the DAB assets (subject to court approval). J.C. 61-62 (capitalization omitted). The record does not support such assertions, and as explained below, neither does the law. In the record is the Statement of Interest of the United States submitted in the proceedings below. *See* App. 34. In it, the United States expressed its "strong interest in the President's constitutional authority to make decisions with respect to the recognition of foreign governments and his blocking and licensing authority . . . and in ensuring the proper construction of TRIA

---

[32]    *See Havlish* Writ of Execution, App. 149.

12.

and the [FSIA]." U.S. SOI, App. 44. It identified the only path for Joint-Creditors to recover the Afghan Assets as successfully "establishing a theory of *ownership* [of the assets] by the Taliban" that would either require this Court "to make its own determination as to the identity of Afghanistan's government or to make its own determination as to whether Afghanistan is a state sponsor of terrorism." U.S. SOI, App. 68 (emphasis added). Without recommending an outcome, it set out certain factual findings and principles to guide resolution of the Turnover Motions:

➢ Determining whether blocked assets are assets "of" an agency or instrumentality of a terrorist party, i.e., the Taliban, requires inquiring whether it has "an ownership interest" in the Afghan Assets – an inquiry that "implicate[s] significant issues of foreign policy" including "the prerogative of the President to recognize and to conduct diplomacy with foreign states" (U.S. SOI, App. 61)

➢ Neither Afghanistan nor its agencies or instrumentalities have been designated as a state sponsor of terrorism, and DAB is an agency or instrumentality of Afghanistan under the FSIA's definition and thus is to be treated as a "foreign state" for FSIA purposes (U.S. SOI, App. 61-62)

➢ FSIA provides that property of a central bank, held in its own account, is immune from attachment and execution, absent explicit waiver; TRIA allows state assets to be attached "only" with respect to designated state sponsors of terrorism (U.S. SOI, App. 65-66)

➢ Permitting the assets of a state that is not designated as a state sponsor of terrorism "to be attached indirectly to satisfy the judgment against a non-state terrorist organization would supplant the discretion that Congress afforded to the Executive Branch in designating state sponsors of terrorism" (U.S. SOI, App. 68 n. 9)

➢ Under U.S. foreign relations law and international law, there is a distinction between a foreign government and foreign state, and therefore a distinction between property "owned by" the state and property "owned by" a governing regime; if a regime is not recognized as the government of a state, it is not

13.

entitled to access property located in the United States belonging to the state (U.S. SOI, App. 66-67)

➤ U.S. property abroad risks reciprocal challenges if the narrowly defined exceptions to execution immunity are not properly applied (U.S. SOI, App. 67-68).

Rather than supporting turnover of the DAB assets to Joint-Creditors, given the significant political considerations raised by the United States – implicating security, foreign relations, and multilateral negotiations – these guidelines are, *Amici* respectfully submit, in effect a mandate to deny the appeal and affirm the District Court opinion.

## ARGUMENT

**I. UNDER FUNDAMENTAL PRINCIPLES OF U.S. FOREIGN RELATIONS AND INTERNATIONAL LAW, ASSETS OF DAB ARE PROTECTED SOVEREIGN ASSETS FOR THE STATE AND ITS PEOPLE, NOT THE TALIBAN.**

Consideration of the Turnover Motions must begin with the FSIA and corresponding comity and foreign relations principles undergirding it. TRIA is not a stand-alone statute and enforcement actions thereunder must be assessed against the immunity provisions – and limited exceptions – of the FSIA. Those statutes, and that analysis (*infra* Section I(C)), are informed by fundamental principles of public international law, as incorporated into U.S. law, and U.S. foreign relations law governing recognition of sovereigns (and governments), ownership of sovereign assets, and immunities that apply to sovereign assets. *See The Paquete Habana,* 175 U.S. 677, 700 (1900) (finding "[i]nternational law is part of our law and must be

14.

ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination").

### A. THE STATE OF AFGHANISTAN, AND ITS AGENCY DAB, NOT THE TALIBAN, IS THE SOVEREIGN ENTITY OF AFGHANISTAN.

Granting Joint-Creditors' appeal would implicitly give judicial imprimatur to a flawed political assertion that the current *de facto* rulers of Afghanistan, the Taliban, who assumed the levers of governmental power through a sustained campaign of violence and terror against Afghan citizens, represents the sovereign state of Afghanistan. Elementary principles of constitutionalism and popular sovereignty recognize that sovereignty inheres in the people – not in governments and certainly not in *de facto* authorities that seize power through violence.

Specifically, a sovereign state is "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." Restatement (Third) of Foreign Relations Law § 201. Afghanistan, as a sovereign state, has been a member state of the United Nations since 1946. A foreign state is distinct from a foreign government. *Id.* at § 203 cmt. a ("A state can . . . recognize or treat an entity as a state while denying that a particular regime is its government").

15.

Joint-Creditors conflate concepts of a state and a representative government. Changes of government – even in the context of hostile takeovers or *coup d'états* – have no effect on the legal personality and the continuity of states *qua* states. *See* Situation in the Islamic Republic of Afghanistan, ICC-02/17, Order, ¶ 15 (Feb. 24, 2022); Restatement (Third) of Foreign Relations Law § 208 cmt. a ("*Succession of states and governments distinguished*: Under international law, the capacities, rights, and duties . . . appertain to the state, not to the government which represents it. . . . They are not affected by a mere change in the regime or in the form of government or its ideology").

It is a truism that while governments come and go, the state's legal personality remains:

> the effect of a revolution resulting in a government which for a time fails to secure any recognition from foreign states, does not destroy the international personality of the state or free it, permanently at any rate, from existing treaty obligations; though it involves an interruption in that state's ability to exercise its legal capacity for international purposes.

1. R. JENNINGS & A. WATTS, OPPENHEIM'S INTERNATIONAL LAW: PEACE § I 149-50, ¶ 44 (9th ed., 1992).

U.S. courts have upheld the distinction between State and government. For example, in a case involving the consequences of the nonrecognition of the Soviet Government by the U.S., the Supreme Court distinguished between the rights of the State and the government. *See Guar. Tr. Co. v. United States*, 304 U.S. 126, 137

(1938) ("the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it").

As the District Court acknowledged, under the U.S. Constitution, the President has the power to recognize (or not recognize) foreign nations and governments – "an act with immediate and powerful signification for international relations." *Zivotofsky v. Kerry*, 576 U.S 1, 21 (2015). *See* S.A. 26-27. As such, it has long been recognized that such a power is "outside the competence" of courts. *Nat'l City Bank v. Republic of China*, 348 U.S. 356, 358 (1955); *see also Baker v. Carr*, 369 U.S. 186, 212 (1962). President Biden has not recognized the Taliban – a *de facto* authority, at best – as the government of Afghanistan, a position shared by every country in the world. The Taliban's takeover does nothing to change the sovereign status of Afghanistan and the constituent people of Afghanistan.

## B. PRINCIPLES OF FOREIGN SOVEREIGN IMMUNITY PROTECT THE SOVEREIGN PROPERTY OF AFGHANISTAN, INCLUDING DAB, FROM TURNOVER IN U.S. COURTS.

Joint-Creditors give short shrift to longstanding common law principles recognizing foreign sovereign immunity, and in so doing, urge this Court to go down a path that would not only contravene the FSIA's black-letter law but would place the United States in contravention of international norms, practices, and obligations. This Court should decline to do so. Under both customary international law and treaty law, foreign sovereigns enjoy immunity, in respect of the state itself and its

property, for public acts in the national courts of other countries with limited exceptions and as specifically waived.  *See* HAZEL FOX & PHILIPPA WEBB, THE LAW OF STATE IMMUNITY, (Oxford University Press, 3d ed. 2015); Convention on Jurisdictional Immunities of States and their Property, *adopted* Dec. 2, 2004, G.A. Res. 59/38 ("U.N. State Immunities Convention"), *Preamble* (recognizing that "jurisdictional immunities of States and their property are generally accepted as part of customary international law"); *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010) (finding that the doctrine of foreign sovereign immunity was developed as a matter of "grace and comity" under common law); *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 271 (2023) ("*Halkbank*") ("the doctrine of sovereign immunity developed in U.S. courts 'as a matter of common law' rather than by statute") (citations omitted).

The notion that a foreign state enjoys immunity from legal process derives from principles of independence, equality, and dignity of States.  *See The Schooner Exchange v. McFaddon*, 11 U.S. 116, 123 (1812).  Foreign sovereign immunity applies with regards to immunity from jurisdiction *and* immunity from enforcement.  *See, e.g.,* U.N. State Immunities Convention, art. 5 (adjudication) and art. 19 (enforcement).  Notably, because "[e]nforcement against State property constitutes a greater interference with a State's freedom to manage its own affairs and to pursue its public purposes," immunity from enforcement has been called "the last fortress,

18.

the last bastion of State immunity." *See* Fox & Webb, *The Law of State Immunity* 486, 484; *id.* at 519 (national courts recognize state ownership of assets and public use and purpose as the basis for immunity from enforcement for categories of state property, including central banks).[33]  Accordingly, the United States has expressed this same position. *See* Second Statement of Interest of the United States 6-7, *Rubin v. Islamic Republic of Iran*, No. 03-cv-9370 (N.D. Ill. Mar. 3, 2006), ECF No. 145 (observing that lifting immunity from enforcement was "more difficult" than lifting immunity from jurisdiction because "judicial incursion on a foreign sovereign's property is often likely to be far more problematic from a foreign relations point of view than simply requiring the sovereign to appear to defend a lawsuit on the merits").

The United States codified the customary law of foreign sovereign immunity in the FSIA, which allows for certain exceptions arising out of commercial activities – the "restrictive immunity doctrine" – as well as designations as a state sponsor of terrorism, and courts regularly look to international law and practice to decide immunity questions arising from its application. *See Samantar*, 560 U.S. at 319-20

---

[33]    Blocking the assets of a foreign state is fundamentally different in nature than enforcement actions, and falls outside the protections of foreign sovereign immunity. For this reason (among others), that the United States *blocked* the DAB assets in 2000 because it determined DAB "to be owned or controlled by, or to act for or on behalf of the Taliban" (U.S. SOI, App. 63) has no bearing on whether enforcement actions involving DAB funds would or could have been successful even at that time.

(Congress "recognized [the FSIA] was consistent with extant international law"); *Permanent Mission of India to United Nations v. City of New York*, 551 U.S. 193, 199 (2007) (same).

Immunity from attachment has been abrogated with regards to sovereign assets held in central banks under TRIA *only* in cases involving states designated as state-sponsors of terrorism, in accord with the political branches' determination that such odious conduct warrants the limitation or revocation of foreign sovereign immunity so that judgments against terrorist states are enforced. *See, e.g, Weininger v. Castro,* 462 F. Supp. 2d 457, 481 (S.D.N.Y. 2006) (Cuba)*; Gates v. Syrian Arab Republic,* No. 11 C 8715, 2013 WL 1337223, at *5-7 (Mar. 29, 2013) (Syria); *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) (Iran). Afghanistan, a state that has never been designated a state-sponsor of terrorism, enjoys full jurisdictional immunity (save for commercial activities exceptions set forth in the FSIA) and immunity of attachment or execution of its sovereign property. *See* 28 U.S.C. §§ 1604, 1609, 1611.

### 1. DAB is an Agency/Instrumentality of the Sovereign State and Immune from Judicial Process in U.S. Courts.

Joint-Creditors seek to recover assets held by Afghanistan's central bank, DAB. It is well-established that a foreign state's central bank constitutes an "agency or instrumentality" of that foreign state. *See, e.g., S & S Machinery Co. v Masinexportimport,* 706 F.2d 411, 414 (2d. Cir. 1983) (describing a sovereign's

central bank as the "paradigm of a state agency or instrumentality"); H.R. Rep. No. 94-1487, at 15-16 (1976) (identifying a central bank as an entity that constitutes an "agency or instrumentality of a foreign state" for purposes of Section 1603 of the FSIA). Importantly, the FSIA makes clear that agencies and instrumentalities of a foreign state *are* "a foreign state." *See* 28 U.S.C. § 1603(a) ("A "foreign state" . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state . . ."); *see also Halkbank*, 598 U.S. at 272 ("The FSIA defines a "foreign state" to encompass instrumentalities of a foreign state"). This Court's prior finding that "funds of foreign central banks" are, in fact, "reserves of the foreign states' themselves" follows from this conclusion. *NML Capital, Ltd. v. Banco Central de la República Argentina,* 652 F.3d 172, 189 (2d Cir. 2011); *see also* U.S. SOI, App. 66 (affirming assets of a foreign central bank belong "to the foreign state and thus would not be the assets of a private party."). Joint-Creditors cannot rebut this fact, which would be required to make a finding that these same assets can be deemed an agency or instrumentality of a non-state entity. *See Caballero v. Fuerzas Armadas Revolucionarias de Colombia ("FARC")*, 945 F.3d 1270, 1276 (10th Cir. 2019) (citations omitted) (holding that "[i]f the party wishes to execute against the assets of a terrorist party's agency or instrumentality, the party must further establish that the purported agency or instrumentality is *actually* an agency or instrumentality") (emphasis added).

Accordingly, central banks readily come within the statutory definition of a "foreign State," with the assets therein qualifying as sovereign property entitled to protection from attachment. 28 U.S.C. § 1609; *see S & S Machinery Co.,* 706 F.2d at 416. Indeed, central banks often enjoy greater protections from enforcement under international law than other agencies or instrumentalities. *See* Fox & Webb, *The Law of State Immunity* 255, 528. Central bank assets are crucial for the state to exercise sovereign activities such as currency stabilization, printing currency, holding currency auctions and more generally regulating and supporting the banking sector. These are the very functions normally carried out by DAB: "As Central Bank of Afghanistan, Da Afghanistan Bank operates to stabilize price levels, strengthen the financial sector, ensure the safety of payment system, manage currency reserves effectively, print Afghani banknotes and act as state banker." *About Us: Departments*, DA AFGHANISTAN BANK, https://dab.gov.af/index.php/departments.

In accord with international law, and in light of its specific functions, the FSIA "shields from execution property 'of a foreign central bank or monetary authority for its own account.'" *Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016) (quoting 28 U.S.C. §1611(b)(1)). Notably, this Court has opined that foreign central banks enjoy heightened immunities from enforcement "to provide an incentive for foreign central banks to maintain their reserves in the United States." *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 473 (2d Cir. 2007). Joint-Creditors are thus incorrect in

22.

describing the object of these proceedings as mere "property" of a foreign state, J.C. 3, 47-48; in seeking Afghanistan's assets held in its central bank, the Joint-Creditors are, in fact, declaring the foreign state *itself* as the target of this action. This action is thus barred by the immunities Afghanistan (and its agencies and instrumentalities) enjoy under the FSIA. It is disingenuous at best and wrong as a matter of law for the Joint-Creditors to claim that "DAB would not incur any personal obligation as a result of this proceeding" when it is the coffers of the state of Afghanistan which would be emptied if turnover is permitted. J.C. 48.

### 2. Title Over DAB's Assets was Unaffected by the Taliban Takeover and They Remain Assets of the Sovereign – Not the Taliban.

In an effort to seize foreign state assets that are otherwise immune from execution, Joint-Creditors suggest that the central bank assets actually went from being sovereign funds to being private funds when the Taliban overtook the previous regime. The alleged *control* that Joint-Creditors claim the Taliban have of *DAB*, *see* J.C. 24-25, as an entity (*if* established) does *not* translate to *ownership* over *DAB funds,* including sovereign Afghan Assets. The Afghan Assets *cannot* simultaneously be the property "of" *both* the sovereign state of Afghanistan *and* a non-state entity, the Taliban – even if the latter may be operating as the *de facto* authority, but universally unrecognized government. Blocking access to property does not change title; it only limits the powers and privileges associated with ownership. *See* U.S. SOI, App. 48.

## C. TRIA'S OWNERSHIP REQUIREMENTS CANNOT BE BYPASSED IN AN ATTEMPT TO ENFORCE A JUDGMENT AGAINST FUNDS PROTECTED BY SOVEREIGN IMMUNITY.

There is no basis in the legislative history, statutory text, or caselaw to conclude that TRIA preempts the FSIA with regard to foreign sovereigns that have not been designated a state-sponsor of terrorism on the asserted theory TRIA has a generic "notwithstanding" clause regarding *conflicting* statues.[34]  Because it has never been designated a state-sponsor of terrorism, Afghanistan's immunities have not been modified and limited under TRIA, as may happen to those foreign states whose actions warrant this odious label.  And, it would be improper to interpret any ambiguity in the application of TRIA in a way that conflicts with the immunity foreign sovereigns enjoy under international law.  *See Murray v. The Schooner Charming Betsy*, 2 Cranch 64, 118 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains").

### 1.  TRIA Does Not Allow the Joint-Creditors to Bypass Ownership.

As the United States explained, TRIA § 201(a) does not allow the Plaintiffs to bypass the issue of ownership of the assets:

> In assessing whether the DAB Assets constitute the 'blocked assets of [a] terrorist party' or the 'blocked assets of any agency or instrumentality of that terrorist party,' the word 'of' plays an important role. TRIA's standard requires an inquiry into whether a terrorist party (or an agency or instrumentality thereof) has an ownership interest in the DAB Assets.

---

[34]    *Amici* adopt the arguments on the effect of "notwithstanding" in Amicus Curiae Br. of Naseer A. Faiq, pp. 28-29.

U.S. SOI, App. 61.

Section 201 of TRIA and § 1610(g) "denotes ownership" and before any attachment, in fact requires that the terrorist party "own" the contested assets. *Heiser v. Islamic Republic of Iran,* 735 F.3d 934, 937-38 (D.C. Cir. 2013). Here, the Afghan Assets, as assets in Afghanistan's central bank, belong to the state and *only the state*. A "relationship" between the Taliban (even as a *de facto* government) and the contested assets or an interest in the assets is insufficient under TRIA; legal title is required. *Id.* at 938, 941. Like in *Hausler v. JP Morgan Chase Bank, N.A.,* 770 F.3d 207, 212 (2d. Cir. 2014), because the Taliban "does not have any property interest" in the Afghan Assets, they are not the blocked assets "of" the Taliban and are not attachable under TRIA § 201. *See also Bank of N.Y. v. Nickel*, 789 N.Y.S. 2d 95, 99 (N.Y. App. Div. 2004) ("It is beyond cavil that attachment will only lie against the property of the debtor, and that the right to attach the property "is only the same as the defendant's own interest in it.") (citations omitted). To allow property that does not belong to the Taliban to be used to satisfy judgments against it "punish[es] innocent third parties" – the people of Afghanistan – not the Taliban. *See Heiser,* 735 F.3d at 939, 940.

The Joint-Creditors' reliance on *Kirschenbaum v. 650 Fifth Avenue*, 830 F.3d 107 (2d Cir. 2016) is misplaced. As the United States explained, *Kirschenbaum* "arose in a different posture than here," in a case where the entity with the assets

was a non-state entity and the state at issue had been designated a state-sponsor of terrorism, and accordingly, "[t]he Second Circuit had no occasion . . . to consider whether, and under what circumstances (if any), an agency or instrumentality of a foreign state can simultaneously also be an agency or instrumentality of a non-state entity" for which "the relevant considerations may differ." U.S. SOI, App. 63; *see also* S.A. 20 (citing *Kirschenbaum* for finding that TRIA provides execution jurisdiction for a judgment for which there was original jurisdiction under the FSIA).[35] There, the risk of breaching fundamental principles of sovereign immunity were minimal and the foreign relations and separation of powers implications that are so significant in this case were largely absent. Regardless, Joint-Creditors' claim still fails. Ownership of the contested assets is required under TRIA. Notably, nowhere in their Turnover Motions do Joint-Creditors make the assertion that the DAB assets are the assets "of" the Taliban.[36] Indeed, such an assertion cannot be made when the DAB assets are the assets "of" the sovereign state of Afghanistan.[37]

---

[35]  *Kirschenbaum* involved enforcement of judgments against a state that had been designated as a state-sponsor of terrorism, Iran, and not a foreign state never tainted as such (like Afghanistan), which fundamentally alters the analysis and the impact on foreign relations.

[36]  Rather, the Joint-Creditors argue the Taliban "has an interest" in these assets "through its agency or instrumentality, DAB." *Havlish* Turnover Mot. 2. *See* J.C. 1, 4.

[37]  *Caballero v. FARC*, No. 20-MC-0030, 2021 WL 307558 (W.D.N.Y. Jan 29, 2021), upon which Joint-Creditors relied below, in which a state-owned commercial enterprise – an oil company and not a central bank – of a non-designated foreign sovereign was found to be an agency or instrumentality of a terrorist-designated non-

### 2. Joint-Creditors Misapprehend the Relationship Between the FSIA and TRIA.

For states like Afghanistan that are *not* designated as a state-sponsor of terrorism, the FSIA provides the exclusive basis to bring suit against the state or its agencies or instrumentalities. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989). Joint-Creditors seek to make an end-run around the FSIA and lay claim to sovereign assets under TRIA by enforcing a judgment against a non-sovereign terrorist party with funds in which the Taliban have no ownership interest.

TRIA only provides for attachment of blocked assets belonging to a "terrorist party," defined as "a terrorist, a terrorist organization . . . or a foreign state designated as a state sponsor of terrorism."[38] Title II of TRIA, therefore, does not provide a sound legal basis to attach Afghanistan's assets. As the property at issue in this case belongs to the central bank of a foreign state that enjoys the full protections of the FSIA, including 28 U.S.C. §1611(b)(1), the Joint-Creditors' reliance on cases

---

state entity, has been vacated. *See* No. 20-MC-00040-LJV (W.D.N.Y. Sept. 20, 2022), ECF No. 144. *See also* No. 20-MC-00040-LJV (W.D.N.Y. Sept. 20, 2022), ECF No. 125 (U.S. Statement of Interest).

[38] The reason that the District Court found TRIA inapplicable was not, as Joint-Creditors argue (J.C. 41-45), because it incorrectly narrowed TRIA to only "states" rather than also non-state entities – there is no dispute TRIA applies to non-state *terrorist* entities or organizations when conditions are met – but because the statute is limited to *terrorist* parties and the target of attachment here (Afghanistan/DAB) is not so designated.

27.

involving the blocked property of either a foreign state designated as a state-sponsor of terrorism or a non-state terrorist-designated party is inapposite. Of course enforcement requires the judicial authority to ensure that the title (here, the judgment) matches the entity it is enforced against. That is not the case here, as Joint-Creditors are seeking to attach assets whose ownership does not rest with the Taliban. The Taliban itself has no title over DAB's assets; such title rests with the State.

While the TRIA goes beyond the FSIA, it would run contrary to the carefully crafted scheme set forth by the political branches in the FSIA, in accordance with international law and U.S. foreign relations law, to protect the assets of foreign states that are *not* state-sponsors of terrorism and instead allow TRIA to serve as a backdoor to seize such sovereign assets – especially those held in a foreign state's central banks, which enjoy heightened immunity protections under the FSIA, as explained above. Indirectly trying to attach the immunized assets of a sovereign state using TRIA is impermissible. The United States warns against doing so in no uncertain terms: "Where a state is not designated as a state sponsor of terrorism, TRIA does not authorize the attachment of a foreign state's assets to satisfy a judgment against the foreign state. Permitting a foreign state's assets to be attached indirectly to satisfy the judgment against a nonstate terrorist organization would

supplant the discretion that Congress afforded to the Executive Branch in designating state sponsors of terrorism." U.S. SOI, App. 68 n.9.

## **CONCLUSION**

For the foregoing reasons, Joint-Creditors' appeal should be dismissed.

Dated: October 6, 2023                    Respectfully submitted,

                                         */s/Katherine Gallagher*
                                         Katherine Gallagher (KG-2222)
                                         Sadaf Doost
                                         Center for Constitutional Rights
                                         666 Broadway, 7th Floor
                                         New York, NY 10012

                                         *Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,<br>TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS</u>

1.    This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and Local Civil Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,996 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.


Dated: October 6, 2023                    By:    /s/ *Katherine Gallagher*
                                                                    Katherine Gallagher

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 6, 2023, I electronically filed the foregoing Brief of *Amici Curiae* Afghan and Afghan-American Civil Society Organizations: Rawadari, Transitional Justice Coordination Group, Women's Forum on Afghanistan, et al. Supporting Affirmance with the Clerk of the Court of the United States Court of Appeals for the Second Circuit using the Court's CM/ECF system and served on all counsel of record via CM/ECF.  Pursuant to Local Rule 31.1, six paper copies are also delivered to the Court.


Dated: October 6, 2023                    By:    /s/ *Katherine Gallagher*
                                                                Katherine Gallagher