# 23-258(L)

## 23-263 (CON), 23-304 (CON), 23-346 (CON), 23-444 (CON)

### United States Court of Appeals
### for the Second Circuit

FIONA HAVLISH, RUSSA STEINER, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF WILLIAM STEINER, DECEASED, CLARA CHIRCHIRILLO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF PETER CHIRCHIRILLO, TARA BANE, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF MICHAEL A. BANE, GRACE M. PARKINSON-GODSHALK, IN HER OWN RIGHT AND ADMINISTRATIX OF THE ESTATE OF WILLIAM R. GODSHALK, ELLEN L. SARACINI, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF VICTOR J. SARACINI, DECEASED, THERESAANN LOSTRANGIO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF JOSEPH LOSTRANGIO, DECEASED, DEENA BURNETT, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF THOMAS E. BURNETT, JR., DECEASED, THOMAS E. BURNETT, SR., AS THE PARENT AND ON BEHALF OF THE FAMILY OF THOMAS E. BURNETT, JR., JUDITH REISS, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JOSHUA SCOTT REISS, DECEASED, WILLIAM COALE, IN HIS OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JEFFREY ALAN COALE, DECEASED, PATRICIA J. PERRY, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF JOHN WILLIAM PERRY, DECEASED, BARBARA A. MINERVINO, IN HER OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF LOUIS J. MINERVINO, DECEASED,

*(caption continued on inside cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS FIONA HAVLISH, ET AL.; JOHN DOES 1 THROUGH 7; FEDERAL INSURANCE CO., ET AL.; AND RAYMOND ANTHONY SMITH, ET AL. (THE "JOINT CREDITORS")**

---

Andrianna D. Kastanek
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7285

Lee Wolosky
Benjamin D. Alter
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Ian Heath Gershengorn
Douglass A. Mitchell
Elizabeth B. Deutsch
Samuel S. Ungar
JENNER & BLOCK LLP
1099 New York Ave., NW, Ste. 900
Washington, DC 20001
(202) 639-6000

*Counsel for Plaintiffs-Appellants*
*Fiona Havlish, et al., Appellants in 23-258*

*Additional counsel listed inside*

MATTHEW T. SELLITTO, IN HIS OWN RIGHT AND AS ADMINISTRATIX OF THE ESTATE OF LOUIS J. MINERVINO, DECEASED, RALPH MAERZ, JR., AS PARENT AND ON BEHALF OF THE FAMILY OF NOELL MAERZ, DECEASED, LINDA PANIK, AS PARENT AND ON BEHALF OF THE FAMILY OF LT. JONAS MARTIN PANIK, DECEASED, MARTIN PANIK, AS PARENT OF AND ON BEHALF OF THE FAMILY OF LT. JONAS MARTIN PANIK, DECEASED, MARTINA LYNE-ANN PANIK, AS THE SISTER OF LT. JONAS MARTIN PANIK, STEPHEN L. CARTLEDGE, AS HUSBAND OF SANDRA WRIGHT CARTLEDGE, DECEASED, LOISANNE DIEHL, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF MICHAEL DIEHL, DECEASED, TINA GRAZIOSO, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF JOHN GRAZIOSO, DECEASED, JIN LIU, IN HER OWN RIGHT AND AS EXECUTRIX OF THE ESTATE OF LIMING GU, DECEASED, ALL PLAINTIFFS, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, MICHAEL EDWARD PAIGE, SPECIAL ADMINISTRATOR OF THE ESTATE OF TIMOTHY RAYMOND WARD, DECEASED., BRIANNA L. GOMES, ADMINISTRATOR OF THE ESTATE OF DOYLE RAYMOND WARD, DECEASED, JOHN DOES 1 THROUGH 7, RAYMOND ANTHONY SMITH, AS ADMINISTRATOR OF THE ESTATE OF GEORGE ERIC SMITH, DECEASED, FEDERAL INSURANCE COMPANY, PACIFIC INDEMNITY COMPANY, CHUBB CUSTOM INSURANCE COMPANY, CHUBB INDEMNITY INSURANCE COMPANY, CHUBB INSURANCE COMPANY OF CANADA, CHUBB INSURANCE COMPANY OF NEW JERSEY, GREAT NORTHERN INSURANCE COMPANY, VIGILANT INSURANCE COMPANY, TIG INSURANCE COMPANY, KATHLEEN ASHTON, AS ADMINISTRATOR OF THE ESTATE OF THOMAS ASHTON, DECEASED AND ON BEHALF OF ALL SURVIVORS OF THOMAS ASHTON, JOSEPHINE ALGER, AS ADMINISTRATOR OF THE ESTATE OF FREDERICK ALGER, AS COEXECUTORS OF THE ESTATE OF DAVID D. ALGER, DECEASED AND ON BEHALF OF THE SURVIVORS OF DAVID D. ALGER, ANGELICA ALLEN, AS ADMINISTRATOR OF THE ESTATE OF ERIC ALLEN, DECEASED AND ON BEHALF OF ALL SURVIVORS OF ERIC ALLEN, GEORGE ANDRUCKI, AS COADMINISTRATOR OF THE ESTATE OF JEAN ANDRUCKI, DECEASED AND ON BEHALF OF ALL SURVIVORS OF JEAN ANDRUCKI, MARY ANDRUCKI, AS COADMINISTRATOR OF THE ESTATE OF JEAN ANDRUCKI, DECEASED AND ON BEHALF OF ALL SURVIVORS OF JEAN ANDRUCKI,

      Plaintiffs - Appellants,

KATHERINE SOULAS, IN HER OWN RIGHT, AS REPRESENTATIVE OF THE HEIRS, ON BEHALF OF HER MINOR CHILDREN, AND AS EXECUTRIX OF THE ESTATE OF TIMOTHY SOULAS, DECEASED, ON BEHALF OF THE SOLATIUM CLAIMANTS, INCLUDING KATHERINE SOULAS, FREDERICK SOULAS, II, TIMOTHY SOULAS, JR.,

      Plaintiff,

JANE DOE, IN HER OWN RIGHT, ON BEHALF OF HER MINOR CHILDREN, AND AS EXECUTRIX OF THE ESTATE OF TOM SAWYER, A FICTITIOUS NAME, DECEASED,

      Consolidated - Plaintiff,

                        v.

THE ISLAMIC EMIRATE OF AFGHANISTAN, THE TALIBAN, AL QAIDA/ISLAMIC ARMY, SHEIKH USAMAH BIN-MUHAMMAD BIN-LADEN, AKA OSAMA BIN-LADEN, REPUBLIC OF IRAQ,

      Defendants - Appellees,

FEDERAL RESERVE BANK OF NEW YORK,

 Garnishee-Interested-Party,

SHEIKH USAMA BIN-LADEN, MUHAMMAD OMAR, AL QAEDA/ISLAMIC ARMY, ISLAMIC REPUBLIC OF IRAN, AYATOLLAH ALI HOSEINI-KHAMENEI, SUPREME LEADER, IRANIAN MINISTRY OF INFORMATION AND SECURITY, THE ISLAMIC REVOLUTIONARY GUARD CORPS, HEZBOLLAH, AN UNINCORPORATED ASSOCIATION, IRANIAN MINISTRY OF PETROLEUM, IRANIAN MINISTRY OF ECONOMIC AFFAIRS AND FINANCE, IRANIAN MINISTRY OF COMMERCE, IRANIAN MINISTRY OF DEFENSE AND ARMED FORCES LOGISTICS, SADDAM HUSSEIN, PRESIDENT, IRAQI MINISTRY OF DEFENSE, IRAQI MINISTRY OF FINANCE, IRAQI MINISTRY OF OIL, IRAQI INTELLIGENCE SERVICE, QUSAY HUSSEIN, UNIDENTIFIED TERRORIST DEFENDANTS 1-500, ALI AKBAR HASHEMI RAFSANJANI, THE NATIONAL IRANIAN TANKER CORPORATION, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 2, THE NATIONAL IRANIAN OIL CORPORATION, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 3, THE NATIONAL IRANIAN GAS COMPANY, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 4, IRAN AIRLINES, PREVIOUSLY IDENTIFIED AS UNIDENTIFIED TERRORIST 5, THE NATIONAL IRANIAN PETROCHEMICAL COMPANY, THE CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN, UNIDENTIFIED TERRORIST DEFENDANTS 8-500, AL-QAEDA, THE HAQQANI NETWORK, AL QAIDA, EGYPTIAN ISLAMIC JIHAD, OSAMA BIN LADEN, ESTATE OF MUHAMMAD ATEF, AYMAN AL ZAWAHARI, ABU ZUBAYDH,

 Defendants.[*]

---

[*] This caption reproduces the one currently on the Court's docket. However, the *Havlish* Plaintiffs-Appellants (the "*Havlish* Creditors") have moved the Court to correct this caption, as it is incorrect. *See* ECF 51 at 6; *see also* ECF 10. It omits a number of the *Havlish* Creditors and includes individuals who are not party to the *Havlish* case. This Court's April 5, 2023 order (Newman, J.) identified the correct list of *Havlish* Creditors in Exhibit A to that order. *See* ECF 56 at 4. The *Havlish* Creditors respectfully request that the caption be amended to correspond with the list identified in Exhibit A to the Court's April 5, 2023 order.

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300
dbarrett@bsfllp.com

Stuart H. Singer
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
(954) 356-0011
ssinger@bsfllp.com

Timothy B. Fleming
WIGGINS CHILDS PANTAZIS FISHER
GOLDFARB, PLLC
2208 18th Street, NW, #110
Washington, DC 20009
(202) 467-4489
tfleming@wigginschilds.com

*Additional Counsel for Plaintiffs-Appellants
Fiona Havlish, et al., Appellants in 23-258*

John Thornton
Orlando do Campo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com
od@dandtlaw.com

*Counsel for Plaintiffs-Appellants John Does
1 through 7, Appellants in 23-263*

Sean P. Carter, Esq.
Stephen A. Cozen
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
(215) 665-2105
scarter1@cozen.com

Richard Klingler
ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
1155 F Street, NW, Ste. 750
Washington, DC 20004
(202) 249-6900
rklingler@egcfirm.com

Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for Plaintiffs-Appellants Federal
Insurance Co., et al., Appellants in 23-346*

Dion G. Rassias
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000

*Counsel for Plaintiffs-Appellants Raymond
Anthony Smith, et al., Appellants in 23-304*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ......................................................................................... 5

I. The District Court Had Jurisdiction. ................................................ 5

    A. TRIA Grants Subject-Matter Jurisdiction. ............................... 5

    B. The FSIA Does Not Withdraw Subject-Matter Jurisdiction. ...................................................................... 8

        1. Afghanistan and DAB's Jurisdictional Immunities Are Inapplicable. ........................................................ 9

        2. TRIA Overcomes Both Execution and Jurisdictional Immunities. .......................................... 14

II. Turnover Can Be Ordered Without the Participation of DAB or Afghanistan. ........................................................................... 22

III. The Joint Creditors Satisfy All Elements of TRIA. ........................... 27

IV. The Court Should Direct Entry of the Joint Creditors' Turnover Orders. .................................................................................... 32

    A. There Is No Need for Further Proceedings to Assess the Validity of the Joint Creditors' Writs of Execution. ................. 33

    B. There Is No Need for Further Proceedings to Consider the *Ashton* Plaintiffs' "Equitable" Arguments. ........................... 34

CONCLUSION .................................................................................... 39

CERTIFICATE OF COMPLIANCE .......................................................... 42

CERTIFICATE OF SERVICE ................................................................. 43

# TABLE OF AUTHORITIES

## CASES

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ............................................................................................ 6

*Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022), *petition for cert. filed*, 92 U.S.L.W. 3001 (U.S. July 5, 2023) (No. 23-9) ...................... 31

*Bank Markazi v. Peterson*, 578 U.S. 212 (2016) ...................................... 26

*Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020) ............................. 11-12

*Bennett v. Islamic Republic of Iran*, 825 F.3d 949 (9th Cir. 2016), *abrogated on other grounds, Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ................................................................ 19-20, 24

*Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993 (2d Cir. 2014) ................................................................................................. 25

*California v. Deep Sea Research, Inc.*, 523 U.S. 491 (1998) ................................. 10

*Capital Ventures International v. Republic of Argentina*, 282 F. App'x 41 (2d Cir. 2008) ........................................................................... 33

*Cook v. H.R.H. Construction Corp.*, 32 A.D.2d 806 (2d Dep't 1969) ................... 37

*Corwin Consultants, Inc. v. Interpublic Group of Cos.*, 375 F. Supp. 186 (S.D.N.Y. 1974), *rev'd on other grounds*, 512 F.2d 605 (2d Cir. 1975) ........................................................................................... 37-38

*CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462 (2d Cir. 2018) ..................................................................... 26, 37

*The Davis*, 77 U.S. (10 Wall.) 15 (1869) .................................................. 10

*De Csepel v. Republic of Hungary*, 27 F.4th 736 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 630 (2023) ........................................................ 25

*Deravin v. Kerik*, 335 F.3d 195 (2d Cir. 2003) ...................................... 29

*Doe v. Ejercito De Liberacion Nacional*, No. 15-CV-8652, 2017 WL 591193 (S.D.N.Y. Feb. 14, 2017), *aff'd sub nom. Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152 (2d Cir. 2018) .....................................6

*DS-Rendite Fonds Nr. 108 VLCC Ashna GMBH & Co Tankschiff KG v. Essar Capital Americas Inc.*, 882 F.3d 44 (2d Cir. 2018) .............................12

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007) .......................25, 26

*Enron Oil Corp. v. Diakuhara*, 10 F.3d 90 (2d Cir. 1993) .....................................36

*Epperson v. Entertainment Express, Inc.*, 242 F.3d 100 (2d Cir. 2001) .................8

*Federal Reserve Bank of Atlanta v. Thomas*, 220 F.3d 1235 (11th Cir. 2000) ............................................................................................................8

*First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983)...........................................................................................26

*Foley v. Union de Banques Arabes et Francaises*, No. 22-CV-1682, 2023 WL 4646793 (S.D.N.Y. July 20, 2023).......................................................12

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990) .................................................................................................15

*Geveke & Co. International, Inc. v. Kompania Di Awa I Elektrisidat Di Korsou N.V.*, 482 F. Supp. 660 (S.D.N.Y. 1979) .................................................12

*Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428 (D.C. Cir. 2023)................18

*Guaylupo-Moya v. Gonzales*, 423 F.3d 121 (2d Cir. 2005) .....................................32

*Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17 (S.D.N.Y. 2015) ..............................................................................................................25

*Ikelionwu v. United States*, 150 F.3d 233 (2d Cir. 1998) .......................................39

*Jerez v. Republic of Cuba*, 777 F. Supp. 2d 6 (D.D.C. 2011)..................................17

*Kirschenbaum v. 650 Fifth Avenue & Related Properties*, 830 F.3d 107 (2d Cir. 2016), *abrogated on other grounds, Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) ......................................................*passim*

*Kitson & Kitson v. City of Yonkers*, 10 A.D.3d 21 (2d Dep't 2004) ......................34

*Koehler v. Bank of Bermuda, Ltd.*, 911 N.E.2d 825 (N.Y. 2009) ..........9, 12, 23, 24

*Levinson v. Kuwait Finance House (Malaysia) Berhad*, 44 F.4th 91 (2d Cir. 2022) ..................................................................................22, 33, 34

*Metropolitan Property & Casualty Insurance Co. v. Shan Trac, Inc.*, 324 F.3d 20 (1st Cir. 2003).......................................................... 23-24

*Ministry of Defense & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009)......................................20, 35, 36

*NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172 (2d Cir. 2011)................................................................................26

*Peacock v. Thomas*, 516 U.S. 349 (1996)............................................................7, 8

*Peterson v. Islamic Republic of Iran*, No. 10-CV-4518, 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 578 U.S. 212 (2016) ....................................................................................................21

*Peterson v. Islamic Republic of Iran*, 876 F.3d 63 (2d Cir. 2017), *cert. granted, judgment vacated sub nom., Bank Markazi v. Peterson*, 140 S. Ct. 813 (2020), *reinstated in part*, 963 F.3d 192 (2d Cir. 2020).............11, 23

*Peterson v. Islamic Republic of Iran*, 963 F.3d 192 (2d Cir. 2020) ......................12

*Peterson v. Islamic Republic of Iran*, No. 13-CV-9195, 2023 WL 2601265 (S.D.N.Y. Mar. 22, 2023), *on appeal*, No. 23-614 (2d Cir. filed Apr. 11, 2023)..............................................................................21

*Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134 (2014)........................13

*In re Republic of Philippines*, 309 F.3d 1143 (9th Cir. 2002) .................................23

*Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008) .....................3, 23, 24, 25

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018) .................................11, 18

*Samantar v. Yousuf*, 560 U.S. 305 (2010) ..............................................................13

*Smith ex rel. Estate of Smith v. Federal Reserve Bank of New York*, 346 F.3d 264 (2d Cir. 2003) ....................................................... 15-16, 20, 35, 36

iv

*Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713
(11th Cir. 2014) .............................................................................. 19

*Swarna v. Al-Awadi*, 622 F.3d 123 (2d Cir. 2010) ............................ 36

*Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004) ...................... 10

*Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264 (2023) ............ 6, 9, 13, 32

*United States v. Assa Co. Ltd.*, 934 F.3d 185 (2d Cir. 2019) ... 2, 6, 9, 10, 11, 13, 23

*United States v. Santos*, 553 U.S. 507 (2008) ........................................... 28

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) .................................. 28

*Universal Health Services, Inc. v. United States*, 579 U.S. 176 (2016) ................. 32

*Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120 (2d Cir.
2019) ............................................................................................ 15

*Walters v. Industrial & Commercial Bank of China, Ltd.*, 651 F.3d 280
(2d Cir. 2011) .............................................................. 11, 13, 19, 22-23, 26

*Weininger v. Castro*, 462 F. Supp. 2d 457 (S.D.N.Y. 2006) .................... 19

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) ................. *passim*

**STATUTES**

8 U.S.C. § 1182(a)(3)(B)(vi) ...................................................... 21

12 U.S.C. § 632 ................................................................ 8, 36, 37

22 U.S.C. § 8772 .............................................................. 20, 21

28 U.S.C. § 1330(a) ............................................................... 6, 9

28 U.S.C. § 1603(b) ............................................................ 29, 30

28 U.S.C. § 1604 ....................................................... 1, 8, 9, 11, 18

28 U.S.C. § 1605(a)(7) ........................................................ 16, 17

28 U.S.C. § 1605A ............................................................ 16, 17

28 U.S.C. § 1608(b) ................................................................27

28 U.S.C. § 1609 ................................................................8, 11, 35, 37

28 U.S.C. § 1610(d) ................................................................37

28 U.S.C. § 1611 ................................................................8, 11, 26, 35, 37

N.Y. C.P.L.R. § 5240 ................................................................37

N.Y. C.P.L.R. § 5225(b) ................................................................26, 27

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201, 116 Stat. 2322, 2337-40, as amended, Pub. L. No. 112-158, 126 Stat. 1214, 1260 (codified at 28 U.S.C. § 1610 note) ........................................*passim*

## OTHER AUTHORITIES

31 C.F.R. § 594.312 ................................................................ 35-36

Executive Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022) ....................27, 35

Fed. R. Civ. P. 19 ................................................................22, 24

Fed. R. Civ. P. 69(a) ................................................................23

Paul L. Lee, *Central Banks and Sovereign Immunity*, 41 Colum. J. Transnat'l L. 327 (2003) ................................................................36

Memo Endorsement, *John Does 1 Through 7 v. The Taliban*, No. 20-mc-740 (S.D.N.Y. Sept. 23, 2021), ECF 26 ........................................34

Recent Case, *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 130 Harv. L. Rev. 1257 (2017) ................................................................29

D. Siegel, N.Y. Prac. § 510 (6th ed. 2022) ..............................................9

*Special Inspector General for Afghanistan Reconstruction Quarterly Report to the United States Congress* (July 2023), https://www.sigar.mil/pdf/quarterlyreports/2023-07-30qr.pdf..........................32

7 Charles Alan Wright et al., *Federal Practice & Procedure* § 1711, Westlaw (3d ed. database updated Apr. 2023) ..................................................24

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Joint Creditors satisfy every element of Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"). They hold judgments "against a terrorist party," the Taliban, based on acts of terrorism, including the 9/11 attacks. They seek to satisfy those judgments with the "blocked assets of" Da Afghanistan Bank ("DAB"), which is under the control and direction of the Taliban and is thus its "agency or instrumentality." Under a straightforward application of TRIA—on its plain text and as interpreted by this Court—the Joint Creditors are entitled to execute against DAB's blocked assets "[n]otwithstanding any other provision of law."

The district court wrongly denied turnover, principally holding that it lacked subject-matter jurisdiction because Section 1604 of the Foreign Sovereign Immunities Act ("FSIA") rendered DAB immune.[1] This holding suffers two independent, fatal flaws. *First*, a proceeding targeting foreign-state property held by a third party is *not* a claim against a foreign state, so it does not implicate the state's jurisdictional immunities under Section 1604. *Second*, even if Section 1604's jurisdictional immunities were implicated, TRIA overcomes them.

---

[1] The district court separately held that it was constitutionally barred from finding that DAB is the Taliban's agency or instrumentality. The Joint Creditors refuted that holding—which is not meaningfully addressed by *amici*—in their opening brief. *See* Joint Creditors' Principal Brief (ECF 118, hereinafter "J.C.") at 53-61.

*Amici curiae* take issue with the result the law requires.[2] But none of their arguments provides a basis for affirmance.

1.    *Amici* say the Joint Creditors lack a "source of statutory jurisdiction." But this Court has confirmed that TRIA supplies federal courts with jurisdiction. *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010).

2.    *Amici* argue that the Joint Creditors must overcome DAB's jurisdictional immunities, but those immunities do not apply. This Court has drawn a bright line between actions that merely involve foreign-state property and actions that bring *in personam* claims against a foreign state itself—only the latter implicate Section 1604's jurisdictional immunities. *See United States v. Assa Co. Ltd.*, 934 F.3d 185, 189 (2d Cir. 2019). This action involves no *in personam* claims against any state. And although a foreign state's property is ordinarily insulated from judicial seizure by the FSIA's execution immunities (Sections 1609-1611), TRIA deliberately overrides those provisions, as the district court acknowledged and *amici* concede. Thus, this action does not implicate DAB's sovereign immunity *at all.*

3.    Even if *amici* were correct that Section 1604 of the FSIA were implicated, they are wrong that TRIA fails to overcome it. TRIA's text authorizes

---

[2] *See* ECF 162 (Brief of Terri Kay Rockefeller, "Rockefeller"); ECF 169 (Brief of Unfreeze Afghanistan, "Unfreeze"); ECF 171 (Brief of Nasser A. Faiq, "Faiq"); ECF 183 (Brief of Afghan and Afghan-American Civil Society Organizations, "Orgs."). This Reply also addresses the *Ashton* Plaintiffs-Appellants' brief. *See* ECF 116 ("Ashton").

execution "[n]otwithstanding *any* other provision of law" and "in every case." As this Court has repeatedly held, the statute's "plain language" directs that execution proceedings against the blocked property of a terrorist party's agency or instrumentality can proceed regardless of otherwise-applicable immunities— including Section 1604's "jurisdictional immunity." *Weinstein*, 609 F.3d at 49-50; *see Kirschenbaum v. 650 Fifth Avenue & Related Props.*, 830 F.3d 107, 132 (2d Cir. 2016), *abrogated on other grounds*, *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018).

4.    *Amici* further insist that this proceeding must be dismissed because a foreign state is a necessary party to an action seeking turnover of its property. This argument, however, overreads *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008). And it flies in the face of decades of settled law governing execution proceedings, which can (indeed, often do) proceed in the absence of the foreign state.

5.    Finally, *amici* try to exclude these execution proceedings from TRIA's ambit, arguing that a *state* entity like DAB cannot be an agency or instrumentality of a *nonstate* terrorist group like the Taliban. But TRIA covers the assets of "any agency or instrumentality" of "any terrorist party," whether state or nonstate. *Weinstein*, 609 F.3d at 49. The Taliban is a terrorist party that controls and directs DAB, so TRIA makes DAB's blocked assets available for execution by the Taliban's judgment creditors.

Throughout their briefs, *amici* advocate alternative dispositions of the DAB assets. The Joint Creditors recognize the real crisis the Afghan people face. But the political branches—via Congress's enactment of TRIA and the President's decision to block DAB's U.S. assets—have made the relevant policy determinations. They established that terror victims have a right to pursue half of DAB's blocked assets and set aside the other half for "the benefit of the people of Afghanistan." App.74. The only thing for this Court to decide is whether TRIA must be applied as written, and as this Court has said it applies.

Finally, the appropriate remedy on appeal is to direct the district court to issue the turnover orders it wrongly believed it lacked the jurisdiction to enter. The district court held that the Joint Creditors "satisf[ied] all but one element [of] TRIA," S.A.24, and the court's factual findings satisfy the supposedly missing element by establishing DAB's status as a Taliban instrumentality. The Joint Creditors have thus demonstrated their entitlement to relief. The arguments raised by the *Ashton* Plaintiffs concerning distribution of the DAB assets among various groups of terror victims do not provide any basis in law or equity to forestall the Joint Creditors' right to turnover orders.

## ARGUMENT

## I.   The District Court Had Jurisdiction.

The district court had subject-matter jurisdiction over these execution proceedings. First, TRIA provides an underlying source of jurisdiction, as this Court's cases confirm. The district court did not doubt this point, though Faiq has questioned it on appeal. Second, contrary to *amici*'s and the district court's mistaken view, Section 1604's immunities do not preclude such jurisdiction. Indeed, Section 1604 has no application to this case. But even if it did, TRIA would overcome it.

### A.   TRIA Grants Subject-Matter Jurisdiction.

Faiq argues that the Joint Creditors "cannot point to a *source* of statutory jurisdiction" over these execution proceedings. Faiq 7, 31-32. This argument is foreclosed by the law of this Circuit. J.C. 27-29.

As this Court has repeatedly held, it is "clear beyond cavil that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor." *Weinstein*, 609 F.3d at 50. TRIA furnishes an "independent basis for subject matter jurisdiction." *Kirschenbaum*, 830 F.3d at

5

132.[3] Both *Weinstein* and *Kirschenbaum* involved execution proceedings against foreign-state property.

Faiq tries to circumvent these cases' binding rule by invoking the aphorism that Section 1330(a) of the FSIA is the "sole basis for obtaining jurisdiction over a foreign state." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). But this Court has rejected Faiq's precise argument. *See infra* Part I.B.1. *Assa* held that an action against a foreign state's property is "*not* a suit against a foreign state." 934 F.3d at 189 (emphasis added). The Court refused to read *Amerada Hess* to mean that Section 1330(a) supplies "the sole basis … for obtaining jurisdiction over a foreign state's *property*." *Id.* (emphasis in original); *cf. Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) (rejecting overbroad reading of *Amerada Hess*). To the contrary, *Assa* makes clear that a party must proceed through the FSIA's jurisdictional "gateway," Section 1330(a), only when it brings a claim *in personam* against a foreign state. 934 F.3d at 188-89. Because the Joint Creditors bring no such claims, the district court did not need to exercise

---

[3] Other courts have characterized TRIA as supplying federal-question jurisdiction under 28 U.S.C. § 1331. *See Doe v. Ejercito De Liberacion Nacional*, No. 15-CV-8652, 2017 WL 591193, at *1 (S.D.N.Y. Feb. 14, 2017), *aff'd sub nom. Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152 (2d Cir. 2018).

jurisdiction "over a foreign state."[4] It only needed jurisdiction to adjudicate the execution proceeding, which TRIA provides.

The district court also had ancillary jurisdiction. J.C. 27-28. Faiq argues that ancillary jurisdiction "cannot be used to take the property of a nonparty not already liable," citing *Peacock v. Thomas*, 516 U.S. 349, 357 (1996). Faiq 31 & n.15. But *Peacock*'s rule is inapplicable. There, the Supreme Court held that a judgment creditor (who held an ERISA judgment against his employer) could not invoke ancillary jurisdiction to "impose liability" for the judgment on a third-party officer of the employer in the absence of "any provision of ERISA that" permitted such imposition. 516 U.S. at 351, 353. Here, by contrast, the Joint Creditors are not seeking to "impose liability" on DAB, but instead are using TRIA's express authorization to execute on the blocked assets of an agency or instrumentality of their judgment debtor, the Taliban. *Cf. Weinstein*, 609 F.3d at 51 ("The effect of the TRIA … was simply to render a judgment more readily enforceable against a related third party."). This action is fully consistent with *Peacock*, which permits "the exercise of ancillary jurisdiction over a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal

---

[4] *Weinstein* separately recognized that TRIA "constitute[s] an independent grant of jurisdiction over the agencies and instrumentalities" of terrorist parties, even if the agency or instrumentality is a foreign state—meaning that if jurisdiction "over" DAB (and not only DAB's property) is required, the court has that jurisdiction. 609 F.3d at 49.

judgments." 516 U.S. at 356; *accord Epperson v. Ent. Express, Inc.*, 242 F.3d 100, 106 (2d Cir. 2001).

Finally, still another source of subject-matter jurisdiction is the Federal Reserve Act, which provides that "[n]otwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits." 12 U.S.C. § 632 (second paragraph); *see Fed. Rsrv. Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1240 (11th Cir. 2000). This is a proceeding against the FRBNY for turnover of blocked assets it is holding. So Section 632 grants jurisdiction to hear it.

## B. The FSIA Does Not Withdraw Subject-Matter Jurisdiction.

The district court did not dispute that TRIA grants jurisdiction, or that TRIA overcomes the FSIA's execution immunities for sovereign property under 28 U.S.C. §§ 1609 and 1611. The district court's error was to hold that was not sufficient. It held—and *amici* here contend—that the Joint Creditors still needed to, and could not, overcome *DAB*'s immunity from jurisdiction under 28 U.S.C. § 1604 (separate from the immunity of DAB's *property* from execution under 28 U.S.C. § 1609). That is wrong for two reasons. For one, DAB's jurisdictional immunities have no relevance to this case because the Joint Creditors seek to execute against the blocked property of DAB as an instrumentality of the Taliban; they do not seek to proceed

*in personam* against DAB. For another, even *were* Section 1604 relevant, TRIA overcomes it; TRIA authorizes execution "in every case" and "[n]otwithstanding *any* other provision of law"—*including* Section 1604.

**1.    Afghanistan and DAB's Jurisdictional Immunities Are Inapplicable.**

*Amici* say this action cannot proceed because of DAB's jurisdictional immunities under Section 1604. But Section 1604 has nothing to do with this case.

Section 1604 withdraws jurisdiction only in the "category of cases" where 28 U.S.C. § 1330(a) supplies jurisdiction in the first instance, *Halkbank*, 598 U.S. at 276—namely, "civil action[s] against a foreign state … as to any claim for relief *in personam*." 28 U.S.C. § 1330(a). In all other cases, "[n]o jurisdiction flows from [Section] 1330(a), and no immunity flows from [Section] 1604." *Assa*, 934 F.3d at 189.

The Joint Creditors are asserting no claims implicating Section 1604. They are not pursuing any claims against DAB; they do not seek a judgment against DAB; nor do they seek relief directing DAB to do anything. The Joint Creditors are, instead, pursuing DAB's blocked *property*, and the turnover order they seek will run solely "against the garnishee," the FRBNY (over which a New York district court indisputably has jurisdiction). *See* D. Siegel, N.Y. Prac. § 510 (6th ed. 2022); *Koehler v. Bank of Berm., Ltd.*, 911 N.E.2d 825, 830 (N.Y. 2009) (to order turnover, a New York court needs jurisdiction only over the garnishee).

9

This Court in *Assa* rejected *amici*'s suggestion that "a suit against a foreign state's property is a suit against a foreign state." 934 F.3d at 189; *see* Orgs. 23. It drew a sharp distinction between actions against foreign *states* (to which Section 1604 applies) and actions against foreign-state *property* (to which it does not). *See* 934 F.3d at 189. Because "*the defendant*" in this turnover proceeding (the FRBNY) "is not a foreign state … § 1604 does not confer immunity." *Id.* (emphasis added).[5]

Faiq (at 34-35) misreads *Assa*, claiming it shows that this action remains "forbidden by the FSIA." Faiq observes that *Assa* distinguished between the *in rem* civil forfeiture proceeding at issue there and "*quasi in rem* suits meant to enforce *in personam* judgments against a foreign state"—noting that, in the latter category, the FSIA continues to confer "immunity in actions involving a foreign state's property." 934 F.3d at 190. *Assa* indeed drew that distinction, but its point was not that judgment-enforcement proceedings implicate *Section 1604*'s jurisdictional immunities. (They do not, so long as the party holding the property—the "defendant"

---

[5] Courts have long observed that judicial intrusion on a sovereign's jurisdictional immunity occurs only where courts would be required to interfere with the sovereign's "actual possession" of property—entailing a "collision" between officers of the sovereign and officers of the court—rather than with the "mere constructive possession ... implied by reason of ownership" presented here. *The Davis*, 77 U.S. (10 Wall.) 15, 20-21 (1869); *see also California v. Deep Sea Rsch., Inc.*, 523 U.S. 491, 507-08 (1998) (endorsing the rule of *The Davis* and the "requirement that a State possess the disputed res"); *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 446-47 (2004) (applying the same principle to bankruptcy discharge proceedings).

in a turnover proceeding—is "not a foreign state." *Id*. at 189.) Rather, *Assa* drew this distinction to explain that under the FSIA, protection of sovereign property from post-judgment collection is supplied by *Section 1609*. *Id*. The Joint Creditors agree that the FSIA's *execution* immunities under Sections 1609 and 1611 would normally forbid a turnover action against sovereign property. But the key point here is that TRIA "rescind[s]" those execution immunities. *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018). Section 1604's jurisdictional immunities "operate independently" from execution immunities, *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011), and do not apply when private litigants seek turnover of blocked foreign-state property from a third party under TRIA.

This principle is confirmed by *Peterson v. Islamic Republic of Iran*, which held that where Section 1609 does not apply, the FSIA is "no impediment" to an order against a garnishee requiring the turnover of sovereign assets; Section 1604's jurisdictional immunity is inapplicable where the garnishee—the "defendant" in a turnover action—is not a "foreign state." 876 F.3d 63, 91 (2d Cir. 2017) ("Section 1604's grant of jurisdictional immunity applies only to 'a foreign state,' which Clearstream [the turnover defendant] of course is not."). Though the Supreme Court granted certiorari, vacated, and remanded that judgment on unrelated grounds (to consider the passage of an intervening statute), *Bank Markazi v. Peterson*, 140 S. Ct.

813 (2020), this Court later reinstated it in part, 963 F.3d 192, 196 (2d Cir. 2020), and its analysis remains sound, *see Foley v. Union de Banques Arabes et Francaises*, No. 22-CV-1682, 2023 WL 4646793, at *13 (S.D.N.Y. July 20, 2023).

Faiq's arguments regarding "jurisdictional attachments" fail for similar reasons. In the types of pre-FSIA *quasi in rem* cases Faiq describes, *see* Faiq 9, 34, the plaintiffs relied on the "fortuitous presence of property in the United States" to vest a U.S. court with jurisdiction to adjudicate merits claims against a foreign state. *See Geveke & Co. Int'l, Inc. v. Kompania Di Awa I Elektrisidat Di Korsou N.V.*, 482 F. Supp. 660, 662-63 (S.D.N.Y. 1979); *cf. DS-Rendite Fonds Nr. 108 VLCC Ashna GMBH & Co Tankschiff KG v. Essar Cap. Ams. Inc.*, 882 F.3d 44, 47 (2d Cir. 2018) (in "a classic quasi in rem proceeding," the "plaintiff is seeking to assert a claim against a defendant, over whom the court does not (otherwise) have personal jurisdiction, by seizing property of the defendant" in the jurisdiction). But this is not that kind of proceeding. The Joint Creditors are not "assert[ing] a claim" against DAB, nor are they relying on the location of DAB's property in New York to establish adjudicative jurisdiction over DAB. Subject-matter jurisdiction over these turnover proceedings derives from TRIA, *supra* Part I.A, and the court's authority to dispose of the blocked property derives from its personal jurisdiction over the FRBNY as the defendant-garnishee. *See Koehler*, 911 N.E.2d at 830.

Nor is Faiq (at 34) correct that *Halkbank* casts doubt on *Assa*; as the above discussion shows, the cases are entirely consistent. J.C. 46. It is of course true that "civil litigants seeking to take sovereign assets [from a third party] must go through the FSIA," Faiq 33, but the relevant provisions of the FSIA in that situation concern the *assets*' immunity from execution under Sections 1609-1611, not the *state*'s immunity from adjudicative jurisdiction under Section 1604.

For that very reason, Faiq is wrong that, if Section 1604 does not apply, then the assets are otherwise immune under common law. Faiq 7, 32. The immunity of DAB's property is still "governed by" the FSIA, *Halkbank*, 598 U.S. at 280—it is ordinarily protected by the Act's execution immunities under Sections 1609-1611. *Walters*, 651 F.3d at 291. Thus, any claim that foreign-state property is immune from execution "must [either] stand on the Act's text" or "it must fall"—common law does not enter the equation. *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141-42 (2014) ("After the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to sovereign immunity."). Common law applies only where the FSIA is *silent*—as in criminal proceedings against a sovereign, *see Halkbank*, 598 U.S. at 280, or civil proceedings against individual foreign officials, *see Samantar v. Yousuf*, 560 U.S. 305, 325 (2010).

2. **TRIA Overcomes Both Execution and Jurisdictional Immunities.**

Even if Section 1604's immunities applied here, this Court's decisions confirm that TRIA overcomes them. TRIA authorizes execution "[n]otwithstanding *any* other provision of law" and "in every case." It thus defeats the FSIA's jurisdictional immunities (just as it does the FSIA's execution immunities). *See* J.C. 29-31. Both *Weinstein* and *Kirschenbaum* held that TRIA confers jurisdiction over execution proceedings against the blocked property of a terrorist party's agency or instrumentality, even where the agency or instrumentality is a foreign-state entity otherwise entitled to "jurisdictional immunity." *Weinstein*, 609 F.3d at 49-50; *Kirschenbaum*, 830 F.3d at 132.

*Amici* attempt to distinguish *Weinstein* and *Kirschenbaum* on their facts. Specifically, *Weinstein* and *Kirschenbaum* involved the enforcement of judgments entered against foreign states. *Amici* use that common feature to argue that TRIA should be read to overcome the FSIA's jurisdictional immunities *only* in such cases—where, in *amici* and the district court's view, the state's loss of immunity in the underlying litigation can "flow[] through" to overcome the immunity of the agency or instrumentality in the attachment proceeding. S.A.20; Faiq 23-24.

This "flow-through" theory gets the FSIA's core principles backwards. The FSIA treats foreign states as juridically separate from their agencies and instrumentalities—establishing jurisdiction over a state does not inexorably lead to

14

jurisdiction over the state's instrumentality. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446 (D.C. Cir. 1990) ("The presumption of the juridical separateness of entities also applies to jurisdictional issues."). As *Weinstein* confirms, it is not the FSIA, but "TRIA [that] provides courts with subject matter jurisdiction" in proceedings targeting blocked property of a terrorist party's agency or instrumentality. *Weinstein*, 609 F.3d at 50. And TRIA's grant of jurisdiction is "independent," *Kirschenbaum*, 830 F.3d at 132—not dependent on a state's prior loss of FSIA immunity.

Faiq is also wrong that *Vera v. Banco Bilbao Vizcaya Argentaria, S.A.*, 946 F.3d 120 (2d Cir. 2019) adopted his "flow-through" theory. Faiq 24. The question in *Vera* was whether the plaintiffs held "*valid* judgment[s]" against Cuba that they could enforce against Cuban property using TRIA. 946 F.3d at 133 (emphasis in original) (quotation marks omitted). Whether the *underlying* judgments were valid depended, as with any judgment against a foreign state, on whether they "were based on an exception to immunity from jurisdiction established by the FSIA." *Id*. Because the Court determined that the underlying judgments were invalid (they arose from acts predating Cuba's designation as a state sponsor of terrorism), TRIA did not apply. *Id*. at 137.

*Vera* thus stands for the unremarkable proposition that TRIA does not authorize the execution of *invalid* judgments against foreign-state property. *See, e.g.*,

*Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003) (TRIA "confers no entitlement on victims who have not yet obtained judgments"). The case *reaffirmed* TRIA's applicability where the underlying judgment is *legitimate* (as here). And it said nothing about TRIA jurisdiction over proceedings to enforce an underlying judgment against a nonstate terrorist party, and thus provides no basis to question TRIA's application here.

So, too, *amici*'s cherrypicked language from *Kirschenbaum* and *Weinstein*, *see* Faiq 23-24, shows only that, in those cases, there were underlying FSIA judgments against a foreign state. Those statements did not purport to curtail TRIA's grant of jurisdiction where judgments lie against a nonstate terrorist party. As *Weinstein* held, TRIA confers jurisdiction to enforce an "underlying judgment" against "*any* terrorist party," noting (in a parenthetical) that the terrorist party in that case happened to be Iran. 609 F.3d at 49 (emphasis added).

*Amici*'s textual arguments fare no better. Faiq suggests that, because TRIA refers to the enforcement of judgments entered against state sponsors of terrorism pursuant to the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A,[6] TRIA "expressly contemplates executing on sovereign property" *only* to "satisfy judgments rendered against a state sponsor of terror." Faiq Br. 23; *see* Rockefeller 5, 8; Orgs 20, 26.

---

[6] Formerly 28 U.S.C. § 1605(a)(7).

16

That is not what TRIA's reference to Section 1605A accomplishes. TRIA provides for satisfaction of judgments entered against three types of "terrorist part[ies]": "[1] a terrorist, [2] a terrorist organization …, *or* [3] a foreign state designated as a state sponsor of terrorism[.]" TRIA § 201(d)(4) (emphasis added). And TRIA authorizes execution "in every case in which a person has obtained a judgment against a terrorist party on a claim [1] based upon an act of terrorism, *or* [2] for which a terrorist party is not immune under [Sections 1605A or the former 1605(a)(7)]." TRIA § 201(a) (emphasis added). Faiq fights this text. He would erase the statute's reach to nonstate "terrorist[s]" and "terrorist organization[s]"; rewrite the statute's disjunctive conditions, changing the "or" to an "and"; and further revise the phrase "not immune" to say "where immunity has previously been overcome" under the cross-referenced provisions.[7] But TRIA says none of those things. And it

---

[7] For similar reasons, Faiq is wrong that the Joint Creditors' (correct) reading "renders superfluous" TRIA's reference to Sections 1605A and 1605(a)(7). Faiq 24-25. When TRIA allows for execution of judgments "based on an act of terrorism," it covers all terrorism claims against all terrorist parties, including nonstate terrorists. *See Jerez v. Republic of Cuba*, 777 F. Supp. 2d 6, 28 (D.D.C. 2011); *Kirschenbaum*, 830 F.3d at 133. When it then authorizes execution in alternative cases "for which a terrorist party is not immune under [Sections 1605A or the former 1605(a)(7)]," it extends TRIA's scope to judgments against state sponsors of terror that are not encompassed by the first clause—*e.g.*, judgments premised on claims for state "torture" or "extrajudicial killing," which fall under Section 1605A(a)(1) but are not necessarily "act[s] of terrorism" under TRIA. *Jerez*, 777 F. Supp. 2d at 28-29. *Compare* TRIA § 201(d)(1) (defining "act of terrorism"), *with* 28 U.S.C. § 1605A(a)(1) (describing a broader set of claims for which a state sponsor of terrorism is not immune). The two clauses thus cover distinct actions, as the word "or" between them establishes.

makes no reference to "sovereign" or "state" property. TRIA's plain text thus does not prevent victims with judgments against nonstate terrorists from satisfying those judgments with the assets of a foreign state—even a state like Afghanistan, which is not a designated sponsor of terrorism—if the sovereign assets qualify as the "blocked assets of [an] agency or instrumentality of [a] terrorist party." *Id*.[8]

*Amici* resist this Court's holding that TRIA's "notwithstanding" clause "plain[ly] … extends everywhere," *Weinstein*, 609 F.3d at 49, and so "clearly requires courts to disregard other statutory provisions that conflict with [TRIA's] scope," *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023). Rockefeller posits that the "notwithstanding" clause should not authorize "[s]eizing a foreign state's property." Rockefeller 12. But the Supreme Court has held it *does* authorize exactly that. *See Rubin*, 138 S. Ct. at 826.

Faiq argues that the "notwithstanding" clause cannot overcome the FSIA's jurisdictional immunities because "there is no conflict" between Section 1604 and TRIA. Faiq 27. But any time Section 1604 would otherwise apply to deprive a court of jurisdiction over a TRIA collection action, there *is* a conflict, as the district court's holding shows. Congress's "independent grant of jurisdiction" over TRIA

---

[8] Indeed, such a scenario was front of mind for TRIA's drafters, who understood that foreign-state entities (including Afghan entities in particular) could become tools of terror. *See* Amicus Br. of Sen. George Allen ("Allen") 2, ECF 126-2 ("Congress knew terrorists had used the apparatus of a foreign state to provide material support for the 9/11 terrorist attacks[.]").

proceedings operates "in every case" and "[n]otwithstanding any other provision of law," *Weinstein*, 609 F.3d at 49, thus ensuring that the FSIA cannot deprive a court of that jurisdiction. J.C. 37-38. It would make no sense for TRIA to create jurisdiction for execution against blocked assets of any agency or instrumentality of any terrorist party, while "in the same breath" leaving the owners of those assets with the power to prevent execution. *See Weininger v. Castro*, 462 F. Supp. 2d 457, 488 (S.D.N.Y. 2006). Although *amici* acknowledge that execution immunity is broader than jurisdictional immunity, *see* Orgs. 19; *Walters*, 651 F.3d at 289, they would have the Court adopt an irrational interpretation that Congress abrogated the broader (execution) immunity, yet left the narrower (jurisdictional) immunity in place.

To be sure, TRIA's "notwithstanding" clause does not "clear every possible" prerequisite to turnover. Faiq 28. It does not abrogate, for instance, procedural requirements like service. J.C. 40; *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 729-30 (11th Cir. 2014). But the clause's purpose is to facilitate execution against blocked sovereign assets when the sovereign has been adjudged an agency or instrumentality of a terrorist party, *see* Allen 14, thus overcoming any sovereign immunity that would otherwise stand in the way. *See Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 965 (9th Cir. 2016) (TRIA "removes jurisdictional immunity, as well as immunity from attachment and

execution" (citing *Weinstein*, 609 F.3d at 49-50)), *abrogated on other grounds, Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018); App.65 (U.S. Statement of Interest) ("Under TRIA, the FSIA's immunities and exemptions are inapplicable.").[9]

Faiq still attempts to limit the natural effect of TRIA's "notwithstanding" clause by comparing it to 22 U.S.C. § 8772(a)(1), which was modeled on TRIA and makes certain Iranian property "subject to execution or attachment" "notwithstanding any other provision of law, *including any provision of law relating to sovereign immunity*." (emphasis added). Faiq 28. But that statute supports the Joint Creditors' point. First, Congress's addition of the illustrative phrase "including any other provision of law relating to sovereign immunity" confirms that the phrase "notwithstanding any other provision of law" is naturally read to encompass the FSIA's jurisdictional provisions. Second, by the district court's and *amici*'s logic, Section 8772 should be considered a mere "execution statute." S.A.17-18; App.639-40. Like TRIA, it "identifies 'assets' that 'shall be subject to execution or

---

[9] Faiq overreads cases that rejected the arguments of terror victims concerning TRIA's "notwithstanding" clause. Faiq 28. In *Ministry of Defense v. Elahi*, 556 U.S. 366, 386 (2009), the Supreme Court held that the "notwithstanding" clause, which applies to "any *other* provision of law," did not abrogate another provision of TRIA itself. Here, however, the FSIA and TRIA are separate statutes. J.C. 38-40. Similarly, *Smith*, 346 F.3d at 271, held that TRIA did not prevent the President from removing assets from the reach of judgment creditors. J.C. 40 n.24. These cases stand for the uncontroversial propositions that TRIA's "notwithstanding" clause does not override a creditor's obligation to satisfy the elements of a claim under TRIA, and does not guarantee that assets will forever be available for the taking.

20

attachment,'" Faiq 26, and is "silent on jurisdiction," App.638. But courts have uniformly held that Section 8772 abrogates execution immunity *and* furnishes subject-matter jurisdiction.[10] That is what TRIA does, too.

Unable to overcome the statutory language, *amici* postulate a parade of horribles they say would flow from enforcing TRIA's terms. Faiq 29-30; Orgs. 28. They warn that if the Joint Creditors prevail, the foreign reserves of "every … country in the world" would become vulnerable to execution. Faiq 29.

That argument overlooks the highly unusual confluence of events that must transpire before TRIA would subject central bank holdings to execution in satisfaction of a judgment against nonstate terrorists. First, the Executive Branch would have to "block" a foreign central bank's property. *See* TRIA § 201(d)(2)(A) (defining "blocked asset"). Second, terror victims would need to obtain judgments against a defendant meeting TRIA's definition of "terrorist party," which incorporates Executive Branch designations. TRIA § 201(d)(4); 8 U.S.C. § 1182(a)(3)(B)(vi). Third, the terror victims would have to persuade a court that the central bank had become an agency or instrumentality of that terrorist party, *i.e.*, that it materially supported, or was "owned, controlled, or directed" by, the terrorist

---

[10] *See Peterson v. Islamic Republic of Iran*, No. 13-CV-9195, 2023 WL 2601265, at *15 (S.D.N.Y. Mar. 22, 2023) (*Peterson II*), *on appeal* No. 23-614 (2d Cir. filed Apr. 11, 2023); *Peterson v. Islamic Republic of Iran*, No. 10-CV-4518, 2013 WL 1155576, at *23 (S.D.N.Y. Mar. 13, 2013) (*Peterson I*), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 578 U.S. 212 (2016).

party, *Kirschenbaum*, 830 F.3d at 135—a finding that the central bank could contest, *see Levinson v. Kuwait Fin. House (Malaysia) Berhad*, 44 F.4th 91, 97 (2d Cir. 2022). This particular set of circumstances is so rare that it has occurred precisely once—in this case—in the two decades since TRIA's enactment.[11] If this lightning were to strike twice, it would be because the Executive Branch had used its discretion to block the assets.

## II. Turnover Can Be Ordered Without the Participation of DAB or Afghanistan.

*Amici* next argue that, even if the Court has jurisdiction, turnover is precluded because DAB and Afghanistan are not participating in the litigation. These arguments—whether based on Federal Rule of Civil Procedure 19, service of process, or the absence of Afghanistan—lack merit.

To begin, Faiq is incorrect that "district courts cannot adjudicate claims regarding assets that might belong to a foreign sovereign in that sovereign's absence" without infringing on the sovereign's jurisdictional immunity. Faiq 8, 33-34. In a turnover proceeding, sovereign interests in property are protected by the FSIA's execution immunities, which "inure[] in the property itself," and therefore

---

[11] Faiq quips that the Joint Creditors "cannot cite a single case in which a court has held that TRIA abrogates jurisdictional immunity where the foreign sovereign's jurisdictional immunity had not *already* been overcome." Faiq 23. But the novelty of these facts makes clear why that is so. More telling is that Faiq cannot cite a case where a TRIA collection proceeding was dismissed based on the jurisdictional immunity of a terrorist party's agency or instrumentality.

can be considered in the sovereign's absence. *Walters*, 651 F.3d at 291 (adjudicating turnover proceeding seeking China's property in China's absence). Thus, in *Assa* and *Peterson* this Court allowed suits against Iranian property to proceed without regard to the jurisdictional immunity of Iran's instrumentalities. *See Assa*, 934 F.3d at 189; *Peterson*, 876 F.3d at 91. These principles comport with New York execution procedure—applicable here by operation of Federal Rule of Civil Procedure 69(a)— under which the participation of (or even jurisdiction over) the judgment debtor is wholly unnecessary. *See Koehler*, 911 N.E.2d at 830.

Faiq invokes *Republic of the Philippines v. Pimentel*, 553 U.S. 851 (2008), but that decision does not establish that foreign states must participate in execution proceedings targeting their assets. In *Pimentel*, unlike here, the litigation directly implicated the foreign state's immunity from jurisdiction under Section 1604. That case began when Merrill Lynch filed an interpleader action to resolve competing claims of ownership over property; the Republic was a named defendant because it had a title claim over the property and was simultaneously pursuing litigation in the Philippines to establish that interest. The Philippines' jurisdictional immunity under Section 1604 was implicated—and compelled the Philippines' dismissal from the action—because interpleader is an *in personam* action requiring the exercise of jurisdiction over the defendant. *See In re Republic of Philippines*, 309 F.3d 1143, 1148 (9th Cir. 2002) (invoking Section 1604); *Metro. Prop. & Cas. Ins. Co. v. Shan*

*Trac, Inc.*, 324 F.3d 20, 25 (1st Cir. 2003); 7 Charles Alan Wright et al., *Federal Practice & Procedure* § 1711, Westlaw (3d ed. database updated Apr. 2023) (citing *N.Y. Life Ins. Co. v. Dunlevy*, 241 U.S. 518 (1916)). In subsequent proceedings, the Philippines argued that the interpleader action could not proceed without it and that a separate proceeding in Philippines courts best served to resolve the underlying dispute. The Supreme Court ultimately agreed, holding that, by adjudicating the Philippines' claims "on the merits," the lower courts had "failed to give full effect to sovereign immunity." *Pimentel*, 553 U.S. at 865, 867.

Here there is no claim of any kind against DAB, or need for a court to assert adjudicative jurisdiction over it, because this is a proceeding "brought by the judgment creditor against the garnishee." *Koehler*, 911 N.E.2d at 830. Section 1604's jurisdictional immunities are not at issue, and there is no dispute that TRIA overrides the blocked property's execution immunity. The Court can thus order turnover in DAB's absence without regard to the sovereign-immunity concerns that animated *Pimentel*.[12]

Even if the foregoing analysis did not dispose of the issue (though it does), *Pimentel* did not announce a bright-line rule, but rather preserved Rule 19's "case

---

[12] Even if this case did present a claim against DAB implicating Section 1604, TRIA would render any resulting immunity irrelevant, *see supra* Part I.B.2, thereby eliminating any protections *Pimentel* might otherwise provide. *See Bennett*, 825 F.3d at 965 (because TRIA "removes jurisdictional immunity," Iranian instrumentality "[did] not enjoy sovereign immunity," rendering *Pimentel* inapposite).

specific[] … equitable considerations." 553 U.S. at 863; *accord De Csepel v. Republic of Hungary*, 27 F.4th 736, 749 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 630 (2023). Here, the considerations that moved the Court in *Pimentel* are entirely absent. The Court focused on parallel court proceedings in the Philippines addressing the same ownership dispute, crediting "comity interests in allowing a foreign state to use its own courts for a dispute" over asset ownership. *Pimentel*, 553 U.S. at 865-66. No such parallel proceedings exist here. Also here, unlike in *Pimentel*, ownership of the blocked property is undisputed, and the sovereign has asserted no interests before the court.

Nor, *contra* Rockefeller 5-7, is participation or process related to the State of Afghanistan itself required or appropriate. DAB, not Afghanistan, holds title to the assets in question. The assets in a foreign central bank's account at FRBNY belong to the central bank. *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 465, 473-80 (2d Cir. 2007) (creditors could not satisfy judgment against foreign state by executing against assets of state's central bank at FRBNY); *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 49 (S.D.N.Y. 2015) (under New York law, the named account holder owns the assets in the account); *see also Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993, 1001 (2d Cir. 2014) (in New York proceedings, TRIA's "assets of" clause is governed by New York property law). Moreover, the President has expressly recognized that the blocked assets belong to

DAB. App.70 (blocking and repeatedly referring to the "property of Da Afghanistan Bank").[13] Involving the State of Afghanistan, as Rockefeller advocates, would be contrary to the principles of juridical separation mandated by *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 626-28 (1983) ("*Bancec*"). *See id.* at 625 ("[T]he instrumentality's assets and liabilities must be treated as distinct from those of its sovereign[.]"); *see also Walters*, 651 F.3d at 298 (presumptive juridical separation applies in execution context); *EM Ltd.*, 473 F.3d at 477 (same). These principles explain why proceedings involving a foreign state's instrumentality are routinely undertaken without involvement of the parent state.

As for DAB itself, no further process is required to give it an opportunity to assert its interests. In accordance with applicable New York procedures, the Joint Creditors served their turnover motions upon the FRBNY as garnishee, *see CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 470 (2d Cir. 2018), and provided notice to the Taliban and DAB in accordance with N.Y. C.P.L.R. 5225(b) (requiring "notice" to the judgment debtor). *See* J.C. 14-15. The Joint Creditors' notice to DAB comported with every potentially applicable rule on

---

[13] *NML Capital*, on which *amici* rely (Orgs. 21), is not to the contrary. That case merely affirms that Section 1611(b)(1)'s attachment immunity applies to foreign central bank reserves in cases where the bank is not sufficiently independent to have its own legal personality. *NML Cap., Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 187-88, 190-91 (2d Cir. 2011). This case, by contrast and by operation of TRIA, does not depend on the application of Section 1611(b)(1). *See* S.A.17; *Bank Markazi v. Peterson*, 578 U.S. 212, 217 n.2 (2016).

service, including FSIA Section 1608(b). *See* App.555. DAB could have, but chose not to, appear in the litigation to contest turnover. N.Y. C.P.L.R. 5225(b).

## III. The Joint Creditors Satisfy All Elements of TRIA.

The Joint Creditors have established that (1) their judgments against the Taliban are final monetary "judgment[s] against a terrorist party based upon an act of terrorism"; (2) they seek the "blocked assets of" DAB; and (3) DAB is an "agency or instrumentality" of the Taliban. J.C. 23 (quoting TRIA § 201(a)); *see* J.C. 24-26. Those showings fulfill TRIA's requirements; the remedy is execution and turnover.

The district court agreed on the first two elements, S.A.24, and further agreed that the Joint Creditors had adduced "facts on the ground" that satisfy the third element under the governing *Kirschenbaum* standard—that "the Taliban is using [its] control of DAB to advance its aims[.]" App.648-49; J.C. 25 & n.18. Indeed, the Joint Creditors submitted exhaustive and unchallenged evidence in this regard.[14] What's more, the President would have had no basis to issue Executive Order 14,064—blocking DAB's access to its own assets—unless he had concluded that the Taliban controlled DAB.

---

[14] *Amicus* Unfreeze asserts that the Taliban does not actually control DAB because it has not tried to "overturn or negate" Afghanistan's banking law or "stolen any DAB assets." Unfreeze 3-4, 10-11. None of Unfreeze's assertions rebuts the Joint Creditors' extensive expert evidence that the Taliban functionally directs and controls DAB. App.648-49; J.C. 25 & n.18. Indeed, Unfreeze concedes (at 4) that the Taliban has appointed DAB's current directors, which is sufficient to prove control.

*Amici* attempt to defend the decision below by disputing that DAB has become an agency or instrumentality of the Taliban. These arguments do not hold water.

a.    *Amici* argue that *Kirschenbaum*'s interpretation of "agency or instrumentality of [a] terrorist party," TRIA § 201(a), was not intended to include *state* entities that are controlled by *nonstate* terrorist groups. Orgs. 25-26; Rockefeller 7-8. But there is only one "agency or instrumentality" clause in the statute, and once a statute has been interpreted "in unmistakable terms" it must be given "the same meaning in every case." *United States v. Vilar*, 729 F.3d 62, 74 (2d Cir. 2013); *see also United States v. Santos*, 553 U.S. 507, 522-23 (2008) (plurality op.).

*Amici* ask the Court to rewrite its analysis of "agency or instrumentality" to create an exception for this case's facts.[15] *See* Orgs. 25-26; Rockefeller 7-8. The exception they seek would apply when two conditions are present: (1) a judgment against a nonstate terrorist party and (2) execution against the blocked property of a foreign-state entity that has become an agency or instrumentality of the nonstate terrorist party. The statute, however, contains no such exception. The opposite: it permits execution in "*every* case" seeking the assets of "*any* agency or

---

[15] Faiq argues that the TRIA clause permitting enforcement of judgments against "any agency or instrumentality" of a terrorist party should apply only to "juridically separate entities with a common owner." Faiq 25 n.10. This interpretation is belied by *Kirschenbaum*, which sets out common ownership as just one non-exclusive factor that may give rise to a TRIA agency/instrumentality relationship.

28

instrumentality," TRIA § 201(a), of "*any* terrorist party," *Weinstein*, 609 F.3d at 49 (emphases added). "'Read naturally, the word 'any' has an expansive meaning,' and thus, so long as 'Congress did not add any language limiting the breadth of that word,' the term 'any' must be given literal effect." *Deravin v. Kerik*, 335 F.3d 195, 204 (2d Cir. 2003) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). The Congress that enacted TRIA knew all too well that state institutions like DAB could become organs of nonstate terrorists, because it knew that *DAB itself was an organ of the Taliban* on 9/11. J.C. 45; *see* Allen 21 ("TRIA was written specifically to prevent the Taliban from evading justice, not to abet it.").

Furthermore, *Kirschenbaum* expressly considered whether the FSIA's formalist definition of "agency or instrumentality" (28 U.S.C. § 1603(b)) could be imported into TRIA. 830 F.3d at 133-34. It determined it could not be—precisely because of situations like this, where the terrorist judgment debtor was not a state. Terrorist organizations, this Court observed, are not constrained by formal niceties or the rule of law. They use deception and subterfuge to accomplish their aims, including through organizations and individuals that appear to be legitimate (like DAB). *Id*. at 134. *Kirschenbaum* thus construed the terms "agency" and "instrumentality" consistent with their ordinary meaning in light of TRIA's specific statutory purpose. *Id.* at 135; *see also* Recent Case, *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 130 Harv. L. Rev. 1257, 1263-64 (2017) ("By outlining a

29

functional standard for agencies or instrumentalities, the Second Circuit supported the basic purposes of the terrorism exception."). *Amici* offer no alternative, workable framework for interpreting TRIA—just a good-for-one-case-only atextual exception to the statute.

b.      What's more, DAB can be *both* an instrumentality of the Taliban for purposes of TRIA *and* an instrumentality of Afghanistan for purposes of the FSIA. *Contra* Orgs. 21; Rockefeller 7-8. Neither statutory definition is exclusive. As *Kirschenbaum* explained, the tests for "agency or instrumentality" status under the FSIA and TRIA are distinct, keyed to their respective statutory contexts. 830 F.3d at 134. TRIA nowhere suggests it is impossible for an agency or instrumentality of a foreign state under the FSIA (a formalistic test that includes, for example, a corporation "a majority of whose shares ... is owned by a foreign state," 28 U.S.C. § 1603(b)(2)) to fall under terrorist control or direction for purposes of TRIA. Indeed, that *was* the state of affairs as to DAB and the Taliban when TRIA was introduced.

Some *amici* worry about "the legal consequence of treating the State of Afghanistan as a state sponsor of terrorism." Rockefeller 4-5. But as explained (*supra* at 16-18), TRIA does not require any such designation in order to attach blocked assets of a sovereign entity that is also an agency or instrumentality of a nonstate terrorist party. Courts can and do find that foreign-state agencies have been

30

"overtaken by terrorists" when that is what *actually happened*—even where, as here, the state itself is not a designated sponsor of terror. *See Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 227-28 (D.C. Cir. 2022), *petition for cert. filed*, 92 U.S.L.W. 3001 (U.S. July 5, 2023) (No. 23-9); J.C. 55-57. Refusing to apply TRIA to that reality would reward terrorists for successfully commandeering state entities by cloaking them in immunity.

c.    *Amici* suggest that this action must fail because the Taliban does not hold title to the DAB assets. Rockefeller 9-11; Orgs. 3, 25, 27-28. That argument ignores what TRIA actually says. TRIA authorizes execution against "the blocked assets of any agency or instrumentality" of a terrorist judgment debtor, TRIA § 201(a), "even if the agency or instrumentality is not itself named in the judgment." *Kirschenbaum*, 830 F.3d at 132; *Weinstein*, 609 F.3d at 49-50. The Joint Creditors need not show that the Taliban holds legal title to the blocked assets, but only that the assets belong to DAB, the Taliban's agency or instrumentality—as the district court acknowledged they do. S.A.24; *see supra* at 25-26.

d.    *Amici* propose alternative fates for the DAB assets instead of the turnover TRIA directs—from paying them "directly and immediately" to DAB, Unfreeze 6; to "preserv[ing]" them indefinitely. Rockefeller 13. Other *amici* worry about the implications of these proceedings for the global banking system. Rockefeller 7 n.3, 11 n.7; Faiq 30.

But these "policy arguments cannot supersede the clear statutory text," *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192 (2016), particularly in light of TRIA's mandate that covered assets "*shall* be subject to execution." *Cf. Halkbank*, 598 U.S. at 280 ("[I]t is not our role to rewrite the FSIA based on purported policy concerns that Congress and the President have not seen fit to recognize."). The "political branches" have made all the relevant "considered choices" by enacting TRIA and blocking DAB's assets (thus making them subject to TRIA) in recognition of the 9/11 victims' longstanding suffering. J.C. 61-63.[16] In these circumstances, the Judicial Branch must follow TRIA's plain text—which the Joint Creditors demonstrably satisfy—and proceed with turnover.[17]

## IV.    The Court Should Direct Entry of the Joint Creditors' Turnover Orders.

The Joint Creditors ask this Court to reverse the judgment and to direct the district court to enter the turnover orders that were improvidently denied, thus

---

[16] In any event, *amici*'s desired policy outcomes are remote no matter what the Court decides. As *amici* acknowledge, the United States authorized the transfer of half of DAB's assets to a separate fund in Switzerland "for the benefit of the people of Afghanistan." Faiq 18-19; Orgs. 7-8. Yet nearly two years on, the funds have yet to reach Afghanistan precisely because DAB "lack[s] independence from the Taliban." *Special Inspector Gen. for Afg. Reconstruction Q. Rep. to U.S. Congress* 23 (July 2023), https://www.sigar.mil/pdf/quarterlyreports/2023-07-30qr.pdf; *see also* J.C. 13 n.11.

[17] Arguments based on "customary international law and treaty law" cannot prevail. *E.g.*, Orgs. 17-19. "[C]lear congressional action trumps customary international law and previously enacted treaties," *Guaylupo-Moya v. Gonzales*, 423 F.3d 121, 136 (2d Cir. 2005), and TRIA is just that.

putting the Joint Creditors in the position they would have occupied but for the district court's errors. J.C. 63-64; *see Cap. Ventures Int'l v. Republic of Argentina*, 282 F. App'x 41, 42 (2d Cir. 2008) (summary order) (reversing denial of attachment motion with instructions to enter order of attachment). The district court made factual findings demonstrating that the Joint Creditors satisfied every element of TRIA, *see* J.C. 24-25 & n.18; *supra* at 27, and withheld turnover only because of its jurisdictional and constitutional errors. If this Court corrects those errors, there is nothing further for the district court to consider on remand, and the Joint Creditors should be given the relief they should have been granted in February 2023.

The *Ashton* Plaintiffs—although they agree with the Joint Creditors that the district court's judgment must be vacated—assert that entry of the turnover orders would be (1) "legally impermissible" and (2) "contrary to equity." Ashton 19. Neither argument justifies denying the Joint Creditors' requested relief.

### A. There Is No Need for Further Proceedings to Assess the Validity of the Joint Creditors' Writs of Execution.

The *Ashton* Plaintiffs argue that outright "reversal of the District Court's denial of the Joint Creditors' turnover motions" with instructions to grant turnover "would be … legally impermissible" in light of *Levinson*, 44 F.4th at 97-98 (vacating writ of execution that issued prior to a judicial determination that assets were covered by TRIA). Ashton 19. They argue that *Levinson* calls into question the validity of

the Joint Creditors' writs of execution, and urge this Court to remand for consideration of the turnover motions "in light of *Levinson*." Ashton 20.

This argument is baseless. If the Court agrees that the Joint Creditors have demonstrated entitlement to execution, it should direct that turnover orders be entered. Consideration of whether *Levinson* invalidated the underlying writs of execution is not necessary because, under the controlling New York procedures, a writ of execution is not a prerequisite to entry of a turnover order. *See Kitson & Kitson v. City of Yonkers*, 10 A.D.3d 21, 27 (2d Dep't 2004); J.C. 64 n.29.[18]

## B.   There Is No Need for Further Proceedings to Consider the *Ashton* Plaintiffs' "Equitable" Arguments.

The *Ashton* Plaintiffs next argue that, even if the Joint Creditors are entitled to execution, the district court should not be directed to enter turnover orders, but rather should oversee an "equitable distribution of the DAB Assets to benefit *all* victims of Taliban-sponsored terrorism"—including to plaintiffs who are not legally

---

[18] In any event, nothing in *Levinson* affects the validity of the writs. Unlike in *Levinson*, the property holder here (DAB) did not challenge the writs. In securing the writs, the Joint Creditors followed the "proper process for issuance of a writ of execution," Memo Endorsement, *John Does 1 Through 7 v. The Taliban*, No. 20-mc-740 (S.D.N.Y. Sept. 23, 2021), ECF 26. And the record before the district court unquestionably demonstrated that DAB was controlled by the Taliban. Indeed, the Executive Branch blocked the assets precisely *because* the Taliban controlled DAB and could otherwise access DAB's assets; the writs of execution were issued thereafter. *See* J.C. 12-13; App.149, 350, 460, 505. In addition, the harm that *Levinson* sought to avoid—wrongful restraint of a party's assets, *see* 44 F.4th at 98 & n.6—is inapplicable here, where the assets were already restrained prior to the writs' issuance.

entitled to execution. Ashton 17. In other words, the *Ashton* Plaintiffs ask the Court to deny the relief to which the Joint Creditors are legally entitled so that the district court can entertain requests it has no power to grant.

No party other than the Joint Creditors has established their legal entitlement to execute on the DAB assets. The Joint Creditors moved for turnover orders when they were the only plaintiffs who had obtained final monetary judgments, which is a prerequisite to invoking TRIA. *See Smith*, 346 F.3d at 271-72 (a "final judgment" is essential to obtain execution under TRIA, which "confers no entitlement on victims who have not yet obtained judgments").[19] Plaintiffs without final judgments thus cannot overcome three barriers that otherwise conclusively preclude execution against blocked central-bank assets: (1) execution immunity under Sections 1609-1611; (2) the regulatory prohibition of judicial encumbrances of blocked assets, *see Elahi*, 556 U.S. at 369;[20] and (3) the statutory rule against attaching assets held by a

---

[19] TRIA authorizes execution "in order to satisfy [a] judgment [against a terrorist party] to the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA § 201(a). Only final monetary judgments can establish the "extent of any compensatory damages" awarded against the judgment debtor.

[20] Unless authorized by TRIA (and thus in satisfaction of a final monetary judgment), any attachment of the DAB assets would violate sanctions law. Executive Order 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022) blocked the DAB assets, which means that they "may not be transferred, paid, exported, or otherwise dealt in," *id.* § 1(a), "except to the extent provided by statutes," such as TRIA, and regulations, *id.* § 1(c). Treasury Department regulations confirm that any change in the status of the assets, including as a result of execution or attachment in aid of execution (including pre-judgment attachment), is a "transfer" that is prohibited for these purposes. *See* 31

Federal Reserve bank "before final judgment," 12 U.S.C. § 632 (second paragraph); *accord* Paul L. Lee, *Central Banks and Sovereign Immunity*, 41 Colum. J. Transnat'l L. 327, 383 n.197 (2003). For the Joint Creditors, the combination of their final judgments and their satisfaction of TRIA's other requirements underpinned their turnover motions.

By contrast, at the time of the district court proceedings, the *Ashton* Plaintiffs had not secured final monetary judgments necessary to trigger TRIA, and therefore lacked a legal basis to pursue attachment. They possessed only a preliminary default judgment of liability, *see* Ashton Supp. App.94, which is not a final judgment. *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 97 (2d Cir. 1993); *Swarna v. Al-Awadi*, 622 F.3d 123, 140 (2d Cir. 2010). The *Ashton* Plaintiffs accordingly cannot rely on TRIA, *Smith*, 346 F.3d at 271-72, and thus cannot overcome either execution immunity under Section 1609 or the prohibition on attaching blocked assets, *Elahi*, 556 U.S. at 369.[21]

---

C.F.R. § 594.312 ("The term transfer … include[s] … the issuance, docketing, filing, or levy of or under any judgment, decree, attachment, injunction, execution, or other judicial or administrative process or order, or the service of any garnishment."); Ashton Supp.App.95 n.5 (same "transfer" definition in all sanctions regulations (citing MDL Dkt. 8056 & 8056-1)).

[21] These legal restrictions also bar the efforts of the *Owens* Plaintiffs to secure the DAB assets, at issue in the tandem appeals in *Estate of Aliganga, et al.*, Nos. 23-354, 23-797(C). When the district court denied confirmation of the *Owens* Plaintiffs' pre-judgment attachment, and at the time the Joint Creditors' turnover motion was denied, the *Owens* Plaintiffs lacked even a judgment of liability against the Taliban,

Despite their lack of entitlement to the DAB assets, the *Ashton* Plaintiffs argue the Court should deny the Joint Creditors relief in the name of "equity." They argue that N.Y. C.P.L.R. § 5240 grants the district court sweeping equitable power to override New York's judgment execution framework and divide the assets up as it sees fit among all parties who have a mere claim on file against the Taliban. Ashton 18-19.

This argument is doubly flawed. First, under New York law, a trial court has no broad equitable power to overturn the statutes governing priority in judgment-enforcement proceedings. *See CSX Transportation*, 879 F.3d at 472 (citation omitted) (under C.P.L.R. § 5234, a judgment creditor's priority is established "strictly in accordance with the chronological service" of writs of execution or turnover orders). Section 5240 may not be used as "an alternative procedure for achieving priority." *Cook v. H.R.H. Constr. Corp.*, 32 A.D.2d 806, 807 (2d Dep't 1969) (any measure other than complying with priority rules, "no matter how diligent, is insufficient to qualify for priority"); *see Corwin Consultant v. Interpublic Grp. of Cos.*, 375 F. Supp. 186, 195 (S.D.N.Y. 1974) ("It is clear after *Cook v. H.R.H.*

_____

much less a final monetary judgment. Without such a judgment, the *Owens* Plaintiffs had no basis to overcome the immunity afforded to assets of a foreign state, *see* 28 U.S.C. §§ 1609-1611, and especially were precluded from obtaining any pre-judgment attachment. *Id.* § 1610(d). They also had no basis to secure any type of attachment over or distribution from assets blocked by Presidential order. *See supra* n.20. And they could not overcome 12 U.S.C. § 632's prohibition of prejudgment attachments issued against the Federal Reserve.

*Construction Corp.* … that § 5240 is not an alternative procedure for achieving … priority" (internal quotation marks omitted)), *rev'd on other grounds*, 512 F.2d 605 (2d Cir. 1975). None of the cases cited by the *Ashton* Plaintiffs (at 19) holds to the contrary, and none approves, or even involves, depriving a judgment creditor of priority. To permit courts to overturn New York's ancient and carefully constructed legal framework governing priority based on individual judges' discretionary application of notions of equity would upend the rule of law and invite chaos in enforcement proceedings that underpin much of New York's—and the nation's— commerce.

Second, even if equitable considerations could justify denying relief to a party who has proven their legal entitlement and granting relief to a party that has not, equity would strongly favor entry of the turnover orders. The Joint Creditors who are 9/11 victims have, through the "Framework Agreement," *see* J.C. 15-16, contracted with more than 10,000 other 9/11 victims, including many who lack final judgments against the Taliban, to fairly distribute the DAB assets among the signatories. The *Ashton* Plaintiffs were invited, but, to date, have refused to participate.

The Framework Agreement recognizes the diligent efforts of the 9/11 Joint Creditors, beginning over a decade before the DAB assets became available, to secure judgments of liability, obtain final money judgments, and request turnover.

Equity rewards the diligent and disfavors those who sleep on their rights. *See, e.g.*, *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998). The *Ashton* Plaintiffs were well aware of the Joint Creditors' efforts, but did not seek monetary judgments against the Taliban for over a decade after their liability finding was entered; they sought to do so only after the *Havlish* Plaintiffs perfected their attachment; and they still had not reduced their interim liability determinations to money judgments when the district court denied their motion for prejudgment attachment. The strategic choice of the *Ashton* Plaintiffs (and their sophisticated counsel) not to pursue final judgments against the Taliban until after it gained control over billions of dollars in DAB assets located in New York City does not equitably entitle them to override New York law and overturn the Framework Agreement, which thousands of other plaintiffs accept, in order to seek larger recoveries for themselves outside the Agreement.

## CONCLUSION

The judgment should be reversed, and the cases remanded with instructions for the district court to enter turnover awards to the Joint Creditors.

Dated: November 6, 2023       Respectfully Submitted,


                                         */s/ Ian Heath Gershengorn*

David A. Barrett                                       Ian Heath Gershengorn
BOIES SCHILLER FLEXNER LLP          Douglass A. Mitchell
55 Hudson Yards                                    Elizabeth B. Deutsch
New York, NY 10001                           Samuel S. Ungar
(212) 446-2300                                     JENNER & BLOCK LLP
dbarrett@bsfllp.com                         1099 New York Avenue, NW
                                               Ste. 900
Stuart H. Singer                               Washington, DC 20001
BOIES SCHILLER FLEXNER LLP          (202) 639-6000
401 East Las Olas Blvd., Ste. 1200       igershengorn@jenner.com
Fort Lauderdale, FL 33301             dmitchell@jenner.com
(954) 356-0011
ssinger@bsfllp.com                         Lee Wolosky
                                                 Benjamin D. Alter
Timothy B. Fleming                         JENNER & BLOCK LLP
WIGGINS CHILDS PANTAZIS FISHER      1155 Avenue of the Americas
GOLDFARB, PLLC                             New York, NY 10036
2208 18th Street, NW, #110             (212) 891-1600
Washington, DC 20009                 lwolosky@jenner.com
(202) 467-4489                                     balter@jenner.com
tfleming@wigginschilds.com

                                                 Andrianna D. Kastanek
                                                 JENNER & BLOCK LLP
                                                 353 N. Clark Street
                                                 Chicago, IL 60654
                                                 (312) 840-7285
                                                 akastanek@jenner.com

                                                 *Counsel for Plaintiffs-Appellants*
                                                 *Fiona Havlish, et al., Appellants in*
                                                 *23-258*

/s/ John Thornton
John Thornton
Orlando do Campo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com
od@dandtlaw.com

*Counsel for Plaintiffs-Appellants John
Does 1 through 7, Appellants in
23-263*

/s/ Dion G. Rassias
Dion G. Rassias
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000
dgr@beasleyfirm.com

*Counsel for Plaintiffs-Appellants
Raymond Anthony Smith, et al.,
Appellants in 23-304*

/s/ Sean P. Carter
Sean P. Carter, Esq.
Stephen A. Cozen
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
(215) 665-2105
scarter1@cozen.com

Richard Klingler
ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
1155 F Street, NW, Ste. 750
Washington, DC 20004
(202) 249-6900
rklingler@egcfirm.com

Carter G. Phillips
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for Plaintiffs-Appellants
Federal Insurance Co., et al.,
Appellants in 23-346*

## CERTIFICATE OF COMPLIANCE

On October 24, 2023, this Court issued an order increasing the word limit for this brief to 10,000 words. ECF 197. This brief complies with the Court's order because it contains 9,877 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman 14-point.


Dated: November 6, 2023

By: /s/ Ian Heath Gershengorn
Ian Heath Gershengorn
JENNER & BLOCK LLP
1099 New York Avenue, NW
Ste. 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2023, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 6, 2023            By: /s/ Ian Heath Gershengorn
                                    Ian Heath Gershengorn
                                    JENNER & BLOCK LLP
                                    1099 New York Avenue, NW
                                    Ste. 900
                                    Washington, DC 20001
                                    (202) 639-6000
                                    igershengorn@jenner.com