**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PRUDENCE BUSHNELL, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE ISLAMIC EMIRATE OF AFGHANISTAN, *et al.*,<br><br>Defendants. | No. 22-CV-8901-JSR |

# BRIEF OF *AMICI CURIAE* JOINT TALIBAN CREDITORS

Case 23-258, Document 263-2, 12/02/2024, 3637817, Page2 of 20

# TABLE OF CONTENTS

INTERESTS OF *AMICI* ....................................................................................1

PRELIMINARY STATEMENT ....................................................................................5

ARGUMENT ....................................................................................6

I. A Foreign State And Its Central Bank Are Presumptively Immune From *In Personam* Suits ....................................................................................6

II. Plaintiffs Are Apparently Pursuing Claims Against Foreign-State Defendants....................7

A. Afghanistan Is A Foreign State ....................................................................................7

B. The United States And Several Federal Courts Have Continued To Recognize Defendant Da Afghanistan Bank As Afghanistan's Central Bank ....................................8

III. No Exception To Foreign Sovereign Immunity Applies ....................................................11

IV. Assuming The FSIA Applies, Afghanistan Has Not Been Properly Served And Neither Afghanistan Nor DAB Is In Default ....................................................13

CONCLUSION ....................................................................................16

Judgment Creditors Fiona Havlish *et al.* (the "Havlish Creditors"), John Does 1 through 7 (the "Doe Creditors"), Federal Insurance Company *et al.* (the "Federal Insurance Creditors"), and Estate of Smith *et al.* (the "Smith Creditors)—collectively, the "Joint Taliban Creditors" or "*amici*"—by and through their undersigned counsel, respectfully submit this brief as *amici curiae* concerning questions pertaining to the Court's subject matter jurisdiction over the instant action and the Foreign Sovereign Immunities Act ("FSIA").

## INTERESTS OF *AMICI*

The Joint Taliban Creditors consist of four separate groups of plaintiffs in four separate actions in this District. Each holds a final, enforceable judgment against the Taliban arising out of an act of terrorism.[1] Together, the Joint Taliban Creditors hold judgments aggregating more than $10 billion.

In August 2021, an opportunity arose to enforce those judgments. As the United States withdrew from Afghanistan, the Taliban took control of the country, including government offices and institutions like Da Afghanistan Bank ("DAB"), the country's central bank. The forcible takeover of DAB by a sanctioned terrorist entity prompted the United States to block DAB's assets subject to U.S. jurisdiction pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1702(a)(1)(B), including approximately $7 billion in DAB's assets on deposit at the Federal Reserve Bank of New York. *See* Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11,

---

[1] *See Havlish v. Bin Laden*, 03-cv-9848 (S.D.N.Y.); *John Does 1 through 7 v. the Taliban*, 20-mc-740 (S.D.N.Y.); *Federal Insurance Co. v. al Qaida*, 03-cv-6978 (S.D.N.Y.); *Smith v. Islamic Emirate*, No. 01-CV-10132 (S.D.N.Y.). Each of these actions is part of the multidistrict litigation styled *In re Terrorist Attacks on September 11, 2001*, No. 03-md-1570-GBD-SN (S.D.N.Y.) (hereinafter the "9/11 MDL" or "MDL Dkt."). Although the *John Does 1 through 7* action does not arise out of the September 11 attacks but instead a 2016 Taliban bombing, and although the Doe Creditors are not formally parties to the MDL, their action was transferred to Judge Daniels and they were ordered to file pleadings concerning the DAB assets on the MDL docket.

2022). President Biden determined that half of those blocked assets—approximately $3.5 billion—would be set aside for humanitarian purposes in Afghanistan under a Treasury Department license, while the other half would remain at the FRBNY, such that the victims of terrorism pursuing the assets would have a "full opportunity to have their claims heard in court."[2]

In the aftermath of the Taliban takeover of DAB, *amici* all obtained and levied writs of execution over the assets and initiated turnover proceedings within the 9/11 MDL pursuant to Federal Rule of Civil Procedure 69 and Article 52 of the New York C.P.L.R., seeking to obtain $3.5 billion in the blocked assets of DAB then under Taliban control.[3] *Amici*'s turnover motions argue that, pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"),[4] they are entitled to satisfy their judgments against the Taliban by executing on the blocked assets of DAB, because DAB is an "agency or instrumentality" of the Taliban.

Those turnover motions were denied by the district court. Magistrate Judge Netburn issued a Report & Recommendation on August 26, 2022 recommending that the motions be denied, *see* MDL Dkt. 8463; *amici* jointly filed a comprehensive set of objections to that Report demonstrating their entitlement to turnover, *see* MDL Dkt. 8733; and on February 21, 2023 Judge Daniels adopted

---

[2] *See* White House Fact Sheet (Feb. 11, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/11/fact-sheet-executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-people-of-afghanistan/.

[3] *See* MDL Dkt. 7763 (Havlish turnover motion); MDL Dkt. 7767 (Doe turnover motion); MDL Dkt. 7936 (Federal Insurance turnover motion); Dkt. 62 in *Smith v. Islamic Emirate of Afghanistan*, No. 01-CV-10132 (S.D.N.Y.) (Smith turnover motion).

[4] Pub. L. No. 107-297, 116 Stat. 2322, 2337-2340, as amended, Pub. L. No. 112-158, 126 Stat. 1260 (codified at 28 U.S.C. § 1610 note) ("Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605(a)(7)], the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.").

the Report in part and denied turnover, *see* MDL Dkt. 8866. *Amici*'s turnover motions are now on appeal before the Second Circuit, and *amici* have moved for a stay pending appeal of Judge Daniels' order. *See Havlish v. Bin-Laden*, No. 23-258 (2d Cir.), Dkt. 25. On appeal, *amici* will demonstrate that Judge Daniels erred in concluding that the FSIA withdrew the court's jurisdiction over their execution proceedings. Among other things, *amici* satisfy every element of TRIA Section 201(a), which trumps the FSIA and both gives the court jurisdiction over enforcement proceedings and authorizes execution "[n]otwithstanding any other provision of law" and "in every case" a party has a judgment against a terrorist party. *See Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010). TRIA's statutory exception to the FSIA does not apply to the instant case, however, because the statute "confers no entitlement on victims who have not yet obtained judgments." *Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York*, 346 F.3d 264, 271 (2d Cir. 2003).

In October 2022, while *amici*'s turnover motions were pending in the district court, the Bushnell Plaintiffs ("Plaintiffs") filed the instant action. Although DAB is mentioned in only a few paragraphs of Plaintiffs' lengthy complaint, there are several indications that Plaintiffs filed this action so that they, too, could attempt to execute on the DAB assets. First, although many of these Plaintiffs have been pursuing claims for decades against alleged sponsors and perpetrators of the 1998 embassy bombings, *see* Compl. ¶¶ 2, 15, it was not until October 2022 that they brought claims against the Taliban and DAB for the first time, only months after the Joint Taliban Creditors had served writs of execution and filed turnover motions seeking execution on the DAB Assets. Second, Plaintiffs filed this suit after a large subset of them unsuccessfully sought to intervene in

*amici's* 9/11 MDL turnover proceedings.[5] And third, the *Bushnell* plaintiffs are pursuing a liability judgment against DAB itself, and their complaint references the $3.5 billion that *amici* are pursuing through the MDL turnover proceedings. *See* Compl. ¶ 111.

*Amici* support Plaintiffs' efforts to pursue accountability for the 1998 embassy bombings. *Amici* take no position at this juncture on whether Plaintiffs can establish Defendants' substantive liability for the embassy bombings by satisfactory evidence. *See* 28 U.S.C. § 1608(e). Nor do they take any position on Plaintiffs' pursuit of a default judgment against nonstate defendants, including the Taliban.

*Amici* nonetheless have an interest in bringing to this Court's attention certain issues that are apparent in the *Bushnell* complaint pertaining to subject matter jurisdiction and the Foreign Sovereign Immunities Act (FSIA). Plaintiffs' complaint does not mention the FSIA or discuss the possibility of its applicability here. As explained below, however, the Court may lack jurisdiction to award Plaintiffs a liability judgment against Afghanistan or DAB, because of the immunities afforded under the FSIA in some instances to a foreign state and the central bank of a foreign state.[6] Neither defendant is likely to appear to raise these issues.

---

[5] *See* Joint Taliban Creditors' Motion for Leave to File *Amicus Curiae* Brief at 3 & n.4. Notably, this subset of Plaintiffs did not seek to intervene in order to establish priority to execute on the assets. The Joint Taliban Creditors would not have objected to such intervention, which New York law authorizes as the appropriate procedure to settle competing claims to the same assets. *See* N.Y. C.P.L.R. §§ 5225(b), 5239. Instead, as Magistrate Judge Netburn held, Plaintiffs' intervention was inappropriate because they sought to establish that *no one* had the right to recover the DAB assets. *See* MDL Dkt. 7696 at 6.

[6] These FSIA issues were not relevant when *amici* obtained their judgments against the Taliban many years ago, because the Taliban is a non-sovereign defendant and no judgments were sought by *amici* against the state of Afghanistan or DAB. Contrary to what Judge Daniels held in denying *amici*'s turnover motions, *see* MDL Dkt. 8866, sovereign immunity is not an obstacle to *amici's* turnover motions. The turnover motions against the Federal Reserve do not implicate any immunity from jurisdiction DAB might otherwise enjoy. And even if they did, TRIA authorizes holders of terrorism judgments to execute against the assets of terrorist parties and the terrorist

(cont.)

*Amici's* purpose is to avoid a scenario in which Plaintiffs obtain a judgment against Afghanistan and DAB that would be void for lack of jurisdiction, but still could be asserted to disrupt *amici*'s enforcement proceedings, should they be revived on appeal, and whose validity could become the subject of dispute in those proceedings. *See* N.Y. C.P.L.R. §§ 5225(b), 5239 (rights of adverse claimants to judgment debtor's property may be settled in turnover proceedings). *Amici* believe it is preferable to resolve any issues pertaining to foreign sovereign immunity now, before any potentially void judgment is awarded.

## PRELIMINARY STATEMENT

Plaintiffs appear to be seeking default judgments against DAB, which the United States continues to recognize as the central bank of the state of Afghanistan. *See infra* II.B. Plaintiffs also appear to be seeking a default judgment against the State of Afghanistan itself. Foreign states and their central banks are presumptively immune from jurisdiction from *in personam* claims under the FSIA, and can be subjected to such claims only if an exception to immunity applies. Yet Plaintiffs do not acknowledge this issue and their complaint and other filings to date do not identify the Islamic Emirate of Afghanistan as the State of Afghanistan or acknowledge the United States' position that DAB remains the central bank of Afghanistan and thus an instrumentality of a foreign state. Nor do Plaintiffs mention the FSIA or any of its exceptions, despite the FSIA's obvious relevance to the facts which they allege.

Because the FSIA, when it applies, presumptively deprives the Court of subject matter jurisdiction, the Court cannot grant a default judgment against Afghanistan or DAB on the available record without considering those entities' immunity. *Amici* take no position on Plaintiffs'

---

parties' instrumentalities "in every case" and "notwithstanding any other provision of law," including the FSIA. *See* MDL Dkt. 8733 at 22-43.

allegations with respect to defendants' substantive liability, nor do they express any views about Plaintiffs' pursuit of default judgments against the nonstate defendants. The following observations may assist the Court as it considers whether it has subject matter jurisdiction.

## ARGUMENT

### I. A Foreign State And Its Central Bank Are Presumptively Immune From *In Personam* Suits

The Foreign Sovereign Immunities Act provides the "sole basis" for obtaining jurisdiction over *in personam* claims against a foreign sovereign. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434 (1989). Under the FSIA, a "foreign state" is "immune from the jurisdiction" of federal and state courts except as provided by the exceptions to immunity in 28 U.S.C. §§ 1605-1607. *See* 28 U.S.C. § 1604.

The definition of a foreign state "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Id.* § 1603(a). A foreign state's central bank is "indisputably" an agency or instrumentality of the foreign state under the FSIA. *See S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d Cir. 1983); *see also, e.g., Weininger v. Castro*, 462 F. Supp. 2d 457, 498 (S.D.N.Y. 2006) (central bank of Cuba); *Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 114 (D.D.C. 2021) (central bank of Iran); *Davoyan v. Republic of Turkey*, No. 10-CV-5636 (DMG), 2010 WL 11507885, at *3 (C.D. Cal. Dec. 7, 2010) (central bank of Turkey); *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460 (9th Cir. 1995) (quoting H.R.Rep. No. 94–1487, 94th Cong. 2nd Sess. (1976), *reprinted at* 1976 U.S.C.C.A.N. 6604, 6614) (noting the legislative history of the FSIA, in which the House Report listed "a central bank" as an example of an "entit[y] which meet[s] the definition of an 'agency or instrumentality' of a foreign state").

Accordingly, the FSIA establishes that a foreign state and its central bank are "presumptively immune from the jurisdiction of United States courts; unless a statutorily specified exception applies, a federal court lacks subject-matter jurisdiction over . . . claim[s] against" them. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

## II. Plaintiffs Are Apparently Pursuing Claims Against Foreign-State Defendants

In this case, Plaintiffs are pursuing claims against Afghanistan and DAB. To the extent these Defendants are foreign states, they are presumptively immune from this Court's jurisdiction, and Plaintiffs do not identify any applicable exceptions to their immunity.

### A. Afghanistan Is A Foreign State

The state of Afghanistan—regardless of what name it is given,[7] and regardless of whether its current government garners any international recognition—remains a foreign state within the meaning of the Foreign Sovereign Immunities Act. Even though the United States does not currently recognize the Taliban or any other entity as the *government* of Afghanistan, it has plainly continued to recognize Afghanistan as an extant *state*. *See* MDL Dkt. 7661 at 8 (U.S. Statement of Interest) (referring to DAB as "the central bank of *the foreign state of Afghanistan*"); Exec. Order No. 14,064 § 4(a). The U.S. position is in keeping with the general proposition that a state can "recognize or treat an entity as a state while denying that a particular regime is its government." Restatement (Third) of Foreign Relations Law of the United States, § 203 cmt. a (1987). Despite

---

[7] Plaintiffs have sued both the Taliban and the "Islamic Emirate of Afghanistan." The Taliban is Afghanistan's *de facto*, unrecognized government. As Plaintiffs note, the Taliban has long referred to itself as the Islamic Emirate of Afghanistan, *see* Compl. ¶ 67, and has also used that name to refer to the state and government of Afghanistan, *id*. ¶¶ 103-104. The Complaint does not make clear whether Plaintiffs are proceeding against the Islamic Emirate of Afghanistan as merely an alter ego of defendant the Taliban (which is not a foreign state) or whether they are pursuing a judgment against the state of Afghanistan (which is a foreign state). The analysis in this brief assumes that Plaintiffs seek a judgment against the state of Afghanistan itself; such an assumption flows from Plaintiffs' decision to sue *both* the "Islamic Emirate of Afghanistan" and the "Taliban."

not having a recognized government, Afghanistan meets all the international law requirements for a state, including having a "defined territory and population, self-governance and foreign relations, and the capacity to wage war and to enter into international agreements." *Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 123 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018). Afghanistan's population and borders are well-defined,[8] and it has what the United States calls a "de facto government"[9] that continues to exercise the capacity to engage in foreign relations, including with the United States.[10]

Accordingly, Afghanistan is a foreign state and is presumptively immune from this Court's jurisdiction pursuant to 28 U.S.C. § 1604.

### B. The United States And Several Federal Courts Have Continued To Recognize Defendant Da Afghanistan Bank As Afghanistan's Central Bank

To the extent Defendant DAB is the central bank of the State of Afghanistan, it is the agency or instrumentality of a foreign state. As noted above, agencies or instrumentalities of a foreign state are themselves a "foreign state" within the meaning of the FSIA, and are, too, presumed immune from the Court's jurisdiction. *See* 28 U.S.C. §§ 1603(a), 1604. Although Plaintiffs' complaint calls DAB the Taliban's "private bank," seemingly suggesting that DAB is not a foreign state's central bank, *see* Compl. ¶¶ 107-108, that conclusory assertion is insufficient to overcome U.S. executive branch determinations and the recent findings of several federal courts.

---

[8] *See* Afghanistan, Central Intelligence Agency Factbook, available at https://www.cia.gov/the-world-factbook/countries/afghanistan/ (describing Afghanistan's area, boundaries, geographic coordinates, and population).

[9] *See House Foreign Affairs Committee Holds Hearing on Afghanistan,* CQ Congressional Transcripts (Sept. 13, 2021) (statement of Secretary of State Blinken) (Taliban is the "de facto government of Afghanistan.").

[10] *See, e.g.*, Charlotte Greenfield, *US and Taliban Make Progress on Afghan Reserves, but Big Gaps Remain*, Reuters (July 26, 2022), available at https://reut.rs/3H37tKr.

*First*, the United States has determined that DAB remains the Central Bank of Afghanistan after the Taliban takeover. When President Biden blocked the DAB assets in February 2022, his executive order stated that "the term 'Da Afghanistan Bank' or 'DAB' means the Central Bank of Afghanistan." Exec. Order No. 14,064 § 4(a). That same day, the United States noted in its statement of interest in the MDL turnover proceedings that "DAB is the central bank of the State of Afghanistan." MDL Dkt. 7661 at 15; *see also id*. at 21 ("DAB is an agency or instrumentality of the State of Afghanistan under the FSIA's definition and thus is to be treated as a 'foreign state' for purposes of the FSIA."). The United States has continued to adhere to these views in subsequent proceedings. *See* Letter from United States Department of Justice, *Owens v.* Taliban, No. 22-cv-1949-VEC (S.D.N.Y. Feb. 24, 2023), ECF No. 81 (collecting sources) ("[T]he United States has repeatedly confirmed in a number of contexts that the DAB is 'Afghanistan's central bank.'"). These views are entitled to a degree of deference. "Whether a particular party is a 'state' under the [FSIA] . . . is a question of statutory interpretation, *informed by the views of the executive branch*." Restatement (Fourth) of Foreign Relations Law § 452, cmt. a (2018) (emphasis added).[11]

---

[11] Other recent statements have confirmed the Executive Branch's views that DAB remains Afghanistan's central bank. *See, e.g.,* White House Fact Sheet, *supra* n.2 ("President Biden signed an Executive Order (E.O.) to help enable certain U.S.-based assets belonging to Afghanistan's central bank, Da Afghanistan Bank ('DAB'), to be used to benefit the Afghan people."); State Department Media Note, *The United States and Partners Announce Establishment of Fund for the People of Afghanistan* (September 14, 2022), available at https://www.state.gov/the-united-states-and-partners-announce-establishment-of-fund-for-the-people-of-afghanistan/ (calling DAB "Afghanistan's central bank").

To the extent the Court may have questions concerning the United States' views about jurisdiction over DAB, it may wish to invite the views of the Government. *Amici* note that Judge Caproni recently invited the United States to submit a statement of interest on a related question in *Owens v. Taliban*, No. 22-cv-1949 (S.D.N.Y. Feb. 3, 2023), Dkt. 80, which the Government submitted on February 24, 2023, *see* Owens *Dkt.* 81. The Government there reiterated its view that DAB is the central bank of the state of Afghanistan and thus must be treated as a "foreign state" for FSIA purposes. *Id*. at 2.

*Second*, federal courts have continued to recognize DAB as Afghanistan's central bank, notwithstanding the collapse of the former Afghan government. *See Owens v. Taliban*, No. 22-CV-1949 (VEC), 2023 WL 2214887, at *5 (S.D.N.Y. Feb. 24, 2023) (confirming "DAB's status as Afghanistan's central bank" and rejecting argument by victims of the 1998 embassy bombings that DAB was no longer the central bank because it was operating as an arm of the Taliban); *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 2138691, at *5 (S.D.N.Y. Feb. 21, 2023) (Daniels, J.) ("DAB is the central bank of Afghanistan."); *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 20-MC-40-LJV, 2022 WL 2439386, at *2 (W.D.N.Y. June 7, 2022) (referring to "Afghanistan's central bank, Da Afghanistan Bank").[12]

The fact that Plaintiffs' complaint characterizes DAB as a "private bank" does not make it one for purposes of the FSIA analysis. *See Owens*, 2023 WL 2214887, at *5. A court cannot enter a default judgment without ensuring that it has subject matter jurisdiction. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 125-126 (2d Cir. 2011). The FSIA, when it applies, is a limit on the Court's subject matter jurisdiction over *in personam* actions against foreign states, including their agencies and instrumentalities, such as central banks. *See* 28 U.S.C. §§ 1330(a), 1603(a), 1604; *Nelson*, 507 U.S. at 355. Plaintiffs' characterization is not controlling, particularly given the executive branch's descriptions. In addition, the FSIA imposes a higher evidentiary burden for a default judgment against a foreign sovereign. *See* 28 U.S.C. § 1608(e) ("No judgment by default shall be entered . . . against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by

[12] Assuming DAB is Afghanistan's central bank, that does not preclude it from being an agency or instrumentality of the Taliban within the meaning of Section 201(a) of TRIA, as *amici* have argued in their execution proceedings. A state entity can fall under the control of a nonstate terrorist organization and thus become an instrumentality of it.

evidence satisfactory to the court."). For these reasons, the mere fact that Plaintiffs call DAB the "private bank" of the Taliban is not enough to establish that as fact for purposes of their default judgment application.

## III. No Exception To Foreign Sovereign Immunity Applies

Where "subject matter jurisdiction turns on the existence of an exception to sovereign immunity," and a foreign state "does not enter an appearance to assert an immunity defense," to exercise jurisdiction a "District Court still must determine that immunity is unavailable under the Act." *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 493 n.20 (1983). Moreover, "Plaintiffs seeking jurisdiction under the FSIA must allege facts sufficient to establish an exception to sovereign immunity under the FSIA." *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 107 (2d Cir. 2016). Here, to the extent Afghanistan and DAB are immune from jurisdiction under 28 U.S.C. § 1604, Plaintiffs have not alleged that any exception to such immunity applies, nor have they pleaded facts sufficient to establish any such exception. Each of the potentially applicable exceptions provided for in 28 U.S.C. §§ 1605-1607 is unavailable.

*First*, the FSIA contains a "terrorism exception," which under certain circumstances abrogates a foreign state's immunity for terrorism-related suits. *See* 28 U.S.C. § 1605A. But this exception is available only where the Secretary of State has designated the foreign state as a state sponsor of terrorism. *See id*. § 1605A(a)(2)(A)(i)(I), (c). Afghanistan is not today, and never has been, designated as a state sponsor of terrorism. *See* MDL Dkt. 7661 at 9, n.2 (U.S. Statement of Interest); *see also State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/. Accordingly, Section 1605A is inapplicable.

*Second*, pursuant to the noncommercial tort exception, a foreign state is not immune from suits for money damages based on personal injury or death that occurs in the United States and is

caused by a tortious act or omission of a state or its employees acting in their official capacity. *See* 28 U.S.C. § 1605(a)(5). But the embassy bombings did not "occur[] in the United States"—they occurred in Kenya and Tanzania. *See Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 174-175 (D.D.C. 2006) (rejecting argument that, because the 1998 embassy bombings occurred at U.S. embassies, they occurred "in the United States" within the meaning of Section 1605(a)(5)); *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 842 (D.C. Cir. 1984) (Section 1605(a)(5) did not abrogate Iran's immunity from tort claims brought by Americans held hostage at the U.S. embassy in Tehran). Section 1605(a)(5) is thus inapplicable.

*Third*, another set of exceptions to sovereign immunity govern claims based on commercial activities. *See* 28 U.S.C. § 1605(a)(2). These exceptions apply when "the action is based upon" either (1) "a commercial activity carried on in the United States by the foreign state;" (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.* To determine whether a lawsuit is "based upon" commercial activity, courts look to "the particular conduct on which the plaintiff's action is based," and identify that conduct by looking to "the gravamen of the complaint." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 33, 35 (2015) (citations omitted) (the commercial activity exception did not apply because "the conduct constituting the gravamen of [the] suit plainly occurred abroad"). Here, the "gravamen" of Plaintiffs' lawsuit are the 1998 bombings, which were not a commercial activity and did not occur in the United States. The complaint is otherwise bereft of any allegations that DAB or Afghanistan performed any activity—much less commercial activity—in the United States. Plaintiffs' only potentially relevant allegation is the conclusory statement that DAB "provided . . . access to the

U.S. and international financial systems" for the other defendants. *See* Compl. ¶ 153. But Plaintiffs' lawsuit is not "based upon" such an alleged provision of access. The commercial activity exceptions are thus inapplicable. *See Mwani v. bin Laden*, 417 F.3d 1, 15-17 (D.C. Cir. 2005) (commercial activity exception did not apply to claims against Afghanistan for the 1998 embassy bombings).

*Finally*, 28 U.S.C. § 1605B, part of the 2016 Justice Against Sponsors of Terrorism Act ("JASTA"), created a new exception to immunity and provided for a cause of action for terrorism claims against foreign states, even when they are not state sponsors of terrorism. But Section 1605B abrogates immunity only with respect to claims for death or injury "occurring in the United States and caused by . . . an act of international terrorism in the United States." *Id.* § 1605B(b)(1). *See also* JASTA, Pub. L. 114-222, 130 Stat 852 § 2(a)(7) (2016) (emphasis added) ("The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks *committed within the United States* with full access to the court system[.]"). Because the 1998 embassy bombings were not committed in the United States, Section 1605B is inapplicable.

In sum, to the extent Afghanistan and DAB are foreign states presumptively immune from this Court's jurisdiction, none of the potentially applicable exceptions to their sovereign immunity apply.

## IV. Assuming The FSIA Applies, Afghanistan Has Not Been Properly Served And Neither Afghanistan Nor DAB Is In Default

It is also appropriate to consider whether, to the extent the FSIA applies, Afghanistan and DAB were properly served. "A default judgment may not be granted . . . if the defendant has not been effectively served with process." *O'Callaghan v. Sifre*, 242 F.R.D. 69, 72 (S.D.N.Y. 2007). Here, Plaintiffs' court-ordered service by publication, *see* Dkts. 38 & 41, is likely insufficient as a means of serving Afghanistan itself, although it was likely sufficient as to DAB. Even assuming

both DAB and Afghanistan were properly served, neither was afforded sufficient time to respond to the complaint.

"A foreign state or its political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). Section 1608 contains two sets of rules: one for serving "a foreign state or political subdivision of a foreign state," *see* 28 U.S.C. § 1608(a), and another for serving "an agency or instrumentality of a foreign state," *see id*. § 1608(b). These two subsections "set out similar but not identical options for effecting service, listed in order of precedence." *Holladay*, 523 F. Supp. 3d at 105. For each, "if the first-listed method is unsuccessful or unavailable, then a plaintiff may move to the second, and so on." *Id*.

To serve a foreign state, such as Afghanistan, Section 1608(a) provides for four methods of service.[13] They "constitute the exclusive methods of service" for foreign states themselves, and Section 1608(a) "mandate[s] strict adherence to its terms, not merely substantial compliance." *Finamar Invs. Inc. v. Republic of Tadjikistan*, 889 F. Supp. 114, 117 (S.D.N.Y. 1995); *see also Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1062 (2019) (describing service under Section 1608(a) as a "circumstance[] in which the rule of law demands adherence to strict requirements"). To serve "an agency or instrumentality of a foreign state," there also are specific requirements,[14]

[13] The four methods of service are (1) delivery of the summons and complaint in accordance with a "special arrangement" between the plaintiff and the foreign state; (2) if no such arrangement exists, by service in accordance with an "applicable international convention"; (3) if service cannot be made by those methods, by having the clerk of court dispatch to the foreign state's ministry of foreign affairs a translated copy of the summons and complaint; (4) if that method is unavailable, by having the clerk dispatch the translated papers to the State Department, so that the Secretary of State may transmit the papers through diplomatic channels. *See* 28 U.S.C. § 1608(a).

[14] The prescribed methods of service are (1) in accordance with a "special arrangement" between the parties; (2) if no such arrangement exists, by service upon an officer or agent of the agency or instrumentality in the United States or in accordance with an "applicable international convention"; (3) if service cannot be made by those methods, by three other methods "reasonably calculated to give notice," namely by delivering a translated copy of the service papers (A) "as

(cont.)

although unlike Section 1608(a), which requires strict adherence, Section 1608(b) "relax[es] the required procedures [for service of an agency or instrumentality of a foreign state] in the event actual notice is conveyed." *Finamar Invs.*, 889 F. Supp. at 117.

Section 1608(d) also provides that both foreign states and their agencies or instrumentalities must be provided additional time—sixty days after the completion of service—to file an answer or responsive pleading to the complaint. *See id*. § 1608(d).

Here, it appears the Bushnell Plaintiffs did not properly serve Afghanistan, as they served it only by Twitter and by publication in two newspapers, *see* Dkt. 41. Such service does not constitute "strict adherence" with any of the four methods of service enumerated in 28 U.S.C. § 1608(a), which makes "irrelevant" "[w]hether or not [defendant] received actual notice of the suit." *Finamar Invs.*, 889 F. Supp. at 117-118. And in any event, Plaintiffs have not shown that they attempted to but failed to proceed sequentially through the methods of service enumerated in Sections 1608(a)(1) through (a)(4), as the law requires. *See Cortez Byrd v. Corporacion Forestal y Indus. de Olancho, S.A.*, 974 F. Supp. 2d 264, 273 (S.D.N.Y. 2013).

As noted, Plaintiffs' court-ordered service by Twitter, email, and publication likely constituted adequate service on DAB because they did provide actual notice. Those same methods of service have been approved for DAB in *amici*'s turnover proceedings. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-CV-9848, 2022 WL 1088567, at *7 (S.D.N.Y. Apr. 5, 2022).

However, even assuming that both parties were properly served, neither DAB nor Afghanistan was afforded sufficient time to respond to the Complaint under the FSIA, and therefore to the extent the FSIA applies neither defendant is (yet) in default under that statute.

---

directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request"; (B) by mail dispatched by the clerk of court; or (C) "as directed by order of the court consistent with the law of the place where service is to be made." *See* 28 U.S.C. § 1608(b).

Plaintiffs apparently completed service on February 18, 2023. *See* Transcript of February 8, 2023 Teleconference at 2. Although Plaintiffs' counsel stated that the answers would be due 21 days later, on March 11, that deadline applies only to the *nonstate* defendants. *See* Fed. R. Civ. P. 12(a)(1)(A)(i). Under Section 1608(d), Afghanistan and DAB, assuming they are foreign state defendants, have 60 days to respond, and thus neither is presently in default.

## CONCLUSION

*Amici* very much appreciate the Court's consideration of their views on issues of sovereign immunity and service of process.

Case 1:23-cv-2589-JSR Document 26-2, 12/04/2024, 3637282 Page 19 of 20

Dated: March 24, 2023

/s/ Lee Wolosky
Lee Wolosky
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1628
lwolosky@jenner.com

Douglass A. Mitchell
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001
(202) 639-6090
dmitchell@jenner.com

*Counsel for the Havlish Creditors, Plaintiffs in No. 03-CV-9848 (S.D.N.Y.)*

/s/ Orlando do Campo
Orlando do Campo
John Thornton
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
od@dandtlaw.com

*Counsel for Judgment Creditors John Does 1-7, Plaintiffs in No. 20-mc-740 (S.D.N.Y.)*

/s/ John B. Galligan, Esq.
John B. Galligan, Esq.
COZEN O'CONNOR
3 WTC
175 Greenwich St., 55th Floor
New York, NY 10007
Tel: (212) 908-1276
jgalligan@cozen.com

*Counsel for Judgment Creditors Federal Insurance Co., et al., Plaintiffs in No. 03-cv-6978 (S.D.N.Y.)*

Case 23-258, Document 263-2, 12/04/2024, 3637817, Page20 of 20

/s/ James Edwin Beasley
James Edwin Beasley
The Beasley Firm, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215)-592-1000
jbj@beasleyfirm.com

*Counsel for Judgment Creditors Estate of Smith, et al., Plaintiffs in No. 01-cv-10132 (S.D.N.Y.)*