# 23-258(L)

## 23-263 (CON), 23-304 (CON), 23-346 (CON), 23-444 (CON)

## United States Court of Appeals
## for the Second Circuit

FIONA HAVLISH, ET AL., JOHN DOES 1 THROUGH 7, FEDERAL INSURANCE CO., ET AL.,
RAYMOND ANTHONY SMITH, ET AL., KATHLEEN ASHTON, ET AL.,

*Plaintiffs-Appellants*,

v.

THE TALIBAN,

*Defendant-Appellee*,

FEDERAL RESERVE BANK OF NEW YORK,

*Garnishee-Interested-Party-Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

### PETITION FOR PANEL REHEARING AND REHEARING *EN BANC*

Douglass A Mitchell
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000
dmitchell@willkie.com

Lee S. Wolosky
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000
lwolosky@willkie.com

Ian Heath Gershengorn
JENNER & BLOCK LLP
1099 New York Ave., NW, Ste. 900
Washington, DC 20001
(202) 639-6000

Andrianna D. Kastanek
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7285

Benjamin D. Alter
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

*Counsel for Plaintiffs-Appellants*
*Fiona Havlish, et al., Appellants in 23-258*

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300
dbarrett@bsfllp.com

Stuart H. Singer
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
(954) 356-0011
ssinger@bsfllp.com

Timothy B. Fleming
WIGGINS CHILDS PANTAZIS FISHER
GOLDFARB, PLLC
2202 18th Street, NW, #110
Washington, DC 20009
(202) 467-4489
tfleming@wigginschilds.com

*Additional Counsel for Plaintiffs-Appellants
Fiona Havlish, et al., Appellants in 23-258*

John Thornton
Orlando do Campo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com
od@dandtlaw.com

*Counsel for Plaintiffs-Appellants John Does
1 through 7, Appellants in 23-263*

Andrew Warshawer
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215) 931-2651

*Counsel for Plaintiffs-Appellants Raymond
Anthony Smith, et al., Appellants in 23-304*

Sean P. Carter, Esq.
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
(215) 665-2105
scarter1@cozen.com

Richard Klingler
ELLIS GEORGE LLP
2021 L St. NW, Ste. 101-316
Washington, DC 20036
(202) 249-6900
rklingler@egcfirm.com

*Counsel for Plaintiffs-Appellants Federal
Insurance Co., et al., Appellants in 23-346*

Megan Wolfe Benett
KREINDLER & KREINDLER LLP
485 Lexington Ave., 28th Floor
New York, NY 10017
(212) 973-3406
mbenett@kreindler.com

Samuel Issacharoff, Esq.
40 Washington Square South
Suite 411J
New York, NY 10012
(212) 998-6580
si13@nyu.edu

Theresa Trzaskoma
HARRIS TRZASKOMA
156 West 56th Street Suite 2004
New York, NY 10019
(212) 970-6465
ttrzaskoma@harristrz.com

*Counsel for the Ashton Plaintiffs, Appellants
in 23-444*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ ii

INTRODUCTION AND STATEMENT PURSUANT TO FED. R. APP.
P. 40(b)(2) ....................................................................... 1

BACKGROUND ...................................................................... 4

ARGUMENT ........................................................................... 6

I.    The Panel's New Interpretation of TRIA Incorrectly Resolved an
      Issue of Exceptional Importance in Contravention of Circuit
      Precedent........................................................................ 6

II.   The Panel Incorrectly Resolved Factual Questions That Should Be
      Corrected or Remanded to the District Court.............................. 11

CONCLUSION ........................................................................ 16

i

# TABLE OF AUTHORITIES

## CASES

*Bartlett v. Baasiri*, 81 F.4th 28 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1456 (2024) .............................................................................10, 11

*Bennett v. Islamic Republic of Iran*, 618 F.3d 19 (D.C. Cir. 2010) ...........................8

*Estate of Levin v. Wells Fargo Bank, N.A.*, 45 F.4th 416 (D.C. Cir. 2022) ...............................................................................................9

*Golan v. Saada*, 596 U.S. 666 (2022) ......................................................12

*Harrison v. Republic of Sudan*, 838 F.3d 86 (2d Cir. 2016)...................................12

*Hewitt v. United States*, 145 S. Ct. 2165 (2025)....................................................7, 8

*Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107 (2d Cir. 2016), *abrogated in part on other grounds by Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018) ......................... 3, 5, 10, 12-13, 14

*Mediators, Inc. v. Manney*, 105 F.3d 822 (2d Cir. 1997) ...................................3, 10

*Peterson v. Bank Markazi*, 121 F.4th 983 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 2819 (2025).........................................................................9

*Schansman v. Sberbank of Russia PJSC*, 128 F.4th 70 (2d Cir. 2025), *petition for cert. filed*, 93 U.S.L.W. 3374 (U.S. June 25, 2025) (No. 24-1314)................................................................................................10

*Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340 (11th Cir. 2022).............................................................................................8

*Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010)..................3, 7, 9

## STATUTES

28 U.S.C. § 1605A(a)(2)(A)(i) ...............................................................................8

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201, 116 Stat. 2322, 2337-40, as amended, Pub. L. No. 112-158, 126 Stat. 1214, 1260 (codified at 28 U.S.C. § 1610 note)....................................2, 5, 7, 15

**OTHER AUTHORITIES**

31 C.F.R. § 594.201(a)(1) ........................................................15

31 C.F.R. § 594.306 ...............................................................15

31 C.F.R. § 594.309 ...............................................................15

Executive Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001) .......................15

Executive Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022) ....................15, 16

Carlotta Gall et al., *The Taliban Take Over the Presidential Palace*, N.Y. TIMES (Aug. 16, 2021), https://www.nytimes.com/2021/08/16/world/asia/taliban-presidential-palace-afghanistan.html ....................................13

Clayton Thomas, CONG. RSCH. SERV., R46955, *Taliban Government in Afghanistan: Background and Issues for Congress* (2021) ...............................15

## INTRODUCTION AND STATEMENT PURSUANT TO
## FED. R. APP. P. 40(b)(2)

A sharply divided panel interpreted the Terrorism Risk Insurance Act ("TRIA") to prevent terror victims who hold judgments against the Taliban from reaching $3.5 billion in blocked assets belonging to an entity that the Taliban indisputably controls. It did so, as Judge Sullivan explained in dissent, on grounds that were "never considered by the district court, briefed by the parties, or discussed at oral argument." Dissent 20.[1] It did so, as Judge Sullivan also explained, on grounds at odds with the statutory text. And it did so in open conflict with Circuit precedent. Rehearing—by the panel or the full Court—is necessary to resolve an issue of exceptional importance by correcting the panel's novel construction of TRIA and bringing back into harmony the decisions of this Court. Alternatively, the judgment should be modified to correct significant factual errors or to allow the district court to address in the first instance the factual questions posed by the majority's newly announced (but erroneous) rule.

In this case, thousands of victims of the Taliban—the terror group whose sponsorship of al Qaeda facilitated the 9/11 attacks—moved for turnover of blocked assets belonging to the Taliban-controlled Da Afghanistan Bank ("DAB") that are

---

[1] "Op." refers to the opinion of the Court, Dkt. 277; "Dissent" refers to Judge Sullivan's opinion concurring in part and dissenting in part, Dkt. 278; "App." refers to the Judgment Plaintiffs' Appendix, Dkts. 119-121.

1

held at the Federal Reserve Bank of New York ("FRBNY"). The district court denied the turnover motions, holding principally that DAB was entitled to sovereign immunity. On appeal, the panel majority disagreed but nonetheless affirmed the denial of turnover on alternate grounds, fashioning an entirely new rule of law.

TRIA authorizes victims to satisfy judgments against a terrorist party with the "blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)." TRIA § 201(a).[2] The majority's new rule is that an entity's status as an "agency or instrumentality of [a] terrorist party" must "be assessed as of the date that the assets ... were blocked." Op. 52, 55. According to the majority, DAB was not yet an agency or instrumentality of the Taliban on August 15, 2021, when the Afghan government fell to the Taliban and when, the panel found, DAB's assets were blocked. *Id*. at 52-54.

This newfound restriction appears nowhere in TRIA's text. As Judge Sullivan observed, the majority read an extratextual limitation into the statute, which unambiguously makes the "blocked assets of *any* agency or instrumentality" of a terrorist judgment debtor subject to execution "in *every* case," without regard to when that entity came under the control of the terrorist party. TRIA § 201(a) (emphasis added). The panel cited no text (or cases interpreting the text) to support this interpretation. Although the panel asserted that TRIA should permit terror

---

[2] Section 201 is reprinted in Appellants' special appendix, Dkt. 118 at 115.

victims to recover only those assets that could have been "utilized to further the mission of the terrorist party"—meaning assets that were at the terrorist party's disposal before they were blocked, Op. 51—the statutory text contains no such limitation. Congress adopted TRIA to "deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism." *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (quotation marks omitted). It therefore functions not only to deprive terrorist parties of assets, but also "to ensure that the maximum assets are available to victims of terrorism." Dissent 23.

The majority's approach is further inconsistent with this Court's holding in *Kirschenbaum* that TRIA instrumentality status is assessed "at the time [the turnover] complaints were filed." *Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 136 (2d Cir. 2016), *abrogated in part on other grounds by Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018). The panel overruled *Kirschenbaum* even though authority to "overturn a prior decision of this court" is "vested only in [the] *in banc* court." *Mediators, Inc. v. Manney*, 105 F.3d 822, 828 (2d Cir. 1997).

On rehearing, the panel should reconsider its ruling and bring it in line with the statutory text and Circuit precedent. Failing that, rehearing by the *en banc* court is necessary to address comprehensively these important questions and to bring a measure of justice to 10,000-plus September 11 victims who seek assets that

3

President Biden—after dedicating a separate $3.5 billion of the DAB assets for the Afghan people—set aside expressly to allow terror victims to pursue their claims. Brief of Joint Creditors ("J.C. Br."), Dkt. 118, at 12-14 (describing President Biden's actions).

Rehearing is also warranted because the panel majority took the extraordinary step of applying its new rule in the first instance, and in doing so, made incorrect and unsupported factual findings about when the assets were blocked and when the Taliban gained control of DAB. The panel concluded that the Taliban did not control DAB until they formally appointed its leadership on August 23, 2021, incorrectly asserting that such control could not have been established beforehand. And the panel disregarded evidence that the assets were blocked *as a result of* the Taliban's takeover of DAB on August 15, 2021. Correcting these errors confirms that the assets are subject to turnover, even under the panel's new rule. Alternatively, these fact-bound questions should be addressed initially by the district court, which had no occasion to consider them.

## BACKGROUND

*The Enforcement Proceedings*. Appellants are victims of the September 11 attacks and other Taliban-sponsored terrorism, who collectively hold billions of dollars in unpaid judgments against the Taliban. J.C. Br. 9-10. In the summer of 2021, the Taliban launched an offensive to retake control of Afghanistan,

culminating in the fall of Kabul on August 15. Op. 11, 52. As Afghan officials fled, the Taliban took control of the government, including DAB, Afghanistan's central bank. *Id*. at 11–12; App.260, 263-64. At that time, DAB held approximately $7 billion at the FRBNY. App.145-146.

Appellants moved to secure the DAB assets. Because DAB was now "owned, controlled, or directed" by the Taliban, DAB was the Taliban's agency or instrumentality, *Kirschenbaum*, 830 F.3d at 135, making its blocked assets subject to execution under TRIA "[n]otwithstanding any other provision of law," TRIA § 201(a). Beginning in late August 2021, Appellants began issuing writs of execution against the DAB assets, App.150, and in March 2022, they began filing turnover motions. J.C. Br. 14-15.

**The District Court's Judgment.** The district court denied the turnover motions, holding that DAB enjoyed jurisdictional immunity under the Foreign Sovereign Immunities Act ("FSIA"). J.C. Br. 17-19. The court concluded that TRIA overcomes a foreign sovereign's execution immunity but not its jurisdictional immunity. *Id*. In the alternative, the court held that finding DAB to be a Taliban instrumentality would intrude on the President's constitutional recognition power. *Id*. at 19.

**The Panel Decision.** On appeal, the panel agreed with Appellants on every TRIA question decided by the district court: TRIA is an exception to both

jurisdictional and execution immunity and "plainly provided the District Court with subject matter jurisdiction." Op. 42-43, 45. The panel nevertheless affirmed, manufacturing a rule announced "for the first time" in this case. Op. 8. Overruling *Kirschenbaum*, the panel held that "[a]n entity's 'agency or instrumentality' status under [TRIA] is to be assessed as of the date that the assets at issue were blocked," rather than when turnover proceedings were commenced. Op. 55. The panel then applied its new rule in the first instance, finding that the assets were blocked on August 15, 2021, that the Taliban did not yet control DAB on that date, and that the assets were therefore unavailable for execution. Op. 52-54.

Judge Sullivan dissented. He characterized the majority's new rule as "unsupported by any legal authority" and "at odds with the text and purpose of TRIA," Dissent 2, and noted that he would have "easily conclude[d] that DAB was an agency or instrumentality of the Taliban," Dissent 23.

## ARGUMENT

### I. The Panel's New Interpretation of TRIA Incorrectly Resolved an Issue of Exceptional Importance in Contravention of Circuit Precedent.

The panel affirmed the denial of turnover under a new rule—announced "for the first time" and without the benefit of briefing—that agency or instrumentality status is "determined as of the date that the assets sought in the turnover motion were blocked." Op. 8. This rule is inconsistent with the text and purpose of TRIA and overrules Circuit precedent, all to the detriment of 10,000-plus terror victims.

6

***Statutory text.*** The decision cannot be reconciled with the statutory text. Section 201(a) of TRIA provides that:

> Notwithstanding any other provision of law, … *in every case* in which a person has obtained a *judgment against a terrorist party* on a claim based upon an act of terrorism … the blocked assets of that terrorist party (*including the blocked assets of any agency or instrumentality of that terrorist party*) *shall be* subject to execution[.]

This language makes clear that terror victims "shall" be able to recover the blocked assets of "*any* agency or instrumentality" of "*any* terrorist party," *Weinstein*, 609 F.3d at 49 (emphases added), without regard to when the assets were blocked. To execute on such assets, a judgment holder need show only that (1) they have "judgment[s] against" a terrorist party (here, the Taliban) based on acts of terrorism; (2) the assets they seek are "blocked assets"; and (3) those assets belong to "any agency or instrumentality" of the terrorist party (here, DAB, which has been controlled by the Taliban since August 2021). TRIA § 201(a).

As Judge Sullivan explained, "[n]owhere does the plain text of TRIA confine its application to assets that belonged to the terrorist party (or its agency or instrumentality) at the time those assets were blocked." Dissent 21. The majority likewise acknowledged that the text provides "no guidance" on "the date of assessment" of instrumentality status. Op. 50. But that supposed silence counsels *against* the panel's exclusively backward-looking rule. Congress "of course 'could have phrased its requirement in language that looked to the past.'" *Hewitt v. United*

*States*, 145 S. Ct. 2165, 2173 (2025) (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 57 (1987)). For example, in 28 U.S.C. § 1605A(a)(2)(A)(i), Congress focused the statutory inquiry on the state of affairs "at the time the [terrorist] act … occurred." By contrast, in TRIA, Congress "did not choose this readily available option.'" *Hewitt*, 145 S. Ct. at 2173. The clear import, and the "'most natural reading[,]' is to construe the statute in the present … tense." *Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 25 (D.C. Cir. 2010) (Garland, J., concurring) (quoting *Gwaltney*, 484 U.S. at 57).

Judge Sullivan therefore had good reason to conclude that TRIA requires courts to look to *present* "conditions at the time of attachment or execution," Dissent 22, rather than *past* conditions at the time of blocking.[3]

***Statutory purpose****.* Without textual support, the majority purported to rely on TRIA's purpose. Op. 51. The panel asserted that Congress wanted terror victims to recover only assets that could have been "utilized to further the mission of the terrorist party." *Id*. But "the majority cite[d] no authority"—neither caselaw nor legislative history—"to suggest that Congress intended to limit TRIA's reach" in that way. Dissent 22-23.

---

[3] The Eleventh Circuit looks to past *or* present conditions. *See Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1350 (11th Cir. 2022).

What Congress in fact intended was to "deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism," *Weinstein*, 609 F.3d at 50, by allowing victims "in every case" to "reach any assets [of the judgment-debtor] available in the [United States]," *Peterson v. Bank Markazi*, 121 F.4th 983, 998 (2d Cir. 2024) (emphasis added) (internal citations omitted), *cert. denied*, 145 S. Ct. 2819 (2025). As Judge Sullivan explained, "it strains credulity to suggest that Congress"—in a statute meant to "ensure that the maximum assets are available to victims of terrorism"—would have "intended to create roadblocks preventing victims of terrorism from accessing the assets of terrorist organizations." Dissent 23.

The majority also misapprehended another of TRIA's purposes: to "hold terrorist parties accountable by subjecting their assets to attachment." *Est. of Levin v. Wells Fargo Bank, N.A.*, 45 F.4th 416, 425 (D.C. Cir. 2022) (Pillard, J., concurring). Here, if unblocked, DAB's funds would be restored to Taliban control, as the Taliban now controls DAB. (Indeed, as the panel recognized, the Taliban has openly demanded that the funds be unblocked, *see* Op. 12.). TRIA reflects Congress's policy judgment that the blocked assets of terrorists should go to their *victims*, rather than sit untouched until they could eventually be unblocked and then used to further terrorist aims. The majority's rule frustrates that congressional judgment.

***Precedent.*** Finally, the panel's new rule is in direct and acknowledged conflict with *Kirschenbaum*, which held that whether an entity is "an agency or instrumentality of a terrorist party under ... TRIA" depends on whether it was "owned, controlled, or directed [by the terrorist party] at the time Plaintiffs' [turnover] complaints were filed." *Kirschenbaum*, 830 F.3d at 136.[4] The panel faulted *Kirschenbaum*'s analysis, Op. 48, but it had no authority to overturn that decision. *See Mediators*, 105 F.3d at 828. To the extent the Court wishes to reconsider *Kirschenbaum*, rehearing by the *en banc* Court is the appropriate mechanism.

The majority is wrong that subsequent Circuit precedent supports the new rule. Op. 48-49. The panel found that *Kirschenbaum* had been "unseated" by *Bartlett v. Baasiri*, which held that "immunity under the [FSIA] may attach when a defendant becomes an instrumentality of a foreign sovereign after a suit is filed." 81 F.4th 28, 33 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1456 (2024); *see also Schansman v. Sberbank of Russia PJSC*, 128 F.4th 70, 78-80 (2d Cir. 2025). In *Bartlett*, this Court held that a defendant bank acquired by Lebanon after plaintiffs filed suit was entitled to sovereign immunity, reasoning that the FSIA's "use[] [of] the present tense … reflects the [statute's] concern with current political realities and relationships." 81

---

[4] The "complaints" referred to in *Kirschenbaum* were the victims' *turnover* complaints, not the complaints in the underlying actions. *See* 830 F.3d at 121.

F.4th at 33 (internal quotation marks omitted). If *Bartlett* sheds any light on the proper rule under TRIA, it *undermines* the panel's approach, which disregards "current political realities and relationships" by looking backward to the time of blocking. If a defendant can gain "agency or instrumentality" status under the FSIA when it is taken over by a foreign state mid-litigation, then an entity equally can become an "agency or instrumentality" of a terrorist party under TRIA when it is taken over by the terrorist party after its assets are blocked.

In sum, the panel imposed an atextual limitation on a major federal statute, overruled Circuit precedent, and denied recovery to thousands of victims of the worst terror attacks in the nation's history—and did so without giving Appellants an opportunity to address the panel's intended departure from Circuit law. Appellants respectfully ask the panel to reconsider its decision and, failing that, for the *en banc* Court to give this issue comprehensive consideration.

## II. The Panel Incorrectly Resolved Factual Questions That Should Be Corrected or Remanded to the District Court.

Having replaced this Circuit's established standard for assessing agency or instrumentality status, the panel applied its new rule in the first instance. But it did so erroneously, on a record that was developed under the old standard and which was not meant to answer the factual questions made newly relevant by the panel's decision. Without the benefit of a suitable record, the panel made inaccurate

11

assumptions about (1) when the Taliban took control of DAB; and (2) when and how the DAB assets were blocked.

The panel's decision to reach and resolve these questions is inconsistent with settled practice. "[F]actfinding is the basic responsibility of district courts." *Harrison v. Republic of Sudan*, 838 F.3d 86, 96 (2d Cir. 2016) (quotation marks omitted). Particularly when appellate courts formulate new legal standards, the "ordinary course" is to "allow the District Court to apply the proper legal standard in the first instance." *Golan v. Saada*, 596 U.S. 666, 683 (2022). If the panel or *en banc* Court does not set aside the new rule altogether, the judgment should be corrected to accurately reflect the sequence of (1) the Taliban's takeover of DAB and (2) the blocking of DAB's assets. Alternatively, the case should be remanded for additional factfinding on these questions.

***Timing of Taliban Control of DAB***. First, the panel erred in its conclusions about precisely when the Taliban took control of DAB. The panel assumed that the Taliban did not control DAB until it formally named DAB's governor on August 23, 2021, eight days after Afghanistan's government fell under Taliban control. Op. 53. That assumption is wrong and inconsistent with Circuit law. In assessing whether an entity is controlled by a terrorist party under TRIA, this Court applies a "functional standard," focusing on operational control rather than corporate formalities. *See* J.C. Reply Brief, Dkt. 198, at 29-30. This is because terrorists "operate in the shadows

out of necessity." *Kirschenbaum*, 830 F.3d at 134 (quotation marks omitted). The panel, however, treated a terrorist takeover of a bank like a Wall Street boardroom vote. While the Taliban's appointment of DAB's governor may be indicative of control, it is not dispositive of whether the Taliban controlled DAB prior to that appointment.

The panel further erred in finding "no plausible foothold in the record" to establish that the Taliban controlled DAB on August 15, 2021. Op. 53. The record shows that, as Taliban forces advanced in August 2021, they "[took] over DAB facilities in several provinces around Afghanistan," and "[b]y mid-August," they "had captured Kabul and taken control of DAB entirely." App.260. By August 15, 2021, the Taliban's operational control of DAB was so complete that international financial monitoring bodies cut off DAB's access to secure systems to stop the Taliban from exploiting sensitive data. App.311. Public sources similarly show that when Kabul "fell to the Taliban" on August 15, 2021, Op. 52, the former government collapsed and "power in the country"—necessarily including the central bank— "fully shifted hands."[5]

Moreover, even if the panel majority correctly interpreted the *existing* record, Appellants built their record against the backdrop of the old rule. Under then-binding

---

[5] Carlotta Gall et al., *The Taliban Take Over the Presidential Palace*, N.Y. TIMES (Aug. 16, 2021), https://www.nytimes.com/2021/08/16/world/asia/taliban-presidential-palace-afghanistan.html.

Circuit law, Appellants needed to show only that the Taliban controlled DAB "at the time [the turnover] complaints were filed" in 2022. *Kirschenbaum*, 830 F.3d at 136. Appellants easily cleared that bar. If a new governing standard now applies, Appellants are at a minimum entitled to develop a record tailored to that standard.

***Timing of the Block***. The panel majority also erred in its understanding of how DAB's assets were blocked. The panel assumed the Treasury Department took affirmative steps on August 15, 2021—supposedly prior to the Taliban's control of DAB—to block DAB's assets. Op. 11. That assumption rests on a mistaken understanding of blocking, which, once corrected, shows that even under the panel's new rule, DAB was an agency or instrumentality of the Taliban at the relevant moment in time.

The panel rested its new timing rule on the operational effect of blocking, reasoning that "'blocking' is a status imposed by the United States at a certain time," and that "[o]nce an entity's asset is seized or frozen, the entity can exert no control over it … ." Op. 50-51. The panel then made an unsupported assumption that this is the type of "blocking" that occurred on August 15, 2021.

As the panel noted, Appellants' brief stated that "the blocking date was August 15, 2021." Op. 52 & n.141 (citing J.C. Br. 12, 24). But Appellants did not assert that the assets were blocked based on an affirmative step taken by the U.S. government; rather, they argued that the blocking on August 15 was a direct legal

consequence of the Taliban's seizure of DAB. *See* J.C. Br. 12. The Taliban is a "Specially Designated Global Terrorist" (SDGT) under Executive Order 13,224. *See* J.C. Br. 7. As a result, its property and interests in property in the United States are automatically blocked. Exec. Order No. 13,224 § 1, 66 Fed. Reg. 49,079 (Sept. 23, 2001); 31 C.F.R. § 594.201(a)(1). Here, the Taliban acquired an interest in DAB's property when it took control of DAB. Under U.S. law, the blocked property of a terrorist party includes that of its agencies or instrumentalities. TRIA § 201(a). *Cf.* 31 C.F.R. §§ 594.306, 594.309 (defining "interest" in property to include "an interest of *any nature whatsoever*, direct or indirect," and whether "present, future or contingent" (emphasis added). As a result, the takeover of DAB by an SDGT on August 15, 2021, rendered DAB's assets blocked under Executive Order 13,224, and therefore subject to TRIA execution.[6]

To the extent the panel's new rule requires assessing the Taliban's control of DAB when blocking was affirmatively "imposed by the United States at a certain time," Op. 50, the record indicates that moment did not arrive until much later, on February 11, 2022, when President Biden issued Executive Order 14,064, 87 Fed.

---

[6] The panel cited (at 11) a Congressional Research Service report, which indicated that the basis for the blocking of the assets on August 15, 2021, was "the Taliban's continued designation as an SDGT under E.O. 13224." Clayton Thomas, CONG. RSCH. SERV., R46955, *Taliban Government in Afghanistan: Background and Issues for Congress* 39 (2021). There is no evidence of any other executive action taken to block the assets prior to February 2022.

Reg. 8391 (Feb. 11, 2022). In that order, the President expressly designated the DAB assets at the FRBNY as blocked, *id.* § 1(a), and, for this purpose, specifically superseded and displaced any prior executive order, including E.O. 13,224, "to the extent such order blocks, regulates, or otherwise affects" the DAB assets, *id*. § 2. By February 2022, of course, DAB had for months been under the control of the Taliban.

In sum, DAB's assets were blocked after the Taliban seized DAB, by dint of the Taliban's interest in those assets. That would mean that DAB was necessarily an agency or instrumentality of the Taliban "at the time those assets were blocked," thus satisfying the panel's new rule. Op. 51. If that rule or the majority's related factual assumptions are not reconsidered by the panel or *en banc* Court, Appellants should have an opportunity to clarify their evidence in the district court.[7]

## CONCLUSION

Appellants respectfully request that the Court grant this petition for panel rehearing or rehearing *en banc*.

---

[7] Below, the Doe Creditors sought discovery concerning the FRBNY's decision to suspend transfers from DAB's accounts "on August 16, 2021." *Does v. Taliban*, No. 20-MC-740 (S.D.N.Y.), ECF Nos. 33 & 37. That discovery became unnecessary when President Biden issued E.O. 14,064. The panel's new rule has made that discovery relevant again, and Appellants should be permitted to pursue it on remand.

16

Dated: September 25, 2025

Respectfully Submitted,

*/s/ Ian Heath Gershengorn*

Douglass A Mitchell
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006
(202) 303-1000
dmitchell@willkie.com

Ian Heath Gershengorn
JENNER & BLOCK LLP
1099 New York Avenue, NW
Ste. 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

Lee S. Wolosky
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000
lwolosky@willkie.com

Andrianna D. Kastanek
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7285
akastanek@jenner.com

David A. Barrett
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300
dbarrett@bsfllp.com

Benjamin D. Alter
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600
lwolosky@jenner.com
balter@jenner.com

Stuart H. Singer
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
(954) 356-0011
ssinger@bsfllp.com

Timothy B. Fleming
WIGGINS CHILDS PANTAZIS FISHER
GOLDFARB, PLLC
2202 18th Street, NW, #110
Washington, DC 20009
(202) 467-4489
tfleming@wigginschilds.com

*Counsel for Plaintiffs-Appellants Fiona Havlish, et al., Appellants in 23-258*

17

/s/ John Thornton
John Thornton
Orlando do Campo
DO CAMPO & THORNTON, P.A.
150 S.E. 2nd Avenue, Ste. 602
Miami, FL 33131
(305) 358-6600
jt@dandtlaw.com
od@dandtlaw.com

*Counsel for Plaintiffs-Appellants John Does 1 through 7, Appellants in 23-263*

/s/ Sean P. Carter
Sean P. Carter, Esq.
COZEN O'CONNOR
1650 Market Street
Philadelphia, PA 19103
(215) 665-2105
scarter1@cozen.com

Richard Klingler
ELLIS GEORGE LLP
2021 L St., NW, Ste. 101-316
Washington, DC 20036
(202) 249-6900
rklingler@egcfirm.com

*Counsel for Plaintiffs-Appellants Federal Insurance Co., et al., Appellants in 23-346*

/s/ Andrew Warshawer
Andrew Warshawer
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215) 931-2651
andrew.warshawer@beasleyfirm.com

*Counsel for Plaintiffs-Appellants Raymond Anthony Smith, et al., Appellants in 23-304*

/s/ Megan Wolfe Benett
Megan Wolfe Benett
KREINDLER & KREINDLER LLP
485 Lexington Ave., 28th Floor
New York, NY 10017
(212) 973-3406
mbenett@kreindler.com

Samuel Issacharoff, Esq.
40 Washington Square South
Suite 411J
New York, NY 10012
(212) 998-6580
si13@nyu.edu

Theresa Trzaskoma
HARRIS TRZASKOMA
156 West 56th Street Suite 2004
New York, NY 10019
(212) 970-6465
ttrzaskoma@harristrz.com

*Counsel for the Ashton Plaintiffs, Appellants in 23-444*

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit prescribed by Fed. R. App. P. 40(d)(3)(A) because it contains 3,874 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman 14-point.


Dated: September 25, 2025            By: /s/ Ian Heath Gershengorn

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2025, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: September 25, 2025          By: /s/ Ian Heath Gershengorn

# Panel Opinion

23-258 (L); 23-354 (L)
*Havlish v. Taliban; Aliganga v. Taliban*

# In the
# United States Court of Appeals
## for the Second Circuit

————————

AUGUST TERM 2024

————————

No. 23-258-cv (L)
No. 23-263-cv (CON)
No. 23-304-cv (CON)
No. 23-346-cv (CON)
No. 23-444-cv (CON)

FIONA HAVLISH, ET AL., JOHN DOES 1 THROUGH 7, FEDERAL INSURANCE
CO., ET AL., RAYMOND ANTHONY SMITH, ET AL., KATHLEEN ASHTON, ET
AL.,
*Plaintiffs-Appellants,*

v.

THE TALIBAN,
*Defendant-Appellee,*

FEDERAL RESERVE BANK OF NEW YORK,
*Garnishee-Interested-Party-Appellee,* [1]

————————

_____

[1] The Clerk of Court is directed to amend the official caption as shown
above.

On Appeal from the United States District Court
for the Southern District of New York

_____

No. 23-354-cv (L)
No. 23-797-cv (C)

ESTATE OF JESSE NATHANAEL ALIGANGA, ET AL., RIZWAN KHALIQ, ET
AL., JAMES OWENS, ET AL.,
*Plaintiffs-Appellants*,

v.

TALIBAN, AKA THE ISLAMIC EMIRATE OF AFGHANISTAN,
*Defendant-Appellee*.

_____

On Appeal from the United States District Court
for the Southern District of New York

_____

ARGUED: OCTOBER 9, 2024
DECIDED: AUGUST 26, 2025

_____

Before: CALABRESI, CABRANES, and SULLIVAN, *Circuit Judges*.

_____

We consider here claims brought by two different sets of
plaintiffs. The first set of plaintiffs, the Pre-Judgment Plaintiffs, sought
confirmation of a pre-judgment attachment order concerning
"blocked" funds held by the Afghan central bank (Da Afghanistan

Bank, or "DAB") at the Federal Reserve Bank of New York (the "FRBNY"). Pre-Judgment Plaintiffs did so to preserve their chance to collect on a potential future judgment in their lawsuit against the Taliban for its alleged role in the East Africa embassy bombings of August 7, 1998. The United States District Court for the Southern District of New York (Valerie E. Caproni, *Judge*) denied their motion in an Opinion and Order dated February 24, 2023.

The second set of plaintiffs (comprising four groups of judgment creditors), the Judgment Plaintiffs, moved for turnover of those same "blocked" funds held by DAB at the FRBNY to satisfy judgments they held against the Taliban stemming, primarily, from the terrorist attacks of September 11, 2001. The United States District Court for the Southern District of New York (George B. Daniels, *Judge*) denied their motion in a Memorandum Decision and Order dated February 21, 2023.

There are two principal questions before us. The first is whether the Afghan central bank, DAB, is immune from attachment under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602-1611. If it is, then Pre-Judgment Plaintiffs' pre-judgment attachment order as to its assets must fail.

The second question is whether § 201 of the Terrorism Risk Insurance Act of 2002 (the "TRIA") applies to blocked assets in DAB's name held at the FRBNY. To do so, the TRIA would need to (1) abrogate any immunity afforded to DAB by the FSIA *and* (2) have each of its statutory prerequisites satisfied. If the TRIA does not so apply,

Judgment Plaintiffs' turnover motions as to DAB's assets, likewise, must fail.

Judge Sullivan concurs in part and dissents in part.

_____

MATTHEW D. MCGILL, Gibson, Dunn & Crutcher LLP, Washington, D.C. (Jessica L. Wagner, Gibson, Dunn & Crutcher LLP, Washington, D.C.; Robert L. Weigel, Jason W. Myatt, Gibson, Dunn & Crutcher LLP, New York, NY; Clifton S. Elgarten, Emily M. Alban, Crowell & Moring LLP, Washington, D.C.; Jane Carol Norman, Bond & Norman Law, PC, Rockville, MD, *on the brief*), *for Plaintiffs-Appellants* Estate of Jesse Nathanael Aliganga, et al., Rizwan Khaliq, et al., and James Owens, et al.

IAN HEATH GERSHENGORN, Jenner & Block LLP, Washington, D.C. (Douglass A. Mitchell, Jenner & Block LLP, Washington, D.C.; Lee Wolosky, Benjamin D. Alter, Jenner & Block LLP, New York, NY; Andrianna D. Kastanek, Jenner & Block LLP, Chicago, IL; David A. Barrett, Boies Schiller Flexner LLP, New York, NY; Stuart H. Singer, Boies Schiller Flexner, Fort Lauderdale, FL;

4

Timothy B. Fleming, Wiggins Childs Pantazis Fisher Goldfarb, PLLC, Washington, D.C., *on the brief*), *for Plaintiffs-Appellants* Fiona Havlish, et al., *Appellants* in 23-258.

SAMUEL ISSACHAROFF, New York University School of Law, New York, NY (Andrew J. Maloney, III, Kreindler & Kreindler LLP, New York, NY; Noam Biale, Sher Tremonte, LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellants* Kathleen Ashton, et al., *Appellants* in 23-444.

John Thornton, Orlando do Campo, do Campo & Thornton, P.A., Miami, FL, *for Plaintiffs-Appellants* John Does 1 through 7, *Appellants* in 23-263.

Sean P. Carter, Stephen A. Cozen, Cozen O'Connor, Philadelphia, PA; Richard Klingler, Ellis George Cipollone O'Brien Annaguey LLP, Washington, D.C.; Carter G. Phillips, Sidley Austin LLP, Washington, D.C., *for Plaintiffs-Appellants* Federal Insurance Co., et al., *Appellants* in 23-346.

Dion G. Rassias, The Beasley Firm, LLC, Philadelphia, PA, *for Plaintiffs-Appellants*

5

Raymond Anthony Smith, et al., *Appellants* in 23-304.

_____

JOSÉ A. CABRANES, *Circuit Judge*:

We consider here claims brought by two different sets of plaintiffs. The first set of plaintiffs, the Pre-Judgment Plaintiffs, sought confirmation of a pre-judgment attachment order concerning "blocked" funds held by the Afghan central bank (Da Afghanistan Bank, or "DAB") at the Federal Reserve Bank of New York (the "FRBNY"). Pre-Judgment Plaintiffs did so to preserve their chance to collect on a potential future judgment in their lawsuit against the Taliban for its alleged role in the East Africa embassy bombings of August 7, 1998. The United States District Court for the Southern District of New York (Valerie E. Caproni, *Judge*, hereinafter District Court [VEC]) denied their motion in an Opinion and Order dated February 24, 2023.

The second set of plaintiffs (comprising four groups of judgment creditors), the Judgment Plaintiffs, moved for turnover of those same "blocked" funds held by DAB at the FRBNY to satisfy judgments they held against the Taliban stemming, primarily, from the terrorist attacks of September 11, 2001. The United States District Court for the Southern District of New York (George B. Daniels, *Judge*, hereinafter District Court [GBD]) denied their motion in a Memorandum Decision and Order dated February 21, 2023.

There are two principal questions before us. The first is whether the Afghan central bank, DAB, is immune from attachment under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602-1611. If it is, then Pre-Judgment Plaintiffs' pre-judgment attachment order as to its assets must fail.

The second question is whether § 201 of the Terrorism Risk Insurance Act of 2002 (the "TRIA") applies to blocked assets in DAB's name held at the FRBNY. To do so, the TRIA would need to (1) abrogate any immunity afforded to DAB by the FSIA *and* (2) have each of its statutory prerequisites satisfied. If the TRIA does not so apply, Judgment Plaintiffs' turnover motions as to DAB's assets, likewise, must fail.

We answer the question of whether DAB is immune from attachment under the FSIA in the affirmative. DAB is the agency or instrumentality of the foreign state of Afghanistan, which itself continues to be recognized as an independent state by the Executive Branch of the United States. This makes DAB itself a "foreign state" pursuant to § 1603(a) and (b) of the FSIA and imbues it with attachment and execution immunity under § 1609. Moreover, none of the exceptions to attachment and execution immunity in § 1610 pertain.

We therefore **AFFIRM** the order of the District Court (VEC) denying Pre-Judgment Plaintiffs' motion to confirm the pre-judgment attachment order on the basis that DAB's funds are immune from attachment under the FSIA.

7

We answer the question of whether § 201 of the TRIA applies to blocked assets in DAB's name held at the FRBNY in the negative. Although we conclude that the TRIA abrogates any immunity afforded to DAB under the FSIA, we find that at least one of the TRIA's statutory prerequisites is not satisfied—to wit, we find that DAB is not an agency or instrumentality of a terrorist party as required by the TRIA.

Consistent with our precedent, we evaluate the meaning of an "agency or instrumentality" under the TRIA differently from that same term's meaning under the FSIA. Similarly, we hold for the first time that the date at which we must determine an entity's agency or instrumentality status is different under the TRIA than it is under the FSIA. Specifically, an entity's agency or instrumentality status under § 201 of the TRIA must be determined as of the date that the assets sought in the turnover motion were blocked. Applying our TRIA-based definition of agency or instrumentality to DAB as of August 15, 2021—the date its FRBNY-held funds were blocked—we conclude that DAB is not an agency or instrumentality of the Taliban for purposes of the TRIA.

Accordingly, we likewise **AFFIRM** the order of the District Court (GBD) denying Judgment Plaintiffs' turnover motions. While we hold, contrary to the District Court, that the TRIA abrogates immunity granted to DAB by the FSIA and independently establishes subject matter jurisdiction, we agree that Judgment Plaintiffs fail to satisfy the TRIA's requirement that the blocked assets be either the

assets of the terrorist party or the assets of the terrorist party's agency or instrumentality.

# I. BACKGROUND

Today we decide two matters arising from a related set of facts. The first case is brought by plaintiffs (the "Pre-Judgment Plaintiffs") seeking pre-judgment attachment for damages they allege the Taliban has caused. The second case is brought by plaintiffs (the "Judgment Plaintiffs") seeking to satisfy judgments they hold against the Taliban for its role in various terrorist attacks. Both sets of plaintiffs target blocked funds of Da Afghanistan Bank ("DAB"), the central bank of the independent state of Afghanistan, that are held at the Federal Reserve Bank of New York (the "FRBNY").

## A. Factual Background

These cases emerge from the atrocities committed by al-Qaeda—with support from the Afghan Taliban (the "Taliban")—on August 7, 1998, and September 11, 2001.[2]

On August 7, 1998, al-Qaeda perpetrated simultaneous suicide bombings at the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. These embassy bombings killed over two hundred individuals and injured several thousand others. On September 11, 2001, al-Qaeda hijacked several passenger aircraft, flying them into the

---

[2] They also include a suicide bomb attack perpetrated by the Taliban on January 4, 2016. *See* Judgment Plaintiffs' Appendix ("Judgment App'x") at 326.

twin towers of the World Trade Center in New York, NY, the Pentagon in Washington, D.C., and an open field in Somerset County, PA. These aircraft hijackings killed several thousand individuals and injured many others.

The Taliban provided considerable support to al-Qaeda in both sets of devastating terrorist attacks. This includes the Taliban's provision to al-Qaeda of a "base of operations, training bases, and safe haven."[3] Indeed, the historical record reveals "that the [United States Government] believed that the Taliban had the capacity to shut down Al Qaeda operations in Afghanistan but refused to do so."[4] Because of the Taliban's role in al-Qaeda's terrorist attacks and the ongoing threat it posed to the United States and U.S. nationals, the United States designated the Taliban as a Specially Designated Global Terrorist (an "SDGT") in July 2002.[5] To this day, the Taliban remains an SDGT.

The Taliban first rose to power in Afghanistan in 1996 and ruled until 2001, when the United States headed a coalition force that invaded Afghanistan and removed the Taliban from its position of de facto control. Though stripped of power, the Taliban maintained an insurgency in Afghanistan for the next two decades. Following an agreement that the United States formed with the Taliban in 2020 to withdraw U.S. troops from Afghanistan, and the subsequent

---

[3] Judgment App'x 256.

[4] *Id.* at 516.

[5] Exec. Order No. 13,268, 67 Fed. Reg. 44751 (July 2, 2002); *see also* Exec. Order No. 13,224, 66 Fed. Reg. 49079 (Sep. 23, 2001).

withdrawal of those troops in the summer of 2021, the Taliban insurgency mounted an offensive which culminated in the capture of Afghanistan's capital, Kabul, on August 15, 2021. As a result, the Taliban once more seized de facto control over most of Afghanistan—but not formal authority, as no country has recognized the Taliban as Afghanistan's legitimate government.

That same day—August 15, 2021—the U.S. Treasury Department blocked all assets held in the Federal Reserve Bank of New York (the "FRBNY") by the central bank of Afghanistan, Da Afghanistan Bank ("DAB").[6] By the time the Taliban was ousted (if only temporarily) in 2001, DAB had just $90,000 in foreign exchange reserves.[7] That sum swelled to over $10 billion in assets as of June 21, 2021,[8] consisting primarily of foreign exchange funds provided by international donors—such as the United States and other Western countries. The majority of DAB's assets—totaling approximately $7 billion—were held in the FRBNY.[9]

As the Taliban seized control over Afghanistan, many senior DAB officials—including its Acting Governor—either left Afghanistan or went into hiding. The Taliban proceeded to fill those leadership

---

[6] Clayton Thomas, CONG. RSCH. SERV., *Taliban Government in Afghanistan: Background and Issues for Congress* 39 (2021).

[7] *Id.* at 38.

[8] *Id.*

[9] Clayton Thomas, CONG. RSCH. SERV., *Taliban Government in Afghanistan: Background and Issues for Congress* 38-39 (2021).

positions, which included appointing a new Acting Governor on August 23, 2021.[10] The Taliban also appears to have installed individuals designated as terrorists by the Department of the Treasury's Office of Foreign Assets Control ("OFAC") as DAB's First Deputy Governor and Second Deputy Governor.[11] There is little question that the Taliban has attained de facto control over DAB; as former Treasury Department and National Security Council official Adam Smith testified before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on October 5, 2021, DAB "is now under control of the Taliban."[12] From its position of de facto control over both Afghanistan and DAB, the Taliban demanded immediate receipt of the approximately $7 billion in DAB assets held in the FRBNY.

The United States did not accede to the Taliban's request. On February 11, 2022, then-President Joe Biden issued an Executive Order titled "Protecting Certain Property of Da Afghanistan Bank for the Benefit of the People of Afghanistan" (the "Executive Order").[13] The Executive Order asserted that Afghanistan was experiencing a "widespread humanitarian crisis" which, combined with "the potential for a deepening economic collapse in Afghanistan," constituted "an unusual and extraordinary threat to the national

---

[10] The new Acting Governor, Haji Mohammed Idris, was reported to be a "Taliban loyalist." Pre-Judgment Plaintiffs' Appendix ("Pre-Judgment App'x") at 338.

[11] Pre-Judgment App'x 340-54.

[12] *Id.* at 363.

[13] Exec. Order No. 14,064, 87 Fed. Reg. 8391 (Feb. 11, 2022).

security and foreign policy of the United States."[14] It proclaimed a "national emergency" to address the threat and asserted that preserving the U.S.-held assets of DAB—which it defined as the "Central Bank of Afghanistan"—was "of the utmost importance to addressing this national emergency and the welfare of the people of Afghanistan."[15] Accordingly, the Executive Order formally blocked DAB's property in the United States and ordered that the property be transferred "into a consolidated account held at the [FRBNY]."[16] The Executive Order authorized the Secretary of the Treasury to "take such actions . . . as may be necessary to carry out the purposes of this order."[17]

Later that day and pursuant to the authority granted by the Executive Order, OFAC issued a license (the "OFAC License") directing the FRBNY to transfer $3.5 billion to a separate blocked account.[18] The OFAC License set forth that the $3.5 billion could be transferred from the account "for the benefit of the people of Afghanistan" provided that the transfer was initiated by

---

[14] *Id.*

[15] *Id.* at 8391-92.

[16] *Id.* at 8391.

[17] *Id.* at 8392.

[18] Pre-Judgment App'x 297.

"individual(s) certified by the Secretary of State pursuant to Section 25B of the Federal Reserve Act."[19]

The Secretary of State has since certified two individuals as accredited representatives of Afghanistan, giving them joint control over the $3.5 billion that was transferred to a blocked account pursuant to the OFAC License.[20] These accredited representatives founded the Fund for the Afghan People (the "Afghan Fund") and transferred the $3.5 billion to an account at the Bank of International Settlements in Switzerland.[21]

The United States has represented that this approach enables the "$3.5 billion of Afghan central bank reserves to be used for the benefit of the people of Afghanistan while keeping them out of the hands of

---

[19] *Id.* at 298. Section 25B(3) of the Federal Reserve Act provides that the certified individual must be "a representative of such foreign state who is recognized by the Secretary of State as being the accredited representative of such foreign state." *See* 12 U.S.C. § 632.

[20] Press Release, U.S. Dep't of the Treasury, Joint Statement by U.S. Treasury and State Department: The United States and Partners Announce Establishment of Fund for the People of Afghanistan (Sep. 14, 2022), https://home.treasury.gov/news/press-releases/jy0947 [https://perma.cc/952K-6TEY].

[21] *Id.* As of December 31, 2024, the Afghan Fund's assets totaled $3.94 billion. Gene Aloise, SIGAR Quarterly Report to the United States Congress, 45 (Jan. 30, 2025), https://www.sigar.mil/Portals/147/Files/Reports/Quarterly-Reports/2025-01-30qr.pdf [https://perma.cc/2KBA-2K9Z]. As of January 30, 2025, the Afghan Fund "ha[d] not yet made any disbursements to entities on behalf of Afghanistan." *Id.*

the Taliban and other malign actors."[22] While the United States recognizes these reserves as funds belonging to DAB, and in the long run envisions retuning these funds to DAB, it has "made clear that [it] will not support the return of these funds until DAB" meets three criteria, one of which concerns demonstrating independence from the Taliban.[23]

DAB's remaining U.S.-held assets—totaling approximately $3.5 billion—continue to reside at the FRBNY.[24] These assets lie at the crux of the instant litigation.

## B. Procedural Background

We have before us two separate cases, each with its own set of Plaintiffs-Appellants.

The set of plaintiffs in the first case comprises victims of al-Qaeda's suicide bombings at the U.S. embassies on August 7, 1998 (the

---

[22] Press Release, U.S. Dep't of the Treasury, Joint Statement by U.S. Treasury and State Department: The United States and Partners Announce Establishment of Fund for the People of Afghanistan (Sep. 14, 2022), https://home.treasury.gov/news/press-releases/jy0947 [https://perma.cc/952K-6TEY].

[23] *Id.* These three requirements are that DAB: "(1) Demonstrates its independence from political influence and interference; (2) Demonstrates it has instituted adequate anti-money laundering and countering-the-financing-of-terrorism (AML/CFT) controls; and (3) Completes a third-party needs assessment and onboards a reputable third-party monitor." *Id.*

[24] Martin A. Weiss, Clayton Thomas, & Jennifer K. Elsea, CONG. RSCH. SERV., *Afghanistan Central Bank Reserves* 1 (2023).

15

"Pre-Judgment Plaintiffs"). The set of plaintiffs in the second case comprises primarily victims of al-Qaeda's aircraft hijackings on September 11, 2001 (the "Judgment Plaintiffs").[25]

### 1. Pre-Judgment Plaintiffs

On March 8, 2022, Pre-Judgment Plaintiffs filed a complaint against the Taliban, alleging that it was directly and proximately liable for the embassy attacks and seeking compensatory damages.[26] That same day, Pre-Judgment Plaintiffs also filed an *ex parte* emergency motion to attach DAB's funds held at the FRBNY, alleging that those funds belonged to the Taliban.

The District Court (VEC) granted Pre-Judgment Plaintiffs' motion to attach on March 21, 2022, and issued its opinion regarding the same on April 11, 2022. Pre-Judgment Plaintiffs moved to confirm the order of attachment on May 2, 2022. In an Opinion and Order issued on February 24, 2023, the District Court declined to confirm its attachment order, finding that since DAB is the central bank of Afghanistan, its funds are immune from attachment under the FSIA. It therefore denied Pre-Judgment Plaintiffs' motion to confirm and vacated its own order of March 21, 2022 (in which it had granted *ex parte* emergency attachment). The District Court subsequently denied Pre-Judgment Plaintiffs' motion to stay its decision denying

---

[25] Judgment Plaintiffs also include victims of the Taliban's suicide bomb attack on January 4, 2016.

[26] While Pre-Judgment Plaintiffs initially filed their complaint on March 8, 2022, they modified it on March 9, 2022, after incurring a filing error.

16

confirmation of its pre-judgment attachment order. Pre-Judgment Plaintiffs timely appealed from the District Court's order denying their motion to confirm the *ex parte* attachment order and vacating the attachment.

## 2. Judgment Plaintiffs

Judgment Plaintiffs comprise four groups of judgment creditors who hold judgments against the Taliban for its role in terrorist attacks.[27] They seek to satisfy their judgments against the Taliban with the blocked DAB funds held at the FRBNY. On August 26, 2022, a magistrate judge recommended denying these turnover motions for three reasons: (1) DAB is immune to the district court's jurisdiction, (2) the district court is constitutionally restrained from finding that the TRIA mandates authorization of the turnover, and (3) the TRIA requires a consent-based agency relationship between DAB and the Taliban, which was lacking. Judgment Plaintiffs filed objections to the magistrate judge's Report and Recommendation on November 10, 2022. On February 21, 2023, the District Court (GBD) denied Judgment Plaintiffs' turnover motions, adopting the first two of the magistrate

---

[27] There is also a fifth group of plaintiffs-appellants: plaintiffs in Kathleen Ashton, et al. ("Ashton Plaintiffs"). Ashton Plaintiffs seek attachment, whereas Judgment Plaintiffs seek turnover. However, their arguments against the District Court (GBD)'s order largely overlap with those of Judgment Plaintiffs. Indeed, Ashton Plaintiffs note their agreement with Judgment Plaintiffs on "th[e] threshold legal issues." Ashton Plaintiffs' Br. at 3; *see also id.* at 17. Ashton Plaintiffs' remaining arguments as to the distribution of DAB's funds are mooted by our judgment.

judge's three reasons for denial. Judgment Plaintiffs timely appealed from the District Court's order.

## II. DISCUSSION

"We review the district court's ruling on a request for an order of attachment for abuse of discretion."[28] We likewise review "a denial of a . . . turnover order for abuse of discretion."[29] The district court abuses its discretion if it commits an error of law, such as in its application of the FSIA or the TRIA.[30] "We review *de novo* a district court's legal conclusions under the FSIA, including whether a foreign state or its property is or is not shielded by immunity."[31] A district court's legal conclusions under the TRIA are likewise subject to our *de novo* review.

We have jurisdiction over Pre-Judgment Plaintiffs' appeal under 28 U.S.C. § 1291 and the collateral-order doctrine. As instructed by the

---

[28] *Aurelius Capital Partners, LP v. Republic of Argentina*, 584 F.3d 120, 129 (2d Cir. 2009).

[29] *Mohammad Ladjevardian, Laina Corp. v. Republic of Argentina*, 663 F. App'x 77, 79 (2d Cir. 2016).

[30] *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007).

[31] *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 122 (2d Cir. 2016).

Supreme Court, district court orders denying security are immediately appealable pursuant to the collateral-order doctrine.[32]

We have jurisdiction over Judgment Plaintiffs' appeal under 28 U.S.C. § 1291, as the District Court (GBD)'s Memorandum Decision and Order denying their motions for turnover was a final order.

### A. The District Court (VEC) Was Permitted to Address the Applicability of Attachment Immunity *Sua Sponte*

Pre-Judgment Plaintiffs contend that the District Court (VEC) erred when it addressed the applicability of an attachment immunity provision in the FSIA—namely, 28 U.S.C. § 1611(b)—*sua sponte*.[33] We disagree.

Section 1611(b) sets forth that "[n]otwithstanding the provisions of section 1610 of this chapter, the property of a foreign state *shall* be immune from attachment and from execution" provided certain conditions pertain.[34] We have previously determined that nearly identical language in the FSIA "places no limit on the district court's authority to recognize execution immunity."[35] We have further

---

[32] *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 543, 546-47 (1949); *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 689 (1950).

[33] Pre-Judgment Plaintiffs' Br. at 35-41.

[34] 28 U.S.C. § 1611(b) (emphasis added).

[35] *Walters v. Indus. and Com. Bank of China, Ltd.*, 651 F.3d 280, 291 (2d Cir. 2011). The language to which we referred was section 1609's statement that "the property in the United States of a foreign state shall be immune from attachment[,]

concluded that "the statute's use of the mandatory form—providing that such property 'shall be immune' from execution absent a statutory exception—signals that, at least where there is no dispute that the targeted property is owned by a foreign sovereign, execution immunity inures in the property itself and applies without regard to how the issue is raised."[36] These basic principles weigh heavily in favor of finding that district courts possess the authority to review attachment (and execution) immunity *sua sponte*.

Pre-Judgment Plaintiffs argue otherwise. In the main, they assert that an exception to the district court's authority to exercise its *sua sponte* review of immunity arises when "the sovereign status of the property at issue is disputed."[37] It is true that we have stopped short of expressly holding that a district court may consider attachment and execution immunity *sua sponte* in the face of a disputed foreign sovereign.[38] But in doing so, we explicitly left that issue open to be resolved another day.[39]

---

arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609.

[36] *Id.* at 291. The District Court (VEC) thus correctly noted that we have "signaled that Section 1611's use of the term 'shall' indicates that execution immunity inures in property that belongs to a foreign sovereign." *Owens v. Taliban*, No. 22-cv-1949, 2023 WL 2214887, at *5 (S.D.N.Y. Feb. 24, 2023).

[37] Pre-Judgment Plaintiffs' Br. at 35-36.

[38] *Walters*, 651 F.3d at 293-94.

[39] *Id.* at 294 n.11.

That day is upon us. Pre-Judgment Plaintiffs dispute whether DAB's assets are the property of a foreign sovereign,[40] and thus we must determine whether a district court may consider the attachment immunity and execution immunity of those assets *sua sponte*.

We conclude that it may. We see no good reason to foreclose disputed sovereign assets from a court's *sua sponte* consideration of attachment or execution immunity. "Both the Supreme Court and the Second Circuit have long held that courts may dismiss actions on their own motion in a broad range of circumstances where they are not explicitly authorized to do so by statute or rule"[41] and we "identify no doctrinal bar to a district court's applying execution immunity on its own initiative consistent with the terms of the FSIA."[42] We add to that only to note that we likewise identify no doctrinal bar to a district court's *sua sponte* application of attachment or execution immunity even when the sovereign status of the property at issue is disputed.

## B. As an Agency or Instrumentality of a Foreign State to Which No Enumerated Exceptions Apply, DAB Is Entitled to Execution Immunity Under the Foreign Sovereign Immunities Act

We next turn to the matter of whether DAB qualifies for execution immunity under the Foreign Sovereign Immunities Act (the "FSIA"). The FSIA is a statute containing "a comprehensive set of legal

---

[40] Pre-Judgment Plaintiffs' Br. at 35.

[41] *Snider v. Melindez*, 199 F.3d 108, 112 (2d Cir. 1999).

[42] *Walters*, 651 F.3d at 293.

standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies or instrumentalities."[43] "[T]he FSIA imposes a bright-line rule: foreign states and their instrumentalities are immune from suit unless one of the Act's enumerated exceptions applies."[44]

The FSIA was enacted in 1976 with the purpose of "codify[ing] the restrictive theory of sovereign immunity" presented in the Tate Letter.[45] In 1952, motivated by the "widespread and increasing practice on the part of governments of engaging in commercial activities,"[46] Acting Legal Advisor Jack Tate of "the State Department announced the 'restrictive' theory of foreign sovereign immunity, under which immunity was typically afforded in cases involving a foreign state's public acts, but not its strictly commercial acts."[47] However, during the following decades, "[d]ebates over the degree of immunity foreign sovereigns should enjoy in this Nation's courts followed."[48] Accordingly, the FSIA was introduced to "standardize the

---

[43] *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983).

[44] *CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 145 S. Ct. 1572, 1578 (2025).

[45] *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010); *see also Bartlett v. Baasiri*, 81 F.4th 28, 31-32 (2d Cir. 2023).

[46] *See* Letter from Acting Legal Adviser Jack B. Tate to Acting Attorney General Philip B. Perlman (May 19, 1952), *reprinted in Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 711-715 (1976).

[47] *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 271 (2023).

[48] *Republic of Hungary v. Simon*, 604 U.S. 115, 119 (2025).

judicial process with respect to immunity for foreign sovereign entities in civil cases."[49]

Importantly, while the FSIA "defin[es] the circumstances in which foreign states are immune from suit," the FSIA emphatically does *not* charge the Judiciary with the threshold power to determine whether the basic legal existence of a foreign state is *recognized*, especially in contravention of the Executive.[50] The FSIA neither defines what a foreign state is nor provides the Judiciary with a statutory scheme to determine the "qualifications for statehood or [whether] a particular regime is the effective government of a state."[51]

Indeed, thirty-nine years after the FSIA was enacted, the Supreme Court held in *Zivotofsky ex rel. Zivotofsky v. Kerry* that it is the "exclusive power of the President to control recognition determinations, including formal statements by the Executive Branch acknowledging the legitimacy of a state or government."[52] Critically, the *Zivotofsky* Court explained that "[l]egal consequences follow formal recognition," including the "benefit [of] sovereign immunity

---

[49] *Turkiye Halk Bankasi*, 598 U.S. at 272.

[50] *Id*. at 274 (internal quotation marks and citation omitted) (emphasis omitted).

[51] *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 11 (2015) (internal quotation marks and citation omitted).

[52] *Id*. at 32. Some international-law scholars distinguish between the recognition of states and the recognition of governments. *See* Ian Brownlie, PRINCIPLES OF PUBLIC INTERNATIONAL LAW 134-156 (9th ed. 2019). *Zivotofsky* appears to hold that the President's exclusive power extends to both.

23

when [recognized sovereigns] are sued."[53] And sovereign immunity is only of moment in the context of the FSIA, as both the Supreme Court[54] and the FSIA itself[55] have made plain. As a result, while the FSIA's reach is a "pure question of statutory construction" that is "well within the province of the Judiciary," the FSIA must be interpreted in a manner consistent with the Constitutional authority of the Executive to legally recognize the existence of foreign states.[56]

We return, then, to the FSIA. The FSIA contemplates two types of immunity that can apply to the political subdivisions or agencies and instrumentalities of foreign states: jurisdictional immunity (or immunity from suit) and execution immunity (or immunity from attachment of property).

---

[53] *Id.* at 11.

[54] *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) ("We think that the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts."). One can read this holding as suggesting that while the FSIA is the means by which we answer the question of whether a foreign state is entitled to sovereign immunity, the more basic question of whether a foreign state is legally recognized at all is assessed prior to, and independently of, the FSIA's framework. To analogize to mathematics or programming, a foreign state is an "input" used to generate results from the FSIA function, rather than an "output" of that function.

[55] *See* 28 U.S.C. § 1602 ("Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.").

[56] *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446, 448 (1987)); *see also* 28 U.S.C. § 1602.

24

These two different types of immunity are covered in two different parts of the FSIA. 28 U.S.C. § 1604 sets forth that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."[57] 28 U.S.C. § 1609 sets forth that "the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter."[58]

While both types of immunity turn on whether the relevant entity is a political subdivision or an agency or instrumentality of a foreign state, "the FSIA's provisions governing jurisdictional immunity, on the one hand, and execution immunity, on the other, operate independently."[59] In other words, exceptions to jurisdictional immunity do not compel a finding that execution immunity has also been abrogated, or vice versa.[60] This can also be seen from the fact that "the execution immunity afforded sovereign property is broader than the jurisdictional immunity afforded the sovereign itself."[61] This "special protection afforded to the property of a foreign sovereign"[62]

---

[57] 28 U.S.C. § 1604.

[58] *Id.* § 1609.

[59] *Walters v. Indus. and Com. Bank of China, Ltd.*, 651 F.3d 280, 288 (2d Cir. 2011).

[60] *Id.* at 289.

[61] *Id.*

[62] *Id.*

derives from the fact that "at the time the FSIA was passed, the international community viewed execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action."[63]

Here, the District Court (VEC) determined that DAB was entitled to execution immunity, and did not assess whether jurisdictional immunity applied. For DAB's assets held in the FRBNY to receive execution immunity under section 1609, DAB must be "a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)" such that DAB itself qualifies as a "foreign state."[64]

Because DAB is an agency or instrumentality of the State of Afghanistan, which is itself recognized as a foreign state by the Executive, and because we find that no exceptions to immunity apply, we hold that DAB's assets held in the FRBNY are entitled to execution immunity under the FSIA.

### 1. Afghanistan Is a Foreign State for the Purposes of the FSIA

As DAB—a central bank—is not itself a foreign state, for it to be considered a "foreign state" under the FSIA it must either be the

---

[63] *Id*. (quoting *Conn. Bank of Com. v. Republic of Congo*, 309 F.2d 240, 255-56 (5th Cir. 2002)).

[64] 28 U.S.C. § 1603(a). It is therefore the case that, under the FSIA, the definition of "foreign state" expands beyond foreign states (*i.e.*, foreign countries) themselves. Foreign states are "foreign states" under the FSIA, but so too are their political subdivisions and their agencies or instrumentalities.

political subdivision or the agency or instrumentality of a foreign state.[65] In this case, the relevant foreign state is the independent state of Afghanistan.

As stated earlier, the FSIA does not define what a foreign state is. It merely provides that the category of "foreign state" is capacious enough to capture the undefined state's political subdivisions and agencies or instrumentalities. The FSIA's silence on this threshold issue makes sense. As the Supreme Court explained in *Zivotofsky*, it is the power of the Executive to legally determine whether "a particular entity possesses the qualifications for statehood or that a particular regime is the effective government of a state," including for the purposes of sovereign immunity.[66]

The question of whether Afghanistan qualifies as a foreign state for the purposes of our FSIA analysis is not close. We find that the Executive Branch continues to afford formal recognition to the *state* of Afghanistan, even as it denies formal recognition of any *government* thereof. This is seen most plainly by reviewing the U.S. Department of State's "Fact Sheet" detailing the entities that the United States recognizes as "independent states," where that term is defined as "a people politically organized into a sovereign state with a definite territory recognized as independent by the [United States]."[67] One

---

[65] *Id.*

[66] *Zivotofsky*, 576 U.S. at 11 (internal quotation marks and citation omitted).

[67] U.S. Department of State, *Fact Sheet: Independent States in the World*, Bureau of Intelligence and Research (Mar. 12, 2025), https://www.state.gov/independent-

need only turn to the very top of the alphabetically arranged table of 197 independent states to find the state of Afghanistan counted among their ranks. This table was last updated in March 2025—well after Kabul fell to the Taliban. Consequently, while the *Taliban* is not a formally recognized *government*, *Afghanistan* continues to be a formally recognized *state*. With this determination by the Executive in hand, we are bound to acknowledge that Afghanistan is a foreign state for the purpose of our analysis of DAB under the FSIA.

Notably, Pre-Judgment Plaintiffs contend in a footnote in their brief that there is "good reason to conclude that Afghanistan no longer qualifies as a 'foreign state' for purposes of the FSIA."[68] But their reasoning relies entirely on the definition of statehood found in the Third Restatement of Foreign Relations Law of the United States—a definition which our Court has turned to only in the absence of formal recognition by the Executive Branch.[69] In such cases, we will only find

---

states-in-the-world [https://perma.cc/XX9Q-KGPA]; *see also* Letter from the United States, 22-cv-1949, ECF No. 81 at 2 (Feb. 24, 2023) (in which the Department of Justice confirms that the official position of the United States is that DAB is the central bank of the State of Afghanistan).

[68] Pre-Judgment Plaintiffs' Br. at 57 n.6.

[69] The Third Restatement identifies a two-step test for determining whether a foreign state legally exists for purposes of further analysis of the relevant state under the FSIA.

First—and in complete consonance with the Supreme Court's later analysis in *Zivotofsky*—we are to look to the Executive Branch. A President's determination that a state is a foreign state is "binding on . . . the courts." Restatement (Third) of

28

a not-formally recognized state to qualify as a foreign state for purposes of the FSIA if it (1) "has a defined territory and a permanent population" that is (2) "under the control of its own government" and that (3) "engages in, or has the capacity to engage in, formal relations with other such entities."[70]

For example, in *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, which was decided before *Zivotofsky*, we went beyond the explicit directives of the FSIA to evaluate whether the Palestinian Liberation Organization (the "PLO") was a foreign state entitled to immunity.[71] There, we were not able to rely on an express determination from the Executive Branch; the United States had "not recognized the PLO" or

---

the Foreign Relations Law of the United States § 204(a) (1987). If the Executive so determines, we have our answer, and do not proceed to the second step.

Rather, we only move to step two—application of the Third Restatement's definition of statehood—"[i]n the absence of a Presidential decision." *Id.* At that point, we would decide for ourselves "whether to treat an entity as a state" by applying the definition we have adopted for a foreign state. *Id.*

This approach is consistent with that described in the Fourth Restatement, which sets forth that "[w]hether a particular party is a 'state' under the [FSIA] . . . is a question of statutory interpretation, informed by the views of the executive branch." Restatement (Fourth) of the Foreign Relations Law of the United States § 452(a) (2018).

[70] *Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 860 F.2d 551, 553-554 (2d Cir. 1988) (quoting Restatement (Third) of the Foreign Relations Law of the United States § 201 (1987)).

[71] *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44 (2d Cir. 1991).

"extended it formal diplomatic recognition."[72] We thus proceeded to apply the Third Restatement to assess whether the PLO met the definition of a "state," and determined that it did not.

That same logic does not apply here. Here, we *do* have a determination from the Executive Branch: the United States continues to recognize Afghanistan as an independent state.[73] We can—and indeed *must*—rely upon the Executive's recognition of Afghanistan's statehood. This is our clear directive from *Zivotofsky*.[74]

Finally, we emphasize, consistent with the FSIA's statutory scheme, that the question of whether the Executive has recognized the legal existence of a state is distinct from questions regarding which entities and activities of a foreign state enjoy sovereign immunity. Our more recent decision in *Kirschenbaum v. 650 Fifth Avenue & Related Properties* is instructive as to this distinction.[75] In *Kirschenbaum*, we inquired into whether a particular foundation and New York partnership with a relation to the state of Iran "bore traditional attributes of statehood (or otherwise qualified as a subdivision,

---

[72] *Id.* at 48-49.

[73] *See ante* note 67.

[74] In addition, as we explain in *ante* note 69, the very source of law upon which we based our "foreign state" analysis in *Klinghoffer*—the Third Restatement—makes plain that "a court will decide whether to treat an entity as a state" only "[i]n the absence of a Presidential decision." Restatement (Third) of the Foreign Relations Law of the United States § 204 (1987).

[75] 830 F.3d 107 (2d Cir. 2016).

agency, or instrumentality)."[76] Such a determination is undoubtedly the province of the Judiciary, to be evaluated according to the FSIA's text—and not by any proclamation of the Executive. Accordingly, we properly determined that while the Executive had issued an order that broadly defined "the 'Government of Iran' to include 'any person owned or controlled by, or acting for or on behalf of, the Government of Iran,'"[77] the Judiciary was not permitted to rely on that definition to "*expand* sovereign statehood under the FSIA for a single 'foreign state.'"[78] However, we did not apply the Third Restatement's definition to determine whether Iran, *itself*, was a foreign state. Instead, implicitly relying on the Executive's formal recognition, we observed that Iran "certainly is" a foreign state.[79]

By contrast, Pre-Judgment Plaintiffs argue that in this highly unusual case, the Court should effectively withdraw the Executive's legal recognition of the state of Afghanistan based on the Court's own analysis of the changing use of force and territorial integrity of a region. Such an approach is inconsistent with the FSIA and this Court's precedents and contradicts the Supreme Court's clear direction in *Zivotofsky*. Accordingly, we proceed to analyze whether DAB is a

---

[76] *Id.* at 125.

[77] *Id.* at 124 (quoting Exec. Order No. 13,599, 77 Fed. Reg. 6659 (Feb. 5, 2012)).

[78] *Id.* at 125 (emphasis added).

[79] *Id.*

political subdivision or an agency or instrumentality of the foreign state of Afghanistan under the FSIA.

## 2. DAB, as the Agency or Instrumentality of the State of Afghanistan, Is a "Foreign State" Under the FSIA

Having determined that Afghanistan is a foreign state under the FSIA, we proceed to consider whether DAB is its political subdivision or its agency or instrumentality. If it is, then DAB would also be considered a "foreign state" for purposes of the FSIA.[80] Both district courts below found that DAB was an agency or instrumentality of Afghanistan and, therefore, was a "foreign state" for purposes of the FSIA.[81] We agree.

Returning to the statute, we assess whether DAB is either (1) a political subdivision of Afghanistan or (2) an agency or instrumentality of Afghanistan.

While the FSIA fails to define the term "political subdivision," we have previously held that an entity is a political subdivision of a

---

[80] *See* 28 U.S.C. § 1603(a) ("A 'foreign state' . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).").

[81] *Owens v. Taliban*, No. 22-cv-1949, 2023 WL 2214887, at *5 (S.D.N.Y. Feb. 24, 2023) (recognizing "DAB's status as Afghanistan's central bank, and, therefore, its status as a sovereign's agency or instrumentality whose assets are afforded immunity from attachment under the FSIA"); *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 326 (S.D.N.Y. 2023) ("Therefore, as a central bank, DAB is the instrumentality of the foreign state of Afghanistan.").

foreign state when its core functions are predominantly governmental rather than commercial.[82] This is known as the "core functions test."[83]

The FSIA draws clearer lines for us to follow in determining which entities are agencies or instrumentalities of foreign states. It sets forth that:

> An "agency or instrumentality of a foreign state" means any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.[84]

Particularly relevant to our present inquiry is the fact that DAB is the central bank of the state of Afghanistan.[85] We have consistently

---

[82] *Garb v. Republic of Poland*, 440 F.3d 579, 590-96 (2d Cir. 2006); *see also id.* at 599-600 (Straub, J., dissenting) ("The majority chooses the narrower core functions test, holding that *any* government entity whose core functions are governmental rather than commercial is by definition a political subdivision rather than an agency or instrumentality.").

[83] *See Schansman v. Sberbank of Russia PJSC*, 128 F.4th 70, 77 (2d Cir. 2025) (noting our articulation of "the core functions test" in *Garb*).

[84] 28 U.S.C. § 1603(b).

[85] Afghanistan Bank Law, art. 1.1 (Dec. 17, 2003), https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf [https://perma.cc/L2TR-Y5Z9] (setting forth that "Da Afghanistan Bank is the central bank of Afghanistan").

recognized that central banks qualify as agencies or instrumentalities of foreign states under the FSIA.[86] Indeed, we have previously gone so far as to assert that central banks are "the paradigm of a state agency or instrumentality," noting that "the House Report . . . specifically identified state central banks . . . in its discussion of qualifying entities for purposes of § 1603(b)."[87] Accordingly, from the outset, it appears probable that DAB, as the central bank of the state of Afghanistan, is its agency or instrumentality. For that reason, we will first assess whether DAB is an agency or instrumentality of Afghanistan before considering whether it is a political subdivision of Afghanistan.

Pre-Judgment Plaintiffs argue that it is not. Specifically, they contend that DAB is not an agency or instrumentality of Afghanistan because it does not satisfy the criteria set forth in 28 U.S.C. §

---

[86] *See, e.g.*, *S & S Mach. Co. v. Masinexportimport*, 706 F.2d 411, 414 (2d Cir. 1983) (holding that "[s]tate-owned central banks indisputably are included in the § 1603(b) definition" of an agency or instrumentality); *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007) (citing the aforementioned holding in *S & S Mach.*); *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 55 (2d Cir. 2016) (noting that plaintiffs-appellants "do not dispute the district court's determination that . . . Rastra Bank[, the central bank of Nepal,] is an agency or instrumentality of a foreign state"); *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 133 (2d Cir. 2022) (noting that plaintiffs-appellants concede "that BDL, as the central bank of Lebanon, is an agency or instrumentality of the Lebanese state").

[87] *S & S Mach. Co.*, 706 F.2d at 414; *see also* H.R. Rep. No. 1487, 94th Cong., 2d Sess. 15-16, *reprinted in* 1976 U.S. Code Cong. & Ad. News 6604, 6614 ("[A]s a general matter, entities which meet the definition of an agency or instrumentality of a foreign state could assume a variety of forms, including . . . a central bank . . . .").

1603(b)(2).[88] To satisfy this subsection, an entity must either (1) be "an organ of a foreign state or political subdivision thereof" or (2) have the "majority of [its] shares or other ownership interest . . . owned by a foreign state or political subdivision thereof."[89]

Pre-Judgment Plaintiffs argue that because "DAB is supposed to be 'entirely independent'" under "the Afghanistan banking law that originally created [it]," the second part of section 1603(b)(2) is inapplicable.[90] We disagree.

First, we note that the Afghanistan banking law referenced by Pre-Judgment Plaintiffs helpfully establishes the other two criteria that an entity must satisfy to be considered an agency or instrumentality under the FSIA: that the entity is "a separate legal person, corporate or otherwise" and that the entity "is neither a citizen of a State of the United States . . . nor created under the laws of any third country."[91]

---

[88] Pre-Judgment Plaintiffs' Br. at 55.

[89] 28 U.S.C. § 1603(b)(2).

[90] Pre-Judgment Plaintiffs' Br. at 55.

[91] 28 U.S.C. § 1603(b)(1) and (b)(3). Article 1.1 of the Afghanistan Bank Law establishes DAB as "the central bank of Afghanistan" and Article 1.2 establishes that DAB "is a juridical person with full capacity under the law." Afghanistan Bank Law, art. 1.1-1.2 (Dec. 17, 2003), https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf [https://perma.cc/L2TR-Y5Z9]. Accordingly, DAB is a "separate legal person" under section 1603(b)(1) and is "neither a citizen of the United States . . . nor created under the laws of any third country" under section 1603(b)(3).

Contrary to Pre-Judgment Plaintiffs' position, it also satisfies the contested criteria—namely, the second part of section 1603(b)(2), which requires that a majority of the entity's "shares or other ownership interest is owned by a foreign state or political subdivision thereof."[92]

Pre-Judgment Plaintiffs correctly observe that the Afghanistan banking law vests DAB with substantial autonomy.[93] But they mistakenly conclude from that premise that Afghanistan does not hold the majority of DAB's ownership interest. Significantly, the Afghanistan banking law sets forth the "[t]he capital of Da Afghanistan Bank shall belong to the State [of Afghanistan]."[94] And indeed, a study analyzing the structure of central banks finds that DAB is subject to "100% state ownership."[95]

Accordingly, DAB—a juridical person created under the laws of Afghanistan that is 100% owned by Afghanistan—meets each of the

---

[92] 28 U.S.C. § 1603(b)(2). Accordingly, as 28 U.S.C. § 1603(b)(2) sets forth a disjunctive test, we do not need to consider whether DAB is also properly considered an "organ" of Afghanistan under the first part of that subsection.

[93] *See* Afghanistan Bank Law, art. 3 (Dec. 17, 2003), https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf [https://perma.cc/L2TR-Y5Z9].

[94] *Id.* at art. 27.2. The banking law further sets forth that "Da Afghanistan Bank shall establish and maintain the international reserves of Afghanistan." Art. 72.1.

[95] *See* Jan Weidner, The Organisation and Structure of Central Banks, Dissertation, Appendix Central Bank Handbook 192 (2017), https://d-nb.info/1138787981/34 [https://perma.cc/P5TN-UZBY].

three requirements set forth in section 1603(b).[96] It is therefore an agency or instrumentality of Afghanistan under the FSIA.[97]

### 3. DAB Has Execution Immunity Under the FSIA

To conclude our FSIA analysis, we turn to 28 U.S.C. §§ 1609-1611 to determine if DAB's FRBNY-held assets are afforded execution immunity.

28 U.S.C. § 1609 states in relevant part that "the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in sections 1610 and 1611 of this chapter."[98] None of the exceptions in section 1610 apply to DAB or the independent state of Afghanistan, and Pre-Judgment Plaintiffs do not argue otherwise.[99]

Section 1611 provides exceptions that, in effect, counteract the exceptions to immunity contained in section 1610: In other words,

---

[96] There is therefore no need to assess whether DAB also qualifies as a political subdivision of Afghanistan, and we make no determinations on that front.

[97] We agree with Pre-Judgment Plaintiffs that the Judiciary cannot rely on an articulation by the Executive to resolve the matter of agencies or instrumentalities under the FSIA. *See* Pre-Judgment Plaintiffs' Br. at 42, 47-48. But as both courts below noted, and as we hold today, DAB unquestionably meets the FSIA's definition of agency or instrumentality by virtue of being Afghanistan's state-owned central bank.

[98] 28 U.S.C. § 1609.

[99] Section 1610 contains various exceptions to a foreign state's immunity from attachment or execution, but none apply to the case at hand. *See* 28 U.S.C. § 1610.

some of what section 1610 lays bare, section 1611 recloaks in immunity. As none of section 1610's exceptions apply, we need not reach section 1611.[100] Accordingly, we conclude that the FSIA also vests DAB with execution immunity.

## C. The Terrorism Risk Insurance Act Abrogates Jurisdictional and Execution Immunity Afforded an Entity Under the Foreign Sovereign Immunities Act, but it Does Not Apply to This Case Because DAB Is Not an Agency or Instrumentality of the Taliban Under the TRIA

Having found that DAB has execution immunity under the FSIA, and assuming, *arguendo*, that DAB is also entitled to jurisdictional immunity under the FSIA (as was determined by the District Court [GBD]), we must now consider whether those grants of immunity withstand another statute: the Terrorism Risk Insurance Act of 2002 (the "TRIA"). If either or both survive the TRIA, and if jurisdictional immunity inures to DAB's benefit, then we lack subject matter jurisdiction to consider Judgment Plaintiffs' case, as the court below held. If neither survives, then we must move on to consider whether the TRIA applies to the facts before us.

### 1. The TRIA Abrogates Jurisdictional and Execution Immunity and Independently Provides Subject Matter Jurisdiction

---

[100] So, while we agree with the District Court (VEC) that DAB has execution immunity under the FSIA, we do not reach section 1611(b)(1) to make this determination; instead, we rely on section 1609. *See Owens v. Taliban*, No. 22-cv-1949, 2023 WL 2214887, at *5-6 (S.D.N.Y. Feb. 24, 2023).

Congress enacted the TRIA in 2002. Section 201(a) of the TRIA sets forth that:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.[101]

The first clause of the statute—which provides that the TRIA applies "[n]otwithstanding any other provision of law"—carries great weight in our analysis of how the TRIA interacts with the FSIA. The Supreme Court has observed that "notwithstanding" clauses, like the one contained in the TRIA, have generally been "interpreted . . . to supersede all other laws," and that to provide a "clearer statement [of a drafter's intent that they so supersede] is difficult to imagine."[102]

---

[101] Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, § 201(a), 116 Stat. 2337, 2337-40, *as amended*, Pub. L. No. 112-158, 126 Stat. 1214, 1260 (*codified at* note following 28 U.S.C. § 1610).

[102] *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (internal quotation marks and citation omitted).

39

Indeed, the Supreme Court has spoken in such terms of the TRIA's own "notwithstanding" clause.[103]

Our own, earlier consideration of the TRIA's "notwithstanding" clause had been to the same effect. We noted that it is a "broad provision"[104] that overcomes any other provision of the law that "conflicts with [the] TRIA."[105]

The question, then, is whether the immunity provisions in the FSIA conflict with the TRIA. If they do, those immunity provisions are rendered inoperative in the face of the TRIA.

The District Court (GBD) analyzed this question, finding that while the FSIA conflicted with the TRIA with respect to execution immunity, it did not with respect to jurisdictional immunity.[106] We agree with its first assessment, but differ on the second.

First, we pause to observe that there can be no doubt that the FSIA's execution immunity provisions are superseded by the TRIA. The Supreme Court has already held that "the FSIA's central-bank

---

[103] *Bank Markazi v. Peterson*, 578 U.S. 212, 217 n.2 (2016) (identifying that the TRIA "take[s] precedence over 'any other provision of law'" and, therefore, is not limited by "the FSIA's central-bank immunity provision").

[104] *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 190 n.2 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 578 U.S. 212 (2016).

[105] *Smith ex rel. Estate of Smith v. Fed. Reserve Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003).

[106] *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 328-29 (S.D.N.Y. 2023).

immunity provision," which provides for execution immunity under §§ 1609 and 1611(b)(1), does not "limit[] . . . the TRIA."[107] Binding Supreme Court precedent thus holds that the TRIA supersedes the FSIA's grant of execution immunity.

The tougher question is whether the TRIA also overrides any jurisdictional immunity that might be granted by the FSIA under § 1604. The District Court (GBD) determined that it does not, because no conflict exists between the FSIA and the TRIA as to jurisdictional immunity.[108] This is so because, according to the District Court, the TRIA is an execution statute, not a jurisdictional statute.[109] The District Court reasoned that the language of the TRIA closely resembled "the other execution immunity language in the FSIA, distinguishing it from the FSIA's language abrogating jurisdictional immunity" and, moreover, that TRIA § 201(a) exists as a note within 28 U.S.C. § 1610, which is the section of the FSIA governing exceptions to execution immunity.[110]

---

[107] *Bank Markazi v. Peterson*, 578 U.S. 212, 217 n.2 (2016). The Supreme Court explained that Congress enacted the TRIA "[t]o lessen . . . enforcement difficulties," with one of those difficulties being the execution immunity granted property of foreign central banks under section 1611(b)(1). *Id.* at 217. Unsurprisingly, a sister Circuit has likewise noted that "§ 201(a) of the TRIA supersedes" § 1609 of the FSIA. *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023).

[108] *In re Terrorist Attacks on September 11, 2011*, 657 F. Supp. 3d 311, 328-329 (S.D.N.Y. 2023).

[109] *Id.* at 329.

[110] *Id.* at 328.

However well-reasoned the District Court (GBD)'s analysis may be, we find that it is foreclosed by our decision in *Weinstein v. Islamic Republic of Iran*.[111] In *Weinstein*, Bank Melli, an instrumentality of a terrorist party (the state of Iran), argued that the TRIA did not establish jurisdiction over it. One of the reasons it offered to the court in support of this proposition was the fact that "the TRIA has been codified as a note to Section 1610 rather than in the sections of the FSIA more directly addressed to exceptions to jurisdictional immunity."[112] We disagreed. First, we explained that "the plain language of the statute cannot be overcome by its placement in the statutory scheme."[113] Turning to that plain language, we concluded that TRIA § 201(a)'s "notwithstanding" clause "mak[es] plain that the force of the section extends everywhere."[114]

Consistent with the foregoing, we hold that TRIA § 201(a) supersedes the FSIA's jurisdictional immunity provisions in addition to its execution immunity provisions. We therefore conclude that neither jurisdictional nor execution immunity can prevent us from subjecting DAB to our jurisdiction under the TRIA.[115]

---

[111] *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010).

[112] *Id.* at 49.

[113] *Id.*

[114] *Id.*

[115] This finding is consistent with our prior observation that "at the time the FSIA was passed, the international community viewed execution against a foreign

In the alternative, the District Court (GBD) held that TRIA § 201(a) does not provide it with the necessary subject matter jurisdiction to review the case at hand.[116] Not so. In *Weinstein*, we "f[ou]nd it *clear beyond cavil* that Section 201(a) of the TRIA provides courts with subject matter jurisdiction over post-judgment execution and attachment proceedings against property held in the hands of an instrumentality of the judgment-debtor, even if the instrumentality is not itself named in the judgment."[117]

The case before us concerns the post-judgment execution proceedings brought by Judgment Plaintiffs. It is against property (DAB's FRBNY-held funds) *allegedly* owned by an instrumentality (DAB) of the judgment-debtor (the Taliban). The TRIA thus plainly provided the District Court with subject matter jurisdiction.

The District Court (GBD) found otherwise, reading *Weinstein*'s holding as applying only to the instrumentalities and agencies of

---

state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action." *Walters v. Indus. and Com. Bank of China, Ltd.*, 651 F.3d 280, 289 (2d Cir. 2011) (quoting *Conn. Bank of Com. v. Republic of Congo*, 309 F.3d 240, 255-56 (5th Cir. 2002)). It can therefore be of little surprise that the TRIA, which indisputably abrogates attachment and execution immunity—which *Walters* would characterize as the "greater affront"—also abrogates jurisdictional immunity—the lesser affront.

[116] *In re Terrorist Attacks on September 11, 2011*, 657 F. Supp. 3d 311, 330-331 (S.D.N.Y. 2023).

[117] *Weinstein*, 609 F.3d at 50 (emphasis added).

foreign states that have been stripped of immunity under the FSIA.[118] But the holding cannot be so limited. We reached it after examining the meaning of the TRIA and analyzing its legislative history, and we did not conclude that it had the limits now drawn by the District Court.[119]

Nor could we have done otherwise. As already discussed, the TRIA applies "[n]otwithstanding any other provision of the law."[120] Yet the District Court (GBD)'s proposed articulation of *Weinstein*'s holding suggests that the TRIA's subject matter jurisdiction is curtailed by the very law it was intended to supersede. It would mean that the TRIA, despite its clear language stating that the blocked assets of a terrorist party's agency or instrumentality "shall be subject to execution or attachment" notwithstanding "any other provision of law," would have a built-in exception for certain entities that, in addition to being the agencies or instrumentalities of a terrorist party, were also separately designated as the agencies or instrumentalities of

---

[118] *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 330-331 (S.D.N.Y. 2023) (examining *Weinstein* and concluding that the TRIA only grants subject matter jurisdiction over agencies and instrumentalities not named in the original judgment when "the sovereign's loss of jurisdictional immunity in the underlying judgment flows through to the instrumentality in the attachment proceeding").

[119] *Weinstein*, 609 F.3d at 49-50 (finding that the "plain language of Section 201(a)" constituted "an independent grant of jurisdiction over the agencies and instrumentalities" and that "even if . . . there were an ambiguity here, it would be resolved in plaintiff's favor by the legislative history").

[120] TRIA § 201(a).

44

a foreign state granted immunity under the FSIA. Such an interpretation would betray the plain language of the TRIA's "notwithstanding" clause by limiting its jurisdiction with back-reference to an FSIA immunity determination—marking an unmistakable conflict between the TRIA and the FSIA that is flatly prohibited by § 201(a)'s "notwithstanding" clause.[121]

In sum, we find that the TRIA overrides any jurisdictional or execution immunities granted to DAB by the FSIA and creates an independent basis for the court to exercise subject matter jurisdiction over DAB's blocked assets—provided that DAB is an agency or instrumentality of the Taliban.

## 2. DAB Is Not an Agency or Instrumentality of the Taliban Under the TRIA

Herein lies the rub. When reviewing the applicability of the TRIA, the District Court (GBD) went through the statutory criteria and held that Judgment Plaintiffs "satisf[ied] all but one element."[122] That one element was the TRIA's requirement that "the blocked assets must be the assets of the terrorist party or the terrorist party's agency or

---

[121] This analysis also forecloses the suggestion that the TRIA could only be wielded against DAB if Afghanistan were designated as a state sponsor of terrorism. *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 331-332 (S.D.N.Y. 2023).

[122] *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 333 (S.D.N.Y. 2023).

instrumentality."[123] We agree with the District Court that this element is missing (albeit for a different reason than the one articulated by the District Court [GBD]), and we find that the TRIA is ultimately inapplicable to the case before us.[124] We therefore affirm the District Court's judgment denying Judgment Plaintiffs' motions for turnover of DAB funds.

As noted earlier, the TRIA sets forth in relevant part that "the blocked assets of th[e] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment."[125] Judgment Plaintiffs argue that while the blocked assets are not those of the terrorist party at issue here (the Taliban), they *are* the blocked assets of an agency or instrumentality of the Taliban: DAB.[126] We must therefore determine whether DAB is

---

[123] *Id.*

[124] The District Court (GBD) reaches this conclusion by reasoning that it was constitutionally restrained from finding that the Taliban controlled the funds of the central bank of Afghanistan, as doing so would recognize the Taliban as the government of Afghanistan and contravene the Executive's recognition power. *In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 333-336 (S.D.N.Y. 2023). We decide on a different ground, and thus do not reach this issue pursuant to our general rule regarding the avoidance of constitutional issues. *See Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149-150 (2d Cir. 2001) ("It is axiomatic that the federal courts should, where possible, avoid reaching constitutional questions.").

[125] TRIA § 201(a).

[126] Judgment Plaintiffs' Br. on behalf of *Havlish*, *Doe*, *Federal Insurance*, and *Smith* Creditors at 1.

properly considered an agency or instrumentality of the Taliban under the TRIA. We conclude that it is not.

Though we must first turn to the plain language of the statute, we note that, unlike the FSIA, the TRIA fails to provide a definition for "agency or instrumentality."[127] We have previously held that the FSIA's definition cannot double as the TRIA's,[128] and have instead fashioned our own definition of those terms "according to their ordinary meanings."[129] In that earlier case—*Kirschenbaum*—we held that an entity is an agency or instrumentality of a terrorist party under the TRIA if it "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, *or* (3) was owned, controlled, or directed by the terrorist party."[130] As the disjunctive "or" indicates, an entity is an agency or instrumentality of a terrorist party under the TRIA as long as it satisfies at least one of these three conditions.

---

[127] *See Kirschenbaum v. 650 Fifth Ave. and Related Props.*, 830 F.3d 107, 132 (2d Cir. 2016) ("While the FSIA defines 'agency or instrumentality,' the TRIA, unfortunately, does not." (internal citations omitted)).

[128] *Id.* at 133 (holding that "applying the FSIA's definition of agency or instrumentality" would "contravene a plain reading of the TRIA").

[129] *Id.* at 135.

[130] *Id.*

It is thus clear what definition we are to use to determine whether DAB is an agency or instrumentality of the Taliban. What is less clear is *when* we are to apply that definition to DAB.

In *Kirschenbaum*, the case in which we defined "agency or instrumentality" for purposes of the TRIA, we concluded that, under the FSIA, "an entity's agency or instrumentality status . . . 'is determined at the time of the filing of the complaint'" because "jurisdiction 'depends upon the state of things at the time . . . the action [is] brought'" and "not necessarily 'as of the time an alleged tort or other actionable wrong occurred.'"[131] Nowhere did we analyze when an entity's agency or instrumentality status should be determined *under the TRIA*. Instead, after holding that the FSIA's definition of "agency or instrumentality" does not apply to the TRIA, we appeared to transport, in passing and without explanation, the same timing test we use to make the "agency or instrumentality" determination under the FSIA.[132]

But that timing test cannot be appropriate in the TRIA context for at least two reasons. First, the logic undergirding the timing test for FSIA agency or instrumentality determinations that we recounted in

---

[131] *Id.* at 126 (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 471, 478, 480 (2003)).

[132] *Id.* at 136 ("Further, insofar as Plaintiffs contend that Alavi itself was sufficiently owned, controlled, or directed by Iran to render it an agency or instrumentality of a terrorist party under the TRIA, questions of fact exist as to whether Alavi was so owned, controlled, or directed *at the time Plaintiffs' complaints were filed*." (emphasis added)).

48

2016 in *Kirschenbaum*—and, indeed, the test itself—no longer controls in our Circuit. In *Bartlett v. Baasiri* (2023), we held that "immunity under the [FSIA] may attach when a defendant becomes an instrumentality of a foreign sovereign *after* a suit is filed."[133] We made this determination by examining the "structure of the FSIA"[134] and the purposes of foreign sovereign immunity.[135] Accordingly, we can no longer say, as we seemed to suggest in *Kirschenbaum*, that FSIA immunity is determined at the time of the complaint's filing because jurisdiction depends on the state of affairs at the time the action was brought; both the rule and its rationale were plainly unseated by our holding in *Bartlett*.

Second, for the same reason that it is improper to simply adopt the FSIA's definition of "agency or instrumentality" for purposes of the TRIA, it is improper to transpose our rule governing the time at which we evaluate an entity's "agency or instrumentality" status for

---

[133] *Bartlett v. Baasiri*, 81 F.4th 28, 33 (2d Cir. 2023) (emphasis added). We reaffirmed this was so in a later case. *See Schansman v. Sberbank of Russia PJSC*, 128 F.4th 70, 79 (2d Cir. 2025) (holding that "an entity's status as an agency or instrumentality" need not be determined "at the time an action is filed," an issue that we "squarely decided" in *Bartlett*).

[134] *Bartlett*, 81 F.4th at 33 (noting that the FSIA "gives foreign states immunity not only from judgments, but from process, too," so there is "no reason why that protection should apply only if the defendant had sovereign status from the beginning of the suit").

[135] *Id.* (discussing the reason for foreign sovereign immunity as opposed to other immunities, and noting that it seeks to give foreign states "some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns" (quoting *Dole Food*, 538 U.S. at 479)).

49

purposes of the FSIA onto our test governing the same under the TRIA. The TRIA is a fundamentally different statute than the FSIA, and it is a mistake to uncritically apply precepts from our FSIA jurisprudence in the TRIA context. Under the FSIA, we are using the "agency or instrumentality" test to, in substantial part, determine whether an entity should be granted jurisdictional or execution immunity. This is the logic that guides our new rule in *Bartlett* concerning *when* we evaluate an entity's possible status as an agency or instrumentality. But as set forth above, the TRIA cares nothing for immunity. Accordingly, ensuring that we capture an entity's present-day immunity eligibility under the FSIA cannot be the controlling factor for deciding the time at which we must evaluate whether an entity is an agency or instrumentality for purposes of the TRIA.

To determine what time *is* appropriate, we first turn to the text of the TRIA. While no guidance is provided there for determining the date of assessment, we find particularly relevant the TRIA's requirement that the property subject to execution or attachment is an entity's "blocked assets."[136] The TRIA sets forth that a "blocked asset" is "any asset seized or frozen by the United States" under one of three statutory provisions.[137] From review of these statutes, it emerges that "blocking" is a status imposed by the United States at a certain time. As blocking is also a critical factor upon which TRIA applicability

_____

[136] TRIA § 201(a).

[137] TRIA § 201(d)(2)(A). Those statutory provisions are "section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b))" and "sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)." *Id.*

turns, there is some immediate appeal to utilizing the blocking date as the relevant time at which to assess the agency or instrumentality question.

The attractiveness of this approach only deepens with further consideration of both what the blocking mechanism entails and the purpose of the TRIA. Once an entity's asset is seized or frozen, the entity can exert no control over it; the entity cannot use the asset to further its own objectives or the objectives of any party for which it operates as an agency or instrumentality.[138] There is thus great value in determining what a given entity's status was in relation to a given terrorist party at the time those assets were blocked: If an entity becomes an agency or instrumentality of a terrorist party *after* that entity's property is blocked, those blocked assets cannot have been utilized to further the mission of the terrorist party.

The blocking date therefore serves as a critical inflection point ripe for determining the time at which we should evaluate an entity's status under the TRIA as an agency or instrumentality. This approach is buttressed by consideration of the purpose of the statute. As Congress set forth, the purpose of TRIA § 201 is to enable the victims of terrorism to collect on judgments against terrorist parties "through

---

[138] For example, the Office of Foreign Asset Control sets forth that when property is blocked, while "[t]itle to the blocked property remains with the blocked [entity] . . . the exercise of powers and privileges normally associated with ownership is prohibited without authorization from OFAC." United States Department of the Treasury, OFAC FAQs No. 9 (Sep. 10, 2002), https://ofac.treasury.gov/faqs/9 [https://perma.cc/2A8R-ZLTE] (last updated Aug. 21, 2024).

51

the attachment of blocked assets of terrorist parties."[139] Surely, though, blocked assets are not "of" a terrorist party if those assets did not belong to either the terrorist party, or an entity then operating as an agency or instrumentality of the terrorist party, as of the date that the assets were blocked. Accordingly, while we apply a broader definition of agency or instrumentality under the TRIA than we do under the FSIA, understanding that terrorist parties "may operate with less transparency than other sovereign countries,"[140] we do not do so free of rational limits. Today we identify one such limit: When we determine whether an entity is an agency or instrumentality of a terrorist party under the TRIA, we assess that entity's status as of the date that the assets at issue were blocked.

In the case before us, it is uncontested that the blocking date was August 15, 2021—which, not coincidentally, was the same date that Kabul fell to the Taliban.[141] We therefore assess DAB's status as of that date and examine whether it satisfies any of the three independently sufficient prongs of the TRIA definition of "agency or instrumentality" that we set forth in *Kirschenbaum*. We find that it does not.

First, there is no evidence that DAB "was a means through which a material function of the [Taliban] is accomplished."[142] Indeed,

---

[139] H.R. Conf. Rep. 107-779, 2002 WL 31529126, at *27 (2002).

[140] *Kirschenbaum*, 830 F.3d at 134.

[141] *See* Judgment Plaintiffs' Br. at 12, 24.

[142] *Kirschenbaum*, 830 F.3d at 135.

it is hard to imagine how it could have been, when the Taliban did not even seize Kabul until August 15, 2021. There is no suggestion that DAB was aiding the Taliban in any manner as of the date its FRBNY-held assets were blocked.

Second, for similar reasons, there is no evidence that DAB "provided material services to, on behalf of, or in support of the [Taliban]" as of August 15, 2021.[143] Indeed, the President blocked the assets precisely to "keep[] them out of the hands of the Taliban and other malign actors."[144]

Third and finally, there is no evidence to suggest that DAB "was owned, controlled, or directed by the [Taliban]" as of that date.[145] Even assuming *arguendo* that the Taliban "controlled" DAB when it installed an alleged loyalist to head the organization, the Taliban did not do so until August 23, 2021—more than a week after the relevant date for evaluating "agency or instrumentality" status.[146]

In sum: There is quite simply no plausible foothold in the record that would enable Judgment Plaintiffs to mount a credible argument

---

[143] *Id.*

[144] Press Release, U.S. Dep't of the Treasury, Joint Statement by U.S. Treasury and State Department: The United States and Partners Announce Establishment of Fund for the People of Afghanistan (Sep. 14, 2022), https://home.treasury.gov/news/press-releases/jy0947 [https://perma.cc/952K-6TEY].

[145] *Kirschenbaum*, 830 F.3d at 135.

[146] Judgment App'x 265-67.

that DAB was an agency or instrumentality of the Taliban on the date its FRBNY-held funds were blocked on August 15, 2021. We are thus required to hold that DAB is not an agency or instrumentality of the Taliban under the TRIA, and consequently, that the TRIA does not apply to the case before us. We therefore affirm the District Court (GBD)'s denial of Judgment Plaintiffs' motions for turnover of DAB funds.

### III. CONCLUSION

To summarize, we hold as follows:

(1) A district court may consider the applicability of attachment or execution immunity *sua sponte* even when the sovereign status of the property at issue is disputed;

(2) The Executive Branch's formal recognition of a state or government establishes that state or government as a foreign state for purposes of the Foreign Sovereign Immunities Act;

(3) Because the Executive Branch formally recognizes Afghanistan as an independent state, Afghanistan is a foreign state for the purpose of our analysis of DAB under the Foreign Sovereign Immunities Act;

(4) Under the Foreign Sovereign Immunities Act, DAB is an "agency or instrumentality" of the foreign state of Afghanistan, and is therefore entitled to execution immunity under 28 U.S.C. § 1609;

54

(5) The Terrorism Risk Insurance Act abrogates any jurisdictional or execution immunity granted by the Foreign Sovereign Immunities Act;

(6) The Terrorism Risk Insurance Act provides district courts with an independent basis to exercise subject matter jurisdiction over the blocked assets of a terrorist party's agency or instrumentality;

(7) An entity's "agency or instrumentality" status under the Terrorism Risk Insurance Act is to be assessed as of the date that the assets at issue were blocked; and

(8) The Terrorism Risk Insurance Act does not apply to this case because DAB was not an agency or instrumentality of the Taliban when its FRBNY-held assets were blocked.

For the foregoing reasons, we **AFFIRM** the District Court (VEC)'s order denying Pre-Judgment Plaintiffs' motion to confirm the pre-judgment attachment and we likewise **AFFIRM** the District Court (GBD)'s order denying Judgment Plaintiffs' turnover motions.

# Judge Sullivan's Partial Concurrence and Partial Dissent

RICHARD J. SULLIVAN, *Circuit Judge*, concurring in part and dissenting in part:

The Supreme Court has long made clear that interpretation of the "reach" of the Foreign Sovereign Immunities Act (the "FSIA") is a "pure question of statutory construction" that is "well within the province of the [j]udiciary." *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004) (internal quotation marks omitted). Our caselaw likewise recognizes that the FSIA "vested *sole* responsibility for applying [its] standards in the federal judiciary." *Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse*, 999 F.3d 808, 818 (2d Cir. 2021) (emphasis added). Remarkably, the majority today turns those foundational principles on their head, concluding that "[t]he Executive Branch's formal recognition of a state or government establishes that state or government as a foreign state for purposes of the [FSIA]." Maj. Op. at 54. To reach this conclusion, the majority turns a blind eye to the history of the FSIA, ignores nearly thirty-five years of our own precedents, and misinterprets a single Supreme Court decision involving an unrelated statute to obscure the Court's clear precedent on the FSIA.

The majority's error is compounded by its flawed interpretation of the Terrorism Risk Insurance Act of 2002 ("TRIA"). Even though this issue was never considered by the district court, briefed by the parties, or discussed at oral

argument, the majority reaches out to hold, for the first time, that "[a]n entity's 'agency or instrumentality' status under [TRIA] is to be assessed as of the date that the assets at issue were blocked." *Id.* at 55. This conclusion is unsupported by any legal authority. More importantly, it is at odds with the text and purpose of TRIA and our longstanding approach to determining immunity from execution, which looks to conditions at the time the writ of execution is issued.

The majority's interpretive gymnastics risk upending a carefully constructed statutory scheme and may have unforeseen downstream consequences for future FSIA (and TRIA) cases. It is for this reason the Supreme Court has taken pains to emphasize that "it is not our role to rewrite the FSIA"; that task lies squarely with Congress. *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 280 (2023). Accordingly, I respectfully dissent.

## I.     The District Court Was Permitted to *Sua Sponte* Consider the Issue of Attachment Immunity

As a threshold matter, I agree with the majority that a district court may, but is not required to, *sua sponte* consider the issue of attachment (or execution) immunity "even when the sovereign status of the property at issue is disputed." Maj. Op. at 20–21. I therefore concur with Section II.A of the majority opinion, which is clearly supported by both the text and structure of the FSIA.

2

As the majority rightly notes, the FSIA's mandatory language that certain property "shall be immune," 28 U.S.C. § 1609, "signals that . . . immunity inures in the property itself and applies without regard to how the issue is raised," *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 291 (2d Cir. 2011). For this reason, the Seventh Circuit has explained that "immunity does not depend on the foreign state's appearance in the case." *Rubin v. The Islamic Republic of Iran*, 637 F.3d 783, 799 (7th Cir. 2011). Rather, "immunity is presumed[,] and the court must find an exception – with or without an appearance by the foreign state – . . . to give effect to the statutory scheme." *Id.* at 800; *see also Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010) ("The structure of the FSIA – which codifies the background rule that foreign states are immune from suit and execution, and then creates narrow exceptions – suggest[s] that courts must begin with the presumption that a foreign state is immune and then the plaintiff must prove that an exception to immunity applies."). Likewise, the fact that execution immunity does not apply where the foreign state waives immunity, *see* 28 U.S.C. § 1610(a)(1), "strongly suggests that immunity from execution is presumed and waiver of immunity is the exception," *Rubin*, 637 F.3d at 800. This interpretation of the FSIA is further supported by "the common-law practice" whereby courts regularly

determined immunity "without regard to the foreign state's appearance in the case." *Id.* at 800–01; *see also Peterson*, 627 F.3d at 1126–27.

The *Aliganga* plaintiffs nevertheless insist that the district court had no authority to *sua sponte* consider attachment immunity because the sovereign status of the property at issue was disputed. But that is hardly dispositive, since each of the above arguments based on the text and structure of the FSIA applies with equal force even when the sovereign status of the property is disputed. I therefore agree with the majority that the district court in *Aliganga* did not err in *sua sponte* examining the immunity issue. That, however, is where my agreement with the majority's interpretation of the FSIA ends.

## II.     Afghanistan Is Not a Foreign State Within the Meaning of the FSIA

The majority concludes that the Da Afghanistan Bank ("DAB") funds are immune from attachment and execution under FSIA section 1609, which provides that "the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution." 28 U.S.C. § 1609.

Naturally, the first step in determining whether section 1609 applies is to identify whether Plaintiffs seek to attach the property *of a foreign state*. While the FSIA does not define what constitutes a foreign state, our binding caselaw "has limited the definition of 'state' to entities that have a defined territory and a

4

permanent population, that are under the control of their own government, and that engage in, or have the capacity to engage in, formal relations with other such entities." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 47 (2d Cir. 1991) (alterations accepted and internal quotation marks omitted); *see also, e.g., Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 123 (2d Cir. 2016) (applying *Klinghoffer* definition of foreign state).

Applying that definition here, Afghanistan clearly lacks the core attributes of statehood. It is undisputed that Afghanistan is no longer "under the control of [its] own government," *Klinghoffer*, 937 F.2d at 47 (internal quotation marks omitted), but rather is controlled by a non-state actor, the Taliban. The previous government of Afghanistan fled the country and is now defunct. There is not even a government in exile seeking to assert its right to govern the territory. Tellingly, the United States does not recognize "the Taliban or any other entity as the Government of Afghanistan or as part of such a government." Bureau of S. & Cent. Asian Affs., *U.S. Relations with Afghanistan*, U.S. Dep't of State (Aug. 15, 2022), https://perma.cc/T45B-WQ8A; *cf. Baker v. Carr*, 369 U.S. 186, 212 (1962) ("[W]ithout executive recognition[,] a foreign state has been called a republic of

whose existence we know nothing." (internal quotation marks omitted)). Nor has any other country recognized the Taliban as the government of Afghanistan. *See* Aliganga App'x at 283. In fact, the United Nations has repeatedly refused to grant diplomatic credentials to Taliban officials. *See* Michelle Nichols, *Afghan Taliban Administration, Myanmar Junta Not Allowed into United Nations for Now*, Reuters (Dec. 14, 2022, 8:29 PM ET), https://perma.cc/HYL4-D2L2. And even if the Taliban may one day be vanquished and a democratic government may return to Afghanistan, "the status quo continues" today, *Morgan Guar. Tr. Co. of N.Y. v. Republic of Palau*, 924 F.2d 1237, 1244 (2d Cir. 1991), and we must determine immunity based on conditions "at the time the writ of attachment or execution [was] issued," *Aurelius Cap. Partners, LP v. Republic of Argentina*, 584 F.3d 120, 130 (2d Cir. 2009) (emphasis omitted).

Afghanistan – as distinct from the Taliban – no longer "engage[s] in, or [has] the capacity to engage in, formal relations with other" states. *Klinghoffer*, 937 F.2d at 47 (internal quotation marks omitted); *see also* Restatement (Third) of the Foreign Relations Law of the United States § 201 cmt. e (Am. L. Inst. 1987) ("An entity is not a state unless it has competence, within its own constitutional system, to conduct international relations with other states, as well as the political, technical,

and financial capabilities to do so.").  Many of Afghanistan's embassies have been forced to close, and its former diplomats face the risk of deportation.  *See, e.g.*, Lara Jakes, *Afghan Embassy, Now out of Money, Will Shut Down, U.S. Says*, N.Y. Times (Mar. 11, 2022), https://perma.cc/WZ7C-RWM7.  And even though one of the *amici* in these appeals calls himself the *Chargé D'Affaires* of the Permanent Mission of the Islamic Republic of Afghanistan to the United Nations, he openly admits that "he does not represent the former government of Afghanistan nor the interest of any political group" but rather "strives to represent the interests of the Afghan people."  Faiq Amicus Br. at 1–2 (alterations accepted and internal quotation marks omitted).

At present, Afghanistan is more akin to a failed state.  *See Failed State*, *Black's Law Dictionary* (12th ed. 2024) ("A state that does not or cannot meet or maintain some of the basic social, economic, or political conditions and responsibilities of a sovereign government.").  Attributes of a failed state – each of which are present here – "include the loss of physical control of its territory, an inability to provide reasonable public services, and the erosion of legitimate authority."  *Id.*  It is therefore clear to me that Afghanistan no longer meets the definition of a foreign state and thus the DAB funds are not covered by the FSIA.

7

But rather than engage in this inquiry, the district court in *Aliganga* simply accepted the Executive Branch's assertion that the DAB funds were the property of a foreign state and thus immune from attachment. In fact, the district court issued its decision refusing to confirm its prejudgment attachment order *the very same day* that the Executive Branch outlined its views on immunity without giving Plaintiffs any opportunity to respond. Such blind deference to the Executive runs contrary to the purpose of the FSIA and longstanding precedent.

As the Supreme Court has recounted, prior to the passage of the FSIA, immunity determinations were left to the Executive Branch, which generated countless problems because "foreign nations often placed diplomatic pressure on the State Department in seeking immunity," causing "political considerations," rather than predictable legal principles, to dictate the outcome. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983). As a result, Congress passed the FSIA to strip the immunity determination from the Executive Branch and ensure that it was "made on purely legal grounds and under procedures that insure due process." *Id.* at 488 (internal quotation marks omitted). The FSIA therefore "vested *sole* responsibility for applying [its] standards in the federal judiciary." *Beierwaltes*, 999 F.3d at 818 (emphasis added). And "[w]hile the United States'

8

views on [immunity] are of considerable interest," the Supreme Court has emphatically held that such views "merit no special deference." *Altmann*, 541 U.S. at 701.

The majority endorses the district court's error by holding that "[t]he Executive Branch's formal recognition of a state or government establishes that state or government as a foreign state for purposes of the Foreign Sovereign Immunities Act." Maj. Op. at 54. This case marks the first time that *any* Circuit across the country has reached such a sweeping conclusion. Not only does this holding fly in the face of the well-established principles that courts have used to interpret the FSIA, it also effectively overrules our decision in *Klinghoffer*. It is axiomatic that we are "bound by the decisions of prior panels until such times as they are overruled either by an *en banc* panel of our Court or by the Supreme Court." *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) (internal quotation marks omitted). Neither has occurred here.

The majority advances three arguments in an attempt to escape the conclusion that it is single-handedly overturning Circuit precedent, but none is persuasive.

9

*First*, the majority seeks to cabin our use of the *Klinghoffer* definition to situations in which there is no "express determination from the Executive Branch" on whether to recognize a foreign state. Maj. Op. at 29. But there is nothing in *Klinghoffer* or our subsequent caselaw to even remotely suggest that our use of that definition is limited to contexts where the Executive Branch has not made a formal recognition decision.

*Second*, the majority asserts that its holding is compelled by the Supreme Court's more recent decision in *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015). *Zivotofsky*, of course, did not involve the FSIA but rather examined the constitutionality of a statute that required American embassy officials, upon request, to list on passports that Israel was the place of birth of American children born in Jerusalem. *See id.* at 7. The majority latches onto the Supreme Court's unremarkable statement that it is the "exclusive power of the President to control recognition determinations," *id.* at 32, to conflate the formal recognition of a foreign state, which is within the sole province of the Executive, with a determination of whether an entity is covered by the FSIA, which is a task for the judiciary.

Indeed, in *Zivotofsky*, the Supreme Court made clear that "[t]he Executive's exclusive power extends *no further* than his formal recognition determination," and affirmed that Congress could take a variety of actions that might "express its disagreement with the President" on the issue of recognition, such as by declining to confirm an ambassador or fund an embassy, enacting an embargo, or declaring war. *Id.* at 30 (emphasis added). In other words, *Zivotofsky* drew a line between "an official executive statement implicating recognition" – which is the sole prerogative of the Executive – and other acts that fall short of formal recognition and can be undertaken by other branches. *Id.*

The determination of whether an entity is entitled to immunity under the FSIA clearly falls into the latter category. As the Supreme Court has explained, "interpretation of the FSIA's reach" is a "pure question of statutory construction." *Altmann*, 541 U.S. at 701 (internal quotation marks omitted); *see also* Restatement (Fourth) of the Foreign Relations Law of the United States § 452 rptr. n.1 (Am. L. Inst. 2018) (noting that "the President has the exclusive power to recognize foreign states for diplomatic purposes," but "[c]lassification as a foreign state for FSIA purposes is a matter of statutory interpretation"). A court's interpretation of whether a certain entity constitutes a foreign state within the meaning of the FSIA

11

does not tread on the Executive's authority to formally recognize (or withdraw recognition of) that entity, nor does it compel any diplomatic action from the Executive. As Professor William Burke White, who submitted an expert declaration in the *Havlish* case, explained, "recognition of a foreign government is a formal act that is circumscribed by form, and can generally be accomplished *only* by express, unambiguous statements or a narrow subset of diplomatic actions." Havlish App'x at 661 (emphasis added). These actions include "concluding a bilateral treaty or . . . sending or receiving diplomatic agents," neither of which is at issue here. *Id.* at 666 (internal quotation marks omitted); *see also* Restatement (Third) of Foreign Relations Law § 204 rptr. n.2 ("Recognition of a state has been effected by express official declaration, by the conclusion of a bilateral agreement with the state, by the presentation of credentials by a United States representative to the authorities of the new state, and by receiving the credentials of a diplomatic representative of that state."). In other words, a court's legal conclusion as to whether an entity falls within the coverage of the FSIA does not constitute an act of recognition and thus does not infringe on the exclusive powers of the

Executive.[1]  Accordingly, it seems clear to me that *Zivotofsky* has not abrogated the rule we set forth in *Klinghoffer*, which thus remains binding authority.  *See Peguero*, 34 F.4th at 158.

*Third*, the majority contends that the Restatement (Third) of Foreign Relations Law, which was the basis for *Klinghoffer*'s definition of a foreign state, establishes "a two-step test for determining whether a foreign state legally exists for purposes of" the FSIA.  Maj. Op. at 28 n.69 (citing Restatement (Third) of Foreign Relations Law § 204 cmt. a).  That is simply not correct.  For starters, *Klinghoffer* never cited section 204 of the Restatement, so the majority's reliance on it is misplaced.  But more importantly, nothing in section 204's general observations about the President's recognition authority explains how courts should interpret the statutory text of the FSIA.  In fact, the Restatement (Fourth) of Foreign Relations Law makes clear that "the views of the executive branch should not control the question of whether, under the FSIA, a foreign state . . . is entitled to immunity."  Restatement (Fourth) of Foreign Relations Law § 452 rptr. n.1.

---

[1] The majority hangs onto a single statement in *Zivotofsky* that "[l]egal consequences follow formal recognition" because "[r]ecognized sovereigns . . . may benefit from sovereign immunity when they are sued."  576 U.S. at 11.  Besides the fact that this statement is dicta, it is clear that the Court was referring to the common-law immunity that foreign states enjoyed prior to the enactment of the FSIA.  *See id.* (citing *National City Bank of New York v. Republic of China*, 348 U.S. 356, 358–59 (1955), which predated enactment of the FSIA).

13

For all these reasons, I am convinced that when interpreting and applying the FSIA, we remain bound by the definition of foreign state that we set forth in *Klinghoffer*, and that Afghanistan clearly fails to meet that definition. As a result, I would (1) hold that the DAB funds are not entitled to immunity under the FSIA, (2) vacate the rulings of the district courts, and (3) remand this case for the district courts to apply New York attachment and execution law to determine whether Plaintiffs can use the DAB funds to satisfy their judgments against the Taliban.

## III.    DAB Is Not an Agency or Instrumentality of a Foreign State

But even if the majority is correct that we are bound by the Executive Branch's recognition decision and that the notional state of Afghanistan constitutes a foreign state, the DAB funds are still not entitled to immunity under the FSIA. That is because, in my view, DAB no longer constitutes an agency or instrumentality of a foreign state.

To qualify as an agency or instrumentality of a foreign state under the FSIA, the entity must, among other things, be "an organ of a foreign state or political subdivision thereof, or a majority of [its] shares or other ownership interest [must be] owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b)(2). To determine whether an entity constitutes an organ of a foreign state, we look to five factors:

14

(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

*Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004) (internal quotation marks omitted).

As the *Aliganga* Plaintiffs amply demonstrated before the district court, DAB is no longer supervised by the state of Afghanistan but rather by the Taliban. Indeed, the Taliban now controls the hiring of DAB employees, "purging prior leadership and technocrats and installing its own unqualified loyalists," including designated terrorists, at the highest levels of DAB's leadership structure. Aliganga App'x at 407. "[A]ny remaining DAB personnel who are not directly affiliated with the Taliban are . . . subject to intimidation and subjugation, preventing them from acting independently." *Id.* at 443. The Taliban has also prohibited women from working at DAB, mandated that employees grow beards and pray five times per day, and required that the Taliban flag be flown at DAB meetings. On this record, it cannot credibly be disputed that the notional state of Afghanistan no longer "actively supervises" DAB, and thus DAB cannot be considered an organ of Afghanistan. *Filler*, 378 F.3d at 217 (internal quotation marks omitted).

15

The majority sidesteps this analysis entirely and concludes that DAB is still an agency or instrumentality of a foreign state because "a majority of [its] shares or other ownership interest is owned by" the state of Afghanistan. 28 U.S.C. § 1603(b)(2). Even though this theory was never raised by the parties or considered by the district court, the majority hangs its hat on a clause in the Afghanistan Bank Law, which states that "[t]he capital of [DAB] shall belong to the State, and shall not [be] subject to lien or to encumbrance." Afghanistan Bank Law, art. 27.2 (Dec. 17, 2003), https://perma.cc/NM8N-3U9P. But this single sentence cannot carry the heavy weight the majority places on it. For starters, the Afghanistan Bank Law was passed in December 2003 and thus was not necessarily in force and effect "at the time the writ of attachment [was] issued" in 2022 or confirmation of attachment was sought in 2023. *Aurelius Cap. Partners*, 584 F.3d at 130 (emphasis omitted). Indeed, the *Aliganga* Plaintiffs documented that, at the time of attachment, DAB was openly flouting the Bank Law, including provisions related to the appointment of DAB's governor and first deputy governor, and that the Taliban had "established a committee" to replace the Bank Law with "traditional Islamic banking." Aliganga App'x at 413. What's more, it is not clear that ownership of DAB's capital is the same as the ownership of DAB itself, which

16

is what section 1603 requires for an entity to be considered an agency or instrumentality of a foreign state. In fact, the *Aliganga* Plaintiffs argue that DAB "does not have or issue ownership shares." Aliganga Br. at 55.

With nothing in the record to suggest that DAB's "shares . . . [are] owned by a foreign state," 28 U.S.C. § 1603(b)(2), the majority reaches outside the record to locate a doctoral dissertation that asserts, without any citation or support, that DAB has "100% state ownership," Maj. Op. at 36 & n.95 (citing Jan Weidner, The Organisation and Structure of Central Banks 192 (Apr. 20, 2007) (Dr. rer. pol. dissertation, Technische Universität Darmstadt), https://perma.cc/P5TN-UZBY). But this cherrypicked statement is simply not sufficient, in my view, to establish that DAB remains an agency or instrumentality of the notional state of Afghanistan.

## IV. The DAB Funds Were Not Being Used for Central Banking Functions

Upon finding that DAB is an agency or instrumentality of Afghanistan, the majority concludes that the DAB funds are entitled to immunity under FSIA section 1609 and ends its analysis there. But the *Aliganga* district court focused on FSIA section 1611, which provides that "the property of a foreign state shall be immune from attachment and from execution, if . . . the property is that of a foreign central bank or monetary authority held for its own account." 28 U.S.C. § 1611(b).

17

While it is true that "funds . . . held in an account in the name of a central bank or monetary authority . . . are presumed to be immune from attachment under [section] 1611(b)(1)," a plaintiff "can rebut that presumption by demonstrating with specificity that the funds are not being used for central banking functions as such functions are normally understood."  *NML Cap., Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 194 (2d Cir. 2011).  Our decision in *NML Capital* did not offer a list of those central banking functions, but we relied extensively on a law-review article that provided such a list.  These functions include the:

> (1) issu[ance] of notes, coin, and legal tender, (2) custody and administration of the nation's monetary reserves through the holding of gold, silver, domestic and foreign securities, foreign exchange, acceptances and other credit instruments, and IMF Special Drawing Rights, (3) establishment and maintenance of reserves of depository institutions, (4) discounts and advances to depository institutions, (5) receipt of deposits from the government, international organizations, depository institutions, and in special cases, private persons, (6) open market operations, (7) credit controls, and (8) licensing, supervision, and inspection of banks.

Ernest T. Patrikis, *Foreign Central Bank Property:  Immunity from Attachment in the United States*, 1982 U. Ill. L. Rev. 265, 274; *see also Central Bank, Black's Law Dictionary* (12th ed. 2024) ("A central bank normally issues currency, functions as the government's bank, regulates the credit system, provides oversight for

commercial banks, manages exchange reserves, and implements monetary policy.").

As the *Aliganga* plaintiffs demonstrated through their expert affidavits, DAB no longer functioned as a central bank at the time of attachment in April 2022. For example, DAB was no longer able to print afghanis; DAB curtailed its auctions of U.S. dollars, which had been used to support the value of the afghani; and foreign currency and aid arriving in Afghanistan were routed through private banks and informal transfer systems rather than DAB. *See* Aliganga App'x at 414, 416. For these reasons, one expert reasonably concluded that DAB "cannot execute central bank functions." *Id.* at 419. That being the case, DAB's assets are not entitled to immunity under FSIA section 1611.

## V. Even If It Could Be Argued That the FSIA Applies Here, TRIA Abrogates the Immunity of an Entity That Is an "Agency or Instrumentality of a Terrorist Party" at the Time of the Turnover Order

Because the majority concludes that the DAB funds are immune under the FSIA from attachment and execution, the majority must still contend with whether TRIA abrogates that immunity for the *Havlish* appeal. TRIA states that "[n]otwithstanding any other provision of law, . . . the blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution

19

in order to satisfy [a] judgment" against that party. TRIA § 201(a). I agree with the majority that TRIA abrogates both jurisdictional and execution immunity and independently provides a grant of subject-matter jurisdiction over post-judgment execution and attachment proceedings. *See* Maj. Op. at 38–45. The majority nevertheless neuters that conclusion by insisting that an entity's status as an agency or instrumentality of a terrorist party under TRIA must "be assessed as of the date that the assets at issue were blocked," *id.* at 55 – an issue that was never considered by the district court, briefed by the parties, or discussed at oral argument.

In *Kirschenbaum*, we previously suggested that an entity's agency or instrumentality status under TRIA should be assessed as of the date the complaint was filed. *See* 830 F.3d at 136. I agree with the majority that *Kirschenbaum's* bright-line rule has been "unseated" by our subsequent caselaw, Maj. Op. at 49, which has made clear that developments subsequent to the filing of a complaint may affect whether an entity is entitled to immunity, *see Barlett v. Baasiri*, 81 F.4th 28, 33–37 (2d Cir. 2023); *Schansman v. Sberbank of Russ. PJSC*, 128 F.4th 70, 79–80 (2d Cir. 2025). But I disagree with the majority's holding that an entity's status as an

20

agency or instrumentality of a terrorist party must "be assessed as of the date that the assets at issue were blocked." Maj. Op. at 55.

For starters, this reading imposes an extratextual limitation on plaintiffs' ability to enforce judgments against terrorist parties. Nowhere does the plain text of TRIA confine its applicability to assets that belonged to the terrorist party (or its agency or instrumentality) at the time those assets were blocked. In other words, the unambiguous language of the statute makes clear that as long as (1) the assets are blocked and (2) they belong to a terrorist party (or its agency or instrumentality), those assets can be used to satisfy a judgment against the terrorist party.

To hold otherwise runs contrary to the statute's purpose, which "is to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties." *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (internal quotation marks omitted). Indeed, we have recognized that "TRIA establishes once and for all, that such judgments are to be enforced against *any* assets available in the [United States]." *Id.* (emphasis added) (internal quotation marks omitted). And yet, under the majority's interpretation, if a

21

terrorist party were to gain control over an entity whose assets were already blocked, those assets could not be used to satisfy a judgment against the terrorist party. In addition to defying logic, such an approach would defeat TRIA's objective of making "any assets available" to the victims of terrorism. *Id.* (internal quotation marks omitted).

The better approach, in my view, is to assess whether an entity is an agency or instrumentality of a terrorist party at the time of the turnover order. This would accord with the approach we have taken to determining attachment and execution immunity under the FSIA, which looks to conditions at the time of attachment or execution. *See Aurelius Cap. Partners*, 584 F.3d at 130. It would also avoid reading extratextual limitations into TRIA and would maximize the assets available to victims of terrorism to enforce judgments against terrorist parties, which was the clear purpose of the statute.

In response, the majority argues that we should look to conditions at the time the assets were blocked because "[i]f an entity becomes an agency or instrumentality of a terrorist party *after* that entity's property is blocked, those blocked assets cannot have been utilized to further the mission of the terrorist party." Maj. Op. at 51. But the majority cites no authority – nor am I aware of any

22

– to suggest that Congress intended to limit TRIA's reach to assets that were "utilized to further the mission of the terrorist party." *Id.* Rather, as noted above, TRIA simply functions to ensure that the maximum assets are available to victims of terrorism.

The majority also make the semantic argument that "blocked assets are not 'of' a terrorist party if those assets did not belong to either the terrorist party, or an entity then operating as an agency or instrumentality of the terrorist party, as of the date that the assets were blocked." *Id.* at 52. But once again, the plain text of TRIA contains no such limitation, and it strains credulity to suggest that Congress intended to create roadblocks preventing victims of terrorism from accessing the assets of terrorist organizations.

For all these reasons, I would hold that an entity's status as an agency or instrumentality of a terrorist party for purposes of TRIA should be determined as of the date of the turnover order. Applying that test here, I would easily conclude that DAB was an agency or instrumentality of the Taliban when the district court issued its decision on the turnover motion in March 2023. At a minimum, as outlined above, DAB was "controlled[] or directed by" the Taliban as of that date. *Kirschenbaum*, 830 F.3d at 135. As the majority acknowledges, *see* Maj. Op. at 47,

23

that is sufficient to be considered an agency or instrumentality of a terrorist party under our caselaw.

*    *    *

To sum up, I concur with the majority's holding that a district court may, but is not required to, *sua sponte* consider the issue of attachment (or execution) immunity even when the sovereign status of the assets at issue is disputed. But I disagree with the majority's novel conclusion that "[t]he Executive Branch's formal recognition of a state or government establishes that state or government as a foreign state for purposes of the [FSIA]." *Id.* at 54. That holding effectively overrules three decades of our precedents and ignores longstanding caselaw from the Supreme Court that makes clear the interpretation of the FSIA is purely a task for the judiciary. I would instead apply the test we set forth in *Klinghoffer*, conclude that Afghanistan no longer constitutes a foreign state for purposes of the FSIA, and thus hold that the DAB funds are not entitled to immunity from attachment or execution. I also disagree with the majority's holding that an entity's status as an agency or instrumentality of a terrorist party under TRIA must "be assessed as of the date that the assets at issue were blocked," *id.* at 55, as opposed to the date of the turnover order.

Accordingly, I would vacate the judgments below and remand for the district courts to apply New York attachment and execution law to determine whether Plaintiffs can use the DAB funds to satisfy their judgments against the Taliban.

For all the above reasons, I respectfully dissent.