23-258 (L); 23-354 (L)
*Havlish v. Taliban; Aliganga v. Taliban*

MENASHI, *Circuit Judge*, dissenting from the denial of rehearing *en banc*:

I would reconsider these cases *en banc* because the panel opinion erred in concluding that the Afghan central bank—"Da Afghanistan Bank" or "DAB"—is entitled to immunity under the Foreign Sovereign Immunities Act.

I agree with the panel opinion that a court cannot second-guess the recognition decision of the President that a country is a "foreign state," even for purposes of the FSIA. The FSIA aimed to provide predictable standards by which foreign sovereigns receive immunity in American courts, and it would undermine that purpose if the Executive and Judicial Branches could reach conflicting conclusions about which states are sovereign in the first place. In our constitutional system, the President rather than the courts recognizes foreign states. Because the Executive Branch recognizes Afghanistan as a foreign state, the panel was bound to accept that determination. But DAB is not itself a foreign state. It receives immunity only if it qualifies as "an agency or instrumentality" of Afghanistan. 28 U.S.C. § 1603(a). DAB does not so qualify because Afghanistan neither owns nor controls it. I would therefore hold that DAB is not entitled to immunity.

The panel opinion further erred in concluding that for purposes of § 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), the status of an entity as an agency or instrumentality of a terrorist party must be determined as of the date that the assets sought in the turnover motion were blocked. I would hold instead that a court must make that determination at the time of the turnover order. This approach accords with the text and purpose of the statute, and it parallels the related framework of the FSIA.

Because I would hold that (1) DAB is not an agency or instrumentality of Afghanistan that receives immunity under the FSIA, and (2) the status of an entity as an agency or instrumentality under the TRIA must be assessed at the time of the turnover order, I dissent from the denial of rehearing *en banc*.

## I

The panel opinion correctly held that the President's determination that a country is a foreign state is conclusive. That holding accords with the text, structure, and purpose of the FSIA. The FSIA does not provide statutory standards for determining whether an entity qualifies as a foreign state, and it does not authorize a federal court to invoke principles of international law to override a recognition decision by the President acting within his exclusive constitutional sphere of authority. The FSIA does, however, provide standards for determining whether an entity qualifies as an agency or instrumentality of a foreign state, and under those standards DAB is not one.

## A

Before the FSIA was enacted, "[t]he doctrine of foreign sovereign immunity developed as a matter of common law." *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010). Early on, Chief Justice Marshall explained that a foreign sovereign lacks a right to immunity from suit in American courts because "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute" and "is susceptible of no limitation not imposed by itself." *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). As a matter of comity, however, countries typically waived jurisdiction over foreign sovereigns—and, on the suggestion of the Executive Branch, the Supreme Court agreed to waive its jurisdiction over an armed ship of

2

a foreign state found in an American port. *See id.* at 137, 145-47. "[T]hat opinion came to be regarded as extending virtually absolute immunity to foreign sovereigns." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983).

Following that precedent, the Supreme Court "consistently has deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Id.* "For much of our history, claims of foreign sovereign immunity were handled on a piecework basis that roughly paralleled the process in *Schooner Exchange*." *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1605 (2020). "[A]fter a plaintiff sought to sue a foreign sovereign in an American court, the Executive Branch, acting through the State Department, filed a 'suggestion of immunity'—case-specific guidance about the foreign sovereign's entitlement to immunity." *Id.* If the State Department provided the suggestion of immunity, "the district court surrendered its jurisdiction." *Samantar*, 560 U.S. at 311. Only "in the absence of recognition of the immunity by the Department of State" did the district court exercise the "authority to decide for itself whether all the requisites for such immunity existed." *Ex parte Republic of Peru*, 318 U.S. 578, 587 (1943).

The State Department provided suggestions of immunity in all cases against friendly sovereigns until 1952, when it "announced the 'restrictive' theory of foreign sovereign immunity." *Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940, 946 (2023); *see also Republic of Austria v. Altmann*, 541 U.S. 677, 689-90 (2004). Pursuant to the restrictive theory, "immunity was typically afforded in cases involving a foreign state's public acts, but not its strictly commercial acts." *Turkiye Halk Bankasi*, 143 S. Ct. at 946. The restrictive theory did not alter the role of the courts. "As in the past, initial responsibility

3

for deciding questions of sovereign immunity fell primarily upon the Executive acting through the State Department, and the courts abided by 'suggestions of immunity' from the State Department." *Verlinden*, 461 U.S. at 487.

But the adoption of the restrictive theory produced inconsistent results. Diplomatic pressure and political considerations sometimes "led to suggestions of immunity in cases where immunity would not have been available under the restrictive theory." *Id.* When a foreign state failed to request a suggestion from the State Department, "the responsibility fell to the courts to determine whether sovereign immunity existed, generally by reference to prior State Department decisions." *Id.* "Not surprisingly, the governing standards were neither clear nor uniformly applied." *Id.* at 488.

By enacting the FSIA in 1976, Congress "sought to standardize the judicial process with respect to immunity for foreign sovereign entities in civil cases." *Turkiye Halk Bankasi*, 143 S. Ct. at 946. The FSIA "codifies a baseline principle of immunity for foreign states and their instrumentalities," *id.* (citing 28 U.S.C. § 1604), and it authorizes suit only if one of several enumerated exceptions to that principle applies, *see* 28 U.S.C. §§ 1605-07.

Congress explained that the purpose of this framework is to provide for "the determination by United States courts of *the claims of foreign states to immunity*." *Id.* § 1602 (emphasis added). Congress furthered that purpose by codifying the restrictive theory of sovereign immunity into a set of rules that could be consistently applied. Those rules replaced the inconsistent invocation of sovereign immunity that prevailed when the courts relied on suggestions of immunity from the State Department. *See* H.R. Rep. No. 94-1487, at 7 (1976); *see also Altmann*, 541 U.S. at 691.

4

The FSIA provides no standards, however, for determining whether a country is a "foreign state" in the first place. It does not even define "foreign state." To be sure, in the absence of a recognition decision by the Executive Branch, courts have determined whether a state is sovereign by reference to "general principles of international law," but "those principles were defeasible, subconstitutional rules that the sovereign could override through clear command." *Fuld v. PLO*, 145 S. Ct. 2090, 2115 (2025) (Thomas, J., concurring in the judgment). Judicial deference to the decisions of the political branches to override international default rules "respects the Constitution's design by reserving matters of foreign affairs to the political branches." *Id.*

If courts were to develop rules that supersede the decision of the political branches that a country qualifies as a foreign state, those rules would replicate the patchwork immunity regime that the FSIA aimed to replace. Under the FSIA, a foreign state receives presumptive immunity from suit. *See* 28 U.S.C. § 1604. If immunity were to depend on a country persuading not only the State Department but each court in which litigation occurs that it should be considered a foreign state, there would be even less predictability than prevailed prior to the FSIA. A court in the Second Circuit might decide that Afghanistan is not a foreign state, but a court in the Fifth Circuit might decide that it is—perhaps based on different interpretations of the relevant international law standards. The Supreme Court would need to resolve such disagreements, followed by remands for previously dismissed litigation to proceed or for previously conducted litigation to be dismissed. This sort of system would not represent an improvement on the pre-FSIA framework; it would be more costly and time-consuming, and the strain on American foreign policy would result not from decisions of the

5

politically accountable Executive Branch but from the unaccountable courts.

We have explained that "[i]n the FSIA, Congress set forth 'a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities' and vested sole responsibility for applying those standards in the federal judiciary." *Beierwaltes v. L'Office Federale de la Culture de la Confederation Suisse*, 999 F.3d 808, 818 (2d Cir. 2021) (citation and alteration omitted) (quoting *Verlinden*, 461 U.S. at 488). But that means the responsibility of the federal courts is to adjudicate the "claims of immunity" for which the FSIA provides standards. In contrast to those comprehensive standards, "[t]he FSIA begins with the baseline presumption that foreign states are 'immune from the jurisdiction of United States courts,'" *id.* (quoting *Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 55 (2d Cir. 2016)), and it provides no standards—comprehensive or otherwise—for deciding which entities qualify as foreign states that receive the presumption.

In a different context, the Supreme Court has declined to interpret a statute in a way that "would require courts, rather than the President," to evaluate "a foreign government's conduct" because the statutory text "offers no standards that would enable courts to assess, for example, whether the situation in North Korea justifies entry restrictions while the terrorist threat in Yemen does not." *Trump v. Hawaii*, 138 S. Ct. 2392, 2415 (2018). The FSIA similarly offers no standards for courts to decide—in contravention of the diplomatic position of the United States—that an entity should not be recognized as a foreign state. "[T]he absence of any textual basis" for such authority "likely indicates that Congress did not intend" for courts to exercise it. *Id.*

6

In my view, the panel opinion was correct to observe that "while the FSIA 'defines the circumstances in which foreign states are immune from suit,' the FSIA emphatically does *not* charge the Judiciary with the threshold power to determine whether the basic legal existence of a foreign state is *recognized*, especially in contravention of the Executive." *Havlish v. Taliban*, 152 F.4th 339, 351 (2d Cir. 2025) (alteration omitted) (quoting *Turkiye Halk Bankasi*, 143 S. Ct. at 947).

"A principal purpose" of the FSIA was "to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby *reducing* the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on *purely legal grounds* and under procedures that insure due process." H.R. Rep. No. 94-1487, at 7 (emphasis added). To transfer the determination of not only immunity but also *statehood* would complicate foreign policy when courts disagreed with each other or with the political branches, and it would require courts to depart from purely legal grounds by making decisions based on extra-statutory standards that implicate political and diplomatic considerations. The FSIA does not suggest that Congress wanted courts to do that.

The other dissent says that if the President wants the courts to respect his recognition decisions, he "is free to file statements of interest suggesting that courts decline to exercise jurisdiction in particular cases implicating foreign sovereign immunity." *Ante* at 7 n.1 (internal quotation marks and alteration omitted). The other dissent reserves judgment on "the question of what degree of deference might be afforded to formal executive intervention" because "the government filed no such statement in this appeal." *Id.* So the other dissent might defer to the recognition decision of the

7

Executive Branch when expressed in a court filing. That possibility undermines the otherwise confident assertion of the other dissent that "Congress vested the courts—not the Executive—with the role of determining whether foreign states should enjoy statutory immunity." *Id.* at 9.

Unquestionably, one purpose of the FSIA was to obviate the need for the State Department to file suggestions of immunity in every case. Yet the other dissent reads the FSIA to require *additional* court filings such that the State Department must provide suggestions not only of *immunity* but also of *statehood*. That approach defeats the purpose of the FSIA. Congress wanted the courts to decide whether a foreign state receives immunity *in a given case*. Nothing in the FSIA confers authority on the courts to determine whether a country should be considered a foreign state at all.

In any event, the Executive Branch *did* provide its views in this case. The United States submitted a letter to the district court arguing that the property of DAB should be immune from execution because "DAB is an agency or instrumentality of the State of Afghanistan."[1] And the United States filed statements of interest explaining that DAB "is the central bank of the foreign state of Afghanistan"[2] and that

---

[1] Letter of the United States at 2, *Owens v. Taliban*, No. 22-CV-1949 (S.D.N.Y. Feb. 24, 2023), ECF No. 81; *see also id.* ("[A]s the United States has previously stated, and confirms again here, the Da Afghanistan Bank ('DAB') 'is an agency or instrumentality of the State of Afghanistan and thus is to be treated as a "foreign state" for purposes of the FSIA.'") (quoting Statement of Interest at 21, *Havlish v. Bin-Laden*, No. 03-CV-9848 (S.D.N.Y. Feb. 11, 2022), ECF No. 563).

[2] Statement of Interest, *supra* note 1, at 8; *see also id.* at 15 ("DAB is the central bank of the State of Afghanistan.").

"DAB is an agency or instrumentality of the State of Afghanistan."[3] If the United States did not insist that Afghanistan is a foreign state as frequently and as fervently as the other dissent would have preferred, that is only because there has never been a practice of filing suggestions of statehood, and no court has ever said that such a practice is required.

**B**

The FSIA does not empower the courts to countermand the President's decision to recognize a country as a foreign state—and the Constitution certainly does not do so either.

Under the Constitution, the President is "the sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936). The Constitution vests in the President the power to appoint and to receive ambassadors, U.S. Const. art. II, §§ 2-3, and these authorities mean that "recognition is exclusively a function of the Executive," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964); *see also Guaranty Trust Co. v. United States*, 304 U.S. 126, 137 (1938) ("What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government."). The Supreme Court has reaffirmed that "[r]ecognition is a topic on which the Nation must 'speak with one voice'" and "[t]hat voice must be the President's." *Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015) (alteration omitted) (quoting *American Ins. Assn. v. Garamendi*, 539 U.S. 396, 424 (2003)).

---

[3] Statement of Interest at 21, *John Does 1 Through 7 v. Taliban*, No. 20-MC-740 (S.D.N.Y. Feb. 11, 2022), ECF No. 49.

The other dissent does not dispute that the recognition power belongs exclusively to the President. It argues, however, that while the "formal" recognition of a foreign state is a decision that "unquestionably belongs to the Executive," the "separate and narrower authority to determine when statutorily created FSIA immunity should attach … clearly belongs to the Judiciary." *Ante* at 7-8. The other dissent describes the latter determination as involving "the core judicial work of parsing the term 'foreign state.'" *Id.* at 9. And it emphasizes that it "is emphatically the province and duty of the judicial department to say what the law is." *Id.* at 5 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). But the invocation of that familiar truism begs the question of what the law requires. *Cf. Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (recognizing that sometimes "the best reading of a statute" is that another branch of government has "discretionary authority").

Determining whether a country qualifies as a foreign state under the FSIA is—at the very least—not "a *pure* question of statutory construction." *Ante* at 4 (emphasis added) (quoting *Altmann*, 541 U.S. at 701). The FSIA provides comprehensive statutory standards for evaluating whether, for example, the activities of a foreign state at issue in a particular case were commercial rather than governmental. *See* 28 U.S.C. § 1605(a)(2). But it provides no standards for deciding that a country does not qualify as a foreign state at all and therefore cannot claim immunity in any case. Conducting such an inquiry necessarily requires a court to look beyond the statute to geopolitics, international legal standards, and American diplomacy. That exercise might be inevitable in the absence of a recognition decision by the Executive Branch. Indeed, the traditional approach has been that "a court will decide whether to treat an entity as a state, or a foreign regime as a government, where such a determination is necessary for

the purposes of a case before the court" only "[i]n the absence of a Presidential decision." Restatement (Third) of Foreign Relations Law § 204 cmt. a (1987). But when the relevant constitutional actor has exercised the recognition power, the courts have no authority—based on the FSIA or the Constitution—to second-guess it.[4]

The other dissent criticizes the panel opinion for purportedly making ours "the first [c]ircuit court in history to conflate the Executive's power to recognize nations with the Judiciary's duty to interpret the jurisdictional grant of the FSIA." *Ante* at 10. But no circuit court has overridden a decision of the President—acting within his exclusive constitutional sphere of authority—to recognize a country as a foreign state. The other dissent would have ours be the first circuit court in history to conclude that the FSIA requires that result.

---

[4] I would not displace the traditional approach with the framework proposed in a more recent Restatement. *See Kansas v. Nebraska*, 574 U.S. 445, 475 (2015) (Scalia, J., concurring in part and dissenting in part) ("[M]odern Restatements … are of questionable value, and must be used with caution. … Over time, the Restatements' authors have abandoned the mission of describing the law, and have chosen instead to set forth their aspirations for what the law ought to be."); *see also United States v. Yousef*, 327 F.3d 56, 99 (2d Cir. 2003) (explaining that Restatements "are not primary sources of international law" and "at most provide evidence of the practice of States, and then only insofar as they rest on factual and accurate descriptions of the past practices of states, not on projections of future trends or the advocacy of the 'better rule'"). But even the most recent Restatement of Foreign Relations Law explains that "[t]o determine whether a particular territorial, political, or regional body is a foreign state under the FSIA, courts consider *whether it has been formally recognized by the United States*, as well as the criteria of statehood from international law." Restatement (Fourth) of Foreign Relations Law § 452 reporters' note 1 (2018) (emphasis added) (citing *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 123 (2d Cir. 2016)).

The other dissent faults the panel opinion for "blurring the distinction between diplomatic recognition and statutory immunity." *Id.* at 8. But it is the other dissent that blurs the distinction between immunity and statehood, which have always been understood as different concepts. "[N]ineteenth-century courts deferred to executive findings of 'fact' as to whether the government was officially sovereign. But those findings typically did not resolve the immunity issue itself, which could be dependent on the facts of the case."[5] When courts "could make independent determinations on whether a foreign sovereign was immune from suit in a particular set of circumstances," the courts nevertheless "regarded themselves as bound by executive branch determinations of the existence of sovereign status."[6]

Perhaps Congress might be able to transfer from the President to the courts the determination of which entities qualify as foreign states under the FSIA. If Congress had provided statutory criteria for determining whether a country qualifies as a foreign state—in the same way that it provided criteria for adjudicating the claim of a foreign state to immunity—we would be compelled to conclude that Congress had attempted to do so. The question would then arise as to whether Congress was constitutionally permitted to transfer so integral an aspect of the recognition power away from the President. The last time such a dispute arose, the Supreme Court explained that "[t]he President's exclusive recognition power encompasses the authority to acknowledge, in a formal sense, the legitimacy of other states and governments, including their territorial bounds," and that

---

[5] G. Edward White, *The Transformation of the Constitutional Regime of Foreign Relations*, 85 Va. L. Rev. 1, 27 (1999).

[6] *Id.* at 134.

this "is an executive power that Congress may not qualify." *Zivotofsky*, 576 U.S. at 17. In light of that decision, I lack the confidence of the other dissent that the Constitution would permit Congress to deprive the President of the power to recognize an entity as a foreign state eligible for a presumption of immunity in American courts—and to confer that power instead on the judiciary.

But Congress has not even attempted to make such a transfer. Neither the text nor the structure nor the purpose of the FSIA indicates that Congress wanted courts to decide which countries should be recognized as foreign states. And the FSIA has not previously been understood to transfer this aspect of the recognition power to judges. In the absence of a clearly expressed congressional purpose to encroach on what would otherwise be the President's exclusive constitutional power of recognition, I would not conclude that Congress has impliedly so encroached. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter."); *see also Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 639 (2026) ("'Both separation of powers principles and a practical understanding of legislative intent' suggest[] Congress would not have delegated 'highly consequential power' through ambiguous language.") (plurality opinion) (alteration omitted) (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022)).

## C

While the FSIA does not provide statutory standards for determining whether an entity qualifies as a foreign state, it does provide a detailed scheme for evaluating whether an entity qualifies

as an agency or instrumentality of a foreign state. I would accept the determination of the President that Afghanistan is a foreign state but hold that DAB is not an agency or instrumentality of Afghanistan. Accordingly, I agree with the conclusion of the other dissent that DAB is not entitled to sovereign immunity. *See ante* at 12 n.3.

The FSIA provides that not only the foreign state itself but also an agency or instrumentality of the foreign state receives immunity in American courts. *See* 28 U.S.C. § 1603(a). An agency or instrumentality of a foreign state is an entity that is (1) "a separate legal person, corporate or otherwise," (2) "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," and (3) "neither a citizen of a State of the United States … nor created under the laws of any third country." *Id.* § 1603(b).

No one disputes that DAB is a separate legal person or contends that it fails the third prong. The question is whether it is "an organ" of Afghanistan or whether a majority of its shares are "owned" by Afghanistan. To determine whether an entity is an organ of a foreign state, we consider "(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the foreign country; and (5) how the entity is treated under foreign state law." *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004) (alteration omitted).

The record here demonstrates that the Taliban rather than the State of Afghanistan controls DAB. The district court observed that the Taliban has "laid claim to the roughly $7 billion in assets held by

14

[DAB] at the N.Y. Fed." *Owens v. Taliban*, No. 22-CV-1949, 2023 WL 2214887, at *1 (S.D.N.Y. Feb. 24, 2023). And the district court found as follows:

> Since taking control of Afghanistan, the Taliban has installed its own officials at DAB, controlled DAB's decision-making, established a committee to replace Afghanistan's central banking laws with traditional Islamic banking, and eliminated (or, at a minimum, seriously compromised) DAB's anti-money laundering and anti-terrorism financing efforts. Foreign governments and organizations have avoided transacting with DAB due to its affiliation with the Taliban.

*Id.* at *2 (citations omitted). The Taliban has also set workplace conditions at DAB—which now include a prohibition on women employees, mandatory prayer, and the flying of the Taliban flag at meetings. *See Havlish*, 152 F.4th at 371-72 (Sullivan, J., concurring in part and dissenting in part). The record, in other words, shows that DAB is no longer "an organ" of the State of Afghanistan.

The panel opinion did not contend otherwise but concluded that DAB still qualifies as an agency or instrumentality because "a majority of [its] shares or other ownership interest is owned" by the State of Afghanistan. 28 U.S.C. § 1603(b)(2). That conclusion rested on two pieces of evidence. First, "the Afghanistan banking law sets forth th[at] 'the capital of Da Afghanistan Bank shall belong to the State of Afghanistan.'" *Havlish*, 152 F.4th at 357 (alterations omitted) (quoting Afghanistan Bank Law, art. 27.2 (Dec. 17, 2003)). Second, "a study analyzing the structure of central banks finds that DAB is subject to '100% state ownership.'" *Id.* (quoting Jan Weidner, The Organisation and Structure of Central Banks 192 (Dissertation, Technical University of Darmstadt 2017)). This evidence does not support the conclusion of the panel opinion.

The text of § 1603(b)(2) uses the present tense, and we have explained that "the present tense reflects the FSIA's concern with current political realities and relationships." *Bartlett v. Baasiri*, 81 F.4th 28, 33 (2d Cir. 2023) (internal quotation marks omitted); *see also Altmann*, 541 U.S. at 696 ("[S]uch immunity reflects current political realities and relationships, and aims to give foreign states and their instrumentalities some *present* protection from the inconvenience of suit as a gesture of comity.") (internal quotation marks omitted). As a result, we have held that "[t]he most natural reading of the statute is one that gives foreign sovereigns immunity even when they gain their sovereign status mid-suit," and for that reason "immunity under the Foreign Sovereign Immunities Act may attach when a defendant becomes an instrumentality of a foreign sovereign after a suit is filed." *Bartlett*, 81 F.4th at 33 (citation omitted). It follows that immunity may also be lost when a defendant ceases to be an instrumentality of a foreign sovereign because a non-sovereign entity has captured it.

So it matters that the Afghanistan banking law is no longer operative and does not reflect the current ownership of DAB. The study of central banks—which was published before the Taliban took over DAB—simply repeats the formalities of the inoperative banking law. *See* Weidner, *supra*, at 192. It does not address the current reality of the ownership or control of DAB.

The panel opinion departed from those precedents holding that claims of immunity must be evaluated in light of current political realities. I would rehear these cases *en banc* to eliminate the conflict with those precedents. *See* Fed. R. App. P. 40(b)(2)(A)-(B). In doing so, I would conclude that DAB is not an agency or instrumentality of Afghanistan but rather of the Taliban and is not entitled to immunity under the FSIA.

16

## II

I agree with the other dissent that the panel opinion additionally erred in holding that the status of an entity as an agency or instrumentality of a terrorist party under the TRIA must be determined as of the time the assets were blocked. *See Havlish*, 152 F.4th at 364-65. I would rehear these cases *en banc* to correct this second error as well.

Section 201(a) of the TRIA authorizes plaintiffs to seek execution or attachment of "the blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)." 28 U.S.C. § 1610 note. Section 201(d)(2)(A) defines "blocked asset" as "any asset seized or frozen by the United States." *Id.* The panel opinion concluded that "[t]he blocking date … serves as a critical inflection point ripe for determining the time at which we should evaluate an entity's status under the TRIA as an agency or instrumentality." *Havlish*, 152 F.4th at 364.

That analysis does not follow from the statutory phrase "blocked assets." An asset may be frozen by the United States, and its owner may later become an agency or instrumentality of a terrorist party. The asset would remain an "asset seized or frozen by the United States"—and accordingly a "blocked asset"—regardless of the change in status of the owner. While "'blocking' is a status *imposed* by the United States at a certain time," *id.* (emphasis added), the status of being a "blocked asset" continues past the blocking date.

The panel opinion suggested that "blocked assets are not 'of' a terrorist party if those assets did not belong to either the terrorist party, or an entity then operating as an agency or instrumentality of the terrorist party, as of the date that the assets were blocked." *Id.* But assets that yesterday were not "of" a terrorist party might today be

17

"of" a terrorist party if the owner has become an agency or instrumentality of a terrorist party. *Cf. Bartlett*, 81 F.4th at 33. No one doubts that the blocked assets here are assets "of" DAB or that DAB is controlled by the Taliban. If the assets were unblocked today, DAB—and therefore the Taliban—would control the assets.

Even if there were some policy reason to approach blocked assets in the way the panel opinion described, that was not the policy that Congress adopted in the TRIA. The statute straightforwardly provides that assets shall be available to satisfy a judgment against a terrorist party if the assets are "blocked" and are "of th[e] terrorist party." 28 U.S.C. § 1610 note. There are no additional requirements.

The history of the statute confirms that Congress intended to adopt this uncomplicated rule. Prior to the TRIA, the President was statutorily authorized to prevent the attachment of the blocked property of foreign states, and he often did so.[7] Congress enacted the TRIA to prevent the President from impeding recovery by judgment creditors. *See Heiser*, 735 F.3d at 939. The statute aimed not only to enable "victims of terrorism" to satisfy judgments "from the frozen assets of terrorist parties" but also to "establish[] once and for all, that such judgments are to be enforced against any assets available in the U.S., and that *the executive branch has no statutory authority to defeat such enforcement under standard judicial processes*." *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 50 (2d Cir. 2010) (emphasis added)

---

[7] *See Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 939 (D.C. Cir. 2013) ("The President waived [attachment] in almost all cases after finding that attachment of blocked property would 'impede the ability of the President to conduct foreign policy' and 'impede the effectiveness of prohibitions and regulations upon financial transactions.'") (alteration omitted) (quoting Determination to Waive Requirements Relating to Blocked Property of Terrorist-List States, 63 Fed. Reg. 59201, 59201 (Oct. 21, 1998)).

(quoting 148 Cong. Rec. S11528 (Nov. 19, 2002) (statement of Sen. Harkin)). Congress directed that the blocked assets could be used to pay victims "whether or not the executive agreed." *Heiser*, 735 F.3d at 939. But the panel opinion—by limiting the reach of the TRIA to assets that belonged to terrorists before the Executive Branch blocked the assets—effectively returned to the Executive Branch the sort of discretionary power over the assets that the TRIA aimed to eliminate.

These cases illustrate the problem. It is undisputed that the assets are blocked, and there is no real question that the owner of those assets—DAB—is an agency or instrumentality of the Taliban. Yet the panel opinion held that the assets are beyond the reach of victims of terrorism because DAB was not an agency or instrumentality of the Taliban at the time the Executive Branch decided to block the assets. The Executive Branch blocked the assets when the Taliban captured Kabul, however, precisely to *avoid* the use of the assets for terrorist purposes. Pursuant to the panel opinion, if the government had blocked the assets *after* the Taliban took over DAB, the funds would be available to victims of the Taliban. But if the government blocked the assets *because* the Taliban was *about* to take over DAB, the victims cannot recover.

The theory of the panel opinion seems to be that the assets continue to belong to the preexisting DAB that was not an agency or instrumentality of the Taliban. But that DAB does not exist. The assets belong to the actual DAB that is an agency or instrumentality of the Taliban. And the TRIA deals with actual rather than imaginary ownership. *Cf. id.* at 940 (deciding, for purposes of the TRIA, whether an entity "actually owns the contested accounts" by reference to a conventional and commonly accepted "measure of ownership").

I would rehear these cases to hold that the status of an entity as an agency or instrumentality of a terrorist party under the TRIA must be assessed at the time of the turnover order because the statute, as in the related context of the FSIA, concerns "current political realities and relationships." *Bartlett*, 81 F.4th at 33.

\* \* \*

The panel opinion correctly accepted the recognition decision of the President that Afghanistan is a foreign state. But when evaluating whether DAB qualifies as an agency or instrumentality under either the FSIA or the TRIA, the panel opinion ignored the statutory command that sovereign immunity and the execution of judgments must reflect current political realities. DAB is an instrumentality of the Taliban rather than the State of Afghanistan. Because the panel opinion pretended otherwise, I would rehear the cases *en banc*. I dissent from the decision of the court not to do so.